## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: | Chapter 11 |
| SILVERROCK DEVELOPMENT COMPANY, LLC, *et al.*, | Case No. 24-11647 |
| Debtors. | (Joint Administration Requested) |

### DECLARATION OF ROBERT S GREEN, JR., PURSUANT TO *28 U.S.C. §1746*, IN SUPPORT OF, DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Robert S. Green, Jr., under penalty of perjury, declare and state as follows:

1.      I am the President and Chief Executive Officer ("CEO") of the Robert Green Company ("RGC"). RGC is the sole Manager of each of the Debtors, including SilverRock Development Company, LLC ("SRDC"). On August 5, 2024 (the "Petition Date"), SRDC and certain affiliates, SilverRock Luxury Residences, LLC, SilverRock Lodging, LLC, SilverRock Lifestyle Residences, LLC, SilverRock Phase I, LLC, and RGC PA 7,8,9 LLC (collectively, with SRDC, the "Debtors") filed voluntary petitions (the "Chapter 11 Petitions") under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), commencing these Chapter 11 cases (the "Cases").

2.      To minimize the adverse effects of filing the Chapter 11 Petitions while at the same time maximizing value for the benefit of creditors and stakeholders, the Debtors have filed a number of pleadings requesting various kinds of "first day" relief (collectively, the "First Day Pleadings"). I submit this Declaration in support of the Chapter 11 Petitions and the First Day Pleadings. I am familiar with the contents of the First Day Pleadings (including the exhibits and other attachments to such motions) and, to the best of my knowledge, after reasonable inquiry, believe the relief sought in each First Day Pleading: (a) is necessary to enable the Debtors to operate in Chapter 11 with minimal disruption; (b) is critical to the Debtors' efforts to preserve value and maximize recoveries during the pendency of the Cases and the Debtors' ability to successfully reorganize described below; and (c) best serves the Debtors' estates and creditors' interests. Further, it is my belief that the relief sought in the First Day Pleadings is narrowly tailored and necessary to achieve the goals of these Cases.

3.      Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my

personal knowledge; (b) information supplied to me by other members of the Debtors' management or the Debtors' professionals that I believe in good faith to be reliable; (c) my review of relevant documents; or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition and the real estate industry at large. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration. The Debtors have authorized me to submit this Declaration.

4.      I am familiar with each of the Debtors' operations, businesses, financial affairs, books and records as they pertain to any of the Debtors' records submitted in support of the First Day Pleadings. The records of the Debtors are made by employees or agents of the Debtors who have a business duty to enter the records of the Debtors accurately and at or near the time of the event which they record.

5.      Prior to the appointment of the CRO, as CEO of RGC, which is the Manager of the Debtors, I had responsibility for managing all activities of the Debtors, including acquisition and feasibility analysis, transaction structuring, finance, development management, entitlement processing, design supervision, construction management, and operator interface and coordination. I am experienced in the design, construction, and development of large-scale mix use, commercial office, and luxury hospitality projects, with a focus in hotel and resort development. For the past twenty-five years, I have spearheaded the development of several multimillion-dollar resort and hotel properties throughout the country, including Four Seasons Resort in Jackson Hole, Wyoming, the Four Seasons Hotel in Palo Alto, California, the Montage Resort and Residences Healdsburg, in Healdsburg, California, and the Pendry Hotel San Diego in San Diego, California.

6.      Prior to the Debtors' bankruptcy filings, in my capacity as CEO of the Manager, I elected to hire Douglas Wilson of the Douglas Wilson Companies as Chief Restructuring Officer ("CRO") of the Debtors, to independently manage its affairs during the pendency of these bankruptcy proceedings and guide the Debtors in achieving confirmable plans of reorganization. Mr. Wilson is extremely well qualified for this role, which is further detailed both in this Declaration and in the First Day Motion to Retain the Services of Mr. Wilson and the Douglas Wilson Companies.

7.      While the Debtors have encountered transitory obstacles to completing the Project, including the COVID-19 pandemic, high-interest rates and inflation, construction cost escalations and a Congressional

hold placed on the EB-5 financing program during the early stages of the Project, the underlying value of the Project is high, having recently been appraised at approximately $409.3 million by highly-regarded expert appraisers such as CBRE and HVS ("Hospitality Valuation Services"). The Debtors' total debt owed to secured creditors for the first phases of the Project is approximately $239.2 million, meaning there is an equity cushion exceeding $170.1 million in the Project. Additionally, the Debtor's assets include certain benefits to be provided by the City of La Quinta which significantly add to the Debtor's equity in the Project.  Under the CRO's guidance, the Debtors can use this Chapter 11 filing to protect their substantial equity cushion, forestall cumbersome litigation proceedings, preserve the time they need to obtain financing for completing the Project, and confirming a plan of reorganization.

## I.    EXECUTIVE SUMMARY AND CORPORATE STRUCTURE

8.    The Debtors' business operations center around the real estate development of a 525-acre master planned resort community in the City of La Quinta, California (the "City"). Formerly known as the "SilverRock Resort" project, the Debtors proposed, and the City agreed, to change the name of the project to "Talus" (the "Project").  To date the Debtors have acquired from the City and currently own approximately 140 acres of land in the Project.

9.    The transaction between the City and the Debtors is outlined by two agreements between the City and SRDC known as the Purchase and Sale Agreement (the "PSDA") and the Development Agreement (the "DA").

10.    The organization chart attached as Exhibit A reflects the structure of the relationships between the Debtor entities.  Each of the Debtors are Delaware LLC's and all have common and preferred equity members.  All are managed by RGC.  SRDC is owned 99% by RGC La Quinta, LLC, ("RGC LQ").  RGC LQ is 100% owned by The Green Family Trust ("Trust").  I am a trustee of Trust.

11.    Since different components of the Project (i.e. Commercial vs Residential, or Phase 1 vs future phases) are subject to different financing structures, SRDC established the other affiliated entities that comprise the group of Debtors.

