## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SilverRock Development Company, LLC, *et al.*,[1] | Case No. 24-11647 (MFW) |
| Debtors. | (Jointly Administered) |
| | **Proposed Hearing Date: Oct. 15, 2024 at 11:30 a.m. (ET)[2]** |
| | **Proposed Obj. Deadline: Oct. 10, 2024 at 4:00 p.m. (ET)** |

## UNITED STATES TRUSTEE'S MOTION TO
## (I) DISMISS CHAPTER 11 CASES FOR CAUSE PURSUANT TO
## 11 U.S.C. § 1112(b), OR, ALTERNATIVELY, (II) APPOINT A CHAPTER 11 TRUSTEE

Andrew R. Vara, the United States Trustee for Region Three (the "U.S. Trustee"),

through his undersigned counsel, hereby moves (this "Motion") to (i) dismiss the above-

captioned chapter 11 cases (the "Chapter 11 Cases") for cause pursuant to 11 U.S.C. § 1112(b),

or, alternatively, (ii) appoint a chapter 11 trustee, and in support of this Motion respectfully

states:

### PRELIMINARY STATEMENT

The Court should dismiss the Chapter 11 Cases for cause pursuant to 11 U.S.C. § 1112(b)

for the following separate and independent reasons:

(a)  **The *Primestone* Factors overwhelmingly support a finding that the Chapter 11 Cases were filed in bad faith.** Two of the debtors appear to be single asset real estate debtors, while the remaining four debtors are defunct

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: SilverRock Development Company, LLC (5730), RGC PA 789, LLC (5996), SilverRock Lifestyle Residences, LLC (0721), SilverRock Lodging, LLC, (4493), SilverRock Luxury Residences, LLC (6598) and SilverRock Phase 1, LLC (2247). The location of the Debtors' principal place of business and the Debtors' mailing address is 343 Fourth Avenue, San Diego, CA 92101.

[2] Concurrently herewith, the U.S. Trustee will be filing his motion to shorten and limit notice of this Motion.

holding companies. These cases were filed on the eve of two foreclosure sales for the purpose of staying those sales as well as state court litigation alleging widespread fraud. The debtors have no income and have not had any income since before 2022. They have no employees, no operations, and no reasonable likelihood of reorganizing. Most significantly, the debtors' management appears to have engaged in substantial misconduct prior to the petition date, including saddling the debtors with over $80 million in new secured debt (including insider debt), one month before the petition date, in exchange for no new consideration. Put simply, the Court would be well-supported in finding that these cases were filed in bad faith.

**(b)**     **The debtors filed the chapter 11 cases without a valid reorganizational purpose.** As an additional basis for finding bad faith, the debtors' filings and testimony reveal that they filed these cases to obtain the benefit of the automatic stay as a litigation advantage. The debtors have no plan for these cases. They are not considering monetizing their only assets with any value. And their goal in the cases is to re-trade a prepetition take-out financing deal that fell apart.

**(c)**     **The debtors are suffering a substantial and continuing diminution of the estate without the likelihood of rehabilitation.** The debtors have no money and have not generated revenue in years. Their own disclosures in the Chapter 11 Cases reveal that they have less than $5,000 in cash on hand. Against that backdrop, the debtors are incurring administrative costs including fees payable to their bankruptcy professionals. The debtors were unable to obtain take-out financing prior to the petition date and will not be able to do so in these Chapter 11 Cases. Moreover, there may not even be a business to rehabilitate; multiple creditors in this case have taken the position that the debtors no longer have any development rights. Allowing these cases to remain in chapter 11 will be a waste of the Court's and the parties' resources.

Should the Court find cause, but determine that dismissal is not in the best interests of creditors or the estate, the Court should appoint a chapter 11 trustee pursuant to 11 U.S.C. § 1104(a). The creditors in these cases have already voiced their displeasure with (and distrust of) the debtors' management. In fact, creditors attempted to impose restrictions in the order appointing the debtors' interim chief restructuring officer that would have been tantamount to the appointment of a chapter 11 trustee. If these cases remain in chapter 11, creditors are entitled to a

truly independent administrator of these estates who will, among other things, investigate

potential prepetition claims arising out of potential mismanagement and abusive practices.

Finally, the U.S. Trustee respectfully requests that the Court hold the debtors' pending

request for postpetition financing [D.I. 125] in abeyance pending the resolution of this Motion.

Given the current posture of these cases, the lack of a "melting ice cube," and the potential case

dispositive relief requested herein, the U.S. Trustee respectfully submits that adjourning the

request for postpetition financing is necessary and non-prejudicial.

## JURISDICTION AND STANDING

1.      This Court has jurisdiction to hear and determine this Motion pursuant to: (i) 28

U.S.C. § 1334; (ii) applicable order(s) of the United States District Court of the District of

Delaware issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C. § 157(b)(2).

2.      Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the

administration of chapter 11 cases filed in this judicial district. The duty is part of the U.S.

Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and

interpreted by the Courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d

498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

3.      The U.S. Trustee has standing to be heard on this Motion pursuant to 11 U.S.C. §

307. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33

F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11

U.S.C. § 307, which goes beyond mere pecuniary interest).

**BACKGROUND**

A.      **The Chapter 11 Cases**

4.      On August 5, 2024 (the "<u>Petition Date</u>"), the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") each filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the District of Delaware (this "<u>Court</u>"), thereby commencing the Chapter 11 Cases.

5.      The Debtors continue to manage and operate their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

6.      On August 28, 2024, the U.S. Trustee filed a notice that he had not appointed an unsecured creditors committee in the Chapter 11 Cases due to insufficient response. D.I. 54.

7.      As of the date hereof, no trustee or examiner has been requested in the Chapter 11 Cases.

8.      There has been relatively little activity in the Chapter 11 Cases. The only "first day" motions the Debtors filed were for joint administration [D.I. 7] and cash management relief [D.I.9]. The Debtors attempted and failed to obtain priming DIP financing. D.I. 77. They have no other source of cash on hand, and no income from operations to fund the Chapter 11 Cases. Although the Court authorized the retention of the Debtors' chief restructuring officer ("<u>CRO</u>"), the Court did so on an interim basis for fourteen days to see whether there is a path forward in chapter 11 for these Debtors. D.I. 109.

9.      The Debtors have filed a new motion for junior DIP financing [D.I. 125], but as discussed herein, the Court should adjourn the hearing on that relief until after it has ruled on this Motion.

4

B.      **The Talus Project**

10.     The Debtors were formed in connection with the development of a master planned

resort community now known as the Talus Project (formerly SilverRock Resort) (the "Project")

located in the City of La Quinta, California (the "City"). *Declaration of Robert S Green, Jr.,*

*Pursuant to* 28 U.S.C. §1746*, in Support of, Debtors' Chapter 11 Petitions and First Day*

*Pleadings* [D.I. 13] (the "Green Declaration"), ¶ 8. As of the Petition Date, the Debtors assert

that they owned approximately 140 acres of land in the Project, as described in more detail

herein. *Id.*

11.     Two agreements between Debtor Silver Rock Development Company, LLC ("SR

Development") and the City govern the development of the Project:

(a)     that certain Purchase, Sale and Development Agreement dated as of
        November 19, 2014 (as may have been amended from time to time, the
        "PSDA"); and

(b)     that certain Development Agreement 2014-1001 dated as of November 19,
        2014 (the "Development Agreement," and together with the PSDA, the
        "Project Agreements").

12.     Pursuant to the PSDA, SR Development purchased specified "Parcels" and

"Planning Areas" on which it agreed to construct and complete certain "Project Components."

*Id.* at ¶ 17.

13.     The Project Components include, among others: (a) the Montage Hotel; (b)

single-family Montage-branded detached resort residential dwelling units (the "Montage

Residences"); (c) the Pendry Hotel; (d) condominium-style Pendry-branded resort residential

dwelling units (the "Pendry Residences"); (e) a public clubhouse serving an adjacent golf course

currently owned by the City (the "Clubhouse"); (f) a conference and shared service facility to be

used by the Montage Hotel and Pendry Hotel (the "Conference Site"); (g) a mixed-use village

5

including both residential and commercial space; and (h) Pendry-branded residential dwelling units with an onsite amenity center. *Id.* at ¶ 18.

14.     Additionally, Debtor RGC PA 789, LLC ("RGC 789") owns certain vacant real property designated Planning Areas 7, 8 and 9 (collectively, the "RGC 789 Parcels"). *Id.* at ¶ 15. The PSDA contemplates that the Debtors would develop the RGC 789 Parcels in a subsequent phase of the Project. *Id.*

15.     Pursuant to the Development Agreement, SR Development was required to develop the Planning Areas and Project Components in accordance with the terms of the PSDA. *Id.* at ¶ 21.

