**<u>EXHIBIT A</u>**

**Transcript of September 3, 2024 Hearing**

<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3  IN RE:                        .  Chapter 11
                                  .  Case No. 24-11647 (MFW)
 4  SILVERROCK DEVELOPMENT        .
    COMPANY, et al.,              .  (Jointly Administered)
 5                                .
                                  .  Objection Deadline:
 6                                .  September 3, 2024 at 2:00 p.m.
                                  .
 7                                .  Courtroom No. 4
                                  .  824 North Market Street
 8                                .  Wilmington, Delaware 19801
            Debtors.             .
 9                                .  Tuesday, September 3, 2024
    . . . . . . . . . . . . . . . .  2:00 p.m.
10
                          TRANSCRIPT OF HEARING
11              BEFORE THE HONORABLE MARY F. WALRATH
                   UNITED STATES BANKRUPTCY JUDGE
12
    APPEARANCES:
13

14  For the Debtors:        Jonathan Stemerman, Esquire
                            ARMSTRONG TEASDALE LLP
15                          1007 North Market Street
                            Third Floor
16                          Wilmington, Delaware 19801

17

18  (APPEARANCES CONTINUED)

19  Audio Operator:         Kim Ross, ECRO

20

21  Transcription Company:  Reliable
                            The Nemours Building
22                          1007 N. Orange Street, Suite 110
                            Wilmington, Delaware 19801
23                          Telephone: (302)654-8080
                            Email:  gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.
</pre>

<pre>
 1   APPEARANCES (CONTINUED):

 2   For the Debtors:          Victor Vilaplana, Esquire
                               ARMSTRONG TEASDALE LLP
 3                             P.O. Box 9038
                               La Jolla, California 92037
 4
     For the U.S. Trustee:     Malcolm Bates, Esquire
 5                             OFFICE OF THE UNITED STATES TRUSTEE
                               844 King Street, Suite 2207
 6                             Lockbox 35
                               Wilmington, Delaware 19801
 7
     For Cypress Point
 8   Holdings:                 Kevin Garland, Esquire
                               FOLEY & LARDNER LLP
 9                             1000 Louisiana Street
                               Suite 2000
10                             Houston, Texas 77002

11                             F. Phillip Hosp, Esquire
                               FOLEY & LARDNER LLP
12                             555 South Flower Street
                               Suite 3300
13                             Los Angeles, California 90071

14   For the City of La
     Quinta, California:       Bradford Englander, Esquire
15                             WHITEFORD TAYLOR & PRESTON LLP
                               3190 Fairview Park Drive
16                             Suite 800
                               Falls Church, Virginia 22042
17
     For R.D. Olson
18   Construction:             Lawrence O'Brien, Esquire
                               WATT, TIEDER, HOFFAR &
19                               FITZGERALD LLP
                               1765 Greensboro Station Place
20                             Suite 1000
                               McLean, Virginia 22102
21
     For Poppy Bank:           Mitchell Greenberg, Esquire
22                             ABBEY, WEITZENBERG, WARREN
                                 & EMERY P.C.
23                             100 Stony Point Road
                               Suite 200
24                             Santa Rosa, California 95401

25
</pre>

1                              INDEX

2    MOTIONS:                                          PAGE

3    Agenda
     Item 1: Motion of the Debtors Pursuant to Sections      4
4            105, 361, 362, 363, 364 and 507 of the
             Bankruptcy Code, Bankruptcy Rule 4001, and
5            Local Rule 4001-2, for Interim and Final
             Orders (I) Authorizing Debtors to Obtain
6            Post-Petition Financing; (II) Granting DIP
             Lenders Liens and Super-Priority Claims;
7            (III) Scheduling a Final Hearing; and (IV)
             Granting Related Relief [D.I. 55 Filed
8            August 29, 2024
             https://ecf.deb.uscourts.gov/doc1/042021781344]
9
             Court's Ruling:                                94
10

11
     EXAMINATIONS:                                     PAGE
12
         FRED SCHUSTER
13       Direct examination by Mr. Stemerman           11
         Cross-examination by Mr. Englander            31
14       Cross-examination by Mr. O'Brien              36
         Cross-examination by Mr. Hosp                 38
15       Redirect examination by Mr. Stemerman         43

16       DOUGLAS WILSON
         Direct examination by Mr. Stemerman           44
17       Cross-examination by Mr. Greenberg            58
         Cross-examination by Mr. Garland              61
18       Cross-examination by Mr. Englander            69
         Cross-examination by Mr. O'Brien              76
19       Cross-examination by Mr. Bates                78
         Redirect examination by Mr. Stemerman         93
20

21

22

23

24

25

1         (Proceedings commence at 2:01 p.m.)

2              THE COURT:  All right.  Good afternoon.  This is

3    Judge Walrath.  We're here in the SilverRock case

4              This is the emergency motion of the debtor for DIP

5    financing.  I'll turn it over --

6              MR. STEMERMAN:  Yes.

7              THE COURT:  I'll turn it over to counsel for the

8    debtor.

9              MR. NOVAK:  Good afternoon, Your Honor.

10             THE COURT:  Wait one second.

11        (Court and court personnel confer)

12             THE COURT:  Hold on a second, we're having

13   technical difficulties.

14        (Court and court personnel confer)

15             THE COURT:  Give us a minute.

16        (Court and court personnel confer)

17             THE COURT:  I'm going to ask counsel for the

18   debtor to try speaking again, to see if we fixed it.

19             MR. STEMERMAN:  Good afternoon, Your Honor.

20   Jonathan Stemerman of Armstrong Teasdale on behalf of the

21   debtors.  And also with me today, Your Honor, my co-counsel

22   Ben Carson and Victor Vilaplana.

23             So, as Your Honor noted, we are here today on the

24   debtors' emergency motion for DIP financing.  As I'm sure

25   Your Honor has seen, there has been an influx of objections

1  to the DIP motion, to our request for interim emergency

2  relief.

3          Your Honor, we are prepared to make an evidentiary

4  record in support of our motion, if that's how Your Honor

5  wishes to proceed; otherwise, we're willing to proceed in any

6  other manner Your Honor wants to.

7          THE COURT:  Well, let me ask a question.  We're

8  here for interim relief, so I am interested in evidence

9  regarding, number one, what the immediate and irreparable

10  harm that may be occasioned if I don't grant a DIP; and,

11  number two, evidence regarding any adequate protection that

12  you are offering to any of the secureds, as I understand

13  that's a major focus.

14          MR. STEMERMAN:  Uh-huh.  True, Your Honor.  And I

15  can -- with respect to the adequate protection -- and I --

16  we're happy to put on some more evidence.  But Your Honor, I

17  can direct Your Honor to the valuation reports, which we

18  filed earlier today, that are -- they were filed at Docket

19  Numbers 68-1, 68-2, and 68-3, that form the basis for the

20  debtors' assertion that the value of the collateral that's

21  part of the DIP collateral is approximately $303 million and

22  ...

23          THE COURT:  Do you have any witnesses to provide

24  that evidence?

25          MR. STEMERMAN:  Your Honor, the witness who we

 1   have is Fred Schuster, who is the CFO of the manager of the

 2   debtors, who's prepared to testify that the debtors received

 3   these valuations and relied on them in making the assertions

 4   regarding the value.

 5            THE COURT:  Does anybody have objection to the

 6   Court considering those exhibits?

 7            MR. GARLAND:  Yes, Your Honor.  Kevin Garland,

 8   Foley & Lardner.  I'm sorry.  I should have let my local

 9   counsel introduce us, I shouldn't have spoken out of turn.

10   But of course I do, Your Honor.

11            First off, I mean, we're obviously here today.

12   They don't have a qualified appraiser on the Zoom that I'm

13   aware of.  They provided these appraisals this morning.

14            Notwithstanding that, we went ahead and looked at

15   them.  And the appraisal provided by HVS comes to an

16   appraised as-is value of $235.4 million.  The appraisal for

17   CBRE comes in at a value of $233.2 million.  Now that I can

18   see, just on its face, Your Honor, that does not add up to

19   three hundred.

20            Importantly, the Robert Green declaration,

21   provided in connection with the first-day motions, that said

22   that there was $239.5 million in debt owed on the project,

23   which means there's not a massive equity cushion, as the

24   debtor would lead you to believe.

25            THE COURT:  Well, I want to go into whether or not

1  it's competent evidence, first and foremost.

2          MR. ENGLANDER:  Your Honor, Brian Englander --

3  again, I apologize if I'm speaking out of turn before our

4  local counsel has introduced me -- Whiteford, Taylor &

5  Preston and am bankruptcy counsel for the City of La Quinta.

6  I should note that the city attorney, who is a partner at

7  Rutan & Tucker in Irvine, California, Bill Ihrke also is on

8  at the hearing, as is the Manager Jon McMillen.

9          And the City does object to the admission of the

10  appraisal reports on the grounds that they are hearsay,

11  they're -- there is no appraiser present to testify and there

12  is no applicable exception to the hearsay rule that would

13  permit them to be used and offered for the truth of the

14  matter asserted.

15          THE COURT:  Mr. Stemerman or Mr. Vilaplana, do you

16  have any response to that, how you intend to get those

17  appraisals in without a witness?

18          MR. STEMERMAN:  Well, Your Honor, so, for purposes

19  of this hearing -- right?  What -- which is on an emergency

20  basis, the testimony would be that the debtors -- right?

21  Obtained these appraisals from reputable valuation companies

22  and have relied on those valuations to make the statements

23  that -- you know, that they did concerning the value of the

24  parcels of land that we're talking about.

25          THE COURT:  I -- you can't give --

1          MR. VILAPLANA:  Your Honor --

2          THE COURT:  -- an appraisal in just by saying I

3 got it and looked at it.  And I don't care --

4          MR. VILAPLANA:  Your Honor --

5          THE COURT:  Go ahead.  And does it matter whether

6 the debtor relied on it or not?  You're asking the Court to

7 rely on it and the secured lenders to rely on it.

8          Mr. Vilaplana, I'm sorry I interrupted you.  Go

9 ahead.

10          MR. VILAPLANA:  I just want to make a brief point,

11 Your Honor, that you indicated --

12          THE COURT:  Excuse me.  You're the one who's

13 echoing.

14          MR. VILAPLANA:  Oh, okay.

15          UNIDENTIFIED:  I'm sorry.  One moment, Your Honor.

16          MR. VILAPLANA:  Is it -- I hope this is better.

17          THE COURT:  Much better.

18          MR. VILAPLANA:  Thank you.  I apologize.

19          I'm just going to make the point, Your Honor, that

20 you focused on competence.  And I think the owner, which are

21 the declarations by Mr. Green, is always competent to testify

22 as to value.  It may go to the weight, but he's always

23 competent to testify as to value and he has testified as to

24 value.  So I think the valuation that is submitted is based

25 on competent and admissible evidence; that is, of the owner.

1          THE COURT:  Well, the owner can tell me what he

2   thinks its worth --

3          MR. VILAPLANA:  Right.

4          THE COURT:  -- but that doesn't mean that he can

5   rely on others and get that other person's appraisal

6   introduced.  And I may just not accept his belief as to what

7   the property is worth.

8          MR. VILAPLANA:  I do not quarrel with what Your

9   Honor just said; that is -- the question is:  Is there

10  competent evidence and admissible evidence as to the value?

11  The answer to that, I believe, Your Honor, is yes.  What

12  weight you give to that is, of course, in your discretion.

13  But there is evidence as to value and beyond the appraisal.

14          And then there's the arguments that Mr. Stemerman

15  made as to why the appraisals, on an emergency basis, in this

16  kind of hearing, should be allowed as evidence.  There's no

17  indicate -- there isn't any -- I'm sorry.

18          THE COURT:  They are hearsay, and I -- emergency

19  or not, I'm not going to admit it, particularly since this is

20  not the first day of the case and the debtor certainly has

21  had time to obtain competent testimony.

22          And what evidence do you have that this is an

23  emergency?  Mr. Stemerman, you're still muted.

24          MR. STEMERMAN:  My apologies.

25          Your Honor, we were prepared to put on testimony

1   that the debtor has received numerous phone calls and

2   outreach from various vendors who, not only are owed money

3   pre-petition, but who are owed money, you know, post-

4   petition, which are accruing admin expenses and haven't, you

5   know, been paid since the filing of the bankruptcy, which, at

6   this point, is approximately a month.

7           And the debtors are fearful, based on their

8   conversations, that, you know, these vendors are no longer

9   going to provide services.  In at least one case, they've

10  threatened to repossess certain assets.

11          THE COURT:  Is the debtor operating at all?

12          MR. STEMERMAN:  Very minimally, Your Honor.  So

13  there are certain things that are going on at the site,

14  including dust control and other safety procedures that

15  involve the use of -- or the need for personnel to oversee

16  those.

17          But beyond that -- and also, Your Honor, there are

18  -- there's a sales broker who is, you know, constantly trying

19  to communicate with folks that have put down deposits to keep

20  those deposits and keep those folks from trying to get those

21  deposits back.  But beyond that, Your Honor, there is minimal

22  other operations that are going on.

23          THE COURT:  Uh-huh.  Well, I'm going to let the

24  debtor put on evidence now regarding those two issues, and

25  I'll allow the parties to object, if they object to -- or to

 1  cross-examine.

 2           So, Mr. Stemerman or Mr. Vilaplana, whom do you

 3  intend to call first?

 4           MR. STEMERMAN:  Your Honor, I'm -- I think, first,

 5  for those two issues, we will call Fred Schuster.

 6           THE COURT:  Where is Mr. Schuster?  Oh, there he

 7  is.  All right.  Mr. Schuster, I'm going to ask the ECRO to

 8  swear you in.

 9           THE ECRO:  Please raise your right hand.

10      FRED SCHUSTER, WITNESS FOR THE DEBTORS, AFFIRMED

11           THE ECRO:  Please state your full name and spell

12  your last name for the record.

13           THE WITNESS:  Fred Schuster, S-c-h-u-s-t-e-r.

14           THE ECRO:  Thank you.

15           THE COURT:  All right.

16                     DIRECT EXAMINATION

17  BY MR. STEMERMAN:

18  Q   Mr. Schuster, can you please very briefly describe your

19  educational background?

