# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>SILVERROCK DEVELOPMENT COMPANY, LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No.: 24-11647 (MFW)<br><br>(Jointly Administered)<br><br>Hearing Date: June 17, 2025 at 11:00 a.m. (ET)<br>Obj. Deadline: June 16, 2025 at 4:00 p.m. (ET) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER
(I) APPROVING THE DEBTORS' SELECTION OF A
STALKING HORSE PURCHASER; (II) APPROVING BREAK-UP FEE
IN CONNECTION THEREWITH; AND (III) GRANTING RELATED RELIEF**

The debtors and debtors in possession (each, a "Debtor" and collectively, the "Debtors"), in the above-captioned chapter 11 cases, by and through their undersigned counsel, hereby submit this motion (this "Motion")[2] for entry of an order (the "Proposed Order"), substantially in the form attached hereto as **Exhibit A**, (i) approving the Debtors' selection of TBE RE Acquisition Co II LLC to serve as stalking horse bidder (the "Stalking Horse Bidder") with respect to the sale of all or substantially all of the Debtors' assets; (ii) approving the proposed Break-Up Fee (as defined herein) for the Stalking Horse Bidder in connection with the sale process; and (iii) granting related relief. In further support of the Motion, the Debtors respectfully represent as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: SilverRock Development Company, LLC (5730), RGC PA 789, LLC (5996), SilverRock Lifestyle Residences, LLC (0721), SilverRock Lodging, LLC (4493), SilverRock Luxury Residences, LLC (6598) and SilverRock Phase I, LLC (2247). The location of the Debtors' principal place of business and the Debtors' mailing address is 343 Fourth Avenue, San Diego, CA 92101.

[2] Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the Proposed Stalking Horse LOI or the Bid Procedures (each as defined herein).

**JURISDICTION AND VENUE**

1. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

2. Pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors confirm their consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of these chapter 11 cases and this Application in this district is proper under 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code"), rules 2002, 6004, and 6006(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1, 6004-1, and 9006-1.

**RELIEF REQUESTED**

5. Through this Motion, the Debtors respectfully request entry of the Proposed Order, substantially in the form attached hereto as **Exhibit A**, (i) approving their designation of TBE RE Acquisition Co II LLC as the Stalking Horse Bidder, (ii) authorizing the payment of the Break-Up Fee to the Stalking Horse Bidder as set forth in the Proposed Order, and (iii) granting related relief. In further support of the Motion, the Debtors submit the *Declaration of Jeffrey Z. Adkison in Support of the Debtors' Motion for Entry of an Order (I) Approving the Debtors' Selection of a Stalking Horse Bidder; (II) Approving the Break-Up Fee in Connection Therewith; and (III)*

2

*Granting Related Relief* (the "Stalking Horse Declaration"), which was filed contemporaneously herewith and is incorporated herein by reference.

## BACKGROUND

### I. General Background

6. On August 5, 2024 (the "Petition Date"), each Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. These chapter 11 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committee of unsecured creditors has been appointed.

7. The factual background regarding the Debtors, including their business operations, capital and debt structure, and the events leading to the filing of these chapter 11 cases, is set forth in more detail in the *Declaration of Robert S. Green, Jr. in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 13] (the "First Day Declaration"). As set forth in the First Day Declaration, the Debtors' business operations center around the real estate development of a 525-acre master planned community in the City of La Quinta, California (the "Project"), now known as "Talus."

### II. The Bid Procedures Order

8. In connection with the sale process, the Court entered an order (the "Bid Procedures Order") [Docket No. 396] approving the relief requested by the Bid Procedures Motion on March 13, 2025. Among other things, the Bid Procedures Order approves certain procedures (the "Bid Procedures") that provide a framework for the sale process in these chapter 11 cases.

9. Pursuant to the Bid Procedures, the Debtors, in consultation with certain Consultation Parties (as defined therein) and the City, may select a Stalking Horse Bidder, provide such Stalking Horse Bidder with bid protections, and enter into an agreement with respect to such Stalking Horse Bidder's bid, which may be a term sheet (the "Stalking Horse LOI"). Bid Procedures Order ¶¶ 6-8.

