# EXHIBIT B

**Proposed Stalking Horse LOI**

**LETTER OF INTENT**

June 5, 2025

*VIA EMAIL*

Douglas P. Wilson, CRO c/o JLL
Attn: Jeff Adkison and Jeremy Sain
Email: Jeff.Adkison@jll.com; Jeremy.Sain@jll.com

Jon McMillen, City Manager City of La Quinta
78495 Calle Tampico La Quinta, CA 92253
Email: jmcmillen@laquintaca.gov

RE:     Letter of Intent to Purchase SilverRock Property Consisting of Approximately 134+/- Acres
        located in the City of La Quinta, County of Riverside, CA (the "LOI")

Dear Messrs. Wilson and McMillen:

The purpose of this letter of intent is to outline the terms upon which TBE RE Acquisition Co II LLC,
a Delaware limited liability company ("Buyer") will enter into (A) a Purchase and Sale Agreement and
Joint Escrow Instructions in the form attached hereto as Exhibit A (the "PSA") for the purchase of the
Assets from RGC PA 789, LLC, a Delaware limited liability company, SilverRock Development
Company, LLC, a Delaware limited liability company, SilverRock Lifestyle Residences, LLC, a
Delaware limited liability company, SilverRock Lodging, LLC, a Delaware limited liability company,
SilverRock Luxury Residences, LLC, a Delaware limited liability company, and SilverRock Phase I,
LLC, a Delaware limited liability company (collectively "Debtors" or "Sellers") and (B) the Amended
Development Documents (defined herein below) with the City of La Quinta (the "City") for the
development of the Assets (defined herein below).

Buyer understands and acknowledges Debtors filed for Chapter 11 bankruptcy protection on August 5,
2024, and the sale of Debtors' interest in the Assets, as described herein is subject to Bankruptcy Court
approval. Debtors' bankruptcy cases are pending before the United States Bankruptcy Court for the
District of Delaware (the "Bankruptcy Court") and are being jointly administered under Case No. 24-
11647-MFW (the "Bankruptcy Case"). Buyer further understands that SilverRock Land II, LLC, a
Delaware limited liability company ("SR Land"), who owns an undivided tenant-in-common interest
in a portion of the Assets, and Debtors agreed to an arrangement for the sale of the portion of the Assets
in which SR Land holds an undivided interest, which has been approved by the Bankruptcy Court
(Bankruptcy Case, Dkt. No. Ex. 3, ¶ 3) under which Debtor is permitted to convey the portion of the
Assets owned by SR Land on behalf of SR Land. The Court-approved Bidding Procedures (Bankruptcy
Case, Dkt. No. 396)[1] govern the process through which Sellers will market and sell their interest in the
Assets. Buyer has received and reviewed the Court-approved Bidding Procedures. Pursuant thereto,

---

[1]     Undefined capitalized terms used herein shall have the meanings set forth in such Bidding Procedures and the
        Bankruptcy Court order approving the Bidding Procedures.

Sellers will be receiving multiple letters of intent and will, subject to consultation with the Consultation Parties and the City as required under the Bidding Procedures, choose a Stalking Horse Bidder, and ultimately a Successful Bidder and a Next- Highest Bidder.

## BIDDER DISCLOSURES

Included with this LOI for review and consideration by Sellers, Buyer provides the following information to Sellers, the City and Consultation Parties:

- Disclosure of identity of Buyer and contact information for specific person(s) to contact with questions or for further discussion. If the Buyer will be a special purpose entity formed for the purpose of consummating the sale, the special purpose entity's financial backer or equity holder must be disclosed along with contact persons for the special purpose entity.
  - Michael Gazzano (mg@turnbridgeq.com; 714-403-6453) is the executive of the Buyer who is the contact person for this transaction.
- A description of any relationships between the Buyer and other bidders, the Debtors, any officers of the Debtors, any officers of the Debtors' non-debtor affiliates, any of the Debtors' secured creditors or equity security holders (the "Parties in Interest").
  - A list of the Parties in Interest is attached to the LOI as Exhibit B. Buyer has previously provided Sellers with such disclosures. such disclosures.
- Adequate information including (i) information demonstrating that Buyer has the financial capacity to consummate the proposed sale and development of the project, (ii) evidence that the Buyer has obtained authorization or approval from its board of directors (or comparable governing body) with respect to submission of its bid, (iii) evidence of the Buyer's experience in the management and development of comparable real estate projects, and (iv) any additional information Buyer wishes to provide.
  - This transaction has been approved by the requisite executives of the Buyer, which is a SEC-registered investment advisor. In regards to Buyer's experience in the management and development of comparable real estate projects, please see Buyer's RFP Deck.

## PSA TERMS

1. Assets: Certain real property owned by Sellers consisting of approximately 134+- Acres located in the City of La Quinta, County of Riverside, CA with APNs 777-060-083, 777-060-085, 777-060-075, 777-060-078, 777-490-058, 777-490-063, 777-490-064, 777-490-065, 777-490-066, 777-490-037, 777-490-057, 777-490-059, 777-490-068, 777-490-042, 777-490-076 and portions of 777-490-072 and 777-90-073, 777-490-074 and portions of 777-490-072 and 777-490-073 and 777-490-075 and 777-490-077 and 777-490-079 and 777-490-080, 777-490-046, 777-490-071, 777-060-082, 777-060-084, portions of 777-490-075 and 777-490-077 and 777-490-078 and 777-490-079 and 777-490- 080, portion of 777-490-079, 777-510-001 through 023, 777-510-025, and 777-520-001 through 018, including any existing appurtenant rights, permits, entitlements, personal property and improvements (collectively, the "Assets"). The APNs correspond to Parcels 1, 2, 3, 4, 5, 6, 7, 8, 9A, 9B, and 12 in the legal description of the real estate constituting part of the Assets set forth in Schedule A of preliminary title report dated January 10, 2025, Update No. 4, Order No. 2306435 from  Stewart Title of California [Bankruptcy Case Dkt. No. 425].

2. Purchase Price: The purchase price for the Assets shall be Sixty Million and 00/100 Dollars ($60,000,000.00).

3. <u>Bid Deposit</u>: Within three business days of approval by the Bankruptcy Court of the Debtors' designation of Buyer as the Stalking Horse Bidder, Buyer shall deposit with Sellers, in a segregated trust account established by Sellers, Five Million and no/100 Dollars ($5,000,000.00) (the "<u>Bid Deposit</u>"), which trust account shall not be commingled with the general funds or estate property of the Sellers. The Bid Deposit shall be refundable to Buyer solely as provided in the Bidding Procedures, the order approving Buyer as Stalking Horse Bidder, and the PSA.

4. <u>PSA Execution and Amended Development Documents</u>: In the event that Buyer is selected as the Stalking Horse Bidder by the Debtors and the Bankruptcy Court approves such selection, this LOI shall become binding on Buyer. In the event Buyer is selected as the Stalking Horse Bidder, Buyer and the City shall diligently and in good faith attempt to negotiate and finalize for execution the Amended Development Documents (defined below). In the event Buyer is selected as the Successful Bidder, subject to compliance with the Bidding Procedures and obtaining the Bankruptcy Court order approving Buyer as the Successful Bidder, Sellers and Buyer shall execute the PSA and open escrow pursuant to the terms of the PSA.

5. <u>PSA Deposit</u>: After execution of the PSA by the Successful Bidder and Sellers, within three (3) business days thereafter, Sellers shall transfer on behalf of Buyer, as the Successful Bidder, and deposit the Bid Deposit with Stewart Title of California Inc., 73020 EL Paseo, Ste. 103, Palm Desert, CA 92260 Attn: Tamara Castro, Escrow Officer, E-Mail: tcastro@stewart.com and Teo Cadenas, Title Officer, E-Mail: teo.cadenas@stewart.com and telephone (760) 771-4645; with notice of the Bid Deposit copied to Teo Cadenas, Title Officer, E-Mail: teo.cadenas@stewart.com) to serve as the Deposit required under the terms of the PSA (the "<u>PSA Deposit</u>"). The PSA Deposit shall be non-refundable to Buyer other than in the event of a default by Sellers or a failure of a condition to Buyer's obligation to purchase, and as otherwise provided in the PSA.

6. <u>Break-Up Fee</u>. Subject to approval of the Bankruptcy Court of Buyer as the Stalking Horse Bidder, Buyer shall be entitled to a Break-Up Fee of Two Million and no/100 Dollars ($2,000,000.00) on the terms and conditions set forth in the Bankruptcy Court order approving Buyer as the Stalking Horse Bidder.

7. <u>Closing</u>. Close of Escrow shall occur on or before November 12, 2025.

8. <u>Diligence and Title</u>. Prior to execution of this letter of intent, Buyer and its agents, representatives and consultants will have (a) reviewed all documentation and conducted such inspections and investigations regarding the Assets as Buyer deems necessary, provided, however, that Buyer shall have the right to conduct the additional diligence set forth in sections 5.1-5.5 and 5.7 -5.9 of the PSA in accordance with the terms therewith and (b) reviewed the Preliminary Title Report attached as an exhibit to the PSA and the status of title, which will be transferred free and clear of all claims, liens, interests, and encumbrances under Bankruptcy Code sections 363 or 1123, 1129, 1141, sale order, and any confirmation order, if applicable. In addition, and without prejudice to the Sellers' fiduciary obligations to obtain the highest or otherwise best offer available for the Assets and the Debtors' sale process which remains ongoing, Sellers shall reasonably cooperate with the Buyer in connection with the negotiation of the Amended

Development Documents and obtaining City council and other governmental approvals that are required for the Development Plan and the purchase of the Assets by Buyer (including, without limitation, by executing and delivering such consents, applications, submissions and other instruments, and providing such information, as shall be reasonably required with regard thereto), provided that, with regard to the foregoing, if Buyer is not ultimately selected as the Successful Bidder or the Next-Highest Bidder or otherwise ceases to perform in accordance with the terms of this LOI , promptly thereafter Buyer shall cause all such applications and submissions applicable to be withdrawn and/or otherwise ineffective.

9. <u>As-Is Acknowledgement</u>.  The Assets will be purchased "AS IS" with no representations by Sellers and shall include a waiver by Buyer of Section 1542 of the California Civil Code (other than as set forth in the Bidding Procedures or PSA).

10. <u>Acknowledgement of No Contingencies</u>. Buyer acknowledges that the offer to purchase set forth herein is not subject to any contingencies other than as expressly permitted by the LOI or the Bidding Procedures or the PSA.

11. <u>Group or Committee Bid</u>. In the event this offer to purchase as set forth in this LOI is proposed by a group or committee to which Bankruptcy Rule 2019 applies, such group or committee shall promptly file a statement required by Bankruptcy Rule 2019 as a condition to becoming the Stalking Horse Bidder.

12. <u>Pre-Closing Matter</u>. It is anticipated that on or before July 29, 2025, Buyer and the City shall negotiate and have finalized the form of (a) an unrecorded restated Purchase, Sale, and Development Agreement (Restated PSDA, see Paragraph 2 below), to be incorporated by reference into the Amendment to Development Agreement, (b) an Amendment to Development Agreement, (c) Amendments to Option Agreements, (d) Amendments to Agreements to Share TOT Revenue, and (e) Amendments to Covenants Affecting Real Property (all individually defined herein below, and collectively referred to as the "<u>Amended Development Documents</u>").

## <u>AMENDED DEVELOPMENT DOCUMENTS TERMS</u>:

1. <u>Development Plan</u>. Concurrently with the delivery of this LOI, Buyer shall provide City with a detailed plan for development of the Assets (the "<u>Development Plan</u>"). The Development Plan should describe the proposed use of each parcel of the Phase I and Phase II property shown on the Offering Memorandum, including the following:
    a. The proposed uses for the Phase I (Phase 1A and Phase 1B) and Phase II property, with said uses corresponding to the existing parcel numbers, APNs, or Planning Areas as identified in the prior PSDA.
    b. Any changes to the uses and/or unit counts shown in the Offering Memorandum;
    c. Proposed product type and number of units/square footage with respect to Phase I(b);
    d. The number of hotels to be built on Phase I;
    e. The number of hotel rooms contemplated for each hotel;
    f. Conference space;
    g. The identity of each hotel/flag;
    h. The number of branded residential units, their size and location;
    i. Revenue projections and operating pro formas with respect to hotels and short-term

rental of branded residential units. Such projections and pro formas must include reasonable detail regarding daily rates, occupancy rates, growth rates, requirements regarding minimum rental of branded residences.

j.  Public amenities, including if applicable public access to any new golf course (and acknowledgement with respect to public access to existing golf course);

k.  Development phasing, timetable, and milestones for all phases of the project, preferably presented as a schedule of performance to be incorporated into the Restated PSDA and/or Amendment to Development Agreement

l.  Proposal with respect to TOT sharing (if any) with respect to hotel(s), (and acknowledgement that there will be no TOT sharing with respect to branded residences).

m.  Proposal with respect to mitigation fees on account of proposed uses that diminish the tax revenues to the City or sale of Phase II for less than fair market value.

n.  Proposed terms and conditions for the option to purchase the Phase II property.

