## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>SILVERROCK DEVELOPMENT COMPANY, LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No.: 24-11647 (MFW)<br><br>(Jointly Administered)<br><br>**Ref. Docket No. 513** |

### DECLARATION OF JEFFREY Z. ADKISON
### IN SUPPORT OF THE DEBTORS' MOTION FOR
### ENTRY OF AN ORDER (I) APPROVING THE DEBTORS' SELECTION
### OF A STALKING HORSE BIDDER; (II) APPROVING BREAK-UP FEE
### IN CONNECTION THEREWITH; AND (III) GRANTING RELATED RELIEF

I, Jeffrey Z. Adkison, hereby declare under penalty of perjury, pursuant to section 1746 of

title 28 of the United States Code, as follows:

### INTRODUCTION[2]

1.     I submit this declaration (this "Stalking Horse Declaration") in support of the

*Debtors' Motion For Entry of an Order (I) Approving the Debtors' Selection of a Stalking Horse*

*Bidder; (II) Approving Break-Up Fee in Connection Therewith; and (III) Granting Related Relief*

(the "Motion"), filed contemporaneously herewith.

2.     I am a Managing Director in the Capital Markets group of Jones Lang LaSalle

North Americas, Inc. ("JLL"), a commercial real estate services and investment firm that maintains

an office located at 2029 Century Park East in Los Angeles, California. JLL is a well-known,

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: SilverRock Development Company, LLC (5730), RGC PA 789, LLC (5996), SilverRock Lifestyle Residences, LLC (0721), SilverRock Lodging, LLC (4493), SilverRock Luxury Residences, LLC (6598) and SilverRock Phase I, LLC (2247). The location of the Debtors' principal place of business and the Debtors' mailing address is 343 Fourth Avenue, San Diego, CA 92101.

[2]   All capitalized terms used but not otherwise defined herein shall have the same meanings ascribed to such terms in the Motion.

reputable, and diversified firm with approximately 100 offices in the United States. JLL and its professionals have experience in providing services regarding the review, analysis, disposition, and negotiation of real property transactions, inside and outside of bankruptcy. In addition, JLL has extensive experience regarding lease renegotiations and subleasing transactions, including inside and outside of bankruptcy.

3.      I have experience handling complex financial and other restructuring matters for a variety of companies, with particular focus on land and underutilized real estate assets.  I have more than twenty-five (25) years of real estate experience in markets throughout North America.

4.      I have been employed by JLL since 1999. Prior to joining JLL, I was an institutional real estate investment and development executive with Mitsui/SBD Properties. I graduated with a B.A. in economics from California State University, Fullerton.

5.      I am not being specifically compensated for this testimony other than through payments JLL would receive as a professional pursuant to the *Order Authorizing the Retention and Employment of Jones Lang LaSalle North Americas, Inc. as Real Estate Broker and Advisor to the Debtors Effective as of December 23, 2024* [Docket No. 312] entered on January 15, 2025. I am over the age of 18 years and authorized to submit this Stalking Horse Declaration on behalf of the Debtors.  If called to testify, I could and would competently testify to the facts set forth herein.

## THE MARKETING PROCESS AND SELECTION OF STALKING HORSE BIDDER

### I.      Retention of JLL and Approval of Bid Procedures

6.      As described in the *Declaration of Douglas Wilson in Support of Debtors' Application for Entry of an Order: (I) Authorizing the Retention and Employment of JLL as Real Estate Broker and Advisor to the Debtors Effective as of December 23, 2024* (attached as Exhibit C to the *Debtors' Application for Entry of an Order: (I) Authorizing the Retention and Employment*

*of JLL as Real Estate Broker and Advisor to the Debtors Effective as of December 23, 2024; and (II) Granting Related Relief* [Docket No. 261]), JLL was engaged by the Debtors on December 23, 2024 to broker a value maximizing transaction with respect to certain real property owned by Debtors RGC PA 789, LLC and SilverRock Development Company, LLC (together with the other Debtors, the "Sellers") consisting of approximately 134+- acres located in the City of La Quinta, County of Riverside, California (the "Real Property").

