**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SilverRock Development Company, LLC, *et al.*,[1] | Case No. 24-11647 (MFW) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 913** |

**OBJECTION OF CONSTRUCTION LOAN SERVICES II, LLC D/B/A BUILDERS CAPITAL TO DEBTORS' AMENDED MOTION FOR ENTRY OF AN ORDER (I) DETERMINING THE VALUE OF THE SECURED CLAIMS OF CERTAIN CREDITORS PURSUANT TO 11 U.S.C. § 506(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3012; (II) ESTABLISHING THE AMOUNT TO BE PAID ON ACCOUNT OF SR LAND'S TIC INTEREST; AND (III) GRANTING RELATED RELIEF**

Construction Loan Services II, LLC d/b/a Builders Capital ("**Builders**") hereby objects (this "**Objection**") to the *Debtors' Amended Motion for Entry of an Order (I) Determining the Value of the Secured Claims of Certain Creditors Pursuant to 11 U.S.C. § 506(a) of the Bankruptcy Code; (II) Establishing the Amount to be Paid on Account of SR Land's TIC Interest; and (III) Granting Related Relief* [Docket No. 913] ("**Motion**") requesting, among other things, approval of a per-acreage valuation of the secured claims against the proceeds of the sale of the Debtors' real property. In support of this Objection, Builders respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      Builders acknowledges that the value of all secured claims against the Real Property Assets equal the net sale proceeds and that claims in excess of that amount are unsecured.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: SilverRock Development Company, LLC (5730), RGC PA 789, LLC (5996), SilverRock Lifestyle Residences, LLC (0721), SilverRock Lodging, LLC (4493), SilverRock Luxury Residences, LLC (6598) and SilverRock Phase I, LLC (2247). The location of the Debtors' principal place of business and the Debtors' mailing address is 343 Fourth Avenue, San Diego, CA 92101.

110291108.2

As such, the only issue before this Court is how to allocate the sale proceeds amongst secured creditors, an issue that affects only secured creditors. Yet, for reasons known only to them, the Debtors have inserted themselves into the dispute. The Debtors' efforts are unwanted and have materially increased the costs to the estate and its creditors.

2.      Instead of listening to their creditors, the Debtors propose to distribute the net sale proceeds to secured creditors by dividing the Real Property Assets subject to each respective lien by the total acreage of the Real Property Assets[2] (the "**Pure Acreage Methodology**") and then distributing such amount to the secured creditor that the Debtors—not this Court—believe has the senior claim. The Debtors' assert the Pure Acreage Methodology is "the only reasonable and effective of determining the value of any given parcel." *Motion* at ¶ 36.

3.      The Debtors are wrong.

4.      ***First***, the Pure Acreage Methodology is based solely on the Debtors' belief that the Real Property Assets should be treated as an amorphous whole because they were sold as a whole and it is unknown how Turnbridge will develop the Real Property Assets. The Debtors beg the question. Because the whole is greater than the sum of its parts does not mean the parts all have the same value. Moreover, in the Sale Order, this Court required Turnbridge to file a development plan for the Real Estate Assets as a condition to closing. Turnbridge complied and filed its plan on October 7, 2025—a week ***before*** the Sale Hearing. Under Turnbridge's Plan, Turnbridge will develop the Real Property Assets in a manner materially consistent with the Debtors' prepetition development plan.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion or below, as applicable.

110291108.2

5.    ***Second,*** to support the Purchase Price, the City solicited the Cushman Report and proffered testimony at the Sale Hearing to support the appraised value in the Cushman Report, in each case without objection from the Debtors. The Cushman Report determined the Debtors' proposed development plan was the highest and best use for the Real Estate Assets and separately appraised each component of the Project. The components of the Project valued in the Cushman Report are substantially the same as those contained in the Turnbridge Plan.

