# EXHIBIT B

**Blackline**

*SOLICITATION VERSION*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>SILVERROCK DEVELOPMENT COMPANY, LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No.: 24-11647 (MFW)<br><br>(Jointly Administered) |

## ~~FIRST~~SECOND *AMENDED* COMBINED DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN OF LIQUIDATION OF SILVERROCK DEVELOPMENT COMPANY, LLC AND ITS DEBTOR AFFILIATES

**WILSON SONSINI GOODRICH & ROSATI, P.C.**

Erin R. Fay (No. 5268)
Shane M. Reil (No. 6195)
Catherine C. Lyons (No. 6854)
222 Delaware Avenue, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 304-7600
E-mails: efay@wsgr.com
        sreil@wsgr.com
        clyons@wsgr.com

*Co-Counsel to the Debtors
and Debtors in Possession*

**LAW OFFICES OF BENJAMIN M. CARSON, P.C.**

Benjamin M. Carson (admitted *pro hac vice*)
5965 Village Way, Suite E105
San Diego, California 92130
Telephone: (858) 255-4529
E-mail:  ben@benjamincarson.com

*-and-*

Victor A. Vilaplana (admitted *pro hac vice*)
823 La Jolla Rancho Road
La Jolla, California 92037
Telephone: (619) 840-4130
Email: vavilaplana@gmail.com

*Co-Counsel to the Debtors
and Debtors in Possession*

Dated: ~~April 7~~May 11, 2026

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: SilverRock Development Company, LLC (5730), RGC PA 789, LLC (5996), SilverRock Lifestyle Residences, LLC (0721), SilverRock Lodging, LLC (4493), SilverRock Luxury Residences, LLC (6598) and SilverRock Phase I, LLC (2247). The location of the Debtors' principal place of business and the Debtors' mailing address is 343 Fourth Avenue, San Diego, CA 92101.

*~~SOLICITATION VERSION~~*

**IMPORTANT INFORMATION REGARDING THIS
COMBINED DISCLOSURE STATEMENT AND PLAN[2]**

**THIS DISCLOSURE STATEMENT HAS BEEN CONDITIONALLY APPROVED BY THE BANKRUPTCY COURT FOR PURPOSES OF SOLICITATION OF THE PLAN BUT HAS NOT BEEN FINALLY APPROVED. THE INFORMATION CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN IS SUBJECT TO CHANGE.**

**The Debtors are soliciting votes on this Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation of SilverRock Development Company, LLC and its Debtor Affiliates from the Holders of Claims in Classes ~~3-15~~3-27.**

**If you are in Classes ~~3-15~~3-27, you are receiving this document and the accompanying materials because you are entitled to vote on the Plan. Before submitting a Ballot to vote on the Plan, you should review this Combined Disclosure Statement and Plan.**

**ABSENT THE WRITTEN CONSENT OF THE DEBTORS, ALL BALLOTS MUST BE PROPERLY COMPLETED, EXECUTED, AND DELIVERED ACCORDING TO THE VOTING INSTRUCTIONS IN THE BALLOTS AND THE SOLICITATION AND TABULATION PROCEDURES, AS MODIFIED HEREIN, SO THAT THE BALLOTS ARE ACTUALLY RECEIVED BY THE DEBTORS' CLAIMS AGENT, RELIABLE COMPANIES, NO LATER THAN MAY ~~8~~13, 2026 AT ~~5:00 P.M~~4:00 P.M. (PREVAILING EASTERN TIME) (the "EXTENDED VOTING DEADLINE"). BALLOTS ~~MUST~~MAY BE SUBMITTED TO THE CLAIMS AGENT BY PHYSICAL DELIVERY OR MAIL OR BY EMAIL TO: GMATTHEWS@RELIABLE-CO.COM, DEL@RELIABLE-CO.COM, ERIN FAY (EFAY@WSGR.COM) AND CATHERINE LYONS (CLYONS@WSGR.COM).**

To vote, you must deliver, prior to the Voting Deadline, an original, completed, and executed Ballot in the pre-addressed postage-paid envelope that accompanied your Ballot or as follows:

SilverRock Ballot Processing
c/o Reliable Companies
Attn:  Gene Matthews
1007 North Orange Street, Suite 110
Wilmington, DE 19801


or


By email to: gmatthews@reliable-co.com, del@reliable-co.com, Erin Fay (efay@wsgr.com) and Catherine Lyons (clyons@wsgr.com) so that your Ballot is received on or before the Voting Deadline.

---

[2]   Capitalized terms used but not defined in this section shall have the meanings ascribed to them elsewhere in this Combined Disclosure Statement and Plan.

*SOLICITATION VERSION*

**PLEASE READ YOUR BALLOT CAREFULLY FOR FURTHER INFORMATION AND INSTRUCTIONS. FAILURE TO ABIDE BY SUCH INSTRUCTIONS MAY RESULT IN YOUR BALLOT NOT BEING COUNTED.**

**The Debtors urge each holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Combined Disclosure Statement and Plan, and each proposed transaction contemplated thereby.**

**The Debtors strongly encourage holders of Claims in Classes 3-153-27 to read this Combined Disclosure Statement and Plan (including the Risk Factors described in Article VI hereof) in its entirety before voting to accept or reject the Plan.  Assuming the requisite acceptances of the Plan are obtained, the Debtors will seek the Bankruptcy Court's final approval of the Disclosure Statement and confirmation of the Plan at the Combined Hearing.**

---

**RECOMMENDATION BY THE DEBTORS**

**THE DEBTORS' INDEPENDENT MANAGER HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY AND DESCRIBED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN, AND THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED HEREIN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.**

**THE DEBTORS THEREFORE STRONGLY RECOMMEND THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE ACTUALLY RECEIVED BY THE CLAIMS AND NOTICING AGENT OR COUNSEL TO THE DEBTORS BY NO LATER THAN MAY 813, 2026 AT 5:00 P.M4:00 P.M. (PREVAILING EASTERN TIME) PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND ON THE BALLOT.**

---

*SOLICITATION VERSION*

**PRELIMINARY STATEMENT AND DISCLAIMERS**

The Bankruptcy Court ~~has~~initially established **May 7, 2026 at 4:00 p.m. (prevailing Eastern Time)** as the deadline for filing and serving objections to final approval of the Disclosure Statement and confirmation of the Plan (the "Combined Disclosure Statement and Plan Objection Deadline"). *See* Docket No. 951. The Debtors have extended the Combined Disclosure Statement and Plan Deadline to May 13, 2026 at 4:00 p.m. (ET). Any objection to final approval of the Disclosure Statement or confirmation of the Plan must (a) be in writing, (b) comply with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the order entered approving the disclosures in this Combined Disclosure Statement and Plan on an interim basis (the "Interim Approval and Procedures Order") [Docket No. 951], (c) state, with specificity, the legal and factual bases thereof, and (d) be filed with the Bankruptcy Court and served on the Debtors no later than the Combined Disclosure Statement and Plan Objection Deadline.

A hearing on final approval of the Disclosure Statement and confirmation of the Plan (as such hearing may be continued from time to time, the "Combined Hearing") will commence on **May ~~20~~21, 2026 at 10:30 a.m. (prevailing Eastern Time)** in the Bankruptcy Court before the Honorable Mary F. Walrath, 5th Floor, Courtroom No. 4, 824 N. Market Street, Wilmington, Delaware 19801. The Combined Hearing may be adjourned or continued from time to time by the Bankruptcy Court or the Debtors by announcement of the adjournment or continuance at a hearing before the Bankruptcy Court or by filing a notice on the docket of the Chapter 11 Cases. In accordance with the Plan, the Plan may be modified, if necessary, before, during, or as a result of the Combined Hearing without further action by the Debtors and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

**THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH CLAIM HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VI HEREIN.**

**HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS COMBINED DISCLOSURE**

*SOLICITATION VERSION*

**STATEMENT AND PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.**

**THIS COMBINED DISCLOSURE STATEMENT AND PLAN CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS AND ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.**

**IN PREPARING THIS COMBINED DISCLOSURE STATEMENT AND PLAN, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND CLAIMS AGAINST THE DEBTORS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS UTILIZED HEREIN. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.**

**THIS COMBINED DISCLOSURE STATEMENT AND PLAN DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, UNLESS OTHERWISE PROVIDED HEREIN.**

# TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW .................................................................................................. 2

    A.    Defined Terms. ................................................................................................... 2

    B.    Rules of Interpretation. .................................................................................... 17

    C.    Computation of Time. ................................................................................... ~~18~~19

    D.    Reference to Monetary Figures. ...................................................................... 19

    E.    Controlling Document. ..................................................................................... 19

ARTICLE II. UNCLASSIFIED CLAIMS ................................................................................ 19

    A.    Administrative Claims. .............................................................................. ~~19~~20

    B.    DIP Senior Claims and DIP Junior Claims. .............................................. ~~19~~20

    C.    Professional Fee Claims. ................................................................................. 20

    D.    Priority Tax Claims. ................................................................................... ~~20~~21

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ..... 21

    A.    Classification of Claims and Interests. ........................................................... 21

    B.    Treatment of Claims and Interests. ............................................................ ~~22~~23

    C.    Reservation of Rights Regarding Claims. .................................................. ~~29~~33

    D.    Elimination of Vacant Classes. .................................................................. ~~29~~34

    ~~E.~~    ~~Voting Classes, Presumed Acceptance by Non-Voting Classes.~~ ..................... 30

    ~~F~~E.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .................. ~~30~~34

ARTICLE IV. BACKGROUND AND DISCLOSURES .......................................................... ~~30~~34

    A.    Background of the Debtors ......................................................................... ~~30~~34

    B.    Description of the Project. .......................................................................... ~~30~~34

    C.    Overview of the Debtors' Corporate History and Structure ....................... ~~32~~36

    D.    Events Leading to the Chapter 11 Filings. ................................................ ~~33~~37

    E.    Events During the Chapter 11 Cases .......................................................... ~~37~~41

ARTICLE V. CONFIRMATION AND VOTING PROCEDURES ......................................... ~~50~~53

    A.    Confirmation Procedure .............................................................................. ~~50~~53

    B.    Procedure for Objections ............................................................................ ~~50~~53

    C.    Requirements for Confirmation .................................................................. ~~51~~54

    D.    Classification of Claims and Interests ........................................................ ~~52~~55

    E.    Impaired Claims or Interests ...................................................................... ~~53~~56

    F.    Confirmation Without Necessary Acceptances; Cramdown ...................... ~~53~~56

    G.    Best Interests Test and Liquidation ............................................................ ~~54~~57

    H.    Acceptance of the Plan ............................................................................... ~~55~~58

ARTICLE VI. CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING ....... ~~55~~58

    A.    Risk of Amendment, Waiver, Modification or Withdrawal of the Plan ..... ~~55~~58

    B.    Parties May Object to the Plan's Classification of Claims and Interests .... ~~56~~59

    C.    The Plan May Not Be Confirmed ............................................................... ~~56~~59

    D.    The Conditions Precedent to the Effective Date of the Plan May Not Occur ..... ~~56~~59

    E.    General Unsecured Creditors May Recover Less Than Projected ............... ~~56~~59

F.     The Allowed Amount of Claims May Differ from Current Estimates .......... 56 59

G.     Risks Related to Income Taxation .......... 57 60

H.     Litigation .......... 57 60

I.     Failure to Identify Litigation Claims or Projected Objections .......... 57 60

J.     No Waiver of Right to Object or Right to Recover Transfers and Assets .......... 57 60

K.     Certain Tax Considerations .......... 57 60

ARTICLE VII. MEANS FOR IMPLEMENTATION OF THE PLAN .......... 64 67

A.     Implementation of the Plan .......... 64 67

B.     Global Settlement and Funding of Sale Proceeds Reserve .......... 67

BC.     Corporate Existence. .......... 64 68

CD.     Dissolution Transactions. .......... 64 68

DE.     Litigation Trust. .......... 65 68

EF.     Corporate Governance, Directors and Officers. .......... 69 72

FG.     No Revesting of Assets. .......... 69 73

GH.     Creation and Maintenance of Trust Accounts. .......... 70 73

HI.     Substantive Consolidation of the Debtors. .......... 70 74

IJ.     Preservation of Causes of Action .......... 72 76

JK.     Cancellation and Surrender of Instruments, Securities and Other Documentation. .......... 72 76

KL.     Release of Liens. .......... 72 76

LM.     Effectuating Documents; Further Transactions. .......... 73 77

MN.     Substitution in Pending Legal Actions. .......... 73 77

ARTICLE VIII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES .......... 73 77

A.     Executory Contracts and Unexpired Leases. .......... 73 77

B.     Rejection Claims. .......... 73 77

C.     Special Provisions Governing Insurance. .......... 73 77

ARTICLE IX. PROVISIONS GOVERNING DISTRIBUTIONS .......... 76 79

A.     Distributions on Account of Claims Allowed as of the Effective Date. .......... 76 79

B.     Method of Distributions to Holders of Allowed Claims. .......... 76 80

C.     Rights and Powers of Disbursing Agent. .......... 76 80

D.     Disputed Claims Reserve. .......... 77 80

E.     Investment of Trust Accounts. .......... 77 81

F.     Delivery of Distributions and Undeliverable Distributions to Holders of Allowed Claims. .......... 77 81

G.     Recognition of Transfers After Distribution Record Date. .......... 78 82

H.     Minimum Distributions. .......... 78 82

I.     Compliance With Tax Requirements. .......... 78 82

J.     Manner of Payment Under the Plan. .......... 79 83

K.     Time Bar to Cash Payments .......... 79 83

L.     Setoffs .......... 79 83

M.     Allocation Between Principal and Accrued Interest .......... 80 83

N.     Distributions to Holders of Disputed Claims .......... 80 84

O.     Claims Paid or Payable by Third Parties .......... 80 84

ii

ARTICLE X. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS .................................................................................................. 8185

    A.    Allowance of Claims. ............................................................................... 8185
    B.    Prosecution of Objections to Claims ...................................................... 8185
    C.    Estimation of Claims. .............................................................................. 8286
    D.    Claims Subject to Pending Actions. ........................................................ 8286
    E.    Offer of Judgment. .................................................................................. 8286
    F.    No Distributions Pending Allowance. ..................................................... 8387
    G.    Distributions After Allowance. ............................................................... 8387
    H.    No Postpetition Interest on Claims. ......................................................... 8387

ARTICLE XI. EFFECT OF PLAN ON CLAIMS AND INTERESTS .................................. 8387
    A.    Binding Effect ......................................................................................... 8387
    B.    Treatment of Claims ............................................................................... 8387

ARTICLE XII. RELEASE, INJUNCTION, AND RELATED PROVISIONS ...................... 8488
    A.    Non-Discharge of the Debtors; Injunction. ........................................... 8488
    B.    Releases by the Debtors. .......................................................................... 8589
    C.    Releases by Holders of Claims. ............................................................... 8589
    D.    Exculpation and Limitation of Liability ................................................ 8790
    E.    City ~~Settlement Contribution~~ 87Release ................................. 91

ARTICLE XIII. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ...... 8891
    A.    Conditions Precedent to the Effective Date. ........................................... 8891
    B.    Waiver of Conditions. ............................................................................. 8892
    C.    Effect of Failure of Conditions. .............................................................. 8892

ARTICLE XIV. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN .... 8992
    A.    Modification and Amendments. ............................................................... 8992
    B.    Effect of Confirmation on Modifications. ............................................... 8993
    C.    Revocation or Withdrawal of Plan. ......................................................... 8993

ARTICLE XV. RETENTION OF JURISDICTION ............................................................ 8993

ARTICLE XVI. MISCELLANEOUS PROVISIONS ........................................................... 9195
    A.    Binding Effect. ......................................................................................... 9195
    B.    No Stay of Combined Order .................................................................... 9195
    C.    Post-Effective Date Compromises and Settlements. ............................... 9195
    D.    Additional Documents. ............................................................................ 9295
    E.    Payment of Statutory Fees; Filing of Quarterly Reports. ....................... 9295
    F.    Reservation of Rights. ............................................................................. 9296
    G.    Successors and Assigns. .......................................................................... 9296
    H.    Term of Injunctions or Stays. ................................................................. 9396
    I.    Plan Supplement; Global Settlement. ..................................................... 9396
    J.    Severability of Plan Provisions. .............................................................. 9396
    K.    Headings. ................................................................................................. 9397
    L.    Governing Law. ....................................................................................... 9397

iv

M.        Notices .................................................................................................................... ~~93~~97

ARTICLE XVII. REQUEST FOR CONFIRMATION ....................................................... ~~94~~97
A.        Request for Confirmation ...................................................................................... ~~94~~97

## INTRODUCTION

Pursuant to sections 1121(a) and 1125 of the Bankruptcy Code, the Debtors propose this *First**Second** Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation of SilverRock Development Company, LLC and its Debtor Affiliates*, as it may be amended, modified, or supplemented from time to time in accordance with the terms thereof (including all appendices, exhibits, schedules, and supplements (including the Plan Supplement) thereto to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes on the Plan and the Combined Hearing to consider confirmation thereof. The Debtors are the proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. Other agreements and documents may supplement this Plan; such items may have been or may be filed with the Bankruptcy Court. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and Article XIII, the Debtors reserve the right to alter, supplement, amend, or modify (one or more times), revoke, or withdraw the Plan prior to its substantial consummation.

The purpose of the Disclosure Statement is to describe the Plan and its provisions and to provide adequate information, as required under section 1125 of the Bankruptcy Code, to Holders of Claims against the Debtors who have the right to vote on the Plan so they can make informed decisions doing so. Holders of Claims entitled to vote to accept or reject the Plan will receive a Ballot together with this Combined Disclosure Statement and Plan to enable them to vote in accordance with the voting instructions and make any other elections or representations required pursuant to the Plan.

This Combined Disclosure Statement and Plan includes information pertaining to the Debtors' prepetition business operations and financial history and the events leading up to the Chapter 11 Cases. In addition, this Combined Disclosure Statement and Plan includes the effects of confirmation of the Plan, certain risk factors associated with the Plan, the way Distributions will be made, the confirmation process, and confirmation requirements.

The Bankruptcy Court entered the Interim Approval and Procedures Order on April 8, 2026 approving on an interim basis the Disclosure Statement contained in this Combined Disclosure Statement and Plan, as containing "adequate information" in compliance with section 1125 of the Bankruptcy Code. Entry of the Interim Approval and Procedures Order does not constitute a judgment by the Bankruptcy Court as to the desirability of the Plan or as to the value or suitability of any consideration proposed thereunder. The Bankruptcy Court's interim approval of the Disclosure Statement contained herein does indicate, however, that the Bankruptcy Court has determined on an interim basis that the Disclosure Statement contains adequate information to permit a Holder entitled to vote on the Plan to make an informed judgment in doing so. The adequacy of the Disclosure Statement is still subject to final approval by the Bankruptcy Court at the Combined Hearing.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY AND CONSULT WITH THEIR RESPECTIVE LEGAL,**

BUSINESS, FINANCIAL, TAX, AND OTHER ADVISORS BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

The Debtors believe that confirmation and consummation of the Plan are in the best interests of the Debtors, their Estates, and their creditors. The Plan provides for, among other things, (i) the substantive consolidation of the Debtors' assets and liabilities for the purposes of implementing, voting on, and calculating and making Distributions under the Plan, assessing whether the Confirmation standards have been met, and filing certain post-Confirmation reports and paying certain fees and (ii) the establishment of a Litigation Trust and appointment of a Litigation Trustee to implement the terms of the Plan, including the investigation and prosecution of Retained Causes of Action, the liquidation of the Debtors' Remaining Assets, and the Distribution of the net proceeds thereof to Holders of Allowed Claims in accordance with the relative priorities established in the Bankruptcy Code.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Debtors urge all eligible Holders of Claims entitled to vote on the Plan to ACCEPT the Plan and to complete and submit their Ballots so that they will be RECEIVED by the Claims Agent on or before the Voting Deadline.

ARTICLE I.
DEFINED TERMS, RULES OF INTERPRETATION,
COMPUTATION OF TIME, AND GOVERNING LAW

A.      *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1. "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 327, 328, 330, 365, 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates and operating the Debtors' business incurred on or after the Petition Date and through the Effective Date; (b) Allowed Professional Fee Claims; and (c) all fees and charges assessed against the Estates under chapter 123 of the Judicial Code.

2. "*Administrative Claims Bar Date*" means the deadline for Filing all requests for allowance and payment of Administrative Claims, which, except in the case of Professional Fee Claims, shall be thirty (30) days after the Effective Date.

3. "*Affiliates*" has the meaning set forth in section 101(2) of the Bankruptcy Code, as if such Entity were a debtor in a case under the Bankruptcy Code.

4. "*Allocation Methodology*" means the Debtors' methodology for allocation of the net proceeds of the Sale to the various parcels of real property comprising the Purchased Assets (as defined in the Sale Order), as detailed in the Allocation Motion.

5. "*Allocation Motion*" mean the motion Filed on March 24, 2026 [Docket No. 913] with the Bankruptcy Court requesting approval of the Allocation Methodology and the Allocation Schedule.

2

~~6. "*Allocation Schedule*" means, collectively, the schedules set forth on pages 30-32 of the Allocation Motion and attached thereto as Exhibit C, respectively, and as corrected in those schedules attached as **Exhibit A** hereto, as the same may be amended, modified, or supplemented from time to time in accordance with the terms thereof and hereof.~~

4. ~~7.~~ "*Allowed*" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that has been scheduled by the Debtors on the Schedules as other than Disputed, contingent or unliquidated and as to which no proof of claim has been Filed (subject to the Debtors' and the Litigation Trustee's right to amend the Schedules); (b) a Claim that is set forth in a Filed proof of claim as to which no objection has been Filed on or before the Claims Objection Deadline, and which is not otherwise a Disputed Claim; (c) a Claim that has been allowed by a Final Order; (d) a Claim that is allowed: (i) in any stipulation or agreement executed by the Debtors prior to the Effective Date and approved by the Bankruptcy Court, (ii) in any stipulation executed by the Litigation Trustee on or after the Effective Date, or (iii) in any contract, instrument, indenture or other agreement entered into or assumed by the Debtors in connection and accordance with the Plan.; or (e) a Claim that is allowed pursuant to the terms of the Plan.

5. ~~8.~~ "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or the Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including avoidable or fraudulent transfer laws.

6. "*Axia Talus*" means Axia Talus, LLC.

7. "*Axia Talus Secured Claim*" means the Secured portion of any Claims asserted by of Axia Talus subject to the resolution of the Remaining Disputes.

8. "*Backstop Settlement Payment*" means a Cash payment to Poppy in the amount of $1,190,000 under the terms of the Global Settlement that the City will instruct to be paid from the collateral of the City presently held in escrow by the Debtors for the benefit of the City as DIP Lender pursuant to paragraph 5 of the DIP Amendment Order.

9. "*Ballot*" means the applicable form or forms of ballot(s) distributed to Holders of Claims entitled to vote on the Plan and on which the acceptance or rejection of the Plan is to be indicated.

10. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

11. "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

12. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure.

3

13. "***BAR Architects***" means BAR Architects & Interiors.

14. "***BAR Architects Secured Claim***" means the Secured portion of any Claims asserted by BAR Architects subject to the resolution of the Remaining Disputes.

15. 13. "***Bar Date***" means, as applicable, the Administrative Claims Bar Date and any other date or dates established by an order of the Bankruptcy Court by which Proofs of Claim or requests for payment of Administrative Claims must be Filed, including pursuant to the *Order (I) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim, Including 503(b)(9) Claims, and Requests for Payment of Administrative Expenses; (II) Approving the Form and Manner of Notice Thereof; and (III) Granting Related Relief* [Docket No. 472], and subject to any extension granted by the Debtors or the Litigation Trustee.

16. 14. "***Builders Capital***" means Construction Loan Services II, LLC d/b/a Builders Capital.

15. "***Builders/Poppy Dispute***" means the dispute primarily between Poppy and Builders Capital regarding the Disputed Residential Collateral, but which dispute may also include Granite.

17. 16. "***Builders Capital Secured Claim***" means the Secured portion of any Claims asserted by Builders Capital, as reflected on the Allocation Schedule subject to resolution of the Remaining Disputes.

17. "***Builders/Poppy Reserve Account***" means an account established and funded with the Builders/Poppy Reserve Amount in connection with the Effective Date for purposes of reserving funds for Distributions on account of Allowed Secured Claims of Poppy, Granite, or Builders Capital, respectively, if any, upon resolution of the dispute with respect to the Disputed Residential Collateral between Poppy, Granite, and Builders and in accordance with the Allocation Schedule and this Plan.

18. "***Builders/Poppy Reserve Amount***" means the amount denominated as such in the Allocation Schedule.

18. 19. "***Business Day***" means any day other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)) or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the State of Delaware.

19. 20. "***Buyer***" has the meaning set forth in the Sale Order.

20. 21. "***Cash***" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

21. 22. "***Causes of Action***" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, judgments, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or

4

non-contingent, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state, provincial, or federal law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence; (c) the right to object to or otherwise contest Claims or Interests; (d) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any Avoidance Actions.

22. ~~23.~~ "*Chapter 11 Cases*" means the Debtors' voluntary chapter 11 bankruptcy cases, which are being jointly administered under the caption *In re SilverRock Development Company, LLC, et al.*, Case No. 24-11647 (MFW).

23. ~~24.~~ "*City ~~Settlement Contribution~~*" ~~means the amount in dollars representing the difference between any amount paid by the DIP Lender to Poppy on account of the Poppy Indemnity and $3,250,000, subject to the terms and conditions set forth in Article XII.E below.~~*Additional Funding*" means an additional amount of $1,050,000 to be funded by the City under the terms of the Global Settlement which shall be used to provide initial funding for the Litigation Trust and to pay Administrative Claims required under the Plan.

~~25.  "*City Settlement Offerees*" means, all parties, other than Poppy, whom the Bankruptcy Court, by Final Order, determines are entitled to a distribution of net proceeds of the Sale on account of the disposition of the parcels that are identified in paragraph 5 of Exhibit 3 to the Final DIP Order.~~

24. ~~26.~~ "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

25. ~~27.~~ "*Claims and Noticing Agent*" means Reliable Companies d/b/a Reliable, the claims and noticing agent retained by the Debtors in the Chapter 11 Cases.

26. ~~28.~~ "*Claims Objection Deadline*" means the date that is six (6) months after the Effective Date, which date may be extended pursuant to an order of the Bankruptcy Court upon a motion filed by the Litigation Trustee.

27. ~~29.~~ "*Claims Register*" means the official register of Claims and Interests maintained by the Claims and Noticing Agent.

28. ~~30.~~ "*Class*" means a class of Claims or Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

29. "*Cockrell Electric*" means Cockrell Electric Inc.

5

30. "*Cockrell Electric Secured Claim*" means the Secured portion of any Claims asserted by Cockrell Electric subject to resolution of the Remaining Disputes.

31. "*Combined Hearing*" means the hearing to be held by the Bankruptcy Court on confirmation of the Plan and final approval of the Combined Disclosure Statement and Plan, as such hearing may be continued from time to time.

32. "*Combined Order*" means the order entered by the Bankruptcy Court on the docket of the Chapter 11 Cases approving the Combined Disclosure Statement and Plan on a final basis and confirming the Plan.

33. "*Confirmation*" means the Bankruptcy Court's entry of the Combined Order on the docket of the Chapter 11 Cases.

34. "*Confirmation Date*" means the date the Combined Order is entered on the docket of the Chapter 11 Cases.

35. "*Converted Secured Creditors*" mean those parties who executed unwind agreements with the Debtors during the Chapter 11 Cases regarding their alleged security interests in the Debtors' assets and as a result of such execution became either holders of preferred equity or general unsecured creditors.

36. "*Cypress*" means Cypress Point Holdings, LLC.

37. "*Cypress Secured Claim*" means the Secured portion of any Claims asserted by Cypress subject to the resolution of the Remaining Disputes.

38. ~~35.~~ "*Debtors*" means, collectively, each of the following: SilverRock Development Company, LLC, RGC PA 789, LLC, SilverRock Lifestyle Residences, LLC, SilverRock Lodging, LLC, SilverRock Luxury Residences, LLC and SilverRock Phase I, LLC.

39. ~~36.~~ "*Debtor Related Party*" means, with respect to the Debtors, each of, and in each case solely in its capacity as such, the Debtors' current directors, managers, officers, members of any governing body, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals and advisors and any such Debtor Related Party's respective heirs, executors, estates, and nominees; *provided* that the Robert Green Parties and Cypress or any of its affiliated or related Persons or Entities shall not be Debtor Related Parties.

40. ~~37.~~ "*Debtor Release*" means the release set forth in Article XII.B of the Plan.

41. ~~38.~~ "*Deficiency Claim*" means the portion of any Claim (which, for the avoidance of doubt, may be 100% of such Claim) asserted by the Holder thereof to be Secured that~~, upon the application of the Allocation Methodology,~~ as set forth in the Allocation Schedule, is unsecured is determined to be unsecured, including in connection with any resolution of the Remaining Disputes.

6

42. 39. "*DIP Amendment*" means the amendment to the DIP Credit Facility pursuant to the DIP Motion and DIP Order.

43. 40. "*DIP Amendment Motion*" means the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors' Entry Into Amendment to the DIP Credit Agreement; (II) Authorizing the Debtors to Execute and Deliver the Supplemental Deed of Trust; and (III) Granting Related Relief* [Docket No. 653].

44. 41. "*DIP Amendment Order*" means the order of the Bankruptcy Court approving the DIP Amendment Motion [Docket No. 760].

45. 42. "*DIP Amendment Reserve*" means the funds set aside in reserve pursuant to paragraph 5 of the DIP Amendment Order, i.e., $1,190,400.44 as of the date hereof.

46. 43. "*DIP Beneficial Interests*" mean*Claims*" means, collectively, the DIP Junior Beneficial InterestsClaims and the DIP Senior Beneficial InterestsClaims.

47. 44. "*DIP Collateral*" means the collateral securing the DIP Credit Facility, as set forth more specifically in the DIP Credit Agreement and any security documents relating thereto.

48. 45. "*DIP Credit Agreement*" means that certain *Debtor-in-Possession Credit Facility Loan and Security Agreement*, including all exhibits, annexes, and schedules thereto, as amended by the DIP Amendment and the same as has been, and may be, further amended, modified, restated or supplemented in accordance with the terms thereof and the DIP Orders.

49. 46. "*DIP Credit Facility*" means that certain senior secured postpetition financing facility provided pursuant to the terms and conditions of the DIP Documents.

50. 47. "*DIP Documents*" means, collectively, the DIP Orders, the DIP Credit Agreement, the DIP Amendment, and any other agreements, documents, and instruments delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, instruments, financing and other equivalent statements, notices and related documents, as any of the foregoing may be amended, modified, restated, or supplemented from time to time in accordance with the terms thereof and the DIP Orders.

48. "*DIP Junior Beneficial Interests*" means the second-priority beneficial interest in the Litigation Trust granted to the DIP Lender pursuant to the terms hereof and in consideration of the DIP Junior Claims.

51. 49. "*DIP Junior Claims*" means all Claims of the DIP Lender arising under, derived from, or based on the Wind Down Expense Contribution, which DIP Junior Claims shall have the priorities set forth in the DIP Documents.

52. 50. "*DIP Lender*" or the "*City*" means the City of La Quinta, California, a municipal corporation and charter city organized and existing under the laws of the State of California.

