## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>SILVERROCK DEVELOPMENT COMPANY, LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No.: 24-11647 (MFW)<br><br>(Jointly Administered)<br><br>**Ref. Docket Nos. 904, 905, 951, 955, 1040, 1111, 1116 & 1117** |

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF FINAL APPROVAL AND CONFIRMATION OF THE SECOND AMENDED COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLAN OF LIQUIDATION OF SILVERROCK DEVELOPMENT COMPANY, LLC AND ITS DEBTOR AFFILIATES

**WILSON SONSINI GOODRICH & ROSATI, P.C.**
Erin R. Fay (No. 5268)
Shane M. Reil (No. 6195)
Catherine C. Lyons (No. 6854)
222 Delaware Avenue, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 304-7600
E-mails: efay@wsgr.com
         sreil@wsgr.com
         clyons@wsgr.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**LAW OFFICES OF BENJAMIN M. CARSON, P.C.**
Benjamin M. Carson (admitted *pro hac vice*)
5965 Village Way, Suite E105
San Diego, California 92130
Telephone: (858) 255-4529
E-mail:  ben@benjamincarson.com

*-and-*

Victor A. Vilaplana (admitted *pro hac vice*)
823 La Jolla Rancho Road
La Jolla, California 92037
Telephone: (619) 840-4130
Email: vavilaplana@gmail.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

Dated: May 19, 2026

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: SilverRock Development Company, LLC (5730), RGC PA 789, LLC (5996), SilverRock Lifestyle Residences, LLC (0721), SilverRock Lodging, LLC (4493), SilverRock Luxury Residences, LLC (6598) and SilverRock Phase I, LLC (2247). The location of the Debtors' principal place of business and the Debtors' mailing address is 343 Fourth Avenue, San Diego, CA 92101.

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ................................................................................................................... 4

I.      GENERAL BACKGROUND....................................................................................... 4

II.     DIP FINANCING ........................................................................................................ 5

III.    THE SALE .................................................................................................................. 6

IV.     THE APPEAL.............................................................................................................. 7

V.      THE MEDIATION ...................................................................................................... 8

VI.     THE INITIAL COMBINED DISCLOSURE STATEMENT AND PLAN AND THE
        ALLOCATION MOTION............................................................................................ 9

VII.    THE GLOBAL SETTLEMENT.................................................................................. 11

VIII.   PLAN OVERVIEW .................................................................................................... 12

IX.     VOTING RESULTS .................................................................................................... 14

ARGUMENT ........................................................................................................................ 14

I.      THE COURT HAS JURISDICTION AND NOTICE WAS PROPER........................... 15

        A.      Jurisdiction and Venue.................................................................................... 15

        B.      Adequate Notice of Combined Hearing............................................................ 15

II.     THE DISCLOSURE STATEMENT SHOULD BE APPROVED ON A FINAL BASIS.
        ................................................................................................................................... 15

III.    THE PLAN SHOULD BE CONFIRMED. .................................................................. 18

        A.      The Plan Meets All Applicable Requirements of the Bankruptcy Code. ............. 18

                1.      The Plan Complies with the Applicable Provisions of the
                        Bankruptcy Code (Section 1129(a)(1))........................................................ 18

                        a.      The Plan Satisfies the Classification Requirements of
                                Section 1122 of the Bankruptcy Code. .......................................... 19

**TABLE OF CONTENTS** (Continued)

b.      The Plan Satisfies the Mandatory Plan Requirements of
        Section 1123 of the Bankruptcy Code. ......................................... 21

c.      The Plan Appropriately Contains Certain Discretionary
        Components Permitted by Section 1123(b) of the
        Bankruptcy Code. ....................................................................... 24

d.      The Plan's Release, Injunction and Exculpation Provisions
        Are Appropriate and Should be Approved. .................................. 25

2.      The Plan Proponent Has Complied with Applicable Provisions of
        the Bankruptcy Code (Section 1129(a)(2)).............................................. 32

3.      The Plan Has Been Proposed in Good Faith and Not by Any
        Means Forbidden by Law (Section 1129(a)(3))........................................ 32

4.      The Plan Provides for Court Approval of Payments for Services or
        Costs and Expenses (Section 1129(a)(4)). ............................................... 33

5.      The Plan Supplement Discloses the Litigation Trustee (Section
        1129(a)(5)). .............................................................................................. 34

6.      The Plan Does Not Require Governmental Regulatory Approval of
        Rate Changes (Section 1129(a)(6)).......................................................... 35

7.      The Plan is in the Best Interests of Creditors and Interest Holders
        (Section 1129(a)(7)).................................................................................. 35

8.      Section 1129(a)(8) of the Bankruptcy Code Does Not Preclude
        Confirmation. ........................................................................................... 38

9.      The Plan Provides for Payment in Full, or as Agreed by Claimants,
        of All Allowed Administrative and Priority Claims (Section
        1129(a)(9)). .............................................................................................. 39

10.     At Least One Impaired Class of Claims That Was Entitled to Vote
        Has Accepted the Plan (Section 1129(a)(10)). ......................................... 39

11.     The Plan Is Feasible (Section 1129(a)(11)). ............................................ 40

12.     The Plan Provides for Payment of All Fees Under 28 U.S.C. §
        1930 (Section 1129(a)(12))....................................................................... 41

13.     Sections 1129(a)(13)–(16) of the Bankruptcy Code Are Not
        Applicable to the Plan............................................................................... 42

14.     The Plan Meets the Requirements for Cramdown (Section
        1129(b))..................................................................................................... 42

**TABLE OF CONTENTS (Continued)**

a. The Plan Does Not Discriminate Unfairly with Respect to Impaired Rejecting Classes. .............................................................. 42

b. The Plan Is Fair and Equitable with Respect to the Rejecting Classes. .......................................................................... 44

15. Section 1129(c) of the Bankruptcy Code Is Satisfied. .............................. 45

16. The Principal Purpose of the Plan Is Not Tax Avoidance (Section 1129(d)) ...................................................................................................... 45

IV. OBJECTIONS TO CONFIRMATION OF THE PLAN SHOULD BE OVERRULED.. 46

A. The UST Objection ............................................................................................. 46

V. THE MODIFICATIONS TO THE PLAN DO NOT REQUIRE RESOLICITATION AND SHOULD BE APPROVED ...................................................................................... 48

VI. THE GLOBAL SETTLEMENT SHOULD BE APPROVED ........................................ 50

VII. GOOD CAUSE EXISTS TO WAIVE THE STAY OF THE COMBINED ORDER ...... 52

CONCLUSION ................................................................................................................................ 53

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999)................................................................................36, 45

*Century Glove, Inc. v. First Am. Bank of New York*,
    860 F.2d 94 (3d Cir. 1988)...............................................................................16

*Cohen v. Tic Fin. Sys. (In re Ampace Corp.)*,
    279 B.R. 145 (Bankr. D. Del. 2002) ..............................................................16

*Grogan v. Garner*,
    498 U.S. 279 (1991)........................................................................................18

*Harrington v. Purdue Pharma L.P.*,
    603 U.S. .....................................................................................................47, 48

*In re Abeinsa Holding, Inc.*,
    562 B.R. 265 (Bankr. D. Del. 2016) ..........................................................20, 44

*In re Adelphia Commc'ns Corp.*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...........................................................36

*In re Affiliated Foods, Inc.*,
    249 B.R. 770 (Bankr. W.D. Mo. 2000)...........................................................37

*In re Am. Solar King Corp.*,
    90 B.R. 808 (Bankr. W.D. Tex. 1988).............................................................50

*In re Armstrong World Indus., Inc.*,
    348 B.R. 111 (D. Del. 2006)........................................................................18, 43

*In re Briscoe Enters, Ltd.*,
    994 F.2d 1160 (5th Cir. 1993) .........................................................................41

*In re Buttonwood Partners, Ltd.*,
    111 B.R 57 (Bankr. S.D.N.Y. 1990)................................................................43

*In re Caribbean Petroleum Corp.*,
    512 B.R. 774 (Bankr. D. Del. 2014) ...............................................................27

*In re Chemtura Corp.*,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010).............................................................45

*In re Coastal Broad. Sys., Inc.*,
    570 F. App'x 188 (3d Cir. 2014) .....................................................................19

*In re Coram Healthcare Corp.*,
    315 B.R. 321 (Bankr. D. Del. 2004) ...........................................................26, 48

**TABLE OF AUTHORITIES** (Continued)

*In re Corvias Campus Living – USG, LLC,*
Case No. 25-11214 (LSS) (Bankr. D. Del. Oct. 29, 2025) ..................................................30

*In re Drexel Burnham Lambert Grp., Inc.,*
138 B.R. 723 (Bankr. S.D.N.Y. 1992) ..................................................................34, 37, 43

*In re Exaeris, Inc.,*
380 B.R. 741 (Bankr. D. Del. 2008) ..................................................................26

*In re Exide Techs.,*
303 B.R. 48 (Bankr. D. Del. 2003) ..................................................................27

*In re Fisker, Inc.,*
Case No. 24-11390 (TMH) (Bankr. D. Del. Oct. 11, 2024) ..................................................30

*In re FTX Trading Ltd.,*
Case No. 22-11068 (JTD) (Bankr. D. Del. Oct. 7, 2024) ..................................................30

*In re Greate Bay Hotel & Casino, Inc.,*
251 B.R. 213 (Bankr. D.N.J. 2000) ..................................................................20

*In re Heritage Org., L.L.C.,*
375 B.R. 230 (Bankr. N.D. Tex. 2007)..................................................................20

*In re HRI Holding Corp.,*
No. 19-12415 (MFW) (Bankr. D. Del. Nov. 5, 2020) ..................................................32

*In re Indianapolis Downs, LLC,*
Case No. 20-12816 (BLS), 486 B.R. 286 (Bankr. D. Del. 2013) ................................30, 41

*In re Jersey City Med. Ctr.,*
817 F.2d 1055 (3d Cir. 1987)..................................................................19, 43

*In re Johns-Manville Corp.,*
68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y.), *aff'd sub nom. Kane v. Johns-Manville Corp.,* 843 F.2d 636 (2d Cir. 1988) ..................................................................43

*In re Kaplan,*
104 F.3d 589 (3d Cir. 1997)..................................................................41

*In re Key3Media Grp., Inc.,*
336 B.R. 87 (Bankr. D. Del. 2005) ..................................................................51

*In re Lernout & Hauspie Speech Prod., N.V.,*
301 B.R. 651 (Bankr. D. Del. 2003) *aff'd,* 308 B.R. 672 (D. Del. 2004)..................................................................43

*In re Ligado Networks LLC,*
Case No. 25-10006 (TMH) (Bankr. D. Del. Sept. 23, 2025)..................................................................30

*In re Master Mortg. Inv. Fund, Inc.,*
168 B.R. 930 (Bankr. W.D. Mo. 1994)..................................................................27

**TABLE OF AUTHORITIES** (Continued)

**Page(s)**

*In re Nikola Corp., et al.*,
    Case No. 25-10258 (TMH) (Bankr. D. Del. Sept. 5, 2025)................................................30

*In re Nuverra Env't Solutions, Inc.*
    590 B.R. 75 (D. Del. 2018)................................................44

*In re Orlando Invs. LP*,
    103 B.R. 593 (Bankr. E.D. Pa. 1989)................................................41

*In re PPI Enters. (U.S.), Inc.*,
    228 B.R. 339 (Bankr. D. Del. 1998)................................................33

*In re Pace Indus., LLC*,
    No. 20-10927 (MFW) (Bankr. D. Del. Apr. 12, 2020)................................................32

*In re Phoenix Petroleum Co.*,
    278 B.R. 385 (Bankr. E.D. Pa. 2001)................................................16, 17

*In re Printing Dimensions, Inc.*,
    153 B.R. 715 (Bankr. D. Md. 1993)................................................34

*In re PWS Holding Corp.*
    228 F.3d 224 (3d Cir. 2000)................................................31

*In re S & W Enter.*,
    37 B.R. 153 (Bankr. N.D. Ill. 1984)................................................19

*In re Seegrid Corp.*,
    No. 14-12391 (BLS) (Bankr. D. Del.)................................................41

*In re Smallhold, Inc.*,
    665 B.R. 704 (Bankr. D. Del. 2024)................................................48

*In re Sound Radio, Inc.*,
    93 B.R. 849 (Bankr. D.N.J. 1988)................................................33

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. D. Del. 2011), *on reconsideration*, 464 B.R. 208
    (Bankr. D. Del. 2011)................................................18, 41

*In re Tribune Co.*,
    476 B.R. 843 (Bankr. D. Del. 2012)................................................19

*In re W.T. Grant Co.*,
    699 F.2d 599 (2d Cir. 1983)................................................26

*In re Wash. Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011)................................................27

*In re Wash Mut., Inc.*,
    461 B.R. 200 (Bankr. D. Del. 2011)................................................41

**TABLE OF AUTHORITIES** (Continued)

**Page(s)**

*In re Western Glob. Airlines, Inc.*,
   No. 23-11093 (KBO) (Bankr. D. Del. Nov. 21, 2023) .......................................................31

*In re World Health Alts., Inc.*,
   344 B.R. 291 (Bankr. D. Del. 2006) ................................................................................26

*In re WorldCom, Inc.*,
   No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31,
   2003) ..............................................................................................................................43

*In re Zenith Elecs. Corp.*,
   241 B.R. 92 (Bankr. D. Del. 1999) ......................................................................27, 33, 43

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
   987 F.2d 154 (3d Cir. 1993)........................................................................................19, 20

*Kane v. Johns- Manville Corp.*,
   843 F.2d 636 (2d Cir. 1988)........................................................................................41, 43

*Mercury Cap. Corp. v. Milford Conn. Assocs., L.P.*,
   354 B.R. 1 (D. Conn. 2006) ............................................................................................44

*Meyers v. Martin (In re Martin)*,
   91 F.3d 389 (3d Cir. 1996).............................................................................................51

*U.S. Bank Nat'l Ass'n v. Wilmington Tr. Co. (In re Spansion, Inc.)*,
   426 B.R. 114 (Bankr. D. Del. 2010) ...........................................................................26, 27

*United States v. Energy Res. Co.*,
   495 U.S. 545 (1990) .......................................................................................................41

**Statutes**

11 U.S.C. § 101(2) ...............................................................................................................40

11 U.S.C. § 101(31)(B)..........................................................................................................40

11 U.S.C. § 105.......................................................................................................................5

11 U.S.C. § 105(a) .................................................................................................................34

11 U.S.C. § 331......................................................................................................................34

11 U.S.C. § 361.......................................................................................................................5

11 U.S.C. § 362.......................................................................................................................5

11 U.S.C. § 363.......................................................................................................................5

