UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | . Chapter 11 |
| | . Case No. 24-11647(MFW) |
| SILVERROCK DEVELOPMENT COMPANY, LLC et al, | . 824 Market Street |
| | . Wilmington, Delaware 19801 |
| Debtors. | . |
| . . . . . . . . . . . . . . . | . Thursday, May 21, 2026 |

TRANSCRIPT OF HEARING RE:
Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation of SilverRock Development Company, LLC and its Debtor Affiliates
[Docket No. 1111; filed 5/11/2026]
BEFORE THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors: Erin R. Fay, Esq.
Shane M. Reil, Esq.
Catherine C. Lyons, Esq.
Evanthea Hammer, Esq.
WILSON, SONSINI, GOODRICH & ROSATI, PC
222 Delaware Avenue, Suite 800
Wilmington, Delaware 19801

For the U.S. Trustee: Jane M. Leamy, Esq.
OFFICE OF THE U.S. TRUSTEE
844 King Street, Suite 2207
Wilmington, Delaware 19801

(Appearances Continued)

Audio Operator: Electronically Recorded by Mandy Bartkowski, ECRO

Transcription Company: Reliable
1007 N. Orange Street
Wilmington, Delaware 19801
(302)654-8080
Email: gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

APPEARANCES: (Continued)

For Construction Loan Services II, LLC:

Mary F. Caloway, Esq.
PACHULSKI, STANG, ZIEHL & JONES, LLP
919 North Market Street
17th Floor
Wilmington, Delaware 19899

Gregory V. Demo, Esq.
PACHULSKI, STANG, ZIEHL & JONES, LLP
1700 Broadway, 36th Floor
New York, New York 10019

Michael L. Schuster, Esq.
POLSINELLI, PC
1401 Lawrence Street, Unit 2300,
Denver, Colorado 80202

For the City of La Quinta, California:

Richard W. Riley, Esq.
PASHMAN STEIN WALDER HAYDEN, PC
824 North Market Street
Suite 800
Wilmington, Delaware 19801

Bradford F. Englander, Esq.
WHITEFORD, TAYLOR & PRESTON, LLP
3190 Fairview Park Drive
Suite 800
Falls Church, Virginia 22042

For Poppy Bank:

Mark Minuti, Esq.
SAUL EWING, LLP
1201 North Market Street
Suite 2300
Wilmington, Delaware 19899

Also Appearing:

Hon. Christopher S. Sontchi (Ret.), Independent Manager
SONTCHI, LLC

(Continued)

APPEARANCES VIA ZOOM: (On the Record)

| | |
|---|---|
| For the Debtors: | Benjamin M. Carson, Esq.<br>LAW OFFICES OF BENJAMIN M. CARSON, P.C.<br>5969 Village Way, Suite E105<br>San Diego, California 92130 |
| | VICTOR A. VILAPLANA, ESQ.<br>823 La Jolla Rancho Road<br>La Jolla, California 92037 |
| Also Appearing: | Douglas Wilson, Chief Restructuring Officer<br>DOUGLAS WILSON COMPANIES |
| | Julian K. Edelson<br>THE RELIABLE COMPANIES |

INDEX


| | PAGE |
|---|---|
| PRESENTMENT/ARGUMENT BY MS. FAY | 5 |
| COMMENTS BY MR. ENGLANDER | 17 |
| COURT'S RULING | 21 |

| EXHIBIT | EVID. |
|---|---|
| Edelson Declaration at ECF 1116 | 10 |
| Sontchi Declaration at ECF 1139 | 10 |

(Proceedings commence at 10:31 a.m.)

(Call to order of the Court)

THE COURT OFFICER: You may be seated.

THE COURT: Good morning. For the record, this is Judge Walrath. We're here in the SilverRock case.

I'll turn it over to counsel for the debtor.

MS. FAY: Good morning, Your Honor.

THE COURT: Good morning.

