**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>SILVERROCK DEVELOPMENT COMPANY, LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 24-11647 (MFW)<br><br>(Jointly Administered) |

**PHASE 1B PARTIES' OPENING BRIEF IN SUPPORT OF ALLOCATION OF VALUE AMONG COLLATERAL**

The Traub Family Revocable Trust, dated January 22, 2015 (the "Traub Trust") and SilverRock Land II, LLC ("SR Land," and together with the Traub Trust, the "Traub Parties"); Keillor Capital ("Keillor"), as servicer on behalf of and together with creditors RAF Pacifica Loan Opportunity Fund I, LLC ("RAF Pacifica") and The Arnold Fishman Revocable Trust dated July 15, 1999 ("Fishman Trust", and together with Keillor and RAF Pacifica, the "Keillor Parties"); and SilverRock Resort Investment, LLC ("SRI") and SilverRock Resort Investment M, LLC ("SRI M", together with SRI, the "EB-5 Lenders," and together with the Keillor Parties and the Traub Parties, the "Phase 1B Parties"); hereby file this opening brief pursuant to the *Amended Consent Order Granting Motion for Entry of an Order (I) Valuing Collateral Pursuant to 11 U.S.C. § 506(a) and (II) Granting Related Relief* [Docket No. 1377] (the "Allocation Dispute Order"). This opening brief sets forth (i) the Phase 1B Parties' position with respect to allocation of the Sale Proceeds (as defined below) and (ii) the Phase 1B Parties' position with respect to payment of the TIC Payment (as defined below).

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: SilverRock Development Company, LLC (5730), RGC PA 789, LLC (5996), SilverRock Lifestyle Residences, LLC (0721), SilverRock Lodging, LLC (4493), SilverRock Luxury Residences, LLC (6598) and SilverRock Phase I, LLC (2247). The location of the Debtors' principal place of business and the Debtors' mailing address is 343 Fourth Avenue, San Diego, CA 92101.

# RELEVANT BACKGROUND

## I. General Background

1. As set forth in the *Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation of SilverRock Development Company, LLC and its Debtor Affiliates* [Docket No. 1111] (the "Plan"), prior to their chapter 11 filings, the Debtors' primary business operations consisted of the development of a 525-acre master-planned community (the "Project") in the City of La Quinta, California (the "City"). The Debtors commenced the Project in November 2014 by purchasing from the City approximately 140 acres of real property (the "Real Property Assets"). The Debtors implemented the Project in phases based on defined project components and corresponding development milestones. The project components encompassed a wide range of contemplated uses, including, among others, luxury hotels, branded residential developments, and mixed-use retail and commercial space.

2. The Debtors filed these chapter 11 cases on August 5, 2024 (the "Petition Date"). On December 12, 2024, following the Debtors' failed initial attempts to obtain debtor-in-possession financing, the Debtors filed a motion [Docket No. 246] (the "DIP Motion") seeking approval of an $11 million debtor-in-possession financing facility (the "DIP Facility") from the City (in its capacity as lender, the "DIP Lender"). Pursuant to the DIP Motion, the Debtors sought to grant the City priming liens on all of the Debtors' Real Property Assets.

3. Unsurprisingly, several of the secured lenders whose collateral was included in the Debtors' Real Property Assets voiced concerns and filed objections or reservations of rights with respect to the priming structure of the DIP Facility, including the Phase 1A Parties -- RDO [Docket No. 291], Builders [Docket No. 292] and Poppy [Docket No. 293].[2] On January 23,

[2] As used herein, the "Phase 1A Parties" means: (a) Construction Loan Services II, LLC d/b/a Builders Capital ("Builders"); (b) R.D. Olson Construction, Inc. ("RDO"); and Poppy Bank ("Poppy").

