**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>SilverRock Development Company, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-11647 (MFW)<br><br>(Jointly Administered)<br>Re: Docket No. 1166 |

# GRANITE CONSTRUCTION COMPANY'S OPENING BRIEF REGARDING PROPOSED VALUATION OF REAL PROPERTY ASSETS

**ESBROOK P.C.**
Maria Aprile Sawczuk (DE Bar #3320)
Scott J. Leonhardt (DE Bar # 4885)
Jared T. Green (DE Bar #5179)
800 North King Street, Suite 301
Wilmington, DE 19801
Phone: 302.650.7540
Email: maria.sawczuk@esbrook.com
scott.leonhardt@esbrook.com
jared.green@esbrook.com

-and-

**FINCH THORNTON & BAIRD, LLP**
P. Randolph Finch, Jr. (admitted *pro hac vice*)
Andrea L. Petray (admitted *pro hac vice*)
Lindsey C. Herzik (admitted *pro hac vice*)
4747 Executive Drive
San Diego, CA 92121
Phone: 858.737.3100
Email: pfinch@ftblaw.com
apetray@ftblaw.com
lherzik@ftblaw.com

*Counsel for Granite Construction Company*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: SilverRock Development Company, LLC (5730), RGC PA 789, LLC (5996), SilverRock Lifestyle Residences, LLC (0721), SilverRock Lodging, LLC (4493), SilverRock Luxury Residences, LLC (6598) and SilverRock Phase I, LLC (2247). The location of the Debtors' principal place of business and the Debtors' mailing address is 343 Fourth Avenue, San Diego, CA 92101.

# TABLE OF CONTENTS


STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ........ 1

SUMMARY OF ARGUMENT ........ 2

STATEMENT OF FACTS ........ 2

I. The Property Was Planned, Partially Improved, Marketed, and Sold as a Single Integrated Asset ........ 2

II. Granite Furnished Property-Wide Backbone Infrastructure and Site Improvement, Serving the Integrated Development ........ 3

III. The Sale Process ........ 4

ARGUMENT ........ 5

I. Legal Standard. ........ 5

II. A Per-Acre Allocation is Appropriate ........ 6

III. Hypothetical Parcel-Specific Valuations Do Not Reliably Allocate the Actual Sale Proceeds ........ 8

IV. Granite's Lien Rights and Priority Position. ........ 11

CONCLUSION ........ 11

# TABLE OF AUTHORITIES

Page(s)

Cases

*Associates Commercial Corp. v. Rash*,
520 U.S. 953; 117 S.Ct. 1879 (1997) ........ 6

*In re Aerogroup Int'l Inc.*,
601 B.R. 571 (Bankr. D. Del. 2019) ........ 7

*In re Heritage Highgate, Inc.*,
679 F.3d 132 (3d Cir. 2012) ........ 6

Statutes

11 U.S.C. § 506(a) ........ 2, 5, 6

11 U.S.C. § 506(a)(1) ........ 5

California Civil Code section 8050(b) ........ 11

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

On August 5, 2024, SilverRock Development Company, LLC, SilverRock Lifestyle Residences, LLC, SilverRock Lodging, LLC, SilverRock Luxury Residences, LLC, SilverRock Phase I, LLC ("*SilverRock*"), and RGC PA 789, LLC (collectively, the "*Debtors*") commenced a Chapter 11 bankruptcy case in this Court.

This dispute arises from the development of the Talus Resort and Residences located along SilverRock Way, Ahmanson Lane, Avenue 52, and Jefferson Street in La Quinta, California (the "*Property*"). The Property consists of a number of separate parcels, and numerous secured lenders have security interests in different parcels. Granite Construction Company ("*Granite*") asserts a mechanic's lien in the Property in the amount of $4,651,719.08, as described below.

With Court approval [D.I. 759], the Debtors sold the Property to TBE RE Acquisition Co II, LLC (the "*Buyer*") for an aggregate purchase price of $65 million. After the sale closed on December 9, 2025, disputes arose among certain creditors asserting liens against different portions of the Property, regarding the priority and extent of liens in the $61,964,897.66 of net sale proceeds (the "*Net Sale Proceeds*"). The Debtors sought to determine the allocation of the Net Sale Proceeds among the secured creditors by initially proposing a proportional per acre allocation while preserving the parties' disputes concerning the validity, extent, and priority of their respective liens. When the parties were unable to reach agreement on an allocation method, the Debtors proposed and obtained confirmation of a liquidation plan that preserved the allocation dispute and the parties' competing lien claims for later determination by the Court.

