**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **In re:**<br><br>**SilverRock Development Company, LLC, *et al.*,**<br><br>**Debtors.** | **Chapter 11**<br><br>**Case No. 24-11647-MFW**<br><br>**(Jointly Administered)**<br><br>**Related to D.I. No. 1166** |

# OPENING BRIEF OF CONSTRUCTION LOAN SERVICES II, LLC D/B/A BUILDERS CAPITAL IN SUPPORT OF ITS MOTION FOR ENTRY OF AN ORDER (I) VALUING COLLATERAL PURSUANT TO 11 U.S.C. § 506(a) AND (II) GRANTING RELATED RELIEF

Construction Loan Services II, LLC d/b/a Builders Capital ("Builders") submits this opening brief in support of its *Motion for Entry of an Order (i) Valuing Collateral Pursuant to 11 U.S.C. § 506(a) and (ii) Granting Related Relief* (D.I. 1166) (the "Valuation Motion").

## PRELIMINARY STATEMENT[1]

1. This proceeding concerns the allocation of the proceeds from the $65 million Sale of SilverRock's Real Estate Assets to Turnbridge against which numerous creditors[2] assert liens. Although the Sale established the aggregate consideration for the Properties, it did not determine the value of each secured creditor's interest in the Properties or how the Net Proceeds should be allocated to each Property. Under Section 506(a)(1) and this Court's prior ruling, the relevant

[1] All capitalized terms used but not defined in this Preliminary Statement have the meanings given to them below.

[2] The principal secured creditor groups asserting interests in the Net Proceeds include Builders; Keillor Capital, as servicer on behalf of and together with RAF Pacifica Loan Opportunity Fund I, LLC and The Arnold Fishman Revocable Trust dated July 15, 1999; SilverRock Resort Investment, LLC and SilverRock Resort Investment M, LLC; SilverRock Land II, LLC and the Traub Family Revocable Trust dated January 22, 2015; R.D. Olson Construction, Inc.; and Poppy Bank ("Poppy"). The validity, extent, and priority of their respective asserted liens are reserved for separate determination.

collateral must be valued as of October 23, 2025—the sale approval date—"in light of the purpose of the valuation and of the proposed disposition or use of such property." The question is what value the distinct properties contributed to the single sale, not whether each acre should receive an equal share of the proceeds.

2. To assist the Court, Builders retained FTI to appraise the Properties. FTI's appraiser, Mark S. Dunec, allocated the Properties into six Subject Parcels and then appraised each Subject Parcel using established appraisal methods. Ultimately, Dunec determined the as-is market value of each Subject Parcel along with the total as-is market value of all Subject Parcels. The $70.1 million aggregate appraisal is used to calculate relative shares, not to substitute a different price for the $65 million Sale. Dunec's appraisal thus provides the value of each Subject Parcel as a percentage of the aggregate appraised value, for application to the Net Proceeds as follows:

| Allocation of Net Proceeds per Value Estimate | | |
|---|---|---|
| **Subject** | **Indicated Value** | **% of Total Value** |
| Subject 1 | $1,045,665 | 2.0% |
| Subject 2 | $8,888,149 | 17.0% |
| Subject 3 | $11,651,691 | 22.3% |
| Subject 4 | $8,888,149 | 17.0% |
| Subject 5 | $4,929,562 | 9.4% |
| Subject 6 | $16,954,705 | 32.4% |
| **Totals:** | **$52,357,921** | **100.0%** |

3. Dunec also submitted the FTI Rebuttal in response to discovery produced by Poppy. The FTI Rebuttal supports Dunec's conclusions and identifies deficiencies in Poppy's proposed allocation. Specifically, the FTI Rebuttal provides that:

- Poppy's purported appraiser at HVS valued the project by phase, but did not determine the relative market values of the distinct hotel, condominium, and residential-lot components within Phase 1A.

- Poppy's purported allocation expert, White, allocated the HVS values equally by acreage, using an assumption supplied by Poppy's counsel that she did not independently test against market values.

- Poppy's own development inputs imply materially different component values. The separate analyses of Poppy's two other purported experts, Moeder and Flight, do not supply the missing allocation evidence.

