**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>SILVERROCK DEVELOPMENT COMPANY, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-11647 (MFW)<br><br>(Jointly Administered)<br><br>**Related to Docket Nos. 1166 and 1203** |

**POPPY BANK'S OPENING BRIEF WITH RESPECT TO VALUATION**
**OF REAL PROPERTY ASSETS PURSUANT TO 11 U.S.C. § 506(A)**


**SAUL EWING LLP**
Mark Minuti, Esq. (DE No. 2659)
Monique B. DiSabatino (DE No. 6027)
1201 N. Market Street, Suite 2300
Wilmington, DE 19801
Telephone (302) 421-6800
Email: mark.minuti@saul.com
monique.disabatino@saul.com

-and-

**ABBEY, WEITZENBERG, WARREN & EMERY**
Mitchell B. Greenberg (admitted *pro hac vice*)
100 Stony Point Rd., Suite 200
Santa Rosa, CA 95401
Telephone: (707) 542-5050
Email: mgreenberg@abbeylaw.com

**STOEL RIVES LLP**
John S. Kaplan (admitted *pro hac vice*)
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: (206) 386-7524
Email: john.kaplan@stoel.com

-and-

Kirsten Worley (admitted *pro hac vice*)
501 West Broadway, Suite 2000
San Diego, CA 92101
Telephone: (858) 602-4909
Email: kirsten.worley@stoel.com

*Counsel to Poppy Bank*


Dated: November 9, 2026

[1] The Debtor in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: SilverRock Development Company, LLC (5730), RGC PA 789, LLC (5996), SilverRock Lifestyle Residences, LLC (0721), SilverRock Lodging, LLC (4493), SilverRock Luxury Residences, LLC (6598) and SilverRock Phase I, LLC (2247) (collectively, the "Debtors"). The location of the Debtor's principal place of business and the Debtors' mailing address is 343 Fourth Avenue, San Diego, CA 92101.

## TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ..... i

NATURE AND STAGE OF PROCEEDING ..... 1

SUMMARY OF ARGUMENT ..... 1

RELEVANT BACKGROUND ..... 2

A. The Bankruptcy Cases and the Sale of the Real Property Assets ..... 2

B. The Poppy Loan ..... 6

C. Plan Confirmation and the Global Settlement ..... 5

D. The Debtors' Prior Valuation Motion ..... 6

E. The Allocation Motion and the Briefing Schedule ..... 7

ARGUMENT ..... 8

A. Section 506(a) Focuses on Intended Use ..... 8

B. Poppy's Position Regarding Allocation of Value Among the Real Property Assets ..... 11

C. The Experts Agree That Phase 1A is More Valuable Than Phase 1B and that the Highest and Best Use of the Real Estate Assets Is Dictated by the Amended Development Agreement ..... 12

D. The Real Property Assets Consisted of Two Projects: Phase 1A and Phase 1B ..... 13

E. The Highest and Best Use Depends Upon the Luxury Hotel ..... 14

F. There is No Question that More Value Must Be Allocated to Phase 1A than to Phase 1B ..... 16

G. It Would Be Error to Adopt the Debtor's Prior Valuation Methodology, which Treated Every Acre Across Phase 1A and Phase 1B the Same ..... 17

H. The Valuation by Builders/Dunec is Incorrect and Inconsistent with Builders' Prior Pleadings ..... 18

CONCLUSION ..... 21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Associates Commercial Corp. v. Rash*,
520 U.S. 953 (1997) .......... 9

*In re Heritage Highgate, Inc.*,
679 F.3d 132 (3d Cir. 2012) .......... 9

*In re LTV Steel Co., Inc.*,
285 B.R. 259 (Bankr. N.D. Ohio 2002) .......... 10, 11

*In re Museum of Am. Jewish Hist.*,
No. BR 20-11285-MDC, 2020 WL 7786925 (Bankr. E.D. Pa. Dec. 4, 2020) .......... 9

*Polk Lending 33, LLC v. THL Corporate Fin., Inc. (In re Aerogroup Int'l, Inc.)*,
601 B.R. 571 (Bankr. D. Del. 2019) .......... 9, 10

*In re SubMicron Sys. Corp.*,
432 F.3d 448 (3d Cir. 2006) .......... 9

**Statutes**

11 U.S.C. § 506(a) .......... 1, 8, 9

11 U.S.C. § 506(a)(1) .......... 8, 9

**Other Authorities**

Collier on Bankr. ¶ 506.03[6][b] (16th ed. rev. Alan N. Resnick & Henry J. Somer eds.) .......... 9

Appraisal Institute, *The Dictionary of Real Estate Appraisal* (Michael McKinley *et al.* eds., 8th ed. 2026) .......... 18, 19

Poppy Bank ("**Poppy**") hereby files this Opening Brief setting forth its position with respect to Construction Loan Services II, LLC d/b/a Builder's Capital's ("**Builders**") *Motion for Entry of an Order (I) Valuing Collateral Pursuant to 11 U.S.C. § 506(a) and (II) Granting Related Relief* [D.I. 1166] (the "**Allocation Motion**").

