# EXHIBIT C

## Complete Amended Development Agreement

# ORDINANCE NO. 626

**AN ORDINANCE OF THE CITY COUNCIL OF THE CITY OF LA QUINTA, CALIFORNIA, CONDITIONALLY ADOPTING A REINSTATED AND AMENDED DEVELOPMENT AGREEMENT FOR THE SILVERROCK RESORT**

**CASE NUMBER:**
**DEVELOPMENT AGREEMENT 2025-0001**
**(REINSTATED AND AMENDED DEVELOPMENT AGREEMENT 2014-1001)**

**PROJECT: SILVERROCK RESORT**

**APPLICANT: TBE RE ACQUISITION CO II LLC**
**(SUBSIDIARY OF TURNBRIDGE EQUITIES)**

**WHEREAS,** the City Council of the City of La Quinta, California, did, on September 22, 2025, hold a duly noticed Public Hearing to consider a request by TBE RE Acquisition Co II LLC., subsidiary of Turnbridge Equities, for approval of a Reinstated and Amended Development Agreement ("Development Agreement" or "ADA") and associated documents and agreements for the SilverRock Resort (2025 SilverRock Master Plan), relating to real property south of Avenue 52, west of Jefferson Street, with Assessor Parcel Numbers:

APNs: 770-260-037; 776-150-029, -030; 777-060-008, -010, -011, -019, -020, -062, -070, -071, -072, -074, -075, -078, -079, -080, -081, -082, -083, -084, -085; 777-490-023, -024, -035, -037, -039, -042, -046, -047, -048, -049, -050, -053, -054, -055, -057, -058, -059, -060, -061, -062, -063, -064, -065, -066, -067, -068, -069, -070, -071, -072, -073, -074, -075, -076, -077, -078, -079, -080; 777-510-001, -002, -003, -004, -005, -006, -007, -008, -009, -010, -011, -012, -013, -014, -015, -016, -017, -018, -019, -020, -021, -022, -023, -024, -025; 777-520-001, -002, -003, -004, -005, -006, -007, -008, -009, -010, -011, -012, -013, -014, -015, -016, -017, -018

**WHEREAS,** the Design and Development Department published a public hearing notice in The Desert Sun newspaper on September 11, 2025, as prescribed by State law and the La Quinta Municipal Code. Public hearing notices were also mailed to all property owners within 500 feet of the site and emailed or mailed to all interested parties who have requested notification relating to the project; and

**WHEREAS,** the Planning Commission of the City of La Quinta, California, did adopt Planning Commission Resolution 2025-008 recommending City Council approval of the Development Agreement at a duly noticed Public Hearing on September 9, 2025; and

**WHEREAS,** said Development Agreement has complied with the requirements of "The Rules to Implement the California Environmental Quality Act of 1970" (CEQA) as amended (Resolution 1983-68). The City prepared an Addendum to Environmental

Assessment 2002-453. The City Council has adopted Resolution 2025-022 approving the Addendum; and

**WHEREAS,** California Government Code Section 65864 *et seq*. (the "Development Agreement Law") authorizes cities to enter into binding development agreements with persons having a legal or equitable interest in real property for the development of such property, all for the purpose of strengthening the public planning process, encouraging private participation and comprehensive planning, and identifying the economic costs of such development; and

**WHEREAS**, the sale to the applicant of the Phase 1 Property, as described in the Development Agreement, is contingent on the U.S. Bankruptcy Court for the District of Delaware authorizing said sale, in connection with the following bankruptcy petitions: SilverRock Development Company, LLC (5730), RGC PA 789, LLC (5996), SilverRock Lifestyle Residences, LLC (0721), SilverRock Lodging, LLC (4493), SilverRock Luxury Residences, LLC (6598) and SilverRock Phase I, LLC (2247) (collectively, referred to as the “Bankruptcy Lawsuit” in the “Bankruptcy Court”). As such, the approval of the Development Agreement is subject to the condition that the Bankruptcy Court authorize the sale of the Phase 1 Property to the applicant; and

**WHEREAS,** at the City Council’s Public Hearing, upon hearing and considering all testimony and arguments, if any, of all interested persons desiring to be heard, the City Council did make the following mandatory findings pursuant to Section 9.250.020 of the La Quinta Municipal Code to justify approval of said Development Agreement, attached to this Ordinance as “Exhibit A,” and incorporated herewith by this reference:

1. The Development Agreement is consistent with the applicable objectives, policies, general land uses, and programs of the La Quinta General Plan as follows:

| | |
|---|---|
| GOAL LU-2 | High quality design that complements and enhances the City. |
| Policy LU-2.1 | Changes and variations from the Zoning Ordinance in a Specific Plan will be offset by high quality design, amenities, and mix of land uses. |
| Policy LU-2.2 | Specific Plans shall be required for projects proposing the integration of recreation, tourist commercial, and residential uses; and for all projects proposing flexible development standards that differ from the Zoning Ordinance. |

The proposed project continues the SilverRock Specific Plan development and includes elements of recreation, tourist commercial, and residential uses to provide a high quality project consistent with the General Plan and SilverRock Specific Plan.

GOAL LU-6 A balanced and varied economic base which provides a broad range of goods and services to the City's residents and the region.

Policy LU-6.3 Support and encourage the expansion of the resort industry as a key component of the City's economic base.

The proposed project continues the development of the SilverRock Specific Plan area as a resort development to support the City's economic base.

2. The Development Agreement is compatible with the uses authorized and the regulations prescribed for the SilverRock Specific Plan (SP2006-080) in which the real property is located. The Specific Plan provides for the development of resort, resort residential, and residential uses around the existing golf course. The Specific Plan requires the implementation of high quality development and design standards, and the continued expansion of the City's luxury resort economic sector. The Development Agreement helps implement the Specific Plan.

3. The Development Agreement is in conformity with the public necessity, public convenience, general welfare, and good land use practices. The land uses proposed are consistent with the country club developments that already occur in the area, and will provide for the continued use of the golf course for the residents and visitors of La Quinta. The project will generate revenues to the City, and as a self-contained community, will not directly impact surrounding land uses. The development of the resort and residential uses within the golf course area provides a buffer from surrounding land uses and assures that development intensities will not be exceeded.

4. The Development Agreement will not be detrimental to the health, safety, and general welfare. The development of resort and residential uses within the golf course area assures that the community will be self-contained and will implement infrastructure extensions that are independent of those of surrounding development. The Development Agreement also includes and requires mitigation measures to protect the environment and public health, both within and surrounding the project area.

5. The Development Agreement will not adversely affect the orderly development of property or the preservation of property values because the development planned in the Specific Plan area is consistent with the long-term plans for this property and expands residential and resort opportunities in the City.

6. The Development Agreement will have a positive fiscal impact on the City in that implementation of the Development Agreement will produce revenues, including property tax, sales tax, and transient occupancy tax for the long-term fiscal benefit of the City.

**WHEREAS,** the City Council has separately adopted Resolution 2025-023, conditionally approving the Economic Development Subsidy Report, Transient Occupancy Tax (TOT) Revenue Sharing Agreement, and the Option to Purchase Real Property Agreement which includes a Repurchase Option for Phase 2 Option Property, subject to the conditions that: (a) the Bankruptcy Court authorizes the sale of the Phase 1 Property to the applicant, and (b) the City Council adopts this Ordinance and the Ordinance becomes effective. The Economic Development Subsidy Report is applicable to this Development Agreement to the extent the economic subsidies and financial incentives, the explanations and supporting evidence for the subsidies and incentives therein, and the findings therein, are to be implemented with the approval of the Development Agreement.

**NOW, THEREFORE,** the City Council of the City of La Quinta does ordain as follows:

SECTION 1. **FINDINGS FOR APPROVAL.** The above recitations are true and constitute the Findings of the City Council.

SECTION 2. **CONDITIONAL APPROVAL**. The City Council hereby approves and incorporates herein by this reference Development Agreement 2025-0001 (Reinstated and Amended Development Agreement 2014-1001), "Exhibit A" attached hereto, by the adoption of this Ordinance, with said approval subject to the condition that the Bankruptcy Court authorizes the sale of the Phase 1 Property to the applicant. If the Bankruptcy Court does not authorize the sale of the Phase 1 Property to the applicant, this Ordinance shall automatically be rescinded, without the requirement for further action by the City Council, and the conditional approval set forth herein shall be of no force and effect.

SECTION 3. **SIGNING AUTHORITY**. Subject to the Bankruptcy Court authorizing the sale of the Phase 1 Property to the applicant, the City Council authorizes the City Manager to execute Development Agreement 2025-0001 (Reinstated and Amended Development Agreement 2014-1001) in substantially the form presented to the City Council with the adoption of this Ordinance.

SECTION 4. **EFFECTIVE DATE:** This Ordinance shall be in full force and effect thirty (30) days after its adoption.

SECTION 5. **POSTING:** The City Clerk shall, within 15 days after passage of this Ordinance, cause it to be posted in at least three public places designated by resolution of the City Council (Resolution No. 2022-027), shall certify to the adoption and posting of this Ordinance, and shall cause this Ordinance and its certification, together with proof of posting to be entered into the permanent record of Ordinances of the City of La Quinta.

SECTION 6. **CORRECTIVE AMENDMENTS**: The City Council does hereby grant the City Clerk the ability (a) to make any corrections that may be required by a title officer or escrow officer in connection with the legal descriptions for the real property described in

"Exhibit A", and (b) to make minor amendments and corrections of typographical or clerical errors to "Exhibit A" to ensure consistency of all approved text amendments prior to the publication in the La Quinta Municipal Code.

SECTION 7. **SEVERABILITY:** If any section, subsection, subdivision, sentence, clause, phrase, or portion of this Ordinance is, for any reason, held to be invalid or unconstitutional by the decision of any court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this Ordinance. The City Council hereby declares that it would have adopted this Ordinance and each and every section, subsection, subdivision, sentence, clause, phrase, or portion thereof, irrespective of the fact that any one or more section, subsections, subdivisions, sentences, clauses, phrases, or portions thereof be declared unconstitutional.

**PASSED, APPROVED** and **ADOPTED**, at a regular meeting of the La Quinta City Council held this 7th day of October 2025, by the following vote:

**AYES:** **Councilmembers Fitzpatrick, McGarrey, Peña, Sanchez, and Mayor Evans**

**NOES:** **None**

**ABSENT:** **None**

**ABSTAIN:** **None**

LINDA EVANS, Mayor
City of La Quinta, California

**ATTEST:**

MONIKA RADEVA, City Clerk
City of La Quinta, California

**APPROVED AS TO FORM:**

WILLIAM H. IHRKE, City Attorney
City of La Quinta, California

Recording requested by
Stewart Title of California, Inc.

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO

City of La Quinta
78-495 Calle Tampico
La Quinta, CA 92253
Attn: City Clerk

2025-0382829
12/09/2025 03:47 PM Fee: $ 0.00
Page 1 of 250
Recorded in Official Records
County of Riverside
Peter Aldana
Assessor-County Clerk-Recorder

1032

Order No. 2664882

Space Above This Line for Recorder's Use
(Exempt from Recording Fee per Gov't Code §6103 and §27383)

# REINSTATED AND AMENDED DEVELOPMENT AGREEMENT BY AND BETWEEN

# THE

# CITY OF LA QUINTA

# AND

# TBE RE ACQUISITION CO II LLC
# AN AFFILIATE OF
# TURNBRIDGE EQUITIES

Recorded concurrently and in connection
with a transfer subject to the imposition of
Documentary Transfer Tax - GC 27388.1(a)(2)

698/015610-0207
22795466.2 a11/22/25

# TABLE OF CONTENTS

Page


1. GENERAL ..... 7
    - 1.1 Definitions ..... 7
    - 1.2 Term ..... 23
    - 1.3 Development Agreement Effective Date ..... 24
    - 1.4 Termination of this Agreement ..... 24
    - 1.5 Statement of Benefits and Consideration ..... 25
    - 1.6 City CEQA Findings ..... 25
    - 1.7 Consistency with SilverRock Specific Plan Authority for Location and Alignment of Planning Areas ..... 26

2. AGREEMENTS AND ASSURANCES ..... 26
    - 2.1 Agreement and Assurance on the Part of Developer ..... 26
    - 2.2 Agreement and Assurances on the Part of City ..... 29

3. DEVELOPMENT OF THE PROJECT ..... 31
    - 3.1 Generally ..... 31
    - 3.2 Construction Provisions ..... 34
    - 3.3 Costs of Construction ..... 39
    - 3.4 Completion of Construction ..... 41
    - 3.5 Planned Development and CC&Rs ..... 43
    - 3.6 Dedications and Improvements ..... 44
    - 3.7 Posting Payment and Performance Bonds ..... 45
    - 3.8 Regular Updates to City on Development of the Project ..... 45
    - 3.9 Indemnification ..... 46
    - 3.10 Insurance ..... 49

4. FINANCING THE PROJECT ..... 51
    - 4.1 Developer To Pay All Costs and Expenses for the Project ..... 51
    - 4.2 Submittal of Final Project Budget ..... 51
    - 4.3 City Approval for Financing and Investment in the Project Components ..... 52
    - 4.4 City Financial Assistance ..... 57

5. AUTHORIZED USES AND OPERATIONS ON THE PROPERTY ..... 58
    - 5.1 General Obligation for Developer and Successors and Assigns ..... 58
    - 5.2 Short-Term Vacation Rentals/Transient Occupancy Taxes ..... 60
    - 5.3 Maintenance Covenants ..... 64
    - 5.4 Obligation to Refrain from Discrimination ..... 64

6. POTENTIAL CONDITIONAL TRANSFERS OF CITY-OWNED PROPERTIES ..... 65
    - 6.1 City-Owned Golf Course Property and Ahmanson Ranch Property ..... 66
    - 6.2 City-Owned Option Property ..... 70

7. CITY'S OBLIGATIONS ..... 71
    - 7.1 Scope of Subsequent Review/Confirmation of Compliance Process ..... 71

TABLE OF CONTENTS

Page

7.2 Project Approvals Independent ..... 71
7.3 Review for Compliance ..... 71

8. DEFAULT; REMEDIES; DISPUTE RESOLUTION; TERMINATION ..... 72
8.1 Default and Cure ..... 72
8.2 Termination of Agreement ..... 74
8.3 City Remedies ..... 74
8.4 Developer Remedies ..... 75
8.5 Legal Actions and Litigation ..... 76

9. MORTGAGEE PROTECTION; CERTAIN RIGHTS OF CURE ..... 78
9.1 Liens Recorded Against the Property and Project ..... 78
9.2 Mortgagee Protection ..... 78
9.3 Mortgagee Obligations and Relief Therefrom ..... 79

10. TRANSFERS OF INTEREST IN PROPERTY, PROJECT, OR AGREEMENT ..... 79
10.1 Developer Unique and Material Term to this Agreement ..... 79
10.2 Transfers Generally Prohibited Without Prior City Approval ..... 79
10.3 Successors and Assigns ..... 82
10.4 Developer Entities Documentation and Permitted Affiliate Assignees ..... 82
10.5 Assignment by City ..... 83

11. MISCELLANEOUS ..... 83
11.1 Notices, Demands and Communications Between the Parties ..... 83
11.2 Force Majeure ..... 85
11.3 Binding Effect ..... 85
11.4 Independent Entity ..... 85
11.5 Agreement Not to Benefit Third Parties ..... 85
11.6 Covenants ..... 86
11.7 Non-liability of City Officers and Employees ..... 86
11.8 Amendments or Modifications of Agreement ..... 86
11.9 Amendment or Cancellation by Mutual Consent ..... 87
11.10 No Waiver ..... 87
11.11 Severability ..... 87
11.12 Cooperation in Carrying Out Agreement ..... 88
11.13 Estoppel Certificate ..... 88
11.14 Construction ..... 88
11.15 Recordation ..... 88
11.16 Captions and References ..... 88
11.17 Time ..... 89
11.18 Computation of Days ..... 89
11.19 Recitals & Exhibits Incorporated; Entire Agreement ..... 89
11.20 Exhibits ..... 89
11.21 Authority to Execute; Representations and Warranties ..... 90

## TABLE OF CONTENTS

Page

11.22 City Approvals and Actions by City Manager....90
11.23 No Brokers....91
11.24 Counterpart Signature Pages....91

# REINSTATED AND AMENDED DEVELOPMENT AGREEMENT

This Reinstated and Amended Development Agreement (the "**Agreement**" or "**Reinstated Development Agreement**") is entered into as of the 6th day of November, 2025 ("**Reference Date**"), by and between the CITY OF LA QUINTA, a California municipal corporation and charter city ("**City**"), and TBE RE Acquisition Co II LLC, a Delaware limited liability company and affiliate of Turnbridge Equities ("**Developer**"), with reference to the following:

## RECITALS:

A. Government Code Section 65864 et seq. ("**Development Agreement Act**") authorizes City to enter into a binding development agreement for the development of real property within its jurisdiction with persons having legal or equitable interest in such real property. Pursuant to Section 65865 of the Government Code, City has adopted its Development Agreement Ordinance (La Quinta Municipal Code Section 9.250.020) establishing procedures and requirements for such development agreements ("**Development Agreement Ordinance**").

B. As of the Reference Date, Developer has a legal or equitable interest in fee title to that certain real property comprised of approximately 130+/- acres, identified as APN(s): 777-060-083, 777-060-085, 777-060-075, 777-060-078, 777-490-058, 777-490-063, 777-490-064, 777-490-065, 777-490-066, 777-490-037, 777-490-057, 777-490-059, 777-490-068, 777-490-042, 777-490-076, portions of 777-490-072 and 777-490-073 and 777-490-074 and 777-490-075 and 777-490-077 and 777-490-078 and 777-490-079 and 777-490-080, 777-490-046, 777-490-071, 777-060-082, 777-060-084, 777-510-001 through 023, 777-510-025, 777-520-001 through 018, and 777-490-053,054 and 055; and more specifically described in <u>Exhibit A-1</u> and <u>Exhibit A-2</u> attached hereto and incorporated herein by this reference (the "**Property**" or "**Phase 1 Property**"). The Property consists of the "**Phase 1A Property**" and "**Phase 1B Property**" as more particularly described in Exhibit A-1 and Exhibit A-2, respectively, and incorporated herein by this reference.

C. Prior to City and Developer entering into this Reinstated Development Agreement (among other agreements and instruments), the following relevant history is hereby recited:

1. Except for portions of land transferred to SilverRock Development Company, LLC, a Delaware limited liability company (or one of its affiliated companies, which are referred to herein collectively as "**SDC**" or "**Debtor(s)**")[1] as

---

[1] Debtors were SilverRock Development Company, LLC and affiliated entities that, on August 5, 2024, filed for voluntary bankruptcy protection under chapter 11 of the U.S. Bankruptcy Code, with case number(s) identified in the Title of this Agreement along with the last four digits of each Debtor's federal tax identification number, as applicable, are: SilverRock Development Company, LLC (5730), RGC PA 789, LLC (5996),

explained below in the next Recital Paragraph, City owns fee title to that certain real property of approximately 525 acres located at the southwest intersection of Jefferson Street and Avenue 52, in the City of La Quinta, California, generally referred to as the "**SilverRock Resort Area**" and subject to a Specific Plan adopted by the La Quinta City Council and enforceable as a land use governing document pursuant to the Planning and Zoning Law, California Government Code section 65000 et seq. (the "**SilverRock Specific Plan**");

2. On or about November 19, 2014, City and SDC entered into that certain Purchase, Sale, and Development Agreement (the "**Original SDC PSDA**"), pursuant to which, among other terms and conditions, City agreed to sell to SDC and SDC agreed to purchase from City specified parcels and planning areas (PAs) to thereafter construct, complete, and operate thereon a commercial project containing a luxury resort hotel and spa and associated branded luxury residential units, a lifestyle hotel and associated lifestyle branded residential units, a conference and shared service facility, a temporary and permanent clubhouse for the SilverRock Resort's Arnold Palmer Classic Golf Course, a mixed use village, a resort residential village, and associated amenities, all as further described in the Original SDC PSDA and referred to as various project components, as more particularly described therein. Concurrent with the Original SDC PSDA, on or about November 19, 2014, City and SDC entered into Development Agreement 2014-1001 (the "**Original SDC Development Agreement**") pursuant to the Development Agreement Act and Development Agreement Ordinance, which agreement, among other terms and conditions, required SDC to develop the planning areas and project components in accordance with the SDC PSDA, vested with SDC specified development obligations, memorialized the potential for the future acquisition of additional City-owned property in the SilverRock Resort Area as incorporated vis-à-vis the SDC PSDA, and subjected SDC to City's rights and oversight for those portions of the SilverRock Resort Area to be conveyed to SDC. After entering into the Original SDC PSDA and Original SDC Development Agreement, the following relevant events, very briefly summarized, occurred:

   i. Pursuant to the Original SDC PSDA, City and SDC had the authority to amend by mutual agreement of the parties. Between October 29, 2015, and November 16, 2023, City and SDC entered into five amendments thereto, dated October 29, 2015 ("**First Amendment**"), April 18, 2017 ("**Second Amendment**"), November 28, 2018 ("**Third Amendment**"),

---

SilverRock Lifestyle Residences, LLC (0721), SilverRock Lodging, LLC (4493), SilverRock Luxury Residences, LLC (6598) and SilverRock Phase I, LLC (2247) (collectively, referred to herein as the "**Bankruptcy Lawsuit**" in the "**Bankruptcy Court**").

October 12, 2021 ("**Fourth Amendment**"), and November 16, 2023 ("**Fifth Amendment**," and the Original SDC PSDA as amended by all five amendments is referred to herein as the "**SDC PSDA**");

ii. Pursuant to the SDC PSDA and consistent with boundaries established by applicable subdivision maps and lot line adjustments, City conveyed to SDC the Property for the pre-development, development, operation, and use of a project that was eventually re-named "Talus" and consisted of the following project components (all as defined in the SDC PSDA): Luxury Hotel, Luxury Branded Residential Development, Lifestyle Hotel, Lifestyle Branded Residential Development, Conference and Shared Services Facility (including spa and other amenities), Permanent Golf Clubhouse, Promenade Mixed-Use Village/Resort Residential Village (on Planning Areas 7,8,9), as well as a specified Golf Course Realignment and corresponding Master Site Infrastructure Improvements (MSII). These project components on the Property, pursuant to the SDC PSDA, were divided into Phase 1A project components on the Phase 1A Property and the Phase 1B project components on the Phase 1B Property respectively, as described in the SDC PSDA;

iii. Pursuant to the Third and Fourth Amendments to the SDC PSDA, SDC commenced pre-development and development on the Property for the Phase 1A project components, which as of the Reference Date of this Agreement, in various degrees, were partially constructed after SDC failed to continue to make payments to various contractors, subcontractors, and other interested parties in the development of the Talus project. Multiple lawsuits, including lawsuits seeking payments pursuant to mechanic's lien or various loan or investment agreements, and a City lawsuit against SDC for unlawful and unapproved conveyances in secured interests or mechanic's liens, were filed against SDC;

iv. On August 5, 2024, SDC (Debtors) filed the Bankruptcy Lawsuit, and, pursuant to Bankruptcy Court-approved Bid Procedures, Debtors retained a Chief Restructuring Officer (Douglas Wilson Companies) and marketing professional (JLL) for the purposes of, among other items, marketing the sale of the Debtors estate (which and is primarily comprised of the Property) and soliciting proposals for the: (a) acquisition of the Debtors estate, (b) use, re-use, and/or substitution of the partially constructed improvements on the Property, (c) potential replacement project for a world-class hotel and residential destination resort with related amenities on the Property that complement the existing Arnold Palmer Classic Golf Course surrounding the Property and real property owned by the City, and (d) possible acquisition in the future of the City-Owned Option Property in the SilverRock Resort Area (previously referred to as the Future Option Property in the SDC PSDA and generally referred to in the Bankruptcy Lawsuit and marketing materials as the "**Phase 2 Property**") for possible

future development that may also complement a world-class hotel and residential destination resort;

3. Pursuant to Bankruptcy Court order [Bankruptcy Lawsuit Docket No. 759], among other provisions: (i) Developer was authorized to purchase the Property, (ii) the Original SDC Development Agreement was reinstated and amended and memorialized by this Reinstated Development Agreement (as more particularly described herein), and (iii) An escrow to facilitate the purchase and sale of the Debtors' estate (which includes the Property) was authorized, which, among other terms and conditions, included the transfer of funds and recording of documents (such as this Reinstated Development Agreement) as more particularly set forth in the Debtor PSA (defined below). [NOTE: OTHER RELEVANT TERMS FROM THE BANKRUPTCY COURT ORDER FOR SALE OF DEBTORS PROPERTY MAY BE CONSULTED BY REVIEWING SAID ORDER.]

D. Developer submitted a proposal in response to the marketing materials, and, pursuant to the Bankruptcy Court-approved Bid Procedures, Debtors and City approved Developer's proposal, which, among other terms and conditions, includes a modified Project (as more particularly defined and described in this Agreement) on the Property as well as possible acquisition in the future of the City-Owned Option Property (also referred to herein as the Phase 2 Property) for possible future development that may also complement a world-class hotel and residential destination resort. As of the Reference Date of this Agreement, City is the owner of approximately 193+/- acres that includes raw land and an existing driving range, but said acreage expressly *excludes* approximately 24+- acres that have the existing SilverRock Park and adjacent retention basin, included in the legal description in Exhibit A-3 attached hereto and incorporated herein by reference (the "**City-Owned Option Property**" or "**Phase 2 Property**"), which comprises a portion of the SilverRock Resort Area and is referenced in the Site Maps attached to this Agreement.

E. As part Developer's Project, Developer covenanted to prepare for construction, construct, and open for use and occupancy of a flagship luxury hotel consisting of approximately 150 rooms with amenities, as more particularly described herein (the "**Luxury Hotel**").

F. Developer's acquisition of the Property was conditioned on the final negotiation and approval of certain "**La Quinta Amended Development Documents**" as referenced in the Bankruptcy Lawsuit, which included (among other agreements) this Reinstated Development Agreement (which includes as exhibits certain "**Reinstated and Amended Covenants Affecting Real Property**" relating to Golf Course Use and Ahmanson Ranch House (the "**Reinstated Covenant Affecting Real Property (Golf Course Use)**" and "**Reinstated Covenant Affecting Real Property (Ahmanson Ranch House)**," respectively)), and separate agreements that include an Option to Purchase Real Property ("**Option Agreement**") for the potential acquisition of the City-

Owned Option Property, and "**Transient Occupancy Tax ("TOT") Revenue Sharing Agreement**," and various land use covenants.

G. As more particularly set forth herein, City and Developer desire to enter into this Agreement to memorialize the terms, conditions, rights, and obligations of the Parties for the development of the Project on the Property, for the conveyance of the City-Owned Golf Course Property and City-Owned Ahmanson Ranch Property (as defined below), for the potential future development on the City-Owned Option Property, and for the timely performance and completion of specified obligations.

H. All actions taken by City have been duly taken in accordance with all applicable legal requirements, including the California Environmental Quality Act (Public Resources Code Section 21000, et seq.) ("**CEQA**"), and all other requirements for notice, public hearings, findings, votes and other procedural matters.

I. Pursuant to Government Code section 65402, the La Quinta Planning Commission has determined the disposition of the City-Owned Golf Course Property and City-Owned Ahmanson Ranch Property, if Developer complies with the terms and conditions set forth in this Agreement that would allow for the disposition and conveyance of said properties to Developer, is and would be in conformity with the City's General Plan because Developer's proposed use (and contractual requirements) to continue use of the City-Owned Golf Course Property as a golf course, and continued use of the City-Owned Ahmanson Ranch Property as a facility ancillary to the proposed luxury hotel use, are consistent with existing uses and authorized uses in the SilverRock Specific Plan. Similarly, pursuant to Government Code section 65402, the La Quinta Planning Commission has determined the disposition of the City-Owned Option Property, if Developer exercises the option pursuant to the Option Agreement, is and would be in conformity with the City's General Plan because, as of the Reference Date of this Reinstated Development Agreement, Developer has proposed no specific development or specific project for the City-Owned Option Property and has represented that, as of the Reference Date of this Agreement, any possible future use would be consistent with the authorized uses in the existing SilverRock Specific Plan.

J. City and Developer desire to enter into this Agreement for the development of the Phase 1 Property, with the site and planned development thereof shown on the site map(s) attached hereto as Exhibit B and incorporated herein by this reference (the "**Site Map(s)**").

K. As more particularly defined and described herein, Developer has agreed to construct and develop on the Phase 1 Property the Project, which includes the Project Description in Exhibit C attached hereto and incorporated herein by this reference (the "**Project Description**") as a summary of that construction and development. Also as more particularly defined and described herein, the Project is further subject to (i) this Agreement; (ii) the SilverRock Specific Plan; (iii) the Mitigated Negative Declaration, approved by the former La Quinta Redevelopment Agency (the "**RDA**") on May 15, 2002, by RDA Resolution 2002-09, as updated by the Addendum to Mitigated Negative Declaration, approved by the City Council on July 18, 2006, by City Council Resolution

No. 2006-082, by the Second Addendum to Mitigated Negative Declaration approved by the City Council on November 4, 2014, by City Council Resolution No. 2014-059, and by that certain Addendum No. 3 to the Adopted SilverRock Resort Project Mitigated Negative Declaration approved by the City Council on September 22, 2025, by City Council Resolution No. 2025-022 (the "**Agreement Addendum**" and, collectively, the "**Updated Mitigated Negative Declaration**"); (iv) the subdivision maps, lot-line adjustments ("LLAs"), and ministerial permits issued prior to the Bankruptcy Lawsuit (the "**Pre-Bankruptcy Subdivision Maps and Permits**") as listed in Exhibit F attached hereto and incorporated herein by this reference (collectively, the foregoing clauses (i)-(iv) are referred to as the "**Project Site Development Permits**"); as well as (v) any future discretionary or ministerial approvals and/or permits issued for the Project, including all conditions of approval attached thereto, and (vi) any future subdivision maps approved for the Project pursuant to the Map Act, including all conditions of approval thereto (generally, "**Project Tract Maps**"). The documents, permits, approvals, and conditions described in the foregoing clauses (i)-(vi) are collectively referred to herein as the "**Project Approvals**," and are, or when approved or issued shall be, on file with the City Clerk.

L. In connection with resolution of the Bankruptcy Proceeding, Developer and City desire to reinstate and amend the Original SDC Development Agreement to account for changes to the Project and clarifying the rights and obligations of the Parties with respect to the development and use of the Phase 1 Property and potential acquisition and use of the Phase 2 Property, as more particularly set forth herein.

M. Consistent with Section 9.250.020 of the La Quinta Municipal Code, City and Developer desire to enter into this binding Agreement that shall be construed as a development agreement within the meaning of the Development Agreement Act. This Agreement will eliminate uncertainty in planning for and secure the orderly development of the Project, ensure a desirable and functional community environment, provide effective and efficient development of public facilities, infrastructure, and services appropriate for the development of the Project, and assure attainment of the maximum effective utilization of resources within the City, by achieving the goals and purposes of the Development Agreement Act. In exchange for these benefits to City, Developer desires to receive the assurance that, with respect to the portions of the SilverRock Resort Area owned or acquired by Developer, it may proceed with development of the Project of the Phase 1 Property and the potential acquisition of the Phase 2 Property in accordance with the terms and conditions of this Agreement, the Project Approvals, the La Quinta Amended Development Documents, and other relevant terms and conditions referenced herein.

N. The Planning Commission and the City Council have determined that the Project and this Agreement are consistent with the City's General Plan and the SilverRock Specific Plan, including the goals and objectives thereof.

O. All actions taken by City have been duly taken in accordance with all applicable legal requirements, including CEQA, and all other requirements for notice, public hearings, findings, votes and other procedural matters.

P. On October 7, 2025, the City Council adopted its Ordinance No. 626, approving this Agreement.

**AGREEMENT:**

NOW, THEREFORE, in consideration of the foregoing Recitals, which are incorporated herein by this reference, the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged, the Parties do hereby agree as follows:

1. GENERAL

1.1 Definitions. In addition to the terms that may be defined elsewhere in this Agreement, the following terms when used in this Agreement shall be defined as follows:

1.1.1 "**Affiliate**" means any Person controlling, controlled by or under common control with the specified Person (it being agreed that customary rights of non-managing members shall not constitute control for such purpose including, without limitation, major decision consent rights, forced sale rights, buy/sell rights and management removal rights).

1.1.2 "**Agreement**" means this Reinstated and Amended Development Agreement and all amendments and modifications thereto.

1.1.3 "**Agreement Addendum**" shall have the meaning set forth in Recital K.

1.1.4 "**Applicable Rules**" means the land use regulations, ordinances and officially adopted policies of the City governing the Phase 1 Property in full force and effect as of the Development Agreement Reinstatement Date, which, specifically, includes the City's General Plan, Zoning Ordinance, and SilverRock Specific Plan. Additionally, notwithstanding the language of this Section or any other language in this Agreement, all specifications, standards and policies regarding the design and construction of public works facilities, if any, shall be those that are in effect at the time the Project plans are being processed for approval and/or under construction.

1.1.5 "**Assignment and Assumption Agreement**" shall have the meaning set forth in Section 10.2.4 of this Agreement.

1.1.6 "**CC&Rs**" means the Declaration of Conditions, Covenants, and Restrictions described in Section 3.5 of this Agreement.

1.1.7 "**CEQA**" means the California Environmental Quality Act (Cal. Public Resources Code Sections 21000 *et seq.*) and the State CEQA Guidelines (Cal. Code of Regs., Title 14, Sections 15000 *et seq.*).

1.1.8 "**Certificate for Building Permit**" shall have the meaning set forth in Section 2.2.5 herein.

1.1.9 "**Certificate of Completion**" means that certain recordable certificate, substantially in form of Exhibit G attached hereto and incorporated herein by this reference, confirming that the final certificate of occupancy or other final City approval has been issued for any Project Component, based on the Project Approvals, as more fully described in Section 3.4 of this Agreement. A Certificate of Completion may be issued and recorded against the Phase 1A Property upon completion of any Project Components on the Phase 1A Property (or separate Lot(s) or Parcel(s) of land within the Phase 1A Property upon which said Project Component is situated), and a separate Certificate of Completion may be issued and recorded against the Phase 1B Property upon completion of all Project Components on the Phase 1B Property (or separate Lot(s) or Parcel(s) of land within the Phase 1B Property upon which said Project Component is situated), and the same shall apply to every other Project Component.

1.1.10 "**City**" means the City of La Quinta, a charter city and municipal corporation, including each and every agency, department, board, commission, authority, employee, and/or official acting under the authority of the City, including without limitation the City Council and the Planning Commission.

1.1.11 "**City Attorney**" means the individual duly appointed to the position of City Attorney of City.

1.1.12 "**City Clerk**" means the individual duly appointed to the position of City Clerk of City, or duly designated deputy of the City Clerk.

1.1.13 "**City Council**" means the City Council of the City and the legislative body of the City pursuant to California Government Code Section 65867.

1.1.14 "**City Manager**" means the individual duly appointed to the position of City Manager of City, or his or her authorized designee.

1.1.15 "**City-Owned Ahmanson Ranch Property**" means that certain real property, improved with the Ahmanson Ranch House, comprised of approximately 0.6+/- acres and more particularly described in Exhibit A-4 attached hereto and incorporated herein by this reference.

1.1.16 "**City-Owned Golf Course Property**" means the Arnold Palmer Classic Golf Course, commonly known as the SilverRock Golf Course, improved as such with ancillary improvements and amenities, comprised of approximately 170+/-

acres and more particularly described in Exhibit A-5 attached hereto and incorporated herein by this reference.

1.1.17 "**City-Owned Option Property**" shall have the meaning set forth in Recital D. The City-Owned Option Property is the same real property as the "Phase 2 Property."

1.1.18 "**Coachella Valley Multiple Species Habitat Conservation Plan**" means that certain Final Circulated Coachella Valley Multiple Species Habitat Conservation Plan and Natural Community Conservation Plan, dated September 2007, as may be amended.

1.1.19 "**Community Development Director**" means the individual duly appointed to the position of Director of City's Design & Development Department, or his or her authorized designee.

1.1.20 "**Conditions of Approval**" shall mean any and all conditions of approval attached to any Project Approval as described in Recital K of this Agreement.

1.1.21 "**Construction Improvement Security**" shall have the meaning in Section 3.7 of this Agreement.

1.1.22 "**Construction Lender(s)**" means a Lender(s) that provide(s) a Construction Loan to Developer to pay the construction costs and expenses for all or a portion of the Project. It is acknowledged that there may be one (1) or more Construction Lender(s), each of which may apply to any one (1) or more Project Components.

1.1.23 "**Construction Loan(s)**" means a Loan obtained by Developer, in accordance with this Agreement, from a Construction Lender to finance all or part of the land acquisition, pre-construction/development, and/or construction costs and expenses for one (1) or more of the Project Components. "Construction Loan" includes any and all "construction to permanent loan(s)" obtained by Developer and approved by City (to the extent such approval is required pursuant to this Agreement) for any Project Component(s). For the avoidance of doubt, a "Construction Loan" may include a Loan for financing the acquisition of real or personal property related to the development of the Project, and a "Construction Loan" may include financing for the construction of part or all of the MSII that comprises the Master Site Infrastructure Improvement Project Component with one (1) or more other Project Component(s) or separately. It is acknowledged that there may be one (1) or more Construction Loan(s).

1.1.24 "**Construction Loan Deed(s) of Trust**" means the Lien(s) required by a Construction Lender recorded in the Recorder's Office against a Lot(s) and/or Parcel(s) of any portion of the Project to secure the Developer's performance under the associated Construction Loan.

1.1.25 "**Davis-Stirling Act**" means the Davis-Stirling Common Interest Development Act in California Civil Code Section 4000 *et seq.* (as may be amended from time to time).

1.1.26 "**Debtor PSA**" is defined in Section 2.1.2 of this Agreement.

1.1.27 "**Default**" shall have the meaning set forth in Section 8.1 of this Agreement.

1.1.28 "**Developer**" means the entity identified in the preamble of this Agreement, and permitted successors and assigns under this Agreement.

1.1.29 "**Developer Entities Organizational Chart**" means the organization chart attached hereto as Exhibit H and incorporated by reference herein.

1.1.30 "**Developer Representatives**" means any of Developer's officers, directors, members, employees, agents, and representatives.

1.1.31 "**Development Agreement Act**" means Government Code Section 65864 *et seq.*

1.1.32 "**Development Agreement Ordinance**" means La Quinta Municipal Code Section 9.250.020 as the same may be amended from time to time.

1.1.33 "**Development Agreement Reinstatement Date**" shall have the meaning set forth in Section 1.3 of this Agreement.

1.1.34 "**Discretionary Action**" means an action which requires the exercise of judgment, deliberation, or a decision on the part of City, including any board, commission, committee, or department or any officer or employee thereof, in the process of approving or disapproving a particular activity, as distinguished from an activity which merely requires City, including any board, commission or department or any officer or employee thereof, to determine whether there has been compliance with statutes, ordinances or regulations.

1.1.35 "**Discretionary Permits**" means any permits, approvals, plans, Project Tract Maps, inspections, certificates, documents, and licenses that require a Discretionary Action, including, without limitation, future Project Approvals, grading permits, stockpile permits, and encroachment permits.

1.1.36 "**Dust Control Program**" means a program compliant with the City's dust control ordinance and with applicable South Coast Air Quality Management District requirements.

1.1.37 "**Eligibility Requirements**" means the applicable Person(s) either collectively or independently, as the context may require with respect to the purpose and work (such as pre-construction or construction) relating to a specific Project

Component(s), has (or who has an Affiliate or direct or indirect investor who has) reasonably sufficient creditworthiness to pay and perform the applicable obligations in the applicable context under this Agreement (including, without limitation, with respect to the financing of the specific Project Component(s) pursuant to Article 4 of this Agreement), who may lawfully do so under federal and state law, and taking into consideration Developer's equity and other sources of funds. For example, a Construction Lender shall be deemed to have satisfied the Eligibility Requirements if or one or more of its investors or owners has or has access to funds in the maximum principal amount of the applicable Construction Loan consistent with the Final Project Budget taking into account Developer's equity and other sources of funds. The meeting of Eligibility Requirements shall be based on financial documentation and other relevant evidence (as the context may require) delivered to the City for verification by the City (which shall not be unreasonably withheld, delayed or conditioned) based on objective industry standards for assessing creditworthiness of Person(s) for facilitating the development of similar luxury resort/residential projects.

1.1.38 "**Environmental Claims**" shall have the meaning set forth in Section 3.9.1 of this Agreement.

1.1.39 "**Environmental Laws**" means all federal, state, and local laws, rules, orders, regulations, statutes, ordinances, codes, decrees, or requirements of any government authority regulating, relating to, or imposing liability of standards of conduct concerning any Hazardous Materials (defined below), or pertaining to occupational health or industrial hygiene (and only to the extent that the occupational health or industrial hygiene laws, ordinances, or regulations relate to hazardous substances on, under, or about the Property, occupational or environmental conditions on, under, or about the Property, as now or may at any later time be in effect, including without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") [42 USC § 9601 *et seq.*]; the Resource Conservation and Recovery Act of 1976 ("RCRA") [42 USC § 6901 *et seq.*]; the Clean Water Act, also known as the Federal Water Pollution Control Act ("FWPCA") [33 USC § 1251 *et seq.*]; the Toxic Substances Control Act ("TSCA") [15 USC § 2601 *et seq.*]; the Hazardous Materials Transportation Act ("HMTA") [49 USC § 1801 *et seq.*]; the Insecticide, Fungicide, Rodenticide Act [7 USC § 6901 *et seq.*] the Clean Air Act [42 USC § 7401 *et seq.*]; the Safe Drinking Water Act [42 USC § 300f *et seq.*]; the Solid Waste Disposal Act [42 USC § 6901 *et seq.*]; the Surface Mining Control and Reclamation Act [30 USC § 101 *et seq.*] the Emergency Planning and Community Right to Know Act [42 USC § 11001 *et seq.*]; the Occupational Safety and Health Act [29 USC § 655 and 657]; the California Underground Storage of Hazardous Substances Act [California Health & Safety Code § 25288 *et seq.*]; the California Hazardous Substances Account Act [California Health & Safety Code § 25300 *et seq.*]; the California Safe Drinking Water and Toxic Enforcement Act [California Health & Safety Code § 24249.5 *et seq.*] the Porter-Cologne Water Quality Act [California Water Code § 13000 *et seq.*] together with any amendments of or regulations promulgated under the statutes cited above and any other federal, state, or local law, statute, ordinance, or regulation now in effect or later enacted that pertains to occupational health or industrial hygiene, and only to the extent

the occupational health or industrial hygiene laws, ordinances, or regulations relate to hazardous substances on, under, or about the Property, or the regulation or protection of the environment, including ambient air, soil, soil vapor, groundwater, surface water, or land use.

1.1.40 "**Final Project Budget**" means the final Project development budget, which shall consist of any preliminary project budget materials as the same may modified and/or updated by Developer from time to time. At a minimum, the Final Project Budget shall include: (a) Good faith estimates for all costs and expenses associated with the pre-development/pre-construction and development/construction of the Project (which may be separated into estimates for the Project Components); and (b) Revenue projections and operating proformas (with included assumptions) for the Project, which shall separate such projections and operating costs for the Luxury Hotel Project Component, Public Golf Clubhouse Project Component, and short-term vacation rentals. It is acknowledged that the Developer shall be permitted to deliver to City one (1) or more supplement(s) or updates to the Final Project Budget, as applicable, for any one (1) or more of the Project Components as Developer may elect.

1.1.41 "**General Plan**" means the General Plan of the City.

1.1.42 "**Golf Course**" means the existing Arnold Palmer Classic Golf Course on the City-Owned Golf Course Property and in the SilverRock Resort Area.

1.1.43 "**Golf Course And Ahmanson Ranch Property Transfer Conditions**" shall have the meaning set forth in Section 6.1.2 of this Agreement.

1.1.44 "**Golf Couse Wildlife Protection Fence**" means a fence (or the functional equivalent, as determined by City) that meets the applicable specifications and standards of the Coachella Valley Conservation Commission acting as authorized agent for the requirements and obligations of the Coachella Valley Multiple Species Habitat Conservation Plan.

1.1.45 "**Hazardous Materials**" and "**Hazardous Substances**" means, without implied limitation, substances defined as "hazardous material," "hazardous substances," "toxic substance," "solid waste," or "pollutant or contaminate" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, *et seq.*; the Toxic Substances Control Act ("TSCA") [15 U.S.C. § 2601, *et seq.*]; the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, *et seq.*; the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, *et seq.*; those substances listed in the United States Department of Transportation (DOT) Table [49 CFR 172.101], or by the EPA, or any successor authority, as hazardous substances [40 CFR Part 302]; and those substances defined as "hazardous waste" in Section 25117 of the California Health and Safety Code or, as "hazardous substances" in Section 25316 of the California Health and Safety Code; other substances, materials, and wastes that are, or become, regulated or classified as hazardous or toxic under federal, state, or local laws or regulations and in the regulations adopted pursuant to said laws, and shall also include manure, asbestos,

polychlorinated biphenyl, flammable explosives, radioactive material, petroleum products, and substances designated as a hazardous substance pursuant to 33 USC Section 1321 or listed pursuant to 33 USC Section 1317.

1.1.46 "**Hotel Management Documentation**" shall have the meaning set forth in Section 5.1.1 of this Agreement.

1.1.47 "**Hotel Operator**" shall have the meaning set forth in Section 5.1.1 of this Agreement.

1.1.48 "**Infrastructure Lender(s)**" means one (1) or more Lender(s) that provide(s) an Infrastructure Loan to Developer to pay the construction costs and expenses for all or a portion of the Master Site Infrastructure Improvements Project Component. It is acknowledged that there may be one (1) or more Infrastructure Lender(s).

1.1.49 "**Infrastructure Loan(s)**" means any one (1) or more Loan(s) obtained by Developer, and approved by City to the extent such approval is required under this Agreement, from a Construction Lender to finance all or part of the construction costs and expenses of only Master Site Infrastructure Improvement Project Costs (which the parties acknowledge may be part of the same Construction Loan that finances one (1) or more other Project Components). It is acknowledged that there may be one (1) or more Infrastructure Loan(s).

1.1.50 "**Infrastructure Loan Deed(s) of Trust**" means the Lien(s) required by an Infrastructure Lender recorded in the Recorder's Office against a Lot(s) and/or Parcel(s) of any portion of the Project to secure the Developer's performance under the associated Infrastructure Loan.

1.1.51 "**Insubstantial Modification**" means any minor modification to this Agreement which does not modify: (i) the Term of this Agreement; (ii) the Project Components and permitted uses of the Property based on those Project Components; (iii) maximum density or intensity of use, except as specifically allowed in the Project Approvals; (iv) provisions for the reservation or dedication of land; (v) conditions, terms, restrictions or requirements for Reserved Powers or any approved or future Discretionary Actions; (vi) the name and brand of the Luxury Hotel; (vii) the date or time of any task in the Schedule of Performance (other than modifications expressly contemplated in this Agreement); (viii) the financing for the development and completion of construction for the Project Components; (ix) the obligation to procure and maintain bonds or other payment and performance security for the development and completion of the Infrastructure Improvements Project Components once said obligation arises under this Agreement or from issuance of any permit, license, approval, or other entitlement; or (x) any monetary obligations of either City or Developer (other than modifications expressly contemplated in this Agreement), and said minor modification can be processed under CEQA either as not a "project" or as exempt from CEQA, and said minor modification does not require a public hearing prior to the Parties executing a modification to this Agreement.

1.1.52 "**Impact Fees**" means impact fees, linkage fees, exactions, assessments or fair share charges or other similar impact fees or charges (including any and all fees imposed and authorized pursuant to the Mitigation Fee Act, Government Code section 66000 *et seq.*) imposed on and in connection with new development by City pursuant to the current duly adopted resolution or other City Council action approving such fees. Notwithstanding anything herein to the contrary, none of the following shall constitute Impact Fees: (i) Processing Fees, (ii) impact fees, linkage fees, exactions, assessments or fair share charges or other similar fees or charges imposed by other governmental entities and which City is required to collect or assess pursuant to applicable law, including, without limitation, school district impact fees pursuant to Government Code Section 65995, fees required pursuant to the Coachella Valley Multiple Species Habitat Conservation Plan, and the Transportation Uniform Mitigation Fee, or (iii) other City-wide fees or charges of general applicability, provided that such City-wide fees or charges are not imposed as an impact fee on new development.

1.1.53 "**Landscaping And Trails Project Component**" means that component of the Project described in the definition of Project Components in this Agreement.

1.1.54 "**La Quinta Amended Development Documents**" means the agreements specifically identified in Recital F.

1.1.55 "**Lender**" means any one (1) or more Person(s) providing any type financing to Developer, its direct or indirect equity owners or any of their respective Affiliates in connection with any one (1) or more Project Components.

1.1.56 "**Lien**" means any mortgage, deed of trust, or other security instrument encumbering Developer's fee interest in the Property and/or Project, (or any portion thereof) or any part thereof, or any pledge or other agreement given as security for the repayment of a Loan and by which a Lender would be able to acquire any direct or indirect interest in the Developer upon the Developer's breach of any obligation under the Lender's loan documents.

1.1.57 "**Loan**" means any (i) loan or (ii) third-party equity/capital contribution (e.g. mezzanine financing) being invested directly or indirectly in Developer in the form of debt for the Project or Property other than the financial assistance provided by the City as specified in this Agreement.

1.1.58 "**Loan Documents**" and "**loan documents**" means the various documents and instruments made by and between the Developer (or its direct or indirect owners or their Affiliates) and a Lender that evidence a Loan for the Project or any Project Components and the security for repayment of such Loan.

1.1.59 "**Lot**" and "**lot**" means an area of land under one (1) ownership which is identified as a lot on a recorded final map, parcel map, record of survey

recorded pursuant to an approved division of land, certificate of compliance, or lot line adjustment.

1.1.60 "**Luxury Hotel**" and "**Luxury Hotel Project Component**" means that component of the Project described in the definition of Project Components in this Agreement.

1.1.61 "**MAE Default**" is a materially adverse effect Default and has the meaning set forth in Section 8.1 of this Agreement.

1.1.62 "**Map Act**" means the Subdivision Map Act, Government Code Section 66410 *et seq.* (as may be amended from time to time).

1.1.63 "**Master Site Infrastructure Improvements Project Component**" or "**MSII**" means that component of the Project described in the definition of Project Components in this Agreement.

1.1.64 "**Ministerial Permits and Approvals**" means the permits, approvals, plans, inspections, certificates, documents, licenses, and all other actions required to be taken by City in order for Developer to implement, develop and construct the Project and the Mitigation Measures, including without limitation, building permits, foundation permits, and other similar permits and approvals which are required by the La Quinta Municipal Code and Project plans and other actions required by the Project Approvals to implement the Project and the Mitigation Measures. Ministerial Permits and Approvals shall not include any Discretionary Actions or Discretionary Permits.

1.1.65 "**Mitigation Fee Act**" means the Mitigation Fee Act, Government Code section 66000 *et seq.* (as may be amended from time to time).

1.1.66 "**Mitigation Measures**" means the mitigation measures described in the Agreement Addendum (including the Mitigation Monitoring Program in Section 5.0 of said Agreement Addendum) and all applicable mitigation measures in the Coachella Valley Multiple Species Habitat Conservation Plan that apply to the Project.

1.1.67 "**New Laws**" means amendments or modifications to the Applicable Rules, and all ordinances, resolutions, initiatives, regulations, rules, laws, plans, policies, and guidelines of the City and its City Council, Planning Commission, and all other City boards, commissions, departments, agencies, and committees enacted or adopted after the Development Agreement Reinstatement Date.

1.1.68 "**Option Agreement**" shall mean the agreement described in Recital F.

1.1.69 "**PA(s)**" is defined in "Planning Area(s)" below.

1.1.70 "**Parcel**" and "**parcel**" means an area of land under one (1) ownership which is identified as a parcel on a recorded final map, parcel map, record of

survey recorded pursuant to an approved division of land, certificate of compliance or lot line adjustment.

1.1.71 "**Parties**" means collectively Developer and City. Each shall be referred to in the singular as a "Party".

1.1.72 "**Permanent Financing Lender(s)**" means one (1) or more Lender(s) that provide(s) any Permanent Financing Loan to Developer, its direct or indirect owners or any of their Affiliates with respect to the Property. It is acknowledged that there may be one (1) or more Permanent Financing Lenders(s).

1.1.73 "**Permanent Financing Loan(s)**" means a Loan obtained by Developer or its direct or indirect owners or any of their Affiliates, and approved by City (to the extent such approval is required pursuant to this Agreement), from a Permanent Financing Lender to finance all or part of the conversion, ownership, and operating costs of any one (i) or more the Project Components. A "Permanent Financing Loan" does not include any "construction to permanent loan(s)," or any Construction Loan or Infrastructure Loan. It is acknowledged that there may be one (1) or more Permanent Financing Loan(s).

1.1.74 "**Permanent Financing Loan Deed(s) of Trust**" means the Lien(s) required by an Permanent Financing Lender recorded in the Recorder's Office against a Lot(s) and/or Parcel(s) of any portion of the Project to secure the Developer's performance under the associated Permanent Financing Loan.

1.1.75 "**Permitted Affiliate Assignee**" is defined in Section 10.4 of this Agreement.

1.1.76 "**Permitted Development/Operational Transferee**" means any one (1) or more of the following: Permitted Lenders, real estate companies, developers, sovereign wealth funds, high net worth United States or foreign individuals or other investors, private equity or opportunity funds, hedge funds (provided that if such Person is a private equity or opportunity fund, hedge fund or similar investment fund, it is agreed and understood that one or more such entities (Y) investing side by side and (Z) collectively and at all times are under common control shall not fail to be deemed a single "Permitted Development/Operational Transferee" pursuant to this definition), *provided, however*, in each such case said transferee shall (i) satisfy the Eligibility Requirements, (ii) is or has personnel, management and/or direct or indirect investors or Affiliates that are experienced in managing, owning, investing in, developing and/or operating commercial real estate properties that are substantially similar to the Project Component(s) for which the Transfer to transferee is to occur, and may lawfully do so under federal and state law; and (iii) if both of the foregoing clauses (i) and (ii) do not apply, has been approved by the City (which approval shall not be unreasonably withheld, delayed or conditioned). It is acknowledged that there may be one (1) or more Permitted Development/Operational Transferees with respect to one (1) or more Project Components.

1.1.77 "**Permitted Hotel Operator**" means a nationally and/or internationally known first class luxury hotel brand, manager or operator that may lawfully be a Hotel Operator under federal and state law, and approved by the City in its sole and absolute discretion. As of the Reference Date, the City has approved the Montage and Four Seasons as Permitted Hotel Operators that meet the City Council's criteria for being a nationally and/or internationally known first class luxury hotel brand.

1.1.78 "**Permitted Lender**" means any one (1) or more of the following (or Affiliates of any of the following) that issue Loans to developments and developers and/or their direct or indirect equity holders, and may lawfully do so under federal and state law, for projects that are similar to the Project Component(s) for which the Loan is to be issued, and made in the normal course of business for said Lender: (a) any state or federally chartered bank, savings and loan association, other third-party financial institution or finance company, capital investment group, investment fund, investment bank, governmental entity, bond issuer, a real estate investment trust, insurance company, trust company, debt fund, high net worth individual or high net worth family (which may operate through a family office), commercial credit corporation, pension plan, pension fund or pension advisory firm, mutual fund, or any other Person, *provided, however*, in each such case said Lender shall satisfy the Eligibility Requirements; (b) an investment company, money management firm or "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, as amended, or an institutional "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended, *provided, however,* in each such case said Lender shall satisfy the Eligibility Requirements; (c) an institution or other Person substantially similar to any of the foregoing entities described in clauses (a) or (b) that satisfies the Eligibility Requirements; (d) any other Permitted Development/Operational Transferee which is not described previously in this definition, *provided, however,* in each such case said Permitted Development/Operational Transferee had previously met and shall continue to satisfy the Eligibility Requirements, and (e) any other Lender proposed by Developer to the City and approved by the City (which approval shall not be unreasonably withheld, delayed or conditioned). It is acknowledged that there may be one (1) or more Permitted Lenders with respect to one (1) or more Project Component(s).

1.1.79 "**Permitted Transfer**" means the Transfers that are permissible as part of this Agreement and listed in Section 10.2.5 of this Agreement.

1.1.80 **"Permitted Transferee**" means the transferee, assignee, and/or any other successor-in-interest from Developer pursuant to a Permitted Transfer.

1.1.81 "**Person**" means any individual or any limited liability company, corporation, partnership, association, joint venture, trust, estate or other entity or organization.

1.1.82 "**Phase 1 Property**" shall have the meaning set forth in Recital B. The Phase 1 Property consists of the "**Phase 1A Property**" and "**Phase 1B Property**" as defined in Recital B of this Agreement.

1.1.83 "**Phase 1 Residential Components**" means the Phase 1A Luxury Residential Project Component and Phase 1B Luxury Residential Project Component.

1.1.84 "**Phase 1A Luxury Residential Project Components**" means collectively: (a) the "**Phase 1A Luxury Branded Residences Project Component**," and (b) the "**Phase 1A Luxury Branded Condominiums Project Component**," as described in the definition of Project Components in this Agreement.

1.1.85 "**Phase 1B Luxury Residential Project Component**" means that component of the Project described in the definition of Project Components in this Agreement.

1.1.86 "**Phase 2 Pre-Closing Work**" shall have the meaning set forth in Section 3.1.5(B) of this Agreement.

1.1.87 "**Phase 2 Property**" shall have the meaning set forth in Recital D. The Phase 2 Property is the same real property as the "City-Owned Option Property."

1.1.88 "**Planning and Zoning Law**" means the Planning and Zoning Law, Government Code section 65000 *et seq.* (as may be amended from time to time).

1.1.89 "**Planning Area(s)**" and "**PA(s)**" means the planning area(s) within the SilverRock Resort Area as amended by this Agreement and as more particularly depicted in the Site Maps and described in the Scope of Work. As established by this Agreement, there shall be eight (8) Planning Areas with the Project Components therein, as more particularly depicted in the Site Maps and described in the Scope of Work. For ease of reference, "**PA 1**" shall mean "Planning Area 1"; "**PA 2**" shall mean "Planning Area 2"; "**PA 3**" shall mean "Planning Area 3"; "**PA 4**" shall mean "Planning Area 4"; "**PA 5**" shall mean "Planning Area 5"; "**PA 6**" shall mean "Planning Area 6"; "**PA 7**" shall mean "Planning Area 7"; and "**PA 8**" shall mean "Planning Area 8."

1.1.90 "**Planning Commission**" means the City Planning Commission and the planning agency of the City pursuant to California Government Code Section 65867.

1.1.91 "**Plans Assignable At Termination**" means those plans described in Section 8.3.2 of this Agreement.

1.1.92 "**Pre-Bankruptcy Subdivision Maps and Permits**" shall have the meaning set forth in Recital H.

1.1.93 "**Post-Bankruptcy Sale Permitting Processes**" means the modified application and permitting processes set forth in <u>Exhibit I</u>, attached hereto and incorporated herein by this reference, which are intended to provide an alternative option to Developer for obtaining, with respect to partially completed structures and improvements on the Phase 1A Property, any of the following (including emergency or

temporary) permits, licenses, approvals, and/or entitlements: (a) building permits, (b) demolition permits, (c) grading permits, (d) encroachment permits, (e) hauling permits, (f) site development permits, (g) conditional use permits, and (h) any other permits, licenses, approvals, and/or entitlements necessary or proper as related to those permits that are intended to be subject to the Post-Bankruptcy Sale Permitting Processes. Nothing in this Agreement precludes Developer from using the application and permitting process otherwise applicable pursuant to the La Quinta Municipal Code and Uniform Codes.

1.1.94 "**Private Clubhouse Project Component**" means that component of the Project described in the definition of Project Components in this Agreement.

1.1.95 "**Processing Fees**" means all processing fees and charges required by City including, but not limited to, fees for land use applications, Project permits and/or approvals, building applications, building permits, grading permits, encroachment permits, Project Tract Maps, lot line adjustments, air right lots, street vacations, certificates of occupancy, and any fees over which City has no authority with respect to setting the rates, which are necessary to accomplish the intent and purpose of this Agreement. Processing Fees shall not include Impact Fees. Notwithstanding the language of this Section or any other language in this Agreement, Developer shall not be exempt from the payment of fees, if any, imposed on a City-wide basis as part of City's program for storm water pollution abatement mandated by the Federal Water Pollution Control Act of 1972 and subsequent amendments thereto.

1.1.96 "**Project**" means development of the Property in full compliance with this Agreement, as set forth and described in Recital K, Project Description, Scope of Work, Project Schedule, and Section 3.1 of this Agreement.

1.1.97 "**Project Approvals**" shall have the meaning set forth in Recital K.

1.1.98 "**Project Components**" shall mean the distinct phases and uses to be developed and operated on the Phase 1 Property, as more particularly depicted in the Site Maps and described in the Scope of Work, and include the following:

(a) Luxury Hotel Project Component and related ancillary uses that include (but are not limited to) one or more wellness, spa and fitness area(s), restaurants, conference and banquet facilities, pool and recreational facilities, and "back-of-house" facility area, on the Phase 1A property and located in Plannings Areas 3 and 5 (PAs3&5);

(b) Public Golf Clubhouse Project Component on the Phase 1A Property, which shall be open to the public, residents, and guests, with related uses ancillary to the clubhouse, and is located in Planning Area 4 (PA 4);

(c) Phase 1A Luxury Residential Project Components, consisting of for-sale, single family luxury home lots, residences, and condominiums on the Phase 1A Property that all will be linked to the Luxury Hotel operations and available as short-term vacation rentals pursuant to this Agreement, and comprise the following two (2) phases (which may be developed separately or together as determined by Developer): (i) the Phase 1A Luxury Branded Residences Project Component, consisting of 29 residential lots to be sold and privately developed pursuant to this Agreement and located in Planning Area 2 (PA 2), and (ii) the Phase 1A Luxury Branded Condominiums Project Component, consisting of approximately 70 luxury condominium units to be constructed pursuant to this Agreement and located in Planning Area 6 (PA 6);

(d) Private Clubhouse Project Component means the clubhouse and amenities for residents and guests in the Phase 1A Luxury Residential Project Components to be located with the Phase 1A Luxury Branded Condominiums in Planning Area 6 (PA 6);

(e) Phase 1B Luxury Residential Project Component, consisting of for-sale, single family luxury home lots and residences on the Phase 1B Property that may be available as short-term vacation rentals pursuant to this Agreement and located in Planning Area 7 (PA 7);

(f) Landscaping And Trails Project Component covering the Phase 1 Property and SilverRock Resort Area areas along a portion of Avenue 52, as more particularly described in this Agreement; and

(g) Master Site Infrastructure Improvements Project Component, consisting of Developer's construction and installation of all of the backbone infrastructure improvements required to serve the Phase 1 Property, consistent with the Specific Plan and development of the Project according to the Scope of Work and Schedule of Performance.

For the avoidance of doubt, each of the categories of Project Components listed in subsections (a) through (g) of this definition may have more than one Project Component (i.e., there may be separate sub-Project Components if so elected by Developer), each Project Component may separately obtain Certificates of Completion under the process set forth in Section 3.4 of this Agreement.

1.1.99 "**Project Milestone(s)**" means those tasks in the Schedule of Performance identified and agreed by the Parties herein as material deadlines that shall not be missed or delayed (except for events of Force Majeure or other excusable delays set forth in this Agreement or by law).

1.1.100 "**Project Schedule**" and "**Schedule of Performance**" means the project schedule and phasing plan as set forth in Exhibit E attached hereto and

incorporated herein by this reference. Developer may have one (1) or more separate Project Schedules with combined or separate Project Milestones from time to time as applicable to different Project Components as may be elected by Developer and approved by the City in City's reasonable discretion.

1.1.101 "**Project Tract Maps**" shall have the meaning set forth in Recital K.

1.1.102 "**Public Golf Clubhouse Project Component**" means that component of the Project described in the definition of Project Components in this Agreement.

1.1.103 "**Reference Date**" shall be the date that the City Council's Ordinance adopting this Agreement (as identified in Recital P of this Agreement) becomes effective pursuant to state law, which date shall be inserted in the Preamble of this Agreement.

1.1.104 "**Reinstated Covenant Affecting Real Property (Ahmanson Ranch House)**" means that land use covenant described in Recital F and substantially in the form attached to this Agreement as Exhibit J and incorporated herein by this reference.

1.1.105 **"Reinstated Covenant Affecting Real Property (Golf Course Use)**" means that land use covenant described in Recital F and substantially in the form attached to this Agreement as Exhibit K and incorporated herein by this reference.

1.1.106 "**Reserved Powers**" means the rights and authority excepted from this Agreement's restrictions on City's police powers and which are instead reserved to City, its City Council, Planning Commission, and all other City boards, commissions, departments, agencies, and committees. The Reserved Powers include the powers to enact or adopt New Laws or take future Discretionary Actions after the Development Agreement Reinstatement Date that may be in conflict with the Applicable Rules and Project Approvals, except such New Laws which would prevent or materially impair Developer's ability to develop the Project in accordance with the Project Approvals; provided, however, that with respect to such New Laws which would prevent or materially impair Developer's ability to develop the Project in accordance with the Project Approvals, such New Laws shall apply to the Project if such New Laws are: (1) necessary to protect the public health, safety, and welfare, and are generally applicable on a City-wide basis (except in the event of natural disasters as found by the City Council such as floods, earthquakes and similar acts of God, which shall apply even if not applicable on a City-wide basis); (2) amendments to Uniform Codes, as adopted by City, and/or the La Quinta Municipal Code, as applicable, regarding the construction, engineering and design standards for private and public improvements to be constructed on the Property; (3) required by a non-City entity to be adopted by or applied by the City (or if optional the failure to adopt or apply such non-City law or regulation would cause City to sustain a material loss of funds or loss of access to funding or other resources), or (4) necessary to comply with state or federal laws and

regulations (whether enacted prior or subsequent to the Development Agreement Reinstatement Date).

1.1.107 "**Schedule of Performance**" means the Project Schedule.

1.1.108 "**Scope of Work**" and "**Scope of Development**" means the pre-construction, construction, demolition, improvements, operations, and uses on the Phase 1 Property for the Project Components as set forth in Exhibit D attached hereto and incorporated herein by this reference.

1.1.109 "**Short-Term Vacation Rental Regulations**" means all provisions of the La Quinta Municipal Code related to short-term vacation rentals as the same may be amended from time to time, including specifically Chapter 3.24 or successor provisions related to transient occupancy tax and Chapter 3.25 related to short-term vacation rentals, except to the extent any provision directly conflicts with the vested rights in Section 2.2.1 of this Agreement.

1.1.110 "**Site**" has the same meaning as Property and Phase 1 Property.

1.1.111 "**Site Development Permit**" and "**site development permit**" shall have the meaning set forth in Section 9.180.020 of the La Quinta Municipal Code.

1.1.112 "**Site Map(s)**" means the site map(s) attached hereto as Exhibit B and incorporated herein by this reference.

1.1.113 "**Specific Plan**" shall have the meaning as set forth in Recital C and is identified by the City as Specific Plan (SP) 2006-080 SilverRock Resort.

1.1.114 "**Term**" means the period of time for which the Agreement shall be effective in accordance with Section 1.2 herein.

1.1.115 "**TOT**" means "transient occupancy tax" collected by City pursuant to Chapter 3.24 of the La Quinta Municipal Code and applicable state laws.

1.1.116 "**TOT Covenant Agreement**" shall mean the "Transient Occupancy Tax (TOT) Revenue Sharing Agreement" described in Recital F and executed on or about even date as this Agreement.

1.1.117 "**Transfer**" means any transfer of any interest, including fee simple or ground leasehold interest, as applicable, in the Property (Phase 1A Property and Phase 1B Property), the City-Owned Option Property, the City-Owned Golf Course Property, and the City-Owned Ahmanson Ranch Property, and corresponding interests in this Agreement.

1.1.118 "**Transferee**" and "**transferee**" shall mean the Person(s) receiving an interest subject to a Transfer.

1.1.119 "**Transfer Exemption(s)**" means, for the purposes of this Agreement, a Transfer by leases, subleases, licenses, or other occupancy arrangements (other than ground leases) for uses on any portion(s) of the Property and Planning Areas consistent with the overall first class character of the Luxury Hotel and Permitted Hotel Operator, including, without limitation, restaurants and other food services, fitness centers, wellness facilities, residential rentals that qualify as short-term vacation rentals under the Short-Term Vacation Rental Regulations, banquets and parties, corporate events, spa services, bars, gift shops, boutiques and other retail, recreational activities, and other similar services. A Transfer Exemption shall not require prior approval or consent by the City under this Agreement; provided, however, all uses subject to a Transfer Exemption shall be governed by this Agreement and by any and all applicable federal, state, and local (including City) laws and regulations, including but not limited to Ministerial Permits and Approvals and City's Reserved Powers. Nothing in this definition does or shall be deemed to release Developer or any transferee with an interest in any leases, subleases, licenses, or other occupancy arrangements qualifying as an Transfer Exemption from compliance with the uses set forth in this Agreement and by any and all applicable federal, state, and local (including City) laws and regulations, including the City's Zoning Ordinance.

1.1.120 "**Uniform Codes**" means those building, electrical, mechanical, plumbing, fire and other similar regulations of a City-wide scope which are based on recommendations of a multi-state professional organization and become applicable throughout the City, such as, but not limited to, the Uniform Building Code, the Uniform Electrical Code, the Uniform Mechanical Code, Uniform Plumbing Code, or the Uniform Fire Code (including those amendments to the promulgated uniform codes which reflect local modification to implement the published recommendations of the multi-state organization and which are applicable City-wide).

1.1.121 "**Updated Mitigated Negative Declaration**" shall have the meaning as set forth in Recital K.

1.1.122 "**Zoning Ordinance**" means Title 9 of the La Quinta Municipal Code.

1.2 Term.

This Agreement shall be in full force and effect as of the Reference Date, but for purposes of the duration of this Agreement pursuant to Section 65865.2 of the Development Agreement Act, the "**Term**" of this Agreement shall commence on the Development Agreement Reinstatement Date, and shall continue for thirty (30) years after the Development Agreement Reinstatement Date unless said term is otherwise terminated, modified, or extended by circumstances set forth in this Agreement or by mutual consent of the Parties after the satisfaction of all applicable public hearing and related procedural requirements.

1.3 Development Agreement Effective Date.

The vesting of the rights and obligations for the development of the Project set forth in this Agreement shall be effective as of the date this Agreement is recorded in the Recorder's Office ("**Development Agreement Reinstatement Date**"), but upon becoming effective, the vesting of said rights and obligations shall be retroactive to the effective date of the Original SDC Development Agreement (the "**Effective Date**") but without Developer having assumed any liability with respect to acts or omissions on the Property occurring prior to the Development Agreement Reinstatement Date. The City shall have the right to deliver to the Parties a written confirmation of the Development Agreement Reinstatement Date, but said Development Agreement Reinstatement Date shall be the date as set forth in the preceding sentence regardless of whether or when the City delivers such notice.

1.4 Termination of this Agreement.

Unless terminated earlier pursuant to the terms hereof, this Agreement shall automatically terminate and be of no further effect upon the expiration of the Term of this Agreement. Termination of this Agreement, for any reason, shall not, by itself, affect any right or duty arising from entitlements or approvals set forth in the Project Approvals. After such termination, the Parties shall execute evidence of such termination in customary and recordable form.

Furthermore, and notwithstanding anything herein to the contrary, this Agreement shall be subject to termination pursuant to Sections 8.2 and 8.3 if, following the notice and cure provisions set forth in Section 8.1, Developer fails to commence or complete the Luxury Hotel Project Component or Public Golf Clubhouse Project Component in accordance with the Project Milestones , as may be modified or adjusted pursuant to the terms of this Agreement.

Furthermore, notwithstanding anything herein to the contrary, in the event Developer does not acquire title to the Phase 2 Property pursuant to the Option Agreement covering the City-Owned Option Property by the outside closing date for Developer to purchase the Phase 2 Property as set forth in the Option Agreement (referred to herein as the "**Outside Phase 2 Property Acquisition Date**"), this Agreement shall automatically terminate with respect to the Phase 2 Property and Developer and City agree to execute and record such document as reasonably required to terminate and remove this Agreement from record title against the Phase 2 Property. The Parties acknowledge that in the event of automatic early termination with respect to the Phase 2 Property as provided in this paragraph, the Parties shall be deemed to have mutually consented to the early termination of this Agreement solely for the Phase 2 Property for purposes of the Development Agreement Act and Development Agreement Ordinance.

The Parties acknowledge and agree that, except for the provisions in the foregoing paragraphs in this Section 1.4 and any other termination rights of a Party that are expressly set forth herein, the Development Agreement Act and Development

Agreement Ordinance require that, prior to any such early termination of this Agreement, the La Quinta Planning Commission must hold a public hearing regarding the proposed termination and make certain recommendations to the City Council, and then the City Council must hold a public hearing regarding the termination and make certain findings.

1.5 Statement of Benefits and Consideration.

The Parties have determined that a development agreement is appropriate for the construction and operation of the Project due to the substantial benefits to be derived therefrom.

The Project will promote the health, safety and general welfare of City and its residents. In exchange for these and other benefits to City, Developer will receive the assurance that Developer may develop the Project during the Term of this Agreement, subject to the terms and conditions herein contained. City has undertaken the necessary proceedings, has found and determined that this Agreement is consistent with the General Plan, and has adopted the requisite ordinance approving this Agreement. As a result of the development of the Project in accordance with this Agreement, City will receive substantial benefits, including the benefits consistent with economic opportunities leading to significant job creation and general fund revenue increases that the California Legislature has promoted pursuant to Government Code section 52200 *et seq.*

In consideration of the substantial benefits, commitments and consideration to be provided by Developer pursuant to this Agreement and in order to strengthen the public planning process and reduce the economic costs of development, City hereby provides Developer assurance that if Developer acquires title to the Property, Developer can proceed with the construction and operation of the Project for the Term of this Agreement pursuant to the Applicable Rules and this Agreement. Developer would not enter into this Agreement or agree to provide the public benefits, commitments and consideration described in this Agreement if it were not for the certainty provided by the agreement of City that the Project could be constructed and operated during the Term of this Agreement in accordance with the Applicable Rules and this Agreement.

1.6 City CEQA Findings.

City finds that review of the environmental impacts of this Agreement and the Project has been conducted in accordance with the provisions of CEQA and the State and local guidelines adopted thereunder, and City has given consideration to such environmental review prior to its approval of this Agreement and the Project and has undertaken all actions necessary to comply with CEQA.

1.7 Consistency with SilverRock Specific Plan Authority for Location and Alignment of Planning Areas.

Pursuant to Section 2.2.1 of the SilverRock Specific Plan, the location and alignment of the land uses and zones in the Specific Plan are diagrammatic, and the precise layout of the various land uses are ultimately to be determined by the actual alignment and adjacency of each land use category. Consistent with Section 2.2.1 of the Specific Plan, the Planning Areas as set forth in this Agreement shall govern and apply to the Development of the Project and shall supersede the planning areas as identified and located in the Specific Plan, to the extent the planning areas in the Specific Plan are inconsistent with the Planning Areas set forth in this Agreement.

2. AGREEMENTS AND ASSURANCES

2.1 Agreement and Assurance on the Part of Developer.

In consideration for City entering into this Agreement, and as an inducement for City to obligate itself to carry out the covenants and conditions set forth in this Agreement, and in order to effectuate the purposes and intentions set forth in this Agreement, Developer hereby agrees to develop and use the Property and the Project pursuant to all of the requirements set forth in this Agreement and other Project Approvals.

2.1.1 Bankruptcy Lawsuit and Property Acquisition Requirements.

From and after the Reference Date of this Agreement, and to facilitate the close of escrow for Developer to acquire from Debtors the Property as part of the Bankruptcy Lawsuit and pursuant to any order of the Bankruptcy Court, Developer shall have the following obligations assuming that concurrently therewith or prior thereto, the City has entered into and duly authorized all La Quinta Amended Development Documents:

(A) Take all actions necessary or proper to ensure that, prior to the date of the close of escrow for Developer to acquire the Property, this Agreement and all La Quinta Amended Development Documents are fully executed and, as appropriate, notarized and ready for recording in the Recorder's Office;

(B) Deliver or cause to be delivered to the escrow officer and/or title officer, servicing the acquisition of the Property by Developer from Debtors, any and all escrow instructions as may be necessary or proper to ensure this Agreement and all La Quinta Amended Development Documents will be binding on Developer as of the date of the close of escrow and, as appropriate, to ensure this Agreement and any other La Quinta Amended Development Documents or other instruments are recorded in the Recorder's Office no later than the close of escrow on the Property;

(C) Instruct the escrow officer and/or title officer, servicing the acquisition of the Property by Developer from Debtors, to ensure that the following La Quinta Amended Development Documents are fully executed and notarized to be

recorded against the Phase 1 Property on the date of the close of escrow, in the following order:

i. This Reinstated Development Agreement shall be recorded immediately after the grant deed conveying fee title of the Property to Developer, with no other document or instrument (including any deed of trust) to be recorded prior to this Agreement, it being expressly understood and agreed by the Parties that this Agreement shall have priority and will remain with priority over any other recorded document or instrument after the date Developer acquires fee title to the Property;

ii. The Reinstated Covenant Affecting Real Property (Golf Course Use) and Reinstated Covenant Affecting Real Property (Ahmanson Ranch House);

iii. The TOT Covenant Agreement;

iv. The Memorandum of the Option Agreement in the form attached to the Option Agreement.

v. Any other documents as may be necessary or proper, as determined by the City and Developer, to effectuate the development and use of the Property consistent with this Agreement.

(D) Deliver or cause to be delivered to City the original signed copies of this Agreement and other La Quinta Amended Development Documents, and deliver or cause to be delivered to City conformed copies of the recorded copies of this Agreement and (as appropriate) other La Quinta Amended Development Documents.

2.1.2 Developer to Cooperate with City in Good Faith.

Developer and City shall cooperate in good faith to prepare and deliver to the escrow officer and/or title officer any and all documents so that Developer's acquisition of the Property from Debtors may occur by the date for the close of escrow pursuant to the purchase and sale agreement between Developer and Debtors (the "**Debtor PSA**").

2.1.3 Taxes and Assessments.

Commencing upon the date of the close of escrow for Developer's acquisition of the Property, Developer shall pay prior to delinquency all ad valorem real estate taxes and assessments on the Property (pro-rated to after such time that Developer acquires fee title to the Property), subject to Developer's right to contest in good faith any such taxes or assessments. Developer agrees on behalf of itself, and on behalf of all persons or entities that may own an interest in the portions of the Property developed

with any Project Component in the future, that during the term of the TOT Covenant Agreement, neither Developer nor any such person or entity shall (i) apply for or receive any exemption from the payment of property taxes or assessments on any interest in or to the Project or any portion thereof, or (ii) take any action, including any assessment appeal, to decrease the assessed value of the Phase 1A Property below the assessed value as of the Reinstatement Date, to the extent the TOT Covenant Agreement continues to apply to the Phase 1A Property.

2.1.4 Covenant to Maintain Property on Tax Rolls.

Developer for itself, its successors and assigns to all or any part or portion of the Property and/or Project, covenants and agrees that Developer shall not use or otherwise sell, transfer, convey, assign, lease, leaseback or hypothecate the Property, the Project, or any portion of any of the foregoing to any entity or person, or for any use of the Property, the Project, or any portion of any of the foregoing, that is partially or wholly exempt from the payment of real or personal property taxes or that would cause the exemption of the payment of all or any portion of real or personal property taxes otherwise assessable regarding the Property, the Project, or any portion of any of the foregoing, without the prior written consent of City, which may be withheld in City's sole and absolute discretion for a period of thirty (30) years from the Reference Date. Notwithstanding the foregoing, the lease or sublease of up to five percent (5%) of the Property to a tax-exempt organization shall be considered *de minimis* for the purposes of this subsection and shall be permitted without any further approval by the City.

Except as permitted pursuant to the preceding sentence, if the Property, or any portion of the Property, shall be conveyed, transferred or sold to any entity or person that is partially or wholly exempt from the payment of real or personal property taxes otherwise assessable against the Property, or any portion thereof, without the prior written consent of City commencing from the Reference Date and for the duration of the Term of this Agreement, then, at City's election and in addition to all other remedies available to City under this Agreement or at law or in equity, Developer shall pay to City a fee in lieu of payment of such taxes each year in an amount determined by City to be equal to its share of property taxes received from the ad valorem tax on the "full cash value" of the Property, or portion thereof, as may be subject to such exemption from payment of real or personal property taxes (the "**Lost Tax Revenue**"). City's determination of the Lost Tax Revenue for in-lieu payment purposes under this Section shall be established by City each year, if necessary, by reference to the real or personal property tax valuation principles and practices generally applicable to a county property tax assessor under Section 1 of Article XIIIA of the California Constitution. City's determination of the Lost Tax Revenue shall be supported by substantial evidence and shall be conclusive on such matters. If City determines that an amount is payable as an in-lieu payment under this Section in any tax year, then such amount shall be paid to City for that tax year within sixty (60) days following transmittal by City to Developer of an invoice for payment of the in-lieu amount.

The covenants of this Section 2.1.4 shall run with the land of the Property, shall be enforceable against the Developer and its successors and assigns, for the duration of the Term of this Agreement.

2.2 Agreement and Assurances on the Part of City.

In consideration for Developer entering into this Agreement, and as an inducement for Developer to obligate itself to carry out the covenants and conditions set forth in this Agreement, and in order to effectuate the purposes and intentions set forth in this Agreement, City hereby agrees as follows:

2.2.1 Reinstated and Amended Development Agreement.

On and after the Reference Date, and pursuant to order from the Bankruptcy Court, the Original SDC Development Agreement shall be deemed reinstated and amended as provided for in this Agreement. Furthermore, City covenants and agrees that the SDC PSDA is no longer of any force and effect, and on and after the Reference Date, the SDC PSDA no longer is incorporated by reference into this Agreement, it being expressly understood and agreed by the Parties that this Agreement (along with all other agreements between City and Developer resulting from the purchase and sale of the Property vis-à-vis the Bankruptcy Lawsuit) governs the pre-development, development, operation, and use of the Property for the Project.

2.2.2 Entitlement to Develop with Vested Rights.

Developer has the vested right to develop the Project subject to the terms and conditions of this Agreement, Project Site Development Permits, and Applicable Rules, subject to the Reserved Powers. Developer's vested rights under this Agreement shall include, without limitation, the right to remove, remodel, renovate, rehabilitate, rebuild or replace the existing construction and development, or any portion thereof, for the Project throughout the Term for any reason, including, without limitation, in the event of damage, destruction or obsolescence of the existing construction or development or any portion thereof, subject to Developer's timely performance of its obligations under this Agreement, Project Approvals, and Applicable Rules (and subject to the Reserved Powers). To the extent that all or any portion of the existing construction or development for the Project is removed, remodeled, renovated, rehabilitated, rebuilt or replaced, Developer may demolish and/or relocate that portion of the existing construction or development, as the case may be, at another location on the Property, subject to timely compliance with, and the requirements of, this Agreement, Project Approvals, and Applicable Rules (and subject to the Reserved Powers).

2.2.3 Short-Term Vacation Rentals.

This Agreement does hereby provide that short-term vacation rentals, as set forth in the Short-Term Vacation Rental Regulations, are a permitted use within all portions of the Project that allow residential uses, and the rights to such permitted use are hereby vested in Developer pursuant to the terms of this Agreement. Developer shall comply

with the provisions in this Agreement (below) pertaining to the use and operation of short-term vacation rentals.

2.2.4 Changes in Applicable Rules.

(A) Nonapplication of Changes in Applicable Rules.

Any change in, or addition to, the Applicable Rules adopted or becoming effective after the Development Agreement Reinstatement Date, including, without limitation, any such change by means of ordinance, City Charter amendment, initiative, referendum, resolution, motion, policy, order or moratorium, initiated or instituted for any reason whatsoever and adopted by the City, City Council, Planning Commission or any other board, commission, department or agency of the City, or by the electorate, as the case may be, which would, absent this Agreement, otherwise be applicable to the Property and/or Project, and which would be in direct conflict of this Agreement, shall not be applied to the Property or the Project unless such changes represent an exercise of City's Reserved Powers, or are otherwise agreed to in this Agreement. Notwithstanding the foregoing, Developer may, in its sole discretion, consent to the application to the Property and/or Project any change in the Applicable Rules.

(B) Changes in Uniform Codes.

Notwithstanding any provision of this Agreement to the contrary, development and use of the Project shall be subject to changes which may occur from time to time in the Uniform Codes, as such Codes are adopted by the City of La Quinta.

(C) Changes Mandated by Federal or State Law.

This Agreement shall not preclude the application to the Property or Project of changes in, or additions to, the Applicable Rules, including rules, regulations, ordinances and official policies, to the extent that such changes or additions are mandated to be applied to developments such as the Project on the Property by state or federal laws and/or regulations, pursuant to the Reserved Powers. In the event state or federal laws or regulations prevent or preclude compliance with one or more provisions of this Agreement, such provisions shall be modified or suspended as may be necessary to comply with such state or federal laws or regulations.

2.2.5 Subsequent Development Review.

Nothing set forth herein shall impair or interfere with the right of City to require Developer (or any agent acting on Developer's behalf) to apply for and obtain any and all Discretionary Permits, Ministerial Permits and Approvals, and any other permits, licenses, approvals, or entitlements required by law pursuant to applicable provisions of the La Quinta Municipal Code, Uniform Codes, or other rules and procedures adopted by City and applicable to the Project pursuant to the Applicable Rules.

Prior to each request for a building permit, Developer shall provide City with a Compliance Certificate for Building Permit ("**Certificate for Building Permit**") in a form created by Developer and reasonably approved by City, which shall describe how all applicable Project Approvals, including applicable Conditions of Approval, have been fully complied with so that Developer may be issued a building permit. Each Certificate for Building Permit shall be distributed by City to the relevant City departments for checking the representations made by Developer thereon, and City shall diligently pursue completion of such process to avoid any unnecessary delays in the prompt issuance of building permits for the Project.

2.2.6 Effective Development Standards.

City agrees that it is bound to permit the uses, intensities of use and densities on the Property which are permitted by this Agreement and the Project Approvals, insofar as this Agreement and the Project Approvals so provide or as otherwise set forth in the Applicable Rules (subject to Reserved Powers). City hereby agrees that it will not unreasonably withhold, condition, or delay any permits, licenses, approvals, or entitlements which must be issued by City in order for the Project to proceed, provided that Developer is in compliance with this Agreement and the Project Approvals and reasonably and satisfactorily complies with all City-wide standard procedures for processing applications for such approvals and/or permits.

Except as expressly provided in this Agreement, the City retains all discretion to approve, deny, or condition any and all permits, licenses, approvals, and entitlements, and other applications related to the Project and development and use of the Property for Discretionary Actions to the extent provided under Applicable Rules.

2.2.7 Moratoria or Interim Control Ordinances.

In the event an ordinance, resolution, policy, or other measure is enacted, whether by action of City, by initiative, or otherwise, which relates directly or indirectly to the Project or to the rate, amount, timing, sequencing, or phasing of the development or construction of the Project on all or any part of the Property or the implementation of the Mitigation Measures adopted in connection with approval of the Project, City agrees that such ordinance, resolution or other measure shall not apply to the Property, the Project or this Agreement, unless such changes are adopted pursuant to the Reserved Powers or other applicable provisions of this Agreement.

3. DEVELOPMENT OF THE PROJECT

3.1 Generally.

Developer shall develop or cause the development of the Project on the Property in accordance with this Agreement and other Project Approvals, the Project Description, Site Maps, Scope of Work for all Project Components, and within commencement and completion dates of the Project Components pursuant to the Schedule of Performance stated to be Project Milestones. The Project Components shall be developed in phases

and in accordance with this Agreement and the Site Maps, Schedule of Performance, Project Description, Scope of Work, and other Project Approvals.

3.1.1 Compliance with Laws.

All work performed in connection with the pre-development, development, construction, demolition, rehabilitation, use, and operation of the Project shall comply with all applicable federal, state, and local laws and regulations.

3.1.2 Compliance with Government Code Section 66473.7.

Developer shall comply with the provisions of Government Code Section 66473.7 with respect to any Project Tract Maps prepared for the Project.

3.1.3 Mitigation Monitoring Program.

The Developer shall comply with any and all Mitigation Measures and reporting requirements as set forth and in accordance with the Mitigation Monitoring Program incorporated into the Updated Mitigated Negative Declaration by the Agreement Addendum.

3.1.4 Temporary Golf Course Clubhouse.

In the event that, prior to the time Developer completes the construction as evidenced by the recording of a Certificate of Completion that applies to the Public Golf Clubhouse Project Component, Developer's construction activities hereunder will if so elected by Developer (i) result in the removal of the existing temporary golf clubhouse, or (ii) render the location of the existing temporary golf clubhouse impractical, as determined by City, then Developer shall erect or install a new temporary golf clubhouse to serve the Golf Course until such time as the Public Golf Clubhouse Project Component has been completed and opened to the public. Said new temporary golf clubhouse shall be constructed according to minimum standards reasonably required by City, and may be a modular or similar facility, but shall provide the same or equivalent services, and operate during the same hours, as the existing temporary golf clubhouse. City shall have the right to review and approve (which approval shall not be unreasonably withheld, delayed or conditioned) Developer's proposals for any such new temporary golf clubhouse.

3.1.5 Obtaining Project Entitlements.

Developer shall have the obligation to apply for and obtain, at its own cost and expense, any and all permits, licenses, approvals and entitlements for the development of the Project and use and operation for the authorized uses attached to each Project Component as set forth in this Agreement. By the approximate dates set forth in the Schedule of Performance (or, with respect to Project Milestones, the dates), Developer shall submit to City Staff for review, comment and conformation of completeness, and

for subsequent processing pursuant to the La Quinta Municipal Code (or, as applicable, this Agreement), the following:

(A) A proposed complete conceptual development plan for the Project Components on the Phase 1A Property that describes and depicts: (1) the location and placement of proposed buildings, (2) the architecture and elevations of the proposed buildings, and (3) any other specifications that Developer and City Staff mutually agree upon to be included in Phase 1A Property Project Components;

(B) A proposed complete conceptual development plan for the Project Components on the Phase 1B Property that describes and depicts: (1) the location and placement of proposed buildings, (2) the architecture and elevations of the proposed buildings, and (3) any other specifications that Developer and City Staff mutually agree upon to be included in Phase 1B Property Project Components (which it is acknowledged and agreed that, at the election of Developer, may be as part of or separate from the development of the Phase 2 Property; provided, however, that any actual clearing, grading, and other infrastructure and horizontal land development work on the Phase 2 Property (collectively, and specifically excluding any vertical construction which shall not be permitted prior to Developer taking title to the Phase 2 Property, the "**Phase 2 Pre-Closing Work**") shall be contingent on (i) Developer providing evidence reasonably acceptable to the City that demonstrates that Developer will have the capital and/or financing required in order to perform the Phase 2 Pre-Closing Work and (ii) Developer entering in to a license agreement with the City on terms and conditions (including, but not limited to, terms and conditions relating to Developer keeping the Phase 2 Property free and clear of mechanic's liens, Developer having sufficient funds in an escrow account or otherwise having a guaranty or letter of credit or other similar arrangement to ensure timely payment of any Phase 2 Pre-Closing Work, and Developer's insurance and indemnity obligations for the benefit of the City relating to any Phase 2 Pre-Closing Work) as reasonably acceptable to Developer and the City (it being agreed, for the avoidance of doubt, that the conditions precedent to exercising the option and exercising the option to purchase the City-Owned Option Property (Phase 2 Property), and acquiring fee title to the Phase 2 Property, pursuant to the Option Agreement shall not be required in order for Developer to perform the Phase 2 Pre-Closing Work pursuant to this clause (B));

(C) A proposed complete conceptual development plan for the Landscaping And Trails Project Component that describes and depicts: (1) the location and placement of proposed landscaping, vegetation, hardscaping, fencing, pathways, trails, and/or related landscaping features or improvements for the Phase 1 Property, (2) the elevations of the proposed landscaping and related features and improvements, (3) a dust mitigation (PM 10 abatement) plan and contingency measures for instances when dust mitigation would be performed by Developer, and (4) any other specifications that Developer and City Staff mutually agree upon (including the landscaping that bounds the SilverRock Resort Area along a portion of Avenue 52 pursuant to Section 5.1.4 of this Agreement) to be included in the Landscaping And Trails Project Component; and

(D) Proposed zoning change, Specific Plan Amendment, or changes to the City's General Plan, if any, necessary to accommodate the Project Components on the Phase 1B Property.

3.1.6 Submission of Additional Information to City.

For informational purposes only, Developer shall also provide the following information to the City Manager in connection with obtaining the remaining entitlements for the Luxury Hotel Project Component, the Phase 1A Luxury Residential Project Component, and the Phase 1B Luxury Residential Project Component.

(A) Commitment letter, term sheet, letter of intent, memorandum of understanding or similar instrument (which it is acknowledged may be non-binding) from the proposed Permitted Hotel Operator for the Luxury Hotel Project Component and (if applicable) Phase 1A Luxury Residential Project Component and/or Phase 1B Luxury Residential Project Component (depending on which Project Component(s) Developer elects to undertake at the appliable time), along with documentation confirming certain of the basic terms and conditions pursuant to which the proposed Permitted Hotel Operator will operate and manage the luxury hotel, but excluding any information reasonably designated proprietary or otherwise confidential by the Hotel Operator including, without limitation, economic terms;

(B) The Final Project Budget for the applicable Project Component(s);

(C) The proposed financing plan generally identifying financing sources for all private and public improvements proposed for the Project Components on the Phase 1A Property, which financing plan is consistent with the Final Project Budget and in compliance with all applicable financing provisions in this Agreement, with respect to the applicable Project Component(s);

(D) The proposed financing plan generally identifying financing sources for all private and public improvements proposed for the Project Components on the Phase 1B Property, which financing plan is consistent with the Final Project Budget and in compliance with all applicable financing provisions in this Agreement, with respect to the applicable Project Component(s).

3.2 Construction Provisions.

3.2.1 Developer Covenant to Complete the Project.

Upon the close of escrow and Developer's acquisition of the Property, Developer covenants, for itself, its successors and assigns, that the Developer shall commence and complete the construction of the Project on the Property within the approximate (or, with respect to Project Milestones, the dates) time period for such actions set forth in the Schedule of Performance. Developer covenants and agrees for itself, its successors, and assigns, that the Property shall be improved and developed with the

Project in substantial conformity with the terms and conditions of this Agreement, Project Approvals, and Applicable Rules, except for such changes as may be mutually agreed upon in writing by and among the Parties, and all applicable laws, regulations, orders and conditions of all other federal, state, and local governmental agencies with jurisdiction over the Property or the Project, subject in each such case to events of Force Majeure. The covenants of this Section shall run with the land of the Property until the earlier of the date of recordation of the final Certificate of Completion or the expiration of the Term of this Agreement, subject to the provisions in this Agreement that state that those portion(s) of the Property that have a Certificate of Completion recorded against an applicable Project Component(s) shall be released from this Section upon the recording of said Certificate of Completion applicable to that Project Component(s).

3.2.2 Changes to Specifications During Course of Construction.

Developer shall have the right during the course of construction of the Project to make minor field changes, without seeking the approval of the City, if such changes do not affect the type of use to be conducted within all or any portion of a structure. "**Minor field changes**" shall be defined as those changes from the Project Approvals or City-approved Discretionary Permits and/or Ministerial Permits and Approvals, that have no substantial effect on the Project or are made in order to expedite the work of construction in response to field or other unforeseen conditions. Developer shall submit all other changes (those changes which are not Minor Field Changes) to the City for its review and approval (which shall not be unreasonably delayed, withheld or conditioned) no less than thirty (30) days prior to the date that Developer intends to implement such changes, or as otherwise determined appropriate by the Parties based on the circumstances presented. City shall have twenty (20) days from its receipt of such proposed changes to review the same and advise the Developer in writing whether such changes are acceptable to City in its reasonable discretion. Any proposed changes which are not disapproved by City within such twenty (20) day period shall be deemed approved. Nothing contained in this Section shall be deemed to constitute a waiver of or change in the City requirements governing changes or any other approvals by the City otherwise required construction of the Project.

3.2.3 Construction Commencement and Completion.

Developer shall commence construction of the Project in approximate accordance with the Schedule of Performance (or, with respect to Project Milestones, in accordance therewith (subject to events of Force Majeure)) and, thereafter, shall diligently proceed to complete the construction of the Project in a good and workmanlike manner in substantial conformity with the Project Approvals according to the Schedule of Performance. Developer shall obtain a Certificate of Completion on or before the final completion date for the Project Milestones, and for other Project Components on the Phase 1A Property and Phase 1B Property, approximately on or before the completion dates, as set forth in the Schedule of Performance. Developer shall, promptly upon completion of construction of any Project Component(s), cause said

Project Component(s) to be inspected by each federal, state, and local (including City) governmental agency with jurisdiction over the Project required under law to conduct such inspection, shall correct any defects and deficiencies that may be disclosed by any such inspection and shall cause to be duly issued all certificates of occupancy and other permits, licenses, approvals or entitlements necessary for the operation and occupancy of said completed Project Component(s). Excepting any preliminary work undertaken by Developer to salvage or use existing improvements on the Property, after commencement of the work of improvement of a Project Component on the Phase 1A Property, the Developer shall not permit the work or improvements to that Project Component of the Phase 1A Property to cease or be suspended for a time period in excess of ninety (90) consecutive calendar days, subject to events of Force Majeure as provided in this Agreement. Similarly, after commencement of the work of improvement of a Project Component on the Phase 1B Property, the Developer shall not permit the work or improvements to that Project Component of the Phase 1B Property to cease or be suspended for a time period in excess of ninety (90) consecutive calendar days, subject to events of Force Majeure as provided in this Agreement.

3.2.4 Compliance and Modifications to Schedule of Performance.

The Schedule of Performance establishes various dates and times setting for the approximate dates for the accomplishment of various tasks assigned to Developer, and satisfaction of all of those tasks must be met prior to issuance by the City of the final Certificate of Completion. Notwithstanding the previous sentence, the Parties agree that time is of the essence in the performance of the Project Milestones, and, if any of the same are not timely met, then the City shall have the right to exercise any of its rights for failure to meet a Project Milestone set forth in this Agreement.

If the date or time for the performance of a task or the satisfaction of a condition, as set forth in either the text of this Agreement or which constitutes a Project Milestone, may not be achieved, then prior to such date or time set forth in the text of this Agreement or the Project Milestone, the Parties shall consider whether a modification to the text of this Agreement or to the Schedule of Performance is warranted. Any decision to approve a modification to a time or date established in either the text of this Agreement or the Project Milestones shall be subject to the discretion of each Party, which shall be exercised reasonably and in good faith, and any request by Developer for any modification shall be reviewed by the City Manager for a determination of whether the modification is an Insubstantial Modification as provided for in this Agreement.

Any modification of a time or date for performance of a particular task or satisfaction of a particular condition that does not result in a change of more than one hundred eighty (180) calendar days may be approved on behalf of the City by the City Manager as an "Insubstantial Modification." A modification of a time or date for performance of a task or satisfaction of a condition that results in an aggregate change of more than one hundred eighty (180) calendar days to that task or condition (excluding any Force Majeure delays) shall be subject to the approval of the City

Council, in its sole and absolute discretion, and would be memorialized as an amendment to this Agreement. If performance of a task or satisfaction of a condition for any Project Milestones in the Schedule Performance is prevented or delayed by an event of Force Majeure, the deadline for completion of such task or satisfaction of such condition shall be extended by the period of such event of Force Majeure. Upon the completion of an event of Force Majeure, the extended period shall be memorialized in writing by the City Manager and Developer and delivered to the Parties.

3.2.5 City's Right to Inspect Property and Project.

Officers, employees, agents and representatives of City shall have the right of reasonable access to the Property, without the payment of charges or fees, during normal construction hours, during the period of construction of the Project. Such officers, employees, agents or representatives of the City shall be those persons who are designated by the City Manager or authorized designee. Any and all officers, employees, agents or representatives of the City who enter the Property, if requested by Developer, shall identify themselves at the construction management office on the Property upon their entrance on to the Property, and, if required by Developer, shall at all times be accompanied by a representative of the Developer while on the Property. Developer shall make a representative of Developer available for this purpose at all times during normal construction hours, upon reasonable notice from the City. City shall defend, indemnify and hold the Developer harmless from injury, property damage or liability arising out of the exercise by the City of the right of access to the Property provided in this Section, other than injury, property damage or liability arising from the negligence or willful misconduct of Developer or its officers, agents or employees. City shall inspect relevant portions of the Property, prior to issuing any written statements reflecting adversely on Developer's compliance with the terms and conditions of this Agreement pertaining to development of the Project. If, in the City's reasonable discretion it is necessary, City shall have the further right, from time to time, to retain a consultant or consultants to inspect the Project and verify compliance by the Developer with the provisions of this Agreement at City's sole cost and expense. Developer acknowledges and agrees that any such inspections are for the sole purpose of protecting the City's rights under this Agreement, are made solely for the City's benefit, that the inspections may be general in nature, and are for the purposes of informing the City of the progress of the Project and the conformity of the Project with the terms and conditions of this Agreement, and that Developer shall not be entitled to rely on any such inspection(s) as constituting an approval, satisfaction or acceptance of any materials, workmanship, conformity of the Project with this Agreement or otherwise. Developer agrees to make its own regular inspections of the work of construction of the Project to determine that the quality of the Project and all other requirements of the work of construction of the Project are being performed in a manner satisfactory to the Developer. Developer also agrees to immediately notify the City in writing should the Developer's inspections show any matters that will prevent a Project Component from being completed by the date and time set forth therefore in the Schedule of Performance.

3.2.6 Dust Control.

From and after the date of the close of escrow for Developer's acquisition of the Property and until the date of the last Certificate of Completion is recorded against the Property (or applicable portion thereof), Developer shall implement the Dust Control Program with respect to the Property. Such implementation shall continue until such time as all Project Components have been completed, as evidenced by City's issuance of, and the recording of, the last Certificate of Completion for the completion of the last Project Component on the Property.

3.2.7 Developer Sale of Undeveloped Lots in Phase 1A Luxury Branded Residences Project Component and Phase 1B Luxury Residential Project Component.

For the duration of the Term of this Agreement, Developer shall have the obligation to complete or cause the completion of construction for all Project Components of the Project; provided, however, that Developer shall have the right, in accordance with phased development of the Phase 1A Luxury Branded Residences Project Component (PA 2) and the Phase 1B Luxury Residential Project Component (PA 7) according to the approximate dates in the Schedule of Performance, to sell to individual buyers any precisely-graded and utility-ready unimproved custom single-family luxury home Lots, as long as any Lot sold to an individual buyer as part of the Project is subject to and governed by terms and conditions promulgated and enforced by the Permitted Hotel Operator and/or Developer for the timely construction and availability for occupancy of a single-family luxury residence on said Lot in accordance with design and construction requirements that are consistent with the use (or availability of the use) of such single-family luxury residence with the Luxury Hotel. The City shall have the right, upon request to Developer, to review the form of any agreements, development or construction guidelines or covenants, or other documents, which would be applicable to any Lots that would be eligible for sale to individual buyers pursuant to this Section, for the purpose of the City ensuring that the sale and construction of such unimproved Lot by an individual buyer is consistent with this Agreement and the Project. Any individual buyer of an unimproved Lot shall have the obligation to comply with any and all federal, state, and local (including City) laws and regulations for the development, use, and maintenance of a single-family luxury residence on the Lot, including but not limited to the requirement to obtain any and all Discretionary Permit and Ministerial Permits and Approvals from the City. Developer shall not sell or otherwise transfer (by lease or other conveyance) to an individual buyer any unimproved Lot on the Property unless such transfer is by a sale (for valuable consideration to a bone-fide purchaser) in accordance with the minimum requirements of this Section 3.2.7 and this Agreement. Developer shall not be entitled to a Certificate of Completion to be issued and recorded against the portion of the Phase 1 Property (including individual Lots) that constitute the Phase 1A Luxury Branded Residences Project Component (PA 2) or the Phase 1B Luxury Residential Project Component (PA 7) until at least one-half (1/2) of the single-family luxury residences have been completely constructed on the Lots within the Phase 1A Luxury Branded Residences

Project Component (PA2), and Developer shall not be entitled to a Certificate of Completion to be issued and recorded against the portion of the Phase 1 Property (including individual Lots) that constitute the Phase 1B Luxury Residential Project Component (PA 7) until at least one-half (1/2) of the single-family luxury residences have been completely constructed on the Lots within the Phase 1B Luxury Residential Project Component (PA 7).

3.3 Costs of Construction.

Except for the TOT rebate as provided for in the TOT Covenant Agreement and the potential premium purchase price for the City-Owned Option Property as provided for in the Option Agreement, all costs and expenses for the undertaking and completing the Project, including, without limitation, constructing all Project Components, all legally imposed on- and off-site improvements, and providing all utilities therefor, shall be borne by Developer at its sole cost, expense, and liability.

3.3.1 Payment of Fees.

During the Term of this Agreement, Developer shall be solely responsible for payment, and shall pay timely when due, all Processing Fees and Impact Fees with respect to the Project. The amounts for any and all Processing Fees, and amounts for any and all Impact Fees, to be charged and applied in connection with the development of the Property and use of the Project, or any Project Components or portions thereof, shall be the amounts which are in effect on a City-wide basis at the time an application for a permit, license, approval or other entitlement is submitted and made for City processing and action, except that City shall not impose on the Project any new Impact Fees that were not in effect as of the Development Agreement Reinstatement Date. To further amplify the preceding sentence and to avoid any doubt, Developer does not have, by entering into this Agreement, a vested right in the amounts of Processing Fees and Impact Fees, or any other fees, charges, levies, or assessments previously paid, in effect as of either the Reference Date or Development Agreement Reinstatement Date, but does have a vested right to be subject to only the Impact Fees in effect as of the Development Agreement Reinstatement Date.

3.3.2 Other Fees and Charges.

Except as otherwise provided in this Agreement, nothing set forth in this Agreement is intended to or shall be construed to limit or restrict the City's authority to impose its existing, or any increased, fees, charges, levies, or assessments for the development and of the Property and Project, or to impose or increase, subject to the required procedure, any taxes applicable to the Property and Project including but not limited to transient occupancy taxes, provided nothing set forth herein is intended or shall be construed to limit or restrict whatever right Developer might otherwise have to challenge any fee, charge, levy, assessment, or tax imposed or any binding agreements between the City and Developer.

3.3.3 Limited Interference with Golf Course Usage.

Developer shall carry out the construction of the Project so as to minimize interference with the Golf Course, including, without limitation, taking all necessary actions to ensure that dust (i) does not blow off or leave any portion of the Property under development and enter onto any portion of the Golf Course; or (ii) is not tracked from any portion of the Property under development onto any of the roadways within or surrounding the SilverRock Resort Area (including Jefferson Street and Avenue 52). Developer shall screen any portion of the Property under development to minimize the visual impacts of such development on persons using the Golf Course. Developer acknowledges that City has previously, and may in the future, enter into a use agreement with a charitable entity, pursuant to which the Golf Course may be utilized for an annual golf tournament. In any year when said tournament is held at the Golf Course, no construction activities shall take place during the televised portion of the tournament unless authorized, in writing, by the City Manager, and Developer and Developer's contractors and subcontractors shall ensure that during the tournament all construction sites are left in a neat and orderly condition. Developer additionally agrees to coordinate with the tournament officials to ensure that construction activities do not interfere with the tournament. In the event construction activities are halted pursuant to this subsection, all remaining dates and deadlines on the Schedule of Performance including the Project Milestones shall automatically be extended for a period of thirty (30) days for each the date such construction is re-commenced, and the Parties shall confirm the revised dates in a writing signed by the City Manager. Nothing in this provision shall be construed to limit or prevent Developer's work to improve the Golf Course pursuant to any plans duly approved by the City.

3.3.4 Prevailing Wages.

Developer acknowledges that the City has not made any representation, express or implied, to Developer or any person associated with Developer regarding whether or not laborers employed relative to the construction of the Project must be paid the prevailing per diem wage rate for their labor classification, as determined by the State of California, pursuant to Labor Code Sections 1720 *et seq.* Developer agrees with City that Developer shall assume the responsibility and be solely responsible for determining whether or not laborers employed relative to the construction of the Project must be paid the prevailing per diem wage rate for their labor classification.

Developer, on behalf of itself, its successors, and assigns, waives and releases City from any right of action that may be available to it pursuant to Labor Code Sections 1726 and 1781. Developer acknowledges the protections of Civil Code Section 1542 relative to the waiver and release contained in this Section, which reads as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST

HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

BY INITIALING BELOW, DEVELOPER KNOWINGLY AND VOLUNTARILY WAIVES THE PROVISIONS OF CIVIL CODE SECTION 1542 SOLELY IN CONNECTION WITH THE WAIVERS AND RELEASES OF THIS SECTION.

Developer's initials: ____

Additionally, in accordance with the general indemnity provisions in this Agreement, Developer shall indemnify, defend (with counsel acceptable to the City), and hold harmless City against any claims pursuant to Labor Code Sections 1726 and 1781 arising from this Agreement or the construction or operation of the Project.

3.4 Completion of Construction.

Provided Developer is not in Default or MAE Default of this Agreement, then Developer shall have the right, upon Developer's purported completion of construction for any Project Components on the Phase 1A Property, and upon Developer's purported completion of construction for any Project Components on the Phase 1B Property, to obtain a Certificate of Completion for that Project Component according to the following provisions:

3.4.1 Request for Certificate of Completion.

Following the substantial completion of construction, and upon written request from the Developer for issuance of a Certificate of Completion, City shall inspect the Project Component(s) to determine whether or not said Project Component(s) have been substantially completed in compliance with this Agreement. If City determines that said Project Component(s) are complete and in compliance with this Agreement, City Manager shall furnish the Developer with a Certificate of Completion for the respective Project Component(s). If City determines that said Project Component(s) are not in compliance with this Agreement, the City Manager shall send written notice of each non-conformity to the Developer. Upon issuance of the final certificate of occupancy for the development of the applicable Project Component(s) (excluding homes on lots sold by Developer for single-family luxury custom home construction by the buyer thereof), based on the applicable Project Approvals for the Project Component(s), City shall deliver the Developer a final Certificate of Completion for the applicable Project Component(s) and Developer shall thereafter be released from the construction obligations under this Agreement with respect to the applicable Project Component(s). Until the issuance of the final certificate of occupancy (excluding homes on lots sold by Developer for single-family luxury custom home construction by the buyer thereof) for a Project Component (if required under Applicable Rules), Developer shall not be entitled to a final Certificate of Completion and shall remain liable for the completion of all construction obligations under this Agreement with respect to such Project Component(s). Neither Developer nor City should unreasonably interfere with the usual

inspections by City agencies or other typical governmental inspections related to requirements for a certificate of occupancy.

3.4.2 Issuance of Certificate of Completion.

City shall not unreasonably withhold the issuance of a Certificate of Completion. A Certificate of Completion shall be evidence of the City's conclusive determination of satisfactory completion of the construction of the Project Component(s) to which it pertains pursuant to the terms of this Agreement. After the recordation of a Certificate of Completion for a Project Component, any person then owning or thereafter purchasing, leasing or otherwise acquiring any interest in the Property improved with said Project Component shall not (because of such ownership, purchase, lease or acquisition) incur any obligation or liability under this Agreement regarding construction of said Project Component except that such person shall be bound by any reservations, covenants, conditions, restrictions and other interests recorded against the Property pursuant to this Agreement which by their terms continue in effect.

3.4.3 Further Actions for Completion of Construction.

If City fails or refuses to issue a Certificate of Completion following written request from Developer within forty-five (45) calendar days of Developer's written request, City shall provide Developer with a written statement setting forth the reasons for City's failure or refusal to issue a Certificate of Completion. The statement shall also contain City's opinion of the action(s) Developer must take to obtain a Certificate of Completion from City. If the reason for Developer's failure to complete the Project (or a Project Component(s) or improvements on any portion of the Property for which the request pertains) is confined to the immediate unavailability of specific items or materials for construction or landscaping at a price reasonably acceptable to Developer or other minor building "punch-list" items, City may issue its Certificate of Completion upon the posting of a cash escrow, bond or irrevocable standby letter of credit by Developer (or other proof of funds being available) in a form reasonably acceptable to the City in an amount representing the cost of the work on the Project (or a Project Component(s) or improvements on any portion of the Property for which the request pertains) remaining to be completed, as reasonably determined by City. If City fails to provide such written statement, within the specified time period, Developer shall be deemed conclusively and without further action of City to have satisfied the requirements of this Agreement with respect to the Project (or a Project Component(s) or improvements on any portion of the Property for which the request pertains) as if a Certificate of Completion had been issued by the City pursuant to this Agreement.

3.4.4 Limits on Legal Effect of Certificate.

A Certificate of Completion shall not constitute evidence of compliance with or satisfaction of any obligation of the Developer to any holder of a Lien, or any insurer of a Lien or mortgage securing money loaned to finance the Project, or any parts thereof. A Certificate of Completion shall not be deemed to constitute a notice of completion under Civil Code Sections 8186 or 9204, nor shall it act to terminate the continuing covenants,

restrictions or conditions contained in any other instruments recorded against the Property pursuant to this Agreement.

3.5 Planned Development and CC&Rs.

Developer shall construct the Project on the Property as a "planned development" as defined in California Civil Code Section 4175 (or successor provision) pursuant to the Davis-Stirling Act, which, among other requirements, shall require the recording by Developer of a declaration (and may at Developer's discretion have multiple declaration(s)) of covenants, conditions, and restrictions ("**CC&Rs**") that, at a minimum, meet the requirements of a "declaration" as defined and described in the Davis-Stirling Act and to memorialize specified Conditions of Approval that are part of the Project Approvals. Developer shall provide to City, no less than ninety (90) days prior to the anticipated date of recording or anticipated date of submittal for review by the California Department of Real Estate (or other state agency with regulatory powers pursuant to the Davis-Stirling Act), whichever is earlier, a copy of a draft of any CC&Rs to be recorded against the Property, and any subsequent CC&Rs covering a portion of the Property for review and approval, not to be unreasonably withheld, by the City Manager and City Attorney. The Project shall have an "association" as defined and described in the Davis-Stirling Act, and may have multiple "associations" connected to the CC&Rs recorded against a portion of the Property as part of the Project if so elected by Developer.

3.5.1 CC&Rs to Include Relevant Conditions of Approval.

Developer shall construct the Project on the Property only in accordance with the Project Approvals, with CC&Rs recorded against the Property and any portions thereof to memorialize any specified Conditions of Approval that apply to the various portions of the Property pursuant to the Project Approvals.

3.5.2 Luxury Residences and Maintenance Obligations.

In addition to any other requirements set forth in applicable Conditions of Approval, prior to City's issuance of a certificate of occupancy for the first residential dwelling that is part of the Phase 1A Luxury Residential Project Component, and that is part of the Phase 1B Luxury Residential Project Component, respectively, Developer shall have submitted to City and shall have obtained City's approval of (such approval not to be unreasonably withheld, conditioned or delayed), CC&Rs that (i) establishes a homeowners' association, (ii) is necessary to create a condominium regime for the condominiums described in and part of any Project Approvals (including as part of this Agreement); (iii) clearly sets forth the maintenance obligations for the homeowners' association and respective owners of the residential dwellings subject to the CC&Rs; (iv) includes a disclosure of this Reinstated Development Agreement and general summary of its primary business terms; (v) includes a disclosure regarding the ownership and control of the Golf Course and Ahmanson Ranch House, as well as a disclosure of the conditional transfer of ownership of same to Developer as more fully described in this Reinstated Development Agreement; and (vi) a statement that

Developer does not and cannot guarantee the timing of or actual development or use of the remaining undeveloped real property located within the SilverRock Resort Area.

3.5.3 Recording of CC&Rs.

Unless a Condition of Approval provides otherwise, Developer shall have the obligation, at its own cost and expense, to record or cause to be recorded in the Recorder's Office any and all CC&Rs after they have been reviewed and approved by City and Developer pursuant to this Agreement.

3.5.4 City as Third Party Beneficiary; Amendments to CC&Rs.

All CC&Rs shall provide that City is a third party beneficiary with the right, but not the obligation, to enforce any and all terms and conditions in CC&Rs that specifically relate to and are required by this Agreement or are for the general benefit of the public (if applicable) based upon the Project and Project Approvals. Additionally, all CC&Rs that have been previously approved by City and recorded in the Recorder's Office shall require the prior written approval (which shall not be unreasonably withheld, delayed or conditioned) of City prior to any amendments to said CC&Rs affecting provisions where City is a third party beneficiary to ensure that such amendments comply with the requirements of this Agreement.

3.5.5 City Right to Compel Corrections to CC&Rs.

In addition to any and all rights and remedies available to City under this Agreement and at law or in equity, City shall have the right to compel Developer (or any successor or assignee, including a homeowners association) to terminate and remove from record title any CC&Rs that were recorded against the Property (or portion thereof) that were not previously approved by City (to the extent such approval is required under this Agreement) and/or otherwise do not comply with the requirements of this Agreement or other Project Approvals. Furthermore, City shall have the right to compel the recording against the Property (or portion thereof) a corrected version of the CC&Rs that has received City's and Developer's written approval and does comply with the requirements of this Agreement and (if applicable) Project Approvals. Developer (or any successor or assignee, including a homeowners association) shall have the obligation to pay all costs and expenses incurred by City, including for City Staff time and City Attorney costs, relating to the enforcement of this Section and need for recording corrected CC&Rs.

3.6 Dedications and Improvements.

Developer shall offer dedications to the City or other applicable public agency, or complete those public improvements in connection with the Project, as specified in the Project Approvals.

3.7 Posting Payment and Performance Bonds.

Developer shall pay for and deliver to City, for each public improvement on the Property (or applicable portion thereof) required to be undertaken by Developer pursuant hereto, duly executed and operative payment and performance bonds (or other improvement security approved by City and permissible pursuant to applicable state and local law) covering one hundred percent (100%) of the costs to complete the construction of the applicable public improvements (generally referred to herein is "**Construction Improvement Security**"). Unless other specified in a Condition of Approval applicable to a Project Component, such Construction Improvement Security shall be delivered to City prior to the commencement of any work, as specified in the Scope of Work, on the applicable Project Component.

3.8 Regular Updates to City on Development of the Project.

Commencing from the Development Agreement Reinstatement Date, and for the duration of the Term, Developer shall deliver to the City Manager (or authorized designee) regular updates on the status of the development and construction of the Project. Unless otherwise agreed by Developer and City, each acting within their reasonable discretion, regular Developer updates to City shall be as follows:

3.8.1 Phase 1A Property Project Components.

No less than once every month until completion of all Project Components on the Phase 1A Property, a Developer Representative(s) shall deliver written updates to City Manager on the status of each Project Component on the Phase 1A Property that has been commenced on the applicable date. Each update shall include status of any permitting, demolition, grading, pre-construction, construction, rehabilitation, and other related material development information for each Project Component until a Certificate of Completion for all Project Components on the Phase 1A Property has been issued by City and recorded against the Phase 1A Property pursuant to this Agreement. City Manager, exercising reasonable discretion, may require additional/more specific information relating to the development of a Project Component on the Phase 1A Property. Each written update provided to City Manager should be assumed to be a public record under the California Public Records Act (Gov. Code, § 7920.000 *et seq.*, "**Public Records Act**"), but certain information therein may be subject to non-disclosure pursuant to the Public Records Act.

Additionally, unless City Manager authorizes a less frequent attendance requirement for Developer, no less than once every third City Council meeting until completion of the Luxury Hotel Project Component, Public Golf Clubhouse Project Component, and Phase 1A Luxury Residential Project Component on the Phase 1A Property, a Developer Representative(s) shall attend City Council public meetings to provide City Council and the general public with status updates relating to the development of these Project Components on the Phase 1A Property.

3.8.2 Phase 1B Property Project Components.

No less than once every two (2) months from commencement of construction activities on the Phase 1B Property until completion of all Project Components on the Phase 1B Property, a Developer Representative(s) shall deliver written updates to City Manager on the status of each Project Component on the Phase 1B Property. Each update shall include status of any permitting, grading, pre-construction, construction, rehabilitation, and other related material development information for each such Project Component until a Certificate of Completion for all Project Components on the Phase 1B Property has been issued by City and recorded against the Phase 1B Property pursuant to this Agreement. City Manager, exercising reasonable discretion, may require additional/more specific information relating to the development of a Project Component on the Phase 1B Property. Each written update provided to City Manager should be assumed to be a public record under the Public Records Act, but certain information therein may be subject to non-disclosure pursuant to the Public Records Act.

3.8.3 Attendance at Planning Commission and City Council Meetings.

In addition to the foregoing requirements in this Section 3.8, Developer agrees to have one or more of Developer Representatives, who is/are knowledgeable regarding this Agreement and the development of the Project, such that such person(s) can meaningfully respond to City questions regarding the progress of the Project, attend Planning Commission and/or City Council public meetings, when Developer is requested to do so on not less than ten (10) days prior written notice by City Manager (or authorized City Staff designee), which requests shall not be made more than one time per quarter.

3.9 Indemnification.

3.9.1 Developer's General Obligation. Commencing on the Reference Date, Developer shall protect, defend, indemnify and hold harmless City and City's officers, officials, members, employees, volunteers, agents, and representatives (any of the foregoing shall be known individually as "Indemnitee" and collectively as "Indemnitees"), and each of them, jointly and severally, against and from any and all claims, demands, causes of action, damages, costs, expenses, losses and liabilities, at law or in equity, of every kind or nature whatsoever, including reasonable attorneys' fees and expert witness fees, and including, without limitation, injury to or death of any person or persons and damage to or destruction of any property, threatened, brought or instituted ("Claims"), arising out of or in any manner directly connected with the entry upon the Property by Developer or any of Developer Representatives, including without limitation (other than with respect to pre-existing conditions unless exacerbated by Developer):

(A) any damage to the Property and any liability to any third party incurred by reason of any acts or omission of, including, but not limited to, any

commission of any negligent or tortious acts, by Developer or the Developer Representatives, or any of them;

(B) any mechanics' or materialmen's liens, claims, demands, actions or suits arising (directly or indirectly) from (i) any work performed or materials supplied to or for Developer, or (ii) any activities of Developer or any of the Developer Representatives, or any of them, on or relating to the Property (including, without limitation, any claims by any of such Developer Representatives);

(C) any claims, demands, actions or suits arising directly or indirectly from any of the following "**Environmental Claims**" first arising from and after the Developer's ownership of the Property or construction or operation of the Project:

i) The presence of Hazardous Materials on, in, under, from or affecting all or any portion of the Property or the Project;

ii) The storage, holding, handling, release, threatened release, discharge, generation, leak, abatement, removal or transportation of any Hazardous Materials on, in, under, from or affecting the Property or the Project;

iii) The violation of any law, rule, regulation, judgment, order, permit, license, agreement, covenant, restriction, requirement or the like by the Developer and/or Developer Representatives relating to or governing in any way Hazardous Materials on, in, under, from or affecting the Property or the Project;

iv) The failure of the Developer and/or Developer Representatives to properly complete, obtain, submit and/or file any and all notices, permits, licenses, authorizations, covenants and the like in connection with the Developer's activities on the Property or regarding the Project;

v) The implementation and enforcement by the Developer and/or Developer Representatives of any monitoring, notification or other precautionary measures that may, at any time, become necessary to protect against the release, potential release or discharge of Hazardous Materials on, in, under, from or affecting the Property or the Project;

vi) The failure of the Developer and/or Developer Representatives, in compliance with all applicable Environmental Laws, to lawfully remove, contain, transport

or dispose of any Hazardous Materials existing, stored or generated on, in, under or from the Property or the Project;

vii) Any investigation, inquiry, order, hearing, action or other proceeding by or before any governmental agency in connection with any Hazardous Materials on, in, under, from or affecting the Property or the Project or the violation of any Environmental Law relating to the Property or the Project;

(D) Any claims, demands, actions or suits arising directly or indirectly from alleged violations of any federal or state prevailing wage laws made by employees of Developer.

(E) Any costs of removing Developer or the Developer Representatives from the Property after the expiration of the Term hereof due to Developer's MAE Default hereunder unless Developer is otherwise entitled to possession of the Property at such time.

In the event of litigation relating to the matters indemnified pursuant to the foregoing, City agrees, at no cost to City, to reasonably cooperate with Developer. Developer shall have the obligation to provide the defense of City in the litigation, either by providing for legal counsel or, at City's option, timely paying the reasonable out of pocket legal costs incurred by City in the defense of litigation, even though negligence or gross negligence of Developer or its contractors, subcontractors, agents, employees or other persons acting on its behalf has not been established at the time that the defense is provided.

Notwithstanding anything to the contrary contained herein, in no event will Developer be liable for consequential or special damages under this Agreement.

3.9.2 Developer's Obligation to Indemnify for Project Approvals. In the event of any court action or proceeding challenging the validity of this Agreement or any of the Project Approvals, Developer shall indemnify, hold harmless, pay all costs and provide defense for City in said action or proceeding with counsel chosen by City and approved by Developer in its reasonable discretion (unless such challenge is initiated by the City). City shall, at no cost to City, cooperate with Developer in any such defense as Developer may reasonably request. In the event Developer fails or refuses to provide such defense of any challenge to this Agreement or the Project Approvals, or any component thereof, City shall have the right not to defend such challenge, and to resolve such challenge in any manner it chooses in its sole discretion.

3.9.3 Exclusions from Indemnification Obligations; Limits to Remedies. Developer's indemnification obligations under this Agreement shall exclude any claims resulting solely from the gross negligence, illegal acts, bad faith or willful misconduct of any Indemnitee. Notwithstanding the preceding sentence or any other provisions in this

Agreement, City shall have no liability for special or consequential damages to Developer or Developer Representative,

3.10 Insurance.

3.10.1 Insurance During Construction of Project. Commencing with the Development Agreement Reinstatement Date and ending on the earliest of (a) the date this Agreement expires or is earlier terminated by the Parties pursuant to the terms hereof; or (b) the date of recording of the final Certificate of Completion for the last Project Component on the Property (provided that Developer has obtained and maintained adequate insurance coverage for each Project Component once completed and has delivered to City the applicable certificate(s) of insurance covering the completed Project Component):

(A) A policy of commercial general liability insurance written on a per occurrence basis in an amount not less than Five Million Dollars ($5,000,000.00) per occurrence and Five Million Dollars ($5,000,000.00) in the aggregate. Said coverage may be achieved by combination of a commercial general liability policies and umbrella/excess liability policies.

(B) A policy of workers' compensation insurance in such amount as will fully comply with the laws of the State of California against any loss, claim or damage arising from any injuries or occupational diseases occurring to any worker employed by Developer in the course of carrying out the work or services contemplated in this Agreement.

(C) A policy of commercial automobile liability insurance written on a per occurrence basis in an amount not less than Three Million Dollars ($3,000,000.00). Said policy shall include coverage for owned, non-owned, leased, and hired cars. Said coverage may be achieved by combination of an auto liability policy and umbrella/excess liability policies.

(D) When vertical construction commences, an "All Risks" Builder's Risk (course of construction) insurance coverage on a replacement cost basis in an amount equal to the full cost of the hard construction costs of the Project. Such insurance shall contain no coinsurance provision, and cover, at a minimum: all work, materials, and equipment to be incorporated into the Project; the Project during construction; the completed Project until such time as City issues the final certificate of occupancy for the Project, and storage, transportation, and equipment breakdown risks. Such insurance shall include coverage for earthquake, flood, ordinance or law, temporary offsite storage, debris removal, pollutant cleanup and removal, preservation of property, landscaping, shrubs and plants and full collapse during construction. Such insurance shall protect/insure the interests of Developer/owner and all of Developer's contractor(s), and subcontractors, as each of their interests may appear. If such insurance includes an exclusion for "design error," such exclusion shall only be for the object or portion which failed.

3.10.2 Post-Construction Insurance. Following the issuance by City to Developer of any Certificate of Completion for any Project Component, Developer shall procure and maintain, at its sole cost and expense, in a form and content satisfactory to City Manager, "All Risks" property insurance on a replacement cost basis in an amount equal to full replacement cost of the applicable Project Component, as the same may change from time to time. The above insurance policy or policies shall contain no coinsurance provision.

3.10.3 Additional Insurance Requirements. The following additional requirements shall apply to all of the above policies of insurance:

All of the above policies of insurance shall be primary insurance and, except the Worker's Compensation and All Risks insurance, shall name City and City's officers, officials, members, employees, and representatives as additional insureds. To the extent allowable by applicable law, the insurer shall waive all rights of subrogation and contribution it may have against City and City's officers, officials, members, employees, and representatives, and their respective insurers. All of said policies of insurance shall provide that said insurance may not be cancelled without providing thirty (30) days' prior written notice to City (ten (10) days for non-payment of premium). In the event any of said policies of insurance are cancelled, Developer shall, prior to the cancellation date, submit new evidence of insurance in conformance with this Section to the City Manager. Not later than the Development Agreement Reinstatement Date, Developer shall provide the City Manager with certificates of insurance or appropriate insurance binders evidencing the above insurance coverages and said certificates of insurance or binders shall be subject to the reasonable approval of the City Manager.

The policies of insurance required by this Agreement shall be satisfactory only if issued by companies (i) licensed and admitted to do business in California, rated "A" or better in the most recent edition of Best Rating Guide, The Key Rating Guide or in the Federal Register, and only if they are of a financial category Class VII or better, or (ii) authorized to do business in California, rated "A+" or better in the most recent edition of Best Rating Guide, The Key Rating Guide, or in the Federal Registry and only if they are of a financial category Class XV. Notwithstanding the foregoing, in the event that the policies required hereunder are not available from such insurers at commercially reasonable rates, the City Manager shall have the authority, in his or her sole and absolute discretion, to waive one or more of such requirements provided the proposed policies will adequately protect City's interests hereunder.

City may reasonably require coverage increases, provided that the percentage increase in coverage shall not be required to exceed the percentage increase in the Consumer Price Index published by the United States Department of Labor, Bureau of Labor Statistics, for Urban Wage Earners and Clerical Workers, for the Riverside-San Bernardino-Ontario statistical area (the "Index") from and after the date of this Agreement, or, if said Index is discontinued, such official index as may then be in existence and which is most nearly equivalent to said Index (the "CPI Adjustment"). Unless otherwise approved in advance by the City Manager, the insurance to be

provided by Developer may provide for a deductible or self-insured retention of not more than Two Hundred Fifty Thousand Dollars ($250,000); provided, however, that the deductible or self-insured retention for the earthquake coverage may be up to, but not exceed, ten percent (10%) of the replacement cost of the damaged Project or portions thereof.

Developer agrees that the provisions of this Section shall not be construed as limiting in any way the extent to which Developer may be held responsible for the payment of damages to any persons or property resulting from Developer's activities or the activities of any person or persons for which Developer is otherwise responsible.

4. FINANCING THE PROJECT

4.1 Developer To Pay All Costs and Expenses for the Project.

The Parties agree that City shall not provide any financial assistance to Developer in connection with the Project except as may be expressly set forth in this Agreement. Developer shall be solely responsible for paying for the costs of all design work, construction, labor, materials, fees and permit expenses associated with the Project and developer and use of the Property (providing that the foregoing shall not preclude Developer from applying for and obtaining any government grants). Developer shall pay any and all fees pertaining to the review and approval of the Project by any federal, state, or local governmental agency (where Developer's payment to City for Processing Fees and Impact Fees shall be as set forth in this Agreement) and utility service providers, including the costs of preparation of all required construction, planning and other documents reasonably required by any federal, state, or local governmental agency (where Developer's payment to City for Processing Fees and Impact Fees shall be as set forth in this Agreement) pertinent to the development or operation of the Project on the Property, such as, but not limited to, specifications, drawings, plans, maps, permit applications, land use applications, zoning applications, environmental review and disclosure documents and design review documents. Developer shall pay for any and all costs, including, but not limited to, the costs of securing of permits for any and all "wet and dry" utilities (such as, but not limited to, water, sewer, electric, gas) or other utility improvements and connections, that may be required in development of the Project, whether located on or off of the Property. Developer shall apply for and obtain any and all necessary permits, licenses, approvals and/or entitlements prior to the commencement of applicable portions of construction for the various Project Components, and Developer shall take reasonable precautions to ensure the safety of surrounding properties (including the Phase 2 Property, City-Owned Golf Course Property, and City-Owned Ahmanson Ranch Property) during said construction.

4.2 Submittal of Final Project Budget.

If not previously delivered to City, Developer shall deliver, no later than thirty (30) days prior to the commencement of construction on any Project Component, the Final Project Budget therefor. Developer shall deliver to City any updates and

supplements to the Final Project Budget for informational purposes from time to time with respect to each Project Component being developed at the applicable time. The Final Project Budget may separate estimated costs and expenses for completion of development of the Project Components on the Phase 1A Property and the Project Components on the Phase 1B Property (or there may be separate Final Project Budgets for one (1) or more separate Project Components). Additionally, Developer may defer or supplement the Final Project Budget estimated costs and expenses for the Project Components on the Phase 1B Property to coincide when, in accordance with the Project Milestones, Developer applies for the required permits, licenses, approvals and entitlements (including a City-issued Site Development Permit) for the Project Components on the Phase 1B Property. Without limiting the foregoing, if so elected by Developer, the Final Project Budget may combine Phase 1B and Phase 2 Pre-Closing Work if Developer satisfies the provisions and requirements in Section 3.1.5(B) of this Agreement.

4.3 City Approval for Financing and Investment in the Project Components.

Developer shall have the obligation, until the final Certificate of Completion is issued by City and recorded against the final Project Component on the Property, to obtain City approval (which shall not be unreasonably withheld, delayed or conditioned) for any and all financing proposed to fund the development of the Project and each Project Component, other than with respect to Loans made by Permitted Lenders (including but not limited to debt and equity financing) that satisfy the Eligibility Requirements. Prior to the commencement of construction on any Project Component, Developer shall have (or have access to) one hundred percent (100%) availability of funds and financing for the completion of construction of that Project Component.

Developer shall propose for City review and approval (if applicable pursuant to this Agreement) financing that would attach to a specific Project Component (or more than one (1) Project Component) including with respect to the Phase 1A Property and/or Phase 1B Property. Developer shall deliver to City any proposed financing term sheet, commitment, letter of intent or similar instrument (which may be non-binding and with economics and other terms that Developer reasonably deems to be confidential redacted), along with the proposed Loan Documents for the financing that would attach to any financing for the Luxury Hotel Project Component and Public Golf Clubhouse Project Component, no later than thirty (30) days (or otherwise as soon as available if not available at such time) prior to Developer's anticipated closing of escrow of any such Loan. For the financing of each and every Project Component, the following general provisions shall apply:

4.3.1 Project Components Financing.

For any Project Component financing, Developer shall have (or Developer's Affiliates or direct or indirect investors shall collectively have) the Required Equity (as defined below), or Developer or its Affiliates shall have entered into a joint venture agreement with one (1) or more Permitted Transferees who have (or whose Affiliates or direct or indirect investors shall collectively have) the Required Equity in its possession

or readily available (including, without limitations, through capital or similar commitments from investors). As used in this Section, the term "**Required Equity**" means sufficient equity capital to pay for one hundred percent (100%) of the difference between (a) the expected hard and soft costs to complete construction of the applicable Project Component(s) for the applicable portion of the Property to be paid for therewith as reasonably estimated by Developer, and (b) the amount of a Construction Loan available to Developer for the construction of said Project Component(s).

4.3.2 Master Site Infrastructure Improvements Financing.

Developer may finance the Master Site Infrastructure Improvements for the Property or any portion thereof (including with respect to the Phase 1B Property) separately from the development and construction of any other Project Component. Developer shall submit to City evidence that Developer (i) has obtained or will have obtained financing from a Lender necessary to undertake the installation and construction of the Master Site Infrastructure Improvements for any particular portion of the Property (such as the Phase 1B Property) in accordance with this Agreement, which may be in the form of a commitment, a term letter, letter of intent or such other form (which may be non-binding), with economics and other terms Developer deems to reasonably be confidential redacted, with all such forms to be approved by City, provided that such approval may not be unreasonably withheld, conditioned or delayed (each, generally referred to as an "**Infrastructure Loan**") if such Loan is being made by a Person other than a Permitted Lender; and (ii) has obtained or has access to the applicable Required Equity (with such equity capital the "**Developer's Master Site Infrastructure Improvements Equity Contribution**"). If City shall disapprove any such evidence of financing (when such approval is required pursuant hereto), City shall do so by written notice to Developer stating with reasonable specificity the reasons for such disapproval, and Developer shall promptly obtain and submit to City new evidence of financing.

4.3.3 Construction and Infrastructure Loans; Authorized Liens; Phase 1A Property and Phase 1B Property.

Any Construction Loan Deed of Trust and any Infrastructure Loan Deed of Trust shall be recorded in the Recorder's Office against the Property (or portion thereof selected by Developer which, for the avoidance of doubt, may include all or portions of the Phase 1B Property and/or other portions of the Property as being collateral for any Project Components). Notwithstanding any provisions in any loan documents for a Construction Loan or Infrastructure Loan, this Reinstated Development Agreement shall have priority and remain with priority over any and all Construction Loan Deed of Trust and Infrastructure Loan Deed of Trust recorded against the Phase 1A Property (or any portion thereof) subject to the terms hereof or as otherwise agreed between the City, the applicable Lender and Developer.

Any Construction Loan Deed of Trust and any Infrastructure Loan Deed of Trust shall be recorded in the Recorder's Office against the Property (or portion thereof selected by Developer which, for the avoidance of doubt, may include the Phase 1A

Property and/or other portions of the Property as being collateral for any Project Components). Notwithstanding any provisions in any loan documents for a Construction Loan or Infrastructure Loan or other Loan, this Reinstated Development Agreement shall have priority and remain with priority over any and all Liens (including a Construction Loan Deed of Trust or Infrastructure Loan Deed of Trust) recorded against the Phase 1A Property (or any portion thereof) subject to the terms hereof or as otherwise agreed between the City, the applicable Lender and Developer.

4.3.4 Unauthorized Liens Prior to Completion of Project Components.

With respect to the Phase 1A Property, until the Certificate of Completion for all Project Components on the Phase 1A Property has been issued by City and recorded against the Phase 1A Property pursuant to this Agreement, and (b) with respect to the Phase 1B Property, until the Certificate of Completion for all Project Components on the Phase 1B Property has been issued by City and recorded against the Phase 1B Property pursuant to this Agreement, then, except as provided in Section 4.3.3 above, Developer shall not record, and shall not allow to be recorded, against the Property, or any portion thereof, any monetary Lien in violation of the terms of this Agreement. Developer shall remove, or shall have removed, any such unauthorized monetary Lien made or recorded against the Property or any portion of the Property in violation of this Agreement, or shall assure the satisfaction thereof to the reasonable satisfaction of the City. After ninety (90) calendar days prior written notice to the Developer, City shall have the right, but not the obligation, to satisfy any such unauthorized monetary Lien made or recorded prior to recordation of the applicable Certificate of Completion and receive reimbursement from the Developer for any amounts paid or incurred in satisfying any such Lien, upon demand; provided, however, that nothing in this Section 4.3.4 shall require the Developer to pay or make provisions for the payment of any tax, assessment, Lien, or charge that Developer is in the process of contesting the validity or amount thereof, in good faith, and so long as such contest shall not subject the Property, or any portion thereof, to forfeiture or sale.

4.3.5 Rights of Lenders and City Regarding Permitted Loans and Liens.

(A) City shall have the right of reasonable review and approval of any Lender from which Developer proposes to obtain either a Construction Loan or Infrastructure Loan other than a Permitted Lender, whether or not such loan is secured by a Lien against the Property or any portion thereof. City shall not unreasonably withhold, condition or delay its approval of any proposed Lender or Construction Loan or Infrastructure Loan where the City's approval thereof is required under this Agreement. In deciding whether to give, condition or withhold such approval, City may consider, among other matters, whether or not the proposed Lender is a state or federally chartered bank, savings and loan, or other financial institution which routinely provides construction financing to development projects such as the Project (or applicable Project Component), whether the terms of the Construction Loan or Infrastructure Loan are reasonable and customary when compared to the financing terms of similar development projects in Riverside County, CA, the size and financial

strength of the proposed Lender, and what effect, if any, any changes requested by the Lender to either this Agreement or any of the exhibits to this Agreement may have upon the City's rights and remedies hereunder.

With respect to any Loan, Developer shall advise City in writing of any amendments, modifications (including Insubstantial Modifications as authorized by this Agreement), or other changes to this Agreement or its exhibits (or related agreements) which the proposed Lender will request in connection with the Developer's obtaining of such Loan. City agrees to reasonably consider, but shall not be obligated to accept, any amendment, modification, or other change to this Agreement or any of the exhibits to this Agreement which either (i) is consistent with the provisions governing Insubstantial Modifications (set forth in this Agreement), or (ii) does not materially adversely restricts, diminishes, or burdens the City's rights and remedies, or both.

(B) Whenever City delivers any notice or demand to Developer regarding any Default or MAE Default by the Developer under this Agreement or any other La Quinta Amended Development Documents, City shall send a copy of such notice to each affected Lender of which City has received notice and a contact address for transmittal of such notices. Each affected Lender receiving a copy of any such notice shall have the right, at its option, to commence the cure or remedy of any such Default or MAE Default of Developer and to diligently and continuously proceed with such cure or remedy, within sixty (60) calendar days following its receipt of notice of the default. If a default of the Developer under this Agreement cannot, with diligence, be remedied or cured, or the remedy or cure of such default cannot be commenced, within such sixty (60) calendar day period, Lender shall have such additional time as is reasonably necessary to remedy or cure such default of the Developer, but in no event beyond one hundred eighty (180) calendar days following its receipt of notice of the default. If such Default or MAE Default of Developer can only be remedied or cured by the Lender upon obtaining possession of the Property (or portion thereof to cure the identified default), the Lender shall seek to obtain possession of the Property with diligence and continuity through a receiver or otherwise, and shall remedy or cure such Default of Developer within sixty (60) calendar days after Lender, its designee or a purchaser of foreclosure obtaining possession of the Property. Nothing contained in this Agreement shall be deemed to permit or authorize any Lender, its designee or a purchaser of foreclosure to undertake or continue the construction of any portion of the Project (beyond the extent necessary to conserve or protect improvements or construction already made), without expressly assuming Developer's obligations under this Agreement by written agreement evidencing such assignment and assumption delivered to the City and in substantially the form of Exhibit L attached hereto as reasonably modified at such Lender's request and approved by City (in its reasonably discretion), in which the Lender, its designee or a purchaser of foreclosure agrees to complete, in the manner provided in this Agreement, the improvements to which the Lien or title of such Lender relates.

(C) In any case where a Lender, its designee or a purchaser of foreclosure has acquired title to all or any portion of the Property or Project through

foreclosure, deed in lieu of foreclosure, or any other means, and such Lender, its designee or a purchaser of foreclosure proposes to enter into an agreement to transfer the Property and/or Project, or any portion thereof, to a third-party transferee, the Lender, its designee or a purchaser of foreclosure shall provide City with written notice thereof, which notice shall include a reasonably detailed description of the terms and conditions of the proposed transaction. City shall have the right, but not the obligation, to purchase the Property and/or Project (or portion thereof) on substantially the same terms as described in the Lender's notice (and in all events the same time period as well as pricing and other economic terms), which option, if ever such option arises, shall be exercised by written notice from City to the Lender within sixty (60) calendar days following City's receipt of the Lender's notice. If City elects not to exercise its option, then, subject to City's right to review and approve the transaction if the transferee is not a Permitted Development/Operational Transferee and the execution by the third-party transferee of an Assignment and Assumption Agreement as provided in this Agreement, then the Lender, its designee or a purchaser of foreclosure may complete the transaction described in its notice, provided that such transaction is closed on materially identical terms and conditions as those described in the Lender's notice to City. If the Lender, its designee or a purchaser of foreclosure and third-party transferee desire to materially amend the terms of their proposed transaction, the Lender, its designee or a purchaser of foreclosure shall give City written notice of the proposed modifications and City shall once again have the right to elect to acquire the Property and the Project (or portion thereof) on terms set forth in this Section 4.3.5(F). If, for any reason, the proposed transaction between the Lender, its designee or a purchaser of foreclosure and third party transferee fails to close within two hundred seventy (270) days following the date on which the City first receives notice of the proposed transaction (or notice of the proposed modified transaction, whichever is later), then City once again have the right to elect to acquire the Property and/or Project pursuant to this Section 4.3.5(C).

4.3.6 Permanent Financing Loans.

After a Certificate of Completion has been recorded against a Project Component for the Phase 1A Property, Developer may obtain permanent/conversion financing Loan(s) or other type of Loan(s) for that Project Component (each, a "**Permanent Financing Loan**"), which would attach to the ownership and operations for any Project Component(s) selected by Developer (so long as the applicable Lender is a Permitted Lender). Other than with respect to a Permanent Financing Loan provided by a Permitted Lender, Developer shall deliver to City any proposed financing term sheet, commitment, letter of intent or similar instrument (with economics and other terms that Developer reasonably deems to be confidential redacted) no later than thirty (30) days prior to Developer's anticipated closing of escrow of such Loan(s). With respect to any Loan with a Lender that is not a Permitted Lender, City shall, in its reasonable discretion, approve or disapprove such evidence of financing within fifteen (15) days after receipt of such financing proposal. If City shall disapprove any such financing, City shall do so by written notice to Developer stating with reasonable specificity the reasons for such disapproval.

4.3.7 Delivery to City of Any Notice of Default from Any Lender.

For the duration of the Term of this Agreement, Developer shall have a continuing obligation to immediately deliver to City, and in no event deliver to City later than five (5) calendar days after Developer's receipt, a copy of any notice of default or notice of breach of any loan documents or any other material contracts purported to be or actually secured by a Lien or other recorded instrument against the Property (or any portion thereof), including notices of default on any loan documents secured by any Construction Loan Deed of Trust, Infrastructure Loan Deed of Trust, or Permanent Financing Loan Deed of Trust, or subject to any mechanics liens which are not removed or bonded over in the manner to preserve the priority of this Agreement. It is expressly understood by the Parties that prompt delivery of any such notice of default or notice of breach is a material term of this Agreement. City shall have any and all rights available under this Agreement if Developer fails to promptly deliver an such notice of default or notice of breach as required by this Section.

4.3.8 Notifications to City on Any Liens to be Recorded on Property.

As part of the regular updates to the City Manager pursuant to Section 3.8 of this Agreement, Developer shall, to the extent Developer has actual knowledge thereof, deliver to the City Manager regular updates as to any Liens anticipated to be recorded against the Property (or any portion thereof), including any anticipated Construction Loan Deed of Trust for the construction of a specific Project Component, as well as regular updates as to all existing Liens recorded against the Property (or any portion thereof) and status of repayment of any existing Loan subject to a Lien recorded against the Property (or any portion thereof). Until the issuance and recording of a Certificate of Completion for an applicable Project Component, Developer shall have a duty to regularly review preliminary title reports or other similar reports that would disclose any documents recorded against fee title for the applicable Project Component. The City Manager, on behalf of the City, and Developer shall meet and confer to decide an appropriate method for the City Manager to receive notice of any anticipated Liens to be recorded against the Property (or any portion thereof) prior to that Lien being recorded so that the City is aware of the Lien and the amount of any Loan it is intended to secure, in each case to the extent Developer has actual knowledge of any such Lien prior to such Lien being recorded.

4.4 City Financial Assistance.

Subject to Developer's continued performance under this Agreement and compliance with the Project Approvals, and Developer not being in MAE Default of this Agreement (after the expiration of all notice and cure periods), the only financial assistance provided to Developer by City shall be the TOT rebate as provided for in the TOT Covenant Agreement and the potential purchase price for the City-Owned Option Property as provided for in the Option Agreement, and the transfer of the City-Owned Golf Course Property and City-Owned Ahmanson Ranch as provided in this Agreement.

With respect to the TOT rebate, and as more particularly set forth in the TOT Covenant Agreement, only the Phase 1A Property shall be subject to its terms and conditions. The Phase 1B Property, and all Project Components on the Phase 1B Property, shall not be subject to the TOT Covenant Agreement.

No other potential or actual financial assistance from City is contemplated by this Agreement or otherwise available to Developer. Notwithstanding any provisions in this Agreement to the contrary, any additional financial assistance from City may only be approved as amendment and may not be processed or approved as an Insubstantial Modification.

5. AUTHORIZED USES AND OPERATIONS ON THE PROPERTY

5.1 General Obligation for Developer and Successors and Assigns.

Upon completion of construction and development of the Property, and each portion thereof, the Property shall be used for the Project Components (and ancillary purposes) as more particularly described in the Site Maps, Project Description, Scope of Work, Schedule of Performance, this Agreement and other Project Approvals.

5.1.1 Luxury Hotel.

During the Term of this Agreement, Developer shall have at least one luxury hotel with first-class amenities and uses complementary to the Golf Course and surrounding SilverRock Resort Area, as approved by City as part of the Project Approvals. Developer shall have the obligation to ensure the luxury hotel generates TOT on a regular and continuous basis upon completion of construction and the opening thereof, with allowances for areas to be temporarily closed for maintenance and repair and, upon receiving any required permit, license, approval or entitlement (such as a building permit), rehabilitation or remodeling and other commercially reasonable business related to the operation of the Property.

Developer shall submit to City from the proposed hotel operator (a "**Hotel Operator**") documentation (which may be a term sheet, letter of intent or other non-binding instrument, as long as the final agreement or evidence of the final agreement is delivered to City for confirmation of a binding agreement that corresponds to the statements made in a term sheet, letter of intent or other non-binding instrument) confirming certain of the basic terms and conditions pursuant to which the Hotel Operator will operate and manage the Luxury Hotel, any residential dwellings (including single-family and condominium units) operated in connection with the Luxury Hotel, and certain other related Project Components if so determined by Developer, but excluding any information reasonably designated proprietary or otherwise confidential by the Hotel Operator or Developer (the "**Hotel Management Documentation**"), with respect to which economic terms may be redacted. The Hotel Operator and Hotel Management Documentation shall not be subject to the City's approval if the Hotel Operator is a Permitted Hotel Operator provided that City's approval of the Hotel Management Documentation and Hotel Operator shall be required if the Hotel Operator is not a

Permitted Hotel Operator, which approval shall not be unreasonably withheld, conditioned or delayed.

5.1.2 Residential Uses on the Property.

The total number, location, distribution, density, and intensity of residential units on the Property shall be generally consistent with the Site Maps, Project Description, Scope of Work, this Agreement and other Project Approvals. As depicted in the Site Maps and Project Approvals, as the same may be updated or amended from time to time consistent with the terms of this Agreement, the residential portions of Project shall consist of residential single-family dwellings, luxury condominium dwelling units, residential and hotel amenities, and other residential dwelling units consistent with the Project Approvals, all of which shall be specifically developed and available for residential purposes, and may be the residents' primary residences or secondary residences, and may be available for long-term and short-term rentals. All residential dwellings, of whatever type, available for use for short-term vacation rentals shall be subject to the provisions in Section 5.2 of this Agreement. The parties acknowledge and agree that Developer may elect to combine Phase 1B and Phase 2 Pre-Closing Work if Developer satisfies the provisions and requirements in Section 3.1.5(B) of this Agreement.

5.1.3 Golf Course and Ahmanson Ranch Uses.

Except during any permitted closures of the Golf Course as reasonably determined by Developer, Developer shall have open and continuously have available for operation and use a public golf clubhouse to serve the Golf Course, which at a minimum shall be open and available for members of the public, and which shall be a part of the Public Golf Clubhouse Project Component pursuant to this Agreement. Developer shall have the obligation to allow for use and occupancy of the City-Owned Golf Course Property consistent with the Reinstated Covenant Affecting Real Property (Golf Course Use) and Reinstated Covenant Affecting Real Property (Ahmanson Ranch House), with said covenants to run with the land and remain operative upon any conveyance and transfer of the City-Owned Golf Course Property and/or City-Owned Ahmanson Ranch Property in accordance with this Agreement, and remain operative upon the expiration or early termination of this Agreement.

5.1.4 SilverRock Resort Area Perimeter Landscaping.

Developer shall have the obligation to construct, install and/or enhance, maintain and repair the perimeter landscaping of the SilverRock Resort Area along the Specific Plan frontage on Avenue 52 from the western boundary to the eastern boundary of the City park. If Developer meets the conditions precedent to exercising the option and validly exercises the option to purchase the City-Owned Option Property (Phase 2 Property) and acquires fee title to the Phase 2 Property pursuant to the Option Agreement, then, upon transfer to Developer of the City-owned Phase 2 Property that bounds the perimeter of the SilverRock Resort Area along Jefferson Street and Avenue

52, Developer will assume responsibility to maintain and repair the perimeter landscaping in that remaining portion of the SilverRock Specific Plan area.

5.2 Short-Term Vacation Rentals/Transient Occupancy Taxes.

Subject to the terms of this Agreement and this Section 5.2, Developer shall have a vested right to use all residential dwellings in the Project as short-term vacation rentals for the Term of this Agreement, and this vested right shall inure to Developer's successor in interest to and manager of the Luxury Hotel (who shall be the Permitted Hotel Operator) and shall have the right to manage the number and location of short-term vacation rentals to avoid adverse impacts to the Luxury Hotel operations and to the community. As such, the rights and obligations under Section 5.2 shall survive the sale of each residential unit to a third-party homebuyer and termination of this Agreement to each such completely constructed residential unit. Except to the extent expressly provided otherwise in this Agreement, the City shall not impose on or apply to the Project (whether by action of the Council, or other legislative body, or by initiative, referendum, or other measure) any ordinance, resolution, standard, directive, condition, or other measure that is in conflict with this provision or that would materially interfere with Developer's right to apply for and operate short-term vacation rentals in all residential units within the Project. All short-term vacation rentals shall be subject to the following:

5.2.1 Definitions.

As used in this Agreement, the term "short-term vacation rental" shall mean and refer to a "short-term vacation rental unit" as that term is defined in Section 3.25.030 of the La Quinta Municipal Code (or successor provision).

5.2.2 Short-Term Vacation Rental Use.

Except as modified by this Section 5.2, all short-term vacation rentals shall comply with the Short-Term Vacation Rental Regulations in effect for the duration of the Term of this Agreement, including the penalties for violations. All short-term vacation rentals developed on the Property as part of the Project shall be permitted in accordance with the Short-Term Vacation Rental Regulations. No residential dwelling developed on the Property as part of the Project may be used for short-term vacation rental purposes unless the residential dwelling has a valid short-term vacation rental permit. If the Short-Term Vacation Rental Regulations (or any provisions therein) are repealed for any reason, then the Short-Term Vacation Rental Regulations (or applicable repealed provisions therein) that were most recently in effect prior to being repealed shall govern and shall remain applicable for the balance of the Term of this Agreement. For reference purposes only, the Short-Term Vacation Rental Regulations (Chapter 3.25 of the La Quinta Municipal Code) as it exists as of the Reference Date is attached as Exhibit M.

5.2.3 CC&Rs Include Requirements for Short-Term Vacation Rentals.

All CC&Rs required to be recorded pursuant to Section 3.5 of this Agreement where residential uses are allowed and/or where residential dwellings are located shall expressly provide that short-term vacation rentals are an authorized use for all residential units, subject to management and control of the number, location and operation of such short-term vacation rentals by Developer and its successor in interest with respect to the applicable Project Component. All such CC&Rs shall state the operational requirements and standard conditions applicable to short-term rentals for all residential dwellings subject to those CC&Rs.

Developer shall execute and record or cause to be recorded in the Recorder's Office, against each and every separate legal parcel and lot subdivided for residential uses on the Property (including all Project Tract Maps and subdivision maps listed as part of the Pre-Bankruptcy Subdivision Maps and Permits) a declaration of covenants, conditions, and restrictions (in a form approved by the City Manager and City Attorney prior to its recording, which approval shall not be unreasonably withheld, delayed or conditioned), which shall run with the land, and shall be binding upon, and place on notice, any and all owners of the separate legal residential lots of the requirements set forth in this Section 5.2. The declaration of covenants, conditions, and restrictions shall expressly provide that short-term vacation rentals are an allowed use for every residential dwelling within Project (i.e., within the homeowner's association subject to the declaration) subject to management and control of the number, location and operation of such short-term vacation rentals by Developer and its successor in interest with respect to the applicable Project Component. The requirements of this Section may be satisfied by including the terms and conditions required herein in the CC&Rs required to be recorded pursuant to Section 3.5 of this Agreement.

5.2.4 Permitting and Related Requirements.

All residential dwellings used for short-term vacation rentals shall be subject to the following permitting and use requirements:

(A) Annual permitting fees consistent with the City's fee program;

(B) Any rental or occupancy of thirty (30) nights or less to be subject to the City's then-current TOT for short-term vacation rentals;

(C) Rental or occupancy agreements, and material renter or occupant information, shall be retained for a minimum of three (3) years (or other retention period as maybe approved by City policy or code) by Developer or Developer's authorized management company for the short-term vacation rentals;

(D) Subject to applicable federal or state law or regulation, occupancy in any residence, including residences used as short-term vacation rentals, shall be capped at two (2) persons per bedroom, plus one (1) person; provided,

however, that there may be an increase in occupancy allowances for permitted short-term vacation rentals as set forth in the Short-Term Vacation Rental Regulations in effect as of the date of the issued permit, or, if the Short-Term Vacation Rental Regulations (or relevant provisions regarding occupancy allowances) are repealed for any reason during the Term of this Agreement, then the occupancy allowances for permitted short-term vacation rentals shall be the Short-Term Vacation Rental Regulations most recently in effect prior to being repealed and shall remain applicable for the balance of the Term of this Agreement.

5.2.5 Short-Term Vacation Rental Centralized Management Obligations; Rental Management Program(s).

(A) In order to ensure the timely collection and reporting of the applicable transient occupancy taxes, and compliance with the applicable operational requirements and conditions set forth in the Short-Term Vacation Rental Regulations, Developer or its successor or assignee (including, for instance, the Permitted Hotel Operator) shall be the "authorized agent or representative" (as that term is defined in the Short-Term Vacation Rental Regulations, or, if the definition is removed during the Term of this Agreement, as defined in Chapter 3.25 as of the Effective Date of this Agreement) for all short-term vacation rentals and short-term vacation rental permits within the Project, including but not limited to applying for and managing all short-term vacation rental permits, making all reservations and payments, and ensuring compliance with all other requirements of the Short-Term Vacation Rental Regulations, and shall do so exclusively through a central rental operator pursuant to this Agreement; provided, however, that the "residence owner" (in this context, means the owner of a residential unit with a short-term vacation rental permit, as that term is defined in the Short-Term Vacation Rental Regulations, or, if the definition is removed during the Term of this Agreement, as defined in Chapter 3.25 as of the Effective Date of this Agreement, and hereinafter defined as "**residence owner**") shall remain ultimately obligated as the holder of the short-term vacation rental permit for any and all remedial actions necessary for compliance with the Short-Term Vacation Rental Regulations and this Agreement, including but not limited to the payment of any fines or recorded liens or any other violations for non-compliance; and, provided further, that the residence owner shall have a process available, through an independent arbitrator or neutral decision-maker designated by the residence owner or homeowner's association ("**HOA**") of which the residence owner is a member, to petition for a change of that residence owner's "authorized agent or representative" because the residence owner demonstrates, with a preponderance of evidence, that the "authorized agent or representative," designated by Developer or its successor or assignee, has failed to perform its duty to ensure compliance with all other requirements of the Short-Term Vacation Rental Regulations for that residence owner's short-term vacation rental unit. Nothing contained herein shall be construed to give any homeowner the right to use its property for a short term vacation rental without the express consent of Developer (or its successor or assignee with respect to the applicable Project Component). To the extent any provisions of this Agreement pertaining to STVRs are determined to violate any provision of the Applicable Rules or other applicable laws or regulations, the parties

shall meet and confer in good faith to attempt to agree on the necessary modifications to ensure compliance with all applicable laws and regulations with the minimum necessary modifications to the terms of this Agreement.

(B) The CC&Rs as described in Section 5.2.3 of this Agreement shall include the terms and conditions, and detailed specifics for process and decision, whenever a residence owner may petition the HOA for a change in that residence owner's "authorized agent or representative" as required by this Section; the City Manager and City Attorney shall review and approve, in their reasonable discretion and not to be unreasonably delayed or denied, said terms and conditions in the CC&Rs that would apply if a residence owner were to petition the HOA for a change in that residence owner's "authorized agent or representative" as required by this Section.

(C) With respect to the residential dwellings developed on the Phase 1A Property as part of the Phase 1A Luxury Residential Project Component, the Permitted Hotel Operator for the Luxury Hotel Project Component shall be approved for the short term vacation rental centralized management obligations set forth in this Agreement, it being expressly understood and agreed by the Parties that the Project contemplates the Phase 1A Luxury Residential Project Component to be integrated and available for short-term vacation rentals as part of the Luxury Hotel Project Component.

(D) With respect to the residential dwellings developed on the Phase 1B Property as part of the Phase 1B Luxury Residential Project Component, the Permitted Hotel Operator for the Luxury Hotel Project Component shall be approved for the short term vacation rental centralized management obligations set forth in this Agreement.

(E) Developer shall be responsible for ensuring that, for the Term of this Agreement, one or more contract(s) shall be in effect at all times which govern the terms and conditions governing the ability of owners of residential units to have the ability to make their units available for short-term rentals permitted by this Agreement and the CC&Rs. The contract or contracts may, but are not required to, be with an on-site rental management agent. Developer may assign this obligation in accordance with this Agreement, regardless of whether the obligation is incident of the transfer and assignment of the portions of the Property to which they relate.

5.2.6 Compliance with other City Municipal Codes.

Short-term vacation rental uses are subject to all provisions of the La Quinta Municipal Code, including without limitation the City's noise compliance provisions set forth in Sections 9.100.210 and 11.08.040 (or successor provisions) of the La Quinta Municipal Code, and the transient occupancy tax (TOT) provisions set forth in Chapter 3.24 (or successor chapter of provisions) of the La Quinta Municipal Code.

5.3 Maintenance Covenants.

Developer shall maintain or cause to maintained the Property and all improvements thereon, including all landscaping, streets, sidewalks, pathways and trails, in a first class condition, and in compliance with all Project Approvals and all applicable provisions of the Municipal Code. Developer may satisfy its obligations in this Section by transferring or assigning said obligations to a homeowners association pursuant to CC&Rs duly approved by City pursuant to this Agreement.

5.4 Obligation to Refrain from Discrimination.

Developer covenants and agrees for itself, its successors, its assigns and all persons claiming under or through them to the Property or any part thereof, that there shall be no discrimination against or segregation of any person or group of persons on account of race, color, creed, religion, sex, marital status, ancestry or national origin in the sale, lease, sublease, transfer, use, occupancy, tenure or enjoyment of the Property, nor shall Developer itself, or any person claiming under or through it, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, subtenants, or sublessees of the Property. The foregoing covenants shall run with the land and shall remain in effect in perpetuity.

5.4.1 Covenants Regarding Nondiscrimination.

Developer covenants by and for itself and any successors in interest that there shall be no discrimination against or segregation of any person, or group of persons on any basis listed in subdivision (a) or (d) of Section 12955 of the Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the Government Code, in the sale, lease, sublease, transfer, use, occupancy, tenure, or enjoyment of the Property, or any part thereof, nor shall Developer, or any person claiming under or through him or her, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use, or occupancy of tenants, lessees, subtenants, sublessees or vendees of the Property, or any part thereof. The foregoing covenants shall run with the land.

Developer agrees for itself and any successor in interest that Developer shall refrain from restricting the rental, sale, or lease of any portion of the Property, or contracts relating to the Property, on the basis of race, color, creed, religion, sex, marital status, ancestry, or national origin of any person. All such deeds, leases, or contracts shall contain or be subject to substantially the following nondiscrimination or nonsegregation clauses:

(A) In deeds: "The grantee herein covenants by and for himself or herself, his or her heirs, executors, administrators, and assigns, and all persons claiming under or through them, that there shall be no discrimination against or segregation of, any person or group of persons on account of any basis listed in

subdivision (a) or (d) of Section 12955 of the Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the Government Code, in the sale, lease, sublease, transfer, use, occupancy, tenure, or enjoyment of the premises herein conveyed, nor shall the grantee or any person claiming under or through him or her, establish or permit any practice or practices of discrimination or segregation with reference to the selection, location, number, use, or occupancy of tenants, lessees, subtenants, sublessees, or vendees in the premises herein conveyed. The foregoing covenants shall run with the land."

(B) In leases: "The lessee herein covenants by and for himself or herself, his or her heirs, executors, administrators, and assigns, and all persons claiming under or through him or her, and this lease is made and accepted upon and subject to the following conditions: "That there shall be no discrimination against or segregation of any person or group of persons, on account of any basis listed in subdivision (a) or (d) of Section 12955 of the Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the Government Code, in the leasing, subleasing, transferring, use, occupancy, tenure, or enjoyment of the premises herein leased nor shall the lessee himself or herself, or any person claiming under or through him or her, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use, or occupancy, of tenants, lessees, sublessees, subtenants, or vendees in the premises herein leased."

(C) In contracts: "There shall be no discrimination against or segregation of, any person or group of persons on account of any basis listed in subdivision (a) or (d) of Section 12955 of the Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the Government Code, in the sale, lease, sublease, transfer, use, occupancy, tenure, or enjoyment of the premises which are the subject of this agreement, nor shall the grantee or any person claiming under or through him or her, establish or permit any practice or practices of discrimination or segregation with reference to the selection, location, number, use, or occupancy of tenants, lessees, subtenants, sublessees, or vendees in the premises herein conveyed. The foregoing covenants shall run with the land."

6. POTENTIAL CONDITIONAL TRANSFERS OF CITY-OWNED PROPERTIES

As of the Reference Date, City owns fee title to the City-Owned Golf Course Property, City-Owned Ahmanson Ranch Property, and City-Owned Option Property (the last also defined herein as the Phase 2 Property). Subject to Developer being in full compliance with this Agreement and not being in MAE Default of this Agreement or any other La Quinta Amended Development Agreements and not be in violation of any Condition of Approval at the purported time of a Transfer if such violation would cause an MAE Default, Developer shall have the right to a Transfer from City to Developer of fee title to the City-Owned Golf Course Property, City-Owned Ahmanson Ranch

Property, and City-Owned Option Property as more particularly described herein and in the Option Agreement.

6.1 City-Owned Golf Course Property and Ahmanson Ranch Property.

Subject to Developer complying with the terms and conditions in this Agreement, the City-Owned Golf Course Property and City-Owned Ahmanson Ranch House Property shall be transferred together and, unless agreed to by the Parties, may not be Transferred separately. City shall Transfer to Developer the City-Owned Golf Course Property and City-Owned Ahmanson Ranch Property pursuant to and upon Developer's satisfaction of the following provisions:

6.1.1 Consideration for Transfer.

In consideration of the conveyance from City to Developer of the City-Owned Golf Course Property, Developer shall have the obligation in perpetuity to operate, maintain, repair, improve, and continuously have available for use the Golf Course in accordance with the Reinstated Covenant Affecting Real Property (Golf Course Use). Developer shall have no obligation to pay monetary consideration for the Transfer of the City-Owned Golf Course Property; provided, however, City shall have no obligation to Transfer the City-Owned Golf Course Property if Developer is in MAE Default under this Agreement. Prior to conveyance of the Golf Course Property to Developer, City shall issue such temporary construction license or other access rights as may be reasonably requested by Developer to allow Developer to make such improvements and upgrades to the Golf Course as may be approved by the City (which approval shall not be unreasonably withheld, delayed or conditioned) so that such improvements can be completed prior to or concurrently with the opening of the Luxury Hotel for overnight guests.

In consideration of the conveyance from City to Developer of the City-Owned Ahmanson Ranch Property, Developer shall have the obligation to use the Ahmanson Ranch House in accordance with the Reinstated Covenant Affecting Real Property (Ahmanson Ranch). Developer shall have no obligation to pay monetary consideration for the Transfer of the City-Owned Golf Ahmanson Ranch Property; provided, however, City shall have no obligation to Transfer the City-Owned Ahmanson Ranch Property if Developer is in MAE Default under this Agreement. Prior to conveyance of the Ahmanson Ranch House Property to Developer, City shall issue such temporary construction license or other access rights as may be reasonably requested by Developer to allow Developer to make such repairs and/or replacement of the existing Ahmanson Ranch House improvements as may be approved by the City so that such improvements can be completed prior to or concurrently with the opening of the Luxury Hotel for overnight guests.

6.1.2 City's Conditions Precedent to Transfer. The obligations of City under this Agreement to Transfer the City-Owned Golf Course Property and City-Owned Ahmanson Ranch Property shall be subject to the satisfaction or signed written waiver

by City of each and all of the following conditions precedent (collectively, "**Golf Course And Ahmanson Ranch Property Transfer Conditions**"):

(A) Construction of the Luxury Hotel Project Component has been substantially completed by the completion date in the Schedule of Performance (as a Project Milestone), as evidenced by the issuance by the City of a temporary or permanent certificate of occupancy, and the Luxury Hotel has been open to the general public or other designated guests (such as designated guests for a "soft opening" followed by an opening to the general public) with expectation of or actual payments to be received on a regular basis from guest of the Luxury Hotel;

(B) The Public Golf Clubhouse Project Component has been substantially completed by the completion date in the Schedule of Performance (as a Project Milestone), and the Public Golf Clubhouse has been opened for business to the general public;

(C) No less than five (5) months and no more than twelve (12) months prior to the anticipated date upon which Developer takes fee title to the City-Owned Golf Course Property and City-Owned Ahmanson Ranch Property, Developer has selected, and the City has approved (in its reasonable discretion) the golf course management company and form of operating and maintenance agreement to operate and maintain the Golf Course commencing from the date Developer takes fee title of the City-Owned Golf Course Property, so that Developer shall have received adequate prior experience for operating and maintaining the Golf Course and ensuring compliance with the Reinstated Covenant Affecting Real Property (Golf Course Use); for the purposes of this condition, City pre-approves the golf course management company that is responsible for the operations and maintenance of the Golf Course as of the Development Agreement Reinstatement Date;

(D) City and Developer have entered into a mutually agreeable lease or license agreement, covering the time period between Transfer of the City-Owned Golf Course Property to Developer and the conveyance of the Phase 2 Property to Developer, with respect to the "Golf Course Driving Range Property" as defined in and more particularly described in Recital H of the Reinstated Covenant Affecting Real Property (Golf Course Use);

(E) Based on the mutual agreement of the Parties, an escrow company has been selected to service the Transfer of the City-Owned Golf Course Property and City-Owned Ahmanson Ranch Property pursuant to this Agreement and any other agreements or escrow instructions mutually agreed upon by the Parties;

(F) The Reinstated Covenant Affecting Real Property (Golf Course Use) has been fully executed and recorded against the City-Owned Golf Course Property, and the Reinstated Covenant Affecting Real Property (Ahmanson Ranch) has been fully executed and recorded against the City-Owned Ahmanson Ranch Property, and any assignment and assumption agreement(s) to any affiliate of Developer (that is a Permitted Transfer under this Agreement) are fully executed and in recordable form to

be recorded in the Recorder's Office at the close of escrow for the Transfer from City to Developer of the City-Owned Golf Course Property and City-Owned Ahmanson Ranch Property.

6.1.3 Conditions on Title for City-Owned Golf Course Property.

The Parties shall mutually agree upon a title company and obtain a preliminary title report describing the state of title of the City-Owned Golf Course Property and City-Owned Ahmanson Ranch Property, together with copies of all underlying documents. Developer may, at its sole cost and expense, obtain a current survey. The Parties shall mutually agree upon terms and conditions governing the condition of title and approvals to exceptions to title insurance that would be acceptable to Developer. In the absence of any such mutual agreement, the terms and conditions governing the title and title insurance matters in the form Agreement for Purchase and Sale and Escrow Instructions attached to the Option Agreement for the City-Owned Option Property shall govern.

Except as may be expressly agreed upon by City in connection with the escrow servicing the Transfer of the City-Owned Golf Course Property and City-Owned Ahmanson Ranch Property (or as set forth in the immediately preceding paragraph or the Option Agreement), Developer acknowledges and agrees that the both the City-Owned Golf Course Property and City-Owned Ahmanson Ranch Property shall be Transferred and conveyed to Developer in its "AS IS," "WHERE IS" and "SUBJECT TO ALL FAULTS CONDITION," as of the date of recordation of the grant deeds conveying title to the same, with no warranties, expressed or implied, as to the environmental or other physical condition of the City-Owned Golf Course Property and City-Owned Ahmanson Ranch Property, the presence or absence of any patent or latent environmental or other physical condition on or in the City-Owned Golf Course Property and City-Owned Ahmanson Ranch Property, or any other matters affecting the City-Owned Golf Course Property and City-Owned Ahmanson Ranch Property (provided that the City shall insure that such property is not encumbered by any monetary liens).

6.1.4 Form of Grant Deed for Conveyance.

Subject to the inclusion of the correct information relating to the City-Owned Golf Course Property and City-Owned Ahmanson Ranch Property (such as the correct legal descriptions), the forms of the grant deeds to Transfer and convey from City to Developer the City-Owned Golf Course Property and City-Owned Ahmanson Ranch Property shall be similar to the form of the Grant Deed attached to the Agreement for Purchase and Sale and Escrow Instructions attached to the Option Agreement for the City-Owned Option Property, unless the Parties agree to a different form for the grant deeds to Transfer and convey from City to Developer the City-Owned Golf Course Property and City-Owned Ahmanson Ranch Property. In clarification of the preceding sentence, there shall be one grant deed for the Transfer and conveyance of the City-Owned Golf Course Property, and another grant deed for the Transfer and conveyance of the City-Owned Ahmanson Ranch Property together with a bill of sale in customary form applicable to each such property.

6.1.5 Maintenance and Operational Requirements upon Transfer.

Upon fee title to the City-Owned Golf Course Property and City-Owned Ahmanson Ranch Property vesting in Developer in accordance with this Agreement, Developer shall have the following maintenance and operational requirements in addition to those applicable from the Project Approvals and relevant provisions in the La Quinta Municipal Code:

(A) Operating and maintaining the Golf Course in first-class condition and in accordance with the Reinstated Covenant Affecting Real Property (Golf Course Use);

(B) Operating and maintaining the Ahmanson Ranch House in first-class condition and in accordance with the Reinstated Covenant Affecting Real Property (Ahmanson Ranch);

(C) Maintaining, repairing, and/or replacing (or contracting for the same) of the Golf Couse Wildlife Protection Fence, which at a minimum shall meet the applicable specifications and standards of the Coachella Valley Conservation Commission acting as authorized agent for the requirements and obligations of the Coachella Valley Multiple Species Habitat Conservation Plan and shall be in compliance with Mitigation Measures related to the protection of Bighorn Sheep set forth in that certain Mitigated Negative Declaration of Environmental Impact for Environmental Assessment 2002-435 (State Clearinghouse No. 1999081020);

(D) Applying for and obtaining from City any and all permits, licenses, approvals and entitlements as owner of the City-Owned Golf Course Property and City-Owned Ahmanson Ranch Property, including business licenses required for the operation of uses pursuant to the Reinstated Covenant Affecting Real Property (Golf Course Use) and Reinstated Covenant Affecting Real Property (Ahmanson Ranch).

6.1.6 "Property" subject to this Reinstated Development Agreement.

If fee title to the City-Owned Golf Course Property and/or City-Owned Ahmanson Ranch Property vests in Developer in accordance with this Agreement, then the Parties shall enter into and record in the Recorder's office an Insubstantial Modification (pursuant to this Agreement) that memorializes City's Transfer and conveyance to Developer of the City-Owned Golf Course Property and/or City-Owned Ahmanson Ranch Property, as applicable, so that the Developer-owned "Property" subject to this Agreement is acknowledged made a matter of public record.

Furthermore, if fee title to the City-Owned Golf Course Property vests in Developer in accordance with this Agreement, then it is acknowledged and agreed that the Developer and City have entered into a mutually agreeable lease or license agreement with respect thereto

6.2 City-Owned Option Property.

The terms and conditions of any Transfer of the City-Owned Option Property (also referred to herein as the Phase 2 Property) from City to Developer shall be by purchase and sale and governed pursuant to the Option Agreement (and exhibits attached thereto).

6.2.1 Phase 2 Property Land Use Authorization.

If Developer acquires the City-Owned Option Property pursuant to the Option Agreement, then the Applicable Rules and any applicable Project Approvals shall apply to the City-Owner Option Property. Nothing in this Agreement, however, precludes Developer from submitting applications or proposals for modifications to the Applicable Rules, which shall be subject to processing, review, and decision pursuant to applicable federal, state, and local laws, including CEQA and the La Quinta Municipal Code.

6.2.2 Amendment to this Agreement or New Development Agreement.

If Developer acquires the City-Owned Option Property pursuant to the Option Agreement, then this Agreement shall be amended to include, among any other necessary or proper terms and conditions, a scope of work, schedule of performance and phasing of development, and the authorized uses (with necessary and appropriate covenants, conditions, and restrictions) for the Phase 2 Property. In the alternative to amending this Agreement, Developer may apply for a new development agreement governing only the Phase 2 Property, which shall be processed and reviewed in accordance with the Development Agreement Act and Development Agreement Ordinance, and shall include, among any other necessary or proper terms and conditions, a scope of work, schedule of performance and phasing of development, and the authorized uses (with necessary and appropriate covenants, conditions, and restrictions) for the Phase 2 Property. Reciprocal rights relating to the Phase 1 Property and Phase 2 Property, such as reciprocal access and use of trails, streets, and other areas open and available to the public shall be addressed, as necessary and proper.

Whether this Agreement is amended or a new development agreement is to govern the Phase 2 Property, said amendment or new development agreement shall be effective and operative, and recorded in the Recorder's Office, on the date fee title to the Phase 2 Property vests with Developer by conveyance of the grant deed attached to the Agreement for Purchase and Sale and Escrow Instructions attached to the Option Agreement. Furthermore, said amendment or new development agreement shall be with priority and shall remain with priority over any other recorded document or instrument for the Phase 2 Property.

6.2.3 Lease or License for Golf Course Driving Range Property.

Prior to the date fee title to the Phase 2 Property vests with Developer, City and Developer shall enter into a mutually agreeable lease or license agreement, covering the time period between Transfer of the City-Owned Golf Course Property to Developer

and the conveyance of the Phase 2 Property to Developer pursuant to the Option Agreement, for the "Golf Course Driving Range Property" as defined in and more particularly described in Recital H of the Reinstated Covenant Affecting Real Property (Golf Course Use).

7. CITY'S OBLIGATIONS

7.1 Scope of Subsequent Review/Confirmation of Compliance Process.

Except as expressly provided for in this Agreement, nothing set forth herein shall impair or interfere with the right of City to require the processing of any and all permits, licenses, approvals and entitlements (including site development permits and building permits) as required by federal, state, and local law, including the applicable provisions of the La Quinta Municipal Code, Uniform Codes, Map Act, California Government Code, California Health and Safety Code, and CEQA. In connection with Developer's right to make repairs, improvements, and upgrades to the Ahmanson Ranch House and the Golf Course while still owned by City, in addition to grating temporary construction licenses or other use rights as provided herein, City shall also reasonably cooperate with Developer in seeking all necessary permits and approvals for the proposed work, including but not limited to signing applications and other documents as the property owner, which cooperation shall be at no material cost to City.

7.2 Project Approvals Independent.

All approvals required for the Project which may be or have been granted, and all land use entitlements or approvals generally which have been issued or will be issued by City with respect to the Project, constitute independent actions and approvals by City. If any provision of this Agreement or the application of any provision of this Agreement to a particular situation is held by a court of competent jurisdiction to be invalid or unenforceable, or if this Agreement terminates for any reason, then such invalidity, unenforceability or termination of this Agreement or any part hereof shall not affect the validity or effectiveness of any Project Approval or other land use permits, licenses, approvals and entitlements. In such cases, such approvals and entitlements will remain in effect pursuant to their own terms, provisions, and the Conditions of Approval. It is understood by the Parties that pursuant to existing law, if this Agreement terminates or is held invalid or unenforceable as described above, such permits, licenses, approvals and entitlements shall not remain valid for the term of this Agreement, but shall remain valid for the term of such permits, licenses, approvals and entitlements.

7.3 Review for Compliance.

City shall review this Agreement at least once during every twelve (12) month period following the Development Agreement Reinstatement Date, in accordance with City's procedures and standards for such review set forth in City's Development Agreement Ordinance. During such periodic review by City, Developer, promptly after written request from City, shall be required to demonstrate, and hereby agrees to

furnish, evidence of good faith compliance with the terms hereof. The failure of City to conduct or complete the annual review as provided herein or in accordance with the Development Agreement Ordinance shall not impact the validity of this Agreement.

8. DEFAULT; REMEDIES; DISPUTE RESOLUTION; TERMINATION.

8.1 Default and Cure.

Subject to the extensions of time for events of Force Majeure as set forth in this Agreement, failure by either Party to perform any action or covenant required by this Agreement within the time periods provided herein if such failure materially and adversely affects the Project, constitutes a "**Default**" under this Agreement. A Party claiming an Default shall give written notice of Default to the other Party specifying the Default complained of. Except as otherwise expressly provided in this Agreement, the claimant shall not institute any proceeding against the other Party, and the other Party shall not be in Default or MAE Default if such Party cures such default within thirty (30) days from receipt of such notice, or if the nature of such default is that it cannot reasonably be expected to be cured within such thirty (30) day period, if such Party, with due diligence, commences to cure, correct or remedy such failure or delay within thirty (30) days from receipt of such notice, and completes such cure, correction or remedy with diligence no later than ninety (90) days after the expiration of the initial 30-day period. A Default that is not cured within such cure periods may be referred to herein as an "**MAE Default**" of this Agreement.

8.1.1 Provisions Relating to Notices and Events of Default.

The Party claiming a Default shall give written notice of Default to the other Party specifying the Default complained of, but a delay in giving such notice shall not constitute a waiver of any Default nor shall it change the time of Default. Any failure or delays by any Party in asserting any of their rights and/or remedies as to any Default shall not operate as a waiver of any Default or of any such rights or remedies. Delays by any Party in asserting any of its rights and/or remedies shall not deprive that Party of its right to institute and maintain any actions or proceedings that it may deem necessary to protect, assert or enforce any such rights or remedies.

In addition to other acts or omissions of the Developer that may legally or equitably constitute a Default or MAE Default of this Agreement, the occurrence of any of the following specific events, prior to the issuance of the final Certificate of Completion for the Project, shall constitute an event of Default under this Agreement, subject to the notice and cure provisions set forth in Section 8.1 above:

(A) Any representation, warranty or disclosure made in writing to City by Developer regarding this Agreement or the Project is materially false or misleading, whether or not such representation or disclosure appears in this Agreement, which representation, warranty or disclosure was known by a senior executive of Developer to be materially false when made.

(B) The construction of the Project is delayed or suspended for a period in excess of that permitted by an event(s) of Force Majeure and/or period(s) for cure of an MAE Default;

(C) Developer fails to meet the dates for performance of the Project Milestones identified in the Schedule of Performance after allowance for any extensions authorized by this Agreement;

(D) Except for the Project Milestones, which are governed by the preceding Section 8.1.1(C), Developer fails to complete the construction (or fails to cause the completion of construction and build-out of the Phase 1 Property) within a reasonable time after the approximate completion dates set forth in the Schedule of Performance, after allowance for any extensions authorized by this Agreement;

(E) The financing or investment in any Project Component(s) that is not in compliance with the provisions in Section 4.3 of this Agreement;

(F) There occurs any event of dissolution or termination of Developer that adversely and materially affects the operation of the Property or the Project, and such event is not corrected within five (5) days following written notice of such event from the City to the Developer.

(G) There is a voluntary Transfer by Developer of its interest in this Agreement, the Property, or the Project, or any portion thereof, in violation of the terms and conditions of this Agreement and such action is not cured within the period prescribed in this Agreement.

(H) A receiver is appointed to conduct the affairs of the Developer, or Developer files for bankruptcy either voluntarily or involuntarily (in which Developer colluded or consented), under state or federal law;

(I) Developer's legal status as a limited liability company authorized by the Secretary of State of the State of California to transact business in California is suspended or terminated and not reinstated within thirty (30) days after Developer obtains actual notice thereof.

8.1.2 Rights and Remedies Are Cumulative.

Except as otherwise expressly stated in this Agreement, the rights and remedies of the Parties are cumulative, and the exercise by either Party of one or more of such rights or remedies shall not preclude the exercise by it, at the same or different times, of any other rights or remedies for the same Default or any other Default by the other Party.

8.2 Termination of Agreement.

In addition to any other rights and remedies available to the City under this Agreement, the City shall have the right to terminate this Agreement if Developer fails to cure any MAE Default listed in Section 8.1.1 of this Agreement.

8.3 City Remedies.

In the event of an MAE Default by Developer of its obligations under this Agreement, City, at its option, may terminate this Agreement as provided in Section 8.2 and may institute legal action in law or in equity to cure, correct, or remedy such MAE Default, enjoin any threatened or attempted violation, or enforce the terms of this Agreement; provided, however, that, except as otherwise provided in this Agreement, City shall not be entitled to an award of consequential or special damages for any Developer Default or MAE Default.

8.3.1 Defaults and Relation to Option Agreement and TOT Covenant Agreements.

Unless otherwise specified in the Option Agreement and the TOT Covenant Agreement (or implementing agreements attached as exhibits to these respective agreements), noticing and rights to cure set forth in this Reinstated Development Agreement shall apply to all defaults thereunder. Nothing in this Section precludes or otherwise limits City's rights and remedies set forth specifically in, and applicable only to, the Option Agreement and/or the TOT Covenant Agreement (and implementing agreements attached as exhibits to these respective agreements).

8.3.2 Assignment of Development Plans.

If this Agreement is terminated by City as a result of any uncured MAE Default by Developer, then, at the election of City and without any additional consideration to be paid to Developer, which election may be exercised in City's sole and absolute discretion, Developer shall deliver to City an executed assignment in a form reasonably acceptable to City of Developer's right to use all plans, blueprints, drawings, sketches, specifications, tentative or final subdivision maps, landscape plans, utilities plans, soils reports, noise studies, environmental assessment reports, grading plans and any other materials relating to the construction of any non-constructed Project Components of the Project on the Property, or portions thereof that are subject to the uncured MAE Default (collectively, the "**Plans Assignable At Termination**") which are not deemed by Developer in its reasonable discretion to be proprietary or contain the marks, tradenames, trademarks of Developer or its Affiliates, together with copies of all of Plans Assignable At Termination, as have been prepared for the development of the Project to date of the termination. Notwithstanding the foregoing right of City and obligation of Developer, Developer does not covenant to convey to City the copyright or other ownership rights of third parties. City understands and agrees that the assignment to City under this Section is subject and subordinate to any assignment which Developer may make to a Lender providing a Loan for the Project, and City

agrees to execute any documents required by such lender acknowledging and effectuating such subordination of City's rights in and to the assignment. City's assumption and/or use of the Plans Assignable At Termination or any of them shall be without any representation or warranty by Developer as to the accuracy or completeness of any such plans, and City shall assume all risks in the use of such plans and is subject to the claims of, and applicable agreements with, Developer.

8.4 Developer Remedies.

The Parties acknowledge that City would not have entered into this Agreement if it were to be liable in monetary damages of any kind whatsoever under or with respect to this Agreement, Project Approvals, or the application of any matters relating to any rights vested by virtue of this Agreement. As such, the Parties agree that declaratory and injunctive relief, mandate, and specific performance (and other remedies that do not constitute monetary damages) shall be Developer's sole and exclusive judicial remedies against City with respect to enforcement of the terms, provisions and conditions of this Agreement.

In the event of an uncured MAE Default by City of the terms of this Agreement, Developer, at its option, may institute legal action in equity to cure, correct, or remedy such default, enjoin any threatened or attempted violation, or enforce the terms of this Agreement; provided, however, that in no event shall Developer be entitled to recover any damages of and kind whatsoever from City.

8.4.1 Limitation of Damages Against City.

The Parties acknowledge agree that City would not have entered into this Agreement if it were to be liable in monetary damages for consequential damages of any kind whatsoever, including consequential damages, incidental damages, and/or future damages, under or with respect to this Agreement or other Project Approvals, or the application of any matters relating to any rights vested in Developer by virtue of this Agreement. In amplification of the preceding sentence and Section 8.4, and not by way of limitation, in no event shall City be liable for or Developer be entitled to an award of damages for economic loss, lost profits, or any other consequential damages of any kind. Notwithstanding the limitations on damages against City, Developer may be entitled to an award of attorney's fees and costs pursuant to Section 8.5.5 of this Agreement.

8.4.2 Specific Performance.

The Parties acknowledge that monetary damages and remedies at law generally are inadequate due, in part, to the size, nature and scope of the Project, and it will not be practical or possible to restore the Property to its natural condition once implementation of this Agreement has begun, and specific performance is a particularly appropriate remedy for the enforcement of this Agreement and should be available to both Parties based on the following reasons and facts:

(A) The unavailability of monetary damages against City;

(B) Developer's obligations provided for in this Agreement were bargained for by City and given in return for assurances by City to Developer regarding the vested rights under the Applicable Rules and Project Site Development Permits (except as specified to the contrary herein, including the City's Reserved Powers) applicable to the development and use of the Property and Project, which assurances were in turn relied upon by Developer in undertaking Developer's obligations;

(C) Due to the size, nature and scope of the Project, it may not be practical or possible to restore the Property to its natural condition once implementation of this Agreement has begun; after such implementation, Developer may be prevented from other choices it may have had to utilize the Property, or portions thereof, and to provide other benefits to City. Developer has invested significant time and resources and performed extensive planning and processing of the Project in agreeing to the terms of this Agreement and will be investing even more significant time and resources in implementing the Project in reliance upon the terms of this Agreement, and it is not possible to determine the sums of money that would adequately compensate Developer for such efforts;

(D) The inability of Developer to recover and receive back its capital investment in the Master Site Infrastructure Improvements to be provided to City as part of Developer's obligations and to re-plan and provide for different uses of the Property once such facilities and infrastructure have been completed; and

(E) The uses of the Property for the purposes and uses described for the Project are unique.

Further, the Parties acknowledge that, for the reasons set forth above (particularly because of the lack of monetary damages available to Developer), in connection with any judicial proceeding regarding the performance of this Agreement, rights, or the interests and duties of the Parties hereunder, it is appropriate to, and the Parties shall, cooperate in requesting (whether by stipulations or otherwise) the court to proceed expeditiously and to retain jurisdiction until the underlying conflict or dispute has been fully resolved.

8.5 Legal Actions and Litigation.

8.5.1 Jurisdiction and Venue.

Any action at law or in equity brought by either Party hereto for the purpose of enforcing, construing, or interpreting the validity of this Agreement or any provision hereof shall be brought in the Superior Court of the State of California in and for the County of Riverside, or such other appropriate court in said county, and the Parties hereto waive all provisions of law providing for the filing, removal, or change of venue to any other court.

Notwithstanding the foregoing paragraph, the Parties consent to the jurisdiction and venue of the Bankruptcy Court to the extent this Agreement (or any other of the La Quinta Amended Development Agreements or subsequent agreements between the Parties) and/or any dispute that arises between the Parties under this Agreement (or any other of the La Quinta Amended Development Agreements or subsequent agreements between the Parties) relates to the Bankruptcy Lawsuit, and the Bankruptcy Court has retained jurisdiction for purposes of oversight and judicial enforcement of any orders issued by the Bankruptcy Court in the Bankruptcy Lawsuit.

8.5.2 Service of Process.

In the event that any legal action is commenced by Developer against City, service of process on City shall be made by personal service on the City Clerk (or City Clerk's Office) pursuant to applicable California law. In the event that any legal action is commenced by City against Developer, service of process on Developer shall be made by personal service upon any officer of Developer, whether made within or outside the State of California, or in such other manner as may be provided by law.

8.5.3 Inaction Not a Waiver of Default.

Any failures or delays by either Party in asserting any of its rights and remedies as to any Default shall not operate as a waiver of any Default or of any such rights or remedies, or deprive either such Party of its right to institute and maintain any actions or proceedings which it may deem necessary to protect, assert or enforce any such rights or remedies.

8.5.4 Applicable Law.

The internal laws of the State of California shall govern the interpretation and enforcement of this Agreement without regard to conflicts of law principles.

8.5.5 Attorneys' Fees.

In any action between the Parties to interpret, enforce, reform, modify, rescind, or otherwise in connection with any of the terms or provisions of this Agreement, the prevailing Party in the action shall be entitled, in addition to damages, injunctive relief, or any other relief to which it might be entitled, reasonable costs and expenses including, without limitation, litigation costs, reasonable attorneys' fees and expert witness fees.

8.5.6 Appointment of Judicial Referee.

A Party initiating legal action hereunder may request that such action be heard by a referee appointed by the Riverside County Superior Court pursuant to the reference procedures of California Code of Civil Procedure Section 638 *et seq.* Developer and City, in such case, shall use their best efforts to agree upon a single referee who shall then try all issues, whether of fact or law, and report a finding and

judgment thereon and issue all legal and equitable relief, as permitted pursuant to this Agreement and appropriate under the circumstances of the controversy. The referee shall be a retired judge from either the California Superior Court, the California Court of Appeal, the California Supreme Court, the United States District Court or the United States Court of Appeals with significant and recent experience in resolving land use and real property disputes. If Developer and City are unable to agree upon a referee within ten (10) days of a written request to do so by any Party, any Party may seek to have a referee appointed pursuant to Section 640 of the California Code of Civil Procedure. The cost and fees of such proceeding including the referee's fees and the court reporter's fees (exclusive of the attorney's fees and cost of the Parties) shall be borne equally by the Parties; provided, however, that the costs and fees for such proceeding, including any initiation fee, shall be ultimately borne by the non-prevailing Party if there is an award of attorney's fees as provided for in Section 8.5.5 of this Agreement. Any referee selected pursuant to this Section shall be considered a temporary judge appointed pursuant to Article 6, Section 21 of the California Constitution. The statement of decision of the referee shall be binding upon the parties, and upon filing of the statement of decision with the clerk of the court (or with the judge where there is no clerk), judgment may be entered thereon in the same manner as if the action had been tried by the court. The decision of the referee shall be appealable as if rendered by the court. In the event that an alternative method of resolving disputes concerning the application, enforcement or interpretation of development agreements is provided by legislative or judicial action after the Effective Date, the Parties may, by mutual agreement, select such alternative method.

9. MORTGAGEE PROTECTION; CERTAIN RIGHTS OF CURE

9.1 Liens Recorded Against the Property and Project.

This Agreement shall not prevent or limit Developer from encumbering the Property or any portion thereof or any improvements thereon with Lien in which the Property, or a portion thereof or interest therein, is pledged as security, and contracted for in compliance with this Agreement and in good faith securing financing with respect to the construction, development, use or operation of the Project.

9.2 Mortgagee Protection.

This Agreement shall be superior and senior to, with priority over, any Lien recorded against the Property or any portion thereof after the Development Agreement Reinstatement Date. Notwithstanding the foregoing, and provided the Lien (including any Construction Loan Deed of Trust and Infrastructure Loan Deed of Trust) is recorded and entered into in compliance with this Agreement, no Default or MAE Default of this Agreement shall defeat, render invalid, diminish, or impair the Lien made in good faith and for value, and any acquisition or acceptance of title or any right or interest in or with respect to the Property or any portion thereof by a holder of a beneficial interest under a Lien, or any successor or assignee to said holder (a "**Mortgagee**"), whether said acquisition or acceptance of title is pursuant to foreclosure, trustee's sale, deed in lieu of

foreclosure, lease termination, or otherwise, shall be subject to all of the terms and conditions of this Agreement.

9.3 Mortgagee Obligations and Relief Therefrom.

With respect to any Mortgagee that is a Lender for any Construction Loan or Infrastructure Loan entered into pursuant to this Agreement, the terms and conditions set forth in Article 4 (including Section 4.3.5) of this Agreement, among other provisions, shall govern said Lender's rights and obligations with respect mortgage protections offered under this Agreement.

No Mortgagee or other Lender will have any obligation or duty under this Agreement to perform the obligations of Developer or other affirmative covenants of Developer hereunder, or to guarantee such performance; provided, however, that to the extent that any covenant to be performed by Developer is a condition to the performance of a covenant by City, the performance thereof shall continue to be a condition precedent prior to the City's performance under this Agreement and, as applicable, under the Option Agreement and TOT Covenant Agreement (and implementing agreements attached as exhibits to these respective agreements).

10. TRANSFERS OF INTEREST IN PROPERTY, PROJECT, OR AGREEMENT

10.1 Developer Unique and Material Term to this Agreement.

Developer acknowledges and agrees that the qualifications and identity of Developer are of particular importance to City. Developer further recognizes and acknowledges that City has relied and is relying on the specific qualifications and identity of Developer in entering into this Agreement with Developer and, as a consequence, Transfers are permitted only as expressly provided in this Agreement. Developer shall promptly notify City in writing of any and all changes whatsoever in the name of the business entities comprising the majority of and/or in control of Developer, as well as any and all changes in the majority interest or the control of Developer, of which information Developer is notified or may otherwise have knowledge or information.

10.2 Transfers Generally Prohibited Without Prior City Approval.

Except for Permitted Transfers for which Developer delivers to City a fully executed and Assignment and Assumption Agreement, Developer may not Transfer or otherwise assign this Agreement or its interest in title to the Property without the prior written consent of City, which shall not be unreasonably withheld, delayed or conditioned.

10.2.1 Obtaining City Approval for Transfers.

Developer represents to City that it has not made and agrees that it will not make or create, or suffer to be made or created, any Transfer other than a Permitted Transfer

without the prior written consent of the City (which shall not be unreasonably withheld, delayed or conditioned), either voluntarily, involuntarily or by operation of law. In deciding whether to approve or disapprove any proposed Transfer, City may consider the proposed financial strength and the experience of the proposed transferee and its senior management in undertaking and successfully completing projects of a similar type and size as the Project or that portion of the Project proposed to be transferred (it being acknowledged that such financial strength and experience may be held by direct or indirect investors or affiliates of the transferee). Any Transfer made in contravention of this Article 10 and Agreement shall be voidable at the election of City, and the City shall have any remedy at law or in equity as a result thereof;, subject to the notice and cure rights provided in Section 8.1.

10.2.2 Request for City Approval of Transfer.

Unless more time is otherwise required under this Agreement, Developer shall provide City no less than thirty (30) days prior written notice (or, for a Permitted Transfer, no less than ten (10) days prior written notice) of any proposed Transfer which Developer desires to enter into. Developer shall have the burden of demonstrating to City's reasonable satisfaction that the proposed Transfer meets the conditions and requirements of this Agreement with respect to any Transfer that is not a Permitted Transfer.

10.2.3 Costs for Review of Proposed Transfer.

In connection with City's review of any request for approval of any proposed Transfer under this Article 10 or of any Lender or Loan pursuant to this Agreement, Developer agrees to reimburse City for those reasonable out of pocket third party costs and expenses incurred by City in connection with its review of Developer's request for approval, including, without implied limitation, the reasonable fees and costs of those outside consultants and legal counsel retained by City to assist it in its review of Developer's request, including the City Attorney.

10.2.4 Assignment and Assumption Agreement.

Except for Permitted Transfers which are expressly released in this Agreement from the obligation of executing and recording an Assignment and Assumption Agreement, every Transfer, including any Permitted Transfer, of all or any portion of the Property, Project, or this Agreement, shall be memorialized by an assignment and assumption agreement, subject to the consent of the City (which shall not be unreasonably withheld, delayed or conditioned) and in substance and form substantially similar to that attached hereto as Exhibit L and incorporated herein by this reference ("**Assignment and Assumption Agreement**"). No Transfer of all or any portion of the Property, Project, or this Agreement shall be operative or effective unless and until an Assignment and Assumption Agreement, is fully executed and recorded in the Recorder's Office against the Property (or portion thereof) to which the Transfer applies. The parties agree that any such Transfer may be for the entire Property or any one (1)

or more Project Components either in a single transaction or multiple transactions, as elected by Developer. In the event of any such Transfer(s), if as a result of any multiple Transfers, Developer shall constitute more than one (1) Person (i.e., if Developer's interests in different Project Components are Transferred to different Persons), then each such Person shall only be liable for (and the applicable Assignment and Assumption Agreement shall solely apply to) the rights and obligations under this Agreement as they relate to the portion of the Property then-owned by such transferee.

10.2.5 Permitted Transfers.

Notwithstanding anything to the contrary contained herein, the following Transfers shall not require prior approval from the City for the purported Transfer (each, a "**Permitted Transfer**"):

(A) The conveyance or dedication of any portion of the Property to an appropriate federal, state, or local (including City) governmental agency, or the granting of easements or permits to facilitate construction and operation of the Project (depending on the type of conveyance or dedication, the Transfer may be exempted from the requirement of an Assignment and Assumption Agreement);

(B) The sale by Developer of any completely constructed residential dwelling unit(s), whether single-family detached or condominium unit, to a bone fide third party purchaser/individual buyer (such sale and conveyance shall be exempted from the requirement of an Assignment and Assumption Agreement);

(C) The sale by Developer of any precisely-graded and utility-ready unimproved custom single-family luxury residence Lot pursuant to Section 3.2.7 of this Agreement to a bone fide third party purchaser/individual buyer (subject to Developer's obligations in Section 3.2.7, such sale and conveyance shall be exempted from the requirement of an Assignment and Assumption Agreement);

(D) Any Transfer that is a Transfer Exemption (such Transfer is exempted from the requirement of an Assignment and Assumption Agreement);

(E) Any Transfer to a Permitted Affiliate Assignee;

(F) Any Transfer to a Permitted Hotel Operator (subject to Developer meeting its obligations in this Agreement, a Transfer to a Permitted Hotel Operator is exempted from the requirement of an Assignment and Assumption Agreement);

(G) Any Transfer to a Permitted Lender (if the Permitted Lender has satisfied the provisions in this Agreement, and as long as the Permitted Lender after the Transfer is not the "Developer" or a "Permitted Developer/Operational Transferee," such Transfer is exempted from the requirement of an Assignment and Assumption Agreement); or

(H) Any Transfer to a Permitted Development/Operational Transferee.

10.2.6 Partial Release of Obligations from Transferor.

Upon the Transfer in whole or in part of Developer's right and interest to all or any portion of the Property, Project, or this Agreement, which shall be evidenced by the recording of an Assignment and Assumption Agreement pursuant to this Agreement, then Developer may obtain from City for a release from Developer's obligations hereunder with respect to the portion of the Property, Project, or this Agreement, so Transferred. City shall approve the partial or full release if: (A) Developer has complied with the obligations in this Article 10 relating to Transfers; (B) Developer is not in MAE Default of this Agreement at the time of the request for release, or provides adequate assurances to the satisfaction of City that it will cure any breach prior to the Transfer; (C) Developer and the transferee have executed and recorded against the portion of the Property to which the Transfer applies an Assignment and Assumption Agreement applicable to the portion of the Property being Transferred, and (D) the transferee has duly assumed all obligations of Developer under this Agreement with respect to the portion of the Property so transferred with respect to matters occurring after the effective date of such Transfer. Failure to obtain City consent when required hereunder shall not negate, modify or otherwise affect the liability under this Agreement of any transferee or future owner of any portion of the Property. Developer shall remain responsible for all obligations set forth in the Agreement that are not subject to an Assignment and Assumption Agreement in accordance with this Article 10. A Party proposing to assign its obligations under this Agreement (i) shall remain liable for the obligations hereunder until and unless City has received a fully executed Assignment and Assumption Agreement, and (ii) shall remain liable for any MAE Default hereunder that occurred prior to the effective date of the assignment. Developer or Developer's successor agrees to reimburse City for those third party costs and expenses incurred by City in connection with its review of any Assignment and Assumption Agreement, including, without implied limitation, the reasonable fees and costs of those outside consultants and legal counsel retained by City to assist it in its review of Developer's Transfer , including the City Attorney.

10.3 Successors and Assigns.

All of the terms, covenants and conditions of this Agreement shall be binding upon Developer and its permitted successors and assigns. Whenever the term "Developer" is used in this Agreement, such term shall include any other permitted successors and assigns as herein provided.

10.4 Developer Entities Documentation and Permitted Affiliate Assignees.

Notwithstanding anything to the contrary contained herein, Developer may assign this Agreement (pursuant to an Assignment and Assumption Agreement) either in its entirety to a single assignee, or separately to separate assignees as to each Project Component or groups of Project Components as elected by Developer, so long as

Developer or Affiliates of Developer continue to own an interest in, and are involved in the control and management of, Developer, and may lawfully be the assignee under federal and state law (any such assignee, a "**Permitted Affiliate Assignee**"). It is acknowledged that each separate assignee (if applicable pursuant to the foregoing) may consist of different investors and/or management, and no consent by the City shall be required prior to the proposed Transfer as long as Developer is a Permitted Affiliate Transferee.

City shall have the right to request from Developer written documentation and evidence confirming a proposed Transfer is to a Permitted Affiliate Assignee. No later than fifteen (15) days prior to the proposed assignment from Developer to a proposed Permitted Affiliate Assignee, Developer shall deliver written notice thereof to City, along with documentation and evidence (as may be recommended by Developer and consistent with industry standards for confirming affiliated entities, such as proposed limited liability company operating agreements, management agreements, or similar documentation) for the City to review solely for the purpose of confirming the proposed Transfer is to a Permitted Affiliate Assignee. The City shall consent to the Transfer, and an Assignment and Assumption Agreement shall be executed and recorded, upon confirmation the proposed Transfer is to a Permitted Affiliate Assignee.

Without limiting the foregoing, the City hereby approves the Developer Entities Organizational Chart and the structure set forth therein as the anticipated structure for Transfers from Developer to Permitted Affiliate Assignees for the various Project Components. Nothing in this Section limits or prevents Developer from modifying or supplementing the Developer Entities Organizational Chart to add or remove proposed Affiliates of Developer, as may be necessary or proper during the Term of this Agreement and development (and completion of development) of the various Project Components.

10.5 Assignment by City.

City may assign or transfer any of its rights or obligations under this Agreement with the approval of Developer, which approval shall not be unreasonably withheld; provided, however, that City may assign or transfer any of its interests hereunder to a joint powers authority in which City is a member at any time without the consent of Developer.

11. MISCELLANEOUS

11.1 Notices, Demands and Communications Between the Parties.

Any approval, disapproval, demand, document or other notice ("Notice") which either Party may desire to give to the other Party under this Agreement must be in writing and shall be sufficiently given if (i) delivered by hand, (ii) delivered by reputable same-day or overnight messenger service that provides a receipt showing date and time of delivery, or (iii) dispatched by registered or certified mail, postage prepaid, return

receipt requested, to the principal offices of City and Developer at the addresses specified below, or at any other address as that Party may later designate by Notice.

| | |
|---|---|
| To City: | City of La Quinta<br>78-495 Calle Tampico<br>La Quinta, California 92253<br>Attn: City Clerk |
| With a copy to: | Rutan & Tucker, LLP<br>18575 Jamboree Road, 9th Floor<br>Irvine, California 92612<br>Attn: William H. Ihrke<br>Email: bihrke@rutan.com |
| To Developer: | TBE RE Acquisition Co II LLC<br>c/o Turnbridge Equities<br>4 Bryant Park, Suite 200<br>New York, New York 10018<br>Attention: General Counsel and Michael Gazzano<br>Email: jw@turnbridgeeq.com and mg@turnbridgeeq.com<br><br>with a copy to:<br>DLA Piper<br>1251 Avenue of the Americas<br>New York, New York 10020<br>Attention: Todd Eisner<br>Email: todd.eisner@us.dlapiper.com<br><br>with a copy to:<br>Procopio<br>200 Spectrum Center Drive, Suite 1650,<br>Irvine, CA 92618<br>Attn: James Vaughn<br>Email: james.vaughn@procopio.com |

Any written notice, demand or communication shall be deemed received immediately if personally delivered or delivered by delivery service, and shall be deemed received on the fifth (5th) day from the date it is postmarked if delivered by registered or certified mail.

11.2 Force Majeure.

In addition to specific provisions of this Agreement, performance by either Party hereunder shall not be deemed to be in MAE Default or Default, and all performance and other dates specified in this Agreement shall be extended, where delays, MAE Defaults or Defaults are due to causes beyond the control or without the fault of the Party claiming an extension of time to perform, which include, without limitation, the following (each, a "**Force Majeure**"): war; insurrection; acts of terrorism; strikes; lockouts; riots; floods; earthquakes; fires; casualties; acts of God; acts of the public enemy; condemnation of property by a federal or state agency; mob violence; natural disasters; utility delays; extraordinary and extreme delays in obtaining permits, entitlements, licenses, or other approvals from the City (provided and subject to Developer acknowledging that approvals from the City, as required by State and City law, may require substantial time and/or cooperation from other governmental agencies); any pandemic or epidemic; unusual disruption to national or international transport services; governmental shut-downs and "stay at home" mandates or other public health restrictions; quarantine restrictions; nation-wide freight embargoes; and unusually severe weather that is not usual in the City for the given time of year. Notwithstanding anything to the contrary in this Agreement, an extension of time for any such cause shall only be for the period of the delay and shall commence to run from the time of the commencement of the cause, if notice by the Party claiming such extension is sent to the other Party within a reasonable time following the commencement of the cause, which notice requirement shall be deemed waived if the other Party is aware of the facts giving rise to the Force Majeure. Upon receiving notice of a Force Majeure or becoming aware of the facts giving rise thereto, the Parties shall meet and confer in good faither to determine the appropriate period of Force Majeure delay, and document same in writing. Times of performance under this Agreement may also be extended in writing by the mutual agreement of City and Developer.

11.3 Binding Effect.

This Agreement, and all of the terms and conditions hereof, shall be binding upon and inure to the benefit of the Parties, any subsequent owner of all or any portion of the Project or the Property, and their respective assigns or successors in interest, whether or not any reference to this Agreement is contained in the instrument by which such person acquired an interest in the Project or the Property.

11.4 Independent Entity.

The Parties acknowledge that, in entering into and performing this Agreement, each of Developer and City is acting as an independent entity and not as an agent of the other in any respect.

11.5 Agreement Not to Benefit Third Parties.

This Agreement is made for the sole benefit of the Parties, and no other person shall be deemed to have any privity of contract under this Agreement nor any right to

rely on this Agreement to any extent for any purpose whatsoever, nor have any right of action of any kind on this Agreement nor be deemed to be a third party beneficiary under this Agreement.

11.6 Covenants.

The provisions of this Agreement shall constitute mutual covenants which shall run with the land comprising the Site for the benefit thereof, and for the benefit of City's adjoining properties, and the burdens and benefits hereof shall bind and inure to the benefit of each of the Parties hereto and all successors in interest to the Parties hereto for the term of this Agreement.

11.7 Non-liability of City Officers and Employees.

No official, officer, employee, agent or representative of City, acting in his/her official capacity, shall be personally liable to Developer, or any successor or assign, for any loss, costs, damage, claim, liability, or judgment, arising out of or connection to this Agreement, or for any act or omission on the part of City.

11.8 Amendments or Modifications of Agreement.

11.8.1 Amendments. This Agreement may be amended from time to time by mutual consent of the original Parties or such party to which Developer assigns all or any portion of its interest in this Agreement, in accordance with the provisions of the City's Development Agreement Ordinance and Government Code Sections 65867 through 65868.

11.8.2 Determination of Insubstantial Modifications. For each proposed modification to this Agreement, the City Manager or his/her designee shall determine, in his/her sole discretion: (1) whether, in his/her reasonable judgment, the requested modification constitutes an "Insubstantial Modification," as defined in this Agreement; (2) whether the requested modification is consistent with the Applicable Rules and Project Approvals (other than that portion of this Agreement sought to be modified); and (3) whether, in his/her reasonable judgment, the requested modification tends to promote the goals of this Agreement. If the City Manager or his/her designee determines that the requested modification is an "Insubstantial Modification," the proposed modification may be reviewed and acted upon by the City Manager, and a written modification will be executed by the Parties and attached to this Agreement. Any such Insubstantial Modification shall not be deemed an "amendment" to this Agreement under Government Code Section 65858, but the document memorializing an approved Insubstantial Modification shall be recorded in the Recorder's Office no later than thirty (30) days after complete execution of said amendment or other agreement. Any modification of which the City Manager, in his/her reasonable discretion, determines not to be an "Insubstantial Modification" shall be an amendment to this Agreement.

11.8.3 Costs of Processing and Memorializing Amendments or Insubstantial Modifications. Developer shall be required to reimburse City for all costs

City incurs in negotiating, preparing, and processing any alterations, changes, or modifications to this Agreement requested by Developer or any lender or investor. In connection with any request for an alteration, change or modification, Developer shall deposit with City the sum of Ten Thousand Dollars ($10,000). Notwithstanding the foregoing, the City Manager shall have the discretion to authorize a lesser deposit, in the event he or she determines the proposed alteration, change or modification is minor. In the event the funds on deposit are depleted, City shall notify Developer of the same, and Developer shall deposit with City an additional Five Thousand Dollars ($5,000) to complete processing of the requested alteration, change or modification. Developer shall make additional deposits to City, as needed, pursuant to the foregoing process, until the requested alteration, change, or modification is finalized. Within sixty (60) days after such alteration, change or modification is finalized, City shall reimburse Developer any unused sums.

11.9 Amendment or Cancellation by Mutual Consent.

Except as expressly stated to the contrary herein, this Agreement may be amended or canceled in whole or in part only by mutual consent of the Parties and in the manner provided for in Government Code Sections 65867–65868 and the Development Agreement Ordinance. Notwithstanding the foregoing, in the event that any portion of the Property is under different ownership at some time during the Term hereof, City and the then-owner of such portion may amend the terms of this Development Agreement and the Project Approvals with respect to said portion, without obtaining the approval or consent of the owners of the other portions of the Property.

11.10 No Waiver.

No waiver of any provision of this Agreement shall be effective unless in writing and signed by a duly authorized representative of the Party against whom enforcement of a waiver is sought and referring expressly to this Section. No delay or omission by either Party in exercising any right or power accruing upon non-compliance or failure to perform by the other Party under any of the provisions of this Agreement shall impair any such right or power or be construed to be a waiver thereof, except as expressly provided herein. No waiver by either Party of any of the covenants or conditions to be performed by the other Party shall be construed or deemed a waiver of any succeeding breach or nonperformance of the same or other covenants and conditions hereof.

11.11 Severability.

If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions of this Agreement shall continue in full force and effect, to the extent that the invalidity or unenforceability does not impair the application of this Agreement as intended by the Parties.

11.12 Cooperation in Carrying Out Agreement.

Each Party shall take such actions and execute and deliver to the other all such further instruments and documents as may be reasonably necessary to carry out this Agreement in order to provide and secure to the other Party the full and complete enjoyment of its rights and privileges hereunder.

11.13 Estoppel Certificate.

Either Party may, at any time, deliver written notice to any other Party requesting such Party to certify in writing that, to the best knowledge of the certifying Party (which, if so requested by a Party, shall inure to the benefit of any Lender, Hotel Operator or Permitted Transferee and their respective successors and assigns), (i) this Agreement is in full force and effect and a binding obligation of the Parties, (ii) this Agreement has not been amended or modified either orally or in writing, or if so amended, identifying the amendments, (iii) the requesting Party is not in default in the performance of its obligations under this Agreement, or if in default, describing the nature and amount of any such defaults, and that to the knowledge of the requesting Party, the other party is not in default (or specifying any such defaults) and (iv) any other reasonable information requested. A Party receiving a request hereunder shall execute and return such certificate within fifteen (15) days following approval of the proposed estoppel certificate by the City Attorney, which approval shall not be unreasonably withheld or delayed. The City Manager or authorized designee is authorized to sign and deliver an estoppel certificate on behalf of City. City acknowledges that a certificate hereunder may be relied upon by transferees and Mortgagees and other Lenders.

11.14 Construction.

The terms of this Agreement shall be construed in accordance with the meaning of the language used and shall not be construed for or against either Party by reason of the authorship of this Agreement or any other rule of construction that might otherwise apply. As used in this Agreement, and as the context may require, the singular includes the plural and vice versa, and the masculine gender includes the feminine and vice versa.

11.15 Recordation.

This Agreement shall be recorded in the Recorder's Office at Developer's cost, if any, within the period required by this Agreement or, if not specified herein, per Government Code Section 65868.5. Amendments and Insubstantial Modifications approved by the Parties, Assignment and Assumption Agreements, and any cancellation or termination of this Agreement, shall be similarly recorded.

11.16 Captions and References.

The captions of the paragraphs and subparagraphs of this Agreement are solely for convenience of reference, and shall be disregarded in the construction and

interpretation of this Agreement. Reference herein to a paragraph or exhibit are the paragraphs, subparagraphs and exhibits of this Agreement.

11.17 Time.

Time is of the essence in the performance of this Agreement and of each and every term and condition hereof as to which time is an element.

11.18 Computation of Days.

Unless expressly identified as being subject to "business days," the computation for performance and word "Days" and "days" shall mean calendar days, continuously calculated and without exclusion of weekends or holidays; provided, however, that if the last "day" were to fall on a weekend day or official holiday recognized under federal or state law, then the time for performance on that last day shall be extended to the next business day. For purposes of this Agreement, "business day" means every day of the calendar year except Saturdays, Sundays, and official holidays recognized under federal or state law and for which City Hall is closed to the general public.

11.19 Recitals & Exhibits Incorporated; Entire Agreement.

The Recitals to this Agreement and all of the exhibits and attachments to this Agreement are, by this reference, incorporated into this Agreement and made a part hereof. This Agreement, including all Exhibits attached hereto, constitutes the entire agreement between the Parties with respect to the subject matter of this Agreement, and this Agreement supersedes all previous negotiations, discussions and agreements between the Parties, and no parole evidence of any prior or other agreement shall be permitted to contradict or vary the terms hereof.

11.20 Exhibits.

Exhibits A-M to which reference is made in this Agreement are deemed appropriated herein in their entirety. Said exhibits are identified as follows:

A. Legal Descriptions Subject to this Agreement

A-1 Legal Description of Phase 1A Property

A-2 Legal Description of Phase 1B Property

A-3 Legal Description of Phase 2 Property (City-Owned Option Property)

A-4 Legal Description of City-Owned Ahmanson Ranch Property

A-5 Legal Description of City-Owned Golf Course Property

B. Site Maps

C. Project Description

D. Scope of Work / Scope of Development

E. Project Schedule / Schedule of Performance

F. List of Pre-Bankruptcy Subdivision Maps and Permits

G. Form of Certificate of Completion

H. Developer Entities Organizational Chart

I. Post-Bankruptcy Sale Permitting Processes

J. Reinstated Covenant Affecting Real Property (Ahmanson Ranch House)

K. Reinstated Covenant Affecting Real Property (Golf Course Use)

L. Form of Assignment and Assumption Agreement

M. Short-Term Vacation Rental Regulations (Ch. 3.25 of La Quinta Mun. Code)

[end of list of Exhibits]

11.21 Authority to Execute; Representations and Warranties.

Developer warrants and represents that (i) it is duly organized and existing, (ii) it is duly authorized to execute and deliver this Agreement, (iii) by so executing this Agreement, Developer is formally bound to the provisions of this Agreement, (iv) Developer's entering into and performance of its obligations set forth in this Agreement do not violate any provision of any other agreement to which Developer is bound, and (v) there is no existing or threatened litigation or legal proceeding of which Developer is aware, other than the Bankruptcy Lawsuit, which could prevent Developer from entering into or performing its obligations set forth in this Agreement.

11.22 City Approvals and Actions by City Manager.

City shall maintain authority of this Agreement and the authority to implement this Agreement through the City Manager. Except as otherwise provided in this Agreement or as required by applicable law (including the La Quinta Municipal Code), the City Manager (or authorized designee) shall have the authority to make approvals, issue interpretations, waive provisions, negotiate and enter into amendments to this Agreement and/or negotiate and enter into implementing agreements or documents on behalf of City so long as such actions do not materially or substantially change the business terms of this Agreement or the uses or development permitted on the Property, or materially or substantially add to the costs incurred or to be incurred by City as specified herein. Such approvals, interpretations, waivers, amendments, and/or implementing agreements or documents may include extensions of time to perform as

specified in the Schedule of Performance. All other material and/or substantial interpretations, waivers, or amendments shall require the consideration, action and written consent of the City Council. Wherever the approval of the City is required under this Agreement, other than approvals required of the City acting in its governmental capacity, such approval shall not be unreasonably withheld, conditioned or delayed, unless expressly stated to the contrary in this Agreement. Nothing in this Section limits or precludes the City Manager from presenting to the Planning Commission and/or City Council, as applicable, for review and consideration any matters to which the City Manager otherwise may act on behalf of City pursuant to this Section.

11.23 No Brokers. Each of the City and the Developer represents to the other party that it has not engaged the services of any finder or broker and that it is not liable for any real estate commissions, broker's fees, or finder's fees which may accrue by means of this Agreement and agrees to hold harmless the other party from such commissions or fees as are alleged to be due from the party making such representations.

11.24 Counterpart Signature Pages.

This Agreement may be signed in multiple counterparts which, when signed by all Parties, shall constitute a binding agreement. This Agreement shall be executed in two (2) originals, each of which is deemed to be an original.

[end – signature page follows]

IN WITNESS WHEREOF, Developer and City have executed this Agreement as of the Reference Date.

**"DEVELOPER"**

TBE RE Acquisition Co II LLC, a Delaware limited liability company, an affiliate of Turnbridge Equities

Date: November 26, 2025

By: ______________________
Name: Andrew Joblon
Title: Authorized Signatory

**"CITY"**

CITY OF LA QUINTA, a California municipal corporation and charter city

Date: 12/1, 2025

By: SIGNED IN COUNTERPART
Jon McMillen, City Manager

ATTEST:

SIGNED IN COUNTERPART
Monika Radeva, City Clerk

APPROVED AS TO FORM
RUTAN & TUCKER, LLP

SIGNED IN COUNTERPART
William H. Ihrke, City Attorney

IN WITNESS WHEREOF, Developer and City have executed this Agreement as of the Reference Date.

**"DEVELOPER"**

TBE RE Acquisition Co II LLC, a Delaware limited liability company and affiliate of Turnbridge Equities

Date: November 26, 2025

By: SIGNED IN COUNTERPART
Name: Andrew Joblon
Title: Authorized Signatory

**"CITY"**

CITY OF LA QUINTA, a California municipal corporation and charter city

Date: 12/1, 2025

By: ______________________
Jon McMillen, City Manager

ATTEST:

______________________
Monika Radeva, City Clerk

APPROVED AS TO FORM
RUTAN & TUCKER, LLP

______________________
William H. Ihrke, City Attorney

**GOVERNMENT CODE 27361.7**

**I CERTIFY UNDER PENALTY OF PERJURY THAT THE ILLEGIBLE PORTIONS OF THIS DOCUMENT TO WHICH THIS STATEMENT IS ATTACHED, READS AS FOLLOWS:**

**JOHN MCMILLEN**

____________________________________ **Dated: December 5, 2025**

**Sandy Staley, Title Officer, Stewart Title**
**Place of Execution: RIVERSIDE, CA**

A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )
County of Los Angeles )

On 11/26/25, before me, MARY FITZGERALD, (insert name and title of the officer)
Notary Public, personally appeared Andrew Jobson,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

MARY FITZGERALD
Notary Public - California
Los Angeles County
Commission # 2424724
My Comm. Expires Nov 1, 2026

Signature [signature]

(Seal)

A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )
County of Riverside )

On December 1, 2025, before me, Monika Radeva (insert name and title of the officer), Notary Public, personally appeared Jon McMillen, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

MONIKA RADEVA
Notary Public - California
Riverside County
Commission # 2500684
My Comm. Expires Oct 22, 2028

WITNESS my hand and official seal.

Signature_______________________ (Seal)

| A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |

State of California )
County of Riverside )

On ______________________, before me, ______________________________,
(insert name and title of the officer)

Notary Public, personally appeared ________________________________________,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature______________________________ (Seal)

# EXHIBIT A

## LEGAL DESCRIPTIONS SUBJECT TO THIS AGREEMENT

[attached]

EXHIBIT A-1
LEGAL DESCRIPTION OF PHASE 1A PROPERTY

All that certain property located in the City of La Quinta, County of Riverside, State of California, described as follows:

PARCEL A:

THAT PORTION OF PARCELS 4 AND 18 OF PARCEL MAP NO. 37207, IN THE CITY OF LA QUINTA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AS SHOWN BY A MAP FILED IN BOOK 242, PAGES 72 THROUGH 87, INCLUSIVE OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS
FOLLOWS:

LOT "C" OF LOT LINE ADJUSTMENT NO. 2020-0010, AS DISCLOSED BY GRANT DEED RECORDED JULY 15, 2021 AS INSTRUMENT NO. 20210426711 OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, STATE OF CALIFORNIA, AS DESCRIBED THEREIN.

EXCEPTING THEREFROM ALL OIL, GAS, HYDROCARBON SUBSTANCES, AND MINERALS OF EVERY KIND AND CHARACTER LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE, TOGETHER WITH THE RIGHT TO DRILL INTO, THROUGH, AND TO USE AND OCCUPY ALL PARTS OF THE PHASE 1A AND 1B PROPERTY LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE THEREOF FOR ANY AND ALL PURPOSES INCIDENTAL TO THE EXPLORATION FOR AND PRODUCTION OF OIL, GAS, HYDROCARBON SUBSTANCES OR MINERALS FROM SAID PHASE 1A AND 1B PROPERTY OR OTHER LANDS, BUT WITHOUT, HOWEVER, ANY RIGHT TO USE EITHER THE SURFACE FROM SAID PHASE 1A AND 1B PROPERTY OR ANY PORTION THEREOF WITHIN FIVE HUNDRED (500) FEET OF THE SURFACE FOR ANY PURPOSE OR PURPOSES WHATSOEVER, OR TO USE THE PHASE 1A AND 1B PROPERTY IN SUCH A MANNER AS TO CREATE A DISTURBANCE TO THE USE OR ENJOYMENT OF THE PHASE 1A AND 1B PROPERTY, AS RESERVED BY THE CITY OF LA QUINTA, A CALIFORNIA MUNICIPAL CORPORATION AND CHARTER CITY, IN THE GRANT DEED RECORDED NOVEMBER 28, 2018, AS INSTRUMENT NO. 2018-0464674 AND RECORDED NOVEMBER 6, 2017, AS INSTRUMENT NO. 2017-0463950, BOTH OF OFFICIAL RECORDS.

APNs 777-490-058, 777-490-063, 777-490-064, 777-490-065 AND 777-490-066 (OLD APNs PORTION OF 777-490-041 and 777-490-051)

[continues on next page]

PARCEL B:

THAT PORTION OF PARCELS 3 AND 4 OF PARCEL MAP NO. 37207, IN THE CITY OF LA QUINTA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AS SHOWN BY A MAP FILED IN BOOK 242, PAGES 72 THROUGH 87, INCLUSIVE OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

LOT "B" OF LOT LINE ADJUSTMENT NO. 2020-0010, AS DISCLOSED BY GRANT DEED RECORDED JULY 16, 2021 AS INSTRUMENT NO. 20210428113 OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, STATE OF CALIFORNIA, AS DESCRIBED THEREIN.

EXCEPTING THEREFROM ALL OIL, GAS, HYDROCARBON SUBSTANCES, AND MINERALS OF EVERY KIND AND CHARACTER LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE, TOGETHER WITH THE RIGHT TO DRILL INTO, THROUGH, AND TO USE AND OCCUPY ALL PARTS OF THE PHASE 1A AND 1B
PROPERTY LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE THEREOF FOR ANY AND ALL PURPOSES INCIDENTAL TO THE EXPLORATION FOR AND PRODUCTION OF OIL, GAS, HYDROCARBON SUBSTANCES OR MINERALS FROM SAID PHASE 1A AND 1B PROPERTY OR OTHER LANDS, BUT WITHOUT, HOWEVER, ANY RIGHT TO USE EITHER THE SURFACE FROM SAID PHASE 1A AND 1B PROPERTY OR ANY PORTION THEREOF WITHIN FIVE HUNDRED (500) FEET OF THE SURFACE FOR ANY PURPOSE OR PURPOSES WHATSOEVER, OR TO USE THE PHASE 1A AND 1B PROPERTY IN SUCH A MANNER AS TO CREATE A DISTURBANCE TO THE USE OR ENJOYMENT OF THE PHASE 1A AND 1B PROPERTY, AS RESERVED BY THE CITY OF LA QUINTA, A CALIFORNIA MUNICIPAL CORPORATION AND CHARTER CITY, IN THE GRANT DEED RECORDED NOVEMBER 28, 2018, AS INSTRUMENT NO. 2018-0464674 AND RECORDED NOVEMBER 6, 2017, AS INSTRUMENT NO. 2017-0463950, BOTH OF OFFICIAL RECORDS.

APNs 777-490-037, 777-490-057, 777-490-059 AND 777-490-068
(OLD APNs PORTION OF 777-490-040 AND 777-490-041)

[continues on next page]

PARCEL C:

PARCEL 5 OF PARCEL MAP NO. 37207 AS SHOWN BY A MAP ON FILE IN BOOK 242 OF PARCEL MAPS, PAGES 72 THROUGH 87, INCLUSIVE, TOGETHER WITH PORTIONS OF PARCELS A AND B OF LOT LINE ADJUSTMENT NO. 2020-0005, RECORDED SEPTEMBER 2, 2021 AS DOCUMENT NO. 2021-0527060 OF OFFICIAL RECORDS OF SAID COUNTY, DESCRIBED AS FOLLOWS:

PARCEL "A" OF LOT LINE ADJUSTMENT NO. 2023-0003 OF THE CITY OF LA QUINTA, AS DISCLOSED BY GRANT DEED RECORDED MAY 4, 2023 AS INSTRUMENT NO. 2023-0128115 OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, STATE OF CALIFORNIA, AS DESCRIBED THEREIN.

EXCEPTING FROM PARCEL 5 ABOVE, ALL OIL, GAS, HYDROCARBON SUBSTANCES, AND MINERALS OF EVERY KIND AND CHARACTER LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE, TOGETHER WITH THE RIGHT TO DRILL INTO, THROUGH, AND TO USE AND OCCUPY ALL PARTS OF THE PHASE 1A AND 1B PROPERTY LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE THEREOF FOR ANY AND ALL PURPOSES INCIDENTAL TO THE EXPLORATION FOR AND PRODUCTION OF OIL, GAS, HYDROCARBON SUBSTANCES OR MINERALS FROM SAID PHASE 1A AND 1B PROPERTY OR OTHER LANDS, BUT WITHOUT, HOWEVER, ANY RIGHT TO USE EITHER THE SURFACE FROM SAID PHASE 1A AND 1B PROPERTY OR ANY PORTION THEREOF WITHIN FIVE HUNDRED (500) FEET OF THE SURFACE FOR ANY PURPOSE OR PURPOSES WHATSOEVER, OR TO USE THE PHASE 1A AND 1B PROPERTY IN SUCH A MANNER AS TO CREATE A DISTURBANCE TO THE USE OR ENJOYMENT OF THE PHASE 1A AND 1B PROPERTY, AS RESERVED BY THE CITY OF LA QUINTA, A CALIFORNIA MUNICIPAL CORPORATION AND CHARTER CITY, IN THE GRANT DEED RECORDED NOVEMBER 28, 2018, AS INSTRUMENT NO. 2018-0464674 AND RECORDED NOVEMBER 6, 2017, AS INSTRUMENT NO. 2017-0463950, BOTH OF OFFICIAL RECORDS.

APNs: 777-490-042, 777-490-076 AND PORTIONS OF 777-490-072 AND 777-490-073 (OLD APNs PORTION of 777-490-043 and 777-490-044)

[continues on next page]

PARCEL D:

PORTIONS OF PARCELS A THROUGH C, INCLUSIVE, OF LOT LINE ADJUSTMENT NO. 2020-0005, RECORDED SEPTEMBER 2, 2021 AS DOCUMENT NO. 2021-0527060 OF OFFICIAL RECORDS OF SAID COUNTY, DESCRIBED AS FOLLOWS:

PARCEL "B" OF LOT LINE ADJUSTMENT NO. 2023-0003 OF THE CITY OF LA QUINTA, AS DISCLOSED BY GRANT DEED RECORDED MAY 4, 2023 AS INSTRUMENT NO. 2023-0128115 OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, STATE OF CALIFORNIA, AS DESCRIBED THEREIN.

EXCEPTING THEREFROM ALL OIL, GAS, HYDROCARBON SUBSTANCES, AND MINERALS OF EVERY KIND AND CHARACTER LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE, TOGETHER WITH THE RIGHT TO DRILL INTO, THROUGH, AND TO USE AND OCCUPY ALL PARTS OF THE PHASE 1A AND 1B PROPERTY LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE THEREOF FOR ANY AND ALL PURPOSES INCIDENTAL TO THE EXPLORATION FOR AND PRODUCTION OF OIL, GAS, HYDROCARBON SUBSTANCES OR MINERALS FROM SAID PHASE 1A AND 1B PROPERTY OR OTHER LANDS, BUT WITHOUT, HOWEVER, ANY RIGHT TO USE EITHER THE SURFACE FROM SAID PHASE 1A AND 1B PROPERTY OR ANY PORTION THEREOF WITHIN FIVE HUNDRED (500) FEET OF THE SURFACE FOR ANY PURPOSE OR PURPOSES WHATSOEVER, OR TO USE THE PHASE 1A AND 1B PROPERTY IN SUCH A MANNER AS TO CREATE A DISTURBANCE TO THE USE OR ENJOYMENT OF THE PHASE 1A AND 1B PROPERTY, AS RESERVED BY THE CITY OF LA QUINTA, A CALIFORNIA MUNICIPAL CORPORATION AND CHARTER CITY, IN THE GRANT DEED RECORDED NOVEMBER 28, 2018, AS INSTRUMENT NO. 2018-0464674 AND RECORDED NOVEMBER 6, 2017, AS INSTRUMENT NO. 2017-0463950, BOTH OF OFFICIAL RECORDS.

APN: 777-490-074 AND PORTIONS OF APNs 777-490-072, 777-490-073, 777-490-075, 777-490-077, 777-490-078, 777-490-079 AND 777-490-080
(OLD APNs PORTION of 777-490-043, 777-490-044 AND 777-490-045)

[continues on next page]

PARCEL E:

[INTENTIONALLY OMITTED]

PARCEL F:

PORTIONS OF PARCELS B AND C OF LOT LINE ADJUSTMENT NO. 2020-0005, RECORDED SEPTEMBER 2, 2021 AS DOCUMENT NO. 2021-0527060 OF OFFICIAL RECORDS OF SAID COUNTY, DESCRIBED AS FOLLOWS:

PARCEL "C" OF LOT LINE ADJUSTMENT NO. 2023-0003 OF THE CITY OF LA QUINTA, AS DISCLOSED BY GRANT DEED RECORDED MAY 4, 2023 AS INSTRUMENT NO. 2023-0128115 OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, STATE OF CALIFORNIA, AS DESCRIBED THEREIN.

EXCEPTING THEREFROM ALL OIL, GAS, HYDROCARBON SUBSTANCES, AND MINERALS OF EVERY KIND AND CHARACTER LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE, TOGETHER WITH THE RIGHT TO DRILL INTO, THROUGH, AND TO USE AND OCCUPY ALL PARTS OF THE PHASE 1A AND 1B PROPERTY LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE THEREOF FOR ANY AND ALL PURPOSES INCIDENTAL TO THE EXPLORATION FOR AND PRODUCTION OF OIL, GAS, HYDROCARBON SUBSTANCES OR MINERALS FROM SAID PHASE 1A AND 1B PROPERTY OR OTHER LANDS, BUT WITHOUT, HOWEVER, ANY RIGHT TO USE EITHER THE SURFACE FROM SAID PHASE 1A AND 1B PROPERTY OR ANY PORTION THEREOF WITHIN FIVE HUNDRED (500) FEET OF THE SURFACE FOR ANY PURPOSE OR PURPOSES WHATSOEVER, OR TO USE THE PHASE 1A AND 1B PROPERTY IN SUCH A MANNER AS TO CREATE A DISTURBANCE TO THE USE OR ENJOYMENT OF THE PHASE 1A AND 1B PROPERTY, AS RESERVED BY THE CITY OF LA QUINTA, A CALIFORNIA MUNICIPAL CORPORATION AND CHARTER CITY, IN THE GRANT DEED RECORDED NOVEMBER 28, 2018, AS INSTRUMENT NO. 2018-0464674 AND RECORDED NOVEMBER 6, 2017, AS INSTRUMENT NO. 2017-0463950, BOTH OF OFFICIAL RECORDS.

PORTION APN: 777-490-075, 777-490-077, 777-490-078, 777-490-079 AND 777-490-080
(OLD APNs PORTION of 777-490-044 AND 777-490-045)

[continues on next page]

PARCEL G:

PORTIONS OF PARCEL C OF LOT LINE ADJUSTMENT NO. 2020-0005, RECORDED SEPTEMBER 2, 2021 AS DOCUMENT NO. 2021-0527060 OF OFFICIAL RECORDS OF SAID COUNTY, DESCRIBED AS FOLLOWS:

PARCEL "D" OF LOT LINE ADJUSTMENT NO. 2023-0003 OF THE CITY OF LA QUINTA, AS DISCLOSED BY GRANT DEED RECORDED MAY 4, 2023 AS INSTRUMENT NO. 2023-0128115 OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, STATE OF CALIFORNIA, AS DESCRIBED THEREIN.

EXCEPTING THEREFROM ALL OIL, GAS, HYDROCARBON SUBSTANCES, AND MINERALS OF EVERY KIND AND CHARACTER LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE, TOGETHER WITH THE RIGHT TO DRILL INTO, THROUGH, AND TO USE AND OCCUPY ALL PARTS OF THE PHASE 1A AND 1B
PROPERTY LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE THEREOF FOR ANY AND ALL PURPOSES INCIDENTAL TO THE EXPLORATION FOR AND PRODUCTION OF OIL, GAS, HYDROCARBON SUBSTANCES OR MINERALS FROM SAID PHASE 1A AND 1B PROPERTY OR OTHER LANDS, BUT WITHOUT, HOWEVER, ANY RIGHT TO USE EITHER THE SURFACE FROM SAID PHASE 1A AND 1B PROPERTY OR ANY PORTION THEREOF WITHIN FIVE HUNDRED (500) FEET OF THE SURFACE FOR ANY PURPOSE OR PURPOSES WHATSOEVER, OR TO USE THE PHASE 1A AND 1B PROPERTY IN SUCH A MANNER AS TO CREATE A DISTURBANCE TO THE USE OR ENJOYMENT OF THE PHASE 1A AND 1B PROPERTY, AS RESERVED BY THE CITY OF LA QUINTA, A CALIFORNIA MUNICIPAL CORPORATION AND CHARTER CITY, IN THE GRANT DEED RECORDED NOVEMBER 28, 2018, AS INSTRUMENT NO. 2018-0464674 AND RECORDED NOVEMBER 6, 2017, AS INSTRUMENT NO. 2017-0463950, BOTH OF OFFICIAL RECORDS.

PORTION APN: 777-490-079
(OLD APN PORTION of 777-490-045)

[continues on next page]

PARCEL H:

LOTS 1 THROUGH 29 AND LOTS A THROUGH L, OF TRACT NO. 37730, IN THE CITY OF LA QUINTA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, FILED IN BOOK 479, PAGES 27 THROUGH 33 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT ALL OIL, GAS, HYDROCARBON SUBSTANCES, AND MINERALS OF EVERY KIND AND CHARACTER LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE, TOGETHER WITH THE RIGHT TO DRILL INTO, THROUGH, AND TO USE AND OCCUPY ALL PARTS OF THE PHASE 1A PROPERTY LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE THEREOF FOR ANY AND ALL PURPOSES INCIDENTAL TO THE EXPLORATION FOR AND PRODUCTION OF OIL, GAS, HYDROCARBON SUBSTANCES OR MINERALS FROM SAID PHASE 1A PROPERTY OR OTHER LANDS, BUT WITHOUT, HOWEVER, ANY RIGHT TO USE EITHER THE SURFACE FROM SAID PHASE 1A PROPERTY OR ANY PORTION THEREOF WITHIN FIVE HUNDRED (500) FEET OF THE SURFACE FOR ANY PURPOSE OR PURPOSES WHATSOEVER, OR TO USE THE PHASE 1A PROPERTY IN SUCH A MANNER AS TO CREATE A DISTURBANCE TO THE USE OR ENJOYMENT OF THE PHASE 1A PROPERTY, AS RESERVED BY THE CITY OF LA QUINTA, A CALIFORNIA MUNICIPAL CORPORATION AND CHARTER CITY, IN THE GRANT DEED RECORDED NOVEMBER 6, 2017, AS INSTRUMENT NO. 2017-0463950 OF OFFICIAL RECORDS.

APNs: 777-510-001 THRU -023; 777-510-025; 777-520-001 THRU -018

PARCEL I:

Parcels E, F and G of Parcel Map No. 37207, in the City of La Quinta, County of Riverside, State of California, as shown by a Map filed for Record May 3, 2017 in Book 242, Pages 72 through 87, inclusive of Parcel Maps, in the Office of the County Recorder of said County.

Excepting all oil, gas, hydrocarbon substances, and minerals of every kind and character lying more than five hundred (500) feet below the surface, together with the right to drill into, through, and to use and occupy all parts of the Phase 1A and 1B property lying more than five hundred (500) feet below the surface thereof for any and all purposes incidental to the exploration for and production of oil, gas, hydrocarbon substances or minerals from said Phase 1A and 1B property or other lands, but without, however, any right to use either the surface from said Phase 1A and 1B property or any portion thereof within five hundred (500) feet of the surface for any purpose or purposes whatsoever, or to use the Phase 1A and 1B property in such a manner as to create a disturbance to the use or enjoyment of the Phase 1A and 1B property, as reserved by The City of La Quinta, a California Municipal Corporation and Charter City, in the Grant Deed recorded November 28, 2018, as Instrument No. 2018-0464674, of Official Records.

FOR INFORMATIONAL PURPOSES ONLY: APN: 777-490-053, 777-490-054, 777-490-055

[End of legal description for Phase 1A Property]

EXHIBIT A-2
LEGAL DESCRIPTION OF PHASE 1B PROPERTY

All that certain property located in the City of La Quinta, County of Riverside, State of California, described as follows:

PARCEL 1:

THAT PORTION OF PARCEL 10 OF PARCEL MAP NO. 37207, IN THE CITY OF LA QUINTA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AS SHOWN BY A MAP FILED IN BOOK 242, PAGES 72 THROUGH 87, INCLUSIVE OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

PARCEL "B" OF LOT LINE ADJUSTMENT NO. 2020-0007, AS DISCLOSED BY GRANT DEED RECORDED AUGUST 20, 2021 AS INSTRUMENT NO. 2021-0499856 OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, STATE OF CALIFORNIA, AS DESCRIBED THEREIN.

EXCEPTING THEREFROM ALL OIL, GAS, HYDROCARBON SUBSTANCES, AND MINERALS OF EVERY KIND AND CHARACTER LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE, TOGETHER WITH THE RIGHT TO DRILL INTO, THROUGH, AND TO USE AND OCCUPY ALL PARTS OF THE PHASE 1A AND 1B PROPERTY LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE THEREOF FOR ANY AND ALL PURPOSES INCIDENTAL TO THE EXPLORATION FOR AND PRODUCTION OF OIL, GAS, HYDROCARBON SUBSTANCES OR MINERALS FROM SAID PHASE 1A AND 1B PROPERTY OR OTHER LANDS, BUT WITHOUT, HOWEVER, ANY RIGHT TO USE EITHER THE SURFACE FROM SAID PHASE 1A AND 1B PROPERTY OR ANY PORTION THEREOF WITHIN FIVE HUNDRED (500) FEET OF THE SURFACE FOR ANY PURPOSE OR PURPOSES WHATSOEVER, OR TO USE THE PHASE 1A AND 18 PROPERTY IN SUCH A MANNER AS TO CREATE A DISTURBANCE TO THE USE OR ENJOYMENT OF THE PHASE 1A AND 1B PROPERTY, AS RESERVED BY THE CITY OF LA QUINTA, A CALIFORNIA MUNICIPAL CORPORATION AND CHARTER CITY, IN THE GRANT DEED RECORDED NOVEMBER 28, 2018, AS INSTRUMENT NO. 2018-0464674 AND RECORDED NOVEMBER 6, 2017, AS INSTRUMENT NO. 2017-0463950, BOTH OF OFFICIAL RECORDS.

APN 777-060-083

[continues on next page]

PARCEL 2:

THAT PORTION OF PARCEL 11 OF PARCEL MAP NO. 37207, IN THE CITY OF LA QUINTA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AS SHOWN BY A MAP FILED IN BOOK 242, PAGES 72 THROUGH 87, INCLUSIVE OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

PARCEL "C" OF LOT LINE ADJUSTMENT NO. 2020-0007, AS DISCLOSED BY GRANT DEED RECORDED AUGUST 20, 2021 AS INSTRUMENT NO. 2021-0499856 OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, STATE OF CALIFORNIA, AS DESCRIBED THEREIN.

EXCEPTING THEREFROM ALL OIL, GAS, HYDROCARBON SUBSTANCES, AND MINERALS OF EVERY KIND AND CHARACTER LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE, TOGETHER WITH THE RIGHT TO DRILL INTO, THROUGH, AND TO USE AND OCCUPY ALL PARTS OF THE PHASE 1A AND 1B PROPERTY LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE THEREOF FOR ANY AND ALL PURPOSES INCIDENTAL TO THE EXPLORATION FOR AND PRODUCTION OF OIL, GAS, HYDROCARBON SUBSTANCES OR MINERALS FROM SAID PHASE 1A AND 1B PROPERTY OR OTHER LANDS, BUT WITHOUT, HOWEVER, ANY RIGHT TO USE EITHER THE SURFACE FROM SAID PHASE 1A AND 1B PROPERTY OR ANY PORTION THEREOF WITHIN FIVE HUNDRED (500) FEET OF THE SURFACE FOR ANY PURPOSE OR PURPOSES WHATSOEVER, OR TO USE THE PHASE 1A AND 1B PROPERTY IN SUCH A MANNER AS TO CREATE A DISTURBANCE TO THE USE OR ENJOYMENT OF THE PHASE 1A AND 1B PROPERTY, AS RESERVED BY THE CITY OF LA QUINTA, A CALIFORNIA MUNICIPAL CORPORATION AND CHARTER CITY, IN THE GRANT DEED RECORDED NOVEMBER 28, 2018, AS INSTRUMENT NO. 2018-0464674 AND RECORDED NOVEMBER 6, 2017, AS INSTRUMENT NO. 2017-0463950, BOTH OF OFFICIAL RECORDS.

APN 777-060-085

[continues on next page]

PARCEL 3:

PARCEL 12 OF PARCEL MAP NO. 37207, AS SHOWN BY A MAP FILED IN BOOK 242, PAGES 72 THROUGH 87, INCLUSIVE OF PARCEL MAPS, IN THE CITY OF LA QUINTA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM ALL OIL, GAS, HYDROCARBON SUBSTANCES, AND MINERALS OF EVERY KIND AND CHARACTER LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE, TOGETHER WITH THE RIGHT TO DRILL INTO, THROUGH, AND TO USE AND OCCUPY ALL PARTS OF THE PHASE 1A AND 1B PROPERTY LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE THEREOF FOR ANY AND ALL PURPOSES INCIDENTAL TO THE EXPLORATION FOR AND PRODUCTION OF OIL, GAS, HYDROCARBON SUBSTANCES OR MINERALS FROM SAID PHASE 1A AND 1B PROPERTY OR OTHER LANDS, BUT WITHOUT, HOWEVER, ANY RIGHT TO USE EITHER THE SURFACE FROM SAID PHASE 1A AND 1B PROPERTY OR ANY PORTION THEREOF WITHIN FIVE HUNDRED (500) FEET OF THE SURFACE FOR ANY PURPOSE OR PURPOSES WHATSOEVER, OR TO USE THE PHASE 1A AND 1B PROPERTY IN SUCH A MANNER AS TO CREATE A DISTURBANCE TO THE USE OR ENJOYMENT OF THE PHASE 1A AND 1B PROPERTY, AS RESERVED BY THE CITY OF LA QUINTA, A CALIFORNIA MUNICIPAL CORPORATION AND CHARTER CITY, IN THE GRANT DEED RECORDED NOVEMBER 28, 2018, AS INSTRUMENT NO. 2018-0464674 AND RECORDED NOVEMBER 6, 2017, AS INSTRUMENT NO. 2017-0463950, BOTH OF OFFICIAL RECORDS.

APN 777-060-075 AND APN 777-060-078

[continues on next page]

PARCEL 4:

THAT PORTION OF PARCELS 9, 10, 11 AND 19 OF PARCEL MAP NO. 37207, IN THE CITY OF LA QUINTA, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AS SHOWN BY A MAP FILED IN BOOK 242, PAGES 72 THROUGH 87, INCLUSIVE OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

PARCEL "A" OF LOT LINE ADJUSTMENT NO. 2020-0007, AS DISCLOSED BY GRANT DEED RECORDED AUGUST 20, 2021 AS INSTRUMENT NO. 2021-0500015 OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, STATE OF CALIFORNIA, AS DESCRIBED THEREIN.

EXCEPTING THEREFROM ALL OIL, GAS, HYDROCARBON SUBSTANCES, AND MINERALS OF EVERY KIND AND CHARACTER LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE, TOGETHER WITH THE RIGHT TO DRILL INTO, THROUGH, AND TO USE AND OCCUPY ALL PARTS OF THE PHASE 1A AND 1B PROPERTY LYING MORE THAN FIVE HUNDRED (500) FEET BELOW THE SURFACE THEREOF FOR ANY AND ALL PURPOSES INCIDENTAL TO THE EXPLORATION FOR AND PRODUCTION OF OIL, GAS, HYDROCARBON SUBSTANCES OR MINERALS FROM SAID PHASE 1A AND 1B PROPERTY OR OTHER LANDS, BUT WITHOUT, HOWEVER, ANY RIGHT TO USE EITHER THE SURFACE FROM SAID PHASE 1A AND 1B PROPERTY OR ANY PORTION THEREOF WITHIN FIVE HUNDRED (500) FEET OF THE SURFACE FOR ANY PURPOSE OR PURPOSES WHATSOEVER, OR TO USE THE PHASE 1A AND 1B PROPERTY IN SUCH A MANNER AS TO CREATE A DISTURBANCE TO THE USE OR ENJOYMENT OF THE PHASE 1A AND 1B PROPERTY, AS RESERVED BY THE CITY OF LA QUINTA, A CALIFORNIA MUNICIPAL CORPORATION AND CHARTER CITY, IN THE GRANT DEED RECORDED NOVEMBER 28, 2018, AS INSTRUMENT NO. 2018-0464674 AND RECORDED NOVEMBER 6, 2017, AS INSTRUMENT NO. 2017-0463950, BOTH OF OFFICIAL RECORDS.

APNs: 777-490-046, 777-490-071, 777-060-082, AND 777-060-084
(OLD APNs PORTION of 777-490-052, 777-060-076 and 777-060-077)

[end of legal description for Phase 1B Property]

EXHIBIT A-3
LEGAL DESCRIPTION OF PHASE 2 PROPERTY

All that certain property located in the City of La Quinta, County of Riverside, State of California, described as follows:

PARCEL 1:

Parcels 13, 14, and 15 of Parcel Map No. 37207, in the City of La Quinta, County of Riverside, State of California, as shown by a Map filed for Record May 3, 2017 in Book 242, Pages 72 through 87, inclusive of Parcel Maps, in the Office of the County Recorder of said County.

PARCEL 2:

Parcel 16 of Parcel Map No. 37207, in the City of La Quinta, County of Riverside, State of California, as shown by a Map filed for Record May 3, 2017 in Book 242, Pages 72 through 87, inclusive of Parcel Maps, in the Office of the County Recorder of said County.

NOTE: NOTWITHSTANDING THE ABOVE-REFERENCED LEGAL DESCRIPTION FOR PARCEL 16 ABOVE, THE PHASE 2 PROPERTY DOES NOT INCLUDE SILVERROCK PARK AND RETENTION BASIN, AS SET FORTH IN THE REINSTATED DEVELOPMENT AGREEMENT, RECITAL D AND DEFINITIONS OF "PHASE 2 PROPERTY" / "CITY OWNED OPTION PROPERTY"

## EXHIBIT A-4
## LEGAL DESCRIPTION OF CITY-OWNED AHMANSON RANCH PROPERTY

All that certain property located in the City of La Quinta, County of Riverside, State of California, described as follows:

That portion of Parcels 2 and 3 of Parcel Map No. 37207, in the City of La Quinta, County of Riverside, State of California, as shown by a Map filed in Book 242, Pages 72 through 87, inclusive of Parcel Maps, in the office of the County Recorder of said County, described as follows:

Lot "A" of Lot Line Adjustment No. 2020-0010, recorded July 16, 2021 as Instrument No. 2021-0427959 of Official Records of Riverside County, State of California.

APN 777-490-039, APN 777-490-069

[end of legal description for City-Owned Ahmanson Ranch Property]

EXHIBIT A-5
LEGAL DESCRIPTION OF CITY-OWNED GOLF COURSE PROPERTY

All that certain property located in the City of La Quinta, County of Riverside, State of California, described as follows:

Parcel A

That portion of Parcels 4 and 18 of Parcel Map No. 37207, in the City of La Quinta, County of Riverside, State of California, as shown by a Map filed in Book 242, Pages 72 through 87, inclusive of Parcel Maps, in the Office of the County Recorder of said County, described as follows:

Lot "D" of Lot Line Adjustment No. 2020-0010, recorded July 15, 2021 as Instrument No. 2021-0426548 of California, as described therein. Official records of Riverside County, State of California.

APN 777-490-035, APN 777-490-060, APN 777-490-061, APN 777-490-062, APN 777-490-067, APN 777-060-070, APN 777-060-071

Except all oil, gas hydrocarbon substances and mineral of every kind and character lying more than five hundred (500) feet below the surface, together with the right to drill into, through, and to use and occupy all parts of the phase 1A property lying more than five hundred (500) feet below the surface thereof for any and all purposes incidental to the exploration for and production of oil, gas hydrocarbon substances or minerals from said phase 1A property or other lands, but without however, any right to use either the surface from said phase 1A property or any portion thereof within five hundred (500) feet of the surface for any purpose or purposes whatsoever, or to use the phase 1A property in such a manner as to create a disturbance to the use or enjoyment of the phase 1A property, as reserved by the City of La Quinta, a California Municipal Corporation and Charter City, in the grant Deed recorded November 6, 2017 as Instrument No. 2017-0463950 of official records.

[continued on next page]

<u>Parcel B</u> [INTENTIONALLY OMITTED]

<u>Parcel C</u>

That portion of Parcel 19 of Parcel Map No. 37207, in the City of La Quinta, County of Riverside, State of California, as shown by Map filed in Book 242, Pages 72 through 87, inclusive of Parcel Maps, in the office of the County Recorder of said County, described as follows:

Parcel "D" of Lot Line Adjustment No. 2020-0007, recorded august 20, 2021 as Instrument No. 2021-0500126 of Official Records of Riverside County, State of California, as described therein.

APN 777-060-080, APN 777-490-070, APN 777-060-072

<u>Parcel D</u>

Parcel 20 of Parcel Map No. 37207, as shown by a Map filed in Book 242, Pages 72 through 87, inclusive of Parcel Maps, in the City of La Quinta, County of Riverside, State of California, in the Office of the County Recorder of said County.

APN 777-060-081

<u>Parcel E</u>

Parcel 17 of Parcel Map No. 37207, as shown by map filed in Book 242, Pages 72 through 87, inclusive of Parcel Maps, in the City of La Quinta, County of Riverside, State of California, in the office of the County Recorder of said County.

Excepting therefrom any portion of said land lying within Tract No. 37730, in the City of La Quinta, County of Riverside, State of California, filed in Book 479, Pages 27 through 33, inclusive of Maps, in the Office of the County Recorder of said County.

APN 777-150-029, APN 777-490-050, APN 770-260-037

[end of legal description for City-Owned Golf Course Property]

EXHIBIT B

SITE MAPS

[attached]

PETER ALDANA
COUNTY OF RIVERSIDE
ASSESSOR-COUNTY CLERK-RECORDER

Recorder
P.O. Box 751
Riverside, CA 92502-0751
(951) 486-7000

www.rivcoacr.org

# CERTIFICATION

Pursuant to the provisions of Government Code 27361.7, I certify under the penalty of perjury that the following is a true copy of illegible wording found in the attached document:

(Print or type the page number(s) and wording below): Reinstated and Amended Development Agreement

Exhibit B - General Vicinity Map - Phase 1A - Phase 1B Phase 2
Exhibit J - Annotated site map

Exhibit B - Annotated site map. Phase 2 option Land 4 Times.

Exhibit B -
Site map of Phase 2 property - streets
Avenue 52
Jefferson street.
Silver Rock way
Avenue 54
@ silverrock Golf Course - 2 times on map.

Date: 12.9.25

Signature: [signature]

Print Name: Mim L Strong

GENERAL VICINITY MAP
(Phase 1A, Phase 1B, and Phase 2 Properties)




*General Location of Phases pictured above

[Site Maps Continue on Next Page]

GENERAL SITE MAP
(2025 SilverRock Master Plan)



[Site Maps Continue on Next Page]

# ANNOTATED SITE MAP
(2025 SilverRock Master Plan)




*All square footage amounts and condominium unit numbers are approximate.
**Permitted maximum amounts (for instance, 70 condominium units) shall be governed by and as set forth in the Agreement Addendum, Project Description, and Scope of Work.
**

[Site Maps Continue on Next Page]

## PHASE 1A DETAILED SITE MAP
(2025 SilverRock Master Plan)




[Site Maps Continue on Next Page]

## SITE MAP BY PLANNING AREAS (PAs)
(2025 SilverRock Master Plan)




[Site Maps Continue on Next Page]

## SITE MAP OF PHASE 2 PROPERTY
(2025 SilverRock Master Plan)

Orange area is Phase 2 Property (i.e., City-Owned Option Property) appx. 193+/- acres







[Site Maps Continue on Next Page]

EXHIBIT B

SITE MAP OF EXISTING SILVERROCK PARK AND RETENTION BASIN
(Not Included in the Phase 2 Property)

SilverRock Park and Retention Basin, appx. 24+/- acres




[End of Exhibit B - Site Maps]

EXHIBIT C

PROJECT DESCRIPTION
(2025 SilverRock Master Plan)

The 2025 SilverRock Master Plan reconfigures the hotel, resort residential, commercial, golf course and related ancillary support uses planned to complement the existing public golf course and related public facilities on the SilverRock site in La Quinta.

The 2025 Master Plan includes an up to 154-room Luxury Resort Hotel with supporting facilities, 192 single-family and condominium resort residential units and a new clubhouse for the existing public golf course in the first phase development areas.

The second phase will include the development of an 18-hole private golf course, 253 residential units and 40,000 square feet of commercial development. (Developer's acquisition of the Phase 2 Property where Planning Area 8 is located is subject to the Option Agreement as identified in this Reinstated Development Agreement, but Developer may elect to combine Phase 1B and Phase 2 Pre-Closing Work if Developer satisfies the provisions and requirements in Section 3.1.5(B) of this Reinstated Development Agreement.)

The 2025 Master Plan is consistent with the SilverRock Specific Plan as approved by the City in 2006. As shown in the attached table, the amount of development planned is consistent with, and less intensive, than analyzed in the City's prior environmental review documents for the SilverRock Resort Project, including the 2002 Mitigated Negative Declaration (MND) adopted at the time the City acquired the property; the 2006 Addendum to the Adopted MND evaluating the Specific Plan; the 2014 Addendum to the Adopted MND analyzing the Master Plan proposed at that time; and the 2018 Master Plan in Amendment No. 3 to the Purchase, Sale and Development Agreement (PSDA).

[End of Project Description]

EXHIBIT D

SCOPE OF WORK / SCOPE OF DEVELOPMENT

This Reinstated Development Agreement governs the pre-development, development, land uses, operations, maintenance and repair of the Phase 1 Property, and the "work" includes any and all activities necessary and property to complete the Project on the Phase 1 Property. Pursuant to Section 6.2.2 of this Reinstated Development Agreement, the Phase 2 Property (*i.e.,* City-Owned Option Property) shall be subject to either an amendment to this Agreement or new development agreement to provide (among other terms and conditions) more detail on the Scope of Work for the Phase 2 Property, which pursuant to this Agreement will correspond to the work to be completed in Planning Area 8.

All work for the Project shall be conducted and completed in accordance with the Project Approvals as defined in this Reinstated Development Agreement. The work is to be completed in phases as provided in this Agreement and according to the Schedule of Performance, with the phases of the work to be organized and completed in eight (8) Planning Areas as depicted in the Site Maps by Planning Areas (PAs).

The work by Planning Area is generally described as follows:

**Planning Area 1 - SilverRock Golf Course (existing)**
Planning Area 1 consists of approximately 173 acres, which consists primarily of the existing Arnold Palmer Classic Golf Course. The Planning Area also contains the existing Ahmanson Ranch House, which sits on a 1.5-acre parcel, and the 3-acre golf course maintenance facility site located at the southern boundary of the SilverRock Resort Area adjacent to 54th Avenue. As currently contemplated by the project, the Golf Course will receive upgrades performed by the Developer and will have the right, but not the obligation, to conduct golf course improvements during City's ownership.

**Planning Area 2 - Luxury Branded Residences Phase 1A**
Planning Area 2 consists of approximately 14 acres and 29 residential lots and a private street. It is anticipated that the residences will range from approximately 4,000sf - 5,500sf. A portion of the existing residential lots have partially-constructed improvements on them that will likely be demolished. The residential lots will be branded with the Luxury Hotel and be sold to private buyers. Developer may build a few speculative homes as model homes, but as contemplated, each residential lot buyer will build their own home with the oversight of Developer and/or Hotel Manager. Additionally, each residential lot will be permitted as a Short-Term Vacation Rental, but Developer, Hotel Owner, Hotel Manager will have final say over which lots can be entered into the rental pool.

**Planning Area 3 & 5 - Luxury Hotel**

Planning Area 3 consists of approximately 23 acres and currently has partially-constructed improvements for the prior Luxury Hotel. Some of the existing improvements may stay as part of the new Luxury Hotel and some may be demolished. The new Luxury Hotel will include approximately 250,000sf of buildings, including a lobby building with restaurant, bar, retail, and back of house uses, spa, fitness, wellness, pools, cabanas, pool bar, guest rooms, and ancillary uses.

Planning Area 5 consists of approximately 9.1 acres and currently has partially-constructed improvements for the prior Luxury Hotel including a Conference Center and Shared Services building. Some of the existing improvements may stay as part of the new Luxury Hotel and some may be demolished. The new Luxury Hotel will include approximately 55,000sf of banquet and back-of-house buildings plus parking and outdoor event areas and hotel amenities. In addition, it is currently conceived to extend the existing Ahmanson Way to the northern portion of SilverRock Way between Planning Areas 4 & 5.

**Planning Area 4 - Public Golf Clubhouse**

Planning Area 4 consists of approximately 3.3 acres and previously contemplated as parking for the Luxury Hotel. The project currently conceives relocating the Public Golf Clubhouse to Planning Area 4 so that it is more accessible to the public as they enter the SilverRock Resort Area off of Avenue 52 and will be adjacent to the Public Park and golf course. The Public Golf Clubhouse will be approximately 16,000sf and planned to serve the Silver Rock Golf Course in Planning Area 1.

**Planning Area 6 - Luxury Branded Condominiums**

Planning Area 6 consists of approximately 18.4 acres and previously contemplated as the Lifestyle Hotel and Public Golf Clubhouse. The project currently conceives demolition of the partially-constructed Public Golf Clubhouse and to be replaced with approximately 70 luxury branded condominium units, a private branded-residences clubhouse, amenities, and private streets. The approximately 70 condominiums will range from approximately 2,000 - 3,500sf each. The condominiums will be built in phases across multiple buildings as opposed to one large building. Each condominium building will have covered parking and up to three levels of condominium units. The private branded residences clubhouse will be approximately 20,000sf and include a fitness area, meeting space, F&B, and amenities areas. Other residential amenities include a pool, tennis, pickleball, padel, and kids area.

**Planning Area 7 - Luxury Branded Residences Phase 1B**

Planning Area 7 consists of approximately 65.8 acres and 93 residential lots and private streets. It is anticipated that the residences will range from approximately 4,000sf - 5,500sf. The residential lots will be branded with the Luxury Hotel and be sold to private buyers. Developer may build a few speculative homes as model homes, but as contemplated, each residential lot buyer will build their own home with the oversight of Developer and/or Hotel Manager. Additionally, each residential lot will be permitted as a Short-Term Vacation Rental, but Developer, Hotel Owner, Hotel Manager will have final say over which lots can be entered into the rental pool.

**Planning Area 8 - Phase 2 - Golf, Residential, Commercial**

Planning Area 8 consists of approximately 193+/- acres and as currently contemplated will be developed with a private 18-hole golf course, 253 private residential lots, 40,000sf of commercial, with new private streets. (Developer's acquisition of the Phase 2 Property where Planning Area 8 is located is subject to the Option Agreement as identified in this Reinstated Development Agreement, but Developer may elect to combine Phase 1B and Phase 2 Pre-Closing Work if Developer satisfies the provisions and requirements in Section 3.1.5(B) of this Reinstated Development Agreement.)

[End of Scope of Work]

# EXHIBIT E

## PROJECT SCHEDULE / SCHEDULE OF PERFORMANCE

[Attached]

| Project Component | Start Date | Completion Date[1] |
|---|---|---|
| **1. Existing Improvements** | | |
| With a goal to better understand the quality and functionality of the existing improvements, Developer will evaluate onsite improvements to determine if preservation is appropriate | Within 6 months of Reinstatement Date, Developer to start engineering and testing of existing improvements. If determined to preserve an existing improvement and work is required to be completed in order to preserve an improvement, then Developer to start the preservation work within 6 months of determination. | 12 months after preservation work commences. |
| **2. Luxury Hotel Project Component** | | |
| Includes Lobby, Guest Room Buildings, Spa, Wellness, Fitness, Banquet, BOH ("Back of House") | Within 24 months of Reinstatement Date;[2] Commencement of the Luxury Hotel Project Component is a "Project Milestone" | 36 months after Start Date; Completion of the Luxury Hotel Project Component is a "Project Milestone" |
| **3. Public Golf Clubhouse Project Component** | | |
| Includes public golf clubhouse building, parking lot, pro shop, F&B | Within 24 months of Reinstatement Date;[2] Commencement of the Public Golf Clubhouse Project Component is a "Project Milestone" | 36 months after Start Date; Completion of the Public Golf Clubhouse Project Component is a "Project Milestone" |
| **4. Phase 1A Luxury Branded Condominiums Project Component** | | |
| Applicable to the first condo phase with a minimum of six units. Subsequent condo building phases will commence after pre-sale targets are met and market conditions allow for subsequent phases. | Within 24 months of Reinstatement Date[2] | 36 months after Start Date |
| **5. Phase 1A Luxury Branded Residences Project Component (29 lots)** | | |
| Residential lots in Phase 1A to include approximately 29 lots. To be sold as finished lots to private buyers. | Within 24 months of Reinstatement Date[2] | 84 months after Start Date[3] |

| | | |
|---|---|---|
| **6. Phase 1B Luxury Branded Residences Project Component (93 lots)** | | |
| Residential lots in Phase 1B to include approximately 93 lots. To be sold as finished lots to private buyers. | No later than 24 months of Phase 1A Luxury Branded Residences Project Component Completion Date | 96 months after Start Date[4] |
| **7. Phase 1 Property Target Completion of Construction** | | |
| | | Month 144[5] |

[1]Definitions of "Completion Date":
For the Luxury Hotel and Public Golf Clubhouse Project Components, Completion Date shall be defined as substantially open for use by hotel guests and public golf clubhouse guests. "Substantially open" shall mean: (a) City issuance of a final Certificate of Occupancy, or temporary Certificate of Occupancy with only "punch list" items remaining to obtain a final Certificate of Occupancy, and (b) regular operations are in place to market to and receive payments from guests, or if there is a "soft opening," regular operations are anticipated to commence for marketing and receiving payments within three (3) to six (6) months of the purported "soft opening" date.
For the Phase 1A Luxury Branded Condominiums Project Component, Completion Date shall be defined as the City issuance of a Temporary Certificate of Occupancy for the first condo unit. Subsequent Condo phases will be completed after pre-sale targets are met and market conditions allow for subsequent phases.
For the Phase 1A Luxury Branded Residences Project Component, Completion Date shall be defined as finished lots and no less than one-half (1/2) of the single-family luxury residences have been completely constructed on the lots. Developer and Permitted Hotel Operator have a binding agreement in place for the management of the single family Lots in Planning Area 2.
For the Phase 1B Luxury Residential Project Component, Completion Date shall be defined as finished lots and no less than one-half (1/2) of the single-family luxury residences have been completely constructed on the lots.
For the Phase 1 Property Target Completion of Construction, Completion Date shall be defined as finished lots and no less than one-half (1/2) of the single-family luxury residences have been completely constructed on the lots for Phase 1A and Phase 1B.

[2]"Reinstatement Date" for purposes of this Schedule of Performance *only* is defined as the later of (i) the Development Agreement Reinstatement Date as defined in Section 1.3 of the Reinstated Development Agreement, and (ii) the running of the statute of limitations and referendum petition deadlines to challenge the adoption of the Reinstated Development Agreement with no legal challenges or petition having been filed or submitted, or if filed or submitted, successfully resolved to the satisfaction of Developer and City.

[3]The 84 month timeline allows 24 months to sell 50% of the lots, then 24 months for lot buyers to start construction, and 36 months to complete construction of the homes.

[4]The 96 month timeline allows 36 months to sell 50% of the lots, then 24 months for lot buyers to start construction, and 36 months to complete construction of the homes.

[5]Phase 1 Property Target Completion of Construction is an estimated target completion date for all Project Components and the extension options described below are still applicable.

[End of Schedule of Performance]

EXHIBIT F

PRE-BANKRUPTCY SUBDIVISION MAPS AND PERMITS

The below-listed Project Site Development Permits (as defined in this Agreement) were approved before the Bankruptcy Lawsuit was filed and shall be deemed to remain valid, to the extent any Scope of Work by Developer for Developer's Project may be facilitated by the below-listed permits.

**PARCEL AND TRACT MAPS**

| NUMBER | RESOLUTION | DESCRIPTION | LOCATION | APPLICANT |
|---|---|---|---|---|
| PM 33367 | 2007-113 | Conditional Final Parcel Map Approval & Time Ext | Generally located south of Avenue 52, east of Coral Reef Mountains, west of Jefferson Street, north of Avenue 54 | City of La Quinta Redevelopment Agency |
| PM 37207 | 2017-012 | Conditional Final Parcel Map Approval - **Recorded 05/03/2017** | SWC of Jefferson Street and Avenue 52 | SilverRock Development Company, LLC |
| TTM2020-0006 | PC 2020-011 *Approved 9/14/2021 *Expiration Extension to 3/14/2026 (AB 2729 (2024)) | Approving Tentative Tract Map TTM2020-0006 (TTM 37929) Map for 10 residential lots on 18.37 acres (former Lifestyle bungalow residences) | Former Planning Area 10A-1 | SilverRock Development Company, LLC |
| TR 37730 | CC 2021-012 ***Conditionally Approved 4/20/2021** | Approval of final tract map and subdivision improvement agreement for TR 37730; authorizing a time extension for completion | Planning Area 2; Luxury Residences | SilverRock Phase I, LLC |

| | | | | |
|---|---|---|---|---|
| TR 37730 | CC 2021-021 ***Approved 6/15/2021** | Approval of final tract map and subdivision improvement agreement for TR 37730 | Former (and current) Planning Area 2; Luxury Residences | SilverRock Phase I, LLC |

## LOT-LINE ADJUSTMENTS

| LLA NUMBER | RECORDING INFORMATION |
|---|---|
| | |
| LLA No. 2020-0005 | Evidenced by Grant Deed, Recorded Sept. 2, 2021, Document No. 2021-0527060 of the Official Records in Riverside County, CA |
| LLA No. 2020-0007 | Evidenced by Grant Deed, Recorded Aug. 20, 2021, Document No. 2021-0500015 of the Official Records in Riverside County, CA |
| LLA No. 2020-0010 | Evidenced by Grant Deed, Recorded July 16, 2021, Document No. 2021-0428113 of the Official Records in Riverside County, CA |
| LLA No. 2023-0003 | Evidenced by Grant Deed, Recorded May 4, 2023, Document No. 2023-0128115 of the Official Records in Riverside County, CA |

| LLA NUMBER | DESCRIPTION | PARCEL OR TRACT MAP |
|---|---|---|
| LLA 2016-0007 | Parcels A, B & C | PM 33367 |
| LLA 2020-0005 | Parcels A, B & C | PM 37207 |
| LLA 2020-0007 | Parcel A | PM 37207 |
| LLA 2020-0007 | Parcel D | PM 37207 |
| LLA 2020-0007 | Parcels B & C | PM 37207 |
| LLA 2020-0010 | Parcel A | PM 37207 |
| LLA 2020-0010 | Parcel B | PM 37207 |
| LLA 2020-0010 | Parcel C | PM 37207 |
| LLA 2020-0010 | Parcel D | PM 37207 |
| LLA 2023-0003 | Parcel 5 - A, B, C & D | PM 37207 |

[continues on next page]

## SITE DEVELOPMENT PERMITS

| PROJECT NUMBER | RESOLUTION | DESCRIPTION | LOCATION | APPLICANT |
|---|---|---|---|---|
| SDP 2016-0005 | PC 2016-016 *Approved 10/25/2016 | SRR-Luxury Hotel, Spa, Residences, Conference Center | Former Planning Areas 2, 3, 4 | SilverRock Development Company, LLC |
| SDP 2016-0005 | CC 2016-051 *Approved 12/20/2016 | SRR-Luxury Hotel, Spa, Residences, Conference Center, Bighorn Sheep Fence | Former Planning Areas 2, 3, 4 | SilverRock Development Company, LLC |
| SDP 2016-0009 | CC 2017-001 *Approved 1/3/2017 | SRR-Luxury Hotel, Golf Course, Golf Villas | Former Planning Areas 5, 6, 10A-1 | SilverRock Development Company, LLC |
| SDP 2017-0013 | CC 2017-056 *Approved 11/7/2017 | SRR Temp. Golf Clubhouse | Former Planning Area 10A | SilverRock Development Company, LLC |
| SDP 2018-0010 | CC 2018-051 *Approved 10/16/2018 | SRR-Luxury Hotel, Spa, Residences, Conference Center (SDP 2016-0005 Time Ext. 1) | Former Planning Areas 2, 3, 4 | SilverRock Development Company, LLC |
| SDP 2018-0011 | CC 2018-052 | SRR-Talus Hotel, Golf Course, Golf Villas (SDP 2016-0009 Time Ext. 1) | Former Planning Areas 5, 6, 10A-1 | SilverRock Development Company, LLC |

## SIGN PERMITS

| PERMIT NO. | DESCRIPTION | LOCATION | APPLICANT |
|---|---|---|---|
| SA 2007-1113 | SilverRock Resort Semi-Permanent Sign (6) *approved 3/28/2007 | Various locations along Jefferson Street and Avenue 52 | LDD SilverRock, LLC |

[continues on next page]

## MODIFICATION BY APPLICANT PERMITS

| PERMIT NO. | DESCRIPTION | LOCATION | APPLICANT |
|---|---|---|---|
| MBA 2020-0005 | Former Luxury Hotel & Shared Services Complex *approved 5/7/2020 | within the SilverRock Specific Plan | SilverRock Development Company, LLC |
| MBA 2020-0006 | Former Lifestyle Hotel & Residences *approved 5/12/2020 | within the SilverRock Specific Plan | SilverRock Development Company, LLC |

## BUILDING PERMITS AND PLANS

| TYPE | SUBTYPE | PERMIT NO. | APPROVED | ISSUED | STATUS |
|---|---|---|---|---|---|
| Building Commercial (BC) | n/a | BCOM2019-0029 | 6/24/2019 | 6/25/2019 | FINALED |
| BC (Web) | Garage | BCOM2019-0028 | 6/19/2019 | 6/26/2019 | ISSUED |
| BC (Web) | Hotel/Motel (H/M) | BCOM2019-0056 | 7/21/2021 | | APPROVED-CONDITIONS |
| BC (Web) | H/M | BCOM2021-0034 | 7/21/2021 | 7/22/2021 | ISSUED |
| BC (Web) | H/M | BCOM2021-0044 | 7/21/2021 | | APPROVED-CONDITIONS |
| BC (Web) | H/M | BCOM2021-0045 | 7/21/2021 | | APPROVED-CONDITIONS |
| BC (Web) | H/M | BCOM2021-0046 | 7/21/2021 | 3/16/2022 | ISSUED |
| BC (Web) | H/M | BCOM2021-0047 | 7/21/2021 | | APPROVED-CONDITIONS |
| BC (Web) | H/M | BCOM2021-0048 | 7/21/2021 | | APPROVED-CONDITIONS |
| BC (Web) | H/M | BCOM2021-0049 | 7/21/2021 | | APPROVED-CONDITIONS |
| BC (Web) | H/M | BCOM2021-0050 | 7/21/2021 | | APPROVED-CONDITIONS |
| BC (Web) | H/M | BCOM2021-0051 | 7/21/2021 | | APPROVED-CONDITIONS |
| BC (Web) | H/M | BCOM2021-0052 | 7/21/2021 | | APPROVED-CONDITIONS |

[Building Permits and Plans continued on next page]

| TYPE | SUBTYPE | PERMIT NO. | APPROVED | ISSUED | STATUS |
|---|---|---|---|---|---|
| BC (Web) | H/M | BCOM2021-0053 | 7/21/2021 | | APPROVED-CONDITIONS |
| BC (Web) | H/M | BCOM2021-0054 | 7/21/2021 | | APPROVED-CONDITIONS |
| BC (Web) | H/M | BCOM2021-0055 | 7/21/2021 | | APPROVED-CONDITIONS |
| BC (Web) | H/M | BCOM2021-0056 | 7/21/2021 | | APPROVED-CONDITIONS |
| BC (Web) | H/M | BCOM2021-0057 | 7/21/2021 | 6/3/2022 | ISSUED |
| BC (Web) | H/M | BCOM2021-0058 | 7/21/2021 | 6/3/2022 | ISSUED |
| BC (Web) | H/M | BCOM2021-0059 | 7/21/2021 | 5/31/2022 | ISSUED |
| BC (Web) | H/M | BCOM2021-0060 | 7/21/2021 | 5/31/2022 | ISSUED |
| BC (Web) | H/M | BCOM2021-0061 | 7/21/2021 | 3/16/2022 | ISSUED |
| BC (Web) | H/M | BCOM2021-0062 | 7/21/2021 | 3/16/2022 | ISSUED |
| BC (Web) | H/M | BCOM2021-0063 | 7/21/2021 | 3/16/2022 | ISSUED |
| BC (Web) | H/M | BCOM2021-0064 | 7/21/2021 | 3/16/2022 | ISSUED |
| BC (Web) | H/M | BCOM2021-0065 | 7/21/2021 | 3/16/2022 | ISSUED |
| BC (Web) | H/M | BCOM2021-0066 | 7/21/2021 | 10/22/2021 | ISSUED |
| BC (Web) | H/M | BCOM2021-0067 | 7/21/2021 | 10/22/2021 | ISSUED |
| BC (Web) | H/M | BCOM2021-0068 | 7/21/2021 | 10/22/2021 | ISSUED |
| BC (Web) | H/M | BCOM2021-0069 | 7/21/2021 | 10/22/2021 | ISSUED |
| BC (Web) | H/M | BCOM2021-0070 | 7/21/2021 | 10/22/2021 | ISSUED |
| BC (Web) | H/M | BCOM2021-0071 | 7/21/2021 | 10/22/2021 | ISSUED |
| BC (Web) | H/M | BCOM2021-0072 | 7/21/2021 | 10/22/2021 | ISSUED |
| BC (Web) | H/M | BCOM2021-0073 | 7/21/2021 | 10/22/2021 | ISSUED |

[Building Permits and Plans continued on next page]

| TYPE | SUBTYPE | PERMIT NO. | APPROVED | ISSUED | STATUS |
|---|---|---|---|---|---|
| BC (Web) | H/M | BCOM2021-0074 | 7/21/2021 | 10/22/2021 | ISSUED |
| BC (Web) | H/M | BCOM2021-0075 | 7/21/2021 | 10/22/2021 | ISSUED |
| BC (Web) | H/M | BCOM2021-0076 | 7/21/2021 | 10/22/2021 | ISSUED |
| BC (Web) | Other Non-Residential (Other N-R) | BCOM2019-0070 | 10/4/2021 | 10/4/2021 | ISSUED |
| BC (Web) | Other N-R | BCOM2019-0072 | | | EXPIRED |
| BC (Web) | Other N-R | BCOM2021-0035 | 7/21/2021 | 7/22/2021 | ISSUED |
| BC (Web) | Other N-R | BCOM2021-0036 | 7/21/2021 | 7/22/2021 | ISSUED |
| BC (Web) | Other N-R | BCOM2021-0092 | 10/14/2021 | 10/14/2021 | ISSUED |
| BC (Web) | Other N-R | BCOM2021-0093 | 10/14/2021 | 10/14/2021 | ISSUED |
| BC (Web) | Other N-R | BCOM2021-0094 | 10/14/2021 | 10/14/2021 | ISSUED |
| BC (Web) | STORES/ CUSTOMER SERVICE | BCOM2021-0037 | 7/21/2021 | 7/22/2021 | ISSUED |
| BUILDING CONSTRUCTION PLAN REVIEW (BCPR) (WEB) | OTHER CONSTRUCTION | BCPR2019-0004 | 7/6/2020 | 10/25/2021 | APPROVED-CONDITIONS |
| BCPR (WEB) | OTHER CONSTRUCTION | BCPR2019-0006 | 7/21/2021 | 10/25/2021 | APPROVED-CONDITIONS |
| BCPR (WEB) | OTHER CONSTRUCTION | BCPR2019-0012 | 4/17/2020 | | EXPIRED |
| BCPR (WEB) | TRACT RESIDENTIAL | BCPR2019-0003 | 6/24/2021 | 12/31/2022 | EXPIRED |
| BCPR (WEB) | TRACT RESIDENTIAL | BCPR2019-0011 | | | EXPIRED |
| BCPR (WEB) | TRACT RESIDENTIAL | BCPR2019-0013 | | | EXPIRED |
| BCPR (WEB) | TRACT RESIDENTIAL | BCPR2022-0012 | | | REVISIONS REQUESTED |

[Building Permits and Plans continued on next page]

| TYPE | SUBTYPE | PERMIT NO. | APPROVED | ISSUED | STATUS |
|---|---|---|---|---|---|
| BUILDING PERMIT APPLICATION - COMMERCIAL (WEB) | NEW BUILDING | BCOM2022-0029 | n/a | n/a | UNDER REVIEW (applied on 5/25/2022) |
| BUILDING RESIDENTIAL (BR) (WEB) | DWELLING - SINGLE FAMILY DETACHED (D-SFD) | BRES2021-0312 | 6/24/2021 | 6/24/2021 | ISSUED |
| BR (Web) | D-SFD | BRES2021-0313 | 6/24/2021 | 6/24/2021 | ISSUED |
| BR (Web) | D-SFD | BRES2021-0314 | 6/24/2021 | 6/24/2021 | ISSUED |
| BR (Web) | D-SFD | BRES2021-0529 | | | EXPIRED |
| BR (Web) | D-SFD | BRES2021-0530 | 11/22/2021 | 11/22/2021 | ISSUED |
| BR (Web) | D-SFD | BRES2021-0531 | 11/22/2021 | 11/22/2021 | ISSUED |
| BR (Web) | D-SFD | BRES2021-0532 | 11/22/2021 | 11/22/2021 | ISSUED |
| BR (Web) | D-SFD | BRES2021-0533 | 11/22/2021 | 11/22/2021 | ISSUED |
| BR (Web) | D-SFD | BRES2021-0534 | 11/22/2021 | 11/22/2021 | ISSUED |
| ELECTRICAL | | BELC2019-0066 | 6/10/2019 | 6/10/2019 | EXPIRED |
| ELECTRICAL (WEB) | | BELC2019-0015 | 3/21/2019 | 3/21/2019 | FINALED |
| ELECTRICAL (WEB) | | BELC2021-0101 | | | EXPIRED |
| ELECTRICAL (WEB) | | BELC2021-0114 | 9/20/2021 | 9/20/2021 | ISSUED |
| ELECTRICAL (WEB) | | BELC2021-0136 | | | EXPIRED |
| ELECTRICAL (WEB) | | BELC2021-0139 | | | EXPIRED |
| ELECTRICAL (WEB) | | BELC2022-0117 | | | UNDER REVIEW (applied on 7/6/2022) |

[Building Permits and Plans continued on next page]

| TYPE | SUBTYPE | PERMIT NO. | APPROVED | ISSUED | STATUS |
|---|---|---|---|---|---|
| PLUMBING - WATER HEATER CHANGEOUT (WEB) | | BPLB2019-0086 | | | EXPIRED |
| PLUMBING (WEB) | | BPLB2019-0075 | 5/22/2019 | 5/23/2019 | FINALED |
| PLUMBING (WEB) | | BPLB2022-0079 | | | UNDER REVIEW |
| PLUMBING (WEB) | | BPLB2022-0080 | | | UNDER REVIEW |
| POOL CONSTRUCTION (WEB) | PRIVATE | BPOL2022-0045 | 2/27/2022 | 3/3/2022 | ISSUED |
| POOL CONSTRUCTION (WEB) | PRIVATE | BPOL2022-0046 | 2/27/2022 | 3/3/2022 | ISSUED |
| POOL CONSTRUCTION (WEB) | PRIVATE | BPOL2022-0047 | 2/27/2022 | 3/3/2022 | ISSUED |
| POOL CONSTRUCTION (WEB) | PUBLIC | BPOL2020-0120 | 10/8/2020 | 10/8/2021 | ISSUED |
| POOL CONSTRUCTION (WEB) | PUBLIC | BPOL2020-0121 | 10/8/2020 | | EXPIRED |
| POOL CONSTRUCTION (WEB) | PUBLIC | BPOL2020-0123 | 10/8/2020 | 8/18/2021 | ISSUED |
| POOL CONSTRUCTION (WEB) | PUBLIC | BPOL2020-0162 | 1/26/2021 | 12/22/2021 | ISSUED |
| POOL CONSTRUCTION (WEB) | PUBLIC | BPOL2020-0221 | | | EXPIRED |
| POOL CONSTRUCTION (WEB) | WATER FEATURE | BPOL2020-0122 | 10/8/2020 | 10/14/2021 | ISSUED |
| SIGN PERMIT (WEB) | | SA2021-0036 | 11/18/2021 | 11/19/2021 | FINALED |
| STRUCTURE OTHER THAN BUILDING (WEB) | | BOTH2022-0001 | 2/14/2022 | 2/16/2022 | ISSUED |
| TEMPORARY TRAILER | | BTTR2022-0001 | | | ON HOLD |

[Building Permits and Plans continued on next page]

| TYPE | SUBTYPE | PERMIT NO. | APPROVED | ISSUED | STATUS |
|---|---|---|---|---|---|
| WALL/FENCE (WEB) | SPECIAL/ENGINEERED DESIGN | BWFE2022-0014 | 3/1/2022 | 3/2/2022 | ISSUED |
| WALL/FENCE (WEB) | SPECIAL/ENGINEERED DESIGN | BWFE2022-0020 | 3/10/2022 | 3/24/2022 | ISSUED |
| WALL/FENCE (WEB) | SPECIAL/ENGINEERED DESIGN | BWFE2022-0021 | 3/10/2022 | 3/24/2022 | ISSUED |
| WALL/FENCE (WEB) | SPECIAL/ENGINEERED DESIGN | BWFE2022-0096 | 3/10/2022 | 3/24/2022 | ISSUED |
| WALL/FENCE (WEB) | SPECIAL/ENGINEERED DESIGN | BWFE2022-0098 | 3/3/2022 | 3/24/2022 | ISSUED |
| WALL/FENCE (WEB) | SPECIAL/ENGINEERED DESIGN | BWFE2022-0132 | 5/13/2022 | 5/13/2022 | ISSUED |

[End of Building Permits and Plans]

## ADDITIONAL SILVERROCK APPROVALS AND PLANS

Additional Prior Project Approvals are available at the following Weblink on the City's Website (collectively, the "**Additional Prior Project Approvals**"): https://laqlaserweb.laquintaca.gov/WebLink/Browse.aspx?id=599873&dbid=1&repo=CityofLaQuinta

The Additional Prior Project Approvals are categorized by type according to the following folders:

- Building Permits
- Building Plans
- Engineering Permits
- Engineering Plans
- Environmental Approvals
- Fire Permits
- Land Actions & Lot Line Adjustments
- Planning Approvals & Entitlement

To the extent any of the previously issued Additional Prior Project Approvals have not expired or would have expired after August 5, 2024, the date when the Bankruptcy Lawsuit was filed, those Additional Prior Project Approvals shall remain issued and not expired.

Furthermore, for any previously issued Additional Prior Project Approvals that have expired, Developer may apply for reinstatement and reissuance pursuant to any applicable provisions in the La Quinta Municipal Code. Any and all such applications for

reinstatement and reissuance of an expired Additional Prior Project Approval shall expressly reference this Reinstated Development Agreement and expressly describe in sufficient detail the portion of the Project for which reinstated and reissued approval would be used.

*NOTE: Some of the Pre-Bankruptcy Subdivision Maps and Permits, listed above, are also including in the folder of the Additional Prior Project Approvals.

[End of Exhibit F]

# EXHIBIT G

## FORM OF CERTIFICATE OF COMPLETION

[Attached]

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO

City of La Quinta
78-495 Calle Tampico
La Quinta, CA 92253
Attn: City Clerk

Space Above This Line for Recorder's Use
(Exempt from Recording Fee per Gov't Code §6103 and §27383)

## CERTIFICATE OF COMPLETION

**THIS CERTIFICATE OF COMPLETION** (the "Certificate") is made by the **CITY OF LA QUINTA**, a California municipal corporation and charter city (the "City"), in favor of ____________________, a ________________ and affiliate of Turnbridge Equities (the "Developer"), and dated as of __________________________,

## RECITALS

A. City and Developer have entered into that certain Reinstated and Amended Development Agreement (the "Reinstated Development Agreement") dated _____________, 2025, and recorded as Document No. ______________ in the Official Records of Riverside County, California, concerning the development of certain real property situated in the City of La Quinta, California, a portion of which is more fully described in Exhibit "A" attached hereto and made a part hereof (the "Property"). **[NOTE: the "Property" shall be only the portion of the real property tied to the applicable Project Component (as defined in the Reinstated Development Agreement) subject to this Certificate.]**

B. As referenced in Section 1.1 [Definitions] and Section 3.4 of the Reinstated Development Agreement (among other sections), upon Developer's request, City is required to furnish Developer or its successor-in-interest with a Certificate of Completion upon Developer's completion of construction of the following Project Component as defined in the Reinstated Development Agreement: ____________________________ ("Applicable Project Component") **[Insert applicable Project Component, as that term is described in the Reinstated Development Agreement]**

C. Also pursuant to the Reinstated Development Agreement, a Certificate of Completion is required to be in such form as to permit it to be recorded in the Recorder's Office of Riverside County, California. Upon full execution, notarizing, and recording, this Certificate is conclusive determination of satisfactory completion of the construction and development required by the Reinstated Development Agreement for the Applicable Project Component cited herein.

D. The City has conclusively determined that such construction and development of the Applicable Project Component on the Property cited herein has been satisfactorily completed.

E. Except as otherwise defined in this Certificate, capitalized words shall have the same meaning ascribed to them in the Reinstated Development Agreement.

**NOW, THEREFORE**, based on the Recitals above, which are a substantive party of this Certificate, the City hereby certifies as follows:

1. The Applicable Project Component cited herein that is to be constructed by Developer has been fully and satisfactorily completed in conformance with the Reinstated Development Agreement. Any operating requirements and all use, maintenance or nondiscrimination covenants contained in the Reinstated Development Agreement, and other documents executed and recorded pursuant to the Reinstated Development Agreement shall remain in effect and enforceable according to their terms and conditions.

2. This Certificate does not constitute evidence of compliance with or satisfaction of any obligation of Developer to any holder of a mortgage or any insurer of a mortgage security money loaned to finance the work of construction if improvements and development of the Property, or any part hereof.

3. This Certificate does not denote completion of any work required to be completed, other than on the Property for the Applicable Project Component.

4. This Certificate is not a notice of completion as referred to in Sections 8186 or 9204 of the California Civil Code.

5. Nothing contained in this instrument shall modify in any other way any other provisions of the Reinstated Development Agreement.

[signatures on next page]

**IN WITNESS WHEREOF**, the City has executed this Release as of the date set forth above:

**"DEVELOPER"**

____________________ LLC, a ________ limited liability company and affiliate of Turnbridge Equities

By: ______________________________
Its: ______________________________

Date:____________________, 20___

By: ______________________________
Its: ______________________________

**"CITY"**

CITY OF LA QUINTA, a California municipal corporation and charter city

Date:____________________, 20___

By: ______________________________
City Manager

ATTEST:

______________________________
City Clerk

APPROVED AS TO FORM:
RUTAN & TUCKER, LLP

______________________________
City Attorney

# EXHIBIT H

## Developer Entities Organizational Chart




*Subject to restructuring depending on tax matters and partnership composition.

***

# EXHIBIT I

## POST-BANKRUPTCY SALE PERMITTING PROCESSES

With the adoption of the Ordinance enacting this Reinstated Development Agreement, the permitting processes listed below shall be and herby are modified. Upon a complete application being filed by Developer (or Developer's authorized representative pursuant to the La Quinta Municipal Code in effect at the time of filing of said application) with the City, with City retaining all authorization to review and determine an application's completeness in accordance with the La Quinta Municipal Code (and, if applicable, state law), then the following permitting processes shall apply:

1. Notwithstanding the provisions in La Quinta Municipal Code, Sections 9.200.020 [and Table 9-23 therein], 9.210.010(D), and 9.210.020(D) to the contrary, Developer may request as part of an application that the Director of the City's Design and Development Department ("**Director**") will be the "decision making authority" for any Site Development Permit (SDP) and/or Conditional Use Permit (CUP) that may be necessary or proper for Developer's work in connection with the assessment and preservation of EXISTING IMPROVEMENTS as described in the Schedule of Performance, Item #1 [Existing Improvements]. If the Director is the "decision making authority" for a SDP and/or CUP pursuant to this Paragraph 1, no public hearing shall be required and a decision may be issued Administratively by the Director, subject to the inclusion of any and all provisions in the La Quinta Municipal Code required for issuance of a decision on a SDP and/or CUP (such as conditions of approval); provided, however, the Director shall retain the discretion to notice and hold a public hearing, based on the scope of anticipated work set forth in an application for a SPD and/or CUP, with said public hearing to be held before the Director. It is the expressed intent of the City Council with the modifications for permitting set forth in this Paragraph 1 to expedite review and approval of SDPs and CUPs necessary or proper for Developer to evaluate the partially constructed onsite improvement to determine if preservation is appropriate, and to facilitate said preservation, and, where preservation may not be feasible or is not pursuant to the Scope of Work, to facilitate removal or relocation of partially constructed onsite improvements. Nothing in this Paragraph 1 does or may be construed to lessen or modify any requirements under state law for the issuance of any demolition permit, or similar permit that may be required along with a SDP and/or CUP under the La Quinta Municipal Code.

2. Notwithstanding the provisions in La Quinta Municipal Code Sections 9.200.110 [introductory paragraph], 9.210.010(F), and 9.210.020(G) to the contrary, the "board of appeals" for any appeal taken of a decision issued by the Director pursuant to Paragraph 1 (above) shall be the City Council. All other provisions relating to administrative appeals in Sections 9.200.110, 9.210.010, and

9.210.020, including the appeal procedure and time limits for filing an appeal, shall apply.

3. Solely for the purposes of changing the street names from the names adopted on July 19, 2022, by Case No. SNC 2022-0002, City Council Reso. No. 2022-026 and modifying Parcel Map 37207 [changing from "Ahmanson Lane" to "Painted Peak Lane" and from "SilverRock Way" to "Talus Way"], Developer may request by submitting an application to the City Manager that the Director initiate a street name change for said streets. If so applied for by Developer, then, notwithstanding any other parts of the La Quinta Municipal Code to the contrary (including Chapter 14.08 and, specifically, Section 14.08.110), the Director may, for any reason it deems in the public interest and necessity, recommend directly to the City Council that those street names be changed. The recommendation may be made without complying with the requirements of La Quinta Municipal Code Sections 14.08.020 through 14.08.080, and the recommendation shall be in the form of an Administrative Request directed to the City Council. Thereafter the City Council shall take such action as it deems appropriate at a public hearing for the purpose thereof. Notice of the public hearing for the City Council's consideration of the Director's Administrative Request shall be provided by at least one (1) publication in a newspaper of general circulation within the City at least ten (10) days prior to the hearing date. The action taken by the City Council shall be adopted by Resolution.

4. Notwithstanding La Quinta Municipal Code Section 9.250.020(C)(13)(a), the City Manager, City Attorney, or City Clerk may authorize the recording of this Reinstated Development Agreement to occur concurrently with the closing of the escrow for the Developer's acquisition from Debtors (SDC) of the Phase 1 Property. Furthermore, and notwithstanding La Quinta Municipal Code Section 9.250.020(C)(13)(a), the City Manager, City Attorney, or City Clerk may authorize the recording of this Reinstated Development Agreement against the City-Owned Ahmanson Ranch Property and City-Owned Golf Course Property to occur concurrently with the closing of the escrow for the Developer's acquisition from Debtors (SDC) of the Phase 1 Property. Furthermore, and notwithstanding La Quinta Municipal Code Section 9.250.020(C)(13)(a), the City Manager, City Attorney, or City Clerk may authorize the recording of this Reinstated Development Agreement to occur concurrently with the closing of the escrow for Developer's purchase from City of an option to potentially purchase the City-Owned Option Property (Phase 2 Property) in accordance with the Option Agreement (as referenced in Recital F of the Reinstated Development Agreement).

[End of Exhibit I]

# EXHIBIT J

## REINSTATED AND AMENDED COVENANT AFFECTING REAL PROPERTY (AHMANSON RANCH HOUSE)

[Attached]

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO

City of La Quinta
78-495 Calle Tampico
La Quinta, CA 92253
Attn: City Clerk

Space Above This Line for Recorder's Use
(Exempt from Recording Fee per Gov't Code §6103 and §27383)

**REINSTATED AND AMENDED**
**COVENANT AFFECTING REAL PROPERTY**
**(AHMANSON RANCH HOUSE)**

**BY AND BETWEEN**

**THE**

**CITY OF LA QUINTA**

**AND**

**TBE RE ACQUISITION CO II LLC**
**AN AFFILIATE OF**
**TURNBRIDGE EQUITIES REAL ESTATE FUND II GP LLC**

REINSTATED AND AMENDED COVENANT AFFECTING REAL PROPERTY (AHMANSON RANCH HOUSE) .......... 3

RECITALS .......... 3

AGREEMENT .......... 7

1. GENERAL PROVISIONS .......... 8
   1.1 Definitions .......... 8
   1.2 Effective Date .......... 9
   1.3 Amendment or Cancellation by Mutual Consent .......... 9
   1.4 Covenants Run With the Land; Expressed Condition of Ahmanson Ranch House Use in Grant Deeds and Other Similar Instruments; Rights of Reverter or Re-Entry .......... 10
   1.5 Recording and Priority of Covenant .......... 11
   1.6 Covenant Parcels Free of Mechanic's Liens .......... 11

2. AUTHORIZED USES OF AHMANSON RANCH HOUSE .......... 12
   2.1 Ahmanson Ranch Property .......... 12
   2.2 Ahmanson Ranch House Access/Operations Parcels .......... 12
   2.3 Dedications and Improvements .......... 13

3. PRESERVATION OF HISTORICAL RESOURCE .......... 13
   3.1 Conveyance of Ahmanson Ranch House and Improvements .......... 13
   3.2 Collection and Receipt of Charges; Allowance for Third-Party Operator .......... 13
   3.3 City Council Approvals to Preserve Historic Resource and Aesthetics .......... 13

4. DEFAULT AND REMEDIES .......... 14
   4.1 City Rights .......... 14
   4.2 Notice and Cure of Default .......... 14

5. MISCELLANEOUS .......... 14
   5.1 Notices, Demands and Communications Between the Parties .......... 14
   5.2 Force Majeure .......... 15
   5.3 Binding Effect .......... 15
   5.4 Non-liability of City Officers and Employees .......... 16
   5.5 Covenant Against Discrimination .......... 16
   5.6 Attorney's Fees and Costs for Prevailing Party .......... 16
   5.7 Severability .......... 16
   5.8 Time .......... 17
   5.9 Recitals & Exhibits Incorporated .......... 17
   5.10 Authority to Execute; Representations and Warranties .......... 17
   5.11 City Approvals and Actions .......... 17
   5.12 Governing Law .......... 17
   5.13 Termination of Original Covenant .......... 18
   5.14 Counterpart Signature Pages .......... 18

EXHIBIT A LEGAL DESCRIPTION AND DEPICTION OF LUXURY HOTEL PROPERTY (DEVELOPER OWNED) ..... 22

EXHIBIT B-1 LEGAL DESCRIPTION OF GOLF COURSE ..... 23

EXHIBIT B-2 LEGAL DESCRIPTION OF CITY-OWNED AHMANSON RANCH PROPERTY ..... 24

EXHIBIT C SITE MAPS ..... 25

**REINSTATED AND AMENDED
COVENANT AFFECTING REAL PROPERTY
(AHMANSON RANCH HOUSE)**

This REINSTATED AND AMENDED COVENANT AFFECTING REAL PROPERTY (AHMANSON RANCH HOUSE) (the "**Ahmanson Ranch Covenant**") is entered into as of the ___ day of ___________, 2025 (the "**Ahmanson Ranch Covenant Effective Date**"), by and between the CITY OF LA QUINTA, a California municipal corporation and charter city ("**City**"), and TBE RE Acquisition Co II LLC, a Delaware limited liability company and affiliate of Turnbridge Equities Real Estate Fund II GP LLC, a Delaware limited liability company ("**Developer**"), with reference to the following:

**RECITALS:**

A. As of the Ahmanson Ranch Covenant Effective Date, Developer has a legal or equitable interest in fee title to that certain real property and improvements thereon comprised of a flagship luxury hotel and related ancillary uses that include (but are not limited to) a spa and fitness area, restaurants, conference and banquet facilities, pool and recreational facilities, and "back-of-house" facility area that are part of the "**Luxury Hotel Project Component**" as defined in the Reinstated Development Agreement (defined below), and more particularly described in the legal description attached hereto as Exhibit A and incorporated herein by this reference (the "**Luxury Hotel Property**"). The Luxury Hotel Property is a portion of real property and improvements thereon referred to as the "Phase 1A Property" as defined in the Reinstated Development Agreement (defined below) to which Developer also has a legal or equitable interest in fee title as of the Ahmanson Ranch Covenant Effective Date. [NOTE: ONLY THE PARCELS WITH THE LUXURY HOTEL ARE THE LEGAL DESCRIPTIONS TO BE ATTACHED AS EXHIBITS, AND NOT THE ENTIRETY OF THE PHASE 1A PROPERTY]

B. As of the Ahmanson Ranch Covenant Effective Date, City owns all of the fee title to that certain real property and improvements thereon comprised of: (i) the Arnold Palmer Classic Golf Course, commonly known as the SilverRock Golf Course, more particularly described in Exhibit A-1 attached hereto and incorporated herein by this reference (the "**Golf Course**"), and (ii) the Ahmanson Ranch House that used as an events building and ancillary facility for the Golf Course, consisting of approximately 0.6+/- acres and more particularly described in Exhibit A-2 attached hereto and incorporated herein by this reference (the "**City-Owned Ahmanson Ranch Property**"). The City-Owned Ahmanson Ranch Property includes easement rights over parcels for access to the Ahmanson Ranch House (the "**Ahmanson Ranch House Access/Operations Property.**") The Luxury Hotel Property, Golf Course and City-Owned Ahmanson Ranch Property are referred to herein as the "**Ahmanson Ranch Covenant Properties.**" [NOTE: ONLY THE GOLF COURSE, NOT ALL OF THE "CITY-OWNED GOLF COURSE PROPERTY" IS ATTACHED HERE BECAUSE

AHMANSON RANCH DOES NOT SERVE CLUBHOUSE OR COURSE MAINTENANCE PARCELS]

C. On _______________, 2025, the La Quinta City Council adopted Ordinance No. ___, approving pursuant to applicable State and City laws that certain Reinstated and Amended Development Agreement, with reference date _____________, 2025, between City and Developer (the "**Reinstated Development Agreement**"). Among other terms and conditions, the Reinstated Development Agreement vests development and use rights to Developer, prescribes rights and obligations of Developer for the resumption and completion of construction, and the continuous operation and use, of specified "Project Components" that include, among others, a luxury hotel with related ancillary amenities and luxury single-family detached and condominium residential dwellings available for use as short-term vacation rentals, as more particularly set forth therein. The Reinstated Development Agreement governs Developer's development and use rights and obligations for the Phase 1 Property. The Reinstated Development Agreement was recorded in the Recorder's Office of or about even date as this Ahmanson Ranch Covenant, with said Reinstated Development Agreement to remain with priority over this Ahmanson Ranch Covenant.

D. Prior to City and Developer entering into this Ahmanson Ranch Houses Covenant (among other agreements and instruments), the following relevant history is hereby recited:

1. Except for portions of land previously transferred to SilverRock Development Company, LLC, a Delaware limited liability company (or one of its affiliated companies, which are referred to herein collectively as "**SDC**" or "**Debtor(s)**")[1] as explained below in the next Recital Subparagraph, City owns fee title to that certain real property of approximately 525 acres located at the southwest intersection of Jefferson Street and Avenue 52, in the City of La Quinta, California, generally referred to as the "**SilverRock Resort Area**", which is depicted in the Site Maps (defined below) and subject to a Specific Plan adopted by the La Quinta City Council and enforceable as a land use governing document pursuant to the Planning and Zoning Law, California Government Code section 65000 et seq. (the "**SilverRock Specific Plan**");

---

[1] Debtors were SilverRock Development Company, LLC and affiliated entities that, on August 5, 2024, filed for voluntary bankruptcy protection under chapter 11 of the U.S. Bankruptcy Code, with case number(s) identified in the Title of this Agreement along with the last four digits of each Debtor's federal tax identification number, as applicable, are: SilverRock Development Company, LLC (5730), RGC PA 789, LLC (5996), SilverRock Lifestyle Residences, LLC (0721), SilverRock Lodging, LLC (4493), SilverRock Luxury Residences, LLC (6598) and SilverRock Phase I, LLC (2247) (collectively, referred to herein as the "**Bankruptcy Lawsuit**" in the "**Bankruptcy Court**").

2. On or about November 19, 2014, City and SDC entered into that certain Purchase, Sale, and Development Agreement (the "**Original SDC PSDA**"), pursuant to which, among other terms and conditions, City agreed to sell to SDC and SDC agreed to purchase from City specified parcels and planning areas (PAs) to thereafter construct, complete, and operate thereon a commercial project containing a luxury resort hotel and spa and associated branded luxury residential units, a lifestyle hotel and associated lifestyle branded residential units, a conference and shared service facility, a temporary and permanent clubhouse for the SilverRock Resort's Arnold Palmer Classic Golf Course, a mixed use village, a resort residential village, and associated amenities, all as further described in the Original SDC PSDA and referred to as various project components, as more particularly described therein. Concurrent with the Original SDC PSDA, on or about November 19, 2014, City and SDC entered into Development Agreement 2014-1001 (the "**Original SDC Development Agreement**") pursuant to the Development Agreement Law, which agreement, among other terms and conditions, required SDC to develop the planning areas and project components in accordance with the SDC PSDA, vested with SDC specified development obligations, memorialized the potential for the future acquisition of additional City-owned property in the SilverRock Resort Area as incorporated vis-à-vis the SDC PSDA, and subjected SDC to City's rights and oversight for those portions of the SilverRock Resort Area to be conveyed to SDC. After entering into the Original SDC PSDA and Original SDC Development Agreement, the following relevant events, very briefly summarized, occurred:

i. Pursuant to the Original SDC PSDA, City and SDC had the authority to amend by mutual agreement of the parties. Between October 29, 2015, and November 16, 2023, City and SDC entered into five amendments thereto, dated October 29, 2015 ("**First Amendment**"), April 18, 2017 ("**Second Amendment**"), November 28, 2018 ("**Third Amendment**"), October 12, 2021 ("**Fourth Amendment**"), and November 16, 2023 ("**Fifth Amendment**," and the Original SDC PSDA as amended by all five amendments is referred to herein as the "**SDC PSDA**");

ii. Pursuant to the SDC PSDA and consistent with boundaries established by applicable subdivision maps and lot line adjustments, City conveyed to SDC the Property for the pre-development, development, operation, and use of a project that was eventually re-named "Talus" and consisted of the following project components (all as defined in the SDC PSDA): Luxury Hotel, Luxury Branded Residential Development, Lifestyle Hotel, Lifestyle Branded Residential Development, Conference and Shared Services Facility (including spa and other amenities), Permanent Golf Clubhouse, Promenade Mixed-Use Village/Resort Residential Village (on Planning Areas 7,8,9), as well as a specified Golf Course Realignment and corresponding Master Site Infrastructure Improvements (MSII). These project components on the Property, pursuant to the SDC PSDA, were divided into Phase 1A project components on the Phase 1A Property and the Phase 1B project components on the Phase 1B Property respectively, as described in the SDC PSDA;

iii. Pursuant to the Third and Fourth Amendments to the SDC PSDA, SDC commenced pre-development and development on the Property for the Phase 1A project components, which as of the Reference Date of this Agreement, in various degrees, were partially constructed after SDC failed to continue to make payments to various contractors, subcontractors, and other interested parties in the development of the Talus project. Multiple lawsuits, including lawsuits seeking payments pursuant to mechanic's lien or various loan or investment agreements, and a City lawsuit against SDC for unlawful and unapproved conveyances in secured interests or mechanic's liens, were filed against SDC;

iv. Pursuant to the requirements of the SDC PSDA, the City and SDC entered into a "Covenant Affecting Real Property (Ahmanson Ranch House) By And Between The City Of La Quinta and SilverRock Development Company, LLC" (Riverside County Recorder No. 2017-0189769), which was recorded on May 11, 2017 (the "**Original Covenant**");

v. On August 5, 2024, SDC (Debtors) filed the Bankruptcy Lawsuit, and, pursuant to Bankruptcy Court-approved Bid Procedures, Debtors retained a Chief Restructuring Officer (Douglas Wilson Companies) and marketing professional (JLL) for the purposes of, among other items, marketing the sale of the Debtors estate (which and is primarily comprised of the Property) and soliciting proposals for the: (a) acquisition of the Debtors estate, (b) use, re-use, and/or substitution of the partially constructed improvements on the Property, (c) potential replacement project for a world-class hotel and residential destination resort with related amenities on the Property that complement the existing Arnold Palmer Classic Golf Course surrounding the Property and real property owned by the City (defined below as the City-Owned Option Property), and (d) possible acquisition in the future of the City-Owned Option Property (defined below) in the SilverRock Resort Area (previously referred to as the Future Option Property in the SDC PSDA and generally referred to in the Bankruptcy Lawsuit and marketing materials as the "**Phase 2 Property**") for possible future development that would also complement a world-class hotel and residential destination resort;

3. Pursuant to Bankruptcy Court order [**Bankruptcy Lawsuit Docket No. ____**], among other provisions: (i) Developer was authorized to purchase the Property, (ii) the Original SDC Development Agreement was required to be reinstated and amended and memorialized by the Reinstated Development Agreement, and (iii) An escrow to facilitated the purchase and sale of the Debtors' estate (which includes the Property) was authorized, which, among other terms and conditions, included the transfer of funds and recording of documents (such as the Reinstated Development Agreement).

E. Developer submitted a proposal in response to the marketing materials, and, pursuant to the Bankruptcy Court-approved Bid Procedures, Debtors and City approved Developer's proposal, which, among other terms and conditions, included a modified "**Project**" (as more particularly defined and memorialized in the Reinstated Development Agreement) on the Phase 1 Property as well as possible acquisition in the

future of the City-Owned Option Property (also referred to therein as the Phase 2 Property) for possible future development that would also complement a world-class hotel and residential destination resort, all as more particularly set forth in the Reinstated Development Agreement.

F. The Reinstated Development Agreement and Specific Plan, among other land use governing documents, permits, and entitlements, are centered around the existing use and enjoyment, by residents, guests of the City, and members of the public, of the Golf Course in the SilverRock Resort Area.

G. This Ahmanson Ranch Covenant is intended to and does bind City and any and all successors in interest to the City-Owned Ahmanson Ranch Property (or any portion thereof), as more particularly set forth herein. Likewise, this Ahmanson Ranch Covenant is intended to and does bind Developer and any and all successors in interest to the Luxury Hotel Property (or portion thereof), as more particularly set forth herein.

H. Pursuant to and as more particularly set forth the Reinstated Development Agreement, upon conveyance of the City-Owned Ahmanson Ranch Property from City to Developer if Developer satisfies specified conditions in the Reinstated Development Agreement, Developer is required, among other provisions relating to land use covenants, to continuously operate and maintain, and have open and available for use and enjoyment, the Golf Course and ancillary improvements and amenities, as more particularly set forth in this Ahmanson Ranch Covenant.

I. This Covenant is being recorded to ensure that the Ahmanson Ranch House facilities and amenities are available for use by guests of the Luxury Hotel Property and incorporate certain complementary improvements and uses as agreed upon by City and Developer, and to further ensure that if such improvements and uses are not completed, that the Ahmanson Ranch House facilities and amenities are available for La Quinta residents and members of the public visiting the Golf Course.

J. City is the owner by dedication of those certain public streets located in the City and known as Avenue 52 and Jefferson Street. The portions of said public streets that are adjacent to the SilverRock Resort Area, as depicted on the Parcel Map, in addition to any and all other real property owned by the City for public use (collectively, the "**City-Benefitted Property**"), is benefited by this Covenant, and serves as the "benefited estate" for purposes of this Covenant, and the terms and conditions, as more particularly set forth herein. Furthermore, the Ahmanson Ranch Covenant Properties are burdened by this Ahmanson Ranch Covenant, serve as the "burdened estate" for purposes of this Ahmanson Ranch Covenant, and are subject to its terms and conditions, as more particularly set forth herein.

## AGREEMENT:

NOW, THEREFORE, in consideration of the foregoing Recitals, which are incorporated herein by this reference, the mutual covenants and agreements contained

herein, and other good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged, the Parties do hereby agree as follows:

12. GENERAL PROVISIONS

12.1 Definitions. In addition to the terms that may be defined elsewhere in this Covenant, the following terms when used in this Ahmanson Ranch Covenant shall be defined as follows:

12.1.1 "**Ahmanson Ranch Covenant**" means this Reinstated and Amended Golf Course Covenant Affecting Real Property (Ahmanson Ranch House).

12.1.2 ""**Ahmanson Ranch Covenant Properties**" shall have the meaning in Recital B of this Ahmanson Ranch Covenant.

12.1.3 "**Ahmanson Ranch House**" means the SilverRock Resort's Ahmanson Ranch House and uses and all operations related thereto, in its current location, as of the Ahmanson Ranch Covenant Effective Date, subject to the improvements under the Project and any other reconfiguring, modification, repair, replacement and/or uses approved by the City from time to time.

12.1.4 "**Ahmanson Ranch House Access/Operations Property**" shall have the meaning in Recital B of this Ahmanson Ranch Covenant.

12.1.5 "**City**" means the City of La Quinta, a charter city and municipal corporation, including each and every agency, department, board, commission, authority, employee, and/or official acting under the authority of the City, including without limitation the City Council and the Planning Commission.

12.1.6 "**City-Benefitted Property**" shall have the meaning in Recital J of this Ahmanson Ranch Covenant.

12.1.7 "**City Council**" means the City Council of the City and the legislative body of the City pursuant to California Government Code Section 65867.

12.1.8 "**City Manager**" means the individual duly appointed to the position of City Manager of City, or his or her authorized designee.

12.1.9 "**City-Owned Ahmanson Ranch House Property**" shall have the meaning in Recital B of this Ahmanson Ranch Covenant.

12.1.10 "**Covenant**" means this Ahmanson Ranch Covenant.

12.1.11 "**Developer**" means the Developer identified in the Preamble of this Ahmanson Ranch Covenant.

12.1.12 "**Effective Date**" shall the "Ahmanson Ranch Covenant Effective Date."

12.1.13 "**Golf Course**" means the SilverRock Resort's Arnold Palmer Classic Course and all operations related thereto, in its current location, as of the Golf Course Effective Date of this Covenant, subject to reconfiguring and realignment pursuant to any reconfiguring approved by the City from time to time, and the real property improved with the Golf Course as described in Recital B of this Ahmanson Ranch Covenant.

12.1.14 "**Luxury Hotel Property**" shall have the meaning in Recital A of this Ahmanson Ranch Covenant.

12.1.15 "**Parties**" means collectively Developer and City, and their respective successors and assigns. Each may be referred to in the singular as a "Party".

12.1.16 "**Recorder's Office**" means the Riverside County, California, Office of Official Records.

12.1.17 "**SilverRock Resort Area**" has the same meaning in the Reinstated Development Agreement and Recital C(1), which refers to the approximately 525 acres of real property located at the southwest intersection of Jefferson Street and Avenue 52 in the City of La Quinta, California 92253, depicted in the Site Maps.

12.1.18 "**Site Map(s)**" means the maps of the SilverRock Resort Area, which is attached hereto as Exhibit C and incorporated herein by this reference.]

12.1.19 "**Specific Plan**" means the SilverRock Resort Specific Plan, approved by the City Council of City on July 18, 2006, as may be amended from time to time.

12.2 Effective Date.

This Ahmanson Ranch Covenant shall be effective and of full force and effect upon complete execution by the Parties, which shall be inserted in the preamble, and shall be perfected as binding against any and all owners of the Ahmanson Ranch Covenant Properties upon recording in the Recorder's Office.

12.3 Amendment or Cancellation by Mutual Consent.

Except as expressly allowed herein, this Ahmanson Ranch Covenant shall not be amended or canceled in whole or in part without the prior written consent of the City, and, except when the City Manager may amend this Ahmanson Ranch Covenant as expressly allowed herein, any cancellation or amendment of this Ahmanson Ranch Covenant shall require the approval of the City Council by not less than a majority vote of the total membership.

12.4 Covenants Run With the Land; Expressed Condition of Ahmanson Ranch House Use in Grant Deeds and Other Similar Instruments; Rights of Reverter or Re-Entry.

In any grant deed or other instrument conveying any right, title, or interest in any or all of the Ahmanson Ranch Covenant Properties (or portion thereof) from the grantor (including the City) to the grantee (including Developer), words shall be included in such grant deed or other instrument signifying that such right, title, or interest, and any such estate created by such conveyance, shall be subject to the terms and conditions of this Ahmanson Ranch Covenant. Furthermore, such grant deed or other instrument shall expressly condition that the City, and its heirs and assigns, shall have a right of reverter and/or right to re-enter any or all City-Owned Ahmanson Ranch House Property upon an uncured Developer default under this Ahmanson Ranch Covenant.

This Ahmanson Ranch Covenant is intended to be and shall be construed as a restrictive covenant that limits, restricts, and burdens the use of the City-Owned Ahmanson Ranch House Property. The City, as owner in fee of the Ahmanson Ranch House Property, hereby declares that this Ahmanson Ranch Covenant, and the covenants, conditions, and restrictions of use on the City-Owned Ahmanson Ranch House Property as set forth herein, is intended to and shall run with the land in perpetuity, and each and every successor of the City that has any ownership interest or right of ownership interest in the City-Owned Ahmanson Ranch House Property (or portions thereof), including Developer, shall be subject to this Ahmanson Ranch Covenant, which is intended to be and shall be construed as placing a reasonable burden on the use of the City-Owned Ahmanson Ranch House Property, which, among other provisions, were developed for use and enjoyment as the Ahmanson Ranch House as more particularly described in this Ahmanson Ranch Covenant. To the maximum extent permitted by law, this Ahmanson Ranch Covenant shall be construed as an expressed, valid, and enforceable deed restriction, restrictive covenant, or other similarly described encumbrance that runs with the Ahmanson Ranch Covenant Properties. This Covenant shall be binding upon any person or entity that acquires any right, title, or interest in or to any portion or all of the Ahmanson Ranch Covenant Properties.

Furthermore, this Ahmanson Ranch Covenant is designed to create equitable servitudes and covenants running with the land, in accordance with the provisions of Civil Code Section 1468. The covenants, conditions, restrictions, reservations, equitable servitudes, liens, and charges set forth herein shall run with the Ahmanson Ranch Covenant Properties, as the "burdened property," and shall be binding upon all persons or entities having any right, title or interest in the Ahmanson Ranch Covenant Properties (or portion thereof) and their heirs, successive owners and assigns, and shall be binding upon the Developer, and its successors and assigns. Furthermore, the covenants, conditions, restrictions, reservations, equitable servitudes, liens, and charges set forth herein shall run with the City-Benefitted Property, as the "benefitted property," and shall inure to the benefit of the City and its successors and assigns, and may be enforced by the City and its successors and assigns. The Developer hereby

declares its understanding and intent that the burden of the covenants set forth herein touch and concern the land and that the Developer's interest in the Ahmanson Ranch Covenant Properties is rendered less valuable thereby. The Developer hereby further declares its understanding and intent that the benefit of such covenants touch and concern the land by enhancing and increasing the enjoyment and use of the Ahmanson Ranch Covenant Properties and by furthering public purposes for the City.

In amplification and not in restriction of the provisions hereinabove, it is intended and agreed that the City is deemed a beneficiary of the covenants provided herein both for and in its own right and also for the purposes of protecting the interests of the community. All covenants without regard to technical classification or designation shall be binding for the benefit of the City and such covenants shall run in favor of the City, without regard to whether the City is or remains the owner of the City-Benefitted Property or of any land or interest therein to which such covenants relate. However, all such covenants and restrictions shall be deemed to run in favor of all real property owned by the City, which real property shall be deemed the benefited property of such covenants. The City shall have the right, in the event of any breach of this Ahmanson Ranch Covenant, to exercise all rights and remedies, and to maintain any action at law or in equity or other proper proceeding to enforce the curing of such breach of this Ahmanson Ranch Covenant.

12.5 Recording and Priority of Covenant.

Upon complete execution and notarizing of this Ahmanson Ranch Covenant, Developer shall record or cause to be recorded in the Recorder's Office this Ahmanson Ranch Covenant. The Covenant shall be recorded against each and every one of the Ahmanson Ranch Covenant Properties and the City-Benefitted Property. This Ahmanson Ranch Covenant shall be recorded as provided for in the Reinstated Development Agreement, and this Ahmanson Ranch Covenant shall have priority over and shall not be made subordinate to any mortgage, deed of trust, or other encumbrance recorded against the Ahmanson Ranch Covenant Properties.

12.6 Covenant Parcels Free of Mechanic's Liens.

The owner of the Ahmanson Ranch Covenant Properties (or any portion thereof) shall pay when due all claims for labor performed and materials furnished in connection with the Ahmanson Ranch Covenant Properties during such owner(s)'s period of ownership. No mechanics', materialmen's or other professional services liens (as contrasted with consensual monetary liens such as construction and/or permanent financing approved by the City and subject to this Covenant) shall be permitted against the Ahmanson Ranch Covenant Properties (or any portion thereof) for any work done or materials furnished in connection with the performance of any contractor or construction work to be completed on the Ahmanson Ranch Covenant Properties; provided, however, that the owner of the Ahmanson Ranch Covenant Properties (or portion thereof) may contest the validity of any such lien, but upon a final determination of the validity thereof, the owner of the Ahmanson Ranch Covenant Properties (or portion thereof) subject to such a lien shall cause the lien to be satisfied and released of record.

The owner of the Ahmanson Ranch Covenant Properties (or portion thereof) shall, within thirty (30) days after receipt of written notice of any encumbrance by any such lien or claim of lien arising during such owner's period of ownership, (i) cause any such outstanding lien or claim of lien to be released of record or transferred to bond in accordance with applicable law, or (ii) give such assurance as would enable a title insurance company to insure over such lien or claim of lien.

13. AUTHORIZED USES OF AHMANSON RANCH HOUSE

13.1 Ahmanson Ranch Property.

Subject to the rehabilitation and related terms and conditions in the Reinstated Development Agreement for the Ahmanson Ranch House, and any other rehabilitation, repair, replacement, modifications, and/or uses upon which City and Developer mutually agree, the City-Owned Ahmanson Ranch House Property and all improvements thereon shall remain open and available as a public restaurant and banquet facility while owned by the City, and upon ownership transferring to Developer, the Ahmanson Ranch House Property shall be used as a restaurant or other hospitality-related uses that are consistent with the SilverRock Resort Area, the Specific Plan, and other permits, licenses, approvals and entitlements of the Ahmanson Ranch House and uses that are beneficial to the Luxury Hotel Property.

13.2 Ahmanson Ranch House Access/Operations Parcels.

Subject to temporary closures or restricted use of access for periodic special events or permitted uses at the Ahmanson Ranch House, the Ahmanson Ranch House Access/Operations Property shall be available for use by the general public, residents, and guests of the Golf Course and Ahmanson Ranch House in the same manner as they were used and available for use as of the Ahmanson Ranch Covenant Effective Date, for so long as owned by the City, according to the following:

(A) The Ahmanson Ranch House shall have access (vehicular and pedestrian ingress and egress) from the City-Benefitted Property at all times on, over, and through some or all of Ahmanson Ranch House Access/Operations Property; provided, however, such access may be modified pursuant to a subdivision map or other City action, pursuant to any applicable law, that maintains access to the Ahmanson Ranch House from the City-Benefitted Property.

(B) The Ahmanson Ranch House Access/Operations Property shall allow access to the Ahmanson Ranch House for the City residents, City officials and employees, and any and all other persons and members of the general public.

13.3 Dedications and Improvements.

Nothing in this Ahmanson Ranch Covenant shall release or relieve Developer from making any offers of dedications to the City or other applicable public agency, or complete those public improvements in connection with the development of the SilverRock Resort Area, as may be required by any conditions of approval, parcel map, or any other requirement imposed by the City.

14. PRESERVATION OF HISTORICAL RESOURCE

14.1 Conveyance of Ahmanson Ranch House and Improvements.

The City may convey the City-Owned Ahmanson Ranch House Property pursuant to the Reinstated Development Agreement, in which case, City shall no longer be owner in fee. City shall have and retain all regulatory authority over the Ahmanson Ranch House in accordance with applicable laws.

14.2 Collection and Receipt of Charges; Allowance for Third-Party Operator.

The owner of the Ahmanson Ranch House shall have the obligation to collect and right to keep moneys charged for any and all services at the Ahmanson Ranch House during City ownership, consistent with this Ahmanson Ranch Covenant; provided, however, if City owns the Ahmanson Ranch House but contracts with Developer or a third party operator of the Ahmanson Ranch House for the administration of the Ahmanson Ranch House, Developer and/or the third party operator shall have the obligation to collect and right to keep moneys charged.

14.3 City Council Approvals to Preserve Historic Resource and Aesthetics.

Unless another use is approved by City in accordance with applicable laws, the Ahmanson Ranch House shall be preserved as a historic resource of the City, and the general architectural style for both the exterior and interior should be attempted to be preserved.

Any and all alterations, structural improvements, fixtures, furnishings, equipment, repair, replacement, or any other modification to the Ahmanson Ranch House shall be applied for by the current owner (or authorized agent) and reviewed by the City Council in its regulatory and design review capacity, and pursuant to applicable federal, state, or local law.

15. DEFAULT AND REMEDIES.

15.1 City Rights.

In the event of failure by Developer or any successor in interest that has any ownership interest in the Ahmanson Ranch Covenant Properties (or any portion thereof) to perform any material term or provision of this Ahmanson Ranch Covenant, the City

shall have those rights and remedies provided in this Ahmanson Ranch Covenant and shall have any and all rights and remedies available at law or in equity, including but not limited to immediate and permanent injunctive relief.

15.2 Notice and Cure of Default.

Upon the receipt of the notice of default by the City, the defaulting party shall promptly commence to cure, correct, or remedy the identified default at the earliest reasonable time after receipt of the notice of default and shall complete the cure, correction or remedy of such default not later than thirty (30) days after receipt of the notice of default, or, for such defaults that cannot reasonably be cured, corrected or remedied within thirty (30) days, such Party shall commence to cure, correct, or remedy such default within such thirty (30) day period, and shall continuously and diligently prosecute such cure, correction or remedy to completion, provided that such cure, correction or remedy is completed within ninety (90) days following expiration of the initial thirty (30) day cure period.

16. MISCELLANEOUS

16.1 Notices, Demands and Communications Between the Parties.

Any approval, disapproval, demand, document or other notice ("**Notice**") which either Party may desire to give to the other Party under this Ahmanson Ranch Covenant must be in writing and shall be sufficiently given if (i) delivered by hand, (ii) delivered by reputable same-day or overnight messenger service that provides a receipt showing date and time of delivery, or (iii) dispatched by registered or certified mail, postage prepaid, return receipt requested, to the principal offices of City and Developer at the addresses specified below, or at any other address as that Party may later designate by Notice.

To City:
City of La Quinta
78-495 Calle Tampico
La Quinta, California 92253
Attn: City Manager

With a copy to:
Rutan & Tucker, LLP
18575 Jamboree Road, 9th Floor
Irvine, CA 92612
Attn: William H. Ihrke

To Developer:

TBE RE Acquisition Co II LLC
c/o Turnbridge Equities
4 Bryant Park, Suite 200
New York, New York 10018
Attention: General Counsel and
Michael Gazzano
Email: jw@turnbridgeeq.com and
mg@turnbridgeeq.com

with a copy to:
DLA Piper
1251 Avenue of the Americas
New York, New York 10020
Attention: Todd Eisner
Email: todd.eisner@us.dlapiper.com

with a copy to:
Procopio
200 Spectrum Center Drive
Suite 1650
Irvine, CA 92618
Attn: James Vaughn
Email: james.vaughn@procopio.com

Any written notice, demand or communication shall be deemed received immediately if personally delivered or delivered by delivery service, and shall be deemed received on the third day from the date it is postmarked if delivered by registered or certified mail.

16.2 Force Majeure.

Notwithstanding any other provision set forth in this Ahmanson Ranch Covenant to the contrary, in no event shall a Party be deemed to be in Default of its obligations set forth herein where delays or failures to perform are due to a Force Majeure, as defined in the Reinstated Development Agreement. Notwithstanding anything to the contrary in this Ahmanson Ranch Covenant, an extension of time for any such cause shall only be for the period of the enforced delay and shall commence to run from the time of the commencement of the cause, if notice by the Party claiming such extension is sent to the other Party within thirty (30) days of the commencement of the cure. Times of performance under this Ahmanson Ranch Covenant may also be extended in writing by the mutual agreement of City and Developer.

16.3 Binding Effect.

This Ahmanson Ranch Covenant, and all of the terms and conditions hereof, shall be binding upon and inure to the benefit of the City, any subsequent owner of all or any portion of the Ahmanson Ranch Covenant Properties, and their respective assigns, heirs or successors in interest, whether or not any reference to this Ahmanson Ranch

Covenant is contained in the instrument by which such person acquired an interest in the Ahmanson Ranch Covenant Properties.

16.4 Non-liability of City Officers and Employees.

No official, officer, employee, agent or representative of City, acting in his/her official capacity, shall be personally liable for any loss, costs, damage, claim, liability, or judgment, arising out of or connection to this Ahmanson Ranch Covenant, or for any act or omission on the part of City.

16.5 Covenant Against Discrimination.

Developer covenants by and for itself and any successors in interest that there shall be no discrimination against or segregation of any person, or group of persons on any basis listed in subdivision (a) or (d) of Section 12955 of the Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the Government Code, in the sale, lease, sublease, transfer, use, occupancy, tenure, or enjoyment of the Property, or any part thereof, nor shall Developer, or any person claiming under or through him or her, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use, or occupancy of tenants, lessees, subtenants, sublessees or vendees of the Property, or any part thereof. The foregoing covenants shall run with the land.

16.6 Attorney's Fees and Costs for Prevailing Party.

If either Party to this Ahmanson Ranch Covenant is required to initiate or defend, or is made a party to, any action or proceeding in any way connected with this Ahmanson Ranch Covenant, the Party prevailing in the final judgment in such action or proceeding, in addition to any other relief which may be granted, shall be entitled to reasonable attorney's fees. Attorney's fees shall include reasonable costs for investigating such action, conducting discovery, retaining expert witnesses, and all other necessary costs the court allows which are incurred in such litigation.

16.7 Severability.

If any term or condition of this Ahmanson Ranch Covenant is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions of this Ahmanson Ranch Covenant shall continue in full force and effect, to the extent that the invalidity or unenforceability does not impair the application of this Ahmanson Ranch Covenant to condition the use of the Ahmanson Ranch House most similar to those uses as of the Ahmanson Ranch Covenant Effective Date.

16.8 Time.

Time is of the essence in the performance of this Ahmanson Ranch Covenant and of each and every term and condition hereof as to which time is an element.

16.9 Recitals & Exhibits Incorporated.

The Recitals to this Ahmanson Ranch Covenant and all of the exhibits and attachments to this Ahmanson Ranch Covenant are, by this reference, incorporated into this Ahmanson Ranch Covenant and made a part hereof.

16.10 Authority to Execute; Representations and Warranties.

Developer warrants and represents that (i) it is duly organized and existing, (ii) it is duly authorized to execute and deliver this Ahmanson Ranch Covenant, (iii) by so executing this Ahmanson Ranch Covenant, Developer is formally bound to the provisions of this Ahmanson Ranch Covenant, (iv) Developer's entering into and performance of its obligations set forth in this Ahmanson Ranch Covenant do not violate any provision of any other agreement to which Developer is bound, and (v) there is no existing or threatened litigation or legal proceeding of which Developer is aware which could prevent Developer from entering into or performing its obligations set forth in this Ahmanson Ranch Covenant.

16.11 City Approvals and Actions.

Whenever a reference is made in this Ahmanson Ranch Covenant to an action or approval to be undertaken by the City, the City Manager or his or her authorized designee is authorized to act on behalf of the City unless this Ahmanson Ranch Covenant specifically provides otherwise, including but not limited to provisions in this Ahmanson Ranch Covenant when the City Council must review and take action, or the law requires otherwise. The City Manager shall have the authority to implement this Ahmanson Ranch Covenant, including the authority to negotiate and sign on behalf of the City implementing agreements and other documents, so long as the substantive provisions of this Ahmanson Ranch Covenant are maintained. Nothing in this Section limits or precludes the City Manager from presenting to the Planning Commission and/or City Council, as applicable, for review and consideration any matters to which the City Manager otherwise may act on behalf of City pursuant to this Section.

16.12 Governing Law.

The internal laws of the State of California shall govern the interpretation and enforcement of this Covenant without regard to conflicts of law principles. Any action at law or in equity brought by for the purpose of enforcing, construing, or interpreting the validity of this Covenant or any provision hereof shall be brought in the Superior Court of the State of California in and for the County of Riverside, or such other appropriate court in said county.

16.13 Termination of Original Covenant.

On and after the Ahmanson Ranch Covenant Effective Date, and pursuant to order from the Bankruptcy Court, the Original Covenant (as defined above) shall be deemed reinstated and amended as provided for in this Ahmanson Ranch Covenant.

Furthermore, City covenants and agrees that the Original Covenant is no longer of any force and effect, and on and after the Ahmanson Ranch Covenant Effective Date, it is expressly understood and agreed by the Parties that this Ahmanson Ranch Covenant (along with all other agreements, including the Reinstated Development Agreement, between City and Developer resulting from the purchase and sale of the Phase 1A Property vis-à-vis the Bankruptcy Lawsuit) governs the Ahmanson Ranch Covenant Properties.

16.14 Counterpart Signature Pages.

For convenience the Parties may execute and acknowledge this Covenant in counterparts and when the separate signature pages are attached hereto, shall constitute one and the same complete Covenant.

[end – signature page follows]

IN WITNESS WHEREOF, Developer and City have executed this Ahmanson Ranch Covenant as of the Ahmanson Ranch Covenant Effective Date.

"**DEVELOPER**"

TBE RE Acquisition Co II LLC, a Delaware liability company and affiliate of Turnbridge E Real Estate Fund II GP LLC, a Delaware liability company

Date:____________________, 2025

By: ____________________________
Its:____________________________
By: ____________________________
Its: ____________________________

"**CITY**"

CITY OF LA QUINTA, a California municipal corporation and charter city

Date:____________________, 2025

By: ____________________________
Jon McMillen, City Manager

ATTEST:

______________________________
Monika Radeva, City Clerk

APPROVED AS TO FORM
RUTAN & TUCKER, LLP

______________________________
William H. Ihrke, City Attorney

| |
|---|
| A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |

State of California )
County of Riverside )

On ________________________, before me, ________________________,
(insert name and title of the officer)
Notary Public, personally appeared ____________________________________, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature______________________________ (Seal)

A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )
County of Riverside )

On ________________________, before me, ____________________________,
(insert name and title of the officer)
Notary Public, personally appeared ________________________________________,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature______________________________ (Seal)

**EXHIBIT A**
**LEGAL DESCRIPTION AND DEPICTION OF LUXURY HOTEL PROPERTY**
**(DEVELOPER OWNED)**

[to be inserted]
[possible include depiction on plotted parcel map]

**EXHIBIT B-1**
**LEGAL DESCRIPTION OF GOLF COURSE**

[to be inserted]
[possible include depiction on plotted parcel map]

**EXHIBIT B-2**
**LEGAL DESCRIPTION OF CITY-OWNED AHMANSON RANCH PROPERTY**

[to be inserted]
[possible include depiction on plotted parcel map]

**EXHIBIT C**
**SITE MAPS**

(Attached)

GENERAL SITE MAP
(2025 SilverRock Master Plan)



[Site Maps Continue on Next Page]

# ANNOTATED SITE MAP
(2025 SilverRock Master Plan)




[Site Maps Continue on Next Page]

PHASE 1A DETAILED SITE MAP
(2025 SilverRock Master Plan)




[Site Maps Continue on Next Page]

## SITE MAP BY PLANNING AREAS (PAs)
(2025 SilverRock Master Plan)




[End of Site Maps]

# EXHIBIT B
# LEGAL DESCRIPTION OF CITY-OWNED GOLF COURSE PROPERTY

[to be inserted]
[possible include depiction of parcels on plotted parcel map]

**EXHIBIT C**
**SITE MAPS**

(Attached)

GENERAL SITE MAP
(2025 SilverRock Master Plan)



[Site Maps Continue on Next Page]

# ANNOTATED SITE MAP
(2025 SilverRock Master Plan)




[Site Maps Continue on Next Page]

## PHASE 1A DETAILED SITE MAP
(2025 SilverRock Master Plan)




[Site Maps Continue on Next Page]

## SITE MAP BY PLANNING AREAS (PAs)
(2025 SilverRock Master Plan)




[End of Site Maps]

# EXHIBIT K

## REINSTATED AND AMENDED COVENANT AFFECTING REAL PROPERTY (GOLF COURSE USE)

[Attached]

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO

City of La Quinta
78-495 Calle Tampico
La Quinta, CA 92253
Attn: City Clerk

Space Above This Line for Recorder's Use
(Exempt from Recording Fee per Gov't
Code §6103 and §27383)

**REINSTATED AND AMENDED
COVENANT AFFECTING REAL PROPERTY
(GOLF COURSE USE)**

**BY AND BETWEEN**

**THE**

**CITY OF LA QUINTA**

**AND**

**TBE RE ACQUISITION CO II LLC
AN AFFILIATE OF
TURNBRIDGE EQUITIES**

# TABLE OF CONTENTS

Page


REINSTATE AND AMENDED COVENANT AFFECTING REAL PROPERTY (GOLF COURSE USE) .......... 1

RECITALS .......... 1

AGREEMENT .......... 6

1. GENERAL PROVISIONS .......... 6
   - 1.1 Definitions .......... 6
   - 1.2 Effective Date .......... 8
   - 1.3 Amendment or Cancellation by Mutual Consent .......... 8
   - 1.4 Covenants Run With the Land; Expressed Condition of Golf Course Use in Grant Deeds and Other Similar Instruments; Rights of Reverter or Re-Entry .......... 9
   - 1.5 Recording of Covenant .......... 10
   - 1.6 Covenant Parcels Free of Mechanic's Liens .......... 10

2. USE GOLF COURSE AND ANCILLARY ACCESS AND MAINTENANCE .......... 11
   - 2.1 Golf Course Property .......... 11
   - 2.2 Golf Course Access/Operations Property .......... 12
   - 2.3 Luxury Hotel Property .......... 12
   - 2.4 Dedications and Improvements .......... 12

3. RESIDENT ACCESS AND USE OF THE GOLF COURSE .......... 12
   - 3.1 Resident Access Cards for Qualifying Persons .......... 12
   - 3.2 Terms and Conditions of Use; Revocable License .......... 13
   - 3.3 Obligation to Honor Valid Resident Access Cards .......... 14
   - 3.4 Minimum Privileges Granted to Valid Resident Access Card Holders .......... 14
   - 3.5 Collection and Receipt of Resident Rate Charges .......... 16
   - 3.6 Additional Privileges Permissible to Resident Access Card Holders .......... 16

4. DEFAULT AND REMEDIES .......... 16
   - 4.1 City Rights .......... 16
   - 4.2 Notice and Cure of Default .......... 17

5. MISCELLANEOUS .......... 17
   - 5.1 Notices, Demands and Communications Between the Parties .......... 17
   - 5.2 Force Majeure .......... 18
   - 5.3 Binding Effect .......... 18
   - 5.4 Third Party Beneficiaries .......... 18
   - 5.5 Non-liability of City Officers and Employees .......... 18
   - 5.6 Covenant Against Discrimination .......... 19
   - 5.7 Attorney's Fees and Costs for Prevailing Party .......... 19
   - 5.8 Severability .......... 19

TABLE OF CONTENTS

Page

5.9 Time ... 19
5.10 Recitals & Exhibits Incorporated ... 19
5.11 Authority to Execute; Representations and Warranties ... 19
5.12 City Approvals and Actions ... 20
5.13 Future Golf Covenant ... 20
Pursuant to the Reinstated Development Agreement and that certain agreement entitled Option to Purchase Real Property dated of or about even date as this Golf Course Covenant by and between City and Developer (the "Phase 2 Property Option Agreement"), Developer has an option to purchase certain real property that is part of the SilverRock Resort Area and owned in fee by City, defined in the Reinstated Development Agreement as the "Phase 2 Property" (also referred to as the "City-Owned Option Property") on which the Golf Course Driving Range Property is located ... 20
5.14 Governing Law ... 21
5.16 Counterpart Signature Pages ... 21

EXHIBIT A-1 LEGAL DESCRIPTION OF LUXUTY HOTEL PROPERTY ... 25

EXHIBIT A-2 LEGAL DESCRIPTION OF PUBLIC GOLF CLUBHOUSE PROPERTY ... 26

EXHIBIT B LEGAL DESCRIPTION OF CITY-OWNED GOLF COURSE PROPERTY ... 27

EXHIBIT C SITE MAPS ... 28

EXHIBIT D TEE TIME BLOCK SCHEDULE EXAMPLE ... 29

**REINSTATED AND AMENDED**
**COVENANT AFFECTING REAL PROPERTY**
**(GOLF COURSE USE)**

This REINSTATED AND AMENDED COVENANT AFFECTING REAL PROPERTY (GOLF COURSE USE) (the "**Golf Course Covenant**" or "**Covenant**") is entered into as of the ___ day of ___________, 2025 (the "**Golf Course Covenant Effective Date**"), by and between the CITY OF LA QUINTA, a California municipal corporation and charter city ("**City**"), and TBE RE Acquisition Co II LLC, a Delaware limited liability company and affiliate of Turnbridge Equities ("**Developer**"), with reference to the following:

**RECITALS:**

A. As of the Golf Course Covenant Effective Date, Developer has a legal or equitable interest in fee title to that certain real property and improvements thereon intended to be used in connection with construction and operation of (i) a flagship luxury hotel and related ancillary uses that include (but are not limited to) a spa and fitness area, restaurants, conference and banquet facilities, pool and recreational facilities, and "back-of-house" facility area that are part of the "**Luxury Hotel Project Component**" as defined in the Reinstated Development Agreement (defined below), and more particularly described in the legal description attached hereto as Exhibit A-1 and incorporated herein by this reference (the "**Luxury Hotel Property**"), and (ii) a golf clubhouse and pro shop for the Golf Course (defined below) to be open and available for use and services to the general public as well as guests and visitors to the luxury hotel and part of the "Public Golf Clubhouse Project Component" as defined in the Reinstated Development Agreement (defined below), and more particularly described in the legal description attached hereto as Exhibit A-2 and incorporated herein by this reference (the "**Public Golf Clubhouse Property**"). The Luxury Hotel Property and Public Golf Clubhouse Property are portions of real property and improvements thereon referred to as the "Phase 1 Property" as defined in the Reinstated Development Agreement (defined below) to which Developer also has a legal or equitable interest in fee title as of the Golf Course Covenant Effective Date. [NOTE: ONLY THE PARCELS WITH THE LUXURY HOTEL AND PUBLIC GOLF CLUBHOUSE ARE THE LEGAL DESCRIPTIONS TO BE ATTACHED AS EXHIBITS, AND NOT THE ENTIRETY OF THE PHASE 1A PROPERTY]

B. As of the Golf Course Covenant Effective Date, City owns all of the real property improved with the Golf Course and ancillary improvements and amenities, comprised of approximately 170+/- acres and more particularly described in Exhibit B attached hereto and incorporated herein by this reference (the "**City-Owned Golf Course Property**"). The City-Owned Golf Course Property consist of (i) the Arnold Palmer Classic Golf Course, commonly known as the SilverRock Golf Course (the "**Golf Course**"), (ii) access, operations, and maintenance parcels of real property appurtenant to the Golf Course (the "**Golf Course**

**Access/Operations Property**"), and (iii) location for a driving range to be part of the Golf Course (the "**Golf Course Driving Range Property**"). The Luxury Hotel Property, Public Golf Clubhouse, and City-Owned Golf Course Property are referred to herein as the "**Golf Course Covenant Properties.**" [NOTE: LEGAL DESCRIPTION FOR THE DRIVING RANGE MAY NEED TO BE ADJUSTED TO BE ONLY A PORTION OF EXISTING PARCEL(S) TO MATCH DEPICTION OF DRIVING RANGE LOCATION IN SITE PLAN]

C. On _______________, 2025, the La Quinta City Council adopted Ordinance No. ___, approving pursuant to applicable State and City laws that certain Reinstated and Amended Development Agreement, with reference date _____________, 2025, between City and Developer (the "**Reinstated Development Agreement**"). Among other terms and conditions, the Reinstated Development Agreement vests development and use rights to Developer, prescribes rights and obligations of Developer for the resumption and completion of construction, and the continuous operation and use, of specified "Project Components" that include, among others, a luxury hotel with related ancillary amenities and luxury single-family detached and condominium residential dwellings available for use as short-term vacation rentals, as more particularly set forth therein. The Reinstated Development Agreement governs Developer's development and use rights and obligations for the Phase 1 Property. The Reinstated Development Agreement was recorded in the Recorder's Office of or about even date as this Golf Course Covenant, with said Reinstated Development Agreement to remain with priority over this Golf Course Covenant.

D. Prior to City and Developer entering into this Golf Course Covenant (among other agreements and instruments), the following relevant history is hereby recited:

1. Except for portions of land previously transferred to SilverRock Development Company, LLC, a Delaware limited liability company (or one of its affiliated companies, which are referred to herein collectively as "**SDC**" or "**Debtor(s)**")[1] as explained below in the next Recital Subparagraph, City owns fee title to that certain real property of approximately 525 acres located at the southwest intersection of Jefferson Street and Avenue 52, in the City of La Quinta, California, generally

[1] Debtors were SilverRock Development Company, LLC and affiliated entities that, on August 5, 2024, filed for voluntary bankruptcy protection under chapter 11 of the U.S. Bankruptcy Code, with case number(s) identified in the Title of this Agreement along with the last four digits of each Debtor's federal tax identification number, as applicable, are: SilverRock Development Company, LLC (5730), RGC PA 789, LLC (5996), SilverRock Lifestyle Residences, LLC (0721), SilverRock Lodging, LLC (4493), SilverRock Luxury Residences, LLC (6598) and SilverRock Phase I, LLC (2247) (collectively, referred to herein as the "**Bankruptcy Lawsuit**" in the "**Bankruptcy Court**").

referred to as the "**SilverRock Resort Area**", which is depicted in the Site Maps (as defined herein), and subject to a Specific Plan adopted by the La Quinta City Council and enforceable as a land use governing document pursuant to the Planning and Zoning Law, California Government Code section 65000 et seq. (the "**SilverRock Specific Plan**");

2. On or about November 19, 2014, City and SDC entered into that certain Purchase, Sale, and Development Agreement (the "**Original SDC PSDA**"), pursuant to which, among other terms and conditions, City agreed to sell to SDC and SDC agreed to purchase from City specified parcels and planning areas (PAs) to thereafter construct, complete, and operate thereon a commercial project containing a luxury resort hotel and spa and associated branded luxury residential units, a lifestyle hotel and associated lifestyle branded residential units, a conference and shared service facility, a temporary and permanent clubhouse for the SilverRock Resort's Arnold Palmer Classic Golf Course, a mixed use village, a resort residential village, and associated amenities, all as further described in the Original SDC PSDA and referred to as various project components, as more particularly described therein. Concurrent with the Original SDC PSDA, on or about November 19, 2014, City and SDC entered into Development Agreement 2014-1001 (the "**Original SDC Development Agreement**") pursuant to the Development Agreement Law, which agreement, among other terms and conditions, required SDC to develop the planning areas and project components in accordance with the SDC PSDA, vested with SDC specified development obligations, memorialized the potential for the future acquisition of additional City-owned property in the SilverRock Resort Area as incorporated vis-à-vis the SDC PSDA, and subjected SDC to City's rights and oversight for those portions of the SilverRock Resort Area to be conveyed to SDC. After entering into the Original SDC PSDA and Original SDC Development Agreement, the following relevant events, very briefly summarized, occurred:

    i. Pursuant to the Original SDC PSDA, City and SDC had the authority to amend by mutual agreement of the parties. Between October 29, 2015, and November 16, 2023, City and SDC entered into five amendments thereto, dated October 29, 2015 ("**First Amendment**"), April 18, 2017 ("**Second Amendment**"), November 28, 2018 ("**Third Amendment**"), October 12, 2021 ("**Fourth Amendment**"), and November 16, 2023 ("**Fifth Amendment**," and the Original SDC PSDA as amended by all five amendments is referred to herein as the "**SDC PSDA**");

    ii. Pursuant to the SDC PSDA and consistent with boundaries established by applicable subdivision maps and lot line adjustments, City conveyed to SDC the Phase 1 Property for the pre-development, development, operation, and use of a

project that was eventually re-named "Talus" and consisted of the following project components (all as defined in the SDC PSDA): Luxury Hotel, Luxury Branded Residential Development, Lifestyle Hotel, Lifestyle Branded Residential Development, Conference and Shared Services Facility (including spa and other amenities), Permanent Golf Clubhouse, Promenade Mixed-Use Village/Resort Residential Village (on Planning Areas 7,8,9), as well as a specified Golf Course Realignment and corresponding Master Site Infrastructure Improvements (MSII). These project components on the Phase 1 Property, pursuant to the SDC PSDA, were divided into Phase 1A project components on the Phase 1A Property and the Phase 1B project components on the Phase 1B Property respectively, as described in the SDC PSDA;

iii. Pursuant to the Third and Fourth Amendments to the SDC PSDA, SDC commenced pre-development and development on the Property for the Phase 1A project components, which as of the Reference Date of this Agreement, in various degrees, were partially constructed after SDC failed to continue to make payments to various contractors, subcontractors, and other interested parties in the development of the Talus project. Multiple lawsuits, including lawsuits seeking payments pursuant to mechanic's lien or various loan or investment agreements, and a City lawsuit against SDC for unlawful and unapproved conveyances in secured interests or mechanic's liens, were filed against SDC;

iv. Pursuant to the requirements of the SD PSDA, the City and SDC entered into a "Covenant Affecting Real Property (Golf Course Use) By And Between The City Of La Quinta and SilverRock Development Company, LLC" (Riverside County Recorder No. 2017-0189004), which was recorded on May 11, 2007 (the "**Original Covenant**");

v. On August 5, 2024, SDC (Debtors) filed the Bankruptcy Lawsuit, and, pursuant to Bankruptcy Court-approved Bid Procedures, Debtors retained a Chief Restructuring Officer (Douglas Wilson Companies) and marketing professional (JLL) for the purposes of, among other items, marketing the sale of the Debtors estate (which and is primarily comprised of the Phase 1 Property) and soliciting proposals for the: (a) acquisition of the Debtors estate, (b) use, re-use, and/or substitution of the partially constructed improvements on the Property, (c) potential replacement project for a world-class

hotel and residential destination resort with related amenities on the Phase 1 Property that complement the existing Arnold Palmer Classic Golf Course surrounding the Property and real property owned by the City (defined below as the City-Owned Option Property), and (d) possible acquisition in the future of the City-Owned Option Property (defined below) in the SilverRock Resort Area (previously referred to as the Future Option Property in the SDC PSDA and generally referred to in the Bankruptcy Lawsuit and marketing materials as the "**Phase 2 Property**") for possible future development that would also complement a world-class hotel and residential destination resort;

3. Pursuant to Bankruptcy Court order, **Bankruptcy Lawsuit Docket No. [___]**, among other provisions: (i) Developer was authorized to purchase the Phase 1 Property, (ii) the Original SDC Development Agreement was required to be reinstated and amended and memorialized by the Reinstated Development Agreement, and (iii) An escrow to facilitated the purchase and sale of the Debtors' estate (which includes the Phase 1 Property) was authorized, which, among other terms and conditions, included the transfer of funds and recording of documents (such as the Reinstated Development Agreement).

E. Developer submitted a proposal in response to the marketing materials, and, pursuant to the Bankruptcy Court-approved Bid Procedures, Debtors and City approved Developer's proposal, which, among other terms and conditions, included a modified "**Project**" (as more particularly defined and memorialized in the Reinstated Development Agreement) on the Phase 1 Property as well as possible acquisition in the future of the City-Owned Option Property (also referred to therein as the Phase 2 Property) for possible future development that would also complement a world-class hotel and residential destination resort, all as more particularly set forth in the Reinstated Development Agreement.

F. The Reinstated Development Agreement and Specific Plan, among other land use governing documents, permits, and entitlements, are centered around the existing use and enjoyment, by residents, guests of the City, and members of the public, of the Golf Course in the SilverRock Resort Area.

G. This Golf Course Covenant is intended to and does bind City and any and all successors in interest to the City-Owned Golf Course Property (or any portion thereof), as more particularly set forth herein. Likewise, this Golf Course Covenant is intended to and does bind Developer and any and all successors in interest to the Luxury Hotel Property (or portion thereof) and the Public Golf Clubhouse Property (or portion thereof), as more particularly set forth herein.

H. Pursuant to and as more particularly set forth the Reinstated Development Agreement, upon conveyance of the City-Owned Golf Course Property from City

to Developer if Developer satisfies specified conditions in the Reinstated Development Agreement, Developer is required, among other provisions relating to land use covenants, to continuously operate and maintain, and have open and available for use and enjoyment, the Golf Course and ancillary improvements and amenities, as more particularly set forth in this Golf Course Covenant. As used in this Covenant with respect to Developer's maintenance and operation responsibilities, the terms "Golf Course" and "City Owned Golf Course Property," shall include the Golf Course Driving Range Property, but only to the extent City and Developer have entered into a mutually agreeable lease or license agreement with respect thereto, covering the time period between conveyance of the Golf Course to Developer and the conveyance of the Phase 2 Property to Developer, and addressing the terms and conditions of Developer's access, maintenance, and operations rights and responsibilities concerning the Golf Course Driving Range Property during that period. For the avoidance of doubt, the Golf Course Driving Range Property will not be conveyed to Developer with the other portions of the City Owned Golf Course Property, and, notwithstanding anything to the contrary in this Covenant, unless and until the Golf Course Driving Range Property is conveyed to Developer, Developer shall have no obligations with respect to maintaining and operating any portion of the Golf Course Driving Range Property unless and only to the extent expressly set forth in a future lease or license agreement entered into between the City and Developer.

I. This Covenant is being recorded to, among other things, ensure that the City-Owned Golf Course Property is maintained and used solely as a first-class golf course that is open to the public, and that residents of the City retain the same quality and level of access to the Golf Course that they have as of the Golf Course Covenant Effective Date which, generally, is one-third (1/3) of all tee times from the time the Golf Course opens until 1:00- p.m., which is approximately 15,000 rounds of golf, all as more specifically set forth in this Covenant.

J. City is the owner by dedication of those certain public streets located in the City and known as Avenue 52 and Jefferson Street. The portions of said public streets that are adjacent to the SilverRock Resort Area, as depicted on the Parcel Map, in addition to any and all other real property owned by the City for public use (collectively, the "**City-Benefitted Property**"), is benefited by this Covenant, and serves as the "benefited estate" for purposes of this Covenant, and the terms and conditions, as more particularly set forth herein. Furthermore, the Golf Course Covenant Properties are burdened by this Golf Course Covenant, serve as the "burdened estate" for purposes of this Golf Course Covenant, and are subject to its terms and conditions, as more particularly set forth herein.

**AGREEMENT:**

NOW, THEREFORE, in consideration of the foregoing Recitals, which are incorporated herein by this reference, the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged, the Parties do hereby agree as follows:

17. GENERAL PROVISIONS

17.1 Definitions. In addition to the terms that may be defined elsewhere in this Covenant, the following terms when used in this Covenant shall be defined as follows:

17.1.1 "**City**" means the City of La Quinta, a charter city and municipal corporation, including each and every agency, department, board, commission, authority, employee, and/or official acting under the authority of the City, including without limitation the City Council and the Planning Commission.

17.1.2 "**City-Benefitted Property**" shall have the meaning in Recital J of this Golf Course Covenant.

17.1.3 "**City Council**" means the City Council of the City and the legislative body of the City pursuant to California Government Code Section 65867.

17.1.4 "**City Manager**" means the individual duly appointed to the position of City Manager of City, or his or her authorized designee.

17.1.5 "**City-Owned Golf Course Property**" shall have the meaning in Recital B of this Golf Course Covenant.

17.1.6 "**Covenant**" and "**Golf Course Covenant**" means this Reinstated and Amended Golf Course Covenant Affecting Real Property (Golf Course Use).

17.1.7 "**Daily Resident Rate Cap**" shall have the meaning set forth in Section 3.4.2(B) of this Covenant.

17.1.8 "**Developer**" means the Developer identified in the Preamble of this Golf Course Covenant.

17.1.9 "**Effective Date**" shall the "Golf Course Covenant Effective Date."

17.1.10 "**Golf Course**" means the SilverRock Resort's Arnold Palmer Classic Course and all operations related thereto, in its current location, as of the Golf Course Effective Date of this Covenant, subject to reconfiguring and realignment pursuant to any reconfiguring approved by the City from time to time.

17.1.11 "**Golf Course Access/Operations Property**" shall have the meaning in Recital B of this Golf Course Covenant.

17.1.12 "**Golf Course Covenant**" means this Reinstated and Amended Golf Course Covenant Affecting Real Property (Golf Course Use).

17.1.13 "**Golf Course Covenant Properties**" shall have the meaning in Recital B of this Golf Course Covenant.

17.1.14 "**Golf Course Driving Range Property**" shall have the meaning in Recital B of this Golf Course Covenant.

17.1.15 "**Luxury Hotel Property**" shall have the meaning in Recital A of this Golf Course Covenant.

17.1.16 "**Parties**" means collectively Developer and City, and their respective successors and assigns. Each may be referred to in the singular as a "Party".

17.1.17 "**Project Component**" shall have the same meaning as defined in the Reinstated Development Agreement.

17.1.18 "**Public Golf Clubhouse Property**" shall have the meaning in Recital A of this Golf Course Covenant

17.1.19 "**Recorder's Office**" means the Riverside County, California, Office of Official Records.

17.1.20 "**Reinstated Development Agreement**" shall have the meaning in Recital C of this Golf Course Covenant.

17.1.21 "**Resident Access Card(s)**" means cards issued by the City to qualifying persons, based on establishing a residence in the City among other criteria as the City may establish from time to time, that grant such cardholders preferred rates of play and scheduling of tee times at the Golf Course.

17.1.22 "**Resident Base Rate**" means the rate charged to a holder of a valid Resident Access Card for each round of golf played at the Golf Course as either (i) the rate set by the City Council for so long as the City owns the Golf Course Parcels, or (ii) the rate set by the City Council as of the date of the conveyance of any right, title or interest in the Golf Course Parcels to Developer or any other third party that is not the City or City-affiliated agency, as may be modified as set forth this Golf Course Covenant.

17.1.23 "**Resident Rate**" means the rate charged to each holder of a valid Resident Access Card for each round of golf played at the Golf Course, as further governed under Section 3.4.2 of this Golf Course Covenant.

17.1.24 "**Resident Rate Annual Percentage Increase**" shall have the meaning set forth in Section 3.4.2(C) of this Golf Course Covenant.

17.1.25 "**Resident Rate Ten-Year Adjustment**" shall have the meaning set forth in Section 3.4.2(D) of this Golf Course Covenant

17.1.26 "**SilverRock Resort Area**" has the same meaning in the Reinstated Development Agreement and Recital C(1), which refers to the approximately 525 acres of real property located at the southwest intersection of Jefferson Street and Avenue 52 in the City of La Quinta, California 92253, depicted in the Site Maps.

17.1.27 "**Site Map(s)**" means the maps of the SilverRock Resort Area, which is attached hereto as Exhibit C and incorporated herein by this reference.

17.1.28 "**Specific Plan**" means the SilverRock Resort Specific Plan, approved by the City Council of City on July 18, 2006, as may be amended from time to time.

17.1.29 "**Tee Time Block Schedule Example**" shall have the meaning in Section 3.4.1 of this Golf Course Covenant, and as depicted in Exhibit D attached hereto and incorporated herein by reference.

17.2 Effective Date.

This Golf Course Covenant shall be effective and of full force and effect upon complete execution by the Parties, which shall be inserted in the preamble, and shall be perfected as binding against any and all owners of the Golf Course Covenant Properties upon recording in the Recorder's Office.

17.3 Amendment or Cancellation by Mutual Consent.

Except as expressly allowed herein, this Golf Course Covenant shall not be amended or canceled in whole or in part without the prior written consent of the City, and, except when the City Manager may amend this Covenant as expressly allowed herein, any cancellation or amendment of this Golf Course Covenant shall require the approval of the City Council by not less than a majority vote of the total membership.

17.4 Covenants Run With the Land; Expressed Condition of Golf Course Use in Grant Deeds and Other Similar Instruments; Rights of Reverter or Re-Entry.

In any grant deed or other instrument conveying any right, title, or interest in any or all of the Golf Course Covenant Properties (or portion thereof) from the grantor (including the City) to the grantee (including Developer), words shall be included in such grant deed or other instrument signifying that such right, title, or interest, and any such estate created by such conveyance, shall be subject to the terms and conditions of this Golf Course Covenant. Furthermore, such grant deed or other instrument shall expressly condition that the City, and its heirs and assigns, shall have a right of reverter and/or right to re-enter any or all of the City-Owned Golf Course Property upon its ceasing to be used for a golf course pursuant to the terms and conditions of this Golf Course Covenant.

This Golf Course Covenant is intended to be and shall be construed as a restrictive covenant that limits, restricts, and burdens the use of the Golf Course Covenant Properties. The City, as owner in fee of the City-Owned Golf Course Property, and as owner of all Golf Course Covenant Properties when the prior Covenant Affecting Real Property (Golf Course Use) was originally recorded prior to it being reinstated by the Bankruptcy Court vis-à-vis this Golf Course Covenant, hereby declares that this Golf Course Covenant, and the covenants, conditions, and restrictions of use on the Golf Course Covenant Properties as set forth herein, is intended to and shall run with the land in perpetuity, and each and every successor of the City and Developer that has any ownership interest or right of ownership interest in the Golf Course Covenant Properties (or portions thereof), including Developer, shall be subject to this Golf Course Covenant, which is intended to be and shall be construed as placing a reasonable burden on the use of the Golf Course Covenant Properties, which, among other provisions, recognize that the City-Owned Golf Course Property was developed for use and enjoyment as the Golf Course for the benefit of the Luxury Hotel Property and the residents of the City of La Quinta. To the maximum extent permitted by law, this Covenant shall be construed as an expressed, valid, and enforceable deed restriction, restrictive covenant, or other similarly described encumbrance that runs with the Golf Course Covenant Properties. This Covenant shall be binding upon any person or entity that acquires any right, title, or interest in or to any portion or all of the Golf Course Covenant Properties.

Furthermore, this Golf Course Covenant is designed to create equitable servitudes and covenants running with the land, in accordance with the provisions of Civil Code Section 1468. The covenants, conditions, restrictions, reservations, equitable servitudes, liens, and charges set forth herein shall run with the Golf Course Covenant Properties, as the "burdened property," and shall be binding upon all persons or entities having any right, title or interest in the Golf Course Covenant Properties (or portion thereof) and their heirs, successive owners and assigns, and shall be binding upon the Developer, and its successors and assigns. Furthermore, the covenants, conditions, restrictions, reservations, equitable servitudes, liens, and charges set forth herein shall run with the City-Benefitted Property, as the "benefitted property," and shall inure to the benefit of the City and its successors and assigns, and may be enforced by the City and its successors and assigns. The Developer hereby declares its understanding and intent that the burden of the covenants set forth herein touch and concern the land and that the Developer's interest in the Golf Course Covenant Properties is rendered less valuable thereby. The Developer hereby further declares its understanding and intent that the benefit of such covenants touch and concern the land by enhancing and increasing the enjoyment and use of the Golf Course Covenant Properties and by furthering public purposes for the City.

In amplification and not in restriction of the provisions hereinabove, it is intended and agreed that the City is deemed a beneficiary of the covenants provided herein both for and in its own right and also for the purposes of protecting the interests of the community. All covenants without regard to technical classification or designation shall be binding for the benefit of the City and such covenants shall run in favor of the City, without regard to whether the City is or remains the owner of the City-Benefitted

Property or of any land or interest therein to which such covenants relate. However, all such covenants and restrictions shall be deemed to run in favor of all real property owned by the City, which real property shall be deemed the benefited property of such covenants. The City shall have the right, in the event of any breach of this Covenant, to exercise all rights and remedies, and to maintain any action at law or in equity or other proper proceeding to enforce the curing of such breach of this Covenant.

17.5 Recording of Covenant.

Upon complete execution and notarizing of this Golf Course Covenant, Developer shall record or cause to be recorded in the Recorder's Office this Golf Course Covenant. The Covenant shall be recorded against each and every one of the Golf Course Covenant Properties and the City-Benefitted Property. This Covenant shall be recorded as provided for in the Reinstated Development Agreement, and this Covenant shall have priority over and shall not be made subordinate to any mortgage, deed of trust, or other encumbrance recorded against the Golf Course Covenant Properties.

17.6 Covenant Parcels Free of Mechanic's Liens.

The owner of the Golf Course Covenant Properties (or any portion thereof) shall pay when due all claims for labor performed and materials furnished in connection with the Golf Course Covenant Properties during the period of its ownership. No mechanics', materialmen's or other professional services liens (as contrasted with consensual monetary liens such as construction and/or permanent financing approved by the City and subject to this Golf Course Covenant) shall be permitted against the Golf Course Covenant Properties (or any portion thereof) for any work done or materials furnished in connection with the performance of any contractor or construction work to be completed on the Golf Course Covenant Properties; provided, however, that the owner of the Golf Course Covenant Properties (or portion thereof) may contest the validity of any such lien, but upon a final determination of the validity thereof, the owner of the Golf Course Covenant Properties (or portion thereof) subject to such a lien shall cause the lien to be satisfied and released of record. The owner of the Golf Course Covenant Properties (or portion thereof) shall, within thirty (30) days after receipt of written notice of any encumbrance by any such lien or claim of lien, (i) cause any such outstanding lien or claim of lien to be released of record or transferred to bond in accordance with applicable law, or (ii) give such assurance as would enable a title insurance company to insure over such lien or claim of lien.

18. USE GOLF COURSE AND ANCILLARY ACCESS AND MAINTENANCE

18.1 Golf Course Property.

The City-Owned Golf Course Property shall be used as a golf course with allowance for appurtenant maintenance yard and facilities, and related golf course amenities, according to the following:

(A) The Golf Course shall be open and available for play as was customarily the practice as of the Golf Course Covenant Effective Date. In explanation of the preceding sentence, the hours of operation, closures for routine maintenance or periodic upgrades, and other factors relating to the services and operations provided, while the Golf Course was open and while it was closed, shall be similar to the practices used annually and regularly, before the Golf Course Covenant Effective Date.

(B) The Golf Course at all times shall be of the caliber, reputation, difficulty, design (including any allowable golf course improvements or realignment design), maintenance, and general "golf experience" that the Golf Course has as of the Golf Course Covenant Effective Date. The Golf Course shall maintain a designation as an "Arnold Palmer" (or successor name) and/or a similar caliber designation or better golf course.

(C) The City-Owned Golf Course Property shall be available for use and enjoyment by City residents and the general public pursuant to the terms and conditions of this Golf Course Covenant, and any other applicable laws, the Reinstated Development Agreement, the rules and policies imposed by the operator of the Golf Course, and any and all City permits, licenses, approvals, and entitlements, and other agreements relating to the Golf Course.

(D) The maintenance yard and facilities shall be and remain on the parcel of the City-Owned Golf Course Property as of the Golf Course Covenant Effective Date.

(E) The Golf Course shall be open and available for use on such days and times as generally were in practice as of the Golf Course Covenant Effective Date, subject to occasional closures or interruption for tournaments and special events, as customary in the industry for golf courses of similar caliber.

(F) The Golf Course shall have a clubhouse that shall be open to the public. The clubhouse shall have at a minimum the same services and operations (such as food and beverage services, golf equipment and clothing, golf carts, and other similar amenities customarily available at a first-class golf course and resort) as were available as of the Golf Course Covenant Effective Date with expectation of improvement pursuant to Developer's proposed improvements to the Public Golf Clubhouse under the Reinstated Development Agreement. The clubhouse shall be constructed, operated, and maintained in accordance with all applicable laws, the Reinstated Development Agreement, and any and all City permits, licenses, approvals, and entitlements, and any other agreements relating to the clubhouse.

18.2 Golf Course Access/Operations Property.

The Golf Course Access/Operations Property, or alternative access to and from the City-Benefitted Property with comparable functionality, shall be used and be available for use in the same manner as they were used and available for use as of the Golf Course Covenant Effective Date, according to the following:

(A) The Golf Course shall have access (vehicular and pedestrian ingress and egress) from the public street segments comprising a portion of the City-Benefitted Property at all times on, over, and through some or all of Golf Course Access/Operations Property; provided, however, such access may be modified pursuant to a subdivision map or other City action, pursuant to any applicable law, that maintains access to the Golf Course from the public street segments comprising a portion of the City-Benefitted Property.

(B) The Golf Course Access/Operations Property, or alternative access to and from the City-Benefitted Property with comparable functionality, shall allow access to the Golf Course for City residents, City officials and employees, and any and all other guests of the Golf Course Property.

18.3 Luxury Hotel Property.

The Luxury Hotel Property shall be used in connection with the Golf Course. Prior to and after the completion of construction of the Luxury Hotel, as evidenced by the Certificate of Completion for the Luxury Hotel Project Component as provided in the Reinstated Development Agreement, this Golf Course Covenant shall be binding against the Luxury Hotel Property.

18.4 Dedications and Improvements.

Nothing in this Golf Course Covenant shall release or relieve Developer from making any offers of dedications to the City or other applicable public agency, or complete those public improvements in connection with the development of the SilverRock Resort Area, as may be required by any conditions of approval, parcel map, or any other requirement imposed by the City.

19. RESIDENT ACCESS AND USE OF THE GOLF COURSE

19.1 Resident Access Cards for Qualifying Persons.

City shall provide a process and program available to qualifying persons to apply for and receive Resident Access Cards. City may contract with Developer or a third party operator of the Golf Course for the administration of the Resident Access Card process and program. City shall establish eligibility requirements, which may be modified from time to time in City's reasonable discretion and subject to the terms and conditions of this Golf Course Covenant, under which City shall administer and issue to qualifying persons the Resident Access Cards. The eligibility requirements shall be the same as were in place as of the Golf Course Covenant Effective Date unless City

modifies those requirements pursuant to this Golf Course Covenant. Eligibility requirements applicable to all Resident Access Cards, which may be modified by City, include but are not limited to:

(A) Reasonable methods to prove and verify residency in the City, such as a requirement that an applicant for a Resident Access Card provide to the City a property tax bill or residential lease with the applicant's name on that property tax bill or residential lease.

(B) A minimum period during which an applicant for a Resident Access Card must be physically present in the City at a residence in the City, such as a requirement that an applicant is or plans to be physically present in the City for at least six months of each year.

19.2 Terms and Conditions of Use; Revocable License.

All Resident Access Cards shall be a license subject to revocation pursuant to terms and conditions established from time to time in City's reasonable discretion and subject to the terms and condition of this Golf Course Covenant. The terms and conditions attached to all currently issued Resident Access Cards as of the Golf Course Covenant Effective Date shall be the same as were in place as of the Golf Course Covenant Effective Date, and the terms and conditions for all Resident Access Cards applied for and issued after the Golf Course Covenant Effective Date shall be the same as were in place as of the Golf Course Covenant Effective Date unless the City modifies those requirements pursuant to this Golf Course Covenant. Terms and conditions applicable to all Resident Access Cards, which may be modified from time to time by City, shall include:

(A) The period for which a Resident Access Card remains valid, which shall be three (3) years from date of issuance.

(B) The cost to purchase a Resident Access Card, which, as of the Golf Course Covenant Effective Date, is One Hundred Fifty Dollars ($150.00). The cost to purchase a Resident Access Card may increase no more than Ten Dollars ($10) per calendar year, commencing in the year of the Effective Date of this Covenant.

(C) If City conveys all right, title, and interest in the City-Owned Golf Property to Developer or any successor in interest, the City Council shall retain the right to set an amount for the purchase of a Resident Access Card that would be the same or similar to the setting of an amount that would be consistent with the setting of such amount as of the Golf Course Covenant Effective Date.

19.3 Obligation to Honor Valid Resident Access Cards.

The owner of the City-Owned Golf Course Property (or any portion thereof, including the Golf Course), including Developer and any successor in interest, shall

honor any and all valid Resident Access Cards and, at a minimum, shall honor the privileges set forth in this Golf Course Covenant to any qualifying person holding a valid Resident Access Card.

19.4 Minimum Privileges Granted to Valid Resident Access Card Holders.

If the City owns the Golf Course, the minimum privileges established by the City as of the Effective Date of this Golf Course Covenant shall apply to each qualifying person who holds a valid Resident Access Card. If the City is not the owner of the Golf Course, then each qualifying person who holds a valid Resident Access Card shall have the following privileges available for use and enjoyment of the Golf Course:

19.4.1 Booking Tee Times. Until such time as City is no longer the owner of the Golf Course, either of the processes set forth in paragraphs (A) and (B) below shall be available to a holder of a valid Resident Access Card when booking a tee time. At such time as City is no longer the owner of the Golf Course, this Golf Course Covenant shall be automatically modified to delete paragraph (A) below, and thereafter the process set forth in paragraph (B) below shall be available to a holder of a valid Resident Access Card when booking a tee time.

(A) The same process and ability to book a tee time as in place as of the Effective Date of this Golf Course Covenant; and/or

(B) No less than one week in advance of the day of play, blocks of reserved tee times representing no less than one-third (1/3) of all tee times from the Golf Course's opening time until 1:00 p.m. each day the Golf Course is open for play, reasonably and proportionately scheduled throughout that opening/1:00 p.m. time period, shall be made available to holders of valid Resident Access Cards.

In the absence of a modified procedure approved by City, the time at which a tee time may be booked shall commence at 6:00 a.m. on the day by which a reservation must be made; for example, if the holder of a Resident Access Card wants to book a tee time for a Saturday pursuant to the one (1)-week advance reservation provision in Section 3.4.1(B) above, the earliest time at which to make that reservation would be 6:00 a.m. the Saturday before the Saturday of play.

Subject to the terms and conditions in this Section 3.4.1, the scheduling of tee times, and the implementation of blocks of reserved tee times, shall follow or be similar to the schedule matrix set forth in the Tee Time Block Schedule Example. Notwithstanding anything to the contrary in this Golf Course Covenant, tournaments and other similar group play shall take priority over other reservations, provided that the "one-third (1/3) of all tee times" requirement described in paragraph (B) above is satisfied on a monthly basis.

In the absence of a modified procedure approved by the City, tee times that have been "blocked-off" for Resident Access Card holders, but have not been booked by a Resident Access Card holder two (2) days prior to the date of play, may be made

available to the general public (including guests at the SilverRock Resort) on a first-come, first-served basis.

19.4.2 Reduced Rate for Golf Course Play. The rate charged to each holder of a valid Resident Access Card for each round of golf played at the Golf Course (the "**Resident Rate**") shall be governed according to the following:

(A) In the absence of a different Resident Rate charged pursuant to this Golf Course Covenant, the Resident Rate shall be the Resident Base Rate.

(B) The Resident Rate shall not exceed, on any given day the Golf Course is open for play, fifty percent (50%) of the actual combined rate paid by hotel guests staying at any hotel at the SilverRock Resort Area and by the general public (who are not holders of Resident Access Cards) for that same day that the Golf Course is open for play, as determined by the Developer or operator of the Golf Course (if not Developer) in their sole and absolute discretion; for example (and example only), if the actual combined rate for hotel guests and general public playing on March 1 of any given year is $100, the maximum Resident Rate for that March 1 is $50. The fifty percent (50%) cap described in this paragraph is referred to as the "**Daily Resident Rate Cap.**" The Daily Resident Rate Cap shall only apply for golf course play during the "prime season months" from November 1 through March 31 of every year.

(C) Subject to the Daily Resident Rate Cap, the Resident Rate may increase annually by a specified percentage (the "**Resident Rate Annual Percentage Increase**"). In the absence of a different annual percentage increase approved by the City, the percentage increase shall not be more than a three percent (3%) increase per year, unless the City and Developer agree to reset the Resident Base Rate to a market rate at such time. For example (and example only) if Resident Base Rate is $60, the following Resident Rates would apply for the following years 1-10 to the extent the Resident Base Rate has not be reset to a market rate by the mutual agreement of the City and Developer:

| | | YEAR | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Season** | | **base** | **1** | **2** | **3** | **4** | **5** | **6** | **7** | **8** | **9** | **10** |
| **PEAK** | 3% | $60 | $62 | $64 | $66 | $68 | $70 | $72 | $74 | $76 | $78 | $81 |
| **SHOULDER** | 3% | $49 | $50 | $52 | $54 | $55 | $57 | $59 | $60 | $62 | $64 | $66 |
| **SUMMER** | 3% | $33 | $34 | $35 | $36 | $37 | $38 | $39 | $41 | $42 | $43 | $44 |

Notwithstanding the foregoing, prior to the conveyance of the Golf Course from the City to the Developer, the City and Developer shall meet and in good faith agree upon a maximum Resident Rate, taking into account the cost of capital improvements made or to be made to the Golf Course by Developer.

(D) Subject to the Daily Resident Rate Cap, after the first consecutive ten (10)-year period commencing from conveyance of all right, title, and interest in the Golf Course from City to Developer or any successor in interest, any increase in the Resident Rate starting in year 11 may not exceed the percentage increase in the Consumer Price Index (or similar nationally recognized inflationary index) (the "**CPI**") for All Urban Consumers, not seasonally adjusted, for the Riverside-San Bernardino-Ontario statistical area (or subsequent similar index for similar area in which City is located), averaged for the twelve (12) month period commencing fifteen (15) months prior to the applicable ten-year adjustment date and ending three (3) months prior to that applicable ten-year adjustment date (the "**Resident Rate Ten-Year Adjustment**"). Each year after the Resident Rate Ten-Year Adjustment, any annual increase in the Resident Rate may not exceed the CPI.

(E) There shall be no "service charge," or any other amount added to the Resident Rate permitted under this Covenant. In explanation of the foregoing, there shall be no "weekend rate" or other kind of "service charge" added to the Resident Rate.

(F) For purposes of determining any increase or adjustment to the Resident Rate, each year shall be based on a calendar year. The first day on which any increase in the Resident Rate may occur is January 1, and for purposes of any increase in the Resident Base Rate, the first day on which such an increase may occur is January 1 of the year following the year of the Golf Course Covenant Effective Date.

19.5 <u>Collection and Receipt of Resident Rate Charges.</u>

The owner of the Golf Course shall have the obligation to collect and right to keep moneys charged at Resident Rates; provided, however, if the City owns the Golf Course but contracts with Developer or a third party operator of the Golf Course for the administration of the Resident Access Card process and program, Developer and/or the third party operator of the Golf Course shall have the obligation to collect and right to keep moneys charged at Resident Rates.

19.6 <u>Additional Privileges Permissible to Resident Access Card Holders.</u>

Nothing in this Covenant prevents the owner of the City-Owned Golf Course Property (or portion thereof) or manager of the Golf Course from granting additional privileges to holders of valid Resident Access Cards, including but not limited to discounts on food and merchandise available at the clubhouse.

20. DEFAULT AND REMEDIES.

20.1 City Rights.

In the event of failure by Developer or any successor in interest that has any ownership interest in the Golf Course Covenant Properties (or any portion thereof) to perform any material term or provision of this Golf Course Covenant, the City shall have those rights and remedies provided in this Golf Course Covenant and shall have any and all rights and remedies available at law or in equity, including but not limited to immediate and permanent injunctive relief.

20.2 Notice and Cure of Default.

Upon the receipt of the notice of default by the City, the defaulting party shall promptly commence to cure, correct, or remedy the identified default at the earliest reasonable time after receipt of the notice of default and shall complete the cure, correction or remedy of such default not later than thirty (30) days after receipt of the notice of default, or, for such defaults that cannot reasonably be cured, corrected or remedied within thirty (30) days, such Party shall commence to cure, correct, or remedy such default within such thirty (30) day period, and shall continuously and diligently prosecute such cure, correction or remedy to completion, provided that such cure, correction or remedy is completed within ninety (90) days of the expiration of the initial thirty (30) day cure period.

21. MISCELLANEOUS

21.1 Notices, Demands and Communications Between the Parties.

Any approval, disapproval, demand, document or other notice ("**Notice**") which either Party may desire to give to the other Party under this Golf Course Covenant must be in writing and shall be sufficiently given if (i) delivered by hand, (ii) delivered by reputable same-day or overnight messenger service that provides a receipt showing date and time of delivery, or (iii) dispatched by registered or certified mail, postage prepaid, return receipt requested, to the principal offices of City and Developer at the addresses specified below, or at any other address as that Party may later designate by Notice.

| | |
|---|---|
| To City: | City of La Quinta<br>78-495 Calle Tampico<br>La Quinta, California 92253<br>Attn: City Manager |
| With a copy to: | Rutan & Tucker, LLP<br>18575 Jamboree Road, 9th Floor<br>Irvine, California 92612<br>Attn: William H. Ihrke |

Email: bihrke@rutan.com

To Developer:

TBE RE Acquisition Co II LLC
c/o Turnbridge Equities
4 Bryant Park, Suite 200
New York, New York 10018
Attention: General Counsel and Michael Gazzano
Email: jw@turnbridgeeq.com and mg@turnbridgeeq.com

with a copy to:
DLA Piper
1251 Avenue of the Americas
New York, New York 10020
Attention: Todd Eisner
Email: todd.eisner@us.dlapiper.com

with a copy to:
Procopio
200 Spectrum Center Drive, Suite 1650,
Irvine, CA 92618
Attn: James Vaughn
Email: james.vaughn@procopio.com

Any written notice, demand or communication shall be deemed received immediately if personally delivered or delivered by delivery service, and shall be deemed received on the third day from the date it is postmarked if delivered by registered or certified mail.

21.2 Force Majeure.

Notwithstanding any other provision set forth in this Golf Course Covenant to the contrary, in no event shall a Party be deemed to be in Default of its obligations set forth herein where delays or failures to perform are due to a Force Majeure, as defined in the Reinstated Development Agreement. Notwithstanding anything to the contrary in this Golf Course Covenant, an extension of time for any such cause shall only be for the period of the enforced delay and shall commence to run from the time of the commencement of the cause, if notice by the Party claiming such extension is sent to the other Party within a reasonable time following the commencement of the cause, which notice requirement shall be deemed waived if the other Party is aware of the facts giving rise to the Force Majeure. Upon receiving notice of a Force Majeure or becoming aware of the facts giving rise thereto, the Parties shall meet and confer in good faither to determine the appropriate period of Force Majeure delay, and document same in writing. Times of performance under this Golf Course Covenant may also be extended in writing by the mutual agreement of City and Developer.

21.3 Binding Effect.

This Golf Course Covenant, and all of the terms and conditions hereof, shall be binding upon and inure to the benefit of the City, any subsequent owner of all or any portion of the Golf Course Covenant Properties, and their respective assigns, heirs or successors in interest, whether or not any reference to this Golf Course Covenant is contained in the instrument by which such person acquired an interest in the Golf Course Covenant Properties.

21.4 Third Party Beneficiaries.

A holder of a valid Resident Access Card shall be deemed and is expressly a third party beneficiary under this Golf Course Covenant, and shall have the right, but not the obligation, to seek enforcement of this Golf Course Covenant's terms and conditions. Except for the Parties to this Golf Course Covenant, which includes any successors in interest, and holders of valid Resident Access Cards, no other persons or entities have any right of action of any kind under this Golf Course Covenant.

21.5 Non-liability of City Officers and Employees.

No official, officer, employee, agent or representative of City, acting in his/her official capacity, shall be personally liable for any loss, costs, damage, claim, liability, or judgment, arising out of or connection to this Golf Course Covenant, or for any act or omission on the part of City.

21.6 Covenant Against Discrimination.

Developer covenants by and for itself and any successors in interest that there shall be no discrimination against or segregation of any person, or group of persons on any basis listed in subdivision (a) or (d) of Section 12955 of the Government Code, as those bases are defined in Sections 12926, 12926.1, subdivision (m) and paragraph (1) of subdivision (p) of Section 12955, and Section 12955.2 of the Government Code, in the sale, lease, sublease, transfer, use, occupancy, tenure, or enjoyment of the Property, or any part thereof, nor shall Developer, or any person claiming under or through him or her, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use, or occupancy of tenants, lessees, subtenants, sublessees or vendees of the Property, or any part thereof. The foregoing covenants shall run with the land.

21.7 Attorney's Fees and Costs for Prevailing Party.

If either Party to this Golf Course Covenant is required to initiate or defend, or is made a party to, any action or proceeding in any way connected with this Golf Course Covenant, the Party prevailing in the final judgment in such action or proceeding, in addition to any other relief which may be granted, shall be entitled to reasonable attorney's fees. Attorney's fees shall include reasonable costs for investigating such action, conducting discovery, retaining expert witnesses, and all other necessary costs the court allows which are incurred in such litigation.

21.8 Severability.

If any term or condition of this Golf Course Covenant is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions of this Golf Course Covenant shall continue in full force and effect, to the extent that the invalidity or unenforceability does not impair the application of this Golf Course Covenant to condition the use of the Golf Course for a golf course and the Golf Course Access/Operations Property to provide access and operations for use as a golf course.

21.9 Time.

Time is of the essence in the performance of this Golf Course Covenant and of each and every term and condition hereof as to which time is an element.

21.10 Recitals & Exhibits Incorporated.

The Recitals to this Golf Course Covenant and all of the exhibits and attachments to this Golf Course Covenant are, by this reference, incorporated into this Golf Course Covenant and made a part hereof.

21.11 Authority to Execute; Representations and Warranties.

Developer warrants and represents that (i) it is duly organized and existing, (ii) it is duly authorized to execute and deliver this Golf Course Covenant, (iii) by so executing this Golf Course Covenant, Developer is formally bound to the provisions of this Golf Course Covenant, (iv) Developer's entering into and performance of its obligations set forth in this Golf Course Covenant do not violate any provision of any other agreement to which Developer is bound, and (v) there is no existing or threatened litigation or legal proceeding of which Developer is aware which could prevent Developer from entering into or performing its obligations set forth in this Golf Course Covenant.

21.12 City Approvals and Actions.

Whenever a reference is made in this Golf Course Covenant to an action or approval to be undertaken by the City, the City Manager or his or her authorized designee is authorized to act on behalf of the City unless this Golf Course Covenant specifically provides otherwise, including but not limited to provisions in this Golf Course Covenant when the City Council must review and take action, or the law requires otherwise. The City Manager shall have the authority to implement this Golf Course Covenant, including the authority to negotiate and sign on behalf of the City implementing agreements and other documents, so long as the substantive provisions of this Golf Course Covenant are maintained. Nothing in this Section limits or precludes the City Manager from presenting to the Planning Commission and/or City Council, as applicable, for review and consideration any matters to which the City Manager otherwise may act on behalf of City pursuant to this Section.

21.13 Future Golf Covenant.

Pursuant to the Reinstated Development Agreement and that certain agreement entitled Option to Purchase Real Property dated of or about even date as this Golf Course Covenant by and between City and Developer (the "**Phase 2 Property Option Agreement**"), Developer has an option to purchase certain real property that is part of the SilverRock Resort Area and owned in fee by City, defined in the Reinstated Development Agreement as the "Phase 2 Property" (also referred to as the "City-Owned Option Property") on which the Golf Course Driving Range Property is located. City and Developer acknowledge and agree that in the event Developer timely exercises the option pursuant to the Phase 2 Property Option Agreement, a subdivision map may be processed and recorded to subdivide the specific portion of the Phase 2 Property that constitutes the Golf Course Driving Range Property improved with the Golf Course Driving Range. Concurrently with, and as a condition to, City's conveyance of the Golf Course Driving Range Property to Developer as part of the Phase 2 Property Option Agreement, City and Developer shall execute and record against the newly subdivided Golf Course Driving Range Property an amendment to this Golf Course Covenant (and any other requested releases or terminations) that releases the portions of the Phase 2 Property that are not the newly subdivided Golf Course Driving Range Property, and ensures that City residents continue to have access to the Golf Course Driving Range Property in a manner that is consistent with residents access to the Golf Course pursuant to this Golf Course Covenant.

21.14 Governing Law.

The internal laws of the State of California shall govern the interpretation and enforcement of this Covenant without regard to conflicts of law principles. Any action at law or in equity brought by for the purpose of enforcing, construing, or interpreting the validity of this Covenant or any provision hereof shall be brought in the Superior Court of the State of California in and for the County of Riverside, or such other appropriate court in said county.

21.15 Termination of Original Covenant.

On and after the Golf Course Covenant Effective Date, and pursuant to order from the Bankruptcy Court, the Original Covenant (as defined above) shall be deemed reinstated and amended as provided for in this Golf Course Covenant. Furthermore, City covenants and agrees that the Original Covenant is no longer of any force and effect, and on and after the Golf Course Covenant Effective Date, it is expressly understood and agreed by the Parties that this Golf Course Covenant (along with all other agreements, including the Reinstated Development Agreement, between City and Developer resulting from the purchase and sale of the Phase 1A Property vis-à-vis the Bankruptcy Lawsuit) governs the Golf Course Covenant Properties.

21.16 Counterpart Signature Pages.

For convenience the Parties may execute and acknowledge this Golf Course Covenant in counterparts and when the separate signature pages are attached hereto, shall constitute one and the same complete Golf Course Covenant.

[end – signature page follows]

IN WITNESS WHEREOF, Developer and City have executed this Golf Course Covenant as of the Golf Course Covenant Effective Date.

"**DEVELOPER**"

TBE RE Acquisition Co II LLC, a Delaware limited liability company and affiliate of Turnbridge Equities

Date:____________________, 2025

By: ____________________________
Its: ____________________________
By: ____________________________
Its: ____________________________

"**CITY**"

CITY OF LA QUINTA, a California municipal corporation and charter city

Date:____________________, 2025

By: ____________________________
Jon McMillen, City Manager

ATTEST:

____________________________
Monika Radeva, City Clerk

APPROVED AS TO FORM
RUTAN & TUCKER, LLP

____________________________
William H. Ihrke, City Attorney

[End of signatures]

| |
|---|
| A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |

State of California )
County of Riverside )

On ______________________, before me, ___________________________,
(insert name and title of the officer)
Notary Public, personally appeared ________________________________________, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature______________________________ (Seal)

A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California )
County of Riverside )

On __________________________, before me, ______________________________,
(insert name and title of the officer)
Notary Public, personally appeared ___________________________________________, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature________________________________ (Seal)

# EXHIBIT A-1
# LEGAL DESCRIPTION OF LUXURY HOTEL PROPERTY

[to be inserted]
[possible include depiction on plotted parcel map]

## EXHIBIT A-2
## LEGAL DESCRIPTION OF PUBLIC GOLF CLUBHOUSE PROPERTY

[to be inserted]
[possible include depiction on plotted parcel map]

# EXHIBIT D
## TEE TIME BLOCK SCHEDULE EXAMPLE

| Time | Player 1 | Player 2 | Player 3 | Player 4 |
|---|---|---|---|---|
| 7:00 | | | | |
| 7:08 | | | | |
| 7:15 | Resident Block | | | |
| 7:23 | | | | |
| 7:30 | | | | |
| 7:38 | | | | |
| 7:45 | | | | |
| 7:53 | Starter Time | | | |
| 8:00 | | | | |
| 8:08 | | | | |
| 8:15 | | | | |
| 8:23 | | | | |
| 8:30 | | | | |
| 8:38 | Resident Block | | | |
| 8:45 | | | | |
| 8:53 | Starter Time | | | |
| 9:00 | | | | |
| 9:08 | | | | |
| 9:15 | | | | |
| 9:23 | | | | |
| 9:30 | | | | |
| 9:38 | | | | |
| 9:45 | | | | |
| 9:53 | Starter Time | | | |
| 10:00 | | | | |
| 10:08 | | | | |
| 10:15 | | | | |
| 10:23 | | | | |
| 10:30 | | | | |
| 10:38 | Resident Block | | | |
| 10:45 | | | | |
| 10:53 | Starter Time | | | |
| 11:00 | | | | |
| 11:08 | | | | |
| 11:15 | | | | |
| 11:23 | | | | |
| 11:30 | | | | |
| 11:38 | | | | |
| 11:45 | | | | |
| 11:53 | Starter Time | | | |
| 12:00 | | | | |
| 12:08 | | | | |
| 12:15 | Resident Block | | | |
| 12:23 | | | | |
| 12:30 | | | | |
| 12:38 | | | | |
| 12:45 | | | | |
| 12:53 | Starter Time | | | |
| 1:00 | | | | |
| 1:08 | | | | |
| 1:15 | | | | |
| 1:23 | Tee Sheet Open @ 1:00 p.m. | | | |
| 1:30 | | | | |
| 1:38 | | | | |
| 1:45 | | | | |

# EXHIBIT L

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

[ attached ]

REQUESTED BY
AND WHEN RECORDED MAIL TO:

City of La Quinta
78-495 Calle Tampico
La Quinta, CA 92253
Attn: City Manager

Exempt From Recording Fee Pursuant to Government Code § 27383

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement ("Assignment") is entered into this ____ day of ____ by and between ______________, a _________ limited liability company **[TBE RE ACQUISITION CO II LLC, a Delaware limited liability company] [OR, INSERT OTHER TURNBRIDGE ENTITY]** and affiliate of Turnbridge Equities ("Assignor") and ____________________, a ________________________________ ("Assignee") with reference to the following:

## RECITALS

A. Assignor is the owner in fee simple of certain real property located at the southwest intersection of Jefferson Street and Avenue 52 in the City of La Quinta, California (the "Site"). The Site is more particularly described on Exhibit A, which is attached hereto and incorporated herein by this reference.

B. On ______________________ the Assignor and the City of La Quinta, a California municipal corporation and charter city ("City") entered into that certain Development Agreement, which was recorded against the [Site or Development Property] in the Official Records of the County of Riverside on ________________ 2025, as Instrument No. ____________________ (the "Development Agreement").

C. Pursuant to the terms of the Development Agreement, the Site was to be used for a __________________ (the "Project").

D. City and Assignor further entered into that certain ____________________________ **[insert other applicable documents encumbering the Site, such as Option Agreement, Agreement to Share Transient Occupancy Tax Revenue, and/or Agreement Containing Covenants, Conditions, and Restrictions Affecting Real Property]** (collectively with the Development Agreement, the "Project Agreements").

E. Assignor now desires to transfer the Site to Assignee, and concurrently therewith, to transfer to Assignee all of Assignor's rights and responsibilities

under the Project Agreements [to the extent that such rights and responsibilities relate to the Site].

NOW, THEREFORE, in consideration of the foregoing Recitals, which are incorporated herein by this reference, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. Assignor hereby assigns to Assignee all of Assignor's rights and responsibilities under the terms of the Project Agreements, [but only to the extent that such rights and responsibilities arise from the ownership of the Project and/or Site] from and after the "Effective Date" (as that term is defined in Section 4 below) of this Assignment (collectively, the "Assigned Rights and Obligations").

2. Assignee hereby accepts the foregoing assignment of the Assigned Rights and Obligations, and agrees to be bound by the terms of the Project Agreements [to the extent that such terms affect or are affected by ownership of the Site].

3. The parties hereto acknowledge and agree that Assignee shall not be responsible for any of the obligations of the Project Agreements which arise from ownership of any portion of the Site and which arise prior to the Effective Date hereof. As such, a default by Assignor under any of the Project Agreements prior to the Effective Date hereof ("Assignor's Default") shall not be deemed a default by Assignee, and Assignor shall indemnify, defend and hold harmless Assignee from any and all losses, claims or liability, including without limitation reasonable attorneys' fees and costs, arising from an Assignor's Default. A default by Assignee under any of the Project Agreements with respect to the Site after the Effective Date hereof ("Assignee's Default") shall not be deemed a default by Assignor, and Assignee shall indemnify, defend and hold harmless Assignor from any and all losses, claims or liability, including without limitation reasonable attorneys' fees and costs, arising from an Assignee's Default.

4. This Assignment shall be deemed effective upon the last of the following events to occur: (a) conveyance of the Site to Assignee as evidenced by the recording of the grant deed therefor in the Official Records of the County of Riverside, California, and (b) the written consent to this Assignment by the City with respect to the Assigned Obligations arising under the Project Agreements (herein referred to as the "Effective Date").

5. Except as otherwise described in paragraph 4 above, the parties hereto each warrant and represent that they have taken all necessary corporate action to authorize the execution and performance of this Assignment and

that the individuals executing this document on behalf of the parties are authorized to do so, and by doing so, create binding obligations as described herein of the party represented.

6. This Assignment shall be governed by the internal laws of the State of California, without regard to conflict of law principles.

7. This Assignment may be signed in counterparts which, when signed by both parties hereto, shall constitute a binding agreement.

[End – Signature page follows]

WHEREFORE, the parties hereto have executed this Assignment on the date first written above.

**"ASSIGNOR"**

**TBE RE ACQUISITION CO II LLC**, a Delaware limited liability company, and affiliate of Turnbridge Equities

Date:____________________, 20___

By: ______________________________
Its: ______________________________

By: ______________________________
Its: ______________________________

**"ASSIGNEE"**

________________________

Date:____________________, 20___

By: ______________________________
______________________________

**CONSENT**

By execution below, the City hereby consents to the foregoing assignment.

CITY OF LA QUINTA, a California municipal corporation and charter city

Date:____________________, 20___

By: ______________________________
Its: City Manager

ATTEST:

______________________________
City Clerk

APPROVED AS TO FORM:
RUTAN & TUCKER, LLP

______________________________
City Attorney

EXHIBIT A

LEGAL DESCRIPTION OF THE SITE

[ attachment to Assignment and Assumption Agreement ]

EXHIBIT M

SHORT-TERM VACATION RENTAL REGULATIONS

For Reference Purposes Only – See Agreement

[Attached]

# Chapter 3.25 SHORT-TERM VACATION RENTALS

## 3.25.010 Title.

This chapter shall be referred to as the "Short-Term Vacation Rental Regulations."

(Ord. 619 § 1, Exh. A, 12-17-2024; Ord. 590 § 1(Exh. A), 3-16-2021; Ord. 586 § 1(Exh. A), 12-15-2020; Ord. 572 § 1, 2018; Ord. 563 § 1, 2017; Ord. 501 § 2, 2012)

## 3.25.020 Purpose.

A. The purpose of this chapter is to establish regulations for the use of privately owned residential dwellings as short-term vacation rentals that ensure the collection and payment of transient occupancy taxes (TOT) as provided in Chapter 3.24 of this code, and minimize the negative secondary effects of such use on surrounding residential neighborhoods.

B. This chapter is not intended to provide any owner of residential property with the right or privilege to violate any private conditions, covenants and restrictions applicable to the owner's property that may prohibit the use of such owner's residential property for short-term vacation rental purposes as defined in this chapter.

C. The requirements of this chapter shall be presumed to apply to any residential dwelling that has received a short-term vacation rental permit. A rebuttable presumption arises that, whenever there is an occupant(s), paying rent or not, of a residential dwelling that has received a short-term vacation rental permit, the requirements of this chapter shall apply, including but not limited to any suspension or other modifications imposed on a short-term vacation rental permit as set forth in this chapter. The city manager or authorized designee shall have the authority to implement any necessary or appropriate policies and procedures to apply the rebuttable presumption set forth in this section.

(Ord. 619 § 1, Exh. A, 12-17-2024; Ord. No. 607, Exh. A, 12-5-2023; Ord. 590 § 1(Exh. A), 3-16-2021; Ord. 586 § 1(Exh. A), 12-15-2020; Ord. 572 § 1, 2018; Ord. 563 § 1, 2017; Ord. 501 § 2, 2012)

## 3.25.030 Definitions.

For purposes of this chapter, the following words and phrases shall have the meaning respectively ascribed to them by this section:

*"Advertise," "advertisement," "advertising, "publish," and "publication"* mean any and all means, whether verbal or written, through any media whatsoever whether in use prior to, at the time of, or after the enactment of the ordinance adding this definition, used for conveying to any member or members of the public the ability or availability to rent a short-term vacation rental unit as defined in this section, or used for conveying to any member or members of the public a notice of an intention to rent a short-term vacation rental unit as defined in this section. For purposes of this definition, the following media are listed as examples, which are not and shall not be construed as exhaustive: verbal or written announcements by proclamation or outcry, newspaper advertisement, magazine advertisement, handbill, written or printed notice, printed or poster display, billboard

display, e-mail or other electronic/digital messaging platform, electronic commerce/commercial Internet websites, and any and all other electronic media, television, radio, satellite-based, or Internet website.

*"Applicable laws, rules and regulations"* means any laws, rules, regulations and codes (whether local, state or federal) pertaining to the use and occupancy of a privately owned dwelling unit as a short-term vacation rental.

*"Applicant"* means the owner of the short-term vacation rental unit.

*"Authorized agent or representative"* means a designated agent or representative who is appointed by the owner and is also responsible for compliance with this chapter with respect to the short-term vacation rental unit.

*"Booking transaction"* means any reservation or payment service provided by a person or entity who facilitates a home-sharing or vacation rental (including short-term vacation rental) transaction between a prospective occupant and an owner or owner's authorized agent or representative.

*"City manager"* means that person acting in the capacity of the city manager for the City of La Quinta or authorized designee.

*"Declaration of non-use"* means the declaration described in Section 3.25.050.

*"Dwelling"* has the same meaning as set forth in Section 9.280.030 (or successor provision, as may be amended from time to time) of this code; "dwelling" does not include any impermanent, transitory, or mobile means of temporary lodging, including but not limited to mobile homes, recreational vehicles (RVs), car trailers, and camping tents.

*"Estate home"* is defined as a single-family detached residence with five (5) or more bedrooms, subject to evaluation criteria and inspection of the property pursuant to Section 3.25.060(D)(1). An estate home is a sub-type of short-term vacation rental unit and shall be subject to a general short-term vacation rental permit, primary residence short-term vacation rental permit, or homeshare short-term vacation rental permit, as applicable, pursuant to this chapter.

*"General short-term vacation rental permit"* is a type of short-term vacation rental permit that is neither a homeshare short-term vacation rental permit nor a primary residence short-term vacation rental permit.

*"Good neighbor brochure"* means a document prepared by the city that summarizes the general rules of conduct, consideration, and respect, including, without limitation, provisions of this code and other applicable laws, rules or regulations pertaining to the use and occupancy of short-term vacation rental units.

*"Homeshare short-term vacation rental permit"* is a type of short-term vacation rental permit whereby the owner hosts visitors in the owner's dwelling, for compensation, for periods of thirty (30) consecutive calendar days or less, while the owner lives on-site and in the dwelling, throughout the visiting occupant's stay.

*"Hosting platform"* means a person or entity who participates in the home-sharing or vacation rental (including short-term vacation rental) business by collecting or receiving a fee, directly or indirectly through an agent or intermediary, for conducting a booking transaction using any medium of facilitation, including but not limited to the Internet.

*"Large lot"* means a single "parcel," as defined in Section 9.280.030 (or successor provision, as may be amended from time to time) of this code, that meets all of the criteria set forth in subsection (A) of Section 3.25.057.

*"Local contact person"* means the person designated by the owner or the owner's authorized agent or representative who shall be available twenty-four (24) hours per day, seven (7) days per week with the ability to respond to the location within thirty (30) minutes for the purpose of: (1) taking remedial action to resolve any

complaints; and (2) responding to complaints regarding the condition, operation, or conduct of occupants of the short-term vacation rental unit. A designated local contact person must obtain a business license otherwise required by Sections 3.24.060 and 3.28.020 (or successor provisions, as may be amended from time to time) of this code.

*"Management company"* means any individual or entity, whether for profit or nonprofit, and regardless of entity type, such as a limited liability company, corporation, or sole proprietorship, that is retained by an owner to be the owner's authorized agent or representative, or is the owner of a short-term vacation rental unit subject to this chapter, and is engaged in or represents itself to be engaged in the business of managing real property.

*"Multi-unit lock-off STVR unit"* means a specific design and construction of a single-family detached dwelling or multi-family attached unit(s) dwelling, which construction is designed to allow sections of such dwelling to be locked-off and separated into individual stand-alone units and meets one (1) or more of the exemptions set forth in Section 3.25.055. The design and construction of a multi-unit lock-off STVR unit provides at a minimum for:

a) Independent living facilities within the space secured by a lock-off door(s),
b) Separate access to the exterior area(s) and public right-of-way without the need to enter or walk through the primary living area of the dwelling or other lock-off STVR units, and
c) Permanent provisions for sleeping and sanitation (bathroom) within the space secured by a lock-off door(s).

Examples of multi-unit lock-off STVR units include a dwelling that has "hotel- or motel-like" exterior access door(s) and interior security door(s) that can be secured from either side between two (2) stand-alone units where each stand-alone unit has the ability to secure itself from the other adjacent unit; or, a two (2)-story dwelling (such as a two (2)-story duplex) in which the first floor and second floor are separate lock-off STVR units, and the first and second floors each have their own independent exterior access to the exterior areas and public right-of-way. A multi-unit lock-off STVR unit is a sub-type of short-term vacation rental unit and shall be subject to a general short-term vacation rental permit or primary residence short-term vacation rental permit, as applicable, pursuant to this chapter.

*"Notice of permit modification, suspension or revocation"* means the notice the city may issue to an applicant, authorized agent or representative, local contact person, occupant, owner, responsible person, or any other person or entity authorized to be issued such notice under this code for a short-term vacation rental unit, upon a determination by the city of a violation of this chapter or other provisions of this code relating to authorized uses of property subject to this chapter.

*"Occupant"* means any person(s) occupying the dwelling at any time.

*"Owner"* means the person(s) or entity(ies) that hold(s) legal and/or equitable title to the subject short-term vacation rental unit.

*"Primary residence"* means a dwelling where an owner spends the majority of the calendar year on the property used as a short-term vacation rental unit, and the property is identified in the Riverside County assessor's record as the owner's primary residence.

*"Primary residence short-term vacation rental permit"* is a type of short-term vacation rental permit whereby the short-term vacation rental unit is the owner's primary residence, as defined herein in this section.

*"Property"* means a residential legal lot of record on which a short-term vacation rental unit is located.

*"Qualified and certified large lot"* has the meaning as set forth in Section 3.25.057.

*"Rent"* has the same meaning as set forth in Section 3.24.020 (or successor provision, as may be amended from time to time) of this code.

*"Rental agreement"* means a written or verbal agreement for use and occupancy of a privately-owned residential dwelling that has been issued a short-term vacation rental permit, including a dwelling that may have a permit which has been or is under suspension.

*"Responsible person"* means the signatory of an agreement for the rental, use and occupancy of a short-term vacation rental unit, and/or any person(s) occupying the short-term vacation rental unit without a rental agreement, including the owner(s), owner's authorized agent(s) or representative(s), local contact(s), and their guests, who shall be an occupant of that short-term vacation rental unit, who is at least twenty-one (21) years of age, and who is legally responsible for ensuring that all occupants of the short-term vacation rental unit and/or their guests comply with all applicable laws, rules and regulations pertaining to the use and occupancy of the subject short-term vacation rental unit.

*"Short-term vacation rental permit"* means a permit that permits the use of a privately owned residential dwelling as a short-term vacation rental unit pursuant to the provisions of this chapter, and which incorporates by consolidation a transient occupancy permit and a business license otherwise required by Sections 3.24.060 and 3.28.020 (or successor provisions, as may be amended from time to time) of this code. A short-term vacation rental permit is one (1) of the following types: (1) general short-term vacation rental permit, (2) primary residence short-term vacation rental permit, or (3) homeshare short-term vacation rental permit, as defined in this section.

*"Short-term vacation rental unit"* means a privately owned residential dwelling, such as, but not limited to, a single-family detached or multiple-family attached unit, apartment house, condominium, cooperative apartment, duplex, or any portion of such dwellings and/or property and/or yard features appurtenant thereto, rented for occupancy and/or occupied for dwelling, lodging, or any transient use, including but not limited to sleeping overnight purposes for a period of thirty (30) consecutive calendar days or less, counting portions of calendar days as full days, by any person(s) with or without a rental agreement.

*"STVR"* may be used by city officials as an abbreviation for "short-term vacation rental."

*"Subtenant"* means any person subject to, or claiming to be subject to, an arrangement in which a privately owned residential dwelling, rented to a lawful occupant, is in turn sub-rented or sub-leased by that lawful occupant to another person or third party, where said arrangement allows for the use and/or occupancy of the dwelling, whether or not said arrangement is with or without a rental agreement.

*"Suspension"* means that short-term vacation rental permit that is suspended pursuant to Section 3.25.090.

*"Tenant"* or *"transient,"* for purposes of this chapter, means any person, including any Subtenant, who seeks to rent or who does rent, or who occupies or seeks to occupy, for thirty (30) consecutive calendar days or less, a short-term vacation rental unit.

(Ord. 619 § 1, Exh. A, 12-17-2024; Ord. No. 607, Exh. A, 12-5-2023; Ord. 595 § 1(Exh. A), 6-15-2021; Ord. 590 § 1(Exh. A), 3-16-2021; Ord. 586 § 1(Exh. A), 12-15-2020; Ord. 572 § 1, 2018; Ord. 563 § 1, 2017; Ord. 501 § 2, 2012)

## 3.25.040 Authorized agent or representative.

A. Except for the completion of an application for a short-term vacation rental permit and business license, the owner may designate an authorized agent or representative to ensure compliance with the requirements of this chapter with respect to the short-term vacation rental unit on his, her or their behalf. Nevertheless, the owner shall not be relieved from any personal responsibility and personal liability for noncompliance with any applicable law, rule or regulation pertaining to the use and occupancy of the subject short-term vacation rental unit, regardless of whether such noncompliance was committed by the owner's authorized agent or representative or the occupants of the owner's short-term vacation rental unit or their guests.

B. The owner shall be the applicant for and holder of a short-term vacation rental permit and business license and shall not authorize an agent or a representative to hold a short-term vacation rental permit and business license on the owner's behalf. The owner's authorized agent or representative may submit an application on behalf of the owner pursuant to Section 3.25.060, but the owner's signature is required on all short-term vacation rental application forms, and the city may prescribe reasonable requirements to verify that an applicant or purported owner is the owner in fact.

(Ord. 619 § 1, Exh. A, 12-17-2024; Ord. 590 § 1(Exh. A), 3-16-2021; Ord. 586 § 1(Exh. A), 12-15-2020; Ord. 572 § 1, 2018; Ord. 563 § 1, 2017; Ord. 501 § 2, 2012)

## 3.25.050 Short-term vacation rental permit—Required.

A. The owner is required to obtain a short-term vacation rental permit and a business license from the city before the owner or the owner's authorized agent or representative may rent or advertise a short-term vacation rental unit. No short-term vacation rental use may occur in the city except in compliance with this chapter. No property in the city may be issued a short-term vacation rental permit or used as a short-term vacation rental unit unless the property is a residential dwelling that complies with the requirements of this chapter.

B. A short-term vacation rental permit and business license shall be valid for one (1) year and renewed on an annual basis in order to remain valid.

1. A short-term vacation rental permit and business license renewal application should be submitted sixty (60) calendar days prior to the permit's expiration date, but no later than the permit's expiration date. Failure to renew a short-term vacation rental permit as prescribed in this section may result in the short-term vacation rental permit being terminated.
2. A new owner of a property (or a new person and/or new entity that owns or controls a business or organization or other entity of any kind, such as a limited liability company, which is the owner of a property) previously operated as a short-term vacation rental unit by the former owner (or by a former person or entity that owned or controlled the business or organization or other entity of any kind that continues to be the owner of the property) may not renew the previous owner's short-term vacation rental permit and shall apply for a new short-term vacation rental permit, pursuant to this chapter, if the new owner (or new person and/or new entity that owns or controls a business or organization or other entity of any kind that continues to be the owner of a property) wants to continue to use the residential dwelling as a short-term vacation rental unit. For purposes of this subsection, a transfer of a short-term vacation rental unit with a valid short-term vacation rental permit resulting from any of the following shall not be deemed a transfer to a new owner which

would otherwise trigger the requirement to apply for and obtain a new short-term vacation rental permit:

(a) Transfers to an entity of any kind, such as a limited liability company or a trust, where the member(s) of the entity or beneficiary(ies) of the trust is(are) the owner(s) of the real property with a valid short-term vacation rental permit, and the proportionate interest(s) of the owner(s) are the same for the real property placed in the entity.

(b) Transfers that take effect upon the death of an owner to an heir designated by the owner (by devise, bequest, or similar transfer upon death) who is any of the following: (i) surviving spouse or domestic partner; or (ii) surviving sibling related by blood or in law, such as a brother, sister, brother-in-law, sister-in-law, step-brother, or step-sister; or (iii) surviving parent or grandparent by blood or in law, such as a mother, father, mother-in-law, father-in-law, step-mother, step-father, grandmother, grandfather, grandmother-in-law, grandfather-in-law, step-grandmother, or step-grandfather; (iv) surviving child or grandchild, such as a daughter, son, daughter-in-law, son-in-law, step-daughter, step-son, granddaughter, grandson, granddaughter-in-law, grandson-in-law, step-granddaughter, or step-grandson.

(c) Transfers to a trust with the beneficiary(ies) identified as an heir described in subsection B(2)(b) above.

3. If an owner or an owner's authorized agent or representative, pursuant to all applicable laws, constructs additional bedrooms to an existing residential dwelling or converts non-bedroom spaces and areas in an existing residential dwelling into additional bedrooms, the owner or owner's authorized agent or representative shall notify the city and update the short-term vacation rental unit's online registration profile upon city approval of the addition or conversion so that the city may confirm that such conversion is consistent with this chapter and the code, including all applicable provisions in Title 8 of the code, and reissue the short-term vacation rental permit so that it accurately identifies the number of approved bedrooms, if the owner wants to continue to use the dwelling as a short-term vacation rental unit. The city may conduct an on-site inspection of the property to verify compliance with this chapter and the code. Code compliance inspections may be billed for full cost recovery at one (1) hour for initial inspection and in thirty (30)-minute increments for each follow-up inspection pursuant to subsection D. For purposes of this chapter, "reissue" or "reissuance" of a short-term vacation rental permit means a permit that is reissued by the city, with corrected information, as applicable, to be valid for the balance of the existing one (1)-year permit and license period.

C. A short-term vacation rental permit and business license shall be valid only for the number of bedrooms in a residential dwelling equal to the number of bedrooms the city establishes as eligible for listing as a short-term vacation rental unit. The allowable number of bedrooms shall meet all applicable requirements under federal, state and city codes, including, but not limited to, the provisions of Section 9.50.100 (or successor provision, as may be amended from time to time) governing "additional bedrooms" and all applicable building and construction codes in Title 8 of this code. A short-term vacation rental permit shall not be issued for, or otherwise authorize the use of, additional bedrooms converted from non-bedroom spaces or areas in an existing residential dwelling except upon express city approval for the additional bedrooms in compliance with this code, including Section 9.50.100 (or successor provision, as may be amended from time to time), and upon approval of an application for a new or renewed short-term vacation rental permit as provided in subsection B.

D. A short-term vacation rental permit and business license shall not be issued, and may be suspended or permanently revoked, if the property, or any building, structure, or use or land use on the property is in

violation of this code. The city may conduct an inspection of the property prior to the issuance or renewal of a short-term vacation rental permit and/or business license. Code compliance inspections may be billed for full cost recovery at one (1) hour for initial inspection and in thirty (30)-minute increments for each follow-up inspection. For purposes of this subsection, a code violation exists if, at the time of the submittal of an application for a new or renewed short-term vacation rental permit or business license, the city has commenced administrative proceedings by issuing written communication and/or official notice to the owner or owner's authorized agent or representative of one (1) or more code violations. For purposes of this chapter, "building," "structure," and "use or land use" have the same meanings as set forth in Section 9.280.030 (or successor provisions, as may be amended from time to time) of this code.

E. A short-term vacation rental permit and business license shall not be issued or renewed, and may be suspended or permanently revoked, if any portion of transient occupancy tax has not been reported and/or remitted to the city for the previous calendar year by the applicable deadline for the reporting and/or remittance of the transient occupancy tax.

F. A short-term vacation rental permit and business license shall not be issued or renewed, and may be suspended or permanently revoked, if the residential dwelling to be used as a short-term rental unit lacks adequate on-site parking. For purposes of this subsection, "adequate on-site parking" shall be determined by dividing the total number of occupants commensurate with the approved number of bedrooms as provided in the table under Section 3.25.070 by four (4), such that the ratio of the maximum allowed number of overnight occupants to on-site parking spots does not exceed four to one (4:1). For example, a residential dwelling with five (5) bedrooms may permissibly host a total number of ten (10) to twelve (12) overnight occupants and therefore requires three (3) on-site parking spots. On-site parking shall be on an approved driveway, garage, and/or carport areas only in accordance with Section 3.25.070(R), and no more than two (2) street parking spots may count towards the number of on-site parking spots necessary to meet the "adequate on-site parking" requirement under this subsection.

G. An owner or owner's authorized agent or representative who claims not to be operating a short-term vacation rental unit or who has obtained a valid short-term vacation rental permit and business license pursuant to this chapter, may voluntarily opt-out of the requirements of this chapter, prior to the issuance or expiration of a short-term vacation rental permit and business license that are applicable to the short-term vacation rental unit, only upon the owner, the owner's authorized agent or representative and/or the owner's designated local contact person submitting a written request or executing, under penalty of perjury, a declaration of non-use as a short-term vacation rental unit, in a form prescribed by the city (for purposes of this chapter, a "declaration of non-use"). Upon the receipt and filing with the city a written request or a fully executed declaration of non-use, the short-term vacation rental permit and business license shall be closed and the owner or owner's authorized agent or representative shall be released from complying with this chapter as long as the property is not used as a short-term vacation rental unit. Use of the property as a short-term vacation unit after the city's receipt and filing of a written request or a declaration of non-use is a violation of this chapter. If, after a written notice or a declaration of non-use has been received and filed with the city, the owner or owner's authorized agent or representative wants to use that property as a short-term vacation rental unit, the owner may apply for a new short-term vacation rental permit and business license only after twelve (12) consecutive months have elapsed from the date of the city's receipt of the written notice or the declaration of non-

use, and the owner and owner's authorized agent or representative otherwise shall fully comply with the requirements of this chapter and the code.

(Ord. 619 § 1, Exh. A, 12-17-2024; Ord. 611, § 1(Exh. A), 3-19-2024; Ord. No. 607, Exh. A, 12-5-2023; Ord. 595 § 1(Exh. A), 6-15-2021; Ord. 590 § 1(Exh. A), 3-16-2021; Ord. 586 § 1(Exh. A), 12-15-2020; Ord. 577 § 1, 2019; Ord. 572 § 1, 2018; Ord. 563 § 1, 2017; Ord. 501 § 2, 2012)

## 3.25.055 Non-issuance of new short-term vacation rental permits; periodic council review.

A. Commencing May 20, 2021, which is the effective date of Ordinance No. 596 which added this section, there shall be no processing of, or issuance for, any applications for a new short-term vacation rental permit, required by this chapter to use or operate a short-term vacation rental unit in the city, except applications for a new a short-term vacation rental permit covering a short-term vacation rental unit that meets one (1) or more of the following:

1. A residential dwelling within a residential project located in the CT Tourist Commercial District zone, as defined in Section 9.70.070 (or successor section) of this code and depicted in the city's official zoning map.
2. A residential dwelling within a residential project located in the VC Village Commercial District zone, as defined in Section 9.70.100 (or successor section) of this code and depicted in the city's official zoning map.
3. A residential dwelling within a residential project subject to a development agreement with the city, or subject to a condition of approval(s) attached to any entitlement approved by the city (including but not limited to a specific plan, subdivision map, or site development permit), pursuant to which short-term vacation rentals are a permitted use, and the residential dwelling's use as a short-term vacation rental is authorized under a declaration of covenants, conditions, and restrictions (CC&Rs), for the residential project.
4. A residential dwelling within the area covered by the SilverRock Resort Specific Plan or the Estates at Griffin Lake Specific Plan.
5. A residential dwelling is located adjacent to the CT Tourist Commercial District zone, as defined in Section 9.70.070 and depicted in the city's official zoning map, and within the following boundaries; west of Avenida Obregon, south of the Avenida Fernando, east of Calle Mazatlan, and north of the driveway access between Calle Mazatlan and Avenida Obregon that serves as a southern boundary for the La Quinta Tennis Villas/Tennis Condos area identified on page 25 of the La Quinta Resort Specific Plan, 121 E—Amendment 5 (as may be subsequently amended from time to time). For purposes of this subsection, "adjacent to" means across the street from or accessible by a driveway or service road designed to provide access to area(s) within the CT Tourist Commercial District zone.

B. The city manager or authorized designee shall have the authority to implement policies or procedures to review and verify whether an application for a new short-term vacation rental permit meets the criteria set forth in this section.

C. This section shall not apply to applications for a homeshare short-term vacation rental permit or applications for a renewal of an existing short-term vacation rental permit and business license, submitted in compliance with this chapter, including when the short-term vacation rental permit is under suspension during the time for processing the renewal application. Applications for renewals must be submitted as prescribed by this chapter. Any short-term vacation rental unit, covered by a permit that is subject to an application for renewal, which is under temporary suspension in violation of

this chapter or any other provisions of this code, shall not become permitted to use the dwelling as a short-term vacation rental unit until all violations that led to the temporary suspension have been remedied and the suspension has expired. Any revoked short-term vacation rental permit shall not be eligible for renewal or new short-term vacation rental permit.

D. The city council shall periodically review the impacts or effects, if any, caused by the non-issuance of new short-term vacation rental permits set forth in this section. The city manager or authorized designee shall prepare a report assessing impacts or effects, if any, for the council to review at a regular or special meeting.

E. Commencing on January 4, 2024, which is the effective date of Ordinance No. 607 adding this subsection (E), this section may not be amended by the city council, except by no less than four-fifths (⅘) majority vote of the city council.

(Ord. 619 § 1, Exh. A, 12-17-2024; Ord. No. 607, Exh. A, 12-5-2023; Ord. 596 § 2, 2021; Ord. 595 § 1(Exh. A), 6-15-2021; Ord. 591 § 1(Exh. A), 4-20-2021)

## 3.25.057 Large Lots; exemption from non-issuance of new short-term vacation rental permits.

A. If none of the exemptions in subsection (A) or (C) of Section 3.25.055 of this code applies, the owner of a large lot may voluntarily submit to the city an application and request to be exempted from the non-issuance of new short-term vacation rental permits set forth in Section 3.25.055 only if, at the time of submittal of an application for exemption pursuant to this section, all of the following criteria are met:

1. The "lot area," as defined in Section 9.280.030 (or successor provision, as may be amended from time to time) of this code, is comprised of a single parcel that is no less than twenty-five thousand (25,000) square feet;
2. The single parcel has at least one (1) existing dwelling, as defined in this chapter, in use or available for use;
3. The single parcel is not, nor will the single parcel ever be for the duration of the period of any qualified exemption under this section, subject to a subdivision under the subdivision map act in Division 2 (commencing with Section 64410) of Title 7 of the California Government Code or under Title 13 of this code (or successor provisions, as may be amended from time to time);
4. The single parcel is not, nor will the single parcel ever be for the duration of the period of any qualified exemption under this section, subject to a reduction in the square footage of the lot area by lot line adjustment, parcel merger, or other action that creates a legal parcel under the subdivision map act in Division 2 (commencing with Section 64410) of Title 7 of the California Government Code or under Title 13 of this code (or successor provisions, as may be amended from time to time);
5. If the single parcel is within a residential project governed by a homeowners association, the use of the single parcel as a short-term vacation rental unit is authorized under the homeowners association's covenants, conditions, and restrictions (CC&Rs) and any other applicable governing documents for the residential project governed by the homeowners association;
6. Use of the single parcel as a short-term vacation rental unit is not prohibited or otherwise inconsistent with any recorded instruments governing the use of the single parcel; and
7. The single parcel has adequate on-site parking pursuant to this chapter for use as a short-term vacation rental unit.

B. Subject to the application and review provisions in this section, if the city determines the single parcel meets the criteria of a large lot to be exempted from the non-issuance of new short-term vacation rental permits that otherwise applies pursuant to Section 3.25.055, the provisions regarding the non-issuance of new short-term vacation rental permits in Section 3.25.055 shall no longer apply to, or be applicable as long as the single parcel meets the criteria in this section, to the large lot upon certification by the city that the criteria set forth in this section have been met.

1. Upon certification by the city that the criteria in this section have been met, then the single parcel shall be identified as a "qualified and certified large lot" for purposes of this section and this chapter.
2. Upon certification by the city of the single parcel as a qualified and certified large lot pursuant to this section, an owner of a residential dwelling within a qualified and certified large lot may apply for a new short-term vacation rental permit pursuant to this chapter and shall be subject to the same requirements of any other short-term vacation rental permit application, use, and operation governed by this chapter.
3. The city may impose any necessary or proper conditions of approval with the certification of a single parcel as a large lot pursuant to this section, including conditions that would terminate the exemption from compliance with Section 3.25.055 if the large lot is subdivided or used in violation of the requirements of this section. Additionally, the city may require as a condition of approval that the owner of the qualified and certified large lot execute a land use covenant, in a form approved by the city and recorded in the county recorder's office against the single parcel, memorializing the terms and conditions applicable to the large lot for use as a short-term vacation rental unit.
4. Any owner of real property that is no longer or is not in compliance with the criteria in this section to be a qualified and certified large lot shall have no right or authority to advertise, use, or operate said real property as a short-term vacation rental unit. Any short-term vacation rental permit (either new or renewal permit) issued by the city in reliance of said real property having previously been located within a qualified and certified large lot shall no longer be valid upon said real property no longer being in compliance with this section.
5. An owner of a qualified and certified large lot who is the successor in interest to the owner who applied for and received the certification of the single parcel as a qualified and certified large lot does not need to re-apply for an exemption from Section 3.25.055 under this chapter as long as the single parcel determined to be the qualified and certified large lot remains in compliance with this section.
6. It is the expressed intent of the city council that an application for exemption from Section 3.25.055, submitted to the city pursuant to this section, need only occur one (1) time as long as the current owner of a qualified and certified large lot remains in compliance with this section whenever a new or renewal application for a short-term vacation rental permit is submitted to the city and for the duration of the term of the issued short-term vacation rental permit. It is also the expressed intent of the city council that the current owner of real property that may have previously been a qualified and certified large lot may be required by the city to submit a new application for exemption from Section 3.25.055, pursuant to this section, if the real property no longer meets the criteria set forth in this section.

C. Any application submitted pursuant to this section shall be subject to any fees established by resolution of the city council and shall identify, by addresses, assessor's parcel number (APN), and any other identifying information requested by the city, the real property purporting to be a large lot.

D. An application submitted pursuant to this section shall be reviewed and considered as follows:

1. *Submittal of Application.* An application for a finding of exemption under this section and certification as a large lot shall be completed in a form approved by the city manager or authorized designee. Applications shall be filed with the city clerk, who shall forward to the planning department together with all maps, plans, documents and other materials required by the city clerk or director of the planning department.
2. *Determination of Completeness.* The city clerk's office and planning department shall coordinate with the applicant to make a determination whether the application is complete or incomplete. Upon the determination that the application is complete by the city clerk, the city clerk shall schedule review and consideration of the complete application by the city council.
3. *Public Hearing and Consideration of the Application.* The city council shall hold a public hearing on the application, and the city council shall be the decision-making authority for the application. The public hearing shall be set within ninety (90) days from the determination by the city clerk of a complete application. The public hearing shall be noticed in accordance with Section 9.200.100(D) (or successor provisions, as may be amended from time to time) of this code. At the public hearing, the city council shall receive written comments and any other evidence or testimony relating to the application. At the public hearing, the city council may take action on the application, or continue the application to a specified date.
4. *Required Findings.* No application presented to the city council pursuant to this section may be approved or conditionally approved unless all of the following findings and requirements are met:
    a. The single parcel subject to the application is in a residential zone, is a legal non-conforming use, or is in a zone that otherwise would allow for residential uses.
    b. The applicant is the owner of the single parcel subject to the application.
    c. The exemption under this section is required for the applicant as owner to be able to apply for a short-term vacation rental permit and use a dwelling or dwellings on the parcel as a short-term vacation rental unit under this chapter.
    d. Approval of the application will not create conditions materially detrimental to the public health, safety and general welfare or injurious to or incompatible with other properties or land uses in the vicinity. Included with this assessment shall be whether approval of the application and issuance of a certification that the single parcel is a qualified and certified large lot results in multiple exemptions under this section being concentrated in one (1) geographic location of the city in a manner than may be incompatible with other properties or land uses in the vicinity.
5. *Decision.* The city council shall approve, approve with conditions, or deny the application. With the concurrence of the applicant, an application may be withdrawn prior to the issuance of a decision by the city council. The decision on an application, including any required findings and any other reasons that serve to explain the determination plus all conditions of approval, shall be in writing. An approval or approval with conditions from the city council shall be adopted by resolution and accompanied with the certification from the city that the single parcel subject to the application meets the criteria for a qualified and certified large lot.
6. *Appeal.* The decision of the city council shall be the final decision of the city on the application.

E. Subject to the review and approval provisions in this section, the city manager or authorized designee shall have the authority to implement policies or procedures to review and verify whether an application and request to be exempted from Section 3.25.055 meets the criteria set forth in this section and any other criteria reasonably necessary for verification of such application and request.

F. The city council may periodically review the impacts or effects, if any, caused by this section concurrently with its periodic review provided for in subsection (D) of Section 3.25.055.

(Ord. 619 § 1, Exh. A, 12-17-2024; Ord. No. 607, Exh. A, 12-5-2023)

## 3.25.060 Short-term vacation rental permit—Application requirements.

A. The owner or the owner's authorized agent or representative must submit the information required on the city's short-term vacation rental permit application form provided by the city, which may include any or all of the following:

1. The name, address, and telephone number of the owner of the subject short-term vacation rental unit;
2. The name, address, and telephone number of the owner's authorized agent or representative, if any;
3. The name and twenty-four (24)-hour telephone number of the local contact person;
4. Reserved;
5. The number of bedrooms shall not exceed the number of permitted bedrooms. The allowable number of bedrooms shall meet all applicable building and construction requirements under federal, state and city codes, including, but not limited to, the provisions of Section 9.50.100 (or successor provision, as may be amended from time to time) governing "additional bedrooms" and all applicable building and construction codes in Title 8 of this code;
6. Acknowledgement of receipt of all electronically distributed short-term vacation rental information from the city, including any good guest brochure;
7. The owner or owner's authorized agent or representative who has applied for a short-term vacation rental permit shall provide the city with written authorization that issuance of a short-term vacation rental permit pursuant to this chapter is not inconsistent with any recorded or unrecorded restrictive covenant, document, or other policy of a homeowner association (HOA) or other person or entity which has governing authority over the property on which a short-term vacation rental unit will be operated; in furtherance of this requirement, there shall be a rebuttable presumption that an owner or owner's authorized agent or representative does not have written authorization for the issuance of a short-term vacation rental permit if a HOA or other person or entity which has governing authority over the property has submitted to the city a duly-authorized official writing, which informs the city that short-term vacation rentals of thirty (30) consecutive days or less are not permitted on the property applying for a short-term vacation rental permit; and
8. Such other information as the city manager or authorized designee deems reasonably necessary to administer this chapter.

B. The short-term vacation rental permit application shall be accompanied by an application fee as set by resolution of the city council. A short-term vacation rental permit and business license shall not be issued or renewed while any check or other payment method cannot be processed for insufficient funds.

C. The city may determine the maximum number of bedrooms in a residential dwelling with multiple bedrooms eligible for use as a short-term vacation rental unit upon issuance of a short-term vacation rental permit. When determining the maximum number of bedrooms eligible for use as short-term vacation rentals, the city shall consider the public health, safety, and welfare, shall comply with building and residential codes, and may rely on public records relating to planned and approved living space within the residential dwellings, including, but not limited to, title insurance reports, official county records, and tax assessor records. An owner and/or owner's authorized agent or representative may not advertise availability for occupancy of a short-term vacation rental unit for more than the

approved number of bedrooms listed in the short-term vacation rental permit issued by the city pursuant to this chapter. In addition to any other rights and remedies available to the city under this chapter, the first violation for failing to advertise the approved number of bedrooms may be subject to a fine by an administrative citation, and a second or subsequent violation for failing to advertise the approved number of bedrooms may result in a revocation (which may include permanent revocation) of the short-term vacation rental permit and/or any affiliated licenses or permits pursuant to the provisions set forth in Section 3.25.090. An owner of a residential dwelling on a lot may apply for additional bedrooms to be included in the maximum number of bedrooms eligible for use under a short-term vacation rental permit, subject to and only if all of the following criteria are met:

1. Only existing rooms within a dwelling may be eligible for repurposing for use as an additional bedroom.
2. Use of an existing room as an additional bedroom shall comply with all building and residential codes, including but not limited to all applicable codes in Title 8 of this code.
3. Any use of an existing room as an additional bedroom shall result in no less than 1,000 square feet of the remainder of the indoor habitable space within the dwelling to be used for living, eating, cooking, and sanitation purposes. "Indoor habitable space" for purposes of this Subsection 3.25.060(C)(3) includes, for example, kitchen, bathroom, dining room, living room, den, home-office, and hallway areas, but excludes, for example, closets, garage, storage, attic, basement, and other areas not usually and regularly occupied by persons in the dwelling.
4. The owner of the dwelling shall have the obligation to ensure the use of an existing room as an additional bedroom pursuant to this Subsection 3.25.060(C) is neither inconsistent with nor a violation of any legal or contractual obligations of the owner as the property owner of the dwelling, including but not limited to any residential/home insurance policies, title insurance policies, or tax assessment records. Nothing in this Subsection 3.25.060(C) does, or may be interpreted as, affecting or authorizing a use of an existing room as an additional bedroom under any other law or regulation, except for purposes of including such additional bedroom in the maximum number of bedrooms eligible for use under a short-term vacation rental permit pursuant to this chapter.

D. Short-term vacation rental permit applications shall comply with the following:

1. A short-term vacation rental permit application for an estate home shall be subject to evaluation and inspection of the property to ensure that the short-term vacation rental unit will not create conditions materially detrimental to the public health, safety and general welfare or injurious to or incompatible with other properties in the vicinity. Evaluation and inspection shall include, but not be limited to: verification of the number of bedrooms, active noise monitor, adequate on-site parking spaces, availability of nearby street parking, physical distance of an estate home from adjacent properties, such as location and distance of outdoor gathering spaces, pools, and other living spaces from neighboring properties. The city manager, or designee, shall have the authority to impose additional conditions on the use of an estate home as a short-term vacation rental unit to ensure that any potential secondary effects unique to the subject short-term vacation rental unit are avoided or adequately mitigated.
2. A short-term vacation rental permit application may be denied if the applicant has failed to comply with application requirements in this chapter, or has had a prior short-term vacation rental permit for the same unit revoked within the past twelve (12) calendar months. In addition, upon adoption of a resolution pursuant to subsection H, the city may limit the number of short-term vacation rental units in a given geographic area based on a high concentration of short-term vacation rental units. The city shall maintain a waiting list of short-term vacation rental permit applications for such

geographic areas where the city determines, based on substantial evidence after a noticed public hearing, there is a higher than average concentration of short-term vacation rental units that either affects the public health, safety, and welfare or significantly negatively impacts the character and standard of living in a neighborhood within that geographic area, or both.

E. Short-term vacation rental permit applications may take up to, and the city shall have, thirty (30) calendar days to process. Nothing in this subsection or chapter shall be construed as requiring the city to issue or deny a short-term vacation rental permit in less than thirty (30) calendar days, as no permit shall be issued until such time as application review is complete. No short-term vacation rental use may occur in the city without a valid short-term vacation rental permit issued in accordance with this chapter.

F. Upon a change of ownership of a property (or upon a new person and/or new entity owning or controlling a business or organization or other entity of any kind, such as a limited liability company, which is the owner of a property) licensed to operate as a short-term vacation rental unit, the owner or owner's authorized agent or representative shall notify the city of such change immediately. The existing short-term vacation rental permit shall be terminated, unless subject to Section 3.25.050(B)(2), and the property must cease operating as a short-term vacation rental immediately. Failure to comply may result in a fine of one thousand dollars ($1,000.00) per day for a continuing violation of this subsection F.

G. Immediately upon a change of an owner's authorized agent or representative, local contact, or any other change pertaining to the information contained in the short-term vacation rental application, the owner or owner's authorized agent or representative shall update the short-term vacation rental unit's online registration profile used by the city for the implementation of the short-term vacation rental regulations. Failure to immediately update this information may result in a violation of this chapter, including but not limited to a suspension or revocation of a short-term vacation rental permit, until all information is updated.

H. The city manager or authorized designee may prepare, for adoption by resolution by the city council, a review procedure and criteria to evaluate the limitation for issuance of STVR permits and/or STVR applications for geographic areas within the city as set forth in subsection D.

(Ord. 619 § 1, Exh. A, 12-17-2024; Ord. No. 607, Exh. A, 12-5-2023; Ord. 590 § 1(Exh. A), 3-16-2021; Ord. 586 § 1(Exh. A), 12-15-2020; Ord. 572 § 1, 2018; Ord. 563 § 1, 2017; Ord. 501 § 2, 2012)

## 3.25.065 Short-term vacation rental permit—Grounds for denial.

A. In addition to any other grounds provided in this chapter, an application (including renewal application) for a short-term vacation rental permit may be denied if use of the short-term vacation rental unit has been, will be, or is apt to become any one (1) or more of the following.

1. Prohibited by any local ordinance or by any state or federal law, statute, rule or regulation;
2. A public nuisance;
3. In any way detrimental to the public interest;
4. Prohibited by zoning laws and ordinances.

B. An application (including renewal application) for a short-term vacation rental permit may also be denied on the grounds that the applicant has knowingly made a false statement in a material matter

either in his/her/their application or in his/her/their testimony before the city manager or other body hearing such testimony.

C. This section is intended to be, and shall be construed as being, in alignment with the grounds for denial of a business license set forth in Section 3.28.080 (or successor section) of this code.

(Ord. 619 § 1, Exh. A, 12-17-2024; Ord. 591 § 1(Exh. A), 4-20-2021)

### 3.25.070 Operational requirements and standard conditions.

A. The owner and/or owner's authorized agent or representative shall use reasonably prudent business practices to ensure that the short-term vacation rental unit is used in a manner that complies with all applicable laws, rules and regulations pertaining to the use and occupancy of the subject short-term vacation rental unit.

1. An estate home may be established for short-term vacation rental use subject to evaluation and inspection of the property pursuant to Section 3.25.060(D)(1).
2. An estate home established for short-term vacation rental use is required to be equipped with a noise monitoring device(s) that is operable at all times.

B. The responsible person(s) shall be an occupant(s) of the short-term vacation rental unit for which he, she or they signed a rental agreement for such rental, use and occupancy, and/or any person(s) occupying the short-term vacation rental unit without a rental agreement, including the owner, owner's authorized agent or representative, local contact(s) and their guests. The responsible person(s) shall not sub-rent or sub-lease the short-term vacation rental unit to a Subtenant unless said sub-rental or sub-leasing is in full compliance with this chapter. No non-permanent improvements to the property, such as tents, trailers, or other mobile units, may be used as short-term vacation rentals. The total number of occupants, including the responsible person(s) and children regardless of age, allowed to occupy any given short-term vacation rental unit may be within the ranges set forth in the table below. By the issuance of a short-term vacation rental permit, the city or its authorized designees, including police, shall have the right to conduct a count of all persons occupying the short-term vacation rental unit in response to a complaint or any other legal grounds to conduct an inspection resulting from the use of the short-term vacation rental unit, and the failure to allow the city or its authorized designees the ability to conduct such a count may constitute a violation of this chapter. The city council may by resolution further restrict occupancy levels provided those restrictions are within the occupancy ranges set forth below.

| Number of Bedrooms | Total of Overnight* Occupants | Total Daytime** Occupants (Including Number of Overnight Occupants) |
|---|---|---|
| 0—Studio | 2 | 2—8 |
| 1 | 2—4 | 2—8 |
| 2 | 4—6 | 4—8 |
| 3 | 6—8 | 6—12 |
| 4 | 8—10 | 8—16 |
| 5 | 10—12 | 10—18 |
| 6 | 12—14 | 12—20 |

| | | |
|---|---|---|
| 7 | 14 | 14—20 |
| 8 | 16 | 16—22 |
| 9 | 18 | 18—24 |

*Overnight (10:01 p.m.—6:59 a.m.)

**Daytime (7:00 a.m.—10:00 p.m.)

C. The person(s) listed as the local contact person in the short-term vacation rental unit's online registration profile shall be available twenty-four (24) hours per day, seven (7) days per week, with the ability to respond to the location within thirty (30) minutes to complaints regarding the condition, operation, or conduct of occupants of the short-term vacation rental unit or their guests. The person(s) listed as a local contact person shall be able to respond personally to the location, or to contact the owner or the owner's authorized agent or representative to respond personally to the location, within thirty (30) minutes of notification or attempted notification by the city or its authorized short-term vacation rental designated hotline service provider. No provision in this section shall obligate the city or its authorized short-term vacation rental designated hotline service provider to attempt to contact any person or entity other than the person(s) listed as the local contact person.

D. The owner, the owner's authorized agent or representative and/or the owner's designated local contact person shall use reasonably prudent business practices to ensure that the occupants and/or guests of the short-term vacation rental unit do not create unreasonable or unlawful noise or disturbances, engage in disorderly conduct, or violate any applicable law, rule or regulation pertaining to the use and occupancy of the subject short-term vacation rental unit.

E. Occupants of the short-term vacation rental unit shall comply with the standards and regulations for allowable noise at the property in accordance with Sections 9.100.210 and 11.08.040 (or successor provision, as may be amended from time to time) of this code. No radio receiver, musical instrument, phonograph, compact disk player, loudspeaker, karaoke machine, sound amplifier, or any machine, device or equipment that produces or reproduces any sound shall be used outside or be audible from the outside of any short-term vacation rental unit between the hours of 10:00 p.m. and 7:00 a.m. Pacific Standard Time. Observations of noise related violations shall be made by the city or its authorized designee from any location at which a city official or authorized designee may lawfully be, including but not limited to any public right-of-way, any city-owned public property, and any private property to which the city or its authorized designee has been granted access.

F. Prior to occupancy of a short-term vacation rental unit, the owner or the owner's authorized agent or representative shall:

1. Obtain the contact information of the responsible person;
2. Provide copies of all electronically distributed short-term vacation rental information from the city, including any good guest brochure to the responsible person and post in a conspicuous location within the short-term vacation rental unit, in a manner that allows for the information to be viewed in its entirety; and require such responsible person to execute a formal acknowledgement that he/she/they is/are legally responsible for compliance by all occupants of the short-term vacation rental unit and their guests with all applicable laws, rules and regulations pertaining to the use and occupancy of the short-term vacation rental unit. This information shall be maintained by the owner or the owner's authorized agent or representative for a period of three (3) years and be made readily

available upon request of any officer of the city responsible for the enforcement of any provision of this code or any other applicable law, rule or regulation pertaining to the use and occupancy of the short-term vacation rental unit.

G. The owner, the owner's authorized agent or representative and/or the owner's designated local contact person shall, upon notification or attempted notification that the responsible person and/or any occupant and/or guest of the short-term vacation rental unit has created unreasonable or unlawful noise or disturbances, engaged in disorderly conduct, or committed violations of any applicable law, rule or regulation pertaining to the use and occupancy of the subject short-term vacation rental unit, promptly respond within thirty (30) minutes to immediately halt and prevent a recurrence of such conduct by the responsible person and/or any occupants and/or guests. Failure of the owner, the owner's authorized agent or representative and/or the owner's designated local contact person to respond to calls or complaints regarding the condition, operation, or conduct of occupants and/or guests of the short-term vacation rental unit within thirty (30) minutes, shall be subject to all administrative, legal and equitable remedies available to the city.

H. The owner of a short-term vacation rental unit that has a valid homeshare short-term vacation rental permit shall occupy the dwelling during the transient stay. A violation of any provision of this chapter, this code, or any other applicable federal, state, or local laws or codes, by the owner, owner's authorized agent or representative and/or the owner's designated local contact person shall be subject to all administrative, legal and equitable remedies available to the city.

I. Trash and refuse shall not be left or stored within public view, except in proper containers for the purpose of collection by the city's authorized waste hauler on scheduled trash collection days. The owner, the owner's authorized agent or representative shall use reasonably prudent business practices to ensure compliance with all the provisions of Chapter 6.04 (Solid Waste Collection and Disposal) (or successor provision, as may be amended from time to time) of this code.

J. Signs may be posted on the premises to advertise the availability of the short-term vacation rental unit as provided for in Chapter 9.160 (Signs) (or successor provision, as may be amended from time to time) of this code.

K. The owner, the owner's authorized agent or representative and/or the owner's designated local contact person shall post a copy of the short-term vacation rental permit and a copy of the good guest brochure in a conspicuous place within the short-term vacation rental unit, and a copy of the good guest brochure shall be provided to each occupant of the subject short-term vacation rental unit.

L. Unless otherwise provided in this chapter, the owner and/or the owner's authorized agent or representative shall comply with all provisions of Chapter 3.24 concerning transient occupancy taxes, including, but not limited to, submission of a monthly return in accordance with Section 3.24.080 (or successor provisions, as may be amended from time to time) of this code, which shall be filed monthly even if the short-term vacation rental unit was not rented during each such month.

M. Guesthouses, detached from the primary residential dwelling on the property, or the primary residential dwelling on the property, may be rented pursuant to this chapter as long as the guesthouse and the primary residential dwelling are rented to one (1) party; provided, however, that this Subsection (M) does not apply to multi-unit lock-off STVR units.

N. The owner and/or the owner's authorized agent or representative shall post the number of authorized bedrooms and the current short-term vacation rental permit number at the beginning or top of any

advertisement that promotes the availability or existence of a short-term vacation rental unit; provided, however, this requirement may be satisfied if a hosting platform used by the owner and/or owner's authorized agent or representative provides a designated field(s) to post the number of authorized bedrooms and the current short-term vacation rental permit number for the short-term vacation rental unit. In the instance of audio-only advertising of the same, the short-term vacation rental permit number and the number of authorized bedrooms shall be read as part of the advertisement.

O. The owner and/or owner's authorized agent or representative shall operate a short-term vacation rental unit in compliance with any other permits or licenses that apply to the property, including, but not limited to, any permit or license needed to operate a special event pursuant to Section 9.60.170 (or successor provision, as may be amended from time to time) of this code. The city may limit the number of special event permits issued per year on residential dwellings pursuant to Section 9.60.170 (or successor provision, as may be amended from time to time).

P. The city manager, or designee, shall have the authority to impose additional conditions on the use of any given short-term vacation rental unit to ensure that any potential secondary effects unique to the subject short-term vacation rental unit are avoided or adequately mitigated, including, but not limited to, a mitigating condition that would require the installation of a noise monitoring device to keep time-stamped noise level data from the property that will be made available to the city upon city's reasonable request.

Q. The standard conditions set forth herein may be modified by the city manager, or designee, upon request of the owner or the owner's authorized agent or representative based on site-specific circumstances for the purpose of allowing reasonable accommodation of a short-term vacation rental unit. All requests must be in writing and shall identify how the strict application of the standard conditions creates an unreasonable hardship to a property such that, if the requirement is not modified, reasonable use of the property as a short-term vacation rental unit would not be allowed. Any hardships identified must relate to physical constraints to the subject site and shall not be self-induced or economic. Any modifications of the standard conditions shall not further exacerbate an already existing problem.

R. On-site parking shall be on an approved driveway, garage, and/or carport areas only; this section does not impose restrictions on public street parking regulations. Recreational vehicles may be parked in accordance with the provisions set forth in Section 9.60.130 (or successor provision, as may be amended from time to time) of this code.

S. No "apartment," "apartment building," or "apartment project," as defined in Section 9.280.030 (or successor provision, as may be amended from time to time) of this code shall be eligible to apply for or obtain a short-term vacation rental permit.

T. A privately owned residential dwelling, regardless of whether it is permitted or not as a short-term vacation rental unit, rented for a period of thirty one (31) consecutive calendar days or more, counting portions of calendar days as full days, by any person(s), with or without a rental agreement, that is subsequently sub-rented or sub-leased to a Subtenant for a period of thirty (30) consecutive days or less, counting portions of calendar days as full days, constitutes use of the privately owned residential dwelling as a short-term vacation rental unit and is subject to the provisions of this chapter. This Subsection (T) is declaratory of existing law under this chapter.

(Ord. 619 § 1, Exh. A, 12-17-2024; Ord. No. 608, § 1, 12-5-2023; Ord. No. 607, Exh. A, 12-5-2023; Ord. 590 § 1(Exh. A), 3-16-2021; Ord. 586 § 1(Exh. A), 12-15-2020; Ord. 577 § 1, 2019; Ord. 572 § 1, 2018; Ord. 563 § 1, 2017; Ord. 501 § 2, 2012)

## 3.25.080 Recordkeeping and hosting platform duties.

A. The owner or the owner's authorized agent or representative shall maintain for a period of three (3) years, records in such form as the tax administrator (as defined in Chapter 3.24) may require to determine the amount of transient occupancy tax owed to the city. The tax administrator shall have the right to inspect such records at all reasonable times, which may be subject to the subpoena by the tax administrator pursuant to Section 3.24.140 (Records) (Transient Occupancy Tax) (or successor provisions, as may be amended from time to time) of this code.

B. Hosting platforms shall not complete any booking transaction for any residential dwelling or other property purporting to be a short-term vacation rental unit in the city unless the dwelling or property has a current and valid short-term vacation rental permit issued pursuant to this chapter, which is not under suspension, for the dates and times proposed as part of the booking transaction.

1. The city shall maintain an online registry of active and suspended short-term vacation rental permits, which hosting platforms may reference and rely upon for purposes of complying with subsection B. If a residential dwelling or other property purporting to be a short-term vacation rental unit matches with an address, permit number, and/or current and valid permit dates (not under suspension) set forth in the city's online registry, the hosting platforms may presume that the dwelling or other property has a current and valid short-term vacation rental permit.
2. The provisions of this subsection B shall be interpreted in accordance with otherwise applicable state and federal law(s) and will not apply if determined by the city to be in violation of, or preempted by, any such law(s).

(Ord. 619 § 1, Exh. A, 12-17-2024; Ord. 590 § 1(Exh. A), 3-16-2021; Ord. 586 § 1(Exh. A), 12-15-2020; Ord. 572 § 1, 2018; Ord. 563 § 1, 2017; Ord. 501 § 2, 2012)

## 3.25.090 Violations.

A. *Additional conditions.* A violation of any provision of this chapter or this code by any applicant, occupant, responsible person, local contact person, owner or owner's authorized agent or representative (including a management company), shall authorize the city manager, or designee, to impose additional conditions on the use of any given short-term vacation rental unit to ensure that any potential additional violations are avoided.

B. *Permit modification, suspension and revocation.* A violation of any provision of this chapter, this code, California Vehicle Code, or any other applicable federal, state, or local laws or codes, including, but not limited to, applicable fire codes and the building and construction codes as set forth in Title 8 of this code, by any applicant, occupant, responsible person, local contact person, owner, or owner's authorized agent or representative (including a management company), shall constitute grounds for modification, suspension and/or revocation (which may include permanent revocation) of the short-term vacation rental permit and/or any affiliated licenses or permits pursuant to the provisions set forth in Section 3.25.100.

C. *Notice of violation.* The city may issue a notice of violation to any applicant, occupant, responsible person, local contact person, owner, owner's authorized agent or representative (including a management company), or hosting platform, pursuant to Section 1.01.300 (or successor provisions, as may be amended from time to time) of this code, if there is any violation of this chapter committed, caused or maintained by any of the above parties.

D. *Two (2) strikes policy.* Subject to a minor violation reprieve request, two (2) violations of any provision of this chapter or this code within one (1) year by any applicant, occupant, responsible person, local contact person, owner, owner's authorized agent or representative (including a management company), with respect to any one (1) residential dwelling shall result in an immediate suspension of the short-term vacation rental permit with subsequent ability to have a hearing before the city, pursuant to this chapter, to request a lifting of the suspension. For purposes of this subsection, a "minor violation reprieve request" means a written request submitted to the city's code enforcement officer for relief from counting one (1) or more violations within the one (1) year period as a minor violation, and "minor violation" means a violation of a particular section of this code that resulted in minimal impact on the use and enjoyment of the adjacent and nearby properties caused by any of the following:

1. Minor debris or trash containers left in view as a first offense;
2. A short-term vacation rental permit number or bedroom count not posted on an advertisement as a first offense;
3. A short-term vacation rental permit number or bedroom count posted in the wrong location on an advertisement as a first offense; or
4. Over occupancy due to a minor child not associated with a disturbance.

A determination of whether a code violation is a minor violation shall be based on substantial evidence presented to the code enforcement officer relating to that violation.

E. *Administrative and misdemeanor citations.* The city may issue an administrative citation to any applicant, occupant, responsible person, local contact person, owner, owner's authorized agent or representative (including a management company), or hosting platform, pursuant to Chapter 1.09 (Administrative Citations) (or successor provisions, as may be amended from time to time) of this code, if there is any violation of this chapter committed, caused or maintained by any of the above parties. Nothing in this section shall preclude the city from also issuing an infraction citation upon the occurrence of the same offense on a separate day. An administrative citation may impose a fine for one (1) or more violations of this chapter in the maximum amount allowed by state law or this code in which the latter amount shall be as follows:

1. General short-term vacation rental violations (occupancy/noise/parking).
   a. First violation: one thousand dollars ($1,000.00);
   b. Second violation: two thousand dollars ($2,000.00);
   c. Third violation: three thousand dollars ($3,000.00).
2. Operating a short-term vacation rental without a valid short-term vacation rental permit.
   a. First violation: one thousand and five hundred dollars ($1,500.00);
   b. Second or more violations: three thousand dollars ($3,000.00);
   c. Third or more violations: five thousand dollars ($5,000.00);
   d. In addition to the fines set forth above, the first, second, third, or subsequent violation of operating a short-term vacation rental unit without a valid short-term vacation rental permit shall be cause for an owner (or person and/or entity that owns or controls a business or organization or other entity of any kind, such as a limited liability company, which is the owner of a property) to be prohibited for all time from being eligible to be issued a short-term vacation rental permit and/or business license for use of a property as a short-term vacation rental unit.
3. Hosting a special event at a short-term vacation rental unit without a special event permit as required by Section 9.60.170 (or successor provision, as may be amended from time to time) of this code.

   a. First violation: five thousand dollars ($5,000.00);
   b. Second violation: five thousand dollars ($5,000.00).
4. Advertising a short-term vacation rental without a valid short-term vacation rental permit by person(s) or entity(ies) other than a management company.
   a. First violation: one thousand dollars ($1,000.00);
   b. Second violation: two thousand dollars ($2,000.00);
   c. Third violation: three thousand dollars ($3,000.00).
5. Advertising a short-term vacation rental without a valid short-term vacation rental permit by a management company.
   a. First violation: one thousand and five hundred dollars ($1,500.00);
   b. Second violation: three thousand dollars ($3,000.00);
   c. Third or more violations: five thousand dollars ($5,000.00);
   d. In addition to the fines set forth above, the first, second, third, or subsequent violation of knowingly advertising a short-term vacation rental unit without a valid short-term vacation rental permit by a management company shall be cause for the management company to be prohibited from being used to advertise or operate a short-term vacation rental unit at the property identified for not having a valid short-term vacation rental permit. Additionally, repeat violations, which is three (3) or more violations of this subsection (E)(5), by a management company for knowingly advertising a short-term vacation rental unit without a valid short-term vacation rental permit shall be cause for the management company to be prohibited for all time from being eligible to be issued a short-term vacation rental permit and/or business license in the city for such property management purposes.

F. *Public Nuisance.* In addition to any and all rights and remedies available to the city, it shall be a public nuisance for any person or entity to commit, cause or maintain a violation of this chapter, which shall be subject to the provisions of Section 1.01.250 (Violations public nuisances) (or successor provisions, as may be amended from time to time) of this code.

(Ord. 619 § 1, Exh. A, 12-17-2024; Ord. No. 607, Exh. A, 12-5-2023; Ord. 590 § 1(Exh. A), 3-16-2021; Ord. 586 § 1(Exh. A), 12-15-2020; Ord. 578 § 1, 2019; Ord. 572 § 1, 2018; Ord. 563 § 1, 2017; Ord. 501 § 2, 2012)

## 3.25.100 Appeals.

A. Any person aggrieved by any decision of a city officer made pursuant to this chapter may request a hearing before the city manager in accordance with Chapter 2.08 (or successor provisions, as may be amended from time to time) of this code.

B. Notwithstanding any provisions in Section 2.08.230 or otherwise in the code, the decision by the city manager of an appeal brought under this chapter shall be the final decision by the city for any violation of a short-term vacation rental permit issued under this order, except for any administrative citation imposing a fine, which shall be processed and subject to an administrative appeal pursuant to Chapter 1.09 of the code.

(Ord. 619 § 1, Exh. A, 12-17-2024; Ord. 590 § 1(Exh. A), 3-16-2021; Ord. 586 § 1(Exh. A), 12-15-2020; Ord. 572 § 1, 2018; Ord. 563 § 1, 2017)

STATE OF CALIFORNIA )
COUNTY OF RIVERSIDE ) ss.
CITY OF LA QUINTA )

I, MONIKA RADEVA, City Clerk of the City of La Quinta, California, do hereby certify the foregoing to be a full, true, and correct copy of Ordinance No. 626 which was introduced at a special meeting on the 22nd day of September, 2025, and was adopted at a regular meeting held on the 7th day of October, 2025, not being less than 5 days after the date of introduction thereof.

I further certify that the foregoing Ordinance was posted in three places within the City of La Quinta as specified in the Rules of Procedure adopted by City Council Resolution No. 2022-027.

MONIKA RADEVA, City Clerk
City of La Quinta, California

DECLARATION OF POSTING

I, MONIKA RADEVA, City Clerk of the City of La Quinta, California, do hereby certify that the foregoing ordinance was posted on the 8th day of October, 2025, pursuant to Council Resolution 2022-027.

MONIKA RADEVA, City Clerk
City of La Quinta, California