# EXHIBIT E

## Moeder Expert Report

MOEDER ADVISORS
REAL ESTATE | ECONOMICS ADVISORY

**Exhibit 106**
10/06/2026
Moeder

In re:

SilverRock Development Company, et al.

Debtors

Chapter 11

Case No. 24-11647 (MFW)

(Jointly Administered)

**Report of**
**Nathan Moeder**
*Principal*

**September 18, 2026**

**moederadvisors.com**

# I. Assignment & Qualifications

I, Nathan Moeder, have been retained by Stoel Rives LLP, to provide expert analysis and testimony on behalf of Poppy Bank in regard to the Chapter 11 bankruptcy of SilverRock Development Company et al. (Case No. 24-11647 MFW). My assignment was to review the documents in this proceeding and provide opinions on various real estate issues that affect value as well as how the real estate industry, including developers, lenders, and investors, approach and analyze the development opportunity of a project. I also offer opinions on how the development industry allocates and assigns value to various components of a project.

This report constitutes my overall opinion as it relates to my review of the information and documents provided to me in this matter. Attached hereto as Exhibit A is a list of the documents I reviewed and relied upon.

I have a Master of Science in Real Estate from the University of San Diego, which I obtained in 2006. In 1998, I obtained a Bachelor of Arts in Economics with a Minor in Mathematics and Business from the University of San Diego. In addition to my formal education, I have served as a strategic consultant for a wide array of clients from the perspective of real estate economics, valuation and strategy. My clients include real estate developers, investors, corporations, financial institutions, as well as business and public agencies. My experience spans all real estate sectors including residential, office, industrial, hotel, retail, mixed-use and large-scale master planned projects.

Part of the work I do for clients includes business and asset valuation services, particularly for real estate development projects and investments. I have extensive experience in applicable valuation methodologies, reviewing contracts, partnership agreements, corporate documents, accounting, purchase documents, and escrow and closing documents, that inform the value of a real estate asset and respective ownership interests.

Since 2000, I have taught various courses at various universities on real estate, including Finance and Investments, Proforma Analysis, Development Feasibility and Market Analysis. My current academic post for the past nine years is at UC San Diego, where I teach Finance & Investments and the development process to undergraduate students in the Real Estate & Development major. Attached hereto as Exhibit B is a true and correct copy of my current curriculum vitae, which better details all my experience and training in the real estate development and valuation industry, and I have not authored any publications in the previous 10 years.

# II. Compensation

Research, analysis and preparation, appearance and consultation are billed at a rate of $650 per hour for Mr. Moeder and $375 per hour for staff analysts.

# III. Cases In Which Testimony Was Given

In addition to working as a real estate consultant, I have been retained as a real estate expert in over 60 matters, as detailed in my List of Expert Witness Cases in Exhibit C. Exhibit C sets forth the

topics and expert witness services I was retained to perform at trial or deposition, which include an overwhelming number of cases involving valuation issues, the actions of reasonably informed and experienced real estate professionals, and damages in a real estate transaction or development.

# IV. Background

Phase 1 of SilverRock Resort is comprised of 127.91 acres and is planned to include a full-service, luxury hotel and branded residences adjacent to the municipal SilverRock golf course. ("SilverRock"). The development plan is divided into two distinct phases:

- **Phase 1A**: includes a luxury hotel of 154 rooms, 70 hotel-branded condominiums; and 29 hotel-branded residential lots, as well as a spa, conference center and golf clubhouse.

- **Phase 1B**: is a latter phase of development that is currently vacant land proposed for a total of 93 hotel-branded residential lots.

On December 9, 2025, the property was purchased out of bankruptcy free and clear of all claims, liens, interest, and encumbrances by Turnbridge Equities for a total of $65 million.[1] The following map depicts the development parcels acquired. This map was found in the Court's records at Docket No. 943-1, page 23 thereof, a copy of which is attached at Exhibit D hereto.

[1] Order Approving the Sale of Assets to the Successful Bidder, Doc 759, filed 10/23/25.

# V. Summary Opinions

Based on my review of the information and documents provided to me in this matter, my opinions are summarized below.

**The Luxury Hotel Is the Primary Driver of Residential Value.** Unlike La Quinta's most elite golf-oriented communities, which derive value from membership exclusivity and championship-caliber golf course pedigree, SilverRock sits adjacent to a non-exclusive public course of lesser quality in terms of design and prestige.

The sale price analysis of the competitive golf communities in La Quinta demonstrates a direct correlation to high sale prices (over $1,000 per square foot) and the most exclusive and prestigious golf experiences. Less exclusive and less prestigious golf experiences achieve sale prices that are approximately 50% lower (approximately $500 per square foot).

Given that the golf experience offered at SilverRock is non-exclusive and of lesser quality in terms of design and prestige, it would be reasonable to assume that the achievable sale prices of residences would likely be in the $500 per square foot range. However, the developer strategy for the property is to introduce a luxury hotel to create brand-value for the residential components of the project. While the ultimate sale prices that could be achieved are unknown, it is important to acknowledge that this value-creating substitution is untested in the market. It is unknown whether buyers will place the same value on a hotel brand as they do premium golf experiences and exclusivity. Nonetheless, it demonstrates the extraordinary value that the developer places on the hotel to provide branding, services, and amenities for residences.

**Shared Back-of-House Services Are Integral to the Branded Residences.** The back-of-house infrastructure shared by the hotel and residences is necessary to service the branded-residence concept and is a key Project Milestone under the Reinstated Development Agreement's Schedule of Performance, tied directly to the hotel. Without it, both the level of service to residences and the pace and pricing of sales would be negatively impacted.

**The "Acreage Only" Allocation Methodology Is Analytically Incorrect.** Allocating the $52,357,920.79 in Phase 1 sale proceeds equally on a per-acre basis assumes all 127.91 acres are equally valuable. This is analytically incorrect because it ignores the fundamental precepts of real estate valuation which is a property's capacity to generate income, the timing of the income, and the market support for developable uses.

Fundamentally, Phase 1A and Phase 1B are different assets. The timing of development for Phase 1B is tied to the completion and market performance of Phase 1A. Phase 1B represents a much later phase of development, and as such represents a lower value to a developer. It is standard practice by developers and acquirers of real estate assets to assign a zero or minimal value to phases of a master planned project that will be held as land and not developed for many years.

An acre only allocation also does not appropriately account for the extraordinary value the developer places on the hotel to create the luxury living experience for residents. Without the hotel,

there is no value creation or value premium for the residential land. The residences are ordinary lots next to a public golf course.

The acre only allocation also ignores the critical events and factors related to value. Most principally, the significant subsidy received by the project through the transient occupancy tax rebate. Over 15 years, the developer is projected to receive a total of $106 million in subsidy, with 64% being generated by the hotel and 36% being generated by residences that are rented. Essentially, the hotel generates approximately 80% more subsidy for the project than residential.

**The HVS and Cushman & Wakefield Valuation Differential Between Phase 1A and Phase 1B Is the More Appropriate Basis for Allocation.** It is my opinion that the differential in value as evidenced by the HVS Appraisal dated 9/18/2026 as well as the CW Appraisal, which occurred at the same time as the bankruptcy sale, is the more fair and accurate method for allocating the proceeds of $52,357,920.79, as opposed to treating all parcels across the entire site the same.

# VI. Opinions Detailed

## A. Critical Importance of the Luxury Hotel to SilverRock

### 1. SilverRock Hotel Brand Substitute for Value-Creation

Buyers of residential property in golf-oriented communities in the La Quinta market value two main factors: 1) membership exclusivity, and 2) golf course design quality and pedigree. Together, they create a high-quality golf experience, which directly translates to value in terms of high sale prices for residences. However, the SilverRock project is located adjacent to a public course that is not private (the golf course is a public course, and will remain public even after completion of the entire resort development) and lacks exclusivity. The golf course is also of lesser quality and pedigree.

