**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>SilverRock Development Company, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-11647 (MFW)<br><br>(Jointly Administered)<br>Re: Docket No. 1166 |

# GRANITE CONSTRUCTION COMPANY'S REPLY BRIEF REGARDING PROPOSED VALUATION OF REAL PROPERTY ASSETS

**ESBROOK P.C.**
Maria Aprile Sawczuk (DE Bar #3320)
Scott J. Leonhardt (DE Bar # 4885)
Jared T. Green (DE Bar #5179)
800 North King Street, Suite 301
Wilmington, DE 19801
Phone: 302.650.7540
Email: maria.sawczuk@esbrook.com
scott.leonhardt@esbrook.com
jared.green@esbrook.com

-and-

**FINCH THORNTON & BAIRD, LLP**
P. Randolph Finch, Jr. (admitted *pro hac vice*)
Andrea L. Petray (admitted *pro hac vice*)
Lindsey C. Herzik (admitted *pro hac vice*)
4747 Executive Drive
San Diego, CA 92121
Phone: 858.737.3100
Email: pfinch@ftblaw.com
apetray@ftblaw.com
lherzik@ftblaw.com

*Counsel for Granite Construction Company*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: SilverRock Development Company, LLC (5730), RGC PA 789, LLC (5996), SilverRock Lifestyle Residences, LLC (0721), SilverRock Lodging, LLC (4493), SilverRock Luxury Residences, LLC (6598) and SilverRock Phase I, LLC (2247). The location of the Debtors' principal place of business and the Debtors' mailing address is 343 Fourth Avenue, San Diego, CA 92101.

## TABLE OF CONTENTS

INTRODUCTION ..... 1

ARGUMENT ..... 2

I. The Phase 1B Parties Improperly Present Disputed Lien Rights as Established Facts. ..... 2

II. The DIP Priming Allocation Does Not Establish the Relative Value of the Parcels ..... 3

III. Poppy's Proposed Allocation Reflects Its Selected Development Assumptions Rather Than the Transaction That Occurred ..... 4

IV. Builders' Appraisal Does Not Establish the Parcels' Relative Contribution to the Integrated Sale ..... 7

V. Common Parcel Identification Must Be Resolved Before Any Allocation Is Applied. ..... 8

CONCLUSION ..... 9

# TABLE OF AUTHORITIES

Page(s)

## Cases

*In re Aerogroup International, Inc.*,
601 B.R. 571 (Bankr. D. Del. 2019) ... 7

*In re Hetzel*,
23 F. Supp. 530 (M.D. Pa. 1938) ... 7

*In re LTV Steel Co.*,
285 B.R. 259 (Bankr. N.D. Ohio 2002) ... 7

*In re Mannington Pottery Co.*,
104 F. Supp. 506 (N.D.W. Va. 1952) ... 8

# INTRODUCTION

Granite Construction Company ("Granite") submits this reply in response to the opening briefs filed by (1) the Traub Family Revocable Trust, dated January 22, 2015, SilverRock Land II, LLC, Keillor Capital, RAF Pacifica Loan Opportunity Fund I, LLC, the Arnold Fishman Revocable Trust dated July 15, 1999 ("Keillor"), SilverRock Resort Investment, LLC, and SilverRock Resort Investment M, LLC ("EB-5 Lenders") (collectively, the "Phase 1B Parties") [D.I. 1396], (2) R.D. Olson Construction, Inc. ("RDO") [D.I. 1397], (3) Construction Loan Services II, LLC d/b/a Builders Capital ("Builders") [D.I. 1399], and (4) Poppy Bank ("Poppy") [D.I. 1400]. The competing briefs confirm the central fact supporting Granite's proposed allocation: the $65 million transaction established a market value for the Property as an integrated whole but assigned no price to its constituent parcels. The Buyer required the entire Property, and no party identifies transaction evidence establishing the consideration attributable to any individual parcel. Granite's proportional acreage approach reflects the integrated sale while preserving the parties' separate disputes concerning lien validity, extent, and priority.

The competing approaches do not reliably allocate the proceeds of the transaction that occurred. The Phase 1B Parties improperly equate negotiated debtor-in-possession ("DIP") priming exposure with relative property value and disregard Granite's asserted lien rights against their parcels. Poppy selectively applies the Property's integrated character to support an allocation favorable to its interests, while Builders allocates value among six appraisal groups, but those groups do not consistently correspond to the individual parcels subject to the competing liens. Each competing method reconstructs parcel or phase values through financing exposure, projected development economics, or post-sale appraisal groupings rather than transaction evidence allocating the consideration actually paid. Significantly, the Phase 1B Parties themselves identify proportional acreage as the appropriate alternative if the Court rejects their DIP-allocation theory.

