**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **In re:**<br><br>**SilverRock Development Company, LLC, *et al.*,**<br><br>**Debtors.** | **Chapter 11**<br><br>**Case No. 24-11647-MFW**<br><br>**(Jointly Administered)**<br><br>**Re: D.I. Nos. 1166, 1396, 1398, 1399, 1400** |

# BUILDERS CAPITAL'S CONSOLIDATED RESPONSE TO THE OPENING BRIEFS OF POPPY BANK, GRANITE CONSTRUCTION COMPANY, AND THE PHASE 1B PARTIES

Construction Loan Services II, LLC d/b/a Builders Capital ("Builders") submits this consolidated response to the opening briefs of Poppy Bank ("Poppy") [D.I. 1400], Granite Construction Company ("Granite") [D.I. 1398], and the Phase 1B Parties [D.I. 1396] and in further support of Builders' valuation motion [D.I. 1166] and opening brief [D.I. 1399]. Unless otherwise stated, defined terms have the meanings given in Builders' opening brief.

## I. PRELIMINARY STATEMENT

1. The Sale established what the Real Property Assets were worth as a whole, but it did not establish what each part contributed to that value. The Court must answer that question to allocate the Net Proceeds, and it has already framed the inquiry as one concerning the value of the Properties on the sale date rather than what Turnbridge planned to do with them afterward. Sept. 2, 2026 Hr'g Tr. (D.I. 1293) at 18:17–19, 26:4–9.

2. Consistent with the Court's guidance, Builders obtained an independent, retrospective appraisal of the Real Property Assets as of October 23, 2025. Builders is the only party offering an appraisal that assigns separate market values to the integrated Properties' economically distinct components. Builders' appraiser, Mark S. Dunec, MAI, CRE, FRICS, identified six Subject

Parcels based on their permitted uses, physical and legal characteristics, development status, existing improvements, and relevant markets. He then valued each one in its actual condition on October 23, 2025, applying the sales comparison approach to unimproved land and the cost approach where existing improvements contributed value, and he did so without relying on any hypothetical conditions or extraordinary assumptions. FTI Appraisal at 4–6, 92–99, 135–50.

3. R.D. Olson Construction, Inc. ("RDO") acknowledges that Builders is the only one that fulfilled this Court's assignment and joins Builders notwithstanding that the methodologies proposed by Poppy and Granite would result in RDO receiving a materially higher distribution of Net Sale Proceeds. RDO joins Builders because Builders' proposed methodology is the only one that answered the fundamental question: "what was each Subject Parcel worth, in its actual condition, on October 23, 2025?" RDO Br. at 2.

## II. RESPONSE TO POPPY BANK

4. Poppy's experts valued only Phase 1A and Phase 1B and then spread each phase's value evenly across its acreage. Notwithstanding Poppy's position, Poppy's own brief describes the correct method. In discussing *LTV Steel*, Poppy explains that the court was "charged with determining the value of each asset," that it considered "the unique circumstances of each asset," and that "valuation in the allocation context requires consideration of the features of each asset." Poppy Br. at 10–11. Dunec's appraisal does exactly that, whereas Poppy's appraisal stops at two phases. Its appraiser valued Phase 1A and Phase 1B, and its forensic accountant, Elaine White, then spread each phase's value evenly across every acre in the phase. White explained that she was "asked to assume that the value for each acre of land within Phase 1A is of equal value." White Supp. Report at 4 and White Report at 5. She testified that Poppy's counsel gave her that assumption, that no one asked her to evaluate its merits, and agreed with examining counsel's characterization of the premise as "an instruction," not "an analysis that [she] performed." White Dep. (Oct. 6, 2026) at

16:15–17:11, 18:11–14, 28:19–29:2. Poppy, for its part, concedes that it "does treat all acreage within Phase 1A the same." Poppy Br. at 18 n.5. Poppy asserts that "[b]ecause HVS made a single conclusion of value for all of Phase 1A, each acre should be treated the same." *Id.* at 11. That reasoning does not establish that the acres contributed equal value. Poppy assumes the conclusion and treats the absence of component-level valuations as a basis for assuming they did.

5. Poppy's own reasoning, moreover, undermines its equal-acre premise. Poppy argues that Phase 1B is worth less because of its timing, its distance from the foothills and hotel amenities, its fewer golf-course lots, and its greater density, Poppy Br. at 16–17, and it characterizes an acreage formula that ignores those differences as "error," *id.* at 17–18. As with Phase 1B, comparable differences exist within Phase 1A, among the hotel site, the condominium parcel, and the 29 finished luxury lots. Poppy's development expert, Nathan Moeder, articulated the same valuation principle in his report. He concluded that treating each acre "as equally valuable regardless of land use, density, timing, income-generating capacity, or development certainty . . . is methodologically incorrect and inconsistent with established real estate valuation principles." Moeder Report at 16. Although Moeder directed that criticism at an equal-acreage allocation across both phases, he acknowledged at his deposition that he did not determine the market value of anything within Phase 1A, did not analyze the relative values of its constituent parcels, and could not say whether he agrees with White's assumption that every acre in Phase 1A has equal value. Moeder Dep. (Oct. 6, 2026) at 26:20–27:10, 40:25–41:17. The same valuation principle applies within Phase 1A, and Poppy has offered no analysis showing that its constituent acres contributed equal value.

**B. Poppy's Authorities Require Evidence of Each Lienholder's Collateral Value**

6. Poppy agrees that the Sale Proceeds "establish[] the aggregate value of the collateral" and that "the allocation of sale proceeds among lienholders is a separate question." Poppy

Br. at 10. Builders agrees on both points and accepts the Sale as the measure of the whole. On the first point, *SubMicron*, on which Poppy relies, observes that "the market's reaction to a sale best reflects the economic realities of assets' worth." *In re SubMicron Sys. Corp.*, 432 F.3d 448, 461 (3d Cir. 2006). But *SubMicron* addressed credit bidding and did not consider how a court should divide a single price among distinct collateral. *Aerogroup* did consider that question, and the court concluded that dividing "the pot of money between the two lenders" "require[d] a determination of the value of the individual assets underlying each lender's lien," which it made on the basis of expert valuation evidence. *In re Aerogroup Int'l, Inc.*, 601 B.R. 571, 583–96 (Bankr. D. Del. 2019), *aff'd*, 620 B.R. 517 (D. Del. 2020).

