**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>SILVERROCK DEVELOPMENT COMPANY, LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 24-11647 (MFW)<br><br>(Jointly Administered)<br><br>**Re: D.I. 1166, 1203, 1377, and 1396-1400** |

**PHASE 1B PARTIES' RESPONSE BRIEF REGARDING**
**ALLOCATION OF VALUE AMONG COLLATERAL**

The Phase 1B Parties[2] hereby file this response brief pursuant to the Allocation Dispute Order. This brief responds to the opening briefs of the Phase 1A Parties and Granite.[3] It further supports allocating the Sale Proceeds under the DIP Lien Allocation Approach or, alternatively, the acreage allocation approach.

## PRELIMINARY STATEMENT

1. Resolution of the allocation issue does not call for competing and hypothetical valuations propounded by subjective experts with competing perspectives. If nothing

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: SilverRock Development Company, LLC (5730), RGC PA 789, LLC (5996), SilverRock Lifestyle Residences, LLC (0721), SilverRock Lodging, LLC (4493), SilverRock Luxury Residences, LLC (6598) and SilverRock Phase I, LLC (2247). The location of the Debtors' principal place of business and the Debtors' mailing address is 343 Fourth Avenue, San Diego, CA 92101.

[2] The Phase 1B Parties incorporate by reference all arguments set forth in the *Phase 1B Parties' Opening Brief in Support of Allocation of Value Among Collateral* [Docket No. 1396] ("Phase 1B Parties' Opening Brief"). Capitalized terms not otherwise defined herein have the meanings assigned to them in the Opening Brief.

[3] This Response addresses the opening briefs filed by the Phase 1A Parties and Granite, including: *R.D. Olson Construction, Inc.'s Opening Brief Regarding Construction Loan Services II, LLC D/B/A Builders Capital's Motion for Entry of an Order (I) Valuing Pursuant to 11 U.S.C. § 506(a) and (II) Granting Related Relief* [Docket No. 1397] ("RDO's Opening Brief"); *Granite Construction Company's Opening Brief Regarding Proposed Valuation of Real Property Assets* [Docket No. 1398] ("Granite's Opening Brief"); *Opening Brief of Construction Loan Services II, LLC D/B/A Builders Capital in Support of its Motion for Entry of an Order (I) Valuing Collateral Pursuant to 11 U.S.C. § 506(a) and (II) Granting Related Relief* [Docket No. 1399] ("Builders' Opening Brief"); *Poppy Bank's Opening Brief with Respect to Valuation of Real Property Assets Pursuant to 11 U.S.C. § 506(A)* [Docket No. 1400] ("Poppy Bank's Opening Brief").

else, this case has demonstrated that expert appraisals are, at times, unreliable. For instance, the $409 million pre-petition appraisal relied upon by the Debtors' Restructuring Officer, Douglas Wilson, a preeminent real estate development professional, overvalued the Debtors' real estate holdings by more than 600%.[4]

2. Nevertheless, the Phase 1A Parties are intent on demonstrating that their respective experts, with perfect 20/20 hindsight, are each the one true expert who can properly piece together this financial puzzle. And this begs the question, what should the Court rely upon when rendering judgment on this important issue?

3. These questions of who and what to rely on have become a repeating issue in these chapter 11 cases, as such reliance has frequently been misplaced. It was a problem with Robert Green and, as noted above, it was an issue with Mr. Wilson.

4. But the Phase 1B Parties assert that their reliance on the Court's findings of fact and conclusions of law establishing allocation of value at the DIP financing stage was not misplaced. Indeed, the Final DIP Order served as the foundation on which the Phase 1B Parties made material decisions throughout the Debtors' chapter 11 proceedings. As stated in the Phase 1B Parties' Opening Brief, the Final DIP Order incorporates disproportionate priming exposure for their collateral, Planning Areas 7, 8, and 9, based on findings about the value and equity cushion of those parcels as compared to the Phase 1A Parties' parcels. The parties who negotiated and consented to that allocation, including the Phase 1A Parties, cannot disavow it now that the results are less favorable to their individual interests.

[4] *See* Declaration Of Douglas Wilson ("Indeed, the Debtors' total assets have been credibly appraised for over $409 million.") [Dkt. No. 55-2, ¶ 2].

5. The competing opening briefs demonstrate that no expert consensus resolves this allocation dispute. Poppy seeks approximately 86% of the Sale Proceeds for Phase 1A and treats each acre in that phase alike. Builders proposes six appraisal subjects with different values. RDO supports Builders but concedes a fundamental implementation problem: Builders' subjects combine parcels with different asserted encumbrances. Granite supports allocation by acreage across the integrated property. These are materially different answers to the same question, not an undisputed valuation that the Court must accept.

