**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>SILVERROCK DEVELOPMENT COMPANY, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-11647 (MFW)<br><br>(Jointly Administered)<br><br>**Related to Docket Nos. 1166, 1203, 1396, 1397, 1398 and 1399** |

# POPPY BANK'S REPLY BRIEF WITH RESPECT TO VALUATION OF REAL PROPERTY ASSETS PURSUANT TO 11 U.S.C. § 506(A)

**SAUL EWING LLP**
Mark Minuti, Esq. (DE No. 2659)
Monique B. DiSabatino (DE No. 6027)
1201 N. Market Street, Suite 2300
Wilmington, DE 19801
Telephone (302) 421-6840
Email: mark.minuti@saul.com
monique.disabatino@saul.com

-and-

**ABBEY, WEITZENBERG, WARREN & EMERY**
Mitchell B. Greenberg (admitted *pro hac vice*)
100 Stony Point Rd., Suite 200
Santa Rosa, CA 95401
Telephone: (707) 542-5050
Email: mgreenberg@abbeylaw.com

**STOEL RIVES LLP**
John S. Kaplan (admitted *pro hac vice*)
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: (206) 386-7524
Email: john.kaplan@stoel.com

-and-

Kirsten Worley (admitted *pro hac vice*)
501 West Broadway, Suite 2000
San Diego, CA 92101
Telephone: (858) 602-4909
Email: kirsten.worley@stoel.com

*Counsel to Poppy Bank*

Dated: November 18, 2026

---

[1] The Debtor in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: SilverRock Development Company, LLC (5730), RGC PA 789, LLC (5996), SilverRock Lifestyle Residences, LLC (0721), SilverRock Lodging, LLC (4493), SilverRock Luxury Residences, LLC (6598) and SilverRock Phase I, LLC (2247) (collectively, the "Debtors"). The location of the Debtor's principal place of business and the Debtors' mailing address is 343 Fourth Avenue, San Diego, CA 92101.

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

PRELIMINARY STATEMENT ..... 1

REPLY ..... 3

I. The Highest and Best Use of the Real Property Assets Must Be Determined By Reference to the Amended Development Plan ..... 3

II. Response to Builders Capital ..... 5

A. HVS Performed Comprehensive Market Analysis ..... 5

B. Dunec Failed to Perform a Proper Highest and Best Use Analysis ..... 7

C. Dunec Failed to Take Into Account the City's Approval, Requirements of the Amended Development Agreement, TOT and Hotel Branding ..... 8

D. Dunec is Not Qualified to Appraise a Luxury Resort-Style Hotel Property with Branded Residences ..... 10

E. Dunec Should Have Used the Income Capitalization Method ..... 11

1. The Real Property Assets Have Been Studied and Appraised Multiple Times and the Income Capitalization Approach Has Been Used in Prior Appraisals ..... 11

2. Contrary to Dunec's Report, the Income Capitalization Method is the Appropriate Methodology for the Allocation, Even Where Land is Undeveloped ..... 11

F. Dunec Failed To Take Into Account That the Partially Completed Residences Would Have To Be Demolished ..... 14

G. Dunec Used Arbitrary and Improper Sales Comps ..... 14

III. The Court Should Disregard All Non-Expert Opinions on Valuation ..... 15

IV. The Per Acreages Approach is Problematic and Fails to Account for the Amended Development Agreement and TOT ..... 16

V. Response to Keillor Capital ..... 17

A. The Priming Limitations in the DIP Orders are Not "Law of the Case," Nor are the Parties Contractually Bound to Such Allocation for Purposes of the Allocation Motion ..... 17

1. The Language of the DIP Orders and Circumstances Giving Rise to Exhibit 3 Show No Intent for Exhibit 3 to Govern the Allocation of the Sale Proceeds ....... 18

2. The Priming Limitations in the DIP Orders are Not "Law of the Case" and the Parties are Not Contractually Bound to the Priming Limitations for Purposes of Allocation ....... 20

B. Paragraph 3 of Exhibit 3 to the DIP Orders Does Not Predetermine Any Amount Due to SR Land ....... 22

C. The Prepetition Secured Creditors Will Not Receive An "Inequitable Windfall" ....... 25

VI. Response to Granite ....... 26

VII. Response to RDOC ....... 26

CONCLUSION ....... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariz. v. Cal.*,
530 U.S. 392 (2000)....................21

*Berger v. Heckler*,
771 F.2d 1556 (1985)....................22

*In re Christmas Tree Shops, LLC*,
No. 23-10576 (TMH), 2026 WL 1907385 (Bankr. D. Del. July 1, 2026)....................20, 21

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)....................15

*Heritage Highgate*,
679 F.3d 132 (3d Cir. 2012) ....................13

*James Cable, LLC v. Millenium Digital Media Systems, LLC (In re BroadStripe, LLC*),
435 B.R. 245 (Bankr. D. Del. 2010)....................20

*Philip Services Corp. v. Luntz (In re Philip Services (Delaware), Inc.)*,
267 B.R. 62 (Bankr. D. Del. 2001)....................20, 22

*U.S. v. ITT Cont'l Banking Co.*,
420 U.S. 223 (1975)....................21, 22

*U.S. v. Schiff*,
602 F.3d 152 (3d Cir. 2010)....................16

**Statutes**

11 U.S.C. § 363(j)....................23

11 U.S.C. § 364(d)(1) ....................17

**Other Authorities**

Appraisal Institute, *The Appraisal of Real Estate* (Michael McKinley *et al.* eds., 16th ed. 2026) ....................12, 13

Appraisal Institute, *The Dictionary of Real Estate Appraisal* (Michael McKinley *et al.* eds., 8th ed. 2026)....................6, 12, 13

Federal Rule of Evidence 702....................2, 15, 16

Poppy Bank ("**Poppy**") hereby files this reply to the Opening Briefs submitted in connection with Construction Loan Services II, LLC d/b/a Builder's Capital's ("**Builders**") *Motion for Entry of an Order (I) Valuing Collateral Pursuant to 11 U.S.C. § 506(a) and (II) Granting Related Relief* [D.I. 1166] (the "**Allocation Motion**"), and in further support of its positions as set forth in *Poppy Bank's Opening Brief with Respect to Valuation of Real Property Assets Pursuant to 11 U.S.C. § 506(a)* [D.I. 1400] (the "**Poppy Opening Brief**").[2]

## PRELIMINARY STATEMENT

Poppy is the only secured creditor that prepared a valid highest and best use analysis and properly analyzed the allocation of value of the Real Property Assets. Regardless, both HVS and Builders' appraiser (Mark Dunec) agree that the highest and best use of the Real Property Assets as of the Sale is determined by reference to the Amended Development Agreement. The Amended Development Agreement was an express condition of the Sale, was incorporated into the Sale Order, and reflects what the City would permit to be built as of the date of the Sale Order. The City's approval and contributions were central drivers of value throughout the sale process. Accordingly, any competent allocation of the Sale Proceeds must be grounded in the Amended Development Agreement, and reference to the Amended Development Agreement in assessing highest and best use should be undisputed material fact for purposes of this Motion.

