# EXHIBIT J

## Excerpts of October 2, 2026 Deposition Transcript of Mark Dunec

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
CASE NO. 24-11647 (MFW)

| | | |
|---|---|---|
| In Re: SILVERROCK DEVELOPMENT COMPANY, LLC, ET AL., | : | Video-recorded DEPOSITION UPON ORAL EXAMINATION OF MARK DUNEC |
| Debtors. | : | |
| ------------------------ | X | |

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before ELLEN J. GODINO, CCR, RPR, CRCR, held via ZOOM VIDEOCONFERENCE from various locations, with the witness located at the OFFICES OF FTI CONSULTING, 9101 East Bay Harbor Drive, Miami, Florida, on Friday, October 2, 2026, commencing at 9:34 a.m. Eastern Daylight time.

property for a potential purchase?
A. I've worked on so many engagements, offhand, I don't recall.
Q. None come to mind?
A. Not offhand, no.
Q. Have you ever been hired by a developer who was looking to buy a luxury resort hotel with branded residences, to conduct an appraisal of that before they purchased it?
A. The same answer.
Q. That none come to mind?
A. No.
Q. How many properties in California in the last five years have you appraised?
A. Offhand, I don't recall the total. Just this last year, I valued approximately eight acres of vacant land for industrial property located in Ventura County. I valued approximately 360 acres of vacant land in the unincorporated community of De Luz. I valued approximately 80 or 90 acres of property in Temecula, California. I valued approximately five acres of vacant land in Newport Beach. I valued a couple of hotels in L.A., a hotel in San Diego, a movie studio in L.A., dealing with a renewal of a fair-market ground lease in Beverly

single buyer and not multiple buyers?
A. Again, the subject property, in my professional opinion, is valued, Subjects 1 through 6, as it shows, as we're seeing it on the screen; and in total, it's 70.1 million. There could be one buyer acquiring it for 70.1 million; there could be multiple buyers acquiring specific subject properties.
But ultimately, my conclusion is: 70.1 million for all subject six properties combined. And yes, one buyer could acquire it for 70.1 million.
Q. But respectfully, sir, you're not answering my question. You didn't take into account what the City would approve, in terms of one buyer or multiple buyers. Correct?
A. No, I did not.
Q. Okay. I'm going to turn to another page within your report, ending Bates label 4249.
Okay. In this section, you talk about highest and best use, which you've mentioned already in this deposition.
What do you mean by the term "highest and best use"?
A. Highest and best use is, as it states

one has to complete highest and best use as though vacant, and as though improved.

Q. Did you undertake a site analysis to determine if something different should have been built on the site?

A. I completed a highest and best use analysis based on the permitted uses, based on the amended development plan.

Q. Other than looking at the permitted uses in the master plan and development -- amended development plan, you did not do any other site analysis of the highest and best use?

A. That is the highest and best use. It is what is approved, what is legally permissible, physically possible; going through those steps, and utilizing the amended development plan.

Q. And when you say approved, you mean approved by the City of La Quinta?

A. Yes, this -- the 127 acres had site plan approval.

Q. Did you do any financial analysis supporting highest and best use?

A. Can you -- I'm just looking at my -- just one moment.

Could you repeat that question again,

please?
Q. Did you do any financial analysis supporting your highest and best use findings for any of the subject properties?
A. Yes, the financial analysis involved looking at the amended development plan, and completing my valuation analysis that focused on land valuation, because of the concluded value conclusions, and completing a cost approach for the partial structures.
Q. Are there different pricing and tiers for resorts in -- when you do a highest and best use analysis? Like luxury, ultra-luxury?
A. The highest and best use analysis focuses on the permitted use. So the nuance that you're describing is the different type of hotel, from limited to full service to luxury. So the answer is no.
Q. Did the permitted uses in the amended development agreement, did they specify a particular tier, like luxury or ultra-luxury?
A. I don't recall offhand.
Q. Okay. And then looking at this document again, basically Bates labeled 4249, you say Subject 1, the highest and best use is vacant;

branded by the hotel; that's the permitted use?
A. Yes.
Q. So how could a residential, buyer unconnected with hospitality or the hotel, be a potential buyer for the residences, then? Don't they have to be connected to the hotel?
A. No.
Q. What's the basis for your analysis?
A. It could be branded; it could not be branded. A luxury -- a luxury home could be a luxury home; it's based on the quality of the home. Having a brand is another -- another component that may or may not increase value. But it could be a different buyer.
Q. If the City restricted the uses to a luxury-branded residence, so it had to be a branded residence, would that inform your -- or change your opinion?
A. It would change my opinion in terms of: There would be then one buyer for all six. But my valuation would be the same, and the concluded values wouldn't change.
Q. Why wouldn't the concluded values change?
A. Why what?

these are golf course communities.

Q. Okay. Another whiplash; so let's go back up to where we were. Okay.

So we were looking at the second bullet point: It says, "We completed mark analysis -- market analysis for the Subject Properties' various development components," and you say, "including branded residential communities."

