# EXHIBIT K

## Excerpts of October 29, 2026 Deposition Transcript of Mark Dunec

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:
SILVERROCK DEVELOPMENT COMPANY, LLC, et al., Chapter 11
Case No. 24-11647 (MFW)

Debtors.
______________________________/

VIDEO-RECORDED DEPOSITION OF MARK S. DUNEC
Remote Zoom Proceedings
Bay Harbor Islands, Florida
Thursday, October 29, 2026

REPORTED BY:
LESLIE ROCKWOOD ROSAS, RPR, CSR 3462
Pages 1 - 126 Job No. 8543239

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In re:

| | |
|---|---|
| SILVERROCK DEVELOPMENT COMPANY, LLC, et al., | Chapter 11 |
| | Case No. 24-11647 (MPW) |
| Debtors. | |

_____________________________/

Video-recorded deposition of MARK S. DUNEC, taken on behalf of POPPY BANK, Remote Zoom Proceedings from Bay Harbor Islands, Florida, beginning at 10:05 a.m. Eastern Daylight Time and ending at 1:42 p.m. Eastern Daylight Time, on Thursday, October 29, 2026, before Leslie Rockwood Rosas, RPR, Certified Shorthand Reporter No. 3462.

A. Yes. Yep.
Q. So my question is: Is it your opinion that the total luxury lots 1A component residual value is, in fact, $30,200,000?
A. That's not my opinion. This is HVS's opinion. 10:13:56 They just don't clearly state it this way. But all the analysis that they've completed and their figures, various figures, do -- they conclude to 3.2 million for the luxury lots. They just don't illustrate it that way.
Q. So to be clear, do you have any opinion at all 10:14:21 about whether 30,200,000 is a correct value or an incorrect value for the luxury lots 1A component residual value?
MR. SCHUSTER: Objection. Asked and answered.
THE WITNESS: I have no opinion. 10:14:37
Q. BY MS. WORLEY: I didn't see anywhere in your rebuttal report any attack of HVS's use of the income approach or the land residual approach.
Is it accurate that you are not critical of HVS for using the income approach or land residual approach 10:14:58 here?
A. No. I've no opinion.
Q. Do you agree that it's a correct approach here, one of many correct approaches, perhaps?
A. It is one of the six recognized approaches to 10:15:17

land valuation, and they utilized the residual method.
Q. And so you agree that the residual method is an appropriate methodology for appraisal of the property, subject property?
A. No, that's not what I stated. I stated it's one of six approaches to land valuation, and they chose to utilize the residual approach. 10:15:53
Q. Is there anywhere in your rebuttal report where you claim that the land residual approach is not the correct methodology that HVS should have used? 10:16:13
A. I don't provide an opinion one way or another.
Q. I'm going to move to page 5 of your main rebuttal report. So this has the Bates number 4467.
Here you talk about Mr. Moeder's opinions regarding "Acreage Only" Methodology. 10:17:20
What did you understand to be Mr. Moeder's opinion about quote/unquote the "Acreage Only" Methodology?
A. My understanding is his exact words within his report, that "Acreage Only" Methodology is analytically incorrect and agrees that value should not be allocated solely based on acreage. 10:17:45
Q. Did you understand Mr. Moeder to be talking about only the acres within Phase 1A of the property?
A. You'd have to ask him. 10:18:06

disagree with that, and he himself fundamentally disagrees with his own opinion.

My value, as it relates to specifically Subject 6, has one highest and best use.

Q. But that doesn't answer the question. 10:25:05

Isn't within Subject Property 6, isn't every acre worth the same within Subject Property 6? Not looking at any of the other subject properties.

A. Yes, it is.

Q. And isn't that the same as HVS, which -- the HVS 10:25:21 report, which says every acre within 1A is the same? You just have a different starting point.

A. No. That is the fundamental difference.

Q. And in --

A. HV -- HVS does not value Phase 1A as a 10:25:36 standalone. They literally break it out into hotel, lots, condos. They themselves value it differently.

Q. Isn't it true that HVS provides a single concluded value for Phase 1A?

A. That is what they do. 10:25:58

Q. And isn't it a logical assumption, then, if there's a single concluded value for 1A, that each acre within 1A will be treated the same?