12.    SilverRock Phase I, LLC ("SRPI") was established for the development of certain planning

areas associated with what is known under the PSDA as Phase 1A. (See the Project Map attached as **Exhibit B**)

13.     Within SRPI there are lodging components, including two hotels, a conference center, a golf club and a golf course. These are also referred to as commercial "operating components" and each have their own economic model, financial structure and development cycle. SilverRock Lodging, LLC ("SRL") was created to be the developer and owner of these components.

14.     Within SRPI are branded residential components which are affiliated with the hotels but are comprised of "for-sale" residential components, as opposed to hotel "operating components". Therefore, the two branded residential components of Phase 1A were created. These are SilverRock Luxury Residences, LLC ("SR Lux") and SilverRock Lifestyle Residence, LLC ("SR Life").

15.     A future phase of the Project, known under the PSDA as Phase 1B, is comprised of vacant land known as Planning Areas 7, 8 and 9, for the development of a mix of other commercial and residential uses. This part of the Project is subject to different financing mechanisms than those in Phase1A, so these properties are held in an entity known as RGC PA 789, LLC ("RGC 789").

## II.     DESCRIPTION AND HISTORY OF THE PSDA AND VISION OF THE PROJECT

16.     The City and SRDC entered into the PSDA on or about November 19, 2014.  The PSDA is a central component to Debtors' business.  The development tasks set forth in the PSDA are difficult and complex.  Debtors' experience and skillset make them uniquely suited to successfully completing those tasks.

17.     As part of the original PSDA, the City agreed to convey to SRDC, and SRDC agreed to purchase and did in fact purchase, specified "Parcels" and "Planning Areas" (or "PAs") of real property in the SilverRock Resort Area, consisting of what was referred to as the "Phase 1 Property" and "Phase 2 Property" in the Original PSDA.

18.     In addition to agreeing to purchasing and owning specified Parcels with corresponding Project Areas, SRDC agreed to construct a destination resort, residential and commercial project, and related public infrastructure improvements, consisting of "Project Components:"

        a)    The Montage Hotel, the Project Component that consists of construction and subsequent

operation of an upscale, luxury, full-service single-story hotel containing not less than one hundred twenty (120) luxury hotel rooms, that offers luxury amenities, full-service accommodations, a full-service sit-down restaurant, a first-class spa and fitness facility, and pools;

b) "Montage Branded Residential Development," the Project Component that consists of construction of approximately thirty-five (35) luxury single-family detached resort residential dwelling units;

c) A "Pendry Hotel," the Project Component that consists of construction and subsequent operation of a modern-style hotel containing not less than a sufficient number of hotel guest rooms that, when added to the number of hotel guest rooms at the Montage Hotel, will result in the Project having an aggregate of at least three hundred forty (340) total hotel guest rooms, and providing food and beverage services, a pool, a surface parking lot, and other related amenities;

d) A "Pendry Branded Residential Development," the Project Component that consists of Debtors' construction of approximately sixty (60) one and/or two-story luxury, condominium-style Resort Residential Dwelling Units that would be developed and subsequently operated in conjunction with the Pendry Hotel;

e) A "Conference and Shared Service Facility," the Project Component that consists of development and subsequent operation of a conference and shared service facility containing space designed and designated for conferences and banquets, back-of-house support services, and management function space shared by the Pendry Hotel and Montage Hotel, and a surface parking lot.

f) A "Permanent Golf Clubhouse," the Project Component that consists of development of a permanent public clubhouse to serve the Project golf course;

g) A "Promenade Mixed-Use Village," the Project Component consisting of Debtors' development of up to two hundred twenty-five thousand (225,000) salable square feet of residential space containing between one hundred ten (110) and two hundred twenty-five (225) Resort Residential Dwelling Units, together with commercial space comprising between twelve thousand

nine hundred (12,900) and forty thousand (40,000) square feet of mixed-use space comprised of permanent retail and seasonable stand-alone "pop-up" space;

h) A "Pendry Residential Village," the Project Component that consists of development and subsequent operation of approximately one hundred sixty (160) Residential Dwelling Units, an onsite amenity center consisting of a clubhouse and a reception and concierge desk

i) "Master Site Infrastructure Improvements," the Project Component consisting of the construction and installation of all of the backbone infrastructure improvements required to serve the respective Project Components, including those identified in Subparagraphs (a)-(h) above and their respective Planning Areas; and

j) A "Golf Course Realignment," the Project Component that consisted of Debtors' realignment of certain portions of the existing Golf Course (as defined in the PSDA) to facilitate the development of the Montage Hotel and Montage Branded Residential Project Components and affecting those Project Areas pursuant to the PSDA and other project approvals; Debtors have completed the Golf Course Realignment Project Component, and the City retained ownership of, and still owns, fee title to all of the real property that consists of the Golf Course (PA 1 and covering approximately 179 acres of the SilverRock Resort Area).

19.    Pursuant to the Original PSDA, the original Phase 1 Property consisted of the Montage Hotel and the Montage Branded Residential Development, and the original Phase 2 Property, consisted of the Pendry Hotel and the Pendry Branded Residential Development, among other specified Project Components.

20.    Concurrent with the Original PSDA, on or about November 19, 2014, the City and SRDC entered into Development Agreement 2014-1001 (the "Development Agreement") vesting certain development obligations with SRDC and subjecting SRDC to the City's rights and oversight for those portions of the SilverRock Resort Area to be conveyed to SRDC.

21.    The Development Agreement required SRDC to develop the Planning Areas and Project Components in accordance with the PSDA. The Development Agreement specifies that approximately 145 acres of the total SilverRock Resort Area would be conveyed to SRDC, covering Planning Areas (PAs) 2, 3,

4, 5, 6, 7, 8, 9, and portion of 10A, and corresponding parcels of property with those Planning Areas.   The recorded Development Agreement runs with the land and places all parties on constructive notice of those terms and conditions.