16.     Notwithstanding that SR Development and the City executed the Project Agreements nearly ten years ago, the Project is nowhere near complete. The Debtors' interim CRO testified that construction on the Project stopped twenty-two months ago. *See* **Exhibit A**, Transcript of September 3, 2024 Hearing ("Tr."), 82:20 – 83:9. The interim CRO further testified that no construction has been completed on the Pendry Hotel, and that to the best of his knowledge the Montage Hotel was approximately twenty-five to thirty percent complete. *Id.*

C.     **The Debtors**

   i.     **SR Development and RGC 789 Appear to be SARE Debtors.**

17.     On September 18, 2024, each Debtor filed its schedules of assets and liabilities ("Schedules") and its statement of financial affairs ("SOFA"). D.I. 114, 115, 116, 117, 118 and 119.

18.     The Schedules and SOFAs appear to confirm that SR Development and RGC 789 are single asset real estate ("SARE") debtors.

19.     For example, SR Development's Schedules and SOFA disclose that its only

material assets are the Project parcels. D.I. 114, Schedule A/B, Part 9, Item 55. SR Development

asserts that the value of these real estate assets is approximately $303.8 million. *Id.* Its only other

assets are its interests in certain model hotel room furniture and less than $1,000 in cash. *Id.* at

Part 1, Item 3 and Part 7, Item 39. These personal property assets appear to be incidental to SR

Development's interests in the Project parcels, and collectively constitute approximately

0.0001% of the asserted combined value of all its assets.

20.     Likewise, RGC 789's Schedules and SOFA disclose that its only material assets

are the RGC 789 Parcels. D.I. 119, Schedule A/B, Part 9, Item 55. RGC 789 asserts that the

value of those parcels is approximately $61.5 million. *Id.* RGC 789's only other asset as of the

Petition Date was approximately $156.10 in cash. *Id.* at Part 1, Item 3.

21.     Notwithstanding the foregoing facts, neither SR Development nor RGC 789 self-

designated as a SARE debtor in their respective chapter 11 petitions.

**ii.     The Remaining Debtors are Vacant Holding Companies.**

22.     The remaining four Debtors' Schedules and SOFAs appear to confirm that such

Debtors are vacant holding companies with no material assets, operations, income, revenue, or

even – in some cases – debt.

23.     For example, Debtor SilverRock Lifestyle Residences, LLC ("SR Lifestyle")

discloses no real estate assets, no secured or unsecured debt, and personal property worth only

$500,100. D.I. 115, Summary of Assets and Liabilities for Non-Individuals ("SOAL"). Further,

SR Lifestyle's Schedule A/B reflects that $500,000 of its scheduled "personal property" actually

constitutes "funds held in escrow for the benefit of Pendry Residence home buyers," and, thus,

"is not property of SilverRock Lifestyle Residences, LLC[.]" *Id.* at Schedule A/B, Part 1, Item 3 and n.[A]. Stated differently, SR Lifestyle has $100 in assets and no liabilities.

24.     Similarly, Debtor SilverRock Lodging, LLC ("SR Lodging") discloses no real estate assets, no secured or unsecured debt, and personal property worth only $1,723.76. D.I. 116, SOAL. SR Lodging's only asset is cash in a checking account. *Id.* at Schedule A/B, Part 1, Item 3.

25.     Further, Debtor SilverRock Luxury Residences, LLC ("SR Luxury") discloses real estate assets worth $0.00, approximately $1.73 million in personal property, approximately $37.1 million in secured debt, and no unsecured debt. D.I. 117, SOAL. Like SR Lifestyle, SR Luxury holds $1.73 million "in escrow for the benefit of Montage Residence home buyers," and such funds are "not property of SilverRock Luxury Residences, LLC[.]" *Id.* at Schedule A/B, Part 1, Item 3 and n.[A]. SR Luxury's only assets are $69.53 in a checking account and leasehold interests in the Montage Residences scheduled as having no value. *Id.* at Part 1, Item 3 and Part 9, Item 55. Its only debt is the $37.1 million secured claim held by Construction Loan Services II d/b/a Builders Capital ("Builders Capital"). *Id.* at Schedule D, Part 1, Item 2.1. Builders Capital asserts that its claim relates to certain secured loan agreements entered into by SR Luxury and Builders Capital on November 22, 2022. D.I. 70, ¶ 7 and n.5. The claim is secured by "a first deed of trust on 13 Montage Residence lots (owned by [SR Development]) and a first position deed of trust in SR Luxury's leasehold interests in 16 Montage Residence lots." Green Decl., ¶ 47(c). So, while SR Luxury may nominally be the borrower under its agreements with Builders Capital, the only collateral securing those agreements that has any apparent value belongs to SR Development.

26.     Debtor SilverRock Phase I, LLC ("SR Phase I") discloses no real estate assets, only $33.17 in personal property, no secured debt, and approximately $17.75 million in unsecured debt. D.I. 118, SOAL. Its only assets are $33.17 in a checking account and certain trademarks scheduled as having no value. *Id.* at Schedule A/B, Part 1, Item 3 and Part 10, Items 60-61. At least 50% of its unsecured debt is insider debt owed to: (i) the Debtors' manager, The Robert Green Company ("RGC"); and (ii) Robert Green Residential, Inc. ("RG Residential"), which is an affiliate of the Debtors' sole officer, Robert Green. *Id.* at Schedule E/F, Ex. A, PDF page 21 of 49 (reflecting $4,134,899 claim held by RGC and $4,787,913 claim held RG Residential, totaling $8,922,812 out of $17.75 million in aggregate unsecured debt).[3] The remainder of SR Phase I's unsecured debt appears to relate to vendor claims, but because the Debtor chose not to schedule these claims using the official form Schedule E/F, it is unclear when these debts were incurred, what they relate to, and whether they are contingent, unliquidated or disputed. *Id.* at Schedule E/F and Ex. A.

27.     Collectively, the Debtors have generated no revenue since prior to 2022. D.I. 114, 115, 116, 117, 118 and 119, SOFA, Part 1, Items 1 and 2. They have no employees. Green Decl., ¶ 50; Ex. A, Tr. at 78:18-19 ("I don't think the debtor has employees, these are employees of the Robert Green Company[.]"). They have no operations, and construction on the Project ceased two years ago. Ex. A, Tr. at 83:4-9.

---

[3] It is unclear whether any of the other unsecured creditors listed in SR Phase I's Schedules are insiders or affiliates of insiders.

28.     In summary, the Debtors' disclosures in these Chapter 11 Cases paint a picture of a long-defunct development project that never got off the ground and has no reasonable likelihood of doing so through the bankruptcy process.

**D.     Material Events Preceding the Chapter 11 Cases**

**i.     The Debtors File the Chapter 11 Cases on the Eve of Two Separate Foreclosure Sales.**

29.     During the one year preceding the Petition Date, the Debtors were parties to at least forty-two separate legal actions. D.I. 114, SOFA, Ex. A. Of these prepetition legal actions, eighteen remained pending as of the Petition Date. *Id.* These include foreclosure actions commenced by two of the Debtors' prepetition secured lenders, Poppy Bank and Cypress Point Holdings, LLC ("Cypress Point"). *Id.*

30.     The Debtors acknowledge a $40 million loan from Poppy Bank to SR Development maturing on November 1, 2024. Green Decl., ¶ 47(a). Poppy Bank is scheduled as a secured creditor of SR Development holding a claim of not less than $33.3 million secured by a first deed of trust encumbering the Montage Hotel, the Pendry Hotel, the Conference Site, the Clubhouse, the Montage Residences and the Pendry Residences. D.I. 114, Schedule D, Ex. A, Item 2.1. The Debtors do not dispute Poppy Bank's claim. *Id.*

31.     The Debtors also acknowledge a secured promissory note in favor of Cypress Point that matured on October 31, 2023. Green Decl., ¶ 47(b). Cypress Point is scheduled as a secured creditor of SR Development holding a claim of not less than $47 million secured by a second deed of trust encumbering the Montage Hotel, the Pendry Hotel, the Conference Site, and the Clubhouse. D.I. 114, Schedule D, Ex. A, Item 2.2. The Debtors dispute Cypress Point's claim. *Id.*

32.     Poppy Bank and Cypress Point allege that SR Development defaulted on its payment obligations to them. D.I. 63, ¶¶ 9-10.