20  A   Sure.  Forty years ago, I graduated from San Diego State

21  University with a degree in business, focused on accounting.

22       I, ultimately, earned my CPA, worked with Kenneth

23  Leventhal for a couple of years.  Then I worked for a local

24  real estate developer for about five years, the Nieman

25  Company (phonetic).

1        I then connected with Four Seasons Hotels and Resorts

2    as their Corporate Director of Finance, involved with all

3    their residential developments, branded residential.

4        Skipping ahead several years, I reacquainted with

5    Robert Green of the Robert Green Company, where he hired me

6    as the Executive Vice President for the company and the Chief

7    Investment Officer, where I handled a lot of responsibilities

8    in finance, accounting, business planning, legal

9    coordination, et cetera, and also overseeing those aspects

10   for our projects, including the TALUS La Quinta project.

11   Q    And in those capacities that you just mentioned, did you

12   ever have occasion to obtain valuations?

13   A    Yes, many times.

14   Q    And did you ever have to value real estate yourself?

15   A    I'm not licensed to value real estate, but I assist the

16   independent appraisers with -- with the information required

17   and necessary to form the valuations.

18   Q    And so where are you currently employed?

19   A    I'm employed by the -- with the Robert Green Company.

20   Q    And what is your current title with the Robert Green

21   Company?

22   A    Well, it's still the Executive Vice President and Chief

23   Investment Officer, but I -- I also perform the function of

24   Chief Financial Officer for the company.  Recently, the

25   company had to scale back some of its operations, so I

1   stepped in to be the -- as the CFO, as well.

2   Q    And can you please briefly describe your

3   responsibilities at the Robert Green Company?

4   A    Well, currently, it's -- it's focused solely, almost 100

5   percent, on the finance, accounting, business planning, cash

6   flow modeling, working closely with the CRO that's been

7   retained by the debtors, all -- all as it relates to the

8   TALUS La Quinta SilverRock project.

9   Q    And can you briefly give an overview of the TALUS La

10  Quinta project?

11  A    Sure.

12       TALUS is an approximate five-hundred-and-twenty-five-

13  acre property with -- with several different phases and

14  components.

15       Phase -- the first -- the first phase is about 140

16  acres, made up of commercial and residential components.  Of

17  that first phase, about 85 acres is what we refer to as

18  "Phase 1A," and that comprises a commercial area made up of

19  two hotels, a conference and shared services building, and a

20  golf clubhouse.

21       The other -- the other component are branded

22  residential components:  Montage Residences, which is made up

23  of 29 residential lots, and Pendry Residences, which are made

24  up of 55 condominiums.

25       Phase 1B is approximately 50 acres, which is also --

1  has also been acquired from the City.  And that's planned for

2  other uses in a different -- in a different phase.

3       In addition to this Phase 1A and Phase 1B, the debtor

4  has -- under the purchase and sale and development agreement,

5  has an option to acquire approximately 190 acres in what's

6  called the "Phase 2 Option Agreement."  And again, that can

7  be exercised at the completion of the first phase.

8  Q    And --

9  A    I did not --

10  Q    -- (indiscernible)

11  A    I did not mention that also, as part of the development,

12  is about a hundred-and-eighty-acre operating golf course that

13  also gets acquired by the debtor upon the completion of the

14  first phase, at the completion of both hotels.

15  Q    Gotcha.

16            MR. STEMERMAN:  And Your Honor, I know you wanted

17  to focus on valuation.  Does Your Honor want any testimony

18  right now as it relates to the debt that is on the DIP

19  collateral?

20            THE COURT:  Well, are you going to get it out of

21  this witness or --

22            MR. STEMERMAN:  Yes.

23            THE COURT:  Then go ahead.

24            MR. STEMERMAN:  Okay.

25            THE COURT:  I don't think --

1          MR. STEMERMAN:  So --

2          THE COURT:  -- that's contested, is it?

3          MR. STEMERMAN:  I don't think it is, for the most

4  part, Your Honor, other than possibly certain amounts of the

5  debt.

6          THE COURT:  All right.

7          MR. STEMERMAN:  So just, if Your Honor wants, I

8  can focus on the disputed amount.

9          THE COURT:  No.  Just go on the overall amount.

10 If you have disputes with some of the amounts, yes, you

11 should focus on that.

12         MR. STEMERMAN:  Okay.

13 BY MR. STEMERMAN:

14 Q    So, Mr. Schuster, can you just briefly state the

15 debtors' capital structure, in terms of -- the debt

16 structure, in terms of who the secured lenders are and how

17 much they're owed and what they might have a security

18 interest in?

19 A    From memory or --

20 Q    Well, let's -- I guess let's start from memory, as best

21 you can.

22 A    Okay.  So the current first deed of trust holder is

23 Poppy Bank, and they're owed approximately $33 million.

24 Their collateral is all of the commercial property, the

25 Pendry Residences property, and 16 of the 29 Montage

1  Residences property.

2  Q    Now --

3  A    The second -- the second trust deed holder is a company

4  called Cypress Point Holdings.  Their second trust deed

5  security is in all of those commercial properties, not in any

6  of the residential property.  And the amount -- the amount

7  that they are owed is -- is being disputed.

8  Q    And can you discuss, just very briefly, what the nature

9  of the dispute is?

10 A    It's -- it's primarily regarding, you know, the amount

11 owed.  Their -- their -- their -- their -- their note balance

12 has reflected, you know, accrued interest, late fees,

13 penalties, and there's a -- there's a dispute over the amount

14 of the -- the calculation on the penalties and -- and some

15 other -- other fees associated with -- with their accrued

16 balance.

17 Q    And if you recall, do you recall what Cypress asserts is

18 the amount that they're owed?

19 A    I believe, from my recollection, their -- they claim to

20 be owed $47 million, somewhere in that.

21 Q    And what does the debtor believe the actual amount owed

22 is, approximately?

23 A    Somewhere -- somewhere in the -- in the thirty-million-

24 dollar range, in the thirties.

25 Q    And then you mentioned Poppy and Cypress.

1          What about Axia Talus?

2  A     Yes.  Well, Axia Talus holds a third trust deed in the -

3  - in the commercial properties, and their balance is

4  approximately $20 million.

5  Q     And then what about R.D. Olson?

6  A     R.D. Olson is the general contractor for a good portion

7  of the commercial component to the project.  They have a

8  mechanics lien, again, on certain portions of the commercial

9  property in an amount of approximately fourteen and a half

10  million dollars.

11  Q     And going back to Axia Talus for a moment.  You

12  mentioned a third deed of trust.  Is that third deed of trust

13  on all of the debtors' property?

14  A     No, only on the -- only on the commercial components,

15  the same ones that Cypress Point Holdings has a second.

16  Q     And what about Builders Capital?

17  A     Yeah.  Builders Capital is the project's residential

18  lender, and they provided a loan on the first 13 lots of the

19  Montage Residences.  Their loan commitment was approximately

20  $48 million, and I believe their outstanding balance is about

21  37 million.

22  Q     And now those 13 lots on the Montage Residences that you

23  mentioned, are those part of the DIP collateral?

24  A     No, they're not.

25  Q     Thank you.

1         I want to turn now to the various valuations.

2               MR. STEMERMAN:  Your Honor, am I able to share my

3    screen?

4               THE COURT:  Just a minute.

5               MR. HOSP:  Your Honor, this is Phil Hosp on behalf

6    of Cypress Point Holdings.

7               I believe Your Honor limited testimony to the

8    actual need for emergency funding, given the fact that we

9    have no qualified appraiser here.  Mr. Green act -- Mr.

10   Schuster actually just admitted that he was not a qualified

11   appraiser.  So I'm not sure why this information is relevant

12   or admissible.

13              MR. ENGLANDER:  And Your Honor, Brad Englander.

14              I join in the objection.  The Court already has

15   ruled on the inadmissibility of the appraisal reports.

16              THE COURT:  Just a moment.

17              MR. STEMERMAN:  Your Honor, I don't believe Your

18   Honor ruled directly on the inadmissibility of it.  I think

19   it can be used to substantiate what the debtors' belief is

20   and the debtors' reliance as the owner --

21              THE COURT:  I'm not --

22              MR. STEMERMAN:  -- of the properties --

23              THE COURT:  I'm not going to allow it.

24              MR. STEMERMAN:  Okay.

25              THE COURT:  It's hearsay.

1          MR. STEMERMAN:  Thank you, Your Honor.

2    BY MR. STEMERMAN:

3    Q    Mr. Schuster, what is the debtors' belief as to the

4    value of the DIP collateral?

5          MR. HOSP:  Objection.  Lack of foundation.

6          THE COURT:  Yeah.  What is his foundation for

7    that?

8          MR. STEMERMAN:  Well, I mean, the foundation, Your

9    Honor, would be based on the appraisals that were performed,

10   and so I don't know if --

11         THE COURT:  That's --

12         MR. STEMERMAN:  -- if that --

13         THE COURT:  If that's all he can rely on, I'm not

14   going to --

15         MR. STEMERMAN:  Okay.

16         THE COURT:  -- allow him to testify.

17         MR. VILAPLANA:  Judge, this is Mr. Vilaplana,

18   Victor Vilaplana.

19         Again, perhaps you already ruled on this, and I

20   apologize if you have, but I thought -- I believe we agreed

21   that, as the owner -- and he is the Chief Financial Officer

22   of the owners -- the owner has -- is competent to testify as

23   to the owner's opinion of value of his assets, and that's how

24   he's testifying --

25         THE COURT:  Is he going to --

1              MR. VILAPLANA:   -- as --

2              THE COURT:  Is he going to testify as to anything

3   of his own personal knowledge, other than that he looked at

4   the appraisals?

5              MR. VILAPLANA:  No.  He's going to rely on his

6   personal knowledge of the property that he has been

7   intimately involved in developing, the acquisition of it, the

8   development of it, the project itself.  He's intimately

9   familiar with the property, the real property, and the

10  project.  And based on that, that's knowledge independent of

11  the appraisals, he has an opinion of the value.

12             THE COURT:  Does he?

13             MR. VILAPLANA:  I believe so.  That's the question

14  that we asked and was objected to.  That's the question to

15  him, I believe.

16             THE COURT:  Well, I think you're going to have to

17  set the foundation before you ask him what he thinks it's

18  worth.

19             MR. VILAPLANA:  Okay.  Well, I turn it over to Mr.

20  Stemerman to ask the foundational questions of what is his

21  familiarity and knowledge with the property.

22             MR. HOSP:  Your Honor, this is Phil Hosp on behalf

23  of Cypress.

24             That still does not establish the foundation to

25  put an appraised value on the property.

1          THE COURT:  Oh, he's not going to -- he's not

2    admitting the appraisals.  They are --

3          MR. VILAPLANA:  That's correct.

4          THE COURT:  They are not being admitted.

5          MR. STEMERMAN:  That is correct..

6          MR. HOSP:  Or, for that matter, in a guesstimate

7    on what he believes the appraisals are.  This is improper

8    expert testimony that he's not qualified to give.

9          THE COURT:  Well --

10          MR. VILAPLANA:  That is incorrect.

11          THE COURT:  Mr. Vilaplana.

12          Owners are entitled to state what they think the

13    property is and I'll hear why he thinks it's worth whatever

14    he thinks it's worth, if he has an opinion on what it might

15    be worth.

16    BY MR. STEMERMAN:

17    Q    So, Mr. Schuster, independent of the valuations that

18    were performed on the property, do you have an opinion as to

19    the value of the DIP collateral that is being put forth as

20    part of this interim DIP motion?

21          MR. HOSP:  Objection.  Vague as to "DIP

22    collateral," Your Honor, as we discussed in our papers.

23          THE COURT:  Yeah, I don't know what the "DIP

24    collateral" is, Mr. Stemerman.

25          MR. STEMERMAN:  Sure.  Your Honor, we can get into

1  that.  I thought we were skipping over some of that.

2  BY MR. STEMERMAN:

3  Q   Mr. Schuster, can you please testify as to what the

4  debtors are proposing as collateral for the debtor-in-

5  possession loan?

6          MR. STEMERMAN:  And actually, it might help, Your

7  Honor, if I put up the termsheet as an exhibit.  Am I allowed

8  to share the screen?

9          THE COURT:  You may.

10          MR. STEMERMAN:  I do not yet have permission to do

11  so.

12      (Pause in proceedings)

13          MR. STEMERMAN:  I have permission now.

14          THE COURT:  Okay.  There you go.

15  BY MR. STEMERMAN:

16  Q   Mr. Schuster, do you recognize this document?

17  A   I do.  And is -- is there a chance you can make it a

18  little bit larger?

19  Q   Yes.  Is that better?

20  A   Yeah.  Thank you.

21          MR. STEMERMAN:  And for the record, Your Honor,

22  I'd like to mark this exhibit as Debtors' 1, D-1.

23          THE COURT:  That's fine.  Let's just -- for the

24  record, it's Document 55-1 and has been docketed, correct?

25          MR. STEMERMAN:  Correct.  And it's --

1          THE COURT:  Okay.

2          MR. STEMERMAN:  It's page -- it starts off on Page

3  21 of Docket 55-1.

4          THE COURT:  Okay.

5  BY MR. STEMERMAN:

6  Q    And Mr. Schuster, what is this document?

7  A    It's a termsheet for the DIP financing from -- from

8  Serene Investment Management.

9  Q    I'm going to scroll down a little bit.

10      Does this document list the collateral for the debtor-

11 in-possession loan?

12 A    Yes, it's on the screen.

13 Q    And with respect to the real estate collateral, does

14 that adequately reflect what the real estate collateral is

15 for the DIP loan?

16 A    Yes.

17          MR. HOSP:  Objection.  Conclusory.

18          THE COURT:  Overrule.

19 BY MR. STEMERMAN:

20 Q    And when we are talking about the value -- strike that.

21      For this particular real estate collateral, do you have

22 an opinion as to the value of this collateral independent of

23 the value -- the valuations that were performed?