10. The Bid Procedures provide that the Stalking Horse Bidder may propose a break-up fee to be paid if (i) a party other than the Stalking Horse Bidder is selected as the Successful Bidder (as defined in the Bid Procedures) for the Assets (defined below) and (ii) if approved by the Court. Bid Procedures Order ¶¶ 6, 8.

11. The framework outlined in the Bid Procedures Order was further refined on April 24, 2025 when the Debtors filed the *Notice of Revised Sale Process Deadlines* [Docket No. 452], on June 2, 2025 when the Debtors filed the *Notice of Further Revised Sale Process Deadlines* [Docket No. 508], and again on June 4, 2025, when the Debtors filed the *Second Notice of Further Revised Sale Process Deadlines* [Docket No. 512] (such notices, the "Sale Process Extension Notices"), thereby extending certain dates related to the sale process.

12. As communicated to all potential bidders, parties that wished to be considered for designation as a stalking horse bidder for the Debtors' assets, were requested to return an executed version of the Stalking Horse LOI to the Debtors' broker and Chief Restructuring Officer by May 27, 2025. Moreover, by submitting a Stalking Horse LOI, each potential bidder agreed that if it was selected as the Stalking Horse Bidder by the Debtors and the Court approved such designation, then (i) the terms of the Stalking Horse LOI would become binding on the Stalking Horse Bidder, (ii) the Stalking Horse Bidder would be required to work diligently with the City to negotiate and finalize for execution the Amended Development Documents (as defined therein), and (iii) if the

4

Stalking Horse Bidder was ultimately selected as the Successful Bidder (subject to Court approval), the Stalking Horse Bidder would be obligated to execute a purchase and sale agreement (the "PSA") with the Debtors and open escrow pursuant to the terms of the PSA. The Debtors received five (5) Stalking Horse LOIs, certain of which were accompanied by marked versions of the PSA, marketing materials, and proforma calculations related to the Assets, and other materials.

### III. The Marketing Process

13. As set forth in greater detail in the *Motion of Entry of Order (I) Authorizing and Approving (A) Bid Procedures and (B) Form and Manner of Notice of Bid Procedures* (the "Bid Procedures Motion") [Docket No. 358], the Debtors are prosecuting these chapter 11 cases in part, in pursuit of a sale transaction of real property owned by Debtors RGC PA 789, LLC and SilverRock Development Company, LLC consisting of approximately 134+- acres located in the City of La Quinta, County of Riverside, California (the "Real Property") and certain personal property located thereon and owned by the Debtors (the "Personal Property" and together with the Real Property, the "Assets"), to a buyer with the financial capability and development competence to finish construction and development of the Project.

14. For the past six months, the Debtors' chief restructuring officer, Douglas Wilson (the "CRO"), and their real estate broker and advisor, Jones Lang LaSalle Americas, Inc. ("JLL"), have prepared for and conducted a robust marketing process for the Assets, including outreach to at least 7,294 potential buyers, with more than 60 of such parties executing non-disclosure agreements (each, an "NDA"), and obtaining access to the Debtors' virtual data room for the sales process (the "VDR"). During the marketing process, relevant information regarding the Project, including the Assets, has been made available in the VDR, including, *inter alia*, surveys and reports related to the Real Property, such as, without limitation, seismic studies, environmental

5

impact assessments, a title report, an ALTA report, entitlement documents, and information related to the golf course associated with the Project.

15. Key components of this process have involved tours of the Real Property for potential bidders and their investment partners and facilitating discussions between potential bidders and the employees and representatives of the Debtors' DIP Lender and major stakeholder, the City of La Quinta, California (the "City"). Five (5) potential bidders executed letters of intent indicating a willingness to serve as a stalking horse bidder in the Debtors' sales process (each, a "Stalking Horse LOI"). In addition to these parties, there are additional parties that did not submit Stalking Horse LOIs, but that have completed substantial due diligence to date and have indicated their desire to remain in the process as a potential bidder (each, a "Qualified Bidder") by submitting a letter of intent (the "Qualified Bidder LOI") by July 7, 2025 (the "Qualified Bid Deadline").