2.  <u>PSDA</u>. In the event Buyer is selected and approved by the Bankruptcy Court as the Stalking Horse Bidder, on or before July 29, 2025, the City and Buyer shall attempt in good faith to negotiate and have finalized for execution concurrent with Closing the mutually acceptable Restated Purchase, Sale and Development Agreement (the "<u>Restated PSDA</u>") that accurately reflects Buyer's Development Plan, and legal and business terms, including without limitation:

a.  Buyer's rights and obligations for the development of the Phase I (including both Phase 1A and Phase 1B) property;

b.  Buyer's rights and obligations for the use and operation of uses on the Phase I (including both Phase 1A and Phase 1B) property, and any proposed assignments after completion of development thereof;

c.  Buyer's financing and payments for construction to completed the development of the Phase I (including Phase 1A and 1B) property, and the City's rights and obligations relating to the review and approval thereof;

d.  Buyer's schedule of performance for the completion of development for the Phase I (Phase 1A and Phase 1B) property, which should include or address the phasing, timetable, and milestones for all phases of the project on Phase I (and Phase II if conditions to purchasing Phase II are met);

e.  Conditions for Buyer to perform prior to the right to purchase the Phase II property, or conditions that would require Buyer to reconvey the Phase II property to the City for failure to perform;

f.  Limitations (including prior rights of approval for the City) on assignments, assumptions, transfers, and any hypothecations or conveyances in interest in the Phase I and (if applicable) Phase II property, including limitations and allowances for transfers in interest for financing and secured interests in the development and use of any of the Phase I and Phase II property;

g.  Terms and conditions relating to any public subsidies applicable to the acquisition and/or development of the Phase I or Phase II property, including any TOT sharing or other cash or cash equivalent in public subsidies, and, if such subsidies are included, terms and conditions addressing Buyer's compliance with all applicable California laws relating to the public subsidies;

h.  Allowances and approvals of any amendments to the Restated PSDA;

i.  Incentives for early performance, and provisions for late performance, of development

milestones as proposed in the schedule of performance;

j.  Proposed mortgage protection and/or mortgage allowances, and City-review and approval rights for any secured or unsecured (equity) creditors that are not included in the original purchase of the Assetsby the Buyer;

k.  Terms and conditions relating to the Amended Option Agreements (*i.e.,* City's options to repurchase the  certain property currently owned by the City(such as Phase 1B) after Buyer's acquisition of such proeprty, such as for failure to timely perform under the schedule of performance;

l.  "Standard" terms and conditions relating to property disposition and development agreements with California municipal corporations; and

any other terms and conditions mutually agreed upon between the Buyer and City.

3.  <u>Amendment to Development Agreement</u>. In the event Buyer is selected and approved by the Bankruptcy Court as the Stalking Horse Bidder, on or before July 29, 2025, the City and Buyer shall attempt in good faith to negotiate and have finalized for execution concurrent with Closing a mutually acceptable restated and amendment to that certain Development Agreement 2014-1001, between the City and SilverRock Development Company LLC, entered into on or about November 19, 2014, and recorded in the Official Records for Riverside County, California, on December 18, 2014, as Document No. 2014-0484106 (the "<u>Reinstated Development Agreement</u>") that accurately reflects Buyer's Development Plan, including without limitation:

a.  the full incorporation of the Restated PSDA (and any amendments thereto) for the balance of the Term of the Restated Development Agreement;

b.  the terms and conditions for vested and non-vested rights in the Restated Development Agreement (which may include "standard" terms and conditions relating thereto); and

c.  any other terms and conditions mutually agreed upon between the Buyer and City.

4.  <u>Amendments to Option Agreements</u>. In the event Buyer is selected and approved by the Bankruptcy Court as the Stalking Horse Bidder, as needed to accurately reflect Buyer's Development Plan, on or before July 29, 2025, the City and Buyer shall attempt in good faith to negotiate and have finalized for execution concurrent with Closing a mutually acceptable reinstatement and amendment to (i) that certain Option Agreement Phase 1A Property and Phase 1B Property (Excluding Planning Areas 7, 8, and 9) And Termination Of Prior Phase 1A Option Agreement between the City and SilverRock Development Company LLC, dated November 28, 2018 and recorded on even date as Document No. 2018-0464676, and (ii) that certain Option Agreement (Phase 1B Property – PA 7, 8, and 9) between the City and SilverRock Development Company LLC, dated November 28, 2018, and recorded on even date as Document No. 2018-0464677 (collectively, the "<u>Reinstated Option Agreements</u>").

5.  <u>Amendments to Agreements to Share TOT Revenue</u>. In the event Buyer is selected and approved by the Bankruptcy Court as the Stalking Horse Bidder, on or before July 29, 2025, the City and Buyer shall attempt in good faith to negotiate and have finalized for execution concurrent with Closing a mutually acceptable amendment to (i) that certain Agreement to Share Transient Occupancy Tax Revenue (Luxury Hotel) dated on or about November 19, 2014 between the City and SilverRock Development Company LLC, and related Agreement Containing Covenants, Conditions, and Restrictions Affecting Real Property (Luxury Hotel) dated May 3, 2017 and recorded on November 6, 2017 as Document No. 2017-0463952, as amended; and (ii) that certain Agreement to Share Transient Occupancy Tax Revenue (Lifestyle Hotel) dated on or about November 28, 2018 between the City and SilverRock Development

Company LLC and related Agreement Containing Covenants, Conditions, and Restrictions Affecting Real Property (Lifestyle Hotel), dated November 28, 2018 and recorded on even date as Document No. 2018-0464678, as amended (collectively, the "Amendments to Agreements to Share TOT Revenue").

6.  Amendments to Covenants Affecting Real Property. In the event Buyer is selected and approved by the Bankruptcy Court as the Stalking Horse Bidder, if and as needed to accurately reflect Buyer's Development Plan, on or before July 29, 2025, the City and Buyer shall attempt in good faith to negotiate and have finalized for execution concurrent with Closing a mutually acceptable amendment to (i) that certain Covenant Affecting Real Property (Golf Course Use), entered May 3, 2017, and recorded on May 11, 2017, as Document No. 2017-0189004 ("Golf Course Use Covenant") between the City and SilverRock Development Company LLC; (ii) that certain Covenant Affecting Real Property (Perimeter Landscaping and Trails), entered May 3, 2017, and recorded on May 11, 2017, as Document No. 2017-0189266 ("Landscaping and Trails Covenant") between the City and SilverRock Development Company LLC; and (iii) that certain Covenant Affecting Real Property (Ahmanson Ranch House), entered May 3, 2017, and recorded on May 11, 2017, as Document No. 2017- 0189769 ("Ranch House Covenant") between the City and SilverRock Development Company LLC (collectively, the "Amendments to Covenants Affecting Real Property").

***Unless and until approved by the Bankruptcy Court as the Stalking Horse Agreement, this LOI is not intended to be a contract or a binding agreement and is intended only as a statement of the present intentions of the parties. Following approval by the Bankruptcy Court of this LOI as the Stalking Horse Agreement and Buyer being deemed a Qualified Bidder in all respects, Buyer shall be bound by this LOI. This LOI is not binding on the City; terms and conditions relating to the City shall be binding only upon execution and approval of formal documentation (including without limitation the Amended Development Documents) and approval of the transaction in accordance with California law.  As described above, sale of the Assets is subject to Bankruptcy Court approval and the Debtors shall not be bound other than in connection with and following such express approval from the Bankruptcy Court.***

Each party acknowledges and understands that any party may terminate negotiations at any time prior to the Bankruptcy Court approving this LOI as the Stalking Horse Agreement, without any liability or obligation, and each party will bear its owns attorneys' fees and other expenses incurred in connection with the proposed transactions.  Following approval by the Bankruptcy Court of this LOI as the Stalking Horse Agreement and Buyer being deemed a Qualified Bidder in all respects, Buyer will be bound by this LOI in the manner set forth above.

Notwithstanding the above, the parties intend the following paragraph to be binding at all times.

Sellers, City, and Buyer each agrees not to disclose the terms of this LOI other than to (i) those of its respective employees, consultants and advisors and investors and other persons as reasonably necessary to finalize and execute the PSA and the Amended Development Documents, (ii) the City and the Consultation Parties as required under the Bidding Procedures, (iii) publicly on the docket of the Bankruptcy Case in the event the Debtors select Buyer as the Stalking Horse Bidder; and (iv) as otherwise required by law (including any SEC requirement), court order, subpoena or otherwise in connection with a litigation.

In connection with the submission of this LOI, Buyer certifies that (i) it has not engaged in any collusion with respect to the Bidding Process, and (ii) this LOI is a good faith bona fide offer that it intends to consummate if selected as the bidder to purchase the Assets.

Sincerely,

TBE RE Acquisition Co II LLC
a Delaware limited liability company

By: _____ Name: Andrew Joblon _____ Title: Authorized Signatory _____

LETTER OF INTENT ACCEPTED:

**_Debtors/Sellers:_**


RGC PA 789, LLC,
a Delaware limited liability company

By: _/s/ Douglas P. Wilson_
Name: Douglas P. Wilson
Title: CRO


By: _/s/ Christopher Sontchi_
Name: Christopher Sontchi
Title: Independent Manager


SilverRock Development Company, LLC,
a Delaware limited liability company

By: _/s/ Douglas P. Wilson_
Name: Douglas P. Wilson
Title: CRO


By: _/s/ Christopher Sontchi_
Name: Christopher Sontchi
Title: Independent Manager


SilverRock Lifestyle Residences, LLC,
a Delaware limited liability company

By: _/s/ Douglas P. Wilson_
Name: Douglas P. Wilson
Title: CRO


By: _/s/ Christopher Sontchi_
Name: Christopher Sontchi
Title: Independent Manager

SilverRock Lodging, LLC,
a Delaware limited liability company

By: _/s/ Douglas P. Wilson_
Name: Douglas P. Wilson
Title: CRO


By: _/s/ Christopher Sontchi_
Name: Christopher Sontchi
Title: Independent Manager

SilverRock Luxury Residences, LLC,
a Delaware limited liability company

By: _/s/ Douglas P. Wilson_____
Name: Douglas P. Wilson
Title: CRO


By: __/s/ Christopher Sontchi___
Name: Christopher Sontchi
Title: Independent Manager

SilverRock Phase I, LLC,
a Delaware limited liability company

By: _/s/ Douglas P. Wilson_____
Name: Douglas P. Wilson
Title: CRO


By: _/s/ Christopher Sontchi___
Name: Christopher Sontchi
Title: Independent Manager


ACKNOWLEDGED BY:

***City:***

City of La Quinta,
a California municipal corporation and Charter City


By: _/s/ Jon McMillen_____
Name: Jon McMillen
Title: City Manager

**<u>Exhibit A</u>**

Purchase and Sale Agreement and Joint Escrow Instructions

## PURCHASE AND SALE AGREEMENT
## AND JOINT ESCROW INSTRUCTIONS

This Purchase and Sale Agreement and Joint Escrow Instructions ("Agreement") is entered into as of June_____, 2025 (the "Effective Date") by and between RGC PA 789, LLC, a Delaware limited liability company,  SilverRock Development Company, LLC, a Delaware limited liability company, SilverRock Lifestyle Residences, LLC, a Delaware limited liability company, SilverRock Lodging, LLC, a Delaware limited liability company, SilverRock Luxury Residences, LLC, a Delaware limited liability company, and SilverRock Phase I, LLC, a Delaware limited liability company (collectively and jointly and severally referred to as "Debtors" or as "Sellers") and TBE RE Acquisition Co II LLC, a Delaware limited liability company (referred to as "Buyer").

For and in consideration of the mutual covenants, terms and conditions set forth below and for other good and valuable consideration and for $100.00 paid by Buyer to Sellers as Independent Contract Consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, subject to approval of the Bankruptcy Court, the parties hereto agree as follows:

1.      UNDERLYING FACTS/RECITALS.

1.1      Bankruptcy. On August 5, 2024, Debtors filed for protection under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). These cases are currently pending before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and are jointly administered under Case No. 24-11647 (MFW) (the "Bankruptcy Case"). The sale of (a) Debtors' interest in the Property, (b) the TIC's interest in a portion of the Property, as described herein, is subject to Bankruptcy Court approval. Additionally, non-debtor SilverRock Land II, LLC  a Delaware limited liability company ("SR Land") which owns an undivided tenant-in-common interest in a portion of the Property, and Debtors have agreed to an arrangement for the Debtors to sell both their interest in such parcel and SR Land's interest in such parcel of the portion of the Property in which SR Land holds an undivided interest (as a result of which Buyer will acquire a 100% undivided fee title interest in such portion of the Property), which has been approved by the Bankruptcy Court. Case No. 24-11647 (MFW), D.I. 437, at Ex. 3, ¶ 3). The Sellers' obligations under this Agreement and the sale of the Property are subject to entry of the Sale Order (defined herein), which sale remains subject to allocation of net sale proceeds and costs incurred by the Debtors, which allocation shall occur following the Closing of Escrow among the Debtors, SR Land, City and Debtors' other secured creditors, but shall not involve Buyer as a party thereto.

1.2      Property. On the terms and conditions set forth in this Agreement, Sellers desire to sell, and Buyer desires to purchase free and clear of all Leases, Contracts, claims, causes of action, liens, encumbrances and interests (except Permitted Liens, defined below), Sellers' right, title and interest in that certain real property located in the City of La Quinta (the "City"), County of Riverside (the "County"), and legally described on **Exhibit A** attached to this Agreement (collectively, the "Real Property") and Sellers' right, title and interest in the following (the following and the Real Property hereinafter collectively being referred to as the "Property"):

1.2.1    All improvements located on or in the Real Property, including, without limitation, buildings, fixtures, landscaping, infrastructure and utility and all other installations located on or at the Real Property as of the Effective Date in substantially the same condition as the same exist on the Effective Date subject only to reasonable wear and tear (collectively, "Improvements");

1.2.2    All easements, rights of way and all other rights (including, without limitation, development rights, air rights, privileges and entitlements, and options) appurtenant to the Real Property (collectively, the "Appurtenant Rights"); and

1.2.3    All permits, licenses, approvals, plans, certificates, agreements and other governmental approvals and entitlements related  to the ownership, development, use or operation of the Real Property, to the extent such rights are assignable, and/or Improvements, including, without limitation, as listed in Exhibit 1 to **Exhibit D** attached hereto (collectively, the "Permits"), free and clear of any and all claims, Claims (as defined in 11 USC 101(5)), Liens (as defined in 11 USC 101(37)), encumbrances, and interests.

1.2.4    Only to the extent assignable, Sellers' interest in all warranty, guaranty and similar rights relating to the Real Property and the Improvements..