7.      In connection with the sale process, the Court entered an order (the "Bid Procedures Order") [Docket No. 396] approving the relief requested by the Bid Procedures Motion on March 13, 2025. Among other things, the Bid Procedures Order approves certain procedures (the "Bid Procedures") that provide a framework for the sale process in these chapter 11 cases. I am familiar with the Bid Procedures and the Bid Procedures Order.

8.      Pursuant to the Bid Procedures Order, the Debtors, in consultation with certain Consultation Parties (as defined therein) and the City, may select a Stalking Horse Bidder, provide such Stalking Horse Bidder with bid protections, and enter into a definitive agreement with respect to such Stalking Horse Bidder's bid, which may be a term sheet. Bid Procedures Order ¶¶ 6-8.

9.      The Bid Procedures provide that the Stalking Horse Bidder may propose a break-up fee  to be paid if (i) a party other than the Stalking Horse Bidder is selected as the Successful Bidder (as defined in the Bid Procedures) for the Real Property and (ii) if approved by the Court. Bid Procedures Order ¶¶ 6, 8.

10.     The framework outlined in the Bid Procedures Order was further refined on April 24, 2025 when the Debtors filed the *Notice of Revised Sale Process Deadlines* [Docket No. 452], on June 2, 2025 when the Debtors filed the *Notice of Further Revised Sale Process Deadlines* [Docket No. 508], and again on June 4, 2025, when the Debtors filed the *Second Notice of Further*

*Revised Sale Process Deadlines* [Docket No. 512] (such notices, the "Sale Process Extension Notices"), thereby extending certain dates related to the sale process.

11.    As communicated to all potential bidders, parties that wished to be considered for designation as a stalking horse bidder for the Debtors' Real Property were requested to return an executed version of the Stalking Horse LOI to JLL, the CRO, and the Debtors by May 27, 2025. Moreover, by submitting a Stalking Horse LOI, each potential bidder agreed that if it was selected as the Stalking Horse Bidder by the Debtors and the Court approved such designation, then (i) the terms of the Stalking Horse LOI would become binding on the bidder, (ii) the Stalking Horse Bidder would be required to work diligently with the City to negotiate and finalize for execution the Amended Development Documents (as defined therein), and (iii) if the Stalking Horse Bidder was ultimately selected as the Successful Bidder (subject to Court approval), the Stalking Horse Bidder would be obligated to execute a purchase and sale agreement (the "PSA") with the Debtors and open escrow pursuant to the terms of the PSA. The Debtors received five (5) Stalking Horse LOIs, certain of which were accompanied by marked versions of the PSA, marketing materials, and proforma calculations related to the Project.

## II.    The Marketing Process To-Date

12.    To date, JLL has contacted more than 7,294 potential buyers, with more than 60 of such parties executing non-disclosure agreements (each, an "NDA"), and obtaining access to the Debtors' data room for the sales process (the "VDR"). During the marketing process, relevant information regarding the Real Property has been made available in the VDR, including, inter alia, surveys and reports related to the Real Property, seismic studies, environmental impact assessments, a title report, an ALTA report, entitlement documents, and information related to the golf course associated with the Real Property.

13.     Additionally, members of my team have toured the Real Property with potential bidders and their investment partners and facilitated discussions between potential bidders and employees and representatives of the Debtors' DIP Lender and major stakeholder, the City of La Quinta, California (the "City"). Of these parties, five (5) executed letters of intent indicating a willingness to serve as a stalking horse bidder in the Debtors' sale process (each, a "Stalking Horse LOI"). In addition to these parties, there are additional parties that did not submit Stalking Horse LOIs,  but that have completed substantial due diligence regarding the Real Property and have indicated their desire to remain in the process as a potential bidder (each, a "Qualified Bidder") with respect to the Real Property by submitting a letter of intent (the "Qualified Bidder LOI") by July 7, 2025 (the "Qualified Bid Deadline").