6.    The Debtors never mention the Turnbridge Plan, the Cushman Report, or their effect on allocation.

7.    ***Finally***, and critically, the Pure Acreage Methodology could never be the "only" reasonable and effective allocation methodology. Indeed, the principal authority relied upon by Debtors, *LTV Steel Co., Inc.,* concluded that "[t]here is no standard operating procedure" for allocating the value of an asset sale among its various portions, rejecting the debtor's proposed "paradigm" as a "form of 'standard operating procedure for allocations.'" 285 B.R. 259, 266 (Bankr. N.D. Ohio 2002). Yet, the Debtors here have done precisely what the *LTV Steel Co.* debtor attempted: insisting on a single allocation methodology as the "only" way to accomplish the task.

8.    Builders proposes two different allocation methods which greatly exceed the Pure Acreage Methodology in analytical rigor: (i) an appraisal of the individual parcels and lots by professional licensed appraisers based on the use of the Real Property Assets in the Turnbridge Plan and Cushman Report and (ii) the allocated values already determined by an independent third party, the Riverside County Tax Assessor.

9.    Based on these alternate methodologies, Builders calculates that the Pure Allocation Methodology would result in an aggregate windfall to certain groups of creditors of approximately $16,000,000, and a concomitant penalty to other groups of creditors in

3

approximately the same amount. Builders is the single creditor most penalized by the Pure Allocation Methodology, receiving less than $5,000,000 into its "allocation buckets," capping its recovery at almost $12,000,000 lower than it would receive under alternate allocation methodologies.[3]

<strong>I.   RELEVANT BACKGROUND</strong>

**A.   The PSDA and Project**

5.      On November 19, 2014, the City of La Quinta, California (the "**City**") and Debtor SilverRock Development Company, LLC ("**SilverRock**") entered into that certain *Purchase, Sale, and Development Agreement* (as amended, the "**PSDA**"). Through the PSDA, SilverRock and the City agreed to develop the Real Property Assets into a luxury living, golfing, and tourism destination (collectively, the "**Project**").

6.      The Project was to be developed in two phases: Phase 1A and Phase 1B. Phase 1A consisted of the development of 29 "ultra-luxury" residences on 29 separate lots (the "**Luxury Residences**"), a number of "lifestyle" residences on separate lots (the "**Lifestyle Residences**"), and two hotels on their own individual parcels (the "**Hotel Development**"). Phase 1B consisted of the development of single family residential (SFR) homes (the "**SFR Homes**").

7.      Given the size and complexity of the Project, SilverRock, and certain of its affiliates, borrowed money from multiple lenders to support the development of the Project. The loans sourced to develop the Real Property Assets had claims against different parcels and different

---

[3] For the avoidance of doubt, Builders is not arguing, through this Objection, that the ultimate allocation should be conducted according to a specific alternative allocation methodology or related conclusions. Those determinations can only be made after an appropriate period of discovery, including expert discovery, as to what is the most reasonable and effective methodology.

4

110291108.2

payment priorities. The terms of the loans, and the structure of their collateral, reflected the differences in use and value of the various parcels of land that made up the Project.[4]

**B.** **The Bankruptcy, Sale Hearing, Bench Ruling, Sale Order, and Appeal**

8.      On August 15, 2025, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Sale of the Purchased Assets to the Successful Bidder Free and Clear of All Claims, Liens, Interests, and Encumbrances; (II) Approving the Consensual Termination or Rejection of Ground Leases, Effective as of the Closing Date; (III) Approving Form of Grant Deed; and (IV) Granting Related Relief* (the "**Sale Motion**"), seeking to sell the Real Property Assets to TBE RE Acquisition Co. II, LLC ("**Turnbridge**") for a total purchase price of $65,000,000 (the "**Purchase Price**"). Docket No. 621.

9.      The Purchase Price was materially lower than the appraised value of the Real Property Assets, which was in excess of $300 million per the Debtors' schedules. *See SilverRock Development Company Schedules and Statement of Financial Affairs* dated September 18, 2024 at p. 6. As such, the Debtors and the City were forced to justify the reasonableness of the Purchase Price.