53. 51. "***DIP Motion***" means the *Motion of Debtors Pursuant to Sections 105, 361, 362,363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rule 4001, and Local Rule 4001-2, for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing from the City Of La Quinta; (II) Granting Non-Priming DIP Lender Liens and Super-Priority Claims; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* [Docket No. 125].

54. 52. "***DIP Obligations***" shall have the meaning given to such term in the DIP Orders.

55. 53. "***DIP Orders***" means, collectively, the Interim DIP Orders, the Final DIP Order, and the DIP Amendment Order.

54. "***DIP Senior Beneficial Interests***" means the first priority beneficial interest in the Litigation Trust granted to the DIP Lender pursuant to the terms hereof in consideration of the DIP Senior Claims, which shall entitle the DIP Lender to receive first priority distributions from the Litigation Trust (except to the extent provided in Article III.B.10 below).

56. 55. "***DIP Senior Claims***" means any and all Claims of the DIP Lender arising under, derived from, or based upon the DIP Documents, including the Poppy Indemnity Claim (if any), all amounts outstanding in respect of principal, interest, fees, expenses, costs, penalties and other charges arising under the DIP Documents, but excluding the DIP Junior Claims, which DIP Senior Claims shall have the priorities set forth in the DIP Documents.

57. 56. "***Disallowed***" means with respect to any Claim or portion thereof, any Claim against the Debtors which: (a) has been disallowed, in whole or part, by a Final Order; (b) has been withdrawn by agreement of the Holder thereof and the Debtors or Litigation Trustee, as applicable, in whole or in part; (c) has been withdrawn, in whole or in part, by the Holder thereof; (d) if listed in the Schedules as zero or as disputed, contingent or unliquidated and in respect of which a Proof of Claim has not been timely filed or deemed timely filed pursuant to this Plan, the Bankruptcy Code or any Final Order or other applicable law; (e) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the filed amount of any Proof of Claim; (f) is evidenced by a Proof of Claim which has been filed, or which has been deemed to be filed, under applicable law or order of the Bankruptcy Court or which is required to be filed by order of the Bankruptcy Court, in each case but as to which such Proof of Claim was not timely or properly filed; (g) is unenforceable to the extent provided in section 502(b) of the Bankruptcy Code; and (h) where the holder of a Claim is a Person or Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, unless such Person, Entity or transferee has paid the amount, or turned over any such property, for which such Person, Entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of the Bankruptcy Code. In each case a Disallowed Claim is disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination, or estimation.

58. 57. "***Disbursing Agent***" means (a) the Litigation Trustee, or any Entity designated by the Litigation Trustee to make or facilitate Distributions contemplated under the Plan, and (b) the

Debtors, solely with respect to Distributions that are required to be made on the Effective Date by the Debtors under the Plan.

59. 58. "**Disclosure Statement**" means the *First*Second *Amended Disclosure Statement for the Joint Chapter 11 Plan of Liquidation of SilverRock Development Company, LLC and its Debtor Affiliates*, as set forth herein and as the same may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and referenced therein, each as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof or hereof.

60. 59. "**Disputed**" means, with respect to any Claim, a Claim: (a) listed on the Schedules as unliquidated, disputed or contingent, unless a Proof of Claim has been Filed in a liquidated and non-contingent amount and no objection to such Proof of Claim has been timely filed; (b) included in a Proof of Claim as to which an objection or request for estimation has been timely filed, or as to which the Debtors or the Litigation Trustee, as applicable, or other parties in interest, retain the ability to interpose a timely objection or request for estimation; or (c) which is otherwise disputed by the Debtors or the Litigation Trustee, as applicable, in accordance with applicable law and for which the objection, request for estimation, or dispute has not been withdrawn or determined by a Final Order.  Claims that are Allowed by the Plan or that have been Allowed by a Final Order shall not be Disputed Claims. For the avoidance of doubt, all Claims subject to the resolution of the Remaining Disputes shall be considered "Disputed" unless and until such Claims are resolved.

61. 60. "**Disputed Claims Reserve**" means a Cash reserve, if any, that may be funded by the Litigation Trustee with a portion of the Litigation Trust Assets for Distribution to Litigation Trust Beneficiaries holding Disputed Claims, if and to the extent that such Disputed Claims become Allowed Claims. For purposes of the Disputed Claims Reserve only, Disputed Claims will be valued at an amount equal to (a) the amount set forth on either the Schedules or the Filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Litigation Trustee; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating a Disputed Claim.

61. "**Disputed Residential Collateral**" means Lots 1-5, 9-12, 15-16, 18-19, and 27-29 of Tract No. 37730 of the real property previously owned by the Debtors.

62. "**Dissolution Transactions**" means the transactions that the Litigation Trustee determines to be necessary or appropriate to implement the terms of the Plan, and that ultimately result in the dissolution or other termination of the corporate entities that comprise the Debtors.

63. "**Distribution**" means a distribution made or facilitated by the Disbursing Agent pursuant to the Plan.

64. "**Distribution Date**" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Litigation Trustee, on or after the Effective Date, upon which the Disbursing Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under the Plan.

65. "***Distribution Record Date***" means the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the Confirmation Date, or such other date as designated in a Final Order of the Bankruptcy Court.

66. "***EB-5 Beneficial Interests***" means the beneficial interests in the Litigation Trust granted to the EB-5 Lenders pursuant to the terms hereof in consideration of the EB-5 Litigation Trust Funding.

66. 67. "***EB-5 Lenders***" mean SilverRock Resort Investment, LLC and SilverRock Resort Investment M, LLC, two subsidiaries of First Pathways Partners, LLC for the purposes of providing funding pursuant to the EB-5 Immigrant Investor Program, a federal program administered by the United States Citizenship and Immigration Services.

68. "***EB-5 Litigation Trust Funding***" means $2,101,142.23 which shall be contributed by the EB-5 Lenders, from their recovery on account of the EB-5 Secured Claim as Litigation Trust funding, utilized to pay Allowed Administrative Claims under the terms hereof, and/or utilized to pay other amounts as agreed between the parties to the EB-5 Settlement.

67. 69. "***EB-5 Secured Claim***" means the Secured portion of any ClaimClaims asserted by the EB-5 Lenders as reflected in the Allocation Schedule and the EB-5 Settlementsubject to resolution of the Remaining Disputes.

70. "***EB-5 Settlement***" means that certain settlement agreed to between the Debtors, the DIP Lender, and the EB-5 Lenders, which provides for, among other things, the allowance of the EB-5 Secured Claim, the provision by the EB-5 Lenders of the EB-5 Litigation Trust Funding, the granting of the EB-5 Beneficial Interests to the EB-5 Lenders, and mutual releases between the parties all as set forth in greater detail in the Plan Supplement.

68. 71. "***Effective Date***" means the date that is the first Business Day on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in Article XIII.B of the Plan have been satisfied or waived in accordance with Article XIII.C of the Plan.

69. 72. "***Entity***" has the meaning set forth in section 101(15) of the Bankruptcy Code.

70. 73. "***Estate***" means as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case.

71. 74. "***Exculpated Parties***" means collectively, and in each case in its or their capacity as such: (a) the Debtors and the Estates; (b) the Debtors' independent manager; and (c) with respect to each of the foregoing entities in (a) and (b), solely to the extent acting in a fiduciary capacity on behalf of the Estates, such entities' respective Related Parties; *provided*, *however,* that the Robert Green Parties shall not be Exculpated Parties.

72. ~~75.~~ "*Executory Contract*" or "*Unexpired Lease*" means a contract or lease to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

73. ~~76.~~ "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

74. ~~77.~~ "*Final DIP Order*" means, collectively, those certain orders of the Bankruptcy Court entered on the docket of the Chapter 11 Cases on January 23, 2025 and April 25, 2025, respectively, approving the DIP Motion on a final basis [Docket Nos. 330 & 437].

75. ~~78.~~ "*Final Distribution Date*" means, for a particular Class of Claims, the Distribution Date upon which final Distributions to Holders thereof are to be made as provided under the Litigation Trust Agreement.

76. ~~79.~~ "*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, that has not been reversed, stayed, modified, or amended, as entered on the docket in the Chapter 11 Cases or the docket of such other court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, re-argument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, re-argument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, re-argument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure, or any analogous Bankruptcy Rule (or analogous rules applicable in another court of competent jurisdiction), or sections 502(j) or 1144 of the Bankruptcy Code, may be filed with respect to such order will not preclude such order from being a Final Order.

77. ~~80.~~ "*Gauston*" means Gauston Corporation.

78. ~~81.~~ "*Gauston Secured Claim*" means the Secured portion of any Claims asserted by Gauston subject to the resolution of the ~~Poppy/RDO Dispute and any objections that may be asserted by the Debtors or the Litigation Trustee~~<u>Remaining Disputes</u>.

79. ~~82.~~ "*General Unsecured Claim*" means any Claim against any of the Debtors that is not: (a) an Administrative Claim; (b) a Professional Fee Claim; (c) a Priority Tax Claim; (d) a DIP Senior Claim; (e) a DIP Junior Claim; (f) a Secured Tax Claim; (g) a Priority Non-Tax Claim; (h) a Keillor Secured Claim; (i) a Poppy Secured Claim; (j) a RDO Secured Claim; (k) a Granite Secured Claim; (l) a Builders Capital Secured Claim; (m) a Gauston Secured Claim; (n) a Rowan Secured Claim; (o) an H&E Secured Claim; (p) a Robert Green Disputed Secured Claim, (q) an EB-5 Secured Claim, (r) a Vermillions Secured Claim, (s) a Traub Secured Claim, (t) a Subordinated Claim, ~~or~~ (u) an Intercompany Claim, <u>(v) a Cypress Secured Claim, (w) an Axia Secured Claim, (x) a Goetz Secured Claim, (y) a Young's Secured Claim, (z) a 20/20 Secured Claim, (aa) a Gensler Secured Claim, (bb) a MSA</u>

Consulting Secured Claim, (cc) a BAR Architects Secured Claim, (dd) a Cockrell Electric Secured Claim, (ee) a Trimark Raygal Secured Claim, (ff) a J. Ginger Masonry Secured Claim, or (gg) a White's Steel Secured Claim.  For the avoidance of doubt, all Deficiency Claims shall constitute General Unsecured Claims.

80. "*Gensler*" means M. Arthur Gensler Jr. & Associates, Inc.

81. "*Gensler Secured Claim*" means the Secured portion of any Claims asserted by Gensler subject to resolution of the Remaining Disputes.

82. "*Global Settlement*" means that certain Global Settlement Agreement, dated May 8, 2026 [Docket No. 1107].

83. "*Goetzes*" means Richard and Lehn Goetz.

84. "*Goetz Secured Claim*" means the Secured portion of any Claims asserted by the Goetzes subject to resolution of the Remaining Disputes.

85. 83. "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

86. 84. "*Granite*" means Granite Construction, ~~Inc~~ Company.

85. "*Granite/Poppy Dispute*" means that certain dispute as to priority of liens between Granite and Poppy on the real property formerly owned by the Debtors encumbered by Granite's mechanic's liens and Poppy's deed of trust.

87. 86. "*Granite Secured Claim*" means the Secured portion of any Claims asserted by Granite subject to resolution of the ~~Granite/Poppy Dispute and any objections that may be asserted by the Debtors or the Litigation Trustee~~Remaining Disputes.

88. 87. "*GUC Beneficial Interests*" means the beneficial interests in the Litigation Trust distributable on a pro rata basis to Holders of Allowed General Unsecured Claims.

89. 88. "*H&E*" means H&E Equipment Services, Inc.

90. 89. "*H&E Secured Claim*" means the Secured portion of any Claims asserted by H&E, subject to resolution of the ~~Poppy/RDO Dispute and any objections that may be asserted by the Debtors or the Litigation Trustee~~Remaining Disputes.

91. 90. "*Holder*" means a Person or an Entity, as applicable, holding a Claim against or an Interest in any of the Debtors.

92. 91. "*Impaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

93. 92. "*Intercompany Claim*" means a Claim against any Debtor by another Debtor.

94. 93. "*Interests*" means any equity security (as such term is defined in section 101(16) of the Bankruptcy Code) of the Debtors, including all issued, unissued, authorized, or outstanding shares of capital stock and any other common stock, preferred stock, common limited liability company membership interests, preferred limited liability company membership interests and any other equity, ownership or profits interests of the Debtors, including all options, warrants, rights, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in either of the Debtors, whether or not arising under or in connection with any employment agreement, and whether or not certificated, transferable, preferred, common, voting, or denominated "stock," or similar security, that existed immediately before the Effective Date.

95. 94. "*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

96. 95. "*Insurance Contract*" means insurance policies, including any and all directors' and officers' liability insurance policies, that have been issued at any time to provide coverage to the Debtors and all agreements, documents or instruments relating thereto, *excluding* any such policies that are, or have been, assumed and assigned to the Buyer on or before the Effective Date pursuant to the Purchase and Sale Agreement, the Sale Order, and section 365 of the Bankruptcy" Code.

97. 96. "*Interim DIP Orders*" means those certain orders of the Bankruptcy Court entered on the docket of the Chapter 11 Cases on October 1, 18, and 31, 2024, and December 6, 2024, approving the DIP Motion on an interim basis [Docket Nos. 162, 188, 208 & 243].

98. 97. "*IRS*" means the United States Internal Revenue Service.

99. "*J. Ginger Masonry*" means J. Ginger Masonry.

100. "*J. Ginger Masonry Secured Claim*" means the Secured portion of any Claims asserted by J. Ginger Masonry subject to resolution of the Remaining Disputes.

101. 98. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time.

102. 99. "*Keillor*" means Keillor Capital, as servicer on behalf of and together with creditors RAF Pacifica Loan Opportunity Fund I, LLC and The Arnold Fishman Revocable Trust dated July 15, 1999.

103. 100. "*Keillor Secured Claim*" means the Secured portion of any Claims asserted by Keillor, as reflected on the Allocation Schedule subject to resolution of the Remaining Disputes.

104. 101. "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code.

13

105.    102. "*Litigation Trust*" means the trust established pursuant to Article VII hereof to, among other things, hold the Litigation Trust Assets and make distributions pursuant to the Plan.

106.    103. "*Litigation Trust Agreement*" means the trust agreement governing the Litigation Trust and setting forth, among other things, the duties and powers of the Litigation Trustee to be filed with the Plan Supplement.

107.    104. "*Litigation Trust Assets*" means (a) all Remaining Assets, (b) all Retained Causes of Action (including any Privilege Rights), and (c) the portion of the City Additional Funding allocated to the Litigation Trust Funding.

108.    105. "*Litigation Trust Beneficiaries*" means the holders of the DIPPoppy Beneficial Interests, EB-5 Beneficial Interests, and the GUC Beneficial Interests.

106. "*Litigation Trust Funding*" means the portion of the EB-5 Litigation Trust Funding contributed to the Litigation Trust together with any other trust funding as agreed between additional funders, the DIP Lender, and the Debtors and as may be further described in the Plan Supplement.

109.    107. "*Litigation Trustee*" means the trustee or trustees appointed by the Debtors, in consultation with the DIP Lender, the EB-5 Lenders, and any other party who contributes to the Litigation Trust Funding, in her, his, or their capacity as trustee of the Litigation Trust.

110.    108. "*Local Rules*" means the Local Rules of the United States Bankruptcy Court for the District of Delaware.

111.    "*MSA Consulting*" means MSA Consulting, Inc.

112.    "*MSA Consulting Secured Claim*" means the Secured portion of any Claims asserted by MSA Consulting subject to resolution of the Remaining Disputes.

113.    109. "*Non-Debtor Related Party*" means, with respect to any non-Debtor Person or Entity, each of, and in each case solely in its capacity as such, such Person's or Entity's current and former directors, managers, officers, committee members, members of any governing body, advisory board members, members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, management companies, fund advisors or managers, predecessors, participants, successors, assigns, representatives, subsidiaries, Affiliates, partners, limited partners, general partners, principals, employees, agents, trustees, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, and other professionals and advisors and any such Related Party's respective heirs, executors, estates, and nominees.

114.    110. "*Person*" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group, a Governmental Entity, or any legal entity or association.

14

115.   111. "*Petition Date*" means August 5, 2024.

116.   112. "*Plan*" means this joint chapter 11 plan of liquidation, including all exhibits, annexes, and schedules hereto, including the Plan Supplement, as such documents may be amended, supplemented, or modified from time to time.

117.   113. "*Plan Supplement*" means the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, including, without limitation, (i) the identity of the initial Litigation Trustee, (ii) the Litigation Trust Agreement, (iii) the non-exclusive schedule of Retained Causes of Action, , (iv) the EB-5 Settlement, (v) further information or documents related to the Litigation Trust Funding, if any, (viv) the schedule of Executory Contracts and Unexpired Leases to be assumed and assigned to the Litigation Trust; and (viivi) the amended and/or restated loan security documentation governing the DIP Liens with respect to the Litigation Trust, as set forth in Article II.B hereof, as all of the same may be amended, supplemented, or modified from time to time. Such documents (or substantially final forms thereof) will be filed with the Bankruptcy Court on or before seven (7) days prior to the Voting Deadline.

118.   114. "*Poppy*" means Poppy Bank.

119.   "*Poppy Beneficial Interests*" mean the beneficial interests in the Litigation Trust that will be granted to Poppy pursuant to the terms of the Global Settlement and that will entitle it to a priority distribution from the Litigation Trust of up to $2,060,000 to the extent that all Administrative Claims, Professional Fee Claims, Priority Tax Claims, Priority Non-Tax Claims, and Allowed Secured Claims have been satisfied in accordance with the terms hereof.

120.   115. "*Poppy Indemnity*" means the indemnity set forth in paragraph 10(l) of the Final DIP Order, as modified by the DIP Amendment Order.

121.   116. "*Poppy Indemnity Claim*" means any Claim of the DIP Lender against the Debtors' Estates arising from the Poppy Indemnity, if anywhich is addressed in the Global Settlement.

122.   117. "*Poppy Secured Claim*" means the Secured portion of any Claims asserted by Poppy, as reflected on the Allocation Schedule, andincluding the Poppy Indemnity Claim, subject, in part, to the resolution of the Poppy/RDO Dispute and the Builders/Poppy Dispute, and any objections that may be asserted by the Debtors or the Litigation TrusteeRemaining Disputes.

118. "*Poppy/RDO Dispute*" means the disputes set forth in that certain adversary proceeding captioned *R.D. Olson Construction, Inc. v. Poppy Bank*, Adv. Pro. No. 25-51049 (MFW) pending in the Chapter 11 Cases.

119. "*Poppy/RDO/Granite Reserve Account*" means an account established and funded with the Poppy/RDO/Granite Reserve Amount in connection with the Effective Date for purposes of reserving funds for Distributions on account of Allowed Secured Claims of Poppy, RDO, Gauston, Rowan, H&E, Vermillions, and/or Granite, respectively, if any, upon resolution

15

~~of the Poppy/RDO Dispute and Granite/Poppy Dispute, and in accordance with the Allocation Schedule.~~

~~120. "*Poppy/RDO/Granite Reserve Amount*" means the amount denominated as such in the Allocation Schedule.~~

123.   ~~121.~~ "*Priority Non-Tax Claim*" means a Claim that is entitled to priority under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

124.   ~~122.~~ "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

125.   ~~123.~~ "*Privilege Rights*" means any attorney-client privilege, attorney work-product protection or any other similar privileges or protections from disclosure associated with the Litigation Trust Assets belonging to or operating in favor of the Debtors and their advisors.

126.   ~~124.~~ "*Pro Rata Share*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in such Class.

127.   ~~125.~~ "*Professional*" means a Person or Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 105, 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 105, 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

128.   ~~126.~~ "*Professional Fee Claim*" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code, subject to any professional fee cap as set forth in the Global Settlement.

129.   ~~127.~~ "*Professional Fee Reserve*" means a segregated interest-bearing account to be established by the Debtors into which the Professional Fee Reserve Amount shall be deposited on or before the Effective Date.

130.   ~~128.~~ "*Professional Fee Reserve Amount*" means the aggregate amount of Professional Fee Claims incurred or estimated in good faith to be incurred in connection with the Chapter 11 Cases prior to and as of the Effective Date and as may be capped as set forth in the Global Settlement.

131.   ~~129.~~ "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

132.   ~~130.~~ "*Purchase and Sale Agreement*" means the purchase and sale agreement between the Buyer and the Debtors, a copy of which was attached to the motion to approve the Sale [Docket No. 621].

133.    ~~131.~~ "**RDO**" means R.D. Olson Construction, Inc.

134.    ~~132.~~ "**RDO Secured Claim**" means the Secured portion of any Claims asserted by RDO, subject to the resolution of the ~~Poppy/RDO Dispute and any objections that may be asserted by the Debtors or the Litigation Trustee~~Remaining Disputes.

135.    ~~133.~~ "**Related Party**" means the Debtor Related Parties and the Non-Debtor Related Parties.

136.    ~~134.~~ "**Release Opt-Out**" means the item set forth in the Ballots for accepting or rejecting the Plan, pursuant to which Holders of Claims entitled to vote to accept or reject the Plan may opt out of the releases set forth in Article XII.C of the Plan.

137.    ~~135.~~ "**Released Party**" means, collectively, and in each case: (a) the Debtor Related Parties; and (b) the DIP Lender and the DIP Lender's Related Parties; ~~(c) Keillor; and (d) the EB-5 Lenders;~~ *provided, however*, that notwithstanding the foregoing, the Robert Green Parties shall not be Released Parties.

138.    ~~136.~~ "**Releasing Party**" means all Holders of Claims in Classes 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14 ~~and~~, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26 & 27 that vote to accept the Plan and do not timely submit a Release Opt-Out indicating such Holder's decision not to participate in the releases set forth in Article XII.C of the Plan.

139.    ~~137.~~ "**Remaining Assets**" means all assets of the Debtors or the Estates on the Effective Date (other than the Retained Causes of Action).

140.    "**Remaining Disputes**" means all issues related to valuation and the allocation of proceeds of the Sale, as well as the priority, extent and validity of liens, claims and interests against the Debtors, their assets, and the Sale proceeds, including without limitation, those of the Settling Creditors, which, for the avoidance of doubt, are preserved and subject to determination by further order of the Bankruptcy Court or as agreed between creditors.

141.    ~~138.~~ "**Retained Causes of Action**" means all Causes of Action, including without limitation all Causes of Action against the Robert Green Parties, **except** all rights of the Debtors (including rights of setoff and rights of recoupment, refunds, claims, counterclaims, demands, and the like) against, and rights of the Debtors to collect damages from, the Released Parties and any third parties released under the Plan, the Confirmation Order, or any other Final Order.

142.    ~~139.~~ "**Robert Green Parties**" shall mean (a) Robert S. Green Jr., (b) the Green Family Trust, an irrevocable trust created UAD September 25, 2003, (c) RGC La Quinta, LLC, (c) RGC PA 24510 LLC,  (d) RGC Financial, LLC, (e) RGC Preferred, LLC, (f) the Robert Green Company, (g) Robert Green Residential, Inc. ("RGRI"), (h) any other non-Debtor Persons affiliated with, managed or controlled by any Person in the preceding (a) – (g), (i) any trust related to any Person related to the Persons in the preceding (a) – (h), and (j) any family member of the Persons in the preceding (a) – (h).

17

143. ~~140.~~ "***Robert Green Secured Parties***" means the Robert Green Company and Robert Green Residential Inc.

144. ~~141.~~ "***Robert Green Disputed Secured Claim***" means the Secured portion of any Claims asserted by the Robert Green Secured Parties, ~~as reflected on the Allocation Schedule,~~ subject to any objections that may be asserted by the Debtors<u>,</u> the Litigation Trustee, or other parties.

145. ~~142.~~ "***Rowan***" means Rowan Incorporated d/b/a Rowan Electric, Inc.

146. ~~143.~~ "***Rowan Secured Claim***" means the Secured portion of any Claims asserted by Rowan ~~in its capacity as a subcontractor for RGRI and not in its capacity as a subcontractor for RDO~~, subject to the resolution of ~~any applicable intercreditor disputes and any objections that may be asserted by the Debtors or the Litigation Trustee~~<u>the Remaining Disputes</u>.

147. ~~144.~~ "***Sale***" means the sale of substantially all of the Debtors' assets to the Buyer pursuant to the Sale Order and Purchase and Sale Agreement~~.~~

148. ~~145.~~ "***Sale Order***" means the *Order (I) Approving the Sale of Assets to the Successful Bidder Free and Clear of all Claims, Liens, Interests, and Encumbrances; (II) Approving the Consensual Termination or Rejection of Ground Leases, Effective as of the Closing Date; (III) Approving Form of Grant Deed; and (IV) Granting Related Relief* [Docket No. 759].

149. "<u>***Sale Proceeds Reserve***</u><u>" means proceeds of the Sale, net of payments permitted to be made under the Sale Order, including the U.S. Trustee Quarterly Fees, which shall be disbursed to the Sale Proceeds Reserve Account.</u>

150. "<u>***Sale Proceeds Reserve Account***</u><u>" means a segregated interest-bearing account established by the Litigation Trust to hold the Net Sale Proceeds Reserve for payment to the Settling Creditors, any other Secured creditor asserting a Claim against the Sale proceeds, and SR Land, LLC in its capacity as holder of the SR Land TIC Interest, as determined by the Court or resolved among such parties. For the avoidance of doubt, the Litigation Trustee shall serve as Disbursing Agent with respect to the Sale Proceeds Reserve and the Sale Proceeds Reserve Account.</u>

151. ~~146.~~ "***Secured***" means, with respect to any Claim, a Claim that is secured by a Lien on property in which the Estates have an interest or that is subject to a valid right of setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the Estate's interest in such property or to the extent of the amount subject to such valid right of setoff, as applicable~~, as determined pursuant to section 506 of the Bankruptcy Code, the Allocation Motion, and the Allocation Schedule~~.

152. ~~147.~~ "***Secured Tax Claim***" means any Secured Claim against any Debtor that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations).

153.    148. "*Schedules*" means, collectively, the (a) schedules of assets and liabilities and (b) statements of financial affairs, as each may be amended and supplemented from time to time, Filed by the Debtors pursuant to section 521 of the Bankruptcy Code.

154.    "*Settling Creditors*" means the City, Builders Capital, RDO, Gauston, Poppy, the EB-5 Lenders, Keillor, the Traub Trust, SR Land II, LLC, Granite, White's Steel, and Rowan.

155.    "*Settling Creditor Released Parties*" means the Settling Creditors and their Non-Debtor Related Parties; *provided, however*, that none of the Robert Green Parties or Cypress or any of Cypress' affiliated or related Persons or Entities shall be Settling Creditor Released Parties.

156.    149. "*Subordinated Claim*" means any Claim against the Debtors that is subject to subordination under section 509(c), section 510(b), or section 510(c) of the Bankruptcy Code, including any Claim for reimbursement, indemnification, or contribution (except indemnification or reimbursement Claims assumed hereunder).

157.    150. "*Solicitation*" means the solicitation of votes to accept or reject the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

158.    151. "*Solicitation Materials*" means all documents, Ballots, forms, and other materials provided in connection with Solicitation of the Plan (other than the Disclosure Statement).

159.    152. "*Third-Party Release*" means the release set forth in Article XII.C of the Plan.

160.    153. "*Third-Party Payment*" means a payment made to the Holder of a Claim on account of such Claim by an Entity that is not a Debtor or the Litigation Trust.

161.    154. "*Traub Secured Claim*" means the Secured portion of any ClaimClaims asserted by the Traub Trust subject to resolution of the Remaining Disputes.

162.    "*Traub Trust*" means the Traub Family Revocable Trust dated January 22, 2015, as reflected on the Allocation Schedule, and subject to any objections that may be asserted by the Debtors or the Litigation Trustee.

163.    "*Trimark Raygal*" means Trimark Raygal LLC.

164.    "*Trimark Raygal Secured Claim*" means the Secured portion of any Claims asserted by Trimark Raygal subject to resolution of the Remaining Disputes.

165.    155. "*Trust Accounts*" means the bank accounts to be held in the name of the Litigation Trustee that are created pursuant to the terms hereof.

166.    156. "*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

167.   ~~157.~~ "*Vermillions*" means Vermillions Environmental Products & Applications, Inc.

168.   ~~158.~~ "*Vermillions Secured Claim*" means the Secured ~~Claim~~portion of any Claims asserted by Vermillions, subject to resolution of the ~~Poppy/RDO Dispute and any objections that may be asserted by the Debtors or the Litigation Trustee~~Remaining Disputes.

169.   ~~159.~~ "*Voting Deadline*" means ~~5:00 p.m~~4:00 p.m. (prevailing Eastern time) on May ~~8~~13, 2026, which is the deadline for submitting Ballots to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

170.   "*White's Steel*" means White's Steel, Inc.

171.   "*White's Steel Secured Claim*" means the Secured portion of any Claims asserted by White's Steel subject to resolution of the Remaining Disputes.

172.   ~~160.~~ "*Wind Down Expense Contribution*" shall have the meaning ascribed to such term in the DIP Amendment Order, in the aggregate principal amount of $2,000,000.00.

173.   "*Young's*" means YH-MCSV Fund I, LLC.

174.   "*Young's Secured Claim*" means the asserted Secured portion of any Claims asserted by of Young's subject to resolution of the Remaining Disputes.

175.   "*20/20*" means 20/20 Plumbing & Heating.

176.   "*20/20 Secured Claim*" means the Secured portion of any Claims asserted by 20/20 subject to resolution of the Remaining Disputes.

B.   *Rules of Interpretation.*

For purposes of this Combined Disclosure Statement and Plan:

(a)   in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)   capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)   unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)   unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided* that any capitalized terms herein which are defined with reference to another agreement are defined with

20

reference to such other agreement as of the date of this Combined Disclosure Statement and Plan, without giving effect to any termination of such other agreement or amendments to such capitalized terms in such other agreement following the date hereof;

(e)     any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns;

(f)     any references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company laws;

(g)     unless otherwise specified, all references herein to "Articles" are references to Articles hereof;

(h)     unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement;

(i)     unless otherwise specified, the words "herein," "hereof," and "hereto" refer to this Combined Disclosure Statement and Plan in its entirety rather than to a particular portion of this Combined Disclosure Statement and Plan;

(j)     unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply;

(k)     any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be;

(l)     all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's Case Management and Electronic Case Filing system;

(m)     all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated;

(n)     the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation";

(o)     references to "Proofs of Claim," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like, as applicable;

(p)     any immaterial effectuating provisions may be interpreted by the Debtors and the Litigation Trustee in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and

(q)     all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

C.      *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.      *Reference to Monetary Figures.*

All references in this Combined Disclosure Statement and Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

E.      *Controlling Document.*

In the event of an inconsistency between this Combined Disclosure Statement and Plan and the Plan Supplement or the Global Settlement, the terms of the relevant provision in the Plan Supplement or the Global Settlement, as applicable, shall control (unless stated otherwise in such Plan Supplement document or in the Combined Order).  In the event of an inconsistency between the Combined Order and this Combined Disclosure Statement and Plan or, the Plan Supplement, or the Global Settlement, the Combined Order shall control.