11 U.S.C. § 364.......................................................................................................................5

11 U.S.C. § 365......................................................................................................................24

## TABLE OF AUTHORITIES (Continued)

**Page(s)**

11 U.S.C. § 365(h) ................................................................................................................53

11 U.S.C. § 506(a) ..................................................................................................................2

11 U.S.C. § 506(b) ................................................................................................................13

11 U.S.C. § 507 ......................................................................................................................5

11 U.S.C. § 507(a)(2) ............................................................................................................21

11 U.S.C. § 507(a)(3) ............................................................................................................21

11 U.S.C. § 507(a)(8) ............................................................................................................21

11 U.S.C. § 546(a) ................................................................................................................53

11 U.S.C. § 1107(a) ................................................................................................................4

11 U.S.C. § 1108 ....................................................................................................................4

11 U.S.C. § 1114(a) ..............................................................................................................42

11 U.S.C. § 1122 ......................................................................................................18, 19, 49

11 U.S.C. § 1122(a) ........................................................................................................19, 20

11 U.S.C. § 1123 .............................................................................................................passim

11 U.S.C. § 1123(a) ..............................................................................................................21

11 U.S.C. § 1123(a)(1) ..........................................................................................................21

11 U.S.C. § 1123(a)(2) ..........................................................................................................21

11 U.S.C. § 1123(a)(3) ..........................................................................................................21

11 U.S.C. § 1123(a)(4) ..........................................................................................................21

11 U.S.C. § 1123(a)(5) ....................................................................................................21, 23

11 U.S.C. § 1123(a)(5)(c) ................................................................................................22, 23

11 U.S.C. § 1123(a)(6) ....................................................................................................21, 23

11 U.S.C. § 1123(a)(7) ..............................................................................................21, 23, 24

11 U.S.C. § 1123(b) ........................................................................................................24, 26

11 U.S.C. § 1123(b)(1) ..........................................................................................................24

11 U.S.C. § 1123(b)(2) ....................................................................................................24, 26

**TABLE OF AUTHORITIES** (Continued)

**Page(s)**

11 U.S.C. § 1123(b)(3) ...................................................................................................51

11 U.S.C. § 1123(b)(3)(A) ..............................................................................24, 26, 29, 53

11 U.S.C. § 1123(b)(3)(B) .............................................................................................24

11 U.S.C. § 1123(b)(5) ...................................................................................................24

11 U.S.C. § 1123(b)(6) ...................................................................................................25

11 U.S.C. § 1125 ...................................................................................................16, 17, 18, 32

11 U.S.C. § 1125(a) ...................................................................................................15, 16

11 U.S.C. § 1125(a)(1) ...................................................................................................16

11 U.S.C. § 1125(b) ...................................................................................................15

11 U.S.C. § 1126 ...................................................................................................32, 39

11 U.S.C. § 1126(c) ...................................................................................................39

11 U.S.C. § 1126(f) ...................................................................................................14, 37, 39

11 U.S.C. § 1126(g) ...................................................................................................14, 37, 39

11 U.S.C. § 1127(a) ...................................................................................................49

11 U.S.C. § 1129 ...................................................................................................18

11 U.S.C. §  1129(13) ...................................................................................................42

11 U.S.C. §  1129(14) ...................................................................................................42

11 U.S.C. §  1129(15) ...................................................................................................42

11 U.S.C. §  1129(16) ...................................................................................................42

11 U.S.C. § 1129(a) ...................................................................................................32, 43

11 U.S.C. § 1129(a)(1) ...................................................................................................18, 19

11 U.S.C. § 1129(a)(2) ...................................................................................................32

11 U.S.C. § 1129(a)(3) ...................................................................................................32, 33

11 U.S.C. § 1129(a)(4) ...................................................................................................33, 34

11 U.S.C. § 1129(a)(5) ...................................................................................................34, 35

11 U.S.C. § 1129(a)(5)(A) ...................................................................................................35

**TABLE OF AUTHORITIES** (Continued)

**Page(s)**

11 U.S.C. § 1129(a)(5)(A)(i) ...................................................................................................35

11 U.S.C. § 1129(a)(5)(A)(ii) ..................................................................................................35

11 U.S.C. § 1129(a)(5)(B) .......................................................................................................35

11 U.S.C. § 1129(a)(6)..............................................................................................................36

11 U.S.C. § 1129(a)(7)...................................................................................................36, 37, 38

11 U.S.C. § 1129(a)(8)...................................................................................................38, 39, 43

11 U.S.C. § 1129(a)(9)..............................................................................................................40

11 U.S.C. § 1129(a)(10).......................................................................................................40, 41

11 U.S.C. § 1129(a)(11).......................................................................................................41, 42

11 U.S.C. § 1129(a)(12)............................................................................................................42

11 U.S.C. § 1129(a)(13)............................................................................................................42

11 U.S.C. § 1129(a)(14)............................................................................................................42

11 U.S.C. § 1129(a)(15)............................................................................................................42

11 U.S.C. § 1129(a)(16)............................................................................................................42

11 U.S.C. § 1129(b) ...............................................................................................3, 42, 43, 44

11 U.S.C. § 1129(b) .................................................................................................................40

11 U.S.C. § 1129(b)(1) .............................................................................................................43

11 U.S.C. § 1129(b)(2) .............................................................................................................44

11 U.S.C. § 1129(b)(2)(A) .......................................................................................................45

11 U.S.C. § 1129(b)(2)(A)(i) ...................................................................................................45

11 U.S.C. § 1129(b)(2)(A)(iii) .................................................................................................45

11 U.S.C. § 1129(b)(2)(B) .......................................................................................................46

11 U.S.C. § 1129(b)(2)(B)(ii) ..................................................................................................45

11 U.S.C. § 1129(b)(2)(C)(ii) ..................................................................................................45

11 U.S.C. § 1129(c) .................................................................................................................46

11 U.S.C. § 1129(d) .................................................................................................................46

x

**TABLE OF AUTHORITIES** (Continued)

**Page(s)**

28 U.S.C. § 157.................................................................................................................15

28 U.S.C. § 157(b)............................................................................................................15

28 U.S.C. § 1334...............................................................................................................15

28 U.S.C. § 1408...............................................................................................................15

28 U.S.C. § 1409...............................................................................................................15

28 U.S.C. § 1930...............................................................................................................42

The Securities Act of 1933 § 5 .........................................................................................46

**Rules**

Fed. R. Bankr. P. 1015(b) ..................................................................................................4

Fed. R. Bankr. P. 2002.......................................................................................................15

Fed. R. Bankr. P. 2016(a) ..................................................................................................34

Fed. R. Bankr. P. 3019..................................................................................................49, 50

Fed. R. Bankr. P. 3020.......................................................................................................53

Fed. R. Bankr. P. 3020(e) ..................................................................................................53

Fed. R. Bankr. P. 4001.......................................................................................................5

Fed. R. Bankr. P. 6004.......................................................................................................53

Fed. R. Bankr. P. 6004(h) ..................................................................................................53

Fed. R. Bankr. P. 6006..................................................................................................15, 53

Fed. R. Bankr. P. 6006(d) ..................................................................................................53

Fed. R. Bankr. P. 9007.......................................................................................................15

Fed. R. Bankr. P. 9014.......................................................................................................15

Fed. R. Bankr. P. 9019..............................................................................................26, 51, 53

Local Rule 2016-2..............................................................................................................34

Local Rule 4001-2..............................................................................................................5

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") submit this (a) memorandum of law in support of final approval and confirmation of the *Second Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation of SilverRock Development Company, LLC and Its Debtor Affiliates* [Docket No. 1111] (as may be amended, modified and/or supplemented, the "Combined Disclosure Statement and Plan," the "Disclosure Statement," or the "Plan," as applicable).[2] In further support of the Combined Disclosure Statement and Plan, the Debtors have filed contemporaneously herewith (a) the declaration of Christopher S. Sontchi (the "Sontchi Declaration), and (b) a proposed form of order confirming the Plan (as may be amended, modified and/or supplemented, the "Combined Order"). The Debtors also rely upon the declaration of Justin Edelson from Reliable Companies ("Reliable") with respect to solicitation and voting, filed on May 13, 2026 [Docket No. 1116] (the "Voting Report"), and the affidavits of service [Docket Nos. 988, 1100, 1112, & 1113] filed by Reliable in connection with Plan solicitation and noticing.

### PRELIMINARY STATEMENT

1.      The Debtors prosecuted these chapter 11 cases with the goal of maximizing the value of their real property assets through a court-approved marketing and sale process. These efforts were successful, and the Debtors consummated the sale (the "Sale") of their real property assets to TBE RE Acquisition Co II, LLC (the "Buyer") on December 9, 2025 (the "Sale Closing"). Following the Sale Closing, the Bankruptcy Court appointed James C. Bastian, Jr. (the "Mediator") to mediate disputes among the Debtors, the City, certain of the Debtors' creditors, and other parties in interest related to allocation of the net proceeds of the Sale and a chapter 11 plan (the "Mediation"). Despite the Mediator's best efforts, the three-month Mediation ultimately

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Combined Disclosure Statement and Plan.

proved unsuccessful. Thereafter, the Debtors continued to negotiate with various parties and revise their form of plan and disclosure statement and motion to establish the value of certain secured claims under section 506(a) of the Bankruptcy Code [Docket No. 913] (the Allocation Motion"). The Debtors noticed the Allocation Motion for hearing in connection with the Plan.

2.    Several of the Debtors' creditors filed objections to the Allocation Motion and indicated they would object to the Plan on multiple grounds. Various and numerous parties served discovery in the form of voluminous document requests, other written discovery, more than 20 deposition notices or subpoenas for more than a dozen fact witnesses and three expert witnesses. While digesting the massive amounts of discovery that was propounded and to be addressed on an expedited basis (which included the Debtors gathering tens of thousands of documents for review and potential production), it became necessary for the Debtors to explore alternatives instead of proceeding in a fashion that was sure to consume resources necessary for a Litigation Trust to function. Throughout the process, the Debtors, certain creditors, parties in interest, and the City engaged in multiple "meet and confers" to discuss, among other things, discovery parameters and the go forward process. From these "meet and confers," the terms of a global settlement began to emerge, which was then negotiated between and among such creditors, parties in interest, the Debtors, and the City of La Quinta, California (the "City") for nearly two weeks. Ultimately, these negotiations produced the Global Settlement filed on May 8, 2026. *See* Docket No. 1107. Also on May 8, 2026, in furtherance of the Global Settlement, the Debtors withdrew the Allocation Motion. *See* Docket No. 1108.

3.    With the Global Settlement in hand, the Debtors are now in a position to successfully confirm a chapter 11 plan that will, among other things, (i) provide additional funding for the establishment of a Litigation Trust to pursue Retained Causes of Action for the benefit of

their creditors, (ii) preserve the Remaining Disputes and all discovery rights related to the same among the parties to the Global Settlement for further litigation or resolution, (iii) establish a Sale Proceeds Reserve Account to hold net proceeds of the Sale until determination or final resolution of the Remaining Disputes occurs, and (iv) provide for the efficient and orderly wind-down of the Debtors' Estates in the near term. The Global Settlement also provides for resolution of the Poppy Indemnity, dismissal of the Appeal of the Sale Order on terms mutually agreeable to the parties thereto, and releases by the Debtors of claims against the Settling Creditors.

4.      The Plan includes twenty-four (24) Voting Classes.  Excluding the votes of any Insiders, twelve Voting Classes (Classes 3-11, 13, 20, and 25) voted to accept the Plan. Four (4) Voting Classes (Classes 16, 17, 26, and 27) voted to reject the Plan. Accordingly, the Debtors must use section 1129(b) of the Bankruptcy Code to confirm the Plan as to Classes 16, 17, 26, and 27.[3]

5.      The Debtors received only one filed objection to the Plan from the Office of the United States Trustee for the District of Delaware [Docket No. 918] (the "U.S. Trustee" and such objection, the "UST Objection").[4] The unresolved portion of the UST Objection relates solely to the Third-Party Releases in the Plan. The Debtors submit the Plan complies with the requirements established by case law in this District with respect to consensual third-party releases and as such, the UST Objection should be overruled.

6.      Further, the Debtors have negotiated with certain parties in interest to resolve informal objections to the Plan.  The Debtors believe they have resolved all informal

---

[3]      No Ballots were received from any Holder entitled to vote in Classes 12, 14, 15, 18, 19, 21, 22, 23, and 24 (each, an "Abstaining Class" and collectively, the "Abstaining Classes"). Consequently, these Abstaining Classes were neither deemed to reject nor accept the Plan.

[4]      As described herein, the UST Objection was resolved for purposes of the Interim Approval and Procedures Order but remains extant as to the Plan with respect to the Third-Party Releases.

objections to final approval and confirmation of the Combined Disclosure Statement and Plan, including through certain modifications to the Combined Disclosure Statement and Plan and the addition of language to the proposed Combined Order.

7.      The Debtors submit that the Combined Disclosure Statement and Plan satisfies the requirements of title 11 of the United States Code, as amended (the "Bankruptcy Code"), the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") and all other applicable law.  Therefore, final approval and confirmation of the Combined Disclosure Statement and Plan is appropriate and in the best interests of the Debtors' Estates, and the Court should enter the Combined Order.

**BACKGROUND**

**I.      GENERAL BACKGROUND**

8.      On August 5, 2024 (the "Petition Date"), each Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code. The Debtors are managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. These Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b). No official committee of unsecured creditors has been appointed in these cases. The factual background regarding the Debtors, including their business operations, capital and debt structure, and the events leading to the filing of these Chapter 11 Cases, is set forth in more detail in the *Declaration of Robert S. Green, Jr. in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 13] (the "First Day Declaration").

9.      The Debtors' business operations centered around the real estate development of a 525-acre master planned community in the City of La Quinta, California (the "Project"). The Debtors' principal assets were 134+- acres of partially constructed, largely

4

unentitled real property in the desert, the full value of which could only be realized through a comprehensive development scheme involving adjacent real property owned by the City.

## II.    DIP FINANCING

10.    On August 29, 2024, the Debtors filed the *Motion of Debtors Pursuant to Sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rule 4001, and Local Rule 4001-2, for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing from the City of La Quinta; (II) Granting Non-Priming DIP Lender Liens and Super-Priority Claims; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* [Docket No. 125] (the "DIP Motion").

11.    On each of October 1, 18, and 31, 2024, and December 6, 2024, the Court granted certain relief sought in the DIP Motion on an interim basis [Docket Nos. 162, 188, 208 & 243, respectively] (collectively, the "Interim DIP Orders"). Through the Interim DIP Orders, the Debtors obtained interim funding in the amount of $2,690,965 (the "Interim Funding") pursuant to a term sheet (the "Interim DIP Term Sheet") between the Debtors and the City. The City provided the Interim Funding under the Interim Term Sheet without priming any of the Project's existing secured creditors.