MS. FAY: Erin Fay of Wilson, Sonsini, Goodrich & Rosati on behalf of the SilverRock Debtors.

Your Honor, we're here today on confirmation of the SilverRock Debtors; Chapter 11 plan. With me in the courtroom is the debtors' independent manager, Mr. Sontchi.

On the Zoom screen is Mr. Douglas Wilson, the debtors' chief restructuring officer and other critical members of his team. We have also on Zoom our co-counsel, Mr. Carson and Mr. Vilaplana.

In the courtroom here with me, I also have my colleagues, Mr. Reil, Ms. Lyons, and Ms. Hammer.

And importantly, we have representatives of and counsel to our consenting creditor group.

Your Honor, I am pleased, albeit a little bit surprised, to be able to be here today with a global resolution to present to Your Honor that has permitted the plan to be heard today without objection from any creditors

in the case. That arm's length and good faith resolution is among the City, the debtors, and 13 of our key creditor constituents.

This was no small feat, Your Honor. On behalf of my client and the whole debtor team, we want to thank the entire group of creditor professionals and clients for working constructively and with alacrity over the last several weeks to get us here.

By way of a roadmap for today, if acceptable to Your Honor, I would like to provide, at a high level, a description of the resolution that's set forth in the plan and global settlement termsheet, then move to evidence, and then present a brief argument.

THE COURT: Okay.

MS. FAY: As we came into today, we thought that the sole remaining objection was the U.S. Trustee to the third-party releases in the plan. However, given the way that those releases were limited in connection with the disclosure statement to only those creditors who voted and did not opt out, I understand that the Office of the United States Trustee's objection is also resolved.

THE COURT: Okay.

MS. FAY: So, as to the plan and settlement, the settlement termsheet stemmed from what became an untenable torrent of litigation between the parties that threatened the

ability for the debtors to conclude these cases in Chapter 11. The litigation included voluminous document requests and information requests to multiple parties and non-parties, the identification of not less than 3 experts, and over 20 deposition notices or subpoenas for such experts, and a dozen other fact witnesses. It would have been quite a hearing, Your Honor. The debtors also gathered and initiated review of tens of thousands of documents.

The settlement stopped that discovery in its tracks and paved the way for a consensual process through the plan. It removed, for present purposes, any briefing or determination with respect to valuation or allocation. The settlement and plan, instead, broadens the reserve disputes as set forth in the prior version of the plan between the creditors, so that all intercreditor issues are preserved for later adjudication or, ideally, resolution.

To do this, we had to withdraw the 506 motion and make parallel changes in the plan. This included classifying certain creditors that were previously in the general unsecured class now in their own secured class because they were only being classified in the general unsecured class because they were under-secured, as set forth in the 506 motion.

It also involved the removal of the EB-5 settlement and the agreed reduction of Keillor's claim, but we did that

consensually with those parties.

The settlement also includes commitments from the City of La Quinta to make certain funds available to pay the administrative claims and to have certain trust funding seed money for the litigation trust.

It also includes voluntary releases by the settling creditors of the City and releases by the debtors of the settling creditors with traditional carveouts.

It resolves the potential indemnity obligation of the City under the final DIP order to Poppy and provides that the City will have -- will receive no further recoveries in the cases, notwithstanding providing that additional financing that I just referenced. Beyond that financing, however, the City will have no other funding commitments to these cases.

Now, to the extent that any of the payments to Poppy on account of the indemnity occur, Poppy has agreed that its liens on the relevant parcels will be reduced accordingly.

Importantly, the builder's appeal of the sale order, which has been costly and time-consuming, will be dismissed with prejudice on terms agreed by the parties to that appeal.

And the resolution permits -- or rather limits, the first priority trust recoveries to approximately $2 million,

the balance after that being available for general unsecured creditors. And this reduces the prior priority trust position almost by half. It was $3.8 million, a little over that in the prior iteration of the plan.