2025, following negotiations among the parties, an evidentiary hearing and revisions to the proposed final order approving the DIP Facility, the Court entered an order [Docket No. 330] (the "Final DIP Order"), which expressly found (in ¶¶ H-I) as follows:

> **Prepetition Secured Creditors Have Consented to the DIP Credit Facility.** All Prepetition Secured Creditors have consented to Debtors borrowing from the DIP Credit Facility pursuant to the Term Sheet and DIP Documents, including the priming limitations and other terms set forth in this Order and on Exhibit 3 hereto….
>
> The Debtors and the DIP Lender stipulate and agree that disproportionate amount of priming with respect to Planning Area 7,8,9 (as defined on Exhibit 3) [*i.e*., the Phase 1B Parties' collateral] (when compared to the percentage of these parcels to the estates' total parcels' in both size and value) is appropriate because, among other reasons: (a) Planning Area 7,8,9 is comprised of some of the most valuable parcels included in the DIP Collateral; (b) there exists a substantial equity cushion in favor of the holder of the first deed of trust on the parcels comprising Planning Area 7,8,9 [*i.e*., the Keillor Parties], even taking into account the DIP Lender's $7 million priming lien; and (c) the equity cushion in favor of the holder of the first deed of trust on the Planning Area 7,8,9 parcels is greater than the aggregate equity cushion, if any, of the holders of the first trust deeds on the estates' other parcels combined.

Three months later, on April 15, 2025, the Court entered an amended Final DIP Order which contained the exact same findings [Docket No. 437, ¶¶ H-I], to which "[t]he parties have all agreed…." [Docket No. 434, ¶ 5]

4. By comparison to the Phase 1B Parties' collateral, the other parcels in the Project received a disproportionately lower allocation of DIP Liens, $4 million, relative to their acreage. Those parcels allegedly secure claims held by the Phase 1A Parties, which now seek to assign their collateral greater relative value than the parcels comprising Planning Areas 7, 8, 9.

5. Thus, while the Final DIP Order did not assign a separate dollar value to each of the various real estate parcels, it does reflect the parties' agreement as to the equitable allocation of relative value as between the two phases comprising the Project, *i.e,*, 36.36% to Phase 1A ($4 million of priming liens) and 63.64% to Phase 1B ($7 million of priming liens).

6. The equity-cushion findings in the Final DIP Order were not incidental to the priming determination — they were its necessary predicate. A party cannot be found to hold "a substantial equity cushion" on specific collateral without an antecedent assessment of that collateral's relative value. When the proposed DIP Facility was under consideration, the Phase 1A Parties had every opportunity to argue that Planning Areas 7, 8, and 9 were not disproportionately valuable, but doing so would have increased their own priming exposure — and so they stipulated, ***twice*** [Docket Nos. 330, 437], to findings to the contrary. Having obtained the benefit of reduced priming exposure by agreeing that their own collateral carried less relative value, the Phase 1A Parties should not now be heard to argue the opposite for purposes of dividing the Sale Proceeds. The allocation that was fair for purposes of shouldering the burden of priming DIP liens is fair for sharing the benefits of the asset sale proceeds which the DIP Facility enabled the estates to achieve.

7. On October 23, 2025, following the Debtors' marketing process, the Court entered an order [Docket No. 759] (the "Sale Order") approving the sale (the "Sale") of substantially all the Debtors' assets to TBE RE Acquisition Co II LLC (the "Buyer") for $65 million (the "Sale Proceeds"). Pursuant to the Purchase and Sale Agreement executed in connection with the Sale, the Buyer made no allocation of sale proceeds and instead valued the Project as a whole. Pursuant to the Sale, the Debtors' assets were transferred to the Buyer free and clear of all liens, claims, and encumbrances pursuant to section 363(f) of the Bankruptcy Code, with such liens, claims, and encumbrances attaching to the proceeds of the Sale. Additionally, given SR Land's consent to the sale of its interest in the TIC Parcel pursuant to section 363(h), SR Land retained an interest in any Sale Proceeds allocable to such interest. *See* Sale Order, ¶ 14. At the hearing to consider entry of the Sale Order, the Court heard evidence that the Buyer valued the Project as a whole without any parcel-by-parcel allocation. *See* Oct. 14, 2025 Hr'g Tr. at 48;

*Declaration of Michael Gazzano in Support of the Debtors' Sale Motion* ("Gazzano Decl.") [Docket No. 721, ¶ 9]. The Sale closed on December 9, 2025 [Docket No. 833].

8. From December 2025 to March 2026, the Debtors and certain parties participated in a mediation to address the value allocation issues. The mediation participants included (i) the Debtors, (ii) the Phase 1A Parties, (iii) the Phase 1B Parties, and (iv) Granite Construction Company ("Granite"). Unfortunately, that mediation did not yield a resolution of the allocation issues. [Docket No. 917] The parties re-engaged in mediation from early May to mid-August 2026 but, again, did not reach a resolution.