Subsequently, Construction Loan Services II, LLC d/b/a Builders Capital ("*Builders*") filed a motion [D.I. 1166] (the "*Motion*")[2] for entry of an order creating a briefing schedule and

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

scheduling a hearing at which this Court will determine the value of the collateral pursuant to 11 U.S.C. § 506(a). The Court granted the Motion, and by Consent Order dated July 27, 2026 [D.I. 1203] implemented a schedule for discovery and motion practice, requiring that each party asserting an interest in the Net Sale Proceeds that wishes to propose a valuation of the Real Property Assets file an opening brief setting forth such party's proposed valuation and the basis therefor. Granite respectfully submits this brief in support of its proposed valuation.

## SUMMARY OF ARGUMENT

The Court should adopt a proportional per-acre allocation of the Net Sale Proceeds because the Property was marketed and sold as a single integrated asset rather than separately valued parcels. The Debtor's independent manager testified that the Property could not practically be divided and that its value depended on the Development, as defined below, as a whole. Similarly, the Buyer conditioned its purchase on acquiring the entire Property and did not allocate its purchase price among the individual parcels. A per-acre allocation is consistent with the transaction that occurred and avoids assigning speculative values to individual parcels based on anticipated future uses or development plans. Allocating the Net Sale Proceeds proportionally across the acreage provides an objective method of distributing the value realized from the sale while preserving the parties' separate disputes concerning the validity, extent, and priority of their respective liens.

## STATEMENT OF FACTS

### I. The Property Was Planned, Partially Improved, Marketed, and Sold as a Single Integrated Asset

The Property was planned as a large-scale, master-planned development consisting of high-end resort hotels, luxury residences, and commercial components (the "*Development*"). Although

the Property comprised numerous parcels, those parcels were planned, improved, marketed, and ultimately sold as components of a single integrated development.

The parcels within the Property were not developed or marketed as independent projects with separately negotiated purchase prices or established standalone sale values. Rather, their utility and value depended on the collective Development plan, including shared access, infrastructure, utilities, drainage, recreation facilities, and entitlements. For example, a parcel devoted to a detention basin may have limited perceived utility or value in isolation but may be essential to the use and value of the Development as a whole. Assigning such a parcel a hypothetical standalone value would therefore fail to capture the value it contributed to the integrated asset that was actually sold.

## II. Granite Furnished Property-Wide Backbone Infrastructure and Site Improvement, Serving the Integrated Development

On or about April 15, 2022, Granite entered into a written contract with Debtor SilverRock to perform dry utility infrastructure work on the Property in exchange for payment in the amount of $6,742,778.00 (the "*Project*"). Granite's work included installation of gas, electrical, and communications infrastructure through trenching, boring, conduit placement, vault installation, and restoration. These permanent improvements formed the backbone infrastructure necessary to support the entire integrated Development rather than a single vertical project or isolated parcel.

Granite's work extended throughout the Property, including major corridors and internal development areas along SilverRock Way, the American Canal, Jefferson Street, and Ahmanson Lane serving the proposed Montage Luxury Residences. The infrastructure Granite installed serves nearly all parcels within the planned Development, remains physically integrated into the Property, and was necessary for the intended use of the Development. The value created by Granite's work is therefore embedded across the entire Property, not confined to discrete parcels.

Granite commenced work on May 5, 2022, and due to non-payment by SilverRock, Granite recorded a mechanic's lien on September 29, 2022, in the amount of $4,222,182.03 for labor and materials used for the Project. As set forth in Granite's proof of claim, and as admitted by the Debtors, Granite is owed $4,651,719.08, and such amount is a secured claim.[3] Granite's lien arises from site improvement work that benefited the entire Property and increased the value of the asset that was ultimately sold. Notably, Granite's work is still functional as it is generally protected in place underground.

## III. The Sale Process

The Debtors sold the Property to the Buyer for an aggregate purchase price of $65 million. The Property consisted of approximately 134 acres of largely undeveloped or partially developed land organized into approximately 43 plots. Its utility and value depended on a comprehensive development scheme involving common infrastructure, access, roadways, easements, landscaping, future entitlements, and coordination with the City of La Quinta. Each parcel's value is dependent on the others. The sale process confirmed that the market valued those interdependent components collectively rather than through separate parcel transactions.