4. Ultimately, Builders asks the Court to adopt the FTI Appraisal and to allocate the Net Proceeds based on the relative value of each Subject Parcel to the whole. Under the FTI Appraisal, $16,954,705 of the assumed Net Proceeds is allocated to Subject 6, before adjudication of competing lien rights.

## BACKGROUND

### I. General Background and Sale of the Properties

5. Prior to their bankruptcy, SilverRock Development Company, LLC and its affiliated debtors (collectively, the "Debtors") intended to develop approximately 128 acres of Phase 1 property in La Quinta, California, as an integrated hospitality and residential resort (the "Real Property Assets").

6. The original development plan for the Real Property Assets contemplated Phase 1A, comprising hotel, condominium, and luxury residential-lot components, and Phase 1B, comprising additional residential development land.

7. Given the size and complexity of the Real Property Assets, certain Debtors borrowed money from multiple lenders[3] to support the development of the Real Property Assets. The loans sourced to develop the Real Property Assets were secured by different parcels and lots within the Real Property Assets (each a "Property" and together, the "Properties") and, in certain instances, had different payment priorities.

[3] Builders was one of the Debtors' lenders. On November 22, 2022, Builders made three loans to Debtor SilverRock Luxury Residences LLC, totaling in aggregate approximately $40,000,000.

8. The Debtors pursued a sale of the Real Property Assets during their chapter 11 cases (the "Sale"), and the Court approved the Sale to TBE RE Acquisition Co. II, LLC ("Turnbridge") on October 23, 2025 (D.I. 759 (the "Sale Order")) for, among other things, a cash purchase price of $65 million (the "Sale Proceeds"). Neither the Sale Order nor any other order of this Court allocated the Sale Proceeds among the Properties or valued any secured creditor's collateral.

9. On October 7, 2025, Turnbridge filed the Reinstated and Amended Development Agreement (the "Development Plan") with the City of La Quinta (the "City"). The City conditionally approved the amended agreement on October 7, 2025, before entry of the Sale Order, with the ordinance approving the Development Plan to become effective 30 days after adoption. Ordinance No. 626 §§ 2, 4 (Ex. 104).

10. The Sale closed on December 9, 2025. D.I. 833.

**II. The Filing of the Plan and Valuation Motion**

11. After considerable negotiations between the Debtors and their constituents, the Debtors filed the *Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation of SilverRock Development Company, LLC and its Debtors Affiliates* (D.I. 1111) (the "Plan"). The Plan created a Litigation Trust to, among other things, hold the Sale Proceeds in escrow until this Court valued the Properties and determined the appropriate allocation of the Sale Proceeds to the Properties.

12. On May 21, 2026, this Court confirmed the Plan (D.I. 1152).

13. On June 10, 2026, Builders filed the Valuation Motion, and this Court set a discovery and briefing schedule (D.I. 1199, 1203).

14. Since June 2026, Builders and the other secured creditors have participated in voluntary—but ultimately unsuccessful—mediation and conducted significant expert discovery regarding the allocation of the Sale Proceeds.

## RELIEF REQUESTED

15. Builders requests that this Court enter an order (i) adopting the appraisal (the "FTI Appraisal") prepared by Mark Dunec of FTI Consulting, Inc. ("FTI"), which values each Subject Parcel and (ii) allocating the Sale Proceeds net of fees and expenses (the "Net Proceeds")[4] among the six Subject Parcels according to their relative appraised values, subject to verification of the Net Proceeds.[5]

## BASIS FOR RELIEF

### I. Legal Framework

16. Section 506(a)(1) directs this Court to value a creditor's interest in collateral "in light of the purpose of the valuation and of the proposed disposition or use of such property." 11 U.S.C. § 506(a)(1). This Court has directed that the collateral be valued "as of the date of the sale hearing"—*i.e.*, October 23, 2025—and that "whatever has happened to that property since is irrelevant…." Sept. 2026 Hr'g Tr. (D.I. 1293) at 18:17–19, 23:9–22, 26:3–9, 35:11–17. *See also In re Guardian Elder Care at Johnstown, LLC*, 666 B.R. 651, 655 n.4 (Bankr. W.D. Pa. 2025) ("[T]he relevant valuation date should be when the sale was approved, as that is the point at which the market determined the value of the collateral.").