## NATURE AND STAGE OF PROCEEDING[2]

On June 10, 2026, Builders filed its Allocation Motion, pursuant to which Builders requested that the Court implement a process for discovery, briefing and a hearing on allocation of the Sale Proceeds and valuation among the Real Property Assets.

On July 27, 2026, the Court entered an order which established, among other things, a briefing schedule with respect to the Allocation Motion [D.I. 1203] (the "**Scheduling Order**"). The Scheduling Order required, *inter alia*, that Opening Briefs (as defined therein) be submitted by October 16, 2026 and that expert reports be exchanged by September 18, 2026. On October 13, 2026, the Court entered an Order re-setting the filing deadline for Opening Briefs for November 9, 2026 [D. I. 1377].

As of the date of this brief, no hearing has been set for the Allocation Motion.

## SUMMARY OF ARGUMENT

As further detailed herein, pursuant to section 506(a) of the Bankruptcy Code, the Court should allocate the Sale Proceeds among the different parcels of the Real Estate Assets by considering the overall Project, the features of each parcel and their intended uses. This approach is most appropriate for several reasons. First, the evidence at the hearing on the Allocation Motion (the "**Hearing**") will show that Phase 1A and 1B are, for all intents and purposes, separate

---

2 Capitalized terms used, but not defined, in the Nature and Stage of Proceedings and Summary of Argument shall have the meanings as set forth in the balance of this Opening Brief.

development projects, and that 86% of the overall value of the Real Estate Assets should be allocated to Phase 1A and that the remaining 14% of the overall value should be attributed to Phase 1B.

Second, there is no dispute among the experts identified by any of the parties that Phase 1A is considerably more valuable that Phase 1B. Similarly, all experts agree that the highest and best use for the Real Property Assets is dictated by the Amended Development Agreement and plan approved by the City.

Further, the evidence at the Hearing will show that the luxury hotel to be constructed as part of Phase 1A is a significant driver of value to all of the Real Estate Assets, since the entire Project depends upon the luxury hotel itself, the associated Transient Occupancy Tax, the hotel amenities and the hotel branding from which all of the other uses within Phase 1A derive their value.

Finally, the evidence at the Hearing will show that the parcels in Phase 1A are worth more than the parcels in Phase 1B due to the timing of the phases and the time value of money, among other things.

## RELEVANT BACKGROUND

### A. The Bankruptcy Cases and the Sale of the Real Property Assets

On August 5, 2024 (the "**Petition Date**"), the above-captioned debtors (the "**Debtors**") each filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors' principal assets were 127+ acres of largely undeveloped real property in the desert (the "**Real Property Assets**").

Prior to the Petition Date, on November 19, 2014, the City of La Quinta, California (the "**City**") and Debtor SilverRock Development Company, LLC ("**SilverRock**") entered into that

certain *Purchase, Sale, and Development Agreement* (as amended, the "**PSDA**") under which the parties agreed to develop the Real Property Assets into a luxury living, golfing, and tourism destination. The Real Property Assets were always required to be developed in two phases and effectively consisted of two projects: Phase 1A and Phase 1B. Under the PSDA, the first phase, Phase 1A, was to be built first and consisted of two luxury hotels (a Montage and a Pendry, two flags of the same parent company), luxury resort amenities including a spa, conference center/shared services, and a golf clubhouse, and branded residences (Montage residences) and branded condominiums (Pendry residences) that would enjoy the luxury hotel resort amenities and luxury resort hotel branding. The second project, Phase 1B, contemplated additional luxury residences, and was always to be built later since its timing and development was dependent upon the success of Phase 1A.

In connection with the sale of the Real Property Assets, the PSDA was subsequently amended pursuant to a *Restated and Amended Development Agreement* by and between the City and TBR RE Acquisition Co II LLC (the "**Buyer**") adopted on October 7, 2025 (the "**Amended Development Agreement**"), which was in effect at the time of the sale of the Real Property Assets and was specifically negotiated between the Buyer and City as a precondition to the City's approval of the sale. Similar to the Debtors' plan, under the Amended Development Agreement, the Real Property Assets were to be developed in two phases and essentially two different projects: Phase 1A to be built first, and Phase 1B to be built later. Schematic concept drawings of the Debtor's plan and the Buyer's plan are attached hereto as **Exhibit A**. Key excerpts from the Amended Development Agreement are attached hereto as **Exhibit B**, and the complete Amended Development Agreement is attached hereto as **Exhibit C**. *See also* City of La Quinta City Council Meeting Staff Report dated October 7, 2025 [D.I. 943-1] (the "**Council Meeting Report**"); Ex.

D to Council Meeting Report [D.I. 943-1] (containing a portion of the Amended Development Agreement).