To mitigate these lacking critical factors that create value and demand for residences, the developer of SilverRock incorporated a luxury hotel in attempt to generate brand-value for residences. Rather than marketing to buyers of residences guaranteed private access to a vetted membership and a prestigious golf course, SilverRock is hoping to substitute in a luxury hotel brand and services. As such, the hotel is the primary value-creation mechanism for the project.

This strategy is untested by the market as the competitive golf communities in La Quinta have traditionally achieved value through membership exclusivity and golf course quality and pedigree. It also demonstrates the importance of the hotel to the project and the value that it hopes to create for the residences. Without the luxury hotel, the residences at SilverRock would be valued significantly less as ordinary lots on a public golf course.

### 2. Overview of La Quinta Golf-Oriented Residential Communities

The following map depicts the locations of the competitive golf course communities in the La Quinta market. The map number corresponds to each community's overall competitive ranking in terms of prestige, exclusivity and overall golf experience.




Generally, residential communities with premium golf experiences are centered on two factors:

- **Exclusivity**: by making the golf course private and closed to the public, it creates status for members of the golf club. It enhances the experience for members because members are of similar social status and there is no concern about who a golfing group or partner will be. This also creates value for residential owners because owners know they are golfing with neighbors and friends who abide by the club's standards.

- **Design Quality and Pedigree**: the quality and architectural design of a golf course creates value for the surrounding land uses, and members are willing to pay higher values for the more sought-after golf courses. The flow of the course, how it plays, the shot values, and memorability of the experience creates prestige for the golf course. Naming also carries value as it identifies what level of involvement the architect had in the design.

The following table summarizes these competitive factors for the competitive golf courses compared to SilverRock. The SilverRock course ranks #7 as it is a non-exclusive public course with a mid-level design quality.

**La Quinta Competitive Golf Communities**
**Golf Course Rankings**

| Comp Ranking | Club | Course Type | Designer | # of Courses | Exclusivity | Quality | PGA Events |
|---|---|---|---|---|---|---|---|
| 1 | The Madison Club | Private | Tom Fazio | 1 | Ultra Exclusive | Elite | Private PGA Events |
| 2 | Tradition Golf Club | Private | Arnold Palmer Legacy | 1 full course, 1 par 3 (9 holes) | Very High | Exceptional | Arnold Palmer Pro-Am |
| 3 | The Hideaway | Private | Pete Dye, Clive Clark | 2 | High | Excellent | Southern California Women's Championship |
| 4 | The Citrus Club | Private | Pete Dye, Alice Dye | 3 | Moderate - High | Great | None |
| 5 | Mountain View Country Club | Private | Arnold Palmer Signature | 1 | Moderate - High | Very Good | None |
| 6 | PGA West | Semi-Private | Pete Dye, Jack Nicklaus, Arnold Palmer, and Tom Weiskopf | 5 | Low | Excellent | American Express Tournament |
| 7 | SilverRock | Public/ Municipal | Arnold Palmer Classic | 1 | Public | Excellent | None. Former Bob Hope Classic (2008 - 2011) |

*The Madison Club (Ranking: #1)*

The Madison Club is an ultra-exclusive, private residential golf and country club community. The community includes a Tom Fazio-designed golf course surrounded by homes and homesites developed by Discovery Land Company. Membership requires a real estate purchase and a substantial initiation fee and monthly dues. In addition to golf, club amenities include:

- Discovery performance center- a private golf training facility
- Tennis and pickleball facility
- Fitness center with personal training
- Resort-style swimming pool
- Multiple dining venues
- Private movie theater/game room

*Tradition Golf Club (Ranking: #2)*

Tradition Golf Club is an ultra-exclusive, private residential golf community on 700 acres in La Quinta. The community includes an Arnold Palmer Legacy course built at the height of his career. Membership is attained through an invitation-only process that includes formal vetting. A real estate purchase within Tradition does not automatically grant you membership. Non-residents can purchase membership through the same process. Golf memberships are capped at 210 members. Membership levels include a full golf membership which is fully inclusive, a "Junior" membership for those under age 50, and a club/social membership which includes full amenity usage along with golf at the 9-hole short course. Tradition markets itself as "golf's best-kept secret" in the Coachella Valley. They specifically point out that, "the fact there is no sign... is a sign." That puts it in the same exclusive bracket as The Madison Club, despite having no real-estate developer behind it. Club amenities include:

- 18-hole championship course
- 9-hole short course
- Golf practice facilities

- Clubhouse & dining
- Meeting rooms and private event space
- Fitness center
- Spa services
- Pickleball and bocce courts

*The Hideaway (Ranking: #3)*

The Hideaway is an exclusive golf community with two complete 18-hole championship courses (Clive Clark and Pete Dye) on 600 acres. Originally developed by the Discovery Land Company, it now operates as a member-owned club. Membership is capped at 225 members per course, or 450 total memberships. Real estate ownership is not required for golf membership but is required for club membership. In addition to golf, club amenities include:

- 80,000-square-foot clubhouse
- Multiple dining venues
- Luxury spa
- Fitness center
- Resort pool
- Sports courts (tennis, pickleball, and bocce)

*The Citrus Club (Ranking: #4)*

The Citrus Club is a premier, private, gated golf community in La Quinta. It includes an 18-hole Pete Dye-designed golf course. Although there is an affiliation with PGA West, the Citrus Club is run independently. Home ownership does not translate to golf or club membership. Membership is by invitation only and features multiple options: Golf membership includes access to the Citrus course as well as other nearby courses via the La Quinta Resort. Golf memberships are capped at 560. Sports membership includes privileges to The La Quinta Resort along with unlimited play, driving range & practice facility at a nearby affiliated golf course but does not include golf at the Citrus Club course. Social Membership provides full access to the La Quinta Resort and The Citrus Club amenities that include:

- Clubhouse dining
- Pools and spas
- Tennis, pickleball and bocce
- Fitness Centers

*Mountain View Country Club (Ranking: #5)*

Mountain View Country Club is one of the most accessible clubs in this competitive set. Every home purchase in the community comes with a non-refundable social membership while golf membership is offered at an extra cost. Non-residents can also purchase both the social and golf memberships. The golf course is an 18-hole Arnold Palmer Signature course (where the original layout

was personally overseen by Arnold Palmer). Members can get tee times seven days in advance. Memberships include a golf membership and a social club membership (non-optional for homeowners). There is also a "Preview Membership" which includes up to two months of golf and club access. In addition to golf, club amenities include:

- Dining
- Fitness center
- Tennis, pickleball and bocce
- Pool and spa

*PGA West (Ranking: #6)*

PGA West south of Avenue 54 and west of Madison Street features five courses, including public resort access, private membership, and two real estate linked memberships. The resort side (Stadium Course and Nicklaus Tournament Course) is bookable by any hotel guest through La Quinta Resort stay-and-play packages, and Stadium hosts The American Express, keeping it in the PGA Tour rotation. The private side runs through The Club at PGA WEST, bundling the Nicklaus Private, Palmer Private, and Weiskopf courses with a Sports Club, dog park, and private dining; Distinguished Desert Membership adds The Citrus Club's course for access to all nine original PGA West layouts. Two additional membership options are through a real estate purchase rather than a membership application: Signature, a gated neighborhood of production homes with its own clubhouse and shared golf/tennis access, and The Residence Club, which sells fractional villa ownership shares (1/4 or 1/9 shares). Amenities at PGA West include:

- Five championship 18-hole golf courses; optional access to four additional golf courses
- Three clubhouses
- Casual to fine dining options
- Sports Club – a 4-acre sports, fitness and entertainment hub
- Tennis, pickleball and bocce
- Swimming pools
- Wellness programs
- Dog park

*SilverRock (Ranking: #7)*

SilverRock is owned by the City of La Quinta and operated by Landmark Golf Management. It is the only public course on this list with no membership, invitation, or real estate purchase required to play there. In addition, the Reinstated and Amended Covenant for the golf course ensures that it is maintained as a golf course open to the public after the City transfers it to the new buyer.[2] The golf course is an Arnold Palmer Classic course (design by Arnold Palmer). Amenities are limited to the golf facility which includes a driving range, pro shop and an indoor and outdoor restaurant. Current plans for SilverRock include:

[2] 06 Reinstated & Amended Covenant – Golf Course Use DOC # 2025-0382831.pdf, p. 6.