The Court should adopt Granite's proportional acreage approach and require a uniform identification of the parcels and their corresponding allocations, subject to resolution of the competing lien claims.

## ARGUMENT

### I. The Phase 1B Parties Improperly Present Disputed Lien Rights as Established Facts.

Before addressing allocation, Granite must correct the Phase 1B Parties' assertion that no mechanic's liens encumbered Planning Areas 7 and 8 when the EB-5 Lenders subordinated their interests to Keillor, and that the EB-5 Lenders' interests remain junior only to Keillor. D.I. 1396 ¶¶ 22–23. Phase 1B Parties' categorical statements improperly present the disputed scope and priority of Granite's recorded mechanic's lien as established facts. However, those very issues are pending before this Court in *Granite Construction Company v. Cassidy Traub, et al.*, Adv. No. 26-50631 (MFW) (the "Granite Adversary Proceeding"), and are outside the scope of this allocation proceeding.

Granite recorded its mechanic's lien on September 29, 2022, and maintains that the lien encompasses the Phase 1B parcels and has priority over the competing interests asserted against them. Granite Adversary Proceeding, D.I. 1 ¶¶ 34–44, 68–71. The Phase 1B Parties' disagreement with Granite's claims does not permit them to assume their own position has prevailed. The Court should determine the allocation of proceeds without adopting findings concerning the validity, extent, or priority of liens reserved for the Granite Adversary Proceeding. Granite does not ask the Court to accept Granite's position on lien scope or priority in determining allocation; Granite asks only that the Court not adopt the Phase 1B Parties' contrary position as an established premise.

The same objection applies to the Phase 1B Parties' treatment of the payment requested by SilverRock Land II, LLC for the sale of its tenant-in-common interest in Planning Area 9 (the "TIC

Payment”). They quote the governing provision as requiring payment net of payments to “creditors secured by Planning Area 9,” but repeatedly identify those creditors as Keillor alone. D.I. 1396 ¶¶ 17, 39, 47. Granite asserts a lien against Planning Area 9 and disputes the priority of the competing interests in that property. Any ruling concerning the TIC Payment must preserve those claims and cannot proceed on the assumption that Keillor is the only creditor whose asserted lien rights must be addressed.

## II. The DIP Priming Allocation Does Not Establish the Relative Value of the Parcels

The Phase 1B Parties also contend the allocation of DIP priming exposure established the percentages by which the subsequent sale proceeds must be divided. Because Phase 1B supported $7 million of the original $11 million in priming exposure, they seek to allocate 63.64% of the sale proceeds to those parcels. D.I. 1396 ¶¶ 24–36. The Phase 1B Parties’ argument conflates the equity available to support additional financing with the value of the underlying property.

An equity cushion depends on both the value of the collateral and the debt already secured by it. Property with less existing secured debt can support greater priming exposure even if its value is lower than property carrying more debt. Accordingly, the agreement to allocate greater priming exposure to Phase 1B does not establish that Phase 1B contributed a correspondingly greater share of the consideration paid in the later sale.

The final order approving DIP financing [D.I. 330], as amended [D.I. 437] (the “Final DIP Order”), did not establish the values the Phase 1B Parties now ask the Court to adopt. Instead, the Final DIP Order recognized that Planning Areas 7, 8, and 9 included valuable parcels and supported a substantial equity cushion, but it did not determine that those parcels represented 63.64 percent of the Property’s total value, as alleged by the Phase 1B Parties. D.I. 1396 ¶¶ 3–5. That

percentage reflects their negotiated share of DIP priming exposure, not a determination of their parcels' relative contributions to the sale proceeds.

Phase 1B Parties' reliance on law of the case and enforcement of the parties' agreement rests on the same unsupported inference. The law-of-the-case argument fails at its premise because the issue now before the Court was never decided. The Final DIP Order determined how much priming exposure, particular collateral, could bear for purposes of authorizing DIP financing; it did not determine what percentage of a later, integrated sale price those parcels would contribute. Indeed, the Phase 1B Parties acknowledge that the Final DIP Order assigned no separate dollar value to the parcels. Their 63.64 percent figure is derived from $7 million of an $11 million priming facility, not from a valuation finding allocating 63.64 percent of the Property's market value to Phase 1B. Giving effect to the DIP Order does not require expanding its findings into a valuation determination they do not contain. Thus, the Phase 1B Parties' proposed allocation should be rejected.

## III. Poppy's Proposed Allocation Reflects Its Selected Development Assumptions Rather Than the Transaction That Occurred

At the September 2, 2026 discovery hearing, the Court explained the relevant inquiry concerns the value of the Property as of October 23, 2025, when the sale was approved, and the Buyer's potential future plans were not relevant to that determination. Hr'g Tr. Sept. 2, 2026 [D.I. 1293], at 18:17–19, 26:4–9. Granite's proposed proportional acreage allocation follows the Court's direction by distributing the value realized from the sale across the interdependent parcels the Buyer acquired. Poppy instead seeks to divide the proceeds based on assumptions concerning the completion and operation of a contemplated future development.