7. *LTV Steel* confirms the point. Although the court valued certain integrated facilities as units, it still assigned values to individual assets and even divided one facility's value between its east and west sides because different creditors held liens on those portions. *In re LTV Steel Co., Inc.*, 285 B.R. 259, 267–69, 275, 278–79 (Bankr. N.D. Ohio 2002). In valuing Hennepin Works, the court credited the expert who "took into account the facilities' unique characteristics." *Id.* at 278. Poppy's allocation, by assigning every acre within a phase the same value without examining the relative values of its components, does not perform the analysis required by the case law.

8. Even if the Court accepts a division of value between Phase 1A and Phase 1B, it must still determine how Phase 1A's value divides among its hotel, condominium, and luxury-lot components. Only Dunec separately appraised the components within Phase 1A. Subject Parcel 6, comprising 29 finished luxury residential lots, including 13 with partly completed residences, and associated subdivision property, accounts for about 20% of Phase 1A's gross acreage but about 44% of its appraised value. FTI Appraisal at 5. Poppy's formula, by contrast, would allocate approximately 21% of Phase 1A's share to White's corresponding Parcel 12 based solely on acreage,

with no component-level value analysis supporting that allocation. White Supp. Report at 6-7. Although White's Parcel 12 and FTI Subject Parcel 6 have slightly different boundaries, that difference does not account for the substantial disparity between Poppy's allocation and Dunec's appraisal.

**C. Dunec Valued the Components of Phase 1A, but Poppy's Experts Did Not**

9. Dunec treated Subject Parcels 1 through 3 as distinct components of the integrated resort and hospitality development, and Subject Parcel 6 as a finished subdivision of 29 luxury residential lots, including 13 with partly completed residences, together with associated support parcels. He valued each using market evidence matched to its use and condition. FTI Appraisal at 4, 94–98, 135–50. In this way, his Subject Parcels account for the integrated resort while distinguishing the components whose relative contributions the Court must determine.

10. The FTI Rebuttal further demonstrates that Poppy's own inputs do not support equal acres. Using HVS's component-level value estimates and the development-cost inputs underlying its appraisal, Dunec allocated costs among the hotel, condominium, and luxury-lot components within Phase 1A and calculated implied residual values of approximately 26%, 20%, and 54% of Phase 1A, respectively. FTI Rebuttal, Appraisal Review at 16–19 (also discussed in FTI Rebuttal at 14). Although Dunec did not offer those figures as his independent appraisal conclusions, they show that HVS's underlying inputs support a component-level analysis rather than requiring an equal-acreage allocation.

11. Poppy's experts performed a different exercise. Cumming estimated the cost to complete a proposed development program, and HVS used those costs and projected revenues in a development-residual analysis to estimate the property's value as of the October 2025 sale date. HVS made "the extraordinary assumption that a buyer would develop the property in accordance with" the 2025 master plan and the Amended Development Agreement, and it acknowledges that

"[t]he improved subject property does not yet, in fact, exist." HVS Supp. Appraisal at 3, 32. Dunec, by contrast, made no extraordinary assumptions. FTI Appraisal at 6.

12. White then spread each phase value by acreage, as counsel instructed, without evaluating whether the result reflected relative market value. White Dep. at 16:15–17:11, 18:11–14, 28:19–29:2. Lancet testified that validating White's equal-acre assumption "was not within [his] work scope." Lancet Dep. (Oct. 12, 2026) at 16:15–22. Although he also testified that he supports equal value per acre because he views Phase 1A as "an assemblage of a mix of uses," the HVS report does not identify Phase 1A as a separate assemblage or analyze the effect of such an assemblage on value. Instead, it identifies the entire Phase 1 property as the assemblage and separately values Phases 1A and 1B. *Id.* at 50:9–14 and FTI Rebuttal at 12–13. When asked whether dividing Phase 1A's costs equally by acreage would mean that an acre of luxury lots bears the same share of the hotel's furniture, fixtures, and equipment and pre-opening costs as an acre of hotel, Lancet answered, "It does if you simply do the math," while maintaining that Phase 1A should be viewed "holistically" as an assemblage. Lancet Dep. (Oct. 12, 2026) at 50:15–23. When asked whether a single purchaser can acquire property "containing components with different contributory values," Moeder agreed that, generally, it can. Moeder Dep. (Nov. 2, 2026) at 19:7–23. He also distinguished his role from that of an appraiser. Id. at 35:13–15.

13. Ultimately, none of Poppy's experts provided separate as-is market values for the components of Phase 1A as of the sale date.

**D. Dunec's Subject Parcels Follow the Property Characteristics**

14. Poppy characterizes the Subject Parcels as "completely of Dunec's own making." Poppy Br. at 19. In fact, Dunec's groupings reflect the physical, legal, economic, and market characteristics relevant to his appraisal assignment. Dunec reviewed the master plan, the entitlements, the physical and legal characteristics of the Properties, their existing improvements, and their

available uses as of October 23, 2025, and he performed a four-part highest-and-best-use analysis. FTI Appraisal at 92–98 and Dunec Dep. (Oct. 2, 2026) at 38:16–39:13, 57:16–58:25, 72:13–73:4. The resulting groups therefore reflect real differences among a hospitality core, unimproved residential land, and a finished luxury subdivision.

15. Poppy, too, divides the Properties into units, using two phases and twelve parcels. The relevant question is therefore not whether to group the Properties but whether the groups reflect actual differences in use and value. Poppy questions Dunec's distinction between Subject Parcels 4 and 5, both unimproved residential tracts in Phase 1B. Even if those two parcels were treated together, that would not justify treating the hotel, condominium, and finished-lot components of Phase 1A as equal-value acreage.