6. The competition of experts can and should be avoided. Because of the findings already rendered in this case, the Court should decline to adopt the Phase 1A Parties' alternate speculative schemes wholesale. If the Court does not follow the DIP Lien Allocation Approach based upon the Final DIP Order, the evidence of an integrated sale supports an objective *pro rata* acreage allocation that the Debtors and their impartial independent manager proposed in their Allocation Motion.

## ARGUMENT IN RESPONSE

### I. Section 506(a)(1) Measures Value by Reference to the Sale That Actually Occurred.

7. Section 506(a)(1) ties a secured claim to "the value of such creditor's interest in the estate's interest in such property," and it directs that this value "be determined in the light of the ***purpose*** of the valuation and of the ***proposed disposition or use*** of such property…." 11 U.S.C. § 506(a)(1) (emphasis added); *see* Builders' Opening Brief, ¶ 16; Poppy's Opening Brief, pp. 8-9; Granite's Opening Brief, pp. 5-6. The statute does not invite the Court to choose any one party's most favorable hypothetical. It mandates that the Court value the collateral in light of what actually happened.

8. The purpose of this valuation is to allocate the net Sale Proceeds from the Court-approved Sale among parcels that were encumbered by different secured parties. The

inquiry is to divide a known, finite, market-tested sum fairly. It is not to determine what each parcel might be worth under some hypothetical future development plan.

9. The proposed disposition of the Real Property Assets was the Sale. Section 506(a)(1) therefore points to the Sale as the starting point and the controlling frame of reference.

10. The Sale was the product of a failed real estate development that led to these chapter 11 cases. Under the negotiated, consensual Final DIP Order, the Debtors financed a comprehensive sale process that reached numerous prospective buyers, marketing the Project as a whole. As a condition of that financing, the parties agreed to allocate priming exposure based on the differences in parcel value and available equity cushion. That allocation remained in place throughout the sale process, even as other terms of the financing were renegotiated until the very end. *See Order (I) Authorizing the Debtors to Amend the DIP Credit Agreement; (II) Authorizing the Debtors to Execute, Deliver, and Record a Supplemental Deed of Trust in Favor of the DIP Lender; and (III) Granting Related Relief* [Docket No. 760].

11. That process produced the highest and best bid: $65 million for the Real Property Assets. That price was far below the more than $200 million of claims secured by those assets. The shortfall reflects the circumstances of these cases and the market's judgment of what the assets were worth when sold.

12. Poppy and Builders now ask the Court to disregard those circumstances and credit their parcels with inflated values that the market did not pay and they did not accept when they negotiated the allocation of priming exposure on the same parcels.

13. Section 506(a)(1) does not permit that. Value must be measured in light of the actual disposition, not an embellished one.

**II. The Poppy and Builders Valuations Depend on Assumptions the Court has Ruled Irrelevant.**

14. Poppy and Builders have each retained experts whose analyses allocate the proceeds in the way that best serves the interests of their respective clients. Both parties ask the Court to disregard the realities of the Sale and the events that led to it, including their own negotiation of, and consent to, the value allocation in the Final DIP Order. An analysis that discards the controlling facts to reach a favorable result is not a neutral application of section 506(a)(1). It is advocacy presented as valuation.

15. The Poppy and Builders valuations depend on the Buyer's future development plans, not the Sale that occurred.[5] That dependence contradicts the Court's own ruling. When Poppy sought discovery from the Buyer, the Court confirmed that the Buyer's future development plans are irrelevant to the section 506(a)(1) issues to be decided here:

> [POPPY'S COUNSEL]: So, again, just so I can cut this short, Your Honor, if necessary, the Court's view is that anything [Buyer] did is irrelevant, any of their plans, any of their changes, all of that is irrelevant to that. Do I understand that correctly?
>
> THE COURT: You are correct. That is what I believe, yes.

*See* Sept. 2, 2026 Hr'g Tr. at 24; *see also id*. at 16-18, 23, 26, 35-36.

16. Poppy and Builders cannot build their valuation cases on assumptions about a future post-Sale development that the Court has ruled irrelevant. The allocation must instead account for the Project as a whole, the Court's existing findings, and the interdependence of the parcels.

---

[5] While Builders suggests otherwise, there is no doubt that both sets of experts base their valuation analyses and opinions on the Buyer's future development plans. *See* Poppy Bank's Opening Brief at 2 ("all experts agree that the highest and best use for the Real Property Assets is dictated by the [Buyer's] Amended Development Agreement and plan approved by the City."); *see also id.* at 13; Builders' Opening Brief at ¶¶ 24, 42 (Builders' expert reviewed and considered the entitlements and development uses in the Buyer's development plan).

17. Section 506(a)(1), applied in light of the realities of these cases, does not permit Poppy and Builders to assign value to a speculative future development that may well encounter the same or similar obstacles that defeated the Project earlier.

18. Rather, the parties' assumptions must reliably measure value as of the date of the Sale. Poppy's and Builders' assumptions do not. Their expert analyses are irrelevant to the section 506(a)(1) analysis and should be excluded from the evidentiary record at the hearing.