Moreover, as explained below although Dunec agrees that the Amended Development Agreement drives the highest and best use analysis, his appraisal is problematic. Indeed, HVS performed a comprehensive market analysis and properly valued Phase 1A as a single economic unit with plottage value, whereas Dunec artificially separated the Real Property Assets into six

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Poppy Opening Brief.

stand-alone "Subject Properties."[3] Dunec never performed the financial feasibility test that he himself acknowledges is required for a highest and best use analysis and ignored the City's approval requirements, the hotel branding of the residences, and the TOT (as defined below), which could add as much as $61.9 million of value to the Project. Fourth, Dunec is unqualified to appraise a luxury resort-style hotel with branded residences and his rejection of the income capitalization approach used by HVS and the CW Appraisal, notwithstanding that his own cited sources and Third Circuit precedent support its use for property that has not been fully developed, is improper.

In addition to these issues with the Dunec report, the Court should also disregard the valuation opinions of the parties that did not retain experts. The Non-Expert Parties (as defined below) neither identified experts nor shared expert reports, as required by the Scheduling Order, and none has shown that it is qualified to offer valuation opinions under Federal Rule of Evidence 702. The per-acreage approach advanced by Keillor and Granite has been rejected by every expert, including Dunec, and fails to account for the separate phasing of Phase 1A and Phase 1B, the time value of money and added carrying costs for Phase 1B, and the luxury hotel's role as the driver of value through the transient occupancy tax and shared amenities.

Finally, as explained below the priming limitations in Exhibit 3 to the DIP Orders do not predetermine the allocation of the Sale Proceeds and are not "law of the case," as the Phase 1B Parties contend. In addition, paragraph 3 of Exhibit 3 to the DIP Orders does *not* entitle SR Land to the full Alleged TIC Payment regardless of the outcome of the Allocation Motion, which would create an inequitable windfall for SR Land.

---

[3] Dunec's appraisal speaks of six "Subject Properties," but both Builder's and RDOC's Opening Briefs use the term "Subject Parcels," adding even further confusion.

For these reasons, the Court should adopt the allocation proposed in Poppy's Opening Brief.

## REPLY

### I. THE HIGHEST AND BEST USE OF THE REAL PROPERTY ASSETS MUST BE DETERMINED BY REFERENCE TO THE AMENDED DEVELOPMENT PLAN

The Amended Development Plan was an express condition of the sale and was even incorporated into the Sale Order. The City's contribution to the sale process and influence over what could be built on the Real Property Assets has been a central driver of value in these cases. What the City would approve and what it would contribute were so important that the bidding procedures for the sale specifically provided for bidders to negotiate directly with the City. *See* Bidding Procedures [D.I. 396-1], ¶ 5. Mr. McMillen, the City's Manager, participated in the auction. *See* Tr. of Hearing (Oct. 17, 2025) [D. I. 748], 37: 21 - 25. In order for the Debtors to select the Buyer's bid, the City compromised a portion of its DIP Financing Claim and agreed to provide additional funding to "equalize" the Buyer's bid. *Id.*, 39: 1 - 12.

The City favored the Buyer based, primarily, on the "thoughtfulness" of the Buyer's development plan. *Id.*, 41: 8-22. Moreover, the Sale Order specifically provides that finalization of the Amended Development Plan was an express condition to the closing of the Sale. *See* Sale Order, ¶ 21.

The Debtors' independent manager, Mr. Christopher Sontchi, testified extensively at the October 16, 2025 sale hearing regarding the importance of what the City would approve in the sale process generally and in obtaining maximum value through such process:

> Even more of an issue is having to have the support of the City in order to be enabled or allowed to actually develop the property. The City is obviously the regulator. You have to work with the regulator to be allowed to develop the property, or at least in California you do. So their preference was very much not for that, but the belief was, and I think this is true, that as a whole, it was definitely worth much more than its constituent parts.

***

> So this -- this whole idea, this whole sale really had three pillars. It had -- you had to -- you had to come up with a buyer that would have money, sufficient financing to actually finish the project. I think that's a lot of what sunk Mr. Green, that he didn't have that. We had to have a developer that knew what they were doing, this was going to be a very, extremely complicated project, and they had to have the support of the City.

*See* Tr. of Hearing (Oct. 16, 202) [D.I. 747], 136: 2-9. 136: 24-137:6. .

The Court further acknowledged the importance of the City in the sale process in rejecting arguments that the City exercised inappropriate control:

> I further find that the City did not exercise inappropriate control over the process or use its veto power inappropriately. The reality is that the City had the power—had some power in this situation because the contracts, and entitlements, and regulations all impacted the ability to develop the project…

*See* Tr. of Hearing (Oct. 21, 2025) [D.I. 809], 5:23-6:3.

For these reasons, any competent valuation of the parcels of the Real Property Assets for purposes of allocation of the Sale Proceeds must, as the HVS Appraisal report did, take into account what the City would permit to be built. USPAP similarly provides at Standards Rule 1-3 that highest and best use must take into account "existing land use regulation" and "reasonably probable modifications of such land use regulation."

Here, the best evidence of what the City would permit to be built is the Amended Development Plan, which was approved, prior to the Sale Order, by the City Council, subject only to Court approval of the sale. Anything else would be pure speculation. Moreover, because the Amended Development Plan reflects what the City would permit to be built as of the date of the Sale Order, reference to this plan in determining allocation does not conflict with this Court's September 2, 2026 ruling on third-party discovery issues.

Notably, a luxury-style resort hotel with branded residences reflected in the Amended Development Agreement with a Phase 1A and Phase 1B is not unique to the Buyer's plan because it was consistent with the City's approval of the Debtor's prior plans under the PDSA as well.

## II. RESPONSE TO BUILDERS CAPITAL

While Builders' expert (Dunec) agrees with Poppy that the Amended Development Plan is the basis for the highest and best use analysis, Dunec failed to take into account, and even ignored, several aspects of the Amended Development Plan, such as the hotel branding of the residences and the transient occupancy tax ("**TOT**"), which demonstrate that the Phase 1A luxury-style hotel and branded residences must be considered one economic whole and that the hotel was and is the driver of value for the Real Property Assets.

### A. HVS Performed Comprehensive Market Analysis

Builders' Opening Brief states several times that Poppy's appraiser, HVS, "did not determine the relative market values of the distinct hotel, condominium, and residential lot components within Phase 1A." *See* Builders' Brief, p. 2.) However, that is not consistent with the findings of Dunec, who testified many times that he understood that HVS did indeed complete all of the market analysis of those components. *See* **Exhibit K**, Excerpts of 10/29/2026 Dep. of Mark Dunec, pp. 20-21, 37-38, 85-89.