So where in my -- in your report do I find your market analysis for -- that relates to branded residential communities that you studied?

A. The analysis that I completed were for residential communities. That extra word that we're focused on, in terms of "branded" -- and again, the analysis is on page beginning 40 through 41 for residential. And the various subdivisions that I looked at, with a summary, the stats, on the bottom of 41.

But again, the word that you're focused on is the word "branded." But this is the analysis that you just -- that you just scrolled away from; that is the analysis that I did, for residential communities.

Q. But none of those -- that doesn't address a hotel branded residential community.

Correct?
A. I focused on -- eight residential communities; looked at residential communities in the market area, which included both within golf resorts and without. And I primarily focused on residential communities that had -- within a golf course community, that was similar to the comparable -- that would be similar to the subject.
Q. Okay. But your report says, "We completed market analyses for the Subject Properties' various development components, including branded residential communities."
But as we sit here today, you can't name a single branded residential community for which you looked at the market analysis of it?
A. That extra word, in hindsight, should have not been included.
Q. Okay. Let's scroll down to the second bullet point from the bottom.
"We completed a Highest and Best Use analysis for each Subject Property, considering the legal, physical, financial, and market characteristics of each property, as well as existing stage of development and applicable entitlements."

Can you please walk me through your financial feasibility analysis for each of the six subject properties, or identify where those separate financial analysis are located in your report?

A. The financial feasibility study deals with the permitted use. And because it was governed -- because the permitted use was governed by the amended development plan -- meaning it specifically states, within each subject area, what will be developed -- that is the highest and best use. And because of that, the financial feasibility concludes to that one permitted use.

Q. Did you prepare any financial pro formas --

A. No.

Q. Regarding the financial analysis supporting highest and best use?

A. No, it was not required, because the amended development plan governs the permitted use for each subject property.

And if a buyer would come in and would acquire the property and would want to do something different: They would have a different vision and dream, or they would want to change the potential zoning, they would want to change the permitted use,

change the as-of-right density, they would have to go through the entitlement process again. That's not what I valued.

What I valued was the highest and best use, which is subject, and it's governed by, the amended development plan, and those specific uses for the subject property.

So I'll give you a very specific example. My Subject 4 and 5 deals with development for residential properties. That's -- the amended development plan governs what can be built on those two -- on those two subject properties. A buyer would want to, for example, build a hotel on that. They could attempt to, but that wouldn't be the highest and best use, because it's not legally permissible.

So the amended development plan governs the permitted uses, and what can be built on those specific Subject Properties 1 through 6.

So from financial feasibility and maximally productive, it's those specific uses that have been concluded to.

Q. Isn't the financial feasibility test a necessary step that you must take, in order to render your highest and best use conclusion?

A. Yes, if there are multiple permitted uses, which, in this circumstance, there's not.
Q. So you did not undertake a financial feasibility test, then, in this case?
A. No, I did. But financial feasibility is about permitted uses; there's only one permitted use, and it's specifically stated in the amended development plan for each subject property. So the highest and best use analysis was completed, from beginning to end.
Q. So other than looking at the permitted uses in the amended development agreement and master plan, you didn't undertake any other kind of financial feasibility test to render a highest and best use conclusion. Is that accurate?
A. No, it's not accurate. I completed a highest and best use analysis, followed it through the appraisal body of knowledge, through the appraisal process, utilizing the amended development plan which governs the permitted use for each subject property.
That concludes to a financial feasibility based on one permitted use, as well as maximally productive, and concluded to a highest and best use conclusion per subject property.

the potential buyers would be hospitality developers and/or residential developers. Was that correct?
A. Yes.
Q. And you don't think any of those people would look at the future income stream of these properties?
A. They may look at the income stream, and -- not "may," they will look at all of those things, in terms of what their ultimate profits may be, and everybody has their own return requirements.
But in terms of valuing the property at a specific point in time, based on its specific use, and zoning, and everything that's physically there at that moment, no, it's not based on the income approach, ever.
Q. So you don't think that the ultimate profit would be important to a buyer, to determine the price they're willing to pay today?
A. It's all about their required return, and they will run their own pro forma, but that's not how vacant land is acquired. Not only in the appraisal body of knowledge, but in terms of my experience dealing with buyers, sellers, investors; all the various clients that I have been engaged with over the years, from publicly traded companies

cannot think of one time where I utilized the income capitalization approach. And for that matter, in those cases where it was litigation, I can't recall one time where the opposing appraiser utilized the income approach.

Q. But you haven't answered my question.
You have not done the sales comparable approach or cost approach for a hospitality developer of vacant land to build it into income-producing hotel. Right?

A. I've appraised hundreds of vacant land parcels, and I believe in every instance, the sales comparison approach was utilized for valuing vacant land. Not once was the income approach utilized.

Q. But you still haven't answered my question. You've never represented a hotel -- a hospitality developer buying vacant land --

(Cross-talk.)

(Court Stenographer clarification.)

Q. Mr. Dunec, you've never represented a hospitality developer buying vacant land for -- to produce it into an income-producing hotel. Correct?