A. That is -- that is their opinion, but it's inconsistent within their opinion. And as I opine to 10:26:15

within my rebuttal report, there was specific information within the HVS report where they were able to conclude to a value, residual value, for hotel, lot, and condo. They chose not to, but the information is within.

Q. Okay. And going back to -- you say, "I agree with Mr. Moeder that it is analytically incorrect to value land on acreage only." You say this in your rebuttal report. 10:26:46

What is it that you think you agree with Mr. Moeder about? 10:26:59

A. Exactly that. The fundamental disagreement is that HVS's overall Phase 1A value, my professional opinion, should not be valued on an acreage basis, and Mr. Moeder agrees with me. I agree with him as well on that. 10:27:18

Q. Would it change your opinion if you understood that Mr. Moeder's critique was only of applying acreage only across both 1A and 1B, the entire Phase 1?

A. Yeah, and I would respectfully say that Mr. Moeder's opinion is inconsistent and fundamentally wrong, based not on because Mark Dunec says so, but because it's foreign to the appraisal body knowledge, real estate valuation methodology, and HVS's own opinion by valuing those three components separately. 10:27:34

Q. Going back to -- 10:28:02

A. I'm not understanding the question.
Q. Isn't it true that HVS has a single concluded value for Phase 1A?
A. Yes.
Q. And that's a different concluded value from Phase 1B? 10:39:49
A. Yes, with a "but," which is: HVS valued the three components separately within Phase 1A and has hard costs and soft costs for all of Phase 1B that is differentiated between those three components. 10:40:13
The real question is why didn't HVS illustrate the values as I show in my rebuttal report? Again, I'm not opining that it's right or wrong; they just didn't do it.
Q. And isn't it true that Mr. Moeder says the Phase 1A allocated value should be different from the Phase 1B allocated value? 10:40:32
MR. SCHUSTER: Objection. Asked and answered.
THE WITNESS: That is Mr. Moeder's inconsistent opinion. 10:40:47
Q. BY MS. WORLEY: But isn't it consistent with the HVS allocation of value for 1A versus for 1B?
A. No.
Q. And isn't it consistent with Ms. White's allocation of "Acreage Only" within 1A and her separate 10:41:00

whole 127 acres?
A. Yes.
Q. Isn't this consistent with the single value allocated by HVS for Phase 1A versus a different single value for 1B? 10:53:40
A. No. There's an inconsistency within the Phase 1A that we're looking at, the 55.9, because HVS valued the three different components separately. And as I -- within my report, within HVS's report, and as I've already testified a couple times -- I'm happy to many 10:54:00 more -- HVS had the information within their own report to conclude to a residual value for each component. They chose not to.
So -- so there is -- so there is a fundamental inconsistency between Ms. White simply taking the HVS 10:54:21 number, allocating on a per-acre basis, and Mr. Moeder saying, yep, that's the way to do it because they both said it should be done that way. But that's not what HVS did.
What HVS did is they concluded to a value for 10:54:40 the hotel, lots, and condos. They even had within the HVS report a breakdown of the cost components for the hotel, lots, and condos. They even had a -- for the hard costs. They even had a breakdown of the costs for soft costs. It's just simply math to illustrate a residual 10:55:01

value per component for Phase 1A.

You'd have to ask HVS why they didn't do that. But within the HVS report, there's an inconsistency to their illustrations and conclusions, and the inconsistency continues between Mr. Moeder's opinions within Phase 1A and Phase 1B. 10:55:27

And then I'm not quite understanding what Ms. -- Ms. White is opining to. But an inconsistency between the three reports.

Q. So you -- you understand, of course, that HVS intentionally gave only a single value to 1A rather than break it out? 10:55:49

A. I can't -- I don't have an opinion what they intended to do. What I can say for certain is that they valued the individual components of a hotel, lots, and condos. In order to conclude to a residual value, they needed the breakdown of those costs for the hotel, lots, and condos. And it was within the report for those breakdowns, including the soft costs. 10:56:10

So they have the information to conclude to a residual value for each component. They chose not to. They -- but what we do know is that they did value all three components separately. 10:56:32

Q. But in choosing a single value for Phase 1A, the way HVS approached this is the same as Ms. White. I 10:56:55

hotel is the 'primary value creation mechanism for the project.'" And you go through his reasoning. And then you say, "However, Mr. Moeder" -- "however, Mr. Moeder provides no market evidence demonstrating that a luxury hotel creates a value effect comparable to membership in an exclusive private golf community." 11:33:24

Let's take this issue of the luxury hotel being the primary value-creation mechanism for the property.