22.     Pursuant to the Original PSDA, the City and SRDC had the authority to amend the Original PSDA by mutual agreement of the parties. Between October 29, 2015, and November 16, 2023, the City and SRDC entered into five amendments to the PSDA. The City and SRDC entered into Amendment No. 1 to the Original PSDA ("First Amendment") dated October 29, 2015 to, among other things, update the Site Map and the various timeframes within the Original PSDA.

23.     On or about April 18, 2017, the City and SRDC entered into Amendment No. 2 to the Original PSDA ("Second Amendment") to modify from the Phase 1 Property and Phase 2 Property in the Original PSDA (and the associated phased development obligations) to the "Phase 1A Property" and the "Phase 1B Property," with corresponding "Phase 1A" and "Phase 1B," all as defined in the Second Amendment. In addition to those properties, additional phased properties were created: "Phase 1C (Golf Course) Property," "Phase 1D (Ahmanson Ranch House) Property," and "Phase 1E (Perimeter Landscaping and Trails) Property." In connection with proposed modifications by SRDC for the phasing of development of the Project Components tied to Planning Areas 2, 3, 4, 5, 6, 7, 8, 9, and portion of 10A (see above), the City processed and approved, pursuant to the California Subdivision Map Act and applicable City law, Parcel Map No. 37207, which re-subdivided the SilverRock Resort Area in the following parcels: Parcels 1-20 inclusive and Parcels A-G inclusive. With the adoption of Parcel Map No. 37207 and approval of the Second Amendment, the "Parcels" applicable to the respective "Planning Areas," for purposes of SRDC's development of the Project, were tied to the Parcels identified in Parcel Map No. 37207.

24.     As a part of the Second Amendment, the City and SRDC modified the property subject to the PSDA, as amended, to include the Phase 1A Property and Phase 1B Property, which comprised approximately 44.6 acres and 84.2 acres, respectively, and approximately 130 acres total. The Phase 1A Property consists of Parcels 1, 3, 4, 5, and 6 of Parcel Map No. 37207, and Phase 1B Property consists of Parcels 7, 8, 9, 10, 11, and 12, and Parcels D, E, F, and G of Parcel Map No. 37207. Together, the Phase 1A Property and Phase 1B

Property correspond, with some modifications to parcel boundaries and acreage, to the Project Components and acreage attached to Planning Areas 2, 3, 4, 5, 6, 7, 8, 9, and portion of 10A from the Original PSDA.

25.     By way of Grant Deed, dated May 3, 2017 and recorded on November 6, 2017 as Instrument No. 2017-0463950 in the Recorder's Office, as amended by an Amendment to Grant Deed, recorded on November 28, 2018 as Instrument No. 2018-0464670 in the Recorder's Office, the City conveyed the Phase 1A Property to SRDC (the "Phase 1A Property Grant Deed").

26.     Thereafter, SRDC assigned to SRPI and SRPI assumed from SRDC, with the consent of the City, all of Developer's right, title, and interest in the Phase 1A Property and the "Project Agreements" (which include the Development Agreement and PSDA, as amended) as they pertain to the Phase 1A Property by an Assignment and Assumption Agreement, recorded on November 28, 2018 as Instrument No. 2018-0465379 in the Recorder's Office. SRDC transferred to SRPI the Phase 1A Property by Grant Deed recorded on November 28, 2018 as Instrument No. 2018-0464673 in the Recorder's Office.

27.     On or about November 28, 2018, City and SRDC entered into Amendment No. 3 to the Original PSDA ("Third Amendment") to, among other things: (i) Set forth amended and restated modifications for the development of the Phase 1A Property and set forth the terms and conditions for the conveyance and sale of the Phase 1B Property from the City to SRDC; (ii) Modify the Master Site Infrastructure Improvements (MSII) (as defined in the Original PSDA) Phasing Plan; (iii) Modify the Schedule of Performance; (iv) Specify assignment and assumptions of interests from SRDC (and any Developer entity); and (v) Incorporate provisions allowing for the closing of the construction loan for the Phase 1A Property and Phase 1B Property. A true and correct copy of the Third Amendment and its Exhibits "A" through "D" (which exhibits relate to Parcels and PAs for the Phase 1A Property and Phase 1B Property) is attached in the COE as Exhibit 5. Pursuant to the Third Amendment, the City conveyed to SRPI the Phase 1B Property by Grant Deed, dated November 28, 2018 and recorded on November 28, 2018, as Instrument No. 2018-0464674 in the Recorder's Office (the "Phase 1B Property Grant Deed").

28.     On or about October 12, 2021, the City and SRDC entered into Amendment No. 4 to the Original PSDA ("Fourth Amendment") to, among other things: (i) Set forth terms and conditions agreed upon by the

City and SRDC for the "Revised Capitalization" (as defined therein) to cover the then-projected remaining costs, and financing of those costs, to develop the Phase 1A Property and Phase 1B Property and all Project Components thereon (excluding the Promenade Mixed-Use Village and Resort Residential Village); (ii) Modify the Master Site Infrastructure Improvements (MSII) Phasing Plan; (iii) Modify the Schedule of Performance; (iv) Specify the operation by a single hotel operator of short-term vacation rentals at the Montage Branded Residential Development and Pendry Branded Residential Development, as set forth therein; (v) Modify the rebate reduction based on transient occupancy tax ("TOT") receipts; (vi) Identify "Project Milestones" (as defined therein) of which failing to meet would result in increases to the purchase price for the "Future Resort Property Phase" if and when there is an ability for SRDC to validly exercise the option to purchase the Future Resort Property (as set forth therein); (vii) If and when a valid exercise by SRDC of the option to purchase the Future Resort Property occurs, clarify allowable uses on the Future Resort Property; and (viii) Incorporate provisions allowing for the closing of the construction loan financing for the Phase 1A Property and Phase 1B Property, as more particularly described in the Fourth Amendment.