33.     On May 5, 2023, Poppy Bank recorded a Notice of Default and Election to Sell Under Deed of Trust in the Official Records of the Riverside County Recorder (the "Official Records") as Document No. 2023-0130215. On May 6, 2024, Poppy Bank recorded a Notice of Trustee's Sale Under Deed of Trust in the Official Records as Document No. 2024-0131108 (the "Poppy Sale Notice"). D.I. 65, Ex. C, ¶ H. The Poppy Sale Notice set a foreclosure sale for June 4, 2024. *Id.*

34.     On December 7, 2023, Cypress Point recorded a Notice of Default and Election to Sell Under Deed of Trust in the Official Records as Document No. 2023-0363986. On May 7, 2024, Cypress Point recorded a Notice of Trustee's Sale Under Deed of Trust in the Official Records as Document No. 2024-0111080 (the "Cypress Point Sale Notice"). *Id.* at ¶ G. The Cypress Point Sale Notice set a foreclosure sale for May 30, 2024. *Id.*

35.     On May 24, 2024, the City, Cypress Point, Poppy Bank, and the Debtors, among others, entered into a certain Memorandum of Understanding and Agreement Relating to Default and Developer Requirements (the "MOU"). Green Decl., ¶ 42; D.I. 63, ¶ 12; D.I. 65, Ex. C.

36.     Pursuant to the MOU, the Debtors had until June 30, 2024 to obtain take-out financing that would pay off Poppy Bank, Cypress Point and certain contractors in whole. Green Decl., ¶ 42; D.I. 63, ¶ 12; D.I. 65, Ex. C, ¶ 2. The MOU provides that Poppy Bank and Cypress Point would agree to postpone their scheduled foreclosure sale dates until after June 30, 2024. D.I. 65, Ex. C, ¶ 3.

37.     The MOU further provides that if the Debtors failed to obtain take-out financing by June 30, 2024, then Christopher M. George ("CMG") "shall have the right (but not the

obligation) to assume all of [the Debtors'] rights and obligations" identified in paragraph 4 thereof. *Id.* at ¶ 2.

38.     It is undisputed that the Debtors did not timely close on take-out financing in accordance with the terms of the MOU. Green Decl., ¶ 42; D.I. 63, ¶ 12. There is a dispute as to whether CMG properly exercised his right to assume the Debtors' rights and obligations in accordance with the terms of the MOU thereafter. Green Decl., ¶ 43 ("CMG reneged on its obligations[.]"); D.I. 63, ¶ 13 ("CMG exercised his right to take over the Project.").

39.     Regardless, following the Debtors' failure to obtain take-out financing, Poppy Bank and Cypress Point both re-noticed their respective foreclosure sales. Cypress Point's foreclosure sale was scheduled to take place on August 6, 2024 – *i.e.*, the day after the Petition Date. Green Decl., ¶ 39. During the initial meeting of creditors pursuant to section 341 of the Bankruptcy Code (the "341 Meeting"), Mr. Green testified that he believed Poppy Bank's foreclosure sale was scheduled to take place at the end of August 2024. Audio Recording of 341 Meeting Held September 12, 2024 ("341 Mtg. Rec.") at 59:03 – 59:18.[4]

40.     Mr. Green further testified that the Debtors filed the Chapter 11 Cases to stop the foreclosure process. *Id.* at 57:05 – 58:41.

**ii.     The Debtors Transfer Millions of Dollars and Grant Security Interests to Robert Green and His Affiliates.**

41.     During the 341 Meeting, Fred Schuster (the Chief Investment Officer for RGC) testified that Robert Green is the sole officer for each Debtor, filling multiple roles in that capacity. *Id.* at 25:07 – 25:50. Mr. Green is also the President and Chief Executive Officer of

---

[4] The U.S. Trustee does not yet have a transcript of the 341 Meeting but will provide the audio recording upon request.

RGC, which is the sole Manager for each of the Debtors (all of which are limited liability companies). Green Decl., ¶ 1.

42.     The Debtors' own filings and the undisputed record in the Chapter 11 Cases reflect that the Debtors transferred millions of dollars and granted security interests to Mr. Green and his affiliates leading up to the Petition Date.

43.     For example, SR Phase I discloses in its SOFA that it transferred approximately $2.64 million to RG Residential during the one-year statutory lookback period for transfers to insiders. D.I. 118, SOFA, Ex. A. During the same period, SR Phase I transferred approximately $2.5 million to RGC. *Id.* Thus, despite generating $0.00 in revenue since prior to 2022, SR Phase I saw fit to transfer over $5 million to Mr. Green's affiliates in the last year. As noted in Section C.ii *supra*, RGC and RG Residential purportedly hold additional unsecured claims against SR Phase I totaling over $8 million.

44.     Similarly, SR Development discloses in its SOFA that it transferred approximately $605,500 to RGC during the statutory lookback period. D.I. 114, Ex. A. Like SR Phase I, SR Development generated no revenues, had no operations and had long since ceased construction on the Project at the time of these transfers.

45.     Moreover, as described in more detail in Section D.iv *infra*, on the eve of filing the Chapter 11 Cases, the Debtors granted secured creditor status to (i) all of their preferred equity holders, and (ii) certain hand-picked unsecured creditors. Green Decl., ¶ 47(f). Mr. Green is one such unsecured creditor. *Id.* at ¶ 47(f)(xxii). Put another way, within one month before causing the Debtors to file the Chapter 11 Cases, Mr. Green (the Debtors' sole officer) caused the Debtors to grant him a claim against SR Development and SR Luxury in the amount of approximately $2,109,250 "secured by a second-position deed of trust" in Planning Area 3. *Id.*

SR Development owns Planning Area 3. *Id.* at ¶ 21. Mr. Green indirectly owns 99% of SR

Development and its interest in Planning Area 3.[5]

### iii.    RGC Files Purported Mechanics Liens Against SR Development's Property.

46.    In addition to the foregoing transfers to Mr. Green and his affiliates, the

undisputed record in this case also reflects that, between July 1 and July 5, 2024 (approximately

1 month before the Petition Date), RGC and RG Residential recorded seven mechanics liens in

the Official Records totaling $8,179,362 against Project parcels owned by SR Development:

| CLAIMANT | LIEN NO. | LIEN AMT. | BASIS |
|----------|----------|-----------|-------|
| RGC | 2024-0194768 | $1,855,784.00[6] | Development management services (Oversee project design and construction). |
| RG Residential | 2024-0199894 | $3,447,487.00 | General contracting services to complete the (29) Montage Residences. |
| RGC | 2024-0199895 | $845,810.00 | Development management services (oversee project design and construction). |
| RGC | 2024-0199898 | $374,244.00 | Development management services (oversee project design and construction). |
| RG Residential | 2021-0199891 | $1,340,426 | General contracting services to complete the Montage Hotel Guestrooms in La Quinta, CA |
| RGC | 2024-0199929 | $117,577.00 | Development management services (oversee project design and construction). |
| RGC | 2024-0199930 | $168,134.00 | Development management services (oversee project design and construction). |

---

[5] RGC La Quinta, LLC owns 100% of RGC 789 and 99% of SR Development. D.I. 119, SOFA, Part 13, Item 28; D.I. 114, SOFA, Part 13, Item 28. The Green Family Trust owns 100% of RGC La Quinta, LLC. Green Decl., ¶ 10. Robert Green is a trustee of the Green Family Trust. *Id.*

[6] Original lien amount was $11,074,000. D.I. 65, Ex. G. On July 5, 2024, RGC filed a Partial Release of Mechanics Lien reducing the amount of its lien by $9,188,216. *Id.* It is unclear why RGC granted this partial release.

D.I. 65, Ex. G. The Debtors did not disclose these insider mechanics liens in either the Green

Declaration or in the Schedules and SOFAs.

47.     It is unclear what these purported liens relate to and when the underlying amounts

were incurred, given that construction on the Project stalled out about two years ago.

48.     It is also unclear whether RGC is entitled to record mechanics liens against the

Project property at all. RGC provides "development services" to the Debtors pursuant to several

Development Management Agreements. A true and correct copy of the Development

Management Agreement dated November 28, 2018 between RGC and SR Phase I (the "<u>SR</u>

<u>Phase I Management Agreement</u>") is attached hereto as **<u>Exhibit B</u>**.[7] The terms of the SR Phase I

Management Agreement are representative of the Development Management Agreements

between RGC and the other Debtors.