24 A    Yes.

25 Q    And what is the basis for your independent opinion of

1  value?

2  A    So there's -- there's two examples:

3       One would be related to the commercial properties, that

4  being the hotels.  The debtor has a management agreement, a

5  hotel management agreement -- actually, we refer to it a

6  resort -- as a "resort management agreement," with Montage

7  International.  They have provided to the debtor their

8  operating performance.  And what that is, it's the projection

9  of how they believe the hotels will perform when they are

10 completed, not only in the first year of operation, but they

11 take it out through stabilization.

12       And the basis for valuing hotel properties are -- are

13 done by using the income approach and taking a capital -- a

14 capitalization rate on the NOIs to come up with value.  And

15 then they do a reversion to bring that back to the present

16 value, to -- to come up with the as-is values.  So, based on

17 our -- our own internal calculations, they -- they assimilate

18 the -- the values associated with the independent appraisers'

19 appraisals performed by HVS, as an example.

20       And then the second part of -- of -- of my

21 interpretation of -- of values for the property is -- is

22 related to the residential components.  The property has

23 already received actual purchase and sale agreements from

24 third-party purchasers, which have validated the -- you know,

25 the values associated with those home sales.

1          MR. HOSP:  Objection.  Hearsay.

2          THE COURT:  Overrule.  What he's saying is not

3   hearsay.  This is the --

4          THE WITNESS:  Yeah.

5          THE COURT:  -- basis for his --

6          THE WITNESS:  Yes.  Thank you.

7          THE COURT:  Anything else?  Have you finished your

8   answer then?

9          THE WITNESS:  Oh, I would just finish by saying

10  that I've, firsthand, seen those purchase contracts with

11  those -- with the prices that have been realized.  They have

12  not -- they haven't closed yet, but they're -- they're

13  binding contracts.  And that, again, was the -- it formed the

14  -- part of the basis for determining the as-is value for the

15  residential properties.

16          One -- one other -- one other element to -- to the

17  as-is values are the -- the actual costs -- construction

18  costs incurred and completed to date on site.  So all of

19  those factors put together help me realize what the -- the

20  as-is value of the property as a whole.

21  BY MR. STEMERMAN:

22  Q    And what is your belief as to the as-is value of the

23  properties that are listed as the real estate collateral for

24  the DIP loan?

25  A    I -- I would agree with the -- the values assigned by

1  CBRE and HVS.

2            UNIDENTIFIED:  Objection.

3            MR. HOSP:  Objection.  Hearsay.

4            THE COURT:  What is your value?

5            THE WITNESS:  I'd say 300 million.

6  BY MR. STEMERMAN:

7  Q    And do you have a belief as to the value of just the

8  commercial properties?

9            MR. HOSP:  Objection.  Vague.

10           THE COURT:  Overrule.  You can answer.  Go ahead.

11           THE WITNESS:  Yeah.  I'm going to say about a

12  hundred and eighty-two, a hundred -- about 200 million.

13  BY MR. STEMERMAN:

14  Q    And then what would your approximate value of the

15  residential properties be and on an as-is basis?

16  A    Approximately 100 million.

17  Q    Thank you.

18      I'd now like to turn your attention to the immediacy of

19  the need for DIP funding.  Can you please describe why the

20  debtor needs immediate funding and what the debtor needs

21  immediate funding for?

22  A    Yes.  The debtor is working to preserve -- preserve the

23  asset, maintain its value, protect the asset.  And there's a

24  number of different vendors, suppliers, employees associated

25  with that effort that are required to be paid, in order to --

1  in order to do so.

2  Q    And can you be a little bit more specific regarding

3  those vendors?

4  A    Sure.  Some examples include:

5       The -- the rentals associated with -- with the fencing;

6       Rent -- rentals associated with on-site trailers,

7  construction trailers, storage trailers;

8       Rentals associated with a hotel guestroom mockup

9  building that houses the -- the mockup of a -- of a hotel

10  guestroom, there's a rental -- the rental costs associated

11  with that.

12      Debtor rents a home in close proximity to the -- to the

13  development that houses project staffing.

14      There's utilities.

15      There's all -- all of the labor that -- that's

16  associated with managing that effort.

17      And in all of those cases, all of those vendors,

18  employees, et cetera are -- are owed balances pre-petition

19  and they continue to be owed money post-petition, given that

20  we're almost 30 days since the filing.  So it's -- it's an

21  emergency to get those -- those vendors and those employees

22  paid; otherwise, we -- we run the risk of -- of losing

23  valuable employees.

24      And as you pointed out earlier, in the case of the

25  storage trailers, which they house valuable construction

1  materials, the -- the vendor has threatened to come and

2  repossess -- repossess those, so we -- we need to get them

3  paid immediately.

4           MR. STEMERMAN:  Your Honor, with the Court's

5  permission, I'd like to share my screen again for another

6  exhibit.

7           THE COURT:  I think you still have it, don't you?

8           MR. STEMERMAN:  Yes, I do.

9  BY MR. STEMERMAN:

10  Q    And Mr. Schuster, do you recognize this document?

11  A    I do, but I need -- once again, need it to be a little

12  bit larger.

13  Q    Is that better?

14  A    Yeah.  Thank you.

15  Q    And Mr. Schuster, what is this document?

16  A    This is the interim -- I'm sorry.  This is the -- this

17  is the interim -- yes, this is the interim budget.

18           MR. STEMERMAN:  And for the record, Your Honor,

19  I'd like to mark this as Exhibit D-1.  It's filed at Docket

20  Number 68-4.

21           THE COURT:  All right.

22           MR. STEMERMAN:  And we're looking at Page 3 of 3.

23  BY MR. STEMERMAN:

24  Q    So you discussed the immediate need for certain of the

25  items on this list, but I'd like to go down to a couple of

1 others (indiscernible)

2      Do you see water and electricity?

3 A    Yes.

4 Q    Why is there immediate need for water and electricity?

5 A    Well, water, for example, that -- that utility is used -

6 - one example is to maintain the dust control on site.  A

7 good portion of the development does not have any structures

8 on it and the -- the property sometimes has a lot of wind.

9 And the -- the debtor, from -- periodically is watering the

10 site, you know, to -- to maintain dust control.

11      Electricity -- electricity is used, also -- you know,

12 it's a project-related cost for trailer functions, site

13 security, et cetera.

14 Q    And just skipping around just a little bit.  Looking at

15 the line item for consulting, residential sales.  Why is that

16 an immediate need?

17 A    Yeah, that's -- that's the cost associated with -- with

18 the individual that we -- the branded residential sales for

19 the project.  That individual is one that's most in contact

20 with -- with the -- the purchasers of homes and the

21 reservation holders of the Pendry Residences.  And that

22 person also coordinates with our -- our legal counsel for the

23 department -- California Department of Real Estate, all of

24 the governing documents and the -- and the public documents

25 for the sales registrations.  So it's a vital -- it's a vital

1  role to preserve -- again, once again, reserve -- preserving

2  the value of the asset by keeping the millions of dollars in

3  -- in pending residential sales on the books.

4  Q    And looking down some more there, there's a line item

5  for payment and performance bond premium.  Can you please

6  describe what that is and why it's important that it get paid

7  immediately?

8  A    Yeah.  That's a -- that's a premium, as it says there,

9  for a payment and performance on -- one the developer or the

10 debtor, completing a variety of site improvements.  And it's

11 -- it's a bond that's required by the City of La Quinta.  So

12 it's -- it's important to keep that -- that bond in place and

13 to be compliant with the City's requirements.

14 Q    And lastly, because I'm sure you'll get questions about

15 it, can you please describe the Line Item 4, "Contingency"?

16 A    Yes.  That -- that is a calculated number.  It's 20

17 percent of all of the -- of the entire interim budget here.

18 And that's typical in the -- in the budgeting process, as

19 these numbers are -- are -- are just that.  They're --

20 they're budgets; they're not actuals.  And there -- there

21 needs to be an adequate contingency to cover costs that go

22 over the budget.

23 Q    And for the weeks of -- the first four weeks, has the

24 debtor already incurred those costs?

25 A    Yes, they have.  And they -- they were based on -- on

1  the actual costs that -- that occurred pre-petition.  Many of

2  these are monthly costs that we've broken out, for the -- for

3  the formatting, into a weekly format.

4  Q    And so, now that the month of August has ended, are --

5  have those costs become due?

6  A    Many of them were due at the first -- at the beginning

7  of the month, so they're -- they're -- they're past due.

8  Q    And now that we've begun the month of September, so I

9  take it that there are expenses that were due at the first of

10  -- the beginning of September?

11  A    That's correct.

12          MR. STEMERMAN:  Your Honor, I have no further

13  questions with respect to those two issues that Your Honor

14  wanted to highlight.

15          THE COURT:  Does anybody wish to cross-examine as

16  to those two issues?

17          MR. ENGLANDER:  Yes, Your Honor.  Brad Englander.

18          THE COURT:  You may proceed.  And for the record,

19  tell us who you're representing again.

20          MR. ENGLANDER:  Thank you, Your Honor.  City of La

21  Quinta.

22          THE COURT:  Okay.

23                    CROSS-EXAMINATION

24  BY MR. ENGLANDER:

25  Q    Mr. Schuster, is there a reason that you did not reach

1  out to the City or any of the other secured lenders to seek

2  DIP financing?

3          MR. STEMERMAN:  Objection, Your Honor.  I don't

4  think that goes to the two issues Your Honor wanted to

5  highlight.

6      (Participants confer)

7          MR. ENGLANDER:  Your Honor, it goes to the

8  emergency or lack of emergency.

9      (Participants confer)

10          THE COURT:  Yeah, I think it does.  Mr. Stemerman,

11  did you understand that emergency was part of the second

12  issue I wanted you to address.

13          MR. STEMERMAN:  Yes.

14          THE COURT:  Okay.  I'll allow the question.

15  BY MR. ENGLANDER:

16  Q   Mr. Schuster, is there a reason that you did not reach

17  out to the City or to any of the other secured lenders to

18  seek debtor-in-possession financing?

19          MR. VILAPLANA:  Your Honor, I object.  It assumes

20  facts not in evidence.  That's incorrect.  There were --

21          THE COURT:  Well, Mr. Vilaplana, I don't want you

22  to answer.  I would like the witness to answer.

23          MR. VILAPLANA:  Thank you.  So --

24          THE COURT:  Overrule the objection.

25          MR. VILAPLANA:  Thank you, Your Honor.

1        THE WITNESS:  So I would say that the debtor has

2   retained Doug Wilson, who is another one of the witnesses,

3   and it's -- it's been his -- and he'll -- he probably would

4   be the better person to respond to that question as to his

5   communication with the secured creditors.

6   BY MR. ENGLANDER:

7   Q    To your knowledge, was there any such outreach?

8   A    What I understand is that there was.

9   Q    And are you aware that the City has arranged to pay for

10   three months of fencing at its expense?

11   A    I was not aware of that.

12   Q    You're not aware then that debtors' counsel threatened a

13   stay violation against the City for doing that?

14        MR. STEMERMAN:  Objection, Your Honor.

15        THE COURT:  Well, he can answer, if he can.

16        THE WITNESS:  I don't recall.

17   BY MR. ENGLANDER:

18   Q    Are you aware that we have requested, for approximately

19   two weeks, a detailed budget of the proposed expenses even

20   before the debtors filed their debtor-in-possession financing

21   motion?

22   A    I don't recall.

23   Q    And do you know why that detailed budget was denied when

24   requested?

25        MR. STEMERMAN:  Objection, Your Honor.  He already

1  testified he doesn't recall.

2          THE COURT:  Well, that was a different question.

3          MR. STEMERMAN:  Right.  But it --

4          THE COURT:  So I'll allow him to answer.

5          THE WITNESS:  I -- I wasn't aware of -- that it

6  was rejected.

7  BY MR. ENGLANDER:

8  Q    And as the CFO, are you responsible for preparing and

9  reviewing budgets?

10 A    Yes.

11 Q    And this emergency budget that the debtors want to fund,

12 is there a reason that it was not filed before this morning?

13 A    That was -- that was up to the legal -- the legal team.

14 Q    As to valuation, you are not an owner in this entity, in

15 the debtor, are you not?

16 A    No.

17 Q    Is that correct?

18 A    That's correct.

19 Q    And you report to Mr. Green.

20 A    That's correct.

21 Q    And you are not licensed as an appraiser.

22 A    Correct.

23 Q    When you testified regarding the valuation of hotel --

24 the hotel valuation, you referred to work product prepared by

25 a third party, by Montage, I believe it was.

1  A     Correct.

2  Q     And that was a document that was given to you?

3  A     Correct.

4  Q     Not your own work product.

5  A     Correct.

6  Q     Would you agree that, if the City, either on its own or

7  in combination with other creditors, were to propose

8  financing for these interim expenses without requiring

9  priming and without requiring a three-million-dollar make

10  whole, without requiring $50,000 of due diligence fees, that

11  that would be a better exercise of the debtors' business

12  judgment than pursuing the loan that is previously on the

13  table in front of the Court?

14          MR. VILAPLANA:  Objection.  I'm going to object,

15  Your Honor.  Assumes facts not in evidence.  No such proposal

16  has been made by anyone.

17          THE COURT:  Overrule.  He can answer the question.

18          You can -- can you answer the question, Mr.

19  Schuster?

20          THE WITNESS:  I guess that I would have to see

21  what the details are then compare it against what's been

22  proposed by the -- the DIP lender.

23  BY MR. ENGLANDER:

24  Q     Do you think that, if, at the beginning of this case,

25  the debtor had reached out to the City and to the other

1 | secured creditors, by now, it might have had those details?

2 |         MR. STEMERMAN:  Objection, Your Honor.  Calls for

3 | speculation.

4 |         THE COURT:  Overrule.

5 |         THE WITNESS:  Again, I don't -- I don't know the -

6 | - you know, the exact timing of -- of communication or lack

7 | of communication between the parties.

8 |         MR. ENGLANDER:  I have nothing further for this

9 | witness, Your Honor.

10 |         THE COURT:  Anybody else?