### IV. The Stalking Horse Bidder

16. On June 5, 2025, the Debtors, in consultation with the Consultation Parties and the City, selected TBE RE Acquisition Co II LLC as the proposed Stalking Horse Bidder and determined that its Stalking Horse LOI (the "Proposed Stalking Horse LOI") represents the highest or otherwise best offer currently available for the Assets. A copy of the Proposed Stalking Horse LOI is attached hereto as **Exhibit B**. Subject to Court approval, the terms of the Proposed Stalking Horse LOI shall become binding upon the Stalking Horse Bidder.

17. The purchase price for the Debtors' Assets under the Proposed Stalking Horse LOI is $60 million dollars (the "Purchase Price"). Pursuant to the terms of the Proposed Stalking Horse LOI, certain required documents for the development of the Real Property (the "Amended Development Documents") must be negotiated and finalized with the City by July 29, 2025

(the "Sealed Bid Deadline").  The Stalking Horse Bidder, upon entry of the Proposed Order, for all purposes is a Qualified Bidder.

18. Pursuant to the Bid Procedures, the Debtors will continue to solicit higher or otherwise better proposals with respect to the sale of the Assets. The Debtors, in consultation with the Consultation Parties and the City, shall have until the Qualified Bid Deadline to approve any additional Qualified Bidders. All Qualified Bidders are required to submit a Qualified Bidder LOI to the Debtors no later than the Qualified Bid Deadline and are encouraged to do so as soon as possible. After the Qualified Bid Deadline, to maximize their ability to submit a successful bid, all Qualified Bidders will need to interface with the City regarding their development plans and Amended Development Documents in advance of the Sealed Bid Deadline.  The City is dedicated to working with all Qualified Bidders during this process.

19. Thereafter, the Debtors, their advisors, and JLL, in consultation with the Consultation Parties and the City, will review all Qualified Bidder LOIs, compare such Qualified Bidder LOIs to the transaction in the Proposed Stalking Horse LOI and related PSA and designate a Successful Bidder and Next-Highest Bidder (each as defined in the Bid Procedures) by not later than September 12, 2025.  Presently, the Debtors expect to be able to designate a Successful Bidder and Next-Highest Bidder much earlier than such outside date, most likely in early August 2025.

20. The Debtors believe the Bid Procedures provide sufficient time for any Qualified Bidder to submit an actionable competing Qualified Bidder LOI that purports to top or otherwise provide higher and otherwise better value than the Proposed Stalking Horse LOI.  This market-tested process will yield the best value for the Assets and, in turn, maximize recoveries for the Debtors' stakeholders.  As set forth in the Stalking Horse Declaration, the "floor" price set by the Proposed Stalking Horse LOI is intended to maximize the value to the Debtors' estates and ensure

the completion of construction of the Project and the development of the Real Property in accordance with its potential and the City's specifications, with the opportunity to further increase value if higher or otherwise better overbids are received by Qualified Bidders.

### V. Material Terms of the Proposed Stalking Horse LOI

21. The following chart summarizes the terms and conditions of the Proposed Stalking Horse LOI and discloses certain information required pursuant to Local Rule 6004-1.[3]