1.2.5    Sellers' right, title and interest in and to all personal property, including, without limitation, all building materials, supplies, equipment, inventory,  temporary fencing, scaffolding, signage, HVAC units, doors, windows, fixtures, any other tangible personal property of any kind (whether or not yet incorporated into the Real Property or stored thereat) (collectively, "Personal Property") located on or at the Real Property and owned by Sellers as of the Effective Date in substantially the same condition and quantity as the same exist on the Effective Date subject only to reasonable wear and tear.

For the avoidance of doubt, the Property to be sold pursuant to this Agreement excludes claims, causes of action, litigation, and similar rights of the Debtors or their estates against any parties.

1.3    Purchase and Sale.  Sellers desire to sell, and Buyer desires to purchase, Sellers' right, title and interest in the Property on the terms and subject to the conditions set forth in this Agreement.

1.4    Excluded Liabilities.  All liabilities of and all claims against the Sellers, or any of them, except as specifically assumed hereby, are not assumed by the Buyer and shall remain, if at all, obligations of the Sellers.

2.    PURCHASE PRICE, DEPOSITS AND CLOSING DATE.

2.1    Agreement.  Sellers agree to sell, and Buyer agrees to purchase, Sellers' right, title and interest in the Property on the terms and subject to the conditions set forth in this Agreement. The purchase and sale transaction contemplated by this Agreement (the "Transaction") shall be

2

accomplished through an escrow (the "Escrow") to be established at Stewart Title Company of California, Inc. (Riverside, CA office) (the "Escrow Holder").

2.2    Closing Date. "Close of Escrow" (as defined below) shall occur on or before November 12, 2025 (the "Closing Date").

2.3    Purchase Price and Deposit. The purchase price for the Property shall be Sixty Million and No/100 Dollars ($60,000,000.00) (the "Purchase Price") payable by Buyer as set forth below. The Purchase Price will be allocated either by the relevant parties, but not Buyer except as Buyer shall provide allocation among assets purchased for IRC reporting (Buyer shall not be involved or expend any resources concerning such allocations among the Debtors, City, SR Land and Debtors' other secured creditors), or by order of the Bankruptcy Court having jurisdiction over the Bankruptcy Case.

2.3.1    Deposit. Buyer shall deposit in "Escrow" (as defined below) Five Million and No/100 Dollars ($5,000,000.00) (the "Deposit") three (3) business days after the mutual execution of this Agreement. Notwithstanding, to the extent Buyer has previously provided the Deposit to Debtors in connection with the letter of intent it executed as the Stalking Horse Bidder, the Debtors and Buyer shall transfer the Deposit from their trust account to Escrow on behalf of Buyer within three (3) days of entry of the Sale Order (defined herein). Upon such transfer to Escrow, the Deposit shall automatically become nonrefundable except as provided herein or in the Stalking Horse Order or the Sale Order. The Deposit actually delivered by Buyer to Escrow Holder shall be applied at Closing to the Purchase Price. The Deposit may, at Buyer's option and cost, be placed in an interest-bearing account and all interest shall accrue to the benefit of the party entitled by this Agreement to receive the Deposit, provided that, if the Closing occurs, then all of such accrued interest shall be credited against the Purchase Price.

2.3.2    Balance. The balance of the Purchase Price shall be paid by Buyer to Sellers in cash at Close of Escrow. The balance of the Purchase Price in excess of the Deposit plus Buyer's estimated share of costs and plus or net of Buyer's prorations (based on closing statement which is acceptable to the parties in their reasonable discretion), shall be deposited with Escrow Holder by Buyer at least one (1) business day before the Closing Date by wire transfer or by certified or bank cashier's check, drawn on or issued by financial institutions..

2.4    No Leases or Contracts. Sellers hereby agree that title to the Property shall be transferred to Buyer upon the Closing free and clear from any agreements, contracts and other arrangements (collectively, the "Contracts"), leases (including, without limitation, any ground leases whether with third parties or any Sellers or any of their affiliates and irrespective of whether a Seller is the landlord or tenant), temporary occupancy agreements, licenses, and all other third-party rights of use or occupancy or occupants of the Property (collectively, the "Leases") or any part thereof, other than the La Quinta Amended Developments when executed with the City. Sellers shall, prior to Closing, (a) submit to the Bankruptcy Court for approval a request to void or reject (and actually accomplish such voiding and rejection of) all existing Leases and Contracts whether or not with entities affiliated with Sellers pursuant to the avoidance powers under the Bankruptcy Code, including any state law rights, at no cost to Buyer or (b) terminatesuch Leases and Contracts at no cost to Buyer with the consent of the parties thereto (and in either such case

3

cause the applicable tenants or occupants to vacate the Property). Buyer is not purchasing or assuming any Contract or Lease under sections 363 or 365 of the Bankruptcy Code and shall have no liability or obligation under any Leases or Contacts before or after the Closing (all such liabilities or obligations remaining with the Sellers).

2.5     Prorations of Expenses.

2.5.1    All charges (to the extent paid or owed by Sellers) for utilities, if any, shall be prorated as of the Closing Date on the basis of the most recent available information. Concurrently with the Close of Escrow, the Sellers shall cause all utility meters for the Property to be read, and for billing arrangements to be transferred to Buyer, as promptly as practical . Seller shall be entitled to receive and retain all deposits with utility companies.

2.5.2    General and special real estate taxes and ad valorem taxes for the Property for the year of Closing and annual municipal or special district assessments (all on the basis of the actual fiscal years for which such taxes or assessments are assessed), will be apportioned as of the Closing Date between Buyer and Sellers (and, as of the Closing, no taxes of such nature will be delinquent) (provided that, if any fines, interest or penalties are owed with regard thereto, the same shall not be prorated but shall instead be paid by Sellers). The above prorations, including those in Section 2.5.1, shall be agreed upon by the parties at least two (2) days prior to the Closing Date and shall be confirmed in amended escrow instructions if required by Escrow Holder.

2.6     Independent Contract Consideration.  Within one business day after the Effective Date, Buyer shall deliver to Escrow Holder the sum of One Hundred and No/100 Dollars ($100.00) (the "Independent Contract Consideration") which amount has been bargained for and agreed to as consideration for Seller's execution and delivery of this Agreement. The Independent Contract Consideration is in addition to and independent of all other consideration provided in this Agreement and is nonrefundable in all events. If the transaction contemplated by this Agreement proceeds to Closing, then the amount of the Independent Contract Consideration shall be applied against the Purchase Price at Closing.

3.     ESCROW AND TITLE INSURANCE.

3.1     Escrow Instructions.  The parties shall from time to time, within five (5) business days after request by Escrow Holder, execute any general or supplemental escrow instructions required by Escrow Holder for the purpose of implementing and carrying out the terms of this Agreement, provided such general or supplemental escrow instructions are consistent with the terms of this Agreement. Except as expressly provided in such escrow instructions, in the event of any conflict between the terms of this Agreement and such escrow instructions, this Agreement shall control.

3.2     Closing.  Close of escrow (the "Close of Escrow" or "Closing") shall be deemed to have occurred on recording of the "Deed" (as defined below) in the Official Records of the County Recorder's Office. The escrow instructions shall provide for Close of Escrow to occur on or before the Closing Date, but only when:

3.2.1    <u>Closing Costs</u>.  Escrow Holder holds funds to pay all closing costs as provided herein.

3.2.2    <u>Sellers' Proceeds</u>.  Escrow Holder holds for Sellers the Purchase Price, less Sellers' share of closing costs and plus or net of prorations for the account of Sellers, with joint written instructions from Buyer, Sellers or their counsel to release such funds to Sellers (which shall be provided when all conditions to Closing have been satisfied).

3.2.3    <u>Closing Documents</u>.  Escrow Holder holds for Buyer the Deed and other "Seller Closing Documents" (as defined below) and for Seller the "Buyer Closing Documents" (as defined below).

3.2.4    <u>Title Insurance</u>.  Stewart Title of California, Inc. (the "<u>Title Company</u>") has issued or unconditionally and irrevocably committed to issue to Buyer, upon recordation of the Deed, an ALTA Owner's Policy of title insurance (the "<u>Title Policy</u>"), with liability in the amount of the Purchase Price, showing title to the Property vested in Buyer subject only to (i) the real estate taxes and assessments which are not delinquent  (provided that, at the Closing Sellers shall ensure that no real estate taxes or assessment are due with respect all periods of time before the Closing Date) ,  (ii) all other exceptions shown on the Preliminary Title Report Update No. 4 issued by Stewart Title Company of California, Inc. dated January 10, 2025 attached hereto as **Exhibit B** other than those exceptions that will be removed by Sellers' submission if a customary title affidavit and monetary liens (and related documents), including, without limitation, those listed on **Exhibit E** attached hereto which shall be removed and discharged of record pursuant to the Bankruptcy Code and applicable laws to permit transfer free and clear thereunder at the Closing, and (iii) any other exceptions recorded at the request or with the permission of Buyer at Closing (the "<u>Permitted Exceptions</u>"). Sellers agree to cause the Property to be conveyed to Buyer pursuant to this Agreement free and clear of all liens, Leases, occupants, litigation (threatened and pending), causes of action, charges, interests, Contracts, claims, taxes, encumbrances, community or other marital property interest, equitable interests, pledges, security interests and mortgages.

3.3    <u>Seller Closing Documents</u>.  Sellers shall deliver to Escrow Holder at least one business day before the Closing Date, and except as otherwise provided below Escrow Holder shall deliver to Buyer immediately following Close of Escrow, the following documents (the "<u>Seller Closing Documents</u>") (in form and substance reasonably acceptable to the parties):

3.3.1    <u>Grant Deed</u>.  A grant deed substantially in the form of attached hereto as **Exhibit C** relating to the Real Property (the "<u>Deed</u>"), executed and acknowledged by Seller.

3.3.2    <u>Assignment of Permits</u>.  An Assignment of Sellers' interest in the Permits, to the extent assignable, substantially in the form of attached hereto as **Exhibit D** (the "<u>Assignment of Permits</u>"), executed by Sellers, with the list of such Permits being assigned and assumed as set forth on **Exhibit D** attached thereto.

3.3.3    <u>FIRPTA Certificate</u>.  A non-foreign person affidavit stating that each Seller is not a foreign person as defined in Section 1445(b)(2) of the Internal Revenue Code (the "<u>FIRPTA Certificate</u>").

3.3.4    <u>California Affidavit</u>.  A Franchise Tax Board form 593-C (the "<u>California Affidavit</u>").

3.3.5    <u>Bill of Sale.</u> A Bill of Sale in the form of **<u>Exhibit F</u>** attached hereto executed by Sellers, which shall assign to Buyer all of Sellers' right, title and interest in and to all Personal Property (it being agreed that the list of personal property attached to the Bill of Sale shall include all Personal Property situated on the Property as of the date hereof only to the extent owned by a Sellers, and will be completed prior to the Closing).

3.3.6    <u>Title Affidavit</u>. A title affidavit in the form reasonably requested by the Title Company, executed by Sellers.

3.3.7    <u>Bankruptcy Court Order/Sale Order</u>.  A certified copy of the Sale Order (as defined herein).

3.3.8    <u>Consents and Good Standings</u>. Such consents, resolutions, good standing certificates, incumbency certificates and other documents as are reasonably necessary or requested by Buyer or the Title Company to confirm (x) the due authorization and execution by Sellers of all documents to be executed and delivered by Sellers with respect to the transactions described herein; and (y) the good standing of Sellers in the States of their respective organization and the State of California.

3.3.9    <u>California Natural Hazard Disclosure Statement</u>. A duly completed and executed California Natural Hazard Disclosure Statement in compliance with California Civil Code Section 1103.

3.3.10    <u>Other Documents</u>.  All other documents reasonably necessary to effectuate this Transaction (in form and substance reasonably acceptable to Buyer and/or the Title Company, as applicable) and as customary in bankruptcy transactions similar to this Transaction.

3.4    <u>Buyer Closing Documents</u>.  Buyer shall deliver to Escrow Holder at least one (1) business day before the Closing Date, and except as otherwise provided below Escrow Holder shall deliver to Sellers immediately following Close of Escrow, the following documents (the "<u>Buyer Closing Documents</u>"):

3.4.1    <u>La Quinta Transaction Documentation</u>.  Without limiting Buyer's right to require the completion, execution and delivery of all thereof, to the extent they are complete and ready for recording by the Closing Date, and have received Final City Approval (as defined in Section 5.6), any documents whether or not to be recorded in the Official Records of the County Recorder's Office in connection with the La Quinta Amended Development Documents (as defined in <u>Section 5.3</u> below), executed and in, where applicable, in recordable form.

3.4.2    <u>Assignment of Permits</u>.  The Assignment of Permits, executed by Buyer.

3.4.3    <u>Other Documents</u>.  All other documents reasonably necessary to effectuate this Transaction (in form and substance reasonably acceptable to Sellers) as customary in bankruptcy transactions similar to this Transaction.

3.5    <u>Actions of Escrow Holder</u>.    Provided that Closing occurs, on the Closing Date, Escrow Holder shall do the following:

3.5.1    <u>Recordation</u>. Escrow Holder shall cause the Deed, and any other documents directed delivered pursuant hereto by the parties (including documentation related to the La Quinta Amended Development Documents if they are complete on or before the Closing Date), with respect to the other recordable documents, to be recorded in the Official Records of the County Recorder's Office, and with respect to all such documents, obtain conformed copies thereof for distribution to Buyer and Sellers.

3.5.2    <u>Compliance with Lender's Instructions</u>. Escrow Holder shall comply with any instructions from Buyer's lender, if any, in accordance with separate instructions approved by Buyer. Buyer's execution of a lender's loan documents shall constitute approval of such lender's instructions.

3.5.3    <u>Disbursement of Funds</u>. Escrow Holder shall disburse all funds deposited with Escrow Holder (including the Deposit) as follows (and in the following order): (i) pay all closing costs to be paid by Sellers through Escrow; (ii) after deducting closing costs and other payments chargeable to Sellers, and deducting or adding (as appropriate) prorations for the account of Sellers, disburse the balance of the Purchase Price in accordance with separate wiring or other payment instructions delivered to Escrow Holder by Sellers, and in accordance with all applicable Bankruptcy Court orders; (iii) pay all closing costs to be paid by Buyer through Escrow; and (iv) disburse any remaining funds to Buyer in accordance with separate wiring or other payment instructions delivered to Escrow Holder by Buyer.