### III.     Selection of the Stalking Horse Bidder

14.     On June 5, 2025, the Debtors, in consultation with the Consultation Parties and the City, selected TBE RE Acquisition Co II LLC as the proposed Stalking Horse Bidder and determined that the terms of its Stalking Horse LOI (the "Proposed Stalking Horse LOI") represent the highest or otherwise best offer currently available for the Real Property and the personal property located thereat and owned by the Debtors, as described in greater detail in the Motion (together, the "Assets"). Subject to Court approval, the terms of the Proposed Stalking Horse LOI shall become binding upon the Stalking Horse Bidder.

15.     The purchase price for the Assets under the Proposed Stalking Horse LOI is $60 million dollars (the "Purchase Price"). Pursuant to the terms of the Proposed Stalking Horse LOI, certain required documents for the development of the Real Property with the City (the "Amended Development Documents") must be negotiated and finalized with the City by July 29, 2025.  The Stalking Horse Bidder, upon entry of the Proposed Order, for all purposes is a Qualified Bidder.

16.    Based on my knowledge of and experience with the marketing process for the Assets and the extensive, arm's-length, and good-faith negotiations between the parties, I believe entry into the Proposed Stalking Horse LOI is in the best interests of the estates and best positions the Debtors under the present circumstances to achieve the highest or otherwise best offer available for the Assets at the conclusion of the sale process.  Pursuant to the Bid Procedures, JLL and the Debtors are continuing to solicit higher or otherwise better proposals with respect to the sale of the Assets. The Debtors, in consultation with the Consultation Parties and the City, have until July 7, 2025 (the "Qualified Bid Deadline") to approve any additional Qualified Bidders. All Qualified Bidders are required to submit a Qualified Bidder LOI to the Debtors no later than the Qualified Bid Deadline and are encouraged to do so as soon as possible. After the Qualified Bid Deadline, to maximize their ability to submit a successful bid, all Qualified Bidders will need to interface with the City regarding their development plans and Amended Development Documents in advance of July 29, 2025 (the "Sealed Bid Deadline").  The City is dedicated to working with all Qualified Bidders during this process.

17.    Thereafter, JLL will assist the Debtors and their advisors, in consultation with the Consultation Parties and the City, in reviewing all Qualified Bidder LOIs and comparing such Qualified Bidder LOIs to the transaction provided for by the Proposed Stalking Horse LOI. A Successful Bidder and Next-Highest Bidder (each, as defined in the Bid Procedures) shall be designated by the Debtors not later than September 12, 2025. Presently, the Debtors expect to be able to designate a Successful Bidder and Next-Highest Bidder much earlier than such outside date, most likely in early August 2025.

18.    After reviewing the Stalking Horse LOIs received, the Debtors, in consultation with the Consultation Parties and the City, believe that the Stalking Horse Bidder has the requisite

resources and experience to close the transaction in the requested time frame and to otherwise complete development of the Real Property.

19.     The Proposed Stalking Horse LOI provides a "floor" above which other potential bidders can bid.  In this respect, I believe that the Proposed Stalking Horse LOI will provide significant value to the Debtors' estates and ensure the completion of construction of the Project and the development of the Real Property in accordance with its potential and the City's specifications, with the opportunity to further increase value if higher or otherwise better overbids are received by Qualified Bidders.

20.     Pursuant to the Proposed Stalking Horse LOI, the Stalking Horse Bidder is prepared to close its purchase of the Assets on a timeline consistent with the milestones set forth in the Bid Procedures Order as extended by the Sale Process Extension Notices and within the confines of the Debtors' liquidity.  I believe that these deadlines provide an appropriate process to test the value of the Assets, and that the inclusion of the Stalking Horse Bidder and the Proposed Stalking Horse LOI in the sale process will increase the likelihood that the sale process results in the highest and otherwise best price available for the Assets.