10.     To that end, "the City commissioned a current appraisal of the Debtors' property by a nationally recognized real estate company, Cushman & Wakefield …." Docket No. 716, ¶ 9. The Cushman & Wakefield appraisal (the "**Cushman Report**") valued the Real Property Assets at approximately $70 million—materially in line with the Purchase Price.

---

[4] Builders was one of the Debtors' lenders. On November 22, 2022, Builders made three loans to Debtor SilverRock Luxury Residences LLC, totaling in aggregate approximately $40,000,000 (the "**Builders Loans**"), which were secured by the 29 lots that were to be developed into the Luxury Residences. The Builders Loans are senior to the loans made by Poppy Bank against the same collateral. Concurrently herewith, Builders is filing that certain *Complaint to Determine Validity, Priority, and Extent of Liens of Secured Creditor and for Declaratory Relief*, seeking a ruling from this Court that the Builders Loan is senior to any claims of Poppy Bank.

110291108.2

11. The Cushman Report arrived at its valuation by first determining that "the Highest and Best Use of the subject site as though vacant is for development with a hotel/resort, luxury residential product, and mid-market sfr community, generally in-line with the formerly approved plans, development agreement, and specific plan guidelines." *Cushman Report* at p. 111.

12. The Cushman Report then separately valued the three components of Phase 1A—the Luxury Residences, the Lifestyle Residences, and the Hotel Development—and added them to its appraised value of Phase 1B—the SFR Homes.

13. On October 14, 2025, the Bankruptcy Court commenced a three-day hearing to consider approval of the Sale Motion (the "**Sale Hearing**"). During the Sale Hearing, the City, without objection from the Debtors, adduced the testimony of Jacob Kovner, a representative of Cushman & Wakefield, who testified that the Cushman Report and the work done by Cushman & Wakefield justified the Purchase Price. Transcript, Oct. 16, 2025, pgs. 48-106.

14. On October 23, 2025, the Bankruptcy Court entered an order [Docket No. 759] (the "**Sale Order**")[5] that approved, among other things, the sale of the Real Property Assets to Turnbridge, but which required Turnbridge to update and record its development plan for the Real Property Assets "as a condition precedent" to the closing of the Sale (Sale Order ¶ 21).

C. **The Turnbridge Plan and Closing of the Sale**

15. On October 7, 2025, approximately one week prior to the Sale Hearing, Turnbridge filed with the City that certain *Reinstated and Amended Development Agreement By and Between the City of La Quinta and TBE RE Acquisition Co II LLC an Affiliate of Turnbridge Equities* (the

---

[5] On November 3, 2025, Builders timely filed its notice of appeal of the Sale Order, commencing the appeal with the United States District Court for the District of Delaware, Case No. 25-01342 (the "**Appeal**"). The Appeal remains pending and briefing has not yet concluded, and nothing herein is or is intended to be a waiver of any of Builders' rights in the Appeal.

110291108.2

"**Turnbridge Plan**"). A true and accurate copy of the Turnbridge Plan is attached hereto as **Exhibit A**.[6] The Turnbridge Plan is the "Amended Development Plan" required by the Sale Order.

16.    The Turnbridge Plan "reconfigures the hotel, resort residential, commercial, golf course and related ancillary support uses planned to complete the existing public golf course and related public facilities on the SilverRock site in La Quinta." Turnbridge Plan, Ex. C. Notably, however, the Turnbridge Plan is, by its own terms, "consistent with the SilverRock Specific Plan as approved by the City in 2006" and includes the development of (i) Phase 1A—the Luxury Residences, Lifestyle Residences, and Hotel Development[7]—and (ii) Phase 1B—the SFR Homes. *Id.*, Ex. C and D.

17.    In other words, the Turnbridge Plan is substantially the same as the Debtors' plan for developing the Real Property Assets and includes all elements appraised by the City in the Cushman Report.