## ARTICLE II.
## UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims.*

Subject to the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code, unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Litigation Trustee, as applicable, or otherwise provided for under the Plan, each Holder of an Allowed Administrative Claim (other than holders of Professional Fee Claims) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim on either: (1) the Effective Date, or as soon as reasonably practicable thereafter; or (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than sixty (60) days after the date on which such Administrative Claim becomes an Allowed Administrative Claim.  Nothing herein shall prejudice the Debtors' rights and defenses regarding any asserted Administrative Claim.

B.      *DIP Senior Claims and DIP Junior Claims.*

~~On the Effective Date, in~~In full and final satisfaction of and in exchange for any remaining DIP ~~Senior~~ Claims, the DIP Lender ~~shall receive, on account of the DIP Senior Claims, the DIP Senior Beneficial Interests and payment of Cash in the amount of the DIP Amendment Reserve~~will receive the treatment and consideration in the Global Settlement.

~~After payment in full of the DIP Senior Claims, and to the extent that all Administrative Claims, Professional Fee Claims, Priority Tax Claims, Priority Non-Tax Claims, and Allowed Secured Claims have been satisfied in full in accordance with the terms hereof, and subject to the funding of any Trust Accounts and reserves provided for herein, the DIP Lender shall receive, on account of the DIP Junior Claims, the DIP Junior Beneficial Interests, which shall entitle the DIP Lender to payment of Cash up to the amount of the DIP Junior Claims from the proceeds available for distribution from the Litigation Trust before any Distributions are made to Holders of Allowed General Unsecured Claims (but subject to payments to be made to the EB-5 Lenders on account of the EB-5 Settlement, as set forth in Article III.B.10 below).~~

~~The DIP Liens shall remain in full force and effect on all assets transferred to the Litigation Trust to secure the obligations of the Debtors and Litigation Trust to the DIP Lender under the Plan (but subject to payments to be made to the EB-5 Lenders on account of the EB-5 Settlement, as set forth in Article III.B.10 below), including, without limitation, the obligations to make distributions under the Plan on account of the DIP Beneficial Interests. Amended and/or restated loan security documentation governing the DIP Liens with respect to the Litigation Trust shall be included in the Plan Supplement.~~

C.      *Professional Fee Claims.*

All Professionals seeking an award by the Bankruptcy Court of Professional Fee Claims (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date and (b) shall be paid in full from the Professional Fee Reserve Account in such amounts as are Allowed by the Bankruptcy Court (i) upon the later of the Effective Date and the date upon which the order relating to any such Allowed Professional Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the Holder of such an Allowed Professional Fee Claim and the Litigation Trustee; *provided*, that ~~to the extent Cash in the Professional Fee Reserve Account is insufficient to pay in full~~, as set forth in the Global Settlement, the total amount of all Allowed Professional Fee Claims ~~incurred prior to the Effective Date, such Allowed Professional Fee Claims shall be paid from the~~ shall be reduced on a pro rata basis not to exceed the sum of unencumbered Cash on hand, the remainder of the Wind Down Expense Contribution and the portion of the City Additional Funding that is not earmarked for Litigation Trust ~~Assets~~Funding.

On or prior to the Effective Date, the Debtors shall fund the Professional Fee Reserve Account with Cash equal to the Professional Fee Reserve Amount. The funds for the Professional Fee Reserve shall be disbursed and deemed disbursed by the Debtors on the Effective Date. Funds held in the Professional Fee Reserve Account shall not be considered property of the Estates or the Litigation Trust, but the Litigation Trust shall have a reversionary

interest in any unused portion of the Professional Fee Reserve Account after all Allowed Professional Fee Claims have been irrevocably paid in full. On and after the Effective Date, the Professional Fee Reserve Account shall be held by the Litigation Trust for the benefit of Professionals and for no other parties until all Allowed Professional Fee Claims have been paid in full. Professional Fee Claims owing to the applicable Professionals shall be paid in full, in Cash, to such Professional from funds held in the Professional Fee Reserve Account when such Claims are (a) Allowed by an order of the Bankruptcy Court or (b) if earlier, authorized to be paid under the *Order, Pursuant to Sections 105(a) and 331 of the Bankruptcy Code, Bankruptcy Rule 2016(a), and Local Rule 2016-2, Establishing Procedures for Interim Compensation and Reimbursement of Professionals* [Docket No. 108]. No Liens, claims, or interests shall encumber the Professional Fee Reserve Account in any way, other than any customary liens in favor of the depository bank at which the Professional Fee Reserve Account is maintained.

D.    *Priority Tax Claims.*

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the Holder of a Priority Tax Claim and the Debtors or the Litigation Trustee, as applicable, each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors or the Litigation Trustee, as applicable, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, on account of and in full and complete settlement, satisfaction and release of such Claim, (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim or (ii) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; provided, however, that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the Litigation Trustee as they become due; provided, further, that, in the event an Allowed Priority Tax Claim that is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as Secured Tax Claim if such Claim is not otherwise paid in full.

Notwithstanding anything to the contrary in this Article II.D, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the Holder for actual pecuniary loss shall be treated as a General Unsecured Claim, and the Holder (other than as the Holder of a General Unsecured Claim) may not assess or attempt to collect such penalty from the Debtors or their respective property.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Classification of Claims and Interests.*

Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fits within the description of such other Classes. A Claim or an Interest also is classified in a

24

particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. The classification of Claims and Interests against the Debtors under the Plan is as follows:

| Class | Type of Claim or Interest | Impairment | Entitled to Vote | Estimated Percentage Recovery[3] |
|---|---|---|---|---|
| Class 1 | Secured Tax Claims | Unimpaired | No (Deemed to accept) | 100% |
| Class 2 | Priority Non-Tax Claims | Unimpaired | No (Deemed to accept) | 100% |
| Class 3 | Keillor Secured Claim | Impaired | Yes | ~~91.29~~100% |
| Class 4 | Builders Capital Secured Claim | Impaired | Yes | 100% |
| Class 5 | Poppy Secured Claim | Impaired | Yes | 100% |
| Class 6 | RDO Secured Claim | Impaired | Yes | 100% |
| Class 7 | Granite Secured Claim | Impaired | Yes | 100% |
| Class 8 | Gauston Secured Claim | Impaired | Yes | 100% |
| Class 9 | Rowan Secured Claim | Impaired | Yes | 100% |
| Class 10 | EB-5 Secured Claim | Impaired | Yes | 100% |
| Class 11 | H&E Secured Claim | Impaired | Yes | 100% |
| Class 12 | Vermillions Secured Claim | Impaired | Yes | 100% |
| Class 13 | Traub Secured Claim | Impaired | Yes | 100% |
| Class 14 | Cypress Secured Claim | Impaired | Yes | 100% |
| Class 15 | Axia Secured Claim | Impaired | Yes | 100% |
| Class 16 | Goetz Secured Claim | Impaired | Yes | 100% |
| Class 17 | Young's Secured Claim | Impaired | Yes | 100% |
| Class 18 | 20/20 Secured Claim | Impaired | Yes | 100% |
| Class 19 | Gensler Secured Claim | Impaired | Yes | 100% |
| Class 20 | MSA Consulting Secured Claim | Impaired | Yes | 100% |
| Class 21 | BAR Architects Secured Claim | Impaired | Yes | 100% |
| Class 22 | Cockrell Electric Secured Claim | Impaired | Yes | 100% |
| Class 23 | Trimark Raygal Secured Claim | Impaired | Yes | 100% |
| Class 24 | J. Ginger Masonry Secured Claim | Impaired | Yes | 100% |
| Class 25 | White's Steel Secured Claim | Impaired | Yes | 100% |
| Class ~~14~~26 | Robert Green Disputed Secured Claim | Impaired | Yes | 0%[4] |

---

[3]    As discussed in more detail below, subject to final resolution or determination of the Remaining Disputes, and as soon as reasonably practicable thereafter, Claims in Classes ~~4~~3 – ~~13~~25 will be paid in full in Cash in the amount of the Secured portion, if any, of such Claim ~~as determined in connection with the Allocation Methodology, as described in the Allocation Motion, and following resolution of any intercreditor disputes~~. The Deficiency Claim, if any, will be treated as a Class ~~15~~27 General Unsecured Claim. ~~Therefore, the estimated Claim recovery percentages reflected in this chart for Classes 4 – 13 are shown as a percentage of recovery for the Secured amount, if any, that will be determined in connection with the Allocation Methodology and following resolution of any intercreditor disputes, not as a percentage of any Filed Claims. Claim recovery amounts remain under review by the Debtors and their advisors.~~

[4]    The Debtors expect this claim will be objected to and that it is reasonably likely such claim will be disallowed in full.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote | Estimated Percentage Recovery[3] |
|---|---|---|---|---|
| Class ~~15~~27 | General Unsecured Claims | Impaired | Yes | To be determined[5] |
| Class ~~16~~28 | Subordinated Claims | Impaired | No (Deemed to reject) | 0% |
| Class ~~17~~29 | Intercompany Claims | Impaired | No (Deemed to reject) | 0% |
| Class ~~18~~30 | Interests | Impaired | No (Deemed to reject) | 0% |

B.      *Treatment of Claims and Interests.*

Each Holder of an Allowed Claim or Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, of such Holder's Allowed Claim or Interest, except to the extent different treatment is agreed to by the Debtors or the Litigation Trustee, as applicable, and the Holder of such Allowed Claim or Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1.   Class 1 –Secured Tax Claims

    (a)     *Classification*: Class 1 consists of all Secured Tax Claims.

    (b)     *Treatment*: Except to the extent that a Holder of an Allowed Secured Tax Claim and the Debtors or the Litigation Trustee, as applicable, agree to less favorable treatment for such Holder, each Holder of an Allowed Secured Tax Claim shall, at the option of the Debtors or the Litigation Trustee, as applicable, in exchange for full and final satisfaction of such Allowed Secured Tax Claim, (i) be paid in full in Cash including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, (ii) receive the collateral securing its Allowed Secured Tax Claim, or (iii) receive any other treatment that would render such Claim Unimpaired.

    (c)     *Voting*: Class 1 is Unimpaired under the Plan. Holders of Secured Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.   Class 2 –Priority Non-Tax Claims

---

[5]   Recoveries to general unsecured creditors will depend on litigation proceeds available from Retained Causes of Action to be asserted by the Litigation Trust, after taking into account distributions on account of the ~~EB-5~~Poppy Beneficial Interests ~~and remaining DIP Claims~~. Such recoveries are therefore inherently uncertain in amount and may be 0%.

26

(a)   *Classification*: Class 2 consists of all Priority Non-Tax Claims.

(b)   *Treatment*: Except to the extent that a Holder of an Allowed Priority Non-Tax Claim and the Debtors or the Litigation Trustee, as applicable, agree to less favorable treatment for such Holder, on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) 30 days following the date on which a Priority Non-Tax Claim becomes Allowed, the Holder of such Allowed Priority Non-Tax Claim shall receive, in full satisfaction thereof, either (a) Cash equal to the unpaid portion of the face amount of such Allowed Priority Non-Tax Claim; or (b) such other less favorable treatment as to which such Holder and the Debtors or the Litigation Trustee, as applicable, shall have agreed upon in writing.

(c)   *Voting*: Class 2 is Unimpaired under the Plan.  Holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.   Class 3 – Keillor Secured Claim

(a)   *Classification*: Class 3 consists of the Keillor Secured Claim.

(b) *Allowance*: On the Effective Date, the Keillor Secured Claim shall be deemed Allowed in the amount of $16,759,043.05.

(b)   (c) *Treatment*: ExceptSubject to final resolution or determination of the Remaining Disputes, and as soon as reasonably practicable thereafter, except to the extent that the Holder of the Keillor Secured Claim and the Debtors or the Litigation Trustee, as applicable, agree to less favorable treatment for such Holder, on or as soon as reasonably practicable after the Effective Date, the Holder of the Keillor Secured Claim shallwill receive, in exchange for full and final satisfaction, settlement and release of such Claim, receive payment of $15,300,000 in Cash.payment in full of the Allowed amount of such Claim in Cash. For the avoidance of doubt, any Deficiency Claim of the Holder of the Keillor Secured Claim shall constitute a Class 27 General Unsecured Claim.

(c)   (d) *Voting*: Class 3 is Impaired under the Plan. The Holder of the Keillor Secured Claim is entitled to vote to accept or reject the Plan.

4.   Class 4 – Builders Capital Secured Claim

(a)   *Classification*: Class 4 consists of the Builders Capital Secured Claim.

(b)   *Treatment*: Subject to the Allocation Methodology and Allocation Schedule and any objections that may be asserted by the Debtors or the Litigation Trust, andfinal resolution or determination of the Remaining

27

Disputes, and as soon as reasonably practicable thereafter, except to the extent that the Holder of the Builders Capital Secured Claim and the Debtors or the Litigation ~~Trust~~Trustee, as applicable, agree to less favorable treatment for such Holder~~, as soon as reasonably practicable after Allowance of the Builders Capital Secured Claim and resolution of the Builders/Poppy Dispute~~, the Holder of the Builders Capital Secured Claim will receive, in exchange for full and final satisfaction of such Claim, payment of such Claim in full of the Allowed amount of such Claim in Cash. For the avoidance of doubt, any Deficiency Claim of the Holder of the Builders Capital Secured Claim shall constitute a Class ~~15~~27 General Unsecured Claim.

(c)   *Voting:* Class 4 is Impaired under the Plan. The Holder of the Builders Capital Secured Claim is entitled to vote to accept or reject the Plan.

5.   Class 5 – Poppy Secured Claim

(a)   *Classification*: Class 5 consists of the Poppy Secured Claim.

(b)   *Treatment*: Subject to ~~the Allocation Methodology and Allocation Schedule,~~ final resolution ~~of the Poppy/RDO Dispute, final resolution of the Builders/Poppy Dispute, final resolution of the Granite/Poppy Dispute, and any objections that may be asserted by~~ the Debtors or the Litigation ~~Trust~~or determination of the Remaining Disputes, and as soon as reasonably practicable thereafter, except to the extent that the Holder of the Poppy Secured Claim and the Debtors or the Litigation Trustee, as applicable, agree to less favorable treatment for such Holder, the Holder of the Poppy Secured Claim will receive, in exchange for full and final satisfaction of such Claim, payment in full of the Allowed amount of such Claim in Cash. For the avoidance of doubt, any Deficiency Claim of the Holder of the Poppy Secured Claim shall constitute a Class ~~15~~27 General Unsecured Claim.[6]

(c)   *Voting:* Class 5 is Impaired under the Plan. The Holder of the Poppy Secured Claim is entitled to vote to accept or reject the Plan.

6.   Class 6 – RDO Secured Claim

(a)   *Classification*: Class 6 consists of the RDO Secured Claim.

(b)   *Treatment*: Subject to ~~the Allocation Methodology and Allocation Schedule,~~ final resolution ~~of the Poppy/RDO Dispute and any objections that may be asserted by~~ the Debtors or the Litigation ~~Trust~~or determination

---

[6]   For the avoidance of doubt, Poppy has agreed that the Backstop Settlement Payment and all payments received by Poppy from the Litigation Trust on account of it stepping into the City's first priority interest as DIP Lender shall be applied to reduce the amount of Poppy's liens asserted against the parcels that were subject to the Backstop Indemnity.

of the Remaining Disputes, and as soon as reasonably practicable thereafter, except to the extent that the Holder of the RDO Secured Claim and the Debtors or the Litigation Trustee, as applicable, agree to less favorable treatment for such Holder, the Holder of the RDO Secured Claim will receive, in exchange for full and final satisfaction of such Claim, payment in full of the Allowed amount of such Claim in Cash. For the avoidance of doubt, any Deficiency Claim of the Holder of the RDO Secured Claim shall constitute a Class ~~15~~27 General Unsecured Claim.

(c)   *Voting:* Class 6 is Impaired under the Plan.  The Holder of the RDO Secured Claim is entitled to vote to accept or reject the Plan.

7.   <u>Class 7 – Granite Secured Claim</u>

(a)   *Classification*: Class 7 consists of the Granite Secured Claim.

(b)   *Treatment*: Subject to ~~the Allocation Methodology and Allocation Schedule,~~ final resolution ~~of the Poppy/RDO Dispute, Granite/Poppy Dispute, the Builders/Poppy Dispute, and any objections that may be asserted by the Debtors or the Litigation Trust~~<u>or determination of the Remaining Disputes</u>, and as soon as reasonably practicable thereafter, except to the extent that the Holder of the Granite Secured Claim and the Debtors or the Litigation Trustee, as applicable, agree to less favorable treatment for such Holder, the Holder of the Granite Secured Claim will receive, in exchange for full and final satisfaction of such Claim, payment in full of the Allowed amount of such Claim in Cash. For the avoidance of doubt, any Deficiency Claim of the Holder of the Granite Secured Claim shall constitute a Class ~~15~~27 General Unsecured Claim.

(c)   *Voting:* Class 7 is Impaired under the Plan. The Holder of the Granite Secured Claim is entitled to vote to accept or reject the Plan.

8.   <u>Class 8 – Gauston Secured Claim</u>

(a)   *Classification*: Class 8 consists of the Gauston Secured Claim.

(b)   *Treatment*: Subject to ~~the Allocation Methodology and Allocation Schedule,~~ final resolution ~~of the Poppy/RDO Dispute and any objections that may be asserted by the Debtors or the Litigation Trust~~<u>or determination of the Remaining Disputes</u>, and as soon as reasonably practicable thereafter, except to the extent that the Holder of the Gauston Secured Claim and the Debtors or the Litigation Trustee, as applicable, agree to less favorable treatment for such Holder, the Holder of the Gauston Secured Claim will receive, in exchange for full and final satisfaction of such Claim, payment in full of the Allowed amount of such Claim in Cash ~~from the Poppy/RDO/Granite Reserve Account~~. For the avoidance of

doubt, any Deficiency Claim of the Holder of the Gauston Secured Claim shall constitute a Class ~~15~~27 General Unsecured Claim.

(c)   *Voting:* Class 8 is Impaired under the Plan.  The Holder of the Gauston Secured Claim is entitled to vote to accept or reject the Plan.

9.   Class 9 – Rowan Secured Claim

(a)   *Classification:* Class 9 consists of the Rowan Secured Claim.

(b)   *Treatment:* Subject to ~~the Allocation Methodology and Allocation Schedule,~~ final resolution ~~of the Poppy/RDO Dispute and any objections that may be asserted by the Debtors or the Litigation Trust~~or determination of the Remaining Disputes, and as soon as reasonably practicable thereafter, except to the extent the Holder of the Rowan Secured Claim and the Debtors or the Litigation Trustee, as applicable, agree to less favorable treatment for such Holder, the Holder of the Rowan Secured Claim will receive, in exchange for full and final satisfaction of such Claim, payment in full of the Allowed amount of such Claim in Cash. For the avoidance of doubt, any Deficiency Claim of the Holder of the Rowan Secured Claim shall constitute a Class ~~15~~27 General Unsecured Claim.

(c)   *Voting:* Class 9 is Impaired under the Plan. The Holder of the Rowan Secured Claim is entitled to vote to accept or reject the Plan.

10.   Class 10 – EB-5 Secured Claim

(a)   *Classification*: Class 10 consists of the EB-5 Secured Claim.

(b)   ~~*Allowance:* Pursuant to the EB-5 Settlement, the EB~~*Treatment*: Subject to final resolution or determination of the Remaining Disputes, and as soon as reasonably practicable thereafter, except to the extent that the Holder of the EB-5 Secured Claim and the Debtors or the Litigation Trustee, as applicable, agree to less favorable treatment for such Holder, the Holder of the EB-5 Secured Claim will receive, in exchange for full and final satisfaction of such Claim, payment in full of the Allowed amount of such Claim in Cash. For the avoidance of doubt, any Deficiency Claim of the Holder of the EB-5 Secured Claim shall ~~be Allowed in the amount of $3,301,142.23~~constitute a Class 27 General Unsecured Claim.

~~(c) *Treatment*: Pursuant to the EB-5 Settlement, the EB-5 Secured Claim shall be treated as follows: (i) on the Effective Date, or as soon as reasonably practicable thereafter, the EB-5 Lenders shall receive a Cash distribution in the amount of $1,200,000; (ii) the remaining $2,101,142.23 of the EB-5 Lenders' recovery on account of the Allowed EB-5 Secured Claim shall be initially utilized as funding for the Litigation Trust and/or utilized to pay Allowed Administrative Claims under the terms hereof and/or as may otherwise be agreed among the Debtors, the EB-5 Lenders, and the City~~

(defined below); (c) the EB-5 Lenders' remaining Claim, over and above the Allowed EB-5 Secured Claim, shall be deemed an Allowed General Unsecured Claim in the amount of $17,503,867.04; and (d) the EB-5 Lenders shall receive the EB-5 Beneficial Interests, which shall entitle the EB-5 Lenders to receive 55% of the first $3,820,258.60 in proceeds distributed by the Litigation Trust on account of its Allowed EB-5 Secured Claim. Upon the distribution of $2,101,142.23 to the EB-5 Lenders from Litigation Trust proceeds and repayment of the DIP Senior Claims and DIP Junior Claims, the EB-5 Lenders shall share *pro rata* with other Holders of Allowed General Unsecured Claims with respect to any further distributions from the Litigation Trust.

    (c)    *Voting:* Class 10 is Impaired under the Plan. The Holders of the EB-5 Secured Claim are entitled to vote to accept or reject the Plan.

11. Class 11 – H&E Secured Claim

    (a)    *Classification*: Class 11 consists of the H&E Secured Claim.

    (b)    *Treatment*: Subject to final resolution or determination of the Remaining Disputes, and as soon as reasonably practicable thereafter, except to the extent that the Holder of the H&E Secured Claim and the Debtors or the Litigation Trustee, as applicable, agree to less favorable treatment for such Holder, the Holder of the H&E Secured Claim will receive, in exchange for full and final satisfaction of such Claim, payment in full of the Allowed amount of such Claim in Cash. For the avoidance of doubt, any Deficiency Claim of the Holder of the H&E Secured Claim shall constitute a Class 27 General Unsecured Claim.

    (c)    *Voting:* Class 11 is Impaired under the Plan. The Holder of the H&E Secured Claim is entitled to vote to accept or reject the Plan.

12. Class 12 – Vermillions Secured Claim

    (a)    *Classification*: Class 12 consists of the Vermillions Secured Claim.

    (b)    *Treatment*: Subject to final resolution or determination of the Remaining Disputes, and as soon as reasonably practicable thereafter, except to the extent that the Holder of the Vermillions Secured Claim and the Debtors or the Litigation Trustee, as applicable, agree to less favorable treatment for such Holder, the Holder of the Vermillions Secured Claim will receive, in exchange for full and final satisfaction of such Claim, payment of such Claim in full in Cash. For the avoidance of doubt, any Deficiency Claim of the Holder of the Vermillions Secured Claim shall constitute a Class 27 General Unsecured Claim.

(c)    *Voting:* Class 12 is Impaired under the Plan. The Holder of the Vermillions Secured Claim is entitled to vote to accept or reject the Plan.

13. Class 13 –Traub Secured Claim

(a)    *Classification:* Class 13 consists of the Traub Secured Claim.

(b)    *Treatment:* Subject to final resolution or determination of the Remaining Disputes, and as soon as reasonably practicable thereafter, and except to the extent that the Holder of the Traub Secured Claim and the Debtors or the Litigation Trustee, as applicable, agree to less favorable treatment for such Holder, the Holder of the Traub Secured Claim will receive, in exchange for full and final satisfaction of such Claim, payment of such Claim in full in Cash. For the avoidance of doubt, any Deficiency Claim of the Holder of the Traub Secured Claim shall constitute a Class 27 General Unsecured Claim.

(c)    *Voting:* Class 13 is Impaired under the Plan. The Holder of the Traub Secured Claim is entitled to vote to accept or reject the Plan.

14. Class 14 – Cypress Secured Claim

(a)    *Classification:* Class 14 consists of the Cypress Secured Claim.

(b)    *Treatment:* Subject to final resolution or determination of the Remaining Disputes, and as soon as reasonably practicable thereafter, except to the extent that the Holder of the Cypress Secured Claim and the Debtors or the Litigation Trustee, as applicable, agree to less favorable treatment for such Holder, the Holder of the Cypress Secured Claim will receive, in exchange for full and final satisfaction of such Claim, payment of such Claim in full in Cash. For avoidance of doubt, any Deficiency Claim of the Holder of the Cypress Secured Claim shall constitute a Class 27 General Unsecured Claim.

(c)    *Voting:* Class 14 is Impaired under the Plan. The Holder of the Cypress Secured Claim is entitled to vote to accept or reject the Plan.

15. Class 15 – Axia Secured Claim

(a)    *Classification:* Class 15 consists of the Axia Secured Claim.

(b)    *Treatment:* Subject to final resolution or determination of the Remaining Disputes, and as soon as reasonably practicable thereafter, except to the extent that the Holder of the Axia Secured Claim and the Debtors or the Litigation Trustee, as applicable, agree to less favorable treatment for such Holder, the Holder of the Axia Secured Claim will receive, in exchange for full and final satisfaction of such Claim, payment of such Claim in full in Cash. For the avoidance of doubt, any Deficiency Claim of the Holder

of the Axia Secured Claim shall constitute a Class 27 General Unsecured Claim.

(c)    *Voting:* Class 15 is Impaired under the Plan. The Holder of the Axia Secured Claim is entitled to vote to accept or reject the Plan.

16. Class 16 – Goetz Secured Claim

(a)    *Classification:* Class 16 consists of the Goetz Secured Claim.

(b)    *Treatment:* Subject to final resolution or determination of the Remaining Disputes, and as soon as reasonably practicable thereafter, except to the extent that the Holder of the Goetz Secured Claim and the Debtors or the Litigation Trustee, as applicable, agree to less favorable treatment for such Holder, the Holder of the Goetz Secured Claim will receive, in exchange for full and final satisfaction of such Claim, payment of such Claim in full in Cash. For the avoidance of doubt, any Deficiency Claim of the Holder of the Goetz Secured Claim shall constitute a Class 27 General Unsecured Claim.

(c)    (d) *Voting:* Class ~~10~~16 is Impaired under the Plan. The ~~Holders~~Holder of the ~~EB-5~~Goetz Secured Claim ~~are~~is entitled to vote to accept or reject the Plan.

17. ~~11.~~ Class ~~11 – H&E~~17 – Young's Secured Claim

(a)    *Classification:* Class ~~11~~17 consists of the ~~H&E~~Young's Secured Claim.

(b)    *Treatment:* Subject to ~~the Allocation Methodology and Allocation Schedule,~~ final resolution ~~of the Poppy/RDO Dispute and any objections that may be asserted by the Debtors or the Litigation Trust~~or determination of the Remaining Disputes, and as soon as reasonably practicable thereafter, except to the extent that the Holder of the ~~H&E~~Young's Secured Claim and the Debtors or the Litigation Trustee, as applicable, agree to less favorable treatment for such Holder, the Holder of the ~~H&E~~Young's Secured Claim will receive, in exchange for full and final satisfaction of such Claim, payment ~~in full of the Allowed amount~~ of such Claim in full in Cash. For the avoidance of doubt, any Deficiency Claim of the Holder of the ~~H&E~~Young's Secured Claim shall constitute a Class ~~15~~27 General Unsecured Claim.

(c)    *Voting:* Class 17 is Impaired under the Plan. The Holder of the Young's Secured Claim is entitled to vote to accept or reject the Plan.

18. Class 18 – 20/20 Secured Claim

(a)    *Classification:* Class 18 consists of the 20/20 Secured Claim.

(b) *Treatment:* Subject to final resolution or determination of the Remaining Disputes, and as soon as reasonably practicable thereafter, except to the extent that the Holder of the 20/20 Secured Claim and the Debtors or the Litigation Trustee, as applicable, agree to less favorable treatment for such Holder, the Holder of the 20/20 Secured Claim will receive, in exchange for full and final satisfaction of such Claim, payment of such Claim in full in Cash. For the avoidance of doubt, any Deficiency Claim of the Holder of the 20/20 Secured Claim shall constitute a Class 27 General Unsecured Claim.

(c) *Voting:* Class 18 is Impaired under the Plan. The Holder of the 20/20 Secured Claim is entitled to vote to accept or reject the Plan.

19. Class 19 – Gensler Secured Claim

(a) *Classification:* Class 19 consists of the Gensler Secured Claim.

(b) *Treatment:* Subject to final resolution or determination of the Remaining Disputes, and as soon as reasonably practicable thereafter, except to the extent that the Holder of the Gensler Secured Claim and the Debtors or the Litigation Trustee, as applicable, agree to less favorable treatment for such Holder, the Holder of the Gensler Secured Claim will receive, in exchange for full and final satisfaction of such Claim, payment of such Claim in full in Cash. For the avoidance of doubt, any Deficiency Claim of the Holder of the Gensler Secured Claim shall constitute a Class 27 General Unsecured Claim.

(c) *Voting:* Class 1119 is Impaired under the Plan. The Holder of the H&EGensler Secured Claim is entitled to vote to accept or reject the Plan.

20. 12. Class 12 – Vermillions20 – MSA Consulting Secured Claim

(a) *Classification:* Class 1220 consists of the VermillionsMSA Consulting Secured Claim.

(b) *Treatment:* Subject to the Allocation Methodology and Allocation Schedule, final resolution of the Poppy/RDO Dispute and any objections that may be asserted by the Debtors or the Litigation Trust, andor determination of the Remaining Disputes, and as soon as reasonably practicable thereafter, except to the extent that the Holder of the VermillionsMSA Consulting Secured Claim and the Debtors or the Litigation TrustTrustee, as applicable, agree to less favorable treatment for such Holder, as soon as reasonably practicable after Allowance of the Vermillions Secured Claim, the Holder of the VermillionsMSA Consulting Secured Claim will receive, in exchange for full and final satisfaction of such Claim, payment of such Claim in full in Cash. For the avoidance of doubt, any Deficiency Claim of the Holder of the

~~Vermillions~~MSA Consulting Secured Claim shall constitute a Class ~~15~~27 General Unsecured Claim.

(c)    *Voting:* Class 20 is Impaired under the Plan. The Holder of the MSA Consulting Secured Claim is entitled to vote to accept or reject the Plan.

21. Class 21 – BAR Architects Secured Claim

(a)    *Classification:* Class 21 consists of the BAR Architects Secured Claim.

(b)    *Treatment:* Subject to final resolution or determination of the Remaining Disputes, and as soon as reasonably practicable thereafter, except to the extent that the Holder of the BAR Architects Secured Claim and the Debtors or the Litigation Trustee, as applicable, agree to less favorable treatment for such Holder, the Holder of the BAR Architects Secured Claim will receive, in exchange for full and final satisfaction of such Claim, payment of such Claim in full in Cash. For the avoidance of doubt, any Deficiency Claim of the Holder of the BAR Architects Secured Claim shall constitute a Class 27 General Unsecured Claim.

(c)    *Voting:* Class 21 is Impaired under the Plan. The Holder of the BAR Architects Secured Claim is entitled to vote to accept or reject the Plan.

22. Class 22 – Cockrell Electric Secured Claim

(a)    *Classification:* Class 22 consists of the Cockrell Electric Secured Claim.

(b)    *Treatment:* Subject to final resolution or determination of the Remaining Disputes, and as soon as reasonably practicable thereafter, except to the extent that the Holder of the Cockrell Electric Secured Claim and the Debtors or the Litigation Trustee, as applicable, agree to less favorable treatment for such Holder, the Holder of the Cockrell Electric Secured Claim will receive, in exchange for full and final satisfaction of such Claim, payment of such Claim in full in Cash. For the avoidance of doubt, any Deficiency Claim of the Holder of the Cockrell Electric Secured Claim shall constitute a Class 27 General Unsecured Claim.