12.    After a diligent search for available financing, including discussions with existing creditors, the best available alternative for post-petition financing (the "DIP Facility") was that offered by the City. On December 12, 2024, the Debtors filed the *Motion of Debtors Pursuant to Sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rule 4001, and Local Rule 4001-2, for an Order (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Granting DIP Lender Priming Liens and Super-Priority Claims; and (III) Granting Related Relief* [Docket No. 246], which was approved by the Court on January 23, 2025 [Docket No. 330] (as amended, the "Final DIP Order").

13.    On January 23, 2025, the Debtors and the City entered into that certain *Debtor-in-Possession Credit Facility Loan and Security Agreement* (the "DIP Credit Agreement") memorializing the terms of the DIP Term Sheet in accordance with the Final DIP Order. As of this filing, the DIP Facility is fully drawn.

14.    On August 29, 2025, the Debtors filed a motion [Docket No. 653] (the "DIP Amendment Motion") to approve an amendment (the "DIP Amendment") to the DIP Credit Agreement. As described in more detail in the DIP Amendment Motion, the DIP Amendment provided the Debtors with, among other things, additional liquidity, and an agreement by the City to waive or credit a portion of the DIP Facility. The DIP Amendment additionally provided for the establishment of a reserve account (the "Supplemental DOT Collateral Reserve") to hold net sale proceeds allocable to the "Supplemental DOT Collateral" (defined in the DIP Amendment), which are certain additional parcels of real property, identified after execution of the DIP Credit Agreement, that also secure the DIP Facility. The DIP Amendment provided that such Supplemental DOT Collateral Reserve would be funded in an amount equal to the net sale proceeds allocable to such additional parcels, which amount was approximately $1,190,000. On October 23, 2025, the Court entered an order approving the DIP Amendment Motion. Docket No. 760.

### III.    THE SALE

15.    As set forth in the *Motion for Entry of Order (I) Authorizing and Approving (A) Bid Procedures and (B)) Form and Manner of Notice of Bid Procedures* [Docket No. 358] and the *Debtors' Motion for Entry of an Order (I) Approving the Sale of the Purchased Assets to the Successful Bidder Free and Clear of all Claims, Liens, Interests, and Encumbrances; (II) Approving the Consensual Termination or Rejection of Ground Leases, Effective as of the Closing Date; (III) Approving Form of Grant Deed; and (IV) Granting Related Relief* [Docket No. 621] (the "Sale Motion"), the Debtors prosecuted these Chapter 11 Cases, in part, in pursuit of a sale of

substantially all of their tangible assets to a buyer with the financial capability and development competence to finish construction and development of the Project.

16.      In furtherance of this objective, the Debtors successfully marketed their assets, appointed a stalking horse bidder, held an auction, and filed the Sale Motion to, among other things, approve the Debtors' entry into a purchase and sale agreement (the "PSA") with the Buyer.

17.      On October 14, 16, 17 and 21, 2025, the Court held a hearing (the "Sale Hearing") to consider the relief requested in the Sale Motion. On October 21, 2025, the Court issued a bench ruling approving the Sale Motion and on October 23, 2025, the Court entered an order [Docket No. 759] (the "Sale Order") approving the Sale, which closed on December 9, 2025. Upon the Sale Closing, the Debtors' estates received $65 million in gross cash consideration *plus* (i) a credit of $2.25 million of the DIP Facility (as defined in the DIP Amendment Motion) and (ii) access to at least $1 million (and up to $2 million) in additional financing to wind-down the Debtors' estates.

### IV.      THE APPEAL

18.      On November 3, 2025, Construction Loan Services II, LLC d/b/a Builders Capital ("Builders Capital") appealed (the "Appeal") the Sale Order to the United States District Court for the District of Delaware (the "District Court"). On November 7, 2025, Builders Capital filed an emergency motion for a stay pending appeal [Docket No. 788] (the "Bankruptcy Stay Motion") in this Court, to which the Debtors, the Buyer, and the City (collectively, the "Appellees") objected [Docket Nos. 795, 796 & 797]. On November 13, 2025, the Court held a hearing to consider the Bankruptcy Stay Motion, at the conclusion of which the Court denied the

Bankruptcy Stay Motion. On November 14, 2025, the Court entered an order memorializing the same [Docket No. 802].

19.    On November 19, 2025, Builders Capital filed an emergency motion for a stay pending appeal in the District Court [District Court Docket No. 8] (the "USDC Stay Motion"), to which the Appellees objected. *See* District Court Docket Nos. 16, 17, 18, 19, 20, 21 & 22. On December 5, 2025, the District Court entered an order denying the USDC Stay Motion. *See* District Court Docket Nos. 25 (Memorandum denying USDC Stay Motion); & 26 (Order denying same). The Sale Closing occurred four days later.

20.    Briefing on the merits and a motion to dismiss occurred thereafter in the Appeal and has now concluded. Pursuant to the Global Settlement (defined below) and following entry of the Combined Order, Builders Capital and the Appellees have agreed to dismiss the Appeal with prejudice on terms mutually agreeable to the parties.

## V.    THE MEDIATION

21.    On December 10, 2025, the Debtors filed the initial Allocation Motion [Docket No. 834], which included requests for relief pertaining to mediation. On December 16, 2025, the Court held a hearing to consider the mediation-related relief in the Allocation Motion. Consistent with the Court's ruling at the hearing, the Debtors revised the proposed form of order to, among other things, make the mediation voluntary and formalize certain other aspects of the mediation. On December 23, 2025, the Court entered the revised order (the "Mediation Order") and appointed the Mediator. *See* Docket No. 864.

22.    Between late December and March 13, 2026, the Mediator conducted the Mediation among the Debtors, the City, R.D. Olson Construction, Inc., Poppy Bank ("Poppy"), Builders Capital, RAF Pacifica Loan Opportunity Fund I and Arnold Fishman, as Trustee of The Arnold Fishman Revocable Trust dated July 15, 1999 (together, "Keillor"), SilverRock Resort

8

Investment LLC and SilverRock Resort Investment M, LLC (together, the "EB-5 Lenders"), non-debtor SilverRock Land II, LLC ("SR Land"), Richard and Lehn Goetz, and Granite Construction Company ("Granite") through a series of individual and group mediation sessions. While the Mediator made every effort, the Mediation did not result in a global settlement and on March 13, 2026, the Mediator determined to conclude the Mediation.

**VI.    THE INITIAL COMBINED DISCLOSURE STATEMENT AND PLAN AND THE ALLOCATION MOTION**

23.    On December 1, 2025, the Debtors filed the *Joint Chapter 11 Plan of Liquidation of SilverRock Development Company, LLC and its Debtor Affiliates* [Docket No. 823] and the *Disclosure Statement for the Joint Chapter 11 Plan of Liquidation of SilverRock Development Company, LLC and its Debtor Affiliates* [Docket No. 824].

24.    Following the conclusion of the Mediation, the Debtors filed (i) the *Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation of SilverRock Development Company, LLC and its Debtor Affiliates* [Docket No. 904], (ii) the *Debtors' Motion for an Order (I) Approving the Combined Disclosure Statement and Plan on an Interim Basis for Solicitation Purposes Only; (II) Approving Solicitation and Voting Procedures, Including (A) Fixing the Record Date, (B) Approving the Solicitation Packages and Procedures for Distribution Thereof, and (C) Approving the Form of Ballot and Establishing Voting and Tabulation Procedures; (III) Scheduling a Combined Hearing and Establishing Related Notice and Objection Procedures; and (IV) Granting Related Relief* [Docket No. 905] (the "Interim Approval and Procedures Motion") [Docket No. 905], and (iii) the Allocation Motion. The Debtors received formal objections to the Interim Approval and Procedures Motion from Laurence Duclos, Trustee of the Duclos Family Revocable Trust u/t/d November 14, 1996, and Jon and Linda Kurtin [Docket

No. 915] (the "Duclos/Kurtin Objection") and the UST, as well as informal comments from certain other parties in interest.

25.     On April 7, 2026, the Court held a hearing (the "Interim Approval Hearing") with respect to the relief requested by the Interim Approval and Procedures Motion. As set forth on the record at the Interim Approval Hearing, the UST Objection was resolved for purposes of the Initial Approval and Procedures Order. The Court overruled the Duclos/Kurtin Objection and orally granted the relief requested by the Interim Approval and Procedures Motion.

26.     On April 8, 2026, the Court entered an order [Docket No. 951] (the "Interim Approval and Procedures Order") (i) approving the Disclosure Statement on an interim basis for solicitation purposes only, (ii) establishing procedures for the solicitation and tabulation of votes to accept or reject the Plan, (iii) approving form of Ballot and Solicitation Packages, (iv) establishing April 8, 2026, as the voting record date (the "Record Date"), (v) scheduling a final, combined hearing to consider the final approval and confirmation of the Combined Disclosure Statement and Plan (the "Combined Hearing"), (iv) approving the forms of the Combined Hearing Notice (defined below) and the notices for non-voting parties, and (v) granting related relief.

27.     Also on April 8, 2026, the Debtors filed the solicitation version of the Combined Disclosure Statement and Plan [Docket No. 952]. The Debtors also filed and served the *Notice of Order (I) Approving the Combined Disclosure Statement and Plan on an Interim Basis for Solicitation Purposes Only; (II) Approving Solicitation and Voting Procedures, Including (A) Fixing the Record Date, (B) Approving the Solicitation Packages and Procedures for Distribution Thereof, and (C) Approving the Form of Ballot and Establishing Voting and Tabulation*

10

*Procedures; (III) Scheduling a Combined Hearing and Establishing Related Notice and Objection Procedures; and (IV) Granting Related Relief* [Docket No. 955] (the "Combined Hearing Notice").

28.    Solicitation was completed on April 9, 2026.    In connection with solicitation, the Debtors served two notices of non-voting status on various parties. Publication versions of the Combined Hearing Notice were published in *The San Diego Union-Tribune* on April 13, 2026 and *The Desert Sun* on April 14, 2026. *See* Docket No. 964.

29.    On April 30, 2026, the Debtors filed an initial plan supplement [Docket No. 1040] (including all exhibits thereto and as amended, modified and/or supplemented from time to time, the "Plan Supplement"), which included as exhibits (i) the form of Litigation Trust Agreement, (ii) the Schedule of Retained Causes of Action, (iii) the EB-5 Settlement, and (iv) loan and security information related to the DIP Interests in the Litigation Trust. On May 13, 2026, the Debtors filed a revised version of the Plan Supplement [Docket No. 1117].

## VII.    THE GLOBAL SETTLEMENT

30.    The objections filed by various creditors to the Allocation Motion spurred a period of intense discovery among the objecting creditors, the Debtors, and the City in which more than 20 depositions or subpoenas for more than a dozen fact witnesses and three expert witnesses were served. Notwithstanding the litigation posture of the parties in propounding such discovery, counsel made every effort during this time to discuss opportunities to resolve the parties' objections and provide a path forward for these Chapter 11 Cases. From such discussions, the Global Settlement emerged. On May 8, 2026, (i) the Debtors, (ii) the City, and (iii) each of Builders Capital, RDO, Poppy, the EB-5 Lenders, Keillor, the Traub Family Revocable Trust dated January 22, 2015 and SR Land (together, the "Traub Parties"), Rowan Incorporated d/b/a Rowan Electric, Granite, and White's Steel, Inc. (the parties within the foregoing section (iii), collectively, the "Settling Creditors") executed the Global Settlement.  *See* Docket No. 1107. A copy of the

11

Global Settlement was filed on the docket and served on, among other parties, all creditors in the Voting Classes with respect to the Plan. Also on May 8, 2026, pursuant to the Global Settlement, the Debtors withdrew the Allocation Motion [Docket No. 1108] and served such notice on all parties that had received the Allocation Motion, including all of the Voting Classes.

31.     To incorporate the terms, conditions, and resolutions embodied in the Global Settlement, the Debtors filed an amended version of the Combined Disclosure Statement and Plan on May 11, 2026 [Docket No. 1111] and also extended the Voting and Plan Objection Deadline to May 13, 2026 at 4:00 p.m. (ET) and permitted Holders of Claims in the Voting Classes to cast their Ballots by email. *See* Docket No. 1112.

## VIII.   PLAN OVERVIEW

32.     The purpose of the Plan is to provide for the liquidation of the Debtors in a manner designed to maximize Distributions to stakeholders by, among other things, (i) establishing a Litigation Trust vested with authority to prosecute the Retained Causes of Action, (ii) establishing a Sale Proceeds Reserve Account to hold net proceeds of the Sale until a final determination or resolution is reached with respect to the Remaining Disputes, (iii) preserving the discovery and other rights of all of the Settling Creditors with respect to the Remaining Disputes, and (iv) providing a process by which the Debtors' Estates may be wound down in an efficient and orderly manner.

33.     Specifically, the Plan provides for:[5]

  a.    Consensual resolution or payment in full of all Allowed Administrative Claims, DIP Claims, Professional Fee Claims, U.S. Trustee Quarterly Fees, and Priority Tax Claims;

  b.    each Holder of an Allowed Secured Tax Claim to (i) be paid in full in Cash including the payment of any interest required to be paid

---

[5]    The summary of the Plan contained herein is qualified in its entirety by the terms of the Plan and in the event of any inconsistency, the Plan shall control in all respects.

under section 506(b) of the Bankruptcy Code, (ii) receive the collateral securing its Allowed Secured Tax Claim, or (iii) receive any other treatment that would render such Claim Unimpaired;

c.      each Holder of an Allowed Priority Non-Tax Claim to (i) be paid in Cash equal to the unpaid portion of the face amount of such Allowed Priority Non-Tax Claim, or (ii) receive such other less favorable treatment as to which such Holder and the Debtors or the Litigation Trustee, as applicable, agree in writing;

d.      subject to final resolution or determination of the Remaining Disputes, each Holder of the Claims in Classes 3-26 to (i) be paid the Allowed amount of its Secured Claim in Cash, or (ii) receive such other less favorable treatment as to which the Holder of such Claim and the Debtors or the Litigation Trustee, as applicable, agree in writing;

e.      each Holder of an Allowed General Unsecured Claim to receive (i) its *pro rata* share of the GUC Beneficial Interests in the Litigation Trust or (ii) such other less favorable treatment to which the Holder of an Allowed General Unsecured Claim and the Debtors or the Litigation Trust, as applicable, agree in writing;

f.      the subordination of all Subordinated Claims and the barring of Holders of any Subordinated Claims from receiving or retaining property on account of such Subordinated Claims;

g.      the release, cancellation, or waiver of all Intercompany Claims and the barring of Holders of any Intercompany Claims from receiving or retaining property on account of such Intercompany Claims;

h.      the cancellation, release, or extinguishment of all Interests on the Effective Date, and the barring of Holders of any Interests receiving or retaining any property on account of such Interests;

i.      the vesting of the Litigation Trust with all of the Litigation Trust Assets, including but not limited to (i) all Remaining Assets, (ii) all Retained Causes of Action (including any Privilege Rights), and (iii) the portion of the City Additional Funding allocated to the Litigation Trust, all of which are being transferred pursuant to the Plan to the Litigation Trust upon the Effective Date;

j.      the substantive consolidation of the Debtors' Estates as set forth in the Plan;

k.      approval of the Global Settlement;

13

l.   releases of the "Released Parties" by the "Releasing Parties" and releases by the Debtors of the "Released Parties" and the "Settling Creditor Released Parties;" and

m.   Exculpation of the "Exculpated Parties" for any acts taken or omitted to have been taken on or after the Petition Date and prior to the Effective Date in connection with, relating to, or arising out of the Chapter 11 Cases.