As to the process, the termsheet was negotiated over several weeks earlier this month. It was executed, filed, and served on May 11th on all parties that received the plan, along with a notice indicating that the settlement terms would be incorporated into a further revised plan.

That amended plan incorporating the settlement was filed as soon as possible thereafter, the next business day, on May 11th, and again served on all parties that received the plan, along with a notice expiring on May 11th extending the plan objection deadline and the plan voting deadline and permitting folks to vote by email.

We notified chambers and asked that the confirmation hearing be restricted to a day, given that we no longer needed two days for a full trial.

That is an overview, Your Honor, of the critical terms of the settlement and plan as revised and the process as to how we got here.

So moving to evidence. Unless Your Honor or others have questions or arguments that require response by way of live testimony or proffer, the debtors intend to rely solely on the file declarations of Mr. Sontchi and Mr. Edelson.

Mr. Edelson is present by Zoom and Mr. Sontchi is here in the courtroom. Both are available for cross-examination.

With that, I would ask that Mr. Edelson's declaration in support of solicitation and voting results at Docket Item 1116 be admitted.

THE COURT: Does anybody object to that?

(No verbal response)

THE COURT: Does anyone wish to cross-examine Mr. Edelson on that?

(No verbal response)

THE COURT: I hear none. I will admit it.

(Edelson Declaration at ECF 1116 received in evidence)

MS. FAY: Thank you, Your Honor.

I would also ask that Mr. Sontchi's declaration generally in support of confirmation at Docket Item 1139 be admitted.

THE COURT: Any objection to that declaration being admitted?

(No verbal response)

THE COURT: I hear none.

Anybody wish to cross-examine Mr. Sontchi?

(No verbal response)

THE COURT: I hear none. I will admit it.

(Sontchi Declaration at ECF 1139 received in evidence)

MS. FAY: Thank you, Your Honor.

As to the confirmation standards, I do not intend to go through each and every requirement, and we will rely on and rest largely on our brief and the admitted declarations, but I did want to touch on a few points.

So, as set forth in Mr. Edelson's declaration, there were 25 impaired classes eligible to vote under the plan, 12 of those voted yes, 4 of those voted no, and the remaining 9 classes did not vote. As such, the plan must be approved under the Code's cramdown provision and -- as the dissenting classes are impaired.

Now as to those dissenting impaired classes and as set forth in our brief, the plan does not discriminate unfairly and it is fair and equitable to each of those classes based on the relevant factors for secured claims or unsecured claims.

As to the releases, first, the debtor release. The release is limited to the debtors' related parties, the DIP lender and its related parties, and the settling creditor released parties, as each are defined in the plan. All of these parties made substantial contributions to these cases and being here today and each release is critical to the plan.

As to the debtor released parties, there's an identity of interest between the debtors and these parties

who worked tirelessly in the cases to maximize value and get to a consensual hearing today. Most of these parties; in fact, probably all of them, have also agreed to reduce fees to permit us to be here today through the global resolution and the Chapter 11 plan.

As to the City, it was critical to these cases in so many ways by providing, voluntarily, DIP funding and then supplemental wind-down financing, working with the debtors to sell and market their unique property alongside the City's unique property, and yet further contributing to the settlement by way of additional funds and wind down and the resolution with Poppy. As the debtors' indemnified DIP lender, there is also an identity of interest between the debtor and the City.

As to the settling creditor released parties, we would not be here today, potentially at all, but certainly not on a consensual basis without these parties. Indeed, the cases could have been in a far worse position without the ability to actually fund a litigation trust or permit a smooth wind down of the rest of the estates.

Now certain of the settling creditors, both the EB-5 lenders and Keillor, had negotiated resolutions with the debtors that included debtor releases in the prior version of the plan. Those resolutions had to be significantly altered to get to the global settlement. And critically, all of the

settling creditors, including those, required a debtor release, in part to clarify that the remaining litigation on priority and validity and allocation would be between the creditors alone. The litigation trust, other than providing information, is not intended to have a role in that remaining litigation or, ideally, the resolution between those parties.