9. On March 10, 2026, following the close of the first mediation, the Debtors filed the *Debtors' Amended Motion for Entry of an Order (I) Determining the Value of the Secured Claims of Certain Creditors Pursuant to 11 U.S.C. § 506(a) of the Bankruptcy Code and Bankruptcy Rule 3012; (II) Establishing the Amount to be Paid on Account of SR Land's TIC Interest; and (III) Granting Related Relief* [Docket No. 913] (the "Allocation Motion"). Pursuant to the Allocation Motion, the Debtors proposed to allocate the Sale Proceeds among the Real Property Assets *pro rata* based on the acreage of each parcel.

10. As with the DIP Motion, the Allocation Motion drew several objections, including from Poppy [Docket No. 939] and Builders [Docket No. 943]. On May 8, 2026, after negotiating with the Phase 1A Parties, the Phase 1B Parties, Granite, and other parties in interest, the Debtors withdrew the Allocation Motion [Docket No. 1108] and instead sought confirmation of a chapter 11 plan that preserved the Sale Proceeds while permitting creditors and other parties in interest to address the allocation and lien priority disputes after plan confirmation. The Court confirmed the Plan on May 21, 2026 [Docket No. 1152], which went effective on June 9, 2026 [Docket No. 1163].

## II. Facts Specific to the Keillor Parties

11. On October 13, 2023, RAF Pacifica and the Fishman Trust loaned Debtor RGC PA and SR Land $12.5 million secured by a first priority lien on Planning Area 7, 8, 9. Debtors used the loan proceeds to pay off existing liens on certain Phase 1A parcels.

12. Prior to the filing of these chapter 11 cases, RGC PA defaulted on the loan. As of May 31, 2026, the outstanding balance due and owing on the loan was approximately $16.8 million [Proof of Claim No. 23].

## III. Facts Specific to the Traub Parties

13. Throughout these chapter 11 cases, in addition to agreeing to a greater allocation of priming DIP Liens, the Traub Parties conferred a separate and material benefit on the estates: SR Land authorized the Debtors to include its tenant-in-common interest in Planning Area 9 as part of its sale process in exchange for the TIC Payment specified in the Final DIP Order. The Final DIP Order provides for payment to SR Land directly from net Sale Proceeds in the amount of $3,816,000 plus 15% interest compounding quarterly, beginning on April 14, 2024, less its allocable share of costs and expenses, and net of payments made to creditors secured by Planning Area 9. In other words, in exchange for its consent to include its tenant-in-common interest in Planning Area 9 as part of the sale process, the Traub Parties negotiated for the TIC Payment to be elevated to an effective deal expense not subject to value allocation so long as Planning Area 9 creditors (*i.e.*, Keillor Parties) received the full value of their claim.

14. As part of the phased development framework, the Real Property Assets were subdivided into discrete planning areas (each, a "Planning Area") designated for specific project components and development characteristics. One such Planning Area is Planning Area 9, which consists solely of a parcel identified as "Parcel B of LLA 2020-0007." As set forth in the Allocation Motion, SR Land and Debtor SilverRock Development Company, LLC ("SRDC") co-

owned Planning Area 9 as tenants in common, with SR Land holding a 42.8% fee interest (the "TIC Interest") and SRDC holding the remaining 57.2%.[3] In April 2023, the Traub Trust acquired 100% of the membership interests in SR Land for $3,701,520, thereby becoming the indirect owner of the TIC Interest.[4] Contemporaneously therewith, the Traub Trust and Debtor SilverRock Luxury Residences, LLC ("SRLR") also executed a *Residential Purchase Agreement* (the "Residential Purchase Agreement"), pursuant to which the Traub Trust agreed to purchase certain residential property from SRLR upon completion.

15. The Membership Sale Agreement further provided that the Traub Trust could terminate the Residential Purchase Agreement and require SRDC to repurchase the membership interests in SR Land for $3,701,520. In April 2024, the Traub Trust elected to cancel the Residential Purchase Agreement, thereby triggering SRDC's repurchase obligation. However, SRDC never repurchased the membership interests in SR Land as required under the Membership Sale Agreement.