The Debtors marketed the Property as a whole both before and during the bankruptcy. At the sale hearing, the Debtors' independent manager testified that there was "no practical way to divide that big property up" given its existing layout and infrastructure; and that most of the approximately 43 plots were landlocked by other plots. *Hr'g Tr.* Oct. 16, 2025 [D.I. 807], at 134:20–135:25. He further testified that the Property "really had to be developed as a whole,"—

[3] On or around April 5, 2024, Granite and SilverRock Development, SilverRock Lodging, SilverRock Luxury, SilverRock Lifestyle, and SilverRock Phase I (collectively the "*SilverRock Defendants*"), entered into a stipulation of facts wherein SilverRock Defendants stipulated that Granite commenced its work on May 5, 2022 and the value of Granite's work performed on the Project as of October 23, 2023 was $4,253,147.83 with interest accruing at $1,388.75 per day.

meaning that piecemeal sales would be impractical, that the existing infrastructure assumed a whole-project development, and that the Property was worth more as a whole than as its constituent parts. *Id.* at 135:25–136:9.

The Buyer's bid was likewise conditioned on acquiring the entire Property. The Buyer stated that it would not have bid on a subset of the Property and that it was unable or unwilling to allocate value among individual parcels because all were required to complete its proposed development. *Declaration of Michael Gazzano in Support of the Debtors' Sale Motion* [D.I. 721] at ¶ 9. The Buyer further stated that, from its perspective, the independent value of any particular parcel, viewed apart from the collective Development, was nonexistent. *Id.*

The sale closed on December 9, 2025, and the Net Sale Proceeds have been held in escrow pending resolution of the disputes regarding the priority and extent of liens and the allocation of the Net Sale Proceeds among the parcels that comprise the Property.

## ARGUMENT

### I. Legal Standard.

Section 506(a) of the Bankruptcy Code provides that an allowed claim secured by a lien on property of the estate "is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property," and that "[s]uch value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a)(1). Section 506(a), on its face, requires valuation to account for both the purpose of the valuation and the disposition or use of the collateral. Here, those considerations strongly favor beginning with the arm's-length sale itself because the Property has already been sold as a single integrated asset, and the issue before the Court is allocation of the proceeds generated by that sale rather than valuation of property to be retained or hypothetically disposed of. The

valuation method must therefore be tied to the actual disposition at issue. *See, e.g., Associates Commercial Corp. v. Rash*, 520 U.S. 953, 959, n.2; (1997) (value equals "the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition"); *In re Heritage Highgate, Inc.*, 679 F.3d 132, 142 (3d Cir. 2012) ("The proper measure under § 506(a) must therefore be the collateral's fair market value because it is most respectful of the property's anticipated use."). In *Heritage Highgate*, the Third Circuit affirmed a valuation of a partially developed real estate project that accounted for the time and expense that would still be required to develop the property, rather than assuming its value as a completed project. *Heritage Highgate*, 679 F.3d at 141-142. *Heritage Highgate* does not require the Court to reconstruct hypothetical parcel-by-parcel market values after an arm's-length sale has already fixed the value realized for the Property as a whole. There, the court valued real property retained under a Chapter 11 plan and rejected a valuation dependent on uncertain future development and sales. 679 F.3d at 141–42. That principle supports Granite here: allocation should rest on the transaction that actually occurred, rather than hypothetical future parcel uses and development assumptions. The "proposed disposition" is not hypothetical: the Property has already been sold, as a whole, for a lump sum purchase price, and the Net Sale Proceeds are the value to be allocated.

## II. A Per-Acre Allocation is Appropriate

The completed sale provides the starting point for allocating the Net Sale Proceeds. The sale established the value of the Property as a whole but assigned no separate values to its constituent parcels. Given the integrated nature of the Property and the absence of separate parcel prices, a proportional per-acre allocation provides the most objective basis for allocating the value actually realized.