17. There is no single valuation standard imposed on a court by Section 506. Instead, in adopting Section 506, Congress "envisioned a flexible approach to valuation whereby bankruptcy courts would choose the standard that best fits the circumstances of a particular case." *In re Heritage Highgate, Inc.*, 679 F.3d 132, 141 (3d Cir. 2012). In determining which valuation

---

[4] The FTI Appraisal uses $52,357,920.79 as the assumed Net Proceeds for allocation purposes. This is the originally reported amount; the fund available for distribution remains subject to verification and any adjustments required by controlling orders, including the treatment of subsequent transfers or recoveries.

[5] Builders is not asking this Court to determine the validity, priority, or extent of any secured (or allegedly secured) creditor's lien or other interest in the Property. Those issues will be adjudicated in separate adversary proceedings.

methodology to use, a court must assess the facts and determine value, as per the explicit language of Section 506, in light of how the property will be disposed of or used. 11 U.S.C. § 506(a). *See also Associates Commercial Corp. v. Rash*, 520 U.S. 953, 954, 961 (1997).

18. Although Section 506(a) does not include any specific test, the case law is instructive. In 2019, the Delaware Bankruptcy Court addressed an allocation problem comparable to the one at bar. *In re Aerogroup Int'l, Inc.*, 601 B.R. 571 (Bankr. D. Del. 2019)*, aff'd,* 620 B.R. 517 (D. Del. 2020). In *Aerogroup*, two lenders had security interests in two different pools of debtor assets. Those assets were then sold in one, consolidated sale transaction for approximately $25 million. After the lenders failed to reach agreement, the court held a hearing "[t]o divide the pot of money between the two lenders" which "require[d] a determination of the value of the individual assets underlying each lender's lien." *Aerogroup*, 601 B.R. at 583. In assessing the value of individual assets that comprised the whole, the *Aerogroup* court heard expert testimony and evaluated the valuation evidence, using industry-standard valuation methods, relevant to the distinct collateral pools. *Id.* at 583–96. *Aerogroup* thus reinforces the need for reliable, collateral-specific evidence supported by relevant industry practice.

19. Similarly, in *LTV Steel*, the debtor sold multiple operating assets in a single transaction. The court did not treat the aggregate sale price as eliminating the need to value the collateral groups individually. "When several assets are sold as one unit, Courts determine the value of each asset based upon competent evidence" and "allocate sale proceeds between individual assets based upon each asset's portion of the total value of all of the assets." *In re LTV Steel Co., Inc.*, 285 B.R. 259, 267 (Bankr. N.D. Ohio 2002). To determine the value allocable to each collateral group, the *LTV Steel* court evaluated competent evidence specific to the assets and then allocated the proceeds by relative value. *Id.* at 266–69.

20. Applying relative values has also been used when appraised value and the sale price differ. In *In re Hetzel*, 23 F. Supp. 530 (M.D. Pa. 1938), a brewery appraised at $85,000 sold as a whole for $36,500. The court awarded the lienholder on refrigeration equipment the same share of the sale proceeds that the equipment's appraised value bore to the appraised value of the entire plant. It explained that the method required the lienholder to bear its relative share of the difference between appraised value and the amount obtained at the sale. *Id.* at 530–31. *See also In re Mannington Pottery Co.*, 104 F. Supp. 506, 520 (N.D.W. Va. 1952) (finding a lien on less than all property sold together transfers to the proceeds only to the extent the encumbered property contributed to the fund, and that contribution must be determined from competent evidence).

21. Here, the Sale established a single proceeds fund, but did not determine the relative value of the individual Properties. The FTI Appraisal determines those relative values for application to the fund. Dunec is a recognized expert in the manner in which real property assets, including integrated developments, are valued, and the FTI Appraisal provides the competent, industry-standard evidence necessary to value each Property.