Under the Amended Development Agreement, Phase 1A of the Project contemplated a single luxury resort with 154 rooms, a spa, banquet center/shared services building, a golf clubhouse, 70 branded condominiums and 29 branded residential lots. Phase 1B corresponded to the balance of the Real Property Assets, which consists of vacant land proposed for a total of 93 branded residential lots to be built in the future since such development was and is dependent upon the success of Phase 1A.

Under the Amended Development Agreement, the Buyer's plan, similar to the Debtor's prior plans, construction of Phase 1B was deferred and dependent upon the success of Phase 1A. Construction of the luxury hotel, the golf clubhouse and the branded condominiums in Phase 1A was to be completed approximately 36 months from the start of construction, with the completion of the branded residences in Phase 1A to take 84 months from the Start Date. The Amended Development Agreement further contemplates that the Phase 1B branded residences could not be deemed complete until at least half of the Phase 1A lots were completed, and that the Phase 1B branded residences were not anticipated to be completed until at least 96 months from the start of construction. *See* Exs. B and C attached hereto.

Leading up to the sale of the Real Property Assets and in connection therewith, the City commissioned an appraisal by Cushman & Wakefield dated October 7, 2025 with a date of value of July 1, 2025 (the "**CW Appraisal**"). *See* Poppy Objection at D.I. 939-1 (containing a copy of the CW Appraisal). The purpose of the CW Appraisal was to support the value of the Real Property Assets as of that time to validate the bids received by the Debtors (which were lower than what the parties anticipated at that time). In connection with the sale approval process, Cushman

testified as to the value of the Real Property Assets. Consistent with the applicable development agreement in place, the CW Appraisal provided a conclusion of value for Phase 1A ($55.1 million), a separate and much lower conclusion of value for Phase 1B ($16.6 million), and then an overall conclusion of value for the Real Property Assets ($71.7 million) based thereupon. The CW Appraisal found that 77% of the value of the Real Property Assets was consolidated in Phase 1A, with the value of Phase 1B making up a much smaller portion.

By order dated October 23, 2025 [D.I. 759] (the "**Sale Order**"), the Court authorized the Debtors to sell the Real Property Assets to the Buyer. The sale closed on December 8, 2025. Upon the closing of the sale, the Debtors' estates received over $61 million in net sale proceeds (the "**Sale Proceeds**"). Of the sales proceeds, after payment of certain closing costs and the then outstanding amount of debtor-in-possession financing the amount of $52,357,920.79 remained available to satisfy the claims of the lienholders.[3]

**B. The Poppy Loan**

Prior to the Petition Date, Poppy loaned SilverRock $40 million at an interest rate of 5% per annum on terms of a loan maturing November 1, 2024. The estimated balance remaining on the loan is approximately $34.8 million. To secure this loan, Poppy held a perfected deed of trust on certain of the Real Property Assets that are included in the Debtors' Phase 1A of the Project.

On June 16, 2025, Poppy filed Proof of Claim No. 49 to assert its secured claim.

Pursuant to the Sale Order, Poppy's lien attached to the Sale Proceeds.

[3] This amount was reduced due to malfeasance of the prior liquidating trustee James Wood. However, efforts are under way by the replacement liquidating trustee to recover these funds.

## C. Plan Confirmation and the Global Settlement

By Order entered on May 21, 2026 [D.I. 1152] (the "**Confirmation Order**"), the Court confirmed the *Second Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation of SilverRock Development Company, LLC and its Debtor Affiliates* (the "**Plan**"). The Plan went "effective" on June 5, 2026 [D. I. 1163].

The Plan included in its Exhibit A the *Global Plan Settlement Term Sheet* (the "**Global Settlement**") among the Debtors, the City, Poppy and the other parties claiming an interest in the Sale Proceeds (defined in the Global Settlement as the "**Settling Creditors**").

Importantly, the Global Settlement, which was expressly approved by the Confirmation Order (*see* Confirmation Order, ¶ 3), among other things, preserved the competing claims to the Sale Proceeds, as follows:

> All issues related to valuation and the allocation of proceeds of the Sale, as well as the priority, extent and validity of liens, claims and interests against the Debtors, their assets, and the Sale proceeds, including without limitation those of the Settling Creditors (the "Remaining Disputes"), shall be preserved and subject to determination by further order of the Court or as agreed between the creditors.
>
> The Sale proceeds, net of payments permitted to be made under the Sale Order, including U.S. Trustee Quarterly Fees, shall be disbursed to and held in a segregated interest-bearing account by the Litigation Trust for payment to creditors and SR Land II, LLC in its capacity as holder of the SR Land TIC Interest (as defined in the Allocation Motion), as determined by the Court or resolved among such parties; for the avoidance of doubt, all rights and arguments of any party or creditor, including the Settling Creditors, are reserved with regard to the Remaining Disputes and disbursement of the Sale Proceeds.

*See* Global Settlement, p. 2.