- 154-room luxury hotel, including a restaurant, spa, fitness facilities, and pools
- Standalone building with banquet and back-of-house space, plus parking
- 194 single-family and condominium resort residential units, consisting of:
    - 29 hotel-branded single-family lots
    - 70 condominium units ranging from approximately 2,000 to 3,500 SF each
    - 93 lots in Phase 1B
- Private residences clubhouse of approximately 20,000 SF

### 3. Achievable Sale Prices

The sale prices for residences achieved at the competitive golf communities are tied directly to exclusivity, design quality and pedigree. As detailed in the following chart, the highest rated and most exclusive golf experiences achieve the highest values for residences over the past 12 months of sales, including The Madison Club ($1,635 per square foot), Tradition Golf Club ($1,083 per square foot) and The Hideaway ($1,132 per square foot). Less competitive clubs achieve residential values ranging from $492 to $528 per square foot.




Source: Moeder Advisors, Redfin

On a total sale price basis, The Madison Club achieved an average sale price of $13,581,250 over the past 12 months. This was followed by Tradition Golf Club ($5,785,077) and The Hideaway ($5,858,333). The less competitive communities achieved average sale prices ranging from $1,523,283 to $1,640,660. This information is detailed in the following chart.




The table on the following page further delineates the sale information in each competitive community in La Quinta:

## La Quinta Competitive Golf Club Residential Sales Analysis
## Ranked by Competitive Ranking
## Last 12 Months of Sales Closings

| Competitive Ranking | Club | Single-Family Residential |
|---|---|---|
| 1 | **The Madison Club** | |
| | Sales Price Avg. | $13,581,250 |
| | Home Size Avg. (SF) | 8,307 |
| | Sales Price Avg. (PSF) | $1,635 |
| | Lot Size Avg. (SF) | 38,166 |
| | # of Sales | 12 |
| 2 | **Tradition Golf Club** | |
| | Sales Price Avg. | $5,785,077 |
| | Home Size Avg. (SF) | 5,341 |
| | Sales Price Avg. (PSF) | $1,083 |
| | Lot Size Avg. (SF) | 21,344 |
| | # of Sales | 13 |
| 3 | **The Hideaway** | |
| | Sales Price Avg. | $5,858,333 |
| | Home Size Avg. (SF) | 5,174 |
| | Sales Price Avg. (PSF) | $1,132 |
| | Lot Size Avg. (SF) | 17,901 |
| | # of Sales | 21 |
| 4 | **The Citrus** | |
| | Sales Price Avg. | $1,640,660 |
| | Home Size Avg. (SF) | 3,264 |
| | Sales Price Avg. (PSF) | $503 |
| | Lot Size Avg. (SF) | 9,839 |
| | # of Sales | 25 |
| 5 | **Mountain View CC** | |
| | Sales Price Avg. | $1,523,283 |
| | Home Size Avg. (SF) | 3,095 |
| | Sales Price Avg. (PSF) | $492 |
| | Lot Size Avg. (SF) | 11,380 |
| | # of Sales | 26 |
| 6 | **PGA West** | |
| | Sales Price Avg. | $1,631,651 |
| | Home Size Avg. (SF) | 3,090 |
| | Sales Price Avg. (PSF) | $528 |
| | Lot Size Avg. (SF) | 10,691 |
| | # of Sales | 61 |
| **Total Sales Price Avg.** | | **$3,426,320** |
| **Total Home Size Avg. (SF)** | | **3,977** |
| **Total Sales Price Avg. (PSF)** | | **$862** |
| **Total Lot Size Avg. (SF)** | | **14,709** |
| **Total # of Sales** | | **158** |
| 7 | **SilverRock Planned** | |
| | ***27 Single-family lots*** | |
| | ***70 condominium units*** | ***2,000 - 3,500 SF*** |
| | ***93 lots in phase 1B*** | |
| | ***Pricing TBD*** | |

Source: Moeder Advisors, Redfin

*Conclusion*

The sale price analysis of the competitive golf communities in La Quinta demonstrates a direct correlation to high sale prices (over $1,000 per square foot) and the most exclusive and prestigious golf experiences. Less exclusive and less prestigious golf experiences achieve sale prices that are approximately 50% lower (approximately $500 per square foot).

Given that the golf experience offered at SilverRock is non-exclusive and of lesser quality in terms of design and prestige, it would be reasonable to assume that the achievable sale prices of residences would likely be in the $500 per square foot range. However, as discussed previously, the strategy by the developer of SilverRock is to introduce a luxury hotel to create brand-value for the residential components of the project. While the ultimate sale prices that could be achieved are unknown, it is important to acknowledge that this value-creating substitution is untested in the market. It is unknown whether buyers will place the same value on a hotel brand as they do premium golf experiences and exclusivity. Nonetheless, it demonstrates the extraordinary value that the developer places on the hotel to provide branding, services, and amenities for residences.

## 4. Alternative Value Premium for Luxury Hotel

While the previous section detailed the approximately 50% valuation difference in residences based on different levels of luxury golf residential communities, I have also researched what the typical value premium is for luxury branded versus non-branded residences.

It is widely understood in the real estate industry that a luxury hotel anchor is valuable to residences that are sold as “hotel-branded”. According to Bresi, a branded residences platform, research shows that branded residences typically achieve a 20% to 35% higher price compared to non-branded properties in established markets. In ultra-luxury segments, the premium achieved could be up to 60%.[3] This is due to higher quality offerings, amenities, and services created by the hotel that are available to owners of branded residences. Without the hotel component in a project, none of these higher quality elements and value premiums would exist and the residential lots, or units, would reflect a much lower value.

[3] https://brandedresi.com/branded-residences-pricing/

## B. Shared Services Between Hotel and Residences

To create the branded residences for the SilverRock project, back of house ("BOH") facilities and services must be established. The BOH space is the operational infrastructure required to cater to residences and hotel guests and includes kitchens, laundry, engineering and building systems, loading and receiving, catering, storage and supply, and staff support areas. This is the basic infrastructure that allows luxury-branded residences to be serviced at standards consistent with the hotel, as well as across the entire resort.

The Reinstated Development Agreement's own Schedule of Performance underscores the importance of this critical project component for the project.[4] According to Exhibit E of the agreement, the BOH component is considered a "Project Milestone" alongside the hotel to create the services and amenities for residences.

The Schedule of Performance also places the residential components on a timeline that runs from, and is measured against, the Luxury Hotel and BOH components. This further demonstrates the importance and value of having these components in place when residences are sold and buyers move in. Without the hotel and BOH components, the level of service for residences would be inadequate and negatively impact the sale prices of residences as well as the pace of sales.

## C. The "Acreage Only" Methodology is Analytically Incorrect

### 1. The Equal Per-Acre Approach Ignores Fundamental Valuation Principles

I have reviewed the "Acreage Only" methodology, such as the Debtors' previously proposed allocation waterfall[5] for the aggregate net sales proceeds of $52,357,920.79. The "Acreage Only" allocation such as the Debtors' allocation distributes the proceeds equally on a per-acre basis. In doing so, the "Acreage Only" methodology incorrectly assumes that all 127.91 acres are equal in value.

It is my opinion that allocating the $52,357,920.79 on a simple average per-acre basis — treating each acre of the Phase 1 Property as equally valuable regardless of land use, density, timing, income-generating capacity, or development certainty — is methodologically incorrect and inconsistent with established real estate valuation principles, particularly as it relates to development projects.