Poppy's appraiser, HVS Consulting & Valuation ("HVS"), assumes a buyer would develop the Property according to the 2025 development plan. HVS further assumes the usability of

portions of the existing construction and the accuracy of Cumming Group's estimated costs to complete Phase 1A according to the Buyer's plan. HVS acknowledges that differences in those assumptions could materially affect its conclusions. D.I. 1400-4 at 4–5. Poppy uses the resulting phase-level values to allocate approximately 86 percent of the proceeds to Phase 1A and only 14 percent to Phase 1B.

Poppy's appraisal and proposed allocation are based on a future development that did not exist when the Property was sold. Using October 23, 2025, as the appraisal's effective date does not change that. The problem is not merely that Poppy's model contains prospective assumptions; a valuation as of a historical date may consider market expectations existing on that date. The fatal problem within its model is that Poppy has not shown that the percentages produced by its assumptions correspond to the relative contribution of the parcels to the $65 million transaction actually consummated. Granite's proportional acreage allocation more closely reflects that sale because the Buyer purchased the Property as a whole, required all of its parcels, and assigned no separate purchase price to either phase.

The evidence establishes the Buyer required the entire Property, would not have purchased a subset, and assigned no separate portion of its purchase price to either phase. Declaration of Michael Gazzano [D.I. 721] ¶ 9. Similarly, the independent manager testified the Property had to be developed as a whole, could not be practically divided given its layout and infrastructure, and was worth more collectively than as separate components. Hr'g Tr. Oct. 16, 2025 [D.I. 807], at 135:13–136:20. Granite's proportional acreage allocation accounts for that collective value by distributing it across the land necessary to generate the purchase price, including parcels supporting the Development through shared infrastructure, access, and utilities.

Poppy itself relies on interdependence to justify treating the components within Phase 1A as a single economic unit and allocating value equally by acreage within that phase. D.I. 1400 at 11–12, 18–19. The Buyer required the entire Property, including Phase 1B, and would not have purchased Phase 1A alone. The two phases also shared infrastructure serving the Development as a whole. Poppy does not explain why the interdependence of the parcels supports an acreage allocation within Phase 1A but should be discounted when allocating proceeds between the two phases. Granite's proposed acreage allocation accounts for the interdependence of the entire Property and more closely reflects the Buyer's purchase of all parcels as a single integrated asset.

Poppy's proposed allocation is internally inconsistent in its treatment of integration. It relies on projected development economics to concentrate value in Phase 1A, then invokes integration to justify an equal-acreage allocation within that selected phase. Even RDO, which acknowledges that it would appear to benefit more from Poppy's allocation than Builders' allocation, declines to support Poppy's approach because it depends on the Buyer's potential future development plans rather than the valuation inquiry the Court identified. D.I. 1397 at 2–3, 6–7. RDO's rejection of Poppy's approach, despite its apparent financial benefit to RDO, reinforces the concerns with Poppy's methodology.

Granite's proportional acreage allocation across the entire Property accounts for the Property's integrated character and better reflects the sale that occurred. The Buyer required all of the parcels, purchased them collectively, and assigned no separate price to either phase. Allocating the realized value proportionally across that acreage accounts for the shared infrastructure and interdependent land that collectively generated the purchase price. It does not require a finding that every acre would command the same standalone price. It supplies an objective allocation of

the actual proceeds without imposing Poppy's selective division based on a contemplated future development. The Court should adopt Granite's proposed proportional acreage allocation.

## IV. Builders' Appraisal Does Not Establish the Parcels' Relative Contribution to the Integrated Sale

Builders assumes that separately appraised hypothetical values establish the relative contribution of the component parcels to the consideration paid in the actual transaction. But that is the question to be proved, not an assumption compelled by section 506(a). The market transaction did not involve six separate marketable assets. The Buyer conditioned its purchase on acquiring the Property as a whole, assigned no separate consideration to the components, and regarded all parcels as necessary to the transaction. Granite's allocation begins with that transaction rather than reconstructing hypothetical component sales that did not occur.

Builders also attacks a proposition Granite does not advance. Granite does not contend that every acre had identical standalone market value. Granite's point is that no standalone values produced the consideration being allocated. The $65 million price arose from a transaction requiring the entire integrated Property, and no transaction-specific evidence assigns any portion of that price to particular parcels.