**E. Poppy's Phase-Level Appraisal Does Not Establish Component Values**

16. Poppy also argues that the Amended Development Agreement dictates highest and best use and that Dunec adopted it without performing a financial-feasibility test. Poppy Br. at 13–15, 18–19. But Dunec reviewed the agreement as "a road map" to the permitted uses and densities as of the valuation date, and he valued the Properties at its market value "to any buyer," not its "investment value to a particular buyer, and specifically, Turnbridge." Dunec Dep. (Oct. 2, 2026) at 38:16–40:13. He also testified that his report addresses financial feasibility as part of its highest-and-best-use analysis. *Id.* at 57:16–58:14 and FTI Appraisal at 92–98.

17. That distinction matters under § 506(a), which "calls for the value the property possesses in light of the 'disposition or use' in fact 'proposed,' not the various dispositions or uses that might have been proposed." *Assocs. Com. Corp. v. Rash*, 520 U.S. 953, 964 (1997). The relevant disposition here was the Sale the Court approved on October 23, 2025, and the Court has stated that Turnbridge's intentions for the property after the Sale are not relevant to the allocation. Sept. 2, 2026 Hr'g Tr. at 26:4–9. HVS's phase-level valuation, however, relies on projections

concerning the future development of the property. Lancet described his residual approach as one "where you look at the future of completion of a development," and he agreed that the tax rebates supporting his valuation are "anticipated future payments." Lancet Dep. (Oct. 30, 2026) at 42:12–43:9, 54:9–14. The Third Circuit emphasized in *In re Heritage Highgate, Inc.* that projected future lot-sale proceeds "do not equate to 'value'" as of the valuation date and that "valuations must be based upon realistic measures of present worth." 679 F.3d 132, 143 (3d Cir. 2012). Although *Heritage Highgate* approved a development-based appraisal that accounted for future costs and timing, *id.* at 145–46, HVS's phase-level valuation does not establish the relative sale-date values of the distinct components within Phase 1A.

18. *In re Museum of American Jewish History*, No. 20-11285-MDC, 2020 WL 7786925, at *19–20 (Bankr. E.D. Pa. Dec. 4, 2020), applies the same rule. The debtor there proposed to retain and operate its museum building. The court rejected appraisals predicated on converting it to offices, but did not finally determine its value. It explained that *Rash* "rejected valuations based on hypothetical uses or dispositions of property in favor of valuations reflecting intended use or disposition." *Id.* at *20. Here, by contrast, the Debtors sold the Properties, and the Court must allocate the Sale Proceeds among the distinct Properties. *Museum* did not address the allocation of proceeds from a sale and provides no basis for treating every acre within Phase 1A as having equal value. *See* Poppy Br. at 9.

**F. Poppy's Remaining Criticisms Do Not Support Equal Acres**

19. *The hotel and its branding.* Builders does not dispute that the hotel, its branding, and its amenities affect the value of the resort. That does not establish, however, that hotel-related value is distributed evenly across Phase 1A. According to Poppy, the City measures the transient occupancy tax rebate on which HVS relies by the tax "collected on a portion of the project site." Poppy Br. at 15 (quoting D.I. 943-1 at 2). HVS's own model distinguishes among the components.

It includes the roughly $62 million present value of the projected rebate, calculated as of June 2029, in its hotel-and-TOT calculation, while valuing the condominiums and luxury lots through separate sellout analyses with no separate rebate component. FTI Rebuttal at 13 and its Appraisal Review at 18–19. Although the projected rebate includes tax revenues from both hotel operations and participating residential rentals, HVS did not determine how the resulting Phase 1A value should be allocated among its components. Poppy's formula nonetheless spreads Phase 1A's residual value evenly across every acre, including the acreage beneath the hotel, condominiums, and luxury lots.

20. Poppy also faults Dunec for not allocating some of the residences' value "back to the luxury hotel" on account of branding and amenities. Poppy Br. at 19. Yet Poppy's own formula assigns the hotel site no more value per acre than the luxury lots. Dunec analyzed Subject Parcels 1 through 3 as an integrated hotel and hospitality component, and he valued Subject Parcel 6 against lot sales from "high-quality private golf course communities that compete directly with the Subject Property within the upper-tier La Quinta residential market." FTI Appraisal at 4, 94–98, 145. Moeder, by contrast, did not survey buyers or otherwise measure the contributory value of hotel branding. FTI Rebuttal at 9. Nor does Poppy identify any market-supported calculation showing that a specific amount of value should shift from one Subject Parcel to another, much less that such a shift would produce equal value per acre.

21. *Experience.* Poppy contends that Dunec could not identify prior experience appraising a luxury resort hotel with branded residences. Poppy Br. at 19. Dunec is a state-certified general appraiser who holds the MAI, CRE, and FRICS designations, and his practice places "a particular emphasis on hospitality, healthcare and development properties." FTI Appraisal at 2 & App. B. He has appraised the Greenbrier Resort in West Virginia, and he has valued "many luxury homes"

and "many luxury hotels." Dunec Dep. (Oct. 2, 2026) at 10:9–17, 11:9-17, 32:1–8. Poppy cites no rule requiring an appraiser to have valued an identical project, and its criticism does not change the fact that Dunec is the only expert who provided separate as-is market values for the components of Phase 1A.