## III. The Court Should Adopt the DIP Lien Allocation Approach.

19. The Phase 1B Parties offer two approaches that fit these circumstances. Both are consistent with the Phase 1A Parties' prior positions and with the Court's findings. The Court should adopt the DIP Lien Allocation Approach or, in the alternative, the acreage allocation approach, which the Debtors initially proposed, and Granite now advocates. Either approach avoids the bias built into the Poppy and Builders expert analyses.

20. The DIP Lien Allocation Approach is the most appropriate approach here. The Court-approved Final DIP Order reflects how the interested parties themselves valued the parcels when real money and real priming risk were at stake. It recognized the value and equity cushion of all the parcels, including Planning Areas 7, 8, and 9, and assigned priming exposure accordingly. The parties agreed to that allocation in exchange for the essential financing that made the sale process, and these cases, possible.

21. The law of the case doctrine reinforces the application of the DIP Lien Allocation Approach. The Court approved the Final DIP Order and made findings on which the parties relied.

22. Poppy and Builders cannot accept the benefits of the DIP financing and then ask the Court to disregard its terms as meaningless when the proceeds are divided.

**IV. Alternatively, the Court Should Allocate the Sale Proceeds *Pro Rata* by Acreage.**

23. If the Court declines to adopt the DIP Lien Allocation Approach, it should allocate the Sale Proceeds *pro rata* by acreage. The transaction evidence supports that approach. The Real Estate Assets were marketed and sold as a whole with no parcel allocation of the price. *See* Granite's Opening Brief, pp. 4-5.

24. An acreage allocation approach does not require a finding that every acre of the Project would have commanded the same price on its own. It provides an objective basis for dividing the value that was realized collectively, where interlocking land, infrastructure, and development rights supported the transaction. The fact that the Buyer might decide to develop individual parcels differently and at different times in the future, as the Poppy and Builders expert valuation analyses speculate, is irrelevant to the value of the Real Estate Assets at the time of their sale as a unified whole.

## CONCLUSION

WHEREFORE, the Phase 1B Parties request that the Court adopt the DIP Lien Allocation Approach or, alternatively, the acreage allocation approach; enforce the TIC Payment Provision according to its terms and require payment to SR Land after payments to the Keillor Parties as the creditors secured by Planning Area 9; and rule that neither development-phase labels nor appraisal-subject labels should expand or diminish the value of any party's collateral under these circumstances.

[*Remainder of page intentionally left blank.*]

Dated: November 18, 2026
Wilmington, Delaware

**CLARK HILL PLC**

*/s/ Karen M. Grivner*
Karen M. Grivner (Bar No. 4372)
824 North Market Street, Suite 710
Wilmington, Delaware 19801
Phone: (302) 250-4750
kgrivner@clarkhill.com

AND

**HUSCH BLACKWELL LLP**

Michael A. Brandess (IL SBN 6299158)
*(Admitted Pro Hac Vice)*
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606
Phone: (312) 526-1542
Fax: (312) 655-1501
michael.brandess@huschblackwell.com

Morgan A. Hutchinson (MO Bar No. 75616)
*(Admitted Pro Hac Vice)*
4801 Main Street, Suite 1000
Kansas City, MO 64112
Phone: (816) 983-8193
Fax: (816) 983-8080
morgan.hutchinson@huschblackwell.com

*Counsel for SilverRock Resort Investment LLC and SilverRock Resort Investment M LLC*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ S. Alexander Faris*
Kenneth J. Enos (No. 4544)
S. Alexander Faris (No. 6278)
Rodney Square
1000 N. King Street
Wilmington, Delaware 19801
Phone: (302) 571-6600
kenos@ycst.com
afaris@ycst.com

*Counsel to the Traub Parties*



HB: 4915-8213-3984.1

**GREENBERG TRAURIG, LLP**

*/s/ Anthony Clark*
Anthony W. Clark (No. 2051)
222 Delaware Avenue, Suite 1600
Wilmington, Delaware 19801
Phone: (302) 661-7000
Fax: (302) 661-7360
anthony.clark@gtlaw.com

AND

Emily D. Nasir (admitted *pro hac vice*)
1000 Louisiana Street, Suite 6700
Houston, TX 7700
Phone: (713) 374-3575
Fax: 713-374-3505
emily.nasir@gtlaw.com

*Counsel to Keillor Capital, as servicer, RAF Pacifica Loan Opportunity Fund I, LLC, and Arnold Fishman, as Trustee of The Arnold Fishman Revocable Trust dated July 15, 1999*

**CERTIFICATE OF SERVICE**

I, Karen M. Grivner, hereby certify that on November 18, 2026, a copy of the foregoing *Phase 1B Parties' Response Brief Regarding Allocation of Value Among Collateral* was served upon all counsel of record by CM/ECF.

*/s/ Karen M. Grivner*
Karen M. Grivner