HVS is the leading appraiser in the United States and internationally for hotels and luxury hotel communities. In connection with the preparation of its report, HVS analyzed market data for similarly situated luxury-style hotels and branded residences. HVS further analyzed residential sales comps. Dunec admitted that all of this analysis was done. Dunec's criticism was simply that HVS did not separately appraise each separate use type (i.e., hotel, residences, etc.) the way Dunec had. *Id.* Instead, HVS provided a single opinion of value for Phase 1A. *Id.*

The disconnect between HVS and Dunec is simple: the foundation of HVS' appraisal of the value of Phase 1A is based on the distinct luxury resort hotel, branded condominium, and branded luxury lots (as outlined in the Amended Development Agreement) and recognizes that the highest and best use of Phase 1A is an assemblage of the sites and uses because it creates plottage value.[4] Notably this was also the approach taken in the CW Appraisal which was introduced into evidence at the Sale Hearing. *See* **Exhibit I**, Excerpts of CW Appraisal.

By contrast, Dunec attempted to unilaterally and artificially separate the Real Property Assets into six different "Subject Properties"[5] and to apply a separate conclusion of value as to each one – in other words, Dunec attempted to value residences as just residences (not hotel-branded residences), and Dunec attempted to value the hotel's supporting buildings like the conference center/banquet center as a stand-alone vacant land property. HVS' opinion was, and is, that this is inappropriate because all of Phase 1A is a single economic unit with each separate use type dependent upon each other. It would be very difficult to separate out the use types because value would have to be allocated to pay for the hotel branding and amenities. More to the point, a potential buyer would only purchase the Phase 1A assets together and the City required a single hotel operator to manage Phase 1A (including management of those branded residences which opted into the hotel rental program). As set forth below, Dunec failed to take any of that into account.

---

4 From the Dictionary of Real Estate, page 143, "plottage value" is the increment of value that often occurs when two or more sites are combined to produce greater utility, resulting in a higher productivity or income than could be obtained from the individual smaller sites.

5 Curiously, Dunec's appraisal speaks of six "Subject Properties," but Builder's Opening Brief used the term "Subject Parcels," adding even further confusion.

### B. Dunec Failed to Perform a Proper Highest and Best Use Analysis

Poppy's expert HVS is the only expert which undertook a financial feasibility test supporting that the highest and best use of the Real Property Assets as of the Sale date was a luxury-style hotel with branded residences. At page 93 of Dunec's appraisal, he admits that in order to show highest and best use, four criteria must be met including a "financially feasible use," "which uses, being both possible and legally permitted, will produce any net return to the site?" However, Dunec admitted that he never performed a financial feasibility test as required; he only adopted the Amended Development Agreement as the highest and best use. *See* **Exhibit J**, Excerpts of 10/2/2026 Dunec Dep., pp. 14, 56-58, 160-161.

Curiously, Dunec's appraisal states on page 93 that "several of the Subject Properties derive their greatest utility and value as integrated components of the overall development rather than as stand-alone parcels" (which exact point is likewise made in the HVS appraisal); however, his appraisal does not expand upon this plottage value that was created. Rather, Dunec simply proceeds to provide value indications for the stand-alone "Subject Properties." Dunec's Subject Properties 1-6 themselves are not identified within, nor consistent with, the Amended Development Agreement. Dunec's Subject Properties are so arbitrary that Dunec testified that he could not even identify why he distinguished his Subject Property 4 from Subject Property 5. *See id.* at pp. 141-143.

Because Dunec failed to perform a financial feasibility test, he missed the point that the Phase 1A components achieve their greatest value as a whole, single economic unit—which is indeed why they were in fact sold as such.

### C. Dunec Failed to Take into Account the City's Approval, Requirements of the Amended Development Agreement, TOT and Hotel Branding

Dunec's selected methods are simply not aligned with the underwriting that a potential purchaser would employ to estimate the value of Phase 1A given what is stated in the Amended Development Agreement since his methods completely ignore the approved uses – which dictate luxury hotel branding – and the income potential of the resort, which is the economic catalyst of the development. Importantly, no part of this analysis depended upon the Buyer's plans or any future changes after the Sale Order. The Amended Development Agreement provides the allowed uses applicable to the Real Property Assets applicable to any proposed buyer, consistent with the City's approval. Dunec overlooked significant restrictions and attributes dictated by the Amended Development Agreement.

Dunec testified that he never took into account that the City would have to approve a potential purchaser and that the City required an experienced luxury hotel operator to manage the branded residences, or that a luxury hotel operator would be the most likely buyer of the entire Phase 1A. *See* Exhibit J, pp. 14, 46, 121-122, 128, 134-136. In fact, Dunec failed to take into account that the residences were hotel-branded at all. *See id.* at 46; Exhibit K, 55-58, 65-66, 71-76, 78. Dunec admitted that he did not study or analyze a single comparable property that was a hotel-branded residential community. Exhibit J, pp. 54-55. Further, Dunec did not take into account that the Amended Development Agreement required a luxury or ultra luxury brand hotel, and not just any hotel. *Id.* at p. 46. Dunec failed to recognize the branded residences' and other components' dependence on the hotel and condominium parcels, which both depend on the benefits from the TOT (as defined below) rebate program to be financially feasible. *See id.* at pp. 63,73, 128; Exhibit K, pp. 55-58, 65-66, 71-76, 78, 120. His failure to recognize the dependence of the branded residences on the branded hotel and the branded condominium parcels leads one to

question if the appraiser performed the assignment with impartiality, objectivity, and independence as required by USPAP's Conduct Rules.

Only Poppy's experts accounted for, and took into consideration, the rebate of Transient Occupancy Tax ("**TOT**"), which could add as much as $106 million of value to the Project over time, the net present value of which HVS discounted to $62,000. *See* D.I. 943-1, p. 2 of 52; *see also* HVS Appraisal, Poppy's Opening Brief, Exhibit D, p. 9. The importance of the TOT was likewise specifically raised by the Debtors' independent manager, Mr. Christopher Sontchi, at the October 16, 2025 sale hearing:

> And you also need the TOT agreements with the City in order to recoup the cost of building the project. So without the TOT, without the option land, you're nowhere in being able to make this thing work and you can't get the TOT and the option land without the support of the City. And you're not going to get the support of the City unless you cooperate with them and work constructively with them on the hotels and the residences.

*See* Tr. of Hearing (Oct. 16, 2025) [D.I. 747], 137:24-138:6.