A. As I sit here today, I don't recall if I have. But again, I've worked on hundreds of land valuations in my career for multiple uses. I don't

recall one instance where I utilized the income capitalization approach for vacant land.

Q. Do you prepare valuations or appraisals for lenders?

A. In terms of litigation, yes. In terms of just -- I hate the word "typical," but typical lender work for an acquisition, no.

Q. Okay. So the same question for potential buyers or owners, developers, investors: Do you do typical appraisal work or only litigation work?

A. I do many appraisals for -- for owners, for general partners, for limited partners. We -- my team, myself personally, my team, we do it for financial reporting. We do purchase price allocation. We do work for estate planning purposes.

We do it for internal management purpose -- internal management purposes, meaning, they just want to get a handle on their -- what -- what we believe, I believe that a property is worth. Not because there's any transaction involved; they just want to have a third-party opinion of what we believe the value of that property is.

Q. Okay. I'm going to move now to 4258.

multiply that by the 52.3 million, you're at 16.9 million. If you look at Subject 1, you take two percent, you multiply that by the 53.3 million; it's a little over a million dollars.

MS. WORLEY: Okay. Let's go ahead and take a five-minute break. Is that okay? Let's go off the record.

THE VIDEOGRAPHER: Thank you, Counsel. This is the videographer. The time is 11:26. We're going off the record. This ends Media File 1.

(A brief recess takes place.)

THE VIDEOGRAPHER: We are back on the record. The time is 11:40. This begins Media File 2.

MS. WORLEY: Okay. Thank you.

BY MS. WORLEY:

Q. Mr. Dunec, before the break, we were talking about your appraisal experience with vacant land appraisals, and you said you've been involved in many appraisals of vacant land where you did the sales comparison approach and cost approach.

Is that an accurate statement of your prior testimony?

A. No, I stated in -- in the vacant land sales, I utilized the sales comparison approach.

Q. Okay. And then -- but in any of those prior engagements where you used the sales comparison approach, was there a specific development agreement or approvals that specified that a hotel was going to be built on that property?

A. I don't recall offhand.

Q. Is it safe to say that you've not encountered that situation, where you have not provided a valuation of vacant land on a sales comparison approach, where the specific development agreement or zoning approvals or other approvals would specify that there's going to be a hotel built in the future?

A. No, that's not correct. I don't recall, again, every vacant land sale that I've worked on, every vacant land valuation that I've worked on.

Q. Do you remember any that had approvals already for a hotel to be built in the future?

A. When you say "approvals," so you're referring to site plan approval, or permitted use of a hotel?

Q. Like our development agreement in this -- the amended development agreement in this instance; it specified that a hotel was the

permitted use?

A. So I don't recall offhand. I have valued hundreds of vacant land parcels.

Q. And do you think that a buyer --

A. And -- I didn't -- I didn't finish the end. Just give me one second.

The question -- can you repeat the question, please, because I don't -- I don't think I answered your question.

MS. WORLEY: And would the court reporter repeat the question, please.

(Testimony read back.)

Q. Okay. So the question is: In the vacant land appraisals that you've done, can you remember a single one that involved a specific development agreement that specified that a hotel was going to be built in the future?

A. I don't recall -- I'm going to answer it in two parts. I don't -- as I sit here today, I don't recall if I have valued vacant land that had site plan approval. I have valued vacant land with different permitted uses, including hospitality.

Q. What's one example? Can you name that project that had hospitality, that was vacant?

A. As I sit here today, I don't recall.

Q. Is it your opinion that -- well, let me ask this one. Sorry, strike that.

Wouldn't a hospitality buyer want to understand and do an analysis of the income potential of such a property before buying?

A. Yes.

Q. Isn't the income approach, then, a more appropriate valuation approach for a vacant property that has a specific development agreement specifying a hotel will be built?

A. No.

Q. Why not?

A. Because that's not how vacant land properties, including for hotels, are valued.

Q. What's the basis for that opinion?

A. The Appraisal Body of Knowledge.

Q. What is the Appraisal Body of Knowledge?

A. The Appraisal Body of Knowledge includes all appraisal textbooks, training, experience; all appraisal literature. And to be very specific, there are two land valuation textbooks that specify how vacant land parcels, aside from The Appraisal of Real Estate, 16th Edition, which is the latest edition of The

(sic) of the report -- of this report. So that's page 14; this is Bates labeled 4446. Okay.

And then this -- the end of this page, the last paragraph says, "The appraiser may also utilize the 'Land Residual Method' in support of the Comparable Sales Approach. This technique is suitable for development projects such as SilverRock, when the timeline for completion is understood. The determination of land parcel value considers the development plan for each parcel, the fair market value of planned improvements (using the Sales Comparison Approach), and the cost of improvements. The difference between the fair market value of the improvements and their cost to build equals land parcel value."

Do you see that?