Regardless about whether you think Mr. Moeder can opine to it or has the market data, do you disagree with the conclusion that the luxury hotel is the primary value-creation mechanism for the project? 11:33:42

A. I don't provide an opinion either way.

Q. Are you aware that the SilverRock project is planned to receive 106 million in public funding in the form of the transient occupancy tax rebate? 11:34:00

A. It's my understanding, yes.

Q. If the project was to receive a cash infusion of $106 million, or present value of over 60 million in today's dollars, do you think that adds value to the land, or does that subtract from it? 11:34:23

A. It's all about financial feasibility. I don't have an opinion.

Q. Did you look at how much of the transient occupancy taxes generated from the hotel versus the 29 11:34:44

Q. Do you know why a developer would choose to brand residential products with a luxury hotel brand?
A. Which developer?
Q. Developers generally.
A. I don't have an opinion. 11:36:38
Q. How many appraisals have you performed that included residential components that are hotel branded?
A. Don't recall.
Q. Okay. You say that, "Mr. Moeder provides no market evidence demonstrating that a luxury hotel creates 11:36:56 a value effect comparable to membership in an exclusive private golf community."
Do you actually disagree with the conclusion that a luxury hotel could create a value effect comparable to membership in an exclusive private golf 11:37:11 community?
A. I don't have an opinion.
Q. Is that something that you looked into?
A. No. It's outside of my scope. My scope of work for this report was reviewing Mr. Moeder's report, which 11:37:26 I did, and providing opinions on Mr. Moeder's report, which I did.
Q. And you didn't look into this issue in connection with your primary original report, either, about the luxury hotel potentially creating a value 11:37:39

effect comparable to membership in an exclusive private golf community?

A. My affirmative report stands on its own two feet.

Q. Where in your report do you discuss the concept -- in your original report or rebuttal report, do you ever discuss the concept of whether a luxury hotel creates a value effect comparable to membership in an exclusive private golf community? 11:38:09

A. Can you break down that question, please? 11:38:25

Q. Yeah.

This concept of whether a luxury hotel creates a value effect comparable to membership in an exclusive private golf community, is this discussed at all in your original report? 11:38:38

A. I do not discuss this in my report.

Q. Okay. Let's go to the next page. So this is ending -- this is page 8, Bates label ending 4470 of Exhibit 127.

And here you talk about "Mr. Moeder provides no market support for the rankings and classifications upon which his analysis relies." 11:39:13

And the next paragraph you say, "Mr. Moeder only analyzes completed homes in established residential golf course subdivisions." And then you go on to say, 11:39:31

introduction of hotel branding, survey buyers or other market participants, or otherwise measure the contributory value of hotel branding and services."

With regard to contributory -- contributory value of hotel branding and services, is that something that you have analyzed in connection with SilverRock? 11:50:08

A. No.

Q. Do you understand that the hotel is a key component of the SilverRock project?

A. I didn't value the SilverRock project. 11:50:28

Q. Do you understand that the hotel is a key component of the property's value?

A. It is a component, as I concluded in my affirmative, as well as HVS.

Q. Did you ever measure the contributory value of hotel branding and services? 11:50:56

A. I did not.

Q. Did you look at the governing documents and entitlements, and notably, the Reinstated and Amended Development Agreement, and conclude that they would allow the 29 lots in 1A and the 70 condominiums to be nonbranded? 11:51:25

A. I reviewed that document, but what specifically is your question?

Q. Is it your opinion that any of those documents 11:51:41

would actually allow the 29 lots or 70 condos to be nonbranded?

A. It doesn't state that it needs to be. Again, I valued the retrospective as-is market value, a hypothetical buyer. 11:52:00

Q. Did you have any understanding about whether the City of La Quinta would allow the 29 lots and 70 condos to be nonbranded?

A. The issue of branded versus nonbranded is not a legally permissible use. That is -- that is a choice 11:52:15 that an owner can decide to do.