29.    On or about November 16, 2023, the City and SRDC entered into the most recent amendment, Amendment No. 5 to the Original PSDA ("Fifth Amendment"). The Fifth Amendment was entered into to avoid a default under the Original PSDA, as amended, and to otherwise: (i) memorialize revised terms and conditions, agreed upon by the City and SRDC, for new "Recapitalization Lenders" (as defined therein) to revise and update the City-approved financing for the development of the Phase 1A Property and Phase 1B Property, which required SRDC close escrow on the updated, City-approved financing by June 30, 2024 (ii) modify the Schedule of Performance and phasing of development; (iii) memorialize SRDC's missed Project Milestones (as identified therein); and (iv) make additional clarifications pertaining to the PSDA.

### III.    HISTORY OF THE PROJECT

30.    SDRC successfully processed entitlements and permitting for Phase 1A of the Project in the years following its signing of the original PSDA. SRDC undertook site work and golf course realignment construction in 2017 and 2018.

31.    On or about March 1, 2017, Debtor SilverRock Lodging LLC entered into a Resort Management

Agreement, Technical Services Agreement, and Marketing Licensing Agreement with Montage North America, LLC to oversee housing, hotel, and resort operations for the Project. These agreements provided that Montage would earn a base management fee and incentive fee for managing all of the Project's resort properties, and that Debtors may use the Montage and Pendry names in promoting the Project. The agreements also allow Montage to earn a license fee for the sale of Montage or Pendry-branded residential units. The Resort Management Agreement was subsequently modified on or about September 29, 2022.

32.    In 2019 SRPI obtained a $212.5M construction loan for master site infrastructure and the commercial components and a $179M commitment from the same lender, Mosaic Real Estate Investors ("Mosaic"), for the construction of the branded residential components.

33.    In 2020, with the onset of COVID 19 and after providing Debtors with $36M in funding, Mosaic was no longer in a position to move forward with the Project, and discontinued funding of the constriction loan. SRDC was forced to pay off the then current balance of that original Mosaic loan with a bridge loan from Poppy Bank ("Poppy") for $40M during October 2021. Poppy's principal loan balance was subsequently paid down by SRDC to $32M.

34.    The lasting impacts on the hospitality industry and the capital markets of COVID 19 are still being felt by the Project. Compounding this challenge, over the course of the last two years or more, the cost of capital due to steep interest rate hikes, severe construction cost escalations, extremely high insurance premiums, and utility and labor cost increases in the hospitality industry have contributed significantly to the difficulty and delay in obtaining new financing for the Project.

35.    Another component of the Project's capital structure is known as EB-5 financing. EB-5 is being utilized as a Preferred Equity component of the Project's capital stack. EB-5 is a federal program administered by the United States Citizenship and Immigration Service ("USCIS") wherein foreign nationals may apply for US residency if they invest in a US-based company or project. Due to the job creation requirements of the EB-5 program, hospitality projects such as Talus are a popular target for foreign investors under the program.

36.    EB-5 capital, by its nature, takes time to raise, since each foreign investor only contributes $800k. The Project seeks to ultimately raise $108M, which requires the subscription of 135 individual investors

around the world.  The EB-5 capital is being raised by a group known as First Pathway Partners ("FPP").  FPP has a stellar reputation and has never had an unsuccessful EB-5 offering in its entire history.  FPP set up two entities it wholly owns, SilverRock Resort Investment, LLC and SilverRock Resort Investment M LLC to facilitate investment of its EB-5 capital into the Project.   SilverRock RGC Preferred, LLC an entity owned by RGC Financial, which is owned by The Robert Green Company (*See* **Exhibit A** hereto) borrows the EB-5 funds raised by FPP from SilverRock Resort Investment, LLC and SilverRock Resort Investment M LLC and then invests, as a preferred equity holder, in SRPI.   Thus far, FPP has invested $14.6M in EB-5 funding with an additional approximately $4.8M in subscriptions in its pipeline for contribution to the Project.

37.     As is typical in the industry, the Project brought in domestic "bridge" preferred equity investors to fund the construction of the Project, with the plan to "take-out" the bridge investors with the eventual EB-5 capital raise.  These investors are contributing their capital as Preferred Equity Bridge funds, which have a stated term and fixed rate of return, which is offered by the project at a higher interest than the eventual low interest associated with the EB-5 capital.  Once the bridge investors and, following them, the EB-5 investors, are redeemed, they have no ongoing interest in the project.  So, the preferred equity acts somewhat like debt in that sense.

38.     Unfortunately, the US Congress placed a hold on the EB-5 program during the early stages of the Project's EB-5 capital raise. This hold was ultimately removed, and the program has been revised and reinstated, and the Project has now begun to successfully raise those funds from foreign investors.

39.     A negative by-product of Congress's delay was the inability of the Project to redeem one of its first domestic bridge preferred equity investors early in the development cycle. That investor, Cypress Point Holdings, LLC ("Cypress"), filed a lawsuit to recover its capital ahead of the Project's obligation to do so. But the damage to the momentum of the Project and its ability to timely close replacement construction loans for both the residential and commercial components of the Project were devastating and exceedingly costly. Cypress later set a foreclosure sale date to auction off the Project property.  Prior to this bankruptcy filing, the foreclosure sale was set for August 6, 2024.  Poppy Bank, who held a first position deed of trust on the Debtors'

real property, also noticed their foreclosure sale.[1]

40.    Moreover, Cypress not only demanded that its position be converted to a secured second trust deed on the commercial components of the Project and a stipulated judgment against certain Debtor-related parties, but it also demanded excessive interest rates, fees and penalties, which the Project still struggles with to this day.