49.     The services RGC provides pursuant to the Development Management

Agreements appear to be ministerial and administrative in nature. RGC is not a general

contractor or a subcontractor on the Project. Ex. B, ¶ 2.3 ("[RGC] shall not be responsible for

construction means, methods, techniques, sequences and procedures employed by the General

Contractor or subcontractors[.]"). Nor is RGC an architect or engineer. *Id.* ("Nothing contained

in this Agreement shall be deemed to require or authorize [RGC] to perform the services of

architects, engineers, contractors or other professionals."). Rather, RGC's services under the

Development Management Agreements include "recommending" general contractors, architects

---

[7] The Debtors advised the U.S. Trustee that they do not consent to the SR Phase I Management Agreement being
filed on the public docket without redactions. The U.S. Trustee will be filing Exhibit B under seal, with a motion to
seal to follow. The U.S. Trustee reserves all rights with respect to such sealing relief.

and other consultants or professionals, with the Debtors retaining final discretion over who to retain. *Id.* at §§ 2.4, 2.5 and 2.6.

50.     Thus, RGC's mechanics liens may be invalid. *See, e.g.*, *In re Crescent Assocs., LLC*, Case No. 2:20-cv-07298-JWH, 2021 WL 4078986 at **1-4 (C.D. Cal. Sept. 7, 2021) (affirming bankruptcy court's order granting summary judgment in debtor's favor, and finding that "consulting, expediting and project management firm" that contracted with engineering firm but was not itself an engineering or architectural firm was not entitled to a mechanics lien under California law) ("[A]dministrative services do not qualify as 'work' performed for 'a work of improvement' under the mechanic's lien statute.") (citations omitted).

51.     So, Mr. Green (the Debtors' sole officer, who indirectly owns 99% of SR Development and its interests in Project property) caused RGC (his affiliate, and the Debtors' sole Manager) to record potentially invalid mechanics liens against SR Development's Project parcels, thereby granting RGC secured claims totaling over $3 million on the eve of the bankruptcy filing that he authorized.

     **iv.**    **The Debtors Intentionally Encumber Their Assets with Over Eighty Million Dollars in New Purported Security Interests in Exchange for "No New Money."**

52.     The Debtors acknowledge that they converted "[a] number of preferred equity holders and … unsecured creditors … into secured creditors" prior to the Petition Date. Green Decl., ¶ 47(f). These *twenty-six* newly minted secured claims total *approximately $82,276,900*. *Id.* They include a secured claim held by the Kenneth Green Family Trust, which is apparently owned by Mr. Green's cousin, and the claim held by Mr. Green himself as identified in <u>Section D.ii</u> *supra*. *Id.*

53.     The Debtors did not disclose in the Green Declaration either (i) why they granted these secured claims to their preferred equity holders and unsecured creditors in the first place, or (ii) how they determined which of their unsecured creditors would be converted to secured creditors.

### a.     Mr. Green's Testimony at the 341 Meeting

54.     During the 341 Meeting, Mr. Green confirmed that he had decided to convert the preferred equity interests and unsecured claims to secured claims within approximately thirty days before the Petition Date, explaining his reasoning as follows:

> At the time we were … we became aware that an investor who came in was intending to wipe out most of our investors, both common equity and preferred equity. And, from our perspective, that individual was a party to an MOU with a number of parties involved in the case. *And there's nothing in the MOU that prevents us from expanding the secured creditors.* And so in order to protect our preferred equity members, we converted them to secured creditors.

341 Mtg. Rec., 40:17 – 41:01 (cleaned up) (emphasis added). Mr. Green confirmed that the "investor" referenced in his response is CMG. *Id.*

55.     As to the manner in which the Debtors converted preferred equity interests and unsecured claims into secured claims, Mr. Green further explained that:

> [T]he methodology was to divide *certain* unsecured creditors and *all* the preferred equity members into different tranches of secured positions. Either they were second trust deeds in certain parcels of land or in some cases they were third trust deeds in certain parcels of land.

*Id.* at 43:08 – 43:33 (cleaned up) (emphasis added).

56.     Mr. Green also testified that the Debtors received no new consideration for these conversions:

> MR. BATES: And do you know approximately what amount of debt the Debtors took out to accomplish this?

17

> MR. GREEN: Approximately $58 million worth of principal and $24 million worth of accrued interest, for a total of just over $82 million. And again, *it wasn't something that we "took out." It was something that already existed as preferred equity or debt that was already in place.*

*Id.* at 43:40 – 44:20 (cleaned up) (emphasis added). Mr. Green added that preferred equity positions "had a fixed … rate of return and duration associated with their preferred equity," and that the "then-unsecured creditors … had loaned money to the Project … all of which happened in the past." *Id.* at 44:38 – 45:00. In other words, "*[t]here was no new money.*" *Id.* at 47:10 – 47:13 (emphasis added).

57.     Mr. Green's testimony suggests the following timeline of events. On June 30, 2024, the Debtors failed to obtain take-out financing before the forbearance period under the MOU expired. At that point, a dispute arose as to CMG's rights and obligations under the MOU. Between July 1 and July 5, 2024, Mr. Green converted twenty-six preferred equity holders and unsecured creditors of the Debtors into secured creditors holding over $82 million in claims. During the same time period, Mr. Green caused his affiliates to record seven mechanics liens against the Debtors totaling over $8 million dollars. Therefore, within five days of forbearance ending under the MOU, Mr. Green saddled the non-operating Debtors with over $90 million in new secured debt. And the Debtors did not receive a cent in new money in exchange for these claims.

**b.     The Conversion Agreements**

58.     Upon request by the U.S. Trustee, the Debtors produced a form of *Settlement Agreement and Agreement for Purchase and Redemption of Membership Interest* dated as of July 1, 2024 by and among SR Phase I, SR Development and an undisclosed prepetition preferred equity holder (the "Conversion Agreement"). A true and correct copy of the Conversion

Agreement is attached hereto as **Exhibit C**.[8] The Debtors represent that the Conversion Agreement is substantially similar to the form of agreement executed with each other converted preferred equity holder.

59. The Conversion Agreement provides that the preferred equity holder purchased Class B Preferred Membership Interests in SR Phase I for $12,500,000 on or about March 11, 2022. Ex C., ¶¶ A-B. Consequently, the equity holder became the Class B Preferred Member of SR Phase I "on the terms of that certain Second Amended and Restated Limited Liability Company Agreement of SilverRock Phase I, LLC dated March 21, 2021" (the "SR Phase I OA").[9] *Id.* at ¶ B. A true and correct copy of the SR Phase I OA is attached hereto as **Exhibit D**.[10]

60. The Conversion Agreement further provides that SR Phase I "shall purchase … and redeem" all of the equity holder's Class B Preferred Membership Interests in SR Phase I for the purchase price of $20,070,000, tendered in the form of a secured promissory note. *Id.* at ¶ 1. This purchase price represents a return of approximately 61% on the equity holders' initial investment over a 26-month period. During that entire 26-month period, the Debtors had no revenues, operations or employees.

---

[8] The Debtors advised the U.S. Trustee that they do not consent to the Conversion Agreement being filed on the public docket without redactions. The U.S. Trustee will be filing Exhibit C under seal, with a motion to seal to follow. The U.S. Trustee reserves all rights with respect to such sealing relief.

[9] Upon information and belief, SR Phase I subsequently amended the SR Phase I OA to, among other things, add the preferred equity holder as the Class B Preferred Member.

[10] The Debtors advised the U.S. Trustee that they do not consent to the SR Phase I OA being filed on the public docket without redactions. The U.S. Trustee will be filing Exhibit D under seal, with a motion to seal to follow. The U.S. Trustee reserves all rights with respect to such sealing relief.

61.     The Conversion Agreement further provides that the Conversion Agreement "shall be secured by a Third Deed of Trust … against certain property owned by [SR Development]." *Id.*

62.     The Conversion Agreement further provides that "[i]nterest will accrue monthly on the unpaid principal amount," including unpaid "Discretionary Advances" capped at $1 million in the aggregate, "at the rate of 22% per year, *compounded quarterly*, commencing as of July 1, 2024." *Id.* at ¶¶ 2(a), 2(b) (emphasis added).