11 |         MR. O'BRIEN:  Your Honor, I have some questions

12 | for the witness.

13 |         THE COURT:  Who's speaking?

14 |         MR. O'BRIEN:  Larry O'Brien for R.D. Olson.

15 |         THE COURT:  All right, Mr. O'Brien.  You may go

16 | ahead.

17 |                    CROSS-EXAMINATION

18 | BY MR. O'BRIEN:

19 | Q    Mr. Schuster, you're familiar with my client R.D. Olson,

20 | correct?

21 | A    Yes.

22 | Q    And R.D. Olson is the general contractor on the Montage

23 | Hotel, Montage Spa, conference center, and golf clubhouse,

24 | correct?

25 | A    That's correct.

1  Q    And it's true that R.D. Olson filed four mechanics liens

2  against the respective parcels where R.D. Olson performed

3  construction work, correct?

4  A    I'm not sure of the exact -- the exact number, but it --

5  it was related to those -- those components are the -- are

6  the components that were worked on by R.D. Olson.

7  Q    Understood.

8       And have you reviewed those four mechanics liens --

9  A    Not --

10  Q    -- or the mechanics liens, any of the filing?

11  A    Not currently.

12  Q    And as a mechanics lienholder, R.D. Olson is entitled to

13  a first priority lien against those parcels under California

14  law, correct?

15         MR. STEMERMAN:  Objection, Your Honor.  Calls for

16  a legal conclusion.

17         THE COURT:  Sustained.

18  BY MR. O'BRIEN:

19  Q    And the total filed value of those mechanics liens you

20  had said was 14 million?

21  A    Approximately 14.5, as part of the settlement agreement

22  entered into between the parties.

23  Q    And the filed value of the actual mechanics liens, had

24  you reviewed them, would be 20 million, correct?

25         MR. STEMERMAN:  Objection, Your Honor.  He said

1  "had you reviewed them."  I don't know --

2           THE COURT:  Well, he may be able to answer it, so

3  I'll overrule your objection.

4           THE WITNESS:  Yeah, I -- I don't -- I'm not aware

5  of what that would be.

6           MR. O'BRIEN:  Understood.  That's all, Your Honor.

7           MR. HOSP:  Your Honor, this is Phil Hosp for

8  Cypress Point.  I'd like to ask the witness a couple of

9  questions.

10                      CROSS-EXAMINATION

11  BY MR. HOSP:

12  Q    Mr. Schuster, with respect to the appraisal you

13  mentioned on hotels' income, are there any complete hotels

14  generating income on any of the collateral?

15  A    No.

16  Q    I believe you also mentioned residences.  Are there any

17  completed homes on any of the collateral?

18  A    No.

19  Q    Are you familiar with -- well, let me back up.

20       Would you admit that the debtors are in default under

21  PSDA with the City?

22           MR. STEMERMAN:  Objection, Your Honor.  Outside

23  the scope.

24           MR. VILAPLANA:  And objection.  Calls for legal

25  conclusion, as well.

1          THE COURT:  Yeah, I'll sustain the objection.

2  BY MR. HOSP:

3  Q    Is your -- from what I heard your testimony today, it

4  seems like the appraisal is based on future development

5  rights.  Is that correct?

6          MR. VILAPLANA:  Objection, Your Honor.  The

7  appraisal has not been admitted into evidence.

8          MR. HOSP:  Well, I'm talking about the witness'

9  appraisal of the -- his own personal opinion.

10          THE COURT:  Okay.  Is your personal opinion based

11  on not being in default, is that the question?

12          MR. HOSP:  Correct.

13          THE WITNESS:  Yes, it would be on the assumption

14  that the development would be completed.

15  BY MR. HOSP:

16  Q    Are you aware of notices of default that had been sent

17  to SilverRock Development by the City of La Quinta?

18  A    Yes.

19  Q    Are you aware of the memorandum of understanding dated

20  May 24th, 2024 between debtors and my client, Cypress Point

21  Holdings, Poppy Bank, and other parties?

22  A    I am aware of that memorandum of understanding, yes.

23  Q    Okay.  The debtors signed the memorandum of

24  understanding.

25  A    Yes.

1  Q     Is it your understanding that the memorandum of

2  understanding, the MOU we will call it, gave debtors an

3  opportunity to cure outstanding defaults by June 30th, 2024?

4  A     I'm sorry, can you repeat the question?

5  Q     Sure.  I'm happy to bring up the document, but before I

6  do is it your understanding that the memorandum of

7  understanding between the City, the debtors, Cypress and

8  other parties gave the debtors the opportunity to cure

9  outstanding defaults by June 30th, 2024?

10          MR. VILAPLANA:  Objection, Your Honor.  It calls

11  for a legal conclusion.

12          THE COURT:  Overruled. I will allow him to

13  testify.

14          THE WITNESS:  I believe that was the date, yes.

15  BY MR. HOSP:

16  Q     And you believe that was the date for the debtors to

17  cure outstanding defaults, correct?

18  A     That is correct.

19  Q     Did debtors cure those defaults?

20          MR. VILAPLANA:  Objection, Your Honor.  It calls

21  for a legal conclusion as to the meaning of the word

22  "default" under the agreement.

23  BY MR. HOSP:

24  Q     Did debtors repay the debts owed to Cypress or Poppy by

25  June 30th, 2024?

1  A       No.

2  Q       Okay.  Is it also your understanding that the MOU --

3  under the MOU the debtors agreed to assign rights to the

4  development, to Chris George, if he exercised his right to

5  receive the assignment?

6             MR. VILAPLANA:  Objection. It calls for a legal

7  conclusion.

8             THE COURT:  Yeah, I'm going to sustain that.

9             MR. HOSP:  Your Honor, with permission of the

10  Court, can I share my screen?

11            THE COURT:  You may. Just wait a second.

12       (Pause)

13            THE COURT:  You should have it.

14            MR. HOSP:  Okay.  Can you see my screen, Your

15  Honor?

16            THE COURT:  Not yet.

17       (Pause)

18            MR. HOSP:  Do you see the MOU up on the screen,

19  Your Honor?

20            THE COURT:  There it is.  Okay.  Section 3?

21            MR. HOSP:  I'm going to be referring to Section 4,

22  Your Honor.

23            MR. VILAPLANA:  Your Honor, is there a reference

24  to the record for this?

25            THE COURT:  Has this been --

1      MR. HOSP:  Yes.  Your Honor, this is Document No.

2  65, first page starts at 28 of 294.

3  BY MR. HOSP:

4  Q    Mr. Schuster, let me refer you to Paragraph 4. It

5  states that if developer fails to close escrow on the

6  recapitalization loans by June 30th, 2024 and/or developer

7  fails to pay Cypress and Poppy the amounts owed and secured

8  by the Cypress deed of trust and Poppy deed of trust,

9  respectively, by June 30th, 2024, then CMG shall the rights

10  to be exercised by notice, in writing, delivered to the

11  parties no later then July 1st, 2024.  Then if you go down,

12  Paragraph 4.1 lists rights that Chris George would have.

13      Do you see that?

14  A    Yes.

15  Q    So, in reviewing this paragraph isn't it true that Mr.

16  George had an exercisable right to assume the debtors

17  development rights but the debtors failed to cure outstanding

18  amounts to Poppy Bank and Cypress?

19      MR. VILAPLANA:  Objection.  It calls for a legal

20  conclusion.  Further objection, his entire line of

21  questioning related to the MOU is irrelevant to the limited

22  scope of testimony that the Court provided.

23      THE COURT:  Yeah, it does call for a legal

24  conclusion and I think we're getting a bit far afield.

25

1        MR. HOSP:  Okay, Your Honor.  If you don't mind,

2   this all goes to the basis for the valuation on the property

3   or his opinion on value, and there being actual development

4   rights.  So, if its contested that the development rights,

5   the debtors do not have them, the value is not what the

6   debtors --

7        THE COURT:  I think you have enough to argue that.

8        MR. HOSP:  Okay.  Very well.  That's all the

9   questions I have for this witness.

10       THE COURT:  Anybody else?

11        (No verbal response)

12       THE COURT:  Mr. Hosp, are you done?

13       MR. HOSP:  Yes, Your Honor.  Thank you.

14       THE COURT:  Anybody else wish to cross-examine Mr.

15  Schuster?

16        (No verbal response)

17       THE COURT:  Any redirect?

18       MR. STEMERMAN:  Just very briefly, Your Honor.

19                    REDIRECT EXAMINATION

20  BY MR. STEMERMAN:

21  Q    Mr. Schuster, when you were testifying as to the as is

22  value of the properties was that based in part on the debtor

23  having future development rights?

24  A    Yes.

25       MR. STEMERMAN:  No further questions.

1          THE COURT:  Anyone else?

2       (No verbal response)

3          THE COURT:  Okay.  Any other witness, Mr.

4  Stemerman?

5          MR. STEMERMAN:  Yes, Your Honor.  For the

6  emergency basis for the relief requested we would like to

7  call Doug Wilson.

8          THE COURT:  Okay.  Mr. Wilson, I am going to ask

9  the clerk to swear you in.

10          MR. WILSON:  Thank you, Your Honor.

11           DOUGLAS WILSON, DEBTOR WITNESS, SWORN

12          THE CLERK:  Please state your full name and spell

13  your last name for the record.

14          THE WITNESS:  Douglas Wilson, W-I-L-S-O-N.

15          THE CLERK:  Thank you.

16                      DIRECT EXAMINATION

17  BY MR. STEMERMAN:

18  Q    Mr. Wilson, could you please describe your current

19  employment?

20  A    I am -- I have worked for Douglas Wilson Companies, as

21  I am currently the CEO and chairman.

22  Q    And how long have you been at Douglas Wilson Companies?

23  A    I founded the company 35 years ago.  This is our

24  anniversary.

25

1  Q     And can you please provide us with, just briefly, some

2  of your background?

3  A     Well, I started in the industry approximately 40 years

4  ago.  I am from Chicago.  I wound up Denver into San Diego

5  and in the 80's built, as a partner, a 1.2 million square

6  foot urban project called Symphony Towers. It was the largest

7  project built in the city.  During that timeframe it was --

8  during that timeframe I had served many of my friends in

9  Colorado, deal with the collapse of the energy markets and

10  saw the impact upon real estate, particularly.  So, my goal

11  in 1989, having sold Symphony Towers, which was very

12  successful, we gave the Symphony Hall, we gave the Fox

13  Theater to the Symphony Hall and pre-leased that building to

14  Peat Marwick, Pricewaterhouse, Gibson Dunn, AT&T, but I

15  learned about cycles.

16      My goal was to navigate bad markets, difficult cycles,

17  the inevitable powerful impacts they have on liquidity.  So,

18  in 1989 I had a lawyer friend explain a remedy under a

19  (indiscernible) deed of trust to put in a fiduciary as a

20  receiver that can actually walk into a situation as a court

21  officer to take over and preserve collateral.  That challenge

22  could be large or small depending on the fact pattern of the

23  case.

24      I did my due diligence at that time and found that

25  there were others doing this, but it was more localized, more

1 of a mom and pop business. I saw an opportunity to craft a

2 business model that could not only navigate but prosper in

3 bad markets.  I knew how to deal with major banks, other

4 financial institutions because of the prominent nature and

5 complexities of Symphony Towers.

6        So, I started that firm and the RTC happened, the

7 savings, the loan collapse.  As you can imagine, there was a

8 lot of opportunity for growth. I was able to hire wonderfully

9 talented people to bring on board, grew it outside of San

10 Diego very quickly into a regional and then national

11 platform. Over the ensuing years I, in the 90's, built the

12 infrastructure of that business model with the appropriate

13 financial and operational controls.  We developed

14 relationships with 200 institutions, most of them major

15 banks, private equities, pension funds, life companies, and

16 the like, and also would gravitate back into real estate

17 development as a part of the business model of Douglas Wilson

18 Companies.

19        In the late 90's and early 2000's I built by the

20 ballpark here in San Diego two of the most prominent projects

21 outside of Centerfield.  I bought the two blocks outside of

22 Centerfield when nothing was there, but I never lost sight of

23 my main focus was to have a diversified firm that was acting

24 as a fiduciary in other advisory capacities.

25

1    We began to evolve the business into doing not just

2  complex real estate, of which we have done all imaginable

3  forms from, you know, partially built ski resorts, building

4  half-built buildings on behalf of Bank of America on the East

5  Coast, taking over high rises in Miami, but to gravitate into

6  operating companies to do SEC matters, security matters.

7    So, we, in the last 35 years, as I look back, I have

8  been able to assemble a wonderfully gifted team of people

9  that I have provided some leadership to, but have really

10  carried the mantle.  We have done approximately 1,200

11  projects in about 33 states involving about $15 billion of

12  assets.

13  Q    Do you have any experience as a court appointed

14  fiduciary?

15  A    Yes.  Of those projects the lion's share is where I

16  have been a court appointed fiduciary either in State or

17  Federal Court as a receiver.  I have been an off panel 9/11

18  trustee on some large complicated real estate matters. I have

19  served a litany of other roles within the bankruptcy court

20  from liquidating agent to examiner and the like through the

21  years.  So, yes, we have served many roles.  We also serve as

22  ABC's, CRO's in a litany of other roles in various capacities

23  all as a fiduciary, which has built, obviously, based on our

24  integrity.

25  Q    And what is your role as it relates to the debtors?

1  A      So, this is only -- this is fairly fresh.  This is a

2  30-day involvement. When I was first approached I had heard

3  of Robert Green.  He and I had met a few times over the years

4  because San Diego is a small place.  We were not friends, we

5  never had breakfast or lunch, but I knew what his business

6  model was.  I was approached by counsel because they knew

7  that I had not only served as a fiduciary around the country,

8  although based in San Diego, 95 percent of our work has been

9  elsewhere, but I also understand large complex real estate

10 projects.