| Proposed Stalking Horse LOI Provision | Summary Description |
|---|---|
| **Proposed Stalking Horse LOI Parties** | Sellers: RGC PA 789, LLC, SilverRock Development Company, LLC, SilverRock Lifestyle Residences, LLC, SilverRock Lodging, LLC, SilverRock Luxury Residences, LLC, and SilverRock Phase I, LLC<br><br>Stalking Horse Bidder: TBE RE Acquisition Co II LLC (the "Buyer")<br><br>*See* Proposed Stalking Horse LOI, Preamble |
| **Purchase Price** | Purchase Price: $60 million<br><br>*See* Proposed Stalking Horse LOI ¶ 2 |
| **Acquired Assets** | Certain real property owned by Sellers consisting of approximately 134+- acres located in the City of La Quinta, County of Riverside, CA with APNs 777-060-083, 777-060-085, 777-060-075, 777-060-078, 777-490-058, 777-490-063, 777-490-064, 777-490-065, 777-490-066, 777-490-037, 777-490-057, 777-490-059, 777-490-068, 777-490-042, 777-490-076 and portions of 777-490-072 and 777-90-073, 777-490-074 and portions of 777-490-072 and 777-490-073 and 777-490-075 and 777-490-077 and 777-490-079 and 777-490-080, 777-490-046, 777-490-071, 777-060-082, 777-060-084, portions of 777-490-075 and 777-490-077 and 777-490-078 and 777-490-079 and 777-490- 080, portion of 777-490-079, 777-510-001 through 023, 777-510-025, and 777-520-001 through 018, including any existing appurtenant rights, permits, entitlements, and improvements. The APNs correspond to Parcels 1, 2, 3, 4, 5, 6, 7, 8, 9A, 9B, and 12 in the legal description of the real property set forth in Schedule A of that |

---

[3] This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the terms and conditions of the Proposed Stalking Horse LOI, the Proposed Stalking Horse LOI shall govern in all respects. Capitalized terms used in the following summary shall have the meanings ascribed to them in the Proposed Stalking Horse LOI. All references to schedules or sections in the following summary shall refer to schedules or sections of the Proposed Stalking Horse LOI.

| **Proposed Stalking Horse LOI Provision** | Summary Description |
|---|---|
| | certain preliminary title report dated January 10, 2025, Update No. 4, Order No. 2306435 from Stewart Title of California [Docket No. 425] (the "Real Property")[4] and all of Sellers' right, title, and interest in and to all personal property, including, without limitation, all building materials, supplies, equipment, inventory, temporary fencing, scaffolding, signage, HVAC units, doors, windows, fixtures, any other tangible personal property of any kind (whether or not yet incorporated into the Real Property or stored threat and only to the extent owned by the Debtors (collectively, the "Personal Property" and together with the "Real Property," the "Assets") located on or at the Real Property and owned by Sellers. *See* Proposed Stalking Horse LOI ¶ 1 |
| **Stalking Horse Bid Protections** **Local Bankr. R. 6004-1(c)(i)(C)** | Break-Up Fee: $2 million (the "Break-Up Fee") payable if the Buyer is not selected as the Successful Bidder at the conclusion of the Debtors' sale process in accordance with or as otherwise set forth in the terms of the Proposed Order. *See* Proposed Stalking Horse LOI ¶ 6 |
| **Representations and Warranties** | The Assets will be purchased "AS IS" with no representations by Sellers and shall include a waiver by Buyer of Section 1542 of the California Civil Code. *See* Proposed Stalking Horse LOI ¶ 9 |
| **Sale to Insider** **Local Bankr. R. 6004-1(b)(iv)(A)** | N/A |
| **Agreements with Management** **Local Bankr. R. 6004-1(b)(iv)(B)** | N/A |
| **Releases** | N/A |

---

[4] The Real Property to be sold pursuant to the Proposed Stalking Horse LOI is only the Debtors' property plus a portion of real property that the Debtors own as undivided tenants-in-common with non-Debtor SilverRock Land II, LLC, a Delaware limited liability company ("SR Land"). SR Land and the Debtors agreed to an arrangement for the sale of the portion of the Real Property in which SR Land holds an undivided interest, which was approved by the Bankruptcy Court. *See* Docket No. 437, Ex. 3, ¶ 3. For the avoidance of doubt, none of the Real Property to be sold pursuant to the Proposed Stalking Horse LOI is owned by the City.