3.5.4    <u>Delivery of Documents</u>. Escrow Holder shall (i) direct the Title Company to issue the Title Policy to Buyer; (ii) deliver to Buyer a conformed copy of the Deed, originals of the other Seller Closing Documents and Buyer's closing statement; and (iii) deliver to Sellers a conformed copy of the Deed, the Buyer Closing Documents, and Sellers' closing statement.

4.    <u>CONDITIONS PRECEDENT</u>.

4.1    <u>Buyer's Closing Conditions</u>. Buyer's obligation to purchase the Property is subject to satisfaction, or waiver by Buyer, of the conditions set forth below at Close of Escrow. If any conditions are not satisfied or waived on the Closing Date, Buyer shall have the right to cancel Escrow and terminate this Agreement without liability by delivering to Seller written notice of termination (the "<u>Notice of Termination</u>"), and upon Buyer's delivery of such Notice of Termination, (i) the Deposit shall be refunded to Buyer without any delay after Buyer's written request therefor in accordance with the terms of the *Order (I) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof; and (II) Granting Related Relief* [D.I. 396]. (the "<u>Bid Procedures Order</u>") and that certain *Order (I) Approving the Debtors' Selection of a Stalking Horse Bidder; (II) Approving Break-Up Fee in Connection Therewith; and (III) Granting Related Relief* (the "<u>Stalking Horse Order</u>"). The foregoing termination right expires after the Closing. If such conditions are not satisfied as of the Closing Date and Buyer does not terminate as set forth above, Buyer shall be deemed to have waived such unsatisfied conditions and shall proceed to Closing.

4.1.1    <u>Title Policy</u>.  The Title Company shall have issued, or irrevocably and unconditionally committed to issue, the Title Policy upon recordation of the Deed.

4.1.2    <u>Performance by Seller</u>.  Seller shall have performed, in all material respects, all of the obligations to be performed by Seller under this Agreement at or prior to Close of Escrow, including execution and delivery of the Seller Closing Documents to Escrow Holder.

4.1.3    <u>No Litigation</u>.  No lawsuit, arbitration or other legal proceeding shall be pending or threatened which seeks to restrain or prevent the sale of the Property to Buyer or would otherwise affect Buyer or the Property after the Closing.

4.1.4    <u>Sale Order</u>.  Seller's delivery to Buyer of a certified copy of the Sale Order (as defined herein).

4.1.5    <u>City Documents</u>.    The following shall have occurred: (a) the La Quinta Planning Commission and City Council approval has been obtained in accordance with applicable law the La Quinta Amended Development Documents and the other matters that require the City's approval in connection with the transactions described herein, and (b) the La Quinta Amended Development Documents have been finalized by the parties thereto and executed and delivered by the Buyer and all other parties thereto and become effective.

4.1.6    No person or entity shall have filed any appeal or other type of challenge or dispute as to the transactions described herein and/or any of the La Quinta Amended Development Documents and the City Council approvals granted in connection therewith <u>(and Final City Approval has been received)</u>.

4.2    <u>Sellers' Closing Conditions</u>.  Sellers' obligation to sell the Property is subject to satisfaction, or waiver by Sellers, of the conditions set forth below at Close of Escrow.  Sellers may waive any or all of such conditions, without prejudicing or affecting any other rights Sellers may have.  If any conditions are not satisfied or waived on the Closing Date, Sellers shall have the right to cancel Escrow and terminate this Agreement without liability, in which event, other than with respect to a default by Buyer in failing to perform its obligations hereunder at the Closing, the Deposit shall be refunded to Buyer. The foregoing termination right expires after the Closing.

4.2.1    <u>Performance by Buyer</u>.  Buyer shall have performed, in all material respects, all of the obligations to be performed by Buyer under this Agreement at or prior to Close of Escrow, including delivery of the balance of the Purchase Price (less the amount of the Deposit) to Escrow Holder and the execution and delivery of the Buyer Closing Documents to Escrow Holder.

4.2.2    <u>Accuracy of Representations and Warranties</u>.  Buyer's representations and warranties shall be accurate, in all material respects, as of Close of Escrow.

4.2.3    <u>No Litigation</u>.  No lawsuit, arbitration or other legal proceeding shall be pending or threatened which seeks to restrain or prevent the sale of the Property to Buyer.

4.2.4    Sale Order. Sellers shall have obtained entry of an order approving this Transaction (the "Sale Order"), in form and substance reasonably acceptable to Buyer, which Sale Order shall (i) authorize Sellers to proceed to Closing, and provide, among other things, that the Property shall be transferred free and clear of all claims, causes of action, liens, interests, and encumbrances under Bankruptcy Code sections 363, 365 or 1123, 1129 and 1141, (ii) provide for the sale of the Property free and clear of all liens, Leases, Contracts, claims, encumbrances, and interests, (iii) include a finding of "good faith" with respect to the transaction and Buyer, and (iv) finding that Buyer is not a successor in interest to Sellers or otherwise liable for any claim or obligation of Sellers. The Sale Order shall further include, without limitation, a requirement that prior to the Closing, the following shall have occurred: (a) the La Quinta Planning Commission and City Council approval has been obtained in accordance with applicable law, and (b) the La Quinta Amended Development Documents have been finalized by the parties thereto and executed and delivered by the Buyer and all other parties thereto. For avoidance of doubt, the Sale Order must be a Final Order and not subject to any stay, appeal, or petition for review. As used herein, "Final Order" means an order or judgment as to which (x) the time to file an appeal, motion for rehearing or reconsideration, or petition for certiorari has expired and no such appeal, motion, or petition is pending, or (y) if an appeal, motion, or petition has been filed, such order has been affirmed or denied and no further appeal or petition is permitted or pending.

5.    OTHER PRE-CLOSING MATTERS. For the period commencing on the Effective Date and ending on Close of Escrow or termination of this Agreement, whichever occurs first:

5.1    Transfers. Sellers shall not sell, market or negotiate for the financing or sale of the Property to or with another person or entity, or the equity interests in any "single purpose entity" directly or indirectly having an interest in the Property.

5.2    Leases. During the period commencing on the Effective Date and ending on the Closing Date, Sellers may not enter into any Leases of the Property or any portion thereof or allow any occupancy thereof, encumber or place a lien upon the Property or any portion thereof, enter into any Contract or bind itself to any third party if the same would affect Buyer or any portion thereof, without the consent of Buyer.

5.3    Sellers Cooperation. Sellers shall reasonably cooperate with Buyer's due diligence the transition of ownership to Buyer including, without limitation, by providing such documents and information as may be reasonably requested by Buyer to the extent Sellers have same within their possession and control and permitting Buyer and its contractors, consultants and other designees to enter the Property (including, without limitation, testing and inspections); provided, however, such entry shall be with not less than 24 hours' written notice, and as a condition to the right of entry set forth above, Buyer shall procure and maintain broad form commercial liability insurance, including direct contractual and contingent liability coverages, with limits of not less than $1,000,000 per occurrence for bodily injury, property damage and personal injury, and $2,000,000 general policy aggregate. Such policy shall (i) name Sellers as an additional insured party with respect to the Buyer's activity on the Property, (ii) provide for at least 30 days' prior written notice to Sellers prior to termination of the policy (except that only 10 days' prior written notice shall be required for termination due to nonpayment of premium), and (iii) be occurrence based (i.e., not claims made). A certificate of insurance evidencing the insurance policy described

above shall be delivered to Sellers before entry onto the Property by Buyer or its agents, representatives, contractors, consultants, or other designees. In addition, Sellers shall reasonably cooperate with the Buyer in connection with the negotiation of the Amended Development Documents and obtaining City council and other governmental approvals that are required for the Development Plan (as defined in the letter of intent between the City and Buyer) and the purchase of the Property by Buyer (including, without limitation, by executing and delivering such consents, applications, submissions and other instruments, and providing such information, as shall be reasonably required with regard thereto), provided that, with regard to the foregoing, if Buyer is not ultimately selected as the Successful Bidder or the Next-Highest Bidder or otherwise defaults under the terms of this Agreement , promptly thereafter Buyer shall cause all such applications and submissions applicable to be withdrawn and/or otherwise ineffective.

      5.4    <u>No Removal of Personal Property</u>.  Sellers shall not remove or alter any Personal Property or other Improvements from the Property.

      5.5    <u>Property Insurance</u>. Sellers shall maintain commercially reasonable insurance on the Property.

      5.6    <u>La Quinta Transaction</u>. Buyer shall diligently and in good faith negotiate restatements, new agreements and/or amendments to certain development agreements, covenants, tax sharing agreements and other agreements with the City of La Quinta for Buyer's development of the Property (collectively, the "<u>La Quinta Amended Development Documents</u>") which, must be finalized, executed by both Buyer and City, have received Final City Approval (as hereinafter defined),and ready for recording at Closing as a condition precedent to Buyer's obligation to close, and shall be recorded (with respect to such documents intended by the parties thereto to be recorded) as part of the Closing. As used in this Agreement, "Final City Approval" shall mean that the City Council has taken all necessary action to finally approve each of the La Quinta Amended Development Documents, the statute of limitations for any legal challenge thereto under the California Environmental Quality Act has expired without the filing of any legal challenge, and the statutory referendum period applicable to any associated ordinance adopted by the City Council has expired without the filing of a referendum petition.  Sellers have no obligation to assist with such negotiation other than as expressly provided in this Agreement including, without limitation, under Section 5.4; provided, however, that the City reserves the right, with the consent of Buyer and through joint written instructions with Buyer, to provide written authorization to proceed to Closing prior to finalization of one or more of the La Quinta Amended Development Documents.

      5.7    <u>City Requests</u>.  Sellers timely shall respond to all inquiries and requests of the City and provide all documents and information requested by the City or other parties involved in the development.

      5.8    <u>Compliance with Laws</u>.  Sellers shall secure the Property, manage water and all other matter and materials on or about the Property so as to avoid any violation of any applicable law, ordinance, regulation or rule, including all Environmental Laws.

      5.9    <u>Bankruptcy Court Matters</u>.

5.9.1   <u>Motion Seeking Approval of Sale</u>.  As promptly as practicable and in any event not later than September 16, 2025, the Debtors shall file with the Bankruptcy Court a motion seeking approval of this Agreement and entry of the Sale Order.  The Sellers shall prosecute entry of the Sale Order, including filing all motions, replies, and declarations, as well as provide any additional testimony that may be required or desired to obtain entry of the Sale Order.  The parties will use commercially reasonable efforts to obtain entry of the Sale Order by October 14, 2025.

5.9.2   <u>Buyer's Cooperation</u>.  Buyer shall promptly take all actions as are reasonably requested by the Sellers to assist in obtaining entry of the Sale Order and any further or other order necessary in connection with the Transaction, including, furnishing affidavits, reasonable and customary financial information demonstrating wherewithal to perform under this Agreement and as adequate assurance of future performance under any documents or information for filing with the Bankruptcy Court for the purposes of, among other things, providing necessary assurance of performance of Buyer under this Agreement, and demonstrating that Buyer is a "good faith" purchaser, as well as demonstrating Buyer's ability to pay and perform following the Closing under this Agreement and the La Quinta Amended Development Documents. The Buyer shall not collude with any other person in contravention of the provisions of Bankruptcy Code section 363(n).

5.9.3   <u>Appearances</u>. Each party to this Agreement and the City shall (a) participate formally or informally in the Bankruptcy Court proceedings if reasonably requested by another party or required by the Bankruptcy Court in connection with this Agreement and (b) keep the other parties (or the City, as applicable) reasonably apprised of the status of material matters related to this Agreement.

5.9.4   <u>Sellers' Obligations Subject to Sale Order</u>. The Sellers' obligations under this Agreement are subject to the entry of and the terms of any orders of the Bankruptcy Court, including, without limitation, the Sale Order.

6.   <u>CONDITION OF PROPERTY</u>.

6.1   <u>"AS IS" Purchase</u>.  Notwithstanding any other term of this Agreement or any term of any "Other Documents" (as defined below), the parties agree as follows:

Buyer is purchasing the Property "AS IS", "WHERE IS" and "WITH ALL FAULTS", without any representations, warranties or guaranties of any nature, express or implied, oral or written, past, present or future, regarding the Property.  Buyer agrees that Sellers make no representations, warranties, guaranties or covenants whatsoever (express or implied) with respect to the actual size of the Real Property or title to the Property, and Sellers shall have no liability whatsoever with respect to any such matters. WITHOUT LIMITING THE FOREGOING, BUYER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES AS TO:  (I) THE QUALITY, NATURE, ADEQUACY, AND PHYSICAL CONDITION OF SOILS, GEOLOGY AND ANY GROUNDWATER, (II) THE EXISTENCE, QUALITY, NATURE, ADEQUACY AND PHYSICAL CONDITION OF UTILITIES SERVING THE PROPERTY, (III) THE DEVELOPMENT POTENTIAL OF THE PROPERTY,

AND THE PROPERTY'S USE, HABITABILITY, MERCHANTABILITY, OR FITNESS, SUITABILITY, VALUE OR ADEQUACY OF THE PROPERTY FOR ANY PARTICULAR PURPOSE, (IV) THE ZONING OR OTHER LEGAL STATUS OF THE PROPERTY OR ANY OTHER PUBLIC OR PRIVATE RESTRICTIONS ON USE OF THE PROPERTY, (V) THE COMPLIANCE OF THE PROPERTY OR ITS OPERATION WITH ANY APPLICABLE CODES, LAWS, REGULATIONS, STATUTES, ORDINANCES, COVENANTS, CONDITIONS AND RESTRICTIONS OF ANY GOVERNMENTAL OR QUASI-GOVERNMENTAL ENTITY OR OF ANY OTHER PERSON OR ENTITY, (VI) THE PRESENCE OF HAZARDOUS MATERIALS ON, UNDER OR ABOUT THE PROPERTY OR THE ADJOINING OR NEIGHBORING PROPERTY, (VII) THE QUALITY OF ANY LABOR AND MATERIALS USED IN ANY IMPROVEMENTS ON THE REAL PROPERTY, (VIII) THE CONDITION OF TITLE TO THE PROPERTY, OR (IX) THE ECONOMICS OF THE OPERATION OF THE PROPERTY. This Section 6.1 shall survive Close of Escrow. This Section 6.1 shall survive termination of this Agreement.