21.     To my knowledge, there was no fraud or collusion between the Stalking Horse Bidder and the Debtors or between the Stalking Horse Bidder and other potential bidders, nor any attempt to take unfair advantage of other potential bidders, during the marketing process.

## There Is a Sound Business Purpose for the Break-Up Fee

22.     I believe that the Purchase Price set forth in the Proposed Stalking Horse LOI provides significant value to the Debtors' estates and will be used to repay obligations of the Debtors as approved by the Court.  The Purchase Price set forth in the Proposed Stalking Horse LOI also provides an opportunity to maximize the value of the Assets by providing a "floor" above which other Qualified Bidders may bid prior to the occurrence of the Qualified Bid Deadline.

23.     In exchange for the value that the Stalking Horse Bidder is providing to the sale process, the Debtors agreed to provide the $2 million Break-Up Fee to the Stalking Horse Bidder only if (i) the Stalking Horse Bidder reaches agreement with the City regarding the Amended Development Documents prior to the Sealed Bid Deadline (July 29, 2025 (subject to extension as approved in the Bid Procedures Order)), and (ii) after all bids are received, (x) the Debtors, in consultation with the City and the Consultation Parties, determine to select other bidders as the Successful Bidder and Next-Highest Bidder or (y) determine to select another bidder as the Successful Bidder and select the Stalking Horse Bidder as the Next-Highest Bidder, but the sale to the Successful Bidder closes. For the avoidance of doubt, if the Stalking Horse Bidder does not undertake reasonable good faith efforts to reach agreement with the City regarding the Amended Development Documents prior to the Sealed Bid Deadline, the Break-Up Fee shall not be payable.

24.     I believe that the decision to provide the Break-Up Fee to the Stalking Horse Bidder under such circumstances was the product of good faith, arm's-length negotiations amongst the parties, with the Debtors at all times acting in the interest of their estates and consistent with their fiduciary duties. Moreover, the Break-Up Fee is consistent, in my experience, with break-up fees provided to stalking horse bidders in comparable transactions.

25.     Moreover, I understand that the Break-Up Fee was, and remains, a critical component of the Stalking Horse Bidder's commitment.  I understand that the Stalking Horse Bidder has expended, and will continue to expend, time and resources negotiating, drafting, and performing pre-acquisition planning activities necessitated by the sale, notwithstanding the fact that the Proposed Stalking Horse LOI remains subject not only to Court approval, but also to overbidding by Qualified Bidders.  I believe that the provision of the Break-Up Fee was necessary to induce the Stalking Horse Bidder's bid, and that if the Court does not approve the Break-Up

Fee, there is significant risk that the Stalking Horse Bidder will elect not to serve as the "stalking horse," to the detriment of the Debtors' estates. In my experience, stalking horse bidders often demand similar protections in exchange for the value of acting as the stalking horse. Accordingly, I believe the Break-Up Fee will maximize the value of the Assets, and thus the Debtors' estates, and is a valid and sound exercise of the Debtors' business judgment.

**<u>Conclusion</u>**

26.     Based on my experience and my personal knowledge of the Debtors' commercial circumstances and the marketing process to-date, I believe that designating TBE RE Acquisition Co II LLC as the Stalking Horse Bidder for the Assets is in the best interests of the estates, and that the provision of the Break-Up Fee was necessary to induce a stalking horse bid for the Assets, which will ultimately maximize value to the Debtors' estates.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: June 5, 2025                                   /s/ *Jeffrey Z. Adkison*
                                                      Jeffrey Z. Adkison
                                                      Managing Director
                                                      Jones Lang LaSalle North Americas, Inc.

                                                      *Real Estate Broker and Advisor to the Debtors*