18.    The Sale closed on December 9, 2025.[8] Docket No. 833.

**D.    The Original Allocation Motion**

19.    On December 10, 2025, one day after the Sale closed, the Debtors filed an

---

[6] After a public hearing in September 2025, the Turnbridge Plan was conditionally approved by the City on October 7, 2025, by *Ordinance No. 626* and finally approved effective as of November 6, 2026.

[7] The Turnbridge Plan includes, for purposes of allocation, immaterial modifications, including the development of one, instead of two, hotels. *See Declaration of Michael Gazzano in Support of the Debtors' Sale Motion* [Docket No. 721] (the "**Gazzano Declaration**") at ¶ 7 ("Debtors' plan had two hotels and Turnbridge's plan contemplates a single hotel and increasing the room count. Turnbridge is also increasing the amount of residential programming to the site.").

[8] On December 8, 2025, Turnbridge and certain of its affiliates entered into that certain *Assignment and Assumption Agreement* (the "**Assignment Agreement**"), which was consented to by the City. A true and accurate copy of the Assignment Agreement is attached hereto as **Exhibit B**. The Assignment Agreement transferred the Real Property Assets, along with the obligations to develop the Real Property Assets in a manner consistent with the Turnbridge Plan (subject to certain irrelevant amendments), to certain of Turnbridge's affiliates. On information and belief, the Turnbridge Plan has not been otherwise amended or updated.

110291108.2

emergency motion seeking to allocate the proceeds from the Sale [Docket No. 834] (the "**Original Allocation Motion**"). Through the Allocation Motion, the Debtors proposed to distribute the $65,000,000 Purchase Price after paying certain allegedly senior claims (i) to the "various parcels of the Real Property Assets based on acreage of each parcel as a percentage of the acreage of the total Project" and (ii) then to the secured party the Debtors believe has the senior claim on such parcel of Real Property Assets. *Original Allocation Motion* at ¶ 66.

20.    The Debtors' only justification for their proposed allocation in the Original Allocation Motion was that the Real Property Assets were sold and marketed as a whole and that the way in which the Real Property Assets may be developed cannot be known "with certainty." Original Allocation Motion ¶¶ 65-67.

21.    The Debtors filed the Original Allocation Motion notwithstanding the Turnbridge Plan, which specifically set forth Turnbridge's intended use of the Real Property Assets, and the Cushman Report.

22.    The Debtors also failed to address in the Original Allocation Motion why they were involving themselves in an intercreditor dispute in which they had no interest.

23.    Ultimately, the Debtors' proposed allocation in the Original Allocation Motion would have resulted in a net recovery to Builders of only $401,202.30 on account of its $43,964,496.33 secured claim—less than a 1% recovery.

24.    On March 24, 2026, Debtors filed the Motion, updating the proposed allocation set forth in the Original Allocation Motion ostensibly upon "further crystaliz[ation]" of "certain intercreditor disputes that will require further intercreditor litigation or other resolution[.]" *Motion* at 1.

25.    The Debtors again provided no justification for their proposed allocation other than

to say that the use of the Real Property Assets is uncertain. Motion, ¶ 53. Again, the Debtors ignored the Turnbridge Plan and Cushman Report and failed to address why the Debtors are imposing a "resolution" of a wholly intercreditor dispute on their secured creditors.[9]

26.    The Motion does increase the estimated range of Builders' recovery from 1% to between 4.7% and 10%. However, that adjustment merely represents the Debtors' concession that the Original Allocation Motion was incorrect because it prioritized distributions to unsubstantiated and junior mechanics' liens over Builders, in particular, the asserted liens of Granite Construction Company, and failed to recognize that Builders asserts that its claims are senior to those of Poppy Bank.

27.    Because of the Debtors' unwavering insistence on the Pure Acreage Methodology as the "the only reasonable and effective of determining the value of any given parcel," the Motion, as with the Original Allocation Motion, ignores the objective evidence supporting a different allocation methodology and unfairly discriminates against Builders by limiting it to a 4.7% - 10% recovery, while other creditors with indisputably inferior collateral will recover between 19% and greater than 100% on account of their respective secured claims.