(c)    *Voting:* Class ~~12~~22 is Impaired under the Plan. The Holder of the ~~Vermillions~~Cockrell Electric Secured Claim is entitled to vote to accept or reject the Plan.

23. ~~13.~~ Class ~~13 – Traub~~23 – Trimark Raygal Secured Claim

(a)    *Classification:* Class ~~13~~23 consists of the ~~Traub~~Trimark Raygal Secured Claim.

(b)    *Treatment:* Subject to ~~the Allocation Methodology and Allocation Schedule and any objections that may be asserted by the Debtors or the~~

~~Litigation Trust, and~~final resolution or determination of the Remaining Disputes, and as soon as reasonably practicable thereafter, except to the extent that the Holder of the ~~Traub~~Trimark Raygal Secured Claim and the Debtors or the Litigation ~~Trust~~Trustee, as applicable, agree to less favorable treatment for such Holder, ~~as soon as reasonably practicable after allowance of the Traub Secured Claim,~~ the Holder of the ~~Traub~~Trimark Raygal Secured Claim will receive, in exchange for full and final satisfaction of such Claim, payment of such Claim in full in Cash. For the avoidance of doubt, any Deficiency Claim of the Holder of the ~~Traub~~Trimark Raygal Secured Claim shall constitute a Class ~~15~~27 General Unsecured Claim.

(c)    *Voting:* Class 23 is Impaired under the Plan. The Holder of the Trimark Raygal Secured Claim is entitled to vote to accept or reject the Plan.

24. Class 24 – J. Ginger Masonry Secured Claim

(a)    *Classification:* Class 24 consists of the J. Ginger Masonry Secured Claim.

(b)    *Treatment:* Subject to final resolution or determination of the Remaining Disputes, and as soon as reasonably practicable thereafter, except to the extent that the Holder of the J. Ginger Masonry Secured Claim and the Debtors or the Litigation Trustee, as applicable, agree to less favorable treatment for such Holder, the Holder of the J. Ginger Masonry Secured Claim will receive, in exchange for full and final satisfaction of such Claim, payment of such Claim in full in Cash. For the avoidance of doubt, any Deficiency Claim of the Holder of the J. Ginger Masonry Secured Claim shall constitute a Class 27 General Unsecured Claim.

(c)    *Voting:* Class 24 is Impaired under the Plan. The Holder of the J. Ginger Masonry Secured Claim is entitled to vote to accept or reject the Plan.

25. Class 25 – White's Steel Secured Claim

(a)    *Classification:* Class 25 consists of the White's Steel Secured Claim.

(b)    *Treatment:* Subject to final resolution or determination of the Remaining Disputes, and as soon as reasonably practicable thereafter, except to the extent that the Holder of the White's Steel Secured Claim and the Debtors or the Litigation Trustee, as applicable, agree to less favorable treatment for such Holder, the Holder of the White's Steel Secured Claim will receive, in exchange for full and final satisfaction of such Claim, payment of such Claim in full in Cash. For the avoidance of doubt, any Deficiency Claim of the Holder of the White's Steel Secured Claim shall constitute a Class 27 General Unsecured Claim.

(c)     *Voting:* Class ~~13~~25 is Impaired under the Plan. The Holder of the ~~Traub~~White's Steel Secured Claim is entitled to vote to accept or reject the Plan.

26. ~~14.~~ Class ~~14~~26 - Robert Green Disputed Secured Claim

(a)     *Classification*: Class ~~14~~26 consists of the Robert Green Disputed Secured Claim. The Robert Green Disputed Secured Claim will be subject to objection.

(b)     *Treatment*: Subject to ~~the Allocation Methodology and Allocation Schedule, and~~d any objections that may be asserted by the Debtors or the Litigation Trust, and as soon as reasonably practicable thereafter, except to the extent that the Holder of the Robert Green Disputed Secured Claim and the Debtors or the Litigation Trustee, as applicable, agree to less favorable treatment for such Holder, the Holder of the Robert Green Disputed Secured Claim will receive, in exchange for full and final satisfaction of such Claim, payment in full of the Allowed amount of such Claim (if any) in Cash ~~as determined by the Allocation Schedule~~. For the avoidance of doubt, any Deficiency Claim of the Holder of the Robert Green Disputed Secured Claim shall constitute a Class ~~15~~27 General Unsecured Claim.[7]

(c)     *Voting:* Class ~~14~~26 is Impaired under the Plan. The Holder of the Robert Green Disputed Secured Claim is entitled to vote to accept or reject the Plan.

27. ~~15.~~ Class ~~15~~27 – General Unsecured Claims

(a)     *Classification*: Class ~~15~~27 consists of all General Unsecured Claims, including, for the avoidance of doubt, all Deficiency Claims.

(b)     *Treatment*: Except to the extent that a Holder of an Allowed General Unsecured Claim and the Debtors or the Litigation Trust, as applicable, agree to less favorable treatment for such Holder, each Holder of an Allowed General Unsecured Claim shall, in full and final satisfaction of such Claim, receive its Pro Rata Share of the GUC Beneficial Interests in the Litigation Trust.

(c)     *Voting:* Class ~~15~~27 is Impaired under the Plan. Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

---

[7]     For the avoidance of doubt, the Debtors expect the Robert Green Disputed Secured Claim to be successfully objected to in full.

37

28. 16. Class 1628 – Subordinated Claims

    (a)    *Classification*: Class 1628 consists of all Subordinated Claims.

    (b)    *Treatment*: On the Effective Date, Holders of Subordinated Claims shall not be entitled to, and shall not receive or retain, any property or interest in property under the Plan on account of such Subordinated Claims.

    (c)    *Voting*: Class 1628 is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

29. 17. Class 1729 – Intercompany Claims

    (a)    *Classification*: Class 1729 consists of all Intercompany Claims.

    (b)    *Treatment*: On the Effective Date, all Intercompany Claims shall be released, canceled, or waived.  No Distribution shall be made on account of any Intercompany Claim.

    (c)    *Voting*: Class 1729 is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

30. 18. Class 1830 – Interests

    (a)    *Classification*: Class 1830 consists of all Interests.

    (b)    *Treatment*: On the Effective Date, all Interests shall be canceled, released and extinguished and will be of no further force or effect.

    (c)    *Voting*: Class 1830 is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

C.    *Reservation of Rights Regarding Claims.*

Except as otherwise provided in the Plan or in any Final Orders of the Bankruptcy Court, nothing shall affect the Debtors' or the Litigation Trustee's rights and defenses, whether legal or equitable, with respect to any Claim, including all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

D.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Combined Hearing shall be deemed eliminated from the Plan for

purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

*E. Voting Classes, Presumed Acceptance by Non-Voting Classes.*

*If a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class votes to accept or reject the Plan, such Class shall be deemed to have accepted the Plan.*

E.        *F. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan.  The Debtors may seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article XIV hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class to render it Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## ARTICLE IV.
## BACKGROUND AND DISCLOSURES

A.        *Background of the Debtors*

The Debtors in the Chapter 11 Cases, SilverRock Development Company, LLC ("SRDC"), SilverRock Phase I, LLC ("SRPI), SilverRock Lodging, LLC ("Lodging"), SilverRock Lifestyle Residences, LLC ("Lifestyle"), SilverRock Luxury Residences, LLC ("Luxury" or "SR Luxury") and RGC PA 789, LLC ("PA 789"), were involved in owning and developing a large-scale resort and mixed-use real estate project in La Quinta, California (the "Project"). The Project was designed as a multi-phased development to include, among other things, two hotels, branded and unbranded residences, a conference center, a spa, a golf course and clubhouse, a mixed-use promenade village, and substantial public infrastructure improvements.

Initially under the management of the Robert Green Company ("RGC"), the Debtors began development of the Project in 2014 after entering into a *Purchase, Sale, and Development Agreement* (the "PSDA") and *Development Agreement* (the "Development Agreement") with the City of La Quinta, California (the "City").

B.        *Description of the Project.*

The Project began on or about November 19, 2014, when SRDC and the City entered into the PSDA, pursuant to which the City agreed to convey to SRDC, specified parcels of real property referred to in the PSDA as the "Phase 1 Property" and the "Phase 2 Property." The PSDA also provided SRDC with the option to acquire additional property from the City (the "Option Property") if certain conditions were met.  Finally, the PSDA granted the City the right to repurchase both the Phase 1 and Phase 2 Property in the event Debtors defaulted and failed to

39

cure the defaults. The PSDA obligated SRDC to develop a series of defined "Project Components," within set timeframes, including:

- Montage Hotel[8] – an upscale, full-service luxury hotel with at least 120 rooms, spa and fitness facilities, pools, and a sit-down restaurant.

- Montage Branded Residential Development – approximately 35 luxury detached residential units.

- Pendry Hotel – a modern-style hotel with sufficient rooms to bring the Project total to at least 340 rooms, plus food and beverage services and amenities.

- Pendry Branded Residential Development – approximately 60 condominium-style residential units to be developed in conjunction with the Pendry Hotel.

- Conference and Shared Service Facility – conference and banquet space, shared back-of-house services, and management offices for both hotels.

- Permanent Golf Clubhouse – a new clubhouse to serve the resort golf course.

- Promenade Mixed-Use Village – up to 225,000 salable square feet of residential units (110–225 units) and 12,900–40,000 square feet of mixed-use retail and "pop-up" commercial space.

- Pendry Residential Village – approximately 160 residential units and an amenity center.

- Master Site Infrastructure Improvements –infrastructure to serve all Project Components.

- Golf Course Realignment – relocation of portions of the existing golf course to accommodate development of the Montage Hotel and Branded Montage Residential Development. This was completed prepetition, and the City retains fee title to the golf course (in Planning Area 1, approximately 179 acres).

In addition to the PSDA, the Development Agreement subjected SRDC to certain obligations subject to the City's oversight in developing the Project. The Development Agreement covered approximately 145 acres of the resort area, including Planning Areas 2 through 9 and a portion of Planning Area 10A.[9]

Between 2015 and 2023, the City and SRDC executed five amendments to the PSDA, adjusting timelines, phasing, financing, and performance obligations. These amendments created Phase 1A and Phase 1B parcels, incorporated additional phasing (golf course, ranch house, landscaping), and modified financing structures, milestones, and tax rebate provisions. The Fifth

---

[8]    Although the Project was initially structured around the Montage and Pendry hospitality flags, the Buyer has elected to pursue different branding. The Debtors are rejecting the Montage and Pendry branding and management agreements as Executory Contracts through the Plan.

[9]    "Planning Areas" refer to undeveloped parcels designated for future development.

Amendment, dated November 16, 2023, attempted to facilitate recapitalization of the Project but ultimately memorialized SRDC's milestone defaults and further delays in development.

The City has played a critical role in the Project since its inception.  First, the City controls the Project's entitlement process and impacts construction costs through its regulatory and environmental oversight. Second, the City has the ability to waive or reduce transient occupancy taxes for the Project's hotel(s) prior to stabilization, which is critical to the Project's success. Third, the City owns the Option Property that is physically adjacent to the Debtors' property and that is critical for a developer of the Project.

C.    *Overview of the Debtors' Corporate History and Structure*

The Debtors' corporate structure was designed to meet financing requirements and to isolate different components of the Project into separate entities, depending on whether they involved commercial or residential development and based on timed phasing. Prior to the appointment of the Independent Manager (discussed below), RGC served as the manager of each of the Debtors. A brief description of the ownership of each of the Debtors is as follows: [10]

1) SRDC, owned the entirety of the fee interest in the Project, except for the property comprising Planning Areas 7, 8, and 9. SRDC is the signatory on the PSDA ~~and Development Agreement~~, as amended, and Development Agreement and it was the lessor on three "ground leases" (together, the "~~Financing Vehicles")[11]~~Ground Leases") previously designated for the development of Montage and Pendry-branded residences. SRDC owns 76.55% of the Common Membership Interest in Debtor SRPI.[12]

2) SRPI was established for the development of certain planning areas associated with what is known under the PSDA as Phase 1A. SRPI and its subsidiaries (all of whom are Debtors) controlled the lodging and commercial operating components, including two hotels, a conference center, a golf club, and a golf ~~course~~clubhouse.   SRPI was

---

[10]   The equity ownership interests of Debtors are set forth in the First Day Declaration and the Schedules. Except for non-debtor RGC Preferred, LLC, all the Preferred Membership Interest Holders in the Debtors were converted (along with multiple unsecured creditors), into allegedly secured creditors of SRDC or PA 789 in July 2024 ~~(collectively, the "Converted Secured Creditors")~~.  As explained herein, all the Converted Secured Creditors, except for Richard & Lehn Goetz (the "Goetzes"), the Traub ~~Family Revocable Trust dated June 22, 2015 (the "~~Traub Trust~~"), YH MCSV Fund I, LLC ("~~Trust, Young's~~")~~, , and Axia ~~Talus, LLC ("Axia")~~, have agreed to unwind their respective security interests and return to their prepetition positions as Preferred Membership Interest Holders of the Debtors.

[11]   ~~At the Sale Hearing and in the Sale Order, the Bankruptcy Court ruled that the Financing Vehicles did not constitute true leases but are instead financing arrangements. The Sale Order approved the Sale to the Buyer free and clear of the Financing Vehicles and further found that such Financing Vehicles "have been determined to not be 'true leases.' Entry of this Sale Order and the recordation of this Sale Order as required under applicable law shall be sufficient to record the disposition of the Purchased Assets "free and clear" of such [Financing Vehicles] and no other documentation shall be required to evidence that the sale of the Purchased Assets is "free and clear" of such [Financing Vehicle] in accordance with section 363(f) of the Bankruptcy Code." Sale Order, ¶ 17.~~

[12]   The other 23.45% of the Common Membership Interest in Debtor SRPI is owned by each of Edward J. Himmelberg Trust (20.68%), Lance Moore (0.81%), Arush Patel (0.22%), and the Goetzes (1.74%).

purportedly responsible for the day-to-day operations of the Debtors and held substantially all of the Debtors' cash assets. The three wholly owned Debtor subsidiaries of SRPI are:

a. SR Lodging was created to be the developer and owner of certain commercial operating components.

b. SR Lifestyle was created in relation to the Pendry-branded residences.

c. SR Luxury was created in relation to the Montage-branded residences.

3) PA 789 was created in August 2023 as a special purpose entity to facilitate new funding from Keillor.  Shortly after its creation, SRDC deeded its fee interest in Planning Areas 7, 8, and 9, which are part of Phase 1B of the Project and were intended for mixed residential and commercial use under the PSDA, to PA 789.  PA 789 owned 100% of the fee interest in Planning Areas 7 and 8 and 57.2% of Planning Area 9 as a tenant in common with non-debtor entity SilverRock Land II, LLC ("SR Land").[13]  Planning Areas 7, 8, and 9 are undeveloped plots of land.

D.    *Events Leading to the Chapter 11 Filings*[14]

In the ten years following the Project's inception, the Project became hindered with building and development delays along with financial setbacks caused by, among other things, the COVID-19 pandemic, supply chain disruptions, inflation, interest rate increases, construction cost escalations, and disruptions to the federally mandated EB-5 investment program.  By March 2024, the Debtors were over-leveraged, undercapitalized, facing foreclosure actions by two secured creditors, Poppy and Cypress Point Holdings, LLC ("Cypress"), while also facing the potential termination of their development rights under the PSDA.

At that time, the Debtors, their secured creditors, the proposed hotel brand (Montage International ("Montage")), and the City attempted to recapitalize and restructure the Project though the involvement of a potential new investor.  Both before and after this attempted restructuring, the City had declared the Debtors in breach of the PSDA. After the restructuring collapsed, the City sent a notice purporting to terminate the Debtors' development rights under the PSDA and sued the Debtors in the Superior Court of California, County of Riverside.

The Debtors' financial condition continued to deteriorate. In this regard, the Debtors' prior management (i.e., certain of the Robert Green Parties) also over-leveraged the Project,

---

[13]    SRDC initially owned 100% of the Membership Interest in SR Land. However, SRDC sold its Membership Interest in SR Land to the Traub Trust shortly before the creation of RGC PA 789.

[14]    For purposes of this Combined Disclosure Statement and Plan, the description of the Debtors' capital structure is presented for background and informational purposes only. Nothing contained herein shall be construed as an admission or concession by the Debtors or the Settling Creditors as to the amount, validity, enforceability, priority, perfection, or extent of any claim, lien, security interest, or equity interest, or as a waiver of the Debtors' or the Settling Creditors' rights to contest any such matters. All rights are expressly reserved. A detailed description of the Debtors' analysis of which creditors have secured interests or priority over others will be set forth in the Allocation Motion.

layering high-cost loans and preferred equity into an already-complex capital structure.  Certain key factors that precipitated the Debtors' bankruptcy filings are summarized below.

        1.      Mosaic Financing and COVID-19 Pandemic.

In 2019, the Debtors obtained a $212.5 million construction loan from Mosaic Real Estate Investors ("Mosaic") to fund infrastructure and commercial components, along with a $179 million commitment for branded residential components.  This loan was intended to provide sufficient funding for the Debtors to achieve their required milestones under the PSDA. Unfortunately, in early 2020 and upon the advent of the COVID-19 pandemic, Mosaic abruptly discontinued all funding to the Debtors after only advancing approximately $36 million of the loan proceeds. In October 2021, SRDC retired Mosaic's loan balance and obtained a $40 million loan from Poppy, secured by a deed of trust covering ~~several~~various parcels of SRDC's real property ~~which remained outstanding at a reduced alleged balance of $32 million as of the Petition Date~~.

Following receipt of the loan from Poppy, the lasting impacts of COVID-19 on the hospitality industry and the capital markets continued to affect the Project. For instance, in the two years before the Petition Date, the construction industry faced steep interest rate increases, severe construction cost escalations, soaring insurance premiums, and increasing utility and labor costs, all of which further compounded the Debtors' financing challenges.

        2.      EB-5 Loans.

In addition to private lending institutions, the Debtors also sought to obtain financing for the Project through the EB-5 Immigrant Investor Program, a federal program administered by the United States Citizenship and Immigration Services. EB-5 funding permits foreign investors to obtain residency through qualified investments in the United States.

In December 2022, RGC Preferred, LLC ("RGC Preferred"), a non-debtor investment vehicle affiliated with the Debtors' prior manager, Robert Green, entered into two separate loan agreements (together, the "EB-5 Loan") with the EB-5 Lenders. The EB-5 Lenders lent $14.5 million to RGC Preferred. At the same time, the EB-5 Lenders issued separate promissory notes (together, the "Notes") listing RGC Preferred as borrower under the EB-5 Loan.

It is believed that RGC Preferred used the proceeds of the EB-5 Loan to purchase preferred membership interests in SRPI. In July 2023, SRDC executed guaranty agreements for the EB-5 Loan with both of the EB-5 Lenders (together, the "Guaranties"), as contemplated by the loan documents, and two deeds of trust encumbering Planning Areas 7 and 8 were recorded in favor of the EB-5 Lenders. In September and October 2023, RGC formed PA 789. As a condition precedent to the closing of a loan between the Debtors and Keillor, SRDC deeded its entire ownership interest in Planning Areas 7, 8, and 9 to PA 789 by quitclaim deed. The liens granted to the EB-5 Lenders remained on the parcels transferred to PA 789 and the EB-5 Lenders agreed to contractually subordinate their liens in the affected collateral to Keillor.

The Debtors have investigated the foregoing transactions with the EB-5 Lenders to the best of their ability, including whether such transactions may be fraudulent transfers.  The EB-5 Lenders participated in the Mediation to, among other things, attempt to consensually resolve the

43

dispute with respect to the EB-5 Loan and their claim in these Chapter 11 Cases with the Debtors and the other Mediation Parties.

Following negotiation with the EB-5 Lenders, the Debtors and the EB-5 Lenders determined to resolve their disputes with respect to the potential avoidability of the transactions with the EB-5 Lenders by entering into the EB-5 Settlement, which, among other things, provides for the allowance of the EB-5 Secured Claim, the payment of $1,200,000 to the EB-5 Lenders in Cash on the Effective Date (or as soon as reasonably practicable thereafter), the EB-5 Lenders' agreement to provide the EB-5 Litigation Trust Funding, a mutual release of the Debtors and the EB-5 Lenders, and such other and further benefits to the Estates as described in greater detail in the EB-5 Settlement.

3.    Builders Capital Loans.

On or about November 22, 2022, as part of the Debtors' efforts to raise additional capital, SR Luxury executed three loan agreements (the "Builders Capital Loans") and related promissory notes (the "Builders Capital Notes") with Builders Capital. Under these agreements, Builders Capital committed to fund up to $48,150,413.60 for the development of the Montage-branded residences located on property subject to a document denominated a "lease "entered into by SRDC and SR Luxury (the "Luxury Financing VehicleGround Lease"). Two of the three Builders Capital Notes matured on May 15, 2024, and the third matured on November 11, 2024.

In connection with the Builders Capital Loans, SRDC, together with Robert S. Green and Wendy Z. Green, as trustees of an irrevocable trust created UAD September 25, 2023 (the "Green Family Trust"), executed guarantees of SR Luxury's obligations under the Builders Capital Loans. SRDC, SR Luxury, and the Green Family Trust also executed indemnification agreements in favor of Builders Capital. Builders Capital recorded three deeds of trust on or about November 28, 2022, in its favor, which purported to encumber both SR Luxury's entire "leasehold interest" under the Luxury Financing VehicleGround Lease and SRDC's fee interest in 13 of the 29 Luxury Financing VehicleGround Lease lots.

On or about May 1, 2023, Poppy recorded a reconveyance with respect to Lots 6-8, 13-14, 17, 20-27certain lots. As of the Petition Date, SRDC and SR Luxury were in default under two of the three Builders Capital Notes. However, Builders Capital did not initiate foreclosure proceedings on either the leasehold or fee interests prior to the Petition Date.

4.    Cypress Lawsuit and Settlement.

On or about May 25, 2022, Cypress, the largest holder of preferred membership interests in SRPI, sought to accelerate recovery of its preferred returns by filing a lawsuit against both SRPI and SRDC. Later that year, on or about November 18, 2022, the Debtors settled this dispute by redeeming Cypress's preferred membership interests in SRPI through issuance of a promissory note (the "Cypress Note") secured by a second position deed of trust, recorded in favor of Cypress, and secured by SRDC's commercial property.

The Cypress Note accrued interest at the rate of 24% per annum and required Debtors to make monthly payments to Cypress that often exceeded $3 million. In total, the Debtors records

show that they paid Cypress not less than $11 million pursuant to this arrangement.  These payments further weakened the Debtors' financial position such that the Debtors became unable to make payments to their contractors as they became due. Because of this, the Project's lead contractors, RDO and Granite sued the Debtors for non-payment, at which point construction of the Project stalled entirely.  A more detailed description of the Debtors' history with RDO, Granite and other contractors follows.

5.    RDO, Granite and other Mechanic's Liens Creditors

RDO contracted with the Debtors for construction work on the Project pursuant to three separate contracts entered into on or around June 25, 2021. Specifically, RDO contracted to build a hotel, spa, golf club house and conference center for the Montage-branded resort originally contemplated to be constructed at the Project.  In December 2022, RDO filed four (4) mechanics lien claims against the Project.  In addition, RDO contracted with certain subcontractors, including, without limitation, Rowan, Gauston, and White's Steel, for the work on the Project who have also asserted claims against the Debtors for nonpayment and in some instances filed separate mechanic's liens for such amounts.  As set forth in greater detail in the Allocation Motion and the Allocation Schedule, the Debtors believe that the RDO Secured Claim includes certain amounts asserted by RDO's subcontractors. The Lien Priority Analysis attached as an exhibit to the Allocation Motion provides notation of such liens in the footnotes of the affected parcels.

Granite contracted with the Debtors on or about April 15, 2022, to perform certain dry utility infrastructure work on the Project. On September 29, 2022, Granite fieldfiled a mechanic's lien with respect to infrastructure improvements and/or work it performed in connection with the Project, and on December 21, 2022, Granite filed a lawsuit against the Debtors for nonpayment. On or about September 20, 2023, the Debtors and Granite entered into a settlement agreement resolving the Granite lawsuit whereby the Debtors were required to pay Granite $4,207,319.08 plus interest, and other amounts to Granite's subcontractors. The Debtors did not make these payments prior to the Petition Date.

In addition to RDO and Granite, the Debtors understand that more than thirty other claimants filed liens on dozens of parcels on the Project.

Certain other mechanic's lienors performed work for Robert Green Residential, Inc. ("RGRI"), another subcontractor to the Project, including Rowan. In furtherance of this work, Rowan recorded a mechanic's lien in the amount of $241,800.90 for unpaid work performed pursuant to its contract with RGRI. The allocation of net sale proceeds related to the parcels on which Rowan worked for RGRI are included within the Poppy/RDO/Granite Reserve. The portion of Rowan's claim related to its work for RDO is included within RDO's claim; however, Rowan requested that the Plan also reflect a separate claim for the RGRI related work.

6. The SR Land TIC Interest

One parcel of the real property formerly owned by the Debtors, referred to as "Planning Area 9" or Parcel B of LLA 2020-0007 (the "TIC Parcel") was actually owned by the Debtors as tenants in common with a non-debtor Entity, SR Land. Specifically, Debtor RGC PA 789 owned

45

an undivided 57.2% interest in Planning Area 9, while SR Land owned the remaining 42.8% interest (the "SR Land TIC Interest"). The membership interests of SR Land are owned by the Traub Trust. SR Land as owner of the SR Land TIC interestInterest in Planning Area 9, consented to the sale of its interest in the TIC Parcel on the terms and conditions set forth in paragraph 3 of Exhibit 3 to the Final DIP Order (defined below).

In July 2024, following negotiations between the Traub Trust and SRDC, RGC PA 789 issued to the Traub Trust (a) a promissory Secured Promissory Note payable by RGC PA 789 to the Traub Trust in the amount of $3,816,000 and (b) a second-position deed of trust and fixture filing to secure RGC PA 789's obligations under the note, which was recorded in Riverside County on July 5, 2024.

### 7.  Defaults and Failed Recapitalization

As development of the Project stopped entirely, the Debtors missed key milestones under the Fifth AmendedAmendment to the PSDA, and the City declared the Debtors in default thereunder.

In May 2024, the Debtors executed a memorandum of understanding ("MOU") with the City, a new investor, Montage, Poppy, Cypress, and other major secured creditors.  Under the terms of the MOU, Poppy and Cypress agreed to forebear from taking any foreclosure action, and the Debtors were given until June 30, 2024, to attempt to sufficiently recapitalize and pay their secured creditors in full.  If the Debtors failed to do so, the MOU gave the new investor the opportunity to recapitalize by July 31, 2024, and subsequently take over the Debtors' rights to the Project.

The Debtors were unable to recapitalize by June 30, 2024.  At that point, RGC executed a transaction to convert unsecured creditors and holders of the Preferred Membership Interests into secured creditors (the "Converted Secured Creditors").  On July 24, 2024, the City sued Debtors and the Converted Secured Creditors for fraudulent conduct and for breaches under the MOU and PSDA. The new investor failed to raise sufficient capital by the July 31, 2024, deadline, and on August 1, 2024, the City issued a notice purporting to terminate all of Debtors' development rights under the PSDA.

Shortly before the Petition Date both Poppy and Cypress issued Notices of Default and Notices of Trustee Sale, as the Debtors lacked the capital to stay current on either the Poppy or Cypress loans. Prior to the filing of the Chapter 11 Cases, the Cypress foreclosure sale was set for August 6, 2024. With limited options remaining, the Debtors commenced the Chapter 11 Cases.

E.  *Events During the Chapter 11 Cases*

1.  Commencement of the Chapter 11 Cases

As of the Petition Date the Debtors were involved in eighteen (18) pending state court actions, including foreclosure proceedings, and had almost no cash.

46

Shortly after the Petition Date, to stabilize operations and build trust within the creditor constituency, the Debtors retained Douglas Wilson Companies ("DWC") to serve as their restructuring advisor and appointed DWC's principal, Douglas Wilson, as their Chief Restructuring Officer ("CRO").

    2.   First Day Relief

On the Petition Date, the Debtors filed certain "first day" motions and applications (the "First Day Motions") with the Bankruptcy Court seeking relief to aid in the efficient administration of the Chapter 11 Cases and to facilitate the Debtors' transition to debtor-in-possession status. The First Day Motions included:

- The *Motion of Debtors for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases* (the "Joint Administration Motion") [Docket No. 7], requesting an order directing the joint administration of the Chapter 11 Cases for procedural purposes only.
- The *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (II) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(b), and (III) Granting Related Relief* (the "Cash Management Motion") [Docket No. 8], seeking entry of an order authorizing the Debtors' continued use of its existing cash management system and granting certain related relief.

On August 13, 2024, the Bankruptcy Court held a hearing to consider the First Day Motions and entered orders on August 13, 2024 and August 14, 2024, approving the relief requested by the Joint Administration Motion and the Cash Management Motion on an interim basis. *See* Docket Nos. 22 & 27.

Despite their best efforts, the Debtors faced challenges transitioning into Chapter 11. For instance, the Debtors were initially unable to obtain court approval for debtor-in-possession financing. Not long after that, multiple creditors sought to have the Chapter 11 Cases classified as "single asset real estate" cases ("SARE"). *See* Docket No. 122. Thereafter, the U.S. Trustee moved to appoint a Chapter 11 Trustee or, in the alternative, dismiss the Chapter 11 Cases. *See* Docket No. 144.

    3.   The DIP Facility and the Appointment of the Independent Manager

      (a)    Interim DIP Order

On September 20, 2024, the Debtors filed the *Motion of Debtors Pursuant to Sections 105, 361, 362,363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rule 4001, and Local Rule 4001-2, for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing From the City of La Quinta; (II) Granting Non-Priming DIP Lender Liens and Super-Priority Claims; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* [Docket No. 125] (the "DIP Motion").

On each of October 1, 18, and 31, 2024, and December 6, 2024, the Court granted certain relief sought in the DIP Motion on an interim basis [Docket Nos. 162, 188, 208 & 243, respectively] (collectively, the "Interim DIP Orders"). Through the Interim DIP Orders, the Debtors obtained interim funding in the amount of $2,690,965 (the "Interim Financing") pursuant to a term sheet (the "Interim DIP Term Sheet") entered into between the Debtors and the City. The City provided the Interim Funding under the Interim Term Sheet without priming any of the Project's existing secured creditors.

(b)     Appointment of the Independent Manager

With the Interim Financing in hand, the Debtors were able to stabilize the Project and pay administrative expenses in connection with the Chapter 11 Cases. In addition, at that time, the Debtors amended their respective operating agreements to, among other things, appoint Christopher S. Sontchi (the "Independent Manager") as the sole and independent manager of each of the Debtors.

The Independent Manager is an independent fiduciary of the bankruptcy estates and the final decision maker for all matters pertaining to the Debtors. Since his appointment, the Independent Manager has undertaken substantial efforts to stabilize the Debtors' operations, to foster transparency with stakeholders, and to lay the groundwork for successful chapter 11 cases.

While the appointment of the Independent Manager enabled the Debtors to meaningfully engage with major stakeholders regarding a consensual go-forward process, the Interim Financing was insufficient to complete a fulsome sale process for the Debtors' assets.