## IX.   VOTING RESULTS

34.   As set forth in the Voting Report, the Debtors received 100% acceptance of the Plan from twelve (12) Voting Classes: Class 3 (Keillor Secured Claim), Class 4 (Builders Capital Secured Claim), Class 5 (Poppy Secured Claim), Class 6 (RDO Secured Claim), Class 7 (Granite Secured Claim), Class 8 (Gauston Secured Claim), Class 9 (Rowan Secured Claim), Class 10 (EB-5 Secured Claim), Class 11 (H&E Secured Claim), Class 13 (Traub Secured Claim), Class 20 (MSA Consulting Secured Claim) and Class 25 (White's Steel Secured Claim) (collectively, the "Accepting Classes"). The following four (4) Voting Classes voted to reject the Plan: Class 16 (Goetz Secured Claim), Class 17 (Young's Secured Claim), Class 26 (Robert Green Disputed Secured Claim), and Class 27 (General Unsecured Claims) (collectively, the "Rejecting Classes").[6] Under the Plan, Class 1 (Secured Tax Claims) and Class 2 (Priority Non-Tax Claims) were deemed to have accepted the Plan and thus were not entitled to vote to accept or reject the Plan.[7] Likewise, Class 28 (Subordinated Claims), Class 29 (Intercompany Claims), and Class 30 (Interests) were deemed to have rejected the Plan and were not entitled to vote to accept or reject the Plan.[8]

## ARGUMENT

---

[6]   The Abstaining Classes are comprised of: Class 12 (Vermillions Secured Claim), Class 14 (Cypress Secured Claim), Class 15 (Axia Secured Claim), Class 18 (20/20 Secured Claim), Class 19 (Gensler Secured Claim), Class 21 (BAR Architects Secured Claim), Class 22 (Cockrell Electric Secured Claim), Class 23 (Trimark Raygal Secured Claim), and Class 24 (J. Ginger Masonry Secured Claim). Because the Abstaining Classes did not cast Ballots with respect to the Plan, they have not been deemed to accept or reject the Plan.

[7]   *See* 11 U.S.C. § 1126(f).

[8]   *See id*. § 1126(g).

14

## I.    THE COURT HAS JURISDICTION AND NOTICE WAS PROPER.

### A.    Jurisdiction and Venue

35.    This Court has jurisdiction over these Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b), and the Court has jurisdiction to determine whether the Combined Disclosure Statement and Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

### B.    Adequate Notice of Combined Hearing

36.    In accordance with Bankruptcy Rules 2002, 6006, 9007, and 9014, the Interim Approval and Procedures Order, the Combined Hearing Notice, and the solicitation procedures set forth therein, adequate notice of (i) the Plan Objection Deadline, (ii) the transactions, settlements and compromises contemplated by the Combined Disclosure Statement and Plan, and (iii) the Combined Hearing was provided to all Holders of Claims and Interests and other parties in interest entitled to receive such notice under the Interim Approval and Procedures Order, the Bankruptcy Code and the Bankruptcy Rules.  No other or further notice is necessary or required.

## II.    THE DISCLOSURE STATEMENT SHOULD BE APPROVED ON A FINAL BASIS.

37.    Section 1125(b) of the Bankruptcy Code requires that, before soliciting votes on a plan, the plan proponent must provide a disclosure statement that contains adequate information regarding the proposed plan. Section 1125(a) defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would

enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.[9]

38.     The amount and type of information required to satisfy section 1125(a) must be determined on a case-by-case basis.  The legislative history of section 1125 indicates that the threshold of what constitutes "adequate information" is flexible and based on the circumstances of each case.[10] Courts also have broad discretion to determine what constitutes adequate information necessary to satisfy the requirements of section 1125(a).[11] This grant of discretion was intended to facilitate a debtor's effective emergence from chapter 11 across the broad range of businesses in which chapter 11 debtors engage.[12] A disclosure statement must provide creditors entitled to vote on the plan with information that is "reasonably practicable" to permit an "informed judgment."[13] The general purpose of the disclosure statement is to set forth sufficient facts to permit a creditor to make an informed evaluation of the merits of the plan.[14]

39.     To determine whether a disclosure statement contains adequate information, courts typically expect the following elements to be included in a disclosure statement, as applicable to the circumstances of the case: (i) the events leading to the filing of a

---

[9]     11 U.S.C. § 1125(a)(1).

[10]    H.R. Rep. No. 95-595, at 409 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6364.

[11]    *See In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) ("The general language of the statute and its surrounding legislative history make clear that the determination of what is adequate information is subjective and made on a case by case basis. The determination is largely within the discretion of the bankruptcy court.") (internal quotations omitted).

[12]    *See* H.R. Rep. No. 95-595, at 408-409 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6364-65.

[13]    *Cohen v. Tic Fin. Sys. (In re Ampace Corp.)*, 279 B.R. 145, 157 n.26 (Bankr. D. Del. 2002).

[14]    *See Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, 100 (3d Cir. 1988); *Phoenix Petroleum*, 278 B.R. at 392.

bankruptcy petition; (ii) a description of the available assets and their values; (iii) the anticipated future of the company; (iv) the source of information stated in the disclosure statement; (v) a disclaimer; (vi) the present condition of the debtor while in chapter 11; (vii) the scheduled claims; (viii) the estimated return to creditors under a chapter 7 liquidation; (ix) the accounting method utilized to produce financial information and the name of the accountants responsible for such information; (x) the future management of the debtor; (xi) the chapter 11 plan or a summary thereof; (xii) the estimated administrative expenses, including attorneys' and accountants' fees; (xiii) the collectability of accounts receivable; (xiv) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the plan; (xv) information relevant to the risks posed to creditors under the plan; (xvi) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; (xvii) litigation likely to arise in a non-bankruptcy context; (xviii) tax attributes of the debtor; and (xix) the relationship of the debtor with affiliates.[15]

40.     Here, the Combined Disclosure Statement and Plan contains adequate information, as required by section 1125 of the Bankruptcy Code, so that creditors were able to make an informed decision in voting to accept or reject the Plan.  The Combined Disclosure Statement and Plan is comprehensive and contains the type of information described above.  The Combined Disclosure Statement and Plan includes a liquidation analysis and complete discussions of: (i) significant events preceding the Debtors' Chapter 11 Cases; (ii) the Debtors' prepetition operations and capital structure; (iii) the designation and treatment of Claims and Interests; (iv) the method to fund the Combined Disclosure Statement and Plan and make Distributions to creditors, including the Global Settlement; (v) the nature and extent of likely claims against the

---

[15]     *See Phoenix Petroleum*, 278 B.R. at 393 n.6.

Debtors' Estates; (vi) the provisions governing releases, injunctions and exculpations; (vii) the risk factors affecting the Combined Disclosure Statement and Plan; and (viii) the federal tax consequences related to the Combined Disclosure Statement and Plan.

41.    Accordingly, the Debtors respectfully submit that the Disclosure Statement contains adequate information within the meaning of section 1125 and should be approved on a final basis.

### III.    THE PLAN SHOULD BE CONFIRMED.

#### A.    The Plan Meets All Applicable Requirements of the Bankruptcy Code.

42.    To confirm the Plan, the Court must find that the provisions of section 1129 of the Bankruptcy Code have been satisfied by a preponderance of the evidence.[16] The Debtors submit that based on the record of these Chapter 11 Cases, the Sontchi Declaration, the Voting Report, and the Debtors' arguments set forth herein, the applicable burden is clearly satisfied and the Plan complies with all relevant sections of the Bankruptcy Code, the Bankruptcy Rules, and applicable non-bankruptcy law.  In particular, the Plan fully complies with the requirements of sections 1122, 1123, and 1129 of the Bankruptcy Code. Each requirement is addressed below.

##### 1.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).

43.    Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of the Bankruptcy Code.  The principal objective of section 1129(a)(1) is to assure compliance with the sections of the Bankruptcy Code governing classification of

---

[16]    *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006); *In re Tribune Co.*, 464 B.R. 126, 151–52 (Bankr. D. Del. 2011) ("Tribune I"), *on reconsideration*, 464 B.R. 208 (Bankr. D. Del. 2011). Preponderance of the evidence has been described as just enough evidence to make it more likely than not that the fact the claimant seeks to prove is true. *See Grogan v. Garner*, 498 U.S. 279, 286 (1991) ("[T]he preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants….") (citations omitted).

claims and interests and the contents of a plan.[17] Consequently, the determination of whether the

Plan complies with section 1129(a)(1) requires an analysis of sections 1122 and 1123 of the

Bankruptcy Code.  As explained below, the Plan complies with sections 1122 and 1123 in all

respects.

### a.    The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

44.    Section 1122(a) of the Bankruptcy Code provides that "a plan may place a

claim or an interest in a particular class only if such claim or interest is substantially similar to the

other claims or interests of such class." 11 U.S.C. § 1122(a).

45.    The Third Circuit "permits the grouping of similar claims in different

classes" as long as those classifications are reasonable.[18] The classifications, however, cannot be

"arbitrarily designed" to secure the approval of an impaired class when "the overwhelming

sentiment of the impaired creditors [is] that the proposed reorganization of the debtor would not

serve any legitimate purpose."[19] Accordingly, the Third Circuit has held that the only requirement

for classification is that it be "reasonable."[20] Separate classes of similar claims are reasonable when

each class represents "a voting interest that is sufficiently distinct and weighty to merit a separate

voice in the decision whether the proposed reorganization should proceed."[21] Courts have

---

[17]    The legislative history of section 1129(a)(1) explains that this provision is intended to draw in the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a plan, respectively. *See* S. Rep. No. 95-989, at 126 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368; *In re S & W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was more directly aimed at were Sections 1122 and 1123.").

[18]    *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987); *see also In re Tribune Co.*, 476 B.R. 843, 854-55 (Bankr. D. Del. 2012).

[19]    *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993).

[20]    *In re Coastal Broad. Sys., Inc.*, 570 F. App'x 188, 193 (3d Cir. 2014) ("Although not explicit in § 1122, a corollary to that rule is that the 'grouping of similar claims in different classes' is *permitted* so long as the classification is 'reasonable.'") (internal citation omitted).

[21]    *John Hancock Mut. Life Ins. Co.*, 987 F.2d at 159.

recognized that this gives both the debtor and the bankruptcy court considerable discretion in determining whether similar claims may be separately classified.[22] Furthermore, if it is evident based on the voting results that the debtor would have an impaired accepting class regardless of the chosen classification scheme, then any challenge to the classification scheme is moot because the plan would have been accepted even if the classes were constituted differently.[23]

46.     Here, the classification of Claims and Interests in the Plan satisfies section 1122(a) of the Bankruptcy Code.  The Plan designates a total of thirty (30) Classes of Claims and Interests of the Debtors.  This classification satisfies section 1122(a) of the Bankruptcy Code because each Class contains only Claims or Interests that are substantially similar to each other.  Furthermore, the classification scheme used by the Plan is based on the nature of Claims or Interests contained in each Class and not on any impermissible classification factor.[24] Finally, no party has objected to the Debtors' classification scheme and similar Claims and Interests have not been placed into different Classes to affect the outcome of the vote on the Plan.

47.     For these reasons, the Debtors submit the Plan's classification scheme is necessary, reasonable, and appropriate under the facts and circumstances of these Chapter 11 Cases and applicable Third Circuit law.  Therefore, the Court should approve the classification scheme as set forth in the Plan as consistent with section 1122(a) of the Bankruptcy Code.

---

[22]   *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 224 (Bankr. D.N.J. 2000).

[23]   *See, e.g.*, *In re Heritage Org., L.L.C.*, 375 B.R. 230, 302 (Bankr. N.D. Tex. 2007) (rejecting challenge to classification scheme where voting results would be the same regardless of whether classes were combined or separate); *In re Abeinsa Holding, Inc*., 562 B.R. 265, 274–75 (Bankr. D. Del. 2016) (rejecting challenge to separate classification in part on the basis that, even without the challenge classification, the voting results would not change).

[24]   *See* Sontchi Decl. ¶ 19(a)(iii).

**b.      The Plan Satisfies the Mandatory Plan Requirements of Section 1123 of the Bankruptcy Code.**

48.      The Plan satisfies the seven mandatory requirements of sections 1123(a)(1) through (a)(7), applicable to a non-individual debtor.

49.      <u>Sections 1123(a)(1)-(4)</u>.  Specifically, Articles II and III of the Plan satisfy the first four requirements of section 1123(a) by: (i) designating thirty (30) Classes of Claims and Interests, not including Claims of the kinds specified in sections 507(a)(2), (a)(3) and (a)(8) of the Bankruptcy Code, as required by section 1123(a)(1); (ii) specifying the Classes of Claims and Interests that are Unimpaired under the Plan, as required by section 1123(a)(2); (iii) specifying the treatment of each Class of Claims and Interests that is Impaired, as required by section 1123(a)(3); and (iv) providing for the same treatment for each Claim or Interest within a particular Class, unless otherwise agreed by the Holder of a particular Claim, as required under section 1123(a)(4).

50.      <u>Section 1123(a)(5)</u>.  Article VII of the Plan sets forth adequate means for implementation of the Plan in accordance with section 1123(a)(5).  Section 1123(a)(5) of the Bankruptcy Code requires that a plan "provide adequate means for the plan's implementation," and gives several examples of what may constitute "adequate means" for implementation.[25]  The implementation mechanisms in the Plan include, among other things:

- the establishment of the Litigation Trust and appointment of the Litigation Trustee to liquidate and administer the Debtors' Remaining Assets following the Effective Date, prosecute the Retained Causes of Action, and distribute recoveries to creditors;

- the establishment of the Sale Proceeds Reserve and the funding of the Sale Proceeds Reserve Account to hold net proceeds of the Sale in accordance with the Global Settlement until the Remaining Disputes (as defined in the Global Settlement) are fully determined or resolved;

- the transfer of the Litigation Trust Assets to the Litigation Trust; and

---

[25]    11 U.S.C. § 1123(a)(5).