Given the significant overall benefits of the settlement and the criticality of the debtor release thereto, the debtors submit that the release is appropriate and should be approved.

As to the third-party releases, I can truncate this a bit given Ms. Leamy's position. But the debtors' position is that each of the releasing parties had ample notice and opportunity to opt out and, indeed, several did.

I did want to note one correction to our brief here. The brief noted or stated that there were three creditors opting out. But as shown in the voting report, there were actually seven claimants that opted out with eight claims, so I wanted to clarify that.

THE COURT: Thank you.

MS. FAY: It's our position that, given the limited nature of the release and that each of those parties that is providing the release took the affirmative step of submitting a ballot without opting out, that that indicates their acceptance under applicable law.

Two final points, Your Honor; one is to the plan as modified. In our view, Your Honor, and under applicable law and rules, we believe that Your Honor can approve the plan today, notwithstanding the timing of the modifications. Section 1127(a) is intended to provide a flexible framework for pre-confirmation plan amendments in recognition of how Chapter 11 cases actually progress and to maximize the opportunity for consensual resolution, such as we have here.

Now the plan, as modified, must still continue to meet 1122, 1123, and 1125, which we believe are amply met here, as described in our brief. As to 1122 in particular, we changed the classification of certain claims to ensure that the plan, as modified, would be sufficient.

And now the case law around plan amendments, Section 1127, and Rule 3019 further support the Court's ability to approve the plan, as modified, today because, as to the settling creditors, we have -- they have approved the amendments in writing, and as to the non-settling creditors, we believe the changes made are not material or adverse. Rather, the creditors view the modifications as neutral or improvements for such creditors.

For Classes 14 through 25 that were previously general unsecured creditors, pursuant to the 506 motion, such creditors can now assert a secured claim, if they so choose, or they can remain silent, as they did *vis-a-vis* the 506

motion. That is either an improvement for such creditors or no change at all.

Moreover, under the prior version of the plan, the recoveries for all of the creditors with the alleged liens on the Phase 1A property, which are most of the creditors in Classes 4 through 12, but for Class 10, which is the EB-5s, those Phase 1A lien creditors were always subject to resolution of the remaining disputes among them, and that remains the case under the current plan. But now allocation is also on the table for such parties, which could improve treatment.

In any event, the debtors are taking no position on allocation today, and the point is that recovery was uncertain under the prior plan and required further resolution, and that remains so under the amended plan.

And as I mentioned in my opening, the treatment for general unsecured creditors is improved here on account of the reduced first priority trust position going from approximately 4 million down to 2 million.

And then finally, Your Honor, as to the settlement itself, it can be approved under 1123(b)(3) and Martin.

The disputes today between the settling parties and the debtors would have been incredibly expensive to litigate and the outcome was uncertain. A negative ruling for the estates on these issues would have led to a chaotic and

value-destructive end for these cases, as became clear as the opposition and discovery mounted.

The litigation, as I mentioned, was anticipated to include 3 experts, more than 12 fact witnesses. And the various nondebtor groups were each proposing their own view of allocation, which would have been quite complicated, and the determination of which is, frankly, uncertain under Section 506 and the wide variety of case law that comes out of that section.

Your Honor, the settlement permits more time for the nondebtor and non-City parties to attempt to resolve their issues without litigation or to engage in non-expedited litigation with the cost to the estates removed.

So, comparing all of the negatives of the expedited complex and multi-party litigation with the benefits of the settlement that I described in opening, which are manifold to the estates, the debtors believe the settlement is fair, reasonable, and in the best interests of the estates and should be approved.

Unless Your Honor has questions, the debtors ask that the Court confirm the plan.

THE COURT: All right. Does anybody else wish to be heard?

MR. ENGLANDER: Good morning, Your Honor. Brad Englander for the City of La Quinta.

First, I'd like to thank the Court for indulging us throughout this case. It's been a complicated real estate case.