16. Following SRDC's failure to repurchase the membership interests, the parties negotiated an amendment to the Membership Sale Agreement, pursuant to which the Debtors issued to the Traub Trust (a) a secured promissory note in the amount of $3,816,000.00 (the "SilverRock Note") and (b) a second deed of trust securing the SilverRock Note (the "SilverRock Mortgage"), which was duly recorded. Of relevance, the SilverRock Mortgage encumbers Planning Area 9.

---

3 On information and belief, prior to the Sale, SRDC's interest in the TIC Parcel was transferred to Debtor RGC PA 789, LLC ("RGC PA").

4 This transaction was memorialized in that certain Membership Interest Purchase and Sale Agreement, dated as of April 13, 2023 (the "Membership Sale Agreement").

17. On January 23, 2025, the Court entered the Final DIP Order, pursuant to which SR Land consented to the Debtors' sale of the TIC Interest on the condition that any order or plan approving such sale require payment to SR Land (the "TIC Payment") in the amount of $3,816,000 plus 15% interest compounding quarterly beginning on April 14, 2024, less SR Land's allocable share of costs and expenses under section 363(j) of the Bankruptcy Code, with such payment to be made solely from Sale Proceeds net of payments made to creditors secured by Planning Area 9. Final DIP Order, Ex. 3, ¶ 3 (the "TIC Payment Provision").

18. The Sale Order conveyed SR Land's interest in the TIC Parcel pursuant to section 363(h) of the Bankruptcy Code. SR Land consented to the Debtors' conveyance of the TIC Interest in exchange for the payment structure and protections expressly preserved in the Final DIP Order, including SR Land's right to receive the TIC Payment directly from the net Sale Proceeds under the TIC Payment Provision. At the time of the Final DIP Order, in addition to the TIC Interest, SR Land also held a junior secured position behind the Keillor Parties. Accordingly, absent the TIC Payment, SR Land would have had no economic incentive to consent to priming liens or the Sale, as it would bear meaningful downside risk without corresponding upside. The TIC Payment was therefore an essential inducement for SR Land's cooperation.

## IV. Facts Specific to EB-5 Lenders

19. Prior to the Petition Date, on or about December 9, 2022, SRI entered into a loan agreement with SilverRock RGC Preferred, LLC ("Borrower"), pursuant to which SRI agreed to lend $108,000,000 to the Borrower (the "SRI Loan"). Simultaneously, SRI M entered into a loan agreement with the Borrower, pursuant to which SRI M agreed to lend $108,000,000 to the Borrower (the "SRI M Loan"). The SRI Loan and SRI M Loan, together with all related amendments, modifications, extensions, and supplements thereto, are collectively referred to as the "EB-5 Lenders' Loan Documents."

20. As of the Petition Date, the amounts due and owing under the EB-5 Lenders' Loan Documents were not less than $16,896,876.75.

21. The proceeds of these loans were provided to the Borrower for the development and construction of the Project. Pursuant to the EB-5 Lenders' Loan Documents, the Borrower's obligations to the EB-5 Lenders were secured and perfected by certain deeds of trust, granting the EB-5 Lenders a security interest in Planning Areas 7 and 8, also known as Parcel C of LLA 2020-0007 and Parcel 12 of Parcel Map 37207 or Riverside County Assessor's Parcel Nos. 777-060-085, 777-060-078, and 777-060-075.

22. The EB-5 Lenders originally held first-priority mortgages on Planning Areas 7 and 8. However, they later subordinated these interests to the Keillor Parties pursuant to that certain subordination agreement, dated October 13, 2023 (the "Subordination Agreement"), to facilitate the Debtors' ability to secure additional financing for the Project. At the time of this subordination and prior to the Keillor Parties' involvement, no mechanic's or other liens encumbered Planning Areas 7 and 8.

23. As a result of the Subordination Agreement, the EB-5 Lenders' liens on Planning Areas 7 and 8 became second in priority behind the Keillor Parties' first-priority liens, which extended across Planning Areas 7, 8, and 9. The EB-5 lenders' second-priority lien position on Planning Areas 7 and 8 was, and is, junior only to the Keillor Parties' first-priority lien position on those same parcels under the Subordination Agreement.