This focus on the completed transaction is consistent with *In re Aerogroup International, Inc.*, which recognized that allocation of proceeds from a completed § 363 sale must account for

the economic evidence supplied by the sale itself. The *Aerogroup* court explained "[t]he auction result set the value of the collateral, and the issue now before me is to determine the appropriate allocation of those Sale Proceeds." *In re Aerogroup Int'l Inc.*, 601 B.R. 571, 590-91 (Bankr. D. Del. 2019). The court rejected an appraisal-based valuation as "not the best assessment for this particular purpose" because it valued the assets as of a date before the bankruptcy and "did not consider certain significant and relevant data points" that followed, including "the result of the § 363 Sale." *Id.* at 591. The same is true here. The Sale fixed the value of the Property as a whole, and the only remaining question is how to allocate the Net Sale Proceeds. Accordingly, a proposed allocation that relies principally on hypothetical parcel values rather than the completed sale would suffer from the same fundamental defect identified in *Aerogroup*: it would give inadequate weight to the transaction that established the value now being allocated.

The Buyer did not separately purchase planning areas, individual lots, utility corridors, landlocked parcels, or discrete future project components. No parcel was separately marketed, bid upon, or assigned a negotiated portion of the $65 million purchase price. There are no parcel-specific bids, appraisals prepared for the sale, or other transaction-based evidence showing that a particular planning area accounted for a greater share of the actual purchase price than another.

The Property was marketed and sold as a single integrated development because the component parcels were interdependent. The Debtors' independent manager testified the Property had to be developed as a whole, there was no practical way to divide it given the existing layout and infrastructure, and many of the plots were landlocked by other plots. He further testified the Property was worth more collectively than as separate components. *See* Hr'g Tr. Oct. 16, 2025, 134:20-136:9. Similarly, the Buyer stated that it would not have bid on a subset of the purchased Property, could not or would not allocate value among the parcels, and viewed the independent

value of any particular parcel as nonexistent because all of the parcels were required for its proposed development plans. *See Declaration of Michael Gazzano in Support of the Debtors' Sale Motion* [D.I. 721] ¶ 9.

As Debtors initially proposed, a proportional per acre allocation provides the most objective method for allocating the value established by the completed sale. It distributes the realized value across the acreage that collectively generated that value without presuming that the transaction assigned an independent market value to any particular parcel. It does not assume that every acre would have identical value in a completed development. Instead, it recognizes that no separate parcel values were established in the sale that occurred. Accordingly, a per acre allocation provides the basis that most closely mirrors the sale to allocate the sale proceeds while preserving the parties' separate disputes concerning lien scope, validity, and priority.

A per-acre allocation does not require a finding that every parcel would command the same price if sold independently. Rather, it recognizes the Property was sold as an integrated Development, with no allocation of the purchase price among its component parcels. Although different areas were designated for different uses, each was necessary to the Development as a whole, and the record does not establish the Buyer attributed any particular portion of its purchase price to any individual parcel. Under these circumstances, allocating the proceeds proportionally by acreage provides an objective basis for distributing the value realized from the collective sale without assigning speculative values to individual components of the Development.

## III. Hypothetical Parcel-Specific Valuations Do Not Reliably Allocate the Actual Sale Proceeds

Valuations based on projected component values, future development plans, or tax assessments do not reliably establish how the Buyer's actual purchase price should be allocated. Such methods assign separate values to portions of the Property based on anticipated uses or future

improvements, even though the Buyer did not separately purchase or price completed hotels, residences, commercial facilities, or other independent components. The Buyer acquired an integrated development site subject to substantial remaining entitlement, construction, financing, and completion risk. The sale record undermines any valuation method premised on independently marketable and separately priced parcels. The independent manager testified that the Property had to be developed as a whole, most plots were landlocked, existing infrastructure assumed whole project development, and the Property was worth more collectively than as separate components. (*See Hr'g Tr.* Oct. 16, 2025, 134:20-136:9.) The record also establishes the Debtors selected a collective sale process because selling the Property in separate pieces would not maximize its value. (*See Hr'g Tr.* Oct. 14, 2025, 17:12-18:3.) A valuation method premised on separate parcel transactions would therefore reconstruct the very disposition that the sale evidence shows was neither practical nor value maximizing.

A parcel-by-parcel appraisal would require assumptions concerning future uses, approvals, construction, financing, development sequencing, and the timing and cost of completing the Development. Those assumptions were not tested through separate parcel sales and did not produce the Buyer's actual bid. Tax assessments are prepared for tax administration purposes and do not establish what portion of the Buyer's purchase price was attributable to any particular parcel. Neither approach reflects the actual transaction. The best reflection of the value of the Property is the lump sum purchase price.