## II. Dunec's Market-Based Appraisal, Grounded in Established Appraisal Principles and USPAP, Supplies the Reliable Values for Allocation

### A. Dunec's Credentials and Assignment

22. Mark S. Dunec is a California Certified General Real Estate Appraiser and Senior Managing Director at FTI. He holds the MAI designation from the Appraisal Institute, the CRE designation from the Counselors of Real Estate, and the FRICS designation from the Royal Institution of Chartered Surveyors. He has more than 25 years of experience in real estate valuation, acquisition due diligence, financing, and investment analysis. FTI Appraisal (Sept. 22, 2026), Appx. B.

23. Builders retained FTI to determine the as-is market value of the Properties as of October 23, 2025, using industry-standard appraisal methods. FTI Appraisal at 3–5. Dunec was not asked to decide the extent, validity, or priority of any lien.

**B. Dunec's Methodology**

24. Dunec first grouped the Properties into six subjects (the "Subject Parcels"). Dunec identified the six Subject Parcels as separate appraisal units based on their uses and market characteristics after reviewing, among other things, the Development Plan, entitlements, physical and legal characteristics, existing improvements, and the uses available as of October 23, 2025. Dunec considered the Development Plan for its permitted uses and densities, not to measure the investment value of Turnbridge's particular plans. Dunec Dep. (Oct. 2, 2026) at 39:9–40:13. Dunec ultimately determined that:

- Subject Parcels 1 through 3 comprise an integrated resort-amenity, hotel, and mixed-use hospitality component.
- Subject Parcels 4 and 5 are substantially unimproved residential development land.
- Subject Parcel 6 is a finished luxury subdivision comprising 29 saleable residential lots and associated support parcels of which 16 lots were vacant and 13 contained partly completed residences.

FTI Appraisal at 4, 94–95, 135.

25. Dunec then appraised the six Subject Parcels using methods consistent with the Uniform Standards of Professional Appraisal Practice ("USPAP").[6] These methods include assessing the highest and best use of each Subject Parcel and considering recognized appraisal

[6] USPAP governs the development and reporting of real-property appraisal opinions. USPAP requires the appraiser to identify the appraisal problem, select a scope of work sufficient for credible results, and support the approaches chosen with an appropriate analysis. *See* USPAP, Scope of Work Rule; Standards Rules 1-1 and 1-4 (2024 ed.). The standards do not prescribe one valuation approach for every assignment.

approaches, including sales comparison, development-residual analysis, and the cost approach. Ultimately, Dunec selected the valuation approach appropriate to each subject's condition:

- For the unimproved Subject Parcels 4 and 5, Dunec applied a comparable sale methodology.
- For Subject Parcels 1, 2, 3, and 6, which contained partially completed improvements, he applied the cost approach method.

FTI Appraisal at 96–97. The FTI Appraisal attributed approximately $21 million in contributory market value to existing improvements, including approximately $7.2 million in Subject Parcel 6. The FTI Appraisal separately valued the land in Subject 6 at $15.5 million.

26. For Subject 6,[7] Dunec considered eleven comparable sales of finished residential lots in the La Quinta market and concluded to a land value of $40 per square foot of saleable lot area. For the thirteen partly completed residences, Dunec estimated replacement cost, reduced it to reflect the work completed, and made deductions for deterioration and obsolescence. He estimated the residences to be approximately 50% complete in the aggregate, applying 18.18% physical deterioration and 10% functional obsolescence. The resulting figures were $18.31 million in land value and approximately $8.34 million in contributory improvements before a 15% bulk-sale discount. A pre-sale Cushman & Wakefield appraisal also described partly completed residences and assumed that most existing construction was physically usable, while recognizing that replacement or upgrading would be required. FTI Appraisal at 3, 96–97, 135–50, 169–73. See also Cushman & Wakefield Appraisal (Oct. 7, 2025) at 3, 5. The FTI Appraisal produced six values for the six Subject Parcels totaling $70.1 million in aggregate.

[7] Builders asserts lien rights in property within Subject Parcel 6; the extent and priority of those rights remain for separate determination.