## D. The Debtors' Prior Valuation Motion

On March 24, 2026, the Debtors filed the *Debtors' Amended Motion for Entry of an Order (I) Determining the Value of the Secured Claims of Certain Creditors Pursuant to 11 U.S.C. 506(a) and Bankruptcy Rule 3012; (II) Establishing the Amount to be Paid on Account of SR Land's TIC*

*Interest; and (III) Granting Related Relief* [D.I. 913] (the "**Debtors' Allocation Motion**"). Attached to the Debtors' Allocation Motion at Exhibit B thereto [D.I. 913-3] was a statement by the Debtors that identified all of the parcels of the Real Property Assets and their acreage, among other things. Both Poppy [D.I. 939] and Builders [D.I. 943] filed objections to the Debtors' Allocation Motion. As reflected in these objections, both Poppy and Builders agreed with the CW Appraisal in its allocation of higher value to Phase 1A over Phase 1B.

For purposes of the instant Allocation Motion, Poppy has assumed the veracity of the identification of the parcels and their acreage only, as set forth in Exhibit B to the Debtors' Allocation Motion [D.I. 913-3]. Poppy and the other creditors dispute the respective validity, extent and priority of the alleged creditor liens as it relates to these parcels, which disputes are subject to separate adversary proceedings and are outside the scope of the current Allocation Motion.

**E. The Allocation Motion and the Briefing Schedule**

Consistent with the Scheduling Order, Poppy shared expert reports from HVS Consulting and Valuation ("**HVS**"), Moeder Advisors ("**Moeder**"), The Cumming Group, and J.S. Held. Builders likewise shared an expert report from Marc Dunec of FTI Consulting ("**Dunec**"). Rebuttal reports were furnished by HVS and Moeder for Poppy, and Dunec for Builders. No other parties identified experts or shared expert reports.

HVS is a global consulting firm focused exclusively on the hospitality industry. HVS' work is focused on providing consulting and valuation services for hotels and resorts which consists of the preparation of appraisals and market and financial feasibility studies. HVS' John Lancet (who will provide testimony in this case), has appraised and/or consulted on more than 1,500 hotels and resorts, and shared ownership developments. HVS' experience includes

consulting and valuation work for a significant number of mixed-use resorts. Mr. Lancet has served as an expert witness on various occasions and was a contributing author to the Urban Land Institute's Resort Development Handbook 2nd Edition.

A copy of the restricted appraisal provided by HVS is attached hereto as **Exhibit D**.

Poppy also designated Moeder as an expert. Moeder provides business and asset valuation services to developers and investors, particularly for real estate development projects and investments. Unlike an appraiser, Moeder typically works with developers, buyers, investors and lenders to assess market conditions, feasibility, profitability and supportable value based on project costs and revenues, entitlements, zoning and applicable policies. Appraisers often use Nathan Moeder's analysis to assess feasibility and understand how buyers and developers approach property value. His experience also includes valuation methodologies and reviewing contracts, partnership agreements, corporate and accounting records, and transaction documents affecting real estate and ownership interests. Moeder has taught real estate courses since 2000 and, for the past nine years, has taught Finance & Investments and the development process at UC San Diego.

A copy of Moeder's expert report in this case is attached hereto as **Exhibit E**.

The experts of both Poppy and Builders were deposed upon their expert reports and rebuttal reports, as applicable, and all parties had the opportunity to attend and participate in such depositions.

## ARGUMENT

### A. Section 506(a) Focuses on Intended Use

Under section 506(a)(1) of the Bankruptcy Code, a secured creditor's claim "is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property," and the secured value must "be determined in light of the purpose of the valuation and of the

proposed disposition or use of such property." *See* 11 U.S.C. § 506(a)(1). Indeed, per the clear language of the statute, the proposed disposition or use of collateral is of paramount importance to the valuation question. *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 962 (1997); *see also In re Museum of Am. Jewish Hist.,* No. BR 20-11285-MDC, 2020 WL 7786925, at *18 (Bankr. E.D. Pa. Dec. 4, 2020) (explaining that debtor's intended use of the collateral is determinative of the approach to value courts must take in § 506(a) proceedings).

Though the statute requires that collateral be valued, it does not specify the appropriate valuation standard; rather, Congress envisioned a flexible approach whereby bankruptcy courts would choose the standard that best fits the circumstances of a particular case. *In re Heritage Highgate, Inc.*, 679 F.3d 132, 141 (3d Cir. 2012); *see also Rash*, 520 U.S. at 961 (explaining that section 506(a)'s direction to consider the value of such creditor's interest "does not expressly reveal how that interest is to be valued"). In determining the value of a secured claim, courts have generally found that the fair market value of the collateral is the appropriate measure under section 506(a). *See In re Heritage Highgate*, 679 F.3d at 142 ("The proper measure under § 506(a) must therefore be the collateral's fair market value because it is most respectful of the property's anticipated use."); *see also In re SubMicron Sys. Corp.*, 432 F.3d 448, 461 (3d Cir. 2006) ("[T]he market's reaction to a sale best reflects the economic realities of assets' worth.").