A fundamental precept of real estate valuation is that land value is derived from its capacity to generate income or proceeds, combined with the timing of such revenue and market support for specific uses. For example, land that will generate revenue in Year 1 is more valuable than land that will generate revenue in eight years. The reason is that development opportunities further into the future, or those that take longer to develop and sell or stabilize operations, are subject to higher holding costs such as cost of equity or debt financing. There are also property taxes, insurance and the potential interruption of development due to market cycles that could prolong the development timeframe and further increase carrying costs of the project. In addition, the longer the development period results in higher construction costs, which could impact feasibility. These are basic factors in the time-value-of-

[4] ORD 626 SilverRock DA 2025-0001 (Reinstated & Amended DA 2014-1001) Turnbri.pdf
[5] Doc 913-4, Filed 03/24/26

money principle that must be analyzed and understood in large-scale master planned projects with multiple land uses.

## 2. Phase 1A and Phase 1B are Fundamentally Different Assets

Prior to the bankruptcy sale and in connection therewith, the City of La Quinta commissioned an appraisal by Cushman & Wakefield to value the property as of October 7, 2025 ("CW Appraisal"), which is relevant because of its near proximity to the sale date although it was based upon the Debtor's plan rather than the ultimate buyer, Turnbridge's, plan. The appraisal's valuation conclusion for Phase 1A was $17.89 per square foot of land totaling $55,100,000.[6] This value was based on the contemplated development of two luxury hotels and branded residences.

The CW Appraisal then valued Phase 1B and concluded a value of $7.50 per square foot of land totaling $16,600,000.[7] This was based on sales comparables of vacant land that represented a much later development timeline after Phase 1A was completed.

Based on the different land uses and timing of development, the value of Phase 1B was 58% less than Phase 1A in the CW Appraisal, which demonstrates the analytical error of an equalized allocation on a per-acre basis across the entire site of both 1A/1B. Phase 1A is the first phase of development that the developer is willing to develop based on what it believes is supportable in the market. This first phase included two hotels: Montage (134 rooms) and Pendry (200 rooms). There were also 29 Montage-branded residences and 55 Pendry-branded residences that could potentially be sold and incorporated into hotel operations as additional rental properties. Phase 1B, however, represented a much later phase of development as a mixed-use village with additional 390 residential units. Thus, the likelihood and timing of Phase 1B was dependent on the successful development, hotel stabilization, and sale of residences in Phase 1A, before it would be initiated. If Phase 1A performed below the market or developer's expectations, then it would not be developed or would be reconceptualized with different land uses.

The CW Appraisal also correctly identified that the property already had partial construction of improvements and infrastructure in Phase 1A, which represents value creation for the first phase of development. However, Phase 1B is vacant and unimproved land. This also demonstrates how these two phases are fundamentally different assets and why an average per-acre allocation is incorrect.

---

[6] CW Appraisal, p. 194

[7] Ibid. However, it is my opinion that the value of Phase 1B of $7.50 per square foot is overstated in the CW Appraisal. The appraisal does not account for the later timing of Phase 1B, which would occur after Phase 1 is completed or near completed. As such, a buyer of Phase 1B would have carrying costs that would reduce the land value of Phase 1B because it represents a development opportunity later in the future (e.g. prolonged equity and debt financing costs, property taxes, insurance, higher construction costs, etc.). There is no immediate opportunity to development Phase 1B. However, in its check of reasonableness in Addendum C, the CW Appraisal assumes that Phase 1B is already graded with infrastructure and a buyer can start the vertical construction of homes, which does not appear to be the case. Regardless, per Addendum C, Cushman & Wakefield's value is actually lower for Phase 1B at $6.73 per square foot. Therefore, the CW Appraisal should be reasonably adjusted to this slightly lower per square foot value for Phase 1B.

In addition to the "type" of land use, a significant driver of real estate value is the "time to income," meaning how long it takes to build a project and turn vacant land into a revenue-producing income stream. Land with income potential that is further off into the future means it is less valuable than land that is more immediately developable.

The approach taken in the CW Appraisal in valuing Phase 1A and 1B differently is consistent with the differential in value applied by HVS in its 9/18/2026 appraisal, and is fundamentally more accurate than treating the value of all the acreage across the site the same.

### 3. Phase 1B Has Little to No Value to a Developer

It is standard practice by developers and acquirers of real estate assets to assign a zero or minimal value to phases of a master planned project that will be held as land and not developed for many years. The main developer objective is to ensure that the immediate phases of development generate sufficient revenue to support the acquisition price, land improvement costs, infrastructure costs and vertical construction costs.

A property that is not developed for many years into the future is difficult to value. It is also well understood in the real estate industry that it does not hold the same value in today's present dollars as an identical property that is immediately developable. Construction costs, interest rates, inflation, absorption rates and buyer demand can all materially change by the time a property is able to be developed. In addition, market conditions and real estate laws governing development can also change and impact what is feasible to develop in the future. There are also holding costs associated with "carrying" a property that cannot be developed for many years (e.g. prolonged equity and debt financing costs, property taxes, insurance, higher construction costs, etc.), which further detracts from any hypothetical value. In addition, a developer cannot reasonably predict, at the time of acquisition, what a much later development phase will be worth or what the future development plan may be.

According to the Schedule of Performance in the Reinstated Development Agreement, Phase 1B cannot start until the luxury branded residences in Phase 1A are completed. This constraint places the development of Phase 1B into the distant future. A reasonably informed and experienced developer, investor, or lender would not assign the same present value to Phase 1B as it would for Phase 1A, which is the immediate development phase.

It stands to reason that the new buyer, Turnbridge Equities, assigned a value of $0 for land cost and acquisition and closing costs for Phase 1B, due to it being a later development.

In addition, this significant valuation difference between Phase 1A and 1B demonstrates that an equalized, acreage-based allocation of land value between the two phases is incorrect and inappropriate from the real estate industry's perspective.

### 4. An Acre Only Allocation Does Not Account for Hotel & Brand Value

As discussed previously, the golf experience offered at SilverRock is non-exclusive and of lesser quality in terms of design and prestige compared to the competitive golf-based residential communities

nearby. This disadvantage was observed in the CW Appraisal,[8] which identifies it as a weakness and states: "The highest tiers of residential product in the Coachella Valley correspond to homes in the most exclusive, private membership communities (such as Madison Club, Bighorn, Quarry, Hideaway, Vintage Club, etc.). Pricing for the residential component of the proposed subject development (both branded residences and mid-market SFR) may be somewhat constrained by the less exclusive, non-private status offering fewer amenities than the most prestigious clubs (such as public vs private golf course)."

To mitigate this competitive disadvantage, the developer strategy is to introduce a luxury brand hotel to add amenities and services for residents. But this strategy is not a guaranteed valuation substitute for a highly exclusive and prestigious golf experience. However, it does demonstrate the critical importance and value of the hotel to the project.

As such, an acre only allocation does not appropriately account for the extraordinary value the developer places on the hotel to create the luxury living experience for residents. Without the hotel, there is no value creation or value premium for the residential land. The residences are ordinary lots next to a public golf course.

### 5. An Acre Only Allocation Ignores Critical Events Related to Value

The 127.91-acre property was purchased by Turnbridge Equities in a bankruptcy auction for $65,000,000. The sale closed on December 9, 2025. Prior to the sale, Turnbridge Equities worked with the City of La Quinta to prepare a revised development plan and Reinstated and Amended Development Agreement (“ADA”) for the property. In the ADA, there are critical events related to value that stem directly from the development and completion of the hotel and amenities, including:

a) The developer would receive a transient occupancy tax rebate for 15 years, which is valued at $106.6 million.
b) The City’s transfer of the existing Arnold Palmer Golf Course and Ahmanson Ranch House to Turnbridge Equities. However, the Reinstated and Amended Covenant for the golf course ensures that it is maintained as a golf course open to the public after the transfer.[9]
c) The developer would have the right to purchase the Phase 2 Property comprising approximately 193 acres for $17 million.
d) Phase 1B is sequenced after Phase 1A and it cannot start until Phase 1A is completed.

[8] CW Appraisal, p. 11
[9] 06 Reinstated & Amended Covenant – Golf Course Use DOC # 2025-0382831.pdf, p. 6.