Builders' reliance on *In re Aerogroup International, Inc.*, 601 B.R. 571 (Bankr. D. Del. 2019), does not establish that its appraisal method controls. *Aerogroup* supports using the completed sale as the controlling economic evidence, but it does not prescribe a universal parcel-by-parcel appraisal method. Section 506(a) requires a valuation method suited to the transaction before the Court. Here, unlike a sale of independently marketable collateral pools, the evidence establishes that the component parcels were interdependent, could not practically be sold separately, and were acquired only as part of the integrated Property. The same distinction limits Builders' reliance on *In re LTV Steel Co.*, 285 B.R. 259 (Bankr. N.D. Ohio 2002), *In re Hetzel*, 23

F. Supp. 530 (M.D. Pa. 1938), and *In re Mannington Pottery Co.*, 104 F. Supp. 506 (N.D.W. Va. 1952). Those authorities recognize the need to determine relative contribution from competent evidence; they do not require a court to disregard the economic character of the actual transaction or to prefer hypothetical component valuations where the evidence shows the components were not independently marketable.

Builders' requested relief also does not complete the necessary parcel-level allocation. Builders concedes that its six appraisal groups must be translated into the legal parcels transferred by the Sale Order. Translation fixes only the nomenclature problem. Where an FTI Subject Parcel contains multiple legal parcels subject to different asserted liens, Builders' group-level valuation still does not determine the proceeds attributable to each parcel. Another allocation method therefore remains necessary even if Builders' appraisal-group values are accepted.

## V. Common Parcel Identification Must Be Resolved Before Any Allocation Is Applied.

The parties' differing parcel designations remain an outstanding issue that must be addressed before any allocation can be applied. Builders' appraisal groups and Poppy's phase and parcel designations do not consistently correspond to the underlying legal parcels, making it difficult to compare their proposed allocations. The Court should direct the parties to confer and identify all parcels included in the sale using common terminology tied to their legal descriptions and assessor's parcel numbers. The parties should explain how those parcels correspond to the competing designations and submit any remaining disagreements to the Court for resolution.

Builders acknowledges its six appraisal groups must be translated into the legal descriptions of the parcels sold. D.I. 1399 ¶ 38. That concession confirms the threshold identification problem, but identification alone is insufficient. Translation fixes only nomenclature; it does not allocate value within an FTI group containing multiple legal parcels subject to different asserted liens. RDO identifies the same defect: Builders' Subject Parcel 4

includes Poppy Parcels 1, 2, and 8, against which different creditors assert different liens. D.I. 1397 at 5. Where a group contains parcels subject to different asserted liens, an allocation to the group leaves the division of proceeds among those parcels unresolved.

Granite's proportional acreage approach provides a direct means of completing that allocation. Once the parcels and their acreage are established, each parcel's share can be calculated by dividing its acreage by the total acreage included in the allocation. The Court should adopt Granite's proportional acreage methodology and require the common parcel identification necessary to apply it, while preserving all disputes concerning lien validity, extent, and priority.

## CONCLUSION

Granite requests that the Court adopt its proposed proportional acreage allocation of the Net Sale Proceeds. Granite's approach best reflects the transaction that occurred—the purchase of the entire integrated Property for a single price, with all parcels required and no separate consideration assigned to either phase. The Phase 1B Parties' negotiated priming exposure and Poppy's projected development economics do not establish a more reliable division of those proceeds. The Court should resolve the outstanding parcel-identification issues necessary to apply Granite's allocation and preserve the competing lien claims, including Granite's asserted rights against the Phase 1B parcels, for determination in the appropriate adversary proceedings. The Court should: (1) adopt proportional acreage as the allocation methodology; (2) direct the parties to submit a common schedule identifying each legal parcel by legal description, assessor's parcel number, and acreage; (3) express each parcel's allocation as a percentage of the Net Sale Proceeds rather than a fixed dollar amount, so later adjustments to the distributable fund are applied consistently; and (4) expressly reserve all issues concerning lien validity, extent, priority, and entitlement to distribution for determination in the appropriate adversary proceedings.

Date: November 18, 2026

**ESBROOK P.C.**

*/s/ Maria Aprile Sawczuk*
Maria Aprile Sawczuk (DE Bar No. 3320)
Scott J. Leonhardt (DE Bar No. 4885)
Jared T. Green (DE Bar #5179)
800 North King Street, Suite 301
Wilmington, DE 19801
Phone: 302.650.7540
Email: maria.sawczuk@esbrook.com
scott.leonhardt@esbrook.com
jared.green@esbrook.com

-and-

P. Randolph Finch, Jr. (admitted *pro hac vice*)
Andrea L. Petray (admitted *pro hac vice*)
Lindsey C. Herzik (admitted *pro hac vice*)
**FINCH, THORNTON & BAIRD, LLP**
4747 Executive Drive
San Diego, CA 92121
Phone: 858.737.3100
Email: pfinch@ftblaw.com
apetray@ftblaw.com
lherzik@ftblaw.com

*Counsel for Granite Construction Company*