22. *Method.* Section 506(a) does not specify a valuation standard, and Congress instead "envisioned a flexible approach to valuation." *Heritage Highgate*, 679 F.3d at 141. Dunec considered the recognized approaches and chose the sales comparison approach for unimproved Subject Parcels 4 and 5 and the cost approach for partly improved Subject Parcels 1, 2, 3, and 6. FTI Appraisal at 96–98. He declined to use a residual model as his primary approach because he considered the necessary assumptions about future construction costs, timing, and pricing too speculative for his assignment and was concerned that reliance on buyer-specific projections would produce investment value rather than market value. *Id.* See also Dunec Dep. (Oct. 2, 2026) at 76:21–79:15.[1]

23. Poppy's contention that the partly completed residences might ultimately be demolished does not establish that they contributed no value on the October 2025 sale date. Dunec accounted for their state of completion, physical deterioration, and functional obsolescence, and applied a bulk-sale discount. FTI Appraisal at 169–73.[2]

24. *Unspecified objections.* Poppy describes its list of criticisms as "not a complete statement of every error made by Dunec" and purports to reserve the right to raise others. Poppy Br. at 20. The Scheduling Order, however, required each party to set out its proposed valuation and the basis for it, and it provides that the Valuation Hearing "shall be a final hearing on all

---

[1] Poppy's own appraiser acknowledged that USPAP does not require a land-residual analysis. Lancet Dep. (Oct. 30, 2026) at 33:5–15, 36:1–8.

[2] The earlier C&W appraisal likewise assumed that most existing construction was physically usable, although some replacement or upgrading would be necessary. C&W Appraisal at 3, 5.

valuation and allocation issues." D.I. 1377 ¶¶ 5, 7. The Court should evaluate objections Poppy identifies and supports with evidence, not unspecified criticisms it merely reserves the right to assert.

25. *The C&W appraisal.* Poppy argues that Builders' reliance on Dunec contradicts its earlier reliance on the C&W appraisal. Poppy Br. at 20. But Poppy mischaracterizes Builders' prior position. In its April 7, 2026 objection to the Debtors' amended allocation motion, Builders argued that the Debtors had not carried their burden by establishing that the pure acreage valuation was the only way to value the individual Properties.[3] Builders, among other alternative valuation methodologies, highlighted the C&W appraisal precisely because it distinguished among the components within Phase 1A. Builders identified C&W's separate valuations of the luxury residences, lifestyle residences, and hotel development, proposed allocating Phase 1A's share of the sale proceeds among those components, and alternatively proposed that a licensed appraiser determine their relative values. D.I. 943 ¶¶ 35–40. Builders expressly reserved its ultimate allocation methodology pending discovery, including expert discovery. *Id.* at 4 n.3. Dunec's subsequent appraisal reflects that further analysis, assigning separate as-is market values to the Subject Parcels rather than relying on C&W's hypothetical completed-development values. Builders' position has not changed: the distinct components within Phase 1A warrant separate valuation, and neither C&W nor Builders' earlier reliance on it supports Poppy's equal-acreage allocation.

[3] Ironically, Poppy objected to the Debtors' valuation methodology on the same grounds. Poppy Bank Obj. to Debtors' Amended Allocation Motion [D.I. 939] ¶ 13 (objecting to the per-acre methodology because "[t]he Debtors have chosen not to actually value the individual parcels that make up the secured creditors' collateral").

## III. RESPONSE TO GRANITE CONSTRUCTION COMPANY

### A. Preliminary Statement

26. Like Poppy, Granite makes no real effort to assess the relative value of the Properties. Granite designated no expert testimony and submitted no appraisal. Granite instead asks the Court to divide the proceeds by acreage, and it maintains that its formula "does not assume that every acre would have identical value in a completed development." Granite Br. at 8. That observation misses the point. The Court is allocating the proceeds of the actual sale, not valuing a completed development, and Granite's formula gives every acre an equal share of those proceeds regardless of whether the acre lies beneath the hotel site, the detention basin, the raw residential land, or the finished luxury lots.

27. Moreover, Granite's position is contrary to the case law, which requires that once a challenger makes a sufficient evidentiary showing that a proof of claim overstates the value of the collateral, the creditor bears "the ultimate burden of persuasion . . . to demonstrate by a preponderance of the evidence both the extent of its lien and the value of the collateral securing its claim." *In re Heritage Highgate, Inc.*, 679 F.3d 132, 139–40 & n.4 (3d Cir. 2012) (citation omitted). In *Heritage Highgate*, the creditors who disputed an appraisal "expressly declined to have 'an appraiser . . . come in,'" relying instead on a budget projection, and the Third Circuit held that they had failed to carry that burden. *Id.* at 146. An acreage formula unsupported by evidence of the properties' relative values cannot substitute for competent valuation proof.

### B. An Integrated Sale Still Requires Valuing the Parts

28. As discussed above, Builders does not dispute that the Debtors planned the Real Property Assets as an integrated development and sold them together, nor does it contend that the Debtors should have sold the resort in pieces. Instead, the FTI Appraisal accounts for the integrated

setting in both its highest and best use analysis and its selection of market evidence. FTI Appraisal at 92–98.

29. Integration explains why the property sold as a whole, but it does not establish that every acre contributed the same value. Granite's own example illustrates the distinction. According to Granite, a detention basin "may have limited perceived utility or value in isolation but may be essential to the use and value of the Development as a whole." Granite Br. at 3. Builders does not dispute that observation. But the fact that a detention basin, a hotel site, unimproved residential land, and a finished luxury lot serve the same project does not mean they contribute equal value. Dunec's values, for example, range from roughly $300,000 per net acre for unimproved residential land to more than $2.1 million per net acre for the finished luxury lots and their partly completed residences. FTI Appraisal at 5. An appraisal is designed to measure those differences. An acreage formula simply disregards them.

30. Granite's infrastructure argument rests on the same premise. Granite contends that any method that "gives greater weight to abandoned, deteriorating vertical work while discounting functional infrastructure" would "unfairly penalize Granite." Granite Br. at 10. That argument concerns the relative value of different components, which is precisely the question Dunec addressed and an acreage formula cannot answer. To the extent Granite contends that its work added value to particular property, that question turns on valuation evidence. Whether Granite's lien extends to that property is a separate issue reserved for its adversary proceeding. Dividing the proceeds by acreage resolves neither question.