The importance of the TOT was also discussed by City Manager Jon McMillen in his testimony during the sale hearing, confirming that a TOT sharing agreement was both part of the original development plan with Debtor, and then re-calculated by the City to update it for the current sale to the Buyer. *See* Tr. of Hearing (Oct. 17, 2025) [D.I. 748], p. 17:3-p. 18:4).

Jon McMillen also testified at the Sale Hearing to the importance of the "branding" of the residence, as follows:

> Q. To the City, what is the significance, financially, of having branded residences?
>
> A. The branded residences help the City's TOT from the standpoint that it was envisioned that the branded residences would be rented through the it hotel flag; effectively, the hotel management company would take care of renting, when available, or when a particular owner of a branded residence wanted it to be in the rental pool, the hotel flag would take care of renting those units and managing all of those rentals.

Q. And the City would derive TOT revenue in the ordinary course, as a result of those rentals, correct?

A. That is correct.

*See* Tr. of Hearing (Oct. 17, 2025)[D.I. 748], 15: 5-17.

### D. Dunec is Not Qualified to Appraise a Luxury Resort-Style Hotel Property with Branded Residences

Dunec is not qualified to appraise a luxury resort-style hotel with branded residences. He testified that he has never appraised such a property, let alone for a real estate developer or investor. Exhibit J, pp. 14, 66-67, 70-72; Exhibit K, pp. 68-70. At most, he provided an appraisal review for one property involving branded residences within the last ten (10) years, but it involved a points system related to time shares, with no relevance to the issues in this case. Exhibit K, pp. 68-70, 79-80, 82. By contrast, HVS handles almost exclusively hospitality appraisals and has performed hundreds of appraisals of similarly situated properties.

Contrary to the statement of Builders' and other parties' briefs, none of Poppy's other experts besides HVS supplied an opinion of value for the Allocation Motion. Moeder provided the perspective of how a real estate developer or investor would view the Real Property Assets and related issues but no opinions of value were offered. The Cumming Group supplied only a cost to complete the improvements to HVS to support the income capitalization appraisal approach used by HVS. The Cumming Group was the same party that previously provided such data to Cushman for the CW Appraisal and is intimately familiar with the Real Property Assets. Finally, Elaine White only provided a demonstrative based upon D.I. 913-3.

## E. Dunec Should Have Used the Income Capitalization Method

### 1. The Real Property Assets Have Been Studied and Appraised Multiple Times and the Income Capitalization Approach Has Been Used in Prior Appraisals

Both the HVS Appraisal and the CW Appraisal utilized the income capitalization approach to appraise the Real Property Assets. HVS, Moeder and the CW Appraisal all indicate that a real estate developer who would be a qualified buyer of the Real Property Assets would rely upon the income capitalization approach as the commonly accepted and industry accepted valuation methodology and as reflecting the most accurate valuation of the assets.

The Real Property Assets have been appraised several times in the past, most notably by Cushman in the CW Appraisal around the time of the Sale, which appraisal report was introduced as an exhibit at the Sale Hearing. All prior appraisers used the income capitalization approach, which provides a present day value of future income. The CW Appraisal similarly concludes, like HVS, that the income approach is the correct approach here. *See* **Exhibit I**, Excepts of CW Appraisal, pp. 112-113. The CW Appraisal similarly found that the highest and best use is driven by the City's approved uses and was a luxury-style hotel with branded residences. *Id.* at 110-111

Dunec failed to use the income approach, and instead used the sales comparison approach, attempting instead to value the Real Property Assets as vacant land. Not only did Dunec fail to study the CW Appraisal or any prior appraisals (see Exhibit J, pp. 90-91), but he is an outlier in his failure to use the income capitalization approach.

### 2. Contrary to Dunec's Report, the Income Capitalization Method is the Appropriate Methodology for the Allocation, Even Where Land is Undeveloped

In his expert report, Dunec contends that the income capitalization method is not suitable when property is undeveloped vacant land. However, Dunec's rebuttal of the HVS appraisal fails to provide any criticism of HVS for using the income capitalization approach. Dunec previously

advised upon the Debtor's Valuation Motion that the income capitalization approach was indeed appropriate. *See* Exhibit H, 5/7/2026 Expert Report of Mark S. Dunec, p. 14; *see also* Exhibit J, pp. 76-77. When asked during his deposition, Dunec stated that he no longer has an opinion about whether the income capitalization approach was appropriate. Exhibit K, pp. 14-15.

Based upon the treatise and accompanying dictionary cited *in Dunec's own report*, the "land residual technique" applied in HVS's expert report is a type of income capitalization method under which "net operating income attributable to the land is capitalized . . . to produce an indication of the land's contribution to the total property." Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 92 (Michael McKinley *et al.* eds., 8th ed. 2026) (the "**Dictionary**"). The procedure for conducting a land residual analysis involves deducting the total cost of construction, which indicates that the land residual analysis can be used when a development has *not* been constructed. *See* Appraisal Institute, *The Appraisal of Real Estate*, 316 (Michael McKinley *et al.* eds., 16th ed. 2026) (the "**Treatise**").

The Treatise further provides that "Any property or property interest that has the potential to generate income or cash flow can be valued using the income capitalization approach." *Id.* at 386. Likewise, the Dictionary definition of "land residual technique" includes the phrase "cost of the proposed improvements," which indicates that the method may be used when anticipated developments to the property have not been completed. *See* Dictionary of Real Estate Appraisal, at 92.

Dunec states in his report that, because the property is undeveloped, an income capitalization approach would be too speculative for the Real Property Assets. Such contention is again countered by the Treatise, which provides that "anticipation is fundamental to the income capitalization approach," and that income capitalization methods involve forecasting. *See*

Treatise, at 385 ("All income capitalization methods, techniques, and procedures forecast anticipated future market benefits and analyze their present value.").

Case law also supports the use of the income capitalization approach for valuing properties that are not fully developed. In *Heritage Highgate*, 679 F.3d 132 (3d Cir. 2012) the United States Court of Appeals for the Third Circuit analyzed a valuation of a real estate development that was only partially complete when the debtor filed for bankruptcy. *Id.* at 136. The appraisal in *Heritage Highgate* used both the sales comparison approach and the income capitalization approach; however, "[t]he appraiser favored the results of the latter because it 'more accurately considered the time and expenses' related to a real estate development like the Project." *Id.* at 137.

In considering the reliability of the appraisal in *Heritage Highgate*, the Third Circuit stated:

> The veteran appraiser it enlisted used well-accepted techniques of real estate appraisal to calculate the Project's fair market value. That the appraiser did so in light of the property's "proposed disposition or use" is clear from its acceptance of results derived from the "Developer's Approach," **an income capitalization "method** of estimating land value when subdivision and development are the highest and best use of the parcel of land being appraised." That approach most "accurately considered the time and expenses" that would be incurred by the Debtors in developing the property.