A. I do.

Q. Does that represent one of your opinions with respect to SilverRock?

A. It is one of them, yes.

Q. Can you explain what you mean by this?

A. Yes. When -- when -- when -- there are six approaches to land valuation, and the land residual method is one of the six. And one can complete a residual method when one has all of the

development plans, construction costs, timing, all of the various assumptions required to complete a residual analysis.

So one can do this as a -- and by the way, this is done as a reasonable check to the sales comparison approach. The sales comparison approach would always be the primary approach to value. So I did include this within my report.

Q. The land -- the land residual method is a subset of the income approach. Is that correct?

A. It is.

Q. Okay. And so when you said, when there are plans, construction costs, and the timing is known, is that what you said, those are the variables, when it's appropriate?

A. It would be for a specific investor. It would result in an investment value. So in order to complete a land residual method, without it being speculative -- meaning, at the end of the day, I'm a real estate appraiser, I'm not a developer; I don't have specific details of the detailed construction costs, the detailed timing of the construction, the detailed plan of the assumptions as it relates to -- let's use residential homes for a moment -- what that price per finished lot, or that price per

ruled 100 percent with my value.

What was the difference between my value and the opposing expert's value? He stated he gave a market value, but in reality, he didn't. He valued an investment value; which was, he utilized all of the assumptions from his client, that developer. He assumed entitlements were in place, but they weren't. I provided an as-is value. There was a retrospective as-is value as well.

Q. So have you seen the Cushman & Wakefield report dated October 7, 2025, with a date of value of July 1, 2025?

A. No.

Q. Are you aware that Cushman & Wakefield had done an appraisal of this property in October of 2025, in connection with the sale proceedings and bankruptcy?

A. I may have been told, but I didn't review it; I haven't had a chance, focusing on preparing for my deposition.

Q. Are you aware that this property has been appraised and studied many times by appraisers in the past, including Cushman?

A. Am I aware?

Q. Have you seen any prior appraisals --

appraisals of this SilverRock property, by any prior appraisers?

A. I don't believe so, no.

MS. WORLEY: I'm going to mark the next exhibit, Exhibit 102.

Q. Well actually, before I do that, sorry, I'm going to ask one more follow-up question.

If I tell you that all of the prior appraisals of the SilverRock property were done on an income approach, would that surprise you?

A. It depends what it was for. Nothing would surprise me.

Q. So the Cushman & Wakefield report was done -- or appraisal was done for the debtors, for Douglas Wilson, the debtor's restructuring officer, around the time of the sale.

Does it surprise you that that was done on an income approach?

A. Nothing -- nothing surprises me.

Q. Why does that not surprise you?

A. Because there are appraisers that unfortunately use wrong valuation methodologies, such as I just described on that Albany case that I worked on. Nothing surprises me.

Q. Are you saying that Cushman &

not review that report, nor did I provide an appraisal review report. It exists, and I stated it within my report.

Q. So to the extent that the Cushman & Wakefield appraisal used an income approach, are you suggesting Cushman & Wakefield was wrong?

A. I'm not suggesting anything, because I did not review their report, nor did I provide an appraisal review report.

Q. And so all of the prior appraisals of SilverRock that I'm aware of have all used an income approach. Are you suggesting that all prior appraisals that used an income approach are wrong?

A. I'm not providing an opinion on any appraisal report that I've not completed an appraisal review report on.

Q. Okay.

MS. WORLEY: So now I'm going to share Exhibit 102.

(Exhibit 102, Law360 Article entitled "How to Reliably Value Income-Producing Real Estate," by Mark Dunec and Anthony DellaPelle, dated January 20, 2021, Three Pages, was received and marked for identification.)

Q. Okay. Exhibit 102 is an article in

Is it your understanding that the master plan and development agreement would permit anyone to come in and be a buyer, or that it had to be a specific type of buyer?

A. I don't have an opinion.

Q. Did you review the amended development agreement for that information?

A. I did not.

Q. And if you understood that the -- in fact, the amended development agreement specifically states that only an experienced operator, operating commercial real estate properties that are substantially similar to the project components, would be the only acceptable buyer, would that change your opinion about who the acceptable buyer is?

A. That is the exact definition of market value: Who would be market participants? That amended development agreement, exactly how you just defined it -- and I would like to see the language. But if the language is exactly as you're describing it, that's exactly the definition of market value. Which is: There are different classes of investors for different property types. So an appropriate buyer for a component, or the entire 127 acres,

would be a developer; not for example, a self-storage operator.

Q. Okay. I'm going to mark the next exhibit, Exhibit 104.

(Exhibit 104, Document entitled, "Ordinance No. 626, an Ordinance of the City Council of the City of La Quinta, California, Conditionally Adopting a Reinstated and Amended Development Agreement for the SilverRock Resort," 256 Pages, was received and marked for identification.)

Q. Exhibit 104 is Development Agreement 2025, Restated -- Reinstated and Amended Development Agreement; the original was from 2014.

Have you seen this document, dated September 22nd, 2025?