Q. Do you have an understanding that when residents are hotel branded, that those residences would have access to the amenities of a hotel?

A. I don't have an opinion. 11:52:38

Q. Isn't that commonly understood?

A. I don't have an opinion.

Q. Do you think that a hotel would allow its name to be used essentially for free without charging for it to the residences? 11:52:53

A. Again, I don't have an opinion.

Q. Is that based on lack of experience with branded residential hotel developments?

A. No. Every single one stands on its own two feet. Every one is -- every one is different with 11:53:08

career appraising thousands of properties, including various types of hotels, there is the -- they could have -- they do have different agreements. They have different fees, different agreements, different business plans, period. 11:54:56

Q. But none of those that you're referring to have involved hotel-branded residences; correct?

A. No. I didn't say that.

Q. What projects that you've worked on have involved hotel-branded residences? 11:55:10

A. I don't recall as I sit here today.

Q. Can you recall ever having worked on a project with hotel-branded residences?

A. Yes.

Q. And approximately when was that? 11:55:23

A. It was a case involving Marriott in Aspen, Colorado.

Q. What type of residential product was it?

A. It was hotel with private client -- with private residents. I forget the exact terminology used for that 11:55:41 case.

Q. Was that an existing hotel and residences or was it something that was going to be built?

A. It was existing at the time. I don't recall if there was an additional phase. 11:56:02

Q. And what was your role?
A. I was a real estate appraiser.
Q. For a lender or for a buyer?
A. I was representing Marriott.
Q. What was the purpose of the appraisal? 11:56:16
A. Don't recall offhand. For litigation -- for -- the purpose was for litigation purposes.
Q. And how long ago was that?
A. I don't recall.
Q. More than ten years ago? 11:56:34
A. No.
Q. Less than ten years ago?
A. Yes.
Q. Less than five years ago?
A. I don't recall. 11:56:41
Q. I don't want you to guess, but would you estimate that it was within five to ten years ago?
A. I'm not guessing, and I don't recall.
Q. Do you have any understanding about whether it was more than five years ago? 11:56:59
A. As I sit here today, I don't recall.
Q. What about more than three years ago?
A. It is more than three years ago.
Q. And have you worked on any other projects involving branded residences connected with a hotel? 11:57:14

A. Yes.
Q. What's another project?
A. As I sit here today, I don't recall.
Q. So the Marriott in Aspen, Colorado, is the only project that you can recall that you worked on that had 11:57:30 branded residences?
A. Yes.
Q. Is it your opinion that branding does not apply to the valuation of this land or should not be taken into account? 11:57:58
A. I don't have an opinion.
Q. Wouldn't it be an error to conclude branding doesn't apply to the valuation of this property when all the evidence shows that the development plan will be branded residential? 11:58:22
A. Could you repeat that question again.
Q. Wouldn't it be an error to assume that branding does not apply when all the evidence shows that the development plan will be branded residential?
MR. SCHUSTER: Objection to form. 11:58:35
THE WITNESS: Don't have an opinion.
Q. BY MS. WORLEY: On the bottom of page 9 of your report, ending Bates label 4471, you say, "The Moeder report" -- second sentence, "The Moeder report presents an unsubstantiated theory that a luxury hotel may enhance 11:59:14

the desirability or pricing of the SilverRock residences."

Do you see that?

A. I do.

Q. Do you have an understanding that the -- it was the apparent strategy of a developer or purchaser of the property to try to create value for the residential components by branding them? 11:59:23

MR. SCHUSTER: Objection. Form.

THE WITNESS: I don't have an opinion. What I was retained to do was provide a retrospective as-is market value of the 127 acres, which I did. 11:59:44

Q. BY MS. WORLEY: And did you have any understanding of whether SilverRock or whether Turnbridge, the Debtors or Turnbridge, that they were employing the strategy of trying to use a luxury hotel to enhance the desirability or pricing of the residences? 12:00:00

A. A, I don't have an opinion, and B, if -- if the -- if the problem to be solved was valuing SilverRock's vision or Turnbridge's vision, that's not what I was retained to do. 12:00:29

Q. Wouldn't that be important to highest and best use analysis, though, to look at whether a luxury hotel could enhance the desirability or pricing of the SilverRock residences? 12:00:49

A. That's exactly the point, based on our first meeting in deposition were -- was I retained and HVS retained to provide a retrospective as-is market value or were we retained to provide an investment value based on either SilverRock and Turnbridge. 12:01:09

I can't speak for HVS, but I can speak for myself. I was retained to provide a retrospective as-is value based on a hypothetical buyer, not SilverRock, not Turnbridge.