41.    In May of 2024 the Debtors identified a potential investor, an individual named Chris George, of CMG Capital ("CMG"), who purportedly had the desire to assist the Debtors by infusing capital into the Project, covering all of the Debtors obligations to third parties, and making all of the Debtors' investors and secured and unsecured creditors whole, in exchange for obtaining the controlling interest in the Project.

42.    On May 24, 2024, Debtors, City, CMG, and certain secured creditors of the Debtors entered into a memorandum of understanding ("MOU") providing the Debtors had until June 30, 2024 to close financing that would pay off Debtors' creditors and that subsequently, CMG would have until July 31, 2024 to cure any defaults that Debtors had not cured, in which case CMG would acquire a controlling interest in the Project.

43.    Unfortunately, CMG reneged on its obligations to pay Debtors' unsecured creditors in full and to make the investors of Debtors whole, failing to cure the various defaults by the July 31 deadline. The City blamed Debtors for CMG's failure to cure, filing a lawsuit against Debtors and its management on or about July 24, 2024 alleging breaches of the MOU and PSDA.  In an August 1, 2024 letter to Debtors, the City purported SRDC had lost its development rights under the PSDA but made no mention of terminating the PSDA or exercising any option to acquire the Project Plans or Project property.

44.    These hurdles notwithstanding, the Project has been provided with a constriction loan offer from a nationally recognized lender Oppenheimer and Company, Inc. totaling $336M, subject to the project closing on additional equity fundings of approximately $100m.  In addition, the Project has an additional $108M commitment from FPP with foreign investors, eager to re-start the funding of their money into the Project at extremely competitive rates – which will be used to redeem our bridge preferred equity members.  This,

---

[1] All real property of the Debtors are owned by SRDC or RGC PA 7,8,9, LLC.

combined with an improving outlook in the capital markets, with interest rates poised to begin dropping and lenders acting more interested in providing capital to development projects, Debtors' rights under the PSDA, and Debtors' ongoing relationship with Montage have Debtors poised to make a recovery and successfully reorganize in Chapter 11 bankruptcy.

### IV.    CAPITAL AND CASH MANAGEMENT STRUCTURE OF DEBTORS

45.    The total capital contributed to the project to date, to include all secured and unsecured obligations as well as equity, is approximately $270.5M.  Of that, $239.2M represents currently secured obligations.  The "as-is" independent value of the real estate and improvements currently owned by the Debtors in Phases 1A and 1B (and not including the value of the real estate the Debtors have the exclusive option to purchase from the City of La Quinta in Phase 2), as indicated by CBRE and HVS ("Hospitality Valuation Services") appraisals, highly regarded experts in the hospitality and hotel spaces, is approximately  $409.3M. This includes an appraised value of $87.2M for the Montage Hotel, $38.6M for the Pendry Hotel, $29.7M for the Conference and Shared Services Building, $16.2M for the Golf Clubhouse, $61.5M for Planning Areas 7,8, and 9, $98.1M for the Montage Residences, $23.5M for the Pendry Residences, and $54.5M for the Pendry Bungalows. The appraisal amount does not include the 190 acres SRDC can acquire in Phase 2 of the PSDA, for $4.5M.

46.    The capital contributed to the Projects breaks down as follows:

**Secured Obligations**

- Sr loan on commercial and part of residential property:          $33.3m

- Second trust deed on commercial property:          $39.5m

- First trust deed on Montage Residential property          $37.1m

- First trust deed on PA 7, 8 & 9          $12.5m

- Second trust deed on PA 7 & 8          $15.0m

- Other subordinated secured debt on commercial/residential          $82.3m

- Contractor settlement agreements:          $19.5m

- Subtotal          $239.2m

- Accounts payable: $18.0m

- Common equity: <u>$13.3m</u>

  o **TOTAL:** **$270.5m**

The "as-is" property value, of the projects land and improvements, breaks down as follows:

- Montage & Pendry hotels, conference and shared services building and golf clubhouse ("commercial properties"): $171.7m

- Branded residential: $176.1m

- Planning areas (PA) 7, 8 & 9: <u>$ 61.5m</u>

  o **TOTAL:** **$409.3m**

47. Details on the Debtors' secured debt structure is as follows:

a) To pay off $36M owed on a prior loan to Mosaic, Poppy Bank provided to SRDC $40M at a rate of 5% per annum on terms of a loan maturing November 1, 2024. The estimated balance remaining on the loan is $33M. To secure this loan, Poppy holds a first position deed of trust on SRDC's commercial property, 16 Montage Residential lots and the entire Pendry Residential lot.

b) Cypress, a preferred equity investor in the Project whose interest was later converted into a secured debt, claims it has a balance due of $39,559,190,65, accruing interest at 24% per annum. The Cypress Promissory Note matured on October 31, 2023 and is secured with a second position deed of trust on SRDC's commercial property.

c) An estimated balance of $37,100,000 remains outstanding pursuant to a secured loan agreement between SilverRock Luxury Residences LLC and Construction Loan Services II (Builders Capital). The loan accrues interest at a variable rate, which is currently 14.5% per annum. The notes executed pursuant to the loan have the same interest rate and mature on May 15, 2024 and November 11, 2024, respectively. The notes are secured by a first deed of trust on 13 Montage Residence lots (owned by SRDC) and a first position deed of trust in SR Luxury's leasehold interest in 16 Montage Residence lots.

d)      An estimated balance of $12,500,000 remains outstanding pursuant to a secured loan agreement between RGC 789 and RAF Pacifica (Keillor).  The loan accrues interest at a variable rate, currently at 13.125% per annum. The loan matures on April 10, 2025.  The loan is secured by a first position deed of trust on PA 7,8, and 9, previously owned by SRDC but now owned by RGC PA 789

e)      An estimated balance of $14,600,000 remains outstanding pursuant to a loan made by SilverRock Resort Investment, LLC, an FPP entity funded with EB5 capital, to SilverRock RGC Preferred, LLC.   This loan accrues at a fixed rate of 5.5% per annum and does not have a maturity date. The loan is secured by a second position deed of trust in PA 7 and 8.