63.     By contrast, the SR Phase I OA provides that the "Class B Preferred Member Preferred Return" means "a cumulative (*but not compounded*) return equal to ten and three quarters percent (10.75%) per annum calculated on the amount of the Class B Preferred Member's Unreturned Capital Contribution as of the end of each month." Ex. D, p. 7 (emphasis added). Even following a payment default, the Class B Preferred Member Preferred Return was 18% per annum, "non-compounding." *Id.*

64.     Thus, in exchange for "no new money," the preferred equity holder: (i) received a 61% return on their initial investment; and (ii) more than doubled their interest rate, which also went from non-compounding to compounding quarterly (resulting in an effective interest rate of nearly 24% over the term of the Conversion Agreement). In addition, the preferred equity investor leapfrogged to the front of the statutory priority scheme for plan distributions, when as an equity holder it likely would have received nothing in these Chapter 11 Cases otherwise. To reiterate, *these were standard terms* that the Debtors offered to *all* their preferred equity holders.

65.     The Conversion Agreement further provides that the anonymous equity holder "hereby fully releases, waives, extinguishes, and discharges" SR Phase I, SR Development, RGC, Mr. Green and Mr. Schuster, and each of SR Phase I, SR Development and RGC's

"employees, attorney's [*sic*], officers, directors, members, managers, agents, representatives, parents, subsidiaries, and affiliates from the Specified Released Claims." Ex. C, ¶ 3. The "Specified Released Claims" relate to "the specific matters described in … clauses C and D" of the Conversion Agreement's recitals. *Id.* at ¶ D. Those "specific matters" include apparent breaches of the SR Phase I OA and potentially fraudulent undercapitalization of SR Phase I. *Id.* at ¶¶ C-D.

       c.     **The Deeds of Trust**

66.     It is undisputed that between July 1 and July 5, 2024, the Debtors recorded four deeds of trust against Project property in the Official Records securing "obligations" totaling $60,720,982:

| Deed of Trust No. | Trustor | Beneficiaries | Amount Secured |
|---|---|---|---|
| 2024-0199180 | RGC 789 | Traub Family Revocable Trust | $3,816,000 |
| 2024-0199181 | RGC 789 | George J. Hauser Revocable Trust *et al.*[11] | $23,146,042 |
| 2024-0199179 | SR Development | Kleiber Real Estate Holdings, LLC and Robert S. Green, Jr. "for the benefit of YH-MCSV Fund I, LLC"[12] | $13,551,940 |
| 2024-019511 | SR Development | Axia Talus, LLC | $20,070,000 |

---

[11] The other beneficiaries of this Deed of Trust include SVR Capital Trust, Kurtin Family Trust, Kenneth and Theresa Green Family Trust (relatives of Robert Green), Duclos Family Revocable Trust, Bryan D. Holker IRA, Jonathan P. Fredricks, Mack Revocable Trust, Kevin and Lindy Welk, LTMDP Living Family Trust, Eric Leitstein, Bill and Susan Hoehn Family Trust and Richard & Lehn Goetz.

[12] It is unclear why Mr. Green holds this secured claim "for the benefit" of YH-MCSV Fund I, LLC ("YH"). On June 14, 2024, YH commenced a state court action against the Debtors, Mr. Green, and Mr. Schuster, among others, alleging that those parties fraudulently induced YH to purchase membership interests in SR Lifestyle. *See YH-MSCV Fund I, LLC, et al. v. SilverRock Lifestyle Residences, LLC, et al.*, San Diego County Superior Court Case No. 37-2024-00028106-CU-SL-CTL.

D.I. 65, Ex. H.

67.      It is unclear whether the Debtors recorded Deeds of Trust or other security

instruments related to the balance of the converted preferred equity and unsecured creditor

claims.

> **d.      The City's Lawsuit**

68.      On July 24, 2024, the City commenced a state court action styled *City of La*

*Quinta v. SilverRock Development Company, LLC, et al.* in the Riverside County Superior Court

(the "State Court Action"). A true and correct copy of the City's complaint in the State Court

Action is attached hereto as **Exhibit E**. The City named as defendants, among others, the

Debtors, RGC, Mr. Green, Mr. Schuster, and the purported preferred equity holders and/or

unsecured creditors whose interests the Debtors converted to secured claims. Ex. E.

69.      By and through the State Court Action, the City alleged counts for breach of

contract, fraud, slander of title, quiet title, and declaratory and injunctive relief. *Id.*

70.      With respect to the mechanics liens and conversion transactions described in this

Section D, the City alleges as follows:

> [SR Development] and its affiliates are now intentionally and fraudulently trying
> to frustrate and thwart the PSDA and MOU and have encumbered all or portions of
> the [SR Development]-Owned Properties with unenforceable mechanics liens and
> unauthorized deeds of trust without the City's approval or consent in violation of
> the PSDA.

*Id.* at ¶ 104.

71.      With respect to the deeds of trust the Debtors recorded between July 1 and July 5,

2024 in favor of the converted equity interest holders and/or unsecured creditors, the City alleges

as follows:

The Axia Deed of Trust, Parekh et al. Deed of Trust, Traub Family Trust Deed of Trust, and Heuser et al. Deed of Trust are collectively referred to as the "Unauthorized Deeds of Trust," as none of the purported creditors or their respective funding contributions were approved by the City, all in violation of the PSDA, and all were entered into and recorded after [SR Development] was in default and in complete contradiction to the City's July 1, 2024 Notice of Default and the MOU.

*Id.* at ¶ 117(d).

72.     The City further alleges that, pursuant to the PSDA, SR Development was required to receive the City's approval prior to obtaining and utilizing any financing for the construction of the Project. *Id.* at ¶ 121. Thus, the City contends, the Debtors' and Mr. Green's conduct with respect to the mechanics liens, deeds of trust and other security interests described in this Section D constitutes both a breach of the MOU and PSDA (among other agreements) and fraud. *Id.* at ¶¶ 120-142.

**E.     The Debtors' Goals in the Chapter 11 Cases**

73.     The Debtors' stated goals for the Chapter 11 Cases are to obtain "the time they need, free of disruptive litigation, to finance the continuation and completion of the Project and ultimately confirm a Chapter 11 Plan[.]" Green Decl., ¶ 53.

74.     During the 341 Meeting, Mr. Green testified that the Debtors wanted to "get an opportunity to reorganize and restructure the deal and bring somebody in who would do what we'd hoped Chris George was going to do." 341 Mtg. Rec., 57:40 – 58:41. This appears to mean obtaining approximately half a billion dollars in new financing to complete the Project. Green Decl., ¶ 44 ("[T]he Project has been provided with a constriction [*sic*] loan offer from a nationally recognized lender Oppenheimer and Company, Inc. totaling $336M, *subject to the project closing on additional equity funding of approximately $100m*.") (emphasis added). Mr. Green also asserts that the Project "has an additional $108M commitment from FPP … which

23

will be used to redeem our bridge preferred equity members." *Id.* There is no record in these cases of a loan offer from Oppenheimer or commitment from FPP other than in the Green Declaration.

75.     The Debtors also contend that "credible appraisals of the Project" support the inference of a $170.1 million equity cushion, which "provides the basis for confirming a Chapter 11 plan of reorganization." *Id.* at ¶ 53.

76.     However, during the 341 Meeting, when asked what mechanisms the Debtors are considering for plan funding, the interim CRO could only point to proposed DIP financing from the City. 341 Mtg. Rec., 1:00:20 – 1:03:10. The interim CRO further testified that the Debtors were planning on "updating appraisals" and, "if needed," the Debtors would work with the appropriate professionals to "look for additional capital sources." *Id.* When asked whether the Debtors are considering a sale of any of the real property assets or improvements, the interim CRO testified that "[t]hat has not been contemplated at this time … We don't want to prematurely say we ought to sell off pieces until we understand holistically how the whole works." *Id.* at 1:03:15 – 1:03:55.

77.     In summary, the Debtors' only contemplated source of plan funding is a proposed DIP in the amount of $2,000,000, they have no current plans to obtain additional plan funding, they have no current plans to sell any of the Project assets, and they will be updating the appraisals that supposedly "provide the basis" for confirming a chapter 11 plan.

## BASIS FOR THE REQUESTED RELIEF

## I.   THE COURT SHOULD DISMISS THE CHAPTER 11 CASES FOR CAUSE BECAUSE THEY WERE NOT FILED IN GOOD FAITH.

### A.   Applicable Legal Standard

78.     Section 1112(b) of the Bankruptcy Code provides that, upon a finding of cause, a court shall convert a chapter 11 case to chapter 7 or dismiss the case entirely. 11 U.S.C. § 1112(b).  Section 1112(b)(4) enumerates sixteen examples that constitute cause, but the list is non-exhaustive. 11 U.S.C. § 102(3) (instructing courts to interpret the use of "includes" to be not limiting). As such, this Court has wide discretion in determining whether cause exists for the purposes of section 1112(b). *In re SGL Carbon Corp.*, 200 F.3d 154, 160 (3d Cir. 1999)

79.     Additionally, section 1112(b) imposes a good-faith requirement on all chapter 11 filings. *Id.* at 162. When the debtor's good faith is called into question, the debtor bears the burden of showing that good faith is present in its filing. *In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000).