11      We have a hotel division headed by Joe Corcoran in

12 Dallas. It's got a longstanding pedigree.  We have been

13 involved in everything from Four Seasons to Ritz Carlton's to

14 Marriotts and the like in the hospitality space.  The

15 president of my firm, Michele Vives, is well astute dealing

16 with cities, complex development agreements.  We are

17 currently engaged in a variety of projects including the

18 Coastal Commission, the Port of San Diego, and the like.

19      I think I was sought out for this assigned because I

20 could bring to bear really two skill sets.  One is, I think,

21 I'm very proud of the fact that in my 35-year history we have

22 been navigated a litany of complex difficult sophisticated

23 matters.  We have always managed to stay out of harm's way

24 because we know how to behave.  We are entrepreneurial, but

25 very institutional.

1       I think it was that backbone, that pedigree combined

2   with the fact that I had signed a billion dollars alone. So,

3   I personally have developed, what in today's value, about a

4   billion dollars of projects primarily in Downtown San Diego.

5   So, I have been there, done that, but I am not just a hired

6   consultant.  I am someone that actually understands capital.

7   I understand finance. I understand processes.  I have also

8   learned a hell of a lot of lessons in these insuring 35 years

9   by being everyone else's receiver and having taken over a

10  variety of projects all across the country and have

11  maintained 30-year reputations, you know, from Bank of

12  America, to Wells, to Morgan and others.  So, I think that

13  skillset allowed me to get involved here.

14  Q    Is one of your fiduciary responsibilities for the

15  debtors obtaining debtor-in-possession financing?

16  A    Yes.  Early on it became obvious to me that besides

17  maintaining my independence, which was, by the way, the

18  foundation upon which I would only accept this assignment

19  because I recognized that in this case that was going to be a

20  key requirement, it was clear to me, when they filed this

21  bankruptcy, that they had no money.  So, you know, initially,

22  candidly, I was skeptical of whether there was value, could

23  this, in fact, be an opportunity.  After some research I

24  determined that, in fact, there is a compelling story here,

25  there is value at the end of the game, but its been a long

1  and storied journey to get here eight years into this

2  process.

3       In order for us to have an opportunity to objectively,

4  wholistically, without a dog in the fight, see if there is a

5  business plan to move forward to restructure this, we needed

6  debtor-in-possession financing. So, that was my initial and

7  primary focus and has remained so over the last two weeks.

8  Q    Can you please describe your efforts in attempting to

9  obtain debtor-in-possession financing?

10 A    So, as you can imagine, in my career, in these various

11 capacities, not all got secured financing on, obviously, my

12 projects but also on many others.  So, you know, we have a

13 lot of relationships in the industry, within the legal

14 community, within the financial community.  I went to New

15 York five times a year for 25 years because that is where the

16 money was.

17      So, we reached out early to see, okay, who would be

18 willing to finance a project like this which, early on,

19 realized this was probably the most challenging fact pattern

20 out there because we have got a partially built complex

21 development project. It's not an operating company, there's

22 no underlying cash flow, there is going to be a belief at the

23 end of the day that there is going to be value.  That

24 eliminates, frankly, 95 percent of lenders that would

25 typically say we would step up in this instance.

1     I did reach out and I reached out to Hilco, who is

2 known in the industry, and I talked to Gordon Brothers, and I

3 talked to FTI who had contacted us, and we know all of these

4 people. I talked to Summit Investments who is really an

5 affiliate of Fortress who we have done projects with in the

6 past as we have with most of the private equity firms from

7 Lone Star, to Fortress, to Goldman through the years and

8 there were several others that we reached out to and, you

9 know, frankly, everyone said I'm not really that interested,

10 or its too much time, or would like to underwrite it but it

11 would take a lot of time to look at.

12     So, early on one of our first calls was to Serene

13 Investment.  I contacted Serene because I had a pre-existing

14 successful relationship with them on a receivership matter in

15 Southern California, Los Angeles, on a very prominent project

16 that a borrower named Mohamad Hadid (phonetic) was the

17 developer of a big house and we needed to bring in millions

18 of dollars of receivership financing on the receivership

19 certificates.

20     So, when I talked to Adam Phillips, who is the

21 principal of this company, you know, he was quick to respond

22 the immediate and appropriate questions: what was the

23 collateral  , what might that term be, what would that amount

24 be.  You know, so when I was first talking to him, I was very

25 -- well, I provided all that factual information to him.

1 Q      Did you reach out to any of the debtors secured

2 creditors or City of Laquinta for DIP funding?

3 A      So, I have reached out, I made a list earlier, to at

4 least a dozen of these stakeholders in this project. I wanted

5 to do that so that they understood that I wanted to introduce

6 myself, I wanted to underscore my independence, I wanted to

7 let them know that although we don't have an answer today our

8 goal was to get enough runway with enough interim financing

9 so that we had a handful of months during which we could put

10 together an objective wholistic strategy to see if this thing

11 can we recapitalized. I was going to do that not incumbered

12 with any predetermined baggage or expectations about who

13 would be the developer, who would be involved, what does a

14 refigured capital stack look like; we want to be very

15 objective.

16      So, yes, I reached out on the 12th of August.  They had

17 Gomez of Poppy Bank.  They are in first position.  They

18 seemed like the logical one to me because they're the bank.

19 They had previously taken out Mosaic. I have a long pre-

20 existing relationship with the principals behind Mosaic

21 coincidentally.

22      So, Ed is a delightful guy.  We had a great

23 conversation and I told him that we are going to, obviously,

24 be securing DIP financing.  As we all know in the industry,

25 all of these financings, be it DIP, receivership financing,

1   its all secured by the same remedy.  They have to be in a

2   super priority lien position.  That is how it is done in the

3   ordinary course of business.

4        I then reached out to the CEO of Montage Hotels with my

5   colleague Joe Corcoran, who he knows very well, to make sure

6   that they were such a key leg of the stool here, to make sure

7   that they are going to sit tight and reach out to them and

8   explain that we are kind of the new sheriff in town, that we

9   are going to approach this independently with a high level of

10  integrity and we actually know what we are doing.  We are

11  going to keep everybody informed and transparent.

12       I then reached out to Ed Keeler (phonetic)m Ed Keeler

13  is one of the key investors, to let him know what was going

14  on.  I then talked to George Houser (phonetic), who I think

15  was on this earlier on the 15th of the month, to inform him

16  what was going on.  I was trading calls with John McMillan

17  (phonetic) of the City, who was down in Mexico, which

18  coincidentally he and I share a love for because I have a

19  home and he is close to that, and told him.

20       We have had a subsequent call as recently as last week

21  that we want to, and I introduced him to both Michele Vives

22  and myself and said, John, I'm aware of the tension, the

23  dynamic in the past but I want you to be -- but we are going

24  to be -- this is like wiping the slate clean.  We want to be

25  forthright with everyone, we want to meet you, we want to

1  come to the property which we scheduled for this Thursday,

2  and by the way we are going to be securing interim financing;

3  why, because we have to.  So, you know, it was obvious.  I

4  wasn't, at that point, going into details but we had to do

5  that.

6        On the 21st of the month I spoke to the owner of

7  Cypress, Bill Torres, and he and I talked for 15, 20 minutes.

8  We are both from Chicago. I get where he is from, he gets

9  where I'm from. So, I also mentioned to him who we were, what

10 we were going to do, what our strategy was.  He is not naïve.

11 He may be a lot of things, but naïve ain't one of them. So,

12 he clearly understood when I said DIP financing, you know,

13 that this would be priming all these other loans.

14            MR. VILAPLANA:  Objection, Your Honor.

15            THE COURT:  Sustained.

16            THE WITNESS:  Thank you.  Then on the 13th of --

17 pardon me, on the 26th, I think, of last week, I had a Zoom

18 with 13 lawyers on Monday morning.  I am not a lawyer, I just

19 know a few.  I shared with all of you on this screen,

20 essentially, who I was, what our strategy was, what our

21 approach was. I underscored our independence and how we are

22 going to be candid, but we needed some time to figure this

23 thing out to see if we could put Humpty Dumpty back together

24 again.

25

1        I am not here with an agenda that is going to turn

2   out some other way. I just think this needs one big capital

3   partner, not a litany of others. Its been a (indiscernible)

4   local financing to get this point and these band aids are now

5   all coming off.  So, its clear to me that if this is going to

6   happen how it would happen.  We had that conversation.

7        I finally reached R.D. Olson and Bill Wilhelm, the

8   CEO, his lawyer was on the call, Bill was traveling a bit, so

9   it was I that we connected, I think, last Friday as well and

10  shared exactly what we were up to.  I had also talked to Axia

11  Partners, they are from Utah, and I think there were four of

12  them on the call.  This was around the 20th, 21st, 22nd and

13  shared with them, again, the same repetitive story I have

14  shared with all of you.

15        To wrap this up I then talked to John McMillan, I

16  talked briefly just to set this trip for later this week and

17  that was late last week. I also did call Ed Gomez last

18  Thursday at Poppy Bank as the second call to let him know

19  that we would be going forward with this DIP financing.

20        So, yes, I was surprised when others said there

21  was no outreach. I spent a lot of time reaching out and told

22  all of them I'm available as needed.

23  BY MR. STEMERMAN:

24

25

1  Q     And after you mentioned to these stakeholders that the

2  debtors were seeking DIP financing, did any of them offer to

3  be the DIP financer for the debtors?

4  A     They did not.  They never even said they would consider

5  it.  There was not a mention of it.

6  Q     Did you play any role in the creation of the interim

7  DIP budget?

8  A     Yes.  Our role was to keep it as small as we could.

9  You know, its funny.  We talked this morning in advance of

10 this hearing talking about that to make sure that what was

11 needed was critically needed because we're going to have a

12 subsequent hearing with the Court in more detail to go

13 through the larger budget which is something that, again,

14 it's a budget and Michele, my president, is going to be

15 culling through that with our CFO in great detail so that we

16 understand what is in that larger budget.

17     Yes, we feel comfortable with these numbers at this

18 point and the important nature of in order to keep this

19 process moving forward there are certain key preservations.

20 One thing I have learned as a fiduciary, as a receiver, as a

21 trustee, as a special master, you name all these titles, is

22 the preservation of the assets.  Our main mandate is preserve

23 what is there.  What is there now is a partially built

24 project that has been wallowing for 22 months.  It needs some

25 damn attention and we want to give it that attention but want

1  to make sure that we aren't diminishing value further by not

2  paying attention to certain things like the Department of

3  Real Estate.

4       There is one line item in the budget, this sales guide,

5  that I questioned.  I said why do we have this.  We aren't

6  really selling homes now.  Then I realized that he is not

7  only preserving the existing contracts on those homes, but

8  more importantly enough he is the conduit with the Department

9  of Real Estate in the CC&R's and the coordination of that and

10 how important that is in the state of California.  We have a

11 lot of personal experience in that area because I developed

12 two high rise condo buildings personally with about 400

13 units.  So, we know the process.

14 Q    In your role as CRO did you have final sign-off on the

15 interim DIP budget?

16 A    Yes.

17 Q    And were your decisions for what was included in the

18 interim DIP budget made into banking?

19 A    Yes.

20           MR. STEMERMAN:  Your Honor, I have no further

21 questions on those two issues.

22           THE COURT:  Does anybody wish to cross-examine Mr.

23 Wilson?

24           MR. GREENBERG:  Your Honor, Mitch Greenberg for

25 Poppy Bank.

1        CROSS-EXAMINATION

2  BY MR. GREENBERG:

3  Q     Mr. Wilson, you mentioned seven or eight individuals to

4  whom you reached out with regard to DIP financing and

5  educating them as to DIP financing and the budget.  You had

6  mentioned a gentleman by the name of Chris George.  Do you

7  know who Chris George is?

8  A     I do.

9  Q     What is your understanding of who Chris George is?

10 A     So I have never had the pleasure of meeting Chris

11 George, but I am aware that he is a player in this movie and

12 at some point I expected I will reach out to him. It seemed

13 totally inappropriate for me to reach out to someone that is,

14 you know, clearly adversarial in some ways to some of the

15 parties.  It was important for me to reach out to a third

16 party that didn't have a dog in this fight other then a

17 secured lender that is already in this arena.  So, I fully

18 expect, after we get through this and any subsequent hearing,

19 to look forward to talking to him and meeting him but, no, I

20 do not know him.

21 Q     Are you familiar with the memorandum of understanding

22 that Mr. Hosp talked about a few minutes ago?

23 A     I am familiar with it. I have not read it.

24 Q     Is it your understanding that there are certain rights

25 that were provided to Mr. George as a result of the debtors

1 | failure to cure defaults by June 30th and then again by July
2 | 31st?

3 | A     I only --

4 |         MR. STEMERMAN: (Indiscernible).

5 |         THE COURT:  Please don't talk over each other.  Is
6 | there an objection first, Mr. Stemerman?

7 |         MR. STEMERMAN:  Yes. It calls for a legal
8 | conclusion. Its also, again, outside the scope of hist
9 | testimony.

10 |         THE COURT:  Sustained.

11 | BY MR. GREENBERG:

12 | Q     So, is it your understanding that Mr. George is
13 | involved in this project with respect to taking over as the
14 | developer to complete this project?

15 |         MR. STEMERMAN:  Objection; irrelevant.

16 |         MR. GREENBERG:  Your Honor, I mean it still goes
17 | to the whole valuation of whether or not this is a project
18 | that the debtor can even continue to be involved in given how
19 | we got here.

20 |         THE COURT:  I agree. I will overrule the
21 | objection.

22 |         MR. STEMERMAN:  Your Honor, he did not testify as
23 | to valuation.

24 |         THE COURT:  I will overrule the objection.  The
25 | issue is on the table.

1        MR. STEMERMAN:  Thank you, Your Honor.

2        THE WITNESS:  Could you restate the question?

3 BY MR. GREENBERG:

4 Q    Are you aware of the fact that Mr. George's involvement

5 in this project is to take over as the developer of the

6 project and to complete the project including funding for it?

7 A     I am aware that that has been his role and I have not,

8 as I said, reviewed all of these documents.  My focus has

9 been on issues of much more immediacy to get some funding

10 into this estate so that we could proceed and then try to put

11 all of these pieces to the puzzle together and, obviously,

12 part of that would be to engage with Mr. George and see if

13 there is a way here, as I have told everyone from the City,

14 to Montage, everybody wins if we have a restructured project

15 with fresh capital, with fresh leadership that is able to

16 actually complete this project.  I don't know who is going to

17 be on the table. I would love to talk to them, but the timing

18 is not appropriate.