| **Proposed Stalking Horse LOI Provision** | **Summary Description** |
|---|---|
| Local Bankr. R. 6004-1(b)(iv)(C) | |
| **Private Sale/No Competitive Bidding** Local Bankr. R. 6004-1(b)(iv)(D) | N/A |
| **Closing and Other Deadlines** Local Bankr. R. 6004-1(b)(iv)(E) | <u>Deadline to Negotiate and Finalize Amended Development Documents with City</u>: July 29, 2025<br><br><u>Closing of Escrow</u>: on or before November 12, 2025<br><br>*See* Proposed Stalking Horse LOI ¶¶ 7; 12 |
| **Good Faith Deposit** Local Bankr. R. 6004-(b)(iv)(F) | <u>Stalking Horse Bid Deposit</u>: Within three business days of the Court's approval of the Debtors' designation of the Buyer as the Stalking Horse Bidder, the Buyer shall deposit $5 million (the "<u>Bid Deposit</u>") in a trust account established by Sellers. The Bid Deposit shall be refundable to Buyer solely as provided in the Proposed Order. If the Stalking Horse Bidder is selected as Successful Bidder, the Bid Deposit shall become the "<u>PSA Deposit</u>" and shall be non-refundable as to Buyer other than in the events described in the PSA.<br><br>*See* Proposed Stalking Horse LOI ¶¶ 3; 5 |
| **Interim Arrangements with Proposed Buyer** Local Bankr. R. 6004-(b)(iv)(G) | N/A |
| **Use of Proceeds** Local Bankr. R. 6004-1(b)(iv)(H) | N/A |
| **Tax Exemption** Local Bankr. R. 6004-1(b)(iv)(I) | N/A |
| **Records Retention** Local Bankr. R. 6004-(b)(iv)(J) | N/A. The Debtors' books and records, other than pertaining to the Assets, are not part of the Assets to be sold pursuant to the Proposed Stalking Horse LOI. |

| Proposed Stalking Horse LOI Provision | Summary Description |
|---|---|
| **Sale of Avoidance Actions**<br><br>Local Bankr. R. 6004-(b)(iv)(K) | N/A. Claims and causes of action under chapter 5 of the Bankruptcy Code are not part of the Assets to be sold pursuant to the Proposed Stalking Horse LOI. |
| **Requested Findings as to Successor Liability**<br><br>Local Bankr. R. 6004-1(b)(iv)(L) | The Proposed Order approving the relief requested by this Motion does not request a finding as to successor liability. However, the Debtors will request such a finding in the order approving the sale of the Assets to the Successful Bidder. |
| **Sale of Unexpired Leases Free and Clear**<br><br>Local Bankr. R. 6004-1(b)(iv)(M) | None. No leases for nonresidential real property are being sold pursuant to the Proposed Stalking Horse LOI. However, the Debtors may request such a finding in the order approving the sale of the Assets to the Successful Bidder. |
| **Relief from Bankruptcy Rule 6004(h)**<br><br>Local Bankr. R. 6004-1(b)(iv)(O) | The Proposed Order approving the relief requested by this Motion requests a finding as to relief from Bankruptcy Rule 6004(h). The Debtors will also request such a finding in the order approving the sale of the Assets to the Successful Bidder. |

### VI.  The Break-Up Fee

22. As set forth above, the Proposed Stalking Horse LOI contemplates that, subject to Court approval of TBE RE Acquisition Co II LLC as the Stalking Horse Bidder, TBE RE Acquisition Co II LLC shall be entitled to a Break-Up Fee of $2 million only if (i) the Stalking Horse Bidder reaches agreement with the City regarding the Amended Development Documents on or before the Sealed Bid Deadline (July 29, 2025 (subject to extension as approved in the Bid Procedures Order)), and (ii), after all bids are received, (x) the Debtors, in consultation with the City and the Consultation Parties, determine to select other bidders as the Successful Bidder and Next-Highest Bidder or (y) determine to select another bidder as the Successful Bidder and select

the Stalking Horse Bidder as the Next-Highest Bidder, but the sale to the Successful Bidder closes. Under such circumstances, the Proposed Order provides that the obligation to pay the Break-Up Fee to the Stalking Horse Bidder be entitled to administrative expense claim status under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code. For the avoidance of doubt, if the Stalking Horse Bidder does not undertake reasonable good faith efforts to reach agreement with the City regarding the Amended Development Documents prior to the Sealed Bid Deadline, the Break-Up Fee shall not be payable.