6.2     Release.  Effective as of Closing, Buyer, for itself and on behalf of each of its successors and assigns, hereby fully and forever release and discharge Sellers, and each and all affiliates of Seller, and each and all of the officers, directors, managers, members, shareholders, employees and agents of Seller, and each and all of the officers, directors, managers, members, shareholders, employees and agents of each affiliate of Sellers (collectively, "Seller Related Persons") and the City and each and all of the officers, Council members, employees, agents and affiliates of the City (collectively, the "City Related Persons"), from any and all claims, rights, actions, damages, and/or liabilities, of any nature whatsoever, fixed or contingent, existing now or arising in the future, known or unknown, in any way relating to the Property except as otherwise expressly provided in this Agreement.  (provided that, with respect to such release of the City, such release shall only apply to acts or omissions taking place prior to the Closing).  Buyer acknowledges Buyer may later learn of circumstances bearing upon the rights released in this Agreement.  Buyer specifically waives the rights afforded by Section 1542 of the California Civil Code which provides:

> "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."

_____ (Buyer Initials)

This Section 6.2 shall survive Close of Escrow.   This Section 6.2 shall survive termination of this Agreement.

6.3     Buyer's Indemnity Obligation.  Buyer shall indemnify, defend and hold Sellers harmless from and against all claims, damages, losses, liabilities, costs and expenses, including without limitation attorneys' fees arising out of (a) any material inaccuracy or material breach of any of Buyer's representations and warranties in this Agreement, and/or (b) a material breach or

material nonfulfillment of any covenant or agreement made by Buyer in or pursuant to any of Buyer Closing Documents. Effective upon Close of Escrow, other than in respect of the acts of Sellers or any of their affiliates, Buyer shall indemnify, defend and hold Sellers harmless from and against all claims, damages, losses, liabilities, costs and expenses, including without limitation attorneys' fees arising out of ownership or possession of the Property by Buyer after Close of Escrow with respect to acts or omissions occurring from and after the Closing. This <u>Section 6.3</u> shall survive Close of Escrow.

6.4    <u>Damage to Property</u>. In the event that, after the Effective Date and prior to the Closing, any of the Property is damaged and/or destroyed by fire or other casualty, the Closing shall occur as scheduled notwithstanding such damage. The Purchase Price shall not in any way be reduced by the amount of any such damages or destruction. If there is any such casualty prior to the Closing, Seller shall cause all insurance proceeds resulting therefrom to be paid over (if received prior to Closing) or assigned (if not received prior to the Closing) to Buyer along with a credit in the amount of any deductibles.

6.5    <u>Eminent Domain</u>. In the event that, after the Effective Date and prior to the Closing, a governmental entity commences or threatens to commence eminent domain proceedings to take any material portion of or interest in the Property, then Buyer shall have the option to terminate this Agreement by written notice to Sellers within ten (10) days after Sellers provide Buyer written notice of such commencement or threat of commencement. In the event of any such termination, the Deposit actually delivered by Buyer to Escrow Holder (less one-half of the escrow cancellation fee) shall be returned to Buyer (provided Buyer is not in default under this Agreement in its obligations to close the transactions described herein), and neither party shall have any further liability or obligation under this Agreement, except as specifically provided herein. In the event that, after the Effective Date and prior to the Closing, a governmental entity commences or threatens to commence eminent domain proceedings to take any part of the Property and this Agreement is not terminated as so provided as a result thereof, then the Closing shall occur as scheduled notwithstanding such proceeding; provided, however, that, if Closing occurs, Sellers' interest in all awards arising out of such proceedings shall be assigned to Buyer at and subject to Closing. The Purchase Price shall not in any way be reduced as a result of any eminent domain matter.

7.    <u>BUYER'S REPRESENTATIONS AND WARRANTIES</u>.

Buyer represents and warrants (and acknowledges) to Sellers as follows:

7.1    <u>Sophisticated Buyer</u>. Buyer is a knowledgeable, experienced and sophisticated buyer of real estate.

7.2    <u>Expertise and Knowledge of Buyer</u>. In purchasing the Property, Buyer has relied and will rely solely on (i) the expertise of Buyer and its agents, representatives and consultants, and (ii) the knowledge of Buyer and its agents, representatives and consultants, based on their own investigations, occupation and inspections of the Property.

7.3    <u>Completion of Investigation</u>.  Buyer and its agents, representatives and consultants will have conducted such inspections and investigations regarding the Property as Buyer deems necessary.

7.4    <u>No Reliance on Sellers or City</u>.  Buyer is not relying and will not rely on any representations, warranties, promises, assurances or other statements relating to or affecting the Property, whether made verbally or in writing, and whether made before  or after the Effective Date, made by Sellers, or any of their agents, affiliates, representatives or consultants except as expressly set forth herein.  Except to the extent set forth in the La Quinta Amended Development Documents approved and executed as set forth in Section 5.3, Buyer is not relying and will not rely on any representations, warranties, promises, assurances or other statements relating to or affecting the Property, whether made verbally or in writing, and whether made before or after the Effective Date, made by the City, or any of its agents, affiliates, representatives or consultants.

7.5    <u>Financial Ability</u>.  Buyer has the financial ability to consummate the Transaction without any delay or restriction that would adversely impact the certainty of Buyer's ability to so consummate.

7.6    <u>No Litigation</u>.  There is no lawsuit, arbitration or other action, proceeding or claim pending or to Buyer's knowledge threatened against Buyer that would impair or materially affect Buyer's ability to enter into or perform Buyer's obligations under this Agreement.

7.7    <u>OFAC</u>.  Neither Buyer nor any of its principals or its affiliates (a) is listed on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control of the Department of the Treasury or on any other similar list; (b) is a person with which Seller is prohibited from dealing or otherwise engaging in any transaction by any anti-terrorism law; (c) is a person that commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224, 66 Fed. Reg. 49079 (published September 25, 2001) or any similar Executive Orders; or (d) is affiliated or associated with a person listed in preceding clause "(a)," "(b)" or "(c)".

7.8    <u>Authority</u>.  Buyer is duly organized, validly existing and in good standing under the laws of the state of its formation.  Buyer has the legal right, power and authority to enter into and perform its obligations under, and to consummate the transactions contemplated by this Agreement.

7.9    <u>Binding Agreement</u>.  This Agreement is, and all documents to be executed by Buyer pursuant to this Agreement will be, binding on Buyer and enforceable against Buyer in accordance with their respective terms (subject to bankruptcy, insolvency and other laws affecting the enforcement of creditor's rights generally and to principles of public policy).

7.10    <u>Bankruptcy; Assignment for Benefit of Creditors; Receivership</u>.  There are no bankruptcy, insolvency or similar actions or proceedings pending or threatened by or against Buyer. Buyer has not made a general assignment for the benefit of creditors, suffered the appointment of a receiver to take possession of all or substantially of Buyer's assets, or suffered the attachment of all or substantially all of Buyer's assets.

The representations set forth above shall survive Close of Escrow.

8.    <u>BROKERS</u>.

8.1    <u>Representation</u>.  Sellers have been represented by JLL (Attn: Jeff Adkison and Jeremy Sain), and Buyer has not been represented.

8.2    <u>Commission</u>.  At and subject to Close of Escrow, Sellers shall pay a brokerage commission to JLL pursuant to the order of the Bankruptcy Court approving the engagement of JLL entered on January 15, 2025 [24-11647 (MFW), D.I. 312] and the Sale Order. In no event shall Buyer have any liability or obligation to JLL with respect to the transactions described herein.

8.3    <u>Indemnification</u>.  Each party represents to the other that it has not had any contact or dealings regarding the Property, or any communications in connection with this Transaction, through any other real estate broker or other person who can claim a right to a commission or finder's fee.  If any other broker or finder makes a claim for a commission or finder's fee based upon a contact, dealings or communications with a party, then such party shall indemnify, protect, defend and hold the other party harmless from and against all claims, damages, losses, liabilities, costs and expenses, including attorneys' fees, arising out of the broker's or finder's claim.  This <u>Section 8.3</u> shall survive termination of this Agreement.

9.    <u>COSTS AND PRORATIONS</u>.

9.1    <u>Taxes and Assessments</u>.  With respect to the current year tax payment, if the due date is before the Closing, same shall be paid for by Sellers prior to Closing and, if the due date is after the Closing, same shall be paid by Buyer after the Closing (in all events subject to proration by the parties as provided herein). Otherwisereal and personal property taxes and assessments shall be prorated as of Close of Escrow, based on twelve (12) thirty (30)-day months. Any and all past years' delinquent or defaulted taxes, assessments, fees, penalties, and interest shall be obligations of the Debtors.

9.2    <u>Transfer Taxes</u>.  Buyer shall pay the County documentary transfer tax and City transfer tax resulting from subject sale of the Real Property by Sellers to Buyer.

9.3    <u>Title Insurance</u>.  Sellers shall pay the cost of the Title Policy (i.e., standard CLTA owner's policy of title insurance), and Buyer shall pay any additional title insurance premiums for any extended coverages and endorsements requested by Buyer.

9.4    <u>Escrow Fee</u>.  Buyer and Sellers shall each pay one-half of the escrow fee.  If this Agreement is terminated, Buyer and Sellers shall each pay one-half of the escrow cancellation fee, provided that, if the Agreement is terminated as a result of a default by a party, the defaulting party shall pay the entire escrow cancellation fee.

9.5    <u>Recording Fees</u>.  Buyer shall pay all recording fees arising out of or relating to this Transaction.

9.6     Other.  All other closing costs and prorations shall be allocated in accordance with the custom and practice in the County.

10.     TERMINATION; LIQUIDATED DAMAGES.

10.1     Termination.  Prior to Closing, this Agreement may be terminated and neither party shall be obligated to proceed with the Transaction as provided in Section 4:

10.1.1     Buyer's Conditions.  At the option of Buyer, and upon written notice to Sellers, if a condition precedent to Buyer's obligation to purchase the Property is not satisfied.

10.1.2     Sellers' Conditions.  At the option of Sellers, and upon written notice to Buyer, if a condition precedent to Sellers' obligation to sell the Property is not satisfied.

10.1.3     Alternative Transaction.  "Alternative Transaction" means any sale or other disposition of the Property or Sellers' interest in the Property to a person or entity other than the Buyer.

10.1.4     Express Right to Terminate.  At the option of a party, and upon written notice to the other party, if the terminating party has an express right to terminate under the terms of this Agreement.

Notwithstanding any term in this Agreement to the contrary, in the event this Agreement is terminated, the obligations of Buyer and Sellers surviving termination shall remain in full force and effect.

10.2     **Buyer's Default; Liquidated Damages.  If Buyer breaches its obligation to purchase the Property in accordance with the terms of this Agreement and Close of Escrow fails to occur by reason of such breach, then Sellers' sole remedy for such breach shall be to terminate this Agreement and receive and retain the Deposit.  Sellers waive all other remedies for such breach.**

**THE DEPOSIT SHALL CONSTITUTE LIQUIDATED DAMAGES. THE PARTIES ACKNOWLEDGE AND AGREE THAT IT WOULD BE IMPRACTICABLE OR EXTREMELY DIFFICULT TO FIX THE ACTUAL DAMAGES THAT SELLERS WOULD INCUR AS A RESULT OF THE BREACH BY BUYER OF ITS OBLIGATION TO PURCHASE THE PROPERTY.  THE PARTIES AGREE THAT THE DEPOSIT IS A REASONABLE ESTIMATE OF SELLERS' DAMAGES, AND SHALL CONSTITUTE LIQUIDATED DAMAGES IN ACCORDANCE WITH CALIFORNIA CIVIL CODE SECTIONS 1671, 1676 AND 1677.**

_____          _____
**(Buyer's Initials)               (Sellers' Initials)**

10.3     Sellers' Default.  If Sellers breach their obligation to sell the Property to Buyer in accordance with the terms of this Agreement and Escrow fails to close by reason of such breach,

16

then Buyer's sole remedy for such breach shall be to either (i) terminate this Agreement and cancel Escrow by delivering notice of such termination and cancellation to Sellers and Escrow on or before the Closing Date, in which case the Deposit shall be returned to Buyer, and Sellers shall have no further liability to Buyer or obligations under this Agreement; or (ii) pursue the remedy of specific performance and recover of its enforcement.

10.4    <u>Escrow Cancellation</u>.  If this Agreement is terminated pursuant to this <u>Section 10</u>, the parties shall promptly execute any escrow cancellation or other instructions necessary to cancel Escrow and to cause the portion of the Deposit previously delivered by Buyer to Escrow Holder to be disbursed in accordance with the above provisions.

11.    <u>GENERAL PROVISIONS</u>.