## II.    OBJECTION

28.    Without providing any justification for their actions, the Debtors seek to officiously force themselves into a dispute between secured creditors in which they have no interest. To compound the damage, the Debtors have provided no justification for their allocation other than

---

[9] To support the Motion, the Debtors cite *In re Aerogroup International Inc.*, 601 B.R. 571 (Bankr. D. Del. 2019). In *Aerogroup*, the debtor—recognizing it had no interest in the dispute—put the sale proceeds into escrow. The debtor's secured creditors, not the debtor, subsequently sued, seeking a valuation of the collateral sold by the debtor and an allocation of the sale proceeds. The court only ruled on an appropriate allocation methodology *after* hearing the secured lenders' expert testimony, among other evidence. *Id.*, at 583-600.

110291108.2

to say that it is necessary because determining the relative value of the individual lots and parcels is impossible because the Real Property Assets were sold as a whole and without a plan for development. The Debtors ignore reality. Per this Court's Sale Order, the Sale was predicated on the Turnbridge Plan, and, at the Sale Hearing, the Debtors relied on the Cushman Report, which valued the Real Property Assets, not as an undifferentiated whole, but as the sum of the individual components that comprise the whole. The Cushman Report valued the same individual parcels and lots that will be developed under the Turnbridge Plan.

29. The Debtors have also ignored other objective evidence, like the tax assessment for tax year 2025 that was done by the County of Riverside, that supports a per parcel allocation

30. Ultimately, Builders proposes two alternate and factually objective allocation methodologies: (i) an appraisal of the individual parcels and lots by professional licensed appraisers based on the use of the Real Property Assets in the Turnbridge Plan and Cushman Report and (ii) application of the Riverside County Assessor's tax assessed values.

A. **Highest and Best Use Analysis**

31. It is beyond reasonable dispute that the Real Property Assets, even in its present state, are comprised of a diverse set of improved, partially improved, and unimproved parcels. The Debtors treat them all the same, however, asserting that it would be improper to take the actual characteristics of each parcel into account because the Debtors' development plans are "long defunct" and Turnbridge merely purchased a "blank slate." *Motion* at ¶ 53. As set forth above, the Debtors' reasoning is flawed. While the Debtors' development plans did not move forward, Turnbridge, as purchaser, adopted those plans in the Turnbridge Plan, which represent the highest and best use of the Real Property Assets.

110291108.2

32.    Numerous courts have held that a bankruptcy court performing a § 506 valuation should consider the highest and best use of the subject property, not necessarily its current use. *See In re Saglio*, 153 B.R. 4, 5 (Bankr. D. R.I. 1993) (adopting expert valuation testimony taking into consideration the highest and best use of the property); *In re: Thoburn Limited Partnership*, 513 B.R. 887 (Bankr. E.D. Va. 2013) ("The highest and best use valuation is the appropriate valuation in this instance because it is the intended disposition of the property."); *Speck v. U.S. Through Farmers Home Admin.*, 104 B.R. 1021, 1023(D. Montana 1989) ("[T]he bankruptcy court's valuation will be upheld provided the ultimate valuation is based on a use. . . that is not wholly inconsistent with the use for which the property is designed or intended.");*In re Peerman*, 109 B.R. 718, 721-22 (Bankr. W.D. Tex. 1989) (The highest and best use . . . is for the sale of the developed lots to end users. [and] the retaining of ownership of the property as an investment for ultimate development into single family residential lots. The fact that the real property will be owned by the Secured Creditor, as opposed to this Debtor, or any other entity, does not alter the highest and best use of the property.); *In re Ehrich*, 109 B.R. 390, 392 (Bankr. D. S.D. 1989) ("I hold that in a Section 506(a) hearing the real estate securing the claim of a creditor should be valued at its highest and best use where the creditor can prove that the land is more valuable for a purpose other than the debtor's present use, and that such proposed use is not speculative[.]"'); *In re Melgar Enterprises, Inc.*, 151 B.R. 34, 39 (Bankr. E.D. N.Y. 1993) ("Most courts have agreed that property should be valued according to its highest and best use.").