(c)     Final DIP Order

After a diligent search, including discussions with existing creditors, the best available alternative for post-petition financing was presented by the City. On December 12, 2024, the Debtors filed the *Motion of Debtors Pursuant to Sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rule 4001, and Local Rule 4001-2, for an Order (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Granting DIP Lender Priming Liens and Super-Priority Claims; and (III) Granting Related Relief* [Docket No. 246] which was approved by the Court on January 23, 2025 [Docket No. 330] (as amended, the "Final DIP Order"). The Final DIP Order authorized the Debtors to, among other things, obtain senior secured postpetition financing in an aggregate principal amount not to exceed $11,000,000.00 (the "DIP Facility") secured by the DIP Collateral.

On January 23, 2025, the Debtors and the City entered into the DIP Credit Agreement memorializing the terms of the DIP Term Sheet in accordance with the Final DIP Order.

48

On April 25, 2025, the Bankruptcy Court entered an amended Final DIP Order [Docket No. 437], which included (a) a statement that the DIP Facility is secured by a deed of trust and similar references; (b) references to an additional parcel number and the Preliminary Title Report filed in the Chapter 11 Cases [Docket No. 425], requested by the title insurance company, which amendment to the Preliminary Title Report was also reflected in Exhibit 3 to the Final DIP Order, as requested by the title insurance company.

In connection with the progress realized in securing the Final DIP Order, along with the Debtors' unwavering efforts, successes in the Chapter 11 Cases followed. For instance, the Debtors obtained agreements from all but four Converted Secured Creditors to reconvey their security interests, resulting in the release of approximately $42 million in liens determined to be avoidable preferences and fraudulent transfers. *See* Docket Nos. 311, 535, & 817. And, after securing the Final DIP Order, the secured creditors withdrew their SARE motions, and the U.S. Trustee withdrew its motion to appoint a Chapter 11 Trustee or dismiss the Chapter 11 Cases. *See* Docket Nos. 224 & 334.

4. The Post-Petition Sale Process.

Access to additional financing made possible by the DIP Facility also enabled the Debtors to pursue a primary objective in the Chapter 11 Cases: the marketing and sale of the Debtors' assets through a court-supervised process pursuant to Section 363 of the Bankruptcy Code.

(a) The Bid Procedures Motion and Retention of JLL

To this end, on January 15, 2025, the Bankruptcy Court approved the appointment of Jones Lang LaSalle North Americas, Inc. ("JLL") to act as the Debtors' exclusive real estate broker and advisor. *See* Docket No. 312.

Thereafter, on February 19, 2025, the Debtors Filed the *Motion of Entry of Order (I) Authorizing and Approving (A) Bid Procedures and (B) Form and Manner of Notice of Bid Procedures* [Docket No. 358] (the "Bid Procedures Motion"), seeking Court approval of certain procedures to govern the process by which all or substantially all of the Debtors' assets would be sold to a buyer with the financial capability and development competence to complete the Project.

For nearly eight months, JLL prepared for and conducted a robust marketing process, including outreach to at least 7,294 potential buyers, with more than 60 of such parties executing non-disclosure agreements, and obtaining access to the Debtors' virtual data room for the sale process. During the marketing process, relevant information regarding the Project, including the Purchased Assets, was made available in the virtual data room, including, *inter alia*, surveys and reports related to the Debtors' real property, such as seismic studies, environmental impact assessments, a title report, an ALTA report, entitlement documents, and information related to the golf course associated with the Project.

Key components of the process involved tours of the property by potential bidders and their investment partners, discussions between the Debtors and prospective bidders, and discussions between potential bidders and the representatives of the City. Additionally, the

Qualified Bidders (as defined below) negotiated voluminous documents directly with the City regarding the acquisition of City-owned property, development plans, and rights, and other terms related to the Project.

(b)     The Bid Procedures Order

In connection with the sale process, the Bankruptcy Court entered an order [Docket No. 396] (the "Bid Procedures Order") approving the relief requested by the Bid Procedures Motion on March 13, 2025. Among other things, the Bid Procedures Order approved procedures (the "Bid Procedures") that provided a framework for the sale process.

The Bid Procedures Order established key dates and deadlines related to the Sale (the "Sale Process Deadlines").  The Sale Process Deadlines were extended from time to time by the Debtors, in consultation with the Consultation Parties (as defined in the Bidding Procedures Order).  The Debtors filed notices of revised Sale Process Deadlines on April 24, 2025 [Docket No. 452], June 2, 2025 [Docket No. 508], June 4, 2025 [Docket No. 512], and on July 24, 2025 [Docket No. 593], ultimately establishing the following Sale Process Deadlines:

| Date | Deadline/Event |
|------|----------------|
| March 12, 2025, at 10:30 a.m. (ET) | Bidding Procedures Hearing |
| June 5, 2025 | Deadline for the Debtors to file the Stalking Horse Supplement |
| June 17, 2025 | Deadline for Debtors to obtain an order approving designation of Stalking Horse Bidder |
| July 7, 2025 | Deadline to approve additional Qualified Bidders as overbidders |
| August 1, 2025 | Last day for Qualified Bidders to submit highest and best sealed offers to JLL and the Debtors (the "Bid Deadline") |
| August 4, 2025 | Auction (defined below) – La Quinta, California |
| September 12, 2025 | Deadline for Debtors to select the Successful Bidder and Next-Highest Bidder |
| September 16, 2025 | Deadline to file and serve Notice identifying the Successful Bidder and Next-Highest Bidder and to file a Notice of Motion for an Order to Sell the Assets |
| October 14, 2025 | Deadline to obtain and order to sell the Assets to the Successful Bidder, or, as necessary, to the Next-Highest Bidder |
| November 12, 2025 | Deadline to close the Sale of the Assets |

50

Pursuant to the Bid Procedures Order, the initial Bid Deadline was July 1, 2025. As permitted under the Bid Procedures, in consultation with the Consultation Parties, the Debtors extended the Bid Deadline twice: first to July 29, 2025, and then again to August 1, 2025.

Subject to the terms of the Bid Procedures, the Debtors were empowered to solicit letters of intent (each, a "Stalking Horse LOI") from bidders willing to serve as a stalking horse, designate such bidder as the stalking horse bidder (the "Stalking Horse Bidder"), and provide bid protections to the Stalking Horse Bidder. Bid Procedures Order ¶¶ 6-8.

As communicated to all potential bidders, parties that wished to be considered for designation as a stalking horse bidder for the Debtors' assets were requested to return an executed version of the Stalking Horse LOI to JLL and the CRO by May 27, 2025. Moreover, by submitting a Stalking Horse LOI, each potential bidder agreed that if it was selected as the Stalking Horse Bidder by the Debtors and the Bankruptcy Court approved such designation, then (i) the terms of the Stalking Horse LOI would become binding upon the Stalking Horse Bidder, (ii) the Stalking Horse Bidder would be required to work diligently with the City to negotiate and finalize for execution the Amended Development Documents (as defined therein), and (iii) if the Stalking Horse Bidder was ultimately selected as the Successful Bidder (subject to Court approval), the Stalking Horse Bidder would be obligated to execute a PSA with the Debtors and open escrow pursuant to the terms of the PSA. The Debtors received five (5) Stalking Horse LOIs, certain of which were accompanied by marked versions of the PSA, marketing materials, and other materials.

(c)    The Selection of a Stalking Horse Bidder

On June 5, 2025, the Debtors, in consultation with the Consultation Parties and the City, selected TBE RE Acquisition Co II LLC ("Turnbridge") as the proposed Stalking Horse Bidder and determined that its Stalking Horse LOI (the "Designated Stalking Horse LOI") represented the highest or otherwise best offer then available for the Purchased Assets. Also on June 5, 2025, the Debtors filed a motion requesting entry of an order approving the Debtors' selection of the Stalking Horse Bidder and a $2 million break-up fee payable in accordance with the terms of such order [Docket No. 513] (the "Break-Up Fee" and such motion, the "Stalking Horse Motion").

On June 20, 2025, the Bankruptcy Court entered an order approving the Stalking Horse Motion [Docket No. 536] (the "Stalking Horse Order").

The purchase price for the Purchased Assets under the Designated Stalking Horse LOI was $60 million dollars. Pursuant to the terms of the Designated Stalking Horse LOI, certain required documents for the development of the real property (the "Amended Development Documents") were required to be negotiated and substantially finalized with the City by the Bid Deadline.

(d)    The Overbid Process

Following the selection of the Stalking Horse Bidder, JLL and the CRO continued to work with other bidders to facilitate due diligence requests and provide them with additional

information to enable them to submit letters of intent (each a "Qualified Bidder LOI") and other information sufficient to be "qualified" by the Debtors, in consultation with the City and the Consultation Parties (each, a "Qualified Bidder") by July 7, 2025 (the "Qualified Bid Deadline").

Ultimately, the Debtors determined, in consultation with the City and the Consultation Parties, to designate three (3) parties that submitted materials and development proposals prior to the Qualified Bid Deadline as Qualified Bidders, in addition to the Stalking Horse Bidder. Thereafter, the Debtors, the City, and their respective advisors worked with such parties, depending on the applicable Qualified Bidder's level of engagement, to (i) negotiate and finalize the Amended Development Documents with the City on or before the Bid Deadline, (ii) submit a Qualified Bidder LOI to the Debtors on or before the Bid Deadline, and (iii) provide their bid deposit of $5 million.

(e)     The Auction Procedures Motion, the Auction, and the Notice of Successful Bidder

On July 11, 2025, the Debtors filed that certain *Debtors' Motion for Entry of Order (I) Authorizing Auction; (II) Approving Auction Procedures; (III) Approving Notice Procedures Related to Auction; and (IV) Granting Related Relief* [Docket No. 562] (the "Auction Procedures Motion").  The Bankruptcy Court held a hearing to consider the Auction Procedures Motion on July 18, 2025, and thereafter entered an order granting the same. *See* Docket No. 577 (the "Auction Procedures Order"). Among other things, the Auction Procedures attached as Exhibit 1 to the Auction Procedures Order made clear that only Qualified Bidders that satisfied certain requirements would be eligible to participate in the live auction for the Debtors' assets to be held in La Quinta, California on August 4, 2025 (the "Auction").

On July 24, 2025, the Debtors filed that certain *Notice of Revised Bid Deadline* [Docket No. 593] extending the Bid Deadline to August 1, 2025.

Following the Bid Deadline, the Debtors, in consultation with the City and the Consultation Parties, reviewed the Qualified Bidder LOIs and assessed whether the Qualified Bidders and the Stalking Horse Bidder had satisfied the applicable requirements.  As a result of this review, the Debtors determined that only the Stalking Horse Bidder and one other Qualified Bidder had satisfied the applicable requirements and were eligible to participate in the Auction.

Thereafter, in accordance with the Auction Procedures Order, the Debtors conducted the Auction. In accordance with the Auction Procedures, the Auction continued until all bidders had submitted their Last and Final Bids (as defined in the Auction Procedures). The Last and Final Bids of both bidders were held open, and on August 5, 2025, the City of La Quinta, California City Council (the "Council") met in closed session to review the Last and Final Bids.

Following the Council's closed session meeting, the Debtors and the Council continued to discuss and consider the Last and Final Bids. The Council ultimately indicated that it would only preliminarily approve Turnbridge as the Successful Bidder.[15] Ultimately, the Debtors

---

[15]   The closed session meeting served solely to consider the City's preliminary approval for the purpose of the Auction process. The Successful Bidder is required to submit a formal application pursuant to California law and City ordinances, and final approval is subject to the outcome of those procedures.

selected Turnbridge as the Successful Bidder and designated its bid as the Successful Bid. *See* Docket No. 620.

The Successful Bid is essentially the Stalking Horse LOI with an increased cash purchase price of $65 million and an agreement by the Successful Bidder to modify its form of Purchase and Sale Agreement to provide greater certainty as to the Successful Bidder's termination rights with respect to any appeal filed under the California Environmental Quality Act (the "PSA Modification").

In connection with the Debtors' determination to select Turnbridge as the Successful Bidder, the City agreed to certain accommodations (the "City Consideration"). Specifically, in furtherance of closing the sale to Turnbridge, the City agreed to provide the City Consideration, which is comprised of: (i) the subordination of $2.25 million of the DIP Facility to valid secured claims on the Purchased Assets and (ii) the provision of up to $2 million in committed additional non-priming secured financing to wind-down the Debtors' Estates following the closing of the Sale.

(f)    The Sale Hearing and Approval of the Sale and the DIP Amendment

Numerous parties including Builders Capital, Poppy Bank, Cypress, and the EB-5 Lenders objected to approval of the Sale to the Successful Bidder.  On October 14, 16, 17, and 21, 2025, the Bankruptcy Court held a contested hearing (the "Sale Hearing") to consider approval of the Sale to Turnbridge.  On October 21, 2025, following three days of presentations of evidence and witnesses, the Bankruptcy Court made an oral ruling on the record of the Sale Hearing, finding that the Debtors met their burden under Bankruptcy Code section 363(b), and were authorized to sell the Purchased Assets "free and clear" of all liens, claims, interests, and encumbrances under sections 363(f)(1), (f)(4) and (f)(5).

Thereafter, on October 23, 2025, the Bankruptcy Court entered the Sale Order. On October 21, 2025, the Bankruptcy Court additionally approved the DIP Amendment. *See* Docket No. 760. The DIP Amendment memorializes the City Consideration offered in connection with the Sale, providing the Debtors with, among other things, additional liquidity to prosecute the Plan and wind down the Estates.

(g)    The Appeal of the Sale Order

On November 3, 2025, Builders Capital filed an appeal (the "Appeal") of the Sale Order in the United States District Court for the District of Delaware (the "District Court").    On November 7, 2025, Builders Capital filed an emergency motion for stay pending appeal of the Sale Order [Docket No. 788] (the "Motion for Stay") in the Bankruptcy Court.  On November 13, 2025, the Debtors and Turnbridge filed objections [Docket Nos. 795 and 796] to the Motion for Stay, and the City filed a joinder to the objections [Docket No. 797].  On November 13, 2025, the Bankruptcy Court held a hearing to consider the Motion for Stay wherein it denied the Motion for Stay, and on November 14, 2025, entered an order memorializing the same [Docket No. 802].

On November 17, 2025, Builders Capital filed its statement of issues on appeal in the Appeal.  On November 19, 2025, Builders Capital filed an emergency motion for stay pending

appeal of the Sale Order in the District Court (the "USDC Motion for Stay") [District Court Docket No. 8].  The Debtors, the City and Turnbridge agreed to an expedited briefing schedule on the USDC Motion for Stay.  On November 24, 2025, the Debtors filed an objection to the USDC Motion for Stay along with a declaration from the Independent Manager of the Debtors in support of the same. *See* District Court Docket Nos. 19 & 20.  The Buyer also filed an objection to the USDC Motion for Stay [District Court Docket Nos. 16 & 18], and the City filed a joinder and declaration from City Manager, Jon McMillen in opposition to the USDC Motion for Stay. *See* District Court Docket Nos. 21 & 22.

The District Court entered an order denying the USDC Motion for Stay on December 5, 2025. *See* District Court Docket No. 25. Following the Closing Date (defined below), on December 19, 2025, Builders Capital filed its opening brief (the "Opening Brief") [District Court Docket No. 27]. On January 2, 2026, the Buyer (defined below), the City, and the Debtors (together, the "Appellees") filed the *Appellees' Joint Motion to Dismiss Appeal* (the "Motion to Dismiss") [District Court Docket No. 29] in the District Court.

Upon the commencement of the Mediation (defined below), the Appellees and Builders Capital agreed to six (6) stays of these briefing deadlines to allow the Mediation to continue. Upon conclusion of the Mediation, briefing resumed in the Appeal. Builders Capital filed its response to the Motion to Dismiss on March 20, 2026. [District Court Docket No. 45] The Appellees filed a reply in support of the Motion to Dismiss on March 27, 2026. [District Court Docket No. 47]. The Appellees also filed their answering brief on March 31, 2026. [District Court Docket No. 48]. On April 14, 2026, Builders Capital filed a reply in support of its Opening Brief [District Court Docket No. 54]. Briefing has concluded with respect to the Appeal, but as of the date of this Plan, the District Court has yet to render a decision regarding the Motion to Dismiss or the merits of the Appeal.

The Debtors believe the Appeal is meritless and reserve all rights with respect to the Appeal. For the avoidance of doubt, nothing herein shall be construed as an admission or waiver related thereto.

(h)     The Closing of the Sale

The After satisfaction of all conditions precedent in the Sale Order, including the filing with the City of the Amended Development Plan, the Debtors closed the Sale to the Buyer on December 9, 2025 (the "Closing Date").  In connection therewith, the Debtors paid certain closing costs and the then outstanding amount of the DIP Financing out of the gross sale proceeds received from the Sale. The remainder of the sale proceeds were placed into an escrow accountsaccount.

(i)     The Mediation

On December 10, 2025, the Debtors filed their initial allocation motion. *See* Docket No. 834. On December 16, 2025, the Bankruptcy Court held a hearing (the "Mediation Hearing") with respect to the mediation-related relief in the initial allocation motion. Consistent with the Bankruptcy Court's ruling at the Mediation Hearing and as discussed on the record at the hearing, the mediation procedures order made the mediation voluntary and formalized certain

other aspects of the mediation. The Bankruptcy Court entered the revised form of order on December 23, 2025 and appointed James C. Bastian, Jr. to serve as mediator (the "Mediator") in accordance with the mediation procedures described therein. *See* Docket No. 864.

Thereafter, between late December and March 13, 2026, the Mediator conducted the mediation (the "Mediation") among the Debtors, the City, RDO, Poppy, Builders Capital, Keillor, the EB-5 Lenders, the TIC Participant, the Goetzes, and Granite (the "Mediation Parties") through a series of individual and group mediation sessions. While the Mediator made every effort, the Mediation did not result in global settlement and on March 13, 2026, the Mediator determined to conclude the Mediation without a global settlement having been reached.

5.   The Allocation Motion

On March 24, 2026, the Debtors filed the Allocation Motion, which ~~seeks~~sought among other things, determination of the value of certain Asserted Secured Claims under section 506(a) of the Bankruptcy Code pursuant to a revised allocation methodology that the Debtors and their advisors ~~have~~ refined as a result of discussions with certain Mediation Parties and further analysis of the Debtors' books and records, additional research, and review of the relevant issues.

Under the revised allocation methodology, the Debtors ~~continue~~continued to utilize a per-acre approach to allocation. ~~The~~Their proposed allocation also ~~takes~~took into account the "priming caps" set forth in Exhibit 3 to the Final DIP Order. The Debtors ~~have~~initially scheduled the Allocation Motion for hearing in connection with approval of the Combined Disclosure Statement and Plan on a final basis. In furtherance of the Global Settlement, on May 8, 2026, the Debtors withdrew the Allocation Motion. *See* Docket No. 1108.

~~The revised allocation methodology also considers the reality that during the Mediation certain additional disputes between creditors emerged that affect how Distributions may eventually be made by the Litigation Trust after the Effective Date. As a result, the Allocation Motion and the classification structure set forth in this Combined Disclosure Statement and Plan reflects the creation of additional Disputed Reserves to hold a portion of the net sale proceeds that the Debtors believe are properly allocated to the affected collateral under the revised allocation methodology, but as to which there remains an intercreditor priority dispute.~~

~~Only some of the Asserted Secured Claims are either partially or fully Secured.  The Secured portion, if any, of the Asserted Secured Claims that are partially Secured are each classified in their own Class and have the treatment set forth under the Plan.  The unsecured deficiency portion of such claims and claims that are fully unsecured (as determined by the Allocation Methodology) are classified in Class 15 General Unsecured Claims.~~

6.   Other Procedural and Administrative Motions

After the Petition Date, the Debtors also filed a number of customary motions and applications to retain professionals and further facilitate the efficient administration of the Chapter 11 Cases, including:

- **Debtor Professional Retention Applications**.  The Debtors filed applications requesting authority to retain and employ certain professionals pursuant to sections 327, 328 and

55

330, as applicable, of the Bankruptcy Code, including DWC as restructuring advisor and Chief Restructuring Officer to the Debtors [Docket No. 9]; the Law Offices of Benjamin M. Carson, P.C. as bankruptcy co-counsel [Docket No. 103]; Richards, Layton & Finger, P.A. as counsel to the Independent Manager [Docket No. 225]; JLL as the Debtors' real estate broker and advisor [Docket No. 261]; Reliable Companies as claims and noticing agent [Docket No. 453]; and Wilson Sonsini Goodrich & Rosati, P.C. ("WSGR"), as bankruptcy co-counsel [Docket No. 480][16]; (collectively, the "Retention Applications"). The Bankruptcy Court entered orders approving the Retention Applications. *See* Docket Nos. 103, 109, 163, 175, 206, 238, 250, 312, 473 & 500.

- **Interim Compensation Motion**. On August 21, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Professionals; and (II) Granting Related Relief* (the "Interim Compensation Motion") [Docket No. 50], requesting that the Bankruptcy Court establish certain customary procedures related to the approval of professional compensation during the Chapter 11 Cases. On September 16, 2024, the Bankruptcy Court entered an order approving the Interim Compensation Motion (the "Interim Compensation Order") [Docket No. 108].

- **Bar Date Motion.** On April 28, 2025, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim, Including 503(b)(9) Claims, and Requested for Payment of Administrative Expenses; (II) Approving the Form and Manner of Notice Thereof; and (III) Granting Related Relief* (the "Bar Date Motion") [Docket No. 455], requesting that the Bankruptcy Court establish certain bar dates for the filing of Proofs of Claim in the Chapter 11 Cases. On May 12, 2025, the Bankruptcy Court entered an order approving the Bar Date Motion [Docket No. 472] (the "Bar Date Order"). Pursuant to the Bar Date Order, the Court established the following Bar Dates:

  o June 16, 2025, at 5:00 p.m. (ET), as the final date and time for each entity (including individuals, partnerships, corporations, joint ventures, and trusts), other than any governmental units, to file a Proof of Claim on account of a prepetition claim, including 503(b)(9) Claims (the "General Bar Date") and as the final date and time for each Governmental Units to file proofs of claims on account of a prepetition claims (the "Governmental Bar Date");

  o with respect to any scheduled Claim affected by the Debtors' amendment of, or supplement to, the Schedules, the later of (a) the General Bar Date and (b) twenty-one (21) days after the date notice is given regarding any such amendment or supplement (the "Amended Schedules Bar Date"); and

---

[16]  Through the Independent Manager, the Debtors engaged WSGR to serve as substituted co-counsel to the Debtors on April 21, 2025.  In furtherance thereof, WSGR filed that certain *Notice of Appearance and Substitution of Counsel* on April 24, 2025. *See* Docket No. 450.

    o   with respect to any claims alleged to arise from the rejection of an executory contract or unexpired lease, the later of (a) General Bar Date and (b) 5:00 p.m. (ET) on the date that is 30 days after entry of an order of the Bankruptcy Court approving such rejection (the "Rejection Damages Bar Date" and collectively with the General Bar Date, the Governmental Bar Date, and the Amended Schedules Bar Date, the "Bar Dates").

- **Ordinary Course Professionals Motion.** On May 1, 2025, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Retain and Compensate Certain Professionals Utilized in the Ordinary Course of Business; and (II) Granting Related Relief* (the "OCP Motion") [Docket No. 463], requesting that the Bankruptcy Court establish certain customary procedures for the retention and compensation of professionals utilized by the Debtors in the ordinary course of business. On May 12, 2025, the Bankruptcy Court entered an order approving the OCP Motion. *See* Docket No. 471.

7. Schedules and Statements

On September 18, 2024, the Debtors filed their respective schedules of assets and liabilities and statements of financial affairs [Docket Nos. 114, 115, 116, 117, 118 & 119 (as amended at Docket Nos. 637, 638, 639, 640 & 641)] (collectively, the "Schedules and Statements"). The Debtors incorporate by reference the information contained in the Schedules and Statements, subject to all accompanying notes and disclaimers, including the descriptions of the Debtors' assets and liabilities as of the Petition Date and of pending legal proceedings involving the Debtors.

8. Adversary Proceedings During the Chapter 11 Cases

Throughout the Chapter 11 Cases, the Debtors have been involved in certain adversary proceedings, which are summarized below.

    (a)    Mechanics Lien and Priority ~~Dispute~~Disputes

On June 27, 2025, RDO commenced an adversary proceeding in the Bankruptcy Court captioned *R.D. Olson Construction, Inc. v. Poppy Bank*, Adv. Pro. No. 25-51049 (MFW) Adv. Case No. 25-51049. Through this proceeding, RDO is seeking a declaratory judgment concerning the extent, validity and priority of RDO's and Poppy's respective liens against certain parcels of the Project. RDO additionally objected to Poppy's claim filed in the Chapter 11 Cases.

On July 28, 2025, Poppy filed an answer and counterclaim (the "Answer and Counterclaim") [Adv. Docket No. 7]. The Answer and Counterclaim admits that an actual controversy exists between RDO and Poppy concerning the extent, validity and priority of RDO's and Poppy's respective liens. Poppy also seeks a declaratory judgment, equitable subordination, and enforcement of equitable lien of the lien disputes between RDO and Poppy.

On August 27, 2025, three lien claimants, White's Steel, Inc., Rowan, and Gauston Corp. (collectively, the "Intervenor Parties") filed a complaint in intervention (the "Intervenors'

57

Complaint") [Adv. Docket No. 15] to determine the validity, priority and extent of Poppy's liens over certain of the Debtors' real property.  All of the Intervenor Parties are subcontractors of RDO who entered into subcontracting agreements related to the Project.  The Intervenors' Complaint alleges that each of the Intervenor Parties has filed and asserted valid mechanic's liens for work performed at the Project. On September 3, 2025, the Bankruptcy Court entered a scheduling order [Adv. Docket No. 19], which established discovery and dispositive motion deadlines along with a deadline for the parties to meet and confer related to mediation.

(b)     Pending and Closed Preference and Fraudulent Transfer Actions

During the Chapter 11 Cases, the Debtors have also commenced four adversary proceedings against creditors who received security interests in the Debtors as a result of transactions undertaken in July 2024 that the Debtors believe constitute avoidable preferences and/or fraudulent conveyances and refused to execute voluntary unwinds or reconveyances of such interests. The status of these proceedings is as follows:

(i)     SRDC and PA 789 v. the Goetzes and DOES 1-20 [Adv. Case No. 25-50450]: The Debtor-plaintiffs filed their complaint on March 25, 2025 [Adv. Docket No. 1], and the Goetzes answered on April 24, 2025 [Adv. Docket No. 5]. On June 13, 2025, the Debtor-plaintiffs moved to stay the adversary proceeding in its entirety pending the closing of the Sale [Adv. Docket No. 13]. The stay was lifted on December 9, 2025, and on December 11, 2025, the Debtor-plaintiffs and the Goetzes stipulated to dismiss the adversary proceeding without prejudice [Adv. Docket No. 23]. The Bankruptcy Court closed the case on December 17, 2025.

(ii)    SRDC and SRPI v. Axia and DOES 1-20 [Adv. Case No. 25-50389]: The Debtor-plaintiffs filed their complaint on February 25, 2025 [Adv. Docket No. 1], and Axia answered on May 12, 2025 [Adv. Docket No. 7]. On August 1, 2025, pursuant to a stipulation between the Debtor-plaintiffs and the defendant, the Bankruptcy Court entered an order staying the adversary proceeding in its entirety until 60 days after closing of the Sale [Adv. Docket No. 12]. The stay expired on February 9, 2026, and the Debtor-plaintiffs' motion to dismiss the adversary proceeding without prejudice is pending.

(iii)   SRDC, SRPI, and SR Lifestyle v. Young's and DOES 1-20 [Adv. Case No. 25-50950]: The Debtor-plaintiffs filed their complaint on May 20, 2025 [Adv. Docket No. 1] and dismissed the complaint, without prejudice, on December 17, 2025 [Adv. Docket No. 7]. The Bankruptcy Court closed the case on December 18, 2025.

(iv)    Kloiber Real Estate Holdings, LLC ("Kloiber") and DOES 1-20 [Adv. Case No. 25-51201]: The Debtor-plaintiffs filed their complaint on July 29, 2025 [Adv. Docket No. 1]. The Bankruptcy

Court approved an agreement between the Debtor-plaintiffs and Kloiber, whereby Kloiber agreed to voluntarily reconvey its security in SRDC's real property on November 25, 2025. [Docket No. 817]. On November 14, 2025, the Debtor-plaintiffs and Kloiber stipulated to dismiss the case without prejudice [Adv. Docket No. 8], and the Bankruptcy Court closed the case on December 9, 2025.

(c)      Reservation of Avoidance Actions and Other Estate Causes of Action

Pursuant to the Plan, the Debtors, or, after the Effective Date, the Litigation Trustee, shall retain and preserve all rights, claims, and causes of action belonging to the Debtors or their Estates, including, without limitation, any avoidance actions under Chapter 5 of the Bankruptcy Code. Such actions include, but are not limited to, claims arising under sections 502(d), 510(c), 542, 544, 545, 547, 548, 549, 550, and 551 of the Bankruptcy Code, together with any related claims or remedies available under applicable non-bankruptcy law, including statute fraudulent transfer laws.

Without limiting the generality of the foregoing, the Debtors or, after the Effective Date, the Litigation Trustee, may pursue avoidance actions, as defined above, against any person or entity that received transfers from or on behalf of the Debtors prior to the Petition Date. The reservation of rights described herein includes, without limitation, the right to investigate and pursue avoidance actions relating to transfers made to or for the benefit of certain parties identified in this Combined Disclosure Statement and Plan, including transfers made to or for the benefit of the Robert Green Company for at least $4,326,502.61, RGRI for at least $7,132,916.75, and Cypress Point Holdings, LLC, among others. Nothing in this Combined Disclosure Statement and Plan shall be deemed to limit the scope of such causes of action or the parties against whom they may be asserted. All such causes of action shall be preserved and may be brought if at all, by the Debtors prior to the occurrence of the Effective Date or after the Effective Date by the Litigation Trustee in accordance with the Plan.

9.  Confirmation Schedule

Pursuant to the ~~Solicitation~~Interim Approval and Procedures Motion, the proposed schedule and deadlines for Confirmation ~~include~~included the following, which are subject to change as permitted in the Interim Approval and Procedures Order:

| Event | Date |
|---|---|
| Disclosure Statement Hearing | April 7, 2026 at 10:30 a.m. (ET) |
| Record Date | April 8, 2026 |
| Deadline to File Claims Objections for Plan Voting Purposes | April 8, 2026 |
| Solicitation Date | April 9, 2026 |
| Deadline to File Plan Supplement | April 30, 2026 |
| Deadline to File Bankruptcy Rule 3018 Motions for Plan Voting Purposes | May 1, 2026 |
| ~~Confirmation~~Combined Disclosure Statement and Plan | May 7, 2026 at 4:00 p.m. |

59

| Objection Deadline | (ET)[17] |
|---|---|
| Voting Deadline | May 8, 2026 at 5:00 p.m. (ET)[18] |
| Deadline for Voting Agent to File Plan Voting Report | May 13, 2026 |
| Deadline to Reply to Plan Objections | May 18, 2026 at 12:00 p.m. (ET) |
| Combined Hearing | ~~May 20, 2026 at 10:30 a.m. and~~ May 21 2026 at 10:30 a.m. |

## ARTICLE V. CONFIRMATION AND VOTING PROCEDURES

A.    *Confirmation Procedure*

On April 8, 2026, the Bankruptcy Court entered the Interim Approval and Procedures Order conditionally approving the Combined Disclosure Statement and Plan for solicitation purposes only and authorizing the Debtors to solicit votes to accept or reject the Plan. The Combined Hearing has been scheduled for May ~~20 and~~ 21, 2026 at 10:30 a.m. (prevailing Eastern Time) to consider (a) final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code. The Combined Hearing may be adjourned or continued from time to time by the Bankruptcy Court or the Debtors by announcement of the adjournment or continuance at a hearing before the Bankruptcy Court or by filing a notice on the docket of these Chapter 11 Cases.