- the substantive consolidation of the Debtors' Estates as set forth in the Plan.

51. Section 1123(a)(5)(c) of the Bankruptcy Code authorizes a bankruptcy court to confirm a chapter 11 plan containing provisions which substantively consolidates the estates of two or more debtors. Article VII.I of the Plan provides for substantive consolidation of the Estates under the Plan. As discussed below and in the Sontchi Declaration, substantive consolidation is a common feature of chapter 11 plans where it promotes administrative efficiency, is done on a consensual basis and does not prejudice creditors, as is the case here.

52. Courts in this district have allowed substantive consolidation for plan purposes to promote administrative efficiency. Here, the Debtors seek substantive consolidation to promote administrative efficiency for the benefit of all parties in interest. Holders of Claims in the Accepting Classes voted in favor of the Plan notwithstanding its substantive consolidation provisions. In addition, the Debtors believe creditors will not be prejudiced by the Plan's deemed substantive consolidation because (i) the rights of all Secured Creditors in and to their collateral are explicitly preserved by the Plan, (ii) the Remaining Disputes are preserved by the Global Settlement, and (iii) the costs of reconciling and analyzing distributions by debtor would exceed the benefits.

53. As noted in the Plan, several factors here make substantive consolidation appropriate: (i) the Debtors operated as an integrated business organization, often without regard to corporate separateness prior to the Petition Date; (ii) the Debtors had shared management prior to and during these Chapter 11 Cases, and (iii) the Debtors utilized the assets of certain Debtors for the benefit of others or the enterprise as a whole. The Debtors' real property assets were also marketed and sold as a whole and the full value of the real property assets was only obtained through the Sale of the entirety to the Buyer. Absent substantive consolidation, the Debtors believe that the process of winding down the Estates and administrating Distributions would be time

22

consuming, costly, and likely value destructive. The Debtors do not intend to seek to avoid payment of the U.S. Trustee Quarterly Fees. Moreover, pursuant to the Plan, from and after the Effective Date, the Debtors will have no assets as they will be contributed to the Litigation Trust.

54.     Accordingly, the Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code, including section 1123(a)(5)(c).

55.     Section 1123(a)(6). Section 1123(a)(6) of the Bankruptcy Code requires that the charter of the debtor, or the surviving corporation if the debtor is transferring all of its property or merging or consolidating with another entity, contain a provision prohibiting the issuance of nonvoting equity securities.[26] Section 1123(a)(6) is not applicable under the Plan because the Debtors' corporate Entities will be wound down (and ultimately dissolved) and will not be issuing securities or taking any action other than in furtherance of winding down.

56.     Section 1123(a)(7). Section 1123(a)(7) of the Bankruptcy Code requires that the Plan's provisions with respect to the manner of selection of any director, officer or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy."[27] Pursuant to Article VII.D.1 of the Plan, on the Effective Date, each of the Debtors' managers and officers shall be discharged from their duties and terminated automatically without the need for any company action or approval and without the need for any filings, and, unless subject to a separate agreement with the Litigation Trustee, such managers and officers shall have no continuing or further obligations to the Debtors following the occurrence of the Effective Date. Pursuant to Article VII.E of the Plan, the Litigation Trustee shall be appointed on the Effective Date. The Debtors disclosed the identity of the Litigation Trustee in the Amended

---

[26]   *Id.* § 1123(a)(6).

[27]   *Id.* § 1123(a)(7).

Plan Supplement [Docket No. 1117], which is consistent with the interests of creditors and with public policy.[28] Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code.

### c. The Plan Appropriately Contains Certain Discretionary Components Permitted by Section 1123(b) of the Bankruptcy Code.

57. Certain discretionary provisions are included in the Plan pursuant to section 1123(b) of the Bankruptcy Code. Specifically:

a. in accordance with section 1123(b)(1) of the Bankruptcy Code, Article III of the Plan provides that each particular Class is Impaired or Unimpaired, as the case may be;

b. in accordance with section 1123(b)(2) of the Bankruptcy Code, and as more fully set forth below, Article VIII of the Plan provides for the assumption, assumption and assignment, or rejection of the Debtors' Executory Contracts and Unexpired Leases that have not been previously assumed, assumed and assigned, or rejected pursuant to section 365 of the Bankruptcy Code and prior orders of the Court;

c. in accordance with section 1123(b)(3)(A) of the Bankruptcy Code, the Plan incorporates the settlement and adjustment of certain Claims or Interests belonging to the Debtors and their Estates;

d. in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, Article VII.J of the Plan provides that, among other things, except with respect to the Released Parties, the Settling Creditor Released Parties, or any other beneficiary of the releases, injunctions, and exculpations contained in Article XII of the Plan, the Litigation Trustee shall have, retain, reserve and be entitled to prosecute the Retained Causes of Action transferred to, or vested in, the Litigation Trust;

e. in accordance with section 1123(b)(5) of the Bankruptcy Code, Article III of the Plan modifies or leaves unaffected, as the case may be, the rights of Holders of Claims in each Class; and

f. in accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan includes additional appropriate provisions that are not inconsistent with applicable provisions of the Bankruptcy Code.

---

[28]   *See* Amended Plan Supplement, Exhibit A.

> **d.**     **The Plan's Release, Injunction and Exculpation Provisions Are Appropriate and Should be Approved.**

58.     Article XII of the Plan provides for: (i) releases by the Debtors of the Released Parties[29] and the Settling Creditor Released Parties;[30] (ii) consensual releases of the Released Parties by the Releasing Parties;[31] (iii) an injunction precluding Holders of Claims against or Interests in any of the Debtors or their Estates from bringing any action against the Debtors or their Estates or otherwise taking any action inconsistent with the Plan; and (iv) exculpation for the Exculpated Parties[32] related to the Chapter 11 Cases and Court-approved transactions.  These provisions comply with the Bankruptcy Code and applicable non-bankruptcy law and are necessary and integral components of the Plan.  These provisions are proper because, among other things, they are: (i) reasonable, (ii) in the best interests of the Debtors and their Estates,(iii) the product of good faith, arm's-length negotiations, (iv) given in exchange for substantial consideration from various parties including the Released Parties, and (v) critical to obtaining the support of various constituencies for the Plan.[33]

> **(i)**     **The Debtor Releases Are Permissible and Should Be Approved.**

---

[29]    "Released Party," as defined in Article 1.137 of the Plan "means, collectively, and in each case: (a) the Debtor Related Parties; and (b) the DIP Lender and the DIP Lender's Related Parties; *provided, however*, that notwithstanding the foregoing, the Robert Green Parties shall not be Released Parties.

[30]    "Settling Creditor Released Parties" as defined in Article I.155 of the Plan "means the Settling Creditors and their Non-Debtor Related Parties; *provided, however*, that none of the Robert Green Parties or Cypress or any of Cypress' affiliated or related Persons or Entities shall be Settling Creditor Released Parties."

[31]    "Releasing Party" as defined in Article 1.138 of the Plan, "means all Holders of Claims in Classes 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26 & 27 that vote to accept the Plan and do not timely submit a Release Opt-Out indicating such Holder's decision not to participate in the releases set forth in Article XII.C of the Plan."

[32]    "Exculpated Parties" as defined in Article 1.71 of the Plan, "means collectively, and in each case in its or their capacity as such: (a) the Debtors and the Estates; (b) the Debtors' independent manager; and (c) with respect to each of the foregoing entities in (a) and (b), solely to the extent acting in a fiduciary capacity on behalf of the Estates, such entities' respective Related Parties; *provided, however*, that the Robert Green Parties shall not be Exculpated Parties."

[33]    *See* Sontchi Decl. ¶ 19(a)(vi).

25

59.    Article XII.B of the Plan provides for the release and waiver of any and all Claims, Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies and liabilities of any nature whatsoever taking place prior to the Effective Date in connection with or related to any of the Debtors that could have been asserted by or on behalf of the Debtors or their Estates against any of the Released Parties and the Settling Creditor Released Parties (the "Debtor Releases").  The Debtors have proposed the Debtor Releases based on their business judgment and submit that the Debtor Releases are reasonable and satisfy the standard that courts generally apply when reviewing these types of releases. [34]

60.    Section 1123(b) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[35] Furthermore, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[36]

---

[34]    *See Spansion, Inc.*, 426 B.R. at 142 (approving as a valid exercise of business judgment the debtor's releases of, among others, the debtor's current directors, officers and employees, the debtor's current and former professionals, secured creditors and their advisors, the debtor and their affiliates, and their officers, directors, employees, and advisors and senior noteholders and their advisors).

[35]    11 U.S.C. § 1123(b)(2); *see also In re Coram Healthcare Corp.*, 315 B.R. 321, 334–35 (Bankr. D. Del. 2004) (holding that standards for approval of settlement under section 1123 of the Bankruptcy Code are generally the same as those under Bankruptcy Rule 9019). Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness." *See, e.g.*, *In re Exaeris, Inc.*, 380 B.R. 741, 746–47 (Bankr. D. Del. 2008) (internal citation omitted); *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (examining whether settlement "fall[s] below the lowest point in the range of reasonableness") (alteration in original) (internal citation omitted); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (noting that a settlement must be within reasonable range of litigation possibilities).

[36]    *U.S. Bank Nat'l Ass'n v. Wilmington Tr. Co. (In re Spansion, Inc.)*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'") (internal citation omitted).

61. In addition to analyzing debtor releases under the business judgment standard, some courts within the Third Circuit evaluate the propriety of a "debtor release" in the context of a chapter 11 plan by considering the below five "*Zenith* factors:"

    a. whether the non-debtor has made a substantial contribution to the debtor's reorganization;

    b. whether the release is critical to the debtor's reorganization;

    c. whether a substantial majority of creditors agree to support the release;

    d. whether there is an identity of interest between the debtor and the third party; and

    e. whether the plan provides for payment of all or substantially all of the classes of claims in the class or classes affected by the release.[37]

62. No one factor is dispositive, nor is a plan proponent required to establish each factor for the release to be approved.[38]

63. Here, the Debtors submit that the Debtor Releases are appropriate. First, each of the categories of the Released Parties has contributed significantly to the Debtors' chapter 11 efforts.

    a. With respect to the Debtor Related Parties, including the Debtors' Independent Manager, Chief Restructuring Officer, and the Debtors' Professionals, such efforts include prosecuting these Chapter 11 Cases in an efficient manner to (i) preserve and maintain the Debtors' real property assets until the Closing of the Sale to the Buyer, (ii) conducting a robust and competitive marketing process to ensure that the highest or otherwise best offer available for the real property assets was achieved; and (iii) working with the Debtors' creditors and other parties in interest in these cases to

---

[37] *See In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (citing *In re Master Mortg. Inv. Fund, Inc.,* 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)); *Spansion, Inc.,* 426 B.R. at 143 n.47 (citing the *Zenith* factors).

[38] *See, e.g.*, *Wash. Mut.*, 442 B.R. at 346 ("These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the [c]ourt's determination of fairness."); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that five *Zenith* factors are not exclusive or conjunctive requirements); *In re Caribbean Petroleum Corp.*, 512 B.R. 774, 778 (Bankr. D. Del. 2014) (finding "no question" that release of the Debtors' claims was proper because non-debtor "provided Debtors with substantial consideration in exchange for the releases, providing the justification for the Court approving the releases.").

27

negotiate and resolve matters as consensually as possible, including through the Mediation and the Global Settlement.

b. With respect to the DIP Lender and the DIP Lender's Related Parties, such efforts include: (i) extending the DIP Loans to the Debtors to fund, among other things, the Sale process in these Chapter 11 Cases, (ii) amending the DIP Facility to ensure the Debtors were able to confirm the Plan, (iii) enhancing the likelihood of success of the Sale process by agreeing to sell the Phase II Option Land with the Debtors' real property, (iv) participating in the Appeal and defending entry of the Sale Order, (v) providing the City Additional Funding under the Plan, and (vi) negotiating the Global Settlement with the Debtors and the Settling Creditors.

c. With respect to the Settling Creditors, such efforts include: (i) engaging with the other Settling Creditors, the City, and the Debtors to negotiate and document the Global Settlement which paved the way toward successful confirmation of the Plan; (ii) as to Builders, agreeing to the dismissal with prejudice of the Appeal; and (iii) supporting the consensual liquidation of the Debtors through the implementation of the Plan.

64. Second, the Debtor Releases are critical to the Plan as a whole and represent valid and appropriate settlements of claims the Debtors may have against the Released Parties. The Plan is the result of extensive arm's-length negotiations among the Debtors, the City, the Settling Creditors, and certain parties in interest, as described in greater detail therein, in the Global Settlement, which expressly contemplates mutual releases, and in the Plan Supplement. The Debtor Releases constitute an integral aspect of these negotiations and without such protections the Plan may not have garnered the necessary support of the requisite parties, which would have made it uncertain or impossible for the Debtors to confirm a chapter 11 plan.

65. Third, the Debtor Releases are limited in scope. As is customary, the releases do not extend to claims arising out of or relating to any act or omission of a Released Party that is determined in a Final Order to have constituted intentional fraud, willful misconduct, bad faith, or gross negligence. Additionally, the Debtor Releases do not release direct claims held by third parties against any Released Party.

66.     Fourth, the Debtor Releases are supported by major constituencies in these cases, including the Settling Creditors and the City, and no party in interest objected to the Debtor Releases. The Debtor Releases satisfy section 1123(b)(3)(A) of the Bankruptcy Code.  For the foregoing reasons, the Debtors submit that the Debtor Releases are fair, reasonable and in the best interests of the Debtors' Estates.  Therefore, the Debtor Releases should be approved as a valid exercise of the Debtors' business judgment

### (ii)     The Third-Party Releases Are Permissible and Should Be Approved.

67.     The Plan also provides for consensual releases by certain non-Debtors. Article XII.C of the Plan provides a limited consensual release in favor of the Released Parties by the Releasing Parties, which Releasing Parties are comprised solely of Holders of Claims in the Voting Classes that voted to accept the Plan and did not timely submit a Release Opt-Out. *See* Article I.138. As such, each of the Releasing Parties took the affirmative step of returning a Ballot, without electing to opt-out of the Third-Party Releases and indicating acceptance of the Plan.

68.     The Third-Party Releases are appropriate.  Courts in this District "have consistently held that a plan may provide for a release of third-party claims against a non-debtor upon consent of the party affected."[39] Here, the limited consensual Third-Party Releases under the Plan are permissible and should be approved.