And I'd like to thank the debtors and their counsel for what has truly been a remarkable job coordinating and overseeing the -- not only the sale process, but the wind-down of this case. They've done a great job, and the City is grateful for the work that has been done here.

I'd just like to say a little bit about the City's involvement. I know the Court is well aware, but I'd like to see if I can tie together some information about what the City has done.

THE COURT: I'm sure you've done a lot outside of this courtroom.

MR. ENGLANDER: Just a little bit, just a little bit.

(Laughter)

MR. ENGLANDER: The City, as the Court is aware, support -- has supported the debtors throughout this case. The City agreed with the debtor up front regarding a memorandum of understanding that provided for the joint marketing and sale of not only the debtor's property, but the City-owned property, which was, I think, essential to maximizing value for not only the City, but for the estate as well. And that was successful.

The City funded an eleven-million-dollar debtor-in-possession loan that was at a very low rate of interest. And the City, unusually, agreed to caps on the priming with respect to various parcels of the collateral.

And one of those parcels that was securing, principally, Poppy Bank, was subject to a four-million-dollar cap, and the City agreed, as part of the DIP financing order, to indemnify Poppy Bank for losses as may result from priming. That could have meant as much as $4 million because that was the amount of the priming cap in favor of that particular parcel. So that was a significant, unusual concession for a DIP lender to make.

The City supported the debtors in connection with the sale process by agreeing to outright waive 2.25 million of its DIP loan, and to providing non-priming wind-down financing between one and $2 million.

Then, to facilitate the global settlement, the City confirmed that it would fund the full amount of the $2 million wind-down financing.

It would agree to resolve Poppy's potential indemnification claim by assigning to Poppy Bank the $1,190,000 sale proceeds that had been set aside pursuant to this Court's order on account of the sale proceeds that were not subject to any cap on priming. And that's been in escrow with the debtors since the closing of the sale.

And the City also agreed to contribute another $1,050,000 to the debtors on the effective date to defray administrative expenses and to fund the litigation trust.

As part of the resolution and the global settlement, the City also acknowledged that it would remain subject to certain normal discovery obligations on a go-forward basis as the creditors -- should the creditors need to litigate further with respect to the allocation of the sale proceeds.

In sum, I think that this -- these are the hard costs, leaving aside attorneys' fees and time and expense of just participating in the process. The hard costs total up to be a total of about $6,500,000, about half of which already has been funded, and the remaining half will be funded in connection with the effective date of the plan.

These are substantial contributions. And the City has done this because the City thinks it's not only in the debtor's interest, but also in its interest to have a smooth resolution with respect to this case.

There are several conditions that are in the plan:

The pending appeal of the sale order that has been prosecuted by Builders Capital needs to be dismissed and the parties have agreed on the form.

THE COURT: Could you speak into the mic a little better?

MR. ENGLANDER: Yes.

THE COURT: Because the air is now blowing over my head.

MR. ENGLANDER: Very well.

The several conditions that are -- that relate to the City's obligations under the plan are these:

First, there is remaining the appeal by Builders Capital of the sale order that needs to be dismissed and the parties have agreed on a form of a dismissal to submit to the District Court.

There are, in addition to the plan releases, releases -- general releases to be executed in favor of the City and Turnbridge and related parties by the settling by the parties to the global settlement. That doesn't affect all creditors, just those who have settled consensually as part of that global settlement stipulation which is on file with the Court.

And the City Council needs to convene a hearing or a duly noticed public meeting in accordance with California law. That should take place within the next week or so. It hasn't been scheduled yet, but it should be in that time frame. I certainly cannot commit how this council will vote, but I do think that, based on my dealings with the City Manager and the City Attorney, both of whom are on by Zoom today, that we expect support from the City Council, assuming

that the Court confirms the plan.

So we do think that these conditions are all likely to be satisfied and that the effective date will occur. And the City, again, does support, subject to those conditions, the confirmation and effectiveness of the plan.