## ARGUMENT GENERALLY APPLICABLE TO PHASE 1B PARTIES

24. The Phase 1B Parties are jointly aligned in their approach to allocation – the Court should adhere to the allocation framework to which all parties agreed since entry of the Final DIP Order (the "DIP Lien Allocation Approach"). Alternatively, if the Court does not adopt the

DIP Lien Allocation Approach, the Phase 1B Parties would support the Debtors' *pro rata* acreage approach – including, for consistency, the allocation of the DIP based on acreage, which the Debtors' approach does not reflect – as a reasonable and objective allocation methodology given the various disputes.

25. Courts have recognized that "in a bankruptcy proceeding … a lien on less than all of several parcels of property sold in one lot may be transferred to the gross proceeds only to the extent as the particular property covered by the lien contributed to the whole fund." *In re Mannington Pottery Co.*, 104 F. Supp. 506, 520 (N.D. W.Va. 1952). In such cases, "the proportion contributed to the whole fund by a particular property must be ascertained through competent evidence." *Id.*; *see also In re LTV Steel Co., Inc.*, 285 B.R. 259, 267 (Bankr. N.D. Ohio 2002). "The goal [of allocation] is to determine the value of an individual asset as a portion of the whole sale." *Id.* at 266. However, as the court observed in *LTV*, "few cases deal with valuation in the allocation context" and "there is no standard operating procedure." *Id.* at 266. Competent evidence "can be determined through various methods." *Id.*

26. Here, the Buyer did not assign value among the individual parcels comprising the Real Property Assets and instead valued the Project as a whole. *See Gazzano Decl.* [Docket No. 721, ¶ 9]. Accordingly, the most appropriate method of allocation is left to the discretion of the Court.

## I. The DIP Lien Allocation Approach Should Be Enforced.

27. An allocation derived from the priming caps is the most appropriate method under the circumstances. The Final DIP Order did not appraise every parcel, but it approved an allocation of priming exposure negotiated and agreed to by the parties that rested expressly on differences in parcel value and available equity cushion. The Court should give effect to that agreed

framework because it is the most probative transaction-specific evidence of relative value in a record where the Buyer made no allocation.

**A. The Final DIP Order is Law of the Case.**

28. The law of the case doctrine prevents re-litigation of legal issues already decided in an earlier stage of the same case. The doctrine applies when:

1) The issue arises within the same case. *See, e.g.*, *Home Depot USA, Inc. v. Lafarge N. Am., Inc.*, 59 F.4th 55, 61 (3d Cir. 2023);

2) The issue was actually decided, either expressly or by necessary implication, in a prior proceeding**.** *See, e.g.*, *In re City of Philadelphia Litig.*, 158 F.3d 711, 718 (3d Cir. 1998) ("The law of the case doctrine, however, acts to preclude review of only those legal issues that the court in a prior appeal actually decided, either expressly or by implication…."); *see also Todd & Co. v. S.E.C.*, 637 F.2d 154, 157 (3d Cir. 1980) ("The doctrine applies not only to issues that were actually discussed by the court in the prior appeal, but also to issues decided by necessary implication."); and

3) The prior ruling constituted an actual judicial decision, not mere dicta or a non-decision event**.** *See, e.g.*, *Home Depot*, 59 F.4th at 63.

29. These law of the case conditions are met on the record here. The issue of allocation of relative value arose in these bankruptcy cases, initially in the context of the DIP priming liens and now with respect to the disposition of the asset Sale Proceeds. The allocation was actually litigated, then negotiated and finally agreed to by the parties and decided and approved in the Final DIP Order, with 36.36% of the value and priming liens allocated to the Phase 1A assets and 63.64% of the value and priming liens allocated to the Phase 1B assets. And the Final DIP Order is clearly an actual judicial decision.

30. The Final DIP Order reflects the Court's decision to authorize the Debtors' grant of priming liens to the DIP Lender on the terms set forth therein. The Court should not disregard the factual predicates expressly incorporated into that order, including the stipulated

disproportionate allocation of the DIP Liens, the recognized value of Planning Areas 7, 8, and 9, and the substantial equity cushion supporting those parcels.

31. Here, the Court approved the priming structure only after the parties negotiated an allocation of exposure among the Real Property Assets. The resulting order expressly found and held that the DIP Liens were disproportionately allocated to Planning Areas 7, 8, and 9, that those areas included some of the most valuable parcels in the DIP Collateral, and that they provide a substantial equity cushion. Those same factual predicates should apply when the Court determines the same parcels' relative contributions to the undivided Sale Proceeds. The Phase 1A Parties had an opportunity to review and object to that structure. At the January 23, 2025 hearing before the Court, Poppy and Builders each agreed to entry of the Final DIP Order. Jan. 23, 2025 Hr'g Tr. at 8:21-25; 9:10-16.