The fact that the Debtors' former development plan designated different areas for different uses does not establish that the Buyer attributed different portions of its purchase price to those areas. The Buyer was not purchasing completed components and was not necessarily bound to implement the Debtors' former plan. The allocation should therefore follow the sale that occurred,

not a prior development concept, a speculative future development, or a hypothetical series of parcel sales that the record shows would not have maximized value. A proportional per acre allocation of the Net Sale Proceeds is the valuation method most faithful to the integrated sale and the evidence generated by that sale.

The same problem arises from a valuation method that attempts to assign separate portions of the purchase price to work performed by individual contractors. The Buyer did not separately purchase Granite's infrastructure, another contractor's vertical improvements, or any other individual project component. It purchased the Property as an integrated asset for a single price. Attempting to determine what portion of that price was independently attributable to particular improvements would substitute hypothetical component valuations for the market transaction that actually occurred. The Buyer did not purchase completed buildings or revenue-generating improvements. It purchased an integrated development site with substantial remaining construction, entitlement, and completion risk.

Granite's installed infrastructure further illustrates the difficulty of such an exercise. The infrastructure remains integrated into the Property and was designed to support multiple portions of the Development. Its contribution cannot reliably be isolated from the collective value of the land, shared infrastructure, intended uses, and other improvements. The more reliable approach is to allocate the aggregate value established by the sale rather than attempt to recreate separate transactions for interdependent project components. Any valuation method that gives greater weight to abandoned, deteriorating vertical work while discounting functional infrastructure serving the entire Property would distort the Property's actual sale value and unfairly penalize Granite for furnished site improvement that benefits the Property.

## IV. Granite's Lien Rights and Priority Position.

Granite's lien rights provide important context to allow the Court to resolve the allocation method. Granite's lien rights arise from dry utility infrastructure furnished as part of the Development's integrated work of improvement. California Civil Code section 8050(b) recognizes that, unless otherwise provided, a "work of improvement" means "the entire structure or scheme of improvement as a whole" and includes site improvement. Cal. Civ. Code § 8050(b).[4] Granite's dry-utility infrastructure was furnished as part of the integrated scheme of improvement for the Development, served the Development as a whole, further supporting the use of a valuation methodology that accounts for the integrated nature of the Property.

The parcel-specific scope, validity, extent, and priority of Granite's mechanic's lien are separate issues pending in Adv. No. 26-50631 (MFW). Granite does not request a determination of those issues through this brief, and nothing in Granite's proposed allocation should be construed as resolving them. Granite only requests that the Court adopt a proportional per-acre allocation of the Net Sale Proceeds, subject to the ultimate determination of the competing creditors' respective lien rights.

## CONCLUSION

Granite requests that the Court adopt a proportional acreage allocation of the Net Sale Proceeds. The completed sale established a single market value for the integrated Property but supplied no separate values for its constituent parcels. A proportional acreage allocation does not assume that every acre has the same standalone market value. It provides an objective and administrable means of allocating the value actually realized without introducing speculative

[4] Granite cites § 8050(b) here only as additional context confirming the integrated character of the Development and its infrastructure, not as a request that the Court determine in this valuation proceeding the parcel-specific scope, validity, extent, or priority of Granite's mechanic's lien.

assumptions about future uses, development plans, or parcel transactions that did not occur or have not occurred. It therefore most faithfully reflects the transaction before the Court while preserving all separate disputes concerning the scope, validity, extent, and priority of the parties' respective liens.

Date: November 9, 2026

**ESBROOK P.C.**
*/s/ Maria Aprile Sawczuk*
Maria Aprile Sawczuk (DE Bar No. 3320)
Scott J. Leonhardt (DE Bar No. 4885)
Jared T. Green (DE Bar #5179)
800 North King Street, Suite 301
Wilmington, DE 19801
Phone: 302.650.7540
Email: maria.sawczuk@esbrook.com
scott.leonhardt@esbrook.com
jared.green@esbrook.com

-and-

P. Randolph Finch, Jr. (admitted *pro hac vice*)
Andrea L. Petray (admitted *pro hac vice*)
Lindsey C. Herzik (admitted *pro hac vice*)
**FINCH, THORNTON & BAIRD, LLP**
4747 Executive Drive
San Diego, CA 92121
Phone: 858.737.3100
Email: pfinch@ftblaw.com
apetray@ftblaw.com
lherzik@ftblaw.com

*Counsel for Granite Construction Company*