27. The following two tables are reproduced from pages 3 and 4 of the FTI Appraisal. The first shows Dunec's six as-is market-value conclusions for each Subject Parcel and the relative percentage represented by each Subject Parcel. The second illustrates how those percentages apply to the assumed Net Proceeds of $52,357,921. For example, the $22.7 million value attributed to Subject 6 represents approximately 32.4% of the $70.1 million aggregate appraised value. Applied to the assumed Net Proceeds, that share yields $16,954,705 for Subject 6. Using the appraised value for each Subject Parcel, the Court can, as set forth below, allocate the Net Proceeds by simply multiplying (i) a fraction (a) the numerator of which is the appraised value of a Subject Parcel and (b) the denominator of which is the aggregate appraised value of all Subject Parcels by (ii) the Net Proceeds.

| Subject Properties - Value Conclusion | | | | | | | |
|---|---|---|---|---|---|---|---|
| Subject | Net Land Area (Acres) | Gross Land Area (Acres) | Land Value (Rounded) | Improvement Area (SF) | Improvement Value (Rounded) | Concluded Market Value | % of Total Value |
| Subject 1 | 1.60 | 1.60 | $ 500,000 | 13,380 | $ 900,000 | **$ 1,400,000** | 2.0% |
| Subject 2 | 17.98 | 18.33 | $ 5,400,000 | 105,244 | $ 6,500,000 | **$ 11,900,000** | 17.0% |
| Subject 3 | 30.70 | 32.77 | $ 9,200,000 | 99,978 | $ 6,400,000 | **$ 15,600,000** | 22.3% |
| Subject 4 | 39.52 | 39.52 | $ 11,900,000 | N/A | $ - | **$ 11,900,000** | 17.0% |
| Subject 5 | 22.02 | 22.02 | $ 6,600,000 | N/A | $ - | **$ 6,600,000** | 9.4% |
| Subject 6 | 10.52 | 13.47 | $ 15,500,000 | 77,223 | $ 7,200,000 | **$ 22,700,000** | 32.4% |
| **Totals:** | **122.34** | **127.71** | **$ 49,100,000** | **295,825** | **$ 21,000,000** | **$ 70,100,000** | **100.0%** |

*Excerpt from FTI Appraisal (Sept. 22, 2026), p. 3, "Subject Properties - Value Conclusion." Values and percentages appear as stated in the FTI Appraisal.*

| Allocation of Net Proceeds per Value Estimate | | |
|---|---|---|
| Subject | Indicated Value | % of Total Value |
| Subject 1 | $1,045,665 | 2.0% |
| Subject 2 | $8,888,149 | 17.0% |
| Subject 3 | $11,651,691 | 22.3% |
| Subject 4 | $8,888,149 | 17.0% |
| Subject 5 | $4,929,562 | 9.4% |
| Subject 6 | $16,954,705 | 32.4% |
| **Totals:** | **$52,357,921** | **100.0%** |

*Excerpt from FTI Appraisal (Sept. 22, 2026), p. 4, "Allocation of Net Proceeds per Value Estimate." Illustrative allocation based on the net proceeds assumption shown in the report.*

## III. The FTI Rebuttal Corroborates the FTI Appraisal and Rebuts Poppy's Evidence

28. On October 22, 2026, Dunec produced his rebuttal report (the "FTI Rebuttal") in response to the following reports produced by Poppy:

- HVS produced a phase-level land-residual appraisal;
- Elaine White, a forensic accountant, produced an acreage-based allocation calculation using arithmetic;
- Nathan Moeder produced a developer-specific value analysis; and
- The Cumming Group produced a construction costs estimate.

In compiling the FTI Rebuttal, Dunec reviewed data from Poppy's reports, including projected revenues and cost inputs, and calculated the residual values implied for the hotel, condominium, and luxury-residential-lot components within Phase 1A. As set forth in the FTI Rebuttal, Poppy's evidence does not establish equal market value per acre among the different uses within Phase 1A.