As such, where property has been sold, the sale itself is evidence of value. *See Polk Lending 33, LLC v. THL Corporate Fin., Inc. (In re Aerogroup Int'l, Inc.)*, 601 B.R. 571, 590-591 (Bankr. D. Del. 2019) (stating that the auction result set the value of the collateral); *see also* Collier on Bankr. ¶ 506.03[6][b] (16th ed. rev. Alan N. Resnick & Henry J. Somer eds.) ("[R]egardless of the purposes of the valuation, if an actual sale (or equivalent disposition) is to occur, the value of

the collateral should be based on the consideration to be received by the estate in connection with the sale[.]").

While the purchase price for encumbered assets such as the Real Property Assets establishes the *aggregate* value of the collateral, the allocation of sale proceeds among lienholders is a separate question. *See In re Aerogroup Int'l, Inc.*, 601 B.R. at 591 ("The auction result set the value of the collateral, and the issue now before me is to determine the appropriate allocation of those Sale Proceeds.").

"[F]ew cases deal with valuation in the allocation context." *In re LTV Steel Co., Inc.*, 285 B.R. 259, 266 (Bankr. N.D. Ohio 2002) (explaining that there is no "standard operating procedure" when it comes to allocation of value among assets). The decision of the United States Bankruptcy Court for the Northern District of Ohio in *LTV Steel*, however, is instructive.

In *LTV Steel*, the Court determined the allocation of cash proceeds resulting from a sale of several assets sold as one unit. *Id.* at 261. Similar to the present case, individual assets were secured by different creditors, each with "claims of unique priority." *Id.* The Court was thus charged with determining the value of each asset and allocating sale proceeds between the individual assets. *Id.* at 267 (explaining that when several assets are sold as one unit, courts determine the value of each asset based on "competent evidence," which may be determined through "various methods").

In its ruling, the Court assigned values to the debtors' integrated steel assets after considering expert testimony concerning the appropriate methodologies to value those assets based on the unique circumstances of each asset. *See id.* at 271-78 (considering, *inter alia,* whether the facilities at issue were steel producing, whether there were environmental liabilities, whether bids were received for the facilities in connection with the sale process, among other factors). The

Court then concluded that proceeds would be distributed to certain of the assets pro rata "based upon the asset's percentage of the total [sale] proceeds." *Id.* at 278. Thus, *LTV Steel* demonstrates that valuation in the allocation context requires consideration of the features of each asset, including their intended uses.

**B. Poppy's Position Regarding Allocation of Value Among the Real Property Assets**

As will be established at the Hearing, HVS provided an appraisal of the Real Property Assets as of October 23, 2025, the date of the Sale Order, finding that the combined total value of the Real Estate Assets was $65,100,000. Of that, HVS found that Phase 1A was 86% of that value and Phase 1B was 14% of that value.

Applying the HVS appraisal to the Sale Proceeds, the value of the Real Property Assets should be allocated as between Phase 1A and Phase 1B, with Phase 1A representing 86% of the value of the Real Property Assets and Phase 1B representing 14% of such value, as follows:

| | | | | | | Value per Acre | |
|---|---|---|---|---|---|---|---|
| | Appraisal Value @ 10/23/25 | Percent of Total | Sales Proceeds (1) | Allocation of Sales Proceeds (1) | Acreage | Appraised Value / Acre | Allocation of Sales Proceeds / Acre (1) |
| Phase 1A | $ 55,900,000.00 | 85.87% | $ 52,357,920.79 | $ 44,958,644.73 | 66.380 | $ 842,121.12 | $ 677,292.03 |
| Phase 1B | $ 9,200,000.00 | 14.13% | $ 52,357,920.79 | $ 7,399,276.06 | 61.530 | $ 149,520.56 | $ 120,254.77 |
| **Total** | **$ 65,100,000.00** | **100.00%** | | **$ 52,357,920.79** | **127.910** | | |

Note: (1) This was the original amount available and is subject to proof at the hearing; to the extent that the available proceeds is different, then all numbers will change accordingly.

Because HVS made a single conclusion of value for all of Phase 1A, each acre should be treated the same within Phase 1A. Likewise, because HVS made a single conclusion of value for all of Phase 1B, each acre should be treated the same within Phase 1B. As discussed below, this

is different from the "Acreage Only" approach previously advocated by the Debtors, which sought to treat every acre the same within all of Phase 1.

Attached hereto as **Exhibit F** is a demonstrative showing how Poppy's proposed allocation should be applied to each of the parcels identified by the Debtors based upon the Debtors' prior identification of the parcels and their acreage in Exhibit B to the Debtors' Allocation Motion [D.I. 913-3].