*Economic Subsidy: TOT Rebate*

In economic terms, land in the first phase of development that includes the hotel is not viewed on equal footing with other components of the project. It is "the" component that unlocks City incentives – granting options, creating transfers and generating a significant subsidy revenue stream for the developer. It also is the phase that is most immediately developable in the short term. A reasonably informed and experienced developer, if tasked with assigning value to various components, would assign a premium to the first phase of development to reflect both its near-term revenue-producing capacity and its option value over the remainder of development.

The following table from the Economic Development Subsidy Report in September 2025[10] details the significant income stream used to subsidize the hotel and select residences that are added to the rental pool. In total, $106.6 million of subsidy is estimated to support the project.

**ESTIMATED CITY REVENUES**
**SILVEROCK PROJECT**
**LA QUINTA, CALIFORNIA**

| | TOT Revenue | | | Gross Sales Tax | | Estimated Property Tax | | | City Revenues | |
|---|---|---|---|---|---|---|---|---|---|---|
| Year | Room Revenue | Residential Revenue | TOT | Hotel F&B Sales | Sales Tax | Assessed Value | City Share | Proposed Subsidy | Gross | Net |
| 1 | $33,389,000 | $16,927,000 | $5,365,000 | $23,093,000 | $462,000 | $803,000,000 | $562,000 | ($4,829,000) | $6,389,000 | $1,560,000 |
| 2 | $38,303,000 | $23,517,000 | $6,565,000 | $27,531,000 | $551,000 | $819,060,000 | $573,000 | ($5,909,000) | $7,689,000 | $1,780,000 |
| 3 | $43,081,000 | $26,451,000 | $7,384,000 | $31,427,000 | $629,000 | $835,441,000 | $585,000 | ($6,646,000) | $8,598,000 | $1,952,000 |
| 4 | $48,150,000 | $29,548,000 | $8,251,000 | $35,408,000 | $708,000 | $852,150,000 | $597,000 | ($7,426,000) | $9,556,000 | $2,130,000 |
| 5 | $49,594,000 | $30,435,000 | $8,499,000 | $36,470,000 | $729,000 | $869,193,000 | $608,000 | ($7,649,000) | $9,836,000 | $2,187,000 |
| 6 | $51,082,000 | $31,347,000 | $8,754,000 | $37,568,000 | $751,000 | $886,577,000 | $621,000 | ($7,879,000) | $10,126,000 | $2,247,000 |
| 7 | $52,615,000 | $32,288,000 | $9,016,000 | $38,695,000 | $774,000 | $904,309,000 | $633,000 | ($8,114,000) | $10,423,000 | $2,309,000 |
| 8 | $54,193,000 | $33,256,000 | $9,287,000 | $39,856,000 | $797,000 | $922,395,000 | $646,000 | ($8,358,000) | $10,730,000 | $2,372,000 |
| 9 | $55,819,000 | $34,254,000 | $9,565,000 | $41,052,000 | $821,000 | $940,843,000 | $659,000 | ($8,609,000) | $11,045,000 | $2,436,000 |
| 10 | $57,493,000 | $35,282,000 | $9,852,000 | $42,283,000 | $846,000 | $959,660,000 | $672,000 | ($8,867,000) | $11,370,000 | $2,503,000 |
| 11 | $59,218,000 | $36,340,000 | $10,148,000 | $43,552,000 | $871,000 | $978,853,000 | $685,000 | ($6,089,000) | $11,704,000 | $5,615,000 |
| 12 | $60,995,000 | $37,430,000 | $10,452,000 | $44,858,000 | $897,000 | $998,430,000 | $699,000 | ($6,271,000) | $12,048,000 | $5,777,000 |
| 13 | $62,825,000 | $38,553,000 | $10,766,000 | $46,204,000 | $924,000 | $1,018,399,000 | $713,000 | ($6,460,000) | $12,403,000 | $5,943,000 |
| 14 | $64,709,000 | $39,710,000 | $11,089,000 | $47,590,000 | $952,000 | $1,038,767,000 | $727,000 | ($6,653,000) | $12,768,000 | $6,115,000 |
| 15 | $66,651,000 | $40,901,000 | $11,422,000 | $49,018,000 | $980,000 | $1,059,542,000 | $742,000 | ($6,853,000) | $13,144,000 | $6,291,000 |
| 16 | $68,650,000 | $42,128,000 | $11,764,000 | $50,488,000 | $1,010,000 | $1,080,733,000 | $757,000 | $0 | $13,531,000 | $13,531,000 |
| 17 | $70,710,000 | $43,392,000 | $12,117,000 | $52,003,000 | $1,040,000 | $1,102,348,000 | $772,000 | $0 | $13,929,000 | $13,929,000 |
| 18 | $72,831,000 | $44,694,000 | $12,481,000 | $53,563,000 | $1,071,000 | $1,124,395,000 | $787,000 | $0 | $14,339,000 | $14,339,000 |
| 19 | $75,016,000 | $46,034,000 | $12,855,000 | $55,170,000 | $1,103,000 | $1,146,883,000 | $803,000 | $0 | $14,761,000 | $14,761,000 |
| 20 | $77,266,000 | $47,415,000 | $13,241,000 | $56,825,000 | $1,137,000 | $1,169,821,000 | $819,000 | $0 | $15,197,000 | $15,197,000 |
| 21 | $79,584,000 | $48,838,000 | $13,638,000 | $58,530,000 | $1,171,000 | $1,193,217,000 | $835,000 | $0 | $15,644,000 | $15,644,000 |
| 22 | $81,972,000 | $50,303,000 | $14,047,000 | $60,286,000 | $1,206,000 | $1,217,081,000 | $852,000 | $0 | $16,105,000 | $16,105,000 |
| 23 | $84,431,000 | $51,812,000 | $14,469,000 | $62,094,000 | $1,242,000 | $1,241,423,000 | $869,000 | $0 | $16,580,000 | $16,580,000 |
| 24 | $86,964,000 | $53,367,000 | $14,903,000 | $63,957,000 | $1,279,000 | $1,266,251,000 | $886,000 | $0 | $17,068,000 | $17,068,000 |
| 25 | $89,573,000 | $54,968,000 | $15,350,000 | $65,876,000 | $1,318,000 | $1,291,576,000 | $904,000 | $0 | $17,572,000 | $17,572,000 |
| 26 | $92,260,000 | $56,617,000 | $15,810,000 | $67,852,000 | $1,357,000 | $1,317,408,000 | $922,000 | $0 | $18,089,000 | $18,089,000 |
| 27 | $95,028,000 | $58,315,000 | $16,285,000 | $69,888,000 | $1,398,000 | $1,343,756,000 | $941,000 | $0 | $18,624,000 | $18,624,000 |
| 28 | $97,879,000 | $60,064,000 | $16,773,000 | $71,985,000 | $1,440,000 | $1,370,631,000 | $959,000 | $0 | $19,172,000 | $19,172,000 |
| 29 | $100,815,000 | $61,866,000 | $17,276,000 | $74,144,000 | $1,483,000 | $1,398,044,000 | $979,000 | $0 | $19,738,000 | $19,738,000 |
| 30 | $103,840,000 | $63,722,000 | $17,795,000 | $76,369,000 | $1,527,000 | $1,426,005,000 | $998,000 | $0 | $20,320,000 | $20,320,000 |
| **30 Years** | | | | | | | | | | |
| Total | | | $355,219,000 | | $30,474,000 | | $22,805,000 | ($106,612,000) | $408,498,000 | $301,886,000 |
| NPV @ 8.0% | | | $119,913,000 | | $10,278,000 | | $8,297,000 | ($64,809,000) | $138,488,000 | $73,679,000 |

[10] Economic Dev Subsidy Rpt 2025 Sept (GC 53083 & 52201).pdf, p. 9.

However, most of the subsidy is generated by the hotel. Approximately $68.6 million (64%) is generated by the hotel component, compared to $38 million (36%) generated by residential. Essentially, the hotel generates approximately 80% more subsidy for the project than residential. The following table delineates the TOT rebate per component.