31. Nor does the sale testimony on which Granite relies support equal value per acre. The Debtors' independent manager testified that the property "really had to be developed as a whole" and that it was worth more as a whole than in pieces. Granite Br. at 4–5 (citing Oct. 16,

2025 Hr'g Tr. at 134:20–136:9). Builders does not dispute that testimony. The question is how to allocate that whole-project value, and an allocation based on relative value distributes it among the components in proportion to what each contributed, while an acreage formula distributes it by size alone. Similarly, Gazzano explained that Turnbridge was unable or unwilling to allocate value among the Purchased Assets because "all of the Purchased Assets taken together are required to complete Turnbridge's proposed development plans." Gazzano Decl. (D.I. 721) ¶ 9. Turnbridge's post-sale plans are irrelevant to determining value as of the sale date. *See* Sept. 2, 2026 Hr'g Tr. at 26:4–9. In any event, a buyer's decision to pay a single price does not establish that the individual assets contributed equal value. The buyers in *Aerogroup* and *LTV Steel* likewise paid a single price for assets sold together, and in each case the court nonetheless valued the assets individually.

**C. Granite's Cases Require Asset-Specific Evidence**

32. Again like Poppy, Granite's principal authority is *Aerogroup*. Granite quotes the court's statement that "[t]he auction result set the value of the collateral, and the issue now before me is to determine the appropriate allocation of those Sale Proceeds." Granite Br. at 6–7 (quoting 601 B.R. at 590–91). Granite does not, however, address what the court did next. Rather than allocating proceeds by acreage or another uniform measure, the court held an evidentiary hearing because dividing "the pot of money between the two lenders" "require[d] a determination of the value of the individual assets underlying each lender's lien." 601 B.R. at 583. The court then evaluated competing valuation evidence concerning those assets and allocated the proceeds accordingly. *Id.* at 583–96. On appeal, the district court explained that the sale "established that the market deemed the sold assets to be worth collectively" the price paid, and that "[n]ext, the Bankruptcy Court analyzed in the Allocation Decision how the Sale Proceeds should be allocated based on testimony concerning the value of" each lender's collateral. 620 B.R. at 524. Builders asks the

Court to follow the same approach here: use the Sale to establish aggregate value and competent valuation evidence to allocate the proceeds among the properties.

33. Granite also points out that the *Aerogroup* court found one appraisal "not the best assessment" because it used a pre-sale valuation date and did not account for the auction result. Granite Br. at 7 (quoting 601 B.R. at 591). Neither concern applies to Dunec's appraisal, which uses October 23, 2025, the date the Court approved the Sale, as its effective date. Builders Br. ¶ 23. Builders, moreover, applies Dunec's relative values to the Net Proceeds from the Sale rather than to his $70.1 million appraised total. Builders Br. ¶ 27. Likewise, Granite's broader criticism of valuations built on "projected component values, future development plans," Granite Br. at 8, more aptly describes Poppy's development-residual appraisal than Dunec's, which values each Subject Parcel in its actual condition as of the sale approval date.[4]

34. *LTV Steel* applied the same principle. When several assets are sold as one unit, courts "determine the value of each asset based upon competent evidence" and "allocate sale proceeds between individual assets based upon each asset's portion of the total value of all of the assets." *In re LTV Steel Co., Inc.*, 285 B.R. 259, 267 (Bankr. N.D. Ohio 2002). Although the court valued certain integrated facilities as units, it still assigned values to individual assets and even divided one facility's value between its east and west sides because different creditors held liens on those portions. *Id.* at 267–69, 275, 278–79. The integrated nature of the sale thus did not eliminate the need to determine the value attributable to each asset.

[4] As discussed above, *LTV Steel* applied the same principle. When several assets are sold as one unit, courts "determine the value of each asset based upon competent evidence" and "allocate sale proceeds between individual assets based upon each asset's portion of the total value of all of the assets." *LTV Steel*, 285 B.R. at 267.

35. Granite's remaining authorities, *Assocs. Com. Corp. v. Rash*, 520 U.S. 953 (1997), and *Heritage Highgate*, require valuation to account for the disposition or use of the collateral. *See Rash*, 520 U.S. at 962–65, and *Heritage Highgate*, 679 F.3d at 141–43. Builders agrees with that principle. Here, the relevant disposition was the Sale approved on October 23, 2025, and the Court has directed the parties to value the Properties as of that date. Neither case suggests that a court may dispense with determining the relative values of collateral simply because the properties sold in a single transaction. To the contrary, the Third Circuit in *Heritage Highgate* affirmed a valuation grounded in a professional appraisal and rejected a challenge resting on unsupported projections. 679 F.3d at 145–46. Granite likewise offers no competent valuation evidence supporting its proposed equal-acreage allocation.

**D. Granite's Remaining Points Do Not Support an Acreage Formula**

36. *California Civil Code § 8050(b).* Granite cites this provision "only as additional context." Granite Br. at 11 n.4. Section 8050(b) defines a "work of improvement" for purposes of California mechanics' lien law, and it may bear on the reach of Granite's lien in its adversary proceeding. It neither establishes market value nor prescribes a method for allocating sale proceeds.

37. *The amount of the fund.* Granite defines the Net Sale Proceeds as $61,964,897.66. Granite Br. at 1. The other parties have used $52,357,920.79, subject to verification. Builders Br. ¶ 15 n.4, Poppy Br. at 5, and RDO Br. at 2 n.1. Because the final amount remains subject to accounting, the Court should allocate the fund by percentage, as both Builders and RDO propose.

38. *A common property schedule.* Builders agrees with RDO that the allocation order should identify the property in each allocation unit by legal description and assessor's parcel number. RDO Br. at 4–5. The FTI Appraisal identifies the assessor's parcels comprising its valuation units and provides a starting point for reconciling those units with the legal descriptions in the Sale

Order. Builders Br. ¶ 38. That process does not require abandoning FTI's relative valuations in favor of an acreage formula.