*Id.* at 145 (internal citations omitted) (emphasis added).

Based on the above, because Dunec's own sources – i.e. the Dictionary and the Appraisal – both demonstrate that the income capitalization method can be used for undeveloped property, and because, under the reasoning in *Heritage Highgate*, subdivision and development are the highest and best (and also the intended) use of the Real Property Assets, the income capitalization approach is appropriate in the present case.



59050040.4

### F. Dunec Failed To Take Into Account That the Partially Completed Residences Would Have To Be Demolished

The Dunec appraisal also improperly ascribed contributory value to partially-built residential improvements in Phase 1A, which have since been demolished or are in process of being demolished. The value provided by Dunec is overstated as those improvements have no value. Proper accounting would have lead to a negative adjustment to value to address the costs of demolition. The Amended Development Agreement provides itself that the partially built Phase 1A residences would be demolished, stating "A portion of the existing residential lots have partially-constructed improvements on them that will likely be demolished." (Amended Development Agreement, Ex. D thereof.). Therefore, that demolition was foreseeable was a known fact at the time of the Sale. Dunec did not even take into account that all of the Phase 1A residential improvements would have to be demolished, and instead arbitrarily assumed 50% were usable even though he admitted that he has no construction qualifications to make such a determination. Exhibit J, pp. 144-147. Therefore, Dunec's opinion of value lacks credibility.

### G. Dunec Used Arbitrary and Improper Sales Comps

Dunec used arbitrary and unreliable sales comps in his appraisal, rendering it unreliable. The land comparables that Dunec used for the hotel were not compatible with a luxury-style resort hotel but instead, vacant land in the desert far away from a golf course, and at times, zoned for industrial or other uses. Further, Dunec used inappropriate sales comparables for the branded residences in Phase 1A. *See* Exhibit J, pp. 163-171, 174-175, 205-206.

Curiously, Dunec purported to make adjustments for his sales comparables but his own work product shows no adjustment in price at all with respect to several. These inconsistencies are a consequence of Dunec's use of the sales comparison approach for a property such as the Real

Property Assets, which are not only unique but the subject of a future development. Therefore the sales comparison approach produced arbitrary and unreliable results.

## III. THE COURT SHOULD DISREGARD ALL NON-EXPERT OPINIONS ON VALUATION

Next, the Court should disregard all non-expert opinion on valuation for purposes of the Allocation Motion. All parties to the Allocation Motion consented to entry of the Scheduling Order, under which September 18, 2026 was established as the deadline for identifying experts and delivery of initial expert reports. Both Poppy and Builders timely identified experts, shared expert reports, shared rebuttal expert reports and produced experts for deposition. No other parties to the Allocation Motion identified any experts or shared expert reports. Yet, each of RDOC, the Phase 1B Parties and Granite (collectively, the "**Non-Expert Parties**") now improperly seek to offer opinions on how the parcels of the Real Estate Assets should be valued for purposes of allocating the Sale Proceeds.

For its part, RDOC purports to offer an opinion that, as between Poppy and Builders it prefers the expert report of Builders' expert. *See* RDOC Brief, at 2. The Phase 1B Parties (as an alternative to the DIP Allocation Approach) and Granite each purport to offer expert opinions that the Court should adopt a "pro-rata acreage" methodology to value the individual parcels.[6] *See* 1B Parties' Brief, at 13; Granite Brief, at 6. But, valuation of the individual parcels of the Real Property Assets for purposes of allocating the Sale Proceeds requires competent expert evidence.

The admissibility of expert testimony is a question of law governed by Federal Rule of Evidence ("**FRE**") 702 and the United States Supreme Court's ruling in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). FRE 702 imposes three distinct substantive

[6] The 1B Parties' support for a pro-rata acreage valuation methodology is an alternative argument to their primary position which is addressed elsewhere in this Reply.

requirements on the admissibility of expert testimony: "(1) the proffered witness must be an expert, *i.e.*, must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge [*i.e.*, reliability]; and (3) the expert's testimony must assist the trier of fact [*i.e.*, fit]." *U.S. v. Schiff*, 602 F.3d 152, 172 (3d Cir. 2010) (citation omitted).

The Court should disregard the opinions of the Non-Expert Parties for several reasons. First, not one of the Non-Expert Parties complied with the Scheduling Order, none have identified experts and none have shared expert reports. Second, even if there was still time to offer expert opinions, none of the Non-Expert Parties are competent to offer such opinions. None of those parties has provided any evidence that they are qualified to offer such opinions based upon any scientific, technical or specialized knowledge, as required by FRE 702. Moreover, these self-serving opinions by non-experts cannot provide assistance to the Court. If the Non-Expert Parties wanted to offer competent expert testimony, they had a full and fair opportunity to do so. It is too late to do so now and, accordingly, the Non-Expert Parties should be barred from offering their opinions on valuation for purposes of allocating the Sale Proceeds.

## IV. <u>THE PER ACREAGES APPROACH IS PROBLEMATIC AND FAILS TO ACCOUNT FOR THE AMENDED DEVELOPMENT AGREEMENT AND TOT</u>

Two parties, Keillor and Granite, advocate for the pure acreage approach (meaning every acre within Phase 1 is the same value – without regard to the differences between Phase 1A and Phase 1B). However, the acreage approach has been rejected by both of the experts, HVS and Dunec. Dunec also previously authored a separate opinion about why the acreage approach is invalid.

The acreage approach fails to take into account that the Real Property Assets have always consisted of two separate phased projects, a Phase 1A and a Phase 1B, as set forth in the Amended Development Agreement. The acreage approach also fails to take into account (i) the differences

between Phase 1A and Phase 1B, including most notably the fact that Phase 1B would be built later and thus has less value due to, *inter alia*, the time value of money and additional carrying costs for Phase 1B, and (ii) that the luxury hotel is the driver of value through the TOT and amenities made available to all of the residential components. Thus, use of the acreage approach would be inequitable.

## V. RESPONSE TO KEILLOR CAPITAL

### A. The Priming Limitations in the DIP Orders are Not "Law of the Case," Nor are the Parties Contractually Bound to Such Allocation for Purposes of the Allocation Motion

As described in the Opening Brief of the Phase 1B Parties [D.I. 1396] (the "**Phase 1B Brief**"), the Final DIP Order (as defined therein, and together with its amendment [D.I. 437], the "**DIP Orders**")[7] provided for the City to receive priming liens on the DIP Collateral (as defined in the DIP Orders) pursuant to 11 U.S.C. §364(d)(1), "all as expressly limited by Exhibit 3" to the DIP Orders ("**Exhibit 3**"). *See* DIP Orders, ¶¶ E(ii) and 3(d)(i). Exhibit 3 was a negotiated exhibit among the Debtors, the City and the Prepetition Secured Creditors (as defined in the DIP Orders) that included priming limitations among different parcels of the Real Property Assets.