A. I've seen many documents.

Q. I'll represent to you that this was from the City of La Quinta.

A. If it's in my Documents Relied Upon, then I reviewed it.

Q. This particular copy is from the City of La Quinta website; it's a public record.

A. Okay, again, whatever is in my documents -- I've reviewed every document in my Documents Relied Upon. And if it's not in my

the term "hotel," and I'm not providing a legal position, or taking a legal opinion of the interpretation of this paragraph.

Q. Okay. But you just said "rented out," but highest and best use would not be putting apartments on this property. Right?

A. You could still rent out a single-family home.

Q. And -- but that's still not a commercial property. Correct?

A. A residential home is not a commercial property, no.

Q. Okay. And then the golf clubhouse you mentioned, and the spa; those are all part of the hospitality amenities, right, they're related to the hotel?

A. If it's one integrated unit, one could make the argument, yes. But it could be sold off independently, where you have a gym, a spa, a health club, and a clubhouse associated with the golf. It does not have to necessarily be with the hotel, no.

Q. The golf clubhouse is not a separately operating business that generates its own income, or was never intended to be. Was that your understanding?

information. It's a bankruptcy sale; it sold at auction. The amended development plan gave an indication of what Turnbridge was -- was going to do. Again, the amended development plan governs the highest and best use for the subject properties.

Q. So when we were talking about investment value versus market value, had you done this analysis, wouldn't that show you that a buyer's motivation would be based upon investment value?

A. I don't understand your question.

Q. A buyer's motivation to buy this property, wouldn't that be motivated by the investment value of the property?

A. Real estate investors are in the business of making money, making profit. A developer is going to develop a property to make a profit. That is their motivation of moving forward. I'm not following your question.

Q. But doesn't this treatise, though, that you've relied upon; doesn't it -- doesn't it fully confirm that the buyer's motivation for buying the property is an important part of the appraisal process?

A. Yes, but it -- but it -- it all -- it all depends. So for example, one could buy a vacant

hotel, and decide to reposition the property to multifamily, and in reverse.

So understanding why a buyer is acquiring a vacant multifamily or a vacant office or a vacant what-have-you, or a meaningfully low-occupied or very high-vacancy property, what is their motivation? What are they looking to do?

So if they're planning to invest additional dollars into a value-add acquisition, and they're going to attempt to reposition the property from, let's say, a Class A to Class B, that would be a motivation.

A motivation would be, they're going to be repositioning -- again, I'm just giving a random example -- a vacant hotel, they decided to reposition it to multifamily again, or in reverse. This was a bankruptcy sale.

Q. You're not suggesting, though, that this property could have been repositioned to a use substantially different from what's in the development -- amended development agreement. Right?

A. That's not what I said, though. What I said was: I valued the property based on the highest and best use, which was based on the permitted use

and the as-of-right density, which was governed by the amended development plan.
But in theory, a buyer could have attempted to do something else. But that is not -- but that is -- but that is not the approach I took, and that's not the opinion of value that I'm providing.
Q. So is it safe to say, you did not take into account a buyer's motivations or planned use, from the buyer's perspective?
A. I did, because it's what is governed is -- the amended development plan governs the permitted use and density of the property. That's the highest and best use. That's what I valued the property on, and that's what a potential buyer would do.
Q. Except they would look at it through the investment approach?
A. I'm not understanding your question.
Q. Wouldn't the potential buyer do everything you just said, except for they would look at from the investment approach?
A. I'm not following -- what do you mean by "investment approach"?
Q. All right. Sorry. The investment

values.

Q. Is it your understanding that the spa improvements are fully usable?

A. Could you repeat the question, please?

Q. Is it your understanding that the spa improvements are fully usable -- or fully usable at the time of the sale? Or did you have an understanding about whether they would be demolished, or needed to be demolished?

A. There are partial improvements. Construction has not been completed, even as of my inspection of the subject property.

And I take the issue of elements and functional obsolescence, in terms of potentially being operated or replaced, in my value of not just Subject Property 1's partial improvements, but the improvements for Subject 2 as well as 6.

Q. What's the difference between Subject Property 4 and 5? Why did you break them into two?

A. Because of location.

Q. Can you explain?

A. As you could see, there is -- I just want to go to it in my report as well.

It could have been valued as one. I chose to value it as -- as two. And it was based on

my property inspection. I'm trying to recall now if there was a roadway in between Subject 4 and 5, that ultimately, that was my conclusion to make it separate. Period.

Q. Why is the value different, though, based on location?

A. Why is the value different for what?

Q. For 4 and 5? Or sorry. Why are they a different subject property, based on location?

A. Well, Subject 4 and 5 have different sizes. So the overall conclusions are different, because the sizes are different.

Q. Is the price per acre --

A. But -- but --

Q. The same?

A. But, if I could recall, I just want to confirm, I concluded to the same price per acre of 300,000, but I want to make sure the record is right.

Yes, I concluded to 300,000 for both Subjects 4 and 5. So on a per-acre basis, it's the same value. And as you can see, it's similar in size.

(Cross-talk.)

Q. So I'm confused, like why did you make

them two separate subject properties, then? I'm still confused by that.