Q. But both FTI and HVS did include in their 12:01:23 reports a discussion of highest and best use; correct?

A. They did.

Q. Okay. And so wouldn't it be important to perform a highest-and-best-use analysis to look at whether the luxury hotel would enhance the desirability 12:01:42 or pricing of the SilverRock residences?

A. That's not my opinion, no.

Q. Why not?

A. Because it's not my opinion.

Q. Do you think that whether a luxury branding of 12:01:56 the residences, whether that would increase their value, that that's irrelevant to a highest-and-best-use analysis?

MR. SCHUSTER: Objection. Form.

THE WITNESS: Short answer is no, and that's not 12:02:10

what I was retained to do. I was retained initially to provide a retrospective as-is market value assuming a hypothetical buyer. That's what I did.

My second part of the retention was to provide a rebuttal report, which I did. 12:02:27

Q. BY MS. WORLEY: But if you're performing a highest-and-best-use analysis, wouldn't you have to look at whether the hotel branding would actually be the highest and best use for those residences?

A. Absolutely not. The highest and best use has 12:02:47 four components, which is within my report. And as we've already discussed, the issue is about permitted use. The issue is about permitted density.

The type of hotel or the type of residence is not about highest and best use. That's a -- that's a 12:03:09 taste and preference specifically as -- as the language that Mr. Moeder is using, based on SilverRock and Turnbridge. I wasn't engaged to do that.

I was engaged to provide a retrospective as-is market value based on a hypothetical buyer. That's what 12:03:31 I did.

Q. So if there was market data showing that branded residences on average get some percent higher return when sold, you think that's totally irrelevant to highest-and-best-use analysis for this property? 12:03:43

MR. SCHUSTER: Objection. Form.
THE WITNESS: Short answer is yes, and the slightly longer answer is neither Moeder, White, or HVS did that. There are statements in Moeder's report that's saying that, but there's no market evidence supporting that opinion. 12:04:02
And again, just to emphasize, this is the primary difference between a real estate appraiser and an other real estate professional. I've got standards, rules, and regs that I need to adhere to and follow. I'm not permitted to provide an unsubstantiated opinion without market evidence and support. 12:04:19
Mr. Moeder is not -- does not have to adhere to use that. He can say whatever he wants, and he did.
Q. BY MS. WORLEY: Isn't it true, though, that HVS gave value to the residences in 1A, they gave the additional value equivalency of like those exclusive golf communities to those residences in their appraisal? 12:04:39
A. I -- I -- I don't have an opinion either way.
Q. And if I told you that HVS did, in fact, provide the reasonably equivalent value of those exclusive golf communities on the basis that it was equivalent to the luxury hotel branding, would that change your opinion about whether HVS took into account the hotel branding? 12:04:59
A. I'm not giving an opinion, but "exclusive golf" 12:05:17

is not, A, not branding. And my opinions as it relates to the HVS is clearly stated within the scope of work of my Appraisal Review Report.

Q. And so your report gives that same value of that exclusive golf community to those residences regardless of branding, hotel branding; right? 12:05:37

A. I don't understand the question.

Q. The comps that you used, you didn't do any adjustment based upon hotel branding when you did your comps for the 29 lots? 12:05:52

A. Again, this is a question on my affirmative now? Like...

Q. Well --

A. We discussed my rebuttal. It doesn't matter what I did in my affirmative. We're talking about the rebuttal. So what specifically do you have to ask me a question relating to either Moeder, White, or the HVS report, as it relates to this issue? 12:06:07

Q. Do you actually -- sorry, just to clarify, do you actually disagree that a luxury hotel could enhance the desirability or pricing of the 29 lots? 12:06:27

A. I don't give an opinion either way.

Q. Moving to the next page, page 10, which is the page ending Bates label 4472.

Now you talk about Mr. Moeder's opinions about 12:06:50

shared back-of-house facilities and services. And then you talk about "the existence of the shared operational services does not establish that the hotel and residential components are economically independent" -- "interdependent or incapable of being separately valued." 12:07:13

Do you see that?