f)      A number of preferred equity holders in Debtors and Debtors' unsecured creditors were converted into secured creditors of SRDC and RGC PA 789.  The amount owed to these secured creditors totals approximately $82,276,900.  They are:

      i)      Axia Talus, a creditor of SRDC for the estimated amount of $20,700,000, secured by a third-position deed of trust in SRDC's commercial property.

      ii)      George Heuser, a creditor of RGC PA 789 for the estimated amount of $4,548,811, secured by a third-position deed of trust in PA 7, 8, and 9.

      iii)      SVR Capital Trust (BJ Delzer), a creditor of RGC PA 789 for the estimated amount of $606,272, secured by a third-position deed of trust in PA 7,8, and 9.

      iv)      Jon and Linda Kurtin, a creditor of RGC PA 789 for the estimated amount of $1,494,594, secured by a third-position deed of trust in PA 7,8, and 9.

      v)      Ken Green Family Trust, a creditor of RGC PA 789 for the estimated amount of $223,931, secured by a third-position deed of trust in PA 7,8, and 9.

      vi)      Larry Duclos, a creditor of RGC PA 789 for the estimated amount of $373,218, secured by a third-position deed of trust in PA 7,8, and 9.

      vii)      Bryan Holker, a creditor of RGC PA 789 for the estimated amount of $294,715, secured by a third-position deed of trust in PA 7,8, and 9.

viii)    Diane Cimarusti, a creditor of RGC PA 789 for the estimated amount of $294,715, secured by a third-position deed of trust in PA 7,8, and 9.

ix)    Claire Fruhwirth 2014 Trust, a creditor of RGC PA 789 for the estimated amount of $293,530 secured by a third-position deed of trust in PA 7,8, and 9.

x)    Jason Parr, a creditor of RGC PA 789 for the estimated amount of $292,515, secured by a third-position deed of trust in PA 7,8, and 9.

xi)    Jon Fredricks, a creditor of RGC PA 789 for the estimated amount of $364,162, secured by a third-position deed of trust in PA 7,8, and 9.

xii)    David Mack, a creditor of RGC PA 789 for the estimated amount of $364,162, secured by a third-position deed of trust in PA 7,8, and 9.

xiii)    Kevin and Lindy Welk, a creditor of RGC PA 789 for the estimated amount of $362,683 secured by a third-position deed of trust in PA 7,8, and 9.

xiv)    Larry Welk, a creditor of RGC PA 789 for the estimated amount of $362,383, secured by a third-position deed of trust in PA 7,8, and 9.

xv)    Eric Leitstein, a creditor of RGC PA 789 for the estimated amount of $2,935,352, secured by a third-position deed of trust in PA 7,8, and 9.

xvi)    Susan Hoehn, a creditor of RGC PA 789 for the estimated amount of $1,468,378 secured by a third-position deed of trust in PA 7,8, and 9.

xvii)    Ritch Goetz, a creditor of RGC PA 789 for the estimated amount of $8,866,321 secured by a third-position deed of trust in PA 7,8, and 9.

xviii)    Parekh Family Trust (Sumeet), a creditor of SRDC and SR Luxury for the estimated amount of $1,446,086, secured by a second-position deed of trust in PA 3.

xix)    Jeff McCoy, a creditor of SDRC and SR Luxury for the estimated amount of $7,015,701, secured by a second-position deed of trust in PA 3.

xx)    Naveen Yalamanchi, a creditor of SRDC and SR Luxury for the estimated amount of $749,559, secured by a second-position deed of trust in PA 3.

xxi)  George Heuser, a creditor of SRDC and SR Luxury for the estimated amount of $7,169,256 secured by a second-position deed of trust in PA 3.

xxii)  Eric Beranek, a creditor of SRDC and SR Luxury for the estimated amount of $2,473,066, secured by a second-position deed of trust in PA 3.

xxiii)  Robert S. Green Jr., a creditor of SRDC and SR Luxury for the estimated amount of $2,109,250, secured by a second-position deed of trust in PA 3.

xxiv)  Young Holdings, a creditor of SRDC and SR Lifestyle for the estimated amount of $7,651,940 secured by a second-position deed of trust in PA 6.

xxv)  Dan Kloiber, a creditor of SRDC SR Lifestyle for the estimated amount of $6,000,000 secured by a second-position deed of trust in PA 6.

xxvi)  The Traub Family Trust, a creditor of RGC 7,89 for the estimated amount of $3,816,000 secured by a second-position deed of trust in PA 9.

g)       RD Olson Construction, Inc. ("Olson"), who holds a mechanics lien in the estimated amount of $14,868,089 originating from construction work performed on behalf of SR Lodging.  The lien is secured by SRDC's commercial property, to which Olson claims (and Poppy disputes) it holds a first-position deed of trust.

h)       Granite Construction Company ("Granite") who holds a mechanics lien in the estimated amount of $4,500,000 originating from construction work performed on behalf of SRPI.

i)       SRPI has a total of $17,906,935 in unpaid prepetition payables, including $1,309,880.10 allegedly owed to the City of La Quinta and RGC 789 has a total of $96,915 in unpaid prepetition payables.

48.     Finally, SRPI has five common equity members, in addition to SRDC.  Robert Green owns common equity valued at approximately $4M, Ed Himmelberg owns common equity valued at approximately $8M, Richard Goetz owns common equity valued at approximately $1M, Lance Moore owns common equity valued at approximately $291,250, and Arush Patel owns common equity valued at approximately $125,000.

49.     Historically, all capital brought into the Project was funded into SRPI which would then pay bills on behalf of all subsidiary/related company entities.  When funds were spent for project costs associated

with a related entity, the books of each Debtor-entity would reflect an intercompany accounting balance.