80.     The Bankruptcy Code does not define good faith. Rather, a showing of good faith rests on two questions: (i) whether the petition serves a valid bankruptcy purpose, such as preserving a going concern or maximizing the value of the debtor's estate; and (ii) whether the petition is filed to obtain a tactical advantage. *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119 (3d Cir. 2004).

81.     Upon finding cause under section 1112(b), the Court must determine whether conversion or dismissal best serves the interests of the creditors and the estate. *In re Am. Capital Equip., LLC*, 688 F.3d 145, 161 (3d Cir. 2012). Here again, the Court has wide discretion to use its "'equitable powers' to make 'an appropriate' disposition of the case[.]" *Id.* at 163 (quoting *In re Camden Ordnance Mfg. Co. of Arkansas, Inc.*, 245 B.R. 794, 798 (E.D. Pa. 2000)).

25

82.     In *Primestone Inv. Partners L.P. v. Vornado PS, L.L.C. (In re Primestone Inv. Partners L.P.)*, 272 B.R. 554, 557 (D. Del. 2002) the court identified the following factors material to the court's good faith inquiry:

a.      *Single asset case*;

b.      *Few unsecured creditors*;

c.      *No ongoing business or employees*;

d.      *Petition filed on eve of foreclosure*;

e.      Two party dispute which can be resolved in pending state court action;

f.      *No cash or income*;

g.      No pressure from non-moving creditors;

h.      Previous bankruptcy petition;

i.      *Prepetition conduct was improper*;

j.      *No possibility of reorganization*;

k.      Debtor formed immediately prepetition;

l.      *Debtor filed solely to create automatic stay*;

m.      Subjective intent of the debtor.

*See Primestone*, 272 B.R. at 557 (emphasis added) (citing *In re SGL Carbon*, 200 F.3d at 165; *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394-95 (11th Cir.1988); *In re SB Properties*, 185 B.R. 198, 205 (E.D.Pa.1995)).

83.     As the Court recognized in *Primestone*, "[t]he focus of the inquiry is whether the petitioner sought 'to achieve objectives outside the legitimate scope of the bankruptcy laws' when filing for protection under Chapter 11." *Primestone*, 272 B.R. at 557 (citing *SGL Carbon*, 200 F.3d at 165; *In re Marsch*, 36 F.3d 825, 828 (9th Cir.1994)).  Additionally, "no single factor

is determinative of a lack of good faith in filing a petition." *Primestone*, 272 B.R. at 558 (citing

*In re Tiffany Square Assocs.*, Ltd., 104 B.R. 438, 441 (Bankr.M.D.Fla.1989)).

### B.    The *Primestone* Factors Overwhelmingly Support Dismissal.

84.    Applying the *Primestone* factors to the facts of this case, the Court would be well-

supported in finding cause pursuant to section 1112(b):

| *Primestone* Factor | Application to the Chapter 11 Cases |
|---|---|
| "Single asset case" | Both SR Development and RGC 789 appear to be SARE Debtors. The remaining Debtors have nominal assets, if any.<br><br>This factor supports dismissal. |
| "Few unsecured creditors" | Four of the six debtors have no unsecured debt at all. RGC 789 has only five unsecured creditors. D.I. 119, Schedule E/F, Ex. A.  SR Phase I has approximately 90 unsecured creditors, but at least 50% of its unsecured debt is owed to two insiders: RGC and RG Residential. D.I. 118, Schedule E/F, Ex. A.<br><br>This factor supports dismissal. |
| "No ongoing business or employees" | The Debtors have no operations or employees.<br><br>This factor supports dismissal. |
| "Petition filed on eve of foreclosure" | The Debtors filed the Chapter 11 Cases *one day* before Cypress Point's scheduled foreclosure sale, and approximately 2-3 weeks before Poppy Bank's scheduled foreclosure sale.<br><br>This factor favors dismissal. |
| "Two party dispute which can be resolved in pending state court action" | The Debtors are parties to multiple pending lawsuits, but the material events described herein can be resolved in the State Court Action.<br><br>This factor is neutral. |

| ***Primestone* Factor** | **Application to the Chapter 11 Cases** |
|---|---|
| "No cash or income" | The Debtors have not generated any *revenue*, much less income, since prior to 2022. The Debtors collectively have less than $5,000 in cash on hand.<br><br>This factor favors dismissal. |
| "No pressure from non-moving creditors" | Several non-moving creditors filed prepetition litigation against the Debtors, but it is unclear whether this constitutes "pressure" for purposes of the Court's analysis.<br><br>This factor is either neutral or supports the Debtors. |
| "Previous bankruptcy petition" | The Debtors do not appear to have filed prior bankruptcy petitions.<br><br>This factor is neutral. |
| "Prepetition conduct was improper" | Within five days after forbearance ended pursuant to the MOU:<br><br>(i) RGC and RG Residential recorded mechanics liens against the Debtors totaling over $8 million, including potentially invalid mechanics liens;<br><br>(ii) the Debtors granted over $80 million in new secured claims to previously unsecured creditors and equity holders in exchange for "no new money"; and<br><br>(iii) the Debtors recorded four deeds of trust encumbering their assets, in what the City has characterized as breaches of the MOU and PSDA (among other agreements) and fraud.<br><br>This factor strongly supports dismissal. |
| "No possibility of reorganization" | The Debtors have no money, no income and no postpetition financing. Their only source of proposed postpetition financing is woefully inadequate to fund these cases, much less confirm a plan. The Debtors have not sought additional sources of postpetition capital, and they do not plan to sell any of the Project assets. |

| | Moreover, if the Court designates one or more Debtors as SARE Debtors, then the Debtors will be on an accelerated timeline to file a proposed plan that they cannot meet. 11 U.S.C. § 362(d)(3).<br><br>This factor supports dismissal. |
|---|---|
| ***Primestone* Factor** | **Application to the Chapter 11 Cases** |
| "Debtor formed immediately prepetition" | None of the Debtors was formed immediately prepetition.<br><br>This factor is neutral. |
| "Debtor formed solely to create automatic stay" | The Debtors only sought joint administration and cash management as first day relief. They took weeks to file their first motion for postpetition financing, suggesting that this is not a "melting ice cube." The only other matters before the Court were professional retentions and interim compensation procedures.<br><br>This factor supports dismissal. |
| "Subjective intent of the debtor" | The Debtors assert that the supposed equity cushion in the Project provides a basis for confirming a plan, but they are not considering any sales of Project assets. Mr. Green's testimony suggests that their subjective intent is to re-trade the MOU (which the City, among others, asserts they breached) and stall the foreclosure actions and State Court Action.<br><br>This factor supports dismissal. |

85.     For the reasons articulated above, application of the *Primestone* factors supports a finding of cause for dismissal of these Chapter 11 Cases.

**C.      The Debtors Filed the Chapter 11 Cases in Bad Faith Because the Chapter 11 Cases Serve No Valid Bankruptcy Purpose.**

86.     A debtor availing itself of the automatic stay of litigation, without more, has not filed a chapter 11 petition for a valid bankruptcy purpose. "Courts universally demand more of Chapter 11 petitions than a naked desire to stay pending litigation, and any perceived benefit of

the automatic stay, without more, cannot convert a bad faith filing to a good faith one." *In re 15375 Mem'l Corp. v. Bepco, L.P.*, 589 F.3d 605, 620 (3d Cir. 2009) (cleaned up) (quoting *Integrated Telecom*, 384 F.3d at 128)). "The Third Circuit has explained that once good faith is at issue, the burden falls upon the bankruptcy petitioner to establish that the petition has been filed in good faith." *In re Team Sys. Int'l LLC,* 640 B.R. 296 (Bankr. D. Del. 2022) (cleaned up) (citing *In re SGL Carbon*, 200 F.3d 160, 162 n. 10 (3d Cir. 1999); *In re Rent-A-Wreck of America, Inc.*, 580 B.R. 364, 374 (Bankr. D. Del. 2018)). Thus, the burden rests on the Debtors to establish their good faith.