19 Q    So, one of your main goals is fresh financing to

20 complete this project, correct?

21 A    That is correct.  To the extent that I, in my

22 discussions with Chris George, think that he could compete in

23 that arena then so be it.

24 Q    Right.  And someone who through documentation that was

25 negotiated extensively with all of the major players was in a

1  position to finance and complete this project you decided

2  not, at least at this point, to reach out and talk to that

3  individual. Isn't that correct?

4            MR. VILAPLANA:  Objection.  Asked and answered,

5  Your Honor.

6            THE COURT:  Overruled.

7            THE WITNESS:  I already said that. I didn't think

8  the timing was appropriate.

9            MR. GREENBERG:  That is all I have, Your Honor.

10  Thank you.

11            THE COURT:  Anybody else?

12            MR. GARLAND:  Your Honor, Kevin Garland with Foley

13  & Lardner. I would like to follow up with a few more

14  questions, please.

15            THE COURT:  You may.

16            MR. GARLAND:  Thank you.

17                       CROSS-EXAMINATION

18  BY MR. GARLAND:

19  Q    Mr. Wilson, what was your role in negotiating the DIP

20  term sheet?

21  A    I took the lead.

22  Q    I noticed Robert Green also signed the DIP term sheet.

23  What was his role in negotiating the term sheet?

24  A    He had no role of any significance.

25  Q    Is there a reason why he signed it?

1  A    Because he's the debtor and I was instructed by counsel

2  that that would be appropriate.

3  Q    I would like to ask a few more about the business terms

4  of the term sheet.  If you take the 16 percent interest rate

5  and add the $1 million exit fee on a 15-month term, and you

6  were to express that as an interest rate, do you know what

7  that number would be?

8  A    The -- yeah, let me address that for a moment.  The

9  salient factor with this term sheet, and what I didn't

10  address earlier when I paused, I want to talk about this, are

11  the terms of this loan.  The term that everyone is focused on

12  it's a 1.3X multiple on the funding.  Okay.  All of these

13  other factors are irrelevant.  Now why are we agreeing to

14  this, why did we sign that term sheet, because in our efforts

15  where we reached out to all these other parties and shared

16  with many of you on your screen, your clients what we were

17  doing nobody else stepped forward and said I've got a better

18  alternative.  In our experience --

19  Q    I'm sorry, I just want to stick to the questions as

20  they're asked.

21        MR. STEMERMAN:  Your Honor, can he finish his

22  answer?

23        THE COURT:  He may finish his answer.

24        THE WITNESS:  Thank you. I appreciate that, Your

25  Honor, because I haven't stated this and I think this is all

1  very critical is why we even are proposing these terms which

2  are very expensive.  Why, because no one else has stepped

3  forward.  They have a -- Serene has a 12 to 15 year history

4  of doing transactions like this. They have a track record.

5  They will perform. Yes, they are expensive in challenging

6  difficult situations.  They, in this case, said we will fund

7  in our tranches, we will fund our initial $2.5 million just

8  off a signed term sheet. We don't even have to have loan

9  documents signed until the balance of the funding which we

10  would do at a subsequent later hearing.

11        So, in our judgment we wanted to make sure saying

12  is this absolutely egregious or is this -- what else is in

13  the marketplace.  Now as we all know, the capital markets in

14  the last 30 months have radically changed, rates have gone

15  up, the liquidity and capital for this kind of situation is

16  vastly constraint from what it was.  So, you know, there is a

17  short list of those that are able to step up.

18        I, frankly, think we are fortunate to have someone

19  of their sophistication, of their credibility and their track

20  record that has got the ability to do this and at the end of

21  the day we didn't want a million dollars, we wanted enough

22  money to get through this.  If this project cannot handle

23  this kind of added cost once we, you know, rejigger the deck

24  and the capital structures then we shouldn't be here.  So, I

25  know its expensive.  Are we going to go to them and say, hey,

1  we found $400,000 they're going to say, no, that is not what

2  they are doing.  So, yes, we had a lot of thought that went

3  into these terms, but the term that really is important,

4  forget the rates and everything it's a 1.3X.

5          The other thing that we liked, in summary, is that

6  a lot of people said you're only going to get a DIP loan for

7  six or eight months.  They are willing to go out 15 months so

8  that we have enough time to actually bring in fresh capital

9  to take them out and to restructure this project, if we're

10  able to.

11          By the way, I'm Irish. I'm optimistic, but I am a

12  realist by the way.  I am not saying this is a fait accompli.

13  It's far from it.

14  BY MR. GARLAND:

15  Q    For the record, are you aware that it actually says its

16  1.3X of the commitment and not the draw on funds?

17  A    Yes. I am totally aware of that.  I can read.

18  Q    It's on the commitment.

19  A    When they commit to $10 million you know what we would

20  probably do is we would probably take the $10 million and put

21  it in an interest-bearing account so we could reduce that

22  amount.  That is what we would do from a money management

23  standpoint.  My CFO has recommended that.

24

25

1    Q      Right.  So just to be clear, if the full $10 million,

2    if on the commitment if they were to get 1.3X and it was out

3    for a year that would be a 30 percent interest rate.

4    A      That is correct.

5    Q      Thank you.

6    A      That's correct.  And if its 15 months its slightly

7    lower then that.  But if we are able to pay them off in a

8    year with fresh capital and move this thing along it's a good

9    thing.

10   Q      With respect to the --

11   A      And by the way, we're not asking for $10 million.  I

12   want to be clear about that.  They want to fund $2.5 million.

13   We are not asking for a $10 million commitment.  This is a

14   $2.5 million commitment of which we are going to be spending

15   $400,000 we would hold in our trust account the balance of

16   that.  Now if somebody else on this screen wants to step up

17   and do something differently or offer an alternative that is

18   going to allow this case to at least go forward for another

19   week or two instead of just crater I am all for it.

20   Q      Let me just try to run through these questions a little

21   quicker.

22   A      Sure.

23   Q      So, I see that the DIP term sheet was signed or its

24   dated August 23rd, when was it distributed to the creditors

25   in this case?

1  A    I don't know.  The lawyers distributed it. I am not

2  sure what date that was.  I --

3  Q    I -- go ahead.

4  A    No, I don't know the date.

5  Q    Okay.  I'd like to talk briefly about the collateral.

6        MR. GARLAND:  Your Honor, it would be very helpful

7  if I could pull up a map of the property.

8        THE COURT:  All right, let's give Mr. Garland

9  sharing privileges.

10      (Pause)

11        THE COURT:  You should have it.

12        MR. GARLAND:  Yes, I believe I do.

13        THE COURT:  You do.

14        MR. GARLAND:  You should see that now?

15        THE COURT:  Yes.

16  BY MR. GARLAND:

17  Q    Mr. Wilson, in the DIP term sheet there's a list of

18  seven parcels that are to serve as -- to serve as collateral.

19  Our understanding based upon earlier testimony or perhaps it

20  was earlier comment of the -- of counsel that, of the Montage

21  Residential Site in the upper left-hand corner, is that

22  parcel going to serve as collateral for the DIP?

23  A    Only those lots that aren't encumbered -- unencumbered

24  by Builders Capital.

25  Q    Okay.  So is there a reason why the debtor is

1   selectively encumbering parcels that are previously

2   encumbered by Poppy Bank and not by Builders Capital?

3   A     Yes.  In fact, a great question.  I'm glad you brought

4   this up.  The fact is, when we first looked at how to

5   structure this DIP, the idea was to come up with the simple,

6   most forward collateral that they could understand.  There's

7   enough complexity here.  And so when we looked at it I said,

8   I have an idea, let's look at what the only real bank here is

9   looking for.  And the bank, Poppy, this is -- the collateral

10  we're proposing is all of the collateral secured by their

11  loan, and then there's subsequent seconds and others that are

12  involved, as you know.  That's why we decided that -- and

13  that collateral includes the Pendry Hotel site, the Montage

14  Hotel site, the Clubhouse site, the residences for Montage,

15  that are the ones that are not built on, the lots that are

16  not built, and then the sites for the residences for the

17  Pendry.

18        So that was the reason.  We weren't trying to get cute

19  in any way, but we looked at these valuations.  Now, I'm not

20  an appraiser at all, I've never had a business class, all I

21  know is that I just said, I don't know what they're worth, I

22  don't know if it's worth $300 million, but it's worth a lot

23  of money, it is certainly worth more than the encumbrances.

24  And when I asked Serene to look at this collateral, they were

25  quick to respond and say this seems like a very

1  straightforward approach.  That's how we got here.

2  Q     Do you see on this map, it's coded in yellow and it's

3  described as the Village Parcels --

4  A     Uh-huh.

5  Q     -- is that -- are those two parcels proposed to be DIP

6  collateral?

7  A     I don't think so.

8  Q     Are you generally familiar with -- and I know you've

9  been engaged by the debtor for over a month --

10 A     A month, yeah.

11 Q     -- how familiar are you with debt that is encumbering

12 the various parcels?

13 A     Yes, I'm familiar -- by the way, so the answer to your

14 question, those are not part of our collateral.  We had an

15 exhibit that we had that shows what the -- so, no, that's not

16 part of the collateral.

17 Q     Thank you.  Are you aware that those parcels are

18 encumbered only by deeds of trust that were granted on July

19 5th of this year, one month prior to the bankruptcy?

20 A     I've been told that, but I haven't focused on that.

21 Q     Could you explain the reasoning why the Village parcels

22 are not part of the DIP collateral?

23 A     Because they aren't -- that's for the reason I said we

24 wanted to be consistent, we wanted the collateral that Poppy

25 had.

1  Q      Do you have -- in your capacity as CRO, do you have --

2  do you have any opinion of value on the Village parcels?

3  A      I do not.

4             MR. GARLAND:  That's all, Your Honor.

5             Thank you, Mr. Wilson.

6             THE COURT:  All right, anybody else?

7             MR. ENGLANDER:  Yes, Your Honor, Brad Englander

8  for the City of La Quinta.

9             THE COURT:  Yes.

10                      CROSS-EXAMINATION

11  BY MR. ENGLANDER:

12  Q      Good afternoon, Mr. Wilson.  We met once before, did we

13  not?

14  A      Yes.

15  Q      And that was at the Zoom meeting on August 26?

16  A      Correct.

17  Q      And at that time you did mention that you would be

18  taking DIP financing; is that correct?

19  A      I did.

20  Q      And did I request a budget?

21  A      I think you may have.

22  Q      Yes.  And do you know when that budget first was

23  provided to us?

24  A      I don't recall.

25  Q      Would it surprise you that it was the same day the

1  motion was filed for the DIP financing?

2  A     I really have no comment on that.  I wasn't involved in

3  that.

4  Q     Okay.  Are you familiar with the scope of the priming

5  under the proposed DIP facility?

6  A     To the extent I am that I'm not a lawyer, yes.

7  Q     But it's your understanding that the secured lenders

8  would be primed; is that correct?

9  A     Oh, absolutely, yeah, which is totally customary.  So

10 this is not some revelation, that's what always happens in

11 DIP or receivership financing.

12 Q     And the motion itself, does that identify all of the

13 parties to be primed?

14 A     I would have to defer to counsel on that.

15 Q     Well, you're the one who negotiated the DIP; is that

16 correct?

17 A     That's correct, yeah.

18 Q     And I assume you would understand who was being primed

19 if you negotiated the DIP loan?

20 A     Yes.  So, pardon me.  Yes, the answer is yes, uh-huh.

21 Q     Is it the debtors' intent to prime the property

22 interests of the City of La Quinta?

23            MR. VILAPLANA:  Objection, it calls for a legal

24 conclusion.

25            THE COURT:  I'll overrule --

1          MR. ENGLANDER:  Your Honor, I'm --

2          THE COURT:  -- I'll overrule.

3          MR. ENGLANDER:  Thank you.

4          THE COURT:  Can you answer that?

5          THE WITNESS:  No.

6          THE COURT:  You don't --

7          MR. ENGLANDER:  I'm sorry --

8          THE COURT:  So you don't know or --

9          THE WITNESS:  No, I said no, that's not the

10  objection -- that's not the intent, but I'd like our counsel

11  to elaborate on that because we talked about that earlier and

12  I'd like to clarify that.  We wanted to secure these -- we

13  wanted to prime the secured lenders.

14          THE COURT:  Okay.

15          MR. ENGLANDER:  All right.

16          THE WITNESS:  Which is Poppy, Cypress, Axias, and

17  then to the extent that Olson has liens.

18  BY MR. ENGLANDER:

19  Q    All right, let's talk about opportunities.  You say

20  it's not a done deal until -- or some words to that effect,

21  nothing is done until it's done; is that right?

22  A    Yeah, my mother taught me that.  Yeah.

23  Q    Okay, good.  So you also mentioned that you had reached

24  out to various constituents, and one of them was John

25  McMillen, who's on the hearing today; is that correct?

1  A      Yes.

2  Q      Now, when you spoke with him, did you ask him

3  specifically would the city entertain funding of some of the

4  expenses of this case?

5  A      No, I didn't ask him that.  I didn't -- I have never

6  asked a city for funding on a case.  I've just paid cities a

7  lot, I'd be -- no, that was not something, it was not on my

8  top five list, no.

9  Q      Okay.  So the city didn't have your budget until the

10  motion was filed that day and it was never asked to provide

11  funding; is that correct?

12  A      Let me clear about one thing.  What this project has

13  suffered from is a patchwork of financings, a little here, a

14  little there.  What we wanted is enough money from one sole

15  source that could fund the entire DIP obligation, anything

16  other than that would just allow us to be back in the same

17  place.  That's candidly, my observations, why we're here in

18  the first place is that this was never looked at largely,

19  holistically.  And to ask somebody, say would you put up 400

20  grand and then we'll see if something -- it just didn't make

21  any sense, you know.  We wanted somebody to say, we may need

22  $10 million, can you do that?  Yes.  That was our goal.