23. By this Motion, the Debtors seek entry of an order approving the Break-Up Fee. The Break-Up Fee was a necessary component of the Proposed Stalking Horse LOI, and the Debtors do not believe that the Stalking Horse Bidder would have submitted a stalking horse proposal, let alone permitted such proposal to be made public and subject to superior offers, without the inclusion of the Break-Up Fee. The Break-Up Fee promotes competitive bidding for the Assets by inducing the Stalking Horse Bidder to hold its offer open as a minimum bid on which other bidders and the Debtors can rely. In so doing, the Stalking Horse Bidder has helped lay the foundation for the final phase of the Debtors' sale process and will serve as a catalyst for other Qualified Bids. Designating the Proposed Stalking Horse LOI will enable the Debtors to solicit competing bids for the Assets that may offer materially higher or otherwise better value to the Debtors' estates and the Project than the bid represented by the Proposed Stalking Horse LOI. The Debtors' receipt of the Proposed Stalking Horse LOI also increases the likelihood that the price at which the Assets are sold will reflect their true market value.

24. Particularly given the many nuances at play here, including the partial construction of the Project, the City's interest in the Project as both the municipality where the Project is located and as the DIP Lender in these chapter 11 cases, the various requirements of California real estate

and land use law, and the substantial value if the Project is developed to its full potential, the Debtors believe that the presence of a committed Stalking Horse Bidder in the process will incentivize other parties to become Qualified Bidders, drive up the ultimate purchase price, and produce the highest or otherwise best offer available for the Assets. Accordingly, the Debtors believe that the benefit of the Proposed Stalking Horse LOI to the integrity and robustness of their sale process substantially outweighs the potential cost of providing the Break-Up Fee to the Stalking Horse Bidder.

## BASIS FOR RELIEF

**I.    The Selection of TBE RE Acquisition Co II LLC as Stalking Horse Bidder Is an Exercise of the Debtors' Sound Business Judgment and Should Be Approved**

25.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for the proposed transaction. *See, e.g., In re Martin*, 91 F.3d 389, 395 (3d. Cir. 1996) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (same); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Telesphere Commc's, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

26.     Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company." *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *In re Filene's Basement, LLC*, 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr.

13

29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate") (citations omitted); *In re Integrated Res.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

27. As set forth above, the Debtors have a sound business justification for selecting TBE RE Acquisition Co II LLC as the Stalking Horse Bidder. *First*, as set forth in the Stalking Horse Declaration, the Debtors engaged in extensive, arm's-length negotiations with multiple interested parties before selecting TBE RE Acquisition Co II LLC as Stalking Horse Bidder. Ultimately, the Debtors, in consultation with the City and the Consultation Parties, determined that the bid provided by TBE RE Acquisition Co II LLC offered substantial value for the estates and that TBE RE Acquisition Co II LLC and its principals had sufficient resources and experience to complete construction of the Project and would work expeditiously and in good faith to negotiate the Amended Development Documents by July 29, 2025.

28. *Second*, the sale of the Assets pursuant to the Proposed Stalking Horse LOI will be subject to the competing bids of Qualified Bidders, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets. Consequently, the bid ultimately selected as the highest and best bid for the Assets (the "Successful Bid"), after being subject to a "market check" in the form of the overbid process, will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practically available alternative.

29. *Third*, as noted above, JLL will continue to market the Assets and solicit Qualified Bidder LOIs consistent with the Bid Procedures, including, for example, by contacting previously

solicited and new parties, continuing to provide potential bidders with access to the VDR and requested information regarding the Assets and the Project (in compliance with the Bid Procedures, including the execution of an appropriate NDA), hosting meetings and presentations with potential bidders and facilitating opportunities for potential bidders to tour the Real Property and confer with the City, and otherwise assisting the Debtors with all efforts to increase transaction value. In this way, the number of bidders that are eligible to participate in the process as Qualified Bidders will be maximized with the goal of ensuring that the Successful Bid represents the highest and otherwise best offer available for the Assets. If no additional Qualified Bidder LOIs are received prior to the Qualified Bid Deadline, the Purchase Price set forth in the Proposed Stalking Horse LOI will conclusively represent the fair value of the Assets.