11.1    <u>Notices</u>.  All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed duly given (i) on the date of delivery if personally delivered or delivered via facsimile or when sent by electronic mail as indicated by sender's electronic mail software program, (ii) one (1) business day after delivery by overnight courier, or (iii) three (3) business days after mailing if mailed by first-class mail, postage prepaid, to the parties at their addresses (or to the parties' facsimile numbers) set forth below, or such other address or facsimile number designated from time to time in writing by such party to all other parties.

| | |
|---|---|
| *To Sellers*: | c/o SilverRock Development Company, LLC |
| | 343 Fourth Avenue |
| | San Diego, California 92101 |
| | Attention: Douglas Wilson, CRO & Hon. |
| | Christopher S. Sontchi (ret.) |
| | Telephone: |
| | Email: dwilson@douglaswilson.com and |
| | sontchillc@gmail.com |
| | |
| *With copy to:* | Wilson Sonsini Goodrich & Rosati, P.C. |
| | 222 Delaware Avenue, Suite 800 |
| | Wilmington, Delaware 19801 |
| | Attn: Erin R. Fay |
| | Telephone: 302-502-8404 |
| | Email: efay@wsgr.com |
| *To Buyer*: | c/o Turnbridge Equities |
| | 1 Bryant Park, Suite 200 |
| | New York, New York 10018 |
| | Attention: General Counsel and Michael Gazzano |
| | Telephone: 714-403-6453 (Michael Gazzano) |
| | Email: jw@turnbridgeeq.com and |
| | mg@turnbridgeeq.com |

*With Copy to*:                      DLA Piper LLP
                                     1251 Avenue of the Americas
                                     New York, New York 10020
                                     Attention: Todd Eisner
                                     Telephone: 917-887-3404
                                     Email: Todd.Eisner@US.dlapiper.com


*To Escrow Holder*:                  Stewart Title of California
                                     73020 El Paseo, Ste. 103
                                     Palm Desert, CA 92260
                                     Attn: Tamara Castro, Escrow Officer & Teo
                                     Cardenas, Title Officer
                                     Emails: tcastro@stewart.com
                                            Teo.cadenas@stewart.com


11.2    <u>Governing Law, Severability, and Jurisdiction</u>.  This Agreement shall be governed by and construed under the Bankruptcy Code to the extent applicable, and only thereafter under the laws of the State of California, without regard to its conflicts of law principles.  If any provision of this Agreement is invalid or unenforceable, such provision shall (i) be modified to the minimum extent necessary to render it valid and enforceable, or (ii) if it cannot be so modified, be deemed not to be a part of this Agreement and shall not affect the validity or enforceability of the remaining provisions. Until such time as Debtors' Bankruptcy Case is no longer pending or active, the Bankruptcy Court shall have jurisdiction over resolving any dispute under this Agreement.

11.3    <u>Construction</u>.  This Agreement has been negotiated at arm's length and in good faith, and each party has been, or has had the opportunity to be, represented by legal counsel. Accordingly, any rule of law (including California Civil Code Section 1654) or legal decision that would require interpretation of any ambiguities in this Agreement against the party drafting it is not applicable and is waived.  The provisions of this Agreement shall be interpreted in a reasonable manner to effect the purpose of the parties and this Agreement.

11.4    <u>Amendment and Waiver</u>.  This Agreement may be amended only by a written agreement signed by all parties to this Agreement.  Waiver of any provision of this Agreement shall not be deemed or constitute a waiver of any other provisions, nor shall such waiver constitute a continuing waiver.

11.5    <u>Entire Agreement</u>.  This Agreement (with all schedules and exhibits attached hereto, now or in the future by mutual agreement incorporated herein) constitutes the entire agreement between the parties with respect to the subject matter set forth above, and supersedes all previous oral and written agreements, letters of intent, communications, representations and/or commitments.

11.6    <u>Further Instruments</u>.    The parties covenant and agree that they will execute such other and further instruments and documents that are or may become  reasonably necessary or convenient to carry out and consummate the Transaction.

11.7    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts (including facsimile counterparts or as a pdf or similar attachment to an email), all of which together shall constitute a binding agreement, and each such counterpart shall be deemed to be an original instrument for all purposes.  This Agreement may be executed electronically, and such electronic signature shall constitute an original for all purposes.

11.8    <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns. Buyer shall have the right to assign its rights and obligations under this Agreement to one or more entities (each which will acquire title to a particular portion of the Property as designated by Buyer) so long as each assignee is an affiliate of Buyer and is jointly and severally liable hereunder with all other Buyer assignees. In the event of any such multiple assignments, Sellers shall prepare, execute and deliver multiple separate sets of Seller Closing Documents and Buyer Closing Documents, each of which will apply to such portion(s) of the Property so designated by Buyer.

11.9    <u>Time</u>.  Time is of the essence under this Agreement.

11.10    <u>Drafts not an Offer</u>.  The submission of a draft of this Agreement by a party to the other party is not intended by either party to be an offer to enter into a legally binding contract with respect to the purchase and sale of the Property.  The parties shall be legally bound with respect to the purchase and sale of the Property pursuant to the terms of this Agreement if and only if both parties have fully executed the Agreement.

11.11    <u>Third Party Beneficiary</u>. Each party acknowledges and agrees that the City is an express third-party beneficiary of Sections 3.4.1, 4.2.4, 6.2 and 7.4 of this Agreement, entitled to enforce the terms thereof as if it were an original party hereto. Otherwise, there are no third party beneficiaries with any right to enforce any provision of this Agreement.

**[SIGNATURES ON FOLLOWING PAGE]**

**SIGNATURE PAGE TO PURCHASE AND SALE AGREEMENT**

**AND JOINT ESCROW INSTRUCTIONS**

**Sellers**:                                                  **Buyer**:


                                                             TBE RE Acquisition Co II LLC,
                                                             a Delaware limited liability company

                                                             By: _____
                                                             Name: _____
                                                             Title: _____

RGC PA 789, LLC,
a Delaware limited liability company


By: _____
Name: _____
Title: _____


SilverRock Development Company, LLC
a Delaware limited liability company


By: _____
Name: _____
Title: ____


SilverRock Lifestyle Residences, LLC,
a Delaware limited liability company


By: _____
Name: _____
Title: _____


SilverRock Lodging, LLC,
a Delaware limited liability company


By: _____
Name: _____
Title: _____


SilverRock Luxury Residences, LLC,
a Delaware limited liability company


By: _____
Name: _____
Title: _____


SilverRock Phase I, LLC,
a Delaware limited liability company


By: _____
Name: _____
Title: _____
_____

## ESCROW HOLDER'S ACCEPTANCE

By its execution below, Escrow Holder accepts this Agreement as its escrow instructions.


**<u>ESCROW HOLDER</u>**:

STEWART TITLE OF CALIFORNIA, INC.


By: _____
Name: _____
Title:_____

Date: _____, 2025

**<ins>EXHIBIT A</ins>**

**REAL PROPERTY LEGAL DESCRIPTION**

**(attached)**

**PARCEL 1:**

THAT PORTION OF PARCEL 10 OF PARCEL MAP NO. 37207, IN THE CITY OF LA QUINTA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AS SHOWN BY A MAP FILED IN <u>BOOK 242, PAGES 72 THROUGH 87, INCLUSIVE OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:</u>

PARCEL "B" OF LOT LINE ADJUSTMENT NO. 2020-0007, AS DISCLOSED BY GRANT DEED RECORDED AUGUST 20, 2021 AS <u>INSTRUMENT NO. 2021-0499856</u> OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, STATE OF CALIFORNIA, AS DESCRIBED THEREIN.

EXCEPTING THEREFROM ALL OIL, GAS, HYDROCARBON SUBSTANCES, AND MINERALS OF EVERY KIND AND CHARACTER LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE, TOGETHER WITH THE RIGHT TO DRILL INTO, THROUGH, AND TO USE AND OCCUPY ALL PARTS OF THE PHASE 1A AND 1B PROPERTY LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE THEREOF FOR ANY AND ALL PURPOSES INCIDENTAL TO THE EXPLORATION FOR AND PRODUCTION OF OIL, GAS, HYDROCARBON SUBSTANCES OR MINERALS FROM SAID PHASE 1A AND 1B PROPERTY OR OTHER LANDS, BUT WITHOUT, HOWEVER, ANY RIGHT TO USE EITHER THE SURFACE FROM SAID PHASE 1A AND 1B PROPERTY OR ANY PORTION THEREOF WITHIN FIVE HUNDRED (500) FEET OF THE SURFACE FOR ANY PURPOSE OR PURPOSES WHATSOEVER, OR TO USE THE PHASE 1A AND 18 PROPERTY IN SUCH A MANNER AS TO CREATE A DISTURBANCE TO THE USE OR ENJOYMENT OF THE PHASE 1A AND 1B PROPERTY, AS RESERVED BY THE CITY OF LA QUINTA, A CALIFORNIA MUNICIPAL CORPORATION AND CHARTER CITY, IN THE GRANT DEED RECORDED NOVEMBER 28, 2018, AS <u>INSTRUMENT NO. 2018-0464674</u> AND RECORDED NOVEMBER 6, 2017, AS <u>INSTRUMENT NO. 2017-0463950,</u> BOTH OF OFFICIAL RECORDS.

APN 777-060-083

**PARCEL 2:**

THAT PORTION OF PARCEL 11 OF PARCEL MAP NO. 37207, IN THE CITY OF LA QUINTA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AS SHOWN BY A MAP FILED IN <u>BOOK 242, PAGES 72 THROUGH 87, INCLUSIVE OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:</u>

PARCEL "C" OF LOT LINE ADJUSTMENT NO. 2020-0007, AS DISCLOSED BY GRANT DEED RECORDED AUGUST 20, 2021 AS <u>INSTRUMENT NO. 2021-0499856</u> OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, STATE OF CALIFORNIA, AS DESCRIBED THEREIN.

EXHIBIT A

EXCEPTING THEREFROM ALL OIL, GAS, HYDROCARBON SUBSTANCES, AND MINERALS OF EVERY KIND AND CHARACTER LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE, TOGETHER WITH THE RIGHT TO DRILL INTO, THROUGH, AND TO USE AND OCCUPY ALL PARTS OF THE PHASE 1A AND 1B PROPERTY LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE THEREOF FOR ANY AND ALL PURPOSES INCIDENTAL TO THE EXPLORATION FOR AND PRODUCTION OF OIL, GAS, HYDROCARBON SUBSTANCES OR MINERALS FROM SAID PHASE 1A AND 1B PROPERTY OR OTHER LANDS, BUT WITHOUT HOWEVER, ANY RIGHT TO USE EITHER THE SURFACE FROM SAID PHASE 1A AND 1B PROPERTY OR ANY PORTION THEREOF WITHIN FIVE HUNDRED (500) FEET OF THE SURFACE FOR ANY PURPOSE OR PURPOSES WHATSOEVER, OR TO USE THE PHASE 1A AND 1B PROPERTY IN SUCH A MANNER AS TO CREATE A DISTURBANCE TO THE USE OR ENJOYMENT OF THE PHASE 1A AND 1B PROPERTY, AS RESERVED BY THE CITY OF LA QUINTA, A CALIFORNIA MUNICIPAL CORPORATION AND CHARTER CITY, IN THE GRANT DEED RECORDED NOVEMBER 28, 2018, AS <u>INSTRUMENT NO. 2018-0464674</u> AND RECORDED NOVEMBER 6, 2017, AS <u>INSTRUMENT NO. 2017-0463950</u>, BOTH OF OFFICIAL RECORDS.

APN 777-060-085

**<u>PARCEL 3:</u>**

<u>PARCEL 12 OF PARCEL MAP NO. 37207, AS SHOWN BY A MAP FILED IN BOOK 242, PAGES 72 THROUGH 87, INCLUSIVE OF PARCEL MAPS, IN THE CITY OF LA QUINTA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.</u>

EXCEPTING THEREFROM ALL OIL, GAS, HYDROCARBON SUBSTANCES, AND MINERALS OF EVERY KIND AND CHARACTER LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE, TOGETHER WITH THE RIGHT TO DRILL INTO, THROUGH, AND TO USE AND OCCUPY ALL PARTS OF THE PHASE 1A AND 1B PROPERTY LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE THEREOF FOR ANY AND ALL PURPOSES INCIDENTAL TO THE EXPLORATION FOR AND PRODUCTION OF OIL, GAS, HYDROCARBON SUBSTANCES OR MINERALS FROM SAID PHASE 1A AND 1B PROPERTY OR OTHER LANDS, BUT WITHOUT, HOWEVER, ANY RIGHT TO USE EITHER THE SURFACE FROM SAID PHASE 1A AND 1B PROPERTY OR ANY PORTION THEREOF WITHIN FIVE HUNDRED (500) FEET OF THE SURFACE FOR ANY PURPOSE OR PURPOSES WHATSOEVER, OR TO USE THE PHASE 1A AND 1B PROPERTY IN SUCH A MANNER AS TO CREATE A DISTURBANCE TO THE USE OR ENJOYMENT OF THE PHASE 1A AND 1B PROPERTY, AS RESERVED BY THE CITY OF LA QUINTA, A CALIFORNIA MUNICIPAL CORPORATION AND CHARTER CITY, IN THE GRANT DEED RECORDED NOVEMBER 28, 2018, AS <u>INSTRUMENT NO. 2018-0464674</u> AND RECORDED

EXHIBIT A

NOVEMBER 6, 2017, AS <u>INSTRUMENT NO. 2017-0463950</u>, BOTH OF OFFICIAL RECORDS.

APN 777-060-075 AND APN 777-060-078

**PARCEL 4:**

THAT PORTION OF PARCELS 4 AND 18 OF PARCEL MAP NO. 37207, IN THE CITY OF LA QUINTA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AS SHOWN BY A MAP FILED IN <u>BOOK 242, PAGES 72 THROUGH 87, INCLUSIVE OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:</u>

LOT "C" OF LOT LINE ADJUSTMENT NO. 2020-0010, AS DISCLOSED BY GRANT DEED RECORDED JULY 15, 2021 AS <u>INSTRUMENT NO. 20210426711</u> OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, STATE OF CALIFORNIA, AS DESCRIBED THEREIN.