33.    Here, it is true Turnbridge's representative testified that its "exact plans are uncertain," and that its plan would be "different" than the Debtors' attempts; however, the *Gazzano Declaration* and the testimony at the hearing are unpersuasive. The Turnbridge Plan governs how Turnbridge will develop the Real Property Assets, and it speaks for itself. Turnbridge intends to

develop a high-end mixed-use luxury project in a manner substantially similar, if not identical, to the Debtors' development plans.

34. The Debtors' only justification for the Pure Acreage Methodology requires the assumption that any valuation which takes into account the Debtors' prior development plans must be abandoned because Turnbridge's plans will be different. In reality, Turnbridge's ultimate development is, in sum and substance, the same as the Debtors' prebankruptcy development plan.

**B.   Alternative Methodology: Professional Appraisal Methods**

35. The Debtors ignore the Cushman Report, which individually appraised the three components of Phase 1A and Phase 1B, which together comprise the Real Property Assets. The components individually valued by Cushman are essentially the same components to be developed by Turnbridge under the Turnbridge Plan.

36. The Cushman Report ascribed the following "As If Complete" value to Phase 1A:

| PROPOSED SILVERROCK DEVELOPMENT - PHASE 1A - All Components | |
| --- | --- |
| **Hypothetical Market Value As Complete** | **Indicated Value** |
| Proposed Montage Residences (Ultra-Luxury) | $148,000,000 |
| Proposed Pendry Residences (Lifestyle) | $125,300,000 |
| Proposed Hotel Component | $300,500,000 |
| **Hypothetical Value As If Complete :** | **$573,800,000** |

Accordingly, through the Cushman Report, the City ascribed each component of Phase 1A its own ascribed value as follows:

| Total Phase 1A Value | Values | % of Total |
| --- | --- | --- |
| Luxury Residences | $148,000,000.00 | 25.79% |
| Lifestyle Residences | $125,300,000.00 | 21.84% |
| Hotel Development | $300,500,000.00 | 52.37% |
| Total Phase 1A Value | $573,800,000.00 | 100.00% |

The Cushman Report then deducts from the "As If Complete" value the costs of completion to arrive at an "As Is" value for Phase 1A of $55,100,000:

110291108.2

| PROPOSED SILVERROCK DEVELOPMENT - PHASE 1A - All Components | |
|---|---|
| Hypothetical Market Value As Complete | Indicated Value |
| Proposed Montage Residences (Ultra-Luxury) | $148,000,000 |
| Proposed Pendry Residences (Lifestyle) | $125,300,000 |
| Proposed Hotel Component | $300,500,000 |
| Hypothetical Value As If Complete : | $573,800,000 |
| LESS: Construction Hard Costs | ($389,426,887) |
| LESS: Construction Soft Costs / Contingency (10% of HC) | ($38,942,689) |
| LESS: Municipal Contributions/Power Station | ($14,950,000) |
| LESS: 17% Entrepreneurial Incentive (applied to all costs) | ($75,364,328) |
| Indicated Market Value As Is (rounded): | $55,100,000 |
| Per Square Foot of Land Area: | $17.89 |

Compiled by Cushman & Wakefield Western, Inc.