B.    *Procedure for Objections*

Any objection to final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on (a) co-counsel for the Debtors, (x) Wilson Sonsini Goodrich & Rosati, P.C., 222 Delaware Avenue, Suite 800, Attn: Erin R. Fay, Shane M. Reil, and Catherine C. Lyons (emails: efay@wsgr.com; sreil@wsgr.com; and clyons@wsgr.com), (y) Law Offices of Benjamin M. Carson, P.C., 5965 Village Way, Suite E105, San Diego, California 92130, Attn: Benjamin M. Carson (email: ben@benjamincarson.com), and (z) Victor A. Vilaplana, 823 La Jolla Rancho Road, La Jolla, California 92037 (email: vavilaplana@gmail.com), (b) co-counsel to the DIP Lender, (x)  Pashman Stein Walder Hayden, P.C., 824 North Market Street, Suite 800, Attn: Richard W. Riley (email: rriley@pashmanstein.com), (y) Whiteford, Taylor & Preston LLP, 3190 Fairview Park Drive, Suite 800, Falls Church, Virginia 22042-4510, Attn: Bradford F. Englander (email: benglander@whitefordlaw.com), and (z) Rutan & Tucker, LLP, 18575 Jamboree Road, 9th Floor, Irvine, California 92612, Attn: William H. Ihrke (email: bihrke@rutan.com); and (c) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 North King Street, Suite 2207, Wilmington, Delaware

---

[17]    Extended to May 13, 2026 at 4:00 p.m. (ET).

[18]    Extended to May 13, 2026 at 4:00 p.m. (ET).

19801, Attn: Jane M. Leamy (email: jane.m.leamy@usdoj.gov), in each case by no later than **May 713, 2026 at 4:00 p.m. (prevailing Eastern Time)**. Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Combined Hearing.

C.      *Requirements for Confirmation*

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make certain findings, including that:

- the Plan has classified Claims and Interests in a permissible manner;

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the Debtors, as proponents of the Plan, have proposed the Plan in good faith and not by any means forbidden by law;

- the Plan that has been accepted by the requisite votes, except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code of creditors and equity interest holders;

- the Plan is feasible; and

- the Plan is in the "best interests" of all holders of Claims or Interests in an impaired Class because it provides to those holders on account of their Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that each holder would receive or retain in a chapter 7 liquidation, unless each holder of a Claim or Interest in that Class has accepted the Plan.

A plan is accepted by (i) an impaired class of claims if holders of at least two-thirds in dollar amount and a majority in number of claims of that class vote to accept the plan, and (ii) an impaired class of interests if holders of at least two-thirds in dollar amount of allowed interest vote to accept to the plan.  Only those holders of claims or interests who actually vote (and are entitled to vote) to accept or to reject a plan count in this tabulation.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the plan).  This requirement is satisfied as the Plan proposes a liquidation of the Debtors' Remaining Assets, and the Debtors believe the Debtors' Cash (and any additional proceeds from the liquidation of the Debtors' Remaining Assets) will be sufficient to allow the Litigation Trust to make all payments required to be made under the Plan.

D.      *Classification of Claims and Interests*

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the

treatment for each Class (other than those claims which, pursuant to section 1123(a)(1) of the Bankruptcy Code, need not be and have not been classified).

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest agrees to a less favorable treatment of its claim or interest. The Debtors believe that the Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class, and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If this occurs, the Debtors intend, in accordance with the terms of the Plan, to make such modifications to the Plan as may be necessary to permit its confirmation. Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

EXCEPT AS SET FORTH HEREIN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED A MEMBER.

The amount of any Impaired Claim that is ultimately Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein or the actual Distribution received by creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of Distributions to members of each Class are summarized herein. The Debtors believe that the consideration, if any, provided under the Plan to Holders of Claims reflects an appropriate resolution of their Claims considering the differing nature and priority (including contractual subordination, if any) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

E.      *Impaired Claims or Interests*

Pursuant to the Plan and the provisions of the Bankruptcy Code, only classes of Claims or Interests that are Impaired under the Plan that are not deemed to reject the Plan may vote to accept or reject the Plan.

Under the Plan, only Holders of Claims in Classes ~~3-15~~3-27 are Impaired and are entitled to vote on the Plan. Under the Plan, Holders of Claims and Interests in Classes ~~16-18~~28-30 are deemed to reject the Plan. Therefore, the Holders of Claims and Interests in Classes ~~16-18~~28-30 are not entitled to vote on the Plan. Under the Plan, Holders of Claims in Classes 1 and 2 are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan.

F.      *Confirmation Without Necessary Acceptances; Cramdown*

In the event that any Impaired Class of Claims or Interests does not accept a plan, a debtor may nevertheless move forward for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all Impaired Classes, if the plan has been accepted by at least one Impaired Class of claims, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting Impaired Class of Claims or Interests. Here, because Holders of Claims and Interests in Classes ~~16-18~~28-30 are deemed to reject the Plan, the Debtors will seek confirmation of the Plan by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtors believe that such requirements are satisfied, in part, as no Holder of any Claim or Interest junior to those in Class ~~15~~27 will receive any property under the Plan.

A plan does not "discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests, provided that a debtor may be afforded wide latitude for separately classifying and treating claims of the same priority based on, among other factors, the differing factual or legal nature or attributes of the claims or their holders. The Debtors believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, when taking into account the nature and attribute of such Claims and Interests and their Holders, and no Class of Claims or Interests will receive payments

63

or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors, and membership holders, as follows:

### 1.   Secured Creditors

Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be provided in clause (i) or (ii) above.

### 2.   Unsecured Creditors

Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and that are junior to the claims of the dissenting class will not receive any property under the plan.

### 3.   Interests

Either (i) each holder of an interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtors believe the Distributions provided under the Plan satisfy the absolute priority rule, where required.

G.     *Best Interests Test and Liquidation*

Notwithstanding acceptance of the Plan by each impaired Class, to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each holder of a Claim in any impaired Class who has not voted to accept the Plan.  Accordingly, if an impaired Class does not unanimously accept the Plan, the "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of that impaired Class a recovery on account of the holder's Claim that has a value, as of the Effective Date, at least equal to the value of the distribution that the holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

To address the "best interests" test, the Debtors ~~have~~previously filed the Liquidation Analysis ~~attached hereto as~~ **~~Exhibit B~~**, which includes a summary of the anticipated recoveries under the Plan and in a hypothetical chapter 7 liquidation.

As reflected in the Liquidation Analysis, the Debtors submit that a chapter 7 liquidation would result in diminution in the anticipated recoveries of Holders of Allowed Claims, as compared to the proposed distributions under the Plan. Consequently, the Debtors submit that the Plan will provide a greater ultimate return to holders of Allowed Claims than would a chapter 7 liquidation.

H.      *Acceptance of the Plan*

The rules and procedures governing eligibility to vote on the Plan, solicitation of votes, and submission of ballots are set forth in the Interim Approval and Procedures Order.

For the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Voting Class, excluding the votes of Insiders, must vote to accept the Plan.

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY MAIL THE BALLOT YOU RECEIVE TO THE CLAIMS AGENT. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY AND TO IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE HOLDER. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT OR YOU LOST YOUR BALLOT OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT, RELIABLE COMPANIES, VIA EMAIL AT BANKRUPTCY@RELIABLE-CO.COM WITH A REFERENCE TO "SILVERROCK" IN THE SUBJECT LINE.

**ARTICLE VI. CERTAIN RISK FACTORS TO BE CONSIDERED BEFORE VOTING**

Prior to voting on the Plan, Holders of Claims in Classes ~~3 – 15~~3–27 as well as entities in non-voting Classes, should consider carefully the risk factors described below, as well as all of the information contained in this Combined Disclosure Statement and Plan.  These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

A.      *Risk of Amendment, Waiver, Modification or Withdrawal of the Plan*

The Debtors, the Litigation Trust, and the Litigation Trustee, as applicable, reserve the right, in accordance with the Bankruptcy Code, the Bankruptcy Rules and consistent with the terms of the Plan, to amend the terms of the Plan or waive any conditions thereto if and to the extent that such amendments or waivers are necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.

B.      *Parties May Object to the Plan's Classification of Claims and Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with this requirement. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that parties will not object to the proposed classification.

C.      *The Plan May Not Be Confirmed*

The Debtors may not receive the requisite acceptances to confirm the Plan.  In the event that votes with respect to Claims in the Class entitled to vote are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek Confirmation of the Plan by the Bankruptcy Court.  However, if the requisite acceptances are not received, the Debtors may not be able to obtain Confirmation of the Plan.  Even if the requisite acceptances of the Plan are received, the Bankruptcy Court might not confirm the Plan as proposed if the Bankruptcy Court finds that any of the statutory requirements for confirmation under section 1129 of the Bankruptcy Code has not been met.

If the Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative plan would be on terms as favorable to Holders of Allowed Claims as the terms of the Plan.  In addition, there can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtors' creditors.

D.      *The Conditions Precedent to the Effective Date of the Plan May Not Occur*

The Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not occur.

E.      *General Unsecured Creditors May Recover Less Than Projected*

Any Cash available for Distributions to Holders of Allowed General Unsecured Claims may be reduced by, among other things, the prior payment of (a) the Litigation Trust Expenses; (b) any other wind-down fees, costs and expenses of the Debtors; and (c) Allowed Claims required to be paid by the Estates pursuant to the Plan with priority over Allowed General Unsecured Claims.

F.      *The Allowed Amount of Claims May Differ from Current Estimates*

There can be no assurance that the estimated Allowed Claim amounts set forth herein are correct, and the actual amount of Allowed Claims may differ from the estimates.  The estimated amounts are subject to certain risks, uncertainties, and assumptions.  Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated in this Combined Disclosure Statement and Plan.  Furthermore, a number of additional claims may be Filed, including on

66

account of rejection damages for Executory Contracts and Unexpired Leases rejected pursuant to the Plan.  Any such claims may result in a greater amount of Allowed General Unsecured Claims than estimated herein.

G.      *Risks Related to Income Taxation*

There are several income tax considerations, risks and uncertainties associated with the Plan.  Interested parties should read carefully the discussions set forth in Article VI hereof regarding certain United States federal income tax consequences of the transactions proposed by the Plan.

H.      *Litigation*

As is the case with most litigation, the outcomes of any litigation involving the Debtors, or any other Retained Cause of Action are difficult to assess or quantify.

I.      *Failure to Identify Litigation Claims or Projected Objections*

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Combined Disclosure Statement and Plan. The Debtors and, after the Effective Date, the Litigation Trustee, may seek to investigate, File, and prosecute Retained Causes of Action and/or objections to Claims and may do so irrespective of whether this Combined Disclosure Statement and Plan identifies such Retained Causes of Action and Claims or objections thereto.

Further, no reliance should be placed on the fact that a particular legal action or proceeding that may be pending or threatened against the Debtors is, or is not, identified in this Combined Disclosure Statement and Plan, including any such action or proceeding that was disclosed in the Schedules. The Debtors reserve all rights, defenses, objections, and the like in connection with any pending or threatened legal action or proceeding.

J.      *No Waiver of Right to Object or Right to Recover Transfers and Assets*

The vote by a Holder of a Claim for or against the Plan does not constitute a waiver or release of any Claims, Causes of Action, or rights of the Debtors, the Litigation Trustee (or any Entity, as the case may be) to object to that Holder's Claim, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified in this Combined Disclosure Statement and Plan.

K.      *Certain Tax Considerations*

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE**

**PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

The following discussion summarizes certain United States federal income tax consequences of the Plan to the Debtors and to certain holders of Claims. This discussion is based on the Internal Revenue Code, the Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rulings and pronouncements of the IRS, all as in effect on the date hereof. Legislative, judicial, or administrative changes in law or its interpretation, as well as other events occurring after the date of this Combined Disclosure Statement and Plan, and which may be retroactive, could materially alter the tax treatment described below. Furthermore, this discussion is not binding on the IRS or any other tax authority. There is no assurance that a tax authority will not take, or that a court will not sustain, a position with respect to the tax consequences of the Plan that differs from the tax consequences described below. No ruling has been or will be sought from the IRS, no opinion of counsel has been or will be obtained, and no representations are made regarding any tax aspect of the Plan.

The following discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder in light of such Holder's facts and circumstances, or to certain types of Holders subject to special treatment under the Internal Revenue Code (for example, governmental entities and entities exercising governmental authority, non-U.S. taxpayers, banks and certain other financial institutions, broker-dealers, insurance companies, tax-exempt organizations, real estate investment trusts, regulated investment companies, Persons holding a Claim as part of a hedge, straddle, constructive sale, conversion transaction, or other integrated transaction, Holders that are or hold their Claims through a partnership or other pass-through entity, and Persons that have a functional currency other than the U.S. dollar). This summary does not address state, local, or non-United States tax consequences of the Plan, nor does this summary address federal taxes other than income taxes. Furthermore, this discussion generally does not address U.S. federal income tax consequences to Holders that are Unimpaired under the Plan or that are not entitled to receive or retain any property under the Plan or to Persons who are deemed to have rejected the Plan.

1. Litigation Trust

(a)     Grantor Trust

It is intended that the Litigation Trust qualify as a grantor trust pursuant to sections 671 and 677 of the Internal Revenue Code, and that the Beneficiaries are treated as grantors of the Litigation Trust and the owners of the Litigation Trust Assets. For U.S. federal income tax purposes, it is intended that the Litigation Trust (except with respect to the Disputed Claims, including any disputed ownership fund election that might be made) be classified as a Litigation Trust under Treasury Regulation Section 301.7701-4 and Revenue Procedure 9445, 1994-2 C.B. 684, with no objective to continue to engage in the conduct of a trade or business. As described more fully herein, the transfer of the Litigation Trust Assets will be treated for federal income tax purposes as a transfer to the Beneficiaries, followed by a deemed transfer from such Beneficiaries to the Litigation Trust; *provided, however*, that the Litigation Trust Assets will be subject to any post-Effective Date obligations incurred by the Litigation Trust relating to the pursuit of Litigation Trust Assets.  Accordingly, the Beneficiaries will be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes. All items of income, gain, loss, deduction, and credit will be included in the income of the Beneficiaries as if such items had been recognized directly by the Beneficiaries in the proportions in which they own beneficial interests in the Litigation Trust.

(b)     Reporting

The Litigation Trustee shall comply with all tax reporting requirements, including filing returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulation § 1.671-4(a) and the guidelines set forth for a "Litigation Trust" in Revenue Procedure 94-95, 1994-2 C.B. 684. In connection therewith, the Litigation Trustee may require Beneficiaries to provide certain tax information as a condition to receipt of Distributions, including certification of the Beneficiary's Taxpayer or Employer Identification Number.

(c)     Valuation

As soon as reasonably practicable after the Effective Date, but in any event no later than 180 days thereafter, the Litigation Trustee shall make a good faith valuation of assets of the Litigation Trust, and such valuation shall be used consistently by all parties (including the Debtors, the Litigation Trust and the Beneficiaries) for all federal, state, and local income tax purposes.  The Litigation Trustee also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Litigation Trust that are required by any Governmental Unit for taxing purposes.

(d)     Tax Returns

The Litigation Trustee shall be responsible for filing (and for paying all costs, expenses, and taxes with respect to the preparation and filing of) all federal, state, local, and foreign tax returns for the Debtors, and the Litigation Trust.  Notwithstanding any rule, law, statute, or organizational document of the Debtors to the contrary, the Litigation Trustee or his or her designee shall be deemed the attorney-in-fact for any party required to execute any federal, state, local, and foreign tax returns on behalf of the Debtors or the Litigation Trust.  The Litigation Trust shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions made by the Litigation Trust shall be subject to any such withholding and reporting requirements.

(e)     Disputed Ownership Fund Election

The Plan permits the Litigation Trustee to establish Disputed Claim Reserves. The Litigation Trustee may, at the Litigation Trustee's sole discretion, file a tax election to treat any such Disputed Claim Reserve as a Disputed Ownership Fund as described in Treasury Regulation § 1.468B-9 or other taxable entity rather than as a part of the Litigation Trust for federal income tax purposes. If such election is made, the Litigation Trust shall comply with all tax reporting and tax compliance requirements applicable to the Disputed Ownership Fund or other taxable entity, including, but not limited to, the filing of separate income tax returns for the Disputed Ownership Fund or other taxable entity and the payment of any federal, state, or local income tax due.

(f)     Attribution of Income

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), attribution of Litigation Trust taxable income or loss shall be by reference to the manner in which any economic gain or loss would be borne immediately after a hypothetical liquidating distribution of the remaining Litigation Trust Assets. The tax book value of the Litigation Trust Assets for purpose of this paragraph shall equal their fair market value on the date the Litigation Trust Assets are transferred to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the Internal Revenue Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(g)     Income Taxed on a Current Basis

All income of the Litigation Trust will be subject to tax on a current basis. Except with respect to the Disputed Ownership Fund, the Plan requires the Debtors, the Litigation Trust, and the Beneficiaries to report consistently with characterization of the Litigation Trust as a grantor trust and requires the Litigation Trustee to file tax returns treating the Litigation Trust as a "grantor trust" pursuant to Treasury Regulation section 1.671-4(a) and to report to each Beneficiary a statement of the Beneficiary's share of Litigation Trust income, gain, loss, deduction, and credit for inclusion in the Beneficiary's U.S. federal income tax return.

70

Beneficiaries therefore may owe tax on Litigation Trust income, without regard to whether cash distributions are made to beneficial owners by the Litigation Trust.

> (h)   Tax Identification Numbers

Amounts paid to Beneficiaries are subject to generally applicable withholding, information, and backup withholding rules. The Litigation Trustee may require any Beneficiary to furnish to the Litigation Trustee its Employer or Taxpayer Identification Number as assigned by the IRS or certify to the Litigation Trustee's satisfaction that Distributions to the Beneficiary are exempt from backup withholding. The Litigation Trustee may condition any Distribution to any Beneficiary upon receipt of such identification number. If after reasonable inquiry, any Beneficiary fails to provide such identification number to the Litigation Trustee, the Litigation Trustee shall deem such Beneficiary's Claim as Disallowed and no Distribution shall be made on account of such Beneficiary's Claim.

> (i)   Notices

The Litigation Trustee shall distribute such notices to the Beneficiaries as the Litigation Trustee determines are necessary or desirable.

> (j)   Expedited Determination

The Litigation Trustee may request an expedited determination of taxes of the Debtors or of the Litigation Trust under Bankruptcy Code section 505(b) for all tax returns filed for, or on behalf of, the Debtors and the Litigation Trust for all taxable periods through the dissolution of the Litigation Trust.

> 2.   Federal Income Tax Consequences to the Debtors

> (a)   Cancellation of Indebtedness Income and Reduction of Tax Attributes

For U.S. federal income tax purposes, gross income generally includes income from cancellation of indebtedness ("COD").  In general, the Debtors will have COD income equal to the excess of the amount of debt discharged pursuant to the Plan over the adjusted issue price of the debt, less the amount of cash and the fair market value of property distributed to holders of the debt. Various statutory or judicial exceptions limit the incurrence of COD income (such as where payment of the cancelled debt would have given rise to a tax deduction). COD income also includes interest accrued on obligations of the Debtors but unpaid at the time of discharge. An exception to the recognition of COD income applies to a debtor in a Chapter 11 bankruptcy proceeding. Bankrupt debtors generally do not include COD in taxable income but must instead reduce certain tax attributes (such as capital losses, certain credits, and the excess of the tax basis of the debtor's property over the amount of liabilities outstanding after discharge) by the amount of COD income that was excluded under the bankruptcy exception. Tax benefits are reduced after the tax is determined for the year of discharge.

> 3.   Federal Income Tax Consequences to Holders

(a)      Characterization

The tax treatment of Holders, and the character, amount, and timing of income, gain, or loss recognized as a consequence of the Plan and any Distributions pursuant to the Plan may vary, depending upon, among other things: (i) whether the Claim (or a portion of the Claim) is for principal or interest; (ii) the type of consideration the Holder receives for the Claim; (iii) whether the Holder receives Distributions under the Plan in more than one taxable year; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder of the Claim has taken a bad debt deduction with respect to part or all of the Claim; (viii) whether the Holder of the Claim has previously included in income accrued but unpaid interest on the Claim; (ix) the Holder's method of tax accounting; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; (xi) whether the Claim, and any instrument received in exchange for the Claim, is a "security" for U.S. federal income tax purposes; and (xii) whether and the manner in which the "market discount" rules of the Internal Revenue Code apply to the holder of the Claim.   The discussion below refers to the treatment of Cash and property received by holders of Claims in their capacity as Beneficiaries of the Litigation Trust.

(b)      Gain and Loss Recognition

Holders that receive ~~cash~~Cash and property other than stock and securities for their Claim will recognize gain or loss for U.S. federal income tax purposes equal to the difference between the "amount realized" by the Holder and the Holder's tax basis in the Claim. The "amount realized" is the sum of the amount of ~~cash~~Cash and the fair market value of any other property received under the Plan in respect of the Claim (other than amounts received in respect of a Claim for accrued unpaid interest). The Holder's tax basis in the Claim (other than a Claim for accrued unpaid interest) is generally the Holder's cost, though tax basis could be more or less than cost depending on the specific facts of the Holder. Any gain or loss realized may be capital gain or loss or ordinary gain or loss, depending on the circumstances of the Holder.

(c)      Interest Issues

Holders that receive ~~cash~~Cash and property in exchange for unpaid accrued interest on their Claims may recognize interest income to the extent the interest was not already included in income.   To the extent a Holder of a Claim receives consideration that is attributable to indebtedness and unpaid accrued interest thereon, the Debtors intend to take the position, and the Plan provides, that for U.S. federal income tax purposes, such consideration should be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing unpaid accrued interest. Notwithstanding the Plan provision, there is general uncertainty regarding the extent to which the receipt of ~~cash~~Cash or other property should be attributable to unpaid accrued interest.   To the extent any ~~cash~~Cash received pursuant to the Plan is considered attributable to unpaid accrued interest, a Holder will recognize ordinary income to the extent the value of the cash exceeds the amount of unpaid accrued interest previously included in gross income by the Holder. A Holder generally will be entitled to recognize a loss to the extent any accrued interest previously included in its gross income is not paid in full.

72

**HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE FEDERAL INCOME TAX TREATMENT OF THE RECEIPT OF INTERESTS IN THE LITIGATION TRUST IN EXCHANGE FOR THEIR CLAIMS.**

(d)     Bad Debt and Worthless Security Deductions

A Holder who receives, in respect of such Holder's Claim, an amount that is less than such Holder's tax basis in the Claim may be entitled to a bad debt or worthless securities deduction. The rules governing the character, timing, and amount of these deductions depend upon the facts and circumstances of the Holder, the obligor, and the instrument with respect to which the deduction is claimed, including whether (i) the Holder is a corporation or (ii) the Claim constituted (a) a debt created or acquired (as the case may be) in connection with the Holder's trade or business or (b) a debt, the loss from worthlessness of which is incurred in the holder's trade or business. A Holder that has previously recognized a loss or deduction in respect of such Holder's Claim may be required to include in income amounts received under the Plan that exceed the Holder's adjusted basis in its Claim.

(e)     Installment Obligations

A Holder of a Claim that is an installment obligation for U.S. federal income tax purposes may be required to recognize any gain remaining with respect to such obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold, or otherwise disposed of within the meaning of section 453B of the Internal Revenue Code.

(f)     Market Discount

A Holder of a Claim that acquires a Claim at a market discount generally is required to treat any gain realized on the disposition of the Claim as ordinary income to the extent of the market discount that accrued during the period the Claim was held by the Holder and that was not previously included in income by the Holder.

(g)     Withholding

Amounts paid to Holders are subject to generally applicable withholding, information, and backup withholding rules. The Plan authorizes the Debtors and the Litigation Trustee, as applicable, to withhold and report amounts required by law to be withheld and reported. Amounts properly withheld from Distributions to a Holder and paid over to the applicable taxing authority for the account of such Holder will be treated as amounts distributed to such Holder. Holders are required to provide the Debtors and the Litigation Trustee, as applicable, with the information necessary to effect information reporting and withholding as required by law. Notwithstanding any other provision of the Plan, holders of Claims that receive a Distribution pursuant to the Plan are responsible for the payment and satisfaction of all tax obligations, including income, withholding, and other tax obligations imposed with respect to the Distribution, and no Distribution shall be made until a Holder has made arrangements satisfactory to the Debtors or the Litigation Trustee, as applicable, for the payment and satisfaction of such obligations.

(h)    Backup Withholding

Holders may be subject to backup withholding on payments pursuant to the Plan unless the Holder (A) is not a corporation and is not otherwise exempt from backup withholding and, when required, demonstrates that or (B) provides a correct taxpayer identification and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of previous failure to report dividend and interest income. Amounts withheld due to backup withholding will be credited against the Holder's federal income tax liability and excess withholding may be refunded if a timely claim for refund (generally, a U.S. federal income tax return) is filed with the IRS.

(i)    Certain Disclosure Requirements

Treasury regulations require tax return disclosure of certain types of transactions that result in the taxpayer claiming a loss in excess of specified thresholds. Holders are urged to consult their own tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and would require such disclosure.

(j)    Importance of Obtaining Professional Tax Assistance

**THE FOREGOING DISCUSSION IS: (I) INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN; (II) NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL; AND (III) FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES TO EACH HOLDER ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE STRONGLY URGED TO CONSULT WITH SUCH HOLDERS' TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN INCOME TAX CONSEQUENCES OF THE PLAN.**

**ARTICLE VII.**

**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.    *Implementation of the Plan*

The Plan will be implemented by, among other things, the appointment of the Litigation Trustee and the making of Distributions from the Litigation Trust Assets, including all Cash and the proceeds, if any, from the prosecution, settlement, or other disposition of any Retained Causes of Action, in accordance with the Plan and the Litigation Trust Agreement.  Except as otherwise provided in the Plan, on and after the Effective Date, all assets of the Estates, including all claims, rights, Retained Causes of Action and any property acquired by the Debtors under or in connection with the Plan, shall vest in the Litigation Trust, free and clear of all Liens, Claims, and Interests, subject to the substantive consolidation provided for herein. For the avoidance of doubt, on and after the Effective Date, the Sale proceeds, net of the payments permitted to be made under the Sale Order, including U.S. Trustee Quarterly Fees, shall be

disbursed to and held in a segregated interest-bearing account by the Litigation Trust for payment to creditors and SR Land II, LLC in its capacity as holder of the SR Land TIC Interest (as defined in the Allocation Motion), as determined by the Court or resolved among such parties; for the avoidance of doubt, all rights and arguments of any party or creditor, including the Settling Creditors, are reserved with regard to the Remaining Disputes and disbursements of the Sale proceeds.

B.       *Global Settlement and Funding of Sale Proceeds Reserve*

The Plan implements a structure, by which all rights of parties to assert and contest the Remaining Disputes are fully preserved and the Sale proceeds shall be held in escrow subject to final resolution and determination of the Remaining Disputes among the parties asserting rights to the Sale proceeds by the Bankruptcy Court or among the parties. This structure is set forth in the Global Settlement by and between the Debtors, the City, and the Settling Creditors and is incorporated herein by reference and reproduced in the attached **Exhibit A**.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates the compromise and settlement set forth in the Global Settlement. The entry of the Combined Order shall constitute the Bankruptcy Court's approval of the Global Settlement, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements contained in the Global Settlement are in the best interests of the Debtors, their Estates, their creditors, and other parties in interest, and are fair, equitable and within the range of reasonableness.

On the Effective Date, the Debtors shall fund the Sale Proceeds Reserve. The funds for the Sale Proceeds Reserve shall be disbursed and deemed disbursed by the Debtors on the Effective Date.

C.       ~~B.~~ *Corporate Existence.*

Each of the Debtors will be subject to one or more Dissolution Transactions on or after the Effective Date, at the discretion of the Litigation Trustee and in accordance with the Litigation Trust Agreement.  Each Debtor shall continue to exist after the transfer of the property of the Estates to the Litigation Trust until dissolved by the Litigation Trustee, pursuant to a Dissolution Transaction.

D.       ~~C.~~ *Dissolution Transactions.*

1.   Dissolution Transactions Generally.

At any time on or after the Effective Date, the Litigation Trustee will enter into such Dissolution Transactions as may be necessary or appropriate on the Debtors' behalf to merge, dissolve or otherwise terminate the corporate existence of each of the Debtors in accordance with the Litigation Trust Agreement; *provided* that, effective as of the Effective Date, the Debtors' Professionals, with the exception of the Claims and Noticing Agent, shall be discharged from all duties, responsibilities and obligations in their respective capacities as Professionals for the Debtors.  The actions to effect the Dissolution Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of transfer, merger, consolidation,

75

disposition, liquidation or dissolution containing terms that, among other things, are consistent with the terms of the Plan; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and that satisfy the requirements of applicable law; (iii) the filing of appropriate certificates or articles of merger, consolidation, continuance or dissolution or similar instruments with the applicable governmental authorities; and (iv) the taking of all other actions that these entities determine to be necessary or appropriate, including making other filings or recordings that may be required by applicable law in connection with the Dissolution Transactions.

2. <u>Recourse Solely to Litigation Trust Assets</u>.

All Claims against the Debtors are deemed satisfied, waived and released as to the Debtors in exchange for the treatment of such Claims under the Plan, and, except as otherwise set forth in the Plan or other Final Orders of the Bankruptcy Court, Holders of Allowed Claims against any Debtor will have recourse solely to the assets of the Litigation Trust for the payment of their Allowed Claims in accordance with the terms of the Plan and the Litigation Trust Agreement.

<u>E.</u>        ~~D.~~ *Litigation Trust.*

1. <u>Litigation Trust Generally</u>.