---

[39]  *In re Corvias Campus Living – USG, LLC*, Case No. 25-11214 (LSS) (Bankr. D. Del. Oct. 29, 2025) [D.I. 274] Hr'g Tr. 47:10-12 (confirming that post-*Purdue*, opt-outs remain permissible and adopting a due process framework instead of a contractual theory, citing the uncertainties of applicable state law and concluding that notice by mail is sufficient to solicit consent to third-party releases); *In re Ligado Networks LLC*, Case No. 25-10006 (TMH) (Bankr. D. Del. Sept. 23, 2025) [D.I. 993] Hr'g Tr. 71:6-12 (approving an opt out mechanism and holding that opt outs are "an appropriate way of determining whether consent has been obtained for the releases"); *In re Nikola Corp.*, *et al.*, Case No. 25-10258 (TMH) (Bankr. D. Del. Sept. 5, 2025) [D.I. 1029] Hr'g Tr. 132:3-15 (adopting the due process approach, which prioritizes transparent and prominent notice, over the contract theory approach to determine that opt-outs which did not apply to holders of equity or any non-voting class to be permissible); *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Oct. 7, 2024) [D.I. 26412] Hr'g Tr. 116:10-117:6 (finding opt-out appropriate where releases were narrowly tailored, limited in scope and notice

(continued...)

69.    The Third-Party Releases are consensual, appropriate, and consistent with established precedent.  Moreover, the Third-Party Releases are sufficiently narrow, do not provide a blanket immunity, and provide a specific carve-out for acts or omissions that constitute willful misconduct, bad faith, or gross negligence.[40]

70.    For these reasons, the Third-Party Releases embodied in the Plan should be approved.

### (iii)    The Plan's Exculpation Provision Is Permissible and Should Be Approved.

71.    In addition to the Releases discussed above, the customary exculpation provision found in Article XII.D of the Plan should be approved.  It is narrowly tailored and limited to parties who served in a fiduciary capacity in connection with these Chapter 11 Cases.  The exculpation provision exculpates the Exculpated Parties from claims arising on or after the Petition Date through the Effective Date in connection with or arising out of, among other things, the filing or administration of these Chapter 11 Cases; the postpetition marketing and Sale process; the negotiation and pursuit of the Plan and the solicitation of votes for, or confirmation of, the Plan; the funding and consummation of the Plan; the occurrence of the Effective Date; the DIP Facility; the pre-Effective Date administration of the Plan and the property to be distributed thereunder (including the Litigation Trust Assets); the creation of the Litigation Trust; and the transactions in furtherance of any of the foregoing.

---

was given through ballots and extensive publication, comparing to notice in the context of class action litigation); *In re Fisker, Inc.*, Case No. 24-11390 (TMH) (Bankr. D. Del. Oct. 11, 2024) [D.I. 706] Hr'g Tr. 44:20-45:11 (finding that "in light of *Purdue*, there is no prohibition on the use of opt-out releases" but also finding opt-out releases inappropriate for equity holders who receive nothing under a plan); *In re Indianapolis Downs, LLC*, Case No. 20-12816 (BLS), 486 B.R. 286, 306 (Bankr. D. Del. 2013) (finding "[a]s for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided with detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots" and that "[u]nder these circumstances, the Third Party Releases may be properly characterized as consensual and will be approved.").

40    *See* Sontchi Decl. ¶ 19(a)(viii).

72.     The exculpation provision is appropriate under both applicable law and the facts of these Chapter 11 Cases. Courts in the Third Circuit have approved exculpation provisions for estate fiduciaries for acts taken in connection with the Debtors' chapter 11 efforts with carve-outs for fraud, gross negligence, and willful misconduct.[41]

73.     Here, the scope of the exculpation provision is appropriately limited to the Debtors, the Independent Manager, and their Related Parties that have served as fiduciaries of the Estates during these Chapter 11 Cases and explicitly (i) excludes the Robert Green Parties and (ii) will not have any effect on liability that results from gross negligence, bad faith, or willful misconduct. Furthermore, no party has objected to or opposed the exculpation provision of the Plan. Therefore, the Debtors respectfully request that the Court approve the exculpation set forth in Article XII.D of the Plan.

### (iv)     The Plan's Injunction Provisions Are Permissible and Should Be Approved.

74.     The injunction contained in Article XII.A of the Plan (the "Plan Injunction") is necessary to effectuate the release and the exculpation provisions of the Plan and to protect the Debtors from any potential litigation after the Effective Date from prepetition stakeholders whose Claims and Interests are addressed in the Plan. Without the Plan Injunction, there would be no mechanism to enforce the provisions of the Plan and the Litigation Trust—which has limited funding—could be faced with numerous lawsuits in various jurisdictions related to Claims and Interests that are treated under the Plan.

---

[41]  *See*, *e.g.*, *In re Western Glob. Airlines, Inc.*, No. 23-11093 (KBO) (Bankr. D. Del. Nov. 21, 2023) (D.I. 473), at 5 (confirming a bankruptcy plan that included debtors, the debtors' current managers, the unsecured creditors' committee, and their professionals as exculpated parties); *see generally, In re PWS Holding Corp.* 228 F.3d 224 (3d Cir. 2000).

31

75.     The Plan Injunction is a key component of the liquidation of the Debtors' Estates and is similar to those previously approved in this District.[42] Accordingly, the Debtors submit that the Plan Injunction should be approved.

### 2.     The Plan Proponent Has Complied with Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).

76.     The Debtors have complied with the applicable provisions of the Bankruptcy Code in accordance with section 1129(a)(2) of the Bankruptcy Code. A principal purpose of section 1129(a)(2) is to ensure that plan proponents have complied with the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.[43] As discussed above, the Debtors have complied with all notice, solicitation and disclosure requirements set forth in the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Interim Approval and Procedures Order in connection with the Plan.

### 3.     The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)).

77.     Section 1129(a)(3) of the Bankruptcy Code requires that "[t]he plan has been proposed in good faith and not by any means forbidden by law."[44] In the Third Circuit, "good faith" requires that a "plan be 'proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and the purposes of the Bankruptcy Code.'"[45]

---

[42]    *See, e.g., id.*; *In re HRI Holding Corp.*, No. 19-12415 (MFW) (Bankr. D. Del. Nov. 5, 2020) (D.I. 816), at 8; *In re Pace Indus., LLC*, No. 20-10927 (MFW) (Bankr. D. Del. Apr. 12, 2020) (D.I. 215) at 21-22.

[43]    *See* S. Rep. No. 95-989, at 126 (1978); H.R. Rep. No. 95-595, at 412 (1977) ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure.").

[44]    11 U.S.C. § 1129(a)(3).

[45]    *Zenith*, 241 B.R. at 107 (quoting *In re Sound Radio, Inc.*, 93 B.R. 849, 853 (Bankr. D.N.J. 1988)); *see also In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339, 347 (Bankr. D. Del. 1998) ("[C]ourts have held a plan is to be considered in good faith 'if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.'") (internal citation omitted).

78.    Here, the Plan is structured to enable distribution to various creditors following resolution of the Remaining Disputes and to allow the Litigation Trustee to pursue the Retained Causes of Action to maximize stakeholder recoveries and complies with the objectives and mechanisms of the Bankruptcy Code.[46] The Plan is the product of arm's-length negotiations among the Debtors and many key constituencies in these Chapter 11 Cases, including the City and the Settling Creditors.[47]

79.    For these reasons, the Debtors submit that the Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.

### 4.    The Plan Provides for Court Approval of Payments for Services or Costs and Expenses (Section 1129(a)(4)).

80.    Section 1129(a)(4) of the Bankruptcy Code requires that:

> Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.[48]

This section of the Bankruptcy Code has been construed to require that all payments of professional fees that are made from estate assets be subject to review and approval by the bankruptcy court as reasonable.[49] Article II.C of the Plan contains procedures for filing applications for final allowance of Professional Fee Claims and procedures for the payment of such Professional Fee Claims upon approval by the Bankruptcy Court.[50] Article II.C further

---

[46]    *See* Sontchi Decl. ¶ 19(b)(i).

[47]    *See id.*

[48]    11 U.S.C. § 1129(a)(4).

[49]    *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 760 (Bankr. S.D.N.Y. 1992); *In re Printing Dimensions, Inc.*, 153 B.R. 715, 719 (Bankr. D. Md. 1993).

[50]    *See* Sontchi Decl. ¶ 19(c)(i).

provides that, as set forth in the Global Settlement, the total amount of all Allowed Professional Fee Claims shall be reduced on a pro rata basis not to exceed the sum of unencumbered Cash on hand, the remainder of the Wind Down Expense Contribution, and the portion of the City Additional Funding that is not earmarked for Litigation Trust Funding. On or prior to the Effective Date, the Debtors shall fund the Professional Fee Reserve in an amount equal to the Professional Fee Reserve Amount. Subject to the foregoing, Professional Fee Claims owing to the applicable Professionals shall be paid in full, in Cash, to such Professional from funds held in the Professional Fee Reserve Account when such Claims are (a) Allowed by an order of the Bankruptcy Court or (b) if earlier, authorized to be paid under the *Order, Pursuant to Sections 105(a) and 331 of the Bankruptcy Code, Bankruptcy Rule 2016(a), and Local Rule 2016-2 Establishing Procedures for Interim Compensation and Reimbursement of Professionals* [Docket No. 108]. Therefore, the Plan complies with section 1129(a)(4) of the Bankruptcy Code.

### 5. The Amended Plan Supplement Discloses the Litigation Trustee (Section 1129(a)(5)).

81.     Section 1129(a)(5)(A) of the Bankruptcy Code requires that the plan proponent disclose the "identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor . . . or a successor to the debtor under the plan," and requires a finding that "the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy."[51]

82.     The Debtors have satisfied this requirement. Article VII.C of the Plan provides for the winding down of the Debtors' corporate entities. Article VII.D, in turn, provides

---

[51]   11 U.S.C. § 1129(a)(5)(A)(i)-(ii).

that on the Effective Date, each of the Debtors' managers and officers shall be discharged from their duties and terminated automatically without the need for any company action or approval and without the need for any company filings, and, unless subject to a separate agreement with the Litigation Trustee, such managers and officers shall have no continuing or further obligations to the Debtors following the occurrence of the Effective Date.  Further, the Debtors have disclosed in the Amended Plan Supplement that Jacob Wood of Arkus Advisory will be the Litigation Trustee.  Such appointment will allow the Debtors to continue to pursue the Retained Causes of Action, wind down in an orderly fashion and make distributions to creditors consistent with the interests of creditors, interest holders, and public policy.[52]  Accordingly, the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

### 6. The Plan Does Not Require Governmental Regulatory Approval of Rate Changes (Section 1129(a)(6)).

83.    Section 1129(a)(6) of the Bankruptcy Code is not applicable to the Plan because the Plan does not provide for rate changes subject to the jurisdiction of any governmental regulatory commission.

### 7. The Plan is in the Best Interests of Creditors and Interest Holders (Section 1129(a)(7)).

84.    Section 1129(a)(7) of the Bankruptcy Code requires that a plan be in the best interests of creditors and equity security holders of the debtor.  This "best interests" test, focusing on potential individual dissenting creditors, requires that each holder of a claim or equity interest either accept the plan or receive or retain property under the plan that is not less than the amount such holder would receive or retain in a chapter 7 liquidation.[53]

---

[52]    *See* Sontchi Decl. ¶ 19(d)(i).

[53]    *See Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) (noting that "the 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan").

85.     Under the best interest analysis, "the court must measure what is to be received by rejecting creditors . . . under the plan against what would be received by them in the event of liquidation under chapter 7."[54] Accordingly, the Court is required to "take into consideration the applicable rules of distribution of the estate under chapter 7, as well as the probable costs incident to such liquidation."[55] In evaluating the liquidation analysis, the Court must remain cognizant of the fact that "[t]he hypothetical liquidation entails a considerable degree of speculation about a situation that will not occur unless the case is actually converted to chapter 7."[56] Under section 1129(a)(7), the liquidation analysis applies only to non-accepting holders of impaired claims or equity interests.[57]

86.     The Liquidation Analysis demonstrates that the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code and that under a chapter 7 liquidation Holders of Claims and Interests would receive less than is projected under the Plan.[58]

87.     The uncontroverted assumptions and estimates in the Liquidation Analysis are appropriate in the context of these Chapter 11 Cases and are based upon the knowledge and expertise of the Debtors' professionals and personnel who have extensive knowledge of the Debtors' business and financial affairs as well as relevant industry and financial experience.  In light of the foregoing, the Plan satisfies the requirements of section 1129(a)(7).

88.     The "best interests" test is not implicated with respect to the Accepting Classes (Classes 3-11, 13, 20 & 25), which voted in favor of the Plan; and Holders of Class 1

---

[54]     *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007).

[55]     *See id.*

[56]     *See In re Affiliated Foods, Inc.*, 249 B.R. 770, 788 (Bankr. W.D. Mo. 2000) (internal citations omitted).

[57]     *See Drexel Burnham Lambert Grp. Inc.*, 138 B.R. at 761.

[58]     *See* Sontchi Decl. ¶ 19(f)(ii).

(Secured Tax Claims) and Class 2 (Priority Non-Tax Claims) which were not Impaired and thus were conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. In contrast, the "best interests" test must be applied with respect to the Rejecting Classes (Classes 16, 17, 26 & 27), which voted to reject the Plan, and Class 28 (Subordinated Claims), Class 29 (Intercompany Claims), and Class 30 (Interests), which are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.[59]

89.    The Liquidation Analysis is sound, reasonable and incorporates justified assumptions and estimates regarding the Debtors' assets and claims, such as (i) the additional costs and expenses that would be incurred by the Debtors as a result of a chapter 7 trustee's fees and retention of new professionals, (ii) the delay and erosion of value that would be caused to the Debtors' Estates, (iii) the reduced recoveries caused by increased litigation among creditors and the chapter 7 trustee regarding disposition of the net proceeds of the Sale, (iv) the loss of certain benefits that are only possible in a plan process, such as access to additional funding for a Litigation Trust to pursue Retained Causes of Action for the benefit of the Debtors' creditors, and (v) other potential claims that may arise in a chapter 7 liquidation. The estimates regarding the Debtors' assets and liabilities that are incorporated into the Liquidation Analysis are based upon the knowledge and familiarity of the Debtors' advisors with the Debtors' business and their relevant experience in chapter 11 proceedings.[60] As such, the Debtors' Liquidation Analysis should be afforded deference.

90.    Here, as set forth in the Liquidation Analysis and the Sontchi Declaration, Class 16 (Goetz Secured Claim), Class 17 (Young's Secured Claim), Class 26 (Robert Green

---

[59]    The "best interests" test is also not implicated with respect to the Abstaining Classes (Classes 12, 14, 15, 18, 19, 21, 22 & 24) which were not deemed to accept or reject the Plan.