And again, thanks to the debtors and their council for all the fine work that's been done here.

THE COURT: Okay. Thank you.

MR. ENGLANDER: Thank you.

THE COURT: Anybody else wish to be heard with respect to confirmation?

(No verbal response)

THE COURT: Anybody wish to object?

(No verbal response)

THE COURT: I hear none.

Well, I think I'm more surprised than counsel for the debtor that we're here consensually. And I personally want to thank all of the parties that participated in the successful resolution of the issues that were -- seemed to be insurmountable at the disclosure statement hearing.

I think that the City -- the parties have clearly established or the debtor has established that the settlement is fair and reasonable and in the best interests of the debtors' estate, as well as all parties, and I can easily approve it under 9019 and the Martin factors.

It's far above the worst settlement that could be imagined.

I think it eliminates a lot of litigation costs and the delays incumbent on litigation.

It saves the Court the chore of deciding complex and significant issues that were holding up this case.

It preserves the parties' rights to litigate their interests.

I don't see that any effect of the settlement materially or adversely affects any creditor group. Both the settling creditors and the remaining creditors that are dealt with in the plan are not adversely affected by this settlement.

The amendment has -- of the plan, in accordance with this global settlement, has been agreed to by the settling creditors and, again, is not materially adverse to other creditors, so that the process used by the debtor to extend the deadline for voting, to allow parties to express an opinion on the changes is perfectly appropriate here, and I would approve the amendment and the process used to file it.

With respect to the releases, Ms. Leamy, do you want to confirm that you're no longer objecting to the third-party releases based on the position you took at the disclosure statement hearing?

MS. LEAMY: Good morning, Your Honor. Jane Leamy for the U.S. Trustee.

That's correct. Based on the group that it applies to, the U.S. Trustee does not have an objection. Thank you.

THE COURT: Okay. Well, I can find that the releases are appropriate. I can find that they -- given that they apply only to those who vote, who clearly had notice and a full opportunity to opt out of those releases, I can find that they can be approved as to those who did not opt out.

I think all of the parties that are covered by the releases have made substantial contributions in this case. And it clearly is the unique case where every party stepped forward, it appears. Although I was not involved in the settlement negotiations, it's clear that all parties were able to come to an agreement that maybe they didn't want in the first place, and that's good for any settlement.

But I think that the contribution to this plan by entering into that agreement is substantial and is the only way -- as the debtor had argued at the disclosure statement hearing, the only way to resolve these Chapter 11 cases quickly and for the benefit of all the creditors. So I find that the releases are consensual and are based on substantial contributions made by those parties to this plan process.

The amended plan I've reviewed, and it's fine, it's in accordance with the global settlement.

And I had no other issues with the case. Again, I thank the parties for getting us to this process, and I'll note taking only a half an hour of my time for confirmation instead of what I fully anticipated was more than the two full days that debtor had requested. So I'm happy to confirm the plan and congratulate the parties for getting here.

MS. FAY: Thank you very much, Your Honor.

I was remiss in not thanking the Court in my opening, so we certainly do thank you and your chambers for all the assistance during these cases.

We have -- the confirmation order needs one tweak related to the additional plan supplement document that was filed last night, so we will make that change --

THE COURT: Okay.

MS. FAY: -- and then upload the order and let chambers know.

THE COURT: All right. So you'll be filing it under certification of counsel then?

MS. FAY: Certainly, we can do that, Your Honor.

THE COURT: All right. I'll look forward to getting it.

And again, thank you to the parties and congratulations. I will approve the confirmation -- or confirm the plan once I've received that order.

MS. FAY: Thank you, Your Honor.

THE COURT: All right. And we can stand adjourned. Thank you.

UNIDENTIFIED: Thank you, Your Honor.

(Proceedings concluded at 10:58 a.m.)

*****

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of my knowledge and ability.

________________________________ May 29, 2026

Coleen Rand, AAERT Cert. No. 341

Certified Court Transcriptionist

For Reliable