32. Throughout these chapter 11 cases, the Phase 1B Parties have relied on the Final DIP Order and the Court's legal ruling with respect to allocation of value among the Real Property Assets. Accordingly, the Phase 1B Parties submit that allocation of sale proceeds should occur as set forth on **Exhibit A** hereto.

### B. The Final DIP Order and the Parties' Reliance Support Use of the DIP Allocation Method.

33. The Court may also enforce the terms of the Final DIP Order as a consent order to which all parties to the Allocation Dispute agreed. "[C]onsent . . . orders have many of the attributes of ordinary contracts [and] they should be construed basically as contracts." *U.S. v. ITT Continental Baking Co.*, 420 U.S. 223, 236 (1975).

34. Here, the Final DIP Order approved the negotiated structure under which the Phase 1B holders of interests in Planning Areas 7, 8, and 9 accepted a disproportionate 63.64% share of the priming DIP Liens, while the Phase 1A Parties agreed to be primed by a lesser 36.36%

share of the DIP Liens. The fact that there was insufficient equity in the Phase 1A Parties' parcels formed the basis for the parties' agreement to allocate less of the DIP Liens to such parcels and more to the Phase 1B Parties' collateral.

35. The Court need not treat the Final DIP Order as a parcel-by-parcel appraisal to give effect to the parties' bargain. The stipulated value and equity-cushion findings, the parties' opportunity to object, and the Phase 1B Parties' acceptance of disproportionate priming exposure make the priming caps allocation a more reliable measure of relative contribution to the Sale Proceeds than hypothetical methodologies developed by partisan "experts" only after the Sale closed.

36. Accordingly, the Final DIP Order and the parties' reliance on its allocation framework independently support use of the priming caps as the basis for allocating the Sale Proceeds, as reflected in **Exhibit A**.

## II. In the Alternative, the Court Should Allocate the Sale Proceeds on a *Pro Rata* Acreage Basis Consistent with the Method Proposed in the Allocation Motion.

37. To be clear, the Phase 1B Parties believe that the allocation of DIP Liens established the framework by which value should be allocated among the Real Property Assets. Nevertheless, should the Court decline to apply the DIP Lien Allocation Approach, the next most reliable guidance in the record comes from the Debtors themselves and their independent manager, retired Judge Sontchi — a fiduciary with the most complete, and most neutral, knowledge of the Real Property Assets — who proposed allocating the Sale Proceeds *pro rata* by acreage. [*See* Allocation Motion ¶[¶ 3, 50-60]. That approach follows directly from the undisputed fact that the Buyer valued the Project as a single, undivided asset, without allocating any portion of the purchase price to specific parcels. [*See* Gazzano Decl., Docket No. 721, ¶9]. Where a whole-project sale price must be divided among parcels that were never separately priced, an objective,

non-discretionary metric such as acreage is the most defensible starting point, precisely because it requires no *post hoc* valuation judgment by any party with a stake in the outcome.

38. The acreage allocation approach is attached hereto as **Exhibit B**.

**THE TIC PAYMENT SHOULD BE PAID FROM ALL NET SALE PROCEEDS.**

39. In addition to the DIP Lien Allocation Approach advanced above, the Phase 1B Parties submit that the TIC Payment must be determined and paid in accordance with the precise waterfall in the TIC Payment Provision, including the provision that the payment is made from net Sale Proceeds once the Keillor Parties' claims are satisfied.

40. The Final DIP Order, including the TIC Payment Provision, establishes the governing framework for SR Land's consent to the Sale, and the Court has the authority to enforce its express terms to prevent an inequitable result to SR Land. *See In re Kaiser Aluminum Corp.*, 456 F.3d 328, 340 (3d Cir. 2006) ("bankruptcy courts have broad authority to act in a manner that will prevent injustice or unfairness in the administration of bankruptcy estates"). As reflected in the TIC Payment Provision, SR Land's consent to the Sale of the SR Land TIC Interest was predicated on receiving a fixed payment from the Sale Proceeds. To SR Land's detriment, payment of the TIC Payment following distributions to other secured creditors would fundamentally alter the economic structure the parties negotiated, and the Court approved.