29. The principal problem with Poppy's evidence is the step from HVS's phase-level values to White's allocation by acreage within Phase 1A. Neither HVS nor White established that hotel, condominium, and residential-lot land contributed the same value per acre to the Sale. The other reports offered by Poppy do not supply that missing comparison. As a result, Dunec represents the *only* evidence before the Court which fully addresses the fundamental exercise of the Valuation Motion, namely, the allocation of Sale Proceeds based on valuation of the Property's components at the subject level. At best, Poppy's experts merely provide a phase-level allocation, evidently disregarding the Court's directive that "[t]he Valuation Hearing shall be a final hearing on **all** valuation and allocation issues as identified in the Motion." (D.I. 1203 at ¶ 6) (emphasis added).

30. That exercise demonstrates that even a residual framework can distinguish the economics of the different uses. The different component values underscore why an equal-acreage premise, if ever appropriate, at minimum requires independent market support. It corroborates the need for component-specific value evidence. It is not a substitute for Dunec's primary as-is

appraisal or a separate proceeds allocation. Dunec confirmed that the implied $30.2 million luxury-lot residual was not his independent valuation opinion. Dunec Dep. (Oct. 29, 2026) at 14:2–15.

**Phase 1A Residual Value by Component**

The component-level residual values above reconcile to HVS's total Phase 1A residual value, as summarized below.

| Phase 1A - Residual Breakdown Summary | Value | Rounded | % of Value |
|---|---|---|---|
| Total Hotel Component Residual Value: | $14,332,235 | $14,300,000 | 26% |
| Total Luxury Condos Component Residual Value: | $11,422,331 | $11,400,000 | 20% |
| Total Luxury Lots (1A) Component Residual Value: | $30,161,294 | $30,200,000 | 54% |
| **Total Phase 1A Residual Value:** | **$55,915,860** | **$55,900,000** | **100%** |

*Excerpt from FTI Rebuttal Report (Oct. 22, 2026), Appraisal Review, p. 18, "Phase 1A - Residual Breakdown Summary." This is Dunec's analysis of HVS's component-level inputs, not a separately adopted HVS allocation.*

31. The FTI Appraisal and FTI Rebuttal serve different, complementary purposes. The FTI Appraisal determines six as-is market values for each Subject Parcel as of October 23, 2025, from the characteristics of the real estate, relevant comparable sales, and contributory value of existing improvements. The FTI Rebuttal shows that Poppy's development inputs assign materially different component values. Those inputs do not, without additional evidence, establish equal market value per acre within Phase 1A. The Court should adopt the appraised values in the FTI Appraisal because they directly answer the historical collateral-valuation question. The FTI Rebuttal reinforces that conclusion without changing the FTI Appraisal's effective date or its values.

## IV. The Competing Phase-Level Valuation Does Not Supply the Same Collateral-Specific Evidence

32. Poppy offers a different valuation framework than that set forth in the FTI Appraisal. HVS appraisers led by John Lancet used a land-residual model to estimate the present value of the planned SilverRock development, including future hotel, condominium, and residential-lot receipts and the costs and time required to complete the project, an approach that can be appropriate for an unfinished development in certain circumstances. The revised September 24

HVS appraisal uses October 23, 2025, as its valuation date and estimates approximately $55.9 million for Phase 1A and $9.2 million for Phase 1B. HVS Appraisal (Sept. 24, 2026) at 23–28. But here, while those estimates may inform the value of the project by phase, they fail to establish how much of Phase 1A's value is attributable to the distinct hospitality, condominium, and luxury-lot subjects that are relevant to the allocation of proceeds.

33. The connection from phase values to proposed creditor allocations came through a separate assignment. Elaine White, a forensic accountant at J.S. Held, divided the HVS phase values among properties according to their acreage. That arithmetic assigned every acre within a phase the same value notwithstanding the different approved uses, subdivision status, and improvements. HVS's phase-level appraisal did not establish that each Property within Phase 1A had the same value. Instead, HVS's appraiser Lancet testified that independently validating White's equal-acreage assumption was outside his assignment, although he considered such an allocation appropriate because the development uses were interdependent. Lancet Dep. (Oct. 12, 2026) at 16:10–22, 17:6–23, 18:10–19:4. Ultimately, White testified that Poppy's counsel expressly instructed her to use the "equal-acre premise" and that she did not independently test whether it reflected the properties' relative market values. White Dep. (Oct. 6, 2026) at 16:14–17:11, 18:5–21, 25:24–26:9. See White Supplemental Report (Sept. 28, 2026) at 4, Exs. 1S–2S. It appears that rather than presenting evidence in support of an "equal-acre" premise, Poppy treated its preferred result as a mere assumption and instructed their experts to reverse engineer supporting analysis. Without supporting market evidence, an equal-acreage calculation does not establish how much each property contributed to the price paid for the project.