## C. The Experts Agree that Phase 1A is More Valuable Than Phase 1B and that the Highest and Best Use of the Real Estate Assets is Dictated by the Amended Development Agreement

As noted above, only Poppy and Builders designated experts with respect to the Motion and provided expert reports. While there are key disagreements among the experts, there are also areas in which the experts agree and thus are undisputed in connection with the Allocation Motion and should be treated as undisputed facts.

First, all of the experts agree that Phase 1A is considerably more valuable than Phase 1B. Poppy's expert HVS states in its appraisal that the value of Phase 1A represents 86% of the value of the Real Property Assets. The Moeder expert report further supports that a developer/buyer would allocate considerably more value to Phase 1A. This is consistent with both Builders' expert Dunec and the CW Appraisal who both found that the value of the Real Property Assets lie overwhelmingly and substantially within Phase 1A.[4] No other party identified experts to provide any other contrary opinion.

[4] Note that the Phase 1A in the CW Appraisal was the Debtors' plan, whereas the Phase 1A identified in the Poppy and Builders' expert reports is based upon the Buyer's plan. However, there is not a significant difference other than that the Buyer's plan moved several acres from Phase 1A to Phase 1B. Thus, the version of Phase 1A that the CW Appraisal analyzed was a larger Phase 1A than the ultimate Phase 1A of the Buyer's plan. Both HVS and Dunec based their Phase 1A off of the Buyer's plan rather than the Debtors' plan.

Second, all of the experts agree that the highest and best use of the Real Property Assets is dictated by the Amended Development Agreement. As set forth below, Poppy contends that Builders' expert did not fully consider all aspects of the Amended Development Agreement and thus came to incorrect conclusions where the expert reports differed. That aside, however, all experts agree that highest and best use is fundamentally aligned with and dictated by the Amended Development Agreement.

Third, all of the experts agree that the Buyer's plan is not dissimilar to the Debtor's plan since both are consistent with the PSDA and Amended Development Agreement, which are consistent with each other. The differences between the Debtors' plan and the Buyers' plan were that the Buyer's plan would have only a single luxury hotel instead of two, and a portion of land that had been part of the Debtors' Phase 1A was deferred to and included in the Buyer's Phase 1B instead. *See* Exhibit A hereto. (Both HVS and Dunec identified Phase 1A and Phase 1B based upon the Buyer's plan set forth in the Amended Development Agreement.)

Fourth, both HVS and Dunec utilized October 23, 2025 as the operative date of valuation for their appraisals.

**D. The Real Property Assets Consisted of Two Projects: Phase 1A and Phase 1B**

Like the Debtors' prior plan, there is no question that the Amended Development Agreement provides for essentially two fundamentally different projects, and splits the Real Property Assets into a Phase 1A to be built first (including the hotel, hotel support buildings, hotel amenities and branded residences), and a Phase 1B (consisting of only subsequent residences) to be built later. Entitlements are to be processed separately for Phase 1A and Phase 1B, and the Buyer is required to report to the City with respect to each separate phase on a phase-by-phase basis. *See, e.g.*, Ex. B and C, Amended Development Agreement.

The Amended Development Agreement provides that Phase 1A and Phase 1B shall have separate financing plans such that Phase 1A shall be financed and constructed as one economic unit, whereas, Phase 1B shall be financed and constructed separately as a different economic unit. *Id*.

All of Phase 1A is subject to a single Certificate of Completion to be issued by the City, which is separate from the Certificate of Completion for Phase 1B. The Amended Development Agreement dictates that the Buyer cannot obtain a Certificate of Completion for Phase 1B until at least half of the branded residences on Phase 1A have been built. *See id*.

**E. The Highest and Best Use Depends Upon the Luxury Hotel**

All of the experts agree that the highest and best use of the Real Property Assets is dependent upon the uses set forth in the Amended Development Agreement.

The only expert that provided a proper highest and best use analysis was HVS, on behalf of Poppy Bank. Builders' expert, Dunec, merely adopted the Amended Development Agreement without performing any financial feasibility test. By contrast, HVS performed a financial feasibility test, which demonstrated that the viability of all of the projects, i.e. both Phase 1A and Phase 1B, depends upon the luxury hotel, including the hotel itself, the associated Transient Occupancy Tax ("**TOT**"), the hotel amenities and the hotel branding from which all of the other uses within Phase 1A derive their value.

Indeed, and as will be established at the Hearing, without the $106 million TOT over 15 years, the net present value of which is $62 million pursuant to the HVS Appraisal (*see* Ex. D hereto), the Real Property Assets would substantially lose their value. Moreover, without the $62 million TOT, the appraised value of the Real Property Assets would have never supported the sales price.