**Estimated Subsidy by Component**
**Hotel v. Residential**

| Year | Room TOT Subsidy | Residential TOT Subsidy | Total TOT Subsidy |
|---|---|---|---|
| 1 | $3,305,511 | $1,523,430 | $4,828,941 |
| 2 | $3,791,997 | $2,116,530 | $5,908,527 |
| 3 | $4,265,019 | $2,380,590 | $6,645,609 |
| 4 | $4,766,850 | $2,659,320 | $7,426,170 |
| 5 | $4,909,806 | $2,739,150 | $7,648,956 |
| 6 | $5,057,118 | $2,821,230 | $7,878,348 |
| 7 | $5,208,885 | $2,905,920 | $8,114,805 |
| 8 | $5,365,107 | $2,993,040 | $8,358,147 |
| 9 | $5,526,081 | $3,082,860 | $8,608,941 |
| 10 | $5,691,807 | $3,175,380 | $8,867,187 |
| 11 | $3,908,388 | $2,180,400 | $6,088,788 |
| 12 | $4,025,670 | $2,245,800 | $6,271,470 |
| 13 | $4,146,450 | $2,313,180 | $6,459,630 |
| 14 | $4,270,794 | $2,382,600 | $6,653,394 |
| 15 | $4,398,966 | $2,454,060 | $6,853,026 |
| **Total ($)** | **$68,638,449** | **$37,973,490** | **$106,611,939** |
| **Total (%)** | **64%** | **36%** | |

*Developer Option to Purchase Phase 2*

The developer option to purchase 193 acres from the City for $17 million also demonstrates that land without an immediate development timeframe is less valuable. The option price equates to $88,083 per acre, or $2.02 per square foot of land. The option cannot be exercised until after the hotel opens and earlier phases of development are completed.

## D. Cushman & Wakefield Value Differential Further Supports Valuing Phase 1A Higher Than Phase 1B

It is my opinion that the differential in value between Phase 1A and Phase 1B as evidenced by the recent HVS appraisal dated 9/18/2026 and also the CW Appraisal, which occurred at the same time as the bankruptcy sale, is the more fair and accurate method for allocating the proceeds of $52,357,920.79. Both of those appraisals value Phase 1A as higher than Phase 1B.

Based on the CW Appraisal, land in Phase 1B is valued 58% less than land in Phase 1A, which is conservative considering the lower value included in Addendum C of the appraisal at $6.73 per square

foot. Utilizing the more likely lower value of $6.73 per square foot, the value differential between Phase 1A and 1B is 62%.

Although the Cushman appraisal values the original two-hotel plan, and Turnbridge Equities' latest public statements propose a single hotel plan, it does not materially change the percentages between Phase 1A and Phase 1B. The most important factor related to development value is that Phase 1A will be developed first, and it needs to be completed and supported within the market before development of Phase 1B could occur. In other words, Phase 1B is dependent on the success of Phase 1A.

I understand that there are additional testimony and evidence that may be presented in this case, which I will consider.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 9/18/26

[signature]

Nathan Moeder

# Exhibit A

**Keillor Capital Production**
KEI0000001 to KEI0000582

**2026.09.04 RDOC Allocation Docs**
RDOCALLOCATION_0000001 to RDOCALLOCATION_0000210

**Docket No. 621 to 764 in Case No. 24-11647 (MFW)**
Debtor sale motion pleadings

**Buyer Site Plan – TBEPlan**

**Turnbridge Four Season PPT Deck and overview**

**Site Plan - Turnbridge - SilverRock**

**2026.08.24 Docs Prod by City La Quinta per Subp**
LAQUINTA00000001 to LAQUINTA00004201

**Documents from the RDO AP Case - AP 25-51049-MFW**
Docket No. 1 – Ex. 1, 3, 4, 5, 6, 9, 15, 18, 22

**SilverRock Property Ownership Changes Chart**

**Cushman Wakefield Appraisal Report**
PB_BK00002123

**Photos**
PB_BK00000579 to PB_BK_00000591

**2014 Dev Agt w/ City**
Doc #2014-0484106 recorded in the Riverside County Recorder Office

**Documents filed in Riverside Superior Court Case #CVPS2404750**
Exhibits filed in Support of Complaint by City of La Quinta

**Doc Prod to Debtors 05 2026**
PB_BK00000643 to PB_BK00002644

**Pleadings in Case No. 24-11647 (MFW)**
Docket No. 437 to Docket No. 963

**Robert Green Deposition Transcript and Exhibits 1 - 29**

**HVS real estate appraisals**
PB_BK00000866, PB_BK00001130

**Drone Flyover Video Dated September 15, 2023**

**City of La Quinta Project Documents including Permits, Plans, and Environmental Approvals**
**Creditor Map**

**RDO Mechanics' Liens**
PB_BK00003251to PB_BK00003266

**2026.09.11 Docs Prod by City La Quinta per Subp**
LAQUINTA00004202 to LAQUINTA00004745

**2025.11.20 Poppy Prod to RDO**
POPPY BANK_005095 to POPPY BANK_005398

**Docket No. 425-1 in Case No. 24-11647 (MFW)**
Stewart Title Report

**777-490-051 SilverRock Way Tax Map**

**HVS – SilverRock Resort Phase 1 Valuation dated 9/18/2026**

**Four Seasons – Silverrock Resort Cost to Complete Report, La Quinta, CA dated 9/18/2026**

# Exhibit B

MOEDER
ADVISORS
REAL ESTATE | ECONOMICS ADVISORY



Nathan Moeder
*Principal*

## EDUCATION

Master of Science in Real Estate | University of San Diego 2006
Bachelor of Arts – Economics Major, Mathematics Minor, Business Minor | University of San Diego 1998

## PROFESSIONAL AND BUSINESS HISTORY

Moeder Advisors, Inc. | 2026 – pres.
London Moeder Advisors | 2017 - 2026
The London Group | 1997 to 2017

## BIOGRAPHY

Nathan Moeder is widely considered one of the West Coast's foremost authorities on the financial feasibility of real estate projects. He serves as a strategic consultant who advises a wide array of clients from the perspective of real estate economics. His clients include real estate developers, investors, corporations, financial institutions, businesses, and public agencies. Project assignments span all real estate sectors, including residential developments, office buildings, industrial, hotel, retail, and mixed-use projects. He brings extensive experience and financial expertise as an advisor and analyst to many successful projects and assignments throughout North America.

Prior to Moeder Advisors, he was managing partner at London Moeder for 29 years. In this role he expanded the consultancy into a multidisciplinary economic analysis firm, managing operations and overseeing all methodologies, practices, and work product for clients.

Mr. Moeder is a real estate finance, investment, and valuation expert. His experience in the finance realm ranges from working with institutional Wall Street firms on international deals to working with small entrepreneurial investment groups and owners. He specializes in market analysis, evaluating project feasibility and acquisition strategies, as well as structuring joint ventures and debt layers for projects.

Mr. Moeder also performs business valuation services in various industries. He has extensive experience in applicable valuation methodologies, reviewing contracts, partnership agreements, accounting, and corporate documents that inform the value of a business and the respective ownership interests. He has also testified on fiduciary duty and proper due diligence for financial investments.

He has been an instructor since 2000 in various courses on real estate, including Finance and Investments, Proforma Analysis, Development Feasibility and Market Analysis. He has also guest-lectured in various MBA courses on financial and investment analysis. Currently, he is a Continuing Lecturer at UC San Diego following his most recent posts at the University of San Diego and the graduate program at Woodbury School of Architecture.

He is considered to be an effective expert witness in litigation matters involving issues related to financial damages, lost profits, valuation, partnership disputes, entitlements, the development process, fiduciary duty, industry standards, practice of real estate professionals, economic loss and business valuation.

(619) 269-4012
nathan@moederadvisors.com
2714 Loker Ave W, Suite 250, Carlsbad, CA 92010

Mr. Moeder is a member of Lambda Alpha International (LAI) land economics society. He served on the San Diego/Tijuana Urban Land Institute (ULI) board for 14 years, where he founded the Young Leaders program.