## IV. RESPONSE TO THE PHASE 1B PARTIES

### A. The DIP Priming Caps Do Not Allocate Sale Proceeds

39. The Phase 1B Parties ask the Court to allocate 36.36% of the Sale Proceeds to Phase 1A and 63.64% of the Sale Proceeds to Planning Areas 7, 8, and 9 because they believe the Court already resolved the allocation issue in the DIP Order. D.I. 1396 at 3–4, 11–13. In the alternative, they propose an acreage allocation. *Id.* at 13–14 and D.I. 1396-1, Exs. A–B. The allocation the Phase 1B Parties reference in the DIP Order addresses the extent of DIP priming, not the allocation of the Sale Proceeds, and the DIP Order does not establish the relative value of the Properties sold in the Sale. D.I. 437, findings H–I and D.I. 437-1, Ex. 3.

40. The Phase 1B Parties argument is premised on Finding H and I in the DIP Order. Finding H states that prepetition secured creditors consented to the DIP facility, including the priming limitations. Finding I states that the Debtors and the DIP Lender (not the Phase 1A lenders) stipulated that disproportionately greater priming of Planning Areas 7, 8, and 9 was appropriate because those areas included some of the most valuable DIP Collateral, supported a substantial equity cushion even after $7 million of priming, and possessed a greater equity cushion than the aggregate cushions, if any, on other parcels. D.I. 437 at 7, findings H–I. An equity cushion reflects the relative value of the secured debt on a property versus the value of the property; an equity cushion does not reflect the relative value of one piece of property to another piece of property. Finding I has significance for adequate protection and the negotiated priming arrangement, but neither Finding states that those planning areas comprised 63.64% of the as-is value of all the Properties or that creditors agreed to allocate the proceeds from a sale that occurred approximately 10 months after entry of the DIP Order on that basis.

41. The arithmetic and the full Exhibit 3 confirm that distinction. Exhibit 3 sets a $1 million priming cap for specified luxury residential lots, a $7 million cap for Planning Areas 7, 8, and 9, and a $4 million cap for other specified collateral. D.I. 437-1, Ex. 3 ¶¶ 1, 2, 5. The stated caps total $12 million, while the DIP Order authorizes an $11 million DIP facility. D.I. 437 at 1. Exhibit 3 paragraph 2 itself describes $7 million as approximately 58% of the facility, a percentage consistent with $7 million divided by $12 million but not $7 million divided by $11 million. The Phase 1B Parties instead divide $7 million and $4 million by $11 million, omit the separate $1 million cap, and import the resulting percentages as immutable shares of sale proceeds. D.I. 1396 ¶¶ 5, 29, 34. Whatever accounts for the discrepancy, the priming caps do not specify how the Sale Proceeds must be allocated.

42. Moreover, Paragraph 10(l) of the amended Final DIP Order expressly refers to the need for another, later in time order to "determin[e] the allocation of proceeds of such sale among all parties asserting liens and/or security interests." The City's backstop indemnity to Poppy, to the extent applicable, arises only after closing and that allocation order becomes final. D.I. 437 ¶ 10(l), at 19–20. That provision expressly disclaims indemnification for losses attributable to the "sale price or allocation thereof" or "valuation of the Poppy Collateral or other DIP Collateral." *Id.* The distinction between priming liability and the allocation and valuation that remained to be decided would be unnecessary if Exhibit 3 already disposed of the latter questions.

43. The Phase 1B Parties rely on law of the case and consent-order principles. D.I. 1396 ¶¶ 27–36. Even assuming Finding I implied a relative valuation of Phase 1A and Phase 1B—it does not—the law of the case doctrine would still not apply. For the doctrine to apply, (1) the issue must arise within the same case; (2) the issue must have been actually decided, either expressly or by necessary implication, in a prior proceeding; and (3) the prior ruling must constitute an actual

judicial decision, rather than dicta or a matter left undecided. *Home Depot USA, Inc. v. Lafarge N. Am., Inc.*, 59 F.4th 55, 61-63 (3d Cir. 2023); *In re City of Philadelphia Litig.*, 158 F.3d 711, 718 (3d Cir. 1998). The Phase 1B Parties have failed to establish *any* of these elements.

44. As a starting point, the DIP Motion itself (which the Phase 1B Parties ignore) never asked the Court to decide how the Sale Proceeds would be allocated among secured creditors. D.I. 246 ¶16.[5] That is not surprising. The Debtors did not file their Sale Motion until August 15, 2025 (D.I. 621), four months after entry of the amended Final DIP Order. There were simply no sale proceeds to allocate and no sense, at the time of the DIP Order, how the sale of the Real Property Assets would be conducted. Because no one asked—or could have thought to ask—the Court to allocate the Sale Proceeds among secured creditors in connection with the DIP Order, the Phase 1B Parties cannot meet the second prong of the "law of the case" doctrine.

45. Nor can the Phase 1B Parties establish that the allocation of Sale Proceeds among secured lenders was decided "expressly or by necessary implication" in the DIP Order. As set forth above, the DIP Order approved financing and priming limitations. It did not determine the relative value of the properties in the later Sale. Construing a consent order according to its actual agreed terms, *see United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236 (1975), does not add an unstated allocation term. Nor does the stipulated equity cushion dictate how the Sale Proceeds should be allocated among Phase 1A, Phase 1B, or the Properties that make up Phase 1A and Phase 1B.

46. The later proceedings likewise show that allocation remained unresolved. The May 8, 2026 Global Settlement expressly preserved all "issues related to valuation and the allocation

[5] Rules 4001(c) and 9014(a) require a motion to state the relief requested and its grounds. Here, the Debtors did not ask the Court to allocate sale proceeds among secured creditors nor did anyone else. Deciding an issue that was never raised would have violated the secured parties' due process rights as they had no notice that the issue was before the Court.

of proceeds of the Sale," as well as the priority, validity, and extent of competing liens, for later determination or agreement. D.I. 1107-1 at 2 and D.I. 1111, Art. I.A ("Remaining Disputes").