In the Phase 1B Brief, the Phase 1B Parties argue that the priming limitations in Exhibit 3 to the DIP Orders should be dispositive of the allocation of the Sale Proceeds pursuant to the Allocation Motion. Contrary to the Phase 1B Parties' contentions, however, (i) the parties never intended for the DIP Order priming limitations to be binding in connection with the later allocation of value among the Real Property Assets, and (ii) the DIP Order Allocation is not "law of the

[7] On October 23, 2025, the Court entered the *Order (I) Authorizing the Debtors to Amend the DIP Credit Agreement; (II) Authorizing the Debtors to Execute, Deliver, and Record a Supplemental Deed of Trust in Favor of the DIP Lender; and (III) Granting Related Relief* [D. I. 760], which, *inter alia*, altered certain of the priming limitations in Exhibit 3 to the DIP Orders, but did not alter paragraph 3 of Exhibit 3.

case," nor does it reflect a binding contract among the parties that can extend beyond the context of the DIP Orders.

### 1. The Language of the DIP Orders and Circumstances Giving Rise to Exhibit 3 Show No Intent for Exhibit 3 to Govern the Allocation of the Sale Proceeds

First, there can be no serious contention that the parties intended the agreed upon priming limitations set forth in Exhibit 3 to be used for any purpose beyond the DIP Financing. Indeed, as reflected on the record at the hearing held on January 15, 2025, the proposed priming was premised on appraisals (which were not admitted into evidence) that contemplated a significant equity cushion in the Real Property Assets, and that attributed value to the Real Property Assets well in excess of what was ultimately received in connection with the sale process. *See* DIP Motion [D.I. 246] at ¶ 12 (stating that "there is sufficient equity cushion in the Project to protect the secured interests of the creditors"); DIP Hearing Tr. Jan. 15, 2025 [D.I. 336] 13:13-22 (indicating that the position that there was a "substantial" equity cushion was based on appraisals obtained in June 2024, neither of which was entered into evidence).

That the priming limitations set forth in Exhibit 3 were limited to the DIP Financing is further made clear by the language of the DIP Orders, which provide that "[a]ll Prepetition Secured Creditors have consented to ***Debtors borrowing from the DIP Credit Facility*** pursuant to the Term Sheet and DIP Documents, including the priming limitations and other terms set forth in this Order and on Exhibit 3 hereto." *See* DIP Orders, at ¶ H (emphasis added). The priming agreement thus related solely to the terms on which the Debtors could borrow from the DIP Credit Facility, and was not intended to extend to any other purpose.

Likewise, with respect to Planning Areas 7, 8, 9, the DIP Orders are clear that only the ***Debtors and the City*** (and not any Prepetition Secured Creditors) stipulated and agreed to the

amount of the priming lien on those parcels and to the alleged fact that such parcels were more valuable. Specifically, the DIP Orders state as follows:

> *The Debtors and the DIP Lender stipulate and agree* that disproportionate amount of priming with respect to Planning Areas 7, 8, 9 (as defined on Exhibit 3) (when compared to the percentage of these parcels to the estates' total parcels' in both size and value) is appropriate because, among other reasons (a) Planning Area 7,8,9 is comprised of some of the most valuable parcels included in the DIP Collateral; (b) there exists a substantial equity cushion in favor of the holder of the first deed of trust on the parcels comprising Planning Area 7,8,9, even taking into account the DIP Lender's $7 million priming lien; and (c) the equity cushion in favor of the holder of the first deed of trust on the Planning Area 7,8,9 parcels is greater than the aggregate equity cushion, if any, of the holders of the first trust deeds on the estates' other parcels combined.

*See* DIP Orders, ¶ I(i) (emphasis added). There was thus no agreement by Poppy or any of the other Prepetition Secured Creditors that Planning Areas 7, 8 and 9 were entitled to greater value.

Paragraph 10(l) of the DIP Orders – in which the City agreed to indemnify Poppy for any losses "resulting solely from the granting and implementation of the priming lien in favor of the [City] on the Poppy Collateral" – further demonstrates that the parties neither agreed nor intended for their consent to the DIP Orders to establish or otherwise predetermine the value of the parcels for purposes of the Allocation Motion. Pursuant to paragraph 10(l), the City's obligation to indemnify Poppy Bank "shall arise upon the last to occur of (x) the closing of a sale of substantially all of the Debtors' property, and (y) the finality of an order of this court determining the allocation of proceeds of such sale among all parties asserting liens and/or security interests in such property." *See* DIP Orders, ¶ 10(l).

If, as the Phase 1B Parties suggest, the DIP Orders and Exhibit 3 had already determined the relative values of the parcels among the Real Property Assets, the foregoing provision would be superfluous. Instead, this provision makes clear – and proves it was always understood – that

the Court would decide allocation of Sale Proceeds at a later time, and that all parties' positions regarding allocation were preserved.

Likewise, if it was understood by the parties, as the Phase IB Parties contend, that the priming limitations were dispositive of value for purposes of the Allocation Motion, then query why the Debtors' original allocation motion [D.I. 913], which was filed following entry of the Final DIP Order, did not follow this approach. Clearly, Exhibit 3 to the DIP Orders was intended to be limited solely to establishing the priming limitations needed for the Debtors to obtain financing, and all rights regarding the valuation of the parcels of the Real Property Assets were preserved.

### 2. The Priming Limitations in the DIP Orders are Not "Law of the Case" and the Parties are Not Contractually Bound to the Priming Limitations for Purposes of Allocation

Contrary to the Phase 1B Parties' contentions, the priming limitations in connection with the DIP Orders are not "law of the case" as to the allocation of value among the parcels of the Real Property Assets. The "law of the case" doctrine provides that when a court actually decides a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. *James Cable, LLC v. Millenium Digital Media Systems, LLC (In re BroadStripe, LLC*), 435 B.R. 245, 255 (Bankr. D. Del. 2010); *Philip Services Corp. v. Luntz (In re Philip Services (Delaware), Inc.)*, 267 B.R. 62, 66 (Bankr. D. Del. 2001); *In re Christmas Tree Shops, LLC*, No. 23-10576 (TMH), 2026 WL 1907385, at *9 (Bankr. D. Del. July 1, 2026). The doctrine only applies to issues that were actually litigated and decided by the court. *Id.* (emphasis added). Also, "[t]he law of the case doctrine does not act as an absolute bar on re-litigation (in contrast to the doctrines of claim and issue preclusion). Rather the law of the case doctrine merely directs the court's discretion not to rehear matters *ad nauseam*." *E.g.*, *In re Philip Services (Delaware), Inc.*, 267 B.R. at 66 (citing *Ariz. v. Cal.*, 460 U.S. 605, 618 (1983)).