A. If memory -- it was based on my site inspection, and there was -- give me just one second.

Apologies for the delay, just give me another minute or two, please.

As I'm sitting here right now, I don't recall the specific reason why it was separated. They could have been valued together.

Q. Okay. And in what -- Subject Property 4 and 5, those were residences --

A. It was vacant land --

(Court Stenographer clarification.)

A. It was vacant land, with permitted use for residential development.

Q. And that's part of what would be Phase 1B. Correct?

A. Phase -- yes.

Q. Okay. And then Subject Property 6, those are residences as well. Correct?

A. Yes, but the difference between Subject 6 with Subject 4 and 5 is, lots have been already subdivided, and there are, I believe, 13 partial improvements for Subject 6.

Q. It's your understanding that the lots in Subject Property 6, because they're part of 1A, that they would be built sooner than 1B?
A. They -- well, that's a fact already. They have been, because there are partial improvements.
Q. Are you assuming that all of the partial improvements on Subject Property 6 will be usable?
A. In my report, I give value to those partial improvements. I do take into account that there have been some physical deterioration, as it's been exposed to the elements, as well as some functional obsolescence, that there may be some upgrades or replacements.
Q. Are you aware that there's demolition permits for all of the --
(Court Stenographer clarification.)
MS. WORLEY: Sorry, the witness or myself?
(Court Stenographer clarification.)
MS. WORLEY: Sorry.
Q. Are you aware that there are demolition permits for all of the improvements on Subject Property 6?

A. I am not.
Q. Do you have any understanding of whether a new builder would even be willing to come in and build residential improvements, on top of existing residential improvements that had stood out in the desert for a while?
A. I do have to -- you asked a question about, if I was aware of demolition permits. That is the previous question.
As of October 23rd, 2025, the effective date of value, my understanding was, there wasn't any. So is that demolition permits that you're suggesting, existing -- is that subsequent to October -- October 23rd, 2025? I just want the record -- I just want the record to be clear, that's all.
Q. Yes. Let me ask it a different way.
As of the sale date, if the improvements on Subject Property 6 were deemed incapable of being used, and needed to be demolished, would that change your opinion of fair value?
A. By whom?
Q. By the City, or any buyer?
A. If there was documentation clearly

stating that it was 100 percent nonusable, it would affect my value.

Q. Okay. These aerial photographs that appear in your report, did you take those, or did somebody else?

A. These are all my pictures.

Q. So you were personally present at the site -- this site visit?

A. Oh, yeah.

Q. Okay. Were you able to --

(Cross-talk.)

Q. Who else from FTI came on this site visit?

A. My colleague, Larissa Gotguelf. I hope I pronounced her name right.

Q. And what is her expertise?

A. She works in the restructuring practice, real estate restructuring practice of FTI.

Q. Did you bring along anybody else from FTI?

A. No.

Q. Were you able to go behind the security fencing, and actually look at -- do a walk-through of the improvements?

A. No, I was not. As you can see, it was

fenced off, and for safety purposes, I wouldn't do it.

Q. Including the partially completed hotel reception? It looks like you got pretty close here?

A. As we could see on the pictures, it's walled off.

Q. For any of your site walk, did you have any third-party inspectors or contractors or vendors of any kind?

A. No.

Q. Sorry, that was a no?

A. No.

Q. Did you attempt to inspect these structures to determine what portions of them are reusable, or whether they have to be demolished?

A. It would be beyond the area of my expertise as a real estate appraiser. I'm not -- I'm not a contractor or engineer.

Q. Let's fast forward here. I'm going to move to page 45. You mentioned these key indicators for a 12-month period, but it does -- it doesn't identify what the 12 months are.

What is the 12 months?

A. Give me a second, please.

And where are you looking -- oh, the

1 and 2, for a hotel; it's vacant land. There is not an existing income-producing asset. It's been partially constructed, a partial shell.

What I did is, I looked at other vacant land sales with the permitted use for hotels, to value the underlying land, and I utilized the cost approach to value the depreciated cost of the improvements. Again, this is not an income-producing asset; it's vacant land, with partial improvements.

Q. Let's go to the sentence at the bottom of this page on 4338.

You say, "Accordingly, several of the subject properties derived their greatest utility and value as integrated components of the overall development, rather than as stand-alone parcels."

What do you mean by that?

A. So for example, Subject 1 and 2. Subject Number 1 is that spa; Subject 2 includes the main hotel. They could be sold off separately. They could be -- they could be developed separately; they could be developed independently. They could be sold off independently. They could be sold off together.

It's my professional opinion, and I

valued it as such, that Subject 1 and 2 are integrated together, and that there would be value of Subject 1 and 2 being valued together. There would be -- there would be economies of potential customers from the hotel utilizing the amenity, the spa.

Q. Did you do a highest and best use about whether the residences -- any of the residences have a highest and best use as hotel-branded residences, or just as separate luxury residences?

A. I valued -- I valued Subject 4, 5 and 6 as vacant land, which they are, for residential development. And I utilized subdivision -- subdivisions that included -- that were golf course communities. I did not -- I did not include, for example, residential homes that were sold outside of a golf course community.