A. That's correct.

Q. Is it your opinion that shared operational services would have been offered to the residences for free? 12:07:26

A. I don't have an opinion.

Q. Because that's not something you looked at; correct?

A. Are we speaking about my rebuttal now or my affirmative? 12:07:38

Q. At any point. With the affirmative, your initial report, or your rebuttal report, you didn't look at --

A. So let's break that question down. Are you speaking me specifically about my affirmative? 12:07:47

Q. Let's start there, with your initial report and your analysis of this property at any time, you've never looked at whether the shared operational services, whether there would be a charge associated for that to the residences; correct? 12:08:04

(The record was read by the reporter as follows:

"QUESTION: No.

My question is in terms of your analysis of this property at any time, have you ever looked at whether shared operational services would have been offered for free to the residences or whether there would have been a charge associated with that?") 12:08:29

THE WITNESS: As it relates to Mr. Moeder's report, I reviewed his report as it relates to this issue, and I provided my opinion, which we're looking at on the screen, Opinion Number 2. 12:09:29

Q. BY MS. WORLEY: Do you have any opinion about whether shared operational services would have been offered for free, essentially, to the 29 lots or whether there would have been a charge associated with that? 12:09:43

MR. SCHUSTER: Objection. Asked and answered.

THE WITNESS: I have no opinion.

Q. BY MS. WORLEY: I'm going to move to -- 12:10:35

MR. SCHUSTER: It is 12:10 on the East Coast where the witness sits. Mr. Dunec, do you -- do you need a lunch break? What's your preference?

THE WITNESS: Whenever everybody's ready, that would be wonderful. 12:10:49

MR. SCHUSTER: Defer to you, Kirsten.

MS. WORLEY: So I probably only have like a half-hour or hour more of questions so it may make sense to plow through instead.

THE WITNESS: If we're going to do that, that's fine. Could we just take another five, seven-minute break, if that's okay? 12:11:02

MS. WORLEY: Yes, let's go off the record.

THE VIDEOGRAPHER: Going off the record. The time is 12:11 p.m. 12:11:11

(Recess.)

THE VIDEOGRAPHER: Back on the record. The time is 12:28 p.m.

MS. WORLEY: Mr. Dunec, I'm going to share another exhibit, which I'll mark Exhibit 128. 12:28:58

(Exhibit 128, Expert Report of Mark S. Dunec, 10/26/18, Builders Expert Report_0004463 - 000, was marked for identification by counsel electronically.)

Q. BY MS. WORLEY: Mr. Dunec, I have put up Exhibit 128, which is -- it says Expert Report of Mark Dunec in the case RCHFU, LLC vs. Marriott Vacations Worldwide Corporation. It appears this is dated October 26, 2018, identified by 2018 WESTLAW Number 11325443 in the District of Colorado. 12:29:08 12:29:44

Is this the case that you were talking about earlier where you had provided services to a Marriott in Aspen?

A. Yes.

Q. Okay. And do you recognize this report, says, "I prepared this report at the request of Greenberg Traurig"? 12:30:01

A. Yes.

Q. And it involved a Ritz-Carlton?

A. Yes. 12:30:17

Q. Okay. How many expert reports did you provide in this case?

A. This was a rebuttal report and there was an Appraisal Review Report as part of my expert report.

Q. Okay. It appears that this deals with a conversion to a point system at Ritz-Carlton for a reservation system for branded residences. 12:30:35

Is that what the case was about, generally?

A. I'd have to -- I don't remember the entire case. I'd have to read my report again and my Appraisal Review Report again. Actually, there were many reports. 12:31:00

Q. Okay. So there's a Summary of Opinions. It says, "The focus of my analysis and opinions is the Cushman appraisal and its accompanying work files (i.e., supporting documents). My analyses and opinions are 12:31:19

A. You're asking if I provided my own independent value conclusion?

Q. Or any other appraisal review? Yeah, sorry, not appraisal review, but actually an appraisal. Did you do an appraisal of property? 12:32:55

A. Yes. That's what an appraisal review is. It's providing an opinion.

Q. Sorry. Other than the document we're looking at, did you prepare any other expert reports in this case? 12:33:08

A. Yes.

Q. And other than an appraisal review, was there an actual appraisal performed by you in this case?

A. So just to clarify, you're asking if I provided my own appraisal, standalone appraisal report, that was 12:33:21 different than my Appraisal Review Report?