50.    The Debtors do not have any employees.  Individuals that work directly on the Project, either on-site or off-site, either part time or full time on the Project, are employed by the Manager, RGC, which has a "Development Management Services Agreement" with each project entity, providing a variety of development management services, including providing staffing for the project, administrative services, accounting services, project budget coordination, loan administration and coordination.

51.    Cash requirements during the Chapter 11 phase will be met via a Debtor in Possession (DIP) loan.  It is estimated the debtor will require approximately $5.0m during the initial 6-months of bankruptcy proceedings.

52.    The Debtors each maintain a separate checking account at Bank of America. Fidelity National Title administers multiple escrow accounts held in the names of potential homebuyers of Pendry and Montage residential units.   Fidelity may deliver the purchase amounts to Debtors when Debtors transfer title of the property to the homebuyers, and Debtors will need to assume the sale contracts before transferring title to the property.

## V.    PATH FORWARD TO SUCCESSFUL REORGANIZATION

53.    Despite the transitory obstacles faced by Debtors in the years leading up to this bankruptcy filing, Debtors' outlook is positive. Credible appraisals of the Project confirm Debtors' have an approximately $170.1 million equity cushion in the project.  This makes obtaining DIP financing to pursue completion of development of the Project more feasible, and it provides the basis for confirming a Chapter 11 plan of reorganization. The prospect of securing the $336 Oppenheimer loan after raising adequate equity financing provides further reason for optimism, as do the rights Debtors retain pursuant to the PSDA and Montage agreements.  The Chapter 11 process will give Debtors the time they need, free of disruptive litigation, to finance the continuation and completion of the Project and ultimately confirm a Chapter 11 Plan for the benefit of the creditors to the bankruptcy estates.

54.    Debtors retained the services of Douglas Wilson, of the Douglas Wilson Companies, to act as the Debtors' Chief Restructuring Officer and independently manage the Debtors' business as they move toward

successful reorganization. Mr. Wilson has over 40 years of real estate development experience, providing workout, problem resolution, and real estate management services. He has developed award-winning urban projects such as Symphony Towers, which houses the San Diego Symphony, and a 240-unit luxury condominium located a block from San Diego's Petco Park. Mr. Wilson will spearhead Debtors' DIP financing efforts and negotiations with creditors and parties-in-interest necessary to achieve successful reorganizations.

## VI.    FIRST DAY PLEADINGS

55.    Concurrently with the filing of these Cases, the Debtors filed the First Day Pleadings seeking relief related to the administration of these Cases. Below is a list of the First Day Pleadings:

a.    Motion for Entry of An Order (I) Directing Joint Administration of Chapter 11 Cases; and (II) Granting Related Relief (the "Joint Administration Motion");

b.    Motion for Interim and Final Orders Authorizing: (I) Maintenance Of Existing Bank Accounts (the "Bank Accounts Motion Motion");

c.    Motion for Entry of an Order (I) Approving (A) the Engagement of Douglas Wilson Companies and (B) the Appointment of Douglas Wilson as Chief Restructuring Officer Effective as of July 29, 2024, and (II) Granting Related Relief (the "CRO Motion"), and;

d.    Motion for Entry of an Order Extending Time for Filing Schedules of Assets and Liabilities and Statement of Financial Affairs (the "Extension Motion").

56.    The Debtors have narrowly tailored the First Day Pleadings to meet their goals of: (a) continuing their operations in Chapter 11 with as little disruption and loss of productivity as possible until such time Debtors are able to successfully reorganize and exit the bankruptcy; (b) maintaining the confidence and support of their key constituencies during the Cases; and (c) establishing procedures for the efficient administration of these Cases.

57.    I have reviewed each of the First Day Pleadings (including the exhibits thereto) and I believe the facts stated therein to be true and correct to the best of my knowledge with appropriate reliance on corporate officers and advisors.  I incorporate by reference the factual statements set forth in each of the First Day Pleadings as though set forth herein.

58.     The success of these Cases depends upon the Debtors' ability to pursue continued development of the Project to spearhead confirmation of a Chapter 11 Plan of Reorganization.  Consequently, it is my belief that the relief sought in each of the First Day Pleadings is necessary to the successful implementation of the Debtors' efforts to maximize the recovery of its creditors and necessary to avoid immediate and irreparable harm to the Debtors' estates and creditors.

59.     Accordingly, I respectfully request that all of the relief requested in the First Day Pleadings, and such other and further relief as may be just and proper, be granted based upon the following:[2]

## VII.    JOINT ADMINISTRATION MOTION

60.     Through the Joint Administration Motion, the Debtors seek entry of an order: (a) directing procedural consolidation and joint administration of the Cases; and (b) granting related relief.

61.     As set forth herein and on the corporate ownership chart attached hereto as Exhibit A, the Debtors are related entities. SilverRock Luxury Residences, LLC, SilverRock Lodging, LLC, and SilverRock Lifestyle Residences, LLC are wholly owned subsidiaries of SilverRock Phase I, LLC, which is owned, in part, by SilverRock Development Company LLC.  RGC PA 789, LLC is a wholly owned subsidiary of non-debtor entity RGC La Quinta, LLC, which owns 99% of SilverRock Development, LLC.  All of the Debtors contribute to developing the Project, and the real property on which the Project takes place is owned by SRDC and RGC PA 789.

62.     In light of this close relationship, I believe that joint administration will avoid otherwise unnecessary and expensive duplication of effort and papers caused by preparing and serving the same creditors with multiple sets of differently-captioned but otherwise identical papers.  Joint administration of the Cases will enable the Debtors to avoid the substantial cost of preparation, filing and serving duplicative motions in each proceeding, and the consequent burden on the estates and the Court.

63.     By jointly administering the Debtors' estates, creditors will receive appropriate notice of matters involving each of the Debtors, thereby ensuring that creditors are fully informed of matters potentially affecting their claims.

---

[2] All capitalized terms not otherwise defined in this section shall have the meaning set forth in the applicable First Day Pleading.