87.     Here, the Debtors filed the Chapter 11 Cases to reap the benefit of the automatic stay. The Debtors were one day away from Cypress Point's foreclosure sale, and only weeks away from Poppy Bank's foreclosure sale. Moreover, the Debtors filed the Chapter 11 Cases only days after the City filed the State Court Action, alleging wide-ranging contractual breaches and fraud claims against the Debtors, their affiliates, and both Mr. Green and Mr. Schuster in their individual capacities. Mr. Green testified that the Debtors' hope for the Chapter 11 Cases is to stay "disruptive" litigation while the Debtors try to find a new investor to do "what they'd hoped" CMG would do. In other words, the Debtors want to re-trade the MOU without the foreclosure sales and State Court Action hanging over their heads. But "[w]here the timing of the filing of the Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith." *Bepco*, 589 F.3d at 625 (cleaned up) (quoting *In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999))

88.     The Debtors have not generated any revenue since prior to 2022. They have no intent to monetize their only assets for the benefit of creditors. After ten years of false starts with

different Project financiers (and, according to the City, extensive bad faith conduct), the City and the other parties to the MOU finally pulled the plug. Approximately one month later, the Debtors filed the Chapter 11 Cases. The facts of these cases strongly suggest that the Debtors entered chapter 11 primarily to forestall litigation, and not with a valid reorganizational purpose in mind.

## II.    THE COURT SHOULD DISMISS THE CHAPTER 11 CASES PURSUANT TO SECTION 1112(b)(4).

89.    If a party in interest establishes one of the enumerated bases for cause under section 1112(b), the court "shall" convert or dismiss the case, whichever is in the best interests of creditors and the estate. *See* 11 U.S.C. § 1112(b). Statutory bases for cause under section 1112(b)(4) include substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation. *Id.* at § 1112(b)(4)(A). "Under the interpretation of section 1112(b)(1) consistently used in bankruptcy courts, [a] negative cash flow situation alone is sufficient to establish 'continuing loss to or diminution of the estate.'" *Loop Corp. v. United States Trustee (In re Loop Corp.*), 379 F.3d 511, 515-16 (3d Cir. 2004).

90.    Applied here, the Debtors are incurring administrative expenses in the Chapter 11 Cases, including attorneys' fees and fees for the interim CRO. However, as confirmed in the Schedules and SOFAs, the Debtors are not generating any revenues to offset such costs, which will continue to accrue. Moreover, the proposed interim DIP financing of $2 million (which is meant to support the Debtors through January 2025) will cover less than half of the Debtors' anticipated cash burn during the first six months of these cases (Green Decl., ¶ 51) and should not be approved in any event until after the Court has considered this Motion. Based on the foregoing, the Debtors' estates are incurring continuing losses, with no prospects of a reversal.

91.     As used in section 1112(b)(4), "rehabilitation is not another word for reorganization. [Citation.] Rehabilitation means to reestablish a business." 7 COLLIER ON BANKRUPTCY ¶ 1112.04[6][a][ii] (16th 2024). "In almost every case, the debtor's prospects will depend on whether the debtor has formulated, or can formulate within a reasonable amount of time, a reasonably detailed business plan." *Id.* "Section 1112(b)(1) of the Code is intended to preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation." *In re Lizeric Realty Corp.*, 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995).

92.     The Debtors have not generated any revenues since prior to 2022 and have less than $5,000 in available cash, according to their Schedules. They have no employees and no operations. Put simply, they are a defunct property development enterprise. It strains credulity to believe that the Debtors will be able to fund these cases long enough to obtain their latest round of take-out financing, particularly when the Debtors were unable to do so in a non-bankruptcy context. That's assuming that there is even a business to rehabilitate here; both the City and Cypress Point have repeatedly asserted that the Debtors no longer have development rights with respect to the Project. D.I. 63, pp. 2 ("[T]he [City] cancelled the development rights on August 1, 2024.") and 3 ("The Debtors have no development rights, no viable business prospects, or ongoing construction that requires immediate attention."); D.I. 65, Ex. E ("[P]ursuant to Section 501 of the Original PSDA, [SR Development] is in default, with no right to cure, and [SR Development] no longer has any rights as 'Developer' under the PSDA.").

93.     Based on the foregoing, the Debtors have no reasonable likelihood of rehabilitation.

### III.   ALTERNATIVELY, THE COURT SHOULD APPOINT A CHAPTER 11 TRUSTEE PURSUANT TO SECTION 1104 OF THE BANKRUPTCY CODE.

94.     Section 1112(b) provides that upon finding "cause," the Court "shall" dismiss or convert the case, whichever is in the best interests of creditors and the estate, "unless the court determines that the appointment under section 1104(a) of a trustee … is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1). Should the Court determine that dismissal is not in the best interests of creditors or the estate, the U.S. Trustee respectfully submits that the Court should appoint a chapter 11 trustee.

95.     Creditors, as well as investors, require an independent, conflict-free, experienced party investigating the financial affairs of these Debtors – someone who can determine an appropriate reorganization or liquidation strategy, free from the constraints of current management. Indeed, Cypress Point objected to the appointment of the interim CRO on the grounds that, among other things:

  a)     The CRO to the bankruptcy estates *must have autonomous power and authority to act* on behalf of the Debtors, *independent of the Debtors' prepetition management personnel*; … [and]

  i)     The Debtors must obtain this Court's prior order before terminating DWC as CRO.

D.I. 86, ¶ 1(a), (i) (emphasis added). Both the City and the prepetition secured lenders raised similar arguments at the second day hearing, which resulted in the Court appointing the interim CRO on an interim basis for fourteen days.

96.     However, Congress provided but one way to replace a debtor's management's control of the case with an independent fiduciary: appointment of a trustee pursuant to 11 U.S.C. § 1104(a). The usual presumption in favor of allowing a debtor's management to remain in the case vanishes completely when management does not or cannot perform its fiduciary duties. *See*

33

*Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 355 (1985) ("[T]he willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.'") (*quoting Wolf v. Weinstein*, 372 U.S. 633, 651 (1963)).

97.    Whatever commonalities they share, the roles, powers and obligations of CRO and a Chapter 11 trustee are neither identical nor interchangeable. A CRO *serves* a debtor-in-possession as an executive officer, subject to the direction of its governing body, accountable to its governing body, and subject to dismissal at the will of its governing body. A Chapter 11 trustee *administers* a debtor-out-of-possession after the Court has found cause to dispossess the debtor. A Chapter 11 trustee *becomes* the debtor's governing body. A debtor should not be permitted to use its engagement of a CRO to co-opt, undermine or defend against a motion to appoint a Chapter 11 trustee under Section 1104(a).

98.    Upon information and belief, the Debtors intend to retain the interim CRO on a further interim or final basis. But the CRO's employment is subject to authorization from RGC as the Debtors' sole Manager. Green Decl., ¶ 6. Mr. Green is the individual who "elected to hire" the CRO prepetition in his capacity as CEO of RGC. *Id.* In that same capacity, Mr. Green controls the Debtors and the CRO, as well as any other CRO that might be employed in the Chapter 11 Cases. As described in detail above, Mr. Green appears to have been a key figure in the Debtors' demise, and, by extension, would be a key subject of any investigation regarding the Debtors' prepetition conduct, including without limitation incurring over $90 million in questionable secured debt within a month before the Petition Date in exchange for "no new money."

99.     Section 1104(a) states that the Bankruptcy Court shall order the appointment of a

trustee, at any time after the commencement of the case but prior to confirmation of a plan, on

request of a party in interest or the UST, and after notice and a hearing:

> (1)     for cause, including fraud, dishonesty, incompetence, or gross
> mismanagement of the affairs of the debtor by current management, either
> before or after the commencement of the case, or similar cause, but not
> including the number of holders of securities of the debtor or the amount of
> assets or liabilities of the debtor; or
>
> (2)     if such appointment is in the interests of creditors, any equity security
> holders, and other interests of the estate, without regard to the number of
> holders of securities of the debtor or the amount of assets or liabilities of the
> debtor.

11 U.S.C. § 1104(a).

100.    Further, section 1104(e) of the Bankruptcy Code mandates that the U.S. Trustee

move for the appointment of a trustee if there are reasonable grounds to suspect that members of

current management participated in, among other things, fraud or dishonesty in the management

of the debtor or the debtor's public financial reporting.

101.    Subsection (1) of Section 1104(a) addresses management's pre- and post-petition

misdeeds or mismanagement, while subsection (2) provides the court with "particularly wide

discretion" to appoint a trustee even absent wrongdoing or mismanagement. *See In re Bellevue*

*Place Assocs.*, 171 B.R. 615, 623 (N.D. Ill. 1994). Where the court finds either that cause exists

or that appointment is in the interest of the parties, an order for the appointment of a trustee is

mandatory. *See Official Comm. Of Asbestos Pers. Injury Claimants v. Sealed Air Corp. (In re*

*W.R. Grace & Co.)*, 285 B.R. 148, 158 (Bankr. D. Del. 2002).