23  Q      All right.  Well, and you didn't ask for 400 grand or

24  any other number as to the city; is that correct?

25  A      That's correct.

1   Q     So would you agree -- and, again, focusing on the

2   purpose of today's hearing, which is an emergency hearing,

3   that a materially better loan proposal could be put together

4   in short order than the obligations that are part of this DIP

5   proposal, that that would be a proper exercise of your

6   fiduciary duties?

7             MR. VILAPLANA:  Objection, calls for speculation.

8   Such offers don't exist, Your Honor.

9             THE COURT:  Overruled.  If one could be put

10  together, would it be better?

11            THE WITNESS:  We're -- we -- we're all ears, we're

12  all ears.  No one has called me.

13  BY MR. ENGLANDER:

14  Q     Okay.  Well --

15  A     No one has called me.  And, by the way, time is of the

16  essence here, the one thing -- time is of the essence.  So --

17  Q     Well, let's talk about that for a second because we

18  have for the first time this morning seen what I think I

19  could call a somewhat detailed budget, the one that was filed

20  as an exhibit.  You're familiar with that?

21  A     I am.

22  Q     All right.  And in fact that has some detail regarding

23  some of the protective advances, if I may call them that, but

24  it also has a number of line items that needed further

25  explanation, some of which you've provided during your

1  testimony; is that correct?

2  A     Correct.

3  Q     All right.  So can you fault somebody for not making a

4  proposal when they lacked any information about the detail?

5  A     Well, I think -- I think everyone has been aware of the

6  necessity for some funding.  I candidly was very surprised

7  that we were able to get the number so low.

8  Q     All right.  And let's talk a little bit about some of

9  the terms that maybe can be avoided at least for now.  If you

10  could obtain a loan that didn't require a make whole

11  provision of $3 million, would that be better?

12         MR. VILAPLANA:  Objection, Your Honor, that's

13  irrelevant to today's hearing.  That $3 million make whole is

14  not part of today's hearing.

15         THE COURT:  Yeah, let's not go into it term by

16  term.

17         MR. ENGLANDER:  Very good.

18         THE WITNESS:  Thank you.

19  BY MR. ENGLANDER:

20  Q     Is there some reason that the debtor would oppose

21  accepting funding on terms and conditions better than the one

22  that's on the table if the funders were one or more of the

23  existing secured lenders and/or the City of La Quinta?

24  A     That's a pretty vague question.

25  Q     Well --

1  A     Show us the terms, so submit -- I don't know what that

2  means.

3  Q     Mr. Wilson, I was just instructed not to go into it

4  detail by detail and I'm asking you a general question.  If a

5  better loan, a materially better loan could be worked out in

6  say a week, could the debtors hang in there for that time?

7  A     We're here today because of the emergency nature of

8  this.  We've been talking about this for a few weeks to get

9  to this point internally.

10  Q     All right.  So the question was can the debtor hang in

11  for another week to talk with its constituents about a loan

12  that might be better?

13  A     No.  We've been available to talk about this, I don't

14  know why -- you know, no one has reached out until this

15  point, no one.  And I've reached out to a dozen different

16  players in this project and no one said, hey, I'd be

17  interested, can we work with you on what that emergency

18  funding may be, no one asked that.

19        And so if people are really, genuinely interested, you

20  know, you've kind of got to ask first and say, you know, we'd

21  like to do that, maybe there's a way that we could do that.

22  Because I explained to everybody, everybody -- Brad, you

23  included -- that we need to get enough capital to give us

24  enough runway to see if we can redo this.  So, you know, it's

25  -- to me, it's wordsmith.

1  Q     And you don't think that --

2  A     Sure, if somebody comes in and says we'll fund this

3  whole thing and we'll do it on a very different structure,

4  fine, but no one has done that.

5             MR. ENGLANDER:  I have no further questions.

6             THE COURT:  Any --

7             MR. O'BRIEN:  Your Honor, Larry O'Brien for R.D.

8  Olson.

9             THE COURT:  Yes, Mr. O'Brien, go ahead.

10                        CROSS-EXAMINATION

11 BY MR. O'BRIEN:

12 Q     Mr. Wilson, you heard Mr. Schuster's testimony a few

13 minutes ago, correct?

14 A     I did.

15 Q     And you heard his testimony that the debtor has an

16 urgent exigent need for DIP financing to pay utilities?

17 A     Yes.

18 Q     And to pay employee wages?

19 A     Yes, for people related to the project.

20 Q     And to pay vendors?

21 A     Correct.

22 Q     As the CRO and given your professed background as a

23 fiduciary, you're aware that the debtor cannot prepetition

24 debts after the bankruptcy case is filed without Court

25 approval, correct?

1  A     Correct.

2  Q     Has the debtor filed a motion to pay utilities?

3          MR. VILAPLANA:  I object, Your Honor, it's

4  irrelevant.  There's no -- there's no motion -- there's no --

5  no evidence and it's not the intention to pay any prepetition

6  debts.  So I'm not sure what Mr. O'Brien's question relates

7  to.

8          THE COURT:  I'll overrule.  He can ask the

9  question.  It's not clear, it's certainly not clear to me.

10          Mr. Wilson, can you answer that?

11          THE WITNESS:  Can you restate the question,

12  please?

13  BY MR. O'BRIEN:

14  Q     Has the debtor filed a motion to pay prepetition

15  utilities?

16  A     No.

17  Q     Has the debtor filed a motion to pay critical vendors?

18  A     Post-petition.

19  Q     Prepetition?

20  A     No.

21  Q     Has the debtor filed a motion to pay employee wages?

22  A     Prepetition, no.

23  Q     Prepetition, correct.

24  A     No.

25  Q     Now, how many employees does the debtor have at this

1  moment?

2  A     I can't answer that.

3            MR. O'BRIEN:  That's all for now, Your Honor.

4            THE COURT:  Anybody else?

5            MR. BATES:  Your Honor, Malcolm Bates on behalf of

6  the U.S. Trustee, just a few questions.

7            THE COURT:  You may.

8            MR. BATES:  Thank you, Your Honor.

9                     CROSS-EXAMINATION

10 BY MR. BATES:

11 Q    I'd like to pick up with the last question that was

12 just asked.  Mr. Wilson, you said that you are not aware

13 today how many employees the debtors have?

14 A    Yes, I don't recall that at this instance.

15 Q    Is it not accurate that the debtors have previously

16 represented that they have zero employees currently?

17 A    Pardon me, you're getting into -- you're getting into

18 an area -- I think that's right.  I don't think the debtor

19 has employees, these are employees of the Robert Green

20 Company, they have a contract with the debtor, which is how

21 many development deals are structured, by the way.  So that's

22 my understanding.

23 Q    So the wages the debtors want to pay pursuant to this

24 interim DIP are to employees of the Robert Green Company, not

25 employees of the debtors, correct?

1   A      That's my understanding.

2   Q      And the debtors have an agreement with the Robert Green

3   Company, you said?

4   A      Yes, there's like a development services agreement --

5   Q      Okay.  And --

6   A      -- which, again, is very customary.

7   Q      Do you know who negotiated or executed that agreement

8   on behalf of the debtors?

9   A      No, that pre -- that predated my involvement by a

10  longshot.

11  Q      Do you know whether it's Robert Green?

12          MR. VILAPLANA:  Asked and answered, Your Honor.  I

13  object, it's asked and answered.

14          MR. BATES:  No --

15          THE COURT:  Sustained.  He doesn't know.

16  BY MR. BATES:

17  Q      But the Robert Green Company is also the owner of all

18  the debtors, correct?

19          MR. VILAPLANA:  Object, calls for a legal

20  conclusion.

21          THE COURT:  Well, I --

22          MR. BATES:  Your Honor, I'm asking the debtors'

23  CRO if he knows who owns the debtors.

24          THE COURT:  I'll allow it.

25          THE WITNESS:  I am -- again, I'm not a lawyer.

```
 1  I'm not going to get into how this is structured and legally
 2  who owns what, I'm not going to do that.
 3  BY MR. BATES:
 4  Q    Do you know the answer to the question, sir?
 5  A    Restate the question, please.
 6  Q    Does the Robert Green Company own the debtors?
 7  A    Own the debtors?  I don't know that.
 8  Q    But Robert Green is signing agreements, including this
 9  proposed DIP term sheet, on behalf of the debtors, correct?
10  A    That's -- that's correct.  Again, there are -- it's
11  customary in development projects that I've done where you
12  may have an entity that is contracting with the ownership of
13  a project to provide services --
14  Q    And in your capacity --
15  A    -- that's not unusual.
16  Q    -- yeah, in your capacity --
17  A    So that --
18  Q    -- sorry --
19  A    -- but they don't own it --
20           THE COURT:  Please, please --
21           THE WITNESS:  -- they don't own it.
22           THE COURT:  -- allow him to answer, Mr. Bates,
23  without interrupting.
24           MR. BATES:  I apologize, Your Honor.
25           THE WITNESS:  Thank you.  And so I'm just saying
```

1    that I don't know the detail of what you're really trying to

2    get at, but it's -- but, again, who owns the property is

3    different than, you know, who is managing the property or the

4    development services, who's providing these services.

5    BY MR. BATES:

6    Q     Let me try this.  What is your understanding of the

7    debtors' relationship with the Robert Green Company?

8    A     My understanding is that the debtor has a contractual

9    relationship to provide development and management services.

10   Q     And do you also understand that the Robert Green

11   Company, generally speaking, has some ownership interest in

12   one or more of the debtors?

13   A     I honestly have no idea if it's Robert Green Company or

14   Robert Green or as trust, I didn't -- that's not -- I've

15   never looked into that, nor needed to.

16   Q     Okay.  Going through back to the budget, I'm looking

17   about -- do you have that document in front of you, sir --

18   A     Uh-huh.

19   Q     -- the proposed interim budget?

20   A     Uh-huh.

21   Q     I just want to ask a couple of questions about these

22   line items.  The first one is this first line item rent for a

23   mock-up room.  My understanding is this is for a mock-up

24   guest hotel room; is that correct?

25   A     Correct.

1  Q     And what generally is the purpose of this mock-up room?

2  A     Well, I have not seen it, I'm going to see it Thursday,

3  but -- I'm looking forward to that, but normally what that

4  would be, that's what it says, it's a mock-up of a hotel

5  room.  And so if you were bringing people to the site and

6  showing them what the hotel is going to be like, you could

7  use -- it would be helpful when you're trying to sell

8  residences and the like to show them that.

9        I frankly think that would be a helpful thing to have

10 when we are out in the market looking for fresh capital

11 instead of saying, I'd show you the mock-up room, but we

12 didn't want to pay a thousand dollars and tore it out.  You

13 know, these are tools that are needed on a complex real

14 estate development project and, although I haven't seen it,

15 you know, to keep that intact with a modest amount in this

16 budget, to me, seems like a very, very appropriate decision.

17 Q     And are the debtors currently showing prospective

18 investors the mock-up room?

19 A     No, that will be what I will be doing.

20 Q     And has -- approximately what percentage of

21 construction has been completed on the hotel?

22 A     What -- I don't know that.

23 Q     Has any construction been completed on the hotel?

24 A     Yes, there's been construction completed on the hotel,

25 on the Montage Hotel, not on the Pendry Hotel.  And I don't

1  recall, but it's approximately -- I thought it was around 25

2  to 30 percent, but I don't recall that exact number.  I'm

3  sure that others could provide that.

4  Q    But the construction is not continuing right now; is

5  that correct?

6  A    That is correct, it has stopped.  I mean, that's one of

7  the issues that is also important here, that I think it plays

8  with the importance of this money, is that it has stopped and

9  it stopped 22 months ago.  It is very concerning to me that a

10  partially-built project like this subjected to the elements

11  is -- you know, is not good.  And so to preserve the value to

12  allow us to be in a better position to bring in fresh capital

13  or some capital that can move this project along, we've got

14  to make sure that what is there is preserved and we've got to

15  look into that.  I think it's -- I've heard different

16  opinions about different things, but -- you know, I think it

17  generally is preserved, by the way, but we want to make sure

18  it is going forward.

19  Q    On this second line item in the budget, trailers and

20  containers, can you just generally explain to me the costs

21  associated with that line item?

22  A    Again, Robert -- pardon me, Fred Schuster is the one

23  that went into detail and put this budget together.  I mean,

24  on construction sites-- I have not been there, I'll be there

25  Thursday -- there typically are a number of trailers that are

1  utilized on the site from which you're going to have plans

2  and specs and other items.  It seems to me, again, unless we

3  want to bring in investors and show them a site that has

4  nothing there, no fences, no trailers, no anything to show

5  them a path forward that this could be restarted, it's -- it

6  seems to me like that's a nominal expense, but I can't tell

7  you exactly, I have not seen it.

8  Q     I believe Mr. Schuster testified this contains

9  construction equipment; is that your understanding?

10  A     Yeah, I heard what he said.  Yeah, I was there.

11  Q     Do the debtors own the construction equipment?

12  A     I have no idea.

13  Q     I'm jumping down a couple and I'm not going to ask

14  about every line item, but I do have several more questions.

15  There's a line item for staff housing, can you explain your

16  understanding of that line item?

17  A     My understanding is that they have rented a house in

18  the vicinity of the project, it has been used by all their

19  personnel when they visit the site.  I don't know the nature

20  of that, I would be interested to see that and see what that

21  is.

22  Q     Do you know what personnel are using that housing?

23  A     Just what I have been told.

24  Q     And, I'm sorry, what have you been told?

25  A     That it's used by various personnel when they go out

1  and visit the site instead of trying to rent hotel rooms.  So

2  it, you know, seems to be cost effective to me.  I will know

3  a lot more when we have time to focus on that.

4  Q    My apologies.  And these personnel are personnel of the

5  Robert Green Company, correct?

6  A    That's correct.

7  Q    And just below that there's a line item for project

8  vehicles and, I'll skip ahead, these are vehicles that are

9  also used by Robert Green personnel; is that correct?

10 A    That's my understanding.

11 Q    All right.  And then about halfway down the page

12 there's a line item for project management.