30. Thus, the Debtors submit that the Successful Bidder's bid will constitute the highest or otherwise best offer for the Assets and will provide an equal or greater recovery for the Debtors' estates than would be provided absent approval of the Stalking Horse Bidder. Therefore, the Debtors request that the Court make a finding that the selection of TBE RE Acquisition Co II LLC as the Stalking Horse Bidder is an exercise of the Debtors' business judgment.

### VII. The Break-Up Fee Has a Sound Business Purpose and Should Be Approved.

31. The Debtors are seeking authority to offer the Break-Up Fee to the Stalking Horse Bidder. The Debtors have agreed to pay the Break-Up Fee (if triggered) to the Stalking Horse Bidder as an allowed administrative expense priority claim from the sale proceeds. The use of a stalking horse in a public sales process pursuant to section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in such a process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Off. Comm. of Unsecured Creditors v. Interforum Holding LLC*, 2011 WL 2671254, No. 11-219, *1 (E.D. Wis. July 7, 2011). As a result,

15

stalking horse bidders virtually always require break-up fees and, in many cases, other forms of bid protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Id*. (internal citations omitted).  Thus, the use of bid protections, including break-up fees, has become an established practice in chapter 11 cases.

32. Indeed, break-up fees are a normal and, in many cases, necessary component of significant sales conducted under section 363 of the Bankruptcy Code: "[b]reak-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be ***necessary*** to discharge [such] duties to maximize value." *Integrated Res.*, 147 B.R. at 659–60 (emphasis added).  Specifically, break-up fees "may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assocs.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (quotations omitted); *In re Hupp Int'l Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence.").

33. As a result, courts routinely approve break-up fees like the Break-Up Fee set forth in the Proposed Stalking Horse LOI in connection with proposed bankruptcy sales where a proposed fee provides a benefit to the estate. *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999).  The Debtors believe that in connection with designating a Stalking Horse Bidder, the Break-Up Fee is necessary and, together with the Stalking Horse Bidder's bid, will establish a floor for further bidding that may increase the consideration given in exchange for the Assets.  Moreover, because the Break-Up Fee was a necessary condition of the Stalking Horse Bidder's

16

willingness to act as a stalking horse in these chapter 11 cases, the Break-Up Fee confers substantial benefit on the estates, including with respect to permitting the sale transactions to close in a timeline consistent with the Debtors' liquidity.

34. Based on the marketing process that the Debtors and their advisors have conducted to date, the Debtors have determined that the Break-Up Fee was necessary to attract and retain the Stalking Horse Bidder. Moreover, by inducing the Stalking Horse Bidder to hold its offer open as a baseline from which other potential bidders can submit higher or better offers, the Break-Up Fee serves to encourage more competitive bidding, which should serve to increase the purchase price of the Assets. As such, the Break-Up Fee will, among other things, enable the Debtors to maximize the value of their estates for the benefit of all economic stakeholders in these chapter 11 cases.

35. Furthermore, as set forth in the Stalking Horse Declaration, the Debtors believe that the amount of the Break-Up Fee ($2 million without an additional expense reimbursement) is well within market, and fair and reasonable in amount in light of the size and nature of the proposed transaction, and the efforts that will be and have been expended by the Stalking Horse Bidder in connection with negotiating and entering into the Proposed Stalking Horse LOI, which will serve as the baseline for other bids for the Assets. Further, the Debtors are not seeking to also provide the Stalking Horse Bidder with any expense reimbursement. Finally, the Stalking Horse Bidder is not an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

36. The Break-Up Fee accordingly falls well within the range of break-up fees typically approved by bankruptcy courts in the Third Circuit. The Break-Up Fee represents 3.33% of the Purchase Price proposed by the Proposed Stalking Horse LOI, an amount which is consistent with the range of bid protections typically approved in sale transactions that have been recently approved in this district. *See, e.g.*, *In re Alamo Drafthouse Cinemas Holdings, LLC, et al.*, Case