EXCEPTING THEREFROM ALL OIL, GAS, HYDROCARBON SUBSTANCES, AND MINERALS OF EVERY KIND AND CHARACTER LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE, TOGETHER WITH THE RIGHT TO DRILL INTO, THROUGH, AND TO USE AND OCCUPY ALL PARTS OF THE PHASE 1A AND 1B PROPERTY LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE THEREOF FOR ANY AND ALL PURPOSES INCIDENTAL TO THE EXPLORATION FOR AND PRODUCTION OF OIL, GAS, HYDROCARBON SUBSTANCES OR MINERALS FROM SAID PHASE 1A AND 1B PROPERTY OR OTHER LANDS, BUT WITHOUT, HOWEVER, ANY RIGHT TO USE EITHER THE SURFACE FROM SAID PHASE 1A AND 1B PROPERTY OR ANY PORTION THEREOF WITHIN FIVE HUNDRED (500) FEET OF THE SURFACE FOR ANY PURPOSE OR PURPOSES WHATSOEVER, OR TO USE THE PHASE 1A AND 1B PROPERTY IN SUCH A MANNER AS TO CREATE A DISTURBANCE TO THE USE OR ENJOYMENT OF THE PHASE 1A AND 1B PROPERTY, AS RESERVED BY THE CITY OF LA QUINTA, A CALIFORNIA MUNICIPAL CORPORATION AND CHARTER CITY, IN THE GRANT DEED RECORDED NOVEMBER 28, 2018, AS <u>INSTRUMENT NO. 2018-0464674</u> AND RECORDED NOVEMBER 6, 2017, AS <u>INSTRUMENT NO. 2017-0463950</u>, BOTH OF OFFICIAL RECORDS.

APNS 777-490-058, 777-490-063, 777-490-064, 777-490-065 AND 777-490-066 (OLD APN'S PORTION OF 777-490-041 and 777-490-051)

**PARCEL 5:**

THAT PORTION OF PARCELS 3 AND 4 OF PARCEL MAP NO. 37207, IN THE CITY OF LA QUINTA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AS SHOWN BY A MAP FILED IN <u>BOOK 242, PAGES 72 THROUGH 87, INCLUSIVE OF PARCEL MAPS,</u>

EXHIBIT A

IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

LOT "B" OF LOT LINE ADJUSTMENT NO. 2020-0010, AS DISLOSED BY GRANT DEED RECORDED JULY 16, 2021 AS INSTRUMENT NO. 20210428113 OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, STATE OF CALIFORNIA, AS DESCRIBED THEREIN.

EXCEPTING THEREFROM ALL OIL, GAS, HYDROCARBON SUBSTANCES, AND MINERALS OF EVERY KIND AND CHARACTER LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE, TOGETHER WITH THE RIGHT TO DRILL INTO, THROUGH, AND TO USE AND OCCUPY ALL PARTS OF THE PHASE 1A AND 1B PROPERTY LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE THEREOF FOR ANY AND ALL PURPOSES INCIDENTAL TO THE EXPLORATION FOR AND PRODUCTION OF OIL, GAS, HYDROCARBON SUBSTANCES OR MINERALS FROM SAID PHASE 1A AND 1B PROPERTY OR OTHER LANDS, BUT WITHOUT, HOWEVER, ANY RIGHT TO USE EITHER THE SURFACE FROM SAID PHASE 1A AND 1B PROPERTY OR ANY PORTION THEREOF WITHIN FIVE HUNDRED (500) FEET OF THE SURFACE FOR ANY PURPOSE OR PURPOSES WHATSOEVER, OR TO USE THE PHASE 1A AND 1B PROPERTY IN SUCH A MANNER AS TO CREATE A DISTURBANCE TO THE USE OR ENJOYMENT OF THE PHASE 1A AND 1B PROPERTY, AS RESERVED BY THE CITY OF LA QUINTA, A CALIFORNIA MUNICIPAL CORPORATION AND CHARTER CITY, IN THE GRANT DEED RECORDED NOVEMBER 28, 2018, AS INSTRUMENT NO. 2018-0464674 AND RECORDED NOVEMBER 6, 2017, AS INSTRUMENT NO. 2017-0463950, BOTH OF OFFICIAL RECORDS.

APN 777-490-037, 777-490-057, 777-490-059 AND 777-490-068 (OLD APN'S PORTION OF 777-490-040 AND 777-490-041)

**PARCEL 6:**

PARCEL 5 OF PARCEL MAP NO. 37207 AS SHOWN BY A MAP ON FILE IN BOOK 242 OF PARCEL MAPS, PAGES 72 THROUGH 87, INCLUSIVE, TOGETHER WITH PORTIONS OF PARCELS A AND B OF LOT LINE ADJUSTMENT NO. 2020-0005, RECORDED SEPTEMBER 2, 2021 AS DOCUMENT NO. 2021-0527060 OF OFFICIAL RECORDS OF SAID COUNTY, DESCRIBED AS FOLLOWS:

PARCEL "A" OF LOT LINE ADJUSTMENT NO. 2023-0003 OF THE CITY OF LA QUINTA, AS DISCLOSED BY GRANT DEED RECORDED MAY 4, 2023 AS INSTRUMENT NO. 2023-0128115 OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, STATE OF CALIFORNIA, AS DESCRIBED THEREIN.

EXCEPTING FROM PARCEL 5 ABOVE, ALL OIL, GAS, HYDROCARBON SUBSTANCES, AND MINERALS OF EVERY KIND AND CHARACTER LYING MORE

EXHIBIT A

THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE, TOGETHER WITH THE RIGHT TO DRILL INTO, THROUGH, AND TO USE AND OCCUPY ALL PARTS OF THE PHASE 1A AND 1B PROPERTY LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE THEREOF FOR ANY AND ALL PURPOSES INCIDENTAL TO THE EXPLORATION FOR AND PRODUCTION OF OIL, GAS, HYDROCARBON SUBSTANCES OR MINERALS FROM SAID PHASE 1A AND 1B PROPERTY OR OTHER LANDS, BUT WITHOUT, HOWEVER, ANY RIGHT TO USE EITHER THE SURFACE FROM SAID PHASE 1A AND 1B PROPERTY OR ANY PORTION THEREOF WITHIN FIVE HUNDRED (500) FEET OF THE SURFACE FOR ANY PURPOSE OR PURPOSES WHATSOEVER, OR TO USE THE PHASE 1A AND 1B PROPERTY IN SUCH A MANNER AS TO CREATE A DISTURBANCE TO THE USE OR ENJOYMENT OF THE PHASE 1A AND 1B PROPERTY, AS RESERVED BY THE CITY OF LA QUINTA, A CALIFORNIA MUNICIPAL CORPORATION AND CHARTER CITY, IN THE GRANT DEED RECORDED NOVEMBER 28, 2018, AS <u>INSTRUMENT NO. 2018-0464674</u> AND RECORDED NOVEMBER 6, 2017, AS <u>INSTRUMENT NO. 2017-0463950</u>, BOTH OF OFFICIAL RECORDS.

APN: 777-490-042, 777-490-076 AND PORTIONS OF 777-490-072 AND 777-490-073 (OLD APN'S PORTION of 777-490-043 and 777-490-044)

**PARCEL 7:**

PORTIONS OF PARCELS A THROUGH C, INCLUSIVE, OF LOT LINE ADJUSTMENT NO. 2020-0005, RECORDED SEPTEMBER 2, 2021 AS <u>DOCUMENT NO. 2021- 0527060</u> OF OFFICIAL RECORDS OF SAID COUNTY, DESCRIBED AS FOLLOWS:

PARCEL "B" OF LOT LINE ADJUSTMENT NO. 2023-0003 OF THE CITY OF LA QUINTA, AS DISCLOSED BY GRANT DEED RECORDED MAY 4, 2023 AS <u>INSTRUMENT NO. 2023-0128115</u> OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, STATE OF CALIFORNIA, AS DESCRIBED THEREIN.

EXCEPTING THEREFROM ALL OIL, GAS, HYDROCARBON SUBSTANCES, AND MINERALS OF EVERY KIND AND CHARACTER LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE, TOGETHER WITH THE RIGHT TO DRILL INTO, THROUGH, AND TO USE AND OCCUPY ALL PARTS OF THE PHASE 1A AND 1B PROPERTY LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE THEREOF FOR ANY AND ALL PURPOSES INCIDENTAL TO THE EXPLORATION FOR AND PRODUCTION OF OIL, GAS, HYDROCARBON SUBSTANCES OR MINERALS FROM SAID PHASE 1A AND 1B PROPERTY OR OTHER LANDS, BUT WITHOUT, HOWEVER, ANY RIGHT TO USE EITHER THE SURFACE FROM SAID PHASE 1A AND 1B PROPERTY OR ANY PORTION THEREOF WITHIN FIVE HUNDRED (500) FEET OF THE SURFACE FOR ANY PURPOSE OR PURPOSES WHATSOEVER, OR TO USE THE PHASE 1A AND 1B PROPERTY IN SUCH A MANNER AS TO CREATE A DISTURBANCE TO THE USE OR ENJOYMENT OF THE PHASE 1A AND 1B PROPERTY, AS RESERVED BY THE CITY OF LA QUINTA, A CALIFORNIA

EXHIBIT A

MUNICIPAL CORPORATION AND CHARTER CITY, IN THE GRANT DEED RECORDED NOVEMBER 28, 2018, AS <u>INSTRUMENT NO. 2018-0464674</u> AND RECORDED NOVEMBER 6, 2017, AS <u>INSTRUMENT NO. 2017-0463950</u>, BOTH OF OFFICIAL RECORDS.

APN: 777-490-074 AND PORTIONS OF 777-490-072, 777-490-073, 777-490-075, 777- 490-077, 777-490-079 AND 777-490-080 ( OLD APN'S PORTION 777-490-043, 777-490-044 AND 777-490-045)

## PARCEL 8:

THAT PORTION OF PARCELS 9,10,11 AND 19 OF PARCEL MAP NO. 37207, IN THE CITY OF LA QUINTA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AS SHOWN BY A MAP FILED IN <u>BOOK 242, PAGES 72 THROUGH 87, INCLUSIVE OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:</u>

PARCEL "A" OF LOT LINE ADJUSTMENT NO. 2020-0007, AS DISLOSED BY GRANT DEED RECORDED AUGUST 20, 2021 AS <u>INSTRUMENT NO. 2021-0500015</u> OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, STATE OF CALIFORNIA, AS DESCRIBED THEREIN.

EXCEPTING THEREFROM ALL OIL, GAS, HYDROCARBON SUBSTANCES, AND MINERALS OF EVERY KIND AND CHARACTER LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE, TOGETHER WITH THE RIGHT TO DRILL INTO, THROUGH, AND TO USE AND OCCUPY ALL PARTS OF THE PHASE 1A AND 1B PROPERTY LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE THEREOF FOR ANY AND ALL PURPOSES INCIDENTAL TO THE EXPLORATION FOR AND PRODUCTION OF OIL, GAS, HYDROCARBON SUBSTANCES OR MINERALS FROM SAID PHASE 1A AND 1B PROPERTY OR OTHER LANDS, BUT WITHOUT, HOWEVER, ANY RIGHT TO USE EITHER THE SURFACE FROM SAID PHASE 1A AND 1B PROPERTY OR ANY PORTION THEREOF WITHIN FIVE HUNDRED (500) FEET OF THE SURFACE FOR ANY PURPOSE OR PURPOSES WHATSOEVER, OR TO USE THE PHASE 1A AND 1B PROPERTY IN SUCH A MANNER AS TO CREATE A DISTURBANCE TO THE USE OR ENJOYMENT OF THE PHASE 1A AND 1B PROPERTY, AS RESERVED BY THE CITY OF LA QUINTA, A CALIFORNIA MUNICIPAL CORPORATION AND CHARTER CITY, IN THE GRANT DEED RECORDED NOVEMBER 28, 2018, AS <u>INSTRUMENT NO. 2018-0464674</u> AND RECORDED NOVEMBER 6, 2017, AS <u>INSTRUMENT NO. 2017-0463950</u>, BOTH OF OFFICIAL RECORDS.

APN: 777-490-046, 777-490-071, 777-060-082, AND 777-060-084 (OLD APNS 777-490-052,777-060-076 and 777-060-077)

## PARCEL 9A:

EXHIBIT A

PORTIONS OF PARCELS B AND C OF LOT LINE ADJUSTMENT NO. 2020-0005, RECORDED SEPTEMBER 2, 2021 AS DOCUMENT NO. 2021-0527060 OF OFFICIAL RECORDS OF SAID COUNTY, DESCRIBED AS FOLLOWS:

PARCEL "C" OF LOT LINE ADJUSTMENT NO. 2023-0003 OF THE CITY OF LA QUINTA, AS DISCLOSED BY GRANT DEED RECORDED MAY 4, 2023 AS INSTRUMENT NO. 2023-0128115 OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, STATE OF CALIFORNIA, AS DESCRIBED THEREIN.

EXCEPTING THEREFROM ALL OIL, GAS, HYDROCARBON SUBSTANCES, AND MINERALS OF EVERY KIND AND CHARACTER LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE, TOGETHER WITH THE RIGHT TO DRILL INTO, THROUGH, AND TO USE AND OCCUPY ALL PARTS OF THE PHASE 1A AND 1B PROPERTY LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE THEREOF FOR ANY AND ALL PURPOSES INCIDENTAL TO THE EXPLORATION FOR AND PRODUCTION OF OIL, GAS, HYDROCARBON SUBSTANCES OR MINERALS FROM SAID PHASE 1A AND 1B PROPERTY OR OTHER LANDS, BUT WITHOUT, HOWEVER, ANY RIGHT TO USE EITHER THE SURFACE FROM SAID PHASE 1A AND 1B PROPERTY OR ANY PORTION THEREOF WITHIN FIVE HUNDRED (500) FEET OF THE SURFACE FOR ANY PURPOSE OR PURPOSES WHATSOEVER, OR TO USE THE PHASE 1A AND 1B PROPERTY IN SUCH A MANNER AS TO CREATE A DISTURBANCE TO THE USE OR ENJOYMENT OF THE PHASE 1A AND 1B PROPERTY, AS RESERVED BY THE CITY OF LA QUINTA, A CALIFORNIA MUNICIPAL CORPORATION AND CHARTER CITY, IN THE GRANT DEED RECORDED NOVEMBER 28, 2018, AS INSTRUMENT NO. 2018-0464674 AND RECORDED NOVEMBER 6, 2017, AS INSTRUMENT NO. 2017-0463950, BOTH OF OFFICIAL RECORDS.