37.     The Cushman Report similarly valued the Phase 1B Project, which consists of just one component, by finding its "As If Completed" value:

| PROPOSED SILVERROCK DEVELOPMENT - PHASE 1B - All Components | |
|---|---|
| Hypothetical Market Value As Complete | Indicated Value |
| SilverRock Phase II - Proposed SFR Homes | $541,900,000 |
| Hypothetical Market Value As If Complete : | $541,900,000 |

The Cushman Report again deducted the costs of completion to arrive at an "As Is" value for the Phase 1B Project of $14,900,000:

| PROPOSED SILVERROCK DEVELOPMENT - PHASE 1B - All Components | |
|---|---|
| Hypothetical Market Value As Complete | Indicated Value |
| SilverRock Phase II - Proposed SFR Homes | $541,900,000 |
| Hypothetical Market Value As If Complete : | $541,900,000 |
| LESS: Site Development Costs | ($17,702,784) |
| LESS: Construction Hard Costs | ($376,317,500) |
| LESS: Construction Soft Costs / Contingency (15% of HC) | ($56,447,625) |
| LESS: 17% Entrepreneurial Incentive (applied to all costs) | ($76,579,545) |
| Indicated Hypothetical Market Value As Is (rounded): | $14,900,000 |
| Per Square Foot of Land Area: | $6.73 |

Compiled by Cushman & Wakefield Western, Inc.

38.     The Cushman Report thus appraises the Real Property Assets by aggregating the "As Is" value of the Phase 1A Project and the "As Is" value of the Phase 1B Project:

|  | "As Is" Value | % of Total |
|---|---|---|
| Phase 1A | $55,100,000.00 | 78.714% |
| Phase 1B | $14,900,000.00 | 21.286% |
| Total: | $70,000,000.00 | 100.000% |

13

39.     Phase 1A is 78.714% of the total value of the Real Property Assets and should therefore be allocated 78.714% of the total Purchase Price (the "**Phase 1A Value**") with (i) the Luxury Residences receiving 25.79% of the Phase 1A Value (or approximately 20% of the total Purchased Price), (ii) the Lifestyle Residences receiving 21.84% of the Phase 1A Value (or approximately 17% of the total Purchase Price), and (iii) the Hotel Development receiving 52.37% of the Phase 1A Value (or approximately 41% of the total Purchase Price). The balance of the total Purchase Price—21.286%—would be allocated to Phase 1B.

40.     Because the Turnbridge Plan contains the same components as the Debtors' development plan, the components of the Turnbridge Plan should have the same relative values as the components of the Debtors' plan in the Cushman Report and/or a licensed appraiser, mutually agreeable to the Debtors' secured creditors, should determine the relative value of each component of the Turnbridge Plan individually and in a manner consistent with the Cushman Report.

C.     **Alternative Methodology: Tax Assessed Values**

41.     The Riverside County Tax Assessor is an independent third party which performs valuations of real property within Riverside County for purposes of calculating applicable real estate and other tax obligations.

42.     The Riverside County Tax Assessor categorized each parcel of land based on its intended use: resort hotel, commercial land, golf course, agricultural land, common areas, vacant residential lots, and single family dwellings. While discovery is needed to evaluate the exact methods used by the Riverside County Tax Assessor, including its application of a highest and best use analysis, the 2025 taxable values were necessarily derived after the cessation of development on Debtors' prior plans, and after the Debtors' bankruptcy cases were filed on August 5, 2024.

14

110291108.2

43.     Comparing each parcel's tax assessed value to the total tax assessed value of the

Real Property Assets derives a percentage allocation markedly different from the Pure Acreage

Allocation:

| | Acreage | 2025 Assessed Value | % of Assessed Value | % of Acreage | Assessed Value Allocation | Pure Acreage Allocation | Windfall/(Penalty) |
|---|---|---|---|---|---|---|---|
| Lot B 2020-0010 | 1.66 | 2,260,244.00 | 3.6595% | 1.2975% | $ 2,267,622.2289 | 803,984.13 | (1,456,259.87) |
| Lot C of 2020-0010 | 17.82 | 11,206,527.00 | 18.1443% | 13.9284% | $ 11,243,109.0331 | 8,630,721.15 | (2,575,805.85) |
| Parcel A - D of 2023-0003 | 30.71 | 10,630,684.00 | 17.2120% | 24.0034% | $ 10,665,386.2797 | 14,873,706.32 | 4,243,022.32 |
| Parcels A - C of 2020-0007 | 39.51 | 14,420,046.00 | 23.3473% | 30.8817% | $ 14,467,118.0858 | 19,135,790.84 | 4,715,744.84 |
| Parcel 12 of 37207 | 22.02 | 6,240,554.00 | 10.1040% | 17.2112% | $ 6,260,925.3562 | 10,664,897.86 | 4,424,343.86 |
| Lots 1 - 29 of 37730 | 10.67 | 17,003,171.00 | 27.5296% | 8.3398% | $ 17,058,675.3114 | 5,167,777.48 | (11,835,393.52) |
| Lots A through L of 37730 | 3.13 | 1,100.00 | 0.0018% | 2.4465% | $ 1,103.5908 | 1,515,945.97 | 1,514,845.97 |
| Parcel E of 37207 | 1.55 | 106.00 | 0.0002% | 1.2115% | $ 106.3460 | 750,708.07 | 750,602.07 |
| Parcel F of 37207 | 0.52 | 530.00 | 0.0009% | 0.4064% | $ 531.7301 | 251,850.45 | 251,320.45 |
| Parcel G of 37207 | 0.35 | 318.00 | 0.0005% | 0.2736% | $ 319.0381 | 169,514.73 | 169,196.73 |
| Totals | 127.94 | 61,763,280.00 | 100.0000% | 100.0000% | $ 61,964,897.0000 | 61,964,897.00 | |
| Initial Net Sale Proceeds | | 61,964,897.00 | | | | | |

44.     In fact, the Pure Acreage Methodology when compared to the tax assessment

methodology shows the Pure Acreage Methodology would result in a windfall to certain groups of

creditors, and a concomitant penalty to other groups, of approximately $16,000,000. Builders bears

the largest portion of the penalty, receiving approximately $12,000,000 less under the Pure Acreage

Methodology than indicated by the tax assessed values.[10]

### III.    CONCLUSION

45.     For the foregoing reasons, Builders respectfully requests that this Court deny the

Motion and approve an alternative allocation methodology consistent with this Objection.

[Signature on Next Page]

---

[10] Curiously, the per parcel analysis indicates a total assessed value of $61,763,280, which is within 3% of the initial net sale proceeds of $61,694,897. This may reflect that the tax assessed values were calculated or updated after the final sale price for the Real Property Assets was known, or inversely that Turnbridge's bid was informed by the tax assessed values. Discovery is needed to investigate these figures, but the alignment at minimum demonstrates that the tax assessed values have relevance to the ultimate allocation determination.

15

Dated: April 7, 2026

**POLSINELLI PC**
Stephen A. Smith, Esq. (DE Bar No. 7456)
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801
Telephone:              (302) 252-0920
Facsimile:              (302) 252-0291
Email:                  sasmith@polsinelli.com


-and-

*/s/ Michael L. Schuster*
Michael L. Schuster (*pro hac vice* ECF 925)
1401 Lawrence Street, Suite 2300
Denver, CO 80202
Telephone: (720) 931-1188
Facsimile: (302) 252-0921
Email:                  mschuster@polsinelli.com


**PACHULSKI STANG ZIEHL & JONES LLP**
James O'Neill, Esq. (DE Bar No. 4042)
919 North Market Street, 17th Floor
Wilmington, DE 19801
Telephone:              (302) 652-4100
Facsimile:              (302) 652 4400
Email:                  joneill@pszjlaw.com

- and -

Ira D. Kharasch, Esq. (*pro hac vice* ECF 940)
Gregory V. Demo, Esq. (*pro hac vice* ECF 935)
Jordan A. Kroop, Esq. (*pro hac vice* ECF 941)
1700 Broadway, 36th Floor
New York, NY 10019
Telephone:              (212) 561-7700
Facsimile:              (212) 561-7777
Email:                  ikharasch@pszjlaw.com
                        gdemo@pszjlaw.com
                        jkroop@pszjlaw.com

110291108.2