On or prior to the Effective Date, the Litigation Trust shall be established in accordance with the Litigation Trust Agreement for the purpose of liquidating the Litigation Trust Assets, resolving all Disputed Claims, making all distributions to Holders of Allowed Claims in accordance with the terms of the Plan, and otherwise implementing the Plan.  Subject to and to the extent set forth in the Plan, the Combined Order, the Litigation Trust Agreement or any other order of the Bankruptcy Court entered in connection therewith, the Litigation Trust shall be empowered to: (i) perform all actions and execute all agreements, instruments and other documents necessary to implement the Plan; (ii) establish, maintain and administer the Trust Accounts, which shall be segregated to the extent appropriate in accordance with this Plan; (iii) accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, supervise, prosecute, settle and protect, as applicable, the Litigation Trust Assets (directly or through its professionals or a Third Party Disbursing Agent), in accordance with this Plan; (iv) review, reconcile, settle or object to all Claims that are Disputed Claims as of the Effective Date pursuant to the procedures for allowing Claims prescribed in this Plan; (v) calculate and make Distributions of the proceeds of the Litigation Trust Assets to the Holders of Allowed Claims; (vi) investigate and pursue the Retained Causes of Action transferred to the Litigation Trust in accordance with the Litigation Trust Agreement; (vii) retain, compensate and employ professionals to represent the Litigation Trust; (viii) file appropriate tax returns and other reports on behalf of the Litigation Trust and pay taxes or other obligations owed by the Litigation Trust; (ix) file, to the extent reasonably feasible and subject to the Litigation Trust Agreement, appropriate tax returns on behalf of each Debtor and pay taxes or other obligations arising in connection therewith; (x) exercise such other powers as may be vested in the Litigation Trust under the Litigation Trust Agreement and this Plan, or as are deemed by the Litigation Trustee to be necessary and proper to implement the provisions of this Plan and the Litigation Trust Agreement; (xi) take such actions as are

necessary or appropriate to close or dismiss all of the Chapter 11 Cases; and (xii) dissolve the Litigation Trust in accordance with the terms of the Litigation Trust Agreement.

Notwithstanding anything to the contrary herein, the Litigation Trust's primary purpose is liquidating the Litigation Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Litigation Trust's liquidating purpose and reasonably necessary to conserve and protect the Litigation Trust Assets and provide for the orderly liquidation thereof.

2. <u>Funding of and Transfer of Assets Into the Litigation Trust</u>.

Except as otherwise provided in the Plan or the Combined Order, on the Effective Date, the Debtors shall transfer the Litigation Trust Assets to the Litigation Trust, and all such assets shall vest in the Litigation Trust on such date, to be administered by the Litigation Trustee in accordance with the Plan and the Litigation Trust Agreement. Except as set forth in Article VII.<u>A above, Article VII.</u>K below, <u>or the Global Settlement,</u> the Litigation Trust Assets shall be transferred to the Litigation Trust free and clear of all Liens, ~~other than the Liens securing the Claims of the DIP Lender which shall remain in full force and effect, subject to the terms of the Plan~~.

The Litigation Trustee shall have the authority to create additional sub-accounts in the Trust Accounts and sub-trusts within the Litigation Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the Litigation Trust.

The act of transferring the Litigation Trust Assets, as authorized by this Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Litigation Trust as if the asset or right was still held by the applicable Debtor.

3. <u>Litigation Trustee</u>.

The initial Litigation Trustee will be <u>selected by the Debtors and</u> identified ~~in~~<u>prior to</u> the ~~Plan Supplement~~<u>Effective Date</u>. The Litigation Trustee shall be the successor to and representative of the Estate of each of the Debtors within the meaning of section 1123(b)(3)(B) of the Bankruptcy Code. The powers, rights and responsibilities of the Litigation Trustee shall be specified in the Litigation Trust Agreement and shall include the authority and responsibility to fulfill the items identified in Article VII.D hereof. Other rights and duties of the Litigation Trustee and the Litigation Trust Beneficiaries shall be as set forth in the Litigation Trust Agreement.

4. <u>Litigation Trust Agreement</u>.

Prior to the Effective Date, the Debtors and the Litigation Trustee shall execute and deliver the Litigation Trust Agreement.

5. <u>Reports to be Filed by the Litigation Trustee</u>.

Following the Effective Date, the Litigation Trustee, on behalf of the Litigation Trust, shall File with the Bankruptcy Court (and provide to any other party entitled to receive any such report pursuant to the Litigation Trust Agreement), no later than 45 days after June 30 and December 31 of each calendar year, a semi-annual report regarding the administration of property subject to its ownership and control pursuant to the Plan, distributions made by it and other matters relating to the implementation of the Plan.

6.   Fees and Expenses of the Litigation Trust.

The fees and expenses of the Litigation Trustee (including those incurred prior to the Effective Date in connection with the preparation of the Litigation Trust Agreement) shall be paid after the Effective Date from the appropriate Trust Account pursuant to the terms and conditions of the Litigation Trust Agreement and the Global Settlement.  The Litigation Trustee, on behalf of the Litigation Trust, may employ, without further order of the Bankruptcy Court, professionals (including professionals previously employed by the Debtors) to assist in carrying out its duties under the Litigation Trust Agreement and may compensate and reimburse the expenses of these professionals from the appropriate Trust Account, based upon the nature of the work performed by such professional, without further order of the Bankruptcy Court, subject to any limitations and procedures established by the Litigation Trust Agreement.

7.   Indemnification.

The Litigation Trust Agreement may include reasonable and customary indemnification provisions for the benefit of the Litigation Trustee and/or other parties.   Any such indemnification shall be the sole responsibility of the Litigation Trust and payable solely from the Litigation Trust Assets.

8.   Tax Treatment; No Successor in Interest.

The Litigation Trust is intended to be treated for U.S. federal income tax purposes in part as a liquidating trust described in Treasury Regulation section 301.7701-4(d) and in part as one or more Disputed Claims Reserves treated as disputed ownership funds described in Treasury Regulation section 1.468B-9.  For U.S. federal income tax purposes, the transfer of assets by the Debtors to the Litigation Trust will be treated (i) in part as the transfer of assets by the Debtors to the Holders of the ~~DIP~~Poppy Beneficial Interests~~,~~ and the ~~EB-5 Beneficial Interests, and~~ GUC Beneficial Interests, subject to any liabilities of the Debtors or the Litigation Trust payable from the proceeds of such assets, followed by the transfer of such assets (subject to such liabilities) by such Holders to the Litigation Trust in exchange for the beneficial interests in the Litigation Trust, and (ii) in part as the transfer of assets by the Debtors to one more Disputed Claims Reserves.

(a)   *Litigation Trust as Liquidating Trust*

The Litigation Trust shall be established for the primary purpose of liquidating and distributing the assets transferred to it, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust.  Accordingly, the Litigation Trustee shall, in an expeditious but orderly manner,

liquidate and convert to Cash the Litigation Trust Assets, make timely distributions to the Litigation Trust Beneficiaries and not unduly prolong its duration. The Litigation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in this Plan or in the Litigation Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Litigation Trustee expressly for such purpose.

The Litigation Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes with the Litigation Trust Beneficiaries treated as grantors and owners of the Litigation Trust. For all U.S. federal income tax purposes, all parties (including the Debtors, the Litigation Trustee, and the Litigation Trust Beneficiaries) shall treat the transfer of the Litigation Trust Assets by the Debtors to the Litigation Trust, as set forth in the Litigation Trust Agreement, as a transfer of such assets by the Debtors to the Holders of Allowed Claims entitled to distributions from the Litigation Trust Assets, followed by a transfer by such Holders to the Litigation Trust. Thus, the Litigation Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for U.S. federal income tax purposes.

As soon as practicable after the Effective Date, the Litigation Trustee shall make a good faith determination of the fair market value of the Litigation Trust Assets as of the Effective Date. This valuation shall be used consistently by all parties (including the Debtors, the Litigation Trustee, and the Litigation Trust Beneficiaries) for all U.S. federal income tax purposes. The Bankruptcy Court shall resolve any dispute regarding the valuation of the Litigation Trust Assets.

The right and power of the Litigation Trustee to invest the Litigation Trust Assets, the proceeds thereof, or any income earned by the Litigation Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements, and to the investment guidelines of section 345 of the Bankruptcy Code. The Litigation Trustee may expend the Cash of the Litigation Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the respective assets of the Litigation Trust during liquidation, (ii) to pay the respective reasonable administrative expenses (including, but not limited to, any taxes imposed on the Litigation Trust) and (iii) to satisfy other respective liabilities incurred by the Litigation Trust in accordance with the Plan and the Litigation Trust Agreement (including, without limitation, the payment of any taxes).

(b)      *Disputed Claims Reserve*

Litigation Trust Assets reserved for Holders of Disputed Claims shall be treated as one or more Disputed Claims Reserves.  The Litigation Trustee shall treat each Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections consistent with such tax treatment). The Litigation Trustee shall be the administrator of the Disputed Claims Reserves within the meaning of Treasury Regulation section 1.468B-9(b)(2) and shall be responsible for all Tax reporting and withholding required by the Disputed Claims Reserves.  No Holder of a Claim will be treated as the grantor or deemed owner of any asset reserved for Disputed Claims until such Holder receives or is allocated an interest in such asset.  The Litigation Trustee will file all tax returns on a basis consistent with the treatment of the Litigation Trust in part as a liquidating trust (and grantor trust pursuant to Treasury Regulation section 1.671-1(a)) and in part as one or more Disputed Claims Reserves taxed as disputed ownership funds and will pay all Taxes owed from Litigation Trust assets.

9.   Settlement of Claims.

Except as otherwise provided herein or in the Litigation Trust Agreement, on and after the Effective Date, the Litigation Trustee may compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and may pay the charges that it incurs on or after the Effective Date for Litigation Trust expenses, including professional fees, without application to the Bankruptcy Court.

10. Sales of Assets by Litigation Trust.

The Litigation Trustee may conduct any sales or liquidations of non-Cash Litigation Trust Assets on any terms it deems reasonable, without further order of the Bankruptcy Court.  Upon the sale, liquidation, transfer, or other disposition of the Litigation Trust Assets by the Litigation Trustee, the Litigation Trustee shall deposit the proceeds of all such sales, liquidations, transfers or dispositions into one or more of the Trust Accounts.

F.      E. *Corporate Governance, Directors and Officers.*

1.   Directors and Officers.

Upon the occurrence of the Effective Date, all directors, officers and managers of the Debtors shall be discharged, and all such appointments rescinded for all purposes, without any necessity of taking any further action in connection therewith.  After the Effective Date, the Litigation Trustee shall be the sole party entitled to direct actions on behalf of the Debtors.  For the avoidance of doubt, upon the Effective Date, the position of "Manager," as defined in the Debtors' respective operating agreements, shall be eliminated and shall have no further force or effect, notwithstanding any provision of the Debtors' respective operating agreements, certificates of formation, or other corporate governance documents (collectively, the "Corporate Documents") to the contrary.

80

2.    Corporate Action.

The Dissolution Transactions and the following corporate actions and transactions will occur and be effective as of the date specified in the documents effectuating the applicable Dissolution Transactions (or other transactions), or the Effective Date if no such other date is specified in such other documents, and, notwithstanding any contrary provisions contained in Debtors' respective Corporate Documents, will be authorized and approved in all respects and for all purposes without any requirement of further action by the Debtors, the Litigation Trustee or any other Person: (a) the establishment of the Litigation Trust; (b) the appointment of the Litigation Trustee to act on behalf of the Litigation Trust; (c) the transfer of the Litigation Trust Assets into the Litigation Trust, as set forth in this Plan; (d) the distribution of Cash pursuant to the Plan; (e) the adoption, execution, delivery and implementation of all contracts, instruments, releases and other agreements or documents related to any of the foregoing; (f) the adoption, execution and implementation of the Litigation Trust Agreement; and (g) the other matters provided for under this Plan involving the corporate structure of any Debtor or corporate action to be taken by or required of any Debtor or the Litigation Trustee.

G.        *F.  No Revesting of Assets.*

To the extent not otherwise Distributed in accordance with this Plan, the property of the Estates, including the Remaining Assets, shall not revest in the Debtors on or after the Effective Date but shall instead vest in the Litigation Trust to be administered by the Litigation Trustee in accordance with the Plan and the Litigation Trust Agreement.

H.        *G.  Creation and Maintenance of Trust Accounts.*

1.    Creation of Trust Accounts.

On or prior to the Effective Date, appropriate Trust Accounts will be established and maintained in one or more federally insured domestic banks in the name of the Litigation Trust or, if applicable and appropriate, the Third Party Third-Party Disbursing Agent. Cash deposited in the Trust Accounts will be invested, held and used solely as provided in the Litigation Trust Agreement.  The Litigation Trustee is authorized to establish additional Trust Accounts after the Effective Date, consistent with the terms of the Litigation Trust Agreement, including for purposes of any reserves contemplated herein.

2.    Additional Funding of Trust Accounts.

After the funding of the Trust Accounts on the Effective Date, each Trust Account will be funded by the Cash proceeds obtained through litigation or the disposition of the Litigation Trust Assets.

81

3.  Closure of Trust Accounts.

Upon obtaining an order of the Bankruptcy Court authorizing final Distribution and/or closure of the Chapter 11 Cases, any funds remaining in the Trust Accounts shall be distributed in accordance with the Plan and the Litigation Trust Agreement, and the Trust Accounts may be closed.

I.  ~~H.~~ *Substantive Consolidation of the Debtors.*

1.  Substantive Consolidation of the Debtors.

The Debtors analyzed, *inter alia*, their books and records, intercompany accounting practices, corporate structure and governance documents, financial reporting, and cash management and operational practices. Among other things, the Debtors: (i) operated as an integrated business organization, often without regard to corporate separateness; (ii) had the same management; and (iii) utilized assets of certain Debtors for the benefit of others or the enterprise as a whole.

In addition, as described in detail in the Debtors' pleadings in support of the Sale the Debtors' primary asset is the 134+- acres comprising the Debtors' real property.  Given that the real property comprising their primary asset is a partially constructed, largely unentitled piece of real property in the desert, the full value of which can only be realized through a comprehensive development scheme involving adjacent real property owned by the City, the Debtors' property was marketed and sold as a whole, pursuant to the Bankruptcy Court-approved bid procedures. ~~In view of the foregoing, the Debtors have determined that there is no effective manner in which to divide proceeds to be derived from the Sale among individual parcels or to apportion value on a Debtor-by-Debtor basis. The Debtors' Allocation Methodology therefore attributes value based on acreage of parcels as a percentage of acreage of the entire amount of the~~ The Debtors' real property is also encumbered by a variety of liens, claims, and interests asserted by, without limitation, certain of the Settling Creditors.

In light of the foregoing, the Plan contemplates entry of an Order substantively consolidating the Estates as set forth below. The Debtors believe that substantive consolidation is appropriate given the facts and circumstances and is in the best interest of all creditors, as it will permit a fair, efficient, and cost-effective wind-down of the Estates ~~in accordance with the Allocation Methodology~~ and allow for the non-Debtor parties to continue their efforts to resolve the Remaining Disputes after the Effective Date.. Absent the substantive consolidation proposed under the Plan, the process of winding down the Estates and administering Distributions would be time consuming, costly and likely value destructive. Further, because the ~~Allocation Methodology allocates value derived from the sale based on acreage of parcels as a percentage of acreage of the entire amount of the Debtors' real property~~ Disputed Reserve Account contains the proceeds of the Sale net of the payments permitted to be made under the Sale Order, including U.S. Trustee Quarterly Fees and the Remaining Disputes are entirely preserved by the Global Settlement and this Plan , the Debtors do not believe any creditors will be harmed by the substantive consolidation.

82

~~Except as expressly provided in the Plan~~The Plan substantively consolidates the Debtors' Estates. Specifically, but except as provided herein, on the Effective Date, ~~the Estates shall be deemed substantively consolidated for all purposes related to the Plan, including for purposes of implementing the Plan, for purposes of voting, for assessing whether the Confirmation standards have been met, and for calculating and making Distributions~~ under the Plan.  ~~As of the Effective Date: (i) the~~(i) all assets and liabilities of the Debtors ~~shall be deemed merged or treated as though they were merged into and with the assets and liabilities of SRDC; (ii) all guarantees by one Debtor of the obligations of the other Debtor shall be deemed eliminated and extinguished so that any Claim against any Debtor, and any guarantee thereof executed by either Debtor and any joint or several liability of either Debtor shall be~~ will be merged, (ii) each Claim against the Debtors will be deemed a single Claim against and a single obligation of the Debtors, (iii) each Claim Filed or to be Filed in the Chapter 11 Cases will be deemed a single Claim against the consolidated Debtors, (iv) all guarantees of any Debtor of the payment, performance, or collection of obligations of any other Debtor will be eliminated and canceled, (v) all transfers, disbursements and Distributions on account of Claims made by or on behalf of any of the Debtors' Estates hereunder will be deemed to be made by or on behalf of any of the Debtors' Estates, (vi) any obligation of the Debtors as to Claims will be deemed to be one obligation of ~~SRDC; (iii) each and every Claim filed or to be filed in the Chapter 11 Cases shall be treated as filed against~~ the consolidated Debtors ~~and shall be treated as one~~ ~~Claim against and obligation of SRDC;~~, (~~iv~~vii) all Intercompany Claims shall be eliminated and extinguished, and holders of Intercompany Claims shall not receive any Distributions or retain any property pursuant to the Plan on account of such Intercompany Claims; and (~~v~~viii) for purposes of determining the availability of the right of setoff under section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity~~, SRDC,~~ so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any Debtor may be set off against the debts of any other Debtors. Holders of Allowed Claims entitled to Distributions under the Plan shall be entitled to their share of assets available for Distribution to such Claim without regard to which Debtor was originally liable for such Claim. Except as set forth herein, such substantive consolidation shall not (other than for purposes related to this Plan) affect the legal and corporate structures of the Debtors and does not constitute a transfer of assets or liabilities between the Debtors for any tax purposes. The substantive consolidation of the Debtors' Estates under the Plan does not alter or affect any Secured Creditor's security interest in the proceeds of the specific Estate asset constituting that Secured Creditor's collateral vested in the Litigation Trust. Each Secured Creditor retains its security interest in its collateral or its collateral's proceeds at all times, including after vesting in the Litigation Trust, irrespective of the substantive consolidation of the Debtors' Estates under the Plan. Notwithstanding the foregoing or anything to the contrary herein, the substantive consolidation of the Debtors' estates does not affect any determination by the Bankruptcy Court as to any amount which may be owed on account of the SR Land TIC Interest, which issue is a Remaining Dispute.

This substantive consolidation shall not (other than for purposes related to funding Distributions under the Plan) affect: (i) the legal and corporate structures of the Debtors; (ii) the vesting of the Debtors' assets in the Litigation Trust; (iii) the right to Distributions from any insurance policies or proceeds of such policies; (iv) any Liens granted or arising at any time prior to the Effective Date or the priority of those Liens; (v) the Debtors' of the Litigation Trustee's ability to subordinate or otherwise challenge claims on an entity-by-entity basis, (vi) the Retained Causes of Action or defenses thereto, which in each case shall survive entry of the Combined

Order as if there had been no substantive consolidation of the Estates of the Debtors, or (vii) the rights of the Debtors or the Litigation Trustee to contest setoff or recoupment rights alleged by creditors on the grounds of lack of mutuality under section 553 of the Bankruptcy Code and other applicable law. Notwithstanding anything in this section to the contrary, all post-Effective Date fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930, if any, shall be calculated on a separate legal entity basis for each Debtor.

2.   Plan as Motion Seeking Order Granting Substantive Consolidation of the Debtors.

The Plan will serve as a motion seeking entry of an order substantively consolidating the Debtors, as described and to the extent set forth herein. Unless a written objection to such substantive consolidation by any creditor affected by the same is Filed with the Bankruptcy Court by the deadline to object to Confirmation of theExtended Combined Disclosure Statement and Plan Objection Deadline , or such other date as may be fixed by the Bankruptcy Court, and such objection is sustained by the Bankruptcy Court, the order approving the substantive consolidation of the Debtors (which may be the Combined Order) may be entered by the Bankruptcy Court.

Nothing in this section VII.H shall augment or increase the property that constitutes collateral or any offset or similar right securing any Claim or otherwise increase the secured portion, if any, of any Claim under Bankruptcy Code section 506(a).

J.      I. Preservation of Causes of Action

Except as provided in the Plan or in any contract instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Litigation Trustee will retain and may enforce all Retained Causes of Action (including any Privilege Rights) that the Debtors may hold against any Person or Entity to the extent not released under Article XII hereof or otherwise, including the Avoidance Actions. The Litigation Trustee may pursue the Retained Causes of Action, as appropriate, in accordance with the best interests of the Litigation Trust Beneficiaries. A nonexclusive schedule of Retained Causes of Action will be filed with the Plan Supplement.  For the avoidance of doubt, the Retained Causes of Action include, without limitation, any and all claims and Causes of Action against the Robert Green Parties.  Retention of the Retained Causes of Action assertable by the Litigation Trust against the Robert Green Parties constitute core and valuable Litigation Trust Assets. As set forth in Article XV hereof, the Bankruptcy Court shall maintain jurisdiction to hear disputes and adjudicate the Retained Causes of Action, specifically including, without limitation, those asserted and brought by the Litigation Trust against the Robert Green Parties.

In accordance with and subject to any applicable law, the Debtors' inclusion or failure to include any Retained Cause of Action in the Plan Supplement shall not be deemed an admission, denial or waiver of any Claims, demands, rights or Causes of Action that the Debtors or the Estates may hold against any Entity. The Debtors intend to preserve all Causes of Action except to the extent specifically released herein or otherwise during the Chapter 11 Cases.

84

K. ~~J.~~ *Cancellation and Surrender of Instruments, Securities and Other Documentation.*

Except as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, including the Litigation Trust Agreement, or in the Purchase and Sale Agreement, on the Effective Date and concurrently with the applicable Distributions made hereunder, all notes, instruments, certificates and other documents evidencing Claims against or Interests in the Debtors shall be deemed canceled and surrendered and of no further force and effect against the Debtors or the Litigation Trust without any further action on the part of the Debtors or the Litigation Trust.

L. ~~K.~~ *Release of Liens.*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan, all liens on the Debtors' property shall be fully released and discharged, other than the Sale proceeds, and all of the right, title and interest of any Holder of such liens shall be released and discharged upon such Holder receiving its Distribution (if any) in accordance with the terms of the Plan.

M. ~~L.~~ *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Debtors, the Litigation Trust, and the Litigation Trustee are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and evidence the terms and conditions of the Plan and the Dissolution Transactions, in each case, in the name of and on behalf of the Debtors or the Litigation Trust, as applicable, without the need for any approvals, authorization or consents except those expressly required under the Plan.

N. ~~M.~~ *Substitution in Pending Legal Actions.*

On the Effective Date, the Litigation Trustee shall be deemed to be substituted as a party to any litigation in which any Debtor is a party, including: (a) pending contested matters or adversary proceedings in the Bankruptcy Court; (b) any appeals of orders of the Bankruptcy Court; and (c) any state or federal court or administrative proceedings pending as of the Petition Date. The Litigation Trustee and its professionals may, but shall not be required to, take such steps as are necessary and appropriate to provide notice of such substitution.

## ARTICLE VIII.
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A. *Executory Contracts and Unexpired Leases.*

Subject to the occurrence of the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors, other than the Insurance Contracts, that have not been assumed, assumed and assigned, or rejected, prior to the Effective Date, or are not subject to a motion to assume or reject Filed before the Effective Date, shall be deemed rejected pursuant to the Combined Order, as of the Effective Date. ***Any Creditor asserting a claim arising from the rejection of any***

***Executory Contract or Unexpired Lease shall File a proof of claim with the Claims and Noticing Agent within 30 days of the Effective Date and shall also serve such proof of claim upon the Litigation Trustee.***

B.      *Rejection Claims.*

Any claims asserted to arise from the rejection, pursuant to the Plan, of any Executory Contract or Unexpired Lease that are not timely Filed pursuant to this Article VIII shall be forever Disallowed and barred. The Litigation Trustee may File an objection to any such claims on or prior to the Claim Objection Deadline.

C.      *Special Provisions Governing Insurance.*

Notwithstanding anything to the contrary herein, or in the Plan Supplement, the Combined Order, any bar date notice or claim objection, any other document related to any of the foregoing, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening, grants an injunction, discharge or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of any releases):

(1)      subject to Article VIII.C(5), on the Effective Date, the Insurance Contracts shall vest, unaltered and in their entirety in the Litigation Trust, and all debts, obligations, and liabilities of the Debtors thereunder, whether arising before or after the Effective Date, shall survive and shall not be amended, modified, waived, released, discharged or impaired in any respect, all such debts, obligations, and liabilities of the Debtors shall be satisfied by the Litigation Trust in the ordinary course of business, and the relevant insurers shall not need to or be required to file or serve any objection to a proposed cure amount or a request, application, Claim, proof or motion for payment or allowance of any Claim or Administrative Claim and shall not be subject to any bar date or similar deadline governing cure amounts, proofs of Claims or Administrative Claims;

(2)      for the avoidance of doubt, subject to the automatic stay under section 362 of the Bankruptcy Code and the injunction under Article XII hereof, if there is available insurance, any party with rights against or under the applicable Insurance Contract, including the Debtors, the Estates, the Litigation Trust, and Holders of any insured Claims, may pursue such rights, and the Litigation Trustee may, but shall not be required to, move to limit an insured Claim to the face amount of such insured Claim less the total coverage available with respect to that insured Claim under the Insurance Contracts; *provided, however*, that doing so in no way obligates an insurer to pay any portion of the insured Claim or otherwise alters an insurer's coverage defenses; *provided further, however*, that, subject to Article VIII.C(5), nothing alters or modifies the duty, if any, that insurers have to pay insured Claims covered by the Insurance Contracts and the insurers' right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Litigation Trust); *provided finally, however*, the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article XII hereof, if and to the extent applicable, shall be deemed lifted without further order of the

86

Bankruptcy Court, solely to permit: (i) all current and former employees of the Debtors to proceed with any workers compensation claims they might have in the appropriate judicial or administrative forum; (ii) direct action claims against an insurer under applicable non-bankruptcy law to proceed with their claims; (iii) the insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (A) any valid workers compensation claims, (B) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or where an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its insured Claim, and (C) all costs in relation to each of the foregoing; and (iv) the applicable insurers to cancel any Insurance Contracts, to the extent permissible under applicable non-bankruptcy and bankruptcy law, and in accordance with the terms of the Insurance Contracts (other than on the basis of any outstanding prepetition claims against the Debtors, the Estates, or the Litigation Trust arising from or related to such Insurance Contracts);

(3)   nothing herein shall constitute a waiver of any Causes of Action the Debtors, the Estates, or the Litigation Trust may hold against any Person or Entity, including any insurers.  Nothing herein is intended to, shall or shall be deemed to preclude any Holder of an Allowed insured Claim from seeking and/or obtaining a recovery from any insurer in addition to (but not in duplication of) any Distribution such Holder may receive under the Plan; *provided*, *however*, that the Debtors, the Estates, and the Litigation Trust do not waive, and expressly reserve their rights to assert that the proceeds of the Insurance Contracts are property of the Estates and / or Litigation Trust Assets to which they are entitled to the extent that the Debtors are entitled to assert first-party claims pursuant to the terms and conditions of the applicable Insurance Contract;

(4)   subject to Article VIII.C(5), nothing shall modify the scope of, or alter in any other way, the rights and obligations of any insurers, the Debtors (or, after the Effective Date, the Litigation Trust), or any other individual or entity, as applicable, under the Insurance Contracts, and all such rights and obligations shall be determined under the Insurance Contracts and applicable non-bankruptcy law, and, for the avoidance of doubt, the insurers shall retain any and all rights, claims and defenses to liability and/or coverage that they have under the Insurance Contracts, including the right to contest and/or litigate with any party, including the Debtors and the Litigation Trust, the existence, primacy and/or scope of liability and/or available coverage under any alleged applicable Insurance Contract; and

(5)   any payment, reimbursement or other financial or monetary obligations of the Debtors, the Estates or the Litigation Trust owing to any insurers under the Insurance Contracts, including reimbursement for payments within a deductible, shall be satisfied solely from existing collateral and/or security, if any, held by the insurers in the ordinary course and pursuant to the terms of the Insurance Contracts, and to the extent that any such collateral and/or security is insufficient to satisfy any such obligations, the insurers shall have no recourse to the Debtors,

the Estates, or the Litigation Trust, and hereby waive any and all claims against, and rights to a Distribution from, the Debtors, the Estates, and the Litigation Trust; *provided*, *however*, that nothing herein shall modify the scope of, or alter in any other way, (i) the rights of the insurers to assert any setoff and recoupment rights in any Proof of Claim submitted in accordance with the applicable Bar Date, (ii) the rights of any subrogee of an insurer to assert a claim in accordance with the Bar Date Order, or (iii) the rights and defenses of the Debtors, the Estates or the Litigation Trust with respect to any proofs of claim asserted by any insurers or a subrogee of an insurer.  In no event shall the Litigation Trust, the Litigation Trustee or any of the Litigation Trust Assets be liable for any payment, reimbursement or other financial or monetary obligations under this Article VIII.C.

## ARTICLE IX.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Distributions on Account of Claims Allowed as of the Effective Date.*

Except as otherwise provided in this Article IX, Distributions to be made on the Effective Date to Holders of Allowed Claims shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable by the Debtors or the Litigation Trustee.

B.      *Method of Distributions to Holders of Allowed Claims.*

All Distributions to be made under the Plan shall be made by the Disbursing Agent or such ~~Third Party~~Third-Party Disbursing Agent as the Litigation Trustee may employ in its sole discretion.  Each Disbursing Agent may serve without bond, and any Disbursing Agent may employ or contract with other entities to assist in or make the Distributions required by the Plan, if approved by the Litigation Trustee.

C.      *Rights and Powers of Disbursing Agent.*

1.   Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to: (i) make all Distributions contemplated hereby; (ii) effectuate all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the terms of the Plan.

2.    Expenses Incurred on or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation to the Disbursing Agent for services rendered shall be paid in Cash by the Litigation Trustee from the Litigation Trust Assets pursuant to the terms of the Litigation Trust Agreement.

3.    No Liability.

Except on account of actual fraud, gross negligence, or willful misconduct, the Disbursing Agent shall have no (i) liability to any party of actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or (ii) obligation or liability to any party who does not hold a Claim against the Debtors as of the Distribution Record Date or any other date on which a Distribution is made or who does not otherwise comply with the terms of the Plan.

D.    *Disputed Claims Reserve.*

1.    Establishment of Disputed Claims Reserve.

The Litigation Trustee may maintain a Disputed Claims Reserve. The Litigation Trustee may, in its reasonable discretion, distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein and in the Litigation Trust Agreement, as Disputed Claims are resolved, and such amounts may be distributed on account of such Disputed Claims as if such Disputed Claims were Allowed Claims as of the Effective Date.

2.    Maintenance of Disputed Claims Reserve.

To the extent that the property placed in a Disputed Claims Reserve consists of Cash, that Cash shall be deposited in an interest-bearing account. The property in the Disputed Claims Reserve shall be held in trust for the benefit of the Holders of Claims ultimately determined to be Allowed in each applicable Class. Any Disputed Claims Reserve shall be closed by the Litigation Trust when all Distributions required to be made under this Plan to the Holders of Claims in the applicable Class will have been made in accordance with the terms of this Plan. Upon closure of any Disputed Claims Reserve, all Cash (including any investment yield on the Cash) and other property held in such Disputed Claims Reserve shall be distributed in accordance with the Plan or the Litigation Trust Agreement, as applicable.

E.    *Investment of Trust Accounts.*

To assist in making Distributions under the Plan, Trust Accounts may be held in the name of the Litigation Trust or in the name of one or more Third Party Disbursing Agents, in each case, for the benefit of Holders of Allowed Claims. The Litigation Trustee shall invest or shall direct the Third Party Disbursing Agents to invest, Cash in the Trust Accounts, subject to the limitations established by the Litigation Trust Agreement; *provided, however*, that should the Litigation Trustee determine, in its sole discretion, that the administrative costs associated with such investment exceeds the return on such investment, it may determine not to, and may direct

89

the Third Party Disbursing Agent not to, invest such Cash.  Any interest or other proceeds, if any, from such investment of Cash, net of any taxes payable with respect thereto, shall be deposited into the applicable Trust Accounts and shall be available for Distribution to Holders of applicable Allowed Claims.