[60]    *See* Sontchi Decl. ¶ 19(f)(i).

Disputed Secured Claim), and Class 27 (General Unsecured Claims) will receive or retain property value, as of the Effective Date, in an amount that is at least equal to the value of what they would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Class 28 (Subordinated Claims), Class 29 (Intercompany Claims), and Class 30 (Interests) will also receive or retain property value, as of the Effective Date, in an amount that is at least equal to the value of what they would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Accordingly, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.[61]

### 8. Section 1129(a)(8) of the Bankruptcy Code Does Not Preclude Confirmation.

91.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests either (a) has accepted the plan or (b) is not impaired by the plan.  A class of claims accepts a plan if the holders of at least two-thirds in dollar amount and more than one-half in the number of claims in the class vote to accept the plan, counting only those claims whose holders actually vote to accept or reject the plan.[62] Moreover, a class that is not impaired under a plan, and each holder of a claim or interest in such class, is conclusively presumed to have accepted the plan.[63] Conversely, a class is deemed to have rejected a plan if such plan provides that the claims or interests in a class do not receive or retain any property under the plan on account of such claims or interests.[64] Here, Class 1 (Secured Tax Claims) and Class 2 (Priority Non-Tax Claims) are Unimpaired under the Plan and therefore are deemed to have accepted the Plan.  In addition, as set forth in the Voting Report, in accordance with the tabulation procedures in the

---

[61]     *See id.*

[62]     *See* 11 U.S.C. § 1126(c).

[63]     *See id.* § 1126(f).

[64]     *See id.* § 1126(g).

Interim Approval and Procedures Order, all of the Accepting Classes (Classes 3-11, 13, 20 & 25) unanimously voted to accept the Plan within the meaning of section 1126 of the Bankruptcy Code.

92. Furthermore, as set forth in the Voting Report, in accordance with the tabulation procedures in the Interim Approval and Procedures Order, the Rejecting Classes (Classes 16, 17, 26 & 27) voted to reject the Plan within the meaning of section 1126 of the Bankruptcy Code.

93. Class 28 (Subordinated Claims), Class 29 (Intercompany Claims), and Class 30 (Interests) are also deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code because they will not receive any Distributions or retain any property under the Plan.

94. Despite the rejection by the Rejecting Classes (Classes 16, 17, 26 & 27) and the deemed rejection by Class 28, Class 29, and Class 30, the Plan is nonetheless confirmable because it satisfies section 1129(a)(10) and section 1129(b) of the Bankruptcy Code as to each of the Rejecting Classes, as discussed more fully below.

> **9. The Plan Provides for Payment in Full, or as Agreed by Claimants, of All Allowed Administrative and Priority Claims (Section 1129(a)(9)).**

95. All Administrative Claims, Priority Tax Claims, Secured Tax Claims, and Priority Non-Tax Claims will be paid in full, or as otherwise agreed, under the Plan. *See* Plan Art. II; Plan Art. III.

> **10. At Least One Impaired Class of Claims That Was Entitled to Vote Has Accepted the Plan (Section 1129(a)(10)).**

96. Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims under a plan, at least one impaired class of claims must accept

the plan, "without including any acceptance of the plan by any insider."[65] As evidenced by the Voting Report, there are twelve (12) Impaired Classes (Classes 3-11, 13, 20 & 25) that voted to accept the Plan, excluding the votes of any insiders.   None of the Holders of Claims in the Accepting Classes are statutory Insiders or Affiliates of the Debtors as those terms are defined in Sections 101(31)(B) and 101(2), respectively, of the Bankruptcy Code.[66] As such, the acceptances of the Plan of the aforementioned entities are properly counted for purposes of confirmation. Additionally, Article VII.I.1 of the Plan provides for the substantive consolidation of the Debtors' estates under the Plan such that each Claim Filed in the Chapter 11 Cases will be deemed a single Claim against the consolidated Debtors. Therefore, section 1129(a)(10) of the Bankruptcy Code is satisfied as to each Debtor.

### 11.     The Plan Is Feasible (Section 1129(a)(11)).

97.     Section 1129(a)(11) of the Bankruptcy Code requires that the Court find that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[67] Finding "feasibility" of a chapter 11 plan does not require a guarantee of success by the debtor.[68] Rather, a debtor must demonstrate only a reasonable assurance of success.[69] There is a relatively low threshold of proof necessary to satisfy

---

[65]   *Id.* § 1129(a)(10).

[66]   Section 101(31)(B) of the Bankruptcy Code defines an insider of a corporation as "a director of the debtor; officer of the debtor; person in control of the debtor; partnership in which the debtor is a general partner; general partner of the debtor; or relative of a general partner, director, officer, or person in control of the debtor."

[67]   *Id.* § 1129(a)(11).

[68]   *See U.S. v. Energy Res. Co.*, 495 U.S. 545, 549 (1990); *In re Kaplan*, 104 F.3d 589, 597 (3d Cir. 1997).

[69]   *Tribune I,* 464 B.R. at 185 (citing *In re Wash Mut., Inc.*, 461 B.R. 200, 252 (Bankr. D. Del. 2011) (quoting *In re Orlando Invs. LP,* 103 B.R. 593, 600 (Bankr. E.D. Pa. 1989))); *see also Kane v. Johns- Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988).

the feasibility requirement.[70] Bankruptcy courts in this District have approved plans that were subject to uncertain and contingent future events.[71]

98.      As set forth in the Sontchi Declaration, although the Plan provides for the Debtors' liquidation, the Debtors estimate that they will have sufficient available cash to satisfy their financial obligations thereunder. Additionally, through the implementation of the Global Settlement and with access to the City Additional Funding provided thereby, the Debtors estimate that the Litigation Trust will have sufficient funding to administer the Debtors' post-Effective Date responsibilities, including pursuing the Retained Causes of Action and winding down the Estates.

99.      Therefore, the Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

### 12.      The Plan Provides for Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)).

100.      Section 1129(a)(12) of the Bankruptcy Code requires that certain fees listed in 28 U.S.C. § 1930, determined by the court at the hearing on confirmation of a plan, be paid or that provisions be made for their payment.[72] Article XVI.E of the Plan provides that all fees which are due and payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930 on account of the period on and before the Effective Date shall be paid by the Debtors on the Effective Date.  Further, after the Effective Date the Litigation Trustee shall remit any additional U.S. Trustee fees, if any.[73] Thus, the Plan satisfies the requirements of section 1129(a)(12).

---

[70]   *Tribune I,* 464 B.R. at 185 (quoting *In re Briscoe Enters, Ltd.*, 994 F.2d 1160, 1166 (5th Cir. 1993)).

[71]   *See, e.g.*, *Indianapolis Downs*, 486 B.R. at 298–99 (finding plan feasible despite being conditioned on regulatory approval to operate a casino); *In re Wash. Mut. Inc.*, 461 B.R. 200, 252 (Bankr. D. Del. 2011) (finding plan feasible despite lack of regulatory approval for securities exemption); Jan. 15, 2015 Hr'g Tr. 88-89, *In re Seegrid Corp.*, No. 14-12391 (BLS) (Bankr. D. Del.) (finding, due to the confidence of the debtor's witnesses, that a startup company's Plan was feasible despite no evidence on balance sheet of ability to repay unsecured debt).

[72]   11 U.S.C. § 1129(a)(12).

[73]   *See* Sontchi Decl. ¶ 19(k)(i).

41

### 13. Sections 1129(a)(13)–(16) of the Bankruptcy Code Are Not Applicable to the Plan.

101.     The Debtors (i) do not have any retiree benefits as that term is defined in section 1114(a) of the Bankruptcy Code; (ii) are not required to pay any domestic support obligations; (iii) are not individuals; and (iv) are not nonprofit corporations or trusts.  Accordingly, sections 1129(13)–(16) of the Bankruptcy Code are inapplicable to the Plan.[74]

### 14. The Plan Meets the Requirements for Cramdown (Section 1129(b)).

102.     Section 1129(b) of the Bankruptcy Code provides that when the requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8), a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.[75] To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[76]

#### a. The Plan Does Not Discriminate Unfairly with Respect to Impaired Rejecting Classes.

103.     The unfair discrimination standard of section 1129(b)(1) of the Bankruptcy Code ensures that a plan does not unfairly discriminate against a dissenting class with respect to the value it will receive under a plan when compared to the value given to all other similarly situated classes.[77] Accordingly, as between two classes of claims or two classes of interests, there

---

[74]     *See* Sontchi Decl. ¶¶ 19(*l*)(i).

[75]     *See* 11 U.S.C. § 1129(b).

[76]     *See id.* § 1129(b)(1); *Zenith*, 241 B.R. at 105; *Johns-Manville Corp.*, 843 F.2d at 650.

[77]     *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006) (citing *In re Lernout & Hauspie Speech Prod., N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003) *aff'd,* 308 B.R. 672 (D. Del. 2004)) (noting that the
(continued...)

42

is no unfair discrimination if (i) the classes are comprised of dissimilar claims or interests,[78] or (ii) taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment.[79]

104.    The Plan does not discriminate unfairly against the Impaired Classes that have (or are deemed to have) rejected the Plan (*i.e.*, Class 16, Class 17, Class 26, Class 27, Class 28, Class 29, and Class 30).  Section 1129(b) of the Bankruptcy Code does not prohibit differences in treatment between the classes.  To the contrary, the very premise of any chapter 11 plan with multiple impaired classes is to differentiate among classes. Section 1129(b) of the Bankruptcy Code thus permits a debtor's chapter 11 plan to provide for unequal treatment of separately classified creditors with similar legal rights, so long as the discriminatory treatment of the impaired dissenting class is not "unfair."[80]

105.    With respect to the rejecting Classes, there is no unfair discrimination because Class 16, Class 17, Class 26, Class 27, Class 28, Class 29, and Class 30 are internally comprised of similarly situated Claims or Interests and no other Class contains creditors with

---

"hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination."); *In re WorldCom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *59 (Bankr. S.D.N.Y. Oct. 31, 2003) (citing *In re Buttonwood Partners, Ltd.*, 111 B.R 57, 63 (Bankr. S.D.N.Y. 1990)); *In re Johns-Manville Corp.,* 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1986), *aff'd sub nom. Kane v. Johns-Manville Corp.,* 843 F.2d 636 (2d Cir. 1988).

[78]    *See, e.g., Johns-Manville Corp.*, 68 B.R. at 636.

[79]    *See, e.g., Drexel Burnham Lambert Grp.,*138 B.R. at 715 (separate classification and treatment was rational where members of each class "possesse[d] different legal rights"), *aff'd sub nom. Lambert Brussels Assocs, L.P. v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 140 B.R. 347 (S.D.N.Y. 1992); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (approving classification of general unsecured creditors into different classes with different legal bases: doctors' indemnification claims, medical malpractice claims, employee benefit claims, and trade claims); s*ee also In re Abeinsa Holding, Inc.*, 562 B.R. at 274–75 (rejecting challenge to separate classification in part on the basis that, even without the challenged classification, the voting results would not change); *In re Nuverra Envtl. Sols., Inc.* 590 B.R. 75, 98–99 (D. Del. 2018) (dismissing claimants' appeal and determining the overwhelming acceptance within the claimant's class rendered argument moot).

[80]    *See Mercury Cap. Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 10 (D. Conn. 2006).

Claims or Interests comparable to those in Class 16, Class 17, Class 26, Class 27, Class 28, Class 29, and Class 30.  Accordingly, the Plan does not discriminate unfairly against such Classes.

### b. The Plan Is Fair and Equitable with Respect to the Rejecting Classes.

106.    For a plan to be "fair and equitable" with respect to an impaired class of unsecured claims or interests that rejects a plan (or is deemed to reject a plan), the plan must follow the "absolute priority rule" and satisfy the requirements of section 1129(b)(2) of the Bankruptcy Code.[81] Generally, this requires that the impaired rejecting class of claims or interests either be paid in full or that any class junior to the impaired rejecting class not receive any distribution under a plan on account of its junior claim or interest.[82] In addition, for a plan to be "fair and equitable," no class of claims or interests senior to the impaired dissenting class is permitted to receive more than the full value of its senior claims or interests under the plan.[83]

107.    The Plan is also "fair and equitable" with respect to Classes 16, 17, and 26 because it satisfies the requirements of section 1129(b)(2)(A) of the Bankruptcy Code.[84] Section 1129(b)(2)(A) of the Bankruptcy Code provides that a plan is "fair and equitable" with respect to a class of secured claims if, among other alternatives, it provides that the holders of such claims shall retain the liens securing such claims to the extent of the allowed amount of such claims as of the plan effective date and deferred cash payments of such amount or that holders of such claims receive the indubitable equivalent of such claims. *See* 11 U.S.C. § 1129(b)(2)(A)(i) and (iii). Here, the Plan provides that the Holders of Secured Claims in Classes 16, 17, and 26 will receive, in

---

[81]    *See* 11 U.S.C. §§ 1129(b)(2)(B)(ii), (b)(2)(C)(ii); *see also Bank of Am. Nat'l Tr. & Sav. Ass'n*, 526 U.S. at 441–42.

[82]    *Id.*

[83]    *See In re Chemtura Corp.*, 439 B.R. 561, 592 (Bankr. S.D.N.Y. 2010).

[84]    *See* Sontchi Decl. ¶ 19(g)(iii).

exchange for full and final satisfaction of such Secured Claim, payment of such Secured Claim in full in Cash, except to the extent that the Holder of such Secured Claim and the Debtors or the Litigation Trustee, as applicable, agree to less favorable treatment for such Holder, after resolution of the Remaining Disputes. *See* Plan, Art. III. Art. VII.I.1 of the Plan further provides that each Secured Creditor under the Plan retains its security interest in its collateral or the proceeds thereof at all times, including after vesting in the Litigation Trust.

108.    With respect to Class 27, which is comprised of the Holders of General Unsecured Claims, as well as Classes 28, 29, and 30, which were deemed to reject the Plan and not entitled to vote thereon, the Plan satisfies the "absolute priority rule" of section 1129(b)(2)(B) of the Bankruptcy Code because no class junior to such Classes will receive or retain property under the Plan on account of such junior interest. 11 U.S.C. § 1129(b)(2)(B).[85]

### 15.    Section 1129(c) of the Bankruptcy Code Is Satisfied.

109.    Section 1129(c) of the Bankruptcy Code provides that the bankruptcy court may confirm only one plan.[86] Because the Plan is the only plan before the Court, section 1129(c) of the Bankruptcy Code is satisfied.[87]

### 16.    The Principal Purpose of the Plan Is Not Tax Avoidance (Section 1129(d)).

110.    Section 1129(d) of the Bankruptcy Code provides that a court may not confirm a plan if the principal purpose of the plan is to avoid taxes or the application of Section 5 of the Securities Act of 1933.  The Plan has been proposed in good faith and not for the avoidance of taxes or avoidance of the requirements of Section 5 of the Securities Act of 1933.[88] Moreover,

---

[85]    Sontchi Decl. ¶ 19(g)(iv).