41. Moreover, the TIC Payment is not a distributional entitlement competing *pro rata* with claims against estate property. It is the agreed substitute for SR Land's statutory right to receive the net proceeds attributable to the non-estate TIC Interest conveyed under section 363(h) of the Bankruptcy Code. Treating the TIC Payment as merely a residual secured recovery would collapse the distinction between SR Land's co-owner interest and claims against the Debtors' property, and would deprive SR Land of the fixed-payment protection that induced its

consent. The Debtors had no legal or equitable interest in the SR Land TIC Interest and thus, under section 541(a) of the Bankruptcy Code, SR Land's 42.8% interest in the TIC Parcel was not part of the Debtors' bankruptcy estate. The Debtors therefore could not sell 100% of the TIC Parcel absent further relief.

42. Recognizing the benefit in selling the Project as a whole, the Traub Parties worked with the Debtors to ensure their sale process would run as smoothly as possible. While the Traub Parties could have pursued a sale of the TIC Interest in parallel with the Debtors, the Traub Parties and the Debtors instead negotiated for the Traub Parties' consent to a sale of the TIC Interest pursuant to section 363(h) of the Bankruptcy Code.[5] The compromise between the Traub Parties and the Debtors—embodied in the Final DIP Order—authorized the Debtors to sell the TIC Parcel pursuant to section 363(h), provided that SR Land received its bargained-for benefit: the return of the Traub Trust's $3.8 million purchase price plus interest at the contractual rate less its allocable share of costs and expenses. In reaching this compromise, the Traub Parties waived any right to the upside in the TIC Parcel. However, under section 363(h), the Debtors were obligated to account for and remit the net Sale Proceeds to SR Land. *See In re Stewart*, 368 B.R. 445, 449 n.8 (Bankr. E.D. Pa. 2007) ("Generally, when a trustee sells both the estate's interest and the co-owner's interest in property pursuant to 11 U.S.C. § 363(h), the trustee must account to the co-owner for the co-owner's rightful share of the net proceeds."). In other words, in exchange for the Traub Parties' consent to the sale of the TIC Interest through the Debtors' Sale process, the TIC Payment to the Traub Parties became a cost of the Sale.

[5] Section 363(h) authorizes a debtor to sell "both the estate's interest . . . and the interest of any co-owner in the property in which the debtor had, at the time of commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety." 11 U.S.C. § 363(h). After a sale of a co-owner's interest under section 363(h), the debtor "shall distribute to . . .the co-owners of such property . . . the proceeds of such sale, less the costs and expenses . . . of such sale, according to the interests of such . . . co-owners, and of the estate." 11 U.S.C. § 363(j).

43. Further, precisely because SR Land negotiated to become a fixed cost of the Sale, SR Land agreed to bear its allocable share of costs and expenses pursuant to section 363(j) of the Bankruptcy Code. Section 363(j) confirms the distinct treatment of a co-owner's sale proceeds. After a sale under section 363(h), the trustee "shall distribute" to the co-owner the proceeds of the sale, less the costs and expenses of the sale, "according to the interests" of the co-owner and the estate. 11 U.S.C. § 363(j); *see also In re Sauro*, 2008 WL 2237036, at *2-3 (Bankr. D.N.J. May 30, 2008) (providing that, when a sale of non-debtor property is conducted under section 363(h) of the Bankruptcy Code, "the non-debtor is entitled to the proceeds from the sale proportionate to his interest in the property. These proceeds are not distributed by the trustee to unsecured creditors since the non-debtor is not in bankruptcy. . . . The Trustee has no right to this money."). Against that statutory baseline, SR Land agreed to exchange its potential share of the upside in the TIC Parcel for the fixed TIC Payment formula. That compromise protected the Debtors' sale process while providing SR Land certainty as to its recovery. The Final DIP Order should therefore be enforced as the negotiated substitute for the distribution section 363(j) otherwise would require. Consistent with section 363(j), SR Land remains responsible for its allocable share of sale costs and expenses. But those costs should not be imposed twice, once in calculating net Sale Proceeds and again in reducing SR Land's payment, nor should proceeds attributable to SR Land's conveyed interest be distributed to competing claimants before the TIC Payment waterfall is applied.