34. Other work commissioned by Poppy addresses development considerations without filling that evidentiary gap. Development consultant Nathan Moeder, who holds no appraisal

certification, discussed how branding, amenities, municipal approvals, and coordinated development affect an integrated resort in his personal experience, but supported these conclusions solely by reference to textbooks rather than actual market evidence. Those considerations may be relevant to some parts of the analysis, and indeed Dunec's highest-and-best-use analysis acknowledges the project's integrated design. But, in stark contrast to Dunec, Moeder did not provide a separate as-is market appraisal of the six subjects or quantify relative value per acre. Moeder Dep. (Nov. 2, 2026) at 6:15–7:2. He also acknowledged that a single purchaser may acquire property with components having different contributory values. Id. at 19:7–23. Integration of the development does not, by itself, establish equal market value per acre.

35. Cumming Group, through Graham Flight, estimated the cost of completing a contemplated development program. It did not opine on the market value of the land or the existing improvements. Its construction-cost scenario assumed demolition of certain partly completed residences, but Flight acknowledged limits on the information and inspections supporting that assumption as of the sale date. Flight Dep. (Oct. 7, 2026) at 14:13–16:22, 24:17–31:4, 35:17–37:11. An analysis of contemplated redevelopment costs does not prove that existing improvements contributed no value as of the sale date.

36. The Court need not reject HVS's development-residual method, Moeder's observations about integration, or Cumming's completion-cost work to find Dunec more persuasive here. Those analyses address different assignments. What the Court needs is a reliable, historical measure of the value contributed by the distinct property groups. Dunec supplies such values using market evidence fitted to each subject's highest and best use and development status, and fully complies with the industry gold-standard, USPAP. His October rebuttal also exposes the unsupported equal-acreage assumption in White's separate allocation of HVS's phase values. On this

record, his appraisal offers the sounder foundation for allocating the common fund, but even further, is the only evidence that will be before the Court of a USPAP compliant subject-level allocation, the fundamental exercise underlying the Valuation Motion.

37. For Subject 6, Dunec separately valued the land and the partly completed improvements rather than assigning the same value to every acre within Phase 1A. He used a common base unit value for the 29 lots based on their common residential use and the market evidence for that use. That is different from applying a uniform acreage value across the hotel, condominium, and residential components of Phase 1A. Dunec Dep. (Oct. 29, 2026) at 19:5–20:17. His assignment matches the Court's sale-date inquiry. The subjects reflect the property's permitted uses and development status. His land values draw on transactions in relevant market segments, and his cost analysis addresses improvements existing when the sale was approved. The resulting values yield transparent proportions that can be applied to the verified proceeds without dictating any creditor's lien rights. Criticism of particular comparable sales or cost assumptions should be assessed on its merits, but it does not supply the missing market support for treating unlike properties as equal-value acreage, and therefore does not rebut Dunec's ultimate conclusions. *See LTV Steel*, 285 B.R. at 267–69.

38. The valuation subjects must, of course, be translated into the legal descriptions in the Sale Order. Dunec's "Subject 6" denotes the 29 luxury residential lots together with their supporting subdivision parcels. White's "Parcel 6" denotes a different tract in her materials. The two labels are not interchangeable. The FTI table reports 127.71 gross acres for the six subjects, compared with 127.91 acres for Phases 1A and 1B in HVS's revised appraisal. The Court can identify the appraisal subjects by reference to the property and assessor's parcel number schedules in the FTI Appraisal and the property descriptions in the Sale Order and reserve questions about which

particular fee, leasehold, or other interests are covered by competing liens. This protects the distinction between determining market values and adjudicating lien extent, priority, or ultimate distribution.