The City's records and Amended Development Agreement recognize that the Project's existence is dependent upon the economic subsidies made available by the City, including the $106 million TOT. *See* Council Meeting Report [D.I. 943-1, p. 2] ("The City has agreed that incentives are required to assure the successful completion of development and long-term economic viability of the project…" and identifying the TOT as one of the primary subsidies: "A Transient Occupancy Tax revenue sharing agreement whereby an amount equal to 90% of TOT collected on a portion of the project site will be used as a basis for providing 'rebate' payments to the developer for 10 years, and equal to 60% of TOT collected on a portion of the project site for the following 5 years, after which time all TOT revenue sharing with the developer will expire.") A copy of the City's Economic Subsidy Report supporting the TOT is attached hereto as **Exhibit G**. Without the TOT, the sales proceed would not have been realized. Without the luxury hotel, there would have been no TOT.

Moreover, without the luxury hotel, there could have been no branded residences and other amenities that drive the value of the Real Property Assets. The Amended Development Agreement clearly requires the residential components to be hotel-branded residences and to share in the luxury hotel amenities. *See, e.g.*, Excerpts of Amended Development Agreement set forth at Exhibit B hereto. Without the hotel branding and amenities, as mere residences (as opposed to branded residences), they would lose substantial value. The strategy embodied in the Amended Development Agreement by both the Debtors and the Buyer is to create exclusivity to the residences by making them branded while also providing luxury resort amenities to increase their value. Without the luxury hotel, the residential components would have substantially less value.

**F. There is No Question that More Value Must Be Allocated to Phase 1A than to Phase 1B**

Consistent with all of the expert opinions, there is no question that considerably more value must be allocated to Phase 1A than to Phase 1B of the Real Property Assets due to the timing of the phases and the time value of money. A developer/buyer of such assets views the allocation of value in accordance with the time value of money as set forth herein. This is also consistent with the approach taken by the Buyer and as set forth in the CW Appraisal – in addition to Poppy's experts.

The value primarily supporting the sales price consisted of Phase 1A parcels because those were the only parcels that were immediately developable. As of the Petition Date, development in fact had only started on Phase 1A accordingly.

A fundamental precept of real estate valuation is that land value is derived from its capacity to generate income or proceeds, combined with the timing of such revenue and market support for specific uses. For example, land that will generate revenue in Year 1 is more valuable than land that will generate revenue years later. The reason for this is that development opportunities further into the future, or those that take longer to develop and sell or stabilize operations, are subject to higher holding costs such as the cost of equity or debt financing. There are also property taxes, insurance and the potential interruption of development due to market cycles that could extend the development timeframe and further increase carrying costs of the project.

In addition, the longer the development period, the higher the construction costs which could impact feasibility. Indeed, a buyer of Phase 1B, such as the Buyer here, would have carrying costs that would reduce the land value of Phase 1B because it represents a development opportunity later in the future (with prolonged equity and debt financing costs, property taxes, insurance,

higher construction costs, etc.). At the time of the sale, there was no immediate opportunity to develop Phase 1B.

Whether one looks at the Debtors' development plan, or what can reasonably be discerned as the Buyer's development plan, the improvements in Phase 1A represent commercial (hotel and hotel related structures), and branded residential improvements that are tied to the hotel improvements and derive their value from the hotel. In contrast, the improvements in Phase 1B represent purely residential improvements with no amenities of their own, which, as noted above, are dependent upon completion of the Phase 1A improvements.

Poppy's experts found that the residential components with Phase 1B are inferior because they are further away from the foothills and hotel amenities, offer fewer golf course-frontage lots, and are in a more dense housing development and less exclusive than those found in Phase 1A.

As set forth in the expert opinions of Poppy's expert Moeder, and as will be established at the Hearing, no developer would purchase the Real Property Assets based upon Phase 1B. Instead, a real estate developer would allocate substantially all of the value for the purchase price to Phase 1A.

This appears to be consistent with what the Buyer in fact did in the present case. That is, although the Buyer did not separate out or separately allocate the purchase price at the time of sale, the value of Phase 1A primarily drove the purchase price and created the value of the Real Property Assets, which supported the Buyer's purchase price. Thus, based on the foregoing, it is clear that the parcels in Phase 1A are more valuable than the parcels in Phase 1B.

### G. It Would Be Error to Adopt the Debtor's Prior Proposed Valuation Methodology, which Treated Every Acre Across Phase 1A and Phase 1B the Same

In connection with the Debtor's Valuation Motion, the Debtor previously proposed that every acre within the entire Phase 1 – without regard to 1A or 1B – should be the same (the

"**Acreage Only Methodology**"). It is believed that one or more creditors may advance a similar theory in responding to the current Allocation Motion.