He is an Advanced Toastmaster and speaks regularly to industry and business organizations on global economic trends and real estate land use issues at the local and national levels. He has been quoted in the San Diego Union Tribune, Los Angeles Times, Chicago Tribune, Baja Times, California Real Estate Journal, National Real Estate Investor, Meridian Star, San Diego Daily Transcript, and San Diego Business Journal. Radio and TV appearances have included: Channel 39 KNBC, Channel 10 KABC, Channel 8 KFMB, Channel 9 KUSI.

Mr. Moeder received his B.A. in Economics in 1998 with a concentration in mathematical economic theory from the University of San Diego (USD). He also holds a Master of Science in Real Estate degree (MSRE) from USD, where he participated in its inaugural class.

## TEACHING EXPERIENCE

*UC San Diego – Continuing Lecturer* — *January 2018 - Present*
- USP 5 – Introduction to the Real Estate & Development Process
- USP 152A – Real Estate Development Finance & Investments
- USP 152B – Advanced Real Estate Development Finance & Investments
- USP 152C – Triton Equity Investments

*USD Burnham-Moores Professional & Continuing Education* — *March 2006 - 2018*
- Real Estate Investment & Income Analysis 101
- Real Estate Investment & Income Analysis 102

*Woodbury University (MSArch RED)* — *September 2008 - 2018*
- Financial Analysis I
- Economics and Market Analysis II

*UC San Diego Extension*
- Financing Urban Development — *2003 - 2012*
- Investment & Development Feasibility — *2006 – 2011*
- Real Estate Economics & Market Analysis — *2004 – 2008*

## PROFESSIONAL AND BUSINESS AFFILIATIONS

- Urban Land Institute San Diego / Tijuana Member: Young Leaders Founder
- Member of Lambda Alpha International: The Honorary Society for the Advancement of Land Economics
- University of San Diego Commercial Real Estate Committee Member
- ULI Panel Advisory Services Honorary Associate
- Past Instructor, University of San Diego (USD) MBA program, Real Estate Finance
- Certified Toastmaster (CTM), Toastmasters International

# Exhibit C

| Year | Name of Case | Firm/Attorney | Work Performed |
|---|---|---|---|
| **2026** | FFIC v. Wood Investments | Troutman<br>Christy Markos<br>Cassidy Webb Campanile | Alleged financial damages from commercial property due to fire. |
| **2025-2026** | El Monte Nature Preserve v. City of SD | Thorsnes Bartolotta McQuire LLP<br>Vincent Bartolotta<br>Karen Frostrom | Financial damages from lost mining and extraction operations due to flooding of property that raised the water table. |
| **2026** | Mardesich v. Schmidt | Wade Litigation<br>Larry Elam | Dispute over CC&R's alleged sunset clause for a shopping center comprise of multiple parcels and owners. |
| **2026** | Unison v. Oceanic | Dillon Miller Ahuja & Boss<br>Gerry Schmelter | Alleged financial damages from cell tower easement; tenant cancelled lease prior to sale of easement. |
| **2026** | Bertranou v. Chang | Nevers Palazzo Packard Wildemuth & Wynner, PC<br>Dennis La<br>Ashlei Vargas | Alleged financial damages from option to purchase an option, allged to be an oral loan. |
| **2025-2026** | LA County v. Shepos et al | Miller Barondess<br>Casey Sypek | Financial damages incurred by LA County due to long-term bribery scheme of County official Shepos. |
| **2025-2026** | Sundownder v. Big Tex | Perkins Coie<br>Thomas Ryerson | Alleged financial damages due to lack of mainenance and repairs by tenant. |
| **2024-2026** | MCWE v. OC Media Tower | Miller Barondess<br>Jason Tokoro | Valuation of former OC Register building. |
| **2025-Current** | BMR-Summers Ridge v. HG Fenton Company | Latham & Watkins<br>Anna Rathbun<br>Parag Dharmavarapu | Financial damages from denied land sale to Amazon. |
| **2024-2025** | Casa de las Campanas v. DPR | Procopio<br>Scott Omohundro<br>Laurence Phillips | Damages to skilled nursing facility operations and business plan due to failed construction project. |
| **2025** | SDGE v. NP10 LLC | Thorsnes Bartolotta McQuire LLP<br>Vincent Bartolotta<br>Karen Frostrom | Valuation and impact to LLC regarding unrecorded easement that led to eminent domain action by SDGE to acquire easement. |
| **2024-2025** | Quay Works LLC v. MWCE | G10 Law<br>Daniel Watts | Valuation of building and other cost considerations at reversion of property to the landlord at end of ground lease. |
| **2024** | Stone Lock District Holdings v. Commissioner | Internal Revenue Service<br>John Goodell | Value of contractual rights under an Option and Assignment Agreement |
| **2024** | 7th St v. Agenus West | Robins Kaplan<br>Michael Geibelson | Alleged breach of lease; damages from lost rental income and mitigation analysis; biotech use |
| **2023-2024** | Sheldon Development v. SCG; Reid; Rose | Perkins Coie<br>Eudeen Chang<br>Taylor Russel<br>Monica Vu | Alleged parntership dispute. Includes valuation of development rights for a hotel project that was in the early stages of entitlement process. Determination of duties of owners/partners. |
| **2021-2024** | Property Reserve vs. Sunbelt Construction Co. | Palmieri Hennessy & Leifer, LLP<br>Patrick Hennessey; Elise Kern | Feasibility of office condominium development in support of fair market value for a potential ground rent adjustment per the lease. |
| **2022-2023** | Uptown Investments v. McComas Construction | Law Offices of Kirk Miller<br>Kirk Miller | Financial damages concerning project delay, lost income, and construction defects. |
| **2021-2023** | Village Communities v. Count of San Diego | County of SD Counsel<br>Joshua Heinlein | Financial damages and lost development opportunity relating to project denial and alleged eminent domain. |
| **2019-2023** | Ariel Suites v Swinerton Builders | Koeller Nebecker Carlson Haluk, LLP<br>Chris Grossi | Financial damages from construction defects concerning rental apartments. |