47. Consistent with the Term Sheet, Builders, on June 10, 2026, filed its Valuation Motion in which it asked this Court "to implement a process that creates a realistic schedule for expert and other discovery and briefing and sets a hearing at which this Court will determine the value of the individual parcels and lots that comprise the Real Property Assets." Valuation Motion, ¶ 3.[6] The Court then entered the final valuation and allocation scheduling order, under which the parties exchanged reports and filed opening briefs. The Valuation Hearing is designated a final hearing on those issues. D.I. 1377 ¶¶ 1–8. The Phase 1B Parties nevertheless contend that the DIP Order effectively determined allocation long before this process.

48. Even if the law-of-the-case doctrine otherwise applied, the Phase 1B Parties waived any right they may have had to rely on the DIP Order as a conclusive allocation determination. In *United States v. Olano*, 507 U.S. 725, 733 (1993), the Supreme Court defined waiver as "the intentional relinquishment or abandonment of a known right." Waiver need not be express and may be inferred from a party's conduct. See *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 683–85 (2015) (explaining that consent to bankruptcy court adjudication may be inferred from conduct if knowing and voluntary). Rather than asserting that the DIP Order governed and that mediation and the Valuation Motion were moot, the Phase 1B Parties sat silent and let the Court and the other parties proceed with mediation and the Valuation Motion at a cost of significant time and resources. The Keillor Parties affirmatively supported a valuation process. D.I. 1193 ¶¶ 1–3. Although the Global Settlement reserved rights concerning the Remaining Disputes, the Phase 1B

[6] No Phase 1B Party objected to the Valuation Motion as moot because the DIP Order had finally resolved the question of valuation. In fact, the Keillor Parties filed a response affirmatively supporting the relief requested in the Valuation Motion without any mention of the DIP Order or that the Valuation Motion was moot. D.I. 1193.

Parties' agreement to a later allocation determination and their subsequent conduct support waiver of any contention that the DIP Order had already resolved the issue conclusively.

49. The Phase 1B Parties invoke *Mannington Pottery* for the principle that sale proceeds must follow the value contributed by property subject to a lien. D.I. 1396 ¶ 25 (citing *In re Mannington Pottery Co.*, 104 F. Supp. 506, 520 (N.D. W. Va. 1952)). Builders accepts that principle. It supports parcel-specific valuation, not an automatic division according to borrowing caps. *In re Aerogroup Int'l, Inc.*, 601 B.R. 571, 583, 590–96 (Bankr. D. Del. 2019), *aff'd*, 620 B.R. 517, 524 (D. Del. 2020). See also *In re LTV Steel Co.*, 285 B.R. 259, 267–69 (Bankr. N.D. Ohio 2002). The Phase 1B Parties' alternative assumption that all acreage contributed proportionately is equally unsupported by appraisal of the component parcels. FTI's analysis supplies comparative as-is values that can be tested and used to allocate the verified Sale proceeds without treating the $70.1 million appraised total as proceeds actually received. Builders Br. ¶¶ 23, 27 and FTI Appraisal at 4–6, 92–98, 135–50.

**B. SR Land's Negotiated Tenant-in-Common Payment Requires Separate Analysis**

50. The Phase 1B Parties also ask that the negotiated payment to SilverRock Land II, LLC ("SR Land") be made off the top from all Net Sale Proceeds. D.I. 1396 ¶¶ 39–47. SR Land owned a 42.8% undivided tenant-in-common interest, while Debtor RGC PA 789 owned the remaining 57.2%, in the identified Planning Area 9 TIC Parcel. SR Land did not own an undivided 42.8% interest in all Phase 1B properties. D.I. 437-1, Ex. 3 ¶ 3 and D.I. 1111 at 40. SR Land's interest was a non-estate ownership interest, not simply a junior lien or a claim for a debtor's deficiency, and Builders does not ask the Court to recharacterize or extinguish that interest.

51. Exhibit 3 paragraph 3 states SR Land's consent to sale of its TIC interest under section 363(h) is conditioned upon payment of $3,816,000 plus 15% interest compounding quarterly from April 14, 2024, less the allocable share of costs and expenses under section 363(j). It

further states: “Such payment shall be made solely from the net proceeds of sale, after deducting payments made to lenders secured by Planning Area 9.” D.I. 437-1, Ex. 3 ¶ 3. That language refers specifically to lenders secured by Planning Area 9. It does not say that all creditors secured anywhere in Phase 1B must first be paid, and it does not expressly say “net proceeds allocated to Phase 1B.” The words “net proceeds of sale” must be read in the context of SR Land’s ownership of the Planning Area 9 TIC Parcel and the provision's express reference to lenders secured by that planning area. See, e.g., *Fischer v. United States*, 603 U.S. 480, 487 (2024) (“[T]he canon of *noscitur a sociis* teaches that a word is ‘given more precise content by the neighboring words with which it is associated.’ That ‘avoid[s] ascribing to one word a meaning so broad that it is inconsistent with’ 'the company it keeps.’”) (citations omitted).

52. The Sale Order expressly preserves SR Land's rights under Exhibit 3. Paragraph 14 provides that valid interests, including SR Land's ownership interest, attach to proceeds. Paragraph 19 binds SR Land and calls for the Debtors and SR Land to endeavor to implement Exhibit 3 after closing. D.I. 759 ¶¶ 14, 19. The Confirmation Order likewise states that the Plan does not release or prejudge claims concerning amounts owed on the SR Land TIC Interest. D.I. 1152 ¶ 29 (subject to its express Article XII.E proviso). These provisions defeat any contention that SR Land’s rights were lost, but they do not determine whether the amount must be charged against the proceeds of unrelated Phase 1A collateral before the values of the properties sold are allocated.