In the present case, the priming limitations are not a "rule of law," nor were they "actually litigated." On the contrary, the priming limitations were a consensual resolution that followed extensive negotiation concerning facts specific to each secured creditor, and with the limited goal of enabling the Debtors to obtain the funding needed to finance the sale process and otherwise administer the chapter 11 cases. Because the City, the parties and the Debtors ultimately agreed on a consensual resolution for purposes of priming under the DIP Loan Agreement, there was no need for the Court to decide the merits of the issue or otherwise make any rulings on the appropriate valuation of the individual parcels. *See In re Christmas Tree Shops, LLC*, No. 23-10576 (TMH), 2026 WL 1907385, at *9 (Bankr. D. Del. July 1, 2026) (finding that law of the case doctrine was "misplaced" where objection was resolved by negotiation, final order was submitted under certification of counsel, and thus the merits and enforceability of employer-disclaimer provision were not litigated in connection with court's approval of store closing motion); *see also Ariz. v. Cal.*, 530 U.S. 392, 414 (2000) (citing Restatement (Second) of Judgments § 27, p. 250 (1982) ("In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated.").

For similar reasons, the fact that the DIP Orders were ultimately entered as consensual orders does not render the priming allocations set forth therein binding for purposes of the Allocation Motion. The Phase 1B Parties cite *U.S. v. ITT Continental Baking Co.* in support of their contention that consent orders "have many of the attributes of ordinary contracts" and the Court should enforce the DIP Orders "as a consent order to which all parties to the Allocation Dispute agreed." *See* Phase 1B Opening Brief [D.I. 1396], at ¶ 33; *see also U.S. v. ITT Cont'l Banking Co.*, 420 U.S. 223, 236-37 (1975).

While *ITT* and other courts have construed consent orders as contracts, such courts have also explained that because a consent order is to be construed as a contract, "reliance upon certain aids to constructions is proper, as with any other contract." *U.S. v. ITT Cont'l Banking Co.*, 420 U.S. 223, 238 (1975):

> Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree.

*Id.* (considering context and other explanatory documents in determining that FTC consent order was intended to impose a continuing prohibition on respondent's acquisition of baking companies for the time period specified); *Berger v. Heckler*, 771 F.2d 1556 (1985) (examining agency regulations and agency operating instructions in constructing terms of consent order).

In the present case, as explained above, the language of the DIP Orders themselves and the circumstances surrounding entry into the DIP Orders demonstrate that the priming limitations were intended to be used solely for purposes of the DIP Financing. Moreover, even if the DIP Orders and the priming limitations set forth therein do reflect a contractual agreement, no evidence has been, or can be, provided to show that such agreement was intended to be applied for any purpose other than limiting the City's priming. Thus, even if the DIP Orders were consent orders, that does not render the priming limitations binding for purposes of this later allocation dispute. *See In re Philip Services (Delaware), Inc.*, 267 B.R. at 68 (Bankr. D. Del. 2001) (concluding that approval of cash collateral stipulation did not preclusively prohibit the assertion of challenges regarding solvency in later preference action).

### B. <u>Paragraph 3 of Exhibit 3 to the DIP Orders Does Not Predetermine Any Amount Due to SR Land</u>

The Traub Trust and SR Land argue that paragraph 3 of Exhibit 3 constitutes a binding Court determination that SR Land was to be paid the face amount of its alleged note of $3,816,000

plus 15% interest compounding quarterly beginning on April 14, 2024, less the allocable share of costs and expenses per section 363(j) of the Bankruptcy Code, for its alleged interest in Planning Area 9 (the "**Alleged TIC Payment**"), regardless of the purchase price of the Real Property Assets and regardless of the value of Planning Area 9 as it relates to the value of all other parcels within the Real Property Assets. This is simply not the case.

Paragraph 3 of Exhibit 3 to the DIP Orders provides, as follows:

> Debtor RGC PA 789 LLC owns an undivided 57.2% interest in a portion of parcel no. 10 of Parcel Map. No. 37207 APN 777-060-076, described in greater detail in that certain Membership Interest Purchase and Sale Agreement dated as of April 13, 2023 (the "Planning Area 9"). The remaining 42.8% interest in the Planning Area 9 is owned by SilverRock Land II, LLC ("SR Land"). The membership interests in SR Land are owned by the Traub Family Revocable Trust dated June 22, 2015 (the "Traub Trust"). SR Land and the Traub Trust hereby consent to the sale of the Planning Area 9 by the Debtors pursuant to Section 363(h) of the Bankruptcy Code as part of a plan or a separate sale motion under section 363 of the Bankruptcy Code, provided that the provisions of any plan or order approving the sale of SR Land's interest shall in substance implement the terms of this paragraph, and shall be in a form reasonably acceptable to SR Land and the Traub Trust. In consideration of such consent, upon the closing of a sale of the Planning Area 9 pursuant to section 363 or a plan, SR Land shall be paid the sum of $3,816,000 plus 15% interest compounding quarterly beginning on April 14, 2024, less the allocable share of costs and expenses per section 363(j) of the Bankruptcy Code. Absent agreement of the parties, the Court shall determine the allocable share of such costs and expenses. *Such payment shall be made solely from the net proceeds of sale*, after deducting payments made to lenders secured by Planning Area 9.

*See* DIP Orders, Exhibit 3, ¶ 3 (emphasis added). As made clear from the above language, any payment to SR Land was to come solely from "the net proceeds of sale" and only after payment to the lenders secured by Planning Area 9. In other words, the amount to be paid to SR Land was entirely contingent upon the Debtors receiving Sale Proceeds for Planning Area 9 sufficient to pay those amounts after the payment of any secured claims related to Planning Area 9.

The language used in paragraph 3 of Exhibit 3 simply does not provide that SR Land was to be paid the face amount of its alleged note regardless of the outcome of the sale process and regardless of the outcome of the Allocation Motion. How could it? The only way to pay SR Land an amount in excess of the Sale Proceeds allocable to Planning Area 9 is to use Sale Proceeds allocable to other parcels of the Real Property Assets, all of which are subject to the secured claims of other parties. And at no time did any of these other Prepetition Secured Creditors agree that the recoveries from their respective parcels could be used to fund amounts for SR Land.

Lack of Sale Order Language Regarding the Alleged TIC Payment. Moreover, if SR Land was entitled to the full Alleged TIC Payment no matter the outcome of the sale process, query why SR Land did not actively participate in the sale hearing or otherwise demand that language be added to the Sale Order to provide or require payment to SR Land upon the closing of the Sale to the Buyer. Also, one would have expected parties to insist that SR Land be paid as soon as possible to cut off the accrual of interest at 15% compounded quarterly. Of course, this did not happen.