Q. But you didn't look at whether homes have more value when they're branded with a hotel, versus just being homes, luxury homes?

A. Same answer.

Q. Did you ascribe any value of the branded residences -- did you give any value to the fact that the hotel drove the value?

A. It wasn't -- so the short answer is no.

And my question relates to the sentence where you say, "Estimated replacement cost was adjusted for accrued depreciation, including physical deterioration and functional obsolescence, where appropriate, and entrepreneurial incentive was incorporated to reflect market-based construction costs."

Do you see that?

A. I do.

Q. Okay. Would a substitute developer consider the cost to complete the improvements?

A. I'm sorry, could you repeat that again?

Q. Would a buyer, a developer who buys the property, would they consider the cost to complete these improvements?

A. Yes.

Q. And the -- I think you testified the only replacement cost information used was from Marshall & Swift. Is that right?

A. Yes.

Q. I'm going to skip ahead. So I'm going to look at your land -- your comps. This is comparable sales details for Subject Properties 1 through 3. This is Land Sale Comparative Number 1.

Is this property located adjacent to a

golf course?
A. No.
Q. Is there access to a golf course?
A. No.
Q. Is there any adjacent property that could include the custom residential lots connected to a hypothetical hotel on any of these properties?
A. Repeat that again, please?
Q. Is there any adjacent property that you -- or is there any part of this property that you could see accommodating custom residential lots or branded residences on this property?
A. I did not analyze the adjacent lots to this comparable sale.
Q. Did this property look like the type of property that would be accommodating to a luxury resort hotel?
A. This property -- this property has a permitted use of hospitality, as you can see. And therefore, it was comparable -- it was a data point that I deemed comparable to value Subjects 1, 2, and 3, because the highest and best use was for hospitality, and hospitality is a permitted use for this vacant land parcel.
Q. Did you look at whether this property

is suitable for a luxury resort hotel, though?

A. The analysis was focused on the permitted use, not the -- well, the permitted use of a hotel. Not the class of the hotel; the fact that a hotel can be -- could have been developed on this site.

Q. Do you know what the zoning is? It says "M-SC." Do you see that? Do you know what that means?

A. As I sit here today, I don't have a definition of what that acronym is. But the permitted use, again, for hospitality, which is the same permitted use for the subject property.

Q. Okay. I'll represent to you that "M-SC" means "Manufacturing Service Commercial District." It's an industrial zoning use, and it's seen -- it's for industrial and manufacturing activities.

Does that change your opinion about whether this site would be appropriate for a luxury resort hotel?

A. Again, the -- this comparable was utilized because it's a vacant land sale with the same permitted use of hospitality. So is this an appropriate comp to value Subject 1, 2, and 3? Yes.

Q. But it's not the same use if it's industrial, versus a luxury resort hotel. Right?
A. You're -- you're defining what zoning is, versus the permitted uses within that zone. And what's permitted within that zone is what it says on my Land Sale Comp 1 tab, which could also include a casino.
Q. "Hospitality" means more than a -- a hotel, though, right? It could mean other things besides a hotel?
A. What do you mean by that?
Q. Hospitality is not limited to hotels, is my understanding. Is that your understanding?
A. There are subsets. So when one uses the term "industrial property," it could be a warehouse, it could be manufacturing, it could be industrial flex. There are every -- I shouldn't say "every" -- but there are -- there are permitted uses, such as industrials I just described. Or you look at a -- along where it says retail, it could be -- there's many different types of retail. And hospitality is the same.
Q. But this looks like it's just dirt out in the middle of nowhere, and industrial land. Nobody is going to put a luxury resort hotel. You

didn't even look at that, though, right?
A. Was that -- was there a question?
Q. Yeah. You didn't -- you didn't look at whether the site would actually be appropriate for a luxury resort hotel. Right?
A. I analyzed this comparable that would be appropriate for a hotel, which it is.
Q. Did you analyze it about whether it would be appropriate for a luxury resort hotel?
A. I didn't focus on status or class of a hotel. The valuation -- this valuation analysis was identifying land comps that have similar permitted uses, which I did.
Q. Let's look at your Sale Comparable 2. Same question: Is this located adjacent to a golf course?
A. I don't believe so.
Q. Are you aware of it being near a golf course, or providing access to a golf course?
A. "Near" is relative. Again, I didn't analyze this comparable, this comparable property, other than identifying, when I completed my search criteria for valuing Subjects 1, 2, and 3, I identified comparable land sales that had the same permitted uses; i.e., hospitality.

1 through 3. I'm asking you about Land Sale Comparable 2, and my simple question is: Do you really think that a luxury resort developer would put a luxury hotel on that site?

A. I didn't value a luxury resort. I valued Subjects 1, 2, and 3 as a -- as a permitted use of a hotel. That's what this value is, valued independently.

I did not identify failed developments in La Quinta, or across California, or around the country, to compare to the failed SilverRock development. What I did is I valued the subject properties based on its highest and best use.