Q. Correct.

A. No.

Q. Did this case have anything to do with the value of branding to the residences? 12:33:39

A. I don't recall. I do recall that it was a very complex case.

Q. What do you recall about it?

A. I just remember it being a complex case. I don't remember the nuances. 12:34:07

Q. Well, you're critical of HVS separately analyzing the as-complete value of distinctly identified components but then combining them.

So let's talk about their analysis of the as-complete value of distinctly identified components. 12:38:14

Do you have an issue with HVS having done that, the analysis of the as-complete value of the distinctly identified components?

A. I don't have an opinion as it relates to what they did. What we see on this page where it says value 12:38:35 hotel and TOT as of October 23rd, '25, they conclude -- I'm rounding -- 437 million. For the luxury condos, they conclude to -- again rounding -- 236 million. Luxury lots -- again rounding -- is 46 million.

So they've valued the specific components: 12:39:03 Hotel, condo, lots. They come up with a value. The inconsistency is that they lump the cost to complete and conclude to an as-is residual value. Again, actually it's rounded, 55.9 million.

My issue, as I've stated within my report and 12:39:28 testified to, is that there is information within the HVS appraisal that breaks down -- that's again rounding -- $664 million number into the hotel, condos, and lots, that if HVS wanted to illustrate that, one could have opined to that $55.9 million number without lumping the 12:39:55

cost to complete. It could have illustrated the hotel, condos, and lots broken out. They chose not to do that.

Q. Why do you say inconsistent valuation methodology was used? Was what's the inconsistent valuation methodology? 12:40:20

A. The -- the inconsistency is as they're doing a residual value, they do not include the breakdown of the hard costs and soft costs for each component of Phase 1A. They just lump it together and illustrate 55 nine.

Q. Was that -- 12:40:41

A. Within the -- so there's -- there is an inconsistency, if you scroll down, between valuing Phase 1A and Phase 1B. They break out the components in Phase 1A. They don't break out the components in terms of Phase 1B, assuming it's just one property type, and 12:41:02 again, lumping the cost to complete together, they conclude to 9.2.

There is an inconsistency between the valuation and illustrating the overall $65.1 million number.

Q. Okay. But you say inconsistent valuation 12:41:22 methodology. Isn't it true the same methodology was used, the income and land residual approach, on both 1A and Phase 1B by HVS?

A. What I testified to -- actually, same answer. The inconsistency is Phase 1A could have been illustrated 12:41:47

on each component: Hotel, condo, lots. They chose not to.

Q. Okay. But I'm just trying to clarify the valuation methodology chosen for 1A by HVS was the income approach or land residual value; correct? 12:42:11

A. Could you repeat the question again?

Q. I'm just trying to clarify that the -- you say an inconsistent valuation methodology, the actually same methodology was applied to Phase 1A and Phase 1B by HVS, which was the income approach or land residual approach; 12:42:33 is that correct?

A. So the -- yes. They used the same valuation methodology, but they didn't follow the same approach for Phase 1A and Phase 1B. In Phase 1A, in order to opine to the 55.9 million, what HVS did is they -- they broke down 12:42:52 the cost to complete for hotel, condo, lots, within their report, but they don't illustrate it in their conclusion.

In Phase 1B, they don't. It's just the -- the -- the net present value minus the cost to complete, here is my number. 12:43:18

In Phase 1A, they broke out per highest and best use. They break out the cost to complete, but they conclude to -- oh, no, it's all Phase 1A. It's one component at 55 nine based on all three, when in actuality that -- the individual components could be 12:43:38

illustrated based on the cost to complete for hotel, condo, and lots.

Q. Isn't it true, though, to break out the value for the different use types, there would have to be an allocation of the cost of the hotel to the residences or an allocation from the residences of value back to the hotel? 12:44:01

A. So I don't quite understand your question. But those costs were broken out per hotel, lot, and condo by HVS. They did it. 12:44:23

Q. So let me try it a different way.

Isn't it true, though, if -- if HVS were going to try to break out the valuation number of 1A and assign different values to the different types of properties like you did in the FTI report, wouldn't HVS -- wouldn't it be proper, though, to allocate value or costs among those parcels? For instance, the cost of the hotel would have to be allocated to the residences to the extent they're using their amenities? 12:44:43

MR. SCHUSTER: Objection. Form. 12:45:02

THE WITNESS: I did not complete a residual approach; HVS did. Within the HVS report, they -- they literally complete an allocation of the cost to complete for the hotel, for the condo, for the lot. That's not Mark Dunec's opinion; that's their opinion. They did it. 12:45:25

So your question is did they allocate, should it be -- they did that allocation. It's done. What they didn't do is illustrate the conclusion per hotel, condo, and lot.

Q. BY MS. WORLEY: Wouldn't it be extremely difficult to allocate within 1A the value of the hotel amenities and shared services that are being shared by the residences or the hotel costs? 12:45:47

MR. SCHUSTER: Objection. Form.

THE WITNESS: I'm not understanding the question. 12:46:03

HVS provided an opinion. This is their opinion. 437 million for hotel, 236 million for the condos, $46 million for the lots. Within their report they have costs for hotel, they have costs for condos, they have costs for lots. They've taken all of that into account. They did the work. 12:46:23

What they didn't do is illustrate it.

Q. BY MS. WORLEY: So but isn't it true, though, if you were to have an allocation of value for just the 29 lots, you would have to allocate some of the 29 lot value back to the hotel or some of the hotels costs back to the 29 lots to pay for the amenities and shared services? 12:46:40

A. So the short answer is: This is not my analysis. These are questions you should be asking HVS. 12:47:00

What I can say is what's in HVS's report, and this is the rebuttal opinions that I provided. They did that work. They allocated the costs to complete for hotel, for condos, for lots.

If they -- and I have to make the assumption if they concluded to those costs, they've taken all of these issues that you are bringing up into account. They did it. That's their work. Their opinions. The only thing they didn't do is illustrate it. 12:47:20

Q. Isn't it true, though -- or sorry, strike that. 12:47:36

If -- would it change your opinion if I told you that the HVS report does not attempt to allocate costs between the different types of use types in 1A? In other words, to have one -- the residences pay for part of the hotel. They did not attempt to do that. 12:47:53

A. But that's not what they did. What they did is -- what they did --

Q. Why not?

A. I can only review and give an opinion on what they did. What they did is they provided cost to complete for each component. If you're saying they didn't do that, okay. 12:48:03

Q. I think you're misunderstanding my question. Let me try again.

You keep claiming that they allocated different 12:48:15

changing your testimony?

MR. SCHUSTER: Objection. Mischaracterizes testimony.

You can answer.

THE WITNESS: I'm not even following the question, anymore. I'm not changing. My testimony's been consistent. There's no inconsistencies. 13:34:19

So if you want to restate or reask a specific question and we want the record to be clear, I'm happy to answer. 13:34:35

Q. BY MS. WORLEY: So you have no opinion about if the hotel, condos, and branded residences were all part of the same luxury hotel, whether you -- it would be appropriate to allocate costs or value as among those, for instance, for one to pay for amenities from the other? 13:34:48

A. I have no opinion.

MS. WORLEY: Let's go ahead and take a five-minute break. Let's go off the record.

THE WITNESS: Okay. 13:35:01

THE VIDEOGRAPHER: Going off the record. The time is 1:35 p.m.

(Recess.)

THE VIDEOGRAPHER: Back on the record. The time is 1:41 p.m. 13:41:38

STATE OF CALIFORNIA ) ss:
COUNTY OF MARIN )

I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3452, do hereby certify:

That the foregoing deposition testimony was taken before me at the time and place therein set forth and at which time the witness was administered the oath;

That testimony of the witness and all objections made by counsel at the time of the examination were recorded stenographically by me, and were thereafter transcribed under my direction and supervision, and that the foregoing pages contain a full, true and accurate record of all proceedings and testimony to the best of my skill and ability.

I further certify that I am neither counsel for any party to said action, nor am I related to any party to said action, nor am I in any way interested in the outcome thereof.

IN WITNESS WHEREOF, I have subscribed my name this 31st day of October, 2026.

LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462