64.     Given the integrated nature of the Debtors' operations, I believe that joint administration of these Cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Joint administration will substantially reduce the costs of administering the Debtors' Cases and will serve to eliminate the inefficiency created by maintaining separate dockets.  To a great extent, the Debtors anticipate that numerous similar, if not identical, applications, motions and orders will be involved in the Debtors' Cases.  Joint administration will avoid wasting resources that would result through duplication of effort if the Cases involving the Debtors were to proceed separately.

65.     I believe that the Debtors' creditors stand to benefit from the increased efficiency of administration anticipated through joint administration because they will not be required to review and separately respond to substantially similar motions, disclosure statements, and other pleadings that would otherwise be filed in separate cases.  On the other hand, joint administration will permit the Debtors to respond more efficiently to the demands of their creditors, and will reduce attorneys' fees, copying costs, mailing costs and costs of administering these Cases.

66.     Moreover, through joint administration of the Debtors' Cases, this Court and the Bankruptcy Court Clerk's office will be relieved of the burden of having to file and maintain dockets and case files for each of the related cases.  Furthermore, I believe that joint administration will allow the Office of the United States Trustee for the District of Delaware and all parties in interest to monitor these Cases with greater ease and efficiency.

67.     Accordingly, I believe that joint administration of these Cases is in the best interests of the estates, their creditors, and all other parties in interest.

68.     In sum, I believe that such relief requested by the Joint Administration Motion is not only appropriate under the circumstances, but necessary for the efficient and orderly administration of these Cases.

## VIII.    <u>BANK ACCOUNTS MOTION</u>

69.     Through the Bank Accounts Motion, the Debtors seek an order authorizing them to maintain and utilize their existing bank accounts (collectively, the "<u>Bank Accounts</u>") and to continue to use their existing business forms without reference to "Debtor in Possession."

70.     Given the size of the Cases and the complexity and intricacies of the Debtors' requiring the Debtors to close the Bank Accounts and open new ones will disrupt the Debtors' operations because (a) depositors will not respond quickly to the change and will likely continue to send deposits to the original deposit accounts, and (b) any changes to the disbursement accounts will slow down the payment to crucial vendors. Closing the Bank Accounts will also increase the work of the Debtors' accounting personnel, who are already dealing with the many and varied issues related to these Cases. Furthermore, closing the Bank Accounts and opening new ones would needlessly cost the Debtors time and money and would result in no discernable benefit to the Debtors' bankruptcy estates.

71.     I believe that the uninterrupted use of the Bank Accounts and the Debtors' Existing Forms are essential to the Debtors' ability to seamlessly operate under chapter 11. I believe it would be an unwise expenditure of estate resources to require the Debtors to obtain all new checks simply to have "Debtor in Possession" printed on the check when all parties with whom the Debtors will be transacting business will know that the Cases have been filed as a result of the publicity of the Cases.

72.     Each of the Debtors maintains a single checking account at Bank of America.  Collectively, these checking accounts comprise the Bank Accounts. None of the Bank Accounts auto-debit payments, and neither I nor Debtors' accounting personnel are aware of any Bank Accounts written prepetition that were not cashed as of the Petition Date.  To the extent Debtors discover such prepetition checks in the future, the Debtors will instruct Bank of America not to honor them (unless otherwise approved by the Court).

## IX.    CRO MOTION

73.     Debtors entered into a Consulting Agreement with Douglas Wilson Companies ("DWC") prior to the Petition Date to engage DWC's CEO, Douglas Wilson, as Debtors' independent Chief Restructuring Officer ("CRO") and other DWC personnel to support Mr. Wilson as CRO. The Consulting Agreement enumerates services DWC will provide and the compensation it will receive. Mr. Wilson is exceptionally qualified to act as CRO, independently managing the Debtors' affairs during the pendency of these bankruptcy cases, spearheading the Debtors' efforts to secure DIP financing, leading the Debtor's pursuit to complete development of the Project, and maximizing the chance that these Chapter 11 Cases conclude with successful

reorganization, to the benefit of the bankruptcy estates and all their constituencies.

74.     As CEO of the Debtors' Manager, pursuant to the authority vested in me under the Debtors' LLC Operating Agreements, I authorized Debtors to engage DWC and Mr. Wilson in conjunction with the filing of the Chapter 11 petitions.

75.     I believe the Court should grant the CRO Motion approving the Consulting Agreement to ensure DWC is appropriately retained and compensated to perform the critical services of the Debtors' independent CRO, thereby giving the Debtors the best chance possible to successfully reorganize for the benefit of all creditors to the estates.

## X.     EXTENSION MOTION

76.     Debtors filed their bare-bones Chapter 11 petitions on August 5, 2024, and the remaining parts of its Schedule of Assets and Liabilities and Statement of Financial Affairs (the "Schedules") are currently due August 19, 2024 (the "Current Deadline").

77.     Given the complex nature of Debtors' business, accurately completing the Schedules by the Current Deadline will prove difficult. Debtors will likely have to amend the Schedules to fill in missing information and correct deficiencies, placing additional administrative burden on the Debtors, the Office of the United States Trustee, and the Court staff.

78.     To ensure Debtors have the time they need to thoroughly and accurately complete the Schedules and prepare for their 341(a) Meeting of Creditors, the Extension Motion asks the Court to continue the Current Deadline by 30 days, to September 18, 2024 (the "Extended Deadline").  This short continuance will neither prejudice creditors nor other parties-in-interest to the Chapter 11 Cases, and it will facilitate submission and processing of the Schedules in the most efficient manner possible.

[*This Space Intentionally Left Blank*]

## XI.    <u>CONCLUSION</u>

79.    For all of the reasons set forth herein and in the First Day Pleadings, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated:  August 12, 2024

_/s/ Robert S. Green Jr._
Robert S. Green, Jr.
Chief Executive Officer
The Robert Green Company
Manager of the Debtors