102.    The categories enumerated in 11 U.S.C. § 1104(a)(1) "cover a wide range of

conduct" and, thus, are best described as illustrative, rather than exclusive. *See In re Marvel*

*Entm't Corp.*, 140 F.3d 463, 472 (3d Cir. 1998) (quoting *Committee of Dalkon Shield Claimants*

*v. A.H. Robbins Co.*, 828 F.2d at 242). Fraud, dishonesty, incompetence, and gross mismanagement of a debtor's business affairs are all grounds for appointment of a chapter 11 trustee under 11 U.S.C. § 1104(a)(1). *See, e.g., In re Sharon Steel Corp.*, 871 F.2d 1217 (3d Cir. 1989); *In re Colby Construction Corp.*, 51 B.R. 113, 116-118 (Bankr. S.D.N.Y. 1985). The determination of whether cause exists must be taken on a case-by-case basis, taking into account all relevant factors. *Sharon Steel*, 871 F.2d at 1225. Pre-petition conduct alone may provide the basis for a court to appoint a trustee. *See In re Rivermeadows Assocs., Ltd.*, 185 B.R. 615, 619 (Bankr. D. Wyo. 1995).

103.    In its decision in *In re Marvel Entertainment Group, Inc.*, the Third Circuit quoted the following passage approvingly in affirming the appointment of a Chapter 11 trustee:

> The willingness of Congress to leave a debtor-in-possession is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee.  And if the debtor-in-possession defaults in this respect, Section 1104(a)(1) commands that the stewardship of the reorganization effort must be turned over to an independent trustee.

*Id.* (quoting *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989)) (emphasis added).

104.    The Third Circuit in *Marvel* further stated that appointment of a trustee is mandatory if cause is found under 11 U.S.C. § 1104(a)(1), and while it is not mandatory under 11 U.S.C. § 1104(a)(2), the Third Circuit held that the district court's refusal in that case to appoint something less than a trustee was not an abuse of discretion. *See Marvel*, 140 F.3d at 174-75.  Congress provided no other way to replace debtor's management's control of the case with an independent fiduciary other than appointment of a trustee pursuant to 11 U.S.C. § 1104(a).

105.    The recording of (and failure to disclose) RGC's mechanics liens, the conversion

of equity holders and unsecured creditors into secured creditors for "no new money," and the

rampant self-dealing evident from the record in these Chapter 11 Cases all constitute

"incompetence" or "gross mismanagement" warranting the appointment of a chapter 11 trustee.

*See, e.g., In re Vascular Access Centers, L.P.*, 611 B.R. 742, 764 (Bankr. E.D. Pa. 2020)

("Accordingly, courts have found cause present pursuant to § 1104(a)(1) in circumstances

demonstrating conflicts of interest; misuse of assets and funds; inadequate recordkeeping and

reporting; failure to file required documents; lack of adequate disclosure; lack of appropriate cost

controls; transgressions related to taxes; failure to make required payments; lack of credibility

and creditor confidence; and breaches of fiduciary duties."); *Oklahoma Refining Co. v. Blaik (In*

*re Oklahoma Refining Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988) ("There are many cases

holding that a history of transactions with companies affiliated with the debtor company is

sufficient cause for the appointment of a trustee where the best interests of the creditors

require"); *see also In re PRS Insurance Group*, 274 B.R. 381, 387 (Bankr. D. Del. 2001)

(Walrath, J.) (evidence of diversion of assets, or the absence of accurate financial records,

constitutes "incompetence or gross mismanagement").

106.    There are additional bases for the appointment of a trustee under 11 U.S.C. §

1104(a)(2). The Debtors' assets may include claims and causes of action against a range of

entities, including current management; current management cannot be expected to exercise its

fiduciary duty to the Debtors' creditors or investors to investigate and prosecute claims against

themselves. Additionally, the factual representations made to such creditors has created an

incredible atmosphere of mistrust of the Debtors and their management. This was evident at the

second day hearing, during which the City and the prepetition secured creditors confirmed that

their motivation for imposing additional constraints on the interim CRO was the lack of trust in RGC and Mr. Green.

107.     The "appointment [of a trustee] is in the interests of creditors" under 11 U.S.C. § 1104(a)(2), as their hopes for a recovery on account of their claims are tied to the impartial investigation and prosecution of claims and causes of action. *See Manufacturers and Traders Trust Co. v. Morningstar Marketplace, Ltd. (In re Morningstar Marketplace, Ltd.)*, 544 B.R. 297, 305 (Bankr. M.D. Pa. 2016) ("A court is more likely to appoint a trustee under § 1104(a)(2) when reorganization is not possible, and a Debtor's principal may be motivated to protect his own interests rather than the interests of creditors. When coupled with a lack of confidence in management, and the benefits of appointing a trustee outweigh the cost, courts often find the argument for appointment of a trustee to be compelling.") (internal citation omitted); *In re Euro-American Lodging Corp.*, 365 B.R. 421, 427-28 (Bankr. S.D.N.Y. 2007) ("Where a chapter 11 debtor and its managers … suffer from material conflicts of interest, an independent trustee should be appointed" under 11 U.S.C. § 1104(a)(2)); *In re McCorhill Publ., Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987) (where there are questionable inter-company financial transfers and the principals of the debtor occupy conflicting positions in the transferee companies, appointment of a trustee is warranted in the best interests of all creditors and all parties in interest to investigate the financial affairs of the debtor).

108.     Accordingly, if the Court determines not to dismiss the Chapter 11 Cases, the Court should instead appoint a chapter 11 trustee to administer the Debtors' estates.

## IV.  THE COURT SHOULD DEFER RULING ON INTERIM DIP RELIEF UNTIL AFTER IT HAS RULED ON THIS MOTION.

109.    On September 20, 2024, the Debtors filed their *Motion of Debtors Pursuant to Sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rule 4001, and Local Rule 4001-2, for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing from the City of La Quinta; (II) Granting Non-Priming DIP Lender Liens and Super-Priority Claims; (III) Scheduling a Final Hearing; and (V) Granting Related Relief* [D.I. 125] the ("DIP Motion"). By and through the DIP Motion, the Debtors seek, among other relief, the entry of an order authorizing them to incur $2,000,000 in DIP financing from the City, including $250,000 on an emergency basis. The DIP Motion is currently set to be heard on September 27, 2024.

110.    Given the potentially case-dispositive relief requested in this Motion, the U.S. Trustee respectfully requests that the Court hold the DIP Motion in abeyance until after the Court has ruled on this Motion. The U.S. Trustee submits that such relief is necessary to avoid the Debtor incurring millions of dollars in additional debt with attendant duties and obligations set forth in the DIP Term Sheet. Further, the U.S. Trustee submits that such relief will not prejudice the Debtors or other parties in interest. This is not a "melting ice cube" case. As noted throughout the Motion, the Debtors have not operated in years, have no employees to pay, and have not filed any operational motions.


*[Remainder of Page Intentionally Left Blank]*

## <u>RESERVATION OF RIGHTS</u>

111.    The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and all rights, remedies and obligations to, among other things, complement, supplement, augment, alter or modify this Motion and reservations of rights, assert any objection, file any appropriate motion, or conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further factual discovery

**WHEREFORE**, the U.S. Trustee respectfully requests that the Court enter an order: (i) dismissing the Chapter 11 Cases; (ii) alternatively, appointing a chapter 11 trustee; and (iii) granting such other and further relief as the Court deems just and equitable.

Dated: September 26, 2024                    Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**REGIONS 3 AND 9**

By:  *Malcolm M. Bates*
     Malcolm M. Bates
     Trial Attorney
     United States Department of Justice
     Office of the United States Trustee
     J. Caleb Boggs Federal Building
     844 N. King Street, Room 2207, Lockbox 35
     Wilmington, DE 19801
     Telephone: (302) 573-6491
     Email:   Malcolm.M.Bates@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I, Malcolm M. Bates, hereby certify that on September 26, 2024, I caused to be served a copy of this Motion by electronic service on the registered parties via the Court's CM/ECF system, and courtesy copies were served via email on parties in interest. Concurrently herewith, the U.S. Trustee is filing a motion seeking authority to limit notice of this Motion to such service parties.


Dated: September 26, 2024                   */s/ Malcolm M. Bates*
                                            Malcolm M. Bates