13 A    Uh-huh.

14 Q    This appears to be the largest single line item in the

15 budget.  Can you explain what those fees are related to?

16 A    Those are the salaries or part of salaries of the

17 proposed personnel of Robert Green that would be looking

18 after the site for site oversight, preservation, control, and

19 everything.  That's something that Michele Vives, the

20 president of my company, would be looking at on our behalf to

21 make sure that that is all done properly, and I guarantee

22 she'll get it done.

23 Q    Oh, so these are -- I guess call them management fees

24 that are payable to the Robert Green Company and to pay staff

25 and related expenses, things like -- is that your testimony?

1 A     That is correct.

2 Q     And, again, you -- I just want to make sure I

3 understand completely, your testimony today is that you don't

4 completely understand the ownership interest between the

5 Robert Green Company, Robert Green in his individual

6 capacity, and the debtors; is that correct?

7 A     That's correct, I stated that.

8 Q     Okay.  Do you have any reason to believe that the

9 Robert Green Company doesn't have any ownership interest in

10 the debtors?

11          MR. VILAPLANA:  I object, Your Honor, asked and

12 answered.

13          THE COURT:  Sustained.

14          THE WITNESS:  Yeah, it's a very --

15          THE COURT:  Sustained --

16          THE WITNESS:  -- speculation on my part --

17          THE COURT:  -- don't -- don't --

18          THE WITNESS:  -- yeah.

19          THE COURT:  -- excuse me -- when I sustain an

20 objection, you don't have to answer it.  Okay?

21          Go ahead, Mr. Bates.

22          MR. BATES:  Thank you, Your Honor, just a couple

23 more questions.

24 BY MR. BATES:

25 Q     There are several line items for insurance payments, I

1  just wanted to confirm that these all relate to post-petition

2  insurance payments?

3  A     Correct.

4  Q     Are the debtors current on their prepetition insurance

5  payments?

6  A     I'd have to look at that.  I'm not sure.

7  Q     Okay.  And a couple more, sir.

8        There's a line item at the end of the budget for

9  contingency, I'm wondering if you could explain the purpose

10 of this line item.

11 A     So I'm glad you asked that question.  You know, one of

12 the problems with most real estate developers that I've

13 observed is they think everything can go perfectly, but it

14 always takes longer and costs more, and so to have a

15 contingency is the grown-up thing to do.  This to have a 20-

16 percent contingency is not out of the norm for what we're

17 talking about here.

18       So, you know, it's not like you can -- because things

19 will happen.  We may go out there Thursday and Michele will

20 say what about that, why aren't we doing that to preserve the

21 site.  And so to me, in the ordinary course of being a

22 responsible third party to come in to provide oversight, I

23 think that makes total practical sense.  It would be -- it

24 would be irresponsible not to have a contingency.

25 Q     Did the debtors and the DIP, proposed DIP lender

1  discuss the possibility of budget variance terms that

2  wouldn't include taking out these funds on the front end?

3  A     Can you restate that question?  I missed it.

4  Q     Sure, that wasn't very clear.  Did the debtor and the

5  proposed DIP lender discuss potential budget variance term

6  that would not require the debtor to borrow this money in the

7  first instance?  In other words, there could be budget true-

8  ups without the need for the debtors to draw down the funds

9  and have them accrue interest in the interim period.

10 A     Boy, I hate to do this, but I'm not -- I'm really not

11 sure what that question is, is -- I mean, these are budgets,

12 okay, budgets.  And lenders like it serene or sophisticated;

13 they know that these budgets are going to have adjustments,

14 not just this budget, but the larger budgets as we go forward

15 once we're in there.  The issue that you've got to

16 understand, we're new to this play.  We've only been involved

17 a few short weeks.  Our focus has been on the things I've

18 expressed.  Once we start to peel back the layers of the

19 onion and really see what the issues are, prioritize what

20 those issues are and put numbers to them, that budget overall

21 is going to be readjusted to reflect that more accurate

22 reality and not what we're assuming today.

23      So that's just how you do these things, that's how you

24 do these things, and if somebody doesn't do that, I'm the

25 receiver for them.

```
 1   Q     So I think the question really is, did the debtors and
 2   the proposed DIP lender discuss any alternative terms that
 3   would not require the debtors to draw down these funds?
 4   A     No.
 5   Q     Okay.  And the bottom line on the budget here, the
 6   total budget for this first interim period is $404,000; is
 7   that correct?
 8   A     Correct.
 9   Q     And about $64,000 of that is prospective; is that also
10   correct?
11   A     For 64 is what again?
12   Q     Prospective, meaning it's not already approved, it's --
13   this is a line item, the bottom line item for the September
14   9th column.
15   A     You mean contingency?
16   Q     No, I mean the whole budget, sir.
17   A     Boy, I'm not understanding for some reason, why -- I
18   don't --
19   Q     So --
20   A     -- restate that again.  It's a $404,000 budget, so --
21   Q     Sure.
22   A     -- what's the question?
23   Q     And the budget is broken down into columns by weekly
24   sums, correct?
25   A     Yeah, it sure is.
```

1  Q     And the only weekly column in this budget that includes

2  an update that has not already occurred is column 6 for

3  September 9th, 2024, correct?

4  A     Oh, I see what you're saying.  Oh, pardon me.  I

5  misunderstood what you're saying.  Correct.

6  Q     So that's the only forward-looking column of this

7  budget; is that --

8  A     Correct.

9  Q     -- your understanding?

10  A     Correct.  Pardon me, yes --

11  Q     So the bottom line question is, only about $64,000 of

12  this budget is forward-looking or prospective, right?

13  A     Correct.

14  Q     And the debtors are seeking approval for a $2.5 million

15  interim DIP today?

16  A     That's correct, that's correct, but I have to tell you

17  why because those are the terms that Serene said they're

18  going to do.  I talked to them earlier about would you loan

19  $400,000, they say that's not our business, we don't do that.

20  We want to make sure we're committed, and they're only

21  committed because they know there's more runway here to go

22  forward.  We want to come back and get a larger amount

23  approved, but that's what they -- that's why they're going to

24  do it.  They aren't just agreeing and saying this -- you

25  know, for us to go through this effort.  I've not met anybody

1  lately that's willing to fund two and a half million dollars

2  off a term sheet.  And so, you know, we -- I think that's

3  fortunate circumstances for us.

4  Q    Sir, do you also have the DIP term sheet in front of

5  you?

6  A    I do.

7  Q    The first paragraph of the DIP term sheet provides that

8  the term sheet is nonbinding and merely an expression of

9  interest until entry of the interim financing order.  Is your

10  understanding that the interim financing order is the

11  proposed interim order that the debtors have filed?

12  A    Correct.

13  Q    And so is it your understanding in your capacity as CRO

14  that the term sheet is not currently binding on the DIP

15  lender and won't be unless and until that proposed order is

16  entered?

17          MR. VILAPLANA:  Objection, calls for a legal

18  conclusion.

19          THE COURT:  Say that again?  Repeat your question.

20          MR. BATES:  I'm asking if it's Mr. Wilson's

21  understanding in his capacity as the CRO that the term sheet,

22  as we all sit here today, is not currently binding on the DIP

23  lender and that it will only become binding upon entry of the

24  order.

25          MR. VILAPLANA:  Objection, calls for a legal

1  conclusion.

2         THE COURT:  I think it calls for a legal

3  conclusion.

4         MR. BATES:  Okay, I can --

5         THE COURT:  Sustained.

6         MR. BATES:  -- move on.  And, Your Honor, I have

7  nothing further for the witness.  Thank you.

8         THE COURT:  Anybody else?

9      (No verbal response)

10         THE COURT:  All right.  Any other evidence you

11  wish to present, the debtor?

12         MR. STEMERMAN:  Well, actually, Your Honor, I do

13  have some just very brief redirect.

14         THE COURT:  Okay, I'm sorry.

15                     REDIRECT EXAMINATION

16  BY MR. STEMERMAN:

17  Q    Mr. Wilson, I just want to clear up a couple of things.

18  A    Sure.

19  Q    The debtors' proposed interim budget, that only covers

20  post-petition expenses, correct?

21  A    Correct.

22  Q    Now, with respect to the term sheet that was dated

23  August 23rd, do you recall when that term sheet was actually

24  entered into, like actually executed?

25         Let me rephrase, actually.

1    A      Yeah.

2    Q      Do you recall whether or not that term sheet was

3    executed prior to the meeting, the Zoom meeting that you

4    discussed with the city and counsel for other lenders?

5    A      No, it was executed after that.

6    Q      And that meeting happened last week, correct, the

7    meeting --

8    A      Yeah, I think the 26th or something.

9    Q      Did Robert Green have any influence with you as to the

10   collateral that would be securing the proposed DIP funding?

11   A      No.  I mean, what I do, how I do things always is, we

12   took the lead, we negotiated this.  I reported to our team,

13   okay, to Robert and Fred, also to counsel, the terms that we

14   have come up with.  So we weren't doing this in a vacuum, we

15   weren't being arrogant, saying this is what they've come up

16   with.  And so, you know, it was again, for the sake of

17   expediency and clarity and easy to understand, Serene kind of

18   liked the idea of I'll tell you -- I'll take the collateral

19   that Poppy has got, they're the bank here.

20   Q      And, finally, when you were testifying as to payment

21   for employees of the Robert Green Company, with respect to

22   what's in the interim budget, do those payments include

23   payments related to Robert Green or Fred Schuster?

24   A      They do not.

25            MR. STEMERMAN:  No further questions.

1         THE COURT:  All right.  Any further evidence?

2         MR. STEMERMAN:  If Your Honor is interested in

3   actually getting the answer to the ownership structure that

4   relates to the Robert Green Company and the debtors, we're

5   happy to recall Mr. Schuster to testify as to that effect.

6         THE COURT:  I'm not interested in that today.

7         MR. STEMERMAN:  Then no further evidence for the

8   debtors.

9         THE COURT:  Does anybody else have any testimony

10  regarding the emergency nature and the value of the

11  collateral?

12      (No verbal response)

13        THE COURT:  I hear none.

14        Well, I'm going to do this.  I think that the

15  debtor has not met its burden to show that it is entitled to

16  an interim DIP today for several reasons; principally, I

17  don't think the debtor has shown any emergency today.  Based

18  on the budget that they presented, there is no need for a two

19  and a half million dollar DIP to be approved today.

20        I don't believe, contrary to the evidence I've

21  heard, the testimony I've heard, I do not find it credible --

22  or I cannot conclude on that evidence that the DIP was

23  appropriately marketed.  Just telling a secured creditor that

24  you may be looking for DIP financing is not asking for DIP

25  financing from the secureds, and the existing secured

1  creditors are the typical DIP lenders, in my 26 years on the

2  bench.  In fact, in my tenure on the bench, I don't believe

3  that I have approved more than a few priming DIPs.  It is not

4  the ordinary; it is the extraordinary, in my experience.

5          Priming requires extraordinary proof, namely that

6  the existing secureds are adequately protected.  I do not

7  find that that has been shown in this case.  I think Mr.

8  Schuster's testimony about the value was insufficient,

9  premised on hearsay, and that's the only adequate protection

10  being offered.

11          Further, again, in looking at the budget, I don't

12  see any of these that absolutely, positively have to be filed

13  -- excuse me, have to be paid today.  Yes, the debtor is not

14  paying its administrative expenses, but contrary to the

15  testimony I heard, vendors cannot come in and grab what they

16  have delivered to the debtor because there is an automatic

17  stay.  Further, it appears that many of the expenses on this

18  budget -- well, it's not clear to me that all of the expenses

19  on this budget are in fact obligations of the debtor that the

20  debtor has to pay.  The employees, for example, are not the

21  debtors' employees, and housing for employees of the Robert

22  Green Company, it's questionable whether that is obligations

23  of the debtors.

24          The debtor itself admits that the terms of this

25  DIP are horrible, and yet it did not, even after receiving

1   this, go back to the secured lenders to ask them for a better

2   DIP.  I think that's what the debtor has to do, and I think

3   the debtor has the time to do that.  I just -- under our

4   Local Rule 4001-2, I don't think the debtor has established

5   that there will be immediate and irreparable harm if this

6   interim DIP is not approved.  On the contrary, it appears

7   that there will be immediate and irreparable harm to the

8   debtors if it is approved, namely the incurrence of

9   substantial fees, including a make-whole that, again, I am --

10  I haven't seen every DIP ever offered, but I've not seen a

11  make-whole in a DIP added to a 24-percent effective default

12  rate interest, added to the additional fees that are included

13  here, all for what is proposed to be a priming lien which

14  would be senior to everybody else.

15          And if the debtor is correct and there is $300

16  million in value in this project, why should I be approving

17  terms like this to the first priming lender?  It is not

18  reasonable or fair.

19          I will not get into the other arguments raised by

20  the objecting parties at this stage.  I think the debtor

21  needs to go back to the drawing board and really needs to

22  engage with the city, Poppy, Cypress, Axias, all of the

23  secured lenders, to see what the appropriate budget is and

24  what the appropriate terms for any DIP loan should be.

25          I will continue this hearing.  I know we have

1  another hearing, is it September 11th at --

2            MR. STEMERMAN:  2:00 p.m.

3            THE COURT:  -- at 2:00 p.m., I will continue this

4  until then to see if the debtor and the parties can give me

5  an update as to whether there's the possibility of an

6  alternative DIP or whether Serene is willing to change its

7  terms.

8            Okay?  I'll see the parties on the 11th.

9            COUNSEL:  Thank you, Your Honor.

10            THE COURT:  We'll stand adjourned.

11         (Proceedings concluded at 4:27 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2              We certify that the foregoing is a correct

3   transcript from the electronic sound recording of the

4   proceedings in the above-entitled matter to the best of our

5   knowledge and ability.

6

7   /s/ William J. Garling                  September 4, 2024

8   William J. Garling, CET-543

9   Certified Court Transcriptionist

10  For Reliable

11

12  /s/ Tracey J. Williams                  September 4, 2024

13  Tracey J. Williams, CET-914

14  Certified Court Transcriptionist

15  For Reliable

16

17

18

19

20

21

22

23

24

25