17

No. 21-10474 (MFW) (Bankr. D. Del. May 3, 2021) (approving break-up fee of 2%); *In re Brooks Bros. Grp., Inc.*, Case No. 20-11785 (CSS) (Bankr. D. Del. Aug. 3, 2020) (approving break-up fee of 3%); *In re Lucky Brand Dungarees, LLC*, Case No. 20-11768 (CSS) (Bankr. D. Del. Jul. 30, 2020) (authorizing break-up fee of 3%); *In re Templar Energy LLC*, Case No. 20-11441 (BLS) (Bankr. D. Del. Jun. 29, 2020) (authorizing break-up fee of 3% of cash component of stalking horse bid); *In re Lucky's Market Parent Co., LLC*, Case No. 20-10166 (JTD) (Bankr. D. Del. Feb. 26, 2020) (authorizing break-up fee of 3% of purchase price); *In re Celadon Grp., Inc.*, Case No. 19-12606 (KBO) (Bankr. D. Del. Jan. 6, 2020) (authorizing break-up fee of 3% of purchase price); *In re Things Remembered, Inc.*, No. 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019) (approving break-up fee and expense reimbursement equal to 4.4% of the purchase price); *In re The Weinstein Co. Holdings LLC*, 18-10601 (MFW) (Bankr. D. Del. Apr. 6, 2018) (approving break-up fee and expense reimbursement equal to 5% of the purchase price), each of which was also accompanied by allowance of an expense reimbursement which had the effect of increasing the percentage of the bidder protections approved in these cases.[5]

37. For the foregoing reasons, the Debtors respectfully request that the Court authorize the Break-Up Fee set forth in the Proposed Stalking Horse LOI.

### VIII. Relief Under Bankruptcy Rule 6004(h) Is Appropriate.

38. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." The Debtors request that the Proposed Order be effective immediately upon its entry by providing that the fourteen-day stay under Bankruptcy Rule 6004(h) is waived.

---

[5] Copies of such orders are available upon request.

39. The purpose of Bankruptcy Rules 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 *Collier on Bankruptcy* ¶ 6004.10 (15th rev. ed. 2006). Here, the Stalking Horse Bidder has agreed to fund the Bid Deposit within three (3) business days and should only be required to do so under an order in effect. Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

40. The authority to pay the Break-Up Fee to the Stalking Horse Bidder is a necessary component of its bid. While such rules may not be strictly applicable to the relief requested herein, out of an abundance of caution and to maximize the value received for the Assets, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rule 6004(h), to the extent such rule is applicable.

## NOTICE

41. The Debtors will provide notice of this Motion to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the City; (iii) the Consultation Parties; (iv) the Potential Bidders; and (v) all parties that have filed appropriate notice pursuant to Bankruptcy Rule 2002 requesting notice of all pleadings filed in these chapter 11 cases. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter the Order, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Dated: June 5, 2025  
Wilmington, Delaware

**WILSON SONSINI GOODRICH & ROSATI, P.C.**

*/s/ Erin R. Fay*  
Erin R. Fay (No. 5268)  
Shane M. Reil (No. 6195)  
Catherine C. Lyons (No. 6854)  
Heather P. Lambert (No. 6923)  
222 Delaware Avenue, Suite 800  
Wilmington, Delaware 19801  
Telephone: (302) 304-7600  
E-mails: efay@wsgr.com  
　　　　　sreil@wsgr.com  
　　　　　clyons@wsgr.com  
　　　　　hlambert@wsgr.com

- *and* -

**LAW OFFICES OF BENJAMIN M. CARSON, P.C.**

Benjamin M. Carson (admitted *pro hac vice*)  
5965 Village Way, Suite E105  
San Diego, California 92130  
Telephone: (858) 255-4529  
E-mail: ben@benjamincarson.com

-*and*-

Victor A. Vilaplana (admitted *pro hac vice*)  
823 La Jolla Rancho Road  
La Jolla, California 92037  
Telephone: (619) 840-4130  
Email: vavilaplana@gmail.com

*Counsel to the Debtors  
and Debtors-in-Possession*