PORTION APN: 777-490-075, 777-490-077, 777-490-078, 777-490-079 AND 777-490- 080 ( OLD APNS PORTION of 777-490-044 AND 777-490-045 )

**PARCEL 9B**

PORTIONS OF PARCEL C OF LOT LINE ADJUSTMENT NO. 2020-0005, RECORDED SEPTEMBER 2, 2021 AS DOCUMENT NO. 2021-0527060 OF OFFICIAL RECORDS OF SAID COUNTY, DESCRIBED AS FOLLOWS:

PARCEL "D" OF LOT LINE ADJUSTMENT NO. 2023-0003 OF THE CITY OF LA QUINTA, AS DISCLOSED BY GRANT DEED RECORDED MAY 4, 2023 AS INSTRUMENT NO. 2023-0128115 OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, STATE OF CALIFORNIA, AS DESCRIBED THEREIN. EXCEPTING THEREFROM ALL OIL, GAS, HYDROCARBON SUBSTANCES, AND MINERALS OF EVERY KIND AND CHARACTER LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE, TOGETHER WITH THE RIGHT TO DRILL INTO, THROUGH, AND TO USE

EXHIBIT A

AND OCCUPY ALL PARTS OF THE PHASE 1A AND 1B PROPERTY LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE THEREOF FOR ANY AND ALL PURPOSES INCIDENTAL TO THE EXPLORATION FOR AND PRODUCTION OF OIL, GAS, HYDROCARBON SUBSTANCES OR MINERALS FROM SAID PHASE 1A AND 1B PROPERTY OR OTHER LANDS, BUT WITHOUT, HOWEVER, ANY RIGHT TO USE EITHER THE SURFACE FROM SAID PHASE 1A AND 1B PROPERTY OR ANY PORTION THEREOF WITHIN FIVE HUNDRED (500) FEET OF THE SURFACE FOR ANY PURPOSE OR PURPOSES WHATSOEVER, OR TO USE THE PHASE 1A AND 1B PROPERTY IN SUCH A MANNER AS TO CREATE A DISTURBANCE TO THE USE OR ENJOYMENT OF THE PHASE 1A AND 1B PROPERTY, AS RESERVED BY THE CITY OF LA QUINTA, A CALIFORNIA MUNICIPAL CORPORATION AND CHARTER CITY, IN THE GRANT DEED RECORDED NOVEMBER 28, 2018, AS <u>INSTRUMENT NO. 2018-0464674</u> AND RECORDED NOVEMBER 6, 2017, AS <u>INSTRUMENT NO. 2017-0463950</u>, BOTH OF OFFICIAL RECORDS.

PORTION APN: 777-490-079 (OLD APN PORTION 777-490-045)

*NOTE: <u>Parcel 10</u> and <u>Parcel 11</u> as noted in the PTR are owned by the City of La Quinta*

**PARCEL 12:**

LOTS 1 THROUGH 29 AND LOTS A THROUGH L, OF TRACT NO. 37730, IN THE CITY OF LA QUINTA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, FILED IN BOOK 479, PAGES 27 THROUGH 33 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY. EXCEPT ALL OIL, GAS, HYDROCARBON SUBSTANCES, AND MINERALS OF EVERY KIND AND CHARACTER LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE, TOGETHER WITH THE RIGHT TO DRILL INTO, THROUGH, AND TO USE AND OCCUPY ALL PARTS OF THE PHASE 1A PROPERTY LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE THEREOF FOR ANY AND ALL PURPOSES INCIDENTAL TO THE EXPLORATION FOR AND PRODUCTION OF OIL, GAS, HYDROCARBON SUBSTANCES OR MINERALS FROM SAID PHASE 1A PROPERTY OR OTHER LANDS, BUT WITHOUT, HOWEVER, ANY RIGHT TO USE EITHER THE SURFACE FROM SAID PHASE 1A PROPERTY OR ANY PORTION THEREOF WITHIN FIVE HUNDRED (500) FEET OF THE SURFACE FOR ANY PURPOSE OR PURPOSES WHATSOEVER, OR TO USE THE PHASE 1A PROPERTY IN SUCH A MANNER AS TO CREATE A DISTURBANCE TO THE USE OR ENJOYMENT OF THE PHASE 1A PROPERTY, AS RESERVED BY THE CITY OF LA QUINTA, A CALIFORNIA MUNICIPAL CORPORATION AND CHARTER CITY, IN THE GRANT DEED RECORDED NOVEMBER 6, 2017, AS INSTRUMENT NO. 2017-0463950 OF OFFICIAL RECORDS.

APN: 777-510-001 THRU 025; 777-520-001 THRU 018

EXHIBIT A

**<u>EXHIBIT B</u>**

**PRELIMINARY TITLE REPORT**

**(attached)**

**EXHIBIT C**

**GRANT DEED**

RECORDING REQUESTED BY:

AND WHEN RECORDED MAIL THIS DEED AND, UNLESS
OTHERWISE SHOWN BELOW, MAIL TAX STATEMENT TO:

_____
SPACE ABOVE THIS LINE FOR RECORDER'S USE

APN: _____

**GRANT DEED**

THE UNDERSIGNED GRANTOR DECLARES:
DOCUMENTARY TRANSFER TAX $_____ CITY TAX $_____

__ Computed on full value of property conveyed; OR
__ Computed on full value less value of liens or encumbrances remaining at time of sale.
__ Unincorporated Area __X__ City of La Qunita, and

__ Exempt from Affordable Housing and Jobs Act fee per GC27388.1 due to _____N/A
_____

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

_____, a _____

hereby GRANT(S) to

_____, a _____

the following described real property in the City of La Quinta, County of Riverside, State of
California:

SEE <u>EXHIBIT A</u> ATTACHED HERETO AND MADE A PART HEREOF.

_____

Dated: _____, 2025

EXHIBIT C – Page 2

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

## **ACKNOWLEDGMENT**

STATE OF CALIFORNIA      )
                                     )

COUNTY OF _____   )

On _____, 2025, before me, _____, Notary Public, personally appeared _____ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under Penalty of Perjury under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


_____
Signature of Notary Public


                                          (NOTARY PUBLIC SEAL)

EXHIBIT C – Page 3

**EXHIBIT A**
**TO**
**GRANT DEED**

(Legal Description)

EXHIBIT C – Page 4

## EXHIBIT D

## ASSIGNMENT AND ASSUMPTION OF PERMITS

This Assignment and Assumption of Permits ("Assignment"), is entered into as of _____, 2025 (the "Effective Date"), is made by and between SilverRock Land II, LLC, a Delaware limited liability company, RGC PA 789, LLC, a Delaware limited liability company, and SilverRock Development Company, LLC, a Delaware limited liability company (collectively, "Assignor"), and _____ ("Assignee").

A.     Assignor and Assignee entered into that certain Purchase and Sale Agreement and Joint Escrow instructions dated _____, 2025 (the "Purchase Agreement") relating to certain real property located in the City of La Qunita, County of Riverside, California described in Exhibit A to the Purchase Agreement.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Purchase Agreement.

B.     This Assignment is being made pursuant to the terms of the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.     Assignment.  Pursuant and subject to the terms of the Purchase Agreement, Assignor hereby grants, assigns, transfers, conveys and delivers to Assignee all of Assignor's right, title, interest, benefits and privileges, if any, in and to the Permits set forth on Exhibit 1 hereto, and Assignee hereby accepts such assignment.

2.     Assumption of Obligations.  By acceptance of this Assignment, Assignee hereby assumes and agrees to perform and to be bound by all of the obligations and liabilities of Assignor, and all of the other terms, covenants and conditions imposed upon or assumed by Assignor, under the Permits.

3.     Indemnity.  Assignee shall indemnify, defend and hold Assignor harmless from and against any claims, damages, losses, liabilities, costs and expenses, including without limitation attorneys' fees arising as a result of Assignee's failure to perform the Assignor's obligations under the Permits arising, accruing or owing after the Effective Date.

4.     Successors.  This Assignment shall be binding on and inure to the benefit of the parties hereto and their respective successors in interest, and assigns.

5.     Counterparts.  This Assignment may be executed in one or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument.

6.     Amendment.  This Assignment may not be amended or altered except by a written instrument executed by Assignor and Assignee.

7.    <u>Further Assurances</u>.  Whenever requested to do so by the other party, each party shall take such acts and/or deliver such further instruments or documents that are reasonably necessary to carry out the intent and purposes of this Assignment.

8.    <u>Governing Law and Severability</u>.  This Assignment shall be governed and construed in accordance with California law. Nothing contained herein shall be construed so as to require the commission of any acts contrary to law, and wherever any provisions of this Assignment are invalid or there is a conflict between any provisions of this Assignment and any present or future statute, law, ordinance or regulation, such provisions shall (i) be curtailed, limited and/or deemed not to be a part of this Assignment only to the extent necessary to make it comply with such statute, law, ordinance or regulation, and (ii) not affect the validity or enforceability of the remaining provisions.

9.    <u>Entire Agreement</u>.  This Assignment and the Purchase Agreement represent the entire agreement between the parties with respect to the subject matter set forth above, and supersede all previous oral and written agreements, communications, representations or commitments.

10.    <u>Terms of the Purchase Agreement</u>.  Nothing in this Assignment shall be deemed to modify any of the terms or conditions of the Purchase Agreement.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and terms hereof, the terms of the Purchase Agreement shall govern.  Assignor's obligations hereunder are subject to the terms of <u>Sections 6.1</u>, and <u>6.2</u> of the Purchase Agreement.

11.    <u>Attorneys' Fees</u>.  If either party commences or is made a party to any action or proceeding to enforce or interpret this Assignment, the prevailing party in such action or proceeding shall be entitled to recover from the other party all attorneys' fees, costs and expenses incurred in connection with such action or proceeding or any appeal or enforcement of any judgment obtained in any such action or proceeding.

<u>*Sellers:*</u>                                                            <u>*Buyer:*</u>

RGC PA 789, LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

SilverRock Development Company, LLC
a Delaware limited liability company

By: _____
Name: _____
Title: _____

EXHIBIT D – Page 2

Exhibit 1 to Assignment of Permits

[INSERT LIST HERE]

## EXHIBIT E

**Intentionally Omitted**

## EXHIBIT F

**FORM OF BILL OF SALE**

BILL OF SALE

THIS BILL OF SALE (this "Bill of Sale") is executed as of the [_____ day of _____, 20___], by _____ ("Seller(s)"), in favor of _____("Buyer"), pursuant to that certain Purchase and Sale Agreement and Joint Escrow Instructions dated [_____, 20___] ("Purchase Agreement") entered into between Seller and Buyer relating to the real property located in the City of _____, County of _____, California (the "Property"), more particularly described in Exhibit A to the Purchase Agreement.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Purchase Agreement.

For good and valuable consideration received by Seller, the receipt and sufficiency of which are hereby acknowledged, Seller hereby sells, assigns and transfers to Buyer Seller's interest, if any, in the personal property listed on Exhibit 1 attached hereto, (the "Personal Property").  Seller makes no warranties or representations as to the Personal Property.  The Personal Property is transferred "AS IS", with any and all faults, defects and deficiencies, and ALL WARRANTIES OF QUALITY, FITNESS AND MERCHANTABILITY ARE HEREBY EXCLUDED. The entire risk of the quality and performance of the Personal Property is with Buyer.

Nothing in this Bill of Sale shall be deemed to modify any of the terms or conditions of the Purchase Agreement.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and terms hereof, the terms of the Purchase Agreement shall govern.  Seller's obligations hereunder are subject to the terms of Sections 6.1 and 6.2 of the Purchase Agreement.

SELLER(S):

Exhibit 1

[insert list of Personal Property]

**Exhibit B**

Parties in Interest

| Category | Parties |
|---|---|
| Debtors | SilverRock Development Company, LLC<br>SilverRock Phase I, LLC<br>SilverRock Lodging, LLC<br>SilverRock Luxury Residences, LLC<br>SilverRock Lifestyle Residences LLC<br>RGC PA 789, LLC |
| Major Equity Holders | Axia Talus, LLC<br>George J. Heuser Revocable Trust SVR Capital Trust<br>Kurtin Family Trust DTD 5/1/95  Kenneth and Theresa Green Family Trust<br>Duclos Family Revocable Trust UAD 11/14/96 Bryan D. Holker IRA<br>Diane Cimarusti Claire Fruwirth Trust Jason Parr<br>Jonathan P. Fredricks Mack Revocable Trust Kevin and Lindy Welk<br>LTMDP Living Family Trust Eric Leitstein<br>Bill and Susan Hoehn Family Trust DTD 10/9/96 Richard & Lehn Goetz<br>YH-MCSV Fund I, LLC<br>Parekh Family Trust DTD 11/3/06<br>McCoy Revocable Trust No. 92 DTD 6/17/92 Billings Realty, LLC<br>Robert S. Green, Jr. |
| Secured Lenders | SilverRock Resort Investment LLC SilverRock Resort Investment M LLC<br>Keilor Capital (on behalf of creditors RAF Pacifica Loan Opportunity Fund I, LLC and The Arnold Fishman Revocable Trust dated July 15, 1999)<br>Poppy Bank, N.A.<br>Cypress Point Holdings, LLC<br>Construction Loan Services II, LLC (Builders Capital) |

| | |
|---|---|
| Holders of Mechanic's Liens | Robert Green Residential, Inc. Granite Construction Company<br>R.D. Olson Construction, Inc. Rowan Electric<br>White's Steel, Inc.<br>California Specialty Insulation, Inc. Waterworks and/or Fire Protection Materials<br>MSA Consulting, Inc.<br>BAR Architects & Interiors General Contracting Services<br>Vermillions Environmental Products & Applications<br>Joshua R. Frantz |

| | |
|---|---|
| | The Robert Green Company Jack Roger Tracy<br>Bruce D. Maize<br>H&E Equipment Services, Inc. Ashley Jernigan OBO J&B Materials Executive Landscape Inc.<br>Teserra<br>Ultimate Communication Systems Al Miller & Sons Roofing Co., Inc. 20/20 Plumbing and Heating, Inc.<br>Cockrell Electric Inc. |