F.      *Delivery of Distributions and Undeliverable Distributions to Holders of Allowed Claims.*

        1.    Address for Delivery of Distributions.

        Except as otherwise provided in the Plan, Distributions under the Plan shall be made to the Holders of record of Allowed Claims as of the Distribution Record Date by the applicable Disbursing Agent at the latest known address, as identified in: (i) the most recently filed Proof of Claim; (ii) at the address set forth in any written notices of address change delivered to the Debtors after the date of the most recently filed Proof of Claim or where no Proof of Claim was filed; (iii) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Debtors have not received written notice of a change of address; (iv) on any counsel that has appeared in the Chapter 11 Cases on such Holder's behalf; or (v) if clauses (i) – (iv) are not applicable, at the last address directed by such Holder after such Claim becomes an Allowed Claim.

        2.    Undeliverable Distributions.

        The Disbursing Agent shall not be obligated to make any effort to determine the correct address of any Holders entitled to receive a Distribution. In the event any Distribution to any Holder is returned as undeliverable, no further Distribution to such Holder shall be made unless and until the Disbursing Agent is notified in writing of such Holder's then-current address, at which time the Distribution shall be made to such Holder without interest; *provided*, *however*, that if a Holder fails to claim and undeliverable Distribution in writing within six (6) months after such Distribution is returned as undeliverable, such Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and the Claims of the Beneficiaries that may have been entitled to such Distribution shall be discharged and forever barred. In the event any check sent to a Litigation Trust Beneficiary in respect of a Distribution to such Litigation Trust Beneficiary has not been cashed within six months of the date of the respective Distribution, such check shall be cancelled and no additional Distribution shall be made to such Litigation Trust Beneficiary, such Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code, and the Claims of the Holders that may have been entitled to such Distribution shall be discharged and forever barred from receiving distributions under the Plan.  After such date, all undeliverable Distributions shall revert to the Litigation Trust and shall be redistributed in accordance with the Litigation Trust Agreement.

G.      *Recognition of Transfers After Distribution Record Date.*

        The Litigation Trust and the Litigation Trustee may, but shall have no obligation to, recognize the sale or transfer of any Claim that occurs after the Distribution Record Date.

H.  *Minimum Distributions.*

No Distribution of less than one hundred dollars ($100.00) shall be made by the Disbursing Agent.  Each such Distribution shall be revested in the Litigation Trust for distribution to Holders of Allowed Claims in the applicable Class in accordance with the Plan. Whenever a payment of a fraction of a dollar would otherwise be called for, the actual payment may reflect a rounding down to the nearest whole dollar.

I.  *Compliance With Tax Requirements.*

In connection with this Plan, to the extent applicable, the Debtors or the Litigation Trustee, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit (as defined in the Bankruptcy Code), and all Distributions shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms the Disbursing Agent believes are reasonable and appropriate.  The Disbursing Agent shall have the right to allocate all Distributions in compliance with applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.

The Disbursing Agent shall be authorized to require each Holder of a Claim to provide it with an executed Form W-9, Form W-8 or other appropriate tax form or documentation as a condition precedent to being sent a Distribution.  The applicable Disbursing Agent shall provide advance written notice of such requirement to each Holder of a Claim affected thereby.  The notice shall provide each Holder of a Claim with a specified time period after the date of mailing of such notice to provide an executed Form W-9, Form W-8 or other tax form or documentation to the Disbursing Agent.  If a Holder of an Allowed Claim does not provide the Disbursing Agent with an executed Form W-9, Form W-8 or other tax form or documentation within the time period specified in such notice, or such later time period agreed to by the Disbursing Agent in writing in its discretion, then the Disbursing Agent, in its sole discretion, may (a) make a Distribution net of any applicable withholding or (b) determine that such Holder shall be deemed to have forfeited the right to receive any Distribution, in which case, any such Distribution shall revert to the Debtors or the Litigation Trust, as applicable, for Distribution on account of other Allowed Claims and the Claim of the Holder originally entitled to such Distribution shall be waived, discharged and forever barred without further order of the Bankruptcy Court.

J.  *Manner of Payment Under the Plan.*

Unless a Holder of an Allowed Claim and the Disbursing Agent otherwise agree, any Distribution to be made in Cash shall be made, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank.  Cash payments to foreign creditors may, in addition to the foregoing, be made at the option of the Disbursing Agent in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

91

K.    *Time Bar to Cash Payments*

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 180 days after the date of issuance thereof.  Requests for reissuance of any voided check shall be made directly to the Disbursing Agent by the entity to whom such check was originally issued.  Any claims in respect of such voided check shall be discharged and forever barred and such unclaimed distribution shall be re-allocated as set forth in Article IX.F(2) of the Plan, notwithstanding any Federal or state escheat laws to the contrary.

L.    *Setoffs*

Except with respect to Claims expressly released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disbursing Agent may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Claim (and the Distributions to be made on account of such Claims), counterclaims, rights and Causes of Action of any nature that the Debtors may hold against the Holder of such Claim; *provided, however*, that the failure to effectuate such a setoff shall not constitute a waiver or release by the Debtors, the Disbursing Agent, or the Litigation Trust of any Causes of Action that the Debtors or the Litigation Trust may possess against the Holder of a Claim.

M.    *Allocation Between Principal and Accrued Interest*

Interest shall not accrue on any Allowed Claim in respect of the period from the Petition Date to the date a final Distribution is made on such Allowed Claim. To the extent any Allowed Claim consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such Distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

N.    *Distributions to Holders of Disputed Claims*

Notwithstanding any provision of the Plan: (1) no Distributions will be made on account of a Disputed Claim until such claim becomes and Allowed Claim, if ever; and (2) except as otherwise agreed to by the relevant parties, no partial Distributions shall be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim, including, without limitation, the Remaining Disputes, have been resolved by settlement or Final Order.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, any Distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  On the Distribution Date that is at least 30 days after a Disputed Claim becomes an Allowed Claim (or such lesser period as the Disbursing Agent may determine), the Holder of such Allowed Claim shall receive any Distribution to which such Holder would have been entitled under the Plan as of the Effective Date, if such claim had been allowedAllowed as of the Effective Date, without any interest to be paid on account of such Allowed Claim.

92

O.      *Claims Paid or Payable by Third Parties*

1.   <u>Claims Paid by Third Parties</u>.

To the extent that the Holder of an Allowed Claim receives a Third-Party Payment, the Litigation Trustee shall be authorized to reduce, for the purposes of Distribution, the Allowed amount of such Claim by the amount of the Third-Party Payment, and such Claim shall be Disallowed or deemed satisfied, as applicable, to the extent of the Third-Party Payment without an objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

2.   <u>Claims Payable by Insurance</u>.

No Distributions shall be made on account of any Allowed Claim that is payable pursuant to an Insurance Contract until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Contract. To the extent that any of the Debtors' insurers agrees to satisfy in full or in part an Allowed Claim, then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Contract. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any other Person or Entity may hold against any other Person or Entity, including insurers under any Insurance Contract, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE X.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.      *Allowance of Claims.*

After the Effective Date, the Litigation Trustee shall have any and all rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date, except with respect to any Claim deemed Allowed or released under this Plan.  All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

Any Claim that has been listed in the Schedules as disputed, contingent or unliquidated, and for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged without further action and without any further notice to or action, order or approval of the Bankruptcy Court.

B.    *Prosecution of Objections to Claims*

　　1.    Authority to Prosecute and Settle Claims.

Except as otherwise specifically provided in the Plan, after the Effective Date, the Litigation Trustee shall have the sole authority: (i) to File, withdraw, or litigate to judgment, objections to Claims; (ii) to settle or compromise any Disputed Claim (other than a Professional Fee Claim) without any further notice to or action, order or approval by the Bankruptcy Court; and (iii) to direct the Claims and Noticing Agent to adjust the Claims Register to reflect any such resolutions without any further notice to or action, order or approval by the Bankruptcy Court.

　　2.    Pending Objections.

To the extent that the Debtors have filed objections to Claims that remain pending as of the Effective Date, the Litigation Trustee shall be substituted as the objecting party without further action of the parties or order of the Bankruptcy Court.

　　3.    Application of Bankruptcy Rules.

To facilitate the efficient resolution of Disputed Claims, the Litigation Trustee shall, notwithstanding Bankruptcy Rule 3007(c), be permitted to file omnibus objections to Claims.

　　4.    Authority to Amend Schedules.

The Debtors and the Litigation Trustee, as applicable, will have the authority to amend the Schedules with respect to any Claim and to make distributions based on such amended Schedules (if no Proof of Claim is timely filed in response thereto) without approval of the Bankruptcy Court.  If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtors, or the Litigation Trustee, in accordance with the Bar Date Order, will provide the Holder of such Claim with notice of such amendment.

　　5.    Request of Extension of Claims Objection Bar Date.

Upon motion to the Bankruptcy Court, the Litigation Trustee may request one or more extensions to the Claims Objection Bar Date generally or with respect to a specific list of Claims.  Any motion to extend the Claims Objection Bar Date Filed on or before the then-current Claims Objection Bar Date shall be deemed to automatically extend the Claims Objection Bar Date until such time as the Bankruptcy Court makes a determination on such motion.

C.    *Estimation of Claims.*

The Debtors, prior to the Effective Date, and the Litigation Trustee after the Effective Date, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to such Claim or during the appeal relating to such objection.  In the event that the

94

Bankruptcy Court estimates any contingent or unliquidated Claim, the estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of Distributions), and the Debtors or the Litigation Trustee (as applicable) may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim.

D.      *Claims Subject to Pending Actions.*

Except as otherwise provided herein, any Claims held by Entities against which a Debtor, the Litigation Trustee or another party in interest Files or has Filed a complaint seeking to recover property under sections 542, 543, 550 or 553 of the Bankruptcy Code to avoid a transfer under sections 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be deemed a Disputed Claim pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due as a result, if any, have been turned over by that Entity to the Litigation Trust.

E.      *Offer of Judgment.*

The Debtors, before the Effective Date, and the Litigation Trustee, after the Effective Date, are authorized to serve upon a Holder of a Disputed Claim an offer to allow judgment to be taken on account of such Disputed Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment.  To the extent the Holder of a Disputed Claim must pay the costs incurred by the Debtors or the Litigation Trust, as applicable, after the making of such offer, the Debtors or the Litigation Trust, as applicable, are entitled to set off such amounts against the amount of any Distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

F.      *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim; *provided* that if only the Allowed amount of an otherwise valid Claim is Disputed, such Claim shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

G.      *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without interest.

95

H.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a Final Distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

## ARTICLE XI.  EFFECT OF PLAN ON CLAIMS AND INTERESTS

A.      *Binding Effect*

This Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests and their respective successors and assigns, including, but not limited to, the Liquidating Trust and the Liquidating Trustee.

By participating in the Plan by voting or by accepting Distributions pursuant to the Plan (in whatever sum), or by having a Claim or Interest treated under the Plan, each Holder of an Allowed Claim or Interest extinguished, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to and accepted the terms of the Plan, and each such Holder acknowledges and accepts that the Plan is a binding compromise of an Allowed Claim or Interest extinguished such that such Holders of Claims agree to waive any right (if any) to object to or otherwise challenge the Plan and its effect on Claims or any other matter whatsoever.

B.      *Treatment of Claims*

Notwithstanding anything contained in this Plan to the contrary, the allowance, classification, and treatment of all Allowed Claims and their respective Distributions and treatment under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class with due regard to any contractual, legal, and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, sections 510(b) and (c) of the Bankruptcy Code or otherwise. As of the Effective Date, any and all such rights described in the preceding sentence are settled and compromised pursuant to this Plan.

## ARTICLE XII.
## RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Non-Discharge of the Debtors; Injunction.*

In accordance with section 1141(d)(3) of the Bankruptcy Code, the Plan does not discharge the Debtors. Section 1141(c) of the Bankruptcy Code nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Liens, Claims, and Interests.  As such, no Person or Entity holding a Lien, Claim, or Interest may receive any payment from, or seek recourse against, any assets or property of the Debtors, the Estates, or the Litigation Trust or (to the extent provided in Section XII.B or XII.C) any Released Party other than assets or property required to be distributed to that Person or Entity under the Plan.  From

the Effective Date through the date on which all Distributions required to be made by the Litigation Trust under the Plan and the Litigation Trust Agreement have been made, all parties are precluded from asserting against any assets or property of the Debtors, the Estates, and the Litigation Trust any Claims, rights, causes of action, liabilities or Interests based upon any act, omission, transaction or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Combined Order.

Except as otherwise expressly provided for in the Plan or the Combined Order, all Persons and Entities are permanently enjoined, from the Effective Date through the date on which all Distributions required to be made by the Litigation Trust under the Plan and the Litigation Trust Agreement have been made, on account of any Claim or Interest, from:

(a)     commencing or continuing in any manner any action or other proceeding of any kind against the Debtors, the Estates, the Litigation Trust, or their respective successors and assigns and any of their assets and properties;

(b)     enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the Debtors, the Estates, the Litigation Trust, or their respective successors and assigns, and any of their assets and properties;

(c)     creating, perfecting or enforcing any encumbrance of any kind against the Debtors, the Estates, the Litigation Trust, or their respective successors and assigns and any of their assets and properties;

(d)     asserting any right of setoff or subrogation of any kind against any obligation due from the Debtors, the Estates, the Litigation Trust or their respective successors and assigns, or against any of their assets and properties, except to the extent a right to setoff or subrogation is asserted in a timely filed proof of claim; or

(e)     commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim, Interest or cause of action released or settled hereunder.

From and after the Effective Date, all Persons and Entities are permanently enjoined from commencing or continuing in any manner against the Debtors, the Estates, the Litigation Trust, the Released Parties, or their respective successors and assigns and any of their assets and properties, any suit, action or other proceeding, on account of or respecting any claim, interest, demand, liability, obligation, debt, right, cause of action, or remedy that either is (a) released or to be released pursuant to the Plan or the Combined Order; or (b) is property of, or could be asserted by, the Debtors, their Estates or the Litigation Trust. From and after the Effective Date, the Litigation Trustee shall have the sole authority to prosecute, settle, or otherwise dispose of any Retained Causes of Action and no other parties shall be entitled to assert any Retained Causes of Action derivatively or otherwise on behalf of the Debtors, the Estates or the Litigation Trust.

B.       Releases by the Debtors.

As of the Effective Date, for good and valuable consideration, including the contributions of the Released Parties and Settling Creditor Released Parties in facilitating the administration of the Chapter 11 Cases and other actions contemplated by the Plan and the other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan and the Chapter 11 Cases, the Released Parties and Settling Creditor Released Parties are deemed forever released by the Debtors and the Estates, and anyone claiming by or through the Debtors and the Estates, from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims or claims asserted or assertible on behalf of the Debtors and the Estates, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, existing or hereafter arising, in law, equity or otherwise, that the Debtors or the Estates would have been legally entitled to assert in their own right or on behalf of the Holder of any Claim or Interest, based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date, including in any way relating to the Debtors, the Estates, the Chapter 11 Cases, the Sale Order and the transactions approved thereunder, the Combined Disclosure Statement and Plan, or related agreements, instruments or other documents in the Chapter 11 Cases; provided, however, that the foregoing provisions shall not operate to waive, release or otherwise impair any (i) Remaining Disputes or (ii) Causes of Action arising from criminal acts, willful misconduct, actual fraud, or gross negligence of such applicable Released Party or Settling Creditor Released Parties as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; provided further, however, that nothing in this Article XII.B shall release any direct claims held by non-Debtor parties.

C.       *Releases by Holders of Claims.*

As of the Effective Date, for good and valuable consideration, including the contributions of the Released Parties in facilitating the administration of the Chapter 11 Cases and other actions contemplated by the Plan and the other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan and the Chapter 11 Cases, and subject to Article XII.D, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released the Released Parties from any and all claims, interests, obligations, rights, suits, damages, causes of action (including any and all causes of action under chapter 5 of the Bankruptcy Code), remedies and liabilities whatsoever, including any derivative claims or claims asserted or assertible on behalf of the Debtors and the Estates, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, existing or hereafter arising, in law, equity or otherwise, that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date, relating to the Debtors, the Estates, the Chapter 11 Cases, the Sale Order and the transactions approved thereunder, the Combined Disclosure Statement and Plan or related agreements, instruments or other documents; *provided*, *however*, that nothing in the Plan shall be deemed a waiver or release of any right of any such Releasing Parties to receive a Distribution pursuant to the terms of the Plan; *provided further*, *however*, that the foregoing provisions of this release shall not operate to waive, release or otherwise impair any causes of action arising from criminal acts, willful misconduct, actual

98

fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.  For the avoidance of doubt, notwithstanding anything to the contrary in the Plan, the foregoing release by the Releasing Parties is not, and shall not be deemed to be, in exchange for a waiver of the Debtors' (or the Litigation Trust's) rights or claims against the Releasing Parties, including the Debtors' (or the Litigation Trust's) rights to assert setoffs, recoupments or counterclaims, or to object or assert defenses to any Claim or Interest, and all such rights and claims are expressly reserved.

Each Holder of a Claim entitled to vote on the Plan who accepts the Plan and does not make an Opt-Out Election will be deemed to have provided the releases set forth in this Article XII.C unless such Holder timely opts out of such release by indicating its decision to not participate in such releases by checking the appropriate box on its Ballot or by Filing an objection to such releases prior to the deadline to object to Confirmation of the Plan.

Section 1542 of the Civil Code of the State of California provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Each Releasing Party that does not timely opt out of the releases set forth in this Article XII.C by indicating its decision to not participate in such releases by checking the appropriate box on its Ballot and returning such Ballot to the Claims and Noticing Agent or Filing an objection to such releases prior to the deadline to object to Confirmation of the Plan shall be deemed to have voluntarily waived the rights described in Section 1542 of the Civil Code of the State of California.

D.   *Exculpation and Limitation of Liability*On the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, to the maximum extent permitted by law, none of the Exculpated Parties shall have or incur any liability to any Person or Entity, including to any Holder of a Claim or an Interest, for any act taken or omitted to be taken on or after the Petition Date and prior to or on the Effective Date in connection with, relating to, or arising out of the Chapter 11 Cases, the Sale Order and the transactions approved thereunder, the formulation, negotiation, preparation, dissemination, solicitation of acceptances, implementation, confirmation or consummation of the Combined Disclosure Statement and Plan, the Litigation Trust Agreement or any contract, instrument, release or other agreement or document created, executed or contemplated in connection with the Plan, or the administration of the Plan or the assets and property to be distributed under the Plan; *provided, however*, that the such exculpation provisions shall not apply to acts or omissions constituting actual fraud, willful misconduct or gross negligence by such Exculpated Party, as determined by a Final Order.  The Combined Order and the Combined Disclosure Statement and Plan shall serve as a permanent injunction against any Person or Entity seeking to enforce any claim or cause of action against the Exculpated Parties that has been exculpated pursuant to this Article XII.D.

E.   *City* ~~*Settlement Contribution*~~*Release*

In addition to the releases and exculpations set forth above, pursuant to the Global Settlement, all Settling Creditors and the Debtors shall release the City (and the Buyer, if requested) pursuant to a form of release substantially consistent with the form of general release of all claims, known and unknown, substantially consistent with the form of release that will be filed in a supplemental Plan Supplement, or as agreed to by the Settling Creditor and the City or Buyer, as applicable; provided, however, that all parties' rights are reserved with respect to discovery in connection with proceedings to determine the Remaining Disputes under the Bankruptcy Rules and the Federal Rules of Civil Procedure; provided, further, however, that the Settling Creditors' rights to submit requests under the California Public Records Act ("CPRA") or similar state or federal statutes related to the Project, the Debtors, the Plan, the Sale, the adversary proceeding, and/or the Chapter 11 Cases are waived and released.

~~Following resolution and payment of any amount owed to Poppy pursuant to the Poppy Indemnity, and subject to the conditions set forth in this Article XII.E, the DIP Lender shall pay the City Settlement Offerees the City Settlement Contribution. The City Settlement Contribution shall be allocated among the eligible City Settlement Offerees ratably based on the amount which each City Settlement Offeree is entitled to receive under this Combined Disclosure Statement and Plan on account of its Allowed Secured Claim in the parcels that are subject to paragraph 5 of Exhibit 3 to the Final DIP Order. To be eligible to receive any portion of the City Settlement Contribution, the Holder must (a) vote to accept the Plan, (b) not "opt-out" of granting the Third Party Release set forth in Article XII.C of this Combined Disclosure Statement and Plan, and (c) execute and deliver a general release of all claims, known and unknown, against the DIP Lender and its Related Parties (in a form to be included in the Plan Supplement). The payment of the City Settlement Contribution shall be subject to, and conditioned upon, the determination by the Bankruptcy Court by Final Order(s) of: (1) the amount, if any, payable to Poppy under the Poppy Indemnity; (2) the aggregate amount of the~~

City Settlement Contribution; (3) the allowance and amount of the Allowed Secured Claim of each of the City Settlement Offerees and their eligibility as City Settlement Offerees; and (4) the allocation of the City Settlement Contribution among the eligible City Settlement Offerees. The payment of the City Settlement Contribution shall be further subject to and conditioned upon the Combined Order and (if separate) the Order approving the Allocation Motion having become Final Orders, without regard to the occurrence of the Effective Date; and the approval of the City Settlement Contribution by the DIP Lender in accordance with California law. Distributions on account of the City Settlement Contribution are in addition to distributions to affected creditors under Article III of this Combined Disclosure Statement and Plan.

By way of illustration as to how the City Settlement Contribution could inure to the benefit of the City Settlement Offerees, if the Plan is confirmed and Poppy is unsuccessful in establishing priority on any parcels for which there is an intercreditor dispute, Poppy would only receive a recovery on account of its lien in Lot A of LLA 2020-0010. Poppy will have been primed in the amount of $572,123.36 on such parcel, which would leave up to $2,677,876.44 of the City Settlement Contribution available to qualifying City Settlement Offerees. The City Settlement Contribution would not be available in a Chapter 7 liquidation.

## ARTICLE XIII.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Effective Date.*

The Effective Date shall not occur, and the Plan shall not be consummated, unless and until the following conditions have been satisfied or duly waived pursuant to Article XIII.B:

(1)     All of the requirements and conditions in the Global Settlement shall have been satisfied, including, but not limited to, the execution and delivery to the City of the releases set forth in Article XII.E hereof.

(2)     The Appeal shall have been dismissed with prejudice on terms mutually agreeable to the parties to the Appeal.

(3)     (1) The Bankruptcy Court shall have entered the Combined Order;

(4)     The City Council of the City of La Quinta, California, shall have approved the Global Settlement at a duly noticed public meeting in accordance with California law;

(5)     (2) The Litigation Trustee shall have been appointed and have accepted his or her appointment and the Litigation Trust Agreement shall have been executed;

(6)     (3) The Litigation TrustCity Additional Funding , including the EB-5 Litigation Trust Funding, shall have been receivedescrowed pending the satisfaction of all other conditions to the occurrence of the Effective Date;

(7)     (4) All other documents and agreements necessary to implement the Plan on the Effective Date shall have been effected or executed and delivered to the required

101

parties and, to the extent required, filed with the applicable governmental unit in accordance with applicable Law, and all other actions required to be taken in connection with the Effective Date shall have occurred;

(8) (5) Any reservesaccounts contemplated under the Plan to be funded as the Effective Date, including the Professional Fee Reserve Account, the Poppy/RDO/Granite Reserve, and the Poppy/BuildersSale Proceeds Reserve Account, shall have been created and funded as set forth herein; and

(6) The Bankruptcy Court shall have entered an Order approving the Allocation Motion, which Order may be the Combined Order.

B.      *Waiver of Conditions.*

The conditions precedent to the occurrence of the Effective Date set forth herein, other than in Article XIII.A(1), XIII.A(3), may be waived by the Debtors, with the consent of the DIP Lender and the Settling Creditors, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan. The conditions precedent set forth in XIII.A(4) may be waived solely with the consent of the Debtors and the City. The conditions precedent set forth in Article XIII.A(2) may be waived solely with the consent of all parties to the Appeal.

C.      *Effect of Failure of Conditions.*

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with this Article XIII, the Debtors reserve all rights to seek an order from the Bankruptcy Court directing that the Combined Order be vacated.  If the Combined Order is vacated, (i) the Plan shall be null and void in all respects; and (ii) nothing contained herein shall (a) constitute a waiver or release of any Claims or any Interests, or (b) prejudice in any manner the rights of the Debtors, the Estates or any other Person or Entity.

## ARTICLE XIV.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments.*

Except as otherwise specifically provided in this Plan, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019 and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, the Debtors reserve the right to revoke or withdraw, or to alter, amend, or modify the Plan, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Combined Disclosure Statement and Plan or the Combined Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.     *Effect of Confirmation on Modifications.*

Entry of the Combined Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.     *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans.   If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Person or Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Person or Entity.

## ARTICLE XV.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Combined Order and the occurrence of the Effective Date, on and after the Effective Date, to the fullest extent legally permissible, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

(a)     allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status of any Claim or Interest not otherwise Allowed under the Plan, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests, including without limitation, the Remaining Disputes;

(b)     hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 327, 328, 330, 331, 503(b), 1103 and 1129(a)(4) of the Bankruptcy Code;

(c)     hear and determine all matters with respect to the assumption, assignment or rejection of any executory contract or unexpired lease to which the Debtors are a party or with respect to which the Debtors may be liable, including, if necessary, the nature or amount of any required cure or the liquidation or allowance of any Claims arising therefrom;

(d)     effectuate performance of and payments under the provisions of the Plan and any agreement or order of the Bankruptcy Court with respect to the sale of the Debtors' assets prior to the Effective Date and enforce

103

remedies upon any default under the Plan and any such sale agreement or order;

(e)    hear and determine any and all adversary proceedings, motions, applications and contested or litigated matters that are pending as of the Effective Date, which are arising out of, under or related to, the Chapter 11 Cases, including the Retained Causes of Action;

(f)    enter such orders as may be necessary or appropriate to execute, implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created, executed or contemplated in connection with the Combined Disclosure Statement and Plan or the Combined Order;

(g)    hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

(h)    consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any Order of the Bankruptcy Court, including the Combined Order;

(i)    issue injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the implementation, consummation or enforcement of the Plan or the Combined Order;

(j)    enter and implement such Orders as may be necessary or appropriate if the Combined Order is for any reason reversed, stayed, revoked, modified or vacated;

(k)    hear and determine any matters arising in connection with or relating to the Plan Supplement, the Combined Disclosure Statement and Plan, the Combined Order, any agreement or Final Order of the Bankruptcy Court, or any contract, instrument, release or other agreement or document created, executed or contemplated in connection with any of the foregoing documents and Orders;

(l)    enforce, interpret and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

(m)    except as otherwise limited herein, recover all assets of the Debtors, wherever located;

(n)    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(o)    hear and determine such other matters as may be provided in the Combined Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code;

(p)    resolve any cases, controversies, suits or disputes related to the Estates; and

(q)    enter a final decree closing the Chapter 11 Cases.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set forth in this Article XV, the provisions of this Article XV shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE XVI.
## MISCELLANEOUS PROVISIONS

A.    *Binding Effect.*

Upon the Effective Date, section 1141 of the Bankruptcy Code the Plan shall be binding on all parties to the fullest extent permitted by section 1141(a) of the Bankruptcy Code.

B.    *No Stay of Combined Order*

The Debtors will request that the Bankruptcy Court waive any stay of enforcement of the Combined Order otherwise applicable, including pursuant to Bankruptcy Rules 3020(e), 6004(h) and 7062.

C.    *Post-Effective Date Compromises and Settlements.*

From and after the Effective Date, the Litigation Trustee may compromise and settle Claims against the Debtors and the Estates, as well as the Retained Causes of Action, without any further approval by or notice to the Bankruptcy Court.

D.    *Additional Documents.*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Litigation Trustee, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

E.    *Payment of Statutory Fees; Filing of Quarterly Reports.*

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code ("U.S. Trustee Quarterly Fees") prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Debtors, and the Litigation Trustee, or other applicable disbursing entity, if any, shall be jointly and severally liable to pay any and all U.S. Trustee Quarterly Fees when due and payable.  The Debtors shall file with the Bankruptcy Court all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. Within two (2) business days of the Effective Date, the Debtors or the Litigation Trustee shall file a notice of the occurrence of the Effective Date, identifying the Effective Date and indicating that it has occurred.  After the Effective Date, the Litigation Trustee or other applicable disbursing entity, and each of the Debtors, shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. Each and every one of the Debtors, the Litigation Trustee or other appliable disbursing entity shall remain obligated to pay U.S. Trustee Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.  The U.S. Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing any release under the Plan.

F.    *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Combined Order, and the Combined Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Combined Disclosure Statement and Plan or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Interests prior to the Effective Date.

G.    *Successors and Assigns.*

The rights, benefits, and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Person or Entity.

H.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Combined Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Combined Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Combined Order shall remain in full force and effect in accordance with their terms.

I.      *Plan Supplement; Global Settlement.*

All exhibits and documents included in the Plan Supplement and the Global Settlement are incorporated into and are a part of the Plan as if set forth in full in the Plan.

J.      *Severability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Combined Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted, is valid and enforceable pursuant to its terms.

K.      *Headings.*

The headings of articles, paragraphs and subparagraphs of the Plan are inserted for convenience only and shall not affect the interpretation of any provision of the Plan.

L.      *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), and except as otherwise provide herein, the laws of (a) the State of Delaware shall govern the construction and implementation of the Plan and (except as may be provided otherwise in any such agreements, documents or instruments) any agreements, documents and instruments executed in connection with the Plan and (b) the laws of the state of formation of the Debtors shall govern corporate governance matters with respect to the Debtors; in each case without giving effect to the principles of conflicts of law thereof.

M.      *Notices*

Following the Effective Date, all pleadings and notices Filed in the Chapter 11 Cases shall be served solely on (i) the Litigation Trustee and his or her counsel, (ii) the U.S. Trustee, (iii) any party whose rights are affected by the applicable pleading or notice and (iv) any party

Filing a request with the Bankruptcy Court in the Chapter 11 Cases to receive notices and papers in the Chapter 11 Cases following the Effective Date

After the Effective Date, the Litigation Trustee shall have the authority to send a notice to Persons or Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002 indicating that such Person or Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Litigation Trustee is authorized to limit the list of Persons and Entities receiving documents pursuant to Bankruptcy Rule 2002 to those who have Filed such renewed requests.

**ARTICLE XVII.**
**REQUEST FOR CONFIRMATION**

A.      *Request for Confirmation*

The Debtors request Confirmation of the Plan in accordance with section 1129(b) of the Bankruptcy Code.

IN WITNESS WHEREOF, the Debtors have executed the Plan this ~~7th~~11th day of ~~April~~May, 2026.

**DEBTORS**

*/s/ Christopher S. Sontchi*
By: Christopher S. Sontchi, Independent Manager

## EXHIBIT A

**Allocation Schedule**

**EXHIBIT B**

**Liquidation Analysis**

**EXHIBIT CGlobal Settlement**
**Lien Priority Analysis**

*[Intentionally Omitted; Separately filed at Docket No. 1107]*