[86]    *See* 11 U.S.C. § 1129(c).

[87]    Sontchi Decl. ¶ 19(m)(i).

[88]    *See* Sontchi Decl. ¶ 19(n)(i).

no federal, state, or local government unit, or any other party has raised any objection to the Plan on these or any other grounds, and all Priority Tax Claims and Secured Tax Claims will be paid in full pursuant to the Plan. The Debtors therefore submit that the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

## IV.    OBJECTIONS TO CONFIRMATION OF THE PLAN SHOULD BE OVERRULED.

### A.    The UST Objection

111.    The UST Objection should be overruled and the Third-Party Releases in the Plan should be approved.

112.    Initially, the Debtors modified the Third-Party Releases before solicitation to clarify that the Holders of Claims in Classes 1 and 2, which Holders were Unimpaired under the Plan and thus not entitled to vote, would not be deemed to have consented to the Third-Party Releases. *See* Docket No. 931 (blackline of Plan indicating, *inter alia*, revisions to definition of "Release Opt-Out" and "Releasing Party"). Given these changes, the Debtors submit that the UST Objection's allegation that "the Plan imposes a third-party release on all holders of claims who are deemed to accept the Plan" is moot. *See* UST Objection ¶ 49. Moreover, the definition of "Releasing Parties" in the Plan only includes the Holders of Claims in the Voting Classes that (i) vote to accept the Plan and (ii) do not timely submit a Release Opt-Out," which means that Holders of Claims in the Voting Classes that elected not to vote, e.g., the Abstaining Classes, are not deemed to have consented to the Third-Party Releases. *See* Plan, Art. I.138; *cf.* UST Objection ¶ 54.

113.    Second, the UST Objection argues that the structure of the Third-Party Releases in the Plan violates the Supreme Court's holding in *Harrington v. Purdue Pharma L.P.* by "involuntarily alter[ing] relationships between non-debtors" because the Third-Party Releases

46

are being imposed without a creditor's "affirmative and voluntary consent." UST Objection ¶¶ 31-33. The UST Objection overstates *Purdue* and is inconsistent with established practice in this District.[89] In *Purdue*, the Supreme Court made clear the narrow scope of the decision by pointing out that "nothing in [this opinion] should be construed to call into question *consensual* third-party releases . . ." 603 U.S. at 226. Therefore, *Purdue*'s applicability is limited to cases where a debtor or debtors seek non-consensual third-party releases. Those facts are not present here where the Debtors are not seeking to bind non-consenting parties with respect to the Third-Party Releases.

114.    The UST Objection begs to differ. Per the UST Objection, "[v]oting to approve a plan plus a failure to opt out of a third-party release is nothing more than silence with respect to the offer to release claims against non-debtors." UST Objection ¶ 59. The Debtors disagree. Twelve (12) Voting Classes accepted the Plan. Of those Voting Classes, only three creditors (3) selected the "Opt-Out Election" and rejected "the offer to release claims against non-debtors." *See* Voting Declaration, Ex. C; *see also* UST Objection ¶ 59. It is inconsistent for the U.S. Trustee to allege that those three (3) Classes that accepted the Plan but also selected the "Opt-Out Election" should be treated as having rejected the offer to release, but the other nine (9) Voting Classes that accepted the Plan and did not select the "Opt-Out Election" manifested "nothing more than silence." *Id.* If the Plan is a "contract," as the UST Objection argues, and as recognized in *In re Smallhold, Inc.* and *Coram Healthcare*, then those who vote in favor of it may be bound by its terms. *See, e.g, In re Smallhold, Inc.*, 665 B.R. 704, 722-23 (Bankr. D. Del. 2024); *see also In re Coram Healthcare*, 315 B.R. at 336.

---

[89]    Indeed, as noted in footnote 45 *infra*, many courts in this District routinely approve Third-Party Releases which include an opt-out mechanism for creditors, and have found that once creditors are provided with this means of declining to grant the Third-Party Releases, any creditor that does not elect to Opt-Out can be deemed to have consented to the Third-Party Release.

115. Here, the Debtors submit that the "Opt-Out Election" in the Plan offered creditors sufficient opportunity to elect not to grant the Third-Party Releases and is consensual within the meaning of *Purdue*. The Debtors believe that the structure of the "Opt-Out Election" left the Voting Classes free to consider the possible value of any cause of action being released under the Plan as compared to the value of any distribution they may expect to receive and decide whether or not to opt out of the Third-Party Releases. Moreover, all parties in interest were provided with extensive notice of these Chapter 11 Cases, the Plan, and the Voting Deadline (which was extended by the Debtors). Moreover, the Plan, the Combined Hearing Notice, the Ballots, and the Notices of Non-Voting Status, all provided recipients with timely, sufficient, appropriate, and adequate notice of the Third-Party Releases. Indeed, the Ballots quoted the entire text of the Third-Party Releases in the Plan and clearly provided the Holders of Claims in the Voting Classes with information regarding the steps they should take if they disagreed with the scope of the Third-Party Releases and wanted to opt-out. As such, the Debtors submit that the Third-Party Releases are consensual to all parties subject to those who made an "Opt-Out Election" as set forth on Exhibit C to the Voting Declaration. As a result, the UST Objection should be overruled and the Combined Order entered.

## V. THE MODIFICATIONS TO THE PLAN DO NOT REQUIRE RESOLICITATION AND SHOULD BE APPROVED

116. Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.[90] Further, section 1127(a) of the Bankruptcy Code provides that when the proponent of a plan files the plan with modifications with

---

[90] 11 U.S.C. § 1127(a).

the court, the plan as modified becomes the plan.[91] Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who have previously accepted the plan if such parties accept such modifications in writing or the court finds that the proposed modifications do not adversely affect the treatment of the claim of any creditor or the interest of any equity security holder that has previously accepted the Plan.[92] Courts interpreting Bankruptcy Rule 3019 generally hold that a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated.[93]

117.    The Debtors filed the Plan, as modified, on April 11, 2026, to incorporate the Global Settlement reached between the Debtors, the City, and the Settling Creditors.  All of these parties have consented to the Plan, as modified, in writing, through the Global Settlement and their ballots (if applicable) and most of such ballots were cast after the modified Plan was filed. As to other creditors, the Plan as modified should be approved by the Court because the modifications do not adversely affect the treatment of any such creditor and/or are immaterial.

118.     With respect to certain creditors, the Debtors submit that the modifications in the Plan from the Global Settlement benefitted the Holders of such Claims. Specifically, the Holders of Claims in Classes 14-25 which were previously classified as General Unsecured Claims pursuant to the Debtors' allocation methodology and the Allocation Motion are no longer being determined to be undersecured in connection with confirmation and such parties may continue to seek to assert a secured claim. As to General Unsecured Creditors (including any secured claimants that are ultimately determined to be undersecured in whole or in part), such creditors' treatment

---

[91]    *Id.*

[92]    Fed. R. Bankr. P. 3019.

[93]    *See, e.g., In re Am. Solar King Corp.*, 90 B.R. 808, 823 (Bankr. W.D. Tex. 1988).

was improved by the Global Settlement because the priority trust position ahead of the GUC Beneficial Interests is now limited to not more than $2,060,000, whereas the first priority distributions were previously not less than $3,820,258.60, plus any additional amount that would have been due to the City on account of the Debtors' obligations under the DIP Facility. Finally, as to the creditors whose claims were subject to the previously preserved inter-creditor disputes (i.e., the previously so-defined Poppy/RDO Dispute, the Granite/Poppy Dispute, and the Builders/Poppy Dispute), all such disputes remain preserved, along with allocation disputes more generally. The ability for allocation matters to be resolved or further litigated also means that creditors' ability to obtain more on account of their claims is likewise improved and, in any event, such ultimate recoveries were uncertain at best under the Plan before it was modified.

119.    Furthermore, because the Debtors extended the voting and plan objection deadlines creditors had the ability to change their votes or raise objections. Accordingly, the Debtors submit that no additional solicitation or disclosure is required on account of the modifications.

## VI.    THE GLOBAL SETTLEMENT SHOULD BE APPROVED

120.    The Plan reflects and incorporates certain settlements and compromises, including, without limitation, the Global Settlement, as permitted by section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019. Compromises are favored in bankruptcy because they minimize the costs of litigation and further the parties' interests in expediting the administration of a bankruptcy estate.[94]  In deciding whether to approve a compromise under Bankruptcy Rule 9019, the Court must determine if the settlement is fair, reasonable, and in the

---

[94]    *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).

interests of the estate.[95]    Additionally, the Third Circuit applies a four-factor balancing test for considering motions to approve settlements under Bankruptcy Rule 9019, weighing: (i) the probability of success in litigation; (ii) the likely difficulties in collection; (iii) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (iv) the paramount interest of creditors.[96]

121.    Here, the compromises and settlements pursuant to and in connection with the Plan, including, without limitation, the Global Settlement, are fair, reasonable, and in the best interests of the Debtors, their Estates, and their creditors for the reasons set forth in the Combined Disclosure Statement and Plan, the Sontchi Declaration, and herein.

122.    After extensive, hard fought, good faith, and arm's length negotiations, the Debtors, the City, and the Settling Creditors executed the Global Settlement, which resolves outstanding issues, is supported by good and valuable consideration from the Settling Creditors and a good faith settlement of the Claims subject to the Debtor Releases and paved the way to the Plan with a funded litigation trust. Of particular importance given the number of objections filed to the Allocation Motion, the Global Settlement averts the risk of costly, time-consuming litigation by the Estates relating to, among other things, the validity, priority, and extent of the Settling Creditors' liens, claims, and interests and the proper methodology to allocate net proceeds of the Sale. Instead the Plan and Global Settlement (i) preserve the Remaining Disputes for further determination or resolution and ensures that all of the parties' rights and defenses are preserved with respect to the same, (ii) resolve the Poppy Indemnity Claim and all matters related to the DIP Facility, and (iii) provide for the establishment of a Litigation Trust to, among other things, pursue

---

[95]    *See, e.g., In re Key3Media Grp., Inc.*, 336 B.R. 87, 92 (Bankr. D. Del. 2005) (citation omitted).

[96]    *In re Martin*, 91 F.3d at 393.

the Retained Causes of Action to potentially enhance creditor recoveries. As a result, the Global

Settlement reflects a reasonable balance between, on the one hand, the possible success of litigation

with respect to the claims and disputes resolved thereby and, on the other hand, the risks and

significant costs attendant to such litigation which would have jeopardized the Debtors' ability to

wind-down these Chapter 11 Cases in a timely and efficient manner. The releases under the Global

Settlement are also vital to the Plan as the parties would not have agreed to the Global Settlement

but for such releases.

123.    As such, the Global Settlement is fair, reasonable, and in the best interests

of the Estates and all creditors in these Chapter 11 Cases, and should be approved under section

1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019.

## VII.    GOOD CAUSE EXISTS TO WAIVE THE STAY OF THE COMBINED ORDER

124.    Bankruptcy Rule 3020(e) provides that "[u]nless the Court orders

otherwise, a confirmation order is stayed for 14 days after its entry."[97] Bankruptcy Rules 6004(h)

and 6006(d) provide similar stays to orders authorizing the use, sale or lease of property (other

than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired

lease under section 365(h) of the Bankruptcy Code.[98]  Each rule also permits modification of the

imposed stay upon court order.

125.    The Debtors submit that good cause exists for waiving and eliminating any

stay of the effectiveness of the Combined Order pursuant to Bankruptcy Rules 3020, 6004, and

6006 so that the Combined Order will be effective immediately upon its entry. The Global

Settlement embodied in the Plan was vigorously negotiated among the Debtors, the City, and the

---

[97]    Fed. R. Bankr. P. 3020(e).

[98]    Fed. R. Bankr. P. 6006(d).

Settling Creditors, and the Plan has been accepted by the majority of the Voting Classes which cast Ballots in respect of the Plan. Furthermore, a critical component of the Global Settlement is the funding for the Litigation Trust and the need for the Litigation Trustee and his advisors and counsel to commence work to prosecute the Retained Causes of Action prior to the occurrence of the statutory period in Bankruptcy Code section 546(a) running in August 2026. Moreover, each day the Debtors remain in chapter 11, they incur significant administrative and professional costs—expenses that are unnecessary in light of the significant support of the Voting Classes for the Plan. Accordingly, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the Combined Order may become effective immediately upon its entry.

## CONCLUSION

For all of the reasons set forth herein and in the Sontchi Declaration, the Debtors respectfully submit that the Combined Disclosure Statement and Plan complies with all of the applicable requirements of the Bankruptcy Code and, therefore, request that the Court approve the Disclosure Statement and confirm the Plan by entering the Combined Order, and granting such other and further relief as the Court may deem just and proper.

Dated: May 19, 2026　　　　　　　　　**WILSON SONSINI GOODRICH & ROSATI, P.C.**
Wilmington, Delaware

　　　　　　　　　　　　　　　　　　*/s/ Erin R. Fay*
　　　　　　　　　　　　　　　　　　Erin R. Fay (No. 5268)
　　　　　　　　　　　　　　　　　　Shane M. Reil (No. 6195)
　　　　　　　　　　　　　　　　　　Catherine C. Lyons (No. 6854)
　　　　　　　　　　　　　　　　　　222 Delaware Avenue, Suite 800
　　　　　　　　　　　　　　　　　　Wilmington, Delaware 19801
　　　　　　　　　　　　　　　　　　Telephone: (302) 304-7600
　　　　　　　　　　　　　　　　　　E-mails: efay@wsgr.com
　　　　　　　　　　　　　　　　　　　　　　　sreil@wsgr.com
　　　　　　　　　　　　　　　　　　　　　　　clyons@wsgr.com

　　　　　　　　　　　　　　　　　　*-and-*

　　　　　　　　　　　　　　　　　　**LAW OFFICES OF BENJAMIN M. CARSON, P.C.**
　　　　　　　　　　　　　　　　　　Benjamin M. Carson (admitted *pro hac vice*)

53

5965 Village Way, Suite E105
San Diego, California 92130
Telephone: (858) 255-4529
E-mail:  ben@benjamincarson.com

*-and-*

Victor A. Vilaplana (admitted *pro hac vice*)
823 La Jolla Rancho Road
La Jolla, California 92037
Telephone: (619) 840-4130
E-mail: vavilaplana@gmail.com

*Counsel to the Debtors and Debtors in Possession*

54