44. Critically, SR Land's consent to the Sale—and to the priming of its interest—was expressly conditioned on the TIC Payment. At the time of the Final DIP Order, SR Land already occupied a junior position behind senior secured creditors. Without the certainty of the TIC Payment, SR Land would have had no economic incentive to consent to either the priming

liens or a section 363(h) sale. Indeed, but for SR Land's consent—secured through the TIC Payment Provision—the Debtors could not have consummated a sale of 100% of the TIC Parcel as part of a unified transaction. Allowing the property owners to retain the benefit of that consent without honoring the corresponding payment obligation would deprive SR Land of the very consideration that induced its cooperation.

45. Indeed, permitting the Debtors to avoid the TIC Payment under these circumstances would also result in unjust enrichment. The Debtors and their creditors realized substantial value from the ability to market and sell the Project as a whole, including SR Land's interest in the TIC Parcel. That benefit was obtained only through SR Land's consent, which was conditioned on receiving a fixed payment from Sale Proceeds. To allow the estate to retain the enhanced value generated by that consent while denying SR Land its bargained-for recovery would confer an inequitable windfall on the estate at SR Land's expense.

46. Finally, the TIC Payment Provision reflects a valid, Court-approved agreement supported by ample consideration. SR Land agreed to subordinate its position through consent to priming liens and permit the Debtors to sell their property interest under section 363(h); in exchange the Final DIP Order established a fixed payment from net Sale Proceeds subject to the stated deductions and priority for creditors secured by Planning Area 9. The parties seeking the benefit of SR Land's consent cannot retain that benefit while repudiating. the corresponding obligations.

47. Therefore, the Traub Parties request that the Court enforce the TIC Payment Provision according to its terms, and require payment to SR Land directly from net Sale Proceeds in the amount of $3,816,000 plus 15% interest compounding quarterly beginning on April 14,

2024, less SR Land's share of costs and expenses and net of payments made to the Keillor Parties as the creditors secured by Planning Area 9.

[*Remainder of page intentionally left blank.*]

# CONCLUSION

WHEREFORE, (i) the Phase 1B Parties respectfully request that this Court allocate the Sale Proceeds using the priming cap percentages reflected in Exhibit A or, alternatively, the acreage methodology reflected in Exhibit B, and (ii) the Phase 1B Parties respectfully request that the Court enforce the TIC Payment Provision according to its terms and require payment to SR Land after payments to the Keillor Parties as the creditors secured by Planning Area 9.

Dated: November 9, 2026
Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
*/s/ S. Alexander Faris*
Kenneth J. Enos (No. 4544)
S. Alexander Faris (No. 6278)
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Email: kenos@ycst.com
afaris@ycst.com

*Counsel to the Traub Parties*

**CLARK HILL PLC**
*/s/ Karen M. Grivner*
Karen M. Grivner (Bar No. 4372)
824 North Market Street, Suite 710
Wilmington, Delaware 19801
Phone: 302-250-4750
kgrivner@clarkhill.com

AND

**HUSCH BLACKWELL LLP**

Michael A. Brandess (IL SBN 6299158)
*(Admitted Pro Hac Vice)*
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606
Phone: 302-526-1542
Fax: 302-655-1501
michael.brandess@huschblackwell.com

AND

Morgan A. Hutchinson (MO Bar No. 75616)
*(Admitted Pro Hac Vice)*
4801 Main Street, Suite 1000
Kansas City, MO 64112
Phone: 816-983-8193
Fax: 816-983-8080
morgan.hutchinson@huschblackwell.com

*Counsel for SilverRock Resort Investment LLC and SilverRock Resort Investment M LLC*

**GREENBERG TRAURIG, LLP**
*/s/ Anthony W. Clark*______________________
Anthony W. Clark (No. 2051)
222 Delaware Avenue, Suite 1600
Wilmington, Delaware 19801
Phone: 302-661-7000
Fax: 302-661-7360
Email: anthony.clark@gtlaw.com

AND

Emily D. Nasir (admitted *pro hac vice*)
1000 Louisiana Street, Suite 6700
Houston, TX 7700
Telephone: (713) 374-3575
Fax: 713-374-3505
E-mail: Emily.Nasir@gtlaw.com

*Counsel to Keillor Capital, as servicer, RAF Pacifica Loan Opportunity Fund I, LLC, and Arnold Fishman, as Trustee of The Arnold Fishman Revocable Trust dated July 15, 1999*