39. The governing law calls for collateral-specific evidence of the value contributed to a single sale. Dunec's appraisal provides that evidence as of October 23, 2025. The appraisal recognizes the integrated master plan while valuing economically distinct property groups according to their applicable markets and existing improvements. The Court should adopt those six values, determine their relative percentages, and apply the percentages to the proceeds fund established by the accounting and controlling orders. Disagreement with a particular FTI input would not establish that White's equal-acreage assumption is valid. Any adjustment should instead rest on evidence of the relative values of the affected properties.

**V. USPAP Supports Dunec's Selection of the Appropriate Valuation Approaches**

40. USPAP governs the development and reporting of real-property appraisal opinions. They require the appraiser to identify the appraisal problem, select a scope of work sufficient for credible results, and support the approaches chosen with an appropriate analysis. *See* USPAP, Scope of Work Rule and Standards Rules 1-1 and 1-4 (2024 ed.). The standards do not prescribe one valuation approach for every assignment. Dunec's highest-and-best-use analysis, separate market segments, sales comparisons for land, and cost approach for partially improved property reflect the scope and methodology he described in his report. FTI Appraisal at 93–98. Dunec considered a development-residual analysis but declined to develop it because he viewed the necessary future development and completion-cost assumptions as too speculative. Instead, he relied on comparable sales for land and depreciated replacement cost for existing improvements. FTI Appraisal at 96–97. Compliance with USPAP alone does not establish the reliability of the appraisal. The Court must also weigh the supporting market and property evidence.

41. HVS appraiser John Lancet separately reviewed the FTI Appraisal in October 2026 and criticized Dunec's decision not to use a land-residual model as the primary approach. Lancet acknowledged in his October 30 deposition that USPAP does not require a land-residual analysis. Lancet Dep. (Oct. 30, 2026) at 33:5–15, 36:1–8. Lancet also criticized the use of non-hotel-branded residential comparables and the application of an aggregate cost model to thirteen unfinished residences. Lancet Appraisal Review (Oct. 26, 2026) at 8–9, 11–12. Dunec selected sales in luxury La Quinta golf-course communities and considered differences in lot size and neighborhood completion. His cost analysis applied the resulting improvement unit value to each residence by building area, after accounting for completion and depreciation. FTI Appraisal at 138–50, 169–73. Those methodological objections do not establish that physically and legally distinct properties within Phase 1A contributed the same value per acre. Instead, the Court should conclude that Dunec's selected methods reliably value the actual property in its sale-date condition. His appraisal explains those selections and contains the supporting market and cost analyses. This is an affirmative reason to credit the FTI Appraisal, not merely an answer to a professional-standards objection.

**CONCLUSION AND RELIEF REQUESTED**

42. Builders asks this Court to adopt the FTI Appraisal and to allocate the Net Proceeds based on the relative value of each Subject Parcel to the total value of all Subject Parcels. The FTI Appraisal applies established appraisal methods to the six Subject Parcels in their condition as of October 23, 2025. It considers the development uses reflected in the 2025 SilverRock Master Plan and the City's conditional approval of the amended development agreement before the sale hearing. The Court should adopt the FTI Appraisal and its valuation of the six Subject Parcels. Under FTI's allocation, Subject 6 accounts for approximately 32.4% of the assumed Net Proceeds

($16,954,705), subject to verification of the amount available and without determining lien extent, priority, or entitlement to distribution.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

Dated: November 9, 2026

Respectfully submitted,

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ James O'Neill*
James O'Neill, Esq. (DE Bar No. 4042)
919 North Market Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: joneill@pszjlaw.com
-and-
Gregory V. Demo, Esq. (*pro hac vice* ECF 935)
1700 Broadway, 36th Floor
New York, NY 10019
Telephone: (212) 561-7700
Facsimile: (212) 561-7777
Email: gdemo@pszjlaw.com

-and-

**POLSINELLI PC**

Michael L. Schuster (*pro hac vice* ECF 925)
1401 Lawrence Street, Suite 2300
Denver, CO 80202
Telephone: (720) 931-1188
Facsimile: (302) 252-0921
Email: mschuster@polsinelli.com