Applying the Debtors' Acreage Only Methodology – which provides no difference between Phase 1A and Phase 1B – would be error because it is contrary to the Amended Development Agreement, which clearly shows that there were, at all times, two different projects and fundamentally different assets – Phase 1A and Phase 1B – and that they were phased such that Phase 1B was to be completed later and only after the success of Phase 1A. The luxury hotel of Phase 1A is the driver of all of the success of all improvements, which are reliant upon the TOT. Because of the time value of money, it would be in error to apply the same value to the later-in-time Phase 1B portions of the Real Property Assets.[5]

**H. The Valuation by Builders/Dunec is Incorrect and Inconsistent with Builders' Prior Pleadings**

The approach taken by Builders and Dunec is to arbitrarily separate the Real Property Assets into six different "Subject Properties." However, there is neither any legal nor factual support for applying different valuations to these six different "Subject Properties." The approach is further contrary to both the Amended Development Agreement and to the statement by the Buyer [D.I. 721] about how it valued the Real Estate Assets, and is also contrary to the entire sale process since the different components of the Real Property Assets were not sold separately at the Sale. Phase 1A must be considered a single economic unit for purposes of allocation of value also

[5] The Debtors' Acreage Only Methodology is not to be confused with Poppy's position. Poppy's position is fundamentally that Phase 1A is distinct from Phase 1B. The Debtors' Acreage Only Methodology combines Phase 1A and Phase 1B into a single Phase 1 and treats them the same. Poppy's allocation separates Phase 1A and Phase 1B and gives them separate allocations of the net sales proceeds. Poppy does treat all acreage within Phase 1A the same, and it treats all acreage within Phase 1B the same, but Phase 1A and Phase 1B are different.

because a potential buyer would not purchase its components separately but would value it as one economic unit.

The Amended Development Agreement did not separate the Real Property Assets into six different Subject Properties. These six categories are completely of Dunec's own making, and in his deposition, he could not even identify the differences between his Subject Property 4 and 5 (both of which are in Phase 1B).

Builders' expert Dunec further admitted that, in his valuation, when he separated out the residential components from the hotel, he did not take into account the fact that the residential properties must be "branded" with the luxury resort hotel branding and that such residences would be provided access to amenities from the luxury hotel resort. This is inconsistent with the Amended Development Agreement, which clearly provides that the residential components would be and are branded residences and would enjoy the amenities of the luxury resort hotel. Dunec similarly testified that he did not take into account any adjustments in value to the component parts or his Subject Properties in order to "pay" for the hotel branding and amenities, which is error because it is impossible to analyze the Phase 1A residences in a vacuum as Dunec did without accounting for how some of their value must be allocated back to the luxury hotel on account of the branding and use of amenities by residents.

The Amended Development Agreement provides very little leeway for the developer to make any changes to the Phase 1A and Phase 1B projects. Only "minor changes" are allowed by the City and all other changes must be approved by the City. Further, Dunec could not identify any prior experience appraising a luxury resort hotel with branded residences. Therefore, Dunec's separate appraisal of the six Subject Properties should be disregarded as unreliable.

Dunec further applied the incorrect appraisal approach and should have applied the income capitalization approach, which is the approach that a real estate developer of such an asset would rely upon. Instead, Dunec improperly utilized the sales comparison and cost approaches. Additionally, there are issues with respect to the sales comparable properties that Dunec utilized as well as other issues including incorrect assumptions about whether the residential improvements on Phase 1A could be utilized or would be demolished. The foregoing is not a complete statement of every error made by Dunec. Poppy reserves the right to provide further objections and responses to the Dunec appraisal, methodologies and assumptions.

Finally, Builders' submission of the Dunec opinion is contrary to Builders' prior admissions in this case that the approach taken by the CW Appraisal is proper. The CW Appraisal, similar to the HVS appraisal and Moeder opinions, supports that value should be allocated only as between Phase 1A and Phase 1B, but that it would be improper and contrary to the Amended Development Agreement to separately allocate a conclusion of value to the separate components within either.

[remainder of page left intentionally blank]

## CONCLUSION

For the foregoing reasons, Poppy respectfully submits that the net sales proceeds should be allocated 86% to Phase 1A and 14% to Phase 1B according to the HVS restricted appraisal, and that the allocation set forth on **Exhibit F** hereto should be adopted by Order of the Court.

Dated: November 9, 2026

**SAUL EWING LLP**

By: */s/ Mark Minuti*
Mark Minuti (DE No. 2659)
Monique B. DiSabatino (DE No. 6027)
1201 North Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6800
Email: mark.minuti@saul.com
monique.disabatino@saul.com

-and-

**ABBEY, WEITZENBERG, WARREN & EMERY**
Mitchell B. Greenberg (admitted *pro hac vice*)
100 Stony Point Rd., Suite 200
Santa Rosa, CA 95401
Telephone: (707) 542-5050
Email: mgreenberg@abbeylaw.com

-and-

**STOEL RIVES LLP**
John S. Kaplan (*pro hac vice* to be filed)
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: (206) 386-7524
Email: john.kaplan@stoel.com

-and-

Kirsten Worley (*pro hac vice* to be filed)
501 West Broadway, Suite 2000
San Diego, CA 92101
Telephone: (858) 602-4909
Email: kirsten.worley@stoel.com

*Counsel to Poppy Bank*