| Year | Name of Case | Firm/Attorney | Work Performed |
|---|---|---|---|
| **2019-2023** | Kassab v Kassab | Duane Morris<br>Grant Puleo | Valuation of biotech patents; valuation of ownership in various ownership entities; reconciliation of debts, loans and shareholder distributions |
| **2021-2022** | Circa 1200 LLC v.<br>Lendlease Construction | Perkins Coie<br>Jonathan Goddard<br>Heather Heindel | Financial damages (and lost revenue) from alleged construction delays. |
| **2021-2022** | La Roca v. Church Mutual | Procopio<br>Alexandra "Sasha" Selfridge | Business financial damages from failure of insurance company to defend client, resulting in the forced sale of assets for the church. |
| **2020-2021** | Liebert Corp. (Vertiv) v. SVO Building One, LLC | Procopio<br>Scott Omohundro<br>Laurence Phillips | Financial damages, lost income and valuation related to a data center business. Alleged economic damages were due to alleged project delays in construction. |
| **2017-2021** | 7510 Hazard LLC v.<br>CGLIC | Rockwood & Noziska<br>Neal Rockwood<br>Brant Noziska | Development process, financial feasibility and lost revenue pertaining to lost redevelopment opportunity for failure to build a road, which was a condition of entitlements. |
| **2019-2021** | Hilz v Continental Properties, Inc. | Duane Morris<br>Melissa Geller<br>Justin D'Elia | Financial damages of lost development opportunity. Entitlement and development process issues. |
| **2020-2021** | Aharpour v KONE | Tim Noon | Business and economic valuation. Loss income analysis. |
| **2020-2021** | Corby v Lamden | G10 Galuppo Law<br>Georgia Schneider | Property management fees and services for real estate portfolio management. |
| **2019-2021** | Medical Acquisition Company, Inc. v<br>Tri-City Healthcare District | Sullivan, Workman & Dee, LLP<br>Karyn Jakubowski | Financial damages associated with eminent domain of equity interest in medical building. |
| **2014-2020** | Hard Rock Hotel:<br>T-12 Three LLC v.<br>Turner Construction | Koeller Nebecker Carlson Haluk, LLP<br>Robert Carlson<br>Martha Dorsey<br>Will Trotter | Financial damages from construction defects concerning Hard Rock hotel. |
| **2018-2021** | United States of America v.<br>County of Clark and Nevada Links, Inc. | U.S. Department of Justice<br>Serajul Ali<br>John Kressee<br>David DeCelles | Financial damages of below market ground lease; lost opportunity; risk and damages of leasehold interest. |
| **2016-2020** | United States of America v.<br>400 Acres of Land | U.S. Department of Justice<br>Georgia Garthwaite, Johanna Franzen, Anthony Getner, Eugene Hansen, Reade Wilson | AREA 51 - rebuttal analysis of demand methodology, feasibility analysis, industry practices and investment risk of developing an alien tourism project. Eminent domain action. |
| **2019** | Sherwood v.<br>Vogele | Stokes O'Brien<br>Bonnie Stokes | Entitlement/development process; industry standards and standard of care for developers; rebuttal analysis of damages |
| **2018-2019** | MADFI v.<br>DKN Hotel | Rockwood & Noziska<br>Neal Rockwood<br>Brant Noziska | Trespass issue and permanent damage to building; loss rent analysis and cost to repair; diminution of value |
| **2018-2019** | Baronet & Co. v.<br>Victorville/Desert Springs, L.P. | Procopio<br>Jeff Hood | Proper disclosure and due diligence represented in proforma relied upon in prior settlement. Good faith, reliability and validity of proforma. |
| **2017-2018** | Susanville Indian Rancheria v.<br>Wright Development, et al. | Law Offices of Michael A. Hearn<br>Michael A. Hearn | Loss of hotel income and gaming revenue associated with construction defects. |

| Year | Name of Case | Firm/Attorney | Work Performed |
|---|---|---|---|
| **2017-2018** | Ackerman v. Winchell | Smaha Law Group<br>John Paul Teague<br>John Smaha | Opinions & analysis of note value vs. cash value. Subordination and risk issues regarding secured and unsecured positions. Value of taking cash today vs. seller-carried financing. |
| **2016-2018** | Alan S. Fukushima, Chapter 7 Trustee v. Sutter Central Valley Hospitals, et al | Hanson Bridgett, LLP<br>Mohammad Walizadeh<br>Shannon Nessier | Market analysis, reasonably equivalent value analysis and Insolvency analysis (unreasonably small assets test and causation) regarding a land sale to Sutter Hospitals. |
| **2016-2017** | Silverline Construction, Inc. v. Coyle/Reno, et al. | Procopio<br>David Perkins<br>Tim Salter | Damages analysis and reasonableness of Liquidated Damages clause for an apartment project. |
| **2016** | Blue Lake Rancheria v. Wright Development, et al. | Law Offices of Michael A. Hearn<br>Michael A. Hearn | Loss of hotel income and gaming revenue associated with construction defects. |
| **2015** | Lozier v. Cahill Contractors | Zimmerman & Kahanowitch<br>Kristen Nora | Economic loss and earning capacity analysis for fire sprinkler installer/inspector work. |
| **2015** | Diestro v. Strata Properties | Noon & Associates<br>Timothy Noon | Valuation of SRO Hotel and damages loss analysis. Feasibility of disposition alternatives. |
| **2014** | Joseph Cormier v. Suffolk Construction | Zizik, Powers, O'Connell, Spaulding & Lamontagne, P.C.<br>Brian O'Connell<br>William Fidurko | Ironworker compensation case. Work included estimation of economic loss or lost wages due to inability to work. |
| **2013 - 2014** | William Schwartz v. Joel Schwartz | Caldarelli Hejmanowski & Page<br>Jack Leer | Partnership dispute – conducted analysis for what fair and reasonable compensation should be for duties performed by the manager of an LLC. |
| **2012** | Driscoll v. Pacific West Securities, Inc. | Leslie Schwaebe Akins, A.L.C.<br>Leslie Akins | Lack of due diligence and analysis as it relates to a TIC offering in a student housing project (College Park Investors, LLC) |
| **2012 - 2014** | Bobertz v. Griffin Capital | Lendrum Law<br>Jeff Lendrum | Lack of due diligence and analysis as it relates to a TIC sale/lease-back for an auto dealership; appraisal review; risk analysis |
| **2012** | Windigo v. Berthel Fisher & Co. | Broad and Cassel<br>Mark Raymond | Lack of due diligence and analysis as it relates to two TIC residential land investments; risk analysis; financial damages analysis |
| **2012** | La Jolla Company v. La Salsa Holding Company | Kirby Noonan Lance & Hoge<br>Charles Hoge<br>Micaela Banach | Loss of rent damages |
| **2010** | Century Surety Co. v. 350 W.A. LLC | Vivoli & Associates<br>Michael Vivoli | Economic and Financial Damages / Lost Opportunity Analysis |
| **2010** | Siry Investments v. Smith & Others Architects | Balestreri Pendleton & Potocki<br>Karen Holmes | Hotel feasibility; market trends; damages analysis |
| **2009 – 2010** | Palladium LLC v. KMA Architecture & Engineering | Balestreri Pendleton & Potocki<br>Karen Holmes | Market analysis and trends relating to a Downtown mixed-use high rise project / damages analysis and rebuttal |
| **2009 - 2012** | Swinerton Builders v. India Street Ventures | Gibbs, Giden, Locher, Turner & Senet<br>Glen Turner<br>Travis Feuerbacher | Rebuttal of damages analysis / Market analysis and trends pertaining to the San Diego office condo market |
| **2006 -2010** | United States of America v. 32.42 Acres of Land, San Diego Unified Port District | U.S. Department of Justice<br>Marc Gordon<br>Georgia Garthwaite | Procedure 26 report on discount rate and quantification of investor / developer risk. |
| **2009** | AMN Healthcare v. Kilroy Realty | Morrison & Foerster<br>Mark Zebrowski | Economic and Financial Damages |

| Year | Name of Case | Firm/Attorney | Work Performed |
|---|---|---|---|
| **2009** | Earley v. Chubb | Seltzer Caplan McMahon Vitek<br>Elizabeth Smith-Chavez | Economic and Financial Damages /<br>Lost Opportunity Analysis |
| **2009** | Blackburn v. Dukor | Hurst & Hurst<br>Debra Hurst | Economic and Financial Damages /<br>Lost Opportunity Analysis |
| **2009** | Gifford v. Moy | Greer & Associates<br>Keith Greer | Loss of Wages and Expenses Incurred Due to Alleged Medical Malpractice /<br>Residential & Office Market Trends |
| **2008 - 2010** | Kilroy Realty LP v.<br>Newgen Results Corp | Brownstein Hyatt Farber Schreck, LLP<br>Peter Korneffel<br>McDermott Will & Emery<br>Lisa Stone | Income Loss Analysis /<br>Market Absorption Analysis |
| **2008** | VRT Square LP v. Greenleaf Home Loans, Inc. | The Law Offices of Kyle E. Yaege<br>Kyle Yaege | Income Loss Analysis /<br>Market Absorption Analysis |
| **2008** | Wilder v. Zealot | Law Offices of William J. Tucker<br>William Tucker | Property Valuation, Investor Expectations, and Market Conditions |
| **2006** | Sudeep Dhillon v. Heritage Pacific Homes, Inc. | Enterprise Counsel Group<br>Derek Sparks | Feasibility of Development Options, Property Valuation, Impact of Costs |

# Exhibit D

ANNOTATED SITE MAP
(2025 SilverRock Master Plan)




*All square footage amounts and condominium unit numbers are approximate.
**Permitted maximum amounts (for instance, 70 condominium units) shall be governed by and as set forth in the Agreement Addendum, Project Description, and Scope of Work.
**

[Site Maps Continue on Next Page]