53. Section 363(j) ordinarily provides for distribution of the proceeds of property sold under section 363(h), less qualifying sale costs and expenses, according to the co-owners' interests. SR Land negotiated a specific payment formula in lieu of having its consideration determined solely by a simple ownership fraction. That formula must be reconciled with the Sale Order and the identifiable value of the TIC Parcel. Builders acknowledges the Phase 1B Parties' contention

that SR Land's consent facilitated marketing an integrated project, and that the negotiated payment may reflect value beyond the parcel's isolated acreage. D.I. 1396 ¶¶ 41–45 and Gazzano Decl. (D.I. 721) ¶ 9. But the benefit of one integrated sale, without a further showing, does not establish that the agreed payment should be debited equally to all separately encumbered assets.

54. The TIC Payment arises from SR Land's prepetition ownership interest in the Planning Area 9 TIC Parcel. The cited agreement identifies SR Land's interest in Planning Area 9 and establishes no interest in Phase 1A or entitlement to proceeds attributable to Phase 1A. The Phase 1B Parties rely on the words "net proceeds of sale" without expressly limiting those proceeds to Planning Area 9. That reading ignores all relevant context. The condition expressly addresses payments to lenders secured by that planning area, not all senior claims generally. While SR Land's consent was necessary to sell the TIC Parcel as a whole, it was not necessary to sell Phase 1A as a whole. There is no basis to force the Phase 1A creditors to contribute to a payment for SR Land's Planning Area 9 ownership interest. The Court should reject the proposed off-the-top treatment and require that the TIC payment be charged only against proceeds attributable to the TIC Parcel. The Court should determine the amount, interest through the legally applicable calculation date, prior payments made to lenders secured by Planning Area 9, and the appropriate share of section 363(j) expenses on an accounting that respects both the agreed consideration and the rights attaching to unrelated property. The Court may reserve the contested payment pending that determination.

55. The Phase 1B Parties' Exhibit A and Exhibit B each begin with a $65 million purchase price, deduct $2,070,495 in closing costs, $399,544 in U.S. Trustee fees, a $1,190,400 reserve and a proposed $4,308,844 TIC payment, add $625,337 of escrow interest through May 31, 2026, and subtract an asserted $9,606,977 DIP loan amount to reach $48,049,076. D.I. 1396-1 at

2, 4. Neither exhibit is a final cash reconciliation or a determination that the proposed deductions are proper. The TIC payment is included as an off-the-top deduction before the allocation percentages are applied, which assumes rather than establishes the contested issue. Any implementing order must ensure that the agreed payment and shared expenses are not charged twice to the same fund.

**C. The Final Order Should Determine Relative Values Without Prejudging Liens or Disbursements**

56. The parties use three different figures for net sale proceeds. Granite uses $61,964,897.66, while Builders and Poppy use a provisional $52,357,920.79, and the Phase 1B Parties calculate $48,049,076 after their proposed deductions. Granite Br. at 1, Builders Br. ¶ 15 n.4, Poppy Br. at 5, and D.I. 1396-1 at 2, 4. Those figures reflect different accounting dates and proposed treatment of costs, the DIP, reserves, and the TIC payment.

57. An allocation order should identify each property using an assessor's parcel number and legal description and reconcile FTI's six valuation units to actual lien collateral. RDO has identified potential mismatches requiring closer mapping within FTI Subject Parcel 4. RDO Br. at 4–5. The Sale Order's lien schedules identify instruments for purposes of the sale and conveyance, but paragraph 14 expressly disclaims any adjudication of their validity, priority, or enforceability. D.I. 759 ¶ 14. Further, the Sale Order expressly states that the preliminary title reports were not admitted and are not evidence, but were used to identify the real property. D.I. 759 at 2 n.3 and Oct. 16, 2025 Hr'g Tr. at 45:1–8. The Court may adopt relative market values and direct an implementing parcel schedule without using those reports as proof of lien validity or granting distribution to a creditor not yet entitled to receive it.

58. Builders asks the Court to use FTI's as-is values to allocate the verified sale proceeds proportionately, subject to any necessary correction for differences in parcel descriptions or

lien coverage. The DIP priming liens and the SR Land agreement must be implemented according to their governing orders, with disputed deductions and payments reserved as appropriate. An allocation of value to an appraisal unit should not adjudicate a creditor's claim amount, lien validity, priority, extent, or ultimate disbursement. D.I. 437, D.I. 759 ¶¶ 14–15, 19, D.I. 1111 ("Remaining Disputes"), and D.I. 1377 ¶ 7.

## CONCLUSION

59. For these reasons, Builders requests entry of an order rejecting the unsupported proposals from Poppy, Granite, and the Phase 1B Parties. Only Builders has offered an appraisal assigning separate as-is market values to its distinct components, and this Court, respectfully, should adopt the FTI Appraisal and the six FTI as-is market values as the evidentiary basis for determining relative contributions to the Sale and apply those proportions to the properly determined net proceeds after reconciliation of permitted costs and the DIP treatment. The Court should reject charging the SR Land payment against proceeds attributable to Phase 1A, enforce the negotiated payment terms against proceeds attributable to the Planning Area 9 TIC Parcel, and, if necessary, reserve payment pending a final accounting under the governing orders. The order should also direct a common schedule of assessor's parcel numbers and legal descriptions, with any narrower allocation necessary to reflect distinct lien coverage, and expressly reserve lien validity, extent, priority, claims allowance, and creditor-level distributions.

Dated: November 18, 2026

Respectfully submitted,

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ James E. O'Neill*

James O'Neill, Esq. (DE Bar No. 4042)
919 North Market Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: joneill@pszjlaw.com

Gregory V. Demo, Esq. (pro hac vice ECF 935)
1700 Broadway, 36th Floor
New York, NY 10019
Telephone: (212) 561-7700
Email: gdemo@pszjlaw.com

-and-

**POLSINELLI PC**
Michael L. Schuster (pro hac vice ECF 925)
1401 Lawrence Street, Suite 2300
Denver, CO 80202
Telephone: (720) 931-1188
Facsimile: (302) 252-0921
Email: mschuster@polsinelli.com