Poppy submits that the Phase 1B Parties' conduct reflects an understanding that payment of the Alleged TIC Payment was predicated on the net proceeds attributable to the TIC Parcel and that the appropriate allocation of the Sale Proceeds would be resolved through the Allocation Motion.

The Plan and Global Settlement. The Plan and the Global Settlement (which was approved as part of the Plan pursuant the order confirming the Plan [D.I. 1152]) likewise confirm that the amounts due to SR Land have not been predetermined. The Global Settlement expressly provides that "[a]ll issues related to valuation and the allocation of proceeds of the Sale, as well as the priority, extent and validity of liens, claims and interests against the Debtors, their assets, and the Sale proceeds, including without limitation those of the Settling Creditors (the "Remaining

Disputes"), shall be preserved and subject to determination by further order of the Court or as agreed between the creditors." *See* Global Settlement [D.I. 1107-1] at 2. If the exact amount due to SR Land had already been determined by Exhibit 3, then there was no reason for the Traub Trust or SR Land to have agreed to this provision of the Global Settlement.

In addition, the confirmed Plan does not include a set amount due to SR Land. Instead, the Plan makes clear that the amount due, if any, to SR Land is part of the Remaining Disputes subject to further determination by the Court or as agreed between the creditors. *See* Plan, Art. VII A. As such, based on the above, it is clear that the paragraph 3 of Exhibit 3 to the DIP Orders does not pre-determine the amounts due SR Land.

### C. The Prepetition Secured Creditors Will Not Receive An "Inequitable Windfall"

The Phase 1B Parties also argue that failure to enforce paragraph 3 of Exhibit 3 will result in an "unjust enrichment" and an "inequitable windfall" given the "substantial value" that the Debtors and creditors realized from being able to include the TIC Parcel in the Sale. As a preliminary matter, no evidence is provided in support of this alleged "substantial" added value, nor does SR Land acknowledge the fact that, in all likelihood, the TIC Parcel was of minimal value to SR Land if *not* included in the Debtors' proposed sale.

That aside, Poppy disputes that the equities are in SR Land's favor. On the contrary, in taking the position that it is entitled to the full Alleged TIC Payment regardless of the ultimate net sale proceeds attributable to the TIC Parcel, SR Land is prejudicing the interests of Poppy and the other Prepetition Secured Creditors, none of whom agreed that recoveries from their own parcels could be used to fund the Alleged TIC Payment. Indeed, given that the ultimate price for the Real Property Assets was less than the amount of liens on the Real Property Assets, the source of payment for the Alleged TIC Payment, if satisfied in full, would necessarily come from proceeds

of the other Prepetition Secured Creditors' collateral. Since none of these parties agreed to participate in the downside in this matter, such a result would in fact create an inequitable windfall for SR Land, to the detriment of Poppy and the other Prepetition Secured Creditors, for which there is no justification.

## VI. RESPONSE TO GRANITE

Granite's Brief is not supported by any expert opinion and should be disregarded for the same reasons set forth above. Granite's Brief also offers the incorrect opinion that acreage-only approach should be applied because "[t]he parcels within the Property were not developed or marketed as independent projects…" *See* Granite Opening Br. [D.I. 1398], at 3.

While it is true that the Real Property Assets were sold as a whole, the Amended Development Agreement expressly states that they are to be developed as two separate phased projects, Phase 1A and Phase 1B, and that each project has a separate timeline and separate certificate of completion,, as discussed in Poppy's Opening Brief and is clear in the Amended Development Agreement. *See* Poppy's Opening Brief, Exhibits B and C.

## VII. RESPONSE TO RDOC

RDOC's Brief is not supported by any expert opinion and should be disregarded for the same reasons set forth above. RDOC's Brief also reflects a misunderstanding of both Poppy's and Builders' experts. For instance, RDOC incorrectly assumes that Poppy was splitting the Real Property Assets into 12 parcels, and appears to have misunderstood that the 12 parcels was in fact just a reference to the Debtors' prior analysis at D.I. 913-3, and not Poppy's opinion.

RDOC also criticized Poppy's experts' reliance on the Amended Development Plan, with RDOC going so far as to suggest that such reliance is inconsistent with the Court's views expressed at the September 2, 2026 hearing on the motions concerning Poppy's attempt to obtain third-party

discovery from the Buyer.[8] *See* RDOC Brief [D.I. 1397], at 2, 7. However, Poppy's experts' reliance on the Amended Development Plan is wholly appropriate since such reliance is not predicated on the investment value of the Buyer's plans or what the Buyer is doing or might do in the future, but represents what the City permitted to be built on the Project as of the date of the Sale Order. Moreover, although RDOC states that it believes that Builders' analysis is the correct one,[9] RDOC seems to have misunderstood that Builders' appraiser Dunec also concluded that highest and best use is established by the Amended Development Agreement.

[remainder of page left intentionally blank]

---

8 RDOC further incorrectly suggests that the Court required the parties to separately identify separate values for each use type, "Subject Property," or "buckets" of parcels within the Real Property Assets. However, this was outside the Court's ruling; the Court's mandate was clear – to provide the highest and best use analysis. Moreover, Poppy has provided a demonstrative with its Opening Brief demonstrating how its allocation of value would be applied to each and every parcel.

9 Notably, RDOC previously adopted the Debtors' acreage-only position in connection with the Debtor's Allocation Motion, and appears to have changed its position without any expert opinion or explanation, further impacting RDOC's credibility on this topic.

## CONCLUSION

For the foregoing reasons, Poppy respectfully submits that the net sales proceeds should be allocated 86% to Phase 1A and 14% to Phase 1B according to the HVS restricted appraisal, and that the allocation set forth on **Exhibit F** to Poppy's Opening Brief should be adopted by Order of the Court.

Dated: November 18, 2026

**SAUL EWING LLP**

By: *<u>/s/ Monique B. DiSabatino</u>*

Mark Minuti (DE No. 2659)
Monique B. DiSabatino (DE No. 6027)
1201 North Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6800
Email: mark.minuti@saul.com
monique.disabatino@saul.com

-and-

**ABBEY, WEITZENBERG, WARREN & EMERY**
Mitchell B. Greenberg (admitted *pro hac vice*)
100 Stony Point Rd., Suite 200
Santa Rosa, CA 95401
Telephone: (707) 542-5050
Email: mgreenberg@abbeylaw.com

-and-

**STOEL RIVES LLP**
John S. Kaplan (*pro hac vice* to be filed)
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: (206) 386-7524
Email: john.kaplan@stoel.com

-and-

Kirsten Worley (*pro hac vice* to be filed)
501 West Broadway, Suite 2000
San Diego, CA 92101
Telephone: (858) 602-4909
Email: kirsten.worley@stoel.com

*Counsel to Poppy Bank*