Q. But --

A. And the highest and best use for Subjects 1, 2, and 3 is for a hotel. So I identified vacant land comps with the same permitted use, which is hotel, and that's what that is.

Q. Other than the fact that you see "Permitted Use" says "hospitality," is there anything else about this Land Sale Comparable 2 -- 1 and 2, that would qualify it to be a luxury resort hotel property, in your view?

A. Again, you're using the word "luxury resort hotel." I'm valuing vacant land. I'm

valuing vacant land with a permitted use for a hotel. That's what I valued.

Q. How could -- how could you solve for the permitted use, which is a luxury resort hotel and related development?

A. There is no luxury resort hotel. The subject property has -- is vacant land, with a partial improvement.

If the subject property was improved with a Ritz-Carlton, I would look for comparable properties to the Ritz-Carlton in the La Quinta market. But that's not what's at the subject property. What's at the subject property is vacant land with partial improvements.

(Cross-talk.)

A. That's how I valued it, as-is value.

Q. But don't you have to find comps that actually would be similar land, that could accommodate the uses under the development agreement?

A. I did. It could accommodate a hotel, on this vacant land.

Q. But not a luxury resort hotel?

A. I'm not even following --

Q. You didn't look -- at whether land --

Q. Could they have been developed into a luxury hotel?

A. It could have been. Why not? Why not? It could have been in the various classes, but that's not what I concluded to. What I concluded to is the vacant land could be developed into a hotel.

Q. Okay, let's go back to, like, for instance, One; let's take a look at this.

Is the quality of that land and its location, in terms of whether it could be used for a luxury resort; was that part of your analysis, in determining whether to put it on a comp? To make it a comparable?

A. My search criteria included a 15-mile radius, location-wise from the subject property. In terms of time, I went back two years from the effective date of value, identifying the land comparables that had a similar permitted use.

And the highest and best use of the subject property was for a hotel. I was looking for land comps, again, in between sizes of five to 50, that could -- that could include a hotel, and those four comps did.

Q. And so, again, whether it could accommodate a luxury hotel, that was not considered.

Right?

A. I valued what I considered was a hotel.

You're referring to a specific class of a hotel, and that was not taken into account. The issue was: Can this land be acquired and developed into a hotel.

Q. Okay. So same question for Land Sale Comparable 3: Do you have the same answers, that you did not take into account the quality tier of what could be built on there as a hotel?

A. The same answers for 3.

Q. Okay. And then is this close to a golf course, or adjacent to a golf course?

A. I didn't analyze it, if it was next to a golf course. And again, my search criteria -- my search criteria included a 15-mile radius from the subject property, going back two years, sized between five and 50; with -- five and 50 acres in size, with a permitted use of hotels.

Q. Okay. So the same questions for Land Sale Comparable, are your answers the same --

(Court Stenographer clarification.)

MS. WORLEY: Sorry.

Q. Turning to Land Sale Comparable 4, I'm going to ask you the same questions, and are your



Veritext Legal Solutions
866-299-5127 calendar-ca@veritext.com www.veritext.com

have more value than these -- is that what you're -- I'm not understanding your question.

Q. No, quite the opposite.

Tradition Golf Club and The Quarry; so you've got, it looks like, one, two, three, four -- whoops, four of these sales comparables are from Tradition Golf Club, and then two of them are from The Quarry.

What do you know about Tradition Golf Club?

A. That it's a golf community, and they have single-family homes that are completely built. These comps that we're looking at, 1 through 6, and then 5 through 11 on the next page, also include finished lots in golf communities that will be built, for comparable residential homes that will take place -- potentially take place at the subject property.

Q. Isn't Tradition Golf Club and The Quarry, aren't those both gated communities with their own golf course that only their residents can access?

A. That's what a golf community is. Those residential homeowners will have access to those -- those -- golf courses in those respective

communities. I did not complete research if -- if residents from either one could participate in other golf course communities, which is typically done in, for example, Florida, for example.

Q. Are you aware that the SilverRock golf course is a public golf course?

A. I wasn't referring to public. These are privately owned homes within those golf club communities. But there are instances -- and I know this for a fact within Florida, that you have, within golf course communities, more often than not, they're able to participate and utilize those golf courses in other golf course communities, when they have intercommunity events.

Q. But you testified you don't know if that's the case here, with Tradition and The Quarry?

A. I did not analyze that, as it relates to this valuation. This valuation, for Subject 6, was valuing vacant land parcels that were subdivided; there's finished lots. And I identified comparable finished lot sales within golf communities. Again, the subject property has a golf course. And --

Q. But isn't the SilverRock golf course, because it's a public golf course, it doesn't have

C E R T I F I C A T E

I, ELLEN J. GODINO, CCR, CRCR, RPR, do hereby certify that prior to the commencement of the examination, MARK DUNEC was duly sworn by me to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

ELLEN J. GODINO
CERTIFIED COURT REPORTER
REGISTERED PROFESSIONAL REPORTER
CERTIFIED REALTIME